Volume 18

**PROPERTY OF ARKANSAS SUPREME COURT/COURT OF APPEALS**

# SUPREME COURT CR-17-654

KENNETH REAMS                                    **APPELLANT(S)**

V. JEFFERSON COUNTY CIRCUIT COURT

   JOHN W COLE

   35CR-1993-301

  STATE OF ARKANSAS                              **APPELLEE(S)**

26__ VOLUME RECORD LODGED

### ***COUNSEL***

ATTORNEY GENERAL  APPELLEE COUNSEL
323 CENTER STREET, SUITE 200
LITTLE ROCK AR 72201

CORINNE IRISH  APPELLANT COUNSEL
30 ROCKEFELLER PLAZA
NEW YORK NY 10112

DAVID ROBERT RAUPP  APPELLEE COUNSEL
323 CENTER STREET, SUITE 200
LITTLE ROCK AR 72201

GEORGE KENDALL  APPELLANT COUNSEL
30 ROCKEFELLER PLAZA
NEW YORK NY 10112

JIN HEE LEE APPELLANT COUNSEL
40 RECTOR STREET, 5TH FLOOR
NEW YORK NY 10006

JOHN WINFRED WALKER  APPELLANT COUNSEL
1723 BROADWAY
LITTLE ROCK AR 72206

RECORD FILED AUGUST 4, 2017

**STACEY PECTOL, CLERK**

BY RENEE R. HERNDON, DEPUTY CLERK

Respondent's Exhibit E

PROPERTY OF ARKANSAS SUPREME COURT/COURT OF APPEALS

# CR   94 00558

KENNETH REAMS

v. Jefferson Circuit
   HON. FRED D. DAVIS JUDGE
   CR-93-301-3

STATE OF ARKANSAS

   004 Volume(s)

Appellant(s)

**ORIGINAL**

Appellee(s)



EXHIBIT
1.B
Respondents

Transcript Filed
26th day of May, 1994
Leslie W. Steen, Clerk
By Denise Parks

Volume  2

Respondent's Exhibit E

VOLUME II

Respondent's Exhibit E

1    There may be a whole string of things that you find are mitigating

2    circumstances, but just because there are eight of those that you

3    find and two aggravating circumstances, you are asked to weigh the

4    gravity of those two things, not just the two numbers.  Do you

5    understand that?  The gravity of what the State is saying the

6    reasons why you should give the death penalty as opposed to the

7    ones why Mr. Kizer said he shouldn't.

8    A    Um-hum.

9    Q    Numbers alone don't mean a thing.  Do you understand?

10   A    Um-hum.

11   Q    Do you think you can do that?

12   A    I believe so.

13   Q    You think you can help keep the other jurors straight on it,

14   too?

15   A    I'll do my best.

16              MS. BILLINGS:  Pass.

17              THE COURT:  Mr. Kizer.

18                        CROSS EXAMINATION

19   BY MR. KIZER:

20   Q    Ms. Metz, tell me something more about your employment.  What

21   is it that you do?  Work with children.  Is that correct?

22   A    I'm a secretary in the HIPPY program which is the Home

23   Instruction Program for Preschool Youngsters.

24   Q    Okay.

25   A    I work directly with a paraprofessional in training who is

250

Respondent's Exhibit E

1    sent into the home to teach the parent to preschool the child.  It

2    is a program that's supposed to give them a better foundation to

3    begin school.

4    Q    All right.  And how long have you been associated with this

5    program?

6    A    This is my second ten-year contract.

7    Q    Second ten-year contract?

8    A    Yes -- I'm sorry, ten-month contract.  I wish it was ten

9    years.  No, ten months.

10   Q    And do you have direct contact with the children yourself?

11   A    No.

12   Q    Okay.  The child that you have that is 10 years old, boy or

13   girl?

14   A    Girl.

15   Q    And where does she go to school?

16   A    Gandy Elementary in White Hall.

17   Q    Where do you attend church?

18   A    First Assembly.

19   Q    Where is that?

20   A    On Pine Street right directly behind McDonald's.

21   Q    Okay.

22   A    Presently.  We are breaking ground on new facilities on

23   Ridgway Road.

24   Q    I found it interesting to hear one of your comments a while

25   ago about the death penalty being scripturally based.  What do you

251

Respondent's Exhibit E

1   base that statement on?

2   A    An eye for an eye.  You know, if you take someone's life you,

3   in turn, give yours.

4   Q    Okay.  What -- I would submit to you that what the prosecu-

5   tion and the defense both are after is a level playing field.

6   A    Um-hum.

7   Q    Jurors who will be fair and impartial to both sides.  With

8   that in mind, do you understand, like Ms. Billings was pointing

9   out a few moments, there are two separate and distinct phases to

10  this particular matter that we are going to undertake today.  The

11  first is the guilt or innocence phase.  And the second is a

12  penalty phase.  We may not even get to the penalty phase where the

13  death penalty is involved if you don't make a determination in the

14  guilt or innocence phase.  You might get the impression from all

15  the talking that we're doing about the death penalty phase is that

16  is something that you are going to have to deal with.  But that's

17  not necessarily the case.  That will be up to you as a juror if

18  you are chosen to serve to tell us whether we get to that phase or

19  not.  You understand that that is the case.  We may not even get

20  to that point.

21  A    Yes.

22  Q    That's just an extremely serious matter that -- and this is

23  our only opportunity to discuss this matter with you; so, that's

24  why we're doing so.  It's not to imply that that is necessarily

25  going to follow after the guilt or innocence phase.

252

4825
Respondent's Exhibit E

1       Have you served on a jury before in a criminal matter?

2   A   Yes, sir.

3   Q   Okay.  In the service that you had before, the -- was it a

4   trial where you went in, made a guilt or innocence determination

5   and if you made a guilt determination immediately assess punish-

6   ment?

7   A   Yes, sir.

8   Q   Okay.  Do you understand that you have an option as a juror

9   once you found the individual guilty to consider the full range of

10  the sentencing possibilities?  I don't know what classification

11  felony that matter was that you heard, but all classifications of

12  felonies in this State have a range of punishment, an either/or

13  option.  Five to 20, for example, is the range in a class B

14  felony.  You could listen to the facts, make your determination,

15  once the guilt determination is made that five years is justifi-

16  able given this particular defendant.  Another same charge but a

17  different defendant with a different background perhaps 20 years

18  would be what you would impose.  But both of them are still

19  applicable under the law.  Do you understand that that's what your

20  job was, so to speak, as a juror?

21  A   Yes.

22  Q   Well, that would be the same thing that you would have here.

23  In the guilt or innocence phase of this trial, there are some

24  constitutional safeguards that I want to discuss with you and make

25  sure we are of one mind with what they have to concern themselves

253

Respondent's Exhibit E

1    with.   The presumption of innocence is the first one of these.

2    I'm sure you've heard that phrase before, and since you have sat

3    through a trial before, you've had that explained to you from a

4    legal standpoint.   But do you understand that Kenneth Reams, even

5    though we are sitting here talking about a lot of different

6    things, when we go out in the courtroom, he's presumed to be

7    innocent?

8    A    I understand that, yes, sir.

9    Q    Do you also understand that he doesn't have to prove anything

10   to you?   That is up to the State of Arkansas.   They have the

11   burden of proof by and through the Prosecuting Attorney to prove

12   each element of the charges beyond a reasonable doubt.

13   A    I understand that.

14   Q    Okay.   He may or may not take the witness stand.   I have not

15   made that decision yet and won't until I hear the prosecution's

16   case and make a determination of what's in my client's best

17   interest.   But if he does not take the stand, do you understand

18   that that is an absolute constitutional right that he has and that

19   cannot be considered by you if you are chosen to be a juror?

20   A    I understand that.

21   Q    That no one can be forced or compeled to give testimony

22   against themselves.

23   A    Um-hum.

24   Q    The questionnaire that you answered that the Court passed out

25   earlier indicated that you had read some newspaper articles about

254

Respondent's Exhibit E

1   this matter and then there was a second questionnaire question

2   where you said that you have heard something about this case

3   discussed by someone else.

4   A    Um-hum.

5   Q    What have you heard so far?  What is it that you have read in

6   the paper and that sort of thing?

7   A    Well, I read the initial report in the paper about the

8   incident that happened because my office is about three blocks

9   from there.

10  Q    Okay.

11  A    So it was definitely a major concern for me.  As far as what

12  I've heard, as I indicated to Ms. Billings, the familiarity of the

13  victim's parents.  I have heard through discussion at my aunt's

14  restaurant.

15  Q    Which restaurant is that by the way?

16  A    Trotline Inn out in White Hall.

17  Q    Okay.

18  A    I have heard something of a plea bargain or something

19  happened in the first trial with the first person that went on

20  trial.  I've heard that.  I've heard their feelings on the plea

21  bargain.  And as far as -- that's all I've heard.

22  Q    You're referring to Mr. Goodwin's plea that he entered into?

23  A    I assume that's what it was.  Like I say, I heard bits and

24  pieces.  I did hear their feelings on it.  They did tell me that.

25  Q    And those feelings were positive or negative?

255

Respondent's Exhibit E

1    A    Oh, quite negative, quite negative.

2    Q    Okay.  Did you adopt those feelings or do you have your own

3    feelings?

4    A    Adopt those feelings?  I would say probably -- I understand

5    those feelings.  I must admit I understand them perfectly because

6    I'm a parent also.  And I understand the loss of a child just --

7    I don't care how old that child is, it would be just devastating.

8    So, yes, as a parent, I understood those feelings.

9    Q    Okay.

10   A    As far as agree with them, I can't say I agree or disagree.

11   Q    Since you've had the experience of having set through a trial

12   and you heard the evidence, the legally admissible evidence that

13   the Court told you either by ruling in favor or not sustaining an

14   objection to, you heard what would be sworn truth that came into

15   the courtroom --

16   A    Um-hum.

17   Q    And you made your decision.  People who were not in that

18   courtroom and didn't hear that sworn testimony could reach a

19   decision or reach some kind of conclusion that you would know

20   differently--you would know something more about.  Would you agree

21   with me because you had sat through it?

22   A    Absolutely, um-hum.

23   Q    All right.  The same type of thing is possible in the

24   scenario you just painted for me of individuals who didn't agree

25   with the plea bargain that the other individual entered into.

256

Respondent's Exhibit E

1    They weren't in the courtroom.  They don't know what the facts

2    were.  They don't know any of the things that have to do with what

3    our justice system is all about.  Would you agree?

4    A    I agree totally.

5    Q    With that in mind, would you be able to be fair and impartial

6    in this matter and you make your own decision not based on what

7    you may have heard outside the courtroom, but what that oath is

8    going to be that the Clerk administers to you, that you will well

9    and truly try this case and render a true verdict according to the

10   law and to the evidence and not what you heard outside of here.

11   Can you do that?

12   A    I can do that.  As -- as I said before, I'm only human, and

13   I can do that just as -- probably as good as anyone in my position

14   can.

15   Q    Okay.  Good.  Why then did you write that when you knew the

16   victim's family, the parents, that it may taint my -- I can't read

17   -- this is a photocopy; so, I can't read your last word here.

18   Participation, maybe.

19              THE COURT:  Impartiality.

20   Q    Impartiality.

21   A    Well, as I -- I mean I'm just coming clean with everything.

22   I -- I can't honestly say what I would do in a situation, but

23   there is a slim possibility since I do know the people that -- I

24   mean I just -- I can't be totally removed because I know the

25   people.

4830
Respondent's Exhibit E

1  Q    Is there anything about what your feelings are right now that
2  would cause you to believe, once a determination had been made,
3  and this is a hypothetical situation, that capital murder had been
4  proven to you, would it be your mission or your goal to seek
5  reproration to Mr. Turner's parents and to impose the death
6  penalty?  That would be a way for you to get back, so to speak,
7  for them.
8  A    If the evidence proved beyond a reasonable doubt that he is
9  guilty, I would have no problem with the death penalty.
10 Q    Okay.  Now, keep in mind, as I mentioned to you before, there
11 are two phases to this trial.
12 A    Um-hum.
13 Q    The second part of it would be you having to make a determi-
14 nation about aggravating circumstances and then you also having to
15 weigh in the balance the mitigating circumstances.   And those
16 would be listed out.  We've already prepared the jury instructions
17 and there are a number of them for you to consider if it ever got
18 to that point.  Would you be able to honestly consider those and
19 make your decision that might include life without parole which is
20 exactly what the Turners were upset about?  Would you be able to
21 consider that?
22 A    Well, you just enlightened me on something I didn't know they
23 were upset about, yes.
24 Q    Well, if they didn't agree with what the other person got.
25 A    Well, like I say, I didn't even know what he got.

258

Respondent's Exhibit E

```
1    Q    Well, it was less than the death penalty.

2    A    Oh.

3    Q    Correct.  If it had been the death penalty, there wouldn't

4    have been any reason for them to object.

5    A    Right, right.

6    Q    Okay.

7    A    Would I have a problem with going with the lesser --

8    Q    If that's what the facts were proven to you?

9    A    If that's what the facts, no, I have no problem with that.

10   Q    Okay.

11   A    Because when you are holding someone's life in your hands,

12   you must have all the facts.

13   Q    Do you think the death penalty works in our society?

14   A    No, honestly I don't.

15             MR. KIZER:  That's all the questions I have.

16             THE COURT:  Anything further from the State?

17             MS. BILLINGS:  No, your Honor.

18             THE COURT:  Okay.  Thank you, Ms. Metz.  If you would

19        step outside, please, ma'am.  Thank you very much.

20             MS. BILLINGS:  Good, your Honor.

21             MR. KIZER:  Could I have one second?

22             THE COURT:  Um-hum.

23             MR. KIZER:  We're going to ask that Ms. Metz be excused

24        today, your Honor.

25             THE COURT:  Okay.  We'll excuse Ms. Metz and ask to send
```

259

Respondent's Exhibit E

1      Ms. Flagg in.  Hi, Ms. Flagg.  You want to come around here
2      and have a seat, please, ma'am.  We are continuing in
3      chambers for the purpose of inquiring of Ms. Lynne Marie
4      Flagg.  Ms. Billings.
5              MR. JUNEAU:  Thank you, your Honor.
6              THE COURT:  Excuse me, Mr. Juneau.
7                   PROSPECTIVE JUROR LYNNE M. FLAGG
8      BY MR. JUNEAU:
9      Q    Hi, Ms. Flagg.  My name is Wayne Juneau, and this is Carol
10     Billings.  We are prosecuting attorneys.
11     A    Hi.
12     Q    We're going to ask you some questions and the purpose of it
13     is to try to pick a fair and impartial jury both to the defendant
14     annd to the State of Arkansas.  Have you ever served on a jury
15     before?
16     A    No.
17     Q    This is your first time?
18     A    Right.
19     Q    This is -- you've never been questioned as a juror before?
20     A    No.
21     Q    This may be your unlucky day to get on a capital murder case
22     for the first time.  You are a registered nurse I see by your
23     questionnaire.  And what are of medicine do you practice in?
24     A    Well, I'm a psychiatric nurse now in a children's unit on the
25     night shift.

260

Respondent's Exhibit E

1    Q     And that would be the Bridgeway Hospital in North Little
2    Rock?

3    A     Right, most of my experience is anorexic, bolemic women.

4    Q     Okay.   That's -- I'm trying to think about the Bridgeway
5    Hospital.   Is that for troubled youths?   Is that what it is?

6    A     Yeah.   It serves adults also.

7    Q     Okay.   Primarily psychiatric care, though, is that right?

8    A     Right.

9    Q     How long have you been a psychiatric nurse?

10   A     Approximately three years.

11   Q     You also indicated in your questionnaire that you attended
12   high school at Rome Free Academy in Rome, New York.

13   A     Right.

14   Q     Is that a public school?

15   A     Yes, it is.

16   Q     How long have you lived here in Pine Bluff?

17   A     A little over a year.   I live in Redfield.

18   Q     Okay.   It seems like I read in your questionnaire that you
19   remember something about this case from hearing it on the radio.

20   A     I think it was the radio.

21   Q     Okay.   Well, you know, this is the case involving the
22   shooting at the ATM machine in Pine Bluff.   Are you familiar where
23   that ATM machine is?

24   A     No.

25   Q     Do you know where Worthen Bank is on Main Street?

261

4834
Respondent's Exhibit E

1    A    I'm not sure.

2    Q    Okay.  Do you remember any of the specifics about the case

3    from the radio?

4    A    No.

5    Q    Well, this defendant, Kenneth Reams, is charged with capital

6    murder.  And the State has to prove to you beyond a reasonable

7    doubt elements in order for you to convict him of capital murder.

8    Okay.  One of those elements that we would have to prove is that

9    either he, acting by himself, or with another person, okay,

10   committed or attempted to commit a robbery and in that course of

11   that robbery or in the course of that attempted robbery, that a

12   victim or the person that was being robbed was killed.  And that

13   their conduct showed extreme indifference to the value of human

14   life.  Okay.  Do you understand that?

15   A    Okay.  Yes.

16   Q    If you can find beyond a reasonable doubt those elements,

17   then Mr. Reams is guilty of capital murder.  Do you understand?

18   A    Yes, I do.

19   Q    Do you know what accomplice liability is?  Have you ever

20   heard of that term?

21   A    No.

22   Q    Well, accomplice liability would be when two people act in

23   the course of a crime.  Both are guilty even though one may have

24   actually committed the crime.  Do you understand?

25   A    Yes.

262

Respondent's Exhibit E

1    Q    Do you agree with that concept?

2    A    (Witness nodding head)

3    Q    You look like maybe a little puzzled by it or you are not

4    quite sure.

5    A    Maybe I'm not quite sure.

6    Q    Okay.  Let me give you an example.  If there is a bank

7    robbery and one person goes in and pulls the gun and robs the

8    bank, but the other person sits out in the car and is the getaway

9    person, okay, do you think they are both guilty of the same crime-

10   -bank robbery?

11   A    Yes.

12   Q    Do you agree with that concept?

13   A    Yes.

14   Q    And you understand by the elements of capital murder that

15   accomplice liability is factored in there when it says either this

16   defendant was acting alone or with some other person.

17   A    (Prospective juror nodding head)

18   Q    Okay.  And in the course of the robbery, the defendant or

19   some other person caused the death of the victim.  Do you under-

20   stand how accomplice liability fits in there?

21   A    I can see where it would be possible.

22   Q    Okay.

23   A    You can't totally control the actions of another person.  You

24   could be there but not know things might go that far.

25   Q    Okay.  But if you believe beyond a reasonable doubt that both

263

Respondent's Exhibit E

1   persons agreed to participate in a robbery and that one of them

2   actually killed a person, under the law of Arkansas, you can find

3   both of them guilty of capital murder.

4   A    Okay.  I understand that.

5   Q    Do you understand that?

6   A    Yeah, I understand that.

7   Q    Do you have a problem with that?

8   A    I don't think so.

9   Q    You seem to may be a little reluctant to give me an answer.

10  Why is that?

11  A    I don't know.

12  Q    If you were to hear the evidence and felt beyond a reasonable

13  doubt that both persons were involved in the robbery and that one

14  of them killed someone, could you consider finding both of them

15  guilty of capital murder?

16  A    If it was proved to me beyond a reasonable doubt, probably.

17  Q    Even though one of them was an accomplice to the actual

18  murder itself?

19  A    I think so.

20  Q    And let me go on to the next step and maybe this will help

21  you out a little bit.  Is because even though the person is

22  convicted of capital murder, and I'm talking about maybe the

23  accomplice at this point, you would go out and determine guilt or

24  innocence first.  If you decided he was not guilty, of course,

25  that would basically be the end of that.  But if you decided that

264

1    he was guilty, then you would come back in, the verdict form would

2    be read and you would then be given more information to determina-

3    tion what punishment he should get.

4    A    Oh, okay.

5    Q    Okay.

6    A    Yes.

7    Q    So that in the first phase of the trial, and maybe I should

8    apologize for not explaining that we do this in two phases.   The

9    first phase of the trial would be the guilt or innocence phase.

10   The second phase would be the punishment phase.   Okay.

11   A    Okay.

12   Q    So that in the punishment phase if you should find the

13   defendant guilty of capital murder, there are only two possible

14   punishments.   One is life in prison without parole and the other

15   is death.  Okay.  To determine which punishment you would mete out

16   or rule out, you would have to decide some things that the Judge

17   will instruct you.  One would be aggravating circumstances.  Now,

18   assume with me for just a minute that you have found this defen-

19   dant guilty of capital murder and you are back in during the

20   second phase of the trial.  You're going to hear evidence again

21   for both the State and the defendant about punishment.  The State

22   will offer two aggravating circumstances.   The defendant will

23   probably offer a number of mitigating circumstances.   You are

24   going to determine if, in fact, those aggravating circumstances

25   existed and if, in fact, the mitigating circumstances existed and

265

4838
Respondent's Exhibit E

1    sign forms to that effect.   Okay.   After that point, you would

2    then determine whether the aggravating circumstances outweighed

3    the mitigating circumstances.   Okay.

4    A    Okay.

5    Q    If you found that the mitigating circumstances outweighed the

6    aggravating circumstances, then that would basically be the end of

7    the trial and the defendant would be sentenced to life without

8    parole.  If you found, however, that the aggravating circumstances

9    outweighed the mitigating circumstances, then you would have to

10   determine if the aggravating circumstances justify the death

11   penalty.

12   A    Okay.

13   Q    Okay.  So do you understand how that works?

14   A    Yes, I do now.  It's quite a process.

15   Q    It seems to be and maybe it won't be quite as confusing when

16   you actually have the forms and are able to look at it because it

17   pretty well tracts through it.   But I want you to understand,

18   though.

19   A    I didn't understand there was such a process when I came in

20   here.

21   Q    And I apologize for not explaining it to you earlier.  But we

22   first decide the guilt or innocence.

23   A    Okay.

24   Q    Now tell me if knowing that death may be a possibility in

25   this case, would that have anything to do with the way you decide

266

Respondent's Exhibit E

1    the guilt or innocence phase of the trial?

2    A    I would try to just go straight on the evidence.

3    Q    And not factor in the punishment at that point?

4    A    Right, at that point.

5    Q    Do you, yourself -- and I may have asked and forgot, do you

6    believe in the death penalty?

7    A    In certain circumstances, yes.

8    Q    There are certain circumstances that you could -- you feel

9    that the death penalty is an appropriate sentence?

10   A    I believe it is a possibility.  I came from New York State

11   where it is -- they do not have capital punishment.  So I have

12   never really had to think too much about it.

13   Q    Okay.  You did not know this would be a capital murder case

14   before you came in here today, did you?

15   A    No, no.

16   Q    So you are kind of put on the spot to think about it real

17   quick right here while you are sitting down.

18   A    Yeah.  But I would basically go by the evidence, yes.

19   Q    And should you think that the aggravating circumstances

20   outweighed the mitigating circumstances and justified the death

21   penalty, you have no problem in imposing the death penalty?  And

22   let me -- hold that thought just a minute.

23   A    Yes.

24   Q    Because for you to do that, you will be given a form.

25   A    Okay.

267

Respondent's Exhibit E

1    Q    And on that form you will have to sign your name.  And in

2    that form you will impose the death penalty and sign your name and

3    you are going to have to come into court and look at this defen-

4    dant here and impose the death penalty.  Okay.  Now, given my

5    question, let's go back to my question about aggravating outweigh-

6    ing mitigating circumstance, could you impose the death penalty?

7    A    I would have to be honest.  I really don't know.

8    Q    Okay.  What is the problem?  What exactly are you having the

9    problem with?

10   A    I'm not quite sure to tell you the truth.

11   Q    Is it a personal reason or a religious reason or -- can you

12   give me some reasons why --

13   A    I think I would have to -- I guess I'd have to see the

14   evidence and feel that it was -- the situations you described were

15   without remorse and all of this before I could make that decision.

16   I'd have to feel totally in my mind that this person did this not

17   caring about another person.  There was no possibility of accident

18   or, you know, things getting out of control.

19   Q    Okay.  And, I guess, our questions sometimes as lawyers are

20   not quite fair because we ask you to give us an answer on facts

21   you just don't know about until the end of the trial.

22   A    That's right.

23   Q    But are there situations where you would, in fact, be

24   comfortable -- well, that is not a good word, but you could impose

25   the death penalty under certain circumstances?

268

1    A    I believe so.

2    Q    Okay.  Let me take it just one step further now.  I think

3    that Mr. Kizer may ask or indicate to you that one of the possible

4    punishments for capital murder is life without parole, and that

5    the defendant would be 18 years old and sentenced to life without

6    parole which would be a long, long, long time.  Do you think that

7    even given the fact that he may be in prison for a long, long time

8    that the death penalty may even be a more appropriate sentence in

9    some cases?

10   A    No, I don't think so.  I think life without parole --

11   Q    Hum?

12   A    I don't think the death sentence would be more appropriate.

13   Q    Okay.  I guess, then, my question would be -- let me try to

14   clear that up because I'm confused.  If Mr. Reams was 18 years old

15   and he is 18 years old, the fact that he is 18 years old and you

16   know that if you sentence him to prison to life without parole

17   that he would be there the rest of his life, would that preclude

18   you from considering the death penalty?

19   A    No, I don't think so.

20   Q    You would consider the death penalty even knowing that you

21   could, alternatively, sentence him to life without parole and that

22   he would be there for the rest of his life.

23   A    I think I misunderstood the question.  I'm sorry.

24   Q    Okay.  What did you think I asked?

25   A    Would I consider either of those equally?  Is that what you

4842
Respondent's Exhibit E

1    are asking me?

2    Q    Yeah.   Well, in a certain way, yes.

3    A    Yes, I would.

4    Q    So that, one, life without parole wouldn't preclude your

5    imposing the death penalty if you felt like it was an appropriate

6    sentence?

7    A    That's right.

8    Q    One other thing I want to point out and then I will let you

9    go.   The -- when you determine mitigating and aggravating circum-

10   stances, like I said, the State will allege two.   The defendant

11   may allege four, five or six or seven.   Do you understand that the

12   number -- simply the number alone is not as important as the

13   substance of the mitigating or aggravating circumstances?

14   A    Yes, I understand that.

15   Q    Okay.

16            MR. JUNEAU:  Pass.

17            THE COURT:  Mr. Kizer.

18                            CROSS EXAMINATION

19   BY MR. KIZER:

20   Q    Ms. Flagg, you said you have lived in Arkansas for a year?

21   A    Yes, I have.

22   Q    Did you live in New York all the way up until this past year?

23   A    From when I was 15 years old.

24   Q    Where did you live prior to that?

25   A    I'm an Air Force child.

270

Respondent's Exhibit E

1   Q     Have you ever lived in the south before coming to live here
2   in Arkansas?
3   A     Texas when I was small.
4   Q     Okay.   What -- what have you noticed pretty quickly about
5   the south that's different from where you were in the north in New
6   York?  Anything in particular that sticks out in your mind?
7   A     Well, the mind set is a little different.   There are some
8   cultural differences.
9   Q     Okay.  Can you be a little bit more specific?  I found the
10  same thing when I visited New York.  For example, I'm just kind of
11  curious what your impression is.  What mind set do you find that
12  is a little bit different?
13  A     Life is at a slower pace it seems like.
14  Q     Anything from a political standpoint or a psychological
15  standpoint that you see about southerners that is markedly
16  different from where you grew up?
17  A     Not at this point.  But I've been working the night shift
18  since I've lived here.  So I've been kind of clustered.  I mean --
19  Q     You've been out of the mainstream, so to speak?
20  A     Yes.
21  Q     Did you work last night?
22  A     No, I didn't.
23  Q     And if you are chosen to serve and you have to serve two more
24  days or three days or however long it takes, are you going to be
25  able to not have to go to work at night or is that something you

271

4844 Respondent's Exhibit E

1    are going to try to go to work at night and then come in here?

2    A    No, my employer allows us to take time off for jury duty.

3    Q    Okay.   The -- you work at the Bridgeway Hospital, is that

4    something that you have spent most of your time with adults or

5    most of your time with juveniles?

6    A    I originally was hired for a woman's trauma unit.   And then

7    I worked on the adult.   And now I work on a children's unit at

8    night.

9    Q    Okay.   You encounter, do you not, children who have every-

10   thing from behavioral problems to honest to goodness pscyhological

11   and psychiatric problems.

12   A    Yes.

13   Q    Do you work with any individuals who are in the lower or

14   borderline range of intellect?

15   A    Yes.

16   Q    Are you familiar with psychological profiles and psychologi-

17   cal testing that may be done by a master group -- someone has a

18   master's, a science degree or a Ph.D?

19   A    Yes, to a certain degree.

20   Q    Okay.   Is it your position, and I'm trying to glean from the

21   answers that you gave to the Prosecuting Attorney that you would

22   listen to the evidence, both from the guilt and the innocence

23   phase, and in the punishment phase, and make your decision

24   considering the full name of possibilities?

25   A    Yes.

272

4845
Respondent's Exhibit E

1    Q    I think what the prosecution is entitled to in this type of

2    case is someone who is not going to say, "No, there is no way I

3    could consider the death penalty," and what the defense is

4    entitled to is someone who is going to say, "I'll consider it and

5    will vote my conscience based on the evidence and not just

6    automatically vote the death penalty." Do you understand we may

7    not even get to that point? That if a determination is made by

8    the jury in the guilt or innocence phase we, you know, this may be

9    all premature, us talking about the death penalty. Do you

10   understand that is a possibility?

11   A    Yes.

12   Q    Do you take oaths seriously?

13   A    Yes, I do.

14   Q    If you are chosen to be a juror since you've never served

15   before, you may not be familiar with the oath. But what it

16   basically says is that the Clerk will swear you in and you will

17   have to swear that you will and truly try this case and render a

18   true verdict according to the law and the evidence. Is that an

19   oath you feel that you can uphold?

20   A    I believe so, yes.

21            MR. KIZER: That's all the questions I have, your Honor.

22            THE COURT: Anything further of Ms. Flagg?

23            MS. BILLINGS: No, your Honor.

24            THE COURT: Thank you, Ms. Flagg. Just wait outside for

25       just a minute, please, ma'am. What says the State as to Ms.

273

Respondent's Exhibit E

1     Flagg?

2           MR. JUNEAU:  We'll excuse Ms. Flagg.

3           THE COURT:  Okay.  Ms. Gillespie.

4           DEPUTY SHERIFF BAKER:  Your Honor, Channel 7 asked about

5     camera.

6           THE COURT:  I suspect in this small quarters like this

7     that cameras would probably be obtrusive.  I think that might

8     very well -- after we finish talking to Ms. Gillespie, we'll

9     bring them in and talk to them about it.  But I'm worried --

10    in the courtroom, we can handle them a lot better than we can

11    in just one small room.  But we'll talk about it in just a

12    minute.

13          While we're -- we're here for purposes of talking to Ms.

14    Betty Gillespie.  I had previously assured Ms. Gillespie and

15    her employer that because of the significant impact she has

16    on her work, the smallness of the office, that I wouldn't use

17    her, wouldn't call her unless we kind of had to have her, and

18    we are sort of at that point.  But I guess I probably ought

19    to inquire and see if it is at a particularly bad time for

20    Ms. Gillespie at work.  We could, in fact, maybe move you to

21    the bottom of the list to call back only if we had to.  Is

22    this a --

23          PROSPECTIVE JUROR GILLESPIE: Well, there's two girls at

24    the office and we're trying to run bonuses and get everybody

25    ready to be off for Christmas, hopefully, Friday.  So --

Respondent's Exhibit E

1      THE COURT:  Okay.  With working for Mr. Shelton on the

2      reserve board with stuff to do, are there any of those duties

3      that have to get done now or --

4      PROSPECTIVE JUROR GILLESPIE:  Well, we have a paper to

5      write for Friday.  He has reserve board on Friday.

6      THE COURT:  Why don't I do this, ladies and gentlemen at

7      this point, and just arbitrarily excuse Ms. Gillespie to

8      remain at -- to go home and go to work and only if we get to

9      the point where we have to call her back, let me do that.

10     Something that does not appear on the questionnaire, I don't

11     think, she works for Mark Shelton, III, who is a member of

12     the Federal Reserve Board and Ms. Gillespie, because she does

13     sensitive work for him, had to go through a security clear-

14     ance.  She's the only person in the office that can do that

15     work and it's -- she's kind of in a little different category

16     than a lot of folks.  I had told her that I would not call

17     her unless we needed her, and we felt like on this case we

18     needed all the jurors that we could.  But why don't I do

19     that, Ms. Gillespie, just excuse you to go home, remain at

20     work, and we'll just call you only in the event that we run

21     out of other jurors and just have to have you.  Try to get

22     that paper done just in case I have to call you.  Okay.

23     PROSPECTIVE JUROR GILLESPIE:  Is that it?

24     THE COURT:  Yes, ma'am.  You are excused and free to go.

25     Is that Mr. Potter?

275

4848
Respondent's Exhibit E

1        DEPUTY SHERIFF BAKER:  Yes, sir.

2        THE COURT:  I don't have any problem with shooting stuff

3    if it doesn't interfere with what's going on.  In the big

4    courtroom, you are so far removed, it's no problem.  I'm just

5    a little bit about in this small room.

6        MR. POTTER:  Well, I know not to show the juror's --

7        THE COURT:  The juror's face.

8        MR. POTTER:  I can just set up right over there in that

9    corner.  Is that all right?

10       THE COURT:  Is there any problem with the attorneys?

11   Will y'all be distracted if Mr. Potter shoots a video?

12       MR. KIZER:  Are you going to have use one of those

13   bright lights?

14       MR. POTTER:  No, I won't have any lights or anything.

15       THE COURT:  Oh, heck.

16       MR. POTTER:  Well, Judge, we had to because of the

17   glare.

18       THE COURT:  I understand.  I set him up.  I'm a good

19   straight man.  All right.  Thank you.  Mr. Bradford.  I'm

20   going to arbitrarily move Ms. Betty Gillespie from number 6

21   down to -- now, right after Pammy Graves on your second page.

22   Bill Shollmier, who was not here today because he is home

23   sick -- put Bill Shollmier in as number 20 on there.  Bill is

24   at home sick, and I told him we would call him if we needed

25   him.  So we'll move Ms. Gillespie right after Mr. Shollmier.

276

4849 Respondent's Exhibit E

1            Okay.  Mr. Bradford.  We are here in chambers for the
2       purpose of visiting with Mr. Huey P. Bradford.
3            Ms. Billings, I think is it your turn?
4            MS. BILLINGS:  Yes, sir.  Let me have just a moment,
5       your Honor.  We switched gears there, and I haven't checked
6       his questionnaire.
7                  PROSPECTIVE JUROR HUEY BRADFORD
8    BY MS. BILLINGS:
9    Q    Mr. Bradford, my name is Carol Billings and this is Wayne
10   Juneau.  We are from the Prosecuting Attorney's office.  And we
11   are here, basically, today to ask you some questions about serving
12   on this jury.  I don't show that you've served on a jury before.
13   Is that correct?
14   A    No, I haven't.
15   Q    You have not.  Have you been out there before when we've
16   questioned the jurors and just weren't selected?
17   A    Yes, I have.  Yes.
18   Q    Okay.  I don't know if you are aware of this or not, Mr.
19   Bradford, but this case, we are seeking the death penalty in this
20   case.  It is a capital murder case.  Were you aware of that?
21   A    Do what?
22   Q    Were you aware that we were seeking the death penalty in this
23   case?
24   A    Not until I came up here.
25   Q    Okay.  So word has passed around out there that we're seeking

277

Respondent's Exhibit E

1    the death penalty?

2    A    Well, I was thinking it was told out here.  I'm not sure.

3    Q    Well, it might have been mentioned.

4    A    Well, if it wasn't, it was mentioned out yonder.

5    Q    Okay.  Well, the reason I asked you that is because there are

6    number of things that I need to talk to you about.  On the behalf

7    of the State, we have to show you that this defendant sitting

8    right here, Kenneth Reams, committed a capital murder.  And, in

9    order to show you -- the law says that I can show you that he was

10   acting alone or with someone else.  And that's what we're saying

11   in this case.  He was with -- acting either by himself or with

12   another person.  In this case, there was a guy by the name of

13   Alford Goodwin.  And these two went to rob someone at an ATM

14   machine.  Do you know what an ATM machine is?

15   A    Yes, I do.

16   Q    And that in the course of that robbery they killed a man.

17   His name was Gary Turner.  And we are saying that the circumstanc-

18   es that they did that under manifested extreme indifference to the

19   value of human life.  That's the charge of capital murder.  That's

20   basically what I have to show you what I just told you there.  Do

21   you understand that charge?

22   A    Yes, I think so.

23   Q    There are two possible penalties any time someone is found

24   guilty of capital murder.  Were you aware of that?

25   A    No, not --

278

4851
Respondent's Exhibit E

1 Q Most people think any time you are found guilty of capital

2 murder you automatically get the death penalty.  Isn't that what

3 you --

4 A Well, yes, uh-huh, one of them, yes.

5 Q That's not true.  Okay.  Capital murder has two possible

6 penalties.  One of them is life without parole and the other one

7 is the death penalty.  And in a case like this one, we try a case-

8 -this case--in two separate stages.  We try it just for you -- the

9 first stage is just for you to determine whether or not he or his

10 accomplice committed the crime.  Okay.  You just decide he is

11 guilty of capital murder or he is not guilty of it.  Okay.  If you

12 decide he is guilty of capital murder, then we move on to the

13 second stage, and we call that the penalty phase.  That's where we

14 would put on more evidence and you would determine whether or not

15 you thought life without parole was the appropriate sentence or

16 the death penalty was the appropriate sentence.  Do you understand

17 that?

18 A Yes.

19 Q Okay.  A lot of people don't understand -- sometimes you will

20 see it in the paper that the prosecutor isn't seeking the death

21 penalty, and people say, "Well, why not?  This is a capital murder

22 case."  But the fact of the matter is, the legislature has about

23 seven different criteria and if we don't have one of those

24 criteria besides the fact that the person killed someone, then we

25 can't seek the death penalty.  Were you aware of that?

279

Respondent's Exhibit E

1    A    No.

2    Q    Okay.  Those seven little things that the legislature says

3    that we have to have at last one of those, those are called

4    aggravating circumstances.  Have you ever heard of that?

5    A    Yes, I've heard of that.

6    Q    Okay.  So in order to seek the death penalty on someone, we

7    have to have a murder plus we have to have at least one aggravat-

8    ing circumstance.  Like I said, the legislature tells us what

9    those things are that we can even choose from.  In this particular

10   case, we believe that we have two.  And we're going to be trying

11   to show you two separate aggravating circumstances, reasons why we

12   believe that this defendant sitting right here deserves the death

13   penalty.

14        His attorney, Mr. Kizer, will be trying to show you what they

15   call mitigating circumstances, reasons why he says he shouldn't

16   get the death penalty.  And you're going -- your job as a juror

17   once we pass the guilt phase of the trial, is to determine what is

18   the proper penalty in this case.  You are going to be asked to

19   weigh those aggravating circumstances, the reasons why we say he

20   should get the death penalty against the reasons why Mr. Kizer

21   says he shouldn't.  Okay.  And if you don't find that there are

22   any aggravating circumstances, well, then, the Judge automatically

23   sentences this defendant to life without parole.  But if you find

24   one aggravating circumstance, then you go on to one more step.

25   There are three little steps you have to take in that penalty

4853
Respondent's Exhibit E

1    phase.  First, you have to find an aggravating circumstance; then

2    you have to decide if the aggravating circumstances outweigh the

3    mitigating circumstances.

4         Like I said, in this case, we're alleging that there are two

5    reasons why he should get the death penalty.  Okay.  And there --

6    Mr. Kizer may have a number of reasons why he says that he

7    shouldn't get the death penalty.  But I need you to understand on

8    the front end that you get to weigh those.  It's not just a matter

9    of numbers, who has the biggest numbers.  It's the matter of which

10   one in your mind outweighs the other.  Does the fact -- the

11   reasons why we say he deserves the death penalty, do those

12   outweigh his youth and all of these other things that they are

13   going to bring up?  Maybe so.  You may feel like youth is not a --

14   you know, how young you are when you commit a murder is not

15   something that you want to factor in.   That you won't even

16   consider it as a mitigating circumstance.  Those are the types of

17   things that you will be looking at.  Do you understand that?

18   A    Yes.

19   Q    Then if you find that the aggravating circumstances do

20   outweigh those mitigating circumstances, then you decide does this

21   case right here, is this a death penalty case.  And, if so, then

22   you are going to be asked, along with 11 other jurors to sign your

23   name on a piece of paper and walk back out into the courtroom,

24   basically, and tell this person sitting right here (INDICATING)

25   that you believe he deserves the death penalty.  Is that something

281

Respondent's Exhibit E

1    that you can do?

2    A    Well, I -- let's see, I'd have to think about it a while, you

3    know, before I could as far as -- you know, I would have to look

4    at all of the evidence and all of this and that.

5    Q    Yes, sir.  Well, like I said, we've got two phases to this

6    trial.  You have the guilt phase just where you decide whether or

7    not they committed the crime, then you have the other part where

8    you decide what the penalty should be.  Should it be life without

9    parole or should it be the death penalty.  Do you understand?

10   A    Yeah.

11   Q    I know that's a very, very serious thing that you have to

12   think about.

13   A    Yeah, it is.

14   Q    But I need to know what your gut opinion is really of the

15   death penalty.  Do you believe in it?

16   A    Well, yes.

17   Q    A lot of people say, "I believe in it, but I don't want to be

18   the one that has to" --

19   A    Well, now that -- right here --

20   Q    That's not uncommon.  That's not uncommon.  And we just need

21   to know your, from the heart, what it is that you can do and what

22   you can't do.

23   A    Well, it would hencely hender me, you know, as far as me --

24   I may get over it, but it would take a while.  I'm a -- I'm a

25   nervous person.  I always have been.

282

4855
Respondent's Exhibit E

1    Q    Do you believe it in, but you're not sure that you could do

2    it.  Is that what your answer is?

3    A    Well, that's it.  I believe I could do it, but I don't know.

4    Q    Well, like I said, it's a very grave responsibility.

5    A    Yes, it is.  It sure is.

6    Q    But do you feel like that ought to be the penalty for some

7    crimes?

8    A    Yes.

9    Q    Is murder one of the crimes that you feel like it ought to be

10   a penalty for?

11   A    Yeah, I do.  I really do.  If it goes that far, yeah.

12   Q    Mr. Bradford, in this type of case, accomplice liability

13   becomes an important factor sometimes.  Do you understand what

14   accomplice liability is?  Have you ever heard of that term?

15   A    No, I don't think so.

16   Q    Have you ever heard of someone having an accomplice to a

17   crime?

18   A    Well, now, yes.  Now that you mention that, yeah, if you go

19   that way.

20   Q    Well, what they mean usually when they say that is that

21   person aided you in either planning it or committing it, you know,

22   helped you out in some way, helped you to commit that crime.

23   A    Um-hum.

24   Q    Say for instance, two people decided they are going to rob a

25   bank.  Usually you have to have somebody in the getaway car if you

4856
Respondent's Exhibit E

1    are going to have a successful robbery, you know, have the car out
2    there running, be ready to pick you up at the door.  And someone
3    to go in there and pull the gun and get the money.  That's usually
4    the way it works out best, right?

5    A    Yeah.

6    Q    Are both of those people in your mind guilty of the same
7    crime?

8    A    Yes.

9    Q    They are both guilty of the robbery?

10   A    Um-hum.

11   Q    That's basically what we're saying in this case, too.  Either
12   this defendant or the person he was will killed somebody, but they
13   were a part of the same plan.  Okay.

14   A    Yeah.

15   Q    Under those circumstances, could you find someone guilty of
16   capital murder?

17   A    Yes.

18   Q    One other thing I would like to ask you about, Mr. Bradford.
19   The State has the burden of proving beyond a reasonable doubt this
20   person committed this crime, okay, or his accomplice did.

21   A    Yeah.

22   Q    He or his accomplice in working with each other.  The Judge
23   is going to read you an instruction if you are selected as a juror
24   at the end of the trial that says, beyond a reasonable doubt means
25   basically that you have an abiding conviction of the truth of the

284

Respondent's Exhibit E

1    charge.  Either you believe it is true or you don't.  You know

2    there can be some wild reasons out there why you say, "Well, that

3    may not be true," but you have to think in your mind is that a

4    reasonable thought that I'm having out there.    That's what

5    reasonable doubt is.  When the Judge tells you that you are to

6    decide that this crime has been committed beyond a reasonable

7    doubt.  You know, if you are having some wild -- like I said, some

8    wild doubts about whether or not he committed the crime, consider

9    whether those are really reasonable doubts you have.

10   A    Yeah.

11            MS. BILLINGS:  Good juror.

12            THE COURT:  Okay.

13                        CROSS EXAMINATION

14   BY MR. KIZER:

15   Q    Mr. Bradford, how long have you worked at Viking Bag?

16   A    Seventeen, I think, it is, 17 years.

17   Q    You've listed on your questionnaire that you are a baler?

18   A    Uh-huh.

19   Q    What does that job entail?

20   A    Lifting the bales.

21   Q    And how long have you held that job at Viking Bag?

22   A    For all of that 17 years.

23   Q    Okay.  Mr. Bradford, if, at the end of the case, it is proven

24   to you that a defendant participated in a crime, but not to the

25   same level as another person, do you feel as though that the

                              285

Respondent's Exhibit E

1   person who didn't do as much as the other person should receive
2   the same punishment or not?
3   A    Yes.
4   Q    If it is proven to you, for example, that a person who
5   actually committed -- who actually pulled the trigger and the
6   other person did not, do you think those two people should be
7   punished the same?
8   A    Yes.
9   Q    Would you consider the circumstances of each individual role
10  or participation in the crime that they are accused of when it
11  came time for you to assess punishment?  By that I mean, would you
12  consider all of the factors about the particular individual and
13  that you are being asked to make a decision about?
14  A    Yes.
15  Q    For example, if capital murder is what a defendant is found
16  guilty of, then there are two possible punishments.  There is life
17  without parole and then there is the death penalty.  Would you
18  consider both of those before you make your decision one way or
19  the other?
20  A    Oh, yes, um-hum.
21  Q    If you are sitting in the jury room and there are 12 of you
22  and you have been in there for a long time and 11 of them think
23  the death penalty is what the person ought to get, would you think
24  that life without parole is what they ought to get?  Would you
25  vote your conscience?  Would you continue to vote your conscience,

286

4859
Respondent's Exhibit E

1    or do you think you would just cave in and do what everybody else

2    wanted to do?

3    A    Well, now, that -- that would be hard to do.  I don't know.

4    Q    Well --

5    A    I really don't know.

6    Q    Probably in your lifetime you have come to feel very strongly

7    about some things.

8    A    Oh, yes.

9    Q    And probably those strong beliefs are what, to a large

10   degree, govern how you live every day, whether it is a belief in

11   God or whether it is a belief in doing right from wrong, that sort

12   of thing.  And you try to listen to your inner voice, do you not?

13   You know that little voice --

14   A    Right.

15   Q    In your head that tells you what to do and what not to do?

16   A    Yeah.

17   Q    You try to do what you think is right?

18   A    I try.

19   Q    Is that right?

20   A    I try, but sometimes it -- it wants to go the other way.

21   Q    All right.  Would the fact that the victim in this case, Mr.

22   Turner, was a white male about my age and the defendant is a black

23   male, much younger, would that make a difference to you when it

24   came time to make a decision?

25   A    No.

R860
Respondent's Exhibit E

1    Q    You grew up at Grapevine.  Is that correct?

2    A    Yes.

3    Q    Do you still live there or do you live in Pine Bluff?

4    A    No, I live out in Chapel--Watson Chapel.

5    Q    I notice that you have four children.  Any of them still

6    living here in Pine Bluff?

7    A    All of them.

8    Q    Are they working here in town?

9    A    Well, no, one of them lives at Grapevine, the boy.

10   Q    You indicated on the questionnaire that we passed out prior

11   to the proceedings today that you have read about this case in the

12   newspaper.

13   A    Yes.

14   Q    Have you read about it recently?

15   A    I don't think so.

16   Q    Are you telling me you read about it when the event happened?

17   A    Yes.

18   Q    Okay.  There have been several articles, in fact, there have

19   been a couple of times when this matter has been on local televi-

20   sion news.  Have you read or heard anything about those things

21   that have occurred?

22   A    Well, back then, now.  It hasn't -- I don't think it has now

23   in the last --

24   Q    How about the last month?

25   A    No, I don't think so.  Not that I can remember.

288

Respondent's Exhibit E

```
1    Q    You didn't know Mr. Turner, did you?

2    A    Oh, no.

3    Q    You don't know anyone of the family?

4    A    No.

5    Q    The hypertension medication that you take how frequently do

6    you have to take it?

7    A    Three times a day, meal.

8              MR. KIZER:  That's all the questions I have.

9              THE COURT:  Anything further for the State?

10             MS. BILLINGS:  No, your Honor.

11             THE COURT:  Thank you, Mr. Bradford.  I'll ask you to

12        step outside then.  Thank you, sir.

13             MS. BILLINGS:  We'll excuse Mr. Bradford, your Honor.

14             THE COURT:  Okay.  And Della Marie Horace.  Excuse Mr.

15        Bradford.  I show seven strikes for the State and 11 for the

16        defense.

17             Hi, Ms. Horace.  Come around over here, please, ma'am,

18        and just have a seat right there.  We are continuing in

19        chambers with the examination of Ms. Della Marie Horace.

20             Mr. Juneau.

21             MR. JUNEAU:  Thank you, your Honor.

22                  PROSPECTIVE JUROR DELLA MARIE HORACE

23   BY MR. JUNEAU:

24   Q    Hi, Ms. Horace.

25   A    Fine.  How are you today?
```

289

Respondent's Exhibit E

1    Q    My name is Wayne Juneau.   I'm a prosecuting attorney along
2    with Ms. Carol Billings.
3    A    Nice to meet you.
4    Q    We will be trying this case today.   We're here to ask
5    questions in order to pick a jury who will be fair both to the
6    defendant, Kenneth Reams, and the State of Arkansas.   You under-
7    stand.   That's why we're going to ask you some questions.
8    A    Yes, sir.
9    Q    Have you ever served on a jury before?
10   A    No, sir.
11   Q    Have you ever been picked or asked questions by an attorney?
12   A    In the jury box?
13   Q    Yes.
14   A    Once.
15   Q    Okay.   Was that a criminal case?
16   A    Yes.
17   Q    But you've never actually deliberated--served and then went
18   and deliberated?
19   A    No, sir.
20   Q    Okay.   I'll explain a few things about how we go about this
21   trial in just a few minutes, but I want to ask you a couple of
22   questions about your questionnaire.   I notice that when I read
23   through your questionnaire you are pretty active in civic and
24   religious organizations, aren't you?
25   A    Yes, sir.

4863
Respondent's Exhibit E

1    Q    You are the musician for your church?

2    A    Two, Rose Hill, my home church; and Pine Hill, my second

3    church I play for.

4    Q    I see.  And you have a girl scout troup that you teach or --

5    A    Unit director.

6    Q    Unit director.

7    A    Um-hum.

8    Q    Okay.  Well, let me ask you just right at the beginning,

9    then.  Do you have any opinion as to the death penalty?  One of

10   the reasons I asked you that is because this case involves a

11   capital murder and one possible punishment should you find the

12   defendant guilty is death by lethal injection.  Do you have any

13   opinion, one way or the other, are you for or against the death

14   penalty?  Or have you even ever thought about it?

15   A    I've never thought about it.

16   Q    Well, I guess I'm going to put you on the spot and ask you to

17   think about it.

18   A    Okay.

19   Q    Can you tell me your opinion as to whether you would think of

20   any case qualifies for the death penalty?

21   A    Hum.  When a life is taken unlawfully and if all evidence

22   proves that the individual that committed the crime didn't have to

23   do that, yes.

24   Q    Okay.  And I ask you that because I felt like with you being

25   involved in such an extent with religious organizations, some of

291

Respondent's Exhibit E

1  these civic clubs and organizations, you may be opposed to the

2  death penalty?

3  A    I'm not.

4  Q    So there are cases that you could fathom that you would

5  impose the death penalty should you find the defendant guilty?

6  A    Yes.

7  Q    Now, let me talk to you a little bit about what we are going

8  to do at this trial if you are picked as a juror. This trial will

9  involve two phases. The first phase you will decide guilt or

10  innocence only. Then you will -- you will, in fact, come in this

11  room along with the other jurors and decide whether the defendant

12  is guilty or innocent. Okay. If you should find him guilty of

13  capital murder, you will go back outside. You will tell the

14  Judge, sign the verdict form and the verdict will be read to the

15  Judge, and then you will hear some more evidence. And you will

16  come back and decide, at that point, whether the defendant gets

17  life without parole or death. Do you understand?

18  A    Yes, sir.

19  Q    Now, let's talk right now about the guilt phase of the trial

20  where you determine guilt or innocence only. Okay.

21  A    Okay.

22  Q    How long have you lived in Pine Bluff?

23  A    All my life.

24  Q    Did you hear about the murder at the ATM machine this summer?

25  A    No more than reading in the newspaper.

292

1   Q    Yes.

2   A    I read it in the newspaper.

3   Q    So you're aware the crime happened?

4   A    Yes.

5   Q    Do you know any of the specifics?

6   A    No, sir.

7   Q    In this particular case, the State of Arkansas claims that

8   this defendant, along with another person, attempted a robbery at

9   the ATM machine and that the victim was shot and killed during the

10  course of that robbery.  Do you understand?

11  A    Yes, sir.

12  Q    And the elements -- we have to prove certain things before

13  you can convict him of capital murder.  There are some elements

14  that we have to prove beyond a reasonable doubt.  One of those

15  elements is that either he, by himself, or acting with another

16  person, attempted to commit a robbery.  Okay.

17  A    Okay.

18  Q    The second element that we have to prove is that during the

19  course of that robbery a person was killed and that murder showed

20  extreme indifference to the value of human life.  If you believe

21  those things beyond a reasonable doubt, then this defendant is

22  guilty of capital murder.  Do you understand?

23  A    Yes.

24  Q    Now, when I ask you -- well, let me make one more statement

25  before I ask you the question.  And that is that should you find

293

1866
Respondent's Exhibit E

1    him guilty of capital murder, the range of punishment is fairly

2    narrow.  It's only life without parole or death by lethal injec-

3    tion.

4    A    Okay.

5    Q    Now, if we're talking simply about the guilt or innocence of

6    this case, would the punishment have any affect on how you decide

7    guilt or innocence in this case?

8    A    No, sir.

9    Q    You could separate out the punishment part of it and decide

10   guilt or innocence of capital murder only on the facts of the

11   case?

12   A    Right.

13   Q    Okay.  Let me go one step further and talk with you about

14   accomplice liability.  Have you ever heard that term?

15   A    No, sir.

16   Q    Okay.  Accomplice liability under the law in Arkansas is that

17   if two persons act in a course of a crime, they are both guilty of

18   the crime.

19   A    Um-hum.

20   Q    Okay?

21   A    Right.

22   Q    If one person goes in and robs a bank and the other person

23   drives the car, they are both guilty of the robbery.

24   A    Okay.

25   Q    Do you agree with that?

294

Respondent's Exhibit E

1    A    Yes.

2    Q    In capital murder, that accomplice liability is factored into

3    those things that I talked to you about.  When I told you that a

4    defendant could be convicted of capital murder if we proved to you

5    that he was acting alone or with an accomplice or another person -

6    -

7    A    Um-hum.

8    Q    That's how that is factored in.

9    A    Right.

10   Q    Do you understand that?

11   A    Yes, sir.

12   Q    And that he or another person killed the victim.  That's also

13   factored in.

14   A    Okay.

15   Q    Okay.  Do you have any problem -- should you believe beyond

16   a reasonable doubt that this defendant either acted by himself or

17   with another person and someone was killed, do you have any

18   problem with finding this defendant guilty of capital murder?

19   A    No, sir.

20   Q    Let's move on now to -- well, let me back up one more time.

21   This defendant is 18 years old.

22   A    Okay.

23   Q    Would the fact that he is 18 years old have any bearing on

24   whether you would find him guilty of capital murder or not?

25   A    No, sir.

295

4868
Respondent's Exhibit E

1    Q    Do you think at 18, and there may be evidence that he was 17

2    at the time that this offense was committed, that he would be

3    responsible for his actions at 17 years old?

4    A    Yes, sir.

5    Q    Now, let's move to the punishment part.  Okay?

6    A    Okay.

7    Q    We might not ever get there, but if you should decide--all 12

8    jurors decide that he is guilty of capital murder, then you come

9    back in here and you decide punishment.  There will be some

10   factors that you have to decide.  One will be the State's proof of

11   aggravating circumstances.  I'll tell you that the State has

12   alleged two aggravating circumstances.  Okay.

13        And you will also hear evidence from the defendant's side

14   about mitigating circumstances.  Okay.  And they have -- they may

15   allege several.  I'm not sure how many, anywhere from one to maybe

16   seven or eight or more.  Okay.  Do you understand the number is

17   not as important as the substance?

18   A    That's true, yes, sir.

19   Q    And you would agree with that?

20   A    Yes, sir.

21   Q    You would hear evidence on aggravation and mitigation.  And

22   then you, as a juror, would have an obligation to determine

23   whether the aggravating circumstance outweighed the mitigating

24   circumstances.  Do you understand that?

25   A    Yes, sir.

1860

Respondent's Exhibit E

1   Q    Okay.   And after you did that and if you determined the

2   mitigating outweighed the aggravation, the trial is basically over

3   and the defendant would be sentenced to life without parole.

4   Okay.   If mitigating outweighed aggravation.   But, on the other

5   hand, if aggravation, in your opinion, outweighed the mitigation,

6   then you would have to determine whether the aggravating circum-

7   stances justified the death penalty.

8   A    Okay.

9   Q    And if you did, then your verdict would be death.

10  A    Right.

11  Q    Okay.   Do you -- and I'll ask you again, do you have a

12  problem -- would you have a problem signing a jury form?

13  A    No, sir.

14  Q    Putting your name on a form sentencing this man to death?

15  A    No, sir.

16  Q    Okay.

17              MR. JUNEAU:   We'll pass.

18              THE COURT:   Mr. Kizer.

19                        CROSS EXAMINATION

20  BY MR. KIZER:

21  Q    Ms. Horace, you live over in the Broadmoor area.   Is that

22  correct, over on Nebraska Street?

23  A    Yes.

24  Q    And how long have you lived over there?

25  A    Fifteen years.

1870
Respondent's Exhibit E

1    Q    The service that you have had previous to this, I think you

2    told us you had been voir dired before which means that you go

3    through the process of where you were sitting in the jury box and

4    lawyers talk with you.

5    A    Um-hum.

6    Q    Some of the things that probably were talked to you about are

7    still applicable in this trial today even though this trial, in

8    essence, is going to be two different trials--two separate trials.

9    The first one is complete in and of itself.  That is the guilt or

10   innocence phase.  And during that phase of the trial, it will be

11   your determination, if you are one of the jurors chosen, to hear

12   the evidence and to make a decision as to what is the proper thing

13   to do under the circumstances.

14        For example, you will be charged by the jury instructions

15   that the Court gives you that you may find -- if you believe the

16   circumstances warrant it, you may find this defendant guilty of

17   capital murder.  You may also find him guilty of what's called

18   lesser included offenses, that being a murder in the first degree

19   charge or a manslaughter charge.  Those are two offenses that are

20   of less severe degree of -- well, proof, basically, because they

21   have lesser degree of severity in terms of mental intent required

22   and all of that sort of thing, but also the punishment is a lesser

23   degree.  You realize you will have options, I guess is what I'm

24   basically getting to, when it comes time to make a decision on the

25   guilt or innocence phase?

298

Respondent's Exhibit E

1    A    Yes, sir.

2    Q    Okay.  And will you consider the full range of options based

3    on what you know to be the evidence that you have heard?

4    A    Yes, sir.

5    Q    Likewise, can you do that same thing when it comes to the

6    punishment stage?   Now, you can -- also, there is one option I

7    forgot to mention, that you can find him not guilty of anything.

8    You realize that's an option that is available to a juror.

9    A    Yes, sir.

10    Q    We have a tendency sometimes to get caught up talking about

11    the punishment, so to speak, and particularly when the death

12    penalty is involved, and I hope you don't lose sight of that fact

13    also.

14         When it comes time for the second phase of the trial to be

15    presented, if it ever does, that's a whole new proceeding and

16    you've got to put on another thinking cap, so to speak, because

17    the evidence that is going to be submitted to you is of a little

18    bit different variety than what the evidence in the guilt or

19    innocence phase.  Do you believe that you could weigh and consider

20    all of the factors involved in the punishment phase before you

21    make any type of decision?  That sounds like it may be an easy

22    thing to do, but the State always goes first in any type of

23    criminal proceeding.   You'll hear what they have to say and

24    sometimes you'll hear it and you'll think, "Well, my gosh, that

25    sounds horrible.  I can't believe that somebody would do that."

299

Respondent's Exhibit E

1    But you have closed your mind if you think that type of thought
2    and you are not giving the defense an equal opportunity to show
3    you a different side of the facts.  Do you believe you're the type
4    of person who can allow both sides of the facts to be presented?
5    A    Yes, sir.
6    Q    The death penalty is something that has only been back in
7    operation in the United States a little bit less than two decades.
8    Have you read about the death penalty cases that we've had in the
9    State of Arkansas the last couple of years where people actually
10   got put to death?
11   A    Yes.
12   Q    Is there anything about the death penalty--the concept of it-
13   -that would cause you to hesitate or not be able to vote either
14   for it or against it?
15   A    No, sir.
16   Q    Can you also consider an alternative to the death penalty?
17   For example, the other punishment involved is life without parole.
18   Do you feel like that's a pretty severe sentence?
19   A    Yes, sir.
20   Q    Would you think that would be especially true in light of the
21   age of the defendant with an expected life expectancy that we have
22   in this country?
23   A    Yes, sir.
24   Q    Do you feel as though the -- I think I read in yours, maybe
25   I'm wrong.  Yeah.  Do you feel as though what you may have read in

300

Respondent's Exhibit E

1    the newspaper -- you had indicated on the questionnaire that you

2    had read something about this trial, has caused you to come into

3    the courtroom with any type of preconceived about this matter that

4    we're here to try today?

5    A    No, sir.

6         MR. KIZER:  I think that's all the questions I have,

7    your Honor.

8         THE COURT:  Anything further for the State?

9         MR. JUNEAU:  Nothing.

10        THE COURT:  Okay.  Thank you, Ms. Horace.  I'll let you

11   step outside.

12        MR. JUNEAU:  Good.

13        MR. KIZER:  What was that?

14        THE COURT:  Good.

15        MR. KIZER:  Good for the defense, your Honor.

16        THE COURT:  Okay.  Good.  Let me give her a phone number

17   and tell her to call us back.  Thank you.  I'm not exactly

18   sure what to tell her when.  Ms. TerKeurst is next.  That's

19   a typo on your -- that's T-e-r-K.  Hi, Ms. TerKeurst

20        PROSPECTIVE JUROR TERKEURST:  Your Honor.

21        THE COURT:  How are you?

22        PROSPECTIVE JUROR TERKEURTS:  Fine, thank you.

23        THE COURT:  This is our weekly meeting together as often

24   as we have called you down here.  We are continuing in

25   chambers for the purpose of examining Ms. Mary TerKeurst on

301

Respondent's Exhibit E

1          voir dire.  You may inquire for the State.

2                  MS. BILLINGS:  Thank you, your Honor.

3                      PROSPECTIVE JUROR MARY TERKEURST

4    BY MS. BILLINGS:

5    Q    Good afternoon, Ms. TerKeurst.

6    A    Good afternoon.  What is your name?

7    Q    Carol Billings.

8    A    Billing?

9    Q    Billings.

10   A    Billings.

11   Q    This is Wayne Juneau.

12   A    Wayne.

13   Q    We're from the Prosecuting Attorney's office.

14   A    Um-hum.

15   Q    And we represent the State in this case.  This involves, as

16   you heard out there, a capital murder charge.

17   A    Um-hum.

18   Q    We're saying this defendant sitting right here, Kenneth

19   Reams, either him or by himself or acting with another person --

20   in this case, we're saying he acted with another person by the

21   name of Alford Goodwin, the two of them went to the ATM machine

22   over there on Fifth and Chestnut and attempted or did commit a

23   robbery, in this case, we're saying they attempted to do a

24   robbery, and in the course of doing that, they killed someone by

25   the name of Gary Turner.  We're saying that under the circumstanc-

4875
Respondent's Exhibit E

1    es they did this under manifested extreme indifference to the

2    value of human life.  That's the charge.  That's what Mr. Juneau

3    and I have the obligation of showing you if you are selected as a

4    juror.  We believe that we can do that.

5         In this case, Ms. TerKeurst --

6    A    Am I supposed to ask any questions?

7    Q    Well, like what?

8    A    Never mind.  Go ahead.

9    Q    Okay.  Well, this is a death penalty case.  Were you aware of

10   that?  Were you aware that the State is seeking the death penalty

11   in this case?

12   A    Yes, ma'am.

13   Q    A lot of people out there say that any time there is a

14   capital murder charge the State automatically is supposed to seek

15   the death penalty or the death penalty is an automatic penalty in

16   that.  Were you thinking that, too?

17   A    The death penalty is automatic?

18   Q    Yes, ma'am.  Were you thinking that?  I mean, a lot of people

19   think that that any time someone is charged with capital murder

20   that they automatically should get the death penalty.

21   A    Well, most of the time they usually tell you right off

22   whether they are seeking the death penalty or not.

23   Q    Okay.  Do you understand why sometimes the State does and

24   sometimes the State does not seek the death penalty?

25   A    Well, in capital punishment there is a difference, isn't it?

303

4876
Respondent's Exhibit E

1   Q    Yes, ma'am.

2   A    All right.

3   Q    Well, the legislature has set out like seven different things

4   that they call aggravating circumstances.  Just the fact that you

5   kill someone alone is not enough for you to get the death penalty.

6   Do you understand that?

7   A    Um-hum.

8   Q    You have to kill someone plus have at least one of those

9   aggravating circumstances.  If we don't have one of those, then we

10  can't seek the death penalty.  We believe we have two of those in

11  this case, and we're going to be presenting those to you as

12  evidence later on in the trial, reasons why we say the defendant

13  sitting here, Mr. Reams, should get the death penalty.  Okay?

14  A    The reason why what?

15  Q    Reasons why we think he should get the death penalty.

16  A    Oh.

17  Q    In a capital murder case, it is divided into two sections.

18  You have a guilt section where you just determine whether or not

19  they are guilty of the charge of capital murder, and then you have

20  a section called the penalty phase where you decide what the

21  penalty should be.  The two possible penalties for capital murder,

22  life without parole or the death penalty.  Do you understand?

23  A    Um-hum.

24  Q    Okay.  If you find them not guilty of capital murder, then

25  the trial is over and everybody goes home.  If you find him guilty

304

Respondent's Exhibit E

1    of capital murder, then we go into that second stage called the

2    penalty phase.   And in that stage, Mr. Juneau and I would be

3    bringing in evidence reasons why we say that Kenneth Reams should

4    get the death penalty.  Mr. Kizer, his attorney, would be bringing

5    reasons why he says that he shouldn't get the death penalty.

6    Those are called aggravating circumstances that I have to show and

7    mitigating circumstances that he would be showing.  Have you ever

8    heard of those?

9    A    Yes.

10   Q    Okay.  What you are going to be asked to do once there has

11   been guilty verdict on the capital murder would be decide if there

12   is an aggravating circumstance, if we show you that there is one.

13   That's the first thing you have to decide.   Then you would be

14   asked to decide if the aggravating circumstances outweigh any

15   mitigating circumstances.  And then you would be asked to decide

16   if the aggravating circumstances warrant the death penalty in this

17   case.   At this point, I guess I need to ask you, what are you

18   honest rock bottom feelings about the death penalty?

19   A    Well, according to the constitution, everybody is innocent

20   until proven guilty, right?

21   Q    Right.

22   A    Okay.

23   Q    But I guess --

24   A    That's my feelings.

25   Q    But can you give someone the death penalty?

305

Respondent's Exhibit E

1    A    Me, myself?

2    Q    Yes, ma'am.

3    A    Well, it's according to whether -- I probably wouldn't be

4    asked to if I was relative or something, but I could give somebody

5    the death penalty.  I sure could.

6    Q    Okay.  Well, that's what this case is all about, whether or

7    not you can give someone the death penalty.  Those -- that's what

8    my questions are geared for.  A lot of people say that they

9    believe in it, but they don't want to be the one that has to

10   actually make that determination.  That's what we are asking you

11   here today.

12   A    Yeah.

13   Q    Can you do that?

14   A    You betcha.

15   Q    Okay.  Like I said, we're going to be coming to you once the

16   guilt phase of the trial is over with, once you have decided

17   whether or not he is guilty of capital murder, and if you hit that

18   point, then we will be coming back and giving you more evidence.

19   Okay.  You are not to factor in the punishment whenever you are

20   deciding whether or not he's just guilty of the charge.  Do you

21   understand?

22   A    Um-hum.

23   Q    I've had some people come to me after trials before and say,

24   "Well, I thought if we found him guilty of capital murder, he

25   automatically got the death penalty, and that's why I didn't vote

306

Respondent's Exhibit E

1    for capital murder." That's not true. You have to decide whether

2    or not capital murder is the charge and then you come along in

3    another section and decide what would be the proper punishment in

4    this case. You've got two distinct --

5    A    Two different ones.

6    Q    Yes, ma'am. Do you understand that?

7    A    Um-hum.

8    Q    In that second phase, we would be giving you some forms

9    probably and you would be asked, like I said, to determine if

10   there is an aggravating circumstance and if those aggravating

11   circumstances outweigh the mitigating circumstances. Do you

12   understand that just because Mr. Kizer may have six things that

13   you decide to check off down there that are reasons why he

14   shouldn't get the death penalty, you have to weigh those against

15   what the State has down there even though you may have more

16   numbers, it doesn't necessarily mean anything. His reasons for

17   him not getting the death penalty may not be as great as our

18   reasons for him getting the death penalty even though we only have

19   two over there. Do you understand?

20   A    Um-hum.

21   Q    It's the substance of what's in each one. And you'll have to

22   weigh that in your mind whether you think his youth is a reason

23   for him not to get the death penalty, whether his background is

24   the reason for him not to get the death penalty. Those are things

25   that you will have to decide based on what we show you also.

307

Respondent's Exhibit E

1    Okay.  You look like you have a question.

2    A    Well, the age -- does that have anything to do with it?

3    Q    Well, that's one of those things that you can consider as a

4    mitigating circumstances.

5    A    Yeah.  Okay.

6    Q    Right off the bat, do you feel like someone is responsible if

7    they are 17 or 18 years old for their actions?

8    A    Yes, ma'am.

9    Q    Okay.  Have you served on a jury before, Ms. TerKeurst?

10   A    Yes, ma'am.

11   Q    You have?

12   A    Yes, ma'am.

13   Q    Okay.  So you understand that what we have to show you is

14   reasonable doubt as our burden of proof.

15   A    Yes.

16   Q    Okay.  Then, basically, you believe the truth of the charge.

17   You have -- as the Judge will read you, you have an abiding

18   conviction of the truth of the charge, not some way out doubt out

19   there that he committed it or something like that, you always have

20   to determine in your mind, "Well, if I do have a doubt, is that a

21   reasonable doubt?"  Okay.

22   A    Um-hum.  If it is reasonable.

23   Q    Right.  I mean, you may have some farfetched -- the defense

24   attorney may give you some farfetched reason out there why he says

25   he didn't do it, but in your mind you have to say, "Well, is that

308

Respondent's Exhibit E

1    a reasonable doubt?  That's not even reasonable under the circum-
2    stances.  I believe he did it."
3         Accomplice liability, have you ever heard of that?
4    A    No, I'm not familiar with that term.
5    Q    Okay.  Have you ever heard somebody say, "Well, me and my
6    accomplice did that"?
7    A    Hum, no, uh-uh.
8    Q    Okay.  No one has ever accused you of being an accomplice to
9    someone committing an act?
10   A    No.
11   Q    Okay.  Well, basically what it is, Ms. TerKeurst, is if you -
12   - the law says if you aid someone in committing a crime, if you
13   help him plan it, you are just as guilty as they are.  Do you
14   agree with that?
15   A    Well, some states have that law and some don't.
16   Q    Well, Arkansas is one of those that does.  Do you agree with
17   that?
18   A    Yeah.
19   Q    So, if you and I are going to -- or two people are going to
20   commit a bank robbery usually it works better if you have a person
21   drive a getaway car, doesn't it?
22   A    Um-hum.
23   Q    And one to go in and get the money.
24   A    They are both guilty, though.
25   Q    Right.

309

Respondent's Exhibit E

1          MS. BILLINGS:  We're done.

2          MR. KIZER:  No questions.

3          THE COURT:  Thank you, Ms. TerKeurst.

4          PROSPECTIVE JUROR TERKEURST:  Yes, sir.

5          MS. BILLINGS:  Let me guess.

6          MR. KIZER:  I'll give you two chances.

7          THE COURT:  What says the State?

8          MS. BILLINGS:  Good, your Honor.

9          MR. KIZER:  Not for us.  Not for the defense.

10         THE COURT:  We'll show that Ms. TerKeurst is excused by

11    the defendant.  That will leave 10 peremptory challenges at

12    this point.  Dwight Robinson I show is the next one on the

13    list.  Ms. TerKeurst is cute.  She's a hoot.

14         Continuing in chambers for the purpose of examining Mr.

15    Dwight A. Robinson.

16         Mr. Juneau, on behalf of the State, would you care to

17    inquire.

18         MR. JUNEAU:  Thank you, your Honor.

19              PROSPECTIVE JUROR DWIGHT A. ROBINSON

20    BY  MR. JUNEAU:

21    Q    Hi, Mr. Robinson.

22    A    Howdy.

23    Q    My name is Wayne Juneau.  I'm a Prosecuting Attorney, and

24    this is Carol Billings.  We'll be trying this case today.  We're

25    going to ask you a few questions in order for both the State and

310

Respondent's Exhibit E

1    the defense attorney to pick a fair and impartial jury.

2         Have you ever sat on a jury before?

3    A    No, sir.

4    Q    Have you ever been called to sit in the jury box while the

5    lawyers ask you questions?

6    A    This is my fourth time this term.

7    Q    Fourth time, but you've never sat on a jury?

8    A    I've never sat on a jury.

9    Q    Okay.  You are retired from the Cotton Belt Railroad?

10   A    Right.

11   Q    How long have you been retired?

12   A    Five years.

13   Q    Mr. Robinson, this case involves the murder of a Mr. Gary

14   Wayne Turner who was killed during an attempted robbery at the

15   ATM--automatic teller machine--there at Worthen Bank there on

16   Fifth Street.  Did you ever hear anything about that case?

17   A    I read about it in the paper.

18   Q    When it first occurred?

19   A    Yes.

20   Q    Have you read anything since then?

21   A    I don't recall if I did.

22   Q    Do you recall any of the details about the case?

23   A    Well, just that there was a shooting there at the money

24   machine and -- I mean, that's just about the gist of it.  I mean,

25   I don't -- as far as details, no.

311

Respondent's Exhibit E

1    Q    Okay.  I don't even know if they reported details or not.

2    A    I don't think I read any details.  It was a small article.

3    Q    Okay.  So you come in here with a clear mind as far as the

4    facts of the case?

5    A    Yes, right.

6    Q    Well, the State of Arkansas asserts that this man, Kenneth

7    Reams, was involved in the robbery in which Gary Wayne Turner was

8    killed.  And we have charged Mr. Reams with capital murder.  You

9    were probably not aware until you came today that this was going

10   to be that kind of case where we were charging him with capital

11   murder, were you?

12   A    News to me until I got here.

13   Q    I guess the main question that I want to ask you at this

14   point is about your opinion or even if you have an opinion in

15   regard to the death penalty.  In Arkansas, in certain crimes,

16   capital murder being one of them, if a defendant is convicted, he

17   can get sentenced to death by lethal injection.  Have you ever

18   thought much about the death penalty?

19   A    Yes.

20   Q    Okay.  Do you have an opinion one way or another as to

21   whether you are for the death penalty or opposed to it or --

22   A    Well, in my opinion, if crime that's committed is proven and

23   if that's the way it is, I could vote for it.

24   Q    Okay.  So you're telling me that there are some circumstances

25        --

312

Respondent's Exhibit E

1    A    There are some circumstances that I would vote for the death

2    penalty, yes.

3    Q    And murder would be one of those?

4    A    Yes.

5    Q    When we try this case, if you happen to be on the jury, we're

6    going to try it in two phases.   The first phase, we're going to

7    look at his guilt or innocence and that's all.   In the second

8    phase, we will look at punishment.   Okay.   Now we've claimed that

9    the defendant, Kenneth Reams, was either alone or was acting with

10   another person, an accomplice, and that they committed or tried to

11   commit a robbery.   During the course of that crime of robbery,

12   they killed somebody.   And that that showed extreme indifference

13   to the value of human life.   In fact, that's what the Judge is

14   going to read the crime of capital murder consists of.   Okay.   We

15   have the burden, of course, and I know if you've been on a jury or

16   if you've listened to lawyers talk about trials, you know what

17   reasonable doubt is.   By the way, you need to answer yes or no.

18   It's kind of -- the court reporter is trying to take down what you

19   have to say.

20   A    Excuse me.

21   Q    If we prove to you that set of circumstances that I've just

22   explained beyond a reasonable doubt, could you vote that the

23   defendant is guilty?

24   A    Yes.

25   Q    And, by the way, this defendant is 18 years old now.   He was

313

Respondent's Exhibit E

1    17 at the time the crime was committed.  Would the fact that he

2    was 17 have any influence as to whether he was guilty or innocent

3    of the crime.

4    A    Not in my opinion, no.  Not in my thinking, no.

5    Q    It would be fair to say that you would hold him liable for

6    his -- for the crime as you would any adult, any older person?

7    A    Yes.

8    Q    Now, should you decide, along with your other fellow jurors

9    that Mr. Reams is guilty of capital murder, then you would be

10   asked to come back in this jury room and deliberate with regard to

11   punishment.  Punishment, if he is found guilty of capital murder,

12   can be one of two things.  One is life without parole or the other

13   alternative is death by lethal injection.  Do you understand?

14   A    I understand.

15   Q    Would the fact that he could only get life without parole or

16   death have any influence over your decision as to guilt or

17   innocence?

18   A    No.

19   Q    In fact, you would come in here and only consider the factors

20   you heard, the facts of the case to decide guilt or innocence and

21   not consider the punishment?

22   A    Yes, that's right.

23   Q    And I think the Judge will instruct you to that effect.  And

24   then you can come back and consider punishment later.

25   A    Yes.

314

Respondent's Exhibit E

1    Q    Now, when you come back and consider punishment, you are

2    going to be -- you're going to have to find certain things exist.

3    Okay.  Those things, number one, would be aggravating circumstanc-

4    es.    Simply because he was guilty of capital murder does not

5    authorize the death penalty.   You have to find something in

6    addition to that.   One would be aggravating circumstances.   And

7    the State has alleged two aggravating circumstances.   You would

8    have to find beyond a reasonable doubt that those existed.

9         Then you would consider mitigating circumstances.    The

10   defense attorney would prove to you or try to prove to you that

11   there are mitigating circumstances that exist.   Okay.   And what

12   we're looking at at this point is simply whether he gets death or

13   life without parole.   Okay.

14   A    All right.

15   Q    If you feel like there are both aggravating circumstances and

16   mitigating circumstances, then you have to go one step further an

17   decide if the aggravating circumstances outweigh the mitigating

18   circumstance.   Are you with me so far?

19   A    I'm still with you.

20   Q    Okay.   If you feel like the mitigating circumstance out-

21   weighed the aggravating circumstances, then the sentence would

22   have to be life without parole.

23   A    All right.

24   Q    Okay.

25   A    All right.

315

Respondent's Exhibit E

1    Q    On the other hand, if you felt like the aggravating circum-

2    stance outweighed the mitigating circumstance, then you would have

3    to determine if the aggravating circumstance justified the death

4    penalty.

5    A    All right.

6    Q    Okay.

7    A    All right.

8    Q    If that's the case and everybody felt that way, then the

9    verdict would be death.

10   A    All right.

11   Q    Do you understand?

12   A    All right.

13   Q    And, I guess, the point of all that is that there are two

14   phases, guilt and innocence, and then you have to go through this

15   ordeal, so to speak, of finding mitigating and aggravating to

16   determine punishment.   Okay?

17   A    All right.

18   Q    Again, I indicated that the State has alleged two aggravating

19   circumstances and the defendant may allege one or five or ten, I

20   don't know how many, mitigating circumstances.   But you understand

21   that  the  number  of  mitigating  circumstances  or  aggravating

22   circumstances  is  not  as  important  as  the  substance  to  those

23   circumstances.   Do you understand?

24   A    All right.

25   Q    The  State  only  has  two  aggravating  circumstances.    The

316

Respondent's Exhibit E

1   defense has 10 mitigating circumstances, that doesn't necessarily

2   mean the mitigation outweighs the aggravation.  Do you understand?

3   A    I'm not -- you're saying that number hasn't got anything to

4   do with it.

5   Q    Right.  The number does not have anything to do with it.

6   A    All right.

7   Q    Would you agree with that?

8   A    All right.  I follow you with that.  Yes.

9   Q    Okay.  Do you agree with that?

10   A    I agree with that.

11   Q    Is there anything that I've said so far that you don't agree

12   with?

13   A    No, I'm up with you.

14            MR. JUNEAU:  We pass.

15            THE COURT:  Mr. Kizer?

16            MR. KIZER:  Thank you, your Honor.

17                         CROSS EXAMINATION

18   BY MR. KIZER:

19   Q    Mr. Robinson, how old are you?

20   A    Sixty-seven.

21   Q    You've been retired five years from the Cotton Belt?

22   A    (Prospective juror nodding head)

23   Q    Did you know my grandfather, Harold Kizer?  He was a switch-

24   man.

25   A    No.

317

Respondent's Exhibit E

1    Q    Did you know my father --

2    A    I worked in the shop.  I worked in the car shop.

3    Q    My dad, Larry Kizer, was a yard master.  Did you know him?

4    A    I don't think so.  There was very few people I know on the

5    yard.  I -- transportation department.  I don't know but a very

6    few.

7    Q    Okay.  What did you do in the shop?

8    A    I was a welder in the freight car shop.

9    Q    How long have you lived in Pine Bluff?

10   A    Since May 25, 1944.

11        THE COURT:  That was a good year.

12        PROSPECTIVE JUROR:  Was that a good year?

13   MR. KIZER CONTINUING:

14   Q    Do you feel as though that crime has gotten to be a problem

15   in Pine Bluff?

16   A    Yes, I do.

17   Q    Do you realize -- do you understand that we are here today

18   and will be the for the rest of the week that we are trying this

19   case here to try the State of Arkansas versus Kenneth Reams and

20   not to try to clear up the crime problem in Pine Bluff?

21   A    That's true.

22   Q    That's what the legislature and other bodies can attack.  But

23   what you're here for today is State versus Kenneth Reams.  Do you

24   understand?

25   A    All right, sir.

318

Respondent's Exhibit E

1    Q    The -- if you listened to the questions that were posed by

2    the Prosecuting Attorney, you might get the impression that we are

3    just going to skip right over the guilt or innocence phase and go

4    right on in to those mitigating and aggravating circumstances.  Do

5    you understand we have a trial?

6    A    Yeah.

7    Q    And at that trial, there are some constitutional safeguards

8    that apply.  You have heard the term, have you not, presumption of

9    innocence.

10   A    (Prospective juror nodding head)

11   Q    It means that someone who is charged with a crime is still

12   presumed to be innocent of that crime unless and until it is

13   proved beyond a reasonable doubt, to your satisfaction if you are

14   chosen to be a juror, that they are guilty.  Do you understand

15   that to be the case?

16   A    I understand that.

17   Q    Do you also understand that the defendant doesn't have to

18   prove anything?  It's up to the State of Arkansas to prove the

19   elements of the charge beyond a reasonable doubt.  That's their

20   burden.  And in a criminal case, the defendant doesn't have to

21   prove anything to you.  Do you realize that's the case?

22   A    I realize that.

23   Q    You also realize that I may make the decision as the attorney

24   for Mr. Reams that he may not take the witness stand.  He may.  I

25   don't know yet.  But if he does not, he has an absolute constitu-

319

Respondent's Exhibit E

1    tional right under the Fifth Amendment of the United States

2    Constitution not to give testimony.  You understand that to be the

3    case, do you not?

4    A    Right.

5    Q    The Worthen Bank teller machine over here at Fifth and

6    Chestnut, are you familiar with that machine?

7    A    Yes, sir.

8    Q    Have you ever used it before?

9    A    No, sir.

10    Q    Okay.  The oath that you will take if you are chosen to serve

11    says that you will well and truly try this case and render a true

12    verdict according to the law and to the evidence.  I note from

13    your questionnaire that you said you had read something about this

14    matter.  Have you come into this case today with any type of

15    preconceived ideas about the guilt or innocence of this defendant?

16    A    I don't think so.  I don't think so.

17    Q    Well, you are the only who would know.

18    A    Because I don't have enough knowledge of it to even go into

19    that part of it.  No.

20    Q    Have you ever heard the phrase, "You can't believe everything

21    you read in the newspapers"?

22    A    Oh, yes.

23    Q    And there is probably good reason for that.  People who are

24    coming up with information and relaying it to third parties.

25    There is room for error.  Would you agree with me?

320

Respondent's Exhibit E

1    A     I agree with that.

2    Q     Okay.   Will  you  make  your  decision  based  on  the  sworn

3    testimony  of  the  evidence  that  you  in  this  matter  as  it  is

4    elicited  from  the  witness  stand  if  you  are  chosen  to  serve  as  a

5    juror?

6    A     I will do that.

7    Q     Let's  say  that  the  facts  present  themselves  in  such  a  way

8    that you do vote that capital murder has been proven to you.  That

9    either Mr. Reams or his accomplice, Mr. Goodwin, caused the death

10   of  Mr.  Turner.   At  that  point,  you  have  to  make  a  determination

11   because  it's  a  whole  new  trial  at  that  point  as  to  what  is  the

12   applicable  and  appropriate  punishment.   Will  you  consider  all  the

13   possible  ranges  of  punishment  if  that  is  the  case  --

14   A     Yes.

15   Q     If it gets to that stage?

16   A     Yes.

17   Q     That  would  include  life  without  parole.   Do  you  feel  like

18   that  life  without  parole  is  a  significant  sentence?

19   A     What  do  you  mean  by  significant?

20   Q     Well,  some  people  make  take  the  position  that  life  in  the

21   penitentiary  is  not  harsh  enough  if  someone's  life  is  taken.

22   Would  you  take  --  would  you  agree  with  that  statement  or  would  you

23   believe  that  it  is  a  very  harsh  and  significant  sentence  because

24   of  the  length  of  time  involved  of  someone  of  Mr.  Reams'  age?

25   A     I'll  agree  with  that.   I'll  agree  that  it  is  a  harsh  punish-

321

Respondent's Exhibit E

1    ment.

2    Q    Would it make a difference to you even if it was the law that

3    if two people go out to commit a crime and during the course of

4    the commission of that crime, someone dies and if the law is that

5    both of those individuals are guilty of capital murder, would you

6    assess a different punishment based on the level of participation

7    that each had in the crime?  For example, if one person was the

8    shooter and the other individual was not, would that make a

9    difference to you when it came time to assess punishment given

10   that you have a range of punishment to consider.

11   A    I don't think so.

12   Q    Okay.  So if it is demonstrated to you that one of the

13   individuals did not -- was not armed and had no idea the other

14   person was going to kill someone, would that make a difference to

15   you?

16   A    Well, now that might accidentally make a difference, a little

17   bit.

18   Q    My questions are trying to get you to see that there may be

19   several different factors that you'll need to consider when it

20   comes to that time.  Is that what you are telling me you can do?

21   A    That's what I hope to do, be able to do.

22   Q    Okay.

23   A    Or try to do.  I'll put it that way.

24   Q    All right.  And do you understand that simply because someone

25   is found -- well, not simply because it will be a complicated

322

Respondent's Exhibit E

1  process.   But  just  because  someone  is  found  guilty  of  capital

2  murder,  it  doesn't  automatically  that  the  death  penalty  is  what

3  should  be  applied  or  will  be  applied.   Do  you  understand  that

4  there  are  two  different  ranges  of  punishment?

5  A    Right.

6  Q    There  are  several  police  officers  who  are  going  to  testify  in

7  this  proceeding  I  anticipate.   Would  you  tend  to  believe  the  word

8  of  a  police  officer  over  an  ordinary  citizen  simply  because  he  is

9  a  police  officer?

10  A    That's  a  hard  question.   I'd  say  to  a  degree,  yes.

11  Q    Okay.   Let  me  ask  you  this.   Would  you  agree  with  me  that  a

12  police  officer  is  a  human  being  first  --

13  A    Right.

14  Q    And  uses  his  same  senses  to  gather  information  and  to  give

15  that  information  back  in  the  form  of  testimony  just  like  you  or

16  anybody  else  --  any  other  human  being  walking  this  earth?

17  A    That's  right.

18  Q    Would  you  also  say  then  that  he  is  capable  of  the  same  errors

19  or  the  same  mistakes  that  ordinary  human  beings  are  given  the

20  frailties  of  the  human  senses?   You  know,  a  police  officer  is  a

21  human  being  first.   Would  you  agree  with  me?

22  A    Yes.

23  Q    Do  you  think  he  can  make  a  mistake  just  like  anybody  else

24  can?

25  A    Yes.

4896
Respondent's Exhibit E

1    Q    My purpose --

2    A    If he is human, he can make a mistake, yes.

3    Q    My purpose for asking that is, would you gauge, would you

4    weigh whatever a police officer had to testify to just like an

5    ordinary citizen keeping in mind that first he is a human and that

6    he is just performing a function, a role as a police officer?

7    A    I would do my best, yes.

8         MR. KIZER:   That's all the questions, I have, your

9    Honor.

10        THE COURT:   Anything further from the State?

11        MR. JUNEAU:   No, your Honor.

12        THE COURT:   Thank you, Mr. Robinson.   I'll excuse you at

13   this time.   Remain outside, if you will, please, sir.

14        MR. JUNEAU:   He's good, your Honor.

15        MR. KIZER:   Good for the defense, your Honor.

16        THE COURT:   All right.   I tell you what.   Ask Mr.

17   Robinson to stick his head back inside the door.   I neglected

18   to tell those other two jurors to be sure not to listen to

19   any news accounts or anything.   Ask him to stick his head

20   right back in just a second.

21        MR. KIZER:   Your Honor, I'm going to exercise an

22   peremptory challenge on the next individual.

23        THE COURT:   Okay.

24        MR. KIZER:   From long past experience.

25        THE COURT:   Mr. Robinson, congratulations.   You are

                                324

Respondent's Exhibit E

1    selected.  You will be one of our jurors.  There is no sense
2    in you just sitting around up here now because we've got a
3    bunch more to go through before we have a full panel.  The
4    reason I asked you to step back in I want to make sure that
5    you don't look at, read and listen to any news accounts, not
6    that we'll get into anything that might influence you, but
7    it's just better to be on the safe side and just try to
8    avoid, if you pick up the newspaper, if you see any headline
9    or anything like that, look the other way.  Don't read the
10   articles or anything like that.
11        JUROR ROBINSON:  All right.
12        THE COURT:  What we're doing is trying to see how far we
13   can get with this jury selection.  So I don't know exactly
14   what to tell you right now about when to be back.  I'm going
15   to ask you to call tonight.  You know that phone number we
16   wrote out there on that board, copy that phone number down
17   and call that after about 8 o'clock tonight and we ought to
18   know more about that time.  I'm going to put a message on a
19   recorder for you tonight.  So call and check and I'll have a
20   message for you when to be back or otherwise, in the morning,
21   if I don't tell you on that machine, to be back in the
22   morning.  Stick around somewhere close so we can call you and
23   tell you when to be back.  If I had to guess, and it will be
24   only a guess, I'd say maybe noon tomorrow might be a reason-
25   able time to -- or right after noon tomorrow might be a

325

4898
Respondent's Exhibit E

1          reasonable time to be back.  Don't hold me to that.  We could

2          get all the rest of the jurors here in the next 30 minutes.

3          It's  unlikely, but it could happen.  Or it could be we are

4          still doing this same process this time tomorrow.  So just

5          call that machine and we'll have a message on there for you.

6          And don't talk to anybody else about it.

7                 JUROR ROBINSON:  All right.

8                 THE COURT:  I appreciate you.  Thank you.  Now, tell Mr.

9          Jones that he will be excused and free to go.  Thank you.

10         Then Ms. Parsley.  Ask Ms. Parsley.

11                MR. JUNEAU:  That gives you three.

12                MR. KIZER:  I mean that's number three for me, right?

13                MR. JUNEAU:  Yeah.  Three to three at three o'clock.

14                MR. KIZER:  The bottom of the first.

15                MS. BILLINGS:  Three to three to three.

16                THE COURT:  Hi, Ms. Parsley.  How are you doing?

17                PROSPECTIVE JUROR PARSLEY:  All right.

18                THE COURT:  Just have a seat if you will, please, ma'am.

19         We are continuing here in chambers for the purpose of asking

20         and inquiring of Ms. Bertha Parsley.

21                Ms. Billings, on behalf of the State you may inquire.

22                MS. BILLINGS:  One moment, your Honor.

23                THE COURT:  From what I saw this morning, Ms. Parsley is

24         going to have to hurry to have my sweater finished by Christmas.

25                PROSPECTIVE JUROR PARSLEY:   I've made two potholders

                                      326

Respondent's Exhibit E

1        while I've been waiting.

2                PROSPECTIVE JUROR BERTHA PARSLEY

3    BY MS. BILLINGS:

4    Q    Good afternoon, Ms. Parsley.  My name is Carol Billings and

5    this is Wayne Juneau.   And we are both from the Prosecuting

6    Attorney's office.   We represent the State of Arkansas in the

7    prosecution of this defendant sitting right here, Kenneth Reams.

8    The State has charged Mr. Reams with the crime of capital murder.

9    In order to show you that, Mr. Juneau and I will be putting on

10   witnesses that show you that either this defendant right here or

11   someone acting with him, in this case, a fellow by the name of

12   Alford Goodwin, went to the ATM machine over there at Fifth and

13   Chestnut, and in the course of committing or attempting to commit

14   a robbery, killed a young man by the name of Gary Turner.  We're

15   saying that either he or his accomplice did that.  And that their

16   actions manifested extreme indifference to the value of human

17   life.   That in a nutshell is what Mr. Juneau and I have to prove

18   to you if you are selected to sit on this jury is the charge of

19   capital murder.  Do you understand that?

20   A    Um-hum.

21   Q    Okay.   I don't know if you knew when you came up here this

22   morning that the State was seeking the death penalty in this case.

23   Did you know that?

24   A    No.

25   Q    Did you have any idea that you might be sitting on a case of

                                327

1    that nature?

2    A    I had heard that possibly would have something to do with the

3    death of Gary Turner, but that's all that I really knew.

4    Q    A lot of times people say they don't understand capital

5    murder and the death penalty and so forth. They'll say if someone

6    was killed and they charge him with capital murder, why aren't

7    they seeking the death penalty on him. Have you ever heard people

8    say that? Sometimes, you know, the prosecutor says in the paper,

9    "We will not seek the death penalty, or we will seek the death

10   penalty."

11   A    Yes, uh-huh.

12   Q    Have you ever seen that?

13   A    Yeah.

14   Q    Well, the reason they do that, Ms. Parsley, is because the

15   legislature basically tells us when we can and when we can't seek

16   the death penalty. And in order to seek the death penalty on

17   someone, they have to have committed the murder plus something

18   else. The legislature has seven items that that call aggravating

19   circumstances. In order for us to seek the death penalty on

20   someone, we have to have at least one of those aggravating

21   circumstances. In this particular case, we feel like we have two-

22   -two reasons why this defendant sitting right here (INDICATING)

23   should get the death penalty. Those are, like I said, called

24   aggravating circumstances.

25   A    Um-hum.

4901
Respondent's Exhibit E

1    Q    Mr. Kizer, his attorney, will be presenting to you reasons

2    why he says he shouldn't get the death penalty and those are

3    called mitigating circumstances.   And one of the functions you

4    will have as a juror, if you find him guilty of capital murder, is

5    to come back in a separate part of the trial and determine what

6    the penalty should be.   Either you can give him life without

7    parole or you can give him the death penalty.   Those are your two

8    options.   Those are the two options in any capital murder case.

9         As I said, we have two separate stages to the trial.   In the

10   first one you are just asked to determine whether or not he is

11   guilty of the crime and the second one you determine life without

12   parole or the death penalty.

13        There are three stages that you have in that second phase.

14   You know, I just talked to you about the aggravating circumstances

15   and the mitigating.   Well, first off, one of the things that

16   you'll have to decide in that penalty phase is is there an

17   aggravating circumstances.   Okay.   We'll be putting on proof to

18   show you that we believe that there is.

19        Then you'll have to decide, number two, if the aggravating

20   circumstances outweigh the mitigating circumstances.   Mr. Kizer

21   may have a dozen reasons why he says this man should not receive

22   the death penalty; such as, mental retardation, his youth, that he

23   has other special skills that he could use in prison, this type

24   thing.   Whereas, you'll be asked to weigh those against the

25   reasons why we say he should get the death penalty.   Just the fact

329

Respondent's Exhibit E

1   that he's got 12 and we've got two, numbers don't mean a thing.

2   Do you understand that?

3   A   Um-hum.

4   Q   It's the substance of what those two things are.

5   A   All right.

6   Q   Okay?

7   A   Okay.

8   Q   And you are going to be the one who is going to be asked to

9   weigh those things and decide whether or not you think that it

10  matters whether he is 17 and killed somebody or whether he is

11  retarded and killed somebody.  Which one is more important to you?

12  Those are the things that you are going to be asked to look at.

13  Do you think that you can do that?

14  A   I would think that -- I'm not quite sure.  Are you asking me

15  whether I could decide for a death penalty or against one?

16  Q   No, ma'am, but that was my next question.

17  A   Okay.

18  Q   Do you believe in the death penalty?

19  A   Yes, I believe in capital punishment; yes, I do.

20  Q   There are a lot of people that say, "I believe in the death

21  penalty, but I don't want to be the one that signs that verdict

22  form, and I don't want to be the one that assesses that penalty."

23  Are you one or those or can you do that?

24  A   I believe that I could if the proof was there.

25  Q   Okay.  Well, you understand that you are going to have

330

1    already decided whether or not there has been a capital murder

2    committed by the time you even get to the penalty phase.  Penalty

3    will just be the aggravating and mitigating things that we

4    present.

5    A    Yeah.

6    Q    Okay.  This particular type of case incorporates something we

7    call accomplice liability.  Have you ever heard of that?

8    A    Would you --

9    Q    Like an accomplice in a crime.

10    A    Um-hum.

11    Q    Have you heard that?

12    A    Um-hum.

13    Q    Basically what that means, Ms. Parsley, is that someone aided

14    you in either planning it or committing it, encouraged you to

15    commit the crime, coerced you to commit the crime, any of those

16    things would fit into what we call accomplice liability.  For

17    instance, if two people go to rob a bank, a lot of times one

18    person stays in the car with the motor running so that they can,

19    you know, be the getaway car and the other person goes in and gets

20    the money.  That way it works out better.  They can take off and

21    then get out of there.  Do you feel like both of those are guilty

22    of the robbery?

23    A    Yes.

24    Q    Okay.  They are what the law calls accomplices.  And that's

25    the way the law in Arkansas is written, too.  If you help someone

4904
Respondent's Exhibit E

1    commit a crime, even though you are not the one that pulls the

2    gun, you are an accomplice.

3    A    Um-hum.

4    Q    If you helped them plan it or commit it in any way.  Do you

5    think that's the way the law ought to be?

6    A    Yes, because the person has the option of not taking part.

7    Q    Have you ever sat on a jury before, Ms. Parsley?

8    A    No, I have not.  Basically, because I'm very closely related

9    to law enforcement.  My husband is a retired policeman, and my

10   oldest son is a lieutenant with the police department.

11   Q    I'm sure you've heard a lot from them over the course of the

12   years about different things that have happened, haven't you?

13   A    Yes.

14   Q    But, Ms. Parsley, all we would be asking you to do in this

15   particular case is listen just to the facts and to the evidence

16   that are presented in the courtroom in there.  You know, you can't

17   set aside your common knowledge or you experience in life, no one

18   can do that.  But you can listen -- can you pledge to us that you

19   will make your determination just based on what you hear in there

20   in the courtroom as far as the evidence and the facts?

21   A    I would do the very best that I could.

22   Q    Okay.

23             MS. BILLINGS:  Thank you, ma'am.

24                           CROSS EXAMINATION

25   BY MR. KIZER:

4905
Respondent's Exhibit E

1    Q    Hi, Ms. Parsley.   Let me ask you some questions about the

2    comment you made a few moments ago about your close association

3    with law enforcement.

4    A    Um-hum.

5    Q    Was Lloyd the source of the comment that you made here on the

6    questionnaire that "general conversation about the crime and the

7    results of it"?

8    A    Some and also my daughter-in-law that works for Worthen,

9    we've just discussed the basic information about the incident.

10   Q    Okay.   Have you come into this courtroom today with any type

11   of preconceived idea about the guilt or innocence of Mr. Reams?

12   A    It's very hard to separate what I've already talked about and

13   what will be presented already.

14   Q    You are the only one really that knows the answer to that

15   question because the rest of us can't really fit into your brain.

16   Has the information that you've already received already caused

17   you to draw a conclusion about this matter?   You know, we're all

18   human.   That's not something to be embarrassed about it or

19   something to be ashamed of.

20   A    Um-hum.   Um-hum.

21   Q    It's just something that may happen in any particular set of

22   circumstances.

23   A    Yeah, um-hum.

24   Q    I found out the other day about something happening to one of

25   my kid's schools and that already had me thinking a certain way.

333

Respondent's Exhibit E

1    Of course, when I got to the school, I had a little bit different

2    idea.  Any way, that's something that happens with all of us.

3    A    Um-hum.

4    Q    Is that the way you find yourself?

5    A    Yeah, I'm afraid so.  I -- I don't want anything to interfere

6    with the young man getting a fair and unbiased trial.

7    Q    And you feel like you might be an interference to that if you

8    were chosen to serve on this jury?

9    A    There is a possibility because I'm extremely loyal to family

10   and that has a strong influence as to how I make decisions.

11            MR. KIZER:  That's all the questions I have, your Honor.

12            THE COURT:  Okay.  Thank you, Ms. Parsley.

13            MS. BILLINGS:  Your Honor, I move the Court excuse Ms.

14       Parsley for cause.

15            MR. KIZER:  I join in that movement, your Honor.

16            MS.  BILLINGS:   She  basically  said  she  couldn't  be

17       impartial in this trial.

18            THE COURT:  I didn't attempt to try to rehabilitate her

19       at all.  I suspect that she might could have been based on

20       some answers to some similar questions at previous trials,

21       but it is not worth the effort in this situation.  I will

22       excuse her for cause.  Just tell her, Tommy, if you don't

23       mind, that we respect her answers but because of being too

24       close  to  the  folks  on  the  police  department,  I  kind  of

25       thought  she  would  have  spoken  up  out  there  earlier  this

334

1     morning.  But that's okay.

2          MR. KIZER:  I didn't realize she was Lloyd's mom until

3     we had already gotten in here.

4          THE COURT:  Yeah, that's Mr. Charlie's wife.

5          MR. KIZER:  Your Honor, in light of the hour, may we

6     take a short break?

7          THE COURT:  Yeah, let's take about five minutes.

8     That'll be a good thing to do.

9     (Whereupon, a brief recess was taken at 3:18 p.m., the following

10    proceedings resumed in chambers at 3:31 p.m.)

11         THE COURT:  We are continuing here in chambers for the

12    purpose of inquiring of Mary H. Johnson in this matter as a

13    prospective juror.  Mr. Juneau.

14         MR. JUNEAU:  Thank you, your Honor.

15              PROSPECTIVE JUROR MARY H. JOHNSON

16    BY MR. JUNEAU:

17    Q    My name is Wayne Juneau.  This is Carol Billings.  We are

18    with the State as Prosecuting Attorneys.  Ms. Johnson, I think you

19    have served on a jury before, haven't you?

20    A    (Prospective juror nodding head)

21    Q    How many times?

22    A    Twice.

23    Q    Twice.  Okay.  If I'm not mistaken, on one of those juries,

24    y'all determined guilt or innocence in one phase of the trial and

25    then considered punishment in a second phase of a trial.  Is that

335

Respondent's Exhibit E

1    right.

2    A    (Prospective juror nodding head)

3         COURT REPORTER:   You need to answer outloud for me,

4         please.

5    A    Yes.

6    Q    This is going to be a similar trial.  The other trial you

7    served in, you decided guilt or innocence and punishment at the

8    same time, didn't you?

9    A    We came in and announced the -- you know, we find guilty and

10   then we went back to decide the punishment.

11   Q    Did you do that in both trials?

12   A    No.

13   Q    Was the other trial a criminal trial or a civil trial?

14   A    Civil.

15   Q    Okay.  Well, in this case, Ms. Johnson, we are going to do it

16   in two phases, too, just like the other one.  You will decide

17   guilt or innocence and then you are going to decide punishment.

18   And, of course, you know that we're asking questions now in order

19   to help us, both the State and the defendant, pick a fair and

20   impartial jury.  Okay.

21        You are retired now, are you not?

22   A    I work part time.

23   Q    Okay.  What do you do part time?

24   A    Nursing.

25   Q    And where do you work?

336

1    A    Trinity Village.

2    Q    How long have you been in part-time retirement?

3    A    Two years.

4    Q    Ms. Johnson, are you familiar with the facts of this case in

5    regard to the ATM murder that happened back last summer?

6    A    Only what I read in the newspaper.

7    Q    Near the time that it happened?

8    A    Yeah.

9    Q    Okay.  You've not gotten any opinion, a pre-formed opinion

10    about this case, have you?

11    A    No, sir.

12    Q    Well, the State of Arkansas claims that this man sitting

13    across from you, Kenneth Reams, and another person attempted to

14    rob Gary Wayne Turner at that ATM machine.  And that during the

15    course of that robbery, they killed him.  Do you understand?

16    A    Yes.

17    Q    That's what he is charged with.  That charge is capital

18    murder under the Arkansas law.  We have to prove to you beyond a

19    reasonable doubt, just like in the other trial that you sat in,

20    that this person, Kenneth Reams, was acting by himself or with an

21    accomplice and that they committed or tried to commit a robbery

22    and in the course of that robbery, killed the victim, Gary Wayne

23    Turner.  And that that amounts to extreme indifference to the

24    value of human life.  Do you understand?

25    A    Yes, sir.

337

Respondent's Exhibit E

1    Q    Those are the elements that we have to prove.  If you believe

2    that that happened beyond a reasonable doubt, then he is guilty of

3    capital murder.   Can you consider that evidence and should you

4    decide that beyond a reasonable doubt he committed each one of

5    those elements, could you convict him of capital murder?

6    A    Yes, sir.

7    Q    Okay.  You will hear some testimony that he's 18 now but he

8    was 17 when this happened.  Do you think that his age would have

9    any influence on your decision as to whether he is guilt or

10   innocent of the crime?

11   A    No.

12   Q    Let me make sure that we are clear on this.  We are talking

13   about the guilt phase of the trial at this point and not the

14   punishment.  Okay.  Do you understand that?

15   A    Yes.

16   Q    Are you familiar with the term, "accomplice liability" or

17   have any idea what that might be?

18   A    No.

19   Q    Okay.  Well, let me give you an example.  The same example

20   that we have given everybody that has come through here.  And that

21   is in a, for instance, a bank robbery.  One person goes in and

22   robs the bank, pulls the gun and points the gun and takes the

23   money.  The other person, though, drives the car.  Do you think

24   that the person driving the car is as guilty of the robbery as the

25   person that pulled the gun?

4911
Respondent's Exhibit E

1    A    Yes.

2    Q    And why is that?

3    A    Because they knew what they were doing.

4    Q    Okay.  So they both carry some responsibility--the same

5    responsibility, in fact?

6    A    Um-hum, I think so.

7    Q    And that's the law in Arkansas.  And if you understand or --

8    at some opportunity you'll get to read and the Judge will read to

9    you the jury instruction on capital murder.  And accomplice

10   liability is factored into that.  And I say that because the

11   elements require that you find that this defendant was either

12   acting alone or with an accomplice.  And that's the words that are

13   used.  Okay.  And that he committed or tried to commit an aggra-

14   vated robbery and he or the accomplice killed the person.  Okay.

15   A    Okay.

16   Q    So, I take it from your response that you would be able to

17   determine guilt or innocence or can convict both the person that

18   pulled the gun and also the person that went along with it.

19   A    Yes, sir.

20   Q    Would you have any problem doing that?

21   A    No, sir.

22   Q    Let's move to the second phase of the trial.  This is the

23   punishment part of the trial.  In Arkansas, capital murder, should

24   you convict of capital murder, there are only two punishments.

25   One is life without parole and the other is death by lethal

339

Respondent's Exhibit E

1    injection.

2    A     Okay.

3    Q     Do you understand?

4    A     Yes.

5    Q     Okay.   Would the fact that the death penalty could be

6    involved in this case have any influence on your decision as to

7    the guilt or innocence part of the trial?

8    A     No, sir.

9    Q     You're telling me that you could set aside the penalty part

10   of the trial and just consider the facts as they relate to guilt

11   or innocence?

12   A     Yes, sir.

13   Q     And then you would, in fact, come back and decide the

14   punishment later.

15   A     Yes.

16   Q     When you decide punishment, if we ever get to that point, if

17   you find this defendant, Kenneth Reams, guilty, then you would

18   come back in here and you would have some other things to do, some

19   other factors to find before you could sentence him to death.

20   Okay.

21   A     Okay.

22   Q     You understand that simply finding him guilty of capital

23   murder does not mean he gets the death penalty automatically.

24   A     Right.

25   Q     The things that you are going to have to find and consider

340

4913
Respondent's Exhibit E

1    are called aggravating circumstances and mitigating circumstances.

2    Okay.  The things for the State is aggravating circumstances and

3    things for the defendant is mitigating circumstances.

4    A    I see.

5    Q    The State will -- has alleged, and I believe you will be

6    informed of two aggravating circumstances in this case.    The

7    defendant may raise a number of mitigating circumstances, more

8    than two, I would imagine.  You understand that the sheer number

9    does not -- is not as important as the substance of those allega-

10   tions?

11   A    Yes.

12   Q    And you wouldn't find that the mitigating circumstances

13   outweighed aggravation simply because there were more mitigating

14   circumstances than there were aggravating circumstances?

15   A    No.

16   Q    Well, after you determine aggravation and mitigation, then

17   you have to kind of weigh the two together and determine if the

18   aggravating circumstance outweighs the mitigation.   Okay?

19   A    Yes.

20   Q    That's probably easier said than done, but that's what you

21   have to do.

22   A    I understand.

23   Q    And if you decide mitigation outweighs aggravation, it's over

24   with.   The sentence is life without parole.   Should you decide

25   that the aggravation outweighs the mitigation, then you have to

341

4914
Respondent's Exhibit E

1    determine if that aggravation is sufficient enough to justify the
2    death penalty.
3    A    I see.
4    Q    Okay.  You can see there are a number of steps to go through
5    before you can get to the death penalty.
6    A    Yes.
7    Q    Are you able to go through all of that?
8    A    Yes.
9    Q    Do you have an opinion as -- one way or another as to the
10   death penalty?  Are you in favor of it or against it?
11   A    If it's warranted, then I'm in favor of it.
12   Q    Okay.   In other words, there would be some cases, some
13   circumstances that you feel like would justify the death penalty?
14   A    Yes, sir.
15   Q    And murder would be one of those?
16   A    Yes, sir.
17   Q    Would you have any problem in imposing the death penalty?
18   A    No, sir.
19   Q    When I say impose the death penalty, what I mean is sign a
20   form imposing the death penalty that you find him guilty and you
21   impose the death penalty and then come into the courtroom and look
22   at this man and sentence him to death.  Are you able to do that?
23   A    Yes, sir.
24         MR. JUNEAU:  Pass.
25         THE COURT:  Mr. Kizer.

342

4915
Respondent's Exhibit E

1             MR. KIZER:  Thank you.

2                    CROSS EXAMINATION

3    BY MR. KIZER:

4    Q    Ms. Johnson, how long have you been in this country?

5    A    Since 1954 --

6    Q    How did end up --

7    A    Except for three years out of that time when were stationed

8    in France.

9    Q    Okay.  Was your husband in service?

10   A    He was.

11   Q    And that's how you met him?

12   A    Yes, sir.

13   Q    Did you raise your children here in this country?

14   A    Yes, sir.  Well, they were born in England before I ever came

15   here because he was stationed there five years.

16   Q    All right.  How long have you worked out at Trinity Village?

17   A    Full time, four years; and I was working every other weekend

18   before that when I was working for Dr. Jacks.

19   Q    With regard to the matter that we are here today for, let me

20   ask you a question before I get into the two phases of the trial.

21   Do you believe in redemption for human beings?  I know that you

22   are a Baptist or you say that you attend the Baptist church.

23   A    Yes.

24   Q    Do you believe that human beings have redemption abilities,

25   that they have redeemed themselves of prior acts?

                              343

Respondent's Exhibit E

1    A    I don't know that I've ever reached a definite opinion on

2    that.

3    Q    That's kind of what the Baptist religion is all about, isn't

4    it, redemption?

5    A    Yeah.

6    Q    And you are a believer in that religion?

7    A    Yeah.

8    Q    The case that we are here for today is going to be tried in

9    two different stages.   If we don't -- depending on the outcome of

10   the first stage, we may not even get to the second stage.   And all

11   of this talk about the death penalty and whether you could impose

12   it and whether you believe in it or not and all of that sort of

13   thing may be premature.   Do you understand that?

14   A    Yes, sir.

15   Q    This is just the only chance the lawyers have to talk to you

16   about this matter and it may be that we don't even talk about it

17   all when it comes time for the trial.   But, because it is a

18   possibility, we need to explore what your feelings are about it as

19   it stands right now.   Do you understand that's why we're doing

20   this?

21   A    Yes, sir.

22   Q    The cases that you have sat in on before where at least one

23   or was it two criminal cases?

24   A    One.

25   Q    And the trial was required to you, I think Mr. Juneau said,

344

Respondent's Exhibit E

1    to make the deliberation along with your other jurors on guilt or

2    innocence and then if you return a vote of guilty, go back and the

3    second stage and decide the sentence.  Is that correct?

4    A    Yes.

5    Q    Well, this trial will be somewhat of the same way.  Did you

6    have what's called lesser included offenses--lesser included

7    charges that you could consider with the other trial that you were

8    involved in?

9    A    We were told, you know, how much fine we could impose and how

10   many years.

11   Q    Okay.  Well, did the Court also tell you, that particular

12   case may not have had it, they are not applicable in every case,

13   but I believe they will be in this one.  That there is -- there

14   are several options that you will always have, well, not always,

15   but you will in this case, as a juror, in the guilt or innocence

16   phase.  You will have an option to find the defendant guilty of

17   capital murder just like what he is charged with.  You will also

18   have an option to find him guilty of a lesser charge.  If you

19   don't feel like the State has proven capital murder, you could

20   find him guilty of first degree murder, or, likewise, you could

21   find him guilty of manslaughter.  Or you might find him not even

22   guilty of anything at all.  Do you understand you have those

23   options?

24   A    Yes, sir.

25   Q    That's within your discretion as a juror.  Do you feel like

345

Respondent's Exhibit E

1   that you can exercise that discretion when the appropriate time

2   comes?

3   A    Yes, sir.

4   Q    Do you understand that the concept of the trial is that you,

5   as a juror, are the judge of the facts?   Judge Davis, as the

6   Court, he's the judge of the law.  He will instruct you as to what

7   the law is at the end of the case and you make both of them come

8   together for some type of decision to be reached.

9   A    Yes.

10  Q    Do you understand that?

11  A    Yes.

12  Q    And it is entirely within your purview as one of 12 jurors to

13  make your mind up about what decision is the appropriate one given

14  the weight of all of the evidence.

15  A    Yes, sir.

16  Q    Is that a task that you believe that you can handle?

17  A    I think so, yes, sir.

18  Q    Are you telling me then that you will listen to the evidence

19  and make your decision based on the evidence as you believe it

20  applies to the law in the case?

21  A    Yes, sir.

22  Q    I believe that's all that any of us can ask for in any

23  criminal proceeding.  Do you understand in the guilt or innocence

24  phase that there are certain laws?   I call them constitutional

25  safeguards just to lump them into one category.  But they are all

346

4919
Respondent's Exhibit E

1    separate and distinct from one another.  Do you understand, for

2    example, that a defendant in a criminal case is presumed to be

3    innocent?   When we walk out in the courtroom and start the

4    proceedings, there is a presumption of innocence.   It is here

5    right now with Kenneth Reams, but it will be also when we go out

6    into the courtroom.

7    A    Yes, sir.

8    Q    Do you understand that?

9    A    Yes, I do.

10   Q    We borrowed that from Great Britan, by the way.  The second

11   thing that we have is the State has the burden of proof of all of

12   the elements of the particular charge.   In other words, this

13   defendant doesn't have to prove anything in a guilt or innocence

14   phase of a trial.  Do you understand that to be the case?

15   A    Yes.

16   Q    Finally, he may or may not take the witness stand.  I don't

17   know yet.  That will be my decision whenever the appropriate time

18   arises, and if he does not -- and I'm not saying that he will or

19   won't, but if he does not, do you understand you will not be able

20   to consider that?  Indeed, the Judge will instruct you you may not

21   consider that when it comes time to deliberate and reach a

22   decision.

23   A    Yes, sir.

24   Q    Okay.  Are you familiar with this Worthen ATM machine at

25   Fifth and Chestnut?

347

1    A    I don't use one.  I was instructed when they first came out,

2    but I've never used one.

3    Q    Okay.  But do you know where the location is of this particu-

4    lar one --

5    A    Yes, I do.

6    Q    Pass by it and that sort of thing?  Does -- when it comes

7    time for you to consider, if we reach that portion of the trial,

8    this will be second trial, if you will, the guilt or innocence

9    phase, the State will offer certain types of evidence and the

10   defense will also.  And it will be a lot different evidence than

11   what is normally presented in a criminal proceeding.  It'll have

12   to do, a lot of time, with the life of this young man right here.

13   Will you consider the full range of possibilities because the

14   Court's going to tell you -- we've already drafted the jury

15   instructions.  There are quite a number of choices that you have

16   to consider as far as mitigating versus aggravating circumstances.

17   Will you consider all of those before imposing any type of

18   punishment in this matter?

19   A    Yes, sir.

20   Q    Do you understand it doesn't necessarily follow that, you

21   know, a lot of times you hear where there is smoke there is fire?

22   Well, it doesn't necessarily follow that just because someone is

23   found guilty of capital murder that they automatically get the

24   death penalty.  That's for you as a juror to determine.  And it

25   may be that it is more appropriate for life without parole.  Would

Respondent's Exhibit E

1    you consider that?

2    A    Yes, sir.

3    Q    Do you feel like that you are someone who is strong enough in

4    their beliefs and convictions that you will vote your conscience

5    and not be swayed or run over necessarily by a stronger juror who

6    may have a different feeling about you?

7    A    Definitely.

8              MR. KIZER:  That's all the questions I have, your Honor.

9              MR. JUNEAU:  Nothing further, your Honor.

10             THE COURT:  Thank you, Ms. Johnson.  I'll let you to

11        step aside for a moment, please, ma'am.

12             MR. JUNEAU:  Good.

13             MR. KIZER:  We have four.

14             THE COURT:  Okay.  Excused by the defendant.  Tell Ms.

15        Johnson she is excused --

16             MR. KIZER:  No, I said we have four meaning we have four

17        jurors.

18             THE COURT:  I thought you meant you have four.

19             MR. KIZER:  No, I apologize.

20             THE COURT:  I misread your signal.  Let her step back in

21        and I'll give her that little cautionary instruction.

22             MR. KIZER:  Your Honor, we're going to get -- I'm going

23        to use one of my strikes on Mr. Fox.

24             THE COURT:  Okay.  Ms. Johnson, congratulations.  These

25        folks think that you would be just an excellent juror in this

349

Respondent's Exhibit E

1    matter and they have selected you to be a member of our jury

2    panel and try this case.  There is no sense of your just

3    sitting around the rest of the day because we obviously have

4    to go through this process to get eight more jurors and a

5    couple of alternates.  So, I'm going to let you go on home or

6    back to your place of employment or whatever you want to do.

7    I cannot tell you, as you obviously have seen how the process

8    goes, when we'll be completed with this process.  But I want

9    to do two things.  One, I'm going to caution you because

10   you've noticed some of the media down here covering the

11   trial, not that there is anything of any substance that has

12   gone on that they could report, but you never know.  So, I'm

13   going to ask you to avoid any news accounts, either written

14   or on television or radio or whatever.  Just avoid that to

15   avoid the appearance.  Don't discuss the case with anybody

16   else other than to tell your employer and your spouse that

17   you have been selected.

18        Now, what we're going to try to do is, hopefully, by

19   this evening have a better picture of where we are in the

20   selection process and when we need you back.  So, we've

21   gotten that telephone answering machine installed and if you

22   would jot down that number that we put on the board, I'll

23   have a little message on there for you by 8 o'clock tonight

24   or so.  I figure we'll be far enough along we can certainly

25   have it ready for you to listen to by then.  And I'll let you

350

4923
Respondent's Exhibit E

1    know then on that machine when we think you need to be back.

2    So if you would not discuss the case and check with that

3    answering machine, and if there is any problem with it, you

4    call me at home.  If the machine doesn't work -- it's a brand

5    new machine.  So, if it doesn't work, you call me at home.

6    Okay.

7          JUROR JOHNSON:  Thank you, your Honor.

8          THE COURT:  Thank you.  Mr. Hornsby--Bruce Hornsby.  Mr.

9    Hornsby, have a seat, please, sir.  Continuing here in

10   chambers for the purposes of inquiring of Mr. Bruce E.

11   Hornsby.  Ms. Billings.

12          PROSPECTIVE JUROR BRUCE E. HORNSBY

13   BY MS. BILLINGS:

14   Q    Good afternoon, Mr. Hornsby.  My name is Carol Billings and

15   this is Wayne Juneau.  We both work for the Prosecuting Attorney's

16   office.  We are representing the State in this particular case.

17   We have charged the defendant sitting right here (INDICATING),

18   Kenneth Reams, with the crime of capital murder.  I don't know if

19   you knew it when you came in here this morning, but I feel like

20   you probably know it by now.  We are seeking the death penalty in

21   this case.  Did you know that?

22   A    No.

23   Q    Okay.  In capital murder cases, there are two penalties that

24   you can assess.  One is life without parole and one is the death

25   penalty.

351

Respondent's Exhibit E

1    A    Um-hum.

2    Q    Those are unique to capital murder cases.  In this case, we

3    are saying that Kenneth Reams, either by himself or with another

4    person, and in this particular case, he did act with another

5    person by the name of Alford Goodwin.  They went to the ATM

6    machine on Fifth and Chestnut there and in the course of commit-

7    ting a robbery on Gary Turner, killed Mr. Turner.  We're saying

8    that those -- the circumstances that they did that under manifest-

9    ed an extreme indifference to the value of human life--their

10   actions.  That's basically what Mr. Juneau and I have to show you

11   when this trial gets started if you are selected.  Do you under-

12   stand that that is what we'll be doing?

13   A    Um-hum.

14   Q    As I said, Mr. Hornsby, there are two possible punishments,

15   life without parole or the death penalty.  In a capital murder

16   case, and this, again, is unique really to a capital murder case -

17   - well, no, it's not.  But, any way, in this particular case, we

18   look at the crime itself in the guilt phase of the trial, just

19   whether or not they committed the crime.  Okay.  Then we have a

20   second phase that is called the penalty phase.  You find him

21   guilty of capital murder, then we go on to the penalty phase.  If

22   you find him not guilty of capital murder, well, then, the trial

23   is over and we all go home.  Okay.  But if you find him guilty of

24   capital murder, then we go into the penalty phase.  And in that

25   phase, you will be asked to look at what we call aggravating

4925
Respondent's Exhibit E

1    circumstances and weigh them against mitigating circumstances.  I

2    know a lot of times people say, "Well, why is the State not

3    seeking the death penalty in a particular case?  You know any time

4    somebody is charged with capital murder you have to seek the death

5    penalty."  That's not true.  In fact, we are very limited in the

6    times that we can seek the death penalty.

7    A     Um-hum.

8    Q     The legislature sets these out.  There are seven different

9    items that if we can find one of those that applies to a particu-

10   lar case, then, perhaps, we can seek the death penalty.  In this

11   case, we feel like there are two aggravating circumstances--

12   reasons why Kenneth Reams should be given the death penalty

13   instead of life without parole.  And, like I said, those are

14   called aggravating circumstances.

15         Mr. Kizer, his attorney, will be offering you reasons why he

16   says he should not be given the death penalty.  These are called

17   mitigating circumstances.  I don't know if you have ever heard of

18   either one of those terms.

19   A     Um-hum.

20   Q     Most people haven't.

21   A     I have.

22   Q     And you would be asked in this penalty phase of the trial to

23   jump through basically three hoops.  Okay.  The first one would be

24   to determine whether or not the aggravating circumstances that we

25   are alleging exist.  Okay.  If you find that they do not, the

353

Respondent's Exhibit E

1    trial is over.  He get life without parole and everybody goes

2    home.  If you find that they do exist, then you will be asked to

3    weigh those aggravating circumstances against the mitigating

4    circumstances.  Mr. Kizer may have a number of mitigating circum-

5    stances.  I've already told you we have two aggravating.  We feel

6    like those will outweigh the mitigating.  He may have a dozen of

7    those.  And we're going to ask you to look at the substance of

8    those mitigating circumstances that he is saying are reasons why

9    he should not get the death penalty.

10   A    Um-hum.

11   Q    And weigh those against the substance of what we're saying

12   are aggravating circumstances.  These mitigating reasons he may

13   offer you might be retardation, youth of the defendant, that he

14   has special skills that he could use in prison.  These types of

15   things.  We're going to ask you to weigh how much you think those

16   should factor in to whether or not he should get the death

17   penalty.

18        Then in the last step of that three-pronged -- those three

19   prongs, you will be asked to determine if the aggravating circum-

20   stance, if you find that they outweigh the mitigating, if they

21   warrant the death penalty in this case.  So you've got to do three

22   things before you can give the death penalty.  Do you understand

23   that?

24   A    Yes.

25   Q    Okay.  I need you to be very frank with us and tell us how

354

Respondent's Exhibit E

1    you feel about the death penalty.

2    A    I don't -- I don't have anything against it.

3    Q    You don't have anything against it?

4    A    No.  No, I don't.

5    Q    Could you impose it in a case?

6    A    Yes, I could.

7    Q    A lot of people say that they believe in it.

8    A    Um-hum.

9    Q    And you say that you can impose it, that that wouldn't be an

10   impediment for it, that you could actually do that?

11   A    Yes, ma'am, I could.

12   Q    Okay.  Because you are going to be asked, if you find that

13   the circumstances all exist, to sign a verdict form.  Each person

14   is going to be asked to sign their name on there and walk back out

15   into the courtroom, basically, and look at Kenneth Reams and tell

16   him, "I believe you deserve the death penalty for what you did."

17   Do you feel like you can do that?

18   A    Yes, ma'am.

19   Q    As a part of capital murder in this case, there is an element

20   called accomplice liability.  Have you heard of that before?

21   A    Yes, ma'am.

22   Q    Do you understand what it is?

23   A    Not exactly.

24   Q    Okay.  It is any time you aid or encourage or help someone

25   commit or plan a crime.

355

Respondent's Exhibit E

1   A      Okay.

2   Q      You can be held as liable as they are for committing that

3   crime.

4   A      Okay.

5   Q      Do you feel like in a murder case that a person could be as

6   liable as another one even though they didn't pull the trigger?

7   A      Yes, I do.  I really do.

8   Q      Let me give you a scenario.

9   A      Um-hum.

10  Q      If two people are committing a bank robbery and one is the

11  driver of the car and one goes in and actually pulls the gun on

12  someone and grabs the money and runs out, both of them couldn't

13  have gone in and held the gun, could they?

14  A      No, they couldn't.

15  Q      But are they just as guilty as each other?

16  A      One is just as guilty as the other.

17  Q      And that's the way Arkansas law says it should be, Mr.

18  Hornsby.  Do you agree with that?

19  A      Yes, I do.

20  Q      Have you served on a trial before, sir?

21  A      Yes, ma'am.

22  Q      One thing, Mr. Hornsby, I want to make sure that everybody

23  understand this.  Just because you find someone guilty of capital

24  murder does not mean that they automatically get the death

25  penalty.  You need to understand that.

356

Respondent's Exhibit E

1   A    I understand that.

2   Q    That's going to be separate and apart.

3   A    Yes, ma'am.

4   Q    And reservations you have about that can be decided in the

5  penalty phase.

6   A    That's right.

7          MS. BILLINGS:  Thank you, sir.

8          THE COURT:  Mr. Kizer.

9          MR. KIZER:  Thank you, your Honor.

10                CROSS EXAMINATION

11  BY MR. KIZER:

12   Q    Mr. Hornsby, the medication that you put down here that you

13  are taking, what basically is this medication for?

14   A    The Trandate and Vesitake is high blood pressure medication

15  and the Ibuprofen is for arthritis.

16   Q    Okay.  Either one of them impair your senses or get in the

17  way of you being --

18   A    No.

19   Q    Able to stay alert and awake and all that stuff?

20   A    No.

21   Q    You had indicated in your questionnaire that you have read

22  something about this matter in the newspaper.  Can you give me an

23  idea what you read?

24   A    Only that the incident did happen at the ATM machine and

25  that's basically it.

4930
Respondent's Exhibit E

1   Q    Okay.  Have you read anything about the -- there have been

2   several articles in the paper in the last month.

3   A    No.

4   Q    The process to be gone through in this matter is just like

5   what you've gone through in other trials up to a certain point.

6   A    Um-hum.

7   Q    Only if a verdict of guilty on capital murder is returned

8   will the second issue even arise.  And that second issue will be

9   litigated through a separate trial.  And in that trial, you will

10  have two options.  Only if, however, a number of different things

11  occur will we ever even get to that point.

12  A    Um-hum.

13  Q    So, do you understand that while we're talking about the

14  death penalty, this is just our only opportunity to discuss this

15  matter with you?  We may not even get to it.

16  A    That's right.

17  Q    In the -- if we do get to it, would you consider the full

18  range of evidence that is presented to you and only after you have

19  heard all of the evidence make up your mind whether you believe

20  the appropriate punishment would be life without parole or whether

21  you would believe it would be the death penalty?  The two options

22  that you will have will be governed -- in other words, you will be

23  given a road map by the Court of how you get to that conclusion.

24  And the evidence that will be presented by the State will offer

25  you one direction.

4931
Respondent's Exhibit E

1    A    Um-hum.

2    Q    And the evidence offered by the defense will offer you yet

3    another.  And that's what those scales of justice are all about.

4    It's for the jurors to weigh in the balance what would be the

5    appropriate decision.  Do you have a problem with doing that?

6    A    Oh, no.

7    Q    With regard to the case that is going to be originally

8    presented, all of the matters that you heard before, and I believe

9    I've argued a case that you've been on the jury with, they all

10   still apply here: the constitutional safeguards, the burden on the

11   State, all of those factors.  And at the conclusion of the State's

12   case, you will be asked to make a decision where you will have

13   several options there also.  And that every step of the way you

14   will be asked to give -- to utilize your discretion, so to speak,

15   as a juror.

16   A    Um-hum.

17   Q    Do you feel as though, based on your prior experience as a

18   juror and your personality and your predelictions, that sort of

19   thing, that you are someone who will vote your conscience as to

20   what you honestly believe to be the right thing to do under the

21   circumstances?  My reason for asking that is other jurors may try

22   to put pressure on you to do what they feel to be right.  But do

23   you think you are the type person who will do what you, in your

24   heart, believe to be right under the circumstances?

25   A    Yes.

4932
Respondent's Exhibit E

1   Q    The other thing we are -- the State and the defense is
2   looking under the best of circumstances for a level playing field,
3   someone who will be fair and impartial and make a decision.   If
4   you have ever seen the scales of justice, the lady is blindfolded.
5   A    Um-hum.
6   Q    There is a reason for that.  Can you look at this case under
7   those -- with that same type of impartiality that the scales of
8   justice depict?
9   A    Yes.
10  Q    The lawsuit that you made reference to in your questionnaire
11  versus Southwestern -- St. Louis Southwestern Railroad, was that
12  for an injury you may have received?
13  A    No.
14  Q    Someone else in your family --
15  A    No.
16  Q    Someone that you may have been caught --
17  A    I testified in a lawsuit against the railroad in behalf of
18  another man.
19  Q    Was that Clarence Bruin?
20  A    Clarence Bruin.
21  Q    Okay.  The Prosecution discussed with the concept of accom-
22  plice liability.  And while I don't dispute their definition of
23  what the Arkansas law is, at every step of the way in the determi-
24  nation of accomplice liability, again, you are given a range of
25  discretion.  It will be up to you to decide whether the charge

360

Respondent's Exhibit E

1    against Mr. Reams includes him being a principle or whether it

2    means being an accomplice.   And it will also be up to you to

3    decide, if you do determine that he is guilty of the charge, what

4    his role was so that it justifies one way or the other what the

5    punishment is.   What I'm getting to is, have you ever heard the

6    phrase, "make the punishment fit the crime"?

7    A    Sure.

8    Q    Okay.   That is the goal, I would submit to you, that we are

9    all after if, indeed, that is the case.

10   A    Um-hum.

11   Q    Is that something that you will consider the full range of

12   what those punishments are?

13   A    Yes, sir.

14   Q    Because that includes on capital murder, life without parole

15   as well as death and if it is on a lesser charge, then it will be

16   a range of punishment versus a range of punishment and a fine.

17   A    Yes, sir.

18        MR. KIZER:   That's all the questions I have.

19        THE COURT:   Anything further from the State?

20        MR. JUNEAU:   No.

21        THE COURT:   Thank you, Mr. Hornsby.   I'll let you step

22        outside for a moment, please, sir.

23        MS. BILLINGS:   Good, your Honor.

24        MR. KIZER:   Good for the defense.

25        THE COURT:   Okay.   Ask him to step back in for just a

361

Respondent's Exhibit E

1      second.   Mr. Hornsby, congratulations.   These folks think
2      that you would be a good juror to sit on this case.   You have
3      been selected.   Obviously, we're not anywhere through with
4      this process right now.   There is no sense of you sitting
5      around like you have the rest of the day.   So we're going to
6      excuse you to go about your business for a while.
7            Now, I want to do two things.   One, I want to let you
8      know how to get back in touch with us to figure out when to
9      be back.   Obviously, we don't know right now.   But we've got
10     that answering machine in place and we'll have a message on
11     there tonight.   Copy that number down that is on the board
12     and call sometime after 8 o'clock or so tonight and we'll
13     have a little better idea on when for you to be back.
14           The second thing I want to do is caution you about,
15     certainly, not discussing the case with anybody and avoid any
16     media.   We've seen some of folks from the media up here
17     today.   Not that there is anything that they could have
18     really gleaned in terms of substantative facts about the
19     case, but you just never can tell.   So, let's just avoid that
20     to avoid any kind of problem.   Just don't -- obviously, you
21     are going to have to tell your employer and your family where
22     you are, but don't discuss or look at any or listen to or
23     read any news accounts of it.   Check with the machine and
24     we'll know a little bit more about when to ask you to be
25     back.   I appreciate it.   Thank you.

362

4935
Respondent's Exhibit E

1          THE COURT:  Mr. Fox.

2          MR. KIZER:  I'm going to excuse Mr. Fox, your Honor.

3          THE COURT:  We can excuse Mr. Fox.  Tell Mr. Fox thank

4     you.  He is free to go and ask Mr. Garman to step in.

5          MR. KIZER:  Can we discuss him for just a moment?

6          THE COURT:  Just a second.

7          MR. KIZER:  Has the Court had any previous dealings with

8     Mr. Garman?  He lists his occupation as a mental disability.

9          THE COURT:  Excuse me.  Let's see.

10         THE CLERK:  I've known him since he was a young man.

11         THE COURT:  Howard Garman.

12         MR. KIZER:  On the general questionnaire that's down in

13    the clerk's office, what he listed is --

14         THE COURT:  He's disabled.  He's served before, hasn't

15    he?

16         THE CLERK:  I had to help him -- Darla and I both --

17         THE COURT:  He's the gentleman that left his glasses at

18    home today.  He's --

19         MR. KIZER:  It says, "mental disability."  And I was

20    just kind of curious.

21         THE COURT:  It's -- I think I heard him telling Darla

22    about that.  We need to ask him about what he is on.  Well,

23    let's just ask him about that.  I don't know what it was.  I

24    don't know that I know enough to tell you whether he is okay

25    or not okay.  But I think he has served before, hasn't he, on

                                363

Respondent's Exhibit E

1     some juries?  He's served on a couple of different juries and

2     apparently didn't have any problems.  He remembered to bring

3     his glasses on those days.  Let's just -- we'll make sure we

4     inquire about him -- of him about that.

5          Now, you do want to excuse Mr. Fox?

6          MR. KIZER:  Yes.

7          THE COURT:  Mr. Fox.  That will be number four for the

8     defense.  And ask Mr. Garman to step back.  Howard E. Garman.

9     Hi, Mr. Garman, do you want to come around and have a seat

10    over here, please, sir.  We are continuing in chambers for

11    the purpose of inquiring about or of Mr. Howard E. Garman as

12    a potential juror in this matter.  Mr. Juneau.

13         MR. JUNEAU:  Thank you, your Honor.

14              PROSPECTIVE JUROR HOWARD E. GARMAN

15    BY MR. JUNEAU:

16    Q    Hello, Mr. Garman.  My name is Wayne Juneau and this is Carol

17    Billings.  We are with the Prosecuting Attorney's office.  Mr.

18    Garman, I know that you have served on a couple of juries before,

19    have you not?

20    A    Yes, I have.

21    Q    We are looking at your questionnaire that you filled out

22    today and under the occupation part of the questionnaire you've

23    got that you are disabled?

24    A    Yes, sir, I am.

25    Q    Could you tell us the nature of that disability?

364

Respondent's Exhibit E

1    A    Well, I have a mental disability.  I have a history of mental

2    problems dating back to probably 1974.  And I've been on medica-

3    tion since 1975.  I've experienced audio, visual hallucinations or

4    delusions as defined by the doctors.  And I also had closed my

5    eyes and sometimes I had visual pictures coming in color.  And the

6    last six years, the last -- it's been a little bit over five

7    years, I've been treated by Dr. James at the mental health center.

8    And he's put me on medication that I'm on now.  And it's -- it's

9    helped more than any of the other medications that I've been on

10   throughout the years.

11   Q    Okay.  When was the last time that you had had one of these

12   hallucinations?

13   A    Oh, I've had some frequently.

14   Q    You continue to have them even though you are on medication?

15   A    No, frequently is the wrong word.  I have had some.  But not

16   frequently is what I meant to say.

17   Q    Okay.  Do you still have them from time to time on this

18   medication that you are on?

19   A    Not very often, but a lot less than when I was on the other

20   medication.

21   Q    You've served as a juror on two other cases.  Did you have

22   any problems as a juror?

23   A    No.

24   Q    You were able to listen to the evidence and come to a

25   conclusion on those cases?

Respondent's Exhibit E

1   A    Yes.

2   Q    The reason I asked you that, it's important -- very important

3   in this case because this is a capital murder case.  You may be

4   aware by now that the State is asking for the death penalty.

5           MR. KIZER:  Your Honor, may we take up something out of

6        his hearing for just a moment?

7           THE COURT:  Okay.  Mr. Garman, let me ask you to step

8        outside and we'll be right back with you.

9           MR. KIZER:  I just wanted to let you know.  I want to go

10       ahead and short circuit this.  I'll excuse him based on his

11       responses and the questionnaire.  That way we don't have to

12       waste any more time.

13          THE COURT:  Okay.  All right.  Just tell Mr. Garman that

14       we'll excuse him for this case and ask Ms. Hall to step in.

15          We are, again, in chambers for the purpose of inquiring

16       of Ms. Syble Louise Hall for purposes of determining whether

17       or not she'll be selected as a juror in this case.  Ms.

18       Billings.

19               PROSPECTIVE JUROR SYBLE LOUISE HALL

20   BY MS. BILLINGS:

21   Q    Hi, Ms. Hall.

22   A    Hi.

23   Q    My name is Carol Billings and this Wayne Juneau.  We're both

24   from the Prosecuting Attorney's office.  We represent the State in

25   this particular case.  We have charged the defendant sitting here,

366

4939
Respondent's Exhibit E

1    Kenneth Reams, with the crime of capital murder. And in order to

2    show you that, we have to prove that he, by himself or with

3    another person, and in this case there was another person by the

4    name of Alford Goodwin, went to the ATM over there on Fifth and

5    Chestnut and in the course of committing a robbery, killed a man

6    by the name of Gary Turner. And that we are saying that their

7    actions in doing that manifested extreme indifference to the value

8    of human life. That's basically what Mr. Juneau and I will be

9    trying to show you. That crime is called capital murder. Do you

10   understand that charge?

11   A    Yes, I do.

12   Q    Okay.  Ms. Hall, in a capital murder case, there are two

13   possible punishments. One of those is life without parole. The

14   other one is the death penalty. Were you aware today when you

15   came or have you heard since you have been out there that we are

16   seeking the death penalty in this case?

17   A    No, I didn't know that you were.

18   Q    Okay. I guess we can cut through a lot of things right now.

19   Can you give me your honest opinion about the death penalty? How

20   do you feel about it?

21   A    I believe in it.  I think it would stop a lot of this crime

22   if we have the death penalty.

23   Q    Okay. A lot of people say that they believe in it, Ms. Hall,

24   but they don't want to be the ones that imposes it. Are you one

25   of those people?

367

1    A    Yes, ma'am.

2    Q    Could you impose it?

3    A    Yes, ma'am.

4    Q    The reason I asked that is because if we get to the stage

5    where that becomes important, there will be blank on the page for

6    each one of the jurors to sign their name and basically you'll be

7    having to walk back out in the courtroom and look at this man and

8    tell him that you believe that he deserves the death penalty for

9    this murder.  Could you do that?

10   A    I think he would if he killed the man like they did.

11   Q    Okay.  This crime, like you just said, "like they did."  It

12   incorporates the term called, "accomplice liability."  Have you

13   ever heard of that?

14   A    Yes, um-hum.

15   Q    Are you familiar with what that is?

16   A    Well, I don't know if I really am or not.  I think I am.  But

17   I'm not sure.

18   Q    Well, let me just cover it for you.  It's probably what you

19   were already thinking any way.  But when someone helps you commit

20   a crime, they either aid you in planning it or committing it or

21   they encourage you to do it, they help you out in some manner--

22   actively take some part in your committing that crime, that is

23   called -- you are accomplice at that point.  And you, under

24   Arkansas law, are just as guilty as the other person.

25   A    I believe that.

4941
Respondent's Exhibit E

1    Q    You agree with that?

2    A    Um-hum.

3    Q    Okay.   An example of that would be if two people were

4    committing a bank robbery.  One of them, to make it work out

5    right, would probably need to sit out there in the car with the

6    motor running and the other one go in and get the money.

7    A    I think he's just as guilty.

8    Q    And that's what we are alleging in this case, too, Ms. Hall,

9    that there were two, and it took two to tango in this case.

10   A    Um-hum.

11   Q    This -- all capital murder cases are divided into two stages.

12   The first thing you will be asked to look at is whether or not he

13   is guilty of capital murder.

14   A    Um-hum.

15   Q    And if I show you that he was an accomplice to this, you've

16   already told me that you could find that he was guilty of capital

17   murder.

18        The second stage would be a penalty phase.   And in that

19   stage, you would decide -- you would hear more evidence, reasons

20   why we believe that he deserves the death penalty, reasons why Mr.

21   Kizer says he should not get it in this case.   Okay.   Those

22   reasons why we believe that he should get it are called aggravat-

23   ing circumstances.   A lot of people -- when someone is killed,

24   they say, "I don't understand why the State is not seeking the

25   death penalty."  Have you ever heard people say that?

4942
Respondent's Exhibit E

1    A     Um-hum.

2    Q     Well, it's because the law is written so that you have to

3    kill someone plus have something else before we can seek the death

4    penalty.  The legislature has lined out seven things that they say

5    we have to be able to show one of those things plus the fact that

6    someone was killed before we can seek the death penalty.  Those

7    seven things are called aggravating circumstances.  And we are

8    alleging that two of those existed in this particular case.  There

9    are two reasons that we know of that he should get the death

10   penalty.  Okay.

11   A     Um-hum.

12   Q     And the mitigating circumstances, well, there can be a dozen

13   of them.  But what you are going to have to -- and they would be

14   things such as his youth.  Do you feel like a person is responsi-

15   ble for their actions at 17 or 18 years of age?

16   A     I believe so.

17   Q     Some of the other things that they might present to you as

18   reasons why they say he shouldn't get the penalty might be his

19   mental ability, retardation or that he has particular skills that

20   he could use in prison.  These are the things that they will be

21   presenting as mitigating circumstances.  What you are going to be

22   asked to do in that penalty phase is determine, number one, if we

23   have shown that there is an aggravating circumstance.  Because if

24   you can't find that we show that there is an aggravating circum-

25   stance, you cannot give him the death penalty.  We couldn't do it.

370

Respondent's Exhibit E

1    You can't do it.   Okay.   You would -- you would just find him
2    guilty and the Judge would sentence him to life without parole.
3    So you have to find that aggravating circumstance first.   Then you
4    have to weigh those aggravating circumstances against the mitigat-
5    ing one.   And just because he's got a dozen mitigating ones and
6    we've only got two aggravating, numbers don't mean a thing.   Do
7    you understand?
8    A    Um-hum.
9    Q    It's the substance of what those two things are.
10   A    Um-hum.
11   Q    He may have a dozen and you may say, "Well, that doesn't
12   excuse this crime."   Okay.   Or he may have a dozen and you say,
13   "That does excuse his crime."   If you say that, the trial is over.
14   His sentence is life without parole.   But if you say that doesn't
15   excuse this crime, then we go to the third step and you determine
16   whether in this case you believe the aggravating circumstances
17   warrant the death penalty.   There are a number of things and steps
18   that you have to go through before you can give someone the death
19   penalty.   Do you understand that?
20   A    Yes, I do.
21   Q    Do you have any questions so far about what I have laid out
22   for you?
23   A    No.
24   Q    Our burden in this case just like it is any other case, Ms.
25   Hall, is beyond a reasonable doubt.

371

Respondent's Exhibit E

1    A    Um-hum.

2    Q    You know sometimes attorneys throw out things out there that

3    you -- that -- they say, "Well, what about this?  What about that?

4    What about this?"   You have to determine yourself if those are

5    reasonable things -- reasonable doubts that you would have about

6    whether or not he committed the crime.

7    A    Um-hum.

8    Q    The Judge is going to read you an instruction at the end of

9    the trial if you are selected that says, "If you have an abiding

10   conviction of the truth of the charge, then you can find him

11   guilty."

12   A    Um-hum.

13   Q    Whether you believe it or not.   That's basically what it

14   comes down to.   Okay.   And it's the same burden proof if we had a

15   lawn mower case here today--a stolen lawn mower.   That's the same

16   burden that we have in all criminal trials is showing -- if you

17   believe the evidence is true, then you can find -- vote for a

18   guilty verdict.

19   A    Um-hum.

20   Q    Would you have a problem with sitting in judgment on someone?

21   A    I don't think so.

22   Q    And you do understand, Ms. Hall, that there are two separate

23   parts to this trial.   The first part is just where you decide

24   whether or not he is guilty and then the second part is where you

25   can take into consideration other things as to what his punishment

372

1    should be.

2    A    Um-hum.

3          MS. BILLINGS:  Thank you.

4          THE COURT:  Mr. Kizer.

5          MR. KIZER:  Thank you.

6                      CROSS EXAMINATION

7    BY MR. KIZER:

8    Q    Ms. Hall, you seem to be real quick to answer the question a

9    few minutes ago that you believe in the death penalty.

10   A    I do.

11   Q    Okay.  And your reasoning was that you believe that it would

12   do something to stop crime.

13   A    Help society.  I certainly do.

14   Q    Have you followed with any interest over the past few years

15   the cases where the State of Arkansas has actually put people to

16   death--seen it in the newspaper and on television?

17   A    Um-hum.

18   Q    Did you happen to notice by any chance when the last gentle-

19   man was put to death, it had been followed by the newspapers and

20   by TV for a couple of days leading up to the event that on the day

21   after he had been put to death, it was reported in the paper right

22   below the article about his death that two more murders were

23   committed.   It was right on the front page of the Arkansas

24   Gazette.  Did you happen to see that by any chance?

25   A    I don't believe I remember that.

                              373

Respondent's Exhibit E

1    Q    Well, if that was the case -- okay.  Let's just say that --

2    take it on faith that that was the case.  I'm kind of curious as

3    to why you think that, the death penalty, prohibits crime.  Why

4    would it help stop crime?

5    A    I just think we're too loose with our laws.  I think these

6    people think they can do anything, go to prison and get out on

7    parole in a few years and they've got it made.

8    Q    Okay.

9    A    I think if we had a few more death penalty sentences that

10   that would stop some of that.  I really do believe that.

11   Q    Let me ask you this.  The range of punishment if a defendant

12   in a capital murder case is found guilty, there is only two

13   punishments.

14   A    Um-hum.

15   Q    Life without parole which means they can't get parole.  Okay.

16   A    Um-hum.

17   Q    And the second one is the death penalty.  Do you not think

18   that life without parole does the same good as the death penalty?

19   A    No, I do not.

20   Q    And why is that?

21   A    Because there is too many things that happens in our prisons

22   that I've learned about or heard about.

23   Q    Such as?

24   A    Rapes, molestations among the personnel --

25   Q    So you mean more crimes are committed inside the penitentia-

374

1    ry?

2    A    More crimes are committed inside the penitentiary.

3    Q    I see.   And do you approach a murder case as a prospective

4    juror with any kind of preconceived idea that if a person is found

5    guilty of the capital murder then the death penalty is the only

6    punishment that's feasible as far as you are concerned?

7    A    That's right.

8    Q    Are you telling me you won't even consider the possibility

9    that life without parole is a viable alternative?

10   A    Not if they prove that he is guilty and it looks like to me,

11   from what I see, it would be proven.

12   Q    You mean what you know about this case already?

13   A    No, just from what she has told me here about aggravated

14   assault and what they are trying to do to get the death penalty.

15   Q    You understand you haven't heard any evidence yet.   Do you

16   understand there hasn't been one iota of evidence that's been

17   presented?

18   A    Let me put it this way, maybe I'm prejudiced.

19   Q    That's what we are trying to find out, Ms. Hall.   And this

20   is what this whole idea is about, this whole proceeding.   Are you

21   prejudiced?

22   A    I must be.

23   Q    Prejudiced in what way?

24   A    I just think he's guilty.

25   Q    Okay.

4948
Respondent's Exhibit E

1          MR. KIZER:  That's all the questions I have, your Honor.

2          THE COURT:  All right.  Thank you, Ms. Hall.  Anything

3     further from the State?

4          MS. BILLINGS:  No, your Honor.

5          THE COURT:  Thank you, Ms. Hall.  I'll let you step

6     outside, please, ma'am.

7          MR. KIZER:  Your Honor, I'm going to move to challenge

8     for cause.  I don't know what the State's response may be.

9          MS. BILLINGS:  I agree, your Honor.

10         THE COURT:  We'll excuse Ms. Hall.  And ask Mr. Lindsey

11    to come in.

12         THE CLERK:  Judge, Ms. Turley is after Mr. Lindsey.  Do

13    you want me to have Darla call her?

14         THE COURT:  She is going to -- yeah, I guess we better

15    have her come on up.  I'll circulate this letter from Ken

16    Reed.

17         MR. KIZER:  It would be all right with me if you just

18    want to move her down on the end.

19         THE COURT:  Well, did y'all look at her questionnaire?

20    We'll talk about her in a few minutes then.

21         Continuing here in chambers with Mr. Jerry W. Lindsey.

22    We're here for the purpose of inquiring of Mr. Lindsey as a

23    prospective juror in this matter.  Mr. Juneau.

24         MR. JUNEAU:  Thank you, your Honor.

25              PROSPECTIVE JUROR JERRY LINDSEY

376

Respondent's Exhibit E

1    BY MR. JUNEAU:

2    Q    Hi, Mr. Lindsey.

3    A    Hello.

4    Q    My name is Wayne Juneau with the Prosecuting Attorney's

5    office.  This is Carol Billings also with the Prosecutor's office.

6         We are here today, Mr. Lindsey, to pick a jury to try a

7    capital murder case.  Are you aware that that's what we're doing

8    today is trying a capital murder case?

9    A    Yes, sir.

10   Q    You realize that a potential or possible sentence is death by

11   lethal injection?

12   A    Well, I'm not aware of that, no, if that's what the case is.

13   Q    That's what the case is.

14   A    Okay.

15   Q    So we're going to ask you some questions in regard to that to

16   try to get an idea about whether you would make a good juror or

17   not.  And when I say that, I mean, make a fair and impartial

18   juror.  The first question, I guess, that I need to ask you is

19   whether you have an opinion in regard to capital punishment or the

20   death penalty.

21   A    I guess it would depend on the circumstances.  Now, if you

22   are asking me if it had to do with one of my family members, I

23   would say probably yes.  But if it had to do -- and, again, if it

24   is planned, cold blooded or stuff of this nature.  Before I could

25   answer that question honestly, I think that, you know, I need some

377

Respondent's Exhibit E

1    evidence or some type of proof or something of this nature.

2    Q    And that's the appropriat response.  Sometimes we have to put

3    the cart before the horse particularly at this stage of the trial.

4    I guess my question is more do you have -- are you in favor or

5    against the death penalty, say, in general?

6    A    Again, if it is cold blooded, premeditated and it is planned,

7    yes.

8    Q    You could consider --

9    A    I would consider it.  But if it is a circumstance where -- in

10   the event of a circumstances happening and if, you know, it come

11   up, then -- or if somebody took somebody else's life in self

12   defense or in the process of a tussle or whatever the case may be,

13   then I would think the -- I think I would like to look at it long

14   and hard before I say, "Yeah, let's take his life."

15   Q    Okay.  Well, let me go on a little bit further in this

16   questioning you then.  Kenneth Reams is charged with the murder of

17   Gary Wayne Turner.  Are you familiar at all with the murder that

18   happened at the ATM machine in May of this year?

19   A    Nothing more than, you know, what you heard or saw in the

20   newspaper or stuff of this nature.  No more than that.

21   Q    Have you read any articles here in the last two or three

22   weeks?

23   A    No, sir, I have not.

24   Q    You know that there was a robbery at that ATM machine or an

25   attempted robbery and Mr. Turner was killed.

378

Respondent's Exhibit E

1    A    I understand that through print, yes, sir.

2    Q    Well, it's the state's position that this man, Kenneth Reams,

3    participated in that robbery.  We have charged him with capital

4    murder.  The elements of capital murder and what we have to prove

5    to you before you can convict Kenneth Reams of capital murder are

6    that he was either acting alone or with an accomplice an attempted

7    to commit or did commit an aggravated robbery or a robbery of the

8    victim.  And in the course of that robbery, killed that victim.

9    He or an accomplice killed the victim.  That what they did showed

10   extreme indifference to the value of human life.  Do you under-

11   stand?

12   A    Um-hum.

13   Q    Those are the elements that we have to prove.  Have you ever

14   sat on a criminal jury before?

15   A    No, sir, I have not.

16   Q    Well, in this particular case, you will be given evidence.

17   You will hear witnesses testify.  And you will go out with the

18   other 11 members of the jury and you will deliberate as to guilt

19   or innocence only.  Based on the facts, you will determine whether

20   this defendant is guilty of capital murder or some other offense.

21   Should you decide that he is guilty of capital murder, then you

22   will come back in the jury room with the other 11 members and you

23   will decide the punishment.  So what I'm telling you is, it's a

24   two-stage or two-phase trial.  Do you understand?

25   A    Um-hum.

4952
Respondent's Exhibit E

1    Q    You need to answer outloud so the court reporter can get your

2    testimony.

3    A    Yes, sir, I do.  Excuse me.

4    Q    I want to talk briefly about the guilt part of the trial now.

5    I've explained the elements to you.  I want to -- your opinion as

6    to accomplice liability.  So let me ask you if you have ever heard

7    of or do you know what accomplice liability is?

8    A    No, sir.

9    Q    Accomplice liability, for instance, is when two individuals

10   plan to rob a bank and one individual goes in and pulls a gun and

11   demands the money while the other individual stays in the car and

12   drives the car.  Given that set of factors, would you -- would you

13   find the person who sat in the car guilty of the robbery?

14   A    I think he's as guilty as the one committing it if he knows

15   that's exactly what is going on, yes.

16   Q    Okay.  And you agree with that?

17   A    Yes, sir.

18   Q    And that is the law in Arkansas, your understand?

19   A    Yes, sir.

20   Q    And, in fact, that is factored in to the elements in regard

21   to capital murder.  Okay.  I say that because the instructions

22   will be that the State has to prove that the defendant, Kenneth

23   Reams, or an accomplice attempted to rob Gary Wayne Turner and

24   that Kenneth Reams or an accomplice caused the death of Gary Wayne

25   Turner.  Do you understand?

380

Respondent's Exhibit E

1    A    Yes, sir.

2    Q    Given the seriousness level and the offense of capital

3    murder, do you have any objection to finding Mr. Reams guilty

4    should you believe he is an accomplice to the robbery?

5    A    No, sir.

6    Q    You'll hear evidence that he's 18 now and he was 17 when this

7    crime was committed.   Do you have any reservations about finding

8    him guilty of capital murder because of his young age?

9    A    No, sir.

10   Q    Do you feel like persons 17 years old are responsible for

11   their actions?

12   A    Yes, sir.

13   Q    The fact that Kenneth Reams is 17 and the fact that there is

14   a chance that he could get death, would that factor in in your

15   decision as to guilt or innocence?

16   A    No, sir.

17   Q    So what you are telling me is you could set aside the

18   punishment part of the trial and only consider guilt or innocence

19   --

20   A    Yes, sir.

21   Q    And the facts that you heard it from.   You could do that?

22   A    Yes, sir.

23   Q    Let's move on to the second phase of the trial, the punish-

24   ment.   Assume with me for a minute that Mr. Reams was found guilty

25   of capital murder because otherwise we don't go to this part of

4954
Respondent's Exhibit E

1    the punishment of the trial.  Okay.  But if he is found guilty of

2    capital murder, there are some other factors you have to find

3    before you can convict him of death.  Do you understand that

4    simply being found guilty of capital murder does not mean he is

5    automatically sentenced to the death penalty?

6    A    Yes, sir.

7    Q    There are some factors that the State has to prove which are

8    called aggravating circumstances.  The State would have to prove

9    beyond a reasonable doubt that there are aggravating circumstances

10   that exist in this case.  The State has alleged two aggravating

11   circumstances.

12        The defendant has a chance to introduce and prove mitigating

13   circumstances.  The defendant will, I expect, introduce several

14   mitigating circumstances--more than two mitigating circumstances.

15   You would have to weigh the aggravation against the mitigation.

16   Okay.

17        First, you have to find aggravating circumstance; then, you

18   have to find mitigating circumstances.  These are all on forms.

19   So it is fairly easy once you look at the forms.  The fact that

20   there are more or maybe -- or you may find more aggravating --

21   mitigating circumstances does not mean that mitigation outweighs

22   aggravation.  Would you agree with that?

23   A    Yes, sir.

24   Q    You would agree that the substance is more important than the

25   sheer number.  Would you agree with that?

4955
Respondent's Exhibit E

1    A    Yes, sir.

2    Q    When you weigh the aggravating against the mitigation, should

3    you decide mitigation outweighs the aggravation, then the penalty

4    is automatically life without parole.

5    A    Again, you are asking me to comment on something that, you

6    know, until I hear the evidence --

7    Q    I understand.  I'm not really asking you to give me a comment

8    on that.  I'm just telling you that under the law if you find on

9    your form that mitigation outweighs aggravation, you have no

10   alternative --

11   A    Okay.

12   Q    But to sentence Kenneth Reams to life without parole.  Okay?

13   A    Yes, sir.

14   Q    But, however, should you find that aggravation outweighs

15   mitigation, then you have to go one step further and find that the

16   aggravation is sufficient to justify the death penalty.

17   A    Yes, sir.

18   Q    Okay.  Are you able to do that?

19   A    Yes, sir.

20   Q    And you have no reservations, should you find Mr. Reams

21   guilty of capital murder, to consider those aggravation and

22   mitigation circumstances?

23   A    None whatsoever.

24   Q    And you would be able to look at this defendant, Kenneth

25   Reams, and sign a form sentencing him to death?

383

4956
Respondent's Exhibit E

1   A    If the circumstances and the evidence proved so, yes, sir.

2              MR. JUNEAU:  Thank you.  That's all.

3              THE COURT:  Mr. Kizer.

4              MR. KIZER:  Thank you, your Honor.

5                        CROSS EXAMINATION

6   BY MR. KIZER:

7   Q    Mr. Lindsey, what do you do at HDRS?

8   A    I'm supervisor in the Outreach part of it.  We go out and

9   work with people that -- drugs and alcohol abuse and stuff of this

10  nature.

11  Q    How long have you been working there?

12  A    Only been there since January.

13  Q    Have you had experience at other facilities doing the same

14  type of work?

15  A    No, sir, I'm more in the supervisor and management part of

16  it.  I don't actually go out and bring them in.  I have people

17  that work for me.

18  Q    Okay.  What did you do prior to going to work at HDRS?

19  A    I was in banking.

20  Q    How long have you lived in the Jefferson County area?

21  A    Let's see, my daughter is 18.  About 16 years.

22  Q    Which bank did you work for?

23  A    Simmons Bank.  Simmons and then FirstSouth.

24  Q    You checked on your questionnaire on the answer to 21 that

25  you discussed this matter or at least have heard about this matter

384

Respondent's Exhibit E

1    from someone else.  Can you give me an idea of what you had in

2    mind?

3    A    Well, you can -- you know, you can hear different things at

4    the coffee shop or sitting around the coffee pot or whatever the

5    case may be.  No more than that.

6    Q    Okay.  Was it any discussion about this particular individu-

7    al, Mr. Reams?

8    A    There was no names mentioned.  It was just the -- the event.

9    Q    Is there anything about that experience that you have just

10   outlined for us that has caused you to come into this courtroom

11   with any type of preconceived ideas about the guilt or innocence

12   of Mr. Reams?

13   A    No, sir.  I was raised that you don't prejudge people.

14   Q    You understand that just because someone is charged with a

15   crime that doesn't mean anything except that they are charged with

16   a crime and it's up to the State to prove beyond a reasonable

17   doubt what the elements are of that crime.

18   A    Yes, sir.

19   Q    With regard to the questions that you answered with the

20   Prosecuting Attorney, you understand that the guilt or innocence

21   phase is the first trial that we have in this matter and depending

22   on the outcome of that trial, we may not even get to the death

23   penalty aspect of the case.

24   A    Yes, sir.

25   Q    This is just our only chance to discuss this matter of the

385

Respondent's Exhibit E

1   utmost seriousness with the jurors and we may be premature in even

2   talking that that would ever come about.

3   A    I agree.

4   Q    Do you understand that?

5   A    Yes, sir.

6   Q    With regard to the capital murder charge itself, if the facts

7   did warrant a conviction on that charge and there will be several

8   other charges you can consider, are you telling all of us here

9   today that you would consider all of the relevant factors and make

10  up your mind at that time whether life without parole or the death

11  penalty was the appropriate decision to make?

12  A    Yes, sir.

13  Q    With regard to the concept of accomplice liability that the

14  State discussed with you a few moments ago, do you understand that

15  even though someone may be found guilty just like -- if he was

16  accomplice, just like the person who actually perpetrated the

17  crime, you still have a discretion as a juror within the range of

18  possible punishments that you can determine, based on the level of

19  participation that the individual had in that crime, are you

20  willing to exercise that discretion in this proceeding today based

21  on the evidence?

22  A    Yes, sir.

23          MR. KIZER:   I think that's all the questions I have,

24       your Honor.

25          THE COURT:   Anything further?

386

4959
Respondent's Exhibit E

1          MR. JUNEAU:  Nothing further.

2          THE COURT:  Thank you, Mr. Lindsey.  I'll let you step

3     outside.  What says the State?

4          MS. BILLINGS:  Good.

5          MR. KIZER:  He's good for the defense.

6          THE COURT:  Okay.  Ask him to stick his head back in for

7     just a second.  Mr. Lindsey, these folks think that you would

8     make a good juror and you have been selected to serve on this

9     panel.  I'll need to tell you two things.  First of all,

10    you've seen, I guess, some of the media down here trying to

11    cover the case.  I don't know that there is going to be any

12    substantative stories, but to be on the safe side, just avoid

13    any news accounts on radio or TV or in the newspaper about

14    what's going on.  I can't tell you exactly when to be back.

15    But what we are going to do is by the time we quit tonight,

16    we'll know a lot more.  We've installed that telephone in

17    there with -- I'll put a message on the answering machine.

18    Copy that number down when you leave.  Check with that some

19    time tonight after about 8 o'clock or so, and I'll have you

20    a little bit better information for you at that time about

21    when to be back.

22         JUROR LINDSEY:  Okay.

23         THE COURT:  Now, otherwise, you'll be at work tomorrow.

24         JUROR LINDSEY:  If I'm not here, yes, sir.

25         THE COURT:  Okay.  We'll -- you call that machine

387

Respondent's Exhibit E

1    tonight and we'll have a message on there to give you an idea
2    about when we'll need you back.  If I was going to guess, I'd
3    say somewhere around noonish tomorrow or something like that.
4    But you don't know.  We may be through picking a jury in
5    another 30 minutes or another 30 hours.  We don't know.  But
6    we'll try to have a little more information for you tonight.
7         JUROR LINDSEY:  Check back with you around 8 o'clock.
8         THE COURT:  Yeah, copy that number that we wrote on the
9    board out there.  Check with us and don't discuss the case
10   with anybody else.
11        JUROR LINDSEY:  Okay, sir.  Thank you, sir.
12        THE COURT:  Thank you, sir.  Shirley Turley.  Do you
13   want to just move her to the --
14        MR. KIZER:  I don't have a problem with that if the
15   State doesn't.
16        THE COURT:  Do y'all want to move her to the bottom of
17   the stack or not?  I thought, based on what she said -- first
18   of all, she wasn't sure she could -- she had formed an
19   opinion on the case and she wasn't sure she could give the
20   death penalty.  We can either call her from upstairs (sic) or
21   move here to the bottom of the stack and use her if we have
22   to or whatever.  Y'all tell me what you want to do.  What's
23   your pleasure?  Let's just move her to the only call if we
24   have to stack.
25        I would -- for the record, I'm going to put in the

                                388

Respondent's Exhibit E

1 record that Mr. Reed, the treasurer, has written and said it

2 would pretty much a hardship on his office if we used her

3 right now, and I'm going to include that with her question-

4 naire.  Okay.

5 How about Ms. Kelly Ruggeri?  Kelly Ruggeri.  Come

6 around and have a seat if you would, please, ma'am.  We are

7 continuing here in chambers for the purposes of examining Ms.

8 Kelly Noelle Ruggeri for purpose of determining whether or

9 not she is good juror in this matter.  Ms. Billings.

10 MS. BILLINGS:  Just a moment, your Honor.

11 THE COURT:  Okay.

12 PROSPECTIVE JUROR KELLY NOELLE RUGGERI

13 BY MS. BILLINGS:

14 Q Hi, Ms. Ruggeri.

15 A Hi.

16 Q Is that how you say your last name?  Ruggeri?

17 A Uh-huh.

18 Q Ms. Ruggeri, I'm in the Junior League Provisional class with

19 you, would that have anything to do at all with your listening to

20 the evidence in this case and making a decision just based on the

21 evidence that you hear?

22 A No, ma'am.

23 Q I know that you know me.  This is Wayne Juneau.  He's also

24 with the Prosecuting Attorney's office.  We represent the State in

25 this case.  We've charged the defendant in this case, Kenneth

389

1    Reams, with the crime of capital murder.

2         Basically, what we're saying is that Mr. Reams, along with

3    another person by the name of Alford Goodwin, went to the ATM over

4    there on Fifth and Chestnut and in the course of committing or

5    attempting to commit a robbery killed a young man by the name of

6    Gary Turner.  And that their actions in doing this manifested

7    extreme indifference to the value of human life.  That's basically

8    what Mr. Juneau and I will have to show you once the trial gets

9    started and if you are selected to sit on the jury.  Do you

10   understand that charge?

11   A    (Prospective juror nodding head)

12        COURT REPORTER:  You need to answer outloud instead of

13        nodding your head.

14   A    Yes, ma'am.

15   Q    I don't know if you are aware of this or not, Ms. Ruggeri,

16   but we are seeking the death penalty in this case.  Were you aware

17   of that?

18   A    No, ma'am.

19   Q    Did you realize that that was a possible penalty for capital

20   murder?

21   A    Yes, ma'am.

22   Q    Do you know Mr. Turner?

23   A    No.

24   Q    Do you know his wife?

25   A    No.

390

Respondent's Exhibit E

1   Q    In a capital murder case, there are two possible penalties.
2   There is life without parole and there is the death penalty.

3        And there are also two phases to a trial.  You have a guilt
4   phase where you just decide whether or not this defendant commit-
5   ted the crime of capital murder and then in a second phase, if you
6   decide that that's true, come back and decide what the penalty
7   should be.  Okay.

8        In the guilt phase of the trial, capital murder will incorpo-
9   rate a term called "accomplice liablity."  Have you ever heard of
10  that?

11  A    No, ma'am.

12  Q    Okay.  What it is is any time, in Arkansas, you commit a --
13  help someone commit a crime, if you aid them to commit the crime,
14  you help them plan it, you encourage them to do it, you are what
15  we call an accomplice.  And you are just as liable as they are for
16  committing the crime--for your participation in it.  Your active
17  participation in it.  Do you agree with that?

18  A    Yes, ma'am.

19  Q    You kind of hesitated for a moment.  What's your hesitation?

20  A    I -- I -- I was trying to go back over what you were asking
21  me.  I mean, making sure I understood what you asked me if I
22  believe that a person that's with a person actually commits a
23  crime if that -- if they are just as guilty.  So I was making sure
24  in head I understood what you were asking.

25  Q    Okay.  A typical scenario that we have discussed with some of

391

Respondent's Exhibit E

1    the other jurors is if two people decide to commit a robbery of a

2    bank.  One of them drives the car and the other one goes and pulls

3    the gun.  Is the person in the car just as guilty as the one that

4    went in and pulled the gun?

5    A    Yes, ma'am.

6    Q    Okay.  In this case, that's what we are alleging happened in

7    this capital murder also.  Each one is just as guilty as the

8    other.

9    A    Right.

10   Q    If I show you that accomplice liability extends to this

11   defendant right sitting right here, can you find him guilty of

12   capital murder?

13   A    Yes, ma'am.

14   Q    Okay.  I guess the most important question I need to ask you

15   next, Ms. Ruggeri, is what are you feelings on the death penalty?

16   A    My feelings on the death penalty depends on the circumstanc-

17   es.  I can't say that I would give him the death penalty.  It

18   depends on circumstances and the evidence that I hear.  I don't

19   necessarily believe in it, and I don't necessarily not believe in

20   it.  It depends on the evidence.

21   Q    Okay.  So you're not saying you could never give it and

22   you're not saying you would always give it?

23   A    Right.  That's right.

24   Q    As I told you, there are two stages to a trial.  A lot of

25   people come back sometimes and say, "Well, I wouldn't find him

392

Respondent's Exhibit E

1    guilty of capital murder because the charge is capital murder
2    because I knew if I did, they were going to get the death penal-
3    ty."  But you understand that that's not true.  Is that correct?
4    A    Correct.
5    Q    Okay.  There is a separate stage, a completely separate stage
6    where you decide what the punishment should be.
7    A    Right.
8    Q    And any reservations you have you could factor in in that
9    particular stage of the trial, not in the guilt stage.
10   A    Right.
11   Q    Okay.  People also sometimes say, "I don't understand why the
12   State is not seeking the death penalty in this case.  They killed
13   someone."  There are -- in order to seek the death penalty, we
14   have to follow what the legislature has set out.  And in addition
15   to killing someone, we have to have one -- what they call aggra-
16   vating circumstances.  If we don't have one of those, we can't
17   seek the death penalty.  Okay.
18   A    Okay.
19   Q    A person would automatically get capital murder or maybe a
20   first degree murder charge.  But those -- the legislature has laid
21   out seven things that they call aggravating circumstances.  And if
22   we have one of those in addition to the fact that someone has been
23   killed, well, then, we could seek the death penalty.  We are
24   saying, in this particular case, we have two of those on Mr.
25   Reams.  Okay.

4966
Respondent's Exhibit E

1    A    Okay.

2    Q    We are calling those aggravating circumstances.   There are

3    also items that the legislature lays out that they say are

4    mitigating circumstances.   That if you find that these exist and

5    you find that they outweigh the aggravating circumstances, then

6    you can only sentence him to life without parole.   These items

7    would be offered by Mr. Kizer on behalf of Mr. Reams.   Okay.

8    A    Okay.

9    Q    And like I said, in order to assess the death penalty, you

10   have to basically hop through three hoops in the penalty phase.

11   First, you have to find that there is an aggravating circumstance.

12   If you don't find that there is an aggravating circumstance, then

13   you have to sentence him to life without parole.

14   A    Okay.

15   Q    If you find that there is an aggravating circumstance, then

16   you have to find that they outweigh the mitigating circumstance.

17   Okay.

18   A    Okay.

19   Q    And then if you find that they do outweigh the mitigating

20   circumstances, then you have to decide in this case is the death

21   penalty warranted.   So you have three checkpoints there.   Okay.

22   When you are deciding the aggravating and the mitigating circum-

23   stances, numbers may not be important.   Okay.   In fact, they

24   aren't important.   He may have a dozen mitigating circumstances.

25   What you have to do is weigh whether or not you think those are an

394

Respondent's Exhibit E

1   excuse for this crime.  Okay.

2   A    Okay.

3   Q    Or an excuse for the penalty that can be assessed in this

4   crime.  Like I said, we only have two aggravating circumstances.

5   But just the fact that he's got 12, you have to weigh the sub-

6   stance of those against each other.  You may not find that any of

7   those mitigating reasons that he has offered are any excuse for

8   the crime.  And then, again, you may.  Do you understand?

9   A    Um-hum.

10  Q    Have you sat in on a trial before, Ms. Ruggeri?

11  A    Yes, I have.

12  Q    You understand that in a capital murder case the burden that

13  the State has to prove is the very same that it is as if we were

14  doing a lawn mower theft, beyond a reasonable doubt.  And that

15  there is never going to be a case where we can prove with 100

16  percent certainty that something happened unless you stood there

17  and watched it yourself, right?

18  A    Right.

19  Q    The defense attorney may offer these things that he is going

20  to say that these are reasonable and these are doubts, these are

21  doubts.  You have all these doubts.  Well, you are going to have

22  to consider whether those are really reasonable doubts or not.

23  That's what being a juror is all about.  Is this stuff reasonable

24  or do you have a belief that the charge is true?  That's what the

25  Judge is going to read to you in the jury instructions.  I know

395

Respondent's Exhibit E

1   you have heard it before.  Do you have an abiding conviction of

2   the truth the charge?  If you do, then you can vote for guilt.

3   And that's what we'll be asking you to do in this particular case.

4   Could you do that?

5   A    Yes, I could.

6                MS. BILLINGS:  No more questions.

7                THE COURT:  Mr. Kizer.

8                MR. KIZER:  Thank you.

9                        CROSS EXAMINATION

10  BY MR. KIZER:

11  Q    Ms. Ruggeri, apparently your maiden name is Wadlington, is

12  that correct?

13  A    Yes, it is.

14  Q    I had a trial probably two years, three years ago where I

15  sued on behalf of a client, Cotton Belt Railroad, and your dad was

16  a witness in that case.

17  A    Yes.

18  Q    Has he mentioned anything about that to you about that

19  particular case or anything about me?

20  A    I can remember when it happened -- when the trial did happen

21  that he said that you were the attorney that was against him.

22  Q    Anything about that matter that might cause you to be less

23  than fair and impartial in a case where I am the defense attorney

24  for?

25  A    No.  The other trial that I sat on you were the lawyer.  It

4969
Respondent's Exhibit E

1    didn't affect me at all.

2    Q    The other thing is, is that I defended the guy who stole your

3    brother's car from his house.   That's two licks against me, I

4    guess.   Would that pose a problem?

5    A    No, I didn't even know anything about that.   No.

6    Q    You had indicated on your questionnaire that you had -- first

7    of all, you gave an opinion that I totally agree with you,

8    "downtown Pine Bluff is not a safe place to be after normal

9    business hours or sometimes even during normal business hours."

10   But you indicated that -- I think you said you formed an opinion

11   and expressed it to your husband, mother and father.

12   A    Um-hum.

13   Q    Is that an opinion having to do with the guilt or innocence

14   of this young man in this matter today?

15   A    No, sir.

16   Q    What is that opinion?   What were you making reference to?

17   A    Just to the different things that have happened downtown.   I

18   do work for Simmons Bank and there was a couple of guys there

19   that, I think, were jumped after business hours.

20   Q    I think they were kidnapped, weren't they?

21   A    Yes, they were kidnapped.   And just these instances happen

22   down there.   I mean it is not safe to be after dark.

23   Q    All right.   I think many people in this room would not

24   disagree with you.   But do you understand that we can't, in a

25   particular trial, do anything about that problem?

397

Respondent's Exhibit E

1    A    Right.

2    Q    We're here for the State of Arkansas versus Kenneth Reams.

3    Do you believe that you could be fair and impartial in the

4    consideration of the evidence as you would hear it from the

5    witness stand in this particular trial?

6    A    Yes, sir.

7    Q    Do you have any preconceived ideas about what appropriate

8    punishment may be about capital murder in the event that you found

9    that Mr. Reams was guilty of capital murder?  For example, there

10   are two different punishments that can be considered for capital

11   murder.  Now, you may find that he is guilty of some other crime.

12   You will be instructed about lesser included offenses.  I'm not

13   trying to suppose for you or pre-suppose what you would find.  I'm

14   just trying to find out what your propensity might be.

15        There are two possible ranges of punishment:  life without

16   parole and the death penalty.  Would you hear all of the evidence

17   in the second proceeding and only make your decision -- your

18   decision where you exercise your discretion after you hear all of

19   that evidence?

20   A    Yes, sir.

21   Q    Do you understand that the scales of justice, that's an

22   appropriate symbol for us because that's what your job is as a

23   juror, to weigh the evidence and make a decision.  That would

24   include the guilt or innocence plus the punishment.  Two different

25   decisions.  Do you understand that's the case?

4971
Respondent's Exhibit E

1    A    Yes, sir.

2    Q    The first part of the trial is going to be a trial just like

3    what you have already set through.   By that I mean the guilt or

4    innocence phase that will be conducted just like any other trial.

5    There will be the same constitutional safeguards that will attend

6    and protect this young man just like it would any person who is

7    charged with a crime.   Do you understand that to be the case?

8    A    Yes, sir.

9    Q    Is there -- is there anything about the facts that you know

10   about this particular case in terms of a young man being killed at

11   an ATM machine downtown Pine Bluff and all of that sort of thing

12   that would cause you to be less than fair and impartial today?

13   A    No, sir.

14   Q    I note you also have a little one.   We may end up going late

15   a day or so.   Is that going to pose you any problems?

16   A    No, sir, I've already told my husband that could possibly be.

17   He knows.

18           MR. KIZER:   I think that's all the questions I have,

19       your Honor.

20           THE COURT:   Anything else for the State?

21           MS. BILLINGS:   No, your Honor.

22           THE COURT:   Thank you, Ms. Ruggeri.   I'll let you stand

23       outside for just a second.

24           What say the State?

25           MS. BILLINGS:   Good, your Honor.


                            399

Respondent's Exhibit E

1    MR. KIZER:  Good for the defense, your Honor.

2    THE COURT:  Okay.  Ask her to stpe back in for just a
3    second.  Ms. Kelly, these folks think you would just be
4    wonderful as a juror in this matter.  I know you are excited
5    about that.

6    Let me ask you to do two things.  Well, to do one thing
7    and not do another thing.  First of all, I'm going to --
8    there is no sense in you sitting around here.  I'm going to
9    send you on home.  But check later on tonight -- write that
10   number down for that answering machine out there and call
11   back and I'll have a little bit better idea to tell you when
12   we would need you back.

13   JUROR RUGGERI:  Okay.

14   THE COURT:  Now, what I don't want you to do is to
15   listen to any news accounts.  I doubt that anybody would have
16   anything on there that would be of any substance about the
17   case, but just to be on the safe side, avoid any news
18   accounts and don't talk to anybody about the case.  Certain-
19   ly, it's -- you can tell your spouse that you have been
20   seated.  But, obviously, we haven't talked anything about the
21   facts and it's just much better that you don't discuss it.
22   Check with that answering machine number and we'll know a
23   little bit better when to tell you to be back.a

24   JUROR RUGGERI:  Okay.  Thank you.

25   THE COURT:  Thank you.  Larry Tipton next.  Where is

400

4973
Respondent's Exhibit E

1    Larry?

2          MR. KIZER:  He's the last one in the first group.

3          THE CLERK:   Judge, Mr. Daniels had called Shirley

4    Turley.  And she's out there in the courtroom.

5          THE COURT:  Did you tell her that we were going to move

6    her to the bottom of the list?

7          THE CLERK:   I thought I would double check with you

8    first.

9          THE COURT:   Yeah.   Tell her it's a have to deal and

10   we'll try to work with her.  I'm short Mr. Tipton's question-

11   naire.  Have I missed it?  Larry Tipton.

12         Mr. Tipton.  We are continuing here in chambers for the

13   purpose of inquiring of Larry Ray Tipton to determine whether

14   or not Mr. Tipton might be selected as a juror in this

15   matter.  Mr. Juneau.

16         MR. JUNEAU:  Thank you, your Honor.

17              PROSPECTIVE JUROR LARRY R. TIPTON

18   BY MR. JUNEAU:

19   Q   Mr. Tipton, my name is Wayne Juneau and this is Carol

20   Billings with the Prosecuting Attorney's office.

21   A   How are you doing?

22   Q   Mr. Tipton, have you ever served on a jury before?

23   A   Yes.

24   Q   You know that these preliminary questions that the lawyers

25   ask of you are simply to try to evaluate you as to whether you

401

1    would be a fair and impartial juror.

2    A    Right.

3    Q    We are going to ask you some questions and just ask that you

4    answer as truthfully as you can about those.   Okay?

5    A    Okay.

6    Q    Have you -- are you aware that a robbery occurred at the ATM

7    machine back in May of this year?

8    A    Yes.

9    Q    You've read newspaper articles about that?

10   A    I think I saw on TV or something.   I don't think I read

11   anything about it.

12   Q    Back when it happened?

13   A    Um-hum.

14   Q    Have you heard anything since then?

15   A    No.   I really didn't even know that there had been any

16   arrests.

17   Q    You've indicated in your questionnaire that you are a member

18   of MENSA.   What is that?

19   A    MENSA.

20   Q    What is that?

21   A    It's a society of -- whose requirement to join is to be in

22   the 98 percentile IQ.   It's a high IQ society.

23   Q    Here -- is that something local here in Pine Bluff?

24   A    It's a nation-wide organization.   I don't think we have but

25   about five members in Jefferson County.

Respondent's Exhibit E

1  Q    How often do y'all meet?

2  A    Monthly.

3  Q    How long have you been in that society?

4  A    About eight years, seven or eight years.

5  Q    This is a capital murder case and you may or may not know

6  that at this point.  The State is seeking the death penalty.

7  A    Okay.

8  Q    Are you aware of that?

9  A    I didn't know that they were seeking the death penalty.  I

10  knew it was capital murder.

11  Q    It's important that we have an honest opinion from you as to

12  your views on the death penalty.  And I'm not asking you in this

13  particular case.  I'm just asking for your views on the death

14  penalty in general.

15  A    Right.

16  Q    Could you give me your opinion?

17  A    I feel that the death penalty is appropriate in certain

18  circumstances.  Not in all circumstances, but especially in a case

19  of, say, premeditated, preplanned murder.  I'm a proponent of the

20  death penalty.

21  Q    Okay.  In this particular case, the State alleges that the

22  defendant here, Kenneth Reams, sitting across from you participat-

23  ed in a robbery of the victim at the ATM machine there on Fifth

24  Street.

25  A    Right.

403

Respondent's Exhibit E

1    Q    And in the course of that robbery, that victim was killed.

2    A    Um-hum.

3    Q    Given those factors, as opposed to what you had just indicat-

4    ed as a premeditated, planned out murder --

5    A    Right.

6    Q    Do you feel like the death penalty might be appropriate in a

7    robbery case?

8    A    I think I would be less inclined to feel that that would be

9    an appropriate sentence.  If it happened, you know, in conjunction

10   with a robbery if it was an almost unintentional sort of thing if

11   you understand what I'm saying rather than premeditated.  I would

12   feel less inclined than I would if it was premeditated.  Like the

13   guy on the Long Island Express than planned it six months in

14   advance and bought a gun and wrote out his plans and all of that.

15   Q    Right.

16   A    That's a little bit different situation.

17   Q    Well, that's what I thought you were telling me when you

18   indicated about a premeditated murder.

19   A    Right.

20   Q    But are you telling me that in a circumstance in the scenario

21   that I just laid out for you of a robbery in which a person was

22   killed that you could not consider the death penalty in that

23   instance?

24   A    I'm not saying that I couldn't.  It would depend on how the

25   facts came out in Court and -- you know, there are a lots of other

4977
Respondent's Exhibit E

1    things that go into it.  You know, you can't just say because

2    there was a robbery involved does that necessarily preclude the

3    death penalty and that's doesn't necessarily.

4    Q    And I think I know what you're talking about.  We're kind of

5    putting the cart before the horse, so to speak.

6    A    Right.

7    Q    I'm going to get into a little bit more of that.

8    A    Okay.

9    Q    And I do understand that you have to hear the evidence before

10   you can make your decision.

11   A    Right.

12   Q    In this particular case, the State of Arkansas claims that

13   the defendant, Kenneth Reams, along with an accomplice attempted

14   to rob Gary Wayne Turner, the victim in this case, and during the

15   course of that robbery, they killed him.  And that that manifest

16   extreme indifference to the value of human life.  Okay.

17   A    Okay.

18   Q    Those are the elements that we have to prove.  And I think

19   you said you have sat on a jury before?

20   A    Yes.

21   Q    How many juries?

22   A    Two.

23   Q    Both criminal cases?

24   A    Yes.

25   Q    You know the burden of proof is beyond a reasonable doubt.

405

Respondent's Exhibit E

1    A    Right.

2    Q    And it is not any higher than that simply because this is a

3    capital murder.  You understand that.

4    A    Um-hum.

5    Q    You probably need to speak up a little bit louder so the

6    court reporter can get your testimony.

7    A    Okay.

8    Q    The State says that this defendant or an accomplice attempted

9    to rob the victim.  And the victim was killed in the course of

10   that robbery.

11   A    Right.

12   Q    That's capital murder and that also includes the concept of

13   accomplice liability.

14   A    Right.  I understand that.

15   Q    Are you familiar with that?

16   A    Yes.

17   Q    And do you agree with that theory or that concept?

18   A    Yes, I do.

19   Q    So that in this trial, and it will be, I think, like at least

20   one of the trials that you sat in, where you go out and determine

21   guilt or innocence first, come back in and tell the Judge your

22   verdict and then you go back out and consider other evidence

23   before you pass punishment.

24   A    Right.

25   Q    Okay.  We're talking now about simply the guilt or innocence

4979
Respondent's Exhibit E

1    part of the trial.

2    A    Okay.

3    Q    Should you find this defendant, Kenneth Reams, guilty of

4    being an accomplice in the robbery and murder, is there a reason

5    why you could not find him guilty of capital murder?

6    A    No.

7    Q    You'll hear testimony that he was 17 when he committed the

8    crime.  Would that factor in your decision as far as the guilt or

9    innocence part of the trial?

10   A    No.

11   Q    The fact that he's 18, 17 at the time that he committed the

12   offense and that he's subject to being sentenced to death, would

13   that factor in in your determination as to guilt or innocence?

14   A    Not -- no, not into my determination of guilt or innocence it

15   wouldn't.

16   Q    Okay.  And you're clear about that part of it?

17   A    Yes.

18   Q    Well, assuming that you find this defendant guilty of capital

19   murder, otherwise we go into a different phase of the trial, but

20   assuming that you find him guilty of capital murder, then you have

21   to come back and find other circumstances before you can determine

22   punishment.

23   A    Right.

24   Q    And I believe that's kind of what you and I were talking

25   about a little earlier.

4980
Respondent's Exhibit E

1    A    Right.

2    Q    The way that works is that you would be presented with

3    aggravating and mitigating circumstances.

4    A    Okay.

5    Q    The State has alleged two aggravating circumstances in this

6    case.    The defense will have an opportunity to prove to you

7    mitigating circumstances and I expect there will be more than two.

8    Okay.   Now, I -- should they prove more than two, you understand

9    the sheer number of mitigating circumstances or aggravating

10   circumstances is not as important as the substance of those.

11   A    Could you give me the definition of aggravating and mitigat-

12   ing?

13   Q    Okay.   You know what aggravating circumstances are, that it

14   would justify the death penalty.   Okay.   Something aside from this

15   particular crime that the defendant has done.

16   A    Okay.

17   Q    That may justify the death penalty.   That's an aggravating

18   circumstance.

19   A    Okay.

20   Q    Let me explain to you because you may -- I may have not done

21   that.   If you find the defendant guilty of capital murder, there

22   are only two possible punishments.

23   A    Um-hum.

24   Q    Life without parole or death.

25   A    Right.

408

Respondent's Exhibit E

1   Q    You understand.

2   A    Um-hum.

3   Q    Okay.  Mitigating circumstances are circumstances that would

4   justify in your mind a decision for life without parole and not

5   the death penalty because of some conduct of the defendant or some

6   redeeming value of the defendant or something like that.

7   A    Okay.

8   Q    You would have to determine whether the aggravating circum-

9   stances outweighed the mitigation.

10  A    Okay.  Regardless of the number of each.

11  Q    Regardless the number of each.  Do you understand that?

12  A    Yes.

13  Q    And would you agree that's how it should be?

14  A    Yes.

15  Q    You understand that maybe just simply one aggravating

16  circumstance may outweigh a whole bunch of mitigation?

17  A    Right, depending on the value of it.  I understand.

18  Q    And in that particular case, should you determine that the

19  mitigation outweighs the aggravating, then the sentence would be

20  life without parole.

21  A    Right.

22  Q    That's the only alternative you would have.

23  A    Right.

24  Q    However, if you determine the aggravation outweighs the

25  mitigation, then you have to go one step further and determine

Respondent's Exhibit E

1    that the aggravation justifies the death penalty.

2    A    Correct.

3    Q    Okay.

4    A    And that's what I was trying to get to before.  It depends on

5    the circumstances--the aggravating --

6    Q    I understand.  I understand.  You were trying to get a little

7    ahead of me and I didn't know how to ask my questions otherwise.

8    A    Okay.

9    Q    Now, I think you've indicated to me that you would consider

10   the death penalty in a given situation.

11   A    Yes.

12   Q    And murder being one of them?

13   A    Right.

14   Q    Would you be able to, Mr. Tipton, to look this defendant in

15   the eye, sign a form sentencing him to death should you feel that

16   the circumstances warranted it?

17   A    If I felt that the circumstances warranted it and that it was

18   proved to me beyond reasonable doubt, I would have a difficult

19   time sleeping at night but I could do it.  And I've given that a

20   lot of thought in these last seven or eight hours sitting out

21   there.

22   Q    Okay.  You've been aware the last few hours that we were

23   going to ask you whether you could consider the death penalty?

24   A    Yes.

25   Q    And you're telling me that you could?

4983
Respondent's Exhibit E

1     A     Yes.

2     Q     You wouldn't like to do it, but you could do it?

3     A     Right.   I -- you know, find no joy in it; but, you know, as

4     part of society's burden to do the things that are necessary, and

5     I think that that is one of the things that, unpleasant though it

6     might be, could be necessary depending on how this case works out.

7     Q     Okay.

8                 MR. JUNEAU:   Pass.

9                 THE COURT:   Mr. Kizer.

10                MR. KIZER:   Thank you, your Honor.

11                          CROSS EXAMINATIONA

12    BY MR. KIZER:

13    Q     Mr. Tipton, are you telling me, likewise, you could vote for

14    life without parole if you find that capital murder had been

15    proven to you?

16    A     Certainly.

17    Q     Again, keeping an open mind and hear what the circumstances

18    are, weigh in the balance what your decision would be and then

19    exercise your discretion, is that what you are telling me you

20    could do?

21    A     Absolutely.

22    Q     You will also be afforded, if you are chosen to be a juror,

23    opportunities to, in the guilt or innocence phase, that may even

24    preclude getting to the death penalty phase.

25    A     Right.

411

4984
Respondent's Exhibit E

1  Q    And I don't want you to think that we are suggesting by any
2  stretch of the imagination --
3  A    I understand.
4  Q    Because we are talking to you about the death penalty today
5  that that's -- we may not even get to that.
6  A    Right.
7  Q    This is our only opportunity to talk with you.  And so we
8  need to, because of the serious nature of this matter, discuss
9  what your feelings are on that issue.
10     The guilt or innocence phase of this trial will be conducted
11 just like the guilt or innocence phase of any other trial that you
12 have observed or were a juror in.
13 A    Um-hum.
14 Q    The same constitutionally protected areas, a defendant's
15 right, still apply.  There will be options for you when it comes
16 to the guilt or innocence phase about guilt; if so, what type of
17 charge he is guilty on or innocence.  So, as long as we understand
18 what the ground rules are, I think you can reach a decision that
19 is just in this matter.
20 A    Right.
21 Q    With regard to the incident, I think you told us that you
22 knew something about the incident going on, but that's where it
23 stopped.
24 A    Right.
25 Q    You have no preconceived ideas about the guilt or innocence

412

Respondent's Exhibit E

1    of Mr. Reams coming into this matter?

2    A    Right, I didn't even know that he had been arrested or that

3    anybody had been arrested.

4    Q    Okay.   With regard to accomplice liability, the prosecution

5    asked you about that concept and I believe they were correct in

6    the recitation of the Arkansas law and that is a person who is an

7    accomplice can be found guilty just like the person who perpe-

8    trates the crime.

9    A    Um-hum.

10   Q    Do you understand, though, you still have within your level

11   of discretion the ability to weigh what that person's level of

12   participation was in that crime and then punish them accordingly

13   if you find that to be the case?   That is still an option that is

14   open to you.

15   A    Okay.   I didn't know that that was an option.   But that makes

16   sense.

17   Q    If you think about it, all law is predicated upon common

18   sense.

19   A    Um-hum.

20   Q    At least that's what it is designed to be whether it actually

21   ends up being that or not.   But is that something that you feel

22   comfortable with knowing that during the guilt or innocence phase

23   if you make a decision that goes toward guilt --

24   A    Um-hum.

25   Q    Then you still have the ability to exercise your discretion

413

Respondent's Exhibit E

1    to weigh and balance what that person's actual role was in the

2    crime?

3    A    I'm comfortable with that.

4         MR. KIZER:  That's all the questions I have, your Honor.

5         THE COURT:  Thank you, Mr. Tipton.  I'll let you stand

6    outside for a moment.

7         MS. BILLINGS:  Good, your Honor.

8         MR. KIZER:  We're agreeing too much.  He's good.

9         THE COURT:  There's something with agreeing too much.

10   Ask him to step back in for just a second.  Mr. Tipton, these

11   folks think that you would make just a wonderful juror in

12   this case.

13        JUROR TIPTON:  I was afraid of that.

14        THE COURT:  At least okay.  Let me ask you to do a

15   couple of things or do one thing and not do another thing.

16   First of all, don't discuss the case with anybody else.

17   Obviously, you are going to have to tell employer and spouse

18   and that sort of thing where you are going the next day or

19   so, but don't discuss it.  Avoid, although I'm not sure there

20   is any -- been any media coverage that's going to be of any

21   substantative nature, but just avoid it to be on the safe

22   side.

23        JUROR TIPTON:  Um-hum.

24        THE COURT:  Not only don't discuss it with anybody,

25   don't -- just kind of avoid the media if you will for the

4987
Respondent's Exhibit E

1    duration of this trial.

2         I have no clue as to tell you when we'll actually need
3    you back to get started.   There is obviously no need to be
4    sitting around the courthouse right now.   I'm going to give
5    you this phone number.   This answering machine, we're going
6    to have a message on there by 8 o'clock tonight or so that
7    will give you at least some more indication as to when to be
8    back.   So, just call sometime later on tonight and get a
9    better feel for that.   Be around either your home or your
10   place of business where we can reach you by telephone iIf we
11   don't tell you on that message a specific time to be back.
12   I suspect what we'll do is just pick a particular time and
13   ask you to come back.

14        JUROR TIPTON:   Are we pretty sure that it will be
15   tomorrow some time?

16        THE COURT:   Yes, sir.   It will not be tonight.   We will
17   not need you back tonight.   So, it'll be sometime tomorrow I
18   suspect.   I've been telling folks my best guess is sometime
19   around noon, but it could be earlier than that.

20        JUROR TIPTON:   Okay.

21        THE COURT:   So, depending on how -- we're going to go a
22   little bit later tonight than we ordinarily would to try to
23   get pretty far on in the process.   So, check that number
24   around 8 o'clock or so or maybe a little after 8 and we'll
25   have some news for you hopefully.

                              415

Respondent's Exhibit E

1       JUROR TIPTON:   And we're looking at a couple of days,

2       Tuesday, Wednesday, Thursday.

3       THE COURT:   Well, let me just tell you about lawyers.

4       They are notorious in underestimating on how long it will

5       take to put on their case.   They tell me that the total

6       trial, they think, would be about two, two and a half days.

7       That's why I said three.   So, we're looking at probably

8       Tuesday and Wednesday for sure.   It would be pretty hard to

9       imagine finishing up before Wednesday.   It could possibly go

10      into Thursday.   Okay.

11      JUROR TIPTON:   Yes, sir.

12      THE COURT:   Thank you.   I appreciate your.   You are free

13      to go at this time.

14  (Whereupon a brief recess was taken at 5:25 p.m., the following

15  proceedings resumed at 5:32 p.m. in chambers)

16      THE COURT:   All right.

17      MR. KIZER:   Your Honor, what I had talked to the

18      Prosecution about is that we have all been trying to coordi-

19      nate when we thought we would have witnesses to present and

20      all of that sort of thing, and even if we picked a jury

21      tonight, I don't think we would be ready to go at 8 o'clock

22      in the morning anyway or 8:30 or 9, whenever the Court wanted

23      to go.   Would the Court have a problem with us going, say,

24      another 30 minutes or an hour or something along that lines

25      and come back tomorrow morning depending on how far we get?

416

Respondent's Exhibit E

1    I've got -- for example, I have two people that are going to

2    come from out of town and then I've got to let the doctor --

3    the folks at the mental health center know, and I know

4    they've got folks coming from Little Rock.

5        THE COURT:  Well, if we started in the morning with the

6    State's case at 9 o'clock, the State is not going to be

7    through tomorrow anyway.

8        MS. BILLINGS:  Well -- and we don't have any way to get

9    in touch with them tonight, Judge.  That's the main thing.

10       THE COURT:  What time do you have them coming?

11       MS.  BILLINGS:  Tomorrow?  We had told them -- we

12   anticipated tomorrow afternoon late or even Wednesday morning

13   based on the way that we were going along.

14       THE COURT:  You don't have -- how many of them do you --

15       MS. BILLINGS:  We have two guys from the crime lab and -

16   -

17       THE COURT:  I mean, don't you have some --

18       MS. BILLINGS:  And we are having to coordinate with

19   Little Rock.  That's part of my problem.  They've got Dr.

20   Sturner for that Charmal Burnett case.  And --

21       MR. KIZER:  I think the evidence presentation is going

22   to go quickly in the guilt or innocence phase.

23       MR. JUNEAU:  I don't see -- I think we would probably be

24   through in one day on the State side.  Don't you?

25       MS. BILLINGS:  Um-hum.

417

4990
Respondent's Exhibit E

1          THE COURT:  Well, the defendant is going to have some
2     witnesses as well.  I guess what I'm saying is that if we
3     don't go as far as I think we can another -- we've got eight
4     jurors.  We may very well be able to pick another two or
5     three and tell the rest of the folks -- my problem is, I've
6     got 20 jurors who came back at 3 o'clock, none of whom we've
7     talked to yet.  They've been sitting out there.  Then I've
8     got, by sometime after 8 o'clock tonight or around 8 o'clock,
9     put a message on that machine to tell the remainder of the
10    jurors what to do including tell this bunch what to do.  And
11    I don't have any idea what to tell them other than just --
12    just to hang loose or just to come and sit at the courthouse
13    at this point.  If we had -- if we were further along knowing
14    that we only had one or two jurors to finish selecting, in
15    other words, if we got another couple tonight, we could have
16    a much better -- much better feel for what we could tell the
17    jurors tomorrow which does not mean that we can't finish up
18    in the morning and then just have everybody -- the ones that
19    are selected to show up at 1 o'clock to begin the case.  Now,
20    that's not a problem.  We could have some dead time late
21    morning.  But if we could do as much as we can tonight, let's
22    -- and I'm not talking about going to midnight or anything
23    like that, but I'm talking -- it's 5:30 now.  If we can,
24    certainly, another hour or so, we've been going one juror
25    every 20 minutes or something like that.  So if we can go

                                418

4991
Respondent's Exhibit E

1    another hour, we may very have most of our jurors.  And if we

2    get them all, that's great.  We can tell everybody to come

3    back and start at 1 o'clock tomorrow if that's the time that

4    we all agree on.  That's not a problem.  We can probably find

5    something to do with that time.

6         MS. BILLINGS:  Our biggest problem is getting in touch

7    with people tonight.

8         THE COURT:  Sure.

9         MS. BILLINGS:  You know, everybody has an answering

10   machine.

11        THE COURT:  Well, let's just see how far -- how far we

12   get at this point.  I'm sympathetic to your problem.  I'm not

13   ignoring it.  I just think we can do both.  Mr. Brown--Otis

14   Brown.

15        DEPUTY SHERIFF BAKER:  Otis Brown.

16        THE COURT:  Hi, Mr. Brown.  You want to come around and

17   just have a seat right here, please, sir.

18        PROSPECTIVE JUROR BROWN:  Thank you.

19        THE COURT:  We are continuing in chambers for the

20   purpose of inquiring of Otis L. Brown as a potential juror.

21   Earlier this morning during the time when we allocated --

22   that we allocated to the jurors for filling out this supple-

23   mental questionnaire, Mr. Brown mentioned to me in chambers

24   that he was at least somewhat familiar with the co-defendant

25   in this case, Mr. Alford Goodwin.  Having spent many years in

419

Respondent's Exhibit E

1     the school system here in Pine Bluff and Jefferson County,

2     Mr. Brown had occasion to come in contact through school with

3     Mr. Goodwin and has had some communication with him since he

4     has been in this trouble.  And I told Mr. Brown I would pass

5     that on to you lawyers so that y'all could inquire at greater

6     length about that.  Mr. Brown assured me he did not know Mr.

7     Reams or anything about Mr. Reams.  It was just Mr. Goodwin

8     that he had some information about.  So I'll -- with that

9     having been said, I'll let -- Ms. Billings.

10         MS. BILLINGS:  Yes, sir.

11         PROSPECTIVE JUROR OTIS L. BROWN

12  BY MS. BILLINGS:

13  Q   Mr. Brown, my name is Carol Billings.  And this is Wayne

14  Juneau.  We're from the Prosecuting Attorney's office.

15  A   Um-hum.

16  Q   And we are representing the State in this particular case.

17  I guess before I go any further with my questions I need to know

18  what type of communication have you had with Alford?

19  A   Just a letter in reference to the fact that he had gotten

20  into some trouble and that being in somewhat of a supervisory

21  capacity when he was in school was his principal.

22  Q   Did he tell you any of the facts of this case in the letter?

23  A   No, just that he was sorry he had -- you know, he didn't

24  shoot anyone, the nature of this.

25  Q   Okay.  Do you feel like knowing what Alford has told you in

4993
Respondent's Exhibit E

1    that particular letter would influence what you might do with this

2    particular defendant?

3    A    No.  Since he did not mention his name, I know nothing about

4    it.

5    Q    Okay.  I guess by just being here you now know that this

6    person is the other person that was charged?

7    A    That's correct.

8    Q    Okay.  And if Alford is saying he didn't do the shooting,

9    that only leaves one person, doesn't it?

10   A    That's true, whoever he is.

11   Q    With that in mind -- okay.  Whoever he is?

12   A    That's correct.

13   Q    With that in mind, though, could you give this defendant a

14   fair trial?

15   A    You are going to have to prove to me that he is guilty.

16   Q    Prove to you that he did it.  Okay.  Mr. Brown, I guess the

17   next most important question I need to ask you is do you believe

18   in the death penalty because we are seeking the death penalty in

19   this particular case?

20   A    If the circumstances merit.

21   Q    And is a murder a type of circumstance that you would

22   consider?

23   A    Depends on the kind of murder.

24   Q    Okay.  The law says that that capital murder in Arkansas is

25   one of the types of cases that the death penalty may be assessed

                                    421

Respondent's Exhibit E

1    in.

2    A    I understand.

3    Q    And what type of murder are you talking about?

4    A    Okay.  Case in point I would say that a man and his wife,

5    spouse, get in an argument and in the heat of the argument, a gun

6    is brought forth and someone is shot.  I don't know that I could

7    go to the capital punishment.  I could see prison or something of

8    this nature.

9    Q    I see, sir.

10    A    I can see capital punishment where something is premeditated,

11    pre-planned and carried out.

12    Q    Okay.  Okay.  So, people say, "I believe in the death penalty

13    but they don't want to be the ones that actually gives it."  Could

14    you do that if you found it was --

15    A    I don't believe that as a member of society you can believe

16    in something and not be a part of it.

17    Q    Okay.  In this case, we've charged this defendant sitting

18    right here, Kenneth Reams, with capital murder and that he

19    participated in the crime with Alford Goodwin.  And in order to

20    prove that, what I have to show you is that he or Alford Goodwin,

21    which, for the purpose of committing a robbery in this case, or in

22    the -- in an attempt to commit a robbery, killed someone.

23    A    Okay.

24    Q    And in this particular incident, it was Gary Turner over

25    there on Chestnut Street.  And we're alleging that the circum-

422

Respondent's Exhibit E

1    stances that they did this under manifested extreme indifference
2    to the value of human life.
3    A    Okay.
4    Q    And that they killed him in the course of this robbery.  Do
5    you understand how that can be a capital murder?
6    A    Again, I can see where it would be capital murder if we can
7    say that he did the shooting--he did the killing.
8    Q    Okay.
9    A    In other words, I have some problem with two people killing
10   someone and one telling the other one that this kind of thing and
11   one gets off.  I think both of them is guilty.
12   Q    Um-hum.
13   A    Now, if he did the shooting or whoever did the shooting, I
14   can -- I have no problem whatsoever.
15   Q    Well, in this case, accomplice liability and that's what you
16   are talking about basically there.  Are you familiar with that
17   term?
18   A    Well, I know what accomplice means and I know what liability
19   means.  I don't know what it means in the sense of we're talking
20   in terms of this.
21   Q    Okay.  If you aid someone in committing a crime or help them
22   plan it or prepare it or coerce them or encourage them in doing
23   that, the law says that you are what they called an accomplice.
24   A    I agree.
25   Q    Do you agree that someone that helps you do that much of it

                                  423

Respondent's Exhibit E

1    is just as guilty as the person that actually does it?

2    A    Yes and no.   In other words, if I am robbing a bank and you

3    are driving the getaway car, I think if I can prove that you

4    robbed the bank, then they ought to get you for robbing the bank

5    and the other fellow for accomplicing you.   But we need to be

6    sure.   That's what I'm saying to you.   I need to be sure that what

7    we are dealing with here if you ask for the capital punishment I

8    need to be sure this man is guilty of that.

9    Q    Okay.   The person sitting in the car, though, if the plan was

10   for me to run out and get in the car with you --

11   A    Yeah.

12   Q    And I just as guilty -- I mean, is the person out in the car

13   just as guilty as the one that went in with the gun?

14   A    He didn't pull the trigger.   What I'm saying to you is that

15   I can see punishment for both.   I have no problem with the death

16   penalty if it merits it--if he's guilty, whoever is guilty.   I'm

17   just simply saying that I need to know.   I'm trying to explain to

18   you the Miranda act which says that you've got to read him his

19   rights.   I'm not too concerned about his rights.   I'm concerned

20   about if he's guilty or innocent.

21   Q    Right.

22            THE COURT:   Let me stop you for just a second and make

23        sure that Mr. Brown -- I think we are about to confuse the

24        guilt phase of this trial with the punishment phase.

25            PROSPECTIVE JUROR BROWN:   Define.

                                424

Respondent's Exhibit E

1        THE COURT:   All right.   In this situation, Mr. Brown,
2    the first part of this trial will be just like the other
3    trials you've sat on.
4        PROSPECTIVE JUROR BROWN:   Right.
5        THE COURT:   Determine whether or not Mr. Reams is guilty
6    as charged.
7        PROSPECTIVE JUROR BROWN:   Okay.
8        THE COURT:   Nothing to do with punishment.
9        PROSPECTIVE JUROR BROWN:   I can deal with that.
10       THE COURT:   We won't discuss anything about punishment.
11   If it is determined that Mr. Reams is guilty, and that's what
12   you are talking about accomplice liability a while ago, if
13   and only if the jury votes that he is guilty, at that point
14   would you ever take up the question of punishment.
15       PROSPECTIVE JUROR BROWN:   Okay.
16       THE COURT:   And then I think what I heard you were
17   saying, correct me if I'm wrong, Ms. Billings and Mr. Kizer
18   may want to ask more about this, it may have some bearing on
19   the punishment in your mind as to who the trigger person was.
20   Is that correct?
21       PROSPPECTIVE JUROR BROWN:   That's correct.
22       THE COURT:   Okay.   In light of the Court's questions,
23   Ms. Billings, I'll turn him back over to you and let you
24   finish inquiring.
25   MS. BILLINGS CONTINUING:

425

Respondent's Exhibit E

1   Q    Mr. Brown, are they both guilty of capital murder if they
2   both participated in the same crime and it is just a difference in
3   what the penalty would be for each one.   Is that what you are
4   saying?  Or are they not even both guilty of capital murder?
5   A    I can't see two people unless they were both there partici-
6   pating in.
7   Q    Um-hum.
8   A    I'm holding you while I cut your throat.   I see, then,
9   capital punishment for two people.   I don't think that, in my
10  mind, if I was robbing a bank and you are in the car with the
11  motor running and I shoot the teller, that you ought to sentence
12  both to the chair.  Send me with the pistol.
13  Q    Right.   Okay.
14  A    I don't know if I'm -- that's what I'm trying to say.
15  Q    I think, again, like the Judge said, Mr. Brown, you are
16  confusing the penalty phase with the guilt phase.  First, we would
17  just have the guilt phase to determine whether or not Kenneth
18  Reams is guilty of capital murder.
19  A    Okay.
20  Q    The law in Arkansas says that if you help someone commit a
21  crime or you aid them in planning it or committing it, that you
22  are just as guilty as they are of that crime.   Okay.
23  A    Okay.
24  Q    That would be capital murder in this case.  We believe we can
25  show you that he aided and helped them in planning and committing

426

4999
Respondent's Exhibit E

1    what happened.  Okay?

2    A    All right.

3    Q    That's what I'm saying.  Do you agree with that concept?

4    A    It's the law.  I'll have to agree with it.  I can understand

5    that.

6    Q    Okay.  And then if you say, "Well, he didn't take as active

7    a part in it or something like that, those are something you can

8    consider in the penalty phase.

9    A    Well, I agree.  But I thought you was asking me those

10   questions.

11   Q    And we -- like I said, we are going to separate these into

12   two distinct facets of the trial, just whether or not he's guilty

13   of capital murder and then, in this case, it is going to be by

14   accomplice liability.  Okay?

15   A    Okay.

16   Q    And then the penalty phase, what the punishment should be.

17   A    Okay.  Anyway, we are dealing with two separate issues here?

18   Q    Yes, sir.

19   A    Guilt and the punishment.

20   Q    Yes, sir.

21   A    I have no problem with that.

22   Q    Okay.  You indicated or you said that you had communicated

23   with Alford or he had communicated with you.

24   A    He wrote me a letter.

25   Q    Have you formed an opinion as to whether Alford was the

5000
Respondent's Exhibit E

1  shooter or not?

2  A    That's a good question.  When I first read it, I didn't think

3  he did it.   I mean, he didn't shoot him.   That's just what I

4  thought.  I thought I knew him to the point that he was stupid and

5  do some things, but I didn't think he would do that.  That's just

6  my opinion.

7  Q    Did you change your mind at a later point or something?

8  A    No, I never really thought about it again until I came in

9  here today.

10 Q    Well, since you -- have you thought about it today since

11 you've been sitting out there?

12 A    Not really because what I'm saying to you, I guess, if I was

13 on the jury, I would listen to the facts and I do not have any

14 hangups about capital punishment if the crime deserves it, whoever

15 it is.

16 Q    You understand, and I'm going to keep going back to this Mr.

17 Brown, whether a person is guilty of the -- of capital murder or

18 not, that doesn't automatically get the death penalty.

19 A    I know that.  I understand that.

20 Q    Okay.

21 A    I understand that.

22 Q    Then you would decide that in a different phase of the trial.

23 If you found him guilty of capital murder, if I showed you that he

24 was an accomplice in this case as we have alleged, then you would

25 asked, in the penalty phase, to decide between life without parole

428

Respondent's Exhibit E

1    and the death penalty.  Okay?  In order to give someone the death

2    penalty, you have to find -- you have to hop through, basically,

3    what we call three hoops.  Okay?

4    A    Um-hum.

5    Q    The first hoop is we have to show you there is a reason why

6    we believe that this man deserves the death penalty.   That's

7    called an aggravating circumstance.  Have you ever heard of that?

8    A    Yes.

9    Q    Are you familiar with the death penalty process?

10   A    Well, not all of the trial.  I understand it.

11   Q    The --

12   A    All of the appeals and this kind of thing that's mandatory.

13   I think there is one or two appeals in this kind of thing, isn't

14   it?

15   Q    Well, in order for the State to seek the death penalty on

16   someone there has to be an aggravating circumstance, just the fact

17   that you killed someone is not enough.  The legislature has laid

18   out seven different things that they say if you have done one of

19   these things in addition to killing someone, you are a candidate

20   for the death penalty, but you cannot get it unless you have.

21   Okay?

22   A    Okay.

23   Q    We're alleging two of those aggravating circumstances in this

24   particular case.   Now, if you, from the proof that we would

25   present in the penalty phase, believe that we have shown those

5002
Respondent's Exhibit E

1    aggravating circumstances exist, then you would go on to the
2    second step of that penalty phase.   But if you did not believe
3    that they existed, then the trial would be over and he would
4    automatically be sentenced to life without parole.   Okay?
5    A    Okay.
6    Q    If you found, though, that one of those aggravating circum-
7    stances existed, then you would go to step two.   Step two is where
8    you would weigh the aggravating circumstances against any mitigat-
9    ing reasons that Mr. Kizer might offer as to why he should not get
10   the death penalty.   These may be his youth, his IQ, any of these
11   factors.   Would his youth prevent you from finding him guilty of
12   capital murder?
13   A    If the law does not.
14   Q    No, the law does not.
15   A    Okay.   Then I wouldn't either.
16   Q    Do you feel like a person is responsible for their actions
17   when they are 17 or 18 years old?
18   A    Yes, I do.
19   Q    Okay.   If you found that some aggravating circumstances
20   existed and maybe there were mitigating circumstances that
21   existed, you would be asked to weigh those against each other.
22   Just the fact that there may be nine, 10 or 12 mitigating circum-
23   stances does not necessarily mean that they would outweigh two
24   aggravating circumstances.   You would be looking at the substance
25   of what each one of those is; say, the mitigating might be

430

5003
Respondent's Exhibit E

1   retardation; it might be his youth.  It might be he has special

2   skills that they feel like he could use if he were given a

3   sentence in the penitentiary.  And you would be asked to weigh

4   those things whether you feel like those excuse him from the death

5   penalty in this case.  Okay.  That's what you would be asked to do

6   in that second part.  If you find that they do, well, then, the

7   trial is over and he is automatically sentenced to life without

8   parole.  If you find that those do not outweigh the aggravating

9   circumstances, that the aggravating circumstances are greater than

10  anything he has offered in mitigation, then you would go to the

11  third step.  And there you decide whether the aggravating circum-

12  stances warrant the death penalty.  You have to hit all three of

13  those points before you can give someone the death penalty.  Those

14  are three, more or less, check points.  Do you understand that?

15  A    I follow you.

16  Q    Do you have any sort of notion as to this defendant's guilt

17  in this particular case?

18  A    No.

19                    CROSS EXAMINATION

20  BY MR. KIZER:

21  Q    Mr. Brown, I'm bothered by the fact that you have gotten a

22  letter from Mr. Goodwin.

23  A    Okay.

24  Q    How can you be a fair and impartial juror in this case if

25  you've already gotten a letter from him where he says that he

                              431

1    didn't do the ultimate act?

2    A    If --

3    Q    You would have information none of the other jurors would

4    have?

5    A    That's true.

6    Q    You would have the ability to disseminate that information to

7    the other jurors.

8    A    That's true.

9    Q    It would not come through the proper channels of evidence in

10   this courtroom.

11   A    Trust.

12   Q    And you've already told us that based on what your prior

13   knowledge of Alford Goodwin and his character that you tend to

14   believe that he didn't do that.  He could do some things, but you

15   didn't think he could have done that.

16   A    That's true.

17   Q    But yet you tell Ms. Billings you have no preconceived idea

18   of guilt or innocence with regard to Mr. Reams?

19   A    What I was saying to hear or attempted to say, she would have

20   to prove to me that he was guilty.  I don't know if that's a

21   technical thing.  I think.  But that's, you know --

22            THE COURT:  Do you want some water?

23            PROSPECTIVE JUROR BROWN:  Please.

24   MR. KIZER CONTINUING:

25   Q    What if Mr. Reams says in the trial that he is -- he was not

432

5005
Respondent's Exhibit E

1    the shooter?  That's put you in a dilemma, does it not?

2    A    Yes.   That's put not me in so much a dilemma, it puts the

3    prosecution in a dilemma.  They have to prove to me that he did do

4    it.

5    Q    All things being equal that no one except -- there are only

6    three people, let's say, potentially who know who was the shooter.

7    One of them is dead.  Okay?

8    A    True.

9    Q    One of them has communicated with you.  The other one is

10   standing trial.  Do you feel like that compromises your impartial-

11   ity, the knowledge that you have gained from an outside source?

12   A    I -- you know, I'm not -- I see it as a civic duty to serve

13   on a jury when called. I do not believe it would compromise in a

14   sense that I could not be fair to this young man.  I'm just simply

15   saying that as to having that kind of information and that's why

16   I shared it with the Judge.  This man, I think, wrote that because

17   he felt that he was sure that I had heard about it and I knew

18   about it and because I had done some counseling with this young

19   man on several occasions on many number of times while he was in

20   school and there was some things that I knew about him that I

21   found he was doing while at school that I had tried to correct and

22   was not successful.  And this was, I guess, his way of trying to

23   apologize to me.  I don't know.

24   Q    Do you know how his case was disposed of?

25   A    I heard that, I guess, that he had confessed to being an

                                    433

Respondent's Exhibit E

1    accomplice.  I don't know if that's true or not.  Is that about

2    right?  Okay.  Something like that.

3                MR. KIZER:  That's all the questions I have, your Honor.

4                MS. BILLINGS:  Nothing further.

5                THE COURT:  Okay.  Thank you, Mr. Brown.  I'll let you

6           step outside for just a minute, please, sir.

7                MS. BILLINGS:  Your Honor, I'm going to move that he be

8           removed for cause.  I just don't feel like he could be fair

9           and impartial having communicated with one of the defendants.

10               MR. KIZER:  That's my movement also, your Honor.

11               THE COURT:  It would be -- if anybody could do it, Mr.

12          Brown could do it.  It's just too much to ask of anybody to

13          separate himself.

14               MR. KIZER:  I'm not implying in any way, shape or form

15          because I've known Mr. Brown my whole time I was in school.

16          I know what kind of person he is.  I just don't see how a

17          person could do that.

18               THE COURT:  I do, too.  That's just too much to ask of

19          anybody in that situation.  Ask him to step back in just a

20          second.

21               Mr. Brown, under the circumstances as you have related

22          them here and after hearing these questions and answers, the

23          Court is of the opinion that it ought not put you in a

24          situation of having to decide this matter given the informa-

25          tion that you have brought to us.  It's just not -- I told

434

Respondent's Exhibit E

1    them if anybody in the world could separate himself from that

2    information, I thought you could.  But it's just not fair to

3    you to put you in a situation to ask you to do that.  So, I'm

4    going to excuse you for cause in this matter because of your

5    prior association with Mr. Goodwin.

6         PROSPECTIVE JUROR BROWN:  If ou wanted, your Honor, I'll

7    bring the letter and let you see it.

8         THE COURT:  Mr. Brown, there is not a soul here that

9    doesn't take your word about that, and we appreciate you

10   being here.  I'm going to excuse you.  Thank you.  Matthew

11   Henry.

12        Hi, Mr. Henry.  We are continuing here in chambers for

13   the purpose of examining Matthew R. Henry for purposes of

14   determining whether or not he would be selected as a juror in

15   this matter.  Mr. Juneau.

16        MR. JUNEAU:  Thank you, your Honor.

17                PROSPECTIVE JUROR MATTHEW HENRY

18   BY MR. JUNEAU:

19   Q    Mr. Henry, my name is Wayne Juneau with the Prosecuting

20   Attorney's office and this is Carol Billings also with the

21   Prosecuting Attorney's office.  We are trying to, in this case,

22   pick a fair and impartial jury and we are going to ask you some

23   questions.  You need to answer outloud so the court reporter can

24   get your responses.  Okay?

25   A    Okay.

435

Respondent's Exhibit E

1    Q    Are you -- by now you are probably familiar that we are here

2    trying a capital murder case.  Do you understand?

3    A    That's right.

4    Q    Okay.  And do you understand a potential punishment of

5    capital murder is death by lethal injection?

6    A    That's right.

7    Q    I'm going to ask you not in specifics about this particular

8    case, but just in general as to whether you have an opinion with

9    regard to capital punishment?

10   A    Have an opinion?

11   Q    Yes.

12   A    Well, I think it is appropriate under -- under the appropri-

13   ate circumstances.

14   Q    Okay.  You don't have any reservations about that or any --

15   you would not consider capital punishment regardless of the

16   circumstances, would you?  Maybe you didn't understand my ques-

17   tion.

18   A    I didn't understand the question.

19   Q    You are telling me that in the appropriate circumstances you

20   could consider capital punishment, death -- the death sentence?

21   A    Oh, yes, I think I could.

22   Q    There are, I guess, a number of different ways in which

23   murder can result.  Let me ask you that -- is one of those

24   particular or appropriate circumstances a murder case?

25   A    Yes.  Yes.

436

5009
Respondent's Exhibit E

1    Q    Then there -- and, again, there are a number of ways a person

2    can commit person.  Some of them are premeditated murders.  Some

3    of them are spontaneous, spur of the moment type stuff.  Others

4    happen in the course of a criminal act.  For instance, in this

5    case, a robbery.  Okay.  Are there situations where you could not

6    consider the death penalty in a capital murder case?  For in-

7    stance, those that may occur on the spur of the moment as opposed

8    to a premeditated type murder?

9    A    I can't think of any situation.  I don't -- I don't think I -

10   - I don't really -- when you say a particular situation, I really

11   don't follow you.

12   Q    Let me be a little more specific then.  In this case, the

13   State of Arkansas says that Kenneth Reams, the man sitting across

14   from you, was involved in an aggravated robbery of a man at the

15   ATM machine on Fifth Street.  And that in the course of that

16   robbery, the victim was killed.  Okay.  And that that manifested

17   extreme indifference to the value of human life.  We have to prove

18   those things to you beyond a reasonable doubt.  Do you understand?

19   A    Um-hum.

20   Q    Have you ever sat on a criminal case before?

21   A    No, I haven't.

22   Q    Okay.  Well, back to my original question then as far as

23   capital punishment goes, do you feel like there would be, in a

24   case where a person was killed during a robbery, that may very

25   well be an appropriate circumstance where you could consider the

437

5010
Respondent's Exhibit E

1    death penalty?

2    A    Oh, yes, definitely.

3    Q    Okay.   Basically, what we are going to do in this trial

4    should you be picked as a juror is try this case in two parts--two

5    separate phases.   One will be the guilt and innocence phase.   The

6    other will concern punishment.   Okay.   You will consider and hear

7    evidence and consider that evidence and only determine whether

8    Kenneth Reams is guilty of capital murder or some lesser offense

9    of murder.   Okay.   You are not to consider punishment at that

10   point -- during that period of time.

11       Now, capital murder cases there are only two possible

12   punishments should you find him guilty.   One is life without

13   parole and the other is death.   Okay.   You need to answer yes or

14   no.

15   A    Yes.

16   Q    If you find Kenneth Reams guilty of capital punishment or,

17   excuse me, capital murder, and also hear evidence that he was 17

18   years old when he committed the crime, would the fact that the

19   death penalty be imposed have any influence on your decision as to

20   guilt or innocence?

21   A    No.

22   Q    That's kind of a loaded question, I guess, because I'm asking

23   you two or three different things in that question.   One is, does

24   the fact that Kenneth Reams is 18 now and he was 17 at the time he

25   committed the offense, would that have any bearing as to whether

438

5011
Respondent's Exhibit E

1    he was guilty or innocent of capital murder?

2    A    No.

3    Q    So it's your response to that question that you feel like he

4    is responsible for whatever conduct or acts that he commits?

5    A    That's right.  That is correct.

6    Q    Okay.  Do you understand or have you ever heard of the term

7    accomplice liability?

8    A    I heard of it.  I'm not sure I understand -- know exactly

9    what it entails right now.

10   Q    Okay.  Why don't you kind of tell me what you think is it?

11   A    What was the term again?

12   Q    Accomplice liability.

13   A    Accomplice liability.  Just based upon the term, "accomplice

14   liability," I would say responsbility placed upon a person because

15   of the fact a person is associated with a situation.

16   Q    Okay.  That's basically the interpretation of it.  For

17   instance, if we have two persons plan a bank robbery, one of the

18   drives the car, the other gets out and goes in and robs the bank.

19   In the course of that robbery, he kills somebody.  Would the

20   person -- in your opinion, would the person that drives the car be

21   as guilty of the capital murder and bank robbery as a person who

22   actually committed the robbery?

23   A    My view, they would be inseparable.

24   Q    Inseparable.  And you agree with that as the law?

25   A    Right.

5012
Respondent's Exhibit E

1    Q    Now, in fact, that is how the law reads as far as capital
2    murder in this case goes and what you will be instructed on toward
3    the end of the trial and that is that this defendant, Kenneth
4    Reams, the State will have to prove to you that this defendant
5    acting alone or was an accomplice in a robbery in which he or an
6    accomplice killed the victim.  Do you understand?

7    A    Yeah, I understand.

8    Q    And so you can see how the accomplice liability is factored
9    in or given to you in those instructions on a capital murder,
10   don't you?

11   A    Right.

12   Q    Now let's move to the second phase of the trial.  You
13   understand we've been talking about guilt or innocence and looking
14   at the facts of the case.  Should you come back -- after deliber-
15   ating on guilt or innocence, should you come back and decide that
16   Kenneth Reams is guilty of capital murder, then you will have the
17   opportunity to set the punishment.  As I said before, you can only
18   consider life without parole or death.  Do you understand?

19   A    I understand.

20   Q    Now, when you come back here to determine punishment, you've
21   got to do a number of things.  You've got to consider what we call
22   aggravating circumstances as well as mitigating circumstances.
23   Have you ever heard of those terms before?

24   A    That's right.

25   Q    We have alleged -- the State of Arkansas has alleged that

440

1    there are two aggravating circumstances in this case.  Okay.  The

2    defense attorney, I guess, will present evidence of mitigating

3    circumstances.    They may present evidence of more than two

4    mitigating circumstances.  There may be several that they present.

5    Do you understand the sheer number is not as important as the

6    substance of those allegations, don't you?

7    A    Right.

8    Q    For instance, just because the State may have two aggravating

9    circumstances and the defendant has six or seven mitigating

10   circumstances, that does not necessarily mean the mitigation

11   outweighs the aggravation.

12   A    I understand.

13   Q    And that's part of what you have to do is because one you

14   find aggravation and mitigation, then you have to determine

15   whether the aggravation outweighs the mitigation.  Weigh them and

16   determine which is more serious.  Is the aggravation more serious

17   or does mitigation outweigh the aggravation?  Do you understand?

18   A    Okay.

19   Q    And when you do that and you decide, if you decide that

20   mitigation outweighs aggravation, your decision is made for you at

21   that point because you only have the option of finding punishment

22   of life without parole.  The mitigation outweighs aggravation.

23   A    Um-hum.

24   Q    However, if aggravation outweighs mitigation, then you have

25   to determine whether those aggravating circumstances justify the

5014
Respondent's Exhibit E

1   death penalty.  Do you understand that?

2   A    Yes.

3   Q    In this particular case, you may very well be asked about the

4   death penalty.  Can you sign a form, which you will be required to

5   do should you determine that death is the appropriate sentence,

6   can you sign a form and come into the courtroom and look this man

7   in the face and impose the death penalty?

8   A    I can if I felt that was the appropriate sentence.  I could

9   sign it.

10  Q    You wouldn't have any reservations about doing that?

11  A    No, if I've felt in my heart that that was the appropriate

12  sentence, I would sign it.

13  Q    Okay.

14          MR. JUNEAU:  I'll pass.

15          MR. KIZER:  Thank you, your Honor.

16                    CROSS EXAMINATION

17  BY MR. KIZER:

18  Q    Mr. Henry, do you understand that all of this talk about the

19  death penalty may be totally premature?  This is the only chance

20  the lawyers have to discuss with you certain facets that may come

21  into play in this trial, but depending on what the determination

22  is at the guilt or innocence phase, and there will be several

23  options, not guilty or one of them, guilty of capital murder or

24  guilty or other charges.  Depending on how all of that turns out,

25  we may or may not ever get to the death penalty phase.  Do you

                            442

Respondent's Exhibit E

1    understand that to be the case?

2    A   Yes.

3    Q   If it turns out that the vote of the jury in a particular set

4    of circumstances like what we have here is guilty on capital

5    murder, could you consider both of the possible ranges of punish-

6    ment when it came time to deliberate on that issue?  That being

7    life without parole or the death penalty.

8    A   Yes.  Yes.

9    Q   Would you agree with me that life without parole, particular-

10    ly with someone who is 18 years of age and the life expectancy

11    being what it is in this country, is a significant sentence?

12    A   Really, yes, indeed.

13    Q   And is a severe sentence under the circumstances?

14    A   Of course.

15    Q   Could you consider that and would you consider that as -- and

16    exercise your discretion after hearing the evidence presented by

17    the State and by the defense on aggravation versus mitigation?

18    A   If I felt like that was appropriate, yes, I would.

19    Q   Do you feel as though you are someone who would stick to your

20    guns, so to speak, and vote your conscience in the jury delibera-

21    tions on both guilt or innocence and on punishment even if the

22    other jurors felt strongly and passionately opposite the way that

23    you do?

24    A   I would vote my conscience and mine only.

25    Q   Okay.  Would it make a difference to you in your deliberation

5016
Respondent's Exhibit E

1    concerning the law of accomplice liability not necessarily as much
2    on the issue of guilt or innocence but perhaps on the issue of
3    punishment?   Would it make a difference to you the level of
4    participation that the individual had in the crime that he was
5    charged with?   For example, would you consider the possibility,
6    that's what a range of punishment offers a juror, that someone
7    whose level of participation while it may make them as equally
8    guilty as somebody else, if his level of participation is lower or
9    not as great, may cause him to suffer a different set of punish-
10   ment  than  the  other  individual  whose  participation  is  more
11   indepth.   That's a convulated question.   But what I'm basically
12   trying to get to is would you consider a role that that individual
13   played in the crime when it came time to set punishment?
14   A     Yes, if I could discern the difference in the state of mind.
15   Q     If that --- that's right.   If the evidence is sufficient for
16   you to make that determination was presented to you?
17   A     That's right.   If I could, by some way, see the difference in
18   the state of mind and understand it or what is going to happen or
19   whatever.
20   Q     You had indicated, I believe, that you had read newspaper
21   articles about this case.   Have you read any in the last couple of
22   weeks about this case or the co-defendant's case, Alford Goodwin?
23   A     No, I haven't.
24   Q     Do you come into the courtroom with any type of preconceived
25   idea about the guilt or innocence of Mr. Reams based on anything

444

Respondent's Exhibit E

1     you may have read?

2     A     No, I don't.

3     Q     Based on any other source, conversations with other individu-

4     als, anything like that?

5     A     No, I don't.

6            MR. KIZER:  That's all the questions I have, your Honor.

7            THE COURT:  Anything further from the State?

8            MR. JUNEAU:  That's all.

9            THE COURT:  Mr. Henry, thank you.  I'll let you stand

10    outside.

11           MR. JUNEAU:  Your Honor, we'll excuse Mr. Henry.

12           THE COURT:  Okay.

13           MR. KIZER:  Your Honor, I want to renew my objection

14    just like I made when the State excused Ms. Johnson.  Mr.

15    Henry gave every appropriate response for any juror.  The

16    only reason the State could have is based on his race, I

17    would submit.

18           THE COURT:  Well, there have been four peremptory

19    challenges by the State.  Ms. Johnson iss black.  Ms. Flagg

20    is white.  Mr. Bradford is white.  Mr. Henry is black.  I

21    don't know what the reasons are.  Is the State prepared to

22    offer any reasons for striking Mr. Henry?

23           MR. JUNEAU:  Your Honor, I would also point out that

24    we've -- let's see, one of the jurors that we sat was a black

25    lady--Ms. Horace.

                                    445

Respondent's Exhibit E

1           THE COURT:  Certainly, Della Horace.

2           MR. JUNEAU:  Number 8.

3           THE COURT:  I understand.  I'm just asking you if you

4      have any reason you can offer to the Court for excusing Mr.

5      Henry.

6           MR. JUNEAU:  Based on Mr. Henry's indication that -- I

7      got the impression that Mr. Henry would only consider whether

8      the defendant was the actual shooter or not as to whether he

9      would consider the death penalty.  I think the questions that

10     Mr. Kizer asked would indicate that Mr. Henry was of the

11     opinion that if he felt like that Mr. Reams was not the

12     shooter, that he could not impose the death penalty in this

13     case.

14          MR. KIZER:  Your Honor, the State is not guaranteed a

15     lock on any of these jurors.  Mr. Henry said under the

16     appropriate  circumstances  he  would  consider  the  death

17     penalty.  I think that's all the State is entitled to.  And

18     I might also add that any number of the other jurors, most of

19     whom  are  white,  have  given  exactly  that  same  response.

20     That's what Mr. Tipton and that's exactly what Mr. Hornsby

21     said.

22          THE COURT:  Anything else?

23          MR. JUNEAU:  Nothing, your Honor, than I think the State

24     has the opportunity -- had the opportunity to evaluate Mr.

25     Henry's responses to those questions and the State is not

                              446

Respondent's Exhibit E

1    making any strikes based solely on Mr. Henry's race.

2        THE COURT:   I -- to be candid with you, I didn't hear

3    him say anything that would indicate to me that he would be

4    reluctant to impose the death penalty if the circumstances

5    warrant it at the time.   The thing that bothered me about

6    what he said was he kept mentioning -- he mentioned a couple

7    of times about state of mind -- if the defendant's state of

8    mind warranted it at the time.   I'm not sure -- that was the

9    only concern I had.   I'm not sure how we would ever be able

10   to prove the defendant's state of mind.   When I say, "we,"

11   I'm talking about the State.   That's the only thing that

12   troubled me.   But I think his other responses were pretty

13   much in line with what some of the other jurors have said.

14       MS. BILLINGS:   Your Honor, it seemed like whenever we

15   were asking the questions of Mr. Henry, like Mr. Juneau said,

16   he gave what would appear to be appropriate responses on the

17   State's questions.   And then when Mr. Kizer asked him about,

18   you know, the difference between the two, all of a sudden he

19   started vacillating on, like he said, the state of mind.   And

20   given the way that he responded to Mr. Kizer's questions in

21   light of what we had previously asked, it was like he was

22   almost a flip-flop.   And there is, you know, one of the

23   things we can use our strikes for is to eliminate persons

24   that we feel like have done such a thing like made a flip

25   flop once we have questioned them and then the defense

447

Respondent's Exhibit E

1    attorney has an opportunity to question them.

2         MR. KIZER:  State of mind if one of the elements of the

3    charge.  Reckless indifference to the value of human life.

4    That's what he said.  He would go on the state of mind.

5         THE COURT:  I think he was talking about the punishment

6    phase at this point.  I think he was talking about imposing

7    punishment if the state of mind warranted it.  I'm not sure

8    about that part of it.

9         What is the -- what are you asking the Court to do?

10        MR. KIZER:  I guess grant a mistrial under the circum-

11   stances because I believe that it is racially motivated the

12   strikes that have -- there have only been three blacks that

13   have been possible to be chosen and the State has struck two

14   of them.  The last one, I still submit, that they had no

15   basis other than race.

16        THE COURT:  I'm not sure that striking Mr. Henry is

17   grounds for a mistrial under the circumstances.  I'm not sure

18   what's the State's reason for it.  Of course, I'm not

19   prosecuting the case either.

20        MR. JUNEAU:  Your Honor, I'm not sure -- how many --

21   we've had four black jurors.

22        MR. KIZER:  Three.  Ms. Horace and --

23        THE COURT:  Four.  Mr. Brown was excused for cause.

24        MR. JUNEAU:  Four black jurors and two of which the

25   State has struck.

448

5021

Respondent's Exhibit E

1       MR. KIZER:  One the Court has struck and one is on the

2   jury.

3       THE COURT:  That's correct.  Are y'all waiting for me to

4   say something?

5       MR. KIZER:  If you have denied my motion, I guess we're

6   ready to go on to the next one.

7       THE COURT:  Well, I haven't denied it.  I just don't

8   know that that's the appropriate remedy.  I'm not sure that -

9   - what the remedy is.  You've raised the Batson issue and I'm

10  not sure that that's the issue.  Let's suspend for a minute.

11  You've got your motion in the file concerning the Batson

12  issue.  Have you got a brief that's --

13      MR. KIZER:  I think I cited a case or two.

14      THE COURT:  Who is Jesse Wilford?

15      MR. KIZER:  Hum?

16      THE COURT:  Who is Jesse Wilford?

17      MR. KIZER:  That case, I believe, is up on appeal.  And

18  I don't have a number of the case up on appeal.  We read

19  about that in the paper about one of the judges making a

20  ruling on Batson.  I've just gotten mine.

21      THE COURT:  Let's just suspend and go see what we can

22  do.

23  (Whereupon the proceedings were suspended at 6:15 p.m., the

24  following proceeding resumed at 6:30 p.m.)

25      THE COURT:  Okay.  We are back again in chambers with

449

5022
Respondent's Exhibit E

1       Mr. Henry--potential juror Matthew R. Henry present.   Mr.
2       Henry, I'll just tell you that the delay occasioned in our
3       asking to come back in here was occasioned by the fact that
4       some of us heard some of your responses differently and we
5       thought maybe the better way to handle this was just to get
6       you back in here and let these lawyers ask you some -- maybe
7       some of the same questions again or some different questions.
8       We were unclear as to what your responses were to some of
9       them.   So, I'll just turn it back over to the State for
10      purposes of inquiring further of Mr. Henry.
11           MR. JUNEAU:   Thank you, your Honor.
12              PROSPECTIVE JUROR MATTHEW R. HENRY
13   BY MR. JUNEAU:
14   Q    Mr. Henry, we had some confusion and it just may be my fault
15   for this.   So I'm going to ask you a few more questions about your
16   thoughts on the death penalty.   Okay.   I think understood when we
17   were talking about the guilt phase of the trial.
18   A    Yes.
19   Q    That you could find this defendant guilty if you believed
20   beyond a reasonable doubt that he participated in or was an
21   accomplice to the robbery and murder.
22   A    That's right.   That's correct.
23   Q    And when I say accomplice, I mean that he did not actually --
24   if you believe that he did not actually pull the trigger but that
25   he did participate in the robbery and knew about the robbery

450

1    itself?

2    A    That is correct.

3    Q    Okay.  Then we talked about the death penalty itself.  Aside

4    from the -- the guilt phase of the trial, assume with me that you

5    found Mr. Reams guilty of capital murder, okay?  Would you require

6    the State to prove Mr. Reams guilty -- I mean, excuse me, to prove

7    beyond a reasonable doubt that Mr. Reams actually fired the shot

8    that killed the victim before you could consider the death

9    penalty?

10   A    No, I think -- you asked the question about accomplice

11   liability.  And my view, it's the truth, is that any phase of

12   action is an integral part of the whole regardless.  It has no

13   relevance to this case at all.  I'm just speaking of my view.  So,

14   my answer to your question is yes.

15        Would you repeat the question?

16        THE COURT:  That's a good idea.

17   MR. JUNEAU CONTINUING:

18   Q    I may ask a different question.  I'm not sure.  I think my

19   question was to you, aside from the guilt phase.  Now, we're in

20   the punishment phase at this point, remember?

21   A    Yes.

22   Q    And I talked to you about finding mitigating and aggravating

23   circumstances, remember?

24   A    Yes, sir.

25   Q    My question to you is, would you require the State to prove

451

Respondent's Exhibit E

1    that the defendant beyond a reasonable doubt actually pulled the

2    trigger and killed the victim before you could consider the death

3    penalty in his case?

4    A    That wouldn't be necessary.

5    Q    Okay.  You would require the State to go that far before you

6    would consider whether the death penalty was appropriate?

7    A    No, because, as I said, it's all integral parts of the

8    defendant.

9              MS. BILLINGS:  May I ask one question, your Honor?

10             THE COURT:  You may.

11   BY MS. BILLINGS:

12   Q    Mr. Henry, perhaps I misunderstood when Mr. Kizer was asking

13   you questions.  He asked you questions about levels of intent.

14   A    Um-hum.

15   Q    And we understood that he was asking you during the sentenc-

16   ing phase of the trial would you factor levels of intent in

17   deciding whether or not he deserved the death penalty.  And I

18   understood your answer to him would be, yes, you would.  But

19   you're saying that -- what level of intent he had -- this particu-

20   lar defendant had in that part?

21   A    That was -- it so -- intent would be an integral part in my

22   view of thinking.

23   Q    Okay.

24   A    An integral part element of intent would have to be present

25   to intend to commit a certain act which resulted in something.

452

Respondent's Exhibit E

1   And the consequences would be the same.

2           THE COURT:  Are you telling us, Mr. Henry, that it would

3   be a factor that you would consider but not the only factor

4   because we talked about those aggravating circumstances

5   weighed against mitigating circumstance, et cetera?  When you

6   are trying to decide punishment, you know, the law is and I

7   think both of the lawyers have talked about it somewhat, the

8   State would attempt to prove to you that there were aggravat-

9   ing circumstances as the statute defines them.  And if you

10  find that there were aggravating circumstances and the

11  defendant proved to you that there were some mitigating

12  circumstances, would you weigh those factors as well as what

13  you told us a minute ago about the intent in trying to derive

14  or arrive at an appropriate punishment.  Could you consider

15  all of those factors, the aggravating circumstances, the

16  mitigating circumstances, and as you told us, what you

17  interpreted this defendant's intent to be in arriving at --

18  or would you only look at what his intent was, ignoring the

19  aggravating and mitigating circumstances?

20          PROSPECTIVE JUROR HENRY:  All of them.  All of them.

21          THE COURT:  Okay.

22          PROSPECTIVE JUROR HENRY:  I would consider all of those.

23          THE COURT:  Did I do a poor job or adequate job in

24  asking that question?  I'll address that to the lawyers.

25  Y'all are certainly free to --


453


5026
Respondent's Exhibit E

1           MR. KIZER:  Covered it as far as I'm concerned.

2           THE COURT:  Okay.

3    MR. JUNEAU CONTINUING:

4    Q    Do you have something on your mind that you want to say?

5    A    I want to be sure I'm understanding the question.  I think

6    the actions would determine intent on my part.  That would

7    influence -- influence my perception of intent.

8    Q    Okay.

9    A    So that's the only thing -- I think that's true with anybody.

10   I may not be understanding your question.

11          THE COURT:  I think you did.

12   MR. JUNEAU CONTINUING:

13   Q    And the intent you are speaking about, could you be a little

14   bit more specific as to what particular intent you are referring

15   to?  Would it be the intent to commit the murder or the intent to

16   commit the robbery?

17   A    Well, if an act is -- takes place that normally would result

18   in taking of a life, you could conclude there was intent.  I mean,

19   that's my view associated with intent.  I would have to look at it

20   in that context.

21   Q    So, I take it, from your --

22   A    Do you follow what I'm saying?

23   Q    Yes.  I take it from your response that you would -- the

24   intent goes to the robbery or the underlying crime.

25   A    Um-hum.

454

5027
Respondent's Exhibit E

1    Q    Is that right?

2    A    Yes.  Of course, you could have a robbery without the taking

3    of a life.

4    Q    Sure.  I understand that.

5    A    So, if an act is committed that takes the life, as I said

6    before, in my view, I would presume the intent was to do so if the

7    evidence merits that--only if the evidents merits that.

8    Q    And you would consider that intent along with the aggravating

9    circumstances and the mitigating circumstances to arrive at a

10   punishment?

11   A    That's my view in any case.

12   Q    Okay.

13            MR. JUNEAU:  Pass.

14            THE COURT:  Anything further, Mr. Kizer?

15            MR. KIZER:  No, your Honor.

16            THE COURT:  Okay.  Mr. Henry.  Thank you.  I'll let you

17        stand outside for a minute, please.  What says the State?

18            MS. BILLINGS:  I'm not sure if I'm any clearer on what

19        he says, your Honor, but rather than have a mistrial, we

20        would seat Mr. Henry rather than face a mistrial when we've

21        gone this far along.  We still maintain that that was an

22        objection -- a strike that we would have been entitled to.

23            THE COURT:  Well, let me say this, after re-reading some

24        of the Batson cases, the Court is of the opinion that

25        probably I was premature in asking the State for an explana-

455

5028
Respondent's Exhibit E

1    tion.   I think from the paucity of direction given to us by
2    the United States and the Arkansas Supreme Court in direc-
3    tions on how to proceed procedurally in such matters at least
4    it is the Court's opinion, at this point, that, one: the
5    trial court must make a determination that a pattern of
6    discrimination exclusion has been exhibited by the State in
7    their peremptory challenges.   I was premature in asking the
8    State for its reason for excluding Mr. Henry.   And as such,
9    even though the Court wasn't satisfied with the State's
10   explanation, I can't, at this point, say that with four
11   strikes having been made by the State, including Mr. Henry,
12   one of which was a black female with several members of her
13   family within the criminal justice system as defendants; a
14   white female, Ms. Flagg; a white male, Mr. Bradford; and then
15   a black male, Mr. Henry, I can't say that certainly within
16   this case there is any pattern.   Had I correctly, quite
17   frankly, made that finding, I never would have gotten to the
18   point of asking the State for its explanation.   I'll just
19   tell you at this point I do not find that there has been a
20   pattern established in this case; nor, in the Court's mine in
21   any other cases to the extent warranting granting of a Batson
22   mistrial.   So, I'm going to just tell you that I -- if the
23   State's desire is still to strike Mr. Henry for whatever
24   reason and exercise a peremptory challenge, you can do that,
25   and I am not going to grant a Batson mistrial objection.

456

5029
Respondent's Exhibit E

1          On the other hand, as we discussed very briefly in
2     chambers while we were all reading law books, that that's --
3     whatever the State wants to do at this point, I'll make my
4     ruling accordingly when Mr. Kizer renews his motion.
5          MS. BILLINGS:  Your Honor, we would strike him.
6          MR. KIZER:  For the purpose of the record, your Honor,
7     I renew -- show that I renewed my motion based on Batson.
8          THE COURT:  I understand.  The Court is going to deny
9     the motion for a mistrial pursuant to Batson v. Kentucky
10    already made by Mr. Kizer.  The Court does not feel as I have
11    previously recited that based on these four strikes in this
12    case, two females, two males, two whites and two blacks shows
13    any kind of a pattern that would establish a prima facie
14    exclusion of blacks in this jury panel.  Okay.  Excuse Mr.
15    Henry, but before we do that, let me, gentleman and ladies,
16    have you read Delois Thomas' questionnaire?
17         MR. JUNEAU:  Yes, we were talking about that.
18         THE COURT:  Without bringing her in, I'll entertain some
19    motion based on her answers to the supplemental question-
20    naire.
21         MR. JUNEAU:  The State will move that she be stricken
22    for cause, your Honor.
23         MR. KIZER:  I'll join in that.  Just one of those
24    responses would probably raise your eyebrow, but three of
25    them kind of knock it on down.

457

Respondent's Exhibit E

1    THE COURT:  We can excuse both Mr. Henry and Delois

2    Thomas.  Delois Thomas and Mr. Henry will be excused.  Now,

3    at almost 7 o'clock, do you want to make any attempt to go

4    any further folks, or what do you think?  Does anybody care

5    to go any further?

6        MR. KIZER:  The State gets to go first.

7        MR. JUNEAU:  I haven't really had time to look through

8    the questionnaires on these other people to be able to

9    evaluate or whether our voir dire will be short or long.

10       THE COURT:  Well, why don't we do this?  Why don't we --

11   I don't know where we are with these other folks.  Why don't

12   we suspend for the evening and ask them to come back at 8:30

13   in the morning?  We can resume at 8:30.  We've got eight

14   jurors.  I'll tell these that are out here to be back.  That

15   will take us down through Mr. Hickerson.  Is it your thinking

16   that we ought to put on the machine that the rest of them

17   come back around 10 or so--the rest of the jurors?

18       MS. BILLINGS:  Through Mr. --

19       THE COURT:  See, we've got down through Mr. Hickerson on

20   here and we sent him on home because of his diabetic situa-

21   tion.   He needs to go ahead and eat a meal.   So we've

22   actually got down through number 42, Mr. Rushing.  So we've

23   got 16.  We've got 16 here that we can tell to come back in

24   the morning at 8:30.

25       MS. BILLINGS:  Your Honor, are you going to incorporate

                                458

Respondent's Exhibit E

1    Ms. Thomas' questionnaire as part of the record?

2         THE COURT:   Yes.   That is the reason.   Based on her

3    response to the supplemental questionnaire we are going to

4    strike for cause Ms. Delois Thomas.

5         (WHEREUPON, SUPPLEMENTAL JUROR QUESTIONNAIRE OF DELOIS

6    THOMAS WAS MARKED AS COURT'S EXHIBIT NUMBER 1 AND MADE A PART

7    OF THIS RECORD.   SEE PAGE NUMBER 926 .)

8         Now, why don't I tell the rest of the jurors that have

9    not been questioned that are here to come at 8:30.   That's 16

10   of them.   On the answering machine, I'll tell the ones who

11   were excused today and haven't been here to tell them to come

12   at, say, 10 o'clock.   They'll probably have to do some

13   sitting around.   I doubt if we will cover 16 in an hour and

14   a half, but just in case we may, they will be here for that.

15   And the rest of the jurors that have been selected shall I

16   just tell them 1 o'clock.   That's not too optimistic to have

17   a jury seated by 1, do you think?

18        MR. KIZER:   No.

19        MR. JUNEAU:   We've got -- how many are we going pick,

20   two alternates?

21        THE COURT:   I think so.

22        MR. JUNEAU:   What, have we got six people left to pick?

23        THE COURT:   Right.   Let's go back into the courtroom and

24   I'll tell those that are still here to be back at 8:30.

25   (Proceedings moved into the courtroom at 6:57 p.m., the following

                              459

Respondent's Exhibit E

1    proceedings resumed at 7 p.m.)

2              THE COURT:  Let me count noses right quick and see who

3         is still here.  Jerald Norton.

4              PROSPECTIVE JUROR NORTON:  Here.

5              THE COURT:  Charles Wayne Martin.

6              PROSPECTIVE JUROR MARTIN:  Here.

7              THE COURT:  Carolyn Phillips.

8              PROSPECTIVE JUROR PHILLIPS:  Here.

9              THE COURT:  Clarence Arnold.

10             PROSPECTIVE JUROR ARNOLD:  Here.

11             THE COURT:  Denise Hoffman.

12             PROSPECTIVE JUROR HOFFMAN:  Here.

13             THE COURT:  Carolyn Bolin.

14             PROSPECTIVE JUROR BOLIN:  Here.

15             THE COURT:  Will Barnes.  Will must have -- I -- knowing

16        Mr. Barnes' size, I bet he ran out of gas and had to go get

17        something to eat.

18             Muriel Hayes.

19             PROSPECTIVE JUROR HAYES:  Here.

20             THE COURT:  Jim Shaw.

21             PROSPECTIVE JUROR SHAW:  Here.

22             THE COURT:  Melba Lee never was here or was excused.

23        Dorothy Hodges.

24             PROSPECTIVE JUROR HODGES:  Here.

25             THE COURT:  Alma Wallace.

460

5033
Respondent's Exhibit E

1              PROSPECTIVE JUROR WALLACE:  Here.

2              THE COURT:  Katherine Austin.

3              PROSPECTIVE JUROR AUSTIN:  Here.

4              THE COURT:  David Stelow.

5              PROSPECTIVE JUROR:  He went to eat.

6              THE COURT:  Nancy Davis.  And Mr. Rushing, I think, went

7         to get something to eat.  Mr. Hickerson, we sent him home

8         because of a diabetic condition.  Okay.  Ladies and gentle-

9         men, I think for everybody's benefit, we've decided we've

10        done as much as we can do today.  I'll tell you we've got

11        eight jurors seated.  It probably went a little faster than

12        we actually anticipated.  I'm going to ask those of you that

13        are here and we'll wait around for the other fellows to be

14        back in the morning at 8:30.  Now, I know there is not a

15        whole lot that you could discuss about the facts of the case

16        not having heard anything, but I'll caution you about please

17        don't discuss the case with anybody, certainly not among

18        yourselves or with anybody else.  I don't know what the news

19        coverage might be.  I don't know if there is any factual

20        matters that would be on the news, but just to be on the safe

21        side, try to avoid any news coverage about this matter.  Some

22        of the telephone people have been up here today.  I haven't

23        seen the newspaper reporter.  Just avoid the newspapers and

24        the radio and television if you can.  And come back in the

25        morning at 8:30.  We'll try to be here early enough to start

5034
Respondent's Exhibit E

1    promptly and try to move the process along.  I appreciate

2    your bearing with us today.  I know I've taken a day out of

3    your life, but this is a process that doesn't go necessarily

4    as fast as sometimes we want it to.  Does anybody have any

5    questions?  (No response)  Thank you.  Y'all are excused.

6  (Prospective jurors exited the courtroom at 6:57 p.m.)

7  (The following proceedings resumed in chambers Tuesday, December

8  14, 1993, at 8:30 a.m.)

9        MR. KIZER:  Your Honor, there are a couple of peremptory

10   challenges I want to exercise that will save us some time.

11   I couldn't put names with faces.  So I may just have to

12   signal y'all when they come in.

13        MR. JUNEAU:   What about your motion we talked about

14   yesterday?

15        MR. KIZER:  Yeah, it is being typed right now.

16        THE COURT:  All right.  Okay.  Jerald Franklin Norton.

17   Good morning.  Mr. Norton, come right around over here if you

18   would, please.  Just have a seat.  We are continuing this

19   morning.  This is Tuesday, December 14.  We are continuing in

20   chambers with the seating of a jury.  We have with us Mr.

21   Jerald Norton.  We are here for the purpose of inquiring of

22   Mr. Norton.  Ms. Billings.

23              PROSPECTIVE JUROR JERALD F. NORTON

24  BY MS. BILLINGS:

25  Q   Mr. Norton, my name is Carol Billings, and this is Wayne

462

Respondent's Exhibit E

1    Juneau.   We are from the Prosecuting Attorney's office.   And we

2    represent the State in this case.   We have charged this defendant

3    sitting right here (INDICATING), Kenneth Reams, with the crime of

4    capital murder.   I don't know if you have been out there talking

5    to anyone or not, but I'm sure you know by now you know that the

6    State is seeking the death penalty in this case.   Have you thought

7    about the death penalty yourself?

8    A    Oh, yes.

9    Q    Can you tell me frankly how you feel about it?

10   A    Yeah.   I believe if a fellow commits a crime punishable by --

11   that -- I -- you know, could be eletrocuted in certain crimes and

12   murder, on a certain degree, would be one of those that I could

13   agree with the death penalty on.

14   Q    Okay.   In Arkansas they don't do it by eletrocution any more,

15   they do it by lethal injection.   I know that's just a technicali-

16   ty, but it wouldn't change your opinion about --

17   A    No, it wouldn't.

18   Q    Mr. Norton, as I've said, we've charged this defendant with

19   the crime of capital murder.   In order to prove that to you, what

20   I have to show you and Mr. Juneau, the two of us, have to show you

21   that he or an accomplice and in this case he had an accomplice by

22   the name of Alford Goodwin.   That one of the two of them, in the

23   course of committing a robbery on Gary Turner at the ATM over

24   there on Fifth and Chestnut, caused the death of Gary Turner.   And

25   the circumstances that they did it under showed extreme indiffer-

463

1   ence to the value of human life.  We believe we can show you that.

2   Do you understand that that's a crime?

3   A    Yes, I can.

4   Q    Okay.  That incorporates a concept called accomplice liabili-

5   ty, Mr. Norton.  Have you ever heard of that?

6   A    I don't know whether -- really whether I have or not.

7   Q    Well, let me explain it to you.  You probably have and you'll

8   know when you hear it.

9   A    Okay.

10  Q    When two people plan to do a crime, they are equally liable

11  under the law.  Do you agree with that?

12  A    Yes.

13  Q    Okay.  Arkansas law, in fact, says if you aid someone in

14  planning or committing or encourage them to do it, coerce them to

15  do it, any of those things you are just as liable as the other

16  person.  And you said you agree with that.

17  A    I'll agree with that.

18  Q    So if two people are going to do a bank robbery and one of

19  them sits in the car with the car waiting and the other one goes

20  in and pulls the trigger, is the one in the car just as guilty as

21  the one that goes in?

22  A    I would think he would be.

23  Q    Okay.  In a case like this -- in a capital murder case, there

24  are two punishments that are possible.  And we try capital murder

25  case different than we try most cases.  We try a guilt phase just

464

Respondent's Exhibit E

1    where you decide whether or not the person is guilty of committing
2    the crime of capital murder.   Okay.   And then once you have made
3    a decision on that, if you decide that they are guilty, then we go
4    into the penalty phase.   You'll hear separate evidence at that
5    time as to why we believe that the defendant in this case deserves
6    the death penalty and probably some reasons from Mr. Kizer on his
7    behalf of the reasons that he says he does not.   Okay?

8    A    Okay.

9    Q    But you need to be able to separate the guilt phase from the
10   penalty phase.

11   A    Okay.

12   Q    A lot of people have told us before that I couldn't find him
13   guilty of capital murder because I knew they automatically got the
14   death penalty.   And now you know that's not true.   Right?

15   A    Right.

16   Q    You are not going to let you influence whether or not they
17   are guilty of the crime, are you?

18   A    No.

19   Q    Okay.   In this case, like I said, the two possible penalties
20   are life without parole or the death penalty.   And that's the
21   options that you're going to have as a juror and the discretion
22   that you are going to have to use whenever you look at the
23   aggravating circumstances and the mitigating circumstances.

24        In order to seek the death penalty, the legislature has about
25   seven different things that they lay out for prosecutors and they

465

Respondent's Exhibit E

1    say unless you can tell us that they did one of these or have one

2    of these other seven things besides the fact that they killed

3    someone, you can't seek the death penalty.  Did you know that?

4    A    No, I didn't.

5    Q    Most people don't.  In this case, we feel like we have two of

6    those things that the legislature sat out.  Okay.  Those are

7    called aggravating circumstances.  And then on the other hand,

8    they have also set out reasons why someone might not get the death

9    penalty.  Those are called mitigating circumstances.  Some of

10   those mitigating circumstances that Mr. Kizer might offer, there

11   is a whole list of them, but the youth of the defendant.  Some

12   people take that into account.  Do you feel like a person is

13   responsible for their conduct at 17 years old?

14   A    Yes.

15   Q    Okay.  And you wouldn't let that influence whether or not he

16   was guilty of a crime?

17   A    No, I wouldn't.

18   Q    Okay.  Some other things that might be mitigating -- that

19   they might present as mitigating evidence is sometimes they

20   present their IQ as a mitigating factor that they think might --

21   reason that you might not want to give him the death penalty.

22   Sometimes they present that they have special skills that you

23   might not want to give them the death penalty.  Things that they

24   could use in prison.  All of those things are called mitigating

25   circumstances.  Okay.  And you'll hear evidence from both of us on

466

5039
Respondent's Exhibit E

1    the reasons that we say he should and he should not.  Okay.

2         In order to give someone the death penalty, in that penalty

3    phase, you have to go through three steps.  You have to -- the

4    first one is you have to find that an aggravating circumstance

5    exists.  If you don't find that we show that there is an aggravat-

6    ing circumstance, you can't give them the death penalty.  He

7    automatically gets life without parole.  Do you understand?

8    A    Yes, I do.

9    Q    Okay.  If you find that there is one, though, then you go on

10   to step number two.  You look at those aggravating circumstances

11   and any mitigating circumstances that they offer and you weigh

12   them in your mind and you decide whether the things that we are

13   showing as reasons why he deserves the death penalty outweigh the

14   reasons why he says he doesn't.  Like I said, they are going to be

15   offering mitigating circumstances, more or less to show you an

16   excuse for committing the crime.  Okay.  And it's up to you to

17   weigh those.  Just the fact that he has 12 of those that you may

18   check off on that list does not necessarily mean that the two that

19   you checked off over on our list -- the numbers don't mean

20   anything is what I'm trying to say.  Do you understand that?

21   A    Yes.

22   Q    It's the gravity of what each one of them carries.

23   A    Yes.

24   Q    Okay.  You may find that none of those reasons are -- that

25   you don't believe that any of those reasons are mitigating

467

5040
Respondent's Exhibit E

1    circumstances; that none of those are excuses to you.  In that
2    case, you wouldn't check off any of them.  Okay.  As I said,
3    though, you have to find that an aggravating circumstance exist,
4    then you have to find that the aggravating circumstance outweigh
5    the mitigating circumstance.  And then if you find that that is
6    so, then you go on to step number three which is you look at this
7    case and you say, "Is this one that deserves the death penalty?
8    Do the aggravating circumstances in this case deserve the death
9    penalty?"  That's when you make your decision.

10       At that point, if you've gotten that far, you are going to be
11   asked to sign a verdict form that -- all 12 jurors that believe
12   this person deserves the death penalty have to sign a verdict
13   form.  Basically, you are going to be asked, Mr. Norton, to walk
14   back out into the courtroom and tell this defendant that you think
15   he deserves the death penalty.  Do you think you can do that?
16   A    Yes, I can.  If the evidence presents itself, I can.
17   Q    Okay.  Have you sat on a jury before?
18   A    Yes, I have.
19            MS. BILLINGS:  Pass the juror.
20            THE COURT:  Mr. Kizer?
21            MR. KIZER:  No questions.
22            THE COURT:  Thank you, Mr. Norton.  I'll let you stand
23       outside, please, sir.
24            MR. JUNEAU:  He's good, your Honor.
25            MR. KIZER:  I vote to excuse him and the next one, Mr.

                              468

1    Martin.

2         THE COURT:  Okay.  And Mr. Norton will be strikes number

3    six and seven.   That will leave you with five.   Is that

4    right?

5         MR. KIZER:  Um-hum.

6         THE COURT:  Mr. Norton is a white male.  What about Mr.

7    Martin?

8         MR. JUNEAU:  He is, too.  He is a white male.

9         THE COURT:  Okay.  All right.  Tommy, would you tell Mr.

10   Norton and Mr. Martin thank you.  They are excused.  Ask Ms.

11   Carolyn Phillips to step in.  Charles Wayne Martin.

12        Good morning, Ms. Phillips.  Just have a seat right

13   there if you don't mind.  We are continuing in chambers with

14   Ms.  Carolyn  Sue  Phillips.   We  are  continuing  the  jury

15   selection  process  for  the  purpose  of  inquiring  of  Ms.

16   Phillips.

17        MR. JUNEAU:  Hi, Ms. Phillips.

18             PROSPECTIVE JUROR CAROLYN PHILLIPS

19   BY MR. JUNEAU:

20   Q   Hi, Ms. Phillips.  My name is Wayne Juneau.  I'm with the

21   Prosecuting Attorney's office.  This is Carol Billings also with

22   the prosecutor's office.  Ms. Phillips, have you ever sat on a

23   criminal case before?

24   A   No, I haven't.

25   Q   Have you ever set on a civil case?

469

Respondent's Exhibit E

1    A    No.

2    Q    This is your first time then?

3    A    Right.

4    Q    Okay.

5    A    I've come up, but I haven't been selected.

6    Q    Okay.  Have you sat out there and let the lawyers ask you
7    questions?

8    A    Oh, yeah, um-hum.

9    Q    Ms. Phillips, we're here today, I'm sure you know by now,
10   trying or we are going to be trying a capital murder case.  We've
11   accused this man of being involved in a robbery and murder of Gary
12   Wayne Turner at the ATM machine there on Fifth Street in May of
13   this year.  Part of that trial is going to, of course, be involved
14   with punishment.  Okay.  In a capital murder case, should you and
15   the other jurors decide he is guilty, there is only two punish-
16   ments in that case.  One is life without parole and the other is
17   death.  Okay.  Have you -- I want to ask you some questions, and
18   we'll go through all of this, but right now I just kind of want
19   your ideas on the death penalty.  Have you ever thought about it
20   and if so where do you stand as far as the death penalty goes?

21   A    I believe in the death penalty.

22   Q    Are there certain cases that you believe the death penalty
23   applies and certain cases that you don't?  And let me narrow that
24   down by discussing, of course, murder.

25   A    Well, I think it would depend on the circumstances of it.

470

1    Q    Okay.   This  case  involves,  again,  an  attempted  robbery.

2    Under  the  law,  the  State  has  to  prove  beyond  a  reasonable  doubt

3    several  elements.    Those  elements  would  include  that  this  de-

4    fendant  or  another  person  or  an  accomplice  attempted  to  rob  Mr.

5    Turner  at  the  ATM  machine  and  during  the  course  of  that  robbery,

6    or  attempted  robbery,  either  this  defendant  or  his  accomplice  shot

7    and  killed  Mr.  Turner.   Do  you  understand?

8    A    Um-hum.

9    Q    Those  are  the  elements  --  basically,  those  are  the  elements

10   that  the  State  would  have  to  prove  to  you  beyond  a  reasonable

11   doubt.    Now,  factored  into  that  --  those  elements  is  what  the

12   concept  that's  known  in  the  law  as  accomplice  liability.   Have  you

13   ever  heard  of  that?

14   A    Are  you  referring  to  the  person  that's  accomplice  is  guilty

15   of  the  same  crime,  more  or  less?

16   Q    Yes.

17   A    Um-hum.

18   Q    Do  you  agree  with  accomplice  liability?

19   A    Well,  yes.   I  don't  know  that  the  penalty  would  be  the  same.

20   Q    Well,  I'm  asking  you,  at  this  point,  simply  from  a  guilt  or

21   innocence  standpoint,  not  a  punishment  standpoint?

22   A    Oh,  yes.

23   Q    Okay.   For  instance,  if  a  person  --  two  people  plan  to  rob  a

24   bank  and  one  person  went  in  and  pulled  the  gun,  robbed  the  bank

25   and  even  shot  someone  during  the  course  of  the  robbery  and  the

471

1    second person only drove the car, and you were asked to decide the

2    guilt or innocence on that second driver, would your verdict be

3    guilty or not guilty of the same offense that the person that was

4    involved, the shooter was?

5    A    Guilty.

6    Q    Do you think they are both criminally responsible at the same

7    level?

8    A    Yes, I do.

9    Q    Is that right?

10   A    Um-hum.

11   Q    You need to answer yes or no for the court reporter.

12   A    Yes.

13   Q    Now, you may hear some evidence and will hear some evidence

14   that the defendant is 18 years old now.  He was 17 at the time of

15   the crime.  Do you feel like the fact that he's 18 may somehow or

16   another lessen the guilt or innocence of him?

17   A    No, I don't.

18   Q    Do you feel like at 17 he's responsible for his conduct?

19   A    Yes, I do.

20   Q    Just like anybody else?

21   A    Yes, I do.

22   Q    The way we will handle this case is we will put on evidence

23   as to the guilt or innocence part of the trial only.  Okay?

24   A    Okay.

25   Q    You will consider guilt or innocence only.  You will come in

472

Respondent's Exhibit E

1    here and render a verdict as to guilt or innocence.  Then you will

2    go back out and the State will then put on other evidence regard-

3    ing punishment.  So, you understand that the trial will be in two

4    separate phases.  One is a guilt and innocence phase.  The other

5    is a punishment phase.

6    A    Yes, I do.

7    Q    Knowing that there is a potential sentence of death, would

8    that have any effect on your deliberation in regard to the guilt

9    or innocence phase of the trial?

10   A    No, it wouldn't.

11   Q    You would determine guilt or innocence separate and apart

12   from the punishment that may come later?

13   A    Yes, I could.

14   Q    And that's how this thing is designed to work because in the

15   penalty phase you will hear other evidence that will help you

16   decide what the proper punishment should be.

17   A    Yes.

18   Q    Part of that evidence that you will hear are what we call

19   aggravating circumstances.  The State will present proof of two

20   aggravating circumstances.  On the other hand, the defendant will

21   have the opportunity to present mitigating circumstances.  Do you

22   understand what those are?

23   A    Yes, sir.

24   Q    You will then determine whether those aggravating circum-

25   stances do, in fact, exist or whether the mitigating circumstances

473

1    exist or both.

2    A    Yes.

3    Q    Okay.  And you will probably hear the defendant put on more

4    than two mitigating circumstances.  They may put on anywhere from

5    three to maybe five or six.  Okay.  And you will list those out on

6    a form and make check marks as to whether they exist or not.  Do

7    you understand that just the sheer number of mitigating circum-

8    stances or aggravating circumstances is not as important as the

9    substance of what is alleged in those aggravating and mitigatinf

10   circumstances?

11   A    Yes, sir.

12   Q    So that simply because the defendant may introduce 10

13   mitigating circumstances that doesn't necessarily mean they

14   outweigh only one aggravating circumstance.

15   A    Right, yes, sir.

16   Q    Okay.  And that's the second part of your job.  Once you find

17   whether mitigating and aggravating circumstances exist, then you

18   are to weigh those two: which is more important; which has the

19   most substance to it.   If you find that mitigation outweighs

20   aggravation, then your decision is made for you because your

21   verdict can only be life without parole.

22        On the other hand, if aggravation outweighs mitigation, then

23   you have to go one step further.  You have to look at those

24   aggravating circumstances and see and determine if they justify

25   the death penalty.

474

Respondent's Exhibit E

1    A    Yes, sir.

2    Q    Do you understand?

3    A    Um-hum.

4    Q    Can you do those things?

5    A    Yes, sir.

6    Q    Now at some point in time should y'all decide that this

7    defendant deserves the death penalty, you will be presented with

8    a form and you will have to sign your name on that form.  Can you

9    look at this defendant, come in that courtroom and look at him,

10   sign that form and sit there and convict him of capital murder and

11   sentence him to death?

12   A    Yes, sir.

13   Q    Should you believe the evidence is appropriate?

14   A    Yes, sir.

15   Q    You have no problem with that?

16   A    No, sir.

17          MR. JUNEAU:  That's all.

18          THE COURT:  Okay.  Mr. Kizer.

19          MR. KIZER:  Thank you.

20                    EXAMINATION

21   BY MR. KIZER:

22   Q    Ms. Phillips, how long have you been living in Jefferson

23   County?

24   A    Thirteen years.

25   Q    The teaching that you do at Watson Chapel School District,

475

Respondent's Exhibit E

1  what age do you teach?

2  A    First grade.

3  Q    Have you always been elementary school teacher?

4  A    Yes, sir.

5  Q    The discussions that the -- a lot of what has been discussed

6  this morning centers around the death penalty.  Do you understand

7  that this trial would be conducted, as Mr. Juneau said, in two

8  different phases.  Depending on what happens in the first phase,

9  this may never get to the question of whether the death penalty

10 even applies.  This is just the only opportunity the lawyers have

11 to discuss with you that very serious topic.  Do you understand

12 that to be the case?

13 A    Yes, sir.

14 Q    At each stage and phase of the trial, there will be a number

15 of options that the jury has to exercise its discretion in making

16 a decision about where we go from that point forward.  And those

17 options will include not guilty as well as guilty.  It will

18 include also some other lesser included offenses that you could

19 find the defendant guilty of if you do not believe him guilty of

20 capital murder.  And you understand that to be the case.  There

21 are options that are available to you?

22 A    Yes, sir.

23 Q    The first part of the trial will be conducted as any other

24 criminal trial is conducted.  I think you have told us you've been

25 through voir dire but you have never actually sat on the jury.  Is

476

Respondent's Exhibit E

1   that correct?

2   A    Right, um-hum.

3   Q    There are some constitutional safeguards that attend and

4   protect the defendant in a criminal proceeding that are time

5   honored and been a part of our fabric of criminal justice system

6   when this country began.   The first one is that there is a

7   presumption of the innocence of the defendant in a criminal

8   proceeding.   If you are chosen and we get to the point where an

9   opening statement is made, I would explain that in a lot more

10  detail, and at the end of the trial, the Judge would instruct you,

11  by way of giving you the law of the case, and he will tell you all

12  about that also.   But do you understand that that presumption does

13  exist and do you feel like you have a good grasp of what that

14  means?

15  A    Yes, I do.

16  Q    Also, do you understand that in the first phase -- pardon me.

17  The defendant in a criminal proceeding doesn't have to prove

18  anything.   It's up to the State to prove the elements of the

19  charge beyond a reasonable doubt.   Do you understand that to be

20  the case?

21  A    Yes, sir.

22  Q    Right on the coat tails of that premise is the next premise

23  which means that the defendant under the Fifth Amendment of the

24  United States Constitution can not be compeled to give testimony

25  against himself.   He can testify or not testify.   That's entirely

477

Respondent's Exhibit E

1   up to probably me making that decision.  If he chooses not to, you

2   will be instructed by the Court that you can't take that into

3   consideration.  You understand that to be the law and that to be

4   the case.

5   A   Yes, sir.

6   Q   The first trial -- the first part of it will be where you'll

7   hear evidence from the witness stand and that evidence will go to

8   the facts of the particular case at hand.  And if you are chosen,

9   Madam Clerk will swear you in and that oath will say that you will

10  agree to well and truly try the case and to render a true verdict

11  according to the law and to the evidence.  Do you believe that

12  that is an oath that you can honor?

13  A   Yes, I do.

14  Q   You have no preconceived ideas about this matter or the guilt

15  or innocence of this defendant prior to coming into Court?

16  A   No, sir, I don't.

17  Q   I notice you did not check on the questionnaire that you had

18  read anything about this matter.

19  A   I had been out of town.  I remember -- I came in -- about all

20  I remember is my husband said, "Don't go to the money machine

21  after dark.  There has been a murder."  But I had not -- I'm not -

22  -

23  Q   And you certainly haven't read anything in the last couple of

24  weeks, have you?

25  A   No.


478

Respondent's Exhibit E

1    Q    All right.  The next phase, if we reach it depending on what

2    option the jury chooses, will be the sentencing phase.  It can be

3    a sentencing phase or it can be the death penalty phase.  You will

4    hear also evidence during that phase of the trial, but it will be

5    evidence unlike the evidence that you heard before because it will

6    probably be about more having to do with the life of Kenneth Reams

7    than it will anything else so that you can have a better prospec-

8    tive on who he is and what he is all about and what needs to be

9    done at that point.  Will you consider both the options presented

10   to you in the sentencing phase, the full range of those options?

11   For example, there are two different choices on capital murder.

12   Life without parole as well as the death penalty.  You'll have to

13   weigh the balance what you feel to be the appropriate factors.

14   Can you do that?

15   A    Yes, sir, I can.

16   Q    Can you also consider, if the jury makes another choice, that

17   there will be a separate range of punishment for either first

18   degree murder or manslaughter and that will again require the jury

19   to exercise its discretion in weighing the balance what you feel

20   to the appropriate under the circumstances.  Can you commit to us

21   today that you will consider the full range of those possibili-

22   ties?

23   A    Yes, sir.

24          MR. KIZER:  That's all the questions I have, your Honor.

25          THE COURT:  Anything further from the State?

479

Respondent's Exhibit E

1        MR. JUNEAU:  Nothing further, your Honor.

2        THE COURT:  Thank you, Ms. Phillips.  I'll let you stand

3    outside.  We'll let you know in just a moment.

4        MR. JUNEAU:  Good.

5        MR. KIZER:  Good for the defense, your Honor.

6        THE COURT:  Ask her to step back in.  Ms. Phillips,

7    congratulations, I think.  These folks think you would be an

8    excellent juror in this case and you have been selected to

9    serve.  We'll finish the process this morning.  There is no

10   real need in your standing around here this morning.  I've

11   asked the other jurors to be back at 1 o'clock.  So I'll ask

12   you also to be back at 1 o'clock.  Now, in the meantime,

13   certainly don't discuss the case with anybody else or with

14   any of the other jurors or anybody else and try to avoid any

15   news accounts of the matter between now and then.  We'll see

16   you at 1 o'clock.

17       JUROR PHILLIPS:  Okay.  Thank you.

18       THE COURT:  Thank you.

19       MR. KIZER:  Your Honor, the next juror --

20       THE COURT:  Mr. Arnold.

21       MR. KIZER:  If you might take a look at his question-

22   naire, I think he had indicated he had formed an opinion

23   already about this matter.  Okay.  Let's see what Mr. Arnold

24   has to say.

25       MS. BILLINGS:  Said he hadn't.

                            480

Respondent's Exhibit E

1        MR. KIZER:  I may have confused him with someone else,

2    your Honor.  He indicated that if the individual was proven

3    guilty, that they receive the maximum sentence.  I thought he

4    read his where he said he had formed an opinion about the

5    guilt or innocence.

6        THE COURT:  He works at the Varner Unit for the River-

7    side Vo-Tech within the grounds of the Varner Unit at the

8    Department of Correction.

9        MR. KIZER:  That's where the defendant was housed.

10        THE COURT:  We probably need to inquire then if he knows

11    anything about the defendant at this time.  Okay.  Clarence

12    Arnold.  Mr. Arnold, come right around if you will, please,

13    sir, and have a seat.  We are continuing in chambers with Mr.

14    Clarence Arnold.  Ms. Billings.

15            PROSPECTIVE JUROR CLARENCE ARNOLD

16    BY MS. BILLINGS:

17    Q    Mr. Arnold, my name is Carol Billings and this is Wayne

18    Juneau.  We're from the Prosecuting Attorney's office and we

19    represent the State in this case.  We've charged the defendant

20    sitting right here (INDICATING), Kenneth Reams, with the crime of

21    cpaital murder.  And in order to show you that he is guilty of

22    that crime, we have to show you that he or someone acting with

23    him, in this case there was a co-defendant by the name of Alford

24    Goodwin, that one or two of them in the course of committing a

25    robbbery killed a young man by the name of Gary Turner at the ATM

481

Respondent's Exhibit E

1    over there on Fifth and Chestnut.  And we say that the circum-
2    stances that they did under manifested extreme indifference to the
3    value of human life.  That's basically, what Mr. Juneau and I
4    would have to show you if you were selected to sit as a juror.  Do
5    you understand that?

6    A    Yes, ma'am.

7    Q    I don't know if you heard out there or not, but we are
8    seeking the death penalty in this case.  Were you aware of that?

9    A    Not really.

10   Q    Okay.

11   A    I knew based on what the Judge suggested that it was a
12   capital charge.

13   Q    Yes.

14   A    So it had to be one of the two.

15   Q    So you are familiar with what a capital charge carries?

16   A    Yes.

17   Q    Life without parole or the death penalty.  I need you to be
18   really frank with us and tell us how do you feel about the death
19   penalty.

20   A    I'm for it.

21   Q    Okay.  Are you one of those persons who says, "I'm for it,
22   but I could never give it out"?

23   A    No.

24   Q    You could do that?

25   A    Definitely.

                                    482

Respondent's Exhibit E

1    Q    Okay.  I notice that you work at the Varner -- on the grounds

2    of the Varner Unit, do you not?

3    A    Yes, I teach at the Riverside Vo-Tech.

4    Q    And in your questionnaire you say here that if someone if

5    proven guilty of a crime that they -- you think they should

6    receive the maximum sentence.  In this case, as I said, there is

7    a possibility of life without parole or the death sentence.  Are

8    you saying that right off the bat you would give the death

9    sentence without considering any other evidence?

10   A    No, no.

11   Q    You can consider the other sentence?

12   A    Sure.

13   Q    Have you ever been involved in a capital murder trial before,

14   Mr. Arnold?

15   A    No.

16   Q    We try it in two separate stages.  The first stage is just

17   strictly whether or not they are guilty of the crime of capital

18   murder.  As I told you, capital murder in this case would encom-

19   pass more than one person acting.  It has a -- it is basically the

20   accomplice liability theory.  Have you ever heard of accomplice

21   liability?

22   A    Yes.

23   Q    I don't know how familiar you are with that, but in Arkansas

24   the law says that if you aid someone in planning or committing a

25   crime or encourage them to do it or help them to do it in any

483

Respondent's Exhibit E

1    manner that you are just as guilty as they are.  Do you agree with
2    that?

3    A    Yes.

4    Q    So if two people go in to rob a bank and one of them sits out
5    in the car with the motor running and the other one goes in with
6    a gun and maybe shoots someone and kills them, is the person out
7    in the car just as guilty as the one that went in and shot?

8    A    I would think so.

9    Q    Okay.  This defendant in this case was 17 at the time that he
10   committed this crime.  He is 18 now.  Would that have any weight
11   on whether or not he is guilty of capital murder in your mind?

12   A    None whatsoever.

13   Q    In this type of trial, as I said, we try it in two stages.
14   We have the guilt phase where you just strictly decide whether or
15   not he is guilty of a crime.  If you find that he is not guilty of
16   the crime, then everybody goes home.  If you find he's guilty of
17   the crime, then you would come back and hear more evidence about
18   what the punishment should be.  In this particular case, I don't
19   know how familiar you are with this, but the legislature has set
20   out seven critera that they say are what they call aggravating
21   circumstances.   And unless one of those exist, the Prosecutor
22   can't seek the death penalty.  We are saying in this case that we
23   feel like two of those exist.  On the other hand, they've also set
24   out reasons that they call mitigating circumstances.  Things that
25   you can look at and say, "Well, I believe that's an excuse for the

484

1    crime." And one of your jobs as a juror in the penalty phase of

2    this trial would be to, number one, decide if there is an aggra-

3    vating circumstance or not. If there's not, then he automatically

4    gets life without parole. If you find that there is an aggravat-

5    ing circumstance, then you go on to the second step of the penalty

6    phase. You would be asked to weigh those aggravating circumstanc-

7    es against the mitigating circumstances. And just because there

8    may be eight mitigating circumstances that you find and one

9    aggravating circumstance that you find, doesn't mean that the

10   mitigating, just by the number, would outweigh the gravity of what

11   the aggravating. Do you agree?

12   A    Yes, I do agree.

13   Q    In fact, you may not find that any of those things in your

14   mind are an excuse for committing a crime. None of them are

15   mitigating in your mind.

16   A    That's true.

17   Q    And that's up to you. That's one of the things that you'll

18   have to look at as a juror. If you find that the aggravating

19   outweigh the mitigating, then you would go on to step three and

20   you determine, in this case, if you think the death penalty is

21   warranted based on the aggravating circumstances. So you have

22   three checkpoints in that penalty phase that you look at before

23   you can give someone the death penalty.

24       And at that point if you decide that that is what should be

25   done in this case, each and every one of the jurors will be asked

485

Respondent's Exhibit E

1    to sign their name on a verdict form that says I believe that --

2    this is basically what it says, "I believe this person deserves

3    the death penalty for this crime."

4    A     Um-hum.

5    Q     Could you sign your name to a form like that?

6    A     Yeah.

7    Q     Okay.  Because, basically, that would be what you are going

8    to have to do is walk back out and look at this defendant and tell

9    him that you believe that he deserves the death penalty for what

10   he did.  Can you do that?

11   A     Sure.

12         MS. BILLINGS:  Thank you.

13   A     Based on the circumstances and the evidence if it is there.

14         MS. BILLINGS:  Thank you, sir.

15         THE COURT:  Mr. Kizer.

16                         EXAMINATION

17   BY MR. KIZER:

18   Q     How long have you worked with the Department of Correction,

19   Mr. Arnold?

20   A     I do not work for the Department of Correction, sir.

21   Q     How long have you worked on the grounds of the Arkansas

22   Department of Correction?

23   A     Since January 7, '79.

24   Q     What's your opinion about inmates in the Department of

25   Correction?

                              486

Respondent's Exhibit E

1   A    I'm not sure that I understand your question.

2   Q    Well, have you formed any type of opinion about inmates in

3   general due to your association with them on the grounds of the

4   Arkansas Department of Correction?

5   A    Not really.  They are not -- what I've observed, they are no

6   different than what you see on the outside basically.

7   Q    Kenneth Reams is serving time at the Varner Unit at the

8   Arkansas Department of Correction.  Have you run into him there?

9   A    No, sir.

10  Q    Would that make a difference in your mind if it comes down to

11  time for you to deliberate on his guilt or innocence?

12  A    None whatsoever.

13  Q    Would it make a difference when it comes time to punish him

14  if you find that he was guilty of the crime?

15  A    No.

16  Q    Why did you write that you felt like a person if they were

17  found guilty of a crime should get the maximum sentence?

18  A    I believe that the judicial system has become rather lax in

19  the sentencing process.  We're not getting their attention.  We --

20  I see it day after day.  I work -- in this case, as you know,

21  there has been a change made in shifiting of the type of inmates.

22  I have one student that is on his third time down yet he is only

23  20 years old.  So, undoubtedly, somewhere along the way no one got

24  his attention.

25  Q    We are here today to try the State of Arkansas versus Kenneth

5060
Respondent's Exhibit E

1    Reams and not to go on crusade with cleaning up the judicial

2    system.  Would you agree with me that's the case?

3    A    Say that again.

4    Q    We're here to try one case, State of Arkansas versus Kenneth

5    Reams.

6    A    Okay.

7    Q    Not to correct what may be wrong with the judicial system.

8    Would you agree with that statement?

9    A    No, it won't straighten it out, but it is a good start.

10        MR. KIZER:  That's all the questions I have, your Honor.

11        THE COURT:  Anything further for the State?

12        MS. BILLINGS:  No, your Honor.

13        THE COURT:  Thank you, Mr. Arnold.

14        MR. JUNEAU:  Good.

15        MR. KIZER:  Good Nazi.  I'll excuse him.

16        THE COURT:  We need Denise Hoffman.  Four strikes left

17    for the defendant.  Six for the State.  Is that right?

18        MR. KIZER:  Um-hum.

19        THE COURT:  We are in chambers.  We are continuing jury

20    selection.  We have with us Ms. Mary Denise Hoffman.

21              PROSPECTIVE JUROR MARY DENISE HOFFMAN

22    BY MR. JUNEAU:

23    Q    Hi, Ms. Hoffman.  My name is Wayne Juneau and this is Carol

24    Billings.  We work with the Prosecuting Attorney's office.  Have

25    you ever sat on a jury before?

488

Respondent's Exhibit E

1    A    Yes, I have.

2    Q    How many was that?

3    A    Twice.

4    Q    Were either one of those juries where you went out and

5    decided guilt or innocence and came back and heard some more

6    evidence and then went out and decided punishment?

7    A    Yes.

8    Q    That's the kind of trial we are going to have today or when

9    we start this thing.  You, of course, know that we are trying this

10   man that is sitting across from you on a capital murder charge.

11   And should he be found guilty of that crime, there are only two

12   possible punishments.  One is life without parole and the other is

13   the death penalty.  Of course, we are asking you questions to

14   determine or to try to pick a fair and impartial jury, and I need

15   to ask you some questions in regard to your opinion on the death

16   penalty.  Okay.  Can you tell me what you think about that?

17   A    If circumstances warrant, I believe that it should be used.

18   Q    And you could be a person that could sit on a jury and

19   decide?

20   A    I believe so.

21   Q    You work at NCTR?

22   A    That's correct.

23   Q    How long have you been there?

24   A    About six years.

25   Q    The State has to prove beyond a reasonable doubt, the

489

Respondent's Exhibit E

1    standard that would be in any kind of trial like the last two you
2    sat on, that this man or he or an accomplice, okay, robbed Gary
3    Wayne Turner or attempted to rob Gary Wayne Turner, the victim, at
4    the automatic teller machine there on Fifth Street at the Worthen
5    Bank, and during the course of that robbery, one of them shot and
6    killed Mr. Turner.  Do you understand?

7    A    Um-hum.

8    Q    Those would be the elements that we would have to prove to
9    you.  Factored into that is a concept known in the law as accom-
10   plice liability.  You may be familiar with that.  Have you ever
11   heard of it?

12   A    No.

13   Q    Okay.  You might imagine what it is.  And to give you an
14   example what it is is, for instance, if two people plan to rob a
15   bank and one of them sits in the car and drives the car, while the
16   second person goes in the bank and pulls the gun and robs the
17   person in the bank and shoots them.  They are both tried on a
18   murder charge.  Would you agree that both are guilty of murder?

19   A    I believe so if they can prove to me that they had planned
20   this and had intended to do that.

21   Q    Okay.  Even though the second person who drove the car only
22   drove the car?

23   A    Yes, sir.

24   Q    You would agree with that?

25   A    Yes, sir.

                              490

1  Q    And that's what the law is.  And, in fact, like I said, it is

2  factored into the elements that we have to prove to you.  We have

3  to prove only that either this man or an accomplice--he or another

4  person--attemped to rob Mr. Turner and in the course of that

5  robbery, Mr. Turner was killed by either this man or the other

6  person.  Do you understand?

7  A    Yes.

8  Q    Do you have any problem with that?

9  A    No.

10  Q    Now, you are going to hear evidence that he's only 17 or was

11  17 at the time of the murder.  Do you have any problem convicting

12  a person of capital murder, the most serious charge there is, when

13  he is 17 years old when he committed the offense?

14  A    No.

15  Q    I take it by your response that you feel like he, at 17,

16  would be as responsible as any other person for his actions?

17  A    I believe so.

18  Q    We are going to try this case in two phases.  Of course, you

19  know the guilt or innocence phase comes first.  You'll hear that

20  evidence and you'll come in this room and deliberate on guilt or

21  innocence only.

22  A    Um-hum.

23  Q    But you know that a possible punishment could be death?

24  A    Yes.

25  Q    Would the fact that the death penalty may eventually happen -

5064
Respondent's Exhibit E

1    - you may, at some point in time deliberate and decide death,

2    would the potential of that have any effect on your consideration

3    as far as the guilt or innocence phase of the trial?

4    A    No.

5    Q    When you hear the punishment phase of the trial, that will be

6    a little bit different than the last one you sat in on because

7    there may be other witnesses called where in the last trial that

8    you sat in on I don't think there were any other witnesses.  You

9    just heard some evidence about the defendant's character or

10   background and then you came back.

11   A    That's correct.

12   Q    Well, you are going to hear some more evidence, probably a

13   lot more evidence, and what we will be doing at that point, is the

14   State will have an opportunity to prove to you aggravating

15   circumstances.  And we will allege two aggravating circumstances

16   that existed in this case.  The lawyer for the defendant will

17   present evidence of mitigating circumstances.  Okay.  Simply

18   becuase you find the defendant guilty of capital murder does not

19   mean he is going to be sentenced automatically to death.

20   A    Right.

21   Q    When you hear the aggravating circumstance and mitigating

22   circumstance, then you have to weigh those out.  When you do that,

23   you understand that just the sheer number of mitigating circum-

24   stances does not require that they outweigh the aggravation.  You

25   know the substance of those is more important than just the

492

Respondent's Exhibit E

1    number.

2    A    Um-hum.

3    Q    After you weigh those act, then you would determine if the

4    mitigation outweighs the aggravation.  If that's the case, the

5    penalty is automatically life without parole.  If, on the other

6    hand, aggravation outweighs mitigation, then you have to go one

7    final step and decide whether the aggravation justifies the death

8    penalty.  At some point in time should you decide that aggravation

9    outweighs mitigation, you will have to sign a form signing your

10   name sentencing this man to death.  Now, when you come back in

11   that jury room, are you going to be able to look at him and sign

12   the form and sentence him to death?

13   A    If you can prove to me that it's -- what happened, then I can

14   do that.

15   Q    Okay.

16          MR. JUNEAU:  That's all I have.

17          THE COURT:  Mr. Kizer.

18          MR. KIZER:  Thank you.

19                        EXAMINATION

20   BY MR. KIZER:

21   Q    Ms. Hoffman, where does your brother practice law?

22   A    Monticello.

23   Q    Does he practice a wide range type of law, I mean, criminal

24   cases included?

25   A    I believe so.  I don't think he does a lot of criminal cases.

493

Respondent's Exhibit E

1    Q    Where are you from?

2    A    I'm from White Hall.

3    Q    The work that you do out at NCTR, what does an employee

4    development specialist do?

5    A    I'm in charge of training and I handle some EEO matters.

6    Q    Okay.  The situation that you will be confronted with if you

7    are chosen as a juror in this case will not be unlike any other

8    case that you've had experience with.  By that I mean you will be

9    given options.  There will be several different options at each

10   stage and phase of the trial for you to exercise your discretion

11   concerning those options.  Do you feel like that that is something

12   that you can do?

13   A    Yes.

14   Q    Do you also feel as though that you will consider that at

15   each stage and phase the wide range of options, every option that

16   is available to you --

17   A    Yes.

18   Q    I believe the State and the defense are both looking for

19   someone who will be fair and open minded and consider all of the

20   evidence and make your decision based on all relevant factors.  Do

21   you believe that's the type of thing that you could do?

22   A    Yes.

23   Q    In the event -- and we have no way of knowing at this point

24   in time, but in the event that a capital murder charge is proven

25   sufficiently to you that a vote of guilty comes down for capital

494

5067
Respondent's Exhibit E

1    murder, that leaves two ranges of punishment.  Life without parole

2    and the death penalty.  There will be, as Mr. Juneau mentioned,

3    all types of evidence that will be presented to you at that stage

4    of the trial.  Will you consider both of those ranges of punish-

5    ment?

6    A    Definitely.

7    Q    The testimony of the -- I mean, the trial -- the first stage

8    of the trial, will be, as I mentioned to you before, conducted

9    just like any other trial.  Do you understand at that trial that

10   the State of Arkansas has the burden squarely on its shoulders?

11   A    Yes.

12   Q    The defendant doesn't have to prove anything at that stage?

13   A    Right, um-hum.

14   Q    Do you also understand that the presumption of innocence that

15   you've been told about in those other trials still is it a viable

16   and facet of our law and it is present and protecting Kenneth

17   Reams today?

18   A    Yes, I understand.

19   Q    Do you also understand that Kenneth has the right to testify

20   or not to testify and if he chooses not to, based on my advice,

21   then or his own decision, it doesn't matter, that is not a factor

22   that could be taken into consideration by you as a juror?

23   A    Right.

24   Q    I believe you said that you had heard something about the

25   fact that there had been a murder at the ATM machine here in Pine

                                 495

Respondent's Exhibit E

1    Bluff from someone else, but that's basically all you have put on
2    here.   Have you formed any type of preconceived ideas about the
3    guilt or innocence of this defendant based on what you've heard
4    outside the courtroom?
5    A    No.
6    Q    Have you had very extensive conversations with anyone about
7    what may have occurred at the ATM machine?
8    A    No, I really don't know any of the circumstances.
9    Q    Do you take oath seriously?
10   A    Yes, sir.
11   Q    The oath that you will be administered as a juror, you've
12   already taken it twice before and that is to well and truly this
13   case and render a true verdict according to the law and to the
14   evidence.   Is that something that you believe you would do?
15   A    Yes.
16             MR. KIZER:   That's all the questions I have, your Honor.
17             MR. JUNEAU:   Nothing further.
18             THE   COURT:    Thank  you,  Ms.  Denise.    You  may  stand
19        outside.
20             MR. JUNEAU:   She's good.
21             MR. KIZER:   She's good for the defense, your Honor.
22             THE  COURT:   She's  a  real  sweet  girl.   You  know David,
23        don't you?
24             MR. KIZER:   Well, I'm trying to think if I've met him
25        before.

                              496

Respondent's Exhibit E

1          THE COURT:  He practices with Bill Ball in Monticello.

2          MS.  BILLINGS:   Do  they  have  an  insurance  company  or

3     something?

4          THE COURT:  Congratulations, Ms. Hoffman.   These folks

5     think you would be just the perfect juror.  Let me ask you,

6     of course, as I will tell you all through the trial when we

7     take  a  break  and  you've  heard  me  say  this  before.   Don't

8     discuss  the  case  with  anybody  else  or  with  any  at  all

9     especially  your  fellow  jurors.   Avoid  any  news  accounts  or

10    anything about the case.  I told the other jurors to be back

11    around  1  o'clock.   There  is  no  sense  in  just  sitting  around

12    the courthouse for right now.  But if you will be back at 1

13    o'clock, we hopefully will have the rest of the jurors picked

14    by that time and be ready to start the case.

15         See you then.

16         MR.  KIZER:   Your  Honor,  based  on  my  prior  experience

17    with  this  jury  panel,  I  plan  to  use  my  exemptions  for  Ms.

18    Bolin and Mr. Barnes.

19         THE COURT:  Okay.  All right.

20         MR.  KIZER:   I  don't  want  to  cut  the  State  out  of  a

21    chance to --

22         THE COURT:  Number 9 on Ms. Bolin and Number 10 on Mr.

23    Barnes.  All right.  Leaving two strikes left for the defense

24    and six for the State.  That will take us down to -- let me

25    see.  Just for the record, Carolyn Bolin is a white female.

497

1          And Will Barnes is a white male.  Muriel Hayes is the next
2          juror.  Okay.
3              Ms. Hayes, just come around and have a seat, please,
4          ma'am.  We are in chambers for the purpose of inquiring of
5          Ms. Muriel Hayes for the possible selection on this -- on
6          this jury.
7              Ms. Billings.
8                   PROSPECTIVE JUROR MURIEL M. HAYES
9      BY MS. BILLINGS:
10     Q    Ms. Hayes, my name is Carol Billings.  I think I've talked to
11     you before in there in the courtroom and this is Wayne Juneau from
12     the Prosecuting Attorney's office.
13     A    Yes.
14     Q    We represent the State in this case and we have charged this
15     defendant sitting right here (INDICATING), Kenneth Reams, with the
16     crime of capital murder.  And in order to show you that he
17     committed a capital murder, we have to show you that he or someone
18     acting with him was attempting to commit a robbery and in the
19     course of committing that robbery, killed someone.  In this case,
20     the guy's name was Gary Turner.  And he was using an ATM machine
21     over there on Fifth and Chestnut.
22             We are going to allege that the circumstances they did that
23     under manifested extreme indifference to the value of human life.
24     That's what, basically, Mr. Juneau and I will have to show you
25     that he or someone else, in this particular case, the other

5071
Respondent's Exhibit E

1    person's name was Alford Goodwin, that one of those two shot and
2    killed Mr. Turner.
3         Under Arkansas law, that basically incorporates a term we
4    call accomplice liability.  Have you ever heard of that?
5    A    Yes.
6    Q    Do you know what that is?
7    A    Being with someone that commits a crime.
8    Q    Yes, ma'am.  Do you agree with that theory?
9    A    Well, yes.
10   Q    You do?
11   A    Um-hum.
12   Q    Okay.  Because if we show you that either one of these two
13   people killed this person in the course of a robbery, we've shown
14   all that we have to show besides the circumstances of it.  Do you
15   understand that?
16   A    No, explain.
17   Q    Okay.  The law says that if we show you that either this
18   person or the other person, either one of them, was trying to
19   commit a robbery and killed this man, then we've shown you all
20   that we have to show you to complete the crime of capital murder.
21   Do you understand that?
22   A    Um-hum.
23   Q    In this type of case, as I said, we have accomplice liability
24   and you said you understand that.  But if we have two people and
25   they are going to rob a bank and one of them is driving the

499

Respondent's Exhibit E

1    getaway car and the other one has the gun and they go into the

2    bank, the second person goes into the bank and he pulls a gun, and

3    he shoots and kills somebody, is the person out in the car, in

4    your mind, as guilty as the person that went in or are they on a

5    lesser level?

6    A    Well, I guess they are guilty because they were with them if

7    they planned and plotted it together probably.

8    Q    Okay.  And that's what Arkansas says.  That's what the law

9    says, too.  That as far as your guilt of a crime, you are just as

10   guilty as the other person is if you helped him commit it, and you

11   said you agree with that, right?

12   A    Um-hum.

13   Q    I don't know.  Have you been sitting out there talking to the

14   other jurors before you came in?

15   A    Yeah.

16   Q    Anybody mention to you that we would be asking you about the

17   death penalty?

18   A    No.

19   Q    Well, we are seeking the death penalty in this particular

20   case.  Do you have feelings about the death penalty?

21   A    Well, I don't want to be a person that, you know, would cause

22   somebody being put on death penalty.

23   Q    You don't want to be the one -- well, there are a lot of

24   people that say I believe in it, but I don't want to be the one to

25   give it.  Are you saying that's where you stand?

500

Respondent's Exhibit E