Volume 10

**PROPERTY OF ARKANSAS SUPREME COURT/COURT OF APPEALS**

# SUPREME COURT CR-17-654

KENNETH REAMS                                          **APPELLANT(S)**

V. JEFFERSON COUNTY CIRCUIT COURT

    JOHN W COLE

    35CR-1993-301

   STATE OF ARKANSAS                                   **APPELLEE(S)**

—

26__ VOLUME RECORD LODGED

### *COUNSEL*

ATTORNEY GENERAL  APPELLEE COUNSEL
323 CENTER STREET, SUITE 200
LITTLE ROCK AR 72201

CORINNE IRISH  APPELLANT COUNSEL
30 ROCKEFELLER PLAZA
NEW YORK NY 10112

DAVID ROBERT RAUPP  APPELLEE COUNSEL
323 CENTER STREET, SUITE 200
LITTLE ROCK AR 72201

GEORGE KENDALL  APPELLANT COUNSEL
30 ROCKEFELLER PLAZA
NEW YORK NY 10112

JIN HEE LEE  APPELLANT COUNSEL
40 RECTOR STREET, 5TH FLOOR
NEW YORK NY 10006

JOHN WINFRED WALKER  APPELLANT COUNSEL
1723 BROADWAY
LITTLE ROCK AR 72206

RECORD FILED AUGUST 4, 2017
**STACEY PECTOL, CLERK**
BY RENEE R. HERNDON, DEPUTY CLERK

VOLUME 19
Respondent's Exhibit E

*Volume 19*

PROPERTY OF ARKANSAS SUPREME COURT/COURT OF APPEALS

# CR   94 00558

KENNETH REAMS

Appellant(s)

**ORIGINAL**

v. Jefferson Circuit
HON. FRED D. DAVIS JUDGE
CR-93-301-3

STATE OF ARKANSAS

Appellee(s)

004 Volume(s)



EXHIBIT
1 C
Respondents

Transcript Filed
26th day of May, 1994
Leslie W. Steen, Clerk
By Denise Parks

Volume  3

Respondent's Exhibit E

VOLUME III

1    A    Yeah.

2    Q    You want somebody else to make the decision and not you?

3    A    Well, I wouldn't want the guilty conscious.  I wouldn't want

4    to feel guilty.

5    Q    In fact, in one of the stages in this particular trial, you

6    would be asked to sign your name on a verdict form that says, "I

7    believe this person deserves the death penalty."  Are you telling

8    me that you don't feel like you could do that?

9    A    I wouldn't want to do that.

10   Q    You don't want to do that.  You couldn't do that?

11   A    If I had to do that, I could, but I wouldn't want to.

12   Q    Would someone have to practically put a gun to your head to

13   make you do that?

14   A    Yeah, I just wouldn't want to be -- saying that this person

15   get the electric chair.  I wouldn't want to feel that I was a part

16   of that.

17   Q    We appreciate your being frank with us.  That's why we are

18   asking you these questions because that is a possible penalty in

19   this case, and we just need to know how everybody feels on the

20   front end so we can have a jury that's both fair to the State and

21   fair to the defendant in this case.

22        MS. BILLINGS:  Pass the juror, your Honor.

23        THE COURT:  Mr. Kizer.

24        MR. KIZER:  Thank you.

25                    EXAMINATION


501

1    BY MR. KIZER:

2    Q    Ms. Hayes, there will be several options that are available

3    to you as a juror at each stage and phase of this trial.   For

4    example, the trial will be conducted in two stages.   And a lot of

5    what happens in the second stage will be predicated upon what

6    happens in the first.

7         For example, in the first stage, you will be afforded to find

8    the opportunity to find the defendant not guilty, guilty as

9    charged of capital murder, or guilty of what's called lesser

10   included offenses.   Those are crimes that you can find that he

11   committed that are of a lesser degree of severity in the range of

12   punishment than what capital murder is.   We're not saying automat-

13   ically that there is ever going to be a death penalty phase even

14   discussed about this trial.   It's possible, but it is possible it

15   is not.   Do you understand that to be the case?

16   A    Um-hum.

17   Q    Have you served as a juror before?

18   A    Yes.

19   Q    And was it on a criminal matter?

20   A    No.

21   Q    It was in a civil case?

22   A    Yes.

23   Q    Criminal matters are a little bit different than civil

24   matters.   The trial proceeds in basically the same way but there

25   are some differences that I would like to point out ot you.   In a

502

1    criminal case, for example -- we're talking about the first stage

2    of it where you have to determine whether the defendant is,

3    indeed, guilty or not guilty.  There are some constitutional

4    safeguards that I'm sure you've heard about before that I would

5    like to discuss with you and ask you if you are familiar with

6    them.

7         The first one is that the defendant in a criminal case is

8    presumed to be innocent.  Do you understand that to be the case?

9    A    Um-hum.

10   Q    The Judge will instruct you in far more detail what that

11   actually means but that is an area of the law that is different in

12   a criminal matter.  Do you also understand in a criminal matter

13   the jury verdict has to be unanimous?  In a civil case, it is only

14   nine out of 12.  But in a criminal matter, it has to be unanimous.

15   Do you understand that difference?

16   A    Um-hum.

17   Q    Do you also understand that the State of Arkansas has the

18   burden of proof in a criminal matter and it is not like in a civil

19   matter?   In a civil matter, you have what is called a preponder-

20   ance of the evidence and you just have to weigh who you believe

21   has the most evidence.  But in the criminal matter, the defendant

22   doesn't have the burden.   That's strictly upon the State of

23   Arkansas to prove the elements of the charge beyond a reasonable

24   doubt.  Do you understand that distinction?

25   A    Um-hum.

503

1    Q    It is only if the jury came back and made the determination
2    that capital murder was the appropriate charge and a finding of
3    guilt was entered that we would get into the discussion of the
4    second phase of the trial having to do with the range of punish-
5    ment.  There are only two punishments for capital murder.  Now
6    there will be other punishments available if you find one of the
7    other offenses is what you found him guilty of.  But capital
8    murder is life without parole or the death penalty.  Are you
9    telling us that you can consider or not consider those two ranges
10   of punishment?
11   A    I could -- I can consider either one, but I would rather not.
12   Q    Well, I'd rather not be here today either, but I mean that's
13   what we are here having to do our civic duty, so to speak, and I
14   have an ethical obligation just like the other lawyers and the
15   Court in this room do.  But in light of your comment that you
16   would rather not impose the death penalty, would you vote to
17   impose it if you believed that the facts were proven to you
18   sufficiently that that is the appropriate remedy?
19   A    Yes.  I believe that if a person commits a crime that they
20   should be punished for that crime.
21   Q    That's what I'm trying to see if I can understand what you
22   are saying.  Would you consider all of the relevant factors and
23   you will be presented testimony about aggravating circumstances,
24   mitigating circumstances and you'll just have to weigh them in the
25   balance, but if capital murder is what you are asked to make a

504

1  decision about on the punishment phase, can you consider life
2  without parole and can you consider the death penalty and vote
3  your conscience as to which one you believe to be correct?
4  A    Yes.
5  Q    Even though you would rather not do it, that is something you
6  can vote to do.  Is that correct?
7  A    Yes.
8         MR. KIZER:  That's all the questions I have, your Honor.
9         THE COURT:  Anything further from the State?
10         MS. BILLINGS:  No, your Honor.
11         THE COURT:  Thank you, Ms. Hayes.
12         MS. BILLINGS:  We will excuse, your Honor, based on her
13  severe reservations about ever giving the death penalty.
14         THE COURT:  All right.  We'll excuse Ms. Hayes.
15         MR. KIZER:  I would, once again, renew my motion under
16  Batson, your Honor.  I believe that she was rehabilitated
17  when she said she would consider the full ranges of punish-
18  ment.  The State is not entitled to anybody who says a
19  guarantee that they will give the death penalty.  She said
20  she would consider it and that's all the State is entitled
21  to.  I believe that strike was based on race.
22         THE COURT:  Any response?
23         MS. BILLINGS:  Your Honor, she said from the start that
24  you would practically have to put a gun to her head in order
25  to get her to give the death penalty.  True, Mr. Kizer asked

505

5080 Respondent's Exhibit E

1      her if she could consider that as a range and then she came

2      around and said she would, but I think her initial response

3      was her gut reaction and the State is entitled to use one

4      of the peremptories on her.

5          THE COURT:  I'm going to deny your motion.  We'll call

6      Mr. Jim Shaw.  I tell you what let's do.  Let's take about

7      two or three moments.

8  (Whereupon, a brief recess was taken at 9:50 a.m., the following

9  proceedings resumsed at 10:12 a.m.)

10         THE COURT:  There is a -- there are a bunch of folks

11     on the list that have come back that I suspect we could

12     probably --

13         THE CLERK:  Judge, do you want me to go down and let

14     y'all put a check by the ones that are here that I just

15     called the roll for?

16         THE COURT:  Yeah.

17         THE CLERK:  Let's see.  We're down to --

18         THE COURT:  Melba Lee is not here, is she?

19         THE CLERK:  No.  Jim Shaw is and Dorothy Hodges, Alma

20     Wallace, Katherine Austin.  I moved Pammy Graves to the

21     bottom, but she is here.  I moved it on my list, but she is

22     here.  David Stelow, Nancy Davis, Phillips Rushing, Robert

23     Hickerson, Merle Cobbs, John Weaver, Brenda Silvey, Ida

24     Breitenstein, Darleen Frye, James Nesbett, Sandra Sharp.

25     And I had her excused for cause.

506

5081  Respondent's Exhibit E

1    THE COURT:  I did, too.

2    THE CLERK:  I asked her this morning.  I said, "I

3    thought I had you excused yesterday."  She said, "No, I

4    wish I was."  But anyway.  Then we skip on down to Jackie

5    Deureling and she thought she was supposed to be on the

6    bottom of the list.

7    THE COURT:  Well, she just about is.  She's the one

8    that's got to go to therapy every day.

9    THE CLERK:  Yes, and Monroe Jackson is the one that

10   has the child.  And he is here, number 16.  And that number

11   17 is Alma Brown.

12   THE COURT:  She's the one that's supposed to go to

13   that training session up in Illinois or Indiana or some-

14   where.

15   THE CLERK:  And Robert Morris has his own business.

16   And then, of course, Pammy Graves is on probation at work.

17   And then Houston Davis is here.  And Patricia Meadows.  I

18   just had to write them in.

19   THE COURT:  I don't have --

20   MR. KIZER:  What about Bill Shollmier?

21   THE COURT:  Bill is at home in bed sick.  I told him

22   we would call him if we had to have him.

23   MR. KIZER:  Betty Gillespie?

24   THE COURT:  She is at work to come if we have to have

25   her.

5082  Respondent's Exhibit E

1      COURT REPORTER:  Sandra Sharp was to be moved to the

2      bottom of the list if we needed her.

3      THE COURT:  Okay.  That gives us a bunch of folks to

4      go through.  I just -- some of these folks, for instance,

5      like I know Robert Morris.  We are probably not even going

6      to get to him, but he's got that TV shop right there at

7      Harding and Main.  We could call him if we had to have him.

8      Kind of like Shirley Turley downstairs.  Do you think that

9      there is any chance that we'll even get to the second page?

10      MR. JUNEAU:  I don't think so.

11      THE COURT:  It's pretty slim.  I guess we'd have to go

12      through a bunch of folks for cause to do that.  But --

13      MR. KIZER:  There are only seven more strikes between

14      the two of us.

15      THE COURT:  And there is a lot more folks.

16      MR. KIZER:  And we only need two more.

17      COURT REPORTER:  We need four more with the two alter-

18      nates.

19      THE COURT:  Yeah.  I would say that what we can

20      probably do if they would leave you a phone number where

21      they could be easily reached, I'd say everybody on the

22      second page we could --

23      THE CLERK:  Even Mr. Nesbett.  I -- did he have an

24      excuse?

25      THE COURT:  Well, Mr. Nesbett just thinks he wasn't

508

5083  Respondent's Exhibit E

1    even sworn in.  But I'm going to tell you he was sworn in

2    previously.  He's been up here several times.

3        MR. KIZER:  He was the one muttering under his breath

4    he didn't know why he had to come up here.

5        THE CLERK:  So you want me to --

6        THE COURT:  Start with Sandra Sharp.  WHy don't you

7    call them one at a time back here?

8        THE CLERK:  What about Mr. Davis, Houston Davis?  He's

9    been here from the start.  Shall we write him down on the

10   bottom of the front page?  Did he have an excuse?  He

11   wasn't here yesterday.

12       THE COURT:  Was he one of the one of those that called

13   --

14       THE CLERK:  Uh-huh.

15       THE COURT:  He had a business deal in Hot Springs.  He

16   called and said he was selling something in Hot Springs and

17   if he didn't get over there that the deal wouldn't go

18   through and he was going to lose a bunch of money, but he

19   could be here either late tomorrow -- I mean, late yester-

20   day or Tuesday.

21       THE CLERK:  So, do you want to put him just at the

22   bottom of the front page?

23       THE COURT:  Let's just pencil him in as number 51 on

24   that first page.  I don't know who he is.

25       THE CLERK:  So you want me to tell the other people

5084  Respondent's Exhibit E

1    besides Mr. Davis to get a number on that second page.

2         THE COURT:  Why don't we tell them that -- I'd call

3    them out one at a time through here and just get a phone

4    number and just tell them if they had rather go on if they

5    would just leave us a phone number where they can be

6    reached if we need them.  Our best guess is that we are not

7    going to need them and just send them on their way.

8         THE CLERK:  Did you want me to include Mr. Nesbett or

9    include him here?

10        THE COURT:  Yeah, I did.  Put him on the list, too, I

11   suppose.  Okay.  Which brings us to Jim Shaw.

12        Mr. Shaw, have a seat there if you would, please, sir.

13   Continuing in chambers with Mr. Jim Shaw.  Mr. Juneau.

14

15                PROSPECTIVE JUROR JIM SHAW

16   BY MR. JUNEAU:

17   Q   Hi, Mr. Shaw.  My name is Wayne Juneau.  This is Carol

18   Billings.  We are with the Prosecuting Attorney's office.  We

19   are going to ask you some questions so that we can try to pick

20   an impartial jury to try the man who is seated across from you

21   as you know on a capital murder charge.

22        Before I get into some specifics about the case and what we

23   are going to do, let me ask you about your questionnaire that

24   you filled out.  You indicated that one of your brothers was, at

25   one time, a police officer.

                              510

1   A   Yes.

2   Q   What was his name?

3   A   Johnny Shaw.

4   Q   When did he last work for the police department?

5   A   About the middle '70s to the early '80s.

6   Q   Okay.  He's no longer there then?

7   A   No, sir.  No, sir.

8   Q   What was his reason for leaving?

9   A   He didn't like the way his department was running.  So he
10  quit.

11  Q   He quit?

12  A   Um-hum.

13  Q   Did you and he talk about his problems with the police
14  department?

15  A   No, sir.

16  Q   As I said, we are trying Mr. Kenneth Reams on a capital
17  murder charge.  Part of the case will involve punishment.  Have
18  you ever sat on a jury before?

19  A   Just civil court.

20  Q   Just civil?

21  A   Um-hum.

22  Q   Well, part of the trial will involve punishment and, as you
23  know, capital murder cases the punishment can only be one of two
24  things should he be found guilty of that charge.  One is life
25  without parole and the other is death by lethal injection.

511

1    You may be a part of the jury who decides the case and may
2    even eventually decide the punishment and possibly the death
3    penalty.  I need to know your thoughts about the death penalty.
4    Have you ever thought about it and if so, tell me?
5    A    Yeah, I've thought about it.  I wouldn't want it hanging
6    over my head, you know, making a decision like that for somebody
7    else.
8    Q    Okay.  Are you telling me that you wouldn't want to be on
9    a -- you wouldn't necessarily want to be on a jury that had to
10   consider the death penalty?
11   A    Right.
12   Q    Why not?
13   A    Well, like I said, I wouldn't want to be, you know, to know
14   that I was the one that made that decision.
15   Q    Okay.  Are you opposed to the death penalty?
16   A    No, sir, I'm not.  I'm not opposed to it at all.
17   Q    Do you feel like that in certain circumstances the death
18   penalty would be an appropriate sentence?
19   A    Yes, sir.
20   Q    And murder would be one of those cases?
21   A    Yes.
22   Q    Okay.  But you just wouldn't want to be a juror who would
23   have to --
24   A    That's correct.
25   Q    If you were presented with a form and asked to sign that

512

5087  Respondent's Exhibit E

1    form in favor of the death penalty, could you do that?

2    A    Yes.

3    Q    And I assume you could do that if you felt like the State

4    had proved the case and the death penalty was justified?

5    A    Right, yes.

6    Q    The State has to prove to you beyond a reasonable doubt

7    that the defendant, Kenneth Reams, committed capital murder.  To

8    do that, we have to prove to you two or three elements of the

9    crime.  Okay.  We would have to prove to you that the defendant,

10   Kenneth Reams, or an accomplice, another person, attempted to

11   rob Gary Wayne Turner at the ATM machine there on Fifth Street

12   at the Worthen Bank and in the course of that robbery, either

13   Mr. Reams or an accomplice--his accomplice--killed and shot --

14   killed Mr. Turner.  Do you understand?

15   A    Um-hum.

16   Q    Do you understand that -- that accomplice liability is

17   factored into that, don't you?

18   A    Yes, sir.

19   Q    And do you understand what accomplice liability is?

20   A    Um-hum, yes, sir.

21   Q    Would you have any problems in deciding guilt or innocence

22   now, simply guilt or innocence, not the punishment based on the

23   fact that the State may prove that this defendant was an accom-

24   plice to the murder?

25   A    No, sir, I wouldn't have no problem with that.

513

5088  Respondent's Exhibit E

1    Q    Do you understand that he would be as guilty as the person

2    who actually did the shooting?

3    A    Yes, sir.

4    Q    Would you have a problem convicting him of capital murder?

5    A    No, sir.

6    Q    Would you have a problem of convicting him of capital

7    murder or considering the evidence in an impartial manner simply

8    because the death penalty may be an option at a later time?

9    A    Uh-uh.

10   Q    You need to answer yes or no.

11   A    No.

12   Q    When we get to the -- this trial will be divided into two

13   stages.   The first stage will be the guilt stage.   Okay.   You

14   will determine guilt or innocence based on the evidence that you

15   will hear.

16   A    Yes, sir.

17   Q    The second -- the second phase will be the punishment

18   phase.   That will be where you determine punishment.   And in the

19   punishment stage, you will consider a number of different

20   elements that the State and the defense attorney prove to you.

21   Some of those will be aggravating circumstances and others will

22   be mitigating circumstances.   The State will prove aggravating

23   circumstances and will, in fact, allege two aggravating circum-

24   stances.

25   A    Um-hum.

5089 Respondent's Exhibit E

1    Q    The defense attorney will make allegations in regard to
2    mitigating circumstances and they may prove several, more than
3    two, maybe five or six.  You have to weigh the aggravating
4    circumstance against the mitigating circumstance and determine
5    which one is more substantial.  Do you understand that?
6    A    Yes, sir.
7    Q    If you should determine that the aggravating circumstance
8    outweighs the mitigating circumstance, then you have to go one
9    step further and decide whether the aggravating circumstance
10   justifies the death penalty.  Do you understand?
11   A    I understand.
12   Q    If you should decide that the mitigating circumstance
13   outweighs the aggravating circumstance, then the sentence is
14   automatically life without parole.
15   A    I understand.
16   Q    Now, you have a little bit more insight as to what you have
17   to do and without telling you what the aggravating and mitigat-
18   ing circumstances are.  You are going to have to decide those
19   things.  Would that help you decide those cases or put you in a
20   better position to decide whether the death penalty is appropri-
21   ate or not?
22   A    It would probably put me in a better position to decide.
23   Q    So what I'm concerned about is your statement that you
24   would rather not be the person to invoke the death penalty?
25   A    Um-hum.

5090  Respondent's Exhibit E

1    Q    Okay.  Do you understand that you are just not going to be
2    handed a case and say, "Here.  Decide guilt or innocence and
3    what punishment."  There are going to be other factors and other
4    evidence you have to look at.  Okay.
5    A    Okay.
6    Q    Does that make you feel any better about deciding the death
7    penalty?
8    A    No.  I could probably decide the death penalty, but you
9    know, still there is still going to be that thought.  You know,
10   it would probably linger in my mind.
11   Q    And because of that thought or the seriousness of the
12   punishment, would you require the State to prove a higher burden
13   of proving this man guilty of beyond a reasonable doubt?
14   A    I don't quite follow you there.
15   Q    Do you know what reasonable doubt is?
16   A    Right.
17   Q    And the State is bound to prove to you a case beyond a
18   reasonable doubt, not beyond all possible doubt.  Do you under-
19   stand?
20   A    Um-hum.
21   Q    But because you would be somewhat reluctant to impose the
22   death penalty, do you think you would require more evidence from
23   the State than you would, let's say, in another case?
24   A    No, I don't think so.  It's just -- like I said, it's just
25   the thought of imposing that sentence.  You know, it's not the

516

1    proof or anything.  It's just -- just the mere thought of having

2    to impose that type of sentence on somebody.

3         MR. JUNEAU:  Okay.  We'll pass the witness, your

4    Honor.

5         THE COURT:  Mr. Kizer.

6         MR. KIZER:  Thank you, your Honor.

7                        EXAMINATION

8    BY MR. KIZER:

9    Q    Mr. Shaw, how long have you worked as a welder?

10   A    About the past 15 years.

11   Q    And how long have you worked at your present employer?

12   A    I think about eight or nine months.

13   Q    Where did you work prior to that?

14   A    Prior to that I was at -- I've worked so many, I've done

15   lost track of them.  H. H. Robinson in Sheridan as a welder.

16   Q    Have you done construction work also?

17   A    No, sir.

18   Q    Just curious, where is 6-1/2 Shirley?

19   A    Well, it's really 6 Shirley.  My landlady has built on like

20   a little duplex on the back of her house and, you know, it just

21   makes it 6-1/2.

22   Q    All right.  The situation that you find yourself in today

23   is that we are here to try a case involving two particular

24   aspects of the charge of capital murder.  The first being

25   whether, in fact, the defendant is guilty of capital murder or

                                517

1    not.

2    A    Um-hum.

3    Q    And the first part of this trial will proceed like any

4    other criminal trial, that being that a determination will have

5    to be made as to whether the State can prove their charge or

6    not.  Do you understand -- I know that you said you have sat in

7    on civil cases before.  Do you understand there is a difference

8    between how a criminal case is conducted and a civil case is

9    conducted?

10   A    Right.

11   Q    For example, the burden of proof in a civil case is by a

12   preponderance of the evidence meaning whoever has the most

13   evidence, basically, is the one that you would make a finding

14   for.

15       In the State of Arkansas versus Kenneth Reams, that's a

16   criminal case and the State has the burden of proving the charge

17   beyond a reasonable doubt.  The defendant does not have to prove

18   anything.  Do you understand that to be the case?

19   A    Right.  Yes, I do.

20   Q    Do you also understand as a corollary to that premise that

21   the defendant may or may not take the witness stand?  That's a

22   decision that he and I will reach at the close of the State's

23   evidence.  And if he chooses not to take the witness stand, that

24   is not something that you can take into consideration.  In fact,

25   the Judge will instruct you that you shall not take it into

518

1   consideration when it comes time for you to determine his guilt

2   or innocence.  Do you understand that?

3   A    Yes, sir.

4   Q    At the close of the guilt or innocence phase, you will be

5   afforded several options if you are chosen as a juror.  You may

6   find the defendant not guilty of anything.  You can find him

7   guilty of capital murder as he is charged, or there will be

8   what's called lesser included offenses.  Those are crimes for

9   which you could find him guilty that are lesser -- have a less

10  severe punishment than what capital murder does.  What I'm

11  basically trying to lay out for you is that you will have

12  options.  Will you consider the entire range of options that are

13  put before you and make your decision based on the evidence?

14  A    Yes, sir.

15  Q    Likewise, if we get to the second phase of the trial, there

16  will also be options that will be afforded to you.  The second

17  phase of the trial will come about if he is found guilty of some

18  charge.

19       If he is found guilty of capital murder, there are two

20  ranges of punishment.  The first would be life without parole

21  and the second being the death penalty.  And there will be

22  evidence that will be presented to you.  It will, in essence, be

23  a separate trial.  There will be testimony that will be taken.

24  There will be exhibits that will be introduced and offered for

25  your perusal so that you can look at them and determine if that

519

1    is relevant in your decision or not.  And only after you have
2    heard all of that evidence will you be asked to make up your
3    mind which of those do you feel to be appropriate as far as
4    punishment goes.  Is that something that you can commit to us
5    that you will do, that being consider the full range of punish-
6    ment in this matter?
7    A    Yes, sir, it is.
8    Q    The death penalty, as you have mentioned before, you would
9    rather not do it, but I think from what you told Mr. Juneau and
10   subsequent questions that you said that you possibly can if the
11   evidence merits it.  Is that right?
12   A    Yes, sir.  What I mean, you know, I'm confident in myself
13   I could do that.  But, you know, it still --
14   Q    It is not a very pleasant thing to do?
15   A    Right, exactly.
16   Q    You can also, I take it, consider whether life without
17   parole is an appropriate punishment?
18   A    Yes, sir, I could.
19   Q    Would you agree with me that -- especially given the
20   circumstances that we have here.  Mr. Reams is 18 years of age.
21   And with the life expectancy that human beings have these days
22   ,if he got a life without parole sentence, that is a very
23   significant and very severe sentence for someone to have to
24   serve.  Would you agree that that is a true statement?
25   A    Yes, sir.

520

1    Q    Potentially 50 years or so in the penitentiary is what we
2    are looking at.

3    A    Um-hum.

4    Q    Would you consider when it comes time to make that decision
5    if it ever does whether on mitigating factors the full range of
6    evidence that the Judge permits to come in, for example, there
7    will be factors of -- there will be evidence about his back-
8    ground, what he may have done in school, what he may not have
9    done in school, what his family life may have been like, what
10   his intellectual abilities are, what -- whether he was under the
11   influence of any type of drug or intoxicant at the time the
12   crime was committed, any number of different factors.

13   A    Um-hum.

14   Q    Will you consider all of those factors before you make your
15   decision?

16   A    Yes, sir, I will.

17         MR. KIZER:   That's all the questions I have, your
18        Honor.

19         MR. JUNEAU:   Nothing further, your Honor.

20         THE COURT:   Thank you, Mr. Shaw.   You may step
21        outside, please, sir.

22         MR. JUNEAU:   We will strike him.

23         THE COURT:   Okay.   Tell Mr. Shaw that he will be
24        excused and see if Ms. Hodges will join us.

25         Good morning.   We are here in chambers with Ms.

521

5096   Respondent's Exhibit E

1       Hodges, Ms. Dorothy Hodges.  Ms. Billings.

2                  PROSPECTIVEW JUROR DOROTHY HODGES

3    BY MS. BILLINGS:

4    Q    Ms. Hodges, my name is Carol Billings.  And this is Wayne

5    Juneau.   We are from the Prosecuting Attorney's office.   We

6    represent the State in this particular case.  And in this case,

7    we have charged the defendant sitting here, Kenneth Reams, with

8    the crime of capital murder.  What we have to show you in order

9    to prove that case is that he or someone else acting with him

10   went over to the ATM over there on Fifth and Chestnut and in the

11   course of committing a robbery or attempt to commit a robbery

12   killed a young man by the name of Gary Turner.

13            We say that the circumstances that they did that under

14   manifested extreme indifference to the value of human life.

15   That's basically what Mr. Juneau and I would have to show you if

16   you were selected to sit as a juror.  Do you understand that?

17   A    Um-hum.

18   Q    If either one of them -- if we showed that either one of

19   them killed him in the course of a robbery, that would be the

20   proof that there had been a capital murder committed.  Do you

21   understand that?

22   A    Um-hum.

23   Q    That encompasses a term they call accomplice liability.

24   Have you ever heard of that?

25   A    Um-hum.

5097 Respondent's Exhibit E

1    Q    Well, accomplice liability means that when you aid someone

2    in planning or committing a crime or actually help them do it,

3    then you are just as guilty as they are.  Do you agree with

4    that?

5    A    Well, not entirely.  It's according to the circumstances if

6    they were forced.  Now, if they willing, it's different.  But if

7    they were forced to accomplice, that, to me, is something else.

8    Q    Okay.  I think in most cases it would be that they willing

9    went along with whatever it was, there was some planning and

10   some committing -- and so forth that went on, would you consider

11   that a willing participation?

12   A    Yes.  Yes.

13   Q    Okay.  And in that instance, is the person that helped them

14   plan it just as guilty as the other person?

15   A    Um-hum.

16   Q    So if we had a bank robbery and one person sat out in the

17   car with the motor running and the other one ran in the bank

18   with the gun and shot and killed someone inside the bank, is the

19   person sitting out in the car just as guilty as the one that

20   went in and shot?

21   A    Yeah, in a way.  I mean, he wasn't the trigger man or

22   pulled the weapon or killed him, but if it was already planned

23   and all that, to me he should serve time, you know.

24   Q    Okay.  In a case like this -- this is a capital murder

25   case.  We try this in two separate sections, Ms. Hodges.  We try

523

1    it in just a guilt phase; whether or not you are guilty of the

2    crime legally.   And then the second phase is the penalty phase

3    where you can use any reservations about that person's partici-

4    pation, if you want to call it that in that crime, that you can

5    any reservations there in assessing the penalty.   Under those

6    circumstances, would you be able to find both people guilty of

7    the crime of robbery if I showed you that one of them sat in the

8    car and the other one went in the bank and pulled the gun?

9    A    Um-hum.   Um-hum.

10   Q    Okay.   And that's what the Arkansas law says is the way it

11   is supposed to work, too.   As I said, we are going to try this

12   case in two different stages.   And I don't know what you've

13   heard out there where you have been sitting.   I'm sure by now

14   everybody knows that we're seeking the death penalty in this

15   case.   I need to know from you just, you know, as plainly as you

16   can tell me what is -- whether or not you believe in the death

17   penalty?

18   A    Yes, I do.

19   Q    You do believe in it?

20   A    Yes.

21   Q    See, a lot of people tell us I believe in the death

22   penalty, but I don't want to be the one to impose it.   Are you

23   one of those people?

24   A    No, if the facts prove that that person is totally guilty

25   in my opinion and in my heart and mind, then if that's what --

524

5099 Respondent's Exhibit E

1    I mean, I've been here before.  So he says, this is death

2    penalty or whatever.  Then I would -- if I feel he is guilty or

3    being it him or her or whatever, that's my opinion, then yes.

4    Q    Then you feel like you could actually impose the penalty if

5    you felt like that's what it deserved in this particular case?

6    A    Yes.

7    Q    Would you let the penalty phase of it enter into whether or

8    not they were even guilty of the crime?

9    A    No, no.

10   Q    Okay.  That's the way it is designed to work because you

11   would just consider whether or not they committed the crime and

12   then you would consider the penalty separate.

13   A    Um-hum.

14   Q    In fact, we'll have in the -- just in the guilt phase of

15   the trial, we'll have witnesses to that part and then if we got

16   to the penalty phase, then you will hear other information that

17   would go towards making your decision as to what the penalty

18   should be.

19   A    Um-hum.

20   Q    When we do that -- well, let me back up just a little bit.

21   The legislature says that you can't give someone the death

22   penalty -- we can't even seek it as prosecutors unless there is

23   what they call an aggravating circumstance, something besides

24   the fact that you killed someone.  Did you know that?

25   A    Uh-uh.

5100 Respondent's Exhibit E

1    Q   Okay.  Well, that's the way it works.  The legislature has

2    set out seven different things that they consider aggravating

3    circumstances.  In this particular case, we believe that we have

4    two of those.  Okay.  And we are going to be putting on proof

5    when we get to the penalty stage of the trial to show you the

6    reasons why the State believes that Kenneth Reams deserves the

7    death penalty in this case.

8         On the other hand, Mr. Kizer, his attorney, is going to be

9    putting on reasons, called mitigating factors, things that he

10   says mitigate against him giving him the death penalty, and you

11   are going to be asked as a juror to look at those and decide,

12   number one, if they even exist.  Okay.  And if they exist, if

13   the mitigating are more powerful than the aggravating or vice

14   versa.  Okay.

15        When we get to the penalty stage of the trial, you have

16   three steps that you are going to be asked to look at.  You are

17   going to receive a big pile of papers.  Okay.  I'm going to tell

18   you that right off the bat.  And it may look a little bit

19   complicated at first, but basically the three things that we'll

20   be asking is, number one: did the State show you that there is

21   an aggravating circumstance?  Okay.  If you find that there was

22   no aggravating circumstance, the trial is over and the Judge

23   sentences him to life without parole and everybody goes home.

24   Okay.  But if you find that there was an aggravating circum-

25   stance, then you go on to step two.  In step two, you would be

5101  Respondent's Exhibit E

```
 1    asked to look at mitigating circumstances.   Are there any
 2    mitigating circumstances there, reasons why you believe it would
 3    be an excuse for committing the crime.   Okay.   You don't have to
 4    find that those exist.   If these things don't make -- don't add
 5    up to mitigation in your mind, you don't even have to find that
 6    they exist.   But if they do, you can find those and there are
 7    two or three different forms for how strongly the jurors feel
 8    about the different mitigating circumstances.   Okay.   You would
 9    be asked to weigh, at that point, the aggravating against the
10    mitigating.   As I told you, we are alleging two.   The defense
11    may have several things that they offer as reasons why -- that
12    might excuse this crime in their mind or might lessen the
13    penalty.   And you are going to be asked to weigh those.
14         Do you understand, Ms. Hodges, that we are not talking
15    about just numbers?   We're talking about the gravity of the
16    things that are --
17    A    Um-hum.
18    Q    Here?   Just because we have one or two doesn't mean that it
19    doesn't outweigh everything that they have over here.   Okay?
20    A    Um-hum.
21    Q    That's one of the decisions you are going to have make.
22    A    Um-hum.
23    Q    Does it outweigh it?   If you find that it does not -- that
24    the aggravating circumstances do not outweigh the mitigating,
25    then the trial is over.   Okay.   He automatically gets life
```

5102  Respondent's Exhibit E

1   without parole and that is it.   But if you find that the

2   aggravating circumstances are more powerful than the mitigating

3   circumstances, then you go on to that third step.   And you

4   determine in this case the aggravating circumstances warrant the

5   death penalty.   So you've got three steps you take before you

6   get the death penalty.   Okay.

7   A   Okay.

8   Q   Those are your three checkpoints, I guess you would say.

9   And then at that point, if you decide that that's true, the last

10  form that you would fill out is going to be a verdict form.   It

11  has a place on there for all 12 jurors to sign their name.   And

12  basically what you are saying is I believe this person deserves

13  the death penalty.   Could you sign a form like that?

14  A   Um-hum, if the facts proved that he was guilty.

15  Q   Well, you understand you're going to be deciding the guilt

16  in one phase --

17  A   Um-hum.

18  Q   And then the punishment in the other.

19  A   Punishment in the other, um-hum.

20  Q   Can you assure me that you won't let the punishment enter

21  into your decision about whether he is guilty or not?

22  A   No, it won't.

23  Q   Okay.   And what that means if you sign that form basically

24  you are going to have to walk back out and look at this guy and

25  tell him you believe he deserves the death penalty.   Could you

1   do that?

2   A    Um-hum.

3   Q    The fact that he was 17 when he committed this crime or 18

4   now, would that weigh in your mind any as to his guilt?

5   A    No.

6   Q    Do you feel like --

7   A    If he did it, he did it.

8   Q    He's responsible at 17 for his actions just like anybody

9   else would be?

10  A    Right, right.

11          MS. BILLINGS:  Thank you.

12          THE COURT:  Mr. Kizer.

13          MR. KIZER:  Thank you.

14                          EXAMINATION

15  BY MR. KIZER:

16  Q    Ms. Hodges, just on an entirely personal note, have you

17  seen any ducks over in the Humphrey area?

18  A    Oh, boo-koos.

19  Q    Next Saturday we will be looking for them.  My name is

20  Maxie Kizer.  I'm the attorney that is going to be representing

21  Mr. Reams.  And one of the things I want to inquire about and

22  make sure that you understand is that -- as you were told by the

23  State, there are two different phases to this trial.  We have

24  been -- they have been talking about, and I will also, your

25  feelings about the death penalty and that sort of thing.  Do you

                              529

Respondent's Exhibit E

1    understand that we may not even get to that phase --

2    A    Um-hum.

3    Q    Where the death penalty is even a possibility?

4    A    Yes.

5    Q    That will be entirely up to the jury depending on the guilt

6    or innocence phase.  There will be options that will be avail-

7    able to the jurors after the first trial is concluded.  And

8    those options will including finding the defendant not guilty of

9    anything.  Finding him guilty of capital murder will also be an

10   option as will what are called lesser included offenses, crimes

11   that are -- you may find him guilty of that you believe the

12   evidence has proved to you that he committed that are of a less

13   severe nature than capital murder.  Would you commit to me and

14   to the rest of us in this room that you will consider the entire

15   range of possibilities that are open to you in the guilt or

16   innocence phase?

17   A    Um-hum.

18   Q    Will you also consider that if it comes to the point where

19   capital murder is indeed what the jury finds unanimously is the

20   right charge that you will consider the full range of possibili-

21   ties as far as punishment is concerned?  Capital murder, for

22   example, there are only two ranges of punishment: life without

23   parole and then the death penalty.  Evidence will be presented

24   from both sides, the State and from the defense in what is, in

25   essence, a second trial.  And during that trial, you will be

5105  Respondent's Exhibit E

1  asked to weigh in the balance what you believe to be the most

2  significant factors. And from those factors, you will be asked

3  to make a judgment as to whether the death penalty is justified

4  or whether justice is better served by life without parole.

5  Will you consider both of those possibilities and consider the

6  evidence before you make any type of decision? I take it --

7  A  Oh, yes.

8  Q  The questionnaire that you had completed indicated, and

9  that's why I asked you about ducks over in the Humphrey area

10 that you live over there. Do you live in Humphrey proper?

11 A  Um-hum.

12 Q  Okay. How long have you lived in that part of the county?

13 A  I've lived in Humphrey for right at 25 years.

14 Q  Okay. There are some questions that I have to pose from

15 time to time in all kinds of cases, but particularly criminal

16 cases that are kind of unpleasant and make people a little

17 uncomfortable, and I don't mean for that to be the case. But

18 let me go ahead and ask one or two.

19     The fact that the victim in this case was a white male

20 around my age and that the alleged perpetrator is black, a

21 young, black male, would that make any difference to you when it

22 came time to make your decision?

23 A  No, sir.

24 Q  Would -- the Judge will also instruct you, if you are

25 chosen to serve, that you should not let compassion or let any

531

1  type of consideration that is basically emotionally charged

2  enter into your thought process when you are making a decision.

3  Do you feel as though you could separate your -- whatever

4  feelings you may have about murder or compassion for victims or

5  anything along that line and make your decision based strictly

6  on the law and the evidence in this case?

7  A    Yes.

8       MR. KIZER:   That's all the questions I have, your

9  Honor.

10      THE COURT:   Anything further for the State?

11      MS. BILLINGS:   No, your Honor.

12      THE COURT:   Thank you, Ms. Hodges.   You may step

13  outside.

14      MS. BILLINGS:   Good, your Honor.

15      MR. KIZER:   She's good for the defense, your Honor.

16      THE COURT:   Okay.   Ask her to step back in just a

17  second, please.   Ms. Hodges, these folks think that you

18  will be just a wonderful juror in this matter.   And you

19  have been selected to serve on this jury.   A couple of

20  things, one, there is no sense in you just sitting around

21  here.   If you've got things you need to do between now and

22  when we need to get back together, that's fine.   I'm going

23  to excuse you for a while.   But I need to admonish you,

24  don't discuss -- obviously, there is nothing substantative

25  we've talked about other than what we -- certainly in this

532

5107  Respondent's Exhibit E

1    room.  But don't discuss the case with anybody or -- just

2    anybody, especially other jurors.

3        JUROR HODGES:  Oh, yeah.

4        THE COURT:  And avoid any news accounts whatever there

5    might be out there.  I don't know that there is any news

6    accounts going to be broadcast or otherwise, but avoid it

7    if you can.  And like I told the other jurors, we are going

8    to need you back here about 1 o'clock.  So you are excused

9    until 1 o'clock.

10       JUROR HODGES:  Okay.  Thank you.

11       THE COURT:  Yes, ma'am.  Thank you.  Okay.  Ms.

12   Wallace--Alma Wallace.  We are continuing on in chambers

13   with Ms. Alma G. Wallace for the purposes of voir diring

14   Ms. Wallace.  Mr. Juneau.

15            PROSPECTIVE JUROR ALMA WALLACE

16   BY MR. JUNEAU:

17   Q    Good morning, Ms. Wallace.  My name is Wayne Juneau with

18   the Prosecuting Attorney's office and this is Carol Billings.

19   A    Hi.

20   Q    Ms. Wallace, have you ever sat on a criminal jury before?

21   A    No, sir.

22   Q    Never have.  Have you sat on a civil jury before?

23   A    Well, I got picked one time for a jury for a wreck, you

24   know, where somebody got killed.

25   Q    Uh-huh.

533

5108  Respondent's Exhibit E

1    A    But I got out of it because my son had got killed in a

2    wreck.

3    Q    Oh, I see.  But other than that, you have never --

4    A    No.

5    Q    You've never even been questioned by lawyers?

6    A    Uh-uh.

7    Q    Well, Ms. Wallace, you know that this is a capital murder

8    case and the State of Arkansas has accused the man that sits

9    across from you as being involved in a murder and homicide --

10   excuse me, a robbery and homicide.  Do you understand?

11   A    Yes, sir.

12   Q    Part of the penalty range for that particular crime is

13   death by lethal injection.  And at some point in this trial, and

14   it may not happen, but there is a possibility that you may

15   deliberate and consider the death penalty.  I guess I need to

16   know kind of up front from you as to whether you have any

17   opinion about the death penalty.

18   A    I believe in it.

19   Q    Okay.  You don't have any reservations about being a juror

20   and should the factors justify the death penalty, you would vote

21   for it?

22   A    Yeah.

23   Q    The way this case is going to work out, Ms. Wallace, is

24   this.  We are going to try this case in two phases.  The first

25   phase will be the guilt or innocence phase where you will

534

1    consider the evidence that's presented, come back in this room

2    and decide whether this man is guilty or innocent of the charge.

3    Okay.

4         You may also have some jury instructions in regard to

5    lesser included offenses.  For instance, he's charged with

6    capital murder.  You may get a jury instruction on first degree

7    murder which is a lesser crime or maybe even something even

8    lesser than that.  Okay.

9         But you will decide whether he is guilty or innocent and

10   which crime he is guilty of.  Then you will go back out and tell

11   the Judge.  You will hear some more evidence and come back in

12   here and decide punishment.  Now, you are shaking your head.

13   You need to say yes or no for the court reporter can get your

14   answer.

15   A    Yes.

16   Q    So you understand we are going to do this in two phases.

17   A    Yeah.

18   Q    Let's talk first about the guilt phase of the trial.  You

19   know that possibly death may be a result.  Is there -- would

20   that have anything to do with your decision as to whether

21   Kenneth Reams is guilty of the crime of capital murder?

22   A    I don't understand what you are saying.

23   Q    Okay.  The fact that there may be a death sentence imposed

24   at some point in time.

25   A    Yeah.

535

1  Q    Would that have anything to do with the way you decide this

2  man is guilty or innocent?

3  A    Well, I don't know.  I hadn't really thought about that.

4  Q    Okay.  Well, I guess I'm kind of asking you to think about

5  it.  And the reason I say that is because what I'm trying to do

6  is to show you that in the first phase of the trial it really

7  doesn't matter what the punishment is because you only consider

8  guilt or innocence.  Do you understand?

9  A    Yeah.

10  Q    Okay.  Now, knowing that, would you still let that penalty

11  phase or that death sentence come into play in your mind when

12  you decide guilt or innocence?

13  A    Well, I don't think there is no innocent.

14  Q    Explain that to me.  What do you mean?

15  A    Well, when anybody kills somebody that is innocent, someone

16  has to be guilty.

17  Q    Okay.  I'm not quite sure what you are saying.

18  A    Well, like -- like if they come and shoot her down and she

19  is sitting right there and for no reason.

20  Q    Um-hum.

21  A    They've got to be guilty.

22  Q    But you have to understand -- you understand you have to

23  hear evidence to that part?

24  A    Oh, yeah.  Yeah, you got to hear the evidence.

25  Q    Okay.  Well, the State will present evidence to you of the

536

5111  Respondent's Exhibit E

1    guilt phase of the trial.  Okay?

2    A    Okay.

3    Q    Some people may say, "Well, you know, I don't know if I

4    could decide guilt or innocence because I know that if I decide

5    guilty, that he might get the death penalty.  That would be hard

6    for me to do."

7    A    No.

8    Q    You don't feel that way?

9    A    Uh-uh.

10    Q    You would listen to the evidence and decide guilt or

11    innocence based simply on the evidence that you hear?

12    A    Yeah.

13    Q    Is that right?

14    A    Yeah.

15    Q    Would the fact that this defendant was 17 at the time he

16    committed the offense have anything to do with your consider-

17    ations of guilt or innocence?

18    A    No.

19    Q    Do you feel like at 17 he would be responsible for his

20    conduct?

21    A    Right, right.

22    Q    Let's move now into the second phase of the trial.  Assume

23    with me for a minute that you have come in and decided that this

24    man, Kenneth Reams, is guilty of capital murder.  You go back

25    out into the courtroom and you tell the Judge and then the Judge

                                    537

1    asks the State and the defense attorney to proceed with the

2    case.  We will, at that point, try to prove to you that there

3    are aggravating circumstances, something in addition to this

4    murder that would justify the death penalty.  Do you understand?

5    There are some other factors that you need to consider before

6    you can assess punishment in this case.

7    A    Yeah, I understand what you are saying.

8    Q    Okay.

9    A    But I don't know.  I would have to listen to all of that.

10   Q    Right.  And I understand that's what you would have to do

11   and I don't mean to lead you out somewhere and get you to commit

12   yourself when you don't know what you are committing to.  I'm

13   just trying to explain to you that the State is going to

14   introduce aggravating circumstances.

15   A    Yeah.

16   Q    The defense attorney will introduce mitigating circumstanc-

17   es or reasons why the defendant should get life without parole

18   and not the death sentence.  Okay.  And you are to consider all

19   of those and determine which one has more substance to it and

20   decide, based on that, which one outweighs -- whether the

21   aggravation outweighs the mitigation or whether the mitigation

22   outweighs the aggravation.  Okay.

23   A    Um-hum.

24   Q    And chances are the defense attorney will produce some

25   evidence on mitigation and he may claim there are many mitigat-

538

1    ing factors, several.  Do you understand that just the number of

2    factors is not as important as the substance of what those

3    factors are?

4    A    Okay.

5    Q    As opposed to the aggravation.  Do you understand?

6    A    Yeah.

7    Q    If he produces 10 mitigating factors and we only have two -

8    -

9    A    Yeah.

10    Q    That doesn't necessarily mean that he wins.

11    A    Right.

12    Q    Okay.  After you've done -- you've heard the mitigation and

13    the aggravation, you weigh those out.  If you think that the

14    mitigating circumstances outweighs the aggravation, your verdict

15    can only be life without parole.  Do you understand?

16    A    Not really.

17    Q    Okay.  What don't you understand about that?

18    A    Well, you said it would have to be life without parole.  It

19    can't be the death sentence.

20    Q    If the mitigating circumstances, remember, those things the

21    defense attorney tries to show you justify that he not be put to

22    death.

23    A    Oh, okay.

24    Q    If those outweigh the aggravation --

25    A    Okay.  Yeah, I see now.

5114  Respondent's Exhibit E

1   Q    Okay.  The aggravation, though, if it outweighs the mitiga-
2   tion, then you have to go one step further and you have to
3   decide whether that aggravation justifies the death penalty.
4   Okay?

5   A    Okay.

6   Q    Now, do yo understand that the facts of the case, who
7   pulled the trigger are important in deciding the aggravating
8   circumstances?  Do you understand that?  You would agree with
9   that, wouldn't you?

10  A    Yeah.

11  Q    But you also understand that there are other factors that
12  may not be even related to this particular crime that the State
13  may allege is aggravation that are just as important.  Would you
14  agree with that?

15  A    Yeah.

16  Q    At some point in time should you decide that the aggrava-
17  tion does outweigh the mitigation and you vote in favor of the
18  death penalty, you'll have to sign a form to that effect and
19  sign your name on it, come back in the courtroom.

20  A    That's all right.

21  Q    I guess what I'm asking you is could you look this defen-
22  dant in the eye at the end of the trial and convict him and
23  sentence him to death if you believed that the case justified
24  it?

25  A    Yeah, I believe I can.

540

1    Q    You seem to be a little hesitant about that.

2    A    Well, I had to think about it.

3    Q    Okay.   What went through -- I'd like to know what went

4    through your mind.

5    A    Well, what went through my mind was when the other guy was

6    shot.   The innocent guy.

7    Q    Um-hum.

8    A    I had to think about that.

9    Q    Okay.   What does that have to do with it?

10   A    Well, I just had to think about an innocent man, you know,

11   getting shot, you know; and, yeah, if we proved him guilty,

12   yeah.

13   Q    Okay.

14             MR. JUNEAU:   I'll pass.

15             MR. KIZER:   No questions.

16             THE COURT:   Thank you, Ms. Wallace.   You may step

17        outside.

18             MR. JUNEAU:   Good.

19             MR. KIZER:   You recruited.   She said we had the

20        motive.   I'm going to excuse her, your Honor.

21             THE COURT:   Okay.   Challenge number 11.

22             MR. KIZER:   I'm also going to excuse Katherine Austin.

23             MR. JUNEAU:   You are?

24             MR. KIZER:   Yes.

25             THE COURT:   Based on answers to the supplemental

                                 541

1        questionnaire?

2              MR. KIZER:  Yes, sir.  She's mentioned on two differ-

3        ent occasions or three different occasions she is very

4        sympathetic to victims rights and that sort of thing and --

5              MR. JUNEAU:  Pammy Graves was moved down the list,

6        wasn't she?

7              THE COURT:  Right.  She's a probationary employee at

8        her job and didn't need to be off.  Are you sure you don't

9        want to ask Ms. Austin in to rehabilitate her?

10             MR. KIZER:  No.

11             THE COURT:  Is that all of your peremptory challenges?

12             MR. KIZER:  I believe it is, your Honor.

13             THE COURT:  Ms. Wallace and Ms. Austin.  That brings

14       us to David Stelow.  He can't be all bad.  He restores

15       antique cars.

16             (WHEREUPON, THE SUPPLEMENTAL QUESTIONNAIRE OF KATHER-

17       INE R. AUSTIN WAS MARKED AS COURT'S EXHIBIT NUMBER 2.  SEE

18       PAGE NUMBER 931 .)

19             THE COURT:  Hi, Mr. Stelow.  We are here in chambers

20       for the purpose of inquiring of Mr. Stelow concerning his

21       qualifications to sit on this jury.  Mr. Juneau or Ms.

22       Billings.

23                   PROSPECTIVE JUROR DAVID STELOW

24   BY MS. BILLINGS:

25   Q    Good morning, Mr. Stelow.

                              542

1    A    Good morning.

2    Q    I was trying to remember if it was morning or afternoon.

3    My name is Carol Billings.   This is Wayne Juneau.   And we're

4    from the Prosecuting Attorney's office.   We represent the State

5    in this case and in this case we have charged the defendant

6    sitting over here, Kenneth Reams, with the crime of capital

7    murder.   In order to show you that crime, we have to demonstrate

8    that he or an accomplice -- in this case, he had an accomplice

9    by the name of Alford Goodwin.   Either this man or the other man

10   in the course of committing a robbery or attempting to commit a

11   robbery on a young man by the name of Gary Turner at an ATM

12   machine caused the death of Gary Turner.   And we are alleging

13   that the circumstances that they did that under manifested

14   extreme indifference to the value of human life.   If Mr. Juneau

15   and I show that to you, then we have completed the crime -- the

16   elements of the crime of capital murder.   You understand that if

17   we show that either one of them did it, that that completes that

18   crime?

19   A    Yes, I do.

20   Q    Incorporated in that theory is accomplice liability.   Have

21   you ever heard of that?

22   A    I've heard of it, yes.

23   Q    Okay.   That's basically where you aid someone in planning

24   or committing a crime, actually carrying it out, do something to

25   further the commission of that crime.   Under Arkansas law each

543

1   person is equally guilty, whether you are the person that pulled

2   the trigger or the person that provides the gun; whatever the

3   mechanism is.  Do you agree with that?

4   A    Yes, I do.

5   Q    Okay.  So if we have someone that's going in to commit a

6   bank robbery with one person sitting out in the car with the

7   motor running and the other person goes in with the gun to get

8   the money and then while he is in there he shoots and kills

9   someone, is the person that is out in the car just as guilty as

10  the other one?

11  A    Yes, he is.

12  Q    I'm sure you have heard or figured out from sitting out

13  there that we are seeking the death penalty in this case.

14  A    No, I haven't heard that.

15  Q    Okay.  Well, the State is seeking the death penalty in this

16  particular case.  And I need to know from you what your feelings

17  are about the death penalty.  Do you believe in it?

18  A    Yes, I do.

19  Q    There are a lot of people, Mr. Stelow, that say I believe

20  in the death penalty, but I don't want to be the one to give it.

21  A    Um-hum.

22  Q    Are you one of those?

23  A    No, I could give it.

24  Q    In fact, in the course of the trial, when we get to the

25  penalty phase of the trial, one of the last things that you will

1   have to fill out will be a verdict form.  This isn't the verdict
2   form, but say that it was, it has 12 lines on there.  And
3   basically the form says that I believe that Kenneth Reams
4   deserves the death penalty in this case.  Could you sign your
5   name to a form like that?
6   A    If he is found guilty I could, yeah.
7   Q    Okay.  You just mentioned an important thing right there,
8   whether he is found guilty or not.  We try this case in two
9   separate phases.  One phase is just strictly whether or not he
10  committed the crime of capital murder and the other phase is the
11  penalty phase.  In the phase where we are talking about the
12  crime, you are not to let the penalty for the crime enter into
13  your consideration as to whether they are guilty or not of
14  capital murder.  Do you understand that if someone is found
15  guilty of capital murder they don't automatically get the death
16  penalty?
17  A    Do I understand that he doesn't automatically get it?
18  Q    Right.  Did you know that?
19  A    Yes.
20  Q    You knew that.  Okay.  A lot of people have come back to us
21  at some point and said the reason I didn't vote for capital
22  murder is because I knew that if I did he automatically got the
23  death penalty.  Well, that's just not true.  There's that
24  penalty phase in there where you have discretion as to what you
25  feel is the appropriate sentence in this case.

5120  Respondent's Exhibit E

1      There are two sentences in a capital murder case.  One is

2      life without parole and the other is the death penalty.  In that

3      penalty phase, you would be asked to look at more evidence to

4      determine what the appropriate sentence should be in this case.

5      At that point, we would be putting on on behalf of the State

6      what we call aggravating circumstances.  Our legislature has set

7      out seven different things that they call aggravating circum-

8      stances.  And unless one of those exist, we cannot seek the

9      death penalty.

10     A      Okay.

11     Q      Well, in this particular case, we are saying that there are

12     two of those that we are going to put on proof of.  And then on

13     the other hand, Mr. Kizer, as Kenneth Reams' defense attorney,

14     may be putting on proof of what they -- he calls -- or the

15     legislature calls mitigating circumstances.  Things that you can

16     consider that might mitigate against giving a person the death

17     penalty.  Okay.  That's up to you to decide whether or not you

18     think those things are excuses, basically, for committing a

19     crime.  Either you can find that they don't even exist at all or

20     that you don't feel like they are legitimate excuses for having

21     committed a crime.  That's up to you.  That's one of the

22     weighing decisions that you are going to have if you are

23     selected as a juror.

24     When you get to that penalty phase of the trial, you will

25     be weighing those aggravating circumstances, but you have three

546

5121  Respondent's Exhibit E

1    steps that you have to step through there.  First, you have to

2    find that an aggravating circumstance even exists.  If you find

3    that there is none, then the trial is over and he automatically

4    gets life without parole.  The Judge sentences him to that

5    automatically.

6    A    Okay.

7    Q    If you find that there is one, then you would go to the

8    second step.  You are going to have a pile of papers.  And

9    that's one of the reasons I'm trying to explain this to you

10   because everybody gets back there and they go, "Oh, my gosh,

11   what is all of this."  Like I said, the first one is just

12   strictly whether or not you find an aggravating circumstance.

13   The second one would be to weigh -- to look at and see if you

14   find mitigating circumstances.  The third one we ask you to

15   weigh the aggravating circumstances and the mitigating circum-

16   stances against each other.  Just because one person has more in

17   number than the other doesn't necessarily mean anything.  It's

18   the substance of what those are.  And those are -- that's a

19   decision only you as a juror can make whether you think one

20   thing outweighs the other.  Do you understand that?

21   A    Um-hum.

22   Q    If you found that the mitigating circumstances outweighed

23   any aggravating circumstances, then the trial would be over and

24   he automatically gets life without parole.

25   A    Okay.

547

5122 Respondent's Exhibit E

1    Q    If you find that the aggravating outweigh the mitigating,

2    then you go to step number three and you look at this case and

3    you say, "Do the aggravating circumstances in this case warrant

4    the death penalty."  Okay.  You are going to have to hit all

5    three of those checkpoints before the death penalty can be

6    given.  Okay.  Some people don't know that you have to go

7    through such a process to give the death penalty, but I want you

8    to understand before you ever go back there.

9    A    Okay.

10                MS. BILLINGS:  I'll pass the juror, your Honor.

11                THE COURT:  Mr. Kizer.

12                MR. KIZER:  Thank you, your Honor.

13                        EXAMINATION

14   BY MR. KIZER:

15   Q    Mr. Stelow, how long have you lived here in the south?

16   A    In the south or Pine Bluff?

17   Q    Well, Pine Bluff.

18   A    About a year and eight or nine months, something like that.

19   Q    And you work at where?

20   A    International Paper.

21   Q    Did you come to Pine Bluff from another location from IP?

22   A    Yes, I did.

23   Q    Where was that from?

24   A    That was in Oconto, Wisconsin.

25   Q    You had indicated on your questionnaire that we had ask you

                              548

1  to complete prior to this proceeding that you had, one, read
2  something about this case and number two, that you had discussed
3  this matter with someone else.  But on both occasions that you
4  checked that you had not formed any kind of opinions.
5  A    Um-hum.
6  Q    Can you give me a general idea of what you may have read or
7  heard or discussed?
8  A    What I read was probably a brief headline in the newspaper.
9  I never even read the story completely.
10  Q    Okay.  There have been some articles in the last month in
11  the paper.  Have you read any of those articles?
12  A    No, I don't read the local paper.
13  Q    How about your discussions about the case?  Who have you
14  discussed the case with?
15  A    It's not really a discussion.  What I've heard, you know,
16  how awful it was and that type thing at work.  There has really
17  been no discussions as far as indepth --
18  Q    Are you in the position that you could set aside whatever
19  you may have heard outside this courtroom if you are chosen to
20  serve as a juror and make your decision based strictly on the
21  evidence that you would hear the sworn testimony from the
22  witness podium?
23  A    Yes, I could.
24  Q    The trial that we are going to conduct this week is going
25  to be in two different stages.  Do you understand that depending

1    on what the jury does with the first stage, we may never get to

2    the second stage where the discussion about the death penalty is

3    being discussed today.   We not even get to that.   But because

4    that is such a serious topic and one that we -- this is the only

5    opportunity we have to talk with you individually, that is why

6    it is being discussed right now.   Do you understand that to be

7    the case?

8    A    Yes.

9    Q    At the stage of the first trial, the guilt or innocence

10   phase, there will be options that will be afforded to you as a

11   juror.   Those options include a not guilty verdict as well as a

12   guilty verdict on capital murder as well as lesser included

13   offenses.   Those are charges that are of a less severe degree --

14   well, just less severe nature than the capital murder charge

15   that carry with them a different range of punishment all

16   together.   You'll be instructed that you have those options.   My

17   question to you is, will you commit to us that you will consider

18   the entire range of options when you are retired to deliberate?

19   A    Yes, I will.

20   Q    Likewise, if we get to the point where the sentencing phase

21   comes into play, it is, in essence, a second trial.   It is not -

22   - it's like the first trial to a degree, but it'll be of a

23   different sort all together in another way because the evidence

24   that you will be hearing will be about Kenneth Reams and about

25   his life and really not about the facts of what may have

550

1    happened at the ATM machine.  Do you understand that there are

2    also  ranges  of  punishment  and  consideration  and  different

3    options that you have at that stage of the trial?  For example,

4    if capital murder is what we are deliberating on, and we being

5    all of us collectively, but the jury in particular, that you

6    would  have  the  option  of  life  without  parole  or  the  death

7    penalty.   That would -- will you commit to me that you will

8    consider both of those ranges of punishment if it gets to that

9    point?

10   A    Yes, I will.

11   Q    And will you also commit to us that you will make your mind

12   up based on the relevant factors--the evidence that you hear in

13   that second trial.  As the prosecution mentioned a moment ago,

14   there will be factors presented by the defense, there will be

15   factors presented by the State, and it will be up to the jury to

16   determine what justification or what is the justifiable end of

17   justice so to speak for you to see whether it is the death

18   penalty or not.  Can you commit that you will do that?

19   A    Yes, I will.

20        MR.  KIZER:   That's all the questions I have, your

21        Honor.

22        THE COURT:  Anything further from the State?

23        MS. BILLINGS:  No, your Honor.

24        THE COURT:  Thank you, Mr. Stelow.  I'll let you step

25        outside for just a minute please.  What says the State?

551

5126 Respondent's Exhibit E

1          MS. BILLINGS:  Good, your Honor.

2          MR. KIZER:  He's good for the defense, your Honor.

3          MR. JUNEAU:  I've got down, Maxie that he's used 12

4     strikes.

5          MR. KIZER:  Correct.

6          THE COURT:  Mr. Stelow, these folks think that you

7     would make a good juror for this case and have selected you

8     to be a juror on this case.

9          JUROR STELOW:  Okay.

10         THE COURT:  I don't know exactly when we'll get

11    started.  I told the other jurors that have been selected

12    to come back at 1 o'clock.

13         JUROR STELOW:  Okay.

14         THE COURT:  I'll excuse you for the same period of

15    time.  I'll caution you, however, to make sure that you

16    don't discuss the case with anybody else and avoid any news

17    accounts and that sort of thing, not that there really are

18    any out there that I know of, but if there are, run the

19    other way if you see that kind of thing coming.  Be back

20    here at 1 o'clock.  Hopefully, we'll be ready to go at that

21    time.  Thank you.

22         All right.  Now, we've got our 12 jurors, ladies and

23    gentlemen.  What is your pleasure to number of alternates?

24    I thought we ought to go on and try to seat two at this

25    point.  That would mean that we'd have some new peremptory

552

1   challenges.  I don't know exactly how many.

2        MR. KIZER:  I think you can one for each alternate.

3        THE COURT:  Each side gets one, do you not, for each

4   alternate?

5        MR. KIZER:  I thought for each alternate.  We'd get

6   two and the State would get two.  The only time I've been

7   involved in selecting more than one alternate, that's the

8   way we did it before.  That may not be.

9        MS. BILLINGS:  I don't remember.  So --

10       MR. JUNEAU:  We wouldn't have any objection.

11       MR. KIZER:  Let me ask you this.  How would you feel

12  about selecting one alternate and then in the event that

13  two people fell out that 11 people would decide the case?

14       MS. BILLINGS:  I'd rather have two.

15       MR. KIZER:  That's fine with me, either way.

16       THE COURT:  Okay.  We'll agree then that each side

17  will have two peremptory challenges then in our selection

18  for two alternate jurors.  Do you really think that two is

19  necessary?  That was just out of an abundance of caution to

20  tell you the truth when I suggested that.

21       MR. JUNEAU:  Well, we've gone through this far;

22  probably two, but I -- I -- it's not going to be that long

23  of a trial.

24       THE COURT:  These folks seem to be in reasonably good

25  health, but you never know.

553

5128  Respondent's Exhibit E

1      MR. JUNEAU:  Judge, before we call the next one, I
2  would make a motion that we strike for cause Ms. Davis
3  based on the answers to her questionnaire.

4      THE COURT:  All right.

5      MR. JUNEAU:  Particularly answers to number 26 and 27
6  and number 39 and 41.

7      THE COURT:  Mr. Kizer.

8      MR. KIZER:  I don't have a problem with that, your
9  Honor.  It's pretty clear.  She mentioned it four different
10  times she didn't think that she could in any way consider
11  the death penalty.

12      THE COURT:  Do you want to do that without inquiring
13  of her?  Okay.  I'll show her stricken for cause then.
14  We'll -- let's see.  That's Nancy Davis.  All right.

15      (WHEREUPON, THE SUPPLEMENTAL QUESTIONNAIRE OF NANCY
16  DAVIS MARKED AS COURT'S EXHIBIT NUMBER 3 WAS RECEIVED INTO
17  EVIDENCE.  SEE PAGE NUMBER 937.)

18      THE COURT:  We are ready then for Phillip Rushing.

19      MR. KIZER:  Your Honor, based on his response that he
20  worked with the victim, I'm going to use one of my chal-
21  lenges to excuse Mr. Rushing.

22      THE COURT:  Okay.  Let's see.

23      MR. KIZER:  That was in the Court's general questions
24  in voir dire.

25      THE COURT:  Okay.  We'll excuse Mr. Rushing.  Robert

5129   Respondent's Exhibit E

```
 1          Hickerson then.  Mr. Hickerson, come on around and have a
 2          seat, please, sir.  We are continuing in chambers for
 3          purposes of examining Mr. Robert L. Hickerson for purposes
 4          of determining about serving on this jury.  Mr. Juneau.
 5                      PROSPECTIVE JUROR ROBERT HICKERSON
 6     BY MR. JUNEAU:
 7     Q     Hi, Mr. Hickerson.
 8     A     Hi.
 9     Q     My name is Wayne Juneau.  I'm with the Prosecuting At-
10     torney's office and this is Carol Billings also with the
11     Prosecuting Attorney's office.
12          We here today, Mr. Hickerson, as you know, to try this man
13     that sits across from you for capital murder.  And you are aware
14     that as part of the punishment of capital murder the death
15     penalty might be appropriate.  Do you understand that?
16     A     Right.
17     Q     Okay.  Do you have an opinion, one way or another, as to
18     the death penalty?  Are you in favor of it or opposed or not
19     ever thought about it?
20     A     Well, actually I suppose that I've -- I actually believe in
21     the death penalty, yes.
22     Q     Okay.
23     A     You know, if it is proven that --
24     Q     For certain cases.
25     A     Yes.
```

555

5130 Respondent's Exhibit E

1    Q    For certain types of cases?

2    A    Right.

3    Q    And murder would be one of those cases?

4    A    Uh-huh.

5    Q    Okay.  Have you ever sat on a jury before?

6    A    No, I have not.

7    Q    Have you ever been questioned by the lawyers before?  Come

8    up here and sat in a box and been questioned?

9    A    No.

10   Q    Well, in this particular case we are going to try this case

11   in two phases.  One will be the guilt and the innocence part of

12   the trial where you will only determine whether the man is

13   guilty or innocent.   And then you'll go back and hear more

14   evidence and then come back and determine his punishment.  Okay.

15

16        Now I notice in your questionnaire that you've indicated

17   that you may have formed an opinion in this case?

18   A    Well, I've talked to friends about it.  What I mean, we've

19   discussed it.  I don't know a lot about it, but I mean --

20   Q    What -- can you kind of give me an idea about what y'all

21   have discussed?

22   A    Well, I think whoever did it was animals and I think they

23   should be treated as animals.  That's my opinion.

24   Q    Okay.  Would you listen to the evidence that's presented in

25   the case and make a decision based strictly on the evidence and

556

1    not what you've heard from other people?

2    A    I could do that.

3    Q    Do you think you could put aside any of your opinions that

4    you may have formulated based on what people have said outside

5    of the courtroom and decide this case on nothing but what you

6    hear in the courtroom?

7    A    I think so.

8    Q    And that would go strictly to the guilt or innocence part

9    of the trial, you understand?

10   A    But -- I need to tell you this, though.  I've got medical

11   problems.  I'm a diabetic.  I have to take a shot at 6 of the

12   morning and 6 of the afternoon.  Now, if a trial goes over to

13   past 6 o'clock, I'm supposed to eat.  I'm supposed to take an

14   insulin shot, 52 units of insulin.

15   Q    Okay.

16   A    In other words, that might interfere with me being on a

17   jury.  What I'm talking about, you know, if it is going to go to

18   7, you might be right in the middle of an argument, and I've got

19   to take a shot.

20   Q    Okay.  Do you give yourself a shot?

21   A    Yes, I do.

22        THE COURT:  Let me just ask at this point, Mr. Hicker-

23        son, how critical is it a few minutes the either side of

24        that.  Do you need to be pretty much directly on time?

25        PROSPECTIVE JUROR HICKERSON:  Within an hour, some-

557

5132  Respondent's Exhibit E

1 thing like that.

2   THE COURT:  We can handle that.  Do you need to keep

3 your insulin refrigerated or anything like that?

4   PROSPECTIVE JUROR HICKERSON:  Yeah, I've got it out in

5 the car right now.  I keep it on ice.

6   THE COURT:  We can accommodate that.

7   PROSPECTIVE JUROR HICKERSON:  See, I have to eat, too.

8 I can't take the shot without eating.

9   THE COURT:  I see.  Okay.

10   PROSPECTIVE JUROR HICKERSON:  I just wanted to throw

11 that out because --

12   THE COURT:  I appreciate your doing that.

13   PROSPECTIVE JUROR HICKERSON:  And also I take medicine

14 for my -- I mean I have kidney trouble caused by diabetes

15 and then -- and then I have to urinate quite often due to

16 a pill I'm taking.  I just wanted y'all to know my medical

17 problem because I didn't want to have to hold the court up

18 to go to the rest room.

19   THE COURT:  I understand.

20 MR. JUNEAU CONTINUING:

21 Q If we gave you some breaks during the day or if you needed

22 a break, you would let us know so that you could go to the rest

23 room?

24 A Well, I'd have to let you know or just go right there.

25 Q We would appreciate your letting us know.

558

1            THE COURT:   If those are our options, I know which
2            option to go for.   We're not making light of it.   I just --
3      A    I understand.
4      Q    And if we gave you some time to take your shot and eat a
5      little bit tonight, you would be okay?   You could come back
6      after you did that?
7      A    Yeah, I have to take it before I eat supper, see.   But I
8      mean, it could go, maybe 7, see, what I mean.
9      Q    Okay.   Let's go back to what I was asking you about a few
10     minutes ago and that is this trial itself.   Would you be able to
11     determine the guilt or innocence based on what you have heard in
12     the courtroom?
13     A    Yes.   Yes, I could do that.
14     Q    And you understand that as part of the capital murder case,
15     the State has to prove to you beyond a reasonable doubt the
16     elements of that crime and those elements would be: number one,
17     either this man or he an an accomplice attempted to rob Gary
18     Turner at the ATM machine.   That would be the first thing we
19     would have to prove to you.   The second thing we would have to
20     prove to you is that in the course of that robbery, Gary Turner
21     was killed by either this man or his accomplice.   Do you
22     understand?
23     A    (Prospective juror nodding head)
24     Q    Okay.   And you would have to find that that showed extreme
25     indifference to the value of human life, the murder, during that

                                    559

1    robbery.  Do you understand that?  If you believe those things

2    beyond a reasonable doubt, then could you convict this man of

3    capital murder?

4    A    Yes.

5    Q    And you may hear evidence that he was 17 at the time that

6    he committed the offense.  Would that, in some way, influence

7    your decision as to guilt or innocence?

8    A    No.

9    Q    I take it by that response what you are telling me is that

10    you feel like he's responsible at 17 for his actions?

11    A    I do.

12    Q    When you decide guilt or innocence, assume with me for a

13    minute that you decide that he is guilty of a capital murder.

14    You may not do that or you may find that he is guilty of some

15    lesser murder.  But if you do decide that he is guilty of the

16    capital murder, then you will go back out and tell the Judge and

17    he will then put on another trial or another case -- the second

18    part of the case where the State and the defense attorney get to

19    prove or put on evidence regarding aggravating and mitigating

20    circumstances.

21         The aggravating circumstances would be things that would

22    justify the death penalty.  And the State has alleged two of

23    those.  The defense attorney will put on mitigating circumstanc-

24    es.  In other words, will try to convince you that what this

25    defendant has done does not justify the death penalty.  Okay.

560

1    A    (Prospective juror nodding head)

2    Q    You would have to weigh those out.  And you understand that

3    the sheer number of factors is not as important as the substance

4    of those factors, don't you?

5    A    (Prospective juror nodding head)

6    Q    You need to answer yes or no.

7    A    Yes.

8    Q    So that, for instance, if the State has two mitigating

9    circumstances or aggravating circumstances, and the defendant

10   has 10 mitigating circumstances, simply because he has 10

11   doesn't mean they outweigh the State's two.  Do you understand

12   that?

13   A    Right.  Right.

14   Q    Once you weigh those factors out, you would make a determi-

15   nation as to whether the mitigating factors outweighed the

16   aggravating factors or whether they aggravating factors out-

17   weighed the mitigating factors.  Okay.

18   A    Okay.

19   Q    Simply because you convict the defendant of capital murder

20   does not mean that he gets the death penalty automatically.  You

21   would have to look at those aggravating circumstances and

22   mitigating circumstances.  Do you understand?  You need to

23   answer --

24   A    Right, yes.

25   Q    Now, if you find that the mitigating circumstances outweigh

561

1  the aggravation, then your verdict can only be life without

2  parole if the mitigation outweighs the aggravation.  But if the

3  aggravation outweighs the mitigation, then you would determine

4  whether the aggravation justified the death penalty.  Do you

5  understand?

6  A    Yes.

7  Q    And at that point, your verdict would then be, if you

8  decided that, would be death.  You would be required to sign a

9  form at the end of the trial, put your name on it and come back

10 in the courtroom and look at this defendant and tell them that

11 you sentenced him to death.  Do you understand that?

12 A    Yes.

13 Q    Would you be able to do that if you felt the case justified

14 it?

15 A    Yes.

16            MR. JUNEAU:  I'll pass the witness.

17            THE COURT:  Mr. Kizer.

18            MR. KIZER:  Thank you, your Honor.

19                         EXAMINATION

20 BY MR. KIZER:

21 Q    Mr. Hickerson, you, I take it, were trying to be fair and

22 trying to be honest when you answered this supplemental juror

23 questionnaire, were you not?

24 A    Yes.

25 Q    On question number 42, the last question, said, "Can you

562

1    think of any reason no matter how insignificant it might seem to

2    be whether addressed in this question or not, why you cannot be

3    a fair juror in this case." Your response is, "Yes, my mind is

4    already made up.  Guilty.  Give him death."  You meant that when

5    you wrote it.  Is that correct?

6    A    Yes.

7    Q    Well, you've told Mr. Juneau today --

8    A    However, you know, I -- I mean if I heard any facts that

9    don't substantiate I could weigh the difference.

10   Q    Well, you're not going to make the defendant prove his

11   innocence to you, are you?

12   A    Am I going to make him prove his innocence?

13   Q    Um-hum.

14   A    Well, I suppose I am, yes.

15            MR. KIZER:  That's all the questions I have, your

16       Honor.

17            THE COURT:  Anything further for the State?

18            MS. BILLINGS:  No, your Honor.

19            THE COURT:  Thank you, Mr. Hickerson.  You may step

20       outside, please, sir, and we'll let you know something in

21       just a minute.

22            MR. KIZER:  I challenge for cause, your Honor.

23            THE COURT:  Any objection?

24            MS. BILLINGS:  None, your Honor.

25            MR. KIZER:  I wonder if Pete told him how he could

563

1      guarantee getting off this jury.

2          THE COURT:  I wonder if he didn't.  The motion will be

3      granted.  I, quite frankly, in looking at his questionnaire

4      overlooked that.  I didn't see that.

5          MS. BILLINGS:  I didn't either.

6          THE COURT:  I thought I had.  Okay.  Merle Cobbs.  We

7      are continuing here in chambers with the examination of Ms.

8      Merle Cobbs.  Ms. Billings or Mr. Juneau.

9              PROSPECTIVE JUROR MERLE COBBS

10   BY MS. BILLINGS:

11   Q    Good morning, Ms. Cobbs.

12   A    Good morning.

13   Q    My name is Carol Billings and this is Wayne Juneau.  We

14   work for the Prosecuting Attorney, Mr. Matthews.  And we

15   represent the State of Arkansas in this particular case.  Ms.

16   Cobbs, what we are talking to you about is being an alternate

17   juror in this particular case.  The jury has -- the main jury

18   has already been selected, but if you were selected to sit as a

19   juror, as an alternate juror, you might be called upon at some

20   point to fill in for one of them.  So it would be very important

21   that you listen to all of the evidence just like you were a

22   regular juror.  Do you understand?

23   A    (Prospective juror nodding head)

24   Q    In this case, we have charged the defendant sitting over

25   here (INDICATING), Kenneth Reams with the crime of capital

564

1    murder.  The State is saying that Kenneth Reams or his accom-
2    plice, a man by the name of Alford Goodwin went to the ATM
3    machine over there on Fifth and Chestnut and in the course of
4    committing a robbery, killed a man.  A man by the name of Gary
5    Turner.  And we are saying that the circumstances that they did
6    it under manifested extreme indifference to the value of human
7    life.   That's the charge that Mr. Juneau and I would have to
8    show you if you were selected to sit as a juror here today.  And
9    as I said, even as an alternate juror, it would be very impor-
10   tant to know how you feel about certain things because you might
11   have to step into the shoes of one of the actual jurors.

12       I don't know how much you have heard out there sitting with
13   the other jurors, but we are seeking the death penalty in this
14   case.  Were you aware of that?

15   A    No.

16   Q    Okay.  You are going to need to answer outloud because this
17   lady takes down your answers.

18   A    No.

19   Q    I guess one of the first things I need to ask you then is
20   do you believe in the death penalty?

21   A    No, I don't believe.

22   Q    Not under any circumstances, Ms. Cobb?

23   A    No, I don't believe in taking people's lives.

24   Q    Even if it was a member of your own family who had been
25   killed, you could not give someone the death penalty?

565

5140  Respondent's Exhibit E

1    A    No, I couldn't bring them back and I just don't believe in

2    that.

3    Q    So it wouldn't matter what kind of proof that we put on,

4    you could not give that sentence?

5    A    No.

6              MS. BILLINGS:  Okay.  I appreciate your being candid

7         with me.  Pass the juror, your Honor.

8              THE COURT:  Mr. Kizer.

9              MR. KIZER:  I don't have any questions, your Honor.

10             THE COURT:  Thank you, Ms. Cobbs.  I'll let you step

11        outside a minute, please, ma'am.

12             MS. BILLINGS:  Motion to excuse for cause, your Honor.

13             MR. KIZER:  I really can't object to that, your Honor.

14             MS. BILLINGS:  Your Honor, I believe the next one also

15        says in there the very same thing.

16             MR. KIZER:  He says the same thing.

17             THE COURT:  Let me ask you something.  Let's go off

18        the record just a second.

19   (Off the record)

20             THE COURT:  What does the next one say?

21             MR. KIZER:  Same thing.  Said he doesn't believe in

22        capital punishment.  That's his response to number 41.

23             MS. BILLINGS:  It's in there twice, in fact, back on

24        one of the other pages.

25             MR. JUNEAU:  Twenty-six.

                              566

5141  Respondent's Exhibit E

1          THE COURT:  What does it say on 26?  "I don't believe

2      in capital punishment."  Okay.  Without objection, we'll

3      strike both of those folks for cause--Merle Cobbs and John

4      Weaver.

5          (WHEREUPON, SUPPLEMENTAL JUROR QUESTIONNAIRE OF JOHN

6      WEAVER MARKED AS COURT'S EXHIBIT NUMBER 4 WAS RECEIVED INTO

7      EVIDENCE.  SEE PAGE NUMBER 943.)

8          THE COURT:  That brings us down to Brenda Silvey.  You

9      can tell Ms. Cobbs and Mr. Weaver they are excused.

10          Hi, Ms. Silvey.  Come right around and have a seat

11      right over here, please, ma'am.  We are continuing here in

12      chambers with examination of Brenda Silvey.

13          MR. JUNEAU:  Thank you, your Honor.

14                   PROSPECIVE JUROR BRENDA SILVEY

15  BY MR. JUNEAU:

16  Q   Hi, Ms. Silvey.  My name is Wayne Juneau.  This is Carol

17  Billings with the Prosecuting Attorney's office.  We are trying

18  to seat jurors to hear this capital murder case.  You may very

19  well be the 13th juror.  Have you ever sat on a trial before?

20  A   Yes.

21  Q   Criminal trial?

22  A   Yes.

23  Q   You know the 13th juror may not ever decide the case.  That

24  would be in case one of the other jurors get sick or has to

25  leave for some reason.

567

5142 Respondent's Exhibit E

1    A    Yes, sir.

2    Q    So it's important that you listen to the evidence as you

3    know.

4    A    Yes, sir.

5    Q    In case you are called upon to decide the case.  This is a

6    capital murder case in which the State has claimed that this man

7    who is sitting across from you, Kenneth Reams, was involved in

8    a robbery and during the robbery, was -- a person was killed.

9    Okay.  Have you heard about this case?

10   A    Very little.

11   Q    Back when it happened?

12   A    Back -- the day after or something like that.

13   Q    Well, the State has got to prove to you a number of

14   elements before you could convict him of capital murder.  And

15   those you have to believe beyond a reasonable doubt just like in

16   any other case.

17        The trial will be conducted in two phases.  One will be the

18   guilt or innocence phase where you will hear evidence simply on

19   the guilt or innocence of the defendant.  You will deliberate.

20   Should you find him guilty, you will then hear more evidence on

21   the punishment phase.  And as you know by now, the range of

22   punishment in capital murder is either life without parole or

23   death.  Do you understand?

24   A    Yes.

25   Q    I guess I need to ask you at this point have you got any

568

1    opinion in regard to the death penalty?

2    A    Well, other than if someone is found guilty, it is some-

3    thing you have to weigh with the issue of how severe it is and

4    do they deserve that much punishment or what.

5    Q    Okay.  That's precisely what we'll be doing and what the

6    jury instructions will carry you through.  But do you -- are you

7    personally in favor of the death penalty or are you opposed to

8    it?

9    A    I'm not opposed to it.  I mean, you know, there's cases I

10   know that -- I guess you would say that it is justified.  But it

11   depends on -- the way I look at it, it just kind of depends on

12   the circumstances.

13   Q    Okay.  My question then would be you could impose the death

14   penalty should you feel like the circumstances justified it?

15   A    Yes, sir.

16   Q    Okay.  We're going to have to prove some elements, like I

17   said, and again now I'm talking strictly about the guilt phase

18   of the trial.  Those elements would be that either this man or

19   an accomplice attempted to rob Mr. Gary Turner at the ATM

20   machine.  And during the course of that robbery, either this man

21   or his accomplice shot and killed Mr. Turner.  Do you under-

22   stand?

23   A    Yes.

24   Q    Okay.  Should you find that those elements do exist and

25   that it shows extreme indifference to the value of human life

569

5144  Respondent's Exhibit E

1    what they did, then could you render a verdict of guilty?

2    A    I believe so; yes.

3    Q    You might hear some evidence that he was 17 at the time he

4    committed the offense.  Would that have any influence?

5    A    Seventeen, I believe, is old enough to know the difference

6    between right and wrong.

7    Q    And the fact that at 17 he may get the death penalty, would

8    that any influence?

9    A    Well, the way I look at it is that he put hisself (sic)

10   into that position, he must have known what it could cost him.

11   Q    So you wouldn't have any objection -- it would not influ-

12   ence your decision as far as the guilt or innocence phase if he

13   was 17 and that he might get death?

14   A    No, sir.

15   Q    Let's move now to the penalty phase of the trial because

16   you said that you thought you had to weigh circumstances.

17   A    Yes, sir.

18   Q    That's exactly what you have to do because what we'll do is

19   during the penalty phase of the trial the State will introduce

20   evidence on aggravating circumstances.  We've got two.  The

21   defense will introduce evidence on mitigating circumstances.

22   They may have a number, more than two.  You understand just a

23   number of aggravating and mitigating circumstances is not as

24   important as the substance of those.  You understand that you

25   consider the crime and what happened during this murder along

570

1   with aggravating or mitigating circumstances that may not be
2   related to the crime itself.

3   A   Yes.

4   Q   You weigh those two factors, the aggravation against the
5   mitigation.

6   A   Yes, sir.

7   Q   These will all be explained to you in the jury instructions
8   and you will, in fact, have forms that you can fill out.

9   A   Okay.

10  Q   When you weigh those, if you decide the mitigation out-
11  weighs the aggravation, you have to -- to render a verdict of
12  life without parole.

13  A   I understand.

14  Q   But if you, on the other hand, determine that the aggrava-
15  tion outweighs the mitigation, then you have to go one step
16  further and decide that the aggravation justifies the death
17  penalty.  Do you understand that?

18  A   Yes, sir.

19  Q   And should you do that and get to that point and decide
20  that that is, in fact, the case, can you sign the form sentenc-
21  ing this man to death?

22  A   If it shows that it was -- you know, that -- well, that
23  that's what it requires, yes.

24  Q   Okay.  So you don't have any personal reservations about
25  doing that should you feel like it justifies it?

571

1    A    Right, I have no reservations.

2            MR. JUNEAU:   I'll pass the witness.

3                              EXAMINATION

4    BY MR. KIZER:

5    Q    Good morning, Ms. Silvey.  Ms. Silvey, the discussion that

6    we are having this morning about the death penalty is a discus-

7    sion that may or may not lead to us into discussing this in the

8    courtroom.  Do you understand that what occurs out of the first

9    part of the trial is going to dictate what happens in the second

10   part?  With that in mind, if you were chosen to serve as a

11   juror, the first part of this trial will be just like the other

12   trials that you have sat in on.  The same rules of evidence will

13   apply.   The Court will instruct you that there are certain

14   constitutional rights that the defendant has that I'm sure

15   you've heard of before and among those rights are the presump-

16   tion of innocence of a defendant, the fact that the State of

17   Arkansas has the burden of proving the defendant guilty and the

18   defendant doesn't have to prove anything at that trial.  You are

19   shaking your head in agreement.

20   A    Yes.

21   Q    And then also at that trial when the jury goes back to

22   deliberate as to the guilt or the innocence of this young man,

23   that there will be certain options that will be afforded to the

24   jury.  Those options will be in the form of finding him not

25   guilty of anything; finding him guilty of capital murder as he

                                 572

1    is charged; or finding him guilty of what's called lesser

2    included offenses.  Those are charges that may have occurred in

3    other cases that you have had where the jury has the option to

4    find him guilty of a charge that is substantially less severe in

5    punishment than what capital murder -- the charge that he is

6    currently charged with.  Will you commit to us in this room that

7    you will consider the entire range of options when it is your

8    turn, if you are chosen to deliberate, at the guilt or innocence

9    phase?

10   A    Yes, I will.

11   Q    Would you also make that same commitment when it comes time

12   for the sentencing phase because if, for example, the vote of

13   the jury is that capital murder has been proven beyond a

14   reasonable doubt, then the next phase will be a trial that will

15   be substantially different than the first trial.

16        The second trial will be about Kenneth Reams, all about his

17   life, what he is all about and it will concern the State

18   presenting aggravating circumstances and the defense presenting

19   mitigating circumstances.  And it will be your job to weigh in

20   the balance what you believe those circumstances ultimately lead

21   to, whether you believe one outweighs the other in essence.

22   A    All right.

23   Q    If that is the case, then the range of punishment will be

24   life without parole and then the other range of punishment or

25   the other end of the scale will be the death penalty.  Can you

573

1    commit to us that you would consider all ranges of punishment
2    that the Court instructs you are available?
3    A    Yes, I would.
4              MR. KIZER:  I have no further questions, your Honor.
5              MR. JUNEAU:  Nothing further, your Honor.
6              THE COURT:  Thank you, Ms. Silvey.  I'll let you step
7         outside for just a minute, please.
8              MR. JUNEAU:  Good.
9              MR. KIZER:  She's good.
10             THE COURT:  Okay.  Ms. Silvey is juror 13.  Ms.
11        Silvey, these folks think that you would be a wonderful
12        alternate juror.  My words and not theirs necessarily.
13        But, seriously, you have been selected as our first
14        alternate juror.  I think we are going to try to select one
15        more alternate juror just to be on the safe side.
16             Now, just as these lawyers told you, you are going to
17        be treated just like any other juror.  And in that regard,
18        I need to caution you about discussing the case with
19        anybody at any time during this trial especially in the
20        next couple of hours becuase we're going to reconvene here
21        at 1 o'clock.  Hopefully, we'll be through with all our
22        other stuff at that time and we can get started at 1 or
23        very shortly thereafter.  So, I'm going to excuse you at
24        this time and ask you not to discuss the case with anybody
25        else and be back at 1 o'clock.  Thank you.

574

5149  Respondent's Exhibit E

1          JUROR SILVEY:  Okay.  Thank you.

2          THE COURT:  Ms. Billings --

3          MS. BILLINGS:  Yes, sir.

4          THE COURT:  Ms. Neal --

5          MR. KIZER:  I didn't think she was here.

6          MS. BILLINGS:  I didn't either.

7          THE COURT:  She showed up.  Ms. Neal, right over here,

8      please, ma'am.

9          PROSPECTIVE JUROR NEAL:  Right here (INDICATING)

10          THE COURT:  Right there (INDICATING).  Just have a

11      seat in that chair, please, ma'am.  We are continuing in

12      chambers with examination of Ms. May Catherine Neal.  Ms.

13      Billings.

14              PROSPECTIVE JUROR MAY CATHERINE NEAL

15   BY MS. BILLINGS:

16   Q    Good morning, Ms. Neal.

17   A    Good morning.

18   Q    My name is Carol Billings.  I don't know if you've met Mr.

19   Juneau or not--Wayne Juneau.  He's from the Prosecuting At-

20   torney's office also.  Ms. Neal, the case that we're in here on

21   today, I don't know how much you have discussed it with anybody

22   else out there or if you have or not, but the State is seeking

23   the death penalty in this case.  Were you aware of that?

24   A    No.

25   Q    Okay.  I need to ask you right off the bat if you have

575

5150  Respondent's Exhibit E

1   particular feelings about the death penalty.  Do you believe in
2   it?
3   A    I don't know.
4   Q    Have you ever thought about it?
5   A    No, not really.
6   Q    Okay.  Well, this is one of those cases where I guess most
7   people hope they don't wind up on the jury, but it is one where
8   it has become an issue and may very well be an issue in this
9   particular case.
10  A    Um-hum.
11  Q    Whether or not the death penalty will be given, and I need
12  to know from you whether or not you can consider that as a
13  punishment in the case?
14  A    Well, if I was chosen and that was the issue, I think I
15  could do it, but just to say that -- you know, if that was what
16  I wanted, it wouldn't be a preference.
17  Q    Okay.  So if you were given an option between life without
18  parole and the death penalty, would you automatically go with
19  life without parole?
20  A    Right.
21  Q    Can you see yourself giving someone the death penalty for
22  a case?
23  A    Well, first I would have to hear the evidence.
24  Q    Well, that's the way it works.  That's right.  One of the
25  things that we do in a capital murder case, Ms. Neal, is at the

576

1    end of the trial if you have decided that the person is guilty

2    of capital murder, then you would be asked to sign a form if you

3    believe that the death penalty was warranted and each person

4    that's on the jury has to sign a form that basically says, "I

5    believe this man deserves the death penalty."

6    A    Um-hum.

7    Q    Could you do something like that?

8    A    Yes.

9    Q    And then walk back out in the courtroom and look at this

10   man and, basically, tell him you believe he deserves the death

11   penalty?

12   A    Yes.  If I voted that he did, yes.

13   Q    Are there particular crimes that you believe deserve the

14   death penalty?

15   A    Yes.

16   Q    What's that?

17   A    Someone that kills someone without malice or forethought

18   or, you know, brutal.

19   Q    Okay.  When you say "brutal," what do you mean?  We all

20   have different definitions of things.

21   A    Say, for example, someone just walked up to you and shot

22   you.  They don't know you.  They don't -- you hadn't done

23   anything to them, you know, prankish stuff and maybe mass

24   murderers.

25   Q    Like the New York subway deal?

577

5152 Respondent's Exhibit E

1    A    Yeah.  If he is proven to have done that, I mean, you know,
2    not thinking that he have, but you know, known facts that proved
3    that they have done that.
4    Q    Okay.  In this type of case -- well, in this particular
5    case, Ms. Neal, we have charged the defendant sitting right
6    here, Kenneth Reams, with the crime of capital murder.
7    A    Um-hum.
8    Q    We're saying that Mr. Reams or his accomplice, who was a
9    man by the name of Alford Goodwin.
10   A    Um-hum.
11   Q    Killed Mr. Turner while trying to commit a robbery.
12   A    Um-hum.
13   Q    And that the circumstances of it showed extreme indiffer-
14   ence to the value of human life.  That's what Mr. Juneau and I
15   would be trying to show you that either this man or the other
16   one killed him.  Now, if you -- if you were considering the
17   evidence in this case and say it came out that the other person
18   killed him, could you find this man guilty of capital murder?
19   A    No, not if he -- if -- you said if the other man did it?
20   Q    Um-hum.  If that came out that the other man did it,
21   actually pulled the trigger.
22   A    Okay.  And find him guilty of --
23   Q    Could you find this man guilty of capital murder?
24   A    Not if he didn't do it.
25   Q    Okay.  Well, what if, I mean, he is there with him?

578

5153 Respondent's Exhibit E

1   A    Well, first I would have to hear the circumstances--the

2   evidence.

3   Q    Capital murder includes a concept that we call accomplice

4   liability and that basically is if you aid someone in committing

5   a crime; say, furnish the gun in a crime or you helped them plan

6   it, you helped them commit it and if you do any of those things

7   that you are just as guilty as the other person.  Do you agree

8   with that?

9   A    Yes.

10  Q    Okay.  So if we have a bank robbery and one person is

11  driving a car and the other person gets out with a gun and goes

12  in the bank and he shoots and kills, say, a teller in there

13  while he is in there, is the person in the car guilty of murder

14  also?

15  A    Yes, I would think so.  But, in this case, we would have to

16  hear all of this, you know, proven facts before we could say

17  that, right?

18  Q    That's true.  That's in any case, Ms. Neal.

19  A    Okay.

20  Q    But if it came out that this person or the other person did

21  the shooting in this case and it was in the course of a robbery,

22  we would have shown you what we have to show you.  Do you

23  understand that?  Could you vote to find him guilty of capital

24  murder knowing that the other man may have pulled the trigger?

25  A    If you prove to me that he planned it and all of this stuff

5154  Respondent's Exhibit E

1    with him and he just happened not to be the one to do it, I

2    don't know.  I'd have to think about that for a minute.

3    Q    What bothers you about it?

4    A    I don't know.  I just can't -- I just don't -- I mean I

5    wouldn't have a problem with it if it was proven to me, I mean,

6    you know, with the evidence.  But just to sit up here and say

7    now because -- like I say, I don't know what evidence you have;

8    so, I can't say.

9    Q    You can't say whether or not, though, that you could even

10   find someone guilty of the same crime as the other person?

11   A    Yes.

12   Q    Yes, you would; or, yes, you can say?

13   A    Yes, I can say.  Yes, I can say.  Like you said, the

14   example of two people, you know, they had planned it together

15   and everything and all like that; yeah.  But this particular

16   case, I'd still have to, you know, hear it.

17   Q    Okay.  Well, you realize only one person can hold a gun,

18   right?

19   A    One particular gun, yeah.

20   Q    That's right.  So if it takes two to go, whoever draws the

21   short straw may be the shooter.  Is that right?

22   A    True.

23   Q    The person that drew the long straw and stands there and

24   watches, that's my question.  Are they just as guilty as the one

25   that drew the short straw?

580

1    A    Right.

2    Q    If you are selected to sit on this jury, Ms. Neal, it would

3    be in the position as an alernate juror.

4    A    Um-hum.

5    Q    We've already selected the regular jury, but it would be

6    extremely important for you to listen to all of the evidence

7    because if something happens to one of those other 12 jurors you

8    might be asked to step into their shoes.  Okay.

9    A    Um-hum.

10   Q    At that point, you would be asked to -- to consider the

11   same things that they would consider whenever they go back into

12   the jury room and the first thing they would do is just strictly

13   decide whether or not capital murder has been committed by this

14   defendant.  Okay.  Just the guilt phase.  Then if that was

15   decided, you would come back and have a penalty phase where you

16   would hear more evidence, reasons why the State says that he

17   deserves the death penalty; reasons why the defense attorney

18   says he shouldn't get it.  Okay.  If you -- the legislature has

19   seven items that they have laid out that they call aggravating

20   cicumstances.  The fact that I might, say, shoot Mr. Juneau,

21   that's just not enough to give someone the death penalty.

22   A    Oh.

23   Q    There has to be one of those aggravating circumstances in

24   order to seek the death penalty on someone.  Okay.  And if you

25   don't find an aggravating circumstance, then the person automat-

5156  Respondent's Exhibit E

1  ically gets life without parole.  If you do find that there is
2  an aggravating circumstance, then you would be asked to weigh
3  the aggravating circumstances against any mitigating circum-
4  stances that Mr. Kizer might offer.  He may offer things like
5  the defendant's youth.  Does that make a difference to you right
6  now that the defendant is 17 years old when this crime was
7  committed?

8  A     (Prospective juror shaking head)

9  Q     Was he just as guilty as anybody else?

10 A     True, if he is proven guilty, yes.

11 Q     Okay.  And if you found that the aggravating circumstances
12 outweighed the mitigating, then you would have to determine, in
13 this particular case, if you felt the aggravating circumstances
14 warranted the death penalty?

15 A     Right.

16 Q     But you are saying it's your option, if you were given the
17 option of life without parole or the death penalty, it would
18 automatically be life without parole?

19 A     After you explained all of that, for a choice, my first
20 choice would be life without parole.  But if it -- you say if
21 the -- all of the -- whatever kind of circumstances you say was
22 proven, then, you know, I would just have to do what I had to
23 do.

24 Q     Okay.  Would you let the fact that the defendant might
25 could get the death penalty enter into whether or not you could

5157  Respondent's Exhibit E

1    find him guilty of a crime?

2    A    No.

3    Q    You can reserve any judgment about the death penalty or

4    life without parole until you get to the penalty phase of the

5    case?

6    A    Right.

7              MS. BILLINGS:  Pass the juror, your Honor.

8              MR. KIZER:  No questions.

9              THE COURT:  Thank you.  You may stand outside, Ms.

10   Neal.

11             PROSPECTIVE JUROR NEAL:  Leave?

12             THE COURT:  Just wait outside if you will, please,

13   ma'am.  What says the State?

14             MS. BILLINGS:  Your Honor, I'm going to excuse Ms.

15   Neal.  She was a major hangup in a cut and dry case I had

16   last month, and, I believe, based on her answers here that

17   she wouldn't even consider the death penalty although she

18   says that she would.

19             THE COURT:  All right.

20             MR. KIZER:  I'm going to excuse the next juror.

21             THE COURT:  That will be -- Ms. Neal will be excused.

22   And Ms. Breitenstein will be excused.  That will bring us

23   to Darlene Frye.  We are continuing here in chambers in

24   examination of Ms. Frye.  Ms. Frye, I'll just tell you.  At

25   this point, we have selected 12 jurors and one alternate.

583

1          We are in the process -- continuing the process to select
2          an extra alternate just on the -- out of an abundance of
3          precaution, I guess is what I'm trying to say.  So these
4          ladies and gentlemen will be asking you just a few ques-
5          tions.    They've  already  looked  at  your  supplemental
6          questionnaire and the regular questionnaire that you filled
7          out, and they'll be asking you some additional questions to
8          determine whether or not they think in this particular case
9          you would be just the one to serve as the alternate juror.
10              Mr. Juneau.
11              MR. JUNEAU:   Thank you, your Honor.
12                   PROSPECTIVE JUROR DARLENE FRYE
13   BY MR. JUNEAU:
14   Q    Hi, Ms. Frye.
15   A    Hi.
16   Q    My name is Wayne Juneau with the Prosecuting Attorney's
17   office and this is Carol Billings who is also with the Prosecut-
18   ing Attorney.   You know now that we are trying this man that
19   sits across from you for capital murder.   Okay.   And part of
20   that punishment involved could potentially be punish would be
21   the death penalty.   Were you aware of that?
22   A    I think I heard someone mention something.
23   Q    Okay.   You need to know up front up that simply because he
24   is convicted of capital murder doesn't mean that he automatical-
25   ly gets the death penalty.   Okay.

                              584

1          COURT REPORTER:  You need to answer outloud, please.

2     A    Okay.

3     Q    Do you have an opinion one way or another about the death

4     penalty?

5     A    Well, I am for capital punishment but not in every case.

6     I would just weigh each case individually.

7     Q    Well, would murder be one of those cases?

8     A    Yes.

9     Q    Or could be --

10    A    Yes.

11    Q    Depending on the facts?

12    A    Depending on the facts of the case.

13    Q    But you are not opposed to sentencing someone to death

14    should you think that that case is -- is -- the death penalty is

15    justified?

16    A    Right.

17    Q    We'll try -- have you ever sat on a jury before?

18    A    Yes, on a burglary.

19    Q    Okay.  I think that was a burglary two or three weeks ago

20    or a month ago or so?

21    A    Yeah, a month.  I'm not exactly sure.

22    Q    In that particular burglary, y'all went out and decided

23    guilt or innocence first and then you came back and decided

24    punishment.  Is that what you did?

25    A    We -- I don't believe we ever agreed.  One juror wouldn't

585

1   agree on a punishment; so, we -- I believe the judge decided.

2   Q   Okay.  So y'all didn't decide punishment?

3   A   Right.

4   Q   I was mistaken which burglary you sat on.  In this particu-

5   lar case, we are going to try the guilt or innocence phase

6   first.  You will hear evidence to that effect first.  Then you

7   will render a verdict and come back and decide punishment second

8   in a different part of the trial.  Okay.

9   A   Right.

10   Q   Now, let's talk first about the guilt or innocence phase of

11   the trial.  And I need to tell you that you are being selected

12   as an alternate juror.  That means that you may very well never

13   decide guilt or innocence or punishment because we have enough

14   jurors.

15   A   Okay.

16   Q   But you still need to be aware of the case and you need to

17   listen closely to the case in case you are called on so that you

18   can make a decision.

19   When we decide the guilt or innocence phase, we will, as

20   the State, have to prove beyond a reasonable doubt, just like in

21   any other trial, that this defendant did certain things that

22   constitute capital murder.  One of those things we'll have to

23   prove is that he or an accomplice attempted to rob Mr. Gary

24   Turner at the ATM machine at Worthen Bank.  The second thing

25   we'll have to prove to you is that during the course of the

586

1    robbery he or his accomplice shot and killed Mr. Turner.  And
2    that third thing, obviously, is that that was -- manifested
3    extreme indifference to the value of human life to what they
4    did.  If we prove those three things to you beyond a reasonable
5    doubt, can you render a verdict of guilty?
6    A    Yes.
7    Q    And you will hear evidence that this defendant was 17 at
8    the time.  Would that have any influence in your decision?
9    A    No.
10   Q    Would it have any influence in your decision if you felt
11   like the defendant could possibly get death for the crime that
12   he committed?
13   A    As far as if he were guilty or innocent?
14   Q    Right.
15   A    No.
16   Q    Okay.  Now, let's move to the second phase of the trial
17   which would be the punishment phase should you find him guilty
18   of capital murder, you will hear evidence on what we call
19   aggravating circumstances and mitigating circumstances.
20        The State has two aggravating circumstances that we intend
21   to prove.  The defense would have a number of mitigating
22   circumstances.  Do you understand what I mean by aggravation and
23   mitigation?
24   A    Vaguely.
25   Q    Maybe?

587

1    A    Maybe.

2    Q    Well, aggravation would be circumstances maybe not neces-

3    sarily connected with this particular case, but with some other

4    things that the defendant may have done that would justify under

5    the law a sentence of death.  Okay.

6         On the other hand, mitigation means some of the things that

7    the defendant has done, his character or certain factors about

8    his character that might justify him not being sentenced to

9    death.  Okay.

10   A    Um-hum.

11   Q    You would have to weigh those two factors out, aggravation

12   against mitigation and determine which one weighed heavier.

13   A    Um-hum.

14   Q    Okay.  If you should choose the mitigation and determine

15   that it weighed more than the aggravation, then your sentence

16   would be life without parole because there would be more

17   mitigation than aggravation.

18   A    Right.

19   Q    However, if you felt like there was more aggravation than

20   mitigation, then you would have to go one step further and

21   determine if that aggravation justified the death penalty.

22   A    Right.

23   Q    Do you understand?

24   A    Yes, sir.

25   Q    And you understand that the sheer number of aggravation or

5163  Respondent's Exhibit E

1    mitigating circumstances is not as important as the substance of

2    those?

3    A    Yes.

4    Q    So that if the defense would proved or you believed that

5    there might be seven or eight or even 10 mitigating circumstanc-

6    es, the fact that there is 10 mitigating circumstances and only

7    two aggravating circumstances wouldn't mean that the mitigation

8    outweighed the aggravation simply because of the number.

9    A    Yes.

10   Q    Would you be able to and you would have to should you

11   choose that the death penalty is the appropriate punishment sign

12   the form and put your name on that form sentencing Kenneth

13   Reams, this man (INDICATING), to death?

14   A    Yes.

15              MR. JUNEAU:  Pass the juror.

16              THE COURT:  Mr. Kizer.

17                        EXAMINATION

18   BY MR. KIZER:

19   Q    Ms. Frye, I happen to note from looking at your question-

20   naire that you had indicated that you had read something about

21   this matter in the newspaper.  Can you give us an idea of what

22   you have read?

23   A    Just -- at the time it happened, where it happened and the

24   deceased's name.  That's really all I remember.

25   Q    Okay.  There have been some articles that have been in the

589

1   paper in the last month or so.  Have you read those articles?

2   A    Not that I recall.  We don't get a daily paper and so I

3   don't read it every day.

4   Q    Okay.  To another question, you indicated that your

5   daughter had informed you that the, I guess, decedent was an

6   uncle of a friend?

7   A    Yes.  I think before this incident happened that they had

8   been good friends, but due to some family problems with the

9   deceased's niece, they had kind of -- they had became more or

10  less -- were just friends at school and friendly and not as

11  close.  So I just remember like the day after it happened, you

12  know, them saying that the girl's uncle was the one and -- you

13  know.

14  Q    Well, with those two questions answered the way that you

15  did, have you come into the courtroom with any type of precon-

16  ceived idea about the guilt or innocence of the defendant in

17  this matter?

18  A    No, sir.

19  Q    Okay.  The discussion that we've been having primarily the

20  prosecutor about the death penalty is in the second phase of

21  this trial.  Do you understand we may not even get to that phase

22  of the trial --

23  A    Yes, sir.

24  Q    Depending on what the jury does in the guilt or innocence

25  phase.  There will be options that will be afforded to you if

590

5165 Respondent's Exhibit E

1    you are a juror in the guilt or innocence phase that will be
2    related to guilt or innocence on capital murder, a finding that
3    you could possibly find that he is not guilty of capital murder
4    but he is guilty of what's called lesser included offenses;
5    first degree murder or manslaughter.  Or, a finding that he is
6    not guilty of anything at all.  Those are all options that will
7    be afforded to you if you are chosen to serve.  Would you commit
8    to us that you will consider the full range of options when it
9    comes time to deliberate?

10   A    Yes.

11   Q    Likewise, if it should happen that the jury determines that
12   capital murder is the appropriate charge that's been proven by
13   the prosecutor, then a second trial will be held whereby
14   evidence would be presented by the prosecution and by the
15   defense and that would be the aggravating versus mitigating
16   circumstances that Mr. Juneau made reference to.  You also will
17   have a range of punishment in that circumstance; although they
18   are pretty narrow ranges.  On one hand, you have the range of
19   punishment being life in the penitentiary without the possibili-
20   ty of parole.  The second one would be the death penalty.  Will
21   you commit likewise that if the trial gets to that stage that
22   you will consider the full range of punishment opportunities?

23   A    Yes, sir.

24         MR. KIZER:   That's all the questions I have, your
25         Honor.

591

5166 Respondent's Exhibit E

1          THE COURT:  Anything further for the State?

2          MR. JUNEAU:  Nothing further, your Honor.

3          THE COURT:  All right.  Thank you, Ms. Frye.  You may

4     step outside for a moment, please, ma'am.

5          MR. JUNEAU:  She's good.

6          MR. KIZER:  She's good.

7          THE COURT:  Okay.  I show Ms. Darlene Frye as number

8     14 and the second alternate juror.  Ms. Frye, you have been

9     selected as our second alternate juror.  If for some reason

10    more than one juror is unable to serve, you would move up

11    and take that juror's place and serve on the jury.  You'll

12    be regarded under exactly the same rules as all of the

13    other jurors.  To that end, I'm going to ask you to not

14    discuss this case with anybody else at any during this

15    trial until and unless you are charged by the Court,

16    instructed by the Court and sent into the jury room with

17    the jurors for deliberation.  That's the only time it needs

18    to be discussed.

19         JUROR FRYE:  Okay.

20         THE COURT:  Avoid any news accounts if you will,

21    please about the case and we have told the other jurors to

22    be back about 1 o'clock.  Hopefully, we'll be ready to go

23    about that time.  Thank you very much.

24         Let's take about two minutes.

25         COURT REPORTER:  Do you have any more questionnaires?

5167  Respondent's Exhibit E

1          MR. JUNEAU:  I have those we did not use.  Do you want
2     those?

3          COURT REPORTER:  Yes, sir.

4          MR. JUNEAU:  Those that we did go through will be put
5     in the record, won't they, the ones that we did have.

6          MR. KIZER:  I think he was just going to put in the
7     ones that we excused based on their responses to the
8     questionnaire.

9          MR. JUNEAU:  Okay.

10    (A brief recess was taken, after which time the following
11    proceedings were had)

12         THE COURT:  We're back in chambers for the purpose of
13    taking up -- should we do this when he is back?

14         COURT REPORTER:  They took him to lunch.

15         MR. KIZER:  I didn't think about that.

16         THE COURT:  Well, they've got to take him at certain
17    times.  They can't feed him out there for some reason.

18         MR. KIZER:  I didn't even think about that.

19         THE COURT:  I guess that's what we ought to do.  He's
20    supposed to be here.

21    (A lunch recess was taken at 12:06 p.m., after which time the
22    follwoing proceedings were had and done in chambers, to-wit)

23         THE COURT:  Are y'all ready to proceed?

24         MR. KIZER:  I am, your Honor.

25         THE COURT:  We are in chambers having returned from

593

1    the noon recess.   We are here outside of the presence of
2    the jury for the purpose of disposing of a variety of
3    motions that have previously been filed.  The Court has now
4    had an opportunity to read the motions and the responses
5    thereto.   Starting first with the Motion to Allow Opening
6    Statement at the Penalty Phase filed on November 30.   The
7    State has no objection and that will be granted.

8        The second Motion for Additional Time to File Defense
9    Motions is moot at this point.  It was filed November 30
10   and I think the other motions were, in fact, filed and
11   there are no real objections to them.  The State would, of
12   course, grant that if it is -- if it was necessary.

13       The next motion is to require the State to reveal any
14   agreement entered into between the State and any prosecu-
15   tion witness that could conceivable influence his testimo-
16   ny.  The State's response indicates that it intended to do
17   nothing of the kind.  I would ask that should that become -
18   - their response be any different that they would certainly
19   timely notify the Court and/or the defendant under those
20   circumstances.

21       MR. KIZER:  That really had to do with whether Alford
22   was going to testify or not.

23       THE COURT:  All right.  The next motion is to hold the
24   sentencing provision of the death penalty statute, that
25   being Arkansas Code Section Annotated 5-4-603 unconstitu-

594

1    tional.  The Court is sort of interested in this -- in this

2    manner, the specific reference there is in the death

3    penalty phase several forms required to be -- in the

4    punishment phase there are several forms including Form 3

5    that says -- Form 3 requires the jury to conclude first in

6    part a that one or more aggravating circumstances did exist

7    beyond a reasonable doubt at the time of the commission of

8    capital murder requires the jury to execute that if they

9    find that to be the case.  If they do find part a to exist

10   and check it, then they go to part b where the aggravating

11   circumstances outweigh beyond a reasonable doubt any

12   mitigating circumstances.  If they find that part b exists

13   also, then they move to part c to consider whether or not

14   the aggravating circumstances justify beyond a reasonable

15   doubt a sentence of death.  If they execute that, the

16   instructions are if you have checked paragraphs a, b and c,

17   then sentence Kenneth Reams to death by lethal injection on

18   Form 4.  I am inquiring at this point, do you -- is it the

19   State's position that that is a mandatory provision if they

20   have checked paragraphs a, b and c then the jury must

21   sentence this defendant to death by lethal injection?

22        MR. JUNEAU:  Could I see that last page?

23        THE COURT:  Or should it read, "may sentence him to

24   death by lethal injection"?  Certainly only after making

25   those three specific findings could the jury do that, but

595

Respondent's Exhibit E

1    my understanding from reading the State's response that the
2    jury had the alternative at least at the conclusion of --
3    while considering part c to determine that even if a and b
4    are found beyond a reasonable doubt to exist that they
5    could avoid imposing the death sentence by not checking
6    paragraph c.
7        MR. JUNEAU:  So if I understand what the -- what the
8    Court is saying, the word "may" should be substituted?
9        THE COURT:  I'm asking if that's not what should be.
10   Is it -- is it the State's position that it is mandatory if
11   they check a, b and c that we are directing them to enter
12   a verdict of death or allowing them?  My understanding was,
13   and correct me if I'm wrong.  My understanding is that only
14   in the event they make those three findings could they
15   impose.
16       MR. KIZER:  Could they even consider it.
17       THE COURT:  They could consider the death penalty.
18   And it would seem that the better way to word the last
19   portion of part 3 would be to say, "if you have checked a,
20   b and c, then you may sentence this defendant to death by
21   lethal injection on Form 4."  And the verdict form on Form
22   4 provides alternate sentences.  Of course, we've told them
23   all the way through that unless they did -- unless they
24   find all three of those they may not impose the death
25   penalty.

5171  Respondent's Exhibit E

1           MR. JUNEAU:  Well, I think given the way section c is

2      written,  the  aggravating  circumstance  justify  beyond  a

3      reasonable doubt the death sentence should they find that

4      and  check  section  c,  then  I  think  Form  3  would  be  the

5      appropriate language on that.

6           THE COURT:  You think the conclusion of that would be

7      then that they must.  If they find that it does, that all

8      of  those  circumstances  do  justify  the  imposition  of  the

9      death sentence, are you telling me that then their discre-

10     tion stops at that point and they have to impose it?

11          MR. JUNEAU:  I think that's what section c is saying.

12          MR.  KIZER:   That's  what  it  is  saying,  but  I  don't

13     think that's right.  I don't think that's what the law is.

14          THE COURT:  I don't -- I think what the Supreme Court

15     has so found that -- I think that there are some cases that

16     indicate  that  in  sustaining  a  conviction  where  these

17     virtually identical forms were used, I think they have said

18     that leaving part c unchecked is the way that a jury can

19     not impose the death penalty if it is not so inclined.  I'm

20     not sure that they went so far, and I'm not sure which one

21     of those cases, I'd have to look again and see.  I don't

22     know  that  they  went  so  far  as  to  say  that  even  if  all

23     three,  a,  b  and  c  were  checked,  that  they  then  had  to

24     impose it.  And I'm not sure that the -- I'm not sure where

25     we are with that.  I don't intend to rule on that right now

5172  Respondent's Exhibit E

1      until I read more closely those cases.

2              MR. JUNEAU:  And I think we could bring it up when we

3      argue jury instruction if there is any other argument.

4              THE COURT:  I do, too.  I do, too.  But that is one

5      that I wanted to mention to you because I am somewhat

6      concerned about the mandatory provisions in there, and I

7      want to make sure that we address that thoroughly at that

8      time.  So we're going to withhold a ruling on that motion

9      at this time.

10             Our next one is a Motion to Assure Cross Section of

11     the Community for the Jury.  Our statutory procedure for

12     jury selection, I think, has been followed at this point.

13     That will be granted to the extent that -- well, I guess it

14     is moot by compliance as best I can tell.

15             The next one is the Motion to Quash the Information on

16     the Grounds that the Death Penalty is a Cruel and Unusual

17     Punishment  Violative  of  the  Eighth  Amendment  to  the

18     Constitution of the United States.  I think the cases are

19     replete to the contrary and will deny that motion.

20             The  next one is a Motion to Compel Disclosure of

21     Aggravating Factors of Information relating to the Mitigat-

22     ing Factors.  That would be granted, but I think it is

23     probably moot by compliance as well.  I think the State's

24     response was --

25             MR. KIZER:  They have.

598

Respondent's Exhibit E

 1          THE COURT:  Okay.  The next one is a Motion to
 2     Prohibit the State from Seeking the Death Penalty on the
 3     grounds that historically the death sentence has been
 4     arbitrarily and capriciously imposed in a racially discrim-
 5     inatory manner in violation of the Eighth and Fourteenth
 6     Amendments to the United States Constitution.  That may be
 7     true somewhere, but I don't think there is sufficient for
 8     this Court in this jurisdiction to so find.  I'm going to
 9     deny that motion.
10          The Motion to Prohibit Death Qualification of the
11     Jury.  This was verbally brought up to the Court prior to
12     our starting the process.  And for the record, at this
13     time, the Court has denied that.  We have, in fact, death
14     qualified the jury.
15          The next Motion to Compel Disclosure of Circumstances
16     which allegedly manifested extreme indifference to the
17     value of human life.  I think the State's response has
18     disclosed those, have they not, Mr. Kizer?
19          MR. KIZER:  They have.
20          THE COURT:  I would grant that, but I think it is moot
21     by compliance at this point.
22          Motion for Full Recordation, other than off the record
23     comments, the Court will certainly grant that motion.  I
24     think the only things we have done off of the record have
25     been administerial in nature only.

1          Motion to Hold the Sentencing provision of the Death

2     Penalty Statute Unconstitutional.  I think this motion is

3     duplicated.  I believe there are two motions, Mr. Kizer,

4     that appear to be identical in here.

5          MR. KIZER:  There may be.  I was trying to cover all

6     the bases and may have covered them twice.

7          THE COURT:  I understand.  Okay.  This is really sort

8     of what we were talking about earlier.  We were talking

9     about the mandatory provisions of the death penalty

10    language.  We need to withhold a ruling on that until we

11    read the rest of those cases.

12         The next Motion is to hold the provision of the death

13    penalty statute unconstitutional.

14         MR. KIZER:  Is that a duplicate, too?

15         THE COURT:  No, sir, that's not a duplicate.  This is

16    by virtue of not having a mandatory appellate review.  I

17    think that's what was mentioned in this.  I think the most

18    recent case law indicates that mandatory review is not --

19    is not necessary.  I'll deny that motion.

20         The next one is the Motion to Omit from Submission to

21    the Jury any Aggravating Circumstances Completely Unsup-

22    ported by the Evidence.  Certainly, that will be granted.

23    Try not to submit anything to them that is not supported by

24    the evidence.  I'm sure we always do that.

25         The next one is a Motion for Discovery, Inspection,

1    Examination, Testing of Physical Evidence.  Mr. Kizer had

2    previously indicated to me that he feels the State has

3    complied with that.  It would be moot by compliance.

4         MR. KIZER:  The only thing I haven't seen is whether

5    Andrejack is -- has given an additional report, or did he

6    just adopt the one that he --

7         MS. BILLINGS:  No, he gave a report.  It's just the --

8    it's the very same thing.

9         MR. KIZER:  Okay.  I'll take her at that.

10        THE COURT:   The next one is a Motion to Require

11   Investigative Officers to retain rough field notes.   At

12   this time, I assume that if you want to proceed with

13   whatever notes they have for purposes of appeal and re-

14   trial and that sort of thing, we'll ask them to retain

15   whatever notes they have at this time.

16        MR. KIZER:   It'll really just depend on what their

17   testimony is.

18        THE COURT:  Right.

19        MR. KIZER:  I really don't know yet.

20        THE COURT:  I would have no problem in asking them to

21   retain what they have, but if they don't have anything,

22   they don't have it.  But I would be inclined to grant that.

23   But if you'll try to remember to ask the officers individu-

24   ally whatever they have, we'll ask them to -- I'll ask the

25   State to ask their witnesses to hold on to what notes they

5176  Respondent's Exhibit E

1    do have.

2          Now, the Motion to Prevent the Victim Impact State-

3    ment.  Is this primarily during the penalty phase?

4          MR. KIZER:   I understand the State is not going to

5    seek it any way.

6          THE COURT:  Is that correct?

7          MS. BILLINGS:  Yes.

8          THE COURT:  Okay.  All right.  The Motion to Prohibit

9    Submission to the Jury Aggravating Circumstances for

10   Pecuniary Gain at the Penalty Phase of the Trial.  That's -

11   -

12         MR. KIZER:   I can honestly say that this is the one

13   area of the death penalty stuff I've gotten the most

14   confused about because it seems to -- the Court has been

15   very serpentine in its decisions.

16         THE COURT:  I think that the current state of the law,

17   as best I can tell, of Arkansas' law seems to follow the

18   Lowenfield reasoning as pointed out in the State's re-

19   sponse.  Although I think the various U.S. Circuits are

20   split at this time, at least our circuit supports the

21   Lowenfield reasoning which goes back to pre-Collins v.

22   Lockhart days.  I think that the -- I think we are left

23   being able to elicit testimony about pecuniary gain as an

24   aggravating circumstance.  So, I'll deny yourm otion on

25   those grounds.

602

5177 Respondent's Exhibit E

1          The Motion for Discovery I take it is moot by compli-

2     ance I hope other than what we have talked about.

3          MR. KIZER:  It is.

4          THE COURT:  The Motion to Sequester the Witnesses.

5          MR. KIZER:  I didn't want to forget to make it at

6     trial.  I just -- other than the victim, of course.

7          THE COURT:  How do we want to -- we certainly will

8     exclude them from the courtroom.  Is there any particular

9     place that -- other than the -- I guess the jury pool room

10    or -- I don't know where we can place them.  I don't know

11    what type of -- there is a -- one of the victim's family

12    members, the Clerk told me is here, the father-in-law of

13    the -- he identified himself to the Clerk as the father-in-

14    law of the victim.

15         MR. KIZER:  So is the victim's spouse.  She's here,

16    right?

17         THE COURT:  Is she?

18         MS. BILLINGS:  Um-hum.

19         THE COURT:  I'm sure she is, and I suspect that the

20    victim's parents will be here.

21         MR. JUNEAU:  They should be.

22         THE COURT:  From the conversation I had with them on

23    the telephone about their interest in the matter.  I would

24    say that they witnesses probably ought not be exposed to

25    them, not that -- the majority of the witnesses would

603

Respondent's Exhibit E

1    certainly be sympathetic to their -- we'll certainly

2    exclude them from the courtroom to testify individually and

3    caution them about discussing their testimony.

4        We have previously granted the motion for sequestered

5    individual voir dire.

6        The Motion in Limine as to photographs.  We've

7    discussed that two or three times, and I think that's -- I

8    think we're -- Mr. Kizer is, if not comfortable, at least

9    the State's limited amount of pictures, according to what

10   I've been told, to just a few.

11       MR. KIZER:  Yeah.  Carol showed me all of them and if

12   -- as long as she is going to use the ones that she thought

13   she was going to, I don't have any objection to them.  I

14   don't particularly care for it, but I don't have objection.

15       MR. JUNEAU:  That would be the Crime Lab photos?

16       MR. KIZER:  Right.  And then there is the --

17       MS. BILLINGS:  Some of the truck.

18       THE COURT:  That's okay.  Y'all know which ones you

19   are going to use.

20       MR. JUNEAU:  Well, that's what I was going to make

21   sure.  Do you have any objections to any of these?  I took

22   the other ones out?

23       MR. KIZER:  No, those are all the ones she told me.

24       MR. JUNEAU:  Okay.

25       THE COURT:  Okay.  Motion to Preclude the Prosecution

5179 Respondent's Exhibit E

1        from Using Peremptory Challenges to Exclude Black persons

2        and other -- we've crossed that bridge, I think, during

3        selection on an individual basis.  The Court has granted

4        that motion basically.

5            Motion to Quash the Information on the Ground of the

6        Statutory Aggravating Circumstances is Vague and Overbroad

7        and had been not narrowly construed by the Court.  The

8        Court has -- will deny that.

9            I think those are the Motions other than those

10       relating to the double counting and constitutionality of

11       the death penalty because of that -- or the --

12           MR. KIZER:  Do you want to take up my motion on the

13       retardation aspect if it arises during sentencing?

14           THE COURT:  Yes, sir.  I have seen --

15           MR. KIZER:  Judge, do you want me to submit written

16       orders on all of these?

17           THE COURT:  It's in the record.  If you want to do

18       something any more complete than that, that's fine.  But

19       it's -- I think we are pretty clear on the record.

20       Whatever your pleasure is.  What next?

21           MR. KIZER:  I'm ready to go.

22           THE COURT:  Is everybody ready?

23           MR. JUNEAU:  Yes, sir.

24       (Proceedings were moved into the courtroom at 1:43 p.m. and

25       began as follows to wit:)

5180 Respondent's Exhibit E

1          THE   COURT:   Ladies   and   gentlemen,   thank   you   for

2     putting   up   with   us   during   the   rather   arduous   process   by

3     which   you   were   selected.   I'll   ask   you   now,   the   first   order

4     of   business,   to   stand   and   let   Madam   Clerk   swear   you   in   for

5     this   particular   case,   please.

6     (Jurors   were   sworn   at   1:45   p.m.)

7          THE   COURT:   Ladies   and   gentlemen,   let   me   repeat,   for

8     the   record,   this   time,   and   I'll   --   you'll   hear   it   again.

9     Let   me   ask   you   to   please   do   not   discuss   this   case   during

10    the   time   that   we   are   here   together   until   and   unless   you   are

11    charged   by   the   Court   and   retire   to   the   jury   room.   That's

12    the   time   to   discuss   the   case   among   yourselves.   Otherwise,

13    don't   discuss   it   among   yourselves   or   with   anybody   else.

14    Please   avoid   any   and   all   news   accounts   that   you   might   see.

15    You   know,   I've   told   you   that   before,   but,   again,   that's

16    part   of   my   job   to   make   sure   that   I   remind   you   of   that.

17         Are   there   any   witnesses   present   that   can   be   sworn   at

18    this   time?

19         MR.   JUNEAU:   Yes,   your   Honor,   the   State   has   got   some.

20         THE   COURT:   All   right.   All   the   witnesses   who   are

21    going   to   testify   in   this   matter,   would   you   stand   at   this

22    time,   please,   and   let   me   ask   you   to   raise   your   right   hands.

23         MR.   KIZER:   May   we   approach   the   bench   for   just   one

24    second,   your   Honor?

25         THE   COURT:   Certainly.   Put   your   hands   down,   please.

606

1    (Counsel approached the bench)

2         MR. KIZER:   Since we are trying this case in two

3    phases, my motion to exclude witness really only went to

4    the guilt or innocence phase.  My reason for saying that is

5    that I have some witnesses who may testify if we get to the

6    second phase, and I just wanted a clarification from the

7    Court on how you wanted to proceed with that, whether they

8    would be excluded or not?

9         THE COURT:   Well, how do you want me to proceed?

10        MR. KIZER:   Well, I don't care who is in here if we

11   get to the second phase.

12        THE COURT:   Does the State have any objection to the

13   witnesses being in here --

14        MS. BILLINGS:   Like who, Maxie?

15        MR. KIZER:   Well, like his mother and his father.  I

16   may call them in the second part of it, but they don't know

17   anything about the first part of it.

18        MS. BILLINGS:   Okay.

19        THE COURT:   They can remain in the courtroom.

20        MR. KIZER:   Right.

21   (Conclusion of bench conference)

22        THE COURT:   Okay.  Now, I'll ask you to raise your

23   right hands if you will, please.

24   (Witnesses that were in the courtroom at this point were sworn

25   in)


607


5182 Respondent's Exhibit E

1          THE COURT:  The rule has been requested and those
2     witnesses that will be testifying at least in the first
3     phase of this trial will need to remain outside the
4     courtroom.  You'll be called in individually to testify.
5     I'll caution you about discussing the case among yourselves
6     or certainly with other witnesses after your testimony has
7     been given.  With that, you are excused to be called in one
8     at a time.
9          Any other preliminary matters, ladies and gentlemen?
10    (No response)  Ms. Billings, any other preliminary matters?
11         MS. BILLINGS:  No, your Honor.
12         THE COURT:  Mr. Kizer?
13         MR. KIZER:  I don't believe so.
14         THE COURT:  All right.  Ms. Billings, you may go to
15    the jury with your -- Mr. Juneau, excuse me.
16         MR. JUNEAU:  I'll do that, your Honor.
17         THE COURT:  I had a 50-50 chance.
18                         OPENING STATEMENT
19    BY MR. JUNEAU:
20         Y'all know that I'm Wayne Juneau and I'm with the
21    Prosecuting Attorney's office and this is Carol Billings
22    who is also with the Prosecutor's office.
23         You know that we are here today to try this man
24    (INDICATING), Kenneth Reams.
25         We are here to decide the fate of Mr. Kenneth Reams

                                608

1    because May 5th of this year he and another man, on their

2    own, decided the fate of the victim, Gary Turner.  During

3    a robbery, they shot and killed Mr. Turner.  That's what

4    the State will prove to you today.  We will prove it beyond

5    a reasonable doubt he is guilty of capital murder.

6        You know when we talked in the room right beside the

7    courtroom that we were going to try this case in two

8    phases.  Right now, we are just concerned with the guilt

9    phase of this trial.  That's all that matters right now.

10   The State has the burden to prove to you beyond a reason-

11   able doubt that either this man (INDICATING) or an accom-

12   plice--either this man (INDICATING) or an accomplice

13   attempted to rob Mr. Turner at the ATM machine and that

14   during that attempted robbery, Mr. Turner was shot and

15   killed by either this man (INDICATING) or his accomplice.

16   That manifested extreme indifference to the value of human

17   life, and he is guilty of capital murder.  You will hear

18   testimony today from a number of witnesses, not as many as

19   you might expect in a capital murder case.  The number of

20   witnesses is not that important.  It's what they have to

21   say.

22       You will hear testimony and the evidence will show

23   that on May the 5th about 8:30 this man (INDICATING),

24   Kenneth Reams, and his accomplice Alford Goodwin robbed Mr.

25   Turner.  But before that, they had planned to rob Mr.

5184  Respondent's Exhibit E

1    Turner.   They had sat around and they had talked and they
2    needed money and they talked and they schemed and they
3    thought and they decided the easy way to make a lot of
4    money would be to rob somebody when they pulled up to the
5    ATM machine because it had been done before.   So that's
6    what they did.

7         They got a gun and they walked over there to the ATM
8    machine and, in fact, if you'll remember back -- some of
9    you may remember in May they were tearing down a building.
10   It was right across the street from the ATM machine.   It
11   was by that law firm, what used to be the old Welch Motor
12   place, I think.   And they were tearing that building down.
13   And these two went and sat down in the dark in between
14   those two buildings and they waited.   They waited for their
15   victim to pull up there to the ATM machine.   And they ran
16   across that street.   They went up to the side of the window
17   where the machine is and got between the machine and the
18   window and they told Mr. Turner they wanted his money.

19        And as Mr. Turner began to scuffle with them, they
20   pulled a gun and they shot him through the head.   A gun you
21   will hear testimony was probably six to 18 inches from his
22   head when they shot him.   Then they ran off.   They left him
23   there and they ran off.   They went down the street.   What
24   they did is they ran up on somebody else and they started
25   talking about it.   Everybody was quiet and nobody said

5185  Respondent's Exhibit E

1    anything for a few days.   Then it came to light.   The

2    police department got phone calls.   These two started

3    talking about it.   And they started investigating these

4    phone calls and sure enough they found -- they got the

5    telephone call and said this gun was a .32.   They got

6    telephone call indicating that, in fact, .32 came from a

7    burglary.   And they got to checking and sure enough there

8    was a burglary of a dry cleaners and there was a .32 pistol

9    stolen.   And then they talked to other people and they

10   said, "Well, Kenneth Reams has a .32."   Kenneth Reams said,

11   he robbed this place.   He burglarized this place and he

12   robbed these people.   They went out looking for Kenneth

13   Reams and Alford Goodwin.   And they found them walking down

14   the street.   And at that time, they arrested them and they

15   took information from them.   And at the same time they did

16   that, they executed search warrants and they went over to

17   Kenneth Reams house and what did they find when they went

18   in there, they found three jackets that came from that

19   burglary at the dry cleaners.   They found a holster that

20   the gun was in when it was stolen from the dry cleaners.

21   And they went over to Alford Goodwin's house and they

22   searched Alford Goodwin's house and what did they find

23   there.   They found another jacket from the dry cleaners and

24   they found the gun outside under a bucket.   And they took

25   that gun and they submitted it to the crime lab.   And, at

611

1    the same time, the Crime Lab did an autopsy on Gary Wayne

2    Turner and they removed a bullet from his head.  It was a

3    .32 bullet.  When they did their investigation at the Crime

4    Lab, they can said that that gun fired that bullet.

5         So then they took Mr. Kenneth Reams and they asked him

6    what happened.  Kenneth Reams told them and you'll hear the

7    detectives testify to his statement that he was involved in

8    that robbery where Mr. Turner was killed.  And at the end

9    of the State's evidence, there will be no doubt, it will be

10   well beyond any reasonable doubt that Kenneth Reams was

11   involved in as an accomplice or directly involved in the

12   shooting of Mr. Turner, and he is, in fact, guilty of

13   capital murder.  Thank you.

14        THE COURT:  Mr. Kizer, you may go to the jury with

15   your opening remarks for the defendant.

16        MR. KIZER:  Thank you, your Honor.

17                    OPENING REMARKS

18   BY MR. KIZER:

19        Ladies and gentlemen, as we have talked in pretty good

20   detail in the jury room now, there are two phases of the

21   charge having to do with capital murder.  We're here for

22   the first one.  As I explained to you when we were sitting

23   in there, you have options.  You have goals -- not goals,

24   but you have options that are afforded to you in your

25   service as jurors in this first portion of the trial.  And

612

1    the guilt or innocence phase is going to determine where we

2    go from here.   Unfortunately, for the State and for the

3    defense and for all of us, there is a man who is dead and

4    there are very few people who know exactly what went on.

5    The person who died knows what went on.   Alford Goodwin,

6    who is not on trial today who has already plead guilty, he

7    knows what went on.   And Kenneth Reams, he knows what went

8    on.

9         The State's evidence that you are going to hear is

10   going to be, most of it, of a circumstantial nature.   By

11   that I mean you will hear just exactly as it was outlined

12   by Mr. Juneau about the recovery of certain items.   About

13   what a police officer may have found when he came up on to

14   the scene.   But really when you boil down this case, the

15   only people who know exactly what went on -- or the only

16   person is going to be Kenneth Reams.

17        Now, I told you when we were in chambers in there that

18   it will be my decision whether he testifies or not.   Well,

19   I've talked with Kenneth and Kenneth wants to testify.   He

20   wants to tell you what went on on this particular day.

21        Before we get to that, I would like to remind you

22   there is a way you have to comport your conduct when you

23   are in a formal setting.   When you are in church, you act

24   a certain way and it is expected of you and you expect it

25   of yourself and others around you.   When you are in school,

613

1    that's the same type of thing that you experience.   And
2    when you are in a courtroom, there, likewise, is a way that
3    everyone is expected to comport themselves.   You took an
4    oath and most of you told me that you take that oath very
5    seriously.   That you will well and truly try this case and
6    make your decision according to the law and to the evi-
7    dence.
8         Well, there are certain aspects of the law I want to
9    discuss with you so that you can get a foundation, a
10   prospective, if you will, on what your duty is as a juror
11   and how you should view the evidence coming from that chair
12   right there.
13        The first thing the Judge is going to instruct you
14   when he starts to read the jury instructions is that you
15   should not permit sympathy, prejudice, or like or dislike
16   of any party to this action or of any attorney to influence
17   your findings in this case.   That's important for you to
18   know.   It's important for you to take into consideration
19   because you've all told me that you will make your decision
20   based on the evidence.
21        The second thing I would like for you to take a look
22   at is imagine, if you will, that you were going to scruti-
23   nize every bit of this evidence because you are the triers
24   of fact when it comes to the evidence itself.   You are
25   going to scrutinize it through a microscope.   And in that -

1    - looking through that microscope and examining what you
2    have and figuring out what emphasis or weight you should
3    give that testimony, there is going to be a screen that
4    needs to be placed on that microscope and it will help you
5    to view the evidence in a certain way.  And that screen
6    consists of the constitutional safeguards that I mentioned
7    to you in chambers.  The first thing is is that simply
8    because he has been charge, he being Kenneth Reams, has
9    been charged with a crime is not evidence of guilt.  The
10   Judge is going to read the jury instruction to you and tell
11   you that.  We've all agreed that's just the way we bring
12   somebody into the courtroom.
13        The second thing is is he is going to tell you that
14   there is presumption of innocence.  While he is sitting
15   there in front of you right now, you may think you have
16   heard a lot about this case.  In fact, you may have even --
17   you may think that you have made up your mind, so to speak,
18   about who -- what may have gone on.  But there is a
19   presumption of innocence just like if it was a cloak and it
20   was sitting around him much like what the Judge is wearing
21   right now.  And that presumption of innocence attends and
22   protects him.  It is a prophylactic.  It protects him
23   through every stage of this trial unless and until you are
24   convinced beyond a reasonable doubt that he committed this
25   crime.  If you will think about that, that's the corner-

5190 Respondent's Exhibit E

1    stone of our system--our criminal justice system.  You

2    wouldn't want it any other way.

3         The other thing is is that you look through that

4    microscope and you scrutinize it very closely and you

5    realize that the State of Arkansas, by and through these

6    Prosecuting Attorneys right here, has the burden of proving

7    every element of the charge.  They have to prove every

8    element to you beyond a reasonable doubt.  Kenneth Reams

9    doesn't have to prove anything.  He's going to take the

10   stand.  He's going to tell you in detail what happened that

11   night.  He's arrested.  He's going to tell you everything

12   that went on that screwed up his life as well as the life

13   of Mr. Goodwin and the decedent -- the deceased.

14        But while you view that evidence, keep in mind that

15   there are a number of elements that have to be proven.  In

16   capital murder, it has to be proven that Kenneth Reams,

17   acting alone or with one or more persons, that's an element

18   right there, that he acted along or with one or more

19   persons, committed or attempted to commit the crime of

20   robbery.  That's one element that you view all together.

21        The second element is that in the course of an in the

22   furtherance of that crime or an attempt or immediate flight

23   thereof, that Kenneth Reams or a person acting with him

24   caused the death of Gary Turner under circumstances

25   manifesting extreme indifference to the value of human

616

1    life.  Extreme indifference to the value of human life is

2    a mickle state I would submit to you.  And you'll need to

3    listen to the testimony very closely and have to make up

4    your mind as to whether you believe that that element has

5    been demonstrated to you.

6         When Kenneth Reams takes the stand, he is going to

7    tell you that on the night in question, he and Alford

8    Goodwin had been drinking that day, had been drinking beer.

9    They had been smoking marijuana and that they were both

10   pretty high.  Now, Alford is just about the same age that

11   Kenneth is.  Alford was due to graduate from Pine Bluff

12   High School last May.  And Kenneth was 17 years of age at

13   the time.  He is now 18.  He was not going to school.  In

14   fact, Kenneth is from Pine Bluff.  He had lived for the

15   last three or four years in either Forrest City, which is

16   where his parents live or he had lived with an aunt in

17   Poplar Bluff, Missouri.

18        But Kenneth had come over to Pine Bluff and was

19   staying with an aunt named Jo Ann Reams.  And on this

20   particular day, these guys had been -- been worthless

21   basically.  They were laying around doing things that you

22   don't expect 17-year-olds or 18-year-olds to do.  There was

23   a firearm that was in their possession.  Kenneth Reams is

24   serving time at the Arkansas Department of Correction right

25   now and one of those things that he is serving time for is

5192 Respondent's Exhibit E

1     burglary of the cleaners located over here at 11th and
2     Poplar Street. He is going to tell you that that is where
3     they got this .32 caliber revolver. Kenneth Reams had that
4     revolver with him. And a discussion had been made -- taken
5     place between Kenneth and Alford about trying to rob
6     somebody at the ATM machine. And he and Alford went over
7     and from what Kenneth tells me is they just sat on the curb
8     right out in front of that old building. You know, the
9     public library used to be in that building there at Fifth
10    and Chestnut. It had no windows. And then the Eilbott Law
11    Firm moved in there and now Child Support Enforcement is in
12    there. And the building right beside it used to have Mark
13    Watkins, who is a CPA, he was in there; Mr. Clement, he's
14    a life insurance salesman, was in there; and a couple of
15    other offices had been in there. I'm telling you that so
16    maybe you can recall this building I'm talking about. And
17    I think the City was condemning it and that's why it is
18    being torn down slowly but surely. They were sitting
19    there.

20        Now, keep in mind it is late. It's late in the
21    evening. It is 8:30 or so. It's just now getting dark.
22    And Kenneth and Alford are talking about what they are
23    going to do. They are going to try to hold up somebody at
24    the ATM machine. Kenneth will tell you that when they
25    first sat down that a mini van pulled up at the ATM machine

                              618


Respondent's Exhibit E

1    and they started to go up to it but decided against it.
2    And they continued to just sit there for 10 or 15 minutes.
3    During that time, Kenneth will tell you he told Alford, "I
4    don't think I can pull a gun this time around.  I don't
5    think I can do that."  And Alford took the gun from
6    Kenneth.  Kenneth will tell you that it was a revolver.
7    And that one of the shells was missing from that revolver
8    and that he thought he had the hammer fixed on that
9    revolver where when you pulled the trigger it hit an empty
10   cylinder, nothing could happen.  That's when he handed that
11   gun to Alford Goodwin, that's what he thought was taking
12   place.

13         They sat there for a while and Mr. Turner, although
14   they didn't know who it was at the time, pulls up in a
15   pickup truck.  The prosecution has some photographs they
16   are going to show you it was a jeep pickup truck.  And he
17   pulls up very close to the ATM machine.  Kenneth and Alford
18   walk across the street.  And they -- Kenneth is going to
19   circle around.  He is going to get inside the vehicle
20   somehow or another and turn the motor off so the individual
21   can't drive away.

22         Alford walks up to the side of the vehicle.  Here's
23   the ATM machine here (INDICATING). Here's the pickup truck
24   here (INDICATING).  And as I mentioned to you, it's so
25   tight a space that both of them can't fit.  But Alford is

                              619


5194  Respondent's Exhibit E

1    standing there at the side where the back panel is leading

2    to the bed of that pickup truck.  Alford is engaged in some

3    type of conversation with Mr. Turner.  Kenneth was making

4    his way around the pickup truck because there is no space

5    for him to get through.  When he gets around on the other

6    side, he starts to reach in to turn off the motor.  And

7    when he does, without any forewarning, a shot goes off

8    right in his ear.  And that shot strikes Mr. Turner right

9    in the forehead.  That shot was fired by Alford Goodwin.

10   Now, Kenneth will tell you that he jerked his hand

11   back and that Mr. Turner fell forward.  And when he did, he

12   looked around and Alford Goodwin was no where to be seen.

13   Kenneth will tell you he has never been more scared in his

14   life.  And he had no idea that that's what was going to

15   transpire.  They had never talked about killing anybody.

16   In fact, you are going to hear that they had even attempted

17   to commit an aggravated robbery just a week before at the

18   exact same location.  Nobody got shot.  Nobody -- the plan

19   was for nobody to get shot.

20   He takes off running ultimately and he catches up with

21   Alford Goodwin.  Alford Goodwin is running for his life so

22   to speak.  Come to find out, Mr. Turner told -- said to

23   Alford Goodwin, "What the fuck do you want, Nigger?"  And

24   when he said that, the gun shot was fired.  That was not

25   something that was planned on.  That was not something that

620

1    Kenneth will tell you that he ever intended to come about -
2    - to have come about, but it did.

3    Kenneth takes off running. He is scared. He doesn't
4    know what to do. They both go back to his aunt's house.
5    Ultimately, they hide the weapon or Alford hides the
6    weapon. He still has it in his possession. The police
7    find that weapon in Alford's back yard hidden under a
8    bucket. The three shells that were remaining in that five-
9    shot revolver, one was shot at Mr. Turner and there was
10   already one missing, were found on the window sill in
11   Alford's bedroom.

12   Kenneth does not leave town. He does not do anything.
13   Kenneth thinks that he doesn't have anything to fear with
14   regard to a murder charge because he didn't kill anybody.
15   He had never heard the term, "capital felony murder," which
16   he subsequently learned that there is a whole new set of
17   facts that he had to deal with.

18   That's what Kenneth is going to tell you how every-
19   thing went down. He's going to tell you that he went over
20   there to rob him. That he had no intention of that murder
21   ever happening.

22   Again, we're sitting here. We don't -- none of us
23   were there when this event took place. There were very few
24   people who were. There were very people who can tell you
25   exactly what went on. Basically, this is what Kenneth has

621

1    told the police and basically that's what the report is

2    that you will hear whenever it is read into evidence.  And

3    that's all that the prosecution can offer you as to who

4    fired the firearm in this case and how that event actually

5    took place.  Kenneth can tell you in much more detail.

6        That's what the facts are going to be.  I would ask

7    you to look at these facts and to judge them based on,

8    keeping in mind, that every element has to be proven.

9    Every element, whether it is being involved in a robbery or

10   bringing about the murder -- or bringing about the death

11   with extreme indifference to human life.  What does that

12   mean, extreme indifference to the value of human life?  I

13   guess we would have to go into the mind of Alford Goodwin

14   and find out what caused him to pull that trigger in the

15   first place.  Did he do it accidentally?  Did he do it in

16   a rage or as a knee jerk reaction to those words being

17   said?  Alford Goodwin is a young black male also.  I don't

18   guess we'll ever know.  But that not knowing is something

19   that you'll have to keep in mind when it comes time for you

20   to decide whether this case has been proven to you beyond

21   a reasonable doubt.  Beyond a reasonable doubt is not an

22   ordinary -- I mean, not a doubt that is an imaginable or

23   far out in left field.  But doubt is something that you'll

24   have to decide when it comes time for you to make up your

25   mind whether he willingly participated in killing anyone.

622

1     Thank you.

2            THE COURT:   Ms. Billings, Mr. Juneau, you may call

3     your first witness for the State.

4            MS. BILLINGS:  Greg Taylor.

5            THE COURT:   Greg Taylor.   Mr. Taylor, you have

6     previously been sworn.   I'll remind you you are still under

7     oath.

8                           GREG TAYLOR

9     having been called at the instance of counsel for the State of

10    Arkansas, and after first having been duly sworn, testified as

11    follows, to wit:

12                        DIRECT EXAMINATION

13    BY MS. BILLINGS:

14    Q    Officer Taylor, would you state your name and occupation

15    for the jury, please?

16    A    My name is Greg Taylor, and I'm a patrolman with the Pine

17    Bluff Police Department.

18    Q    How long have you been with the police department?

19    A    Two and a half years.

20    Q    And you said you are a patrolman with the police depart-

21    ment?

22    A    Yes, ma'am.

23    Q    What exactly does a patrolman do?

24    A    A patrolman's duties are to patrol the city of Pine Bluff,

25    to answer criminal calls, work traffic accidents, general

                              623

Respondent's Exhibit E

1   peacekeeping, also taking any kind of report that comes in,

2   theft, battery, robbery, any kind of report where the initial

3   unit that comes out and we decide whether a detective unit or

4   vice unit or a traffic officer needs to be called to the scene

5   to further investigate.

6   Q    Officer Taylor, are you familiar with the area of Fifth and

7   Chestnut?

8   A    Yes, ma'am.

9            MS. BILLINGS:  May I approach the witness, your Honor?

10           THE COURT:  Yes, ma'am.

11  MS. BILLINGS CONTINUING:

12  Q    Officer, I'm going to show you this first and this has been

13  marked as State's Exhibit Number 1 for identification.  Do you

14  recognize that?

15  A    Yes, ma'am.

16  Q    What is that?

17  A    This is the area of Fifth and Chestnut where the Worthen

18  Bank teller machine is, bank parking lot.  It's on the southeast

19  corner of Fifth and Chestnut.

20  Q    Is this a fair and accurate diagram of that area?

21  A    Yes, ma'am.

22           MS. BILLINGS:  Your Honor, if Mr. Kizer has no

23           objection, I'd like to offer this into evidence so that

24           Officer Taylor can testify from it.

25           MR. KIZER:  I've previously seen it, your Honor, and

624

1        I don't have any objection to it.

2                THE COURT:  Let it be received.

3                (WHEREUPON, ENLARGEMENT OF THE DIAGRAM OF FIFTH AND

4        CHESTNUT, PREVIOUSLY MARKED AS STATE'S EXHIBIT NUMBER 1 WAS

5        RECEIVED INTO EVIDENCE.  BEING UNABLE TO ATTACH ENLARGEMENT

6        TO THE TRANSCRIPT, SAID ENLARGEMENT REMAINS IN POSSESSION

7        OF COURT REPORTER.)

8    MS. BILLINGS CONTINUING:

9    Q    Officer Taylor, if you would there, can you point out the

10   various buildings and the streets, north and south for the jury.

11   I think they can read, but I -- if you could just do that for

12   us.

13   A    Could I stand?

14   Q    Yes.

15   A    This is Fifth Street heading west.  This is Chestnut

16   Street, runs north and south; Pine Street runs north and south.

17   This is also an area one and two blocks off of Main Street, west

18   of Main Street.  This is the Worthen Bank Building.  The Worthen

19   teller machine at the southeast corner of Fifth and Chestnut,

20   the new AP&L Building, you've got the child support office here.

21   You've got what used to the old Welch Motor building which is

22   now a vacant lot that has been recently torn down.

23   Q    Okay.  Thank you, Officer Taylor.  Did you answer a call in

24   that area on May 5th?

25   A    Yes, ma'am, I did.

1    Q     And what time would you have arrived there?

2    A     I believe it was at 8:36 that I arrived, approximately 8:36

3    that I arrived at the scene at Fifth and Chestnut.

4    Q     What type of call did you answer there?

5    A     I was dispatched to an armed robbery of an individual at

6    the teller machine at the southeast corner of Fifth and Chest-

7    nut.  Before I arrived there, I was advised by radio that there

8    had been shots fired on the scene and there was supposedly one

9    person down and that an ambulance was en route to the scene.

10   Q     Okay.  And when you arrived there, what did you find?

11   Describe the scene for the ladies and gentlemen.

12   A     First, when I arrived, I found a blue Jeep pickup parked in

13   the driveway at the teller machine, just forward or west of the

14   teller machine.  However, it was right next to it.  There was

15   also a gold Ford Taurus sitting at the southeast corner of the

16   teller machine out into the bank parking lot.

17   Q     Why don't you take that red pen there behind you and mark

18   on the map there where the blue truck was in relation to that

19   ATM machine?

20   A     Okay.  The window of the machine is approximately right

21   here (INDICATING).    There is also a depository right here

22   (INDICATING).  The truck was parked approximately in this manner

23   right here (INDICATING) facing west.  The window of the truck

24   was approximately right here (INDICATING).

25   Q     Even with the deposit --

626

5201   Respondent's Exhibit E

1    A    Yes, ma'am.

2    Q    Slot there?

3    A    Yes, ma'am.

4    Q    So it was just a little bit forward of where the ATM --
5    where you actually put the card in.  Is that right?

6    A    Right, right.

7    Q    And where was the gold Ford Taurus?

8    A    The gold Ford Taurus was parked approximately right here
9    (INDICATING).  I also parked my unit in this manner right here
10   (INDICATING).

11   Q    Okay.  So you arrived there and you see a -- what kind of
12   truck?

13   A    A blue Jeep pickup.

14   Q    Okay.  And what did you do as soon as you arrived?  Did you
15   see anything else at that point?

16   A    At that time, I did not see anything else.  I approached
17   the truck from where I was at.  I went up to the driver's side
18   of the truck between the truck and the depository, looked inside
19   and saw a white male with his head slumped forward on the
20   steering wheel bleeding from a wound to the side of the head.
21   He was breathing very hard, gasping for breath.  I couldn't get
22   a response from the person.  At that time a black male ap-
23   proached me running at a fast walk or run across this area right
24   along in here and told me that he had seen or heard what had
25   happened, and that he had called the police from the Econo Lodge

627

5202  Respondent's Exhibit E

1    which was right here (INDICATING).  He also advised me that this

2    was his gold Taurus that was parked here.

3    Q    And who was that man?

4    A    That was Mr. James Nelson.

5    Q    Okay.  And when you found Mr. Turner -- who was it that you

6    found there in the truck?

7    A    Okay.  The victim identified by driver's license and also

8    by picture and other material inside the vehicle was Gary Wayne

9    Turner.  He was a white male born in August of 1954.

10    Q    Okay.  And you said that he was still alive at that point.

11    So, what did you do?

12    A    Okay.  At that time, I called back on the radio, called

13    headquarters and asked them to have the ambulance to step it up

14    that we did have an injury there, and I was unable to deal with

15    the situation because I'm not a medical person.

16    Q    Okay.  Did you take any further action towards Mr. Turner

17    until that time?

18    A    At that time, I could not take any further action.  Shortly

19    thereafter another unit arrived on the scene and then a detec-

20    tive unit.  And we were able to put the truck in neutral by

21    reaching through the driver's side.  I reached through the

22    driver's side between Mr. Turner and the steering wheel, put the

23    truck out of first gear into neutral.  It's a standard shift

24    truck, and we rolled the truck forward so ambulance personnel

25    could get Mr. Turner out of the truck.

628

1    Q    Okay.  Why did you have to roll it forward?

2    A    It was close to the machine and where it was at with the

3    door open, the door was only able to be open that much.   We

4    could not move Mr. Turner or check any further on him.  So we

5    had to roll it forward up to the opening right here (INDICATING)

6    in order to be able to get Mr. Turner out.

7    Q    Why didn't you go through the passenger side?

8    A    The passenger door was locked.  I checked it.

9    Q    When you rolled it forward to get Mr. Turner out, what

10   happened?

11   A    Okay.  When we rolled Mr. Turner forward -- or the truck

12   forward, ambulance personnel were on the scene.  They removed

13   Mr. Turner from the truck.  As they were removing him from the

14   truck, a card fell out of Mr. Turner's left hand onto the

15   ground.  I observed the card.  It was a Worthen Bank teller

16   machine card.

17   Q    It was still in his hand?

18   A    It was still in his left hand, yes, ma'am.

19   Q    Okay.  You can have a seat, Officer Taylor.  What state was

20   Mr. Nelson in whenever he came up to you?  Was he calm?  Was he

21   excited?  What was he?

22   A    He was very excited, breathing heavy as though he had been

23   running, nervous, and like I said, excited.

24   Q    And did he provide a description of the persons that he had

25   seen there at the scene?

629

1    A    Yes, ma'am, he gave me a brief description because most of

2    my attention was turned toward Mr. Turner at the time.  He gave

3    another officer a full description.  The description he gave me

4    was two young black males.  He said approximately junior high

5    age, very young.  He said one was approximately 5'11 and one was

6    approximately 5'9.  He said that the -- one of them was wearing

7    a gray sweatshirt with a hood on it and the other one was

8    wearing black shorts and a tee-shirt.

9    Q    Okay.  Did he give you a direction?

10   A    Yes, ma'am.  The persons that he saw running from the truck

11   area ran north across Fifth Street between the child support

12   building and the old Welch Motor Company lot approximately

13   through here (INDICATING).

14   Q    So they were on foot?

15   A    Yes, ma'am.

16        MS. BILLINGS:  May I approach the witness, again, your

17        Honor?

18        THE COURT:  Yes, ma'am.

19   MS. BILLINGS CONTINUING:

20   Q    Officer Taylor, for the clarification of the jury, I'm

21   going to mark this first photograph as State's Exhibit Number 2

22   for identification.  Can you tell me what that is?

23   A    Yes, ma'am.  This is a front photographic shot of the

24   Worthen money card machine there at Fifth and Chestnut.

25        MS. BILLINGS:  Maxie, do you have any objection to

630

1    entering this?

2         MR. KIZER:  No.

3         MS. BILLINGS:  Your Honor, I would like to offer this

4    into evidence as State's Exhibit Number 2.

5         THE COURT:  Without objection, let it be received.

6         (WHEREUPON, THE PHOTOGRAPH OF THE WORTHEN MONDY CARD

7    MACHINE AT FIFTH AND CHESTNUT, PREVIOUSLY MARKED AS STATE'S

8    EXHIBIT NUMBER 2 WAS RECEIVED INTO EVIDENCE.   SEE PAGE

9    NUMBER 950.)

10        MS. BILLINGS:  May I pass it to the jury?

11        THE COURT:  You may.

12   MS. BILLINGS CONTINUING:

13   Q    Officer Taylor, you mentioned on the board there that the

14   truck was forward, the window was actually there -- here at the

15   night depository which is just to the right, I believe, in that

16   photograph of the actual ATM window.  Is that right?

17   A    Yes, ma'am.

18   Q    I have what's been marked as State's Exhibit Number 3.  Is

19   this -- what is that?

20   A    This is a view through the window of the pickup truck

21   showing the inside of the truck and articles laying in the seat.

22   Q    Did you move anything inside that truck before the photo-

23   graphs were taken?

24   A    No, ma'am.  The only thing I moved was the gear shift for

25   putting it into neutral.

631

1    Q    What is that laying there in the seat?

2    A    Okay.  That's a plastic cover with probably the money card

3    code.  I did not investigate into that any further, but it is a

4    Worthen Bank machine card holder.  Also, Mr. Turner's glasses.

5              MS.  BILLINGS:    Your  Honor,  I'd  offer  this  into

6         evidence as State's Exhibit Number 3.

7              MR. KIZER:  No objection, your Honor.

8              THE COURT:  Let it be received.

9              (WHEREUPON, THE PHOTOGRAPH OF THE PICKUP TRUCK SHOWING

10        THE  INSIDE  OF  THE  TRUCK  AND  ARTICLES  LAYING  IN  THE  SEAT

11        PREVIOUSLY MARKED AS STATE'S EXHIBIT NUMBER 3 WAS RECEIVED

12        INTO EVIDENCE.  SEE PAGE NUMBER 951.)

13   MS. BILLINGS CONTINUING:

14   Q    I'm going to show you what's been marked as State's Exhibit

15   Number 4 for identification also.

16   A    Okay.

17   Q    Mr. Taylor, what is that?

18   A    Okay.  This is an open door view of the inside of the truck

19   showing further the interior.  It also shows at the bottom left-

20   hand corner, you can see the money card machine card laying on

21   the ground.

22   Q    Was that where it fell when Mr. Turner was pulled out of

23   the car?

24   A    Yes, ma'am.

25             MS.  BILLINGS:   Your  Honor,  I'd  offer  this  as  State's

632

5207   Respondent's Exhibit E

1    Exhibit Number 4.

2         MR. KIZER:  No objection.

3         THE COURT:  Let it be received.

4         (WHEREUPON, THE PHOTOGRAPH OF AN OPEN DOOR VIEW OF THE

5    INSIDE OF THE PICKUP TRUCK PREVIOUSLY MARKED AS STATE'S

6    EXHIBIT NUMBER 4 WAS RECEIVED INTO EVIDENCE.  SEE PAGE

7    NUMBER 952.)

8    MS. BILLINGS CONTINUING:

9    Q    Finally, Officer Taylor, I'm going to show you State's

10   Exhibit Number 5 for identification.  Do you recognize that?

11   A    Yes, m'am.  This is a passenger side window shot of the

12   blue Jeep pickup that was at the teller machine.

13        MS.  BILLINGS:   Your  Honor,  I'd  offer  this  into

14   evidence as State's Exhibit Number 5.

15        MR. KIZER:  No objection.

16        THE COURT:  Let it be received.

17        (WHEREUPON,  THE  PHOTOGRAPH  OF  THE  PASSENGER  SIDE

18   WINDOW OF THE BLUE JEEP PICKUP TRUCK AT THE TELLER MACHINE,

19   PREVIOUSLY MARKED AS STATE'S EXHIBIT NUMBER 5 WAS RECEIVED

20   INTO EVIDENCE.  SEE PAGE NUMBER 953.)

21        MS. BILLINGS:  Thank you, sir.

22        MR. KIZER:  No cross.

23        THE COURT:  Thank you, Officer Taylor.  You may stand

24   down.  May this officer be excused?

25        MS. BILLINGS:  Yes, sir.

633

5208  Respondent's Exhibit E

1           MR. KIZER:  No objection.

2           THE COURT:  Officer Taylor, you are excused and free

3       to go or stay as you wish.  Call your next witness.

4           MS. BILLINGS:  James Nelson.

5           THE COURT:  Mr. Nelson, do you want to come around and

6       have a seat on the witness stand right down here, please,

7       sir.

8                           JAMES NELSON

9   having been called at the instance of counsel for the State of

10  Arkansas, and after first having been duly sworn, testified as

11  follows, to wit:

12                      DIRECT EXAMINATION

13  BY MS. BILLINGS:

14  Q   Mr. Nelson, could you scoot up?  You and I both know you

15  talk very softly.  Thank you, sir.  Mr. Nelson, would you tell

16  the ladies and gentlemen of the jury your name and how old you

17  are?

18  A   James Nelson.  I'm 22.

19  Q   Mr. Nelson, are you from Pine Bluff?

20  A   Yes.

21  Q   Have you lived here all your life?

22  A   Yes.

23  Q   Okay.  Mr. Nelson, on the night of May the 5th, you were

24  out riding around in town.  Is that correct?

25  A   Yeah.

                              634

1    Q    Can you tell these ladies and gentlemen what is was --
2    where you were about 8 o'clock that night or 8:30 and what you
3    saw?
4    A    Well, could I use this (INDICATING)?
5    Q    Yes, sir.
6    A    I was leaving the mall.  I was coming up Fifth Street.  Two
7    guys at a truck at an ATM machine and I was at the light and I
8    proceeded to go.  They ran -- running.  So I stopped.  They left
9    the truck.  So I went around and came back.  I saw a guy was in
10   the truck.  I went to Econo Lodge to call 911 and went back to
11   the truck.  Then I saw the guy had been shot.  So I went back to
12   Econo Lodge and called them again and told them that he had been
13   shot and when I got back the police was there.
14   Q    Okay.  Mr. Nelson, let's take it a little bit slower.  You
15   said you were on your way back from the mall.  Is that correct?
16   A    Yes.
17   Q    And you were heading west on Fifth Street?
18   A    Yes.
19   Q    Were you by yourself?
20   A    No.
21   Q    Who was with you?
22   A    My cousin.
23   Q    What's his name?
24   A    Cordon.
25   Q    Okay.  And what were you doing?  Were you heading home?

635

1    Were you going somewhere else?

2    A    Yes -- well, I was going to his house.

3    Q    You were going to his house?

4    A    Yes.

5    Q    How is he related to you?

6    A    That's my aunt's son, my father's sister's son.  That's my

7    -- yeah.

8    Q    What type of vehicle were you driving?

9    A    A Taurus.

10   Q    Pardon?

11   A    A gold Taurus.

12   Q    Okay.  What is significant about a gold Taurus?

13   A    It looks like a police car.

14   Q    Okay.  And when you saw the people at the -- you say you

15   saw them at the truck or in the truck?

16   A    At the truck.

17   Q    Where at the truck were they?

18   A    On that side (INDICATING) of the truck.

19   Q    Between the truck and the ATM?

20   A    Yeah.

21   Q    Okay.  And where?  At the rear-end of the truck, at the

22   front?

23   A    At the front.

24   Q    At the front of the truck?

25   A    Yeah, by the driver's door.

5211 Respondent's Exhibit E

1  Q   By the driver's door.  Both of them were there?

2  A   Yes.

3  Q   Okay.  Could you tell anything about them in particular?

4  A   One was tall and one was short.

5  Q   And which one was tall?

6  A   The one that had on the hooded sweater, I think.

7  Q   The one that had on a sweater?

8  A   Yeah.

9  Q   What type of sweater?

10 A   I just know it was a hooded sweater.

11 Q   A hooded sweater?

12 A   Yeah.

13 Q   Okay.  What did you notice about them?  You said that you -

14 - that you saw them there at the truck.  What drew your atten-

15 tion to them?

16 A   When I was at the light?

17 Q   Yes, sir.

18 A   I just happened to look over there.

19 Q   Okay.  Did -- what happened after you left the light?

20 A   I heard two noises and they took off running.

21 Q   Both of them took off running?

22 A   Yeah.

23 Q   At the very same time?

24 A   Yeah.

25 Q   How did they go?

637

1   A      The one that was standing here (INDICATING) went that way

2   (INDICATING).  The other one went that way (INDICATING).  They

3   ran in front of me.

4   Q      They both ran around there in front of you?

5   A      Yeah.

6   Q      At the same time?

7   A      One was -- the tallest one was ahead.

8   Q      A long way ahead of him or a short way ahead of him?

9   A      A short distance.

10  Q      Well, from me to you?

11  A      Not that far.

12  Q      Not even that far?  You tell me when to stop, okay?

13  A      All right.

14  Q      Right here (INDICATING).

15  A      Yeah.

16  Q      From me to you?

17  A      Yeah.

18  Q      Okay.  And you said that you heard two noises?

19  A      Yeah.

20  Q      What type of noises?

21  A      A boom.  When I first heard it, you know, I just -- they

22  couldn't get the money out and they hit the machine.  There was

23  two of them.  The second one was louder than the first one.

24  Q      And so what did you do then?

25  A      I started to go.  That's when they took off.  That's what

638

Respondent's Exhibit E

1    really got my attention.

2    Q    What got your attention about them taking off?

3    A    Because they left the truck.

4    Q    What was so strange about that?

5    A    I don't know.  It just got my attention.  I knew something

6    had to be wrong.  That's why I came back.

7    Q    Okay.  So where did you go from there?  Did you go on down

8    the street?

9    A    Yeah, I went past this -- I went to turn by Firestone and

10   came around and came up Chestnut.

11   Q    And what did you do then?

12   A    Went to the truck.

13   Q    Did you go --

14   A    Well, me and my cousin went to the truck.  When we saw

15   there was someone in there, we was calling out trying to get him

16   to talk to us.  He wouldn't say nothing.  That's when I went and

17   used the phone.

18   Q    Okay.  How did you get to the phone?

19   A    I ran to Econo Lodge.

20   Q    That's about what, a block a two away?

21   A    Yeah, close, two blocks.

22   Q    Okay.  Had you ever seen anything like that before in your

23   life?

24   A    No.

25   Q    Did it scare you?

639

Respondent's Exhibit E

1    A    Yeah.

2    Q    Okay.  And when you got to the Econo Lodge, you did what?

3    A    I don't remember if it was a man or a woman that was behind

4    the desk.  I asked her could I use the phone.

5    Q    And what did you do?

6    A    Called 911.

7    Q    Okay.  Then what did you do, Mr. Nelson?

8    A    I went back to the truck and I looked in.  He was sitting

9    over -- he was breathing, but, you know, he wasn't saying

10   nothing to me.  I saw he had been shot.  So I ran back to Econo

11   Lodge and called them again.

12   Q    Okay.  And then what did you do?

13   A    Went back to the truck.

14   Q    And that's when you --

15   A    By that time, the police was there.

16   Q    Okay.  When both of these guys were running across the

17   street in front of you, did you see either one of them with a

18   weapon?

19   A    No.

20   Q    Did you see either one of them with anything in their hand?

21   A    No.

22           MS. BILLINGS:  Just a minute.  Thank you, Mr. Nelson.

23           MR. KIZER:  No cross, your Honor.

24           THE COURT:  Thank you, Mr. Nelson.  You may stand

25   down.  May this witness be excused?

640

Respondent's Exhibit E

1          MS. BILLINGS:  Yes, sir.

2          THE COURT:  Any objection?

3          MR. KIZER:  No, sir, your Honor.

4          THE COURT:  Mr. Nelson, you are excused and free to go

5     or stay as you wish.  Call your next witness.

6          MR. JUNEAU:  Kenny Heroman.

7          THE COURT:  Kenny Heroman.  Captain Heroman, if you

8     would just come right up here and take the witness stand,

9     please, sir.

10         MR. JUNEAU:  Thank you, your Honor.

11                         KENNY HEROMAN

12    having been called at the instance of counsel for the State of

13    Arkansas, and after first having been duly sworn, testified as

14    follows, to wit:

15                      DIRECT EXAMINATION

16    BY MR. JUNEAU:

17    Q    Tell us your name, sir.

18    A    Kenneth  Heroman,  Captain  with  the  Pine  Bluff  Police

19    Department.

20    Q    How long have you been a captain with the Pine Bluff Police

21    Department?

22    A    About four years.

23    Q    How long have you been with the Pine Bluff Police Depart-

24    ment?

25    A    Going on 18 years now.

641

5216 Respondent's Exhibit E

1    Q    And you're the captain over which division, sir?

2    A    I'm captain over the Criminal Investigation Division.

3    Q    You are in charge of the, basically, the detective unit

4    down there?

5    A    Yes, sir, that's correct.

6    Q    Captain Heroman, did you have an occasion to investigate a

7    murder that occurred in May of this year?

8    A    Yes, I did.

9    Q    Okay.  And that would have been the ATM murder of Gary

10   Wayne Turner.  Is that right?

11   A    That's correct.

12   Q    Okay.  Were you -- would it be fair to say that you were

13   the -- being the captain of the detective unit the officer in

14   charge of the investigation?

15   A    Yes, I was.  It is my responsibility.

16   Q    Okay.  And I assume that you supervise the officers in

17   gathering evidence?

18   A    Yes, I did.

19   Q    Did you go to the scene of that crime?

20   A    Yes.

21   Q    Can you tell us just briefly, because it has already been

22   described to us, what you found when you got there?

23   A    When I arrived there, Lieutenant Addison and Sergeant Bacon

24   were already on the scene.  They were my 4 to 12 detectives.

25   The vehicle that the victim was in at the ATM machine had been

642

5217  Respondent's Exhibit E

1    pushed forward maybe 10 or 15 feet.  My -- I questioned that and

2    was told the vehicle had to be pushed forward in order for the

3    ambulance personnel to take him out of the truck.  And that he

4    had been transported to Jefferson Regional Medical Center ER.

5    I had Sergeant Bacon photograph the scene, pick up what evidence

6    was there, and had the vehicle towed to our bay area so that it

7    could be processed also.

8    Q    Okay.  Did you -- did you check the car for fingerprints?

9    A    Yes, it was checked for fingerprints.  And there were some

10   prints lifted, but none that we were able to use in the case.

11   Q    Okay.  And why was that?

12   A    We just -- they didn't develop.  It's possible that they

13   were covered up by ambulance personnel or officers because at

14   the time that they arrived there, Mr. Turner was still alive and

15   our main concern was first aid to him at that point.

16   Q    Did you, at any point in your investigation, develop some

17   suspects into this murder?

18   A    Yes, we did.

19   Q    Who were they?

20   A    We received information that first a subject by the name of

21   Butterball and a subject known as Ken were involved in this

22   robbery/homicide.  We later developed that Butterball was a

23   Alford Goodwin and that Ken was a Kenneth Reams.

24   Q    Okay.  Now this information that you developed was over a

25   course of several days, was it not?

643

1    A    Those -- that information started coming in on the day

2    after the homicide, the 6th, and we received it through the 10th

3    of May.

4    Q    Okay. Did you, at some point in time, also discuss with a

5    Mr. Jermaine Brown this case?

6    A    I did.  I received a phone call at the office from a Mr.

7    Jermaine Brown.  He advised that he had information concerning

8    this homicide.  We spoke with him and told him the seriousness

9    of it and would he be willing to make a sworn statement in front

10   of the Prosecutor.  That if he was not truthful he could be

11   charged with perjury.  We did, in fact, contact him, bring him

12   to the Prosecutor's office and a sworn statement was taken from

13   him.

14   Q    Okay. What did you learn from Mr. Brown?

15   A    Mr. Brown related to us that he had overheard Alford

16   Goodwin and Kenneth Reams talking about their involvement in the

17   murder of Mr. Turner.  They had talked about a robbery being

18   across the street, waiting for someone to come to the ATM

19   machine to rob them and that one of the subjects had fired the

20   shot that killed him.

21   Q    Okay. Did you learn anything about any particular gun that

22   was being used --

23   A    Yes.

24   Q    From Mr. Brown?

25   A    Yes, we did.  The autopsy that was performed on Mr. Turner,

5219 Respondent's Exhibit E

1  as a result of that autopsy, a small caliber projectile was

2  taken from his head.  It was sent to the firearm's section and

3  there it was determined to be a .32 caliber projectile.

4      In the sworn statement that we received from Jermaine

5  Brown, we were advised that on the 6th of May, which would have

6  been the day after the homicide, Jermaine Brown observed Kenneth

7  Reams with a .32 caliber pistol.  How was he aware that it was

8  a .32 caliber pistol, Kenneth Reams told him it was a .32

9  caliber pistol.  As we were taking this sworn statement, I

10  received information from the Arkansas Crime Lab that the

11  projectile in Gary Wayne Turner's head was a .32 caliber.

12  Q   And, so, based on the information that you received from

13  the CIs over the, I think, a five-day period, and also from Mr.

14  Jermaine Brown in regard to the gun and the statements of

15  Kenneth Reams and Alford Goodwin, what did you do?

16  A   It was at that time that I made a determination that we

17  would go ahead and arrest Alford Goodwin and Kenneth Reams for

18  the murder of Gary Wayne Turner.  We had ample probable cause to

19  do so.

20  Q   Would you tell us how you went about making that arrest?

21  A   I had Sergeant Hopson, Sergeant Bacon, Detective Hudgins to

22  drive by and locate the residence of the two suspects.  As they

23  were driving by, Jermaine Brown pointed out Alford Goodwin and

24  Kenneth Reams who were walking together at Third and Elm.  I was

25  advised by radio that they were both -- they were -- both had

645

1   been sighted and were on the street and I made a determination
2   then to have them both arrested.
3   Q   Okay.  And did your officers do that?
4   A   Yes, they did.
5   Q   Do you recognize either one -- is either one of those
6   individuals that you arrested in the courtroom today?
7   A   Yes.  Kenneth Reams is here and he is sitting here to my
8   left with the plaid brown shirt on.
9   Q   You are pointing to this individual here (INDICATING), the
10  defendant?
11  A   Yes, to the defendant.
12  Q   Okay.
13          MR. JUNEAU:  We'll ask the Court to --
14          THE COURT:   Let the record so indicate that the
15      officer has indicated the defendant.
16          MR. JUNEAU:  Thank you, your Honor.
17  MR. JUNEAU CONTINUING:
18  Q   Okay.  At the time that you made the arrest of Mr. Reams
19  and Mr. Goodwin, what else did you do?
20  A   Okay.  We also performed an affidavit for a search warrant
21  at 1003 West Third.   Yes, 1003 West Third we prepared an
22  affidavit and had a search warrant signed by a circuit judge and
23  went and executed that search warrant at 1003 West Third which
24  was the residence that Kenneth Reams was staying at.
25  Q   Okay.   Did you execute a search warrant at any other

1    residence?

2    A    We also executed a consent to search in a search warrant at

3    Alford Goodwin's residence which is located at 314 South Oak.

4    Q    And that was done fairly soon after their arrest?

5    A    Yes, it was.

6    Q    Do you know about how soon after?

7    A    The search warrant was executed at approximately 5:40 p.m.

8    They were arrested at 4 o'clock p.m.

9    Q    Okay.  Now, I'm going to get into the search warrant in a

10   minute.  But let's go back to the two subjects that you arrested

11   and their identifications.  I want to show you what we've got

12   marked as State's --

13            MR. JUNEAU:  May I approach the witness, your Honor?

14            THE COURT:  You may.

15            MR. JUNEAU:  Thank you.

16   MR. JUNEAU CONTINUING:

17   Q    State's Exhibit 6, State's Exhibit 7 and State's Exhibit 8

18   and ask if you can identify these forms for me.

19   A    Okay.  Exhibit 6 is a Criminal Complaint form that we are

20   required to fill out which was filled out by Lieutenant Addison

21   and it is the Criminal Complaint form for Kenneth L. Reams

22   charged with capital murder.

23            Exhibit Number 7 is a Detective Office ID Sheet which gives

24   pertinent information to the arrested subject which, in this

25   case, was Kenneth Reams.

647

1        And State's Exhibit Number 8 is the Detective Office ID

2    Sheet which gives pertinent information to Alford Goodwin.

3    Q    Okay.

4            MR. JUNEAU:   Thank you, your Honor.   I'll offer

5        State's Exhibits 6, 7 and 8.

6            MR. KIZER:   No objection.

7            THE COURT:   Let it be received.

8            (WHEREUPON, THE CRIMINAL COMPLAINT NO. 57408 PREPARED

9        BY LIEUTENANT ADDISON ON KENNETH REAMS, PREVIOUSLY MARKED

10       AS STATE'S EXHIBIT NUMBER 6 WAS RECEIVED INTO EVIDENCE.

11       SEE PAGE NUMBER 954.)

12           (WHEREUPON, THE PINE BLUFF POLICE DEPARTMENT DETECTIVE

13       OFFICE ID SHEET ON KENNETH L. REAMS, PREVIOUSLY MARKED AS

14       STATE'S EXHIBIT NUMBER 7 WAS RECEIVED INTO EVIDENCE.   SEE

15       PAGE NUMBER 955.)

16           (WHEREUPON, THE PINE BLUFF POLICE DEPARTMENT DETECTIVE

17       OFFICE ID SHEET ON ALFORD GOOD, PREVIOUSLY MARKED AS

18       STATE'S EXHIBIT NUMBER 8 WAS RECEIVED INTO EVIDENCE.   SEE

19       PAGE NUMBER 956)

20           MR. JUNEAU:   May I show it to the jury?

21           THE COURT:   You may publish it to the jury.

22           MR. JUNEAU:   Thank you, your Honor.

23   MR. JUNEAU CONTINUING:

24   Q    Before I do, Officer, this is just basically background

25   information as far as height, weight, and address and those

648

1    kinds of things related to Mr. Reams and Mr. Goodwin.  Is that
2    what these forms are for?
3    A    That is correct.
4    Q    And these forms you fill out on every person that y'all
5    arrest?
6    A    That is correct.
7    Q    And that's a regular practice, isn't it?
8    A    Everyone that is charged with a felony charge through our
9    office with have this paper work in their case file.
10   Q    Thank you.  Officer, who would supply that information for
11   those arrest sheets?
12   A    That information would be supplied by the arrested suspect.
13   The name that is above -- the first name that you see, Alford
14   Goodwin, he supplied that information.  Kenneth Reams supplied
15   the information for his ID sheet.
16   Q    So, in fact, your officer would just sit down and ask those
17   questions on that form to the suspect in person?
18   A    Yes.
19   Q    Now, did you -- could you tell us, based on your investiga-
20   tion, who Alford Goodwin was?
21   A    Alford Goodwin was the suspect who was developed and
22   charged with the capital murder of Gary Wayne Turner along with
23   Kenneth Reams.  Alford Goodwin was a 19-year-old black male who
24   resided at 314 South Oak.  He was 5'11, 190 pounds.  Alford
25   Goodwin was a student at Pine Bluff High.  I believe he was a

649

1    senior there.  And he had a part-time job at the post office and

2    no previous criminal record.

3    Q    Okay.  Now, let's go back to the search of these two

4    individuals' homes.  You conducted those searches on May 10th?

5    A    That's correct.

6    Q    Let's talk about the search at Kenneth Reams' house.  Tell

7    us what was found during that search?

8    A    Okay.  The search of Kenneth Reams house at 1003 West Third

9    recovered there was a holster, brown leather holster which would

10   be consistent with the size of a .32 caliber revolver.   Two

11   brown leather jackets were also recovered there.

12   Q    Okay.  Did you ever make a determination as to where these

13   particular items came from?

14   A    Yes.  We were able to do that.  Prior to the search, in the

15   information that we received from informants and anonymous

16   callers, it had been indicated that the murder weapon was taken

17   from a burglary of a dry cleaners in Pine Bluff.   When we

18   researched our reports, it was determined that on April the

19   28th, the night of April the 27th or the early morning hours of

20   April the 28th, there was, in fact, a burglary of Pine Bluff Dry

21   Cleaners located on Poplar.  Taken in that burglary was a .32

22   caliber H & R revolver.  Also taken in that burglary was three

23   to four brown leather jackets.  When we executed the search

24   warrant at 1003 West Third, we located in that house the

25   holster, which would be consistent with the .32 caliber and two

650

1    brown leather bomber jackets.

2    Q    Okay.  Did you make a determination from the owner of this

3    dry cleaners that that property came from him or it was their

4    property?

5    A    It was reported on the initial report what items were

6    taken.  We also had the owner of the dry cleaners come down and

7    ID a photograph of the pistol.  It was since packaged and gone

8    to the Crime Lab.  And when we received it back, he IDed it

9    again by actually observing the pistol itself.

10   Q    As his gun?

11   A    Yes.

12   Q    And what about the holster?

13   A    And the holster was also IDed.  The pistol was in the

14   holster at the dry cleaners under the counter when it was taken.

15   Q    Now, you haven't told us about finding the gun yet; so,

16   we're just really talking about the holster and the jackets.

17   A    That's correct.

18   Q    And I understand your testimony to me that those two were

19   identified.  The jackets and the holster were identifed as

20   coming from the burglary at the dry cleaners?

21   A    That is correct.

22   Q    And that was on April the 28th?

23   A    It would have been the night of the 27th or the morning of

24   April the 28th would have been when the burglary was reported.

25   Q    Okay.  This murder happened on May the 5th?

651

1    A    May the 5th.  The information that we received was consis-

2    tent with the reports that we looked at and the items that we

3    found in the home of Kenneth Reams.

4    Q    Now, let's talk a minute about the search warrant at Alford

5    Goodwin's house.  Did you conduct a search warrant there?

6    A    I had a consent to search.  I had the officers try to

7    obtain a consent to search from Alford Goodwin, which they did.

8    And had officers go to 314 South Oak and execute that consent to

9    search.

10   Q    And tell the ladies and gentlemen of the jury what was

11   found at Mr. Goodwin's house?

12   A    Located at Mr. Goodwin's house at 314 South Oak was a

13   hooded gray sweatshirt, a .32 caliber H & R revolver and a brown

14   leather jacket.

15   Q    Could you tell us where the hooded sweatshirt was found?

16   A    I believe that it was found in the bedroom of Alford

17   Goodwin.  I would have to check the case file to tell you for

18   sure.

19   Q    What about the gun?  Where was it?

20   A    The pistol was located in the back yard of Alford Goodwin's

21   home under a bucket in the back yard wrapped in plastic.

22   Q    Now, I've asked you to bring a piece of evidence to the

23   trial today.  Did you do that?

24   A    Yes, I did.

25   Q    Why don't you open that package up?  We'll mark that as

652

1    State's Exhibit -- is it 9?

2            COURT REPORTER:  Yes, sir.

3    MR. JUNEAU CONTINUING:

4    Q    State's Exhibit 9.  Okay.  I'll show you what we've marked

5    as State's Exhibit 9.  Can you tell me what that is?

6    A    That is a .32 caliber H & R revolver.

7    Q    And where did that gun come from?

8    A    That gun was located under the bucket in the back yard of

9    Alford Goodwin's residence.

10   Q    And when you received that gun into your custody--the Pine

11   Bluff Police Department's custody--what did you do with it?

12   A    This evidence -- this piece of evidence, this pistol, was

13   packaged and sent the following day, May 6th, to the Arkansas

14   State Crime Lab for a ballistics report.

15   Q    Okay.  Officer, you said that -- Captain, you said that you

16   didn't find the gun, I don't think, until May the 10th.  You

17   conducted the search --

18   A    I'm sorry.  I'm sorry.  That is fact.  The pistol was

19   recovered on May the 10th.  The following day, May the 11th it

20   was sent to the Arkansas Crime Lab.

21   Q    And did it -- did you receive it back from the Crime Lab?

22   A    Yes, we did.

23   Q    And what did you do with it when you received it back?

24   A    Since that time, it has been locked in the evidence room of

25   the Pine Bluff Police Department.

653

5228  Respondent's Exhibit E

1   Q   Until today?

2   A   Until today.

3   Q   And you obtained that gun and it was brought it here?

4   A   It was obtained from the evidence officer and brought here.

5          MR. JUNEAU:  I'll offer State's Exhibit Number 9, your

6   Honor.

7          THE COURT:  Any objection?

8          MR. KIZER:  If I could see it a moment?

9          THE COURT:  All right.

10         MR. KIZER:  No, your Honor.

11         THE COURT:  Let it be received.

12         (WHEREUPON, THE H & R .32 CALIBER REVOLVER, PREVIOUSLY

13   MARKED  AS  STATE'S  EXHIBIT  NUMBER  9  WAS  RECEIVED  INTO

14   EVIDENCE.   BEING  UNABLE  TO  ATTACH  SAID  REVOLVER  TO  THE

15   TRANSCRIPT,  SAID  REVOLVER  REMAINS  IN  POSSESSION  OF  THE

16   COURT REPORTER.)

17         MR. JUNEAU:  May I show it to the jury?

18         THE COURT:  You may.

19   MR. JUNEAU CONTINUING:

20   Q   Did -- during the course of the investigation, did you take

21   statements from Mr. Goodwin and from Mr. Reams?

22   A   No, I did not.

23   Q   Did somebody in your office do that?

24   A   Yes, Lieutenant Addision and Detective Phillips.

25   Q   Okay.  And are you aware of the substance of what was said

5229 Respondent's Exhibit E

1    during those statements?

2    A    Yes, I am.

3    Q    Do you know whether either one of these two individuals

4    admitted to being the shooter?

5          MR. KIZER:   Your Honor, I'm going to object to any

6    testimony having to do with Mr. Goodwin as being hearsay.

7          MR. JUNEAU:   Your Honor, at this point, I don't think

8    it is hearsay because I'm not offering that as truth of the

9    matter that I'm asking about for one.

10         THE COURT:   You've asked --

11         MR. JUNEAU:   Secondly, I've asked him if anybody

12   admitted to being the shooter.   I don't think he's -- may

13   I approach the bench?

14         THE COURT:   Okay.

15   (Counsel approached the bench)

16         MR. JUNEAU:   His response is going to be no that

17   nobody admitted to that.   It's not based upon hearsay.

18         MR. KIZER:   How can it not be based on hearsay?   I --

19   I think it is rank hearsay, and plus it has to be offered

20   for the truth of the matter asserted.   It goes right to one

21   of the elements that one of them either did or did not

22   admit that they were -- that the gun was discharged during

23   the robbery.   I don't see how it could avoid being hearsay.

24   I object to it.

25         THE COURT:   Are you going to ask for Reams' statement?

5230  Respondent's Exhibit E

1          MR. JUNEAU:  Not through this officer.  No, Reams'
2     statement will be admitted later.
3          MR. KIZER:  What Reams had to say I, obviously, can't
4     object to.
5          THE COURT:  Once you do that, you could ask him
6     anybody admitted being the shooter.  That's not hearsay.
7          MR. JUNEAU:  That's --
8          MR. KIZER:  If it is a response from anybody else.
9          THE COURT:  I understand.  He can say -- an admission
10    that anybody admitted to shooting.  He would say no.
11         MR. KIZER:  Well, that means that two people then had
12    to respond to that question.
13         THE COURT:  I understand.
14         MR. KIZER:  That's hearsay.  Their response.
15         THE COURT:  He can, basically, say what he can do is
16    that he can tell us what he did without saying the exact
17    words.  He can say, pursuant to your conversation, did you
18    develop such and such and that's really not an --
19         MR. KIZER:  Well, my objection is it is hearsay.  So,
20    I'll go from there.
21         MR. JUNEAU:  But before we -- basically whether I ask
22    this officer that or the officer that took Reams' state-
23    ment, I don't see the difference there.  I mean, the
24    response is going to be the same.
25         THE COURT:  Can you ask him what did Goodwin tell you.

656

1       That's hearsay.

2           MR. JUNEAU:  I'm not asking him that, though.

3           THE COURT:  You can't ask Reams -- I think you can lay

4       a foundation.  But at this point, it is an out of court

5       statement.

6           MR. JUNEAU:  Well, you see, this officer won't testify

7       as to what Reams said.  We've got somebody else for that.

8           THE COURT:  You've got no confession --

9           MR. JUNEAU:  Well, actually did get a confession from

10      him.  I mean, I'm entering the issue as to whether they

11      asked who was the -- if anyone admitted to being the

12      shooter.

13          THE COURT:  You should avoid hearsay.  I'm sure that's

14      what you are --

15          MR. KIZER:  It's got to be.

16          MR. JUNEAU:  Well, the answer to that is going to be

17      no.  Well, one of the two had to be the shooter.  So the

18      statement it not being offered for the truth, and also,

19      even if it is, the fact of the matter is, the answer to

20      that question is, "No, nobody admitted to it."  It can't

21      be.  It's not based on hearsay.

22          MR. KIZER:  I guess y'all read different rules than I

23      did.  I don't understand that.  I don't understand how any

24      response would have to given to a third party that is not

25      hear and that is going to be hearsay.  And that's got to be

657

5232   Respondent's Exhibit E

1    hearsay.   It's got to be.   Unless you can show some
2    exception, and I don't think you can.
3         THE COURT:   I think what you can do is just to avoid
4    hearsay, did you obtain an admission from anybody.   You can
5    ask him that.
6         MR. JUNEAU:   Okay.
7         MR. KIZER:   Well --
8         THE COURT:   Note your exception.
9         MR. KIZER:   Yes, sir.
10   (Conclusion of bench conference)
11   MR. JUNEAU CONTINUING:
12   Q    Okay.   Captain Heroman, my question to you is, you talked
13   with both Mr. Reams and Mr. Goodwin or somebody in your office
14   did?
15   A    That's correct.
16   Q    And you are familiar with what was said?
17   A    Yes.
18   Q    Did you obtain an admission from either one of these people
19   in regard to the shooting of Mr. Turner?
20   A    Neither suspect admitted to shooting Mr. Turner.
21        MR. JUNEAU:   That's all.   Thank you.
22        MR. KIZER:   No cross, your Honor.
23        THE COURT:   Thank you, Captain Heroman.   You may stand
24   down.   Call your next witness.   May this officer be --
25        MS. BILLINGS:   May we approach the bench?

5233   Respondent's Exhibit E

1          THE COURT:  Certainly.  May this officer be excused?

2          MR. JUNEAU:  Yes.

3          THE COURT:  Do you anticipate recalling Captain

4     Heroman?

5          MR. JUNEAU:  Yes.

6          THE COURT:  Wait a minute.  You can't have yes to both

7     of those.  If you anticipate recalling him, he can't be

8     excused.  Remain outside the courtroom and available,

9     Captain Heroman.

10    (Counsel approached the bench)

11         MS. BILLINGS:  Can we take about a 10-minute break?

12    Dr. Sturner?

13         MR. JUNEAU:  He's going to be here at 3 o'clock.

14         THE COURT:  All right.

15    (Conclusion of bench conference)

16         THE COURT:  Ladies and gentlemen, let's take about 10

17    minutes at this point.  Let me ask you please do not

18    discuss the case among yourselves or with anybody else.

19    You are identified by your juror badges.  That will

20    certainly make sure that everybody knows that you are a

21    juror.  We've got a lot of interested family and friends,

22    people that are involved in this case.  I would encourage

23    you to utilize the jury room and the area back here to

24    avoid contact with anybody else who might be tempted to say

25    something to you or not say something to you, and it is

5234  Respondent's Exhibit E

1         just best to avoid any contact.  So, with that having been

2         said, let's be in recess for about 10 minutes.

3   (A recess was taken, after which time the following proceedings

4   resumed at 3:20 p.m., to wit)

5         MR. JUNEAU:  Call Dr. William Sturner.

6         THE COURT:  All right.  Dr. Sturner.  Dr. Sturner,

7         come around and let Madam Clerk place you under oath,

8         please, sir.

9         WILLIAM STURNER, M.D.

10  having been called at the instance of counsel for the State of

11  Arkansas, and after first having been duly sworn, testified as

12  follows, to wit:

13         DIRECT EXAMINATION

14  BY MR. JUNEAU:

15  Q   State your name, sir.

16  A   Yes.  William Quinton Sturner.  The last name is spelled S-

17  t-u-r-n-e-r.

18  Q   And where are you employed?

19  A   I'm employed at the Arkansas State Crime Laboratory in

20  Little Rock.

21  Q   What do you do there?

22  A   I'm the chief medical examiner for the state of Arkansas.

23  Q   And are you a physician?

24  A   Yes, sir, I am.

25  Q   And do you specialize in any particular field?

660

5235  Respondent's Exhibit E

1   A   Yes, I do.

2   Q   What would that be?

3   A   The field is forensic or medical legal pathology.

4   Q   How long have you been a pathologist?

5   A   Since 1964 when I finished my training.  So that's approxi-

6   mately 30 years.

7   Q   Okay.  And, Doctor, could you just kind of give us a little

8   bit of background information?

9        MR. KIZER:  Your Honor, I'm willing to stipulate that

10       he is an expert in the field and allowed to give testimony

11       in that field.  I'm familiar with Dr. Sturner.

12       MR. JUNEAU:  I don't have any objection to that, your

13       Honor, and I'll offer Dr. Sturner as an expert in the field

14       of pathology.

15       THE COURT:  Any objection to the Court recognizing Dr.

16       Sturner as an expert in the field of pathology?

17       MR. KIZER:  No, your honor.

18       THE COURT:  Let him be so recognized.

19  MR. JUNEAU CONTINUING:

20  Q   Doctor, did do -- conduct an autopsy on Mr. Gary Wayne

21  Turner?

22  A   Yes, I did.

23  Q   And when did you do that?

24  A   I performed that examination on May 10, 1993.

25  Q   And what was the reason for that examination?

661

1    A    That was a case which was referred to us from Jefferson
2    County as a sudden death with possible trauma being the result.
3    Q    Okay.  Would you tell the ladies and gentlemen of the jury
4    what an autopsy is?
5    A    Yes, an autopsy has been described and even defined as
6    surgery of the dead.  I think the best way to consider it, at
7    least for the kind and type of cases that we do, is to divide it
8    into two parts--external examination which really means naked
9    eye observations of what you see in the body before you make any
10   incisions.  In other words, the height, the weight, the color of
11   hair, eyes, scars, identifying marks, and importantly, injuries.
12   The second part of the autopsy would be the internal examination
13   which most people think of when they consider an autopsy.  That
14   is a dissection in which the organs of the body are viewed where
15   they are such as the heart and the lungs and the thoracic cavity
16   after removing the breast plate, the liver, spleen, kidneys and
17   intestine and the abdominal cavity following its opening and a
18   viewing of the brain after the scalp and the cranium are
19   removed.  Now this would be the internal examination.  And all
20   of these organs are weighed.  They are dissected in a prescribed
21   manner and a report of the findings is prepared and signed and
22   copies and the original of which I have in my possession at the
23   present time.
24   Q    Okay.  Do you -- after you conduct this autopsy, Doctor, do
25   you arrive at certain conclusions?

662

5237   Respondent's Exhibit E

1   A    Yes, sir.

2   Q    And what do those conclusions consist of?

3   A    You might say they come in two parts.  First we conclude

4   what findings we have made at the autopsy following our external

5   and internal examination.  And following that, we conclude what

6   the cause and the manner of death is if we are able to tell

7   that.

8   Q    And were you able to tell the cause and manner of death

9   with regard to Mr. Turner?

10  A    Yes, sir.  I have an opinion as to both of those items.

11  Q    Okay.  Well, what was the -- your opinion as to the manner

12  of death?

13  A    The manner of death in this case, in my opinion, was

14  homicidal.

15  Q    And what is your opinion as to the cause of death?

16  A    The cause of death of Mr. Turner was a gunshot wound to the

17  head.

18  Q    And that you've concluded based on your first part and

19  second part of your autopsy?

20  A    Yes, sir, that's correct.

21  Q    Let's talk a little bit about the first part of the

22  autopsy, Doctor.  What did you find on your external exam of Mr.

23  Turner?

24  A    Well, briefly, I found him to be a well-developed, slender

25  adult white male.  I thought he appeared his stated age of 38

663

1    years.  And we measured him as 71 inches which means 5'11" in

2    height and his weight was 139 pounds.

3         Now, the significant findings of Mr. Turner were a gunshot

4    wound, which was present in the left temple.  If I would point

5    it out on my own body, it would be approximately this position

6    (INDICATING).  This wound was located two and a quarter inches

7    above and two inches in front of the auditory canal or the hole

8    in the ear, if you will.  In other words, the anatomic land-

9    marks.

10   Q    Doctor, let me stop you right there.

11   A    Yes, sir.

12   Q    I hate to interrupt you, but I have a diagram, I think that

13   you drew of the external and internal injuries of Mr. Turner.

14   A    Yes, sir.

15   Q    Would that help you in explaining your testimony to the

16   jury if you could refer to that diagram?

17   A    Yes, sir.

18        MR. JUNEAU:  Okay.  Your Honor, may I approach the

19        witness?

20        THE COURT:  You may.

21   MR. JUNEAU CONTINUING:

22   Q    Okay.  Doctor, let me show you what we've got marked as

23   State's Exhibit 10.  Could you identify that for me?

24   A    Yes, sir.  This is a two diagramitic representation of what

25   I drew at the time of the autopsy in which I incorporated into

664

1   the autopsy protocol that I have with me.

2   Q   This in relation to Mr. Turner's case?

3   A   Indeed, yes, sir.

4   Q   Okay. Would you --

5       MR. JUNEAU: Your Honor, I'll offer this as State's

6   Exhibit 10.

7       MR. KIZER: No objection, your Honor.

8       THE COURT: All right. Let it be received.

9       (WHEREUPON, THE DIAGRAM, PREVIOUSLY MARKED AS STATE'S

10  EXHIBIT NUMBER 10 WAS RECEIVED INTO EVIDENCE. BEING

11  UNABLE TO ATTACH SAID DIAGRAM TO THE TRANSCRIPT, SAID

12  DIAGRAM REMAINS IN THE POSSESSION OF THE COURT REPORTER.)

13      MR. JUNEAU: May the witness get up and refers to this

14  diagram as he explains his testimony to the jury?

15      THE COURT: If the Doctor thinks it will help in his

16  explanation, I would be happy to let him do that.

17      WITNESS DR. STURNER: Thank you, your Honor.

18  MR. JUNEAU CONTINUING:

19  Q   Doctor, I'm going to ask you to come up a little closer

20  because this was the best I could do with my -- holding this up.

21  Why don't you just kind of come around to the side and explain

22  the external and internal examination.

23  A   Yes, sir. As I indicated, the wound of the left temple is

24  in front of the ear and above the ear. And it is in this

25  location (INDICATING). This is a circular defect. I have made

5240 Respondent's Exhibit E

1  measurements of that defect.  In other words, the outside of the
2  wound has greatest diameter of one quarter inch by one quarter
3  inch, and the inside perforation sight is a sixteenth of an
4  inch.  That is the hole that perforates the skin and passes into
5  the skull.  Also on the outside of this wound are very small
6  areas of what we call stipling which are burned and unburned
7  powder grains which have presented themselves into the wound.
8  They vary in size, maybe one-thirty-second, one-sixteenth of an
9  inch, and they have a dimension of two inches total diameter
10  vertical and one and three-quarter inches total diameter
11  horizontal.

12       The other finding in this case is the bullet itself as we
13  will talk about in the second diagram having passed through the
14  brain and the skull.  It was found in the scalp tissue on the
15  right side of the head also above and in front of the ear with
16  a little different measurements.  In other words, three and a
17  half inches about the ear and one-half inch anterior.  In other
18  words, in about this position (INDICATING) if I would point out
19  on my own head and as you see here.  Perhaps this would be the
20  time if I could go a little bit closer so that they could see
21  some of these items.  I think it is difficult to see where I am.
22       This is --
23  Q    You might also try to keep it so that everybody here can
24  see it.
25  A    I was going to go back and forth.  But anyway, here

666

1    (INDICATING) is the entrance sight.  This is the stipling around

2    the wound.  Here (INDICATING) is the exit area with the bullet

3    immediately underneath the scalp.  All right.

4         The second diagram is the base of the skull, the top of the

5    skull and the bottom of the skull.  I will refer you to the

6    first of these, the base of the skull because this shows where

7    the bullet penetrated the skull on the left side of the head and

8    exited in the mid-portion somewhat behind on the right side.

9    The dark lines that you see are my attempts to draw extensive

10   hemorrhage in the galia or the soft tissue on the outside of the

11   skull.  The other thing this shows are areas of fracture.  The

12   bones in the middle part of the right side and also what is

13   called the orbital plate or the parental bone on the base of the

14   skull on the right side is fractured as one might expect in a

15   wound of this nature.  These were the significant findings.  And

16   included along with the face and the skull would be the brain

17   which showed hemoratic necrosis from the wound passing through

18   each of the cerebral hemispheres, from left to right as I

19   indicated.

20        Now, these were the significant findings at autopsy of Mr.

21   Turner.

22   Q    Now, before you sit down, I would ask you to take this pen

23   and draw for me, if you would, the path of the bullet as it went

24   through Mr. Turner's head probably on this part of the diagram.

25   A    Let me just say, as I indicated by measurements, the wound

667

5242  Respondent's Exhibit E

1   is present on the left side in front of and is a little bit
2   higher and a little bit more posterior on the right side when it
3   comes out.   And if I would draw the path of the wound, it would
4   be approximately in this position (INDICATING).   In other words,
5   slightly from front to back, but generally from left to right
6   and it has very little upwards or downwards deviation.

7   Q     Why don't you turn that around and show it to the Judge so
8   that he'll know, too.

9   A     Oh, sorry.   So, your Honor, this passes from the front to
10  slightly posterior.   In other words, it comes out further behind
11  on the right side than it goes in on the left side.

12              THE COURT:   Thank you.

13              MR. JUNEAU:   You can have a seat now.   Thank you.

14  MR. JUNEAU CONTINUING:

15  Q     Doctor, I want to show you some photographs.   We'll start
16  with State's Exhibit 11 and ask if you can identify that
17  photograph.

18  A     Yes, sir, I can.   This is the photograph of Mr. Turner
19  taken at the time of the examination prior to the autopsy.   It
20  shows the facial and frontal view of the head, the neck and the
21  upper chest.

22  Q     And State's Exhibit Number 12, I'd like to show you and see
23  if you can identify that one.

24  A     Yes, sir.   This is the entrance sight with the stipling in
25  the left temple that I described and showed on the diagram.   It

668

5243  Respondent's Exhibit E

1    is a close-up photograph of that side of his face.

2    Q    That's where the bullet went in at?

3    A    Yes, sir.

4    Q    Let me show you State's Exhibit Number 13.

5    A    Yes, sir.  This represents the right side of Mr. Turner's

6    head with the area where the bullet slightly protrudes and is

7    palpable which has been shaved.

8    Q    That's the side that the bullet came out in?

9    A    Yes, sir.

10   Q    And then I'll show you State's Exhibit 14.

11   A    Yes, sir.  State's 14 is a close-up photograph of what we

12   just saw, the right side of the scalp with popal abrasions and

13   the bullet immediately beneath.

14   Q    Okay.  And let me show me show State's Exhibit 15.

15   A    Yes, sir.

16   Q    Do you recognize that?

17   A    Yes, sir, I do.  This is a photograph of the same location

18   but I have incised the area of the scalp and the bullet pro-

19   trudes and is visible in this photograph.

20   Q    Thank you.

21            MR. JUNEAU:   I'll offer State's Exhibits 11 through

22       15.

23            THE COURT:  Any objection?

24            MR. KIZER:  No, your Honor.

25            MR. JUNEAU:  And may I show them to the jury?

669

1    THE COURT:  Let them be received and you may publish

2   those to the jury.

3    (WHEREUPON, THE PHOTOGRAPH OF GARY WAYNE TURNER TAKEN

4   AT THE TIME OF THE EXAMINATION PRIOR TO THE AUTOPSY.  THE

5   PHOTOGRAP SHOWS THE FACIAL AND FRONTAL VIEW OF THE HEAD,

6   THE NECK AND THE UPPER CHEST PREVIOUSLY MARKED AS STATE'S

7   EXHIBIT NUMBER 11 WAS RECEIVED INTO EVIDENCE.  SEE PAGE

8   NUMBER 959.)

9    (WHEREUPON, THE PHOTOGRAPH OF THE ENTRANCE SIGHT WITH

10   THE STIPLING IN THE LEFT TEMPLE, PREVIOUSLY MARKED AS

11   STATE'S EXHIBIT NUMBER 12 WAS RECEIVED INTO EVIDENCE.  SEE

12   PAGE NUMBER 960.)

13    (WHEREUPON, THE PHOTOGRAPH REPRESENTS THE RIGHT SIDE

14   OF MR. TURNER'S HEAD WITH THE AREA WHERE THE BULLET

15   SLIGHTLY PROTRUDES AND IS PALPABLE WHICH HAS BEEN SHAVED,

16   PREVIOUSLY MARKED AS STATE'S EXHIBIT NUMBER 13 WAS RECEIVED

17   INTO EVIDENCE.  SEE PAGE NUMBER 961.)

18    (WHEREUPON, THE PHOTOGRAPH OF THE RIGHT SIDE OF THE

19   SCALP, PREVIOUSLY MARKED AS STATE'S EXHIBIT NUMBER 14 WAS

20   RECEIVED INTO EVIDENCE.  SEE PAGE NUMBER 962.)

21    (WHEREUPON, THE PHOTOGRAPH OF THE SAME LOCATION , BUT

22   INCISED AREA OF THE SCALP AND THE BULLET PROTRUDES AND IS

23   VISIBLE, PREVIOUSLY MARKED AS STATE'S EXHIBIT NUMBER 15 WAS

24   RECEIVED INTO EVIDENCE.  SEE PAGE NUMBER 963.)

25 MR. JUNEAU CONTINUING:

5245  Respondent's Exhibit E

1   Q   Doctor, basically, what these photographs are are photo-
2   graphs of the entry and the exit wounds?

3   A   Yes, sir, they are.

4   Q   Doctor, I have one more photograph that I want you to look
5   at and tell me if you can identify that which would be State's
6   Exhibit 16.

7   A   Yes, sir.   Yes, sir.   This is the bullet that I removed.
8   It is placed on a paper with the label of the case and a ruler
9   and it has an envelope that I submitted it in with my printing
10   and my initials on it.

11   Q   Okay.   That is the actual photograph of the bullet that you
12   removed from Mr. Turner?

13   A   Yes, sir.

14          MR. JUNEAU:   Thank you.   I'll offer that as State's
15   Exhibit Number 16.

16          THE COURT:   Any objection?

17          MR. KIZER:   No, your Honor.

18          THE COURT:   Let it be received.

19          (WHEREUPON, THE PHOTOGRAPH OF THE BULLET, PREVIOUSLY
20   MARKED AS STATE'S EXHIBIT NUMBER 16 WAS RECEIVED INTO
21   EVIDENCE.   SEE PAGE NUMBER 964.)

22   MR. JUNEAU CONTINUING:

23   Q   Now, Doctor, just one other matter at this point, and I'll
24   ask you to open this package and tell me if you can recognize or
25   identify what is in that package.


671

1    A   Yes, sir.  This is a plastic envelope with my envelope that

2    I made out at the time of autopsy and with the bullet that I

3    removed also within the envelope.

4    Q   Okay.  That is the actual bullet that you removed from Mr.

5    Turner's head?

6    A   Yes, sir.

7    Q   Okay.  Let's mark that as State's Exhibit -- take it out of

8    the package and just mark the envelope, as State's Exhibit 17.

9             MR. JUNEAU:  I'll offer State's Exhibit 17.

10           MR. KIZER:  No objection, your Honor.

11           THE COURT:  Let it be received.

12           (WHEREUPON, THE ACTUAL BULLET, PREVIOUSLY MARKED AS

13    STATE'S EXHIBIT NUMBER 17 WAS RECEIVED INTO EVIDENCE.

14    BEING UNABLE TO ATTACH THE BULLET TO THE TRANSCRIPT, IT

15    REMAINS IN THE POSSESION OF THE COURT REPORTER.)

16           MR. JUNEAU:  May I show it to the jury, your Honor?

17           THE COURT:  You may.

18    MR. JUNEAU CONTINUING:

19    Q   Now, Doctor, I think during your testimony today you said

20    that there was some stipling on the side of Mr. Turner's head at

21    the entrance point.

22    A   Yes, sir.

23    Q   Would you tell us again what the stipling is from?

24    A   Well, stipling is burned and unburned powder grains that

25    find their way into the skin of the wound surrounding the sight

5247   Respondent's Exhibit E

1    of the entry of the bullet.

2    Q    Okay.  And can you tell, based on this stipling that you

3    referred to, how far the gun was from Mr. Turner's head when it

4    was fired?

5    A    Well, not exactly, but we do know it is a close-range

6    wound.  In other words, perhaps around several inches.  But you

7    couldn't get exact about it unless you had test firing performed

8    by a ballistics laboratory.

9    Q    Okay.  But when you say several inches, you are basing that

10   on your opinion and your knowledge as a pathologist?

11   A    Oh, yes, indeed.

12   Q    Okay.  And could you give us some range as to the inches

13   that you --

14   A    Well, again, that would be very difficult and it would

15   probably be a rough estimate.  But anywhere from a couple of

16   inchest to maybe even 12 inches.  It depends on the weapon and

17   many other factors.  So I don't think I could narrow it any

18   closer than that.

19   Q    But you would classify it as a very close range shot?

20   A    I would say close range, yes.

21   Q    Can you tell us, Doctor, based on your autopsy of Mr.

22   Turner and your findings as to which direction -- where the gun

23   was when it was actually fired from -- when the bullet was

24   fired?

25   A    Well, yes.

673

1    Q    In relation to his head?

2    A    Oh, yes.   We know it was on the left side of his head

3    because of the path that I have previously described.

4    Q    Okay.

5         MR. JUNEAU:  That's all.  Thank you, Doctor.

6    A    Thank you.

7         THE COURT:  Mr. Kizer?

8         MR. KIZER:  I have no questions, your Honor.

9         THE COURT:  Thank you, Dr. Sturner.

10   A    Thank you, your Honor.

11        THE COURT:  You may stand down and may the Doctor be

12        excused?

13        MR. JUNEAU:  Yes, sir.

14        THE COURT:  Any objection?

15        MR. KIZER:  No, your Honor.

16        THE COURT:  Dr. Sturner, you are excused and free to

17        go or stay as you wish.  Call your next witness.

18        MS. BILLINGS:  Bud Phillips.

19        THE COURT:  Officer Phillips, just come around here

20        and take a seat on the witness stand.

21                         IVAN PHILLIPS

22   having been called at the instance of counsel for the State of

23   Arkansas, and after first having been duly sworn, testified as

24   follows, to wit:

25                      DIRECT EXAMINATION


                              674

1    BY MS. BILLINGS:

2    Q    Officer Phillips, would you state your name and occupation

3    for the jury, please?

4    A    Ivan Phillips, detective with the Pine Bluff Police

5    Department.

6    Q    How long have you been there, Detective Phillips?

7    A    I've been a detective for approximately four years.

8    Q    Okay.  And how long have you been with the police depart-

9    ment?

10   A    Since January 26, 1987.

11   Q    So you've been there approximately six year?

12   A    Over six years, January will be seven years.

13   Q    Okay.  And as a detective, what are your duties?

14   A    Investigate crimes that come through the office.

15   Q    And in the course of your investigation, do you often take

16   statements from suspects in a crim?

17   A    Yes, I do.

18   Q    Officer Phillips, did you take statements from anyone in

19   connection with the case of Gary Turner?

20   A    I did.

21   Q    Did you take statements from Mr. Reams--Kenneth Reams in

22   connection with this case?

23   A    Yes, ma'am.

24   Q    And can you tell us when you would have done that?

25   A    Interview -- which taped statement from Mr. Reams took

675

5250  Respondent's Exhibit E

1   place on May 11 of this year.

2   Q    Okay.  And that was the day after they were arrested.  Is

3   that correct?

4   A    Correct.

5   Q    Before you took a statement from Mr. Reams, was he read his

6   rights?

7   A    He was.  Lieutenant Addision--Detective Lieutenant advised

8   Mr. Reams of his rights before the statement.

9   Q    Okay.  Were you present when those rights were read to him?

10  A    Yes, ma'am.

11  Q    And did he indicate that he understood his rights?

12  A    Yes, ma'am.

13  Q    And did he waive his right to an attorney and give you a

14  statement?

15  A    Yes, ma'am.

16  Q    Detective Phillips, what was the -- did you take more than

17  one statement from him?

18  A    There were two statements taken that night.

19  Q    Okay.  Were you present during both of those?

20  A    Yes, ma'am.

21  Q    Tell us about the first statement that Mr. Reams gave you.

22  A    The first statement that was taken from Mr. Reams this was

23  done at the Stuttgart jail.

24  Q    Why was it done at the Stuttgart jail?

25  A    That's where he was being held at that time.

676

5251  Respondent's Exhibit E

1    Q    Okay.  Why?

2    A    Ma'am?

3    Q    Why?

4    A    He was transported to Stuttgart because of room problems at

5    the county jail here.

6    Q    So he was over at Stuttgart when you went and talked to

7    him?

8    A    Yes.

9    Q    What time of day was this?

10   A    This was approximately 10 p.m.

11   Q    Is that on your regular shift?

12   A    Yes, ma'am.

13   Q    Okay.  And what did he tell you at that time?

14   A    At that time, the initial reason that we went over there

15   was to talk with him about a burglary which had occurred on the

16   early morning hours of the 28th of April at the Pine Bluff Dry

17   Cleaners on Poplar Street here in Pine Bluff.  And also about a

18   aggravated robbery that took place at the Greyhound Bus Station

19   here in Pine Bluff which occurred on the 29th of April.

20   Q    Okay.  And you said that the burglary took place on the

21   morning hours of the 28th of April?

22   A    Yes, ma'am.

23   Q    And the aggravated robbery at the Greyhound Bus Station the

24   night of the 29th?

25   A    Yes, ma'am.


677


5252 Respondent's Exhibit E

1    Q    Okay.  What did he tell you about the burglary at the Pine

2    Bluff Dry Cleaners?

3    A    Basically, that he admitted to committing the burglary at

4    the Pine Bluff Dry Cleaners and that he acted alone in this

5    burglary and that he kicked the back door of the business in

6    which went along with the report that we had that the back door

7    of the business had been kicked in.  Also, that he took from the

8    business a .32 caliber revolver, some leather jackets.  I

9    believe there were three brown leather jackets and some other

10   items, rolls of stamps, some change, hair clippers from that

11   business.

12   Q    Okay.  So he confirmed that the method -- the way that he

13   got in was consistent with the report that you had taken from

14   the victims in the case?

15   A    Yes, ma'am.

16   Q    Okay.  And that he did that alone.  Is that right?

17   A    Yes, ma'am.

18   Q    Okay.  What did he tell you about the aggravated robbery at

19   the Greyhound Bus Station?

20   A    That he entered the bus station and used this .32 caliber

21   revolver which he had gotten from the previous burglary of the

22   dry cleaners as a weapon in the robbery and had the lady behind

23   the counter lay down on the floor and took money from the

24   register of the business or the money drawer of the business.

25   Q    Did he tell you that he said anything in particular to that

678

1    woman whenever he went in there?

2    A    Told her that it was a robbery and asked her where the

3    money was.  She pointed at the money drawer.  He had her -- told

4    her to lay down on the floor and he took the money from the

5    drawer.

6    Q    Okay.  And you -- did you say he said he acted alone in

7    that particular robbery also?

8    A    Yes, ma'am, he did.

9    Q    Okay.  And he used the .32 that he had taken from Pine

10   Bluff Dry Cleaners earlier that morning or the day before?

11   A    The day before.  This was on the 29th.

12   Q    Twenty-ninth?

13   A    Yes, ma'am.

14   Q    Okay.  Was that consistent with the report that you had

15   gotten at the police department about the Greyhound Bus Station

16   robbery?

17   A    Yes, ma'am, it was.

18   Q    What did he -- what else did he talk about in the course of

19   that statement that you took that night from him?

20   A    Toward the end of that statement, he started talking about

21   the ATM robbery which occurred at Fifth and Chestnut, the

22   Worthen ATM machine.  He discussed that at that particular point

23   saying that he and the other individual, Alford Goodwin, which

24   he referred to as Butterball in that statement.  He stated that

25   they were walking across the lot going to buy dope at a dope

679

1    house and that Mr. Goodwin -- a truck had pulled up to the
2    teller machine and Mr. Goodwin had walked over there to ask the
3    man for a light.   And whenever he got over there, Mr. Reams
4    heard a pow like a gunshot.   And, at the time, Mr. Reams was on
5    Sixth Street, walking on Sixth Street and then he ran over there
6    and looked at the truck and ran off.

7    Q    Okay.   Did he indicate to you why the man was shot?

8    A    He said when he caught up with Mr. Goodwin he asked and Mr.
9    Goodwin replied that he had shot the man because the man asked
10   him, "What the fuck he wanted."

11   Q    Did he say anything to you about any kind of racial slur
12   whenever he told you that the man -- is that a direct quote from
13   Mr. Reams?

14   A    Yes, as to what the reply was from Mr. Goodwin.

15   Q    It was, "What the fuck do you want"?

16   A    Yes, ma'am.

17   Q    It wasn't, "What the fuck do you want, Nigger"?

18   A    No, ma'am.

19   Q    Okay.   Several times, in fact, in his statement doesn't he
20   make that same reference to that same statement?

21   A    Yes, ma'am, he refers back to that at different times.

22   Q    And at any time did he ever say that there was any kind of
23   racial slur on the end of it?

24   A    No, ma'am.

25   Q    Okay.   And those were always direct quotes from him?

680

1    A    Yes, ma'am.

2    Q    Okay.  So the first time you talked to him about it he said

3    he was standing on the sidewalk on Sixth Street?

4    A    Yes, ma'am.

5    Q    When the gun was fired?

6    A    Yes, ma'am.

7    Q    And then caught up with Alford later.

8    A    Yes, ran behind him and caught up with him.

9    Q    Okay.  Did you interview him further on that subject?

10   A    We did.  We -- when we got -- when the interview started

11   getting into that part of it, at that particular time, that was

12   not the initial reason we went to Stuttgart to talk with him and

13   then it led into that.  We stopped the interview and took a --

14   reversed the tape and took a interview just pertaining to the

15   homicide at Fifth and Chestnut.

16   Q    When you say you reversed the tape, flipped it over in the

17   machine?

18   A    Yes, ma'am.

19   Q    Okay.

20   A    Ran a new side.

21   Q    When you took this interview from him about -- are you

22   saying about the murder at the ATM machine?

23   A    Yes, ma'am.

24   Q    Okay.  How did he -- how did he start his statement off

25   that time?

681

1    A    He started off on that statement saying that this was the

2    truth, swearing to this -- what he was fixing to tell about this

3    homicide was absolutely the truth.

4    Q    "The truth this time," isn't that what his quote was?

5    A    Yes, ma'am.

6    Q    Okay.  What did he tell you during that interview about the

7    ATM murder?

8    A    I didn't hear you.

9    Q    What did he tell you during that interview about the ATM

10   murder?

11   A    At that time, I asked him just to tell in his own words

12   what had happened, and he told that Mr. Goodwin had came up to

13   where he was and was talking about needing money for graduation.

14   Mr. Goodwin had a graduation coming up in the next day or a few

15   days and he needed money to get his graduation stuff with and

16   said that he had an idea of how to get a lot of money but they

17   would have to rob a teller.

18   Q    Who had an idea to do that?

19   A    Mr. Goodwin.

20   Q    Kenneth said that --

21   A    Yes.

22   Q    Alford had this idea?

23   A    Mr. Reams said that Mr. Goodwin had this idea that they

24   would have to rob a teller to get a lot of money.  They could

25   get a lot of money that way.


                                682

1    Q    Okay.  So then what?

2    A    They planned out that they would wait and go to the teller

3    at Fifth and Chestnut at approximately 8 o'clock that evening or

4    they were wanting to go when it became dark.

5    Q    What did they do in the meantime?

6    A    Watched movies, sat around the house waiting until that

7    time of the evening.

8    Q    What movie did they watch?

9    A    He stated Leathal Weapon.

10   Q    Okay.  And then they waited until it got dark.  Is that

11   what you said?

12   A    Yes, ma'am.

13   Q    And then they walked up to where?

14   A    They walked up to a building which was in the process of

15   being torn down across the street which would be on the north

16   side of Fifth Street.

17   Q    Are you familiar with that area, Detective Phillips?

18   A    Yes, ma'am.

19   Q    There is a map on the wall behind you there.  Can you point

20   out which building he would have been talking about?

21   A    This building right -- I believe this building right here

22   (INDICATING) would be the one that was being torn down.

23   Q    Okay.  And that sat in that building and waited?

24   A    Yes.

25   Q    What were they waiting on?

683

1    A    Waiting on -- stated that they were going to wait until

2    someone pulled up to the teller machine and when they saw one

3    pull up, they would go across the street and rob them.

4    Q    Who had the gun at that time?

5    A    At that time, Mr. Reams said that he had the gun.   He

6    carried the gun to that location because his pants had pockets

7    where he could carry the gun.

8    Q    Okay.

9    A    And he carried it to that location.   While sitting there or

10    when they -- while they were sitting there waiting on the -- a

11    vehicle to pull up, when the truck pulled up, he told Mr.

12    Goodwin that he just didn't have the guts to pull the gun on

13    anyone and tell them to give them what he had, you know, give

14    them money.   So he gave the gun to Mr. Goodwin at the time for

15    Mr. Goodwin to pull the gun on the individual.

16    Q    Okay.   But he didn't have the guts to do it himself is what

17    he told you?

18    A    Correct.

19    Q    What did Mr. Goodwin do once he had the gun?

20    A    When the truck pulled up and the gun was given to Mr.

21    Goodwin, they went across the street to where the truck had

22    pulled up to the teller machine.   Mr. Goodwin walked behind the

23    truck up toward the driver's door and Mr. Reams went around the

24    teller machine so he could come out in front of the truck.

25    Q    Okay.   Was Mr. Reams at the front of the truck whenever the

684

1   shots were fired?

2   A    Mr. Reams said that as he was going around the teller

3   machine that he heard Mr. Goodwin tell the individual in the

4   truck that this was a robbery and give me everything you got and

5   give me all your money.  And as he was coming around, he heard

6   the man ask Mr. Goodwin or tell Mr. Goodwin, you know, "What the

7   fuck do you want," and as he was coming around -- just breaking

8   around the teller machine, he heard the gunshot.

9   Q    Okay.  And what did he do then?

10  A    He ran up to the driver's door of the truck, looked in and

11  saw the victim -- stated that he saw the victim's head fall

12  slowly to the steering wheel like in slow motion.

13  Q    Where was Alford?

14  A    He said Alford had taken off running.  He said that -- Mr.

15  Reams said that he stood there for a good minute, in his words,

16  "A good minute," before he took off running behind Mr. Goodwin.

17  He caught up with Mr. Goodwin about the railroad tracks and

18  asked him why he shot the man.  And, again, Mr. Reams stated

19  that Mr. Goodwin said he shot the man because he said, "What the

20  fuck do you want."

21  Q    Okay.  Was there any communication between Alford and

22  Kenneth as to what they were to tell anyone?

23  A    Mr. Reams said that Mr. Goodwin told him not to tell anyone

24  and that if he did he would kill him.  Mr. Goodwin would kill

25  Mr. Reams.

685

5260 Respondent's Exhibit E

1    Q    Did he indicate to you that he was scared of Mr. Goodwin?

2    A    Said that he believed that Mr. Goodwin would kill him.

3    Said Mr. Goodwin was a real villian in his words.

4    Q    Were those his words?

5    A    Yes, ma'am.

6    Q    That he was a real villian?

7    A    Yes, ma'am.

8    Q    And, in fact, didn't he say he would kill him straight up?

9    A    Yes, ma'am, he did.

10   Q    Those were his quotes?

11   A    Yes, ma'am.

12   Q    What did they do from that point once he caught up with him

13   at the railroad tracks?

14   A    Went to Mr. Goodwin's house where Mr. Reams stated that he

15   washed his face and Mr. Goodwin changed clothes.

16   Q    And then what did they do?

17   A    Mr. Reams went home from there.

18   Q    Did you ask the defendant if he had gotten inside of that

19   truck?

20   A    Yes, I did ask if he had touched the truck anywhere or if

21   there would be any reason that his fingerprints might be on that

22   truck anywhere.  He stated that they might be on the steering

23   wheel because he reached in the truck --

24   Q    But --

25   A    And took a hold of the steering wheel.

686

1    Q    Was that what he initially told you?

2    A    Ma'am?

3    Q    Is that what he initially told you?

4    A    No, ma'am.

5    Q    What did he initially tell you?

6    A    That he didn't have -- he wasn't at the truck.

7    Q    And then he told you, "Oh, yeah, my fingerprints may be

8    there after all"?

9    A    Yes, ma'am, on the steering wheel.

10   Q    Why did he say they would be there?

11   A    Because he reached in and grabbed the steering wheel.

12   Q    Didn't he also tell you that he reached in there and pushed

13   the man's head?

14   A    Yes, ma'am.   Said that the man wouldn't move.   Just

15   repeated three to four times there that the man wouldn't move.

16   He just wouldn't move.   That type of thing.

17   Q    That doesn't coincide with the earlier statement that you

18   told us about him asking for a light, does it?

19   A    No, ma'am.   In that statement, he stated that he was on

20   Sixth Street which would have been feet from being a block away

21   from where the teller machine sets off just off of Fifth Street.

22   Sixth Street would be almost a block away.

23   Q    Did you ask him about the gun that was used?

24   A    Yes, ma'am.

25   Q    And did you ask him where it was?

687

1    A    He stated -- when I asked him where the gun was, he stated

2    that Alford had told him that he had put the gun under a bucket

3    in his back yard by a fence--that being under a bucket in Mr.

4    Goodwin's back yard by a fence.

5    Q    What else did he tell you about the gun?

6    A    He told me that -- I asked him how many bullets were in the

7    gun because whenever the gun was located there were no bullets

8    in the gun.  He stated that there were four and he knew that

9    there were four because he had loaded the gun.  He stated that

10   he had put four bullets in the gun and set the gun to where if

11   you pulled the trigger it would fall on an empty cylinder.

12   Q    And how was it transported to the building?

13   A    By him in his pants.

14   Q    Okay.  So he loaded it and he transported it up there.  Is

15   that correct?

16   A    Yes, ma'am.

17   Q    Did he tell you how he was dressed?

18   A    Yes, ma'am.  He said that he was dressed in all black with

19   a black and silver baseball cap.

20   Q    What about Alford Goodwin?  Did he tell you how he was

21   dressed?

22   A    He said that he didn't remember what kind of pants Mr.

23   Goodwin had on, but he had on gray hood sweatshirt, type shirt.

24   Q    Have you personally seen both of these defendants together

25   at the same time?

5263  Respondent's Exhibit E

1   A     Yes, ma'am.  I saw them the evening that they were arrest-
2   ed.  One of them was in one room and one of them was in another
3   room.

4   Q     Who is the tallest?

5   A     Mr. Goodwin would be the tallest of the two.

6   Q     Considerably taller?

7   A     Four or five inches.

8   Q     When you were there talking to him about the ATM murder,
9   did you inquire of him about any other crimes?

10  A     Asked him about a -- there was a report of a attempted
11  robbery at that same teller machine which would -- was a few
12  days earlier than when this had occurred and he stated that he
13  knew that it had been tried before; in fact, he thought that Mr.
14  Goodwin had tried it before, but that he didn't have any first-
15  hand knowledge of it.

16  Q     Okay.  And was there, in fact, an aggravated robbery at
17  that teller earlier?

18  A     Yes, ma'am, it was.

19  Q     When was that?

20  A     That would have been on the 29th of April -- the 28th of
21  April, the same night that the burglary occurred at the Pine
22  Bluff Cleaners.  It would have been the night of the 28th of
23  April.

24  Q     Okay.  And who would have been involved in that one as far
25  as a victim?

689

1  A     A Mr. Gilbert.

2  Q     And who is Mr. Gilbert?

3  A     He was a student at UAPB.  He was from Crossett, Arkansas,
4  going to school at UAPB?

5  Q     What time of day would that have happened?

6  A     It happened in the evening, the exact hour I'm not sure at
7  this time.

8  Q     And Mr. Reams told you he didn't know anything about it,
9  but he is sure Alford did?

10  A     Yes, ma'am.

11  Q     In fact, he said Alford did it, didn't he?

12  A     He said that Alford -- he said that Alford had tried it
13  there before.

14  Q     Alford had tried it there before?

15  A     Yes, ma'am.

16  Q     A week before, is that right?

17  A     A week before, yes.

18  Q     A week before the murder?

19  A     Um-hum, yes, ma'am.

20  Q     But he told you that Alford didn't give him any other
21  details about that.  Is that correct?

22  A     No, he didn't have any first-hand knowledge and that that
23  was all that that Alford had tried it there a week before this
24  had occurred.

25  Q     Did he tell you anything else about Alford at that point,

690

1   about that robbery or --

2   A    Not that I can recall at this time.

3   Q    Do you recall him saying that Gary Turner was probably not

4   the first person that Butterball had killed?

5   A    Yes, ma'am.   He stated that -- he talked through this

6   statement whenever he talked about Mr. Goodwin several times he

7   talked about him being a villian, about him being a, you know,

8   bad guy and that he had probably killed people before.   That

9   this was probably not the first person that he had killed.

10   Q    Are those all the statements that you took from Mr. Reams?

11   A    Yes, ma'am.

12             MS. BILLINGS:   Thank you, sir.

13             THE COURT:   You may cross examine.

14             MR. KIZER:   Thank you, your Honor.

15                         CROSS EXAMINATION

16   BY MR. KIZER:

17   Q    Detective Phillips, would you tell us something about how

18   it came to be that you went to Stuttgart to talk to Mr. Reams in

19   the first place?   He had been arrested like the day before.   Is

20   that right?

21   A    Yes, sir.   Yes, sir.

22   Q    And why, again, was he in Stuttgart?

23   A    He was in Stuttgart -- that's where he was transported to.

24   Whenever -- with our jail situation when we don't have a cell

25   available at the Jefferson County Jail, then we have a list of

                              691

1    jails that will accept holding prisoners for us.

2    Q    Did you see Mr. Reams on the night of his arrest--on the

3    afternoon of his arrest?

4    A    I saw him that evening.

5    Q    Okay.  At any time when he was taken down to the police

6    station, did you or any other police officer in your presence

7    strike Mr. Reams or treat him cruelly, anything that you may

8    have done or seen done?

9    A    Not that I saw.

10   Q    Was Mr. Reams with Mr. Goodwin when they were both down at

11   the police station on the night of the arrest?

12   A    When I saw them, they were in separate rooms.  That evening

13   I spoke with Mr. Goodwin, I didn't speak with Mr. Reams.  I saw

14   him sitting in the office -- in one of the offices, but I didn't

15   speak with him.

16   Q    You didn't attempt to take a statement from him?

17   A    No, sir.

18   Q    Why did you go see him the next day at 10 o'clock at night?

19   According to the statements, the transcriptions of which I have

20   been provided, both of them take place after 10 o'clock at

21   night.

22   A    Yes, sir.  Lieutenant Addison wanted to go speak with him

23   about the Pine Bluff Dry Cleaner burglary and the Greyhound Bus

24   Station robbery and he came to my office and asked me to go with

25   him.

692

1    Q    Where was Mr. Goodwin while Mr. Reams was being held in

2    Stuttgart?

3    A    I'm not sure right now which facility Mr. Goodwin was in.

4    Q    Suffice it to say, though, he wasn't in Stuttgart.  Is that

5    correct?

6    A    No.

7    Q    Okay.  Did the -- did Mr. Reams willingly talk to you when

8    you went over to Stuttgart?

9    A    Yes, sir.

10   Q    How did he appear to you?

11   A    He appeared -- as far as physically, he didn't appear like

12   there was any physical problems with him.

13   Q    Did he appear nervous?

14   A    Yes, sir, he was.

15   Q    He talked rather quickly, did he not?

16   A    Yes, sir.

17   Q    The first statement that you began talking with him -- in

18   which you began talking with him, you concentrated the question-

19   ing on the cleaners and what may have been taken from the

20   cleaners.  Is that right?

21   A    Correct.

22   Q    When it came around to time to talk about the ATM murder,

23   do you have the transcription of that first statement in your

24   presence?

25   A    Which statement are you talking about?

5268  Respondent's Exhibit E

1  Q    The one says, "Today's date is May 11, 1993.  It's 10 p.m."

2  A    I do have.

3  Q    Okay.  Would you look on the third page about middle of the

4  page?  Have you found that page?

5  A    Yes, sir.

6  Q    If you will look, there is a sentence that appears to be

7  either you or Detective Addison, I guess, "TA" is Detective

8  Addison.

9  A    Yes, sir.

10 Q    This was done in your presence, though, is that correct?

11 A    Yes, sir.

12 Q    It says, "Okay.  Kenneth, is there anything else that you

13 want to say in your statement?"  Do you see where I'm talking

14 about?

15 A    I -- I'm not finding that.

16        MR. KIZER:  May I approach the witness, your Honor?

17        THE COURT:  Certainly.

18 MR. KIZER CONTINUING:

19 Q    Do you see where I'm talking about?

20 A    Yes, sir.

21 Q    Have you found that sentence that I'm making reference to?

22 A    Yes, sir.

23 Q    What did Mr. Reams tell you after that?

24 A    It states here, "No."  The sentence that you are referring

25 to, "Okay.  Kenneth, is there anything else that you want to say

694

1    in your statement?"   "No."   And then it says, "I ain't killed
2    that man."

3    Q    What did he go on to say after that?

4    A    Do you want me to read?

5    Q    Yes, the next three or four lines.

6    A    Just his part or the question and --

7    Q    Question and the answer.

8    A    All right.   Under Lieutenant Addison, he asked, "Which
9    man?"   Mr. Reams stating, "That was at the teller.   I had no
10   idea that he was going to get killed."   TA, "Who killed him?"
11   Mr. Reams, "Alford."   And then Lieutenant Addison again states,
12   "Alford?"   And then -- do you want me to go on from there?

13   Q    No, that's fine.   Do you have the second statement the
14   transcription of which I have been provided?   I guess it took
15   place after you turned the tape over.

16   A    Yes, sir.

17   Q    As you told us.

18   A    Yes, sir.

19   Q    Do you remember him telling you on page five that he didn't
20   mean for the dude to get shot?   It's down at the bottom of the
21   page.

22   A    I -- I do remember that.   I haven't specifically found it
23   yet, but I do remember it.   Here it is.   Do you want me to read?

24   Q    Yes.   Would you read from there until the end of the page?

25   A    He said, "I don't" -- let's see -- he said, "I don't know,

695

1   man." He said, "I don't man." He said, "I don't know man.   I

2   ain't mean for that dude to get shot, but you know, it just --

3   you know, it just happened the wrong way and everything.   I

4   don't know man." That's the end of the page.

5   Q    When he says, "It just happened the wrong way," did you

6   take it to mean the incident, how everything went down?

7   A    Sir?

8   Q    Did you take it to mean that he was referring to the

9   incident, how everything went down, that's what went the wrong

10  way according to him?

11  A    I guess.

12  Q    Does that appear to be in context with what else he was

13  talking about?

14  A    It would be with the statement.

15  Q    I mean, right before that he had been talking about the ATM

16  murder --

17  A    Correct.

18  Q    He had been talking about the man who had died and didn't

19  it appear to be in context that he is making this reference that

20  the whole thing went down wrong?

21  A    Correct.

22  Q    Okay. Tell me just one more time what it was that Alford

23  described to you how he knew or how it was he knew how many

24  bullets were in that gun and what he had done with those

25  bullets?

696

5271 Respondent's Exhibit E

1    A    How who described to me?

2    Q    I'm sorry.  How Mr. Reams had described to me about the

3    number of bullets in the gun and how they were placed?

4    A    He stated that he had loaded the gun and that there were

5    four bullets in the gun and that the cylinder to the gun was set

6    to where when the trigger was pulled it would -- the hammer

7    would fall on an empty chamber.

8    Q    Do you remember him telling you that -- right after telling

9    you the description of how the bullets were placed in he said,

10   "I guess I set it wrong," meaning he guessed he set the bullets

11   wrong in the cylinder?

12   A    He made the remark that he may have set it wrong.

13   Q    Detective Addison was with you, was he not, the entire

14   night that these two statements were being taken?

15   A    Correct.

16   Q    Was there any other officers present in the room?

17   A    No, sir, it was us three.

18   Q    How long did the interviews take from start to finish, both

19   of them, approximate?

20   A    I'll say 30 to 40 minutes, just guessing.

21   Q    And you had those statements tape recorded and then later

22   transcribed by someone at the police department?

23   A    Correct.  Correct.

24        MR. KIZER:   That's all the questions I have, your

25        Honor.

697

5272   Respondent's Exhibit E

1              THE COURT:  Any redirect?

2              MS. BILLINGS:  Just one thing, your Honor.

3                        REDIRECT EXAMINATION

4    BY MS. BILLINGS:

5    Q    In that first statement that you took from Kenneth where he

6    said that he didn't kill the man, that's the very same one where

7    he said that he was on the other side of the parking lot on

8    Sixth Street, isn't it?

9    A    Correct.

10             MS. BILLINGS:  Thank you, sir.

11             THE COURT:  Recross?

12             MR. KIZER:  No, sir.

13             THE COURT:  Thank you, Officer.  You may stand down.

14        May this officer be excused or should he remain available?

15             MS. BILLINGS:  Just have him remain available.

16             THE COURT:  Okay.  Officer Phillips, you may stand

17        down and remain available outside the courtroom.  Call your

18        next witness.

19             MS. BILLINGS:  Terry Addison.

20             THE COURT:  Lieutenant Addison has previously been

21        sworn.  Just have a seat there and make yourself comfort-

22        able in front of those microphones, please, sir.

23                        TERRY ADDISON

24   having been called at the instance of counsel for the State of

25   Arkansas, and after first having been duly sworn, testified as

                           698

1    follows, to wit:

2                          DIRECT EXAMINATION

3    BY MS. BILLINGS:

4    Q    Detective Addison, would you state your name and occupation

5    for the jury, please?

6    A    Terry  Addison,  Lieutenant  with  the  Pine  Bluff  Police

7    Department, detective division.

8    Q    And how long have you been with the detective division?

9    A    A couple of years this time.

10   Q    Okay.  Have you been there before for a period?

11   A    Yes, ma'am.

12   Q    How many years all together do you think in the detective

13   division?

14   A    Probably six or eight.

15   Q    Okay.  And you are the lieutenant over that shift.  Is that

16   correct?

17   A    Yes, ma'am, swing shift.

18   Q    What shift is that?

19   A    Work 4 to 12.

20   Q    Okay.  Detective Addison, did you have occasion to inter-

21   view Kenneth Reams in connection with the Gary Turner murder?

22   A    Yes, ma'am.

23   Q    Okay.  Detective Phillips was in here just a moment ago and

24   he  testified  basically  that  you  and  he  went  to  Stuttgart  to

25   interview  Mr.  Reams  on  May  the  11th.   Would  that  have  been

                                  699

                             5274

                      Respondent's Exhibit E

1   correct?

2   A    Yes, ma'am, on May the 11th, somewhere around 10 o'clock,

3   I think, 9 -- 9 o'clock or something like that.

4   Q    Okay.  And what was the purpose of that particular trip

5   over there at that time?

6   A    Okay.  Well, I had transported Kenneth to Stuttgart.  The

7   jail here was full.  On the way down there he had told me some

8   things and I had given my card and told him if he wanted to talk

9   to me further about this to have the Stuttgart Police jail

10  contact me.  And he had told them the next day to get a hold of

11  me.  I got down there and that's when he started talking to me

12  about some incidents that he was involved in.

13  Q    And what type of incidents did you talk to him about then?

14  A    Okay.  It started out he was telling me that he had pulled

15  a burglary where he had stolen a pistol and some coats, stamps

16  and a little change from Pine Bluff Dry Cleaners.  And that he

17  had pulled a robbery with that weapon at the Greyhound Bus

18  Station which is about Fourth and Chestnut, somewhere in that

19  area one morning.  And after talking about those, he ran into

20  where he said, "And I didn't shoot this man at the teller

21  machine."  At that time, we concluded that interview and started

22  another one with myself and him and Detective Phillips on that

23  incident.

24  Q    Okay.  And did you interview him -- Detective Phillips has

25  already testified about that second interview with him.  Did you

700

5275  Respondent's Exhibit E

1    interview him again?

2    A    Okay.  On the 12th, Kenneth called me collect.  I talked to

3    him -- he said he -- on the telephone.  And he said he wanted to

4    talk to me again.  And I went to Stuttgart and picked him up and

5    brought him back to Pine Bluff where again we had an interview.

6    Again, he told me about some robberies including the robbery and

7    homicide of Gary Wayne Turner at the ATM machine.

8    Q    Okay.  Did he also tell you about another robbery there at

9    the ATM machine?

10   A    Okay.  He said him and Alford Goodwin and another young man

11   named Curry had pulled a robbery and it didn't go as planned.

12   It kind of messed up at the same machine just on a different

13   date.

14   Q    Is this the same robbery that the night before he just told

15   you that he didn't participate in?

16   A    The -- well -- he -- this was a different robbery all

17   together.  This was on another guy that was at the ATM machine.

18   I believe his name was Griffin.  This was on the 12th when I

19   brought him back to Pine Bluff.

20   Q    Okay.  But in that second interview, did you and Detective

21   Phillips did on May 11th, didn't he tell you -- you two during

22   that time that he did not know anything about that first ATM

23   robbery on Curtis Gilbert?

24   A    Oh, yes.  On the first interview which was on the 11th.

25   Q    That Alford had done it, but he didn't give him any details

701

1    about it?

2    A    Right.  He said he was walking across the parking lot.  In

3    fact, was, I think, crossing Sixth Street when he heard the gun

4    go off and he ran back over to the --

5    Q    Well, we are crossing up two robberies here.  The first one

6    that we are talking about is the Curtis Gilbert robbery on the

7    28th.  Okay.  We just went over that in the statement that he

8    gave you and Detective Phillips the last statement on the 11th.

9    In that statement, didn't he tell you two that he did not

10   participate in the first robbery on Curtis Gilbert.  That that

11   was Alford that had done that, but he didn't give him any

12   details about it?

13   A    Are you talking about on the first interview I did with him

14   at Stuttgart?

15   Q    Yes, sir, I believe it would be the second interview that

16   you and Detective Phillips did.  Let me find it.  It is on page

17   13 of that second statement that you and Detective Phillips took

18   from Mr. Reams.  The top of that page.

19            MS. BILLINGS:  May I approach the witness, your Honor?

20            THE COURT:  Yes, ma'am.

21   MS. BILLINGS CONTINUING:

22   Q    Right here (INDICATING).  Do you see that now?

23   A    Okay.  That was on the same teller machine but a different

24   day.

25   Q    Right.

702

1    A     Now he said he didn't have anything to do with that.

2    Butterball, who is Alford, didn't tell him too much about it.

3    But unless you are with him, he don't tell you anything.

4    Q     Okay.  But he told you he was not there on that one.  Is

5    that right?

6    A     Right, right.

7    Q     But then on May the 12th, when you went down there and

8    talked to him he told you that he did participate in that one

9    after all, didn't he?

10   A     Right.

11   Q     In fact, he had the gun on that one?

12   A     He -- yes, he told me he had the gun during that one.

13   Q     And that was the one that would have been on Curtis Gilbert

14   on the 28th.  Is that right?

15   A     Right, on -- they didn't get anything from him, right.

16   Q     And the reason they didn't was why?

17   A     Okay.  Well, Gilbert didn't have any money on him and he

18   took off just floored his car and drove off.

19   Q     So it didn't go like they planned it, did it?

20   A     Right.

21   Q     In fact, that's what he told you, isn't it?

22   A     Yeah, he said it didn't go as planned.

23   Q     The gun that he used in that robbery, did he tell you which

24   one it was?

25   A     He said it was the one he had taken in the burglary at the

703

1   cleaners.  That it was a .32.

2   Q    Was that the same one he used in the aggravated robbery at

3   the bus station?

4   A    Yes, ma'am.

5   Q    Did you ask him -- have you seen that gun?

6   A    Yes, ma'am.

7   Q    Did you see it?

8   A    Yes, ma'am.

9   Q    Did you notice anything in particular about it?

10  A    I believe the serial numbers have been scratched out on it.

11  Q    Did you ask Mr. Reams about that?

12  A    Yes, ma'am.

13  Q    What did he tell you?

14  A    Well, the first time I asked him he said he didn't know --

15  he said, "Well, Alford did it," and then he said, "No, I can't

16  say Alford did."  Later I talked to him when he was interviewing

17  him on that Gary Wayne Turner he said they were sitting across

18  the street -- they are tearing a building down over there and

19  was sitting down over there and he said, in fact, himself had

20  the gun and was scratching it on the concrete.  That's how the

21  serial number got scratched off.

22  Q    And he scratched those serial numbers off?

23  A    (Witness nodding head.)

24  Q    But initially he told you Alford did it, right?

25  A    Right.  He said Alford did it, but in the same paragraph he

704

1    said, well, he didn't know Alford did it or not.

2    Q    He didn't know how or when Alford did it?

3    A    How or when.

4    Q    He just knew that Alford had done it?

5    A    That was in that other statement.

6    Q    Okay.  Who did he say shot the man at the ATM, Mr. Turner?

7    A    He said Alford did.  And then -- well, he said, Alford did

8    and then he said, "Well, I can't really say Alford did."  Said -

9    - matter of fact, said he was going across the street when he

10   heard the gunshot.  He didn't see him.

11   Q    Okay.  Did he say anything to you about getting caught?

12   A    Okay.  At the end of one of his statements, as a matter of

13   fact, he said that he wished he could go to the man's funeral.

14   He was sorry about what happened.  He was glad he got caught

15   because if he hadn't of, he would have went on a crime spree.

16   He had tried to straighten up once before and just didn't make

17   it.

18   Q    In fact, he said, he wished he could go to the ole boy's

19   funeral because he hated that it had happened?

20   A    Yes, ma'am.

21   Q    Did he also tell you he's sorry he told so many lies?

22   A    Yes, ma'am.  In fact in one of the statements, he started

23   off -- I believe it was the last one where he said, "This one is

24   the truth," you know, "the other was lies.  I'm going to tell

25   the whole straight truth this time."

705

5280  Respondent's Exhibit E

1          MS. BILLINGS:  Thank you, sir.

2          THE COURT:  Mr. Kizer?

3          MR. KIZER:  I don't have any questions, your HOnor.

4          THE COURT:  Thank you, Lieutenant Addision.  You may

5     stand down.  May this witness be excused or should he

6     remain available?

7          MS. BILLINGS:  No, sir, your Honor.

8          THE COURT:  Okay.  Lieutenant Addision, remain outside

9     the courtroom and remain available if you would, please.

10          MS. BILLINGS:  May we approach the bench, please?

11          THE COURT:  Yes, ma'am.

12  (Counsel approached the bench)

13          MS. BILLINGS:  I had called Mr. Andrejack down here,

14     but they apparently sent him back thinking that we were

15     going to use him this afternoon after all.

16          THE COURT:  Who is "they"?

17          MR. JUNEAU:  Someone in our office sent him back.  I'm

18     not sure what -- there was some miscommunication.  They

19     sent back to the Little Rock and told him to be back here

20     at 8:30 in the morning.  He's our last witness.

21          MR. KIZER:  Mr. Curry, I've had an order to delivery

22     for him to be brought up for the Department of Correction,

23     but that order is not for him for tomorrow any way, and I

24     don't know, yet, whether I'm going to call Mr. Curry.  But

25     I'm going to have to have an opportunity to talk with him

706

1   in light of some of this testimony that's come out.

2     THE COURT:  Is he here?

3     MR. KIZER:  Uh-uh.  He wasn't a while ago.  The order

4   of delivery that I saw said tomorrow.

5     THE COURT:  So are you telling me that at 4:25 we

6   can't do anything?

7     MR. KIZER:  I don't see how we can.

8     THE COURT:  That would lose Thursday --

9     MS. BILLINGS:  Well, I think I can get Mr. Andrejack

10   here at 8 in the morning for that matter.  I apologize

11   about that, your Honor.  I didn't know they were going to

12   send him back.  That's why I called him because I saw how

13   fast we were moving.

14     THE COURT:  All right.

15 (Conclusion of bench conference)

16     THE COURT:  Ladies and gentlemen, the -- I've been

17   informed that the next witness in this matter is not here.

18   And won't be available until in the morning coming from

19   Little Rock I understand to testify.  I think that con-

20   cludes about what we can do today unfortunately.  I wish we

21   could go a little bit further.  But anyway, we won't be

22   able to do that.

23     Let me ask you to to remove your badges.  We'll stop

24   now for the night.  I'm going to repeat -- I suspect that

25   there will be -- there will be media coverage of our trial.

5282 Respondent's Exhibit E

1        I'm going to caution you about avoiding that.  Please avoid
2        any kind of media coverage of the trial.  Please don't
3        discuss the case among yourselves or with anybody else.
4        Let me tell you it's the most natural thing in the world
5        for your spouses or loved ones with whom you live to ask
6        you how your day went and what it was all about.  When this
7        trial is all over, you have -- you may certainly tell them
8        whatever you want to.  But for now, I'm going to ask you
9        not to discuss it even and even especially with those folks
10       around the house because those are the people whose
11       normally your opinions that you value most and anything you
12       say is normally and naturally going to get some kind of a
13       response.  That response may very well be something that
14       you would carry with you into the jury room.  Just think
15       about it.  That's kind of how you are influenced sometime,
16       whether we know it or not.  Not that they would say
17       anything, maybe even a look that they would give or
18       whatever.  So, just tell them that mean old Judge told you
19       that you can't discuss it with them.  You'll be glad to
20       talk to them about it when the case is all over.  And with
21       that admonition, I would ask you to be back here in the
22       morning at 8:30.  Everybody else just remain seated until
23       the jury has exited the courtroom.  You are excused at this
24       time.
25   (Jury exited the courtroom at 4:28 p.m.)

708

5283 Respondent's Exhibit E

1    (The following proceedings resumed at 8:52 a.m., on December 15,
2    1993)
3             THE COURT:   All right.   I trust everybody had an
4        uneventfulnight.   There is nothing the jurors need to
5        report to me this morning.   Everybody is in place.   Okay.
6        When we were last together, the State was ready to call its
7        next witness.   Ms. Billings, I'll let you call your next
8        witness for the State.
9             MR. JUNEAU:   Thank you, your Honor.
10            THE COURT:   Mr. Juneau.
11            MR. JUNEAU:   Ron Andrejack.
12            THE COURT:   This witness was not sworn previously, I
13       don't think.   (Witness sworn by Clerk)   Come around and
14       take the witness stand, please, sir.
15                         RON ANDREJACK
16   having been called at the instance of counsel for the State of
17   Arkansas, and after first having been duly sworn, testified as
18   follows, to wit:
19                      DIRECT EXAMINATION
20   BY MR. JUNEAU:
21   Q    Good morning, Mr. Andrejack.
22   A    Good morning.
23   Q    Would you tell us name, please?
24   A    Ronald Andrejack.
25   Q    And where do you work, Mr. Andrejack?

                              709

1    A    The Arkansas State Crime Laboratory.

2    Q    How long have you worked there?

3    A    A little over five and a half years.

4    Q    What do you do for them?

5    A    I'm a firearms tool mark examiner.  As a firearms tool mark

6    examiner, my duties include examination and testing of all types

7    of firearms submitted to the laboratory.   The examination of

8    discharged bullets, discharged cartridge casings, shot shells,

9    shot shell related components.  It also includes the microscopic

10   comparison of discharging bullets to determine whether or not

11   they were fired from a particular gun or fired from the same

12   gun.  The examination of discharge cartridge casings to deter-

13   mine whether or not they were fired in a particular firearm.

14   Q    Okay.  Does that take some special training in the area?

15   A    Yes, it does.

16   Q    Would you briefly tell us your background as far as your

17   training?

18   A    Before -- prior to being employed by the Arkansas State

19   Crime Lab, I was employed as a trooper with the New Jersey State

20   Police for 22 years.  The last 15 and a half years of that time

21   as a firearms tool mark examiner assigned to the State Police

22   Crime Laboratory.  Upon being assigned to the laboratory, I

23   received practical on-the-job training under the supervision of

24   two experienced firearms examiners.  This training took place at

25   the State Police Laboratory on West Trinton and lasted approxi-

5285 Respondent's Exhibit E

1   mately a year and a half.  Then as part of my training, I was

2   assigned to visit many of the major firearms factories and

3   ammunition factories.  The purpose of visiting the factories was

4   to observe the manufacturing and machining techniques which are

5   directly related to the job of firearms identification.  I have

6   attended various schools, seminars and other training programs

7   dealing with investigations in general and firearms investiga-

8   tions in particular.  Some of these include the FBI gunshot

9   residue school conducted at the FBI Academy in Quantico,

10  Virginia.  The death investigation seminar conducted by Corning

11  Community College in Corning, New York.  And I have attended a

12  number of the annual training seminars conducted by the associa-

13  tion of firearm and tool mark examiners, an organization of

14  which I'm a regular member.

15  Q    Okay.  And since you have been working for the crime lab

16  over the past five years, have you been a firearms examiner

17  during that time?

18  A    Yes, sir, I have.

19       MR. JUNEAU:  Your Honor, I'll offer Mr. Andrejack as

20       an expert in firearms examination.

21       MR. KIZER:  No objection.

22       THE COURT:  Let him be so recognized.

23  MR. JUNEAU CONTINUING:

24  Q    Okay.  Mr. Andrejack, did you have an opportunity to

25  examine a firearm and a bullet in regard to the Gary Turner

711

5286 Respondent's Exhibit E

1    case?

2    A    Yes, I did.

3    Q    Okay.   Tell us what was submitted to you and by what

4    agencies.

5    A    It was submitted by the Pine Bluff Police Department.

6    Q    What was submitted by the Pine Bluff Police Department?

7    A    A .32 S & W caliber H & R--Harrington and Richardson--

8    revolver and also a discharged lead bullet.

9    Q    Okay.   Where did you get the bullet from?

10   A    The bullet was also submitted by the Pine Bluff Police

11   Department.

12   Q    Let me show you what we've got marked as State's Exhibit 9

13   and ask you if you can identify this gun marked as State's

14   Exhibit 9.

15   A    Yes, I can.

16   Q    Okay.   Identify it for us.

17   A    This is the .32 caliber H & R six-shot revolver which I re-

18   examined at the laboratory which I can identify by the caliber

19   which is stamped in to the barrel, the brand name, H & R which

20   is stamped in to the frame, and also the evidence tag which was

21   placed on the grip portion of the gun at the time it was

22   examined initially at the laboratory bearing the laboratory

23   number and the firearms laboratory  number.

24   Q    Okay.   And that is the weapon or the gun that was submitted

25   to you by the Pine Bluff Police Department.   Is that correct?

712

1    A    Yes, sir, it was.

2    Q    Okay.  Thank you.  Now, let me show you what we've got

3    marked as -- I think this is Exhibit Number -- is it 17?

4    Seventeen.  Can you identify that for me?

5    A    Yes, I can.  This was the bullet that was submitted by the

6    Pine Bluff Police Department which I can identify by the

7    packaging which bears the Crime Lab lab number and also the

8    firearms section number and also at the time it was examined, it

9    was scribed with the letter E-2 to the bullet itself to identify

10   it.

11   Q    Okay.  What was the reason that these two pieces of

12   evidence were submitted to your office?

13   A    They were submitted to be examined or re-examined in this

14   case to determine whether or not the projectile--the discharged

15   bullet--was fired from this gun.

16   Q    And did you do that examination?

17   A    Yes, sir, I did.

18   Q    What was the results of that examination?

19   A    As a result of my examination, it was my opinion that this

20   bullet was fired from this gun.

21   Q    Are you the only firearms examiner at the Crime Lab?

22   A    No.

23   Q    Okay.  Was that test conducted by someone else?

24   A    Yes.  It was previously examined by Berwin L. Monroe who is

25   the chief of the firearms section at the Crime Lab.

713

5288 Respondent's Exhibit E

1   Q    Did y'all's results agree?

2   A    Yes.

3   Q    Did you -- were you able to determine a serial number on

4   that gun?

5   A    No, I was not.  When I examined it, I was able to determine

6   -- make out four digits of the serial number.  That -- those

7   being 1276 on the butt portion of the frame.

8   Q    Okay.  Could you tell what had happened to the serial

9   number?

10  A    The area of the frame where the serial number is located,

11  it appeared to have been sanded or filed or some abrasion was

12  used to remove or obliterate the original serial number.

13  Q    Okay.  Mr. Andrejack, one other question.  You said that a

14  Mr. Monroe had examined the firearm -- the firearm and the

15  bullet and came to the same conclusion that you did.  Why was it

16  that both of y'all examined bullet?

17  A    Mr. Monroe did the initial examination, but he is hospital-

18  ized right now.  He had an injury and as a result of him being

19  hospitalized and on sick leave, he was not available for court.

20  Q    So you just did the test again?

21  A    Yes.

22  Q    Okay.

23           MR. JUNEAU:  That's all.  Thank you.

24           MR. KIZER:  No cross, your Honor.

25           THE COURT:  Thank you, Mr. Andrejack.  You may stand

714

5289  Respondent's Exhibit E

1      down.  Is this witness excused?

2            MR. JUNEAU:  Yes, your Honor.

3            THE COURT:  Mr. Andrejack, you are excused and free to

4      go as you wish.  Thank you.  Call your next witness for the

5      State.

6            MS. BILLINGS:  The State rests.

7            MR. KIZER:  May we approach, your Honor?

8            THE COURT:  Certainly.

9      (Counsel approached the bench)

10           MR.  KIZER:   May  we  retire  to  chambers  and  make

11      argument?  I have a motion I would like to make.

12           THE COURT:  Okay.  All right.

13      (Conclusion of bench conference)

14           THE COURT:  Prior to proceeding, let's take a couple

15      of  minutes.   We  need  to  take  up  a  matter  in  chambers.

16      Ladies and gentlemen, I'll ask you please not discuss the

17      case  among  yourselves  or  with  anyone  else.   We'll  be  in

18      recess  for,  oh,  maybe  10  minutes,  but  an  indeterminate

19      period  of  time.   I  don't  think  it  will  be  very  long.   So

20      remain  around  in  this  general  area.   We'll  be  in  recess  for

21      about 10 minutes.

22      (A recess was taken at this time)

23      (The following in-chambers record was made out of the presence

24      of the jury)

25           THE COURT:  Okay.  We are in chambers at the conclu-

715

5290 Respondent's Exhibit E

1    sion of the State's case for the purpose of taking up some
2    motions.   Mr. Kizer.
3        MR. KIZER:   Your Honor, the State having rested, and
4    at this point in the trial, I would make a motion for a
5    directed verdict asking the Court to find that there has
6    not been sufficient proof of the indifference to the value
7    of human life as defined by Arkansas law to find that this
8    case should be submitted to the jury at least on the
9    question of whether my client should be subjected to the
10   death penalty even if the Court makes a determination that
11   there is sufficient evidence for it to go to the jury on
12   some other theory.

13        I almost feel like this argument is kind of premature
14   in a way, but the defense needs to know how the Court feels
15   about this issue based on the State's evidence before I can
16   determine how the defense is going to proceed from this
17   point forward.

18        If the -- I know the Court is not bound by opinion
19   from a district court judge in a federal court matter, but
20   the opinion by Judge Eisele that was handed down in the
21   Barry Lee Fairchild matter is quite exhaustive in its
22   discussion on this particular issue, and we have copied all
23   of the cases for the Court from the United States Supreme
24   Court on this particular issue.   And what my submission to
25   the Court is is that the -- well, to use the judge's words,

716

5291 Respondent's Exhibit E

1     on the issue of -- that's the addendum.   Page seven of
2     Judge Eisele's opinion he states that the Eighth Amendment
3     prohibits against cruel and unusual punishment as inter-
4     preted by the United States Supreme Court, and he cites a
5     case which prevents the State from seeking the death
6     penalty unless the State proves that the defendant himself
7     acted with the requisite intent.   That is with extreme
8     indifference to the value of human life.   And then it goes
9     on in this addendum to discuss what that has come to mean
10    in the law, both from the Arkansas Supreme Court, the
11    United States Supreme Court and from Supreme Court in other
12    jurisdictions.

13         The proof, at this point, we basically don't know,
14    except from the statements that have been read into the
15    record from the detectives taken from my client any -- any
16    of the particulars of how the crime may have been commit-
17    ted.   The prosecution may attempt, at some point, to try to
18    show that there were conflicting statements, but my
19    contention is that you can't prove a positive by using
20    negatives.   And that there has been no proof that my client
21    or the other individual involved in this matter acted with
22    extreme indifference to the value of human life.   In fact,
23    the only proof before the Court is that my client indicated
24    that he had gone so far as to attempt to fix the gun so
25    that it would not fire; so that no one would be injured

717

1    during the course of the perpetration of the aggravated

2    robbery.

3        The second factor that I would ask the Court to take

4    a look at is that from all of the statements that were

5    given by my client and read into the record and the only

6    thing that supports this issue at all indicates that there

7    was no death intended.  There was no -- nothing that was

8    done along those lines that was intended to bring about the

9    death of another individual.  And the reckless indifference

10   has been defined as a lot more severe than just simple

11   negligence.  And I -- you know, there is always an argument

12   that any time you take a firearm into a -- the commission

13   of a felony that there is a chance that a death could come

14   about, but even that issue is discussed in quite some

15   detail by Judge Eisele.  And I believe it is supported by

16   these cases that are cited by Judge Eisele.  So for that

17   reason, I would ask the Court to hear two motions.  One for

18   a Motion for a Directed Verdict on the charge of capital

19   murder all together.  In the event that that motion does

20   not pass muster with the Court, that the Court find that

21   there is no basis based on the evidence submitted to this

22   point to submit this case to the jury for them to even

23   consider at some point the death penalty would be within

24   the realm of possibilities.

25       THE COURT:  I'm sorry.  I didn't follow that.

718

1           MR. KIZER:  If the first motion is not granted, then
2      the second motion would be for the Court to find that based
3      on the evidence submitted by the prosecution at this point,
4      that they would be barred from seeking the death penalty if
5      a conviction comes back on the issue of capital murder.
6           THE COURT:  What says the State?
7           MS. BILLINGS:  Well, your Honor, I've looked at this
8      Eisele opinion, too.  And in here the very case that Judge
9      Eisele cites the Tyson case from the Supreme Court that he
10     makes reference to over and over when he talks about
11     circumstances manifesting extreme indifference to the value
12     of human life and in his addendum, he talks about that case
13     and some others where, basically, the Supreme Court said
14     there did not have to be an intent to kill in order to be
15     convicted of capital felony murder.  But -- and they talked
16     about circumstances manifesting extreme indifference to the
17     value of human life and the very type of circumstances that
18     we have in this case and the type of circumstances that
19     they referred to actually planning out a robbery as opposed
20     to being, say, part of a rape where Mr. Fairchild had no
21     reason to know really that there would be a weapon involved
22     in the rape, a robbery is a -- a gun is almost an inherent
23     part of a robbery in order to carry one out.  And the cases
24     that Judge Eisele cites in here says in here that the
25     circumstances are likely to result in the loss of innocent

719

5294 Respondent's Exhibit E

1    human life even absent an intent to kill would suffice for
2    requisite intent as the basis for imposition of the death
3    penalty.  That's that _Tyson_ case.  And I would submit, you
4    konw, the factors that we have shown through Mr. Reams' own
5    statement are that they planned this; that they planned to
6    do  the  robbery;  that  he  actually  loaded  the  gun;  he
7    transported  it  up  there;  he  provided  the  gun  for  the
8    robbery to even take place.  They sat over there and waited
9    on the man to come along.  Every one of the factors that
10   was -- that are contemplated in circumstances manifesting
11   extreme indifference to the value of human life.

12        The  Court,  in  some  of  these  cases,  said  that  the
13   defendant knew that his accomplice was going to kill and
14   made no intent to interfere with the killing.  Mr. Reams,
15   in his statement, made several references to Mr. Goodwin as
16   being a real villian and no telling how many people he had
17   killed besides Gary Turner.  He knew exactly the type of
18   person that he was dealing with according to his state-
19   ments.

20        This  _People v. Davis_  case  that  they  cited.    The
21   defendant  was  present  at  the  scene  and  had  reason  to
22   believe that the accomplice was killed because the defen-
23   dant is in similar circumstances with the accomplice.

24        I just think by his own -- his very own statements,
25   your Honor, that we've gone past any of Judge Eisele's

                              720

1    arguments.

2            MR. JUNEAU:   Your Honor, if I may add something to

3    that argument.   I think Mr. Kizer might be right in

4    claiming that is premature at this point.   If I understood

5    Judge Eisele's argument, he's saying that, in his own

6    words, "defendant wasn't guilty of the death penalty."  But

7    he's not talking in that opinion about whether is guilty of

8    capital murder in the guilt phase of the trial.   And, so,

9    if Mr. Kizer is making a motion to prevent this case from

10   going to be decided on the death penalty, we're premature

11   at this point.   And if he is making an argument that there

12   has not been sufficient evidence to submit it on capital

13   murder, I think that argument goes to the affirmative

14   defense of capital murder.   And, surely, as Ms. Billings

15   said, when this defendant planned the robbery, loaded the

16   gun knowing that the gun was going to be used in a robbery,

17   provided the murder weapon to the other defendant, assuming

18   he shot him, that clearly is aiding or soliciting -- aiding

19   in the homicidal act under the Arkansas affirmative

20   defense, and would qualify sufficient indifference to the

21   value of human life to at least submit the case to the jury

22   on the guilt phase of the trial.

23           THE COURT:   Any rebuttal, Mr. Kizer?

24           MR. KIZER:   No, your Honor.

25           THE COURT:   The Court is of the opinion that the proof

721

1    adduced to this point in the trial is sufficient for

2    reasonable minds to conclude beyond a reasonable doubt that

3    the elements of the crime of capital murder have, in fact,

4    been proven in this case.  I think Mr. Juneau's assessment

5    of it is correct.  I'm going to deny the motion for a

6    directed verdict as to capital punishment, and we'll -- Mr.

7    Kizer, you renew the motion as to the sufficiency proof to

8    sustain the death penalty at the proper time, and we'll

9    retake that up at the conclusion of all of the proof.  But

10   I do think that the elements -- there is sufficient proof,

11   at this point, for those elements to have been covered by

12   the State's case.

13       Anything else?

14       MR. KIZER:  No, your Honor.

15       THE COURT:  Okay.

16       MR. KIZER:  Every case that I have been reading as of

17   late have had some flaw that the defense attorney did of

18   either not being timely; so, I may end up bringing up

19   several things that are trying to get every point that I

20   possibly can, your Honor.

21       THE COURT:  No problem.  I understand.

22   (Proceedings were moved into open court at 9:32 a.m., and

23   resumed as follows)

24       THE COURT:  All right.  Back on the record.  The State

25   having rested.  Mr. Kizer, you may call your first witness

722

Respondent's Exhibit E

1          for the defense.

2                  MR. KIZER:   Thank you, your Honor.   The defense will

3          call Kenneth Reams.

4                  THE COURT:   All right.

5                  THE CLERK:   Was he sworn yesterday?

6                  THE COURT:   I don't believe he was.   (Defendant sworn)

7          Take the witness stand, please, sir.

8                  MR. KIZER:   May I proceed, your Honor?

9                  THE COURT:   Please.

10                           KENNETH REAMS

11     having been called at the instance of counsel for the defendant,

12     and after first having been duly sworn, testified as follows, to

13     wit:

14                         DIRECT EXAMINATION

15     BY MR. KIZER:

16     Q     State your name for the record, please?

17     A     Kenneth Lynnord Reams.

18     Q     How old are you, Kenneth?

19     A     Eighteen.

20     Q     When is your birthday?

21     A     December 21, 1974.

22     Q     Where did you grow up, Kenneth?   Where did you grow up?

23     A     Here in Pine Bluff, Arkansas.

24     Q     Until when?

25     A     Until -- up until the eighth grade, then me and my family,

                                723

1   we moved to Forrest City, Arkansas.

2   Q    When you say, "your family," how many people are in your

3   family?

4   A    Me, my mother, my stepfather and my two brothers.

5   Q    Are the two brothers younger or older than you are?

6   A    Younger.

7   Q    Where did you live when you went to Forrest City?

8   A    On C Street.  I don't know the exact address.

9   Q    Did you attend school in Forrest City?

10  A    Yes, I did.

11  Q    Did there come to be a time where you left Forrest City and

12  went to live some place else?

13  A    Yes.  I stayed in Forrest City for about a year or two, and

14  I had gotten in some trouble in Forrest City and everything and

15  me and my mom had made the decision that -- you know, I told her

16  that I felt I was fixing to start getting into a lot of trouble

17  and she -- me and her made a decision that I could go live with

18  my auntie in Poplar Bluff, Missouri, to, you know, avoid for me

19  getting in a lot of trouble in Forrest City because I had

20  started running with a lot of friends of mine and we had

21  started, you know, doing a lot of things, staying out late at

22  night.  And so we had made that decision.

23  Q    How old were you when you went to Poplar Bluff?

24  A    Sixteen.

25  Q    And how long did you end up living there?

5299 Respondent's Exhibit E

1    A    For about a year, a year or two.

2    Q    Who was the aunt that you say that you went to live with?

3    A    Amelia Reams.

4    Q    And did you make other friends in Poplar Bluff when you

5    went to live there?

6    A    Yes, I did.

7    Q    Adult friends?

8    A    Yes.

9    Q    Who were some of those people?

10   A    Corey Adams, Tony Lewis, Michael Harris, Bobbie Warren.

11   Q    Let me ask you a couple of names.   Do you know Elgin

12   Anders?

13   A    Yes, I do.

14   Q    Who is he?

15   A    My auntie's boy friend.

16   Q    And do you know Reverend George McDaniel?

17   A    Yes, I do.

18   Q    How do you know him?

19   A    He was the reverend of my church.

20   Q    Okay.   And do you know Jenny Mack?

21   A    Yes, I do.

22   Q    How do you know her?

23   A    She was my girl friend's mother.

24   Q    When did you leave Poplar Bluff?

25   A    Earlier in -- earlier this year around January or February

725

1    of this year.

2    Q    Did you go back to Forrest City?

3    A    Yes, I did.

4    Q    Were you in school when you were in Poplar Bluff?

5    A    Yes.  I attended school.

6    Q    How about when you went to Forrest City?

7    A    For -- I attended -- when I went to Forrest City, I

8    attended school for a little -- yes, I attended for a little

9    while.

10   Q    What's the last grade that you completed?

11   A    The 10th grade.

12   Q    You got in some trouble also while you were up in Missouri,

13   did you not, got placed on probation?

14   A    Yes, I did.

15   Q    What was that for?

16   A    For burglary.  I was -- I had burglarized some places in

17   Missouri and the Court put me on probation.

18   Q    Okay.  When you left Missouri and you went to Forrest City,

19   you only stayed there for a few months.  Is that right?

20   A    Yes.

21   Q    Ultimately, did you find your way to Pine Bluff?

22   A    Yes, I -- I left Forrest City and I went to Pine Bluff.

23   Q    And who did you come over here to stay with?

24   A    My auntie by the name of Jo Ann Reams.

25   Q    And she is related to you in what way?  She is whose

5301  Respondent's Exhibit E

1    sister?

2    A    My mother's sister.

3    Q    Her baby sister?

4    A    Yes.

5    Q    Where did Ms. Jo Ann Reams, where did she live here in

6    town?

7    A    On 1003 West Third.

8    Q    The other young man who was charged with the crime, Alford

9    Goodwin, how did you know him?

10   A    We grew up together here in Pine Bluff.  Basically, I knew

11   him from grade school all the way on up to --

12   Q    Did you maintain your relationship with him whenever you

13   moved away and went to Forrest City and then to Poplar Bluff?

14   A    At times when my family came to Pine Bluff, I would, you

15   know, see him, you know.  When my family come to Pine Bluff, I

16   would come to visit also.  And I would come by and I would go

17   and see him, you know, or I would run into him.

18   Q    How about whenever you came to Pine Bluff this last time to

19   live with Ms. Reams--Jo Ann Reams?  Did you know that Alford was

20   around and were you coming to see him specifically?

21   A    When I first came here to Pine Bluff, I had had in mind,

22   you know, when I came here I was going to try to change my life

23   around again, you know, get me a job and everything and try to

24   get my GED.

25        When I first got here, at -- you know, I didn't want to run

727

5302 Respondent's Exhibit E

```
1    into none of my old friends that I had been acquainted with
2    while I was here in Pine Bluff before I had left. So, you know,
3    I tried to avoid them. I got me a job. I was working for Ace
4    Construction Company. I got a job with them and I was going go
5    GE class -- GED class for a minute. And then about two or three
6    weeks after I was here, I ran into Alford and some of my other
7    friends that I had met, and I started, you know, kicking it with
8    them, you know, doing things with them, and I quit my job.
9    Q    Let me ask you a question. Alford didn't live very far
10   from your aunt, did he?
11   A    Around about two blocks away.
12   Q    Was Alford going to school?
13   A    Yes, he was.
14   Q    Pine Bluff High School?
15   A    Yes.
16   Q    Was Alford working?
17   A    Yes.
18   Q    Where at?
19   A    He had a part-time job working for United Postal Service.
20   Q    Okay. When you -- when you say you started hanging out
21   with Alford, what do you mean by that?
22   A    We started -- I started spending the night over at his --
23   I spent the night over his house a couple of times. We started
24   -- I started drinking again, you know, smoking marijuana and
25   partying and stuff, doing things like that.
```

728

5303  Respondent's Exhibit E

1   Q   You are currently living in the Arkansas Department of
2   Correction.  Is that correct?
3   A   Yes, sir.
4   Q   Which unit?
5   A   Varner Unit.
6   Q   How long a period of time are you serving?
7   A   A 40-year sentence.
8   Q   And that -- you plead guilty to what crimes to get sen-
9   tenced to 40 years?
10  A   Two counts of aggravated robbery, a count of burglary and
11  theft of property.
12  Q   The burglary and theft of property occurred at the cleaners
13  that has been discussed here.  Is that right?
14  A   Yes, sir.
15  Q   The aggravated robberies took place where?
16  A   One happened at the bus station here in Pine Bluff and
17  another one happened at the teller machine here in Pine Bluff.
18  Q   The ATM machine
19  A   The ATM machine located on Fifth and Chestnut.
20  Q   And that was just a matter of a little bit less than a week
21  before the matter that we are here for today occurred.  Is that
22  right?
23  A   Yes, sir.
24  Q   Alford Goodwin also plead guilty to that aggravated robbery
25  that occurred the week before, did he not?

729

5304  Respondent's Exhibit E

1    A    Yes, sir.

2    Q    And he plead guilty to this charge today.  Is that correct?

3    A    Yes.

4    Q    Would you tell us what happened involving Mr. Turner at the

5    ATM machine?

6    A    On May 5th, it was around -- it was around, I'd say, 7 --

7    7 something, I don't know the exact time, I was over at Alford's

8    house.   Me and Alford had been watching a moving, Leathal

9    Injection -- I mean, Leathal Weapon.  And we had been talking.

10   And he had told me, he said -- he told me that we needed -- he

11   needed some money at this time.  And I asked him -- I had some

12   money at the time, but I didn't have enough -- the amount of

13   money he needed.  So he --

14   Q    Let me ask you something.  Had you been drinking on that

15   day?

16   A    Yes, earlier about -- he came over to my house about 4

17   o'clock, and we was -- we had went over to his sister's house

18   and they had some beer and stuff over there and we drank a

19   little beer with his sister.  I don't know if it was wife, boy

20   friend or whatever.

21   Q    Okay.  How about -- you had mentioned that you had used

22   marijuana in the past.  Did you use any on this day?

23   A    We smoked some marijuana with him also.

24   Q    Okay.  Did -- continue on, please.  What did y'all decide

25   to do?

730

1    A    Me and Alford, he had told me that he needed some money and

2    everything, right.  So, we had already attempted to rob someone

3    at this teller before.  So he said that he wanted to try it

4    again.  So I told him -- you know, at first I had a doubt about

5    it, see what I'm saying.  But then he told me he needed the

6    money for his graduation.  He had job and everything, but he

7    needed to pay his graduation thing off before 12, but he didn't

8    get paid until after 12 and it would be too late.  So I said,

9    "Okay."

10   Q    Let me stop you again.  Where were you staying in relation

11   to the ATM machine?  The house that you were staying in where Jo

12   Ann Reams lived.  Was it very far from the ATM machine?

13   A    No, sir.

14   Q    And the house where Alford was staying, was it very far

15   from the ATM machine?

16   A    No, sir.

17   Q    Do you know where Smart Chevrolet is?

18   A    Yes, sir.

19   Q    On Fifth Street.  Was the house that you were staying in

20   very far from there?

21   A    No, sir.

22   Q    Okay.  Continue on, please.

23   A    So I told him that I would go with him and everything.  So

24   he said that we was going to leave around -- when it get dark.

25   So it had started getting dark about 8 o'clock then.  At that

731

1   time, the movie had went off and a game had -- a basketball was

2   coming on.   And I told him, I said, "Let's wait a minute and

3   watch a little bit of the game."  He said, "No, let's go now."

4   So I said, "Okay."  He wentin his room and changed clothes and

5   put on his clothes and everything and got a pistol that belongs

6   to me.

7   Q   Where did you get the pistol?

8   A   Sir?

9   Q   Where did you get the pistol?

10   A   Out of a burglary.

11   Q   Which one?

12   A   At Pine Bluff Dry Cleaners.

13   Q   A pistol has been introduced into evidence today.  You've

14   seen that pistol, have you not?

15   A   Yes, sir.

16   Q   Does that appear to be the same pistol that you were

17   talking about?

18   A   Yes, sir.

19   Q   What type pistol is it?

20   A   A .32 revolver.

21   Q   Do you know very much about pistols?

22   A   No, sir.

23   Q   The pistol that we're -- that is in question, how long had

24   you had that pistol in your possession?

25   A   When I first got it from the burglary, I had it for about -

5307   Respondent's Exhibit E

1    - about a week, and one night we was, me and Alford, had been up

2    to a store and this -- this one dude, I don't even know him, he

3    started talking crazy to, and I had the pistol. And I was high

4    and stuff, and I told dude he -- you know, I don't even know

5    him. I don't know why he is talking, you know, talking crazy to

6    me. And Alford told me to give him the pistol. So I gave

7    Alford the pistol at that point and Alford kept the pistol. And

8    he got the pistol from me and he kept the pistol until -- I

9    didn't see it no more until the night that this robbery hap-

10   pened.

11   Q    Okay. When Alford came out after changing clothes, what

12   did y'all do next?

13   A    We left Alford's house. We started walking towards the

14   teller machine. We started walking. We was walking along side

15   the railroad tracks on Fourth Street and Alford had the pistol

16   in his -- a hooded sweater he had on. He had it in the jacket

17   part of the hooded -- the coat part of the hooded sweater he had

18   on. He gave me the pistol and told me to hold the pistol so he

19   could turn his hooded sweater inside-out. At that point, I got

20   the pistol, put it down my pants, unzipped my jacket, put it

21   down my pants and zipped my jacket back up and we kept on

22   walking.

23   Q    How were you dressed?

24   A    I had on a black Nike suit.

25   Q    What do you mean a "Nike suit"? Is that a warm-up suit

733

1    type thing?

2    A    Yes, sir.  Yes, sir.

3    Q    Okay.  What was Alford wearing besides a sweatshirt?

4    A    He was wearing a gray-colored sweatshirt, some gray K-Swiss

5    and a pair of green pants--blue-jean green pants.

6    Q    What happened next?

7    A    We -- so we kept on walking.  We made it up towards the

8    teller machine.  We got up there.  We was walking down Chestnut

9    Street coming up towards Fifth.  And we cut between this alley

10   and came up between this -- by this vacant building--this vacant

11   building.  And we got up to the building, as soon as we got

12   there, it was a mini-van there.  I told Alford, I say, "Come on.

13   Let's go on and rob this person right here now."  I had -- at

14   that point, I had the pistol and everything.  I said, "Let's go

15   on and rob this person here now."  He said, "No, let's wait."

16   So the person that was there at the machine at the time drove

17   off and everything.  So we sat down on the curb.  It was along

18   side the building.  We sat down on the curb.  As we sat down, we

19   was waiting for somebody else to come.  We waited for about 10

20   to 15 minutes.  I had the pistol.  At that point, I got the

21   pistol.  I pulled it up out of my pants and got the pistol and

22   started rubbing the pistol--the bottom of the pistol on the

23   concrete scratching the serial number off.

24   Q    Why did you do that?

25   A    I scratched the serial number off in case if I ever got --

734

1    me or anybody got caught with the pistol, they couldn't trace it

2    back to the owner, whoever pistol it was.

3    Q    Was the pistol loaded?

4    A    Yes, it was.

5    Q    How many bullets did it have in it?

6    A    Three.

7    Q    How do you know that?

8    A    'Cause after I had got through rubbing the pistol on the

9    concrete, I opened the pistol and it had three bullets in it.

10   At that point, I sat the -- I was playing with the pistol and I

11   sat the pistol so when you pull the thing back on it that if you

12   pulled the trigger, it would hit an empty -- where it wasn't no

13   bullet in there.   It would hit an empty shell.

14   Q    You mean when you pull the hammer back?

15   A    Yes.

16   Q    Did you actually try that?

17   A    Yes.

18   Q    Did it work?

19   A    Yes.   So, at that point, we was sitting down.   I still had

20   the pistol in my hand and everything.   And I -- we was high and

21   stuff.   I told Alford, I said, "I don't think I'll be able to

22   pull the pistol this round, man."   He said to me, he said,

23   "Ain't no problem.   Give it to me."   So I gave him the pistol.

24   He put it -- he raised his hooded shirt up and put it in his

25   inside pocket on his hooded sweater.   And about three or four

735

1    minutes later --

2    Q    Let me stop you once again.   Did Alford see you do these

3    things with the pistol?

4    A    Yes.

5    Q    Did he see you try the pistol and hear the hammer fall on

6    the empty cylinder?

7    A    Yes.

8    Q    Okay.

9    A    And about three or four minutes later, someone was pulling

10   up to the teller machine.  We looked up.  And Alford said, "This

11   is a lick right there.  Let's do this person.  Let's rob this

12   person."  So we got up.  We walked across the street.  Alford

13   was in front.  We walked across the street towards the man in

14   the truck.

15   Q    What kind of truck was it?

16   A    Uh --

17   Q    Do you know?

18   A    It was a -- I just know it was blue.

19   Q    Okay.

20   A    So we had walked across the street to the truck and Alford

21   went on the driver's side of the truck.  I went around to the

22   teller part -- went around the teller part of the truck.  As I

23   was going around --

24   Q    Stop just a second.  Let's make sure that we understand

25   what you are talking about.  Can you show us -- this being the

736

1    ATM machine (INDICATING), can you show us what you mean by you
2    went around?
3    A    Can I stand up?
4    Q    Yes.
5    A    Me and Alford --
6    Q    Stand back a little bit further so everybody can see.
7    A    Me and Alford Goodwin, we was waiting along right up in
8    here (INDICATING) beside this vacant building.  And when the
9    truck arrived, the truck came from this way (INDICATING) to the
10   teller machine.  We seen the truck coming and everything.  So,
11   at that point, we got up and started walking across the street.
12   And Alford was in front and the truck had came up -- I don't
13   know if it had made it to this part (INDICATING) or that part
14   (INDICATING) of the machine yet.  Alford went this way (INDICAT-
15   ING) to the truck and I went around this way (INDICATING) 'cause
16   there wasn't enough room for both of us to come this way right
17   here to the truck.  So I went around this way (INDICATING) to
18   the teller machine and when I was -- I came around the teller
19   machine, I could hear Alford and the man talking, but I really
20   couldn't make out what they were saying.  So, at this point, I
21   had came all the way around to the teller machine.  I jumped
22   through the window.  I reached my arm through the window --
23   leaned through the window and I turned off -- at this point, I
24   turned off the -- where the key was at inside the truck, and the
25   man -- when I -- as I was turning it off, the man touched my

5312  Respondent's Exhibit E

1    hand like that (INDICATING).  You know, he touched my hand.  And

2    --

3    Q    Why don't you have a seat so your voice can carry.  Why

4    were you reaching in to turn off the key?

5    A    Because me -- while me and Alford was over there sitting

6    down, we had talked and I told him since I wasn't going to pull

7    the pistol that I was going to reach in and turn off the switch

8    because the last person we tried to rob at the machine drove

9    off.  I was going to turn off the switch so that this person

10   couldn't drive off.

11        So at --

12   Q    Now, when you reached into the side of the car to turn off

13   the ignition, where was Alford?

14   A    He was at the -- at like the back part of the -- right

15   there where the truck was at, but he was -- like at the edge of

16   the window part towards the tail of the truck.  He was at the

17   edge of the window.  He had the pistol on the man.

18   Q    And how close was he to you?

19   A    We was -- when I came -- when I came from around the teller

20   machine to go through and turn off the switch, I -- we was right

21   there (INDICATING).  Right -- you know, right there together.

22   Q    Did you hear any more conversation between Mr. Turner and

23   Alford?

24   A    No, I didn't -- I didn't -- at this time, I didn't hear

25   them say nothing.  I had -- when I went in there and turned off

738

5313 Respondent's Exhibit E

1   the switch, the man touched me on my hand.  And at that time,
2   you know, I heard a sound like a firecracker.  I -- at that
3   time, I didn't know what happened, see what I'm saying.  I seen
4   his -- some stuff that he had in the seat of the truck and
5   stuff.  I come up out of the truck.  As I raised up out of the
6   truck, the man's head hit my shoulder.  I come up out of the
7   truck, and when I came up out of the truck, I said, "Come on.
8   Let's do this."  I looked.  And Alford -- I don't even see
9   Alford.  He ain't nowhere around, see what I'm saying.  Alford,
10  he's gone.  So I see this man.  His head had hit the steering
11  wheel of the truck and I -- I -- the man, he was -- I had
12  touched the window of the truck -- by me -- and the man was
13  saying -- he was making sounds like "Uh, uh."  So I had got
14  paranoid and stuff.  I had started sweating and stuff.  At that
15  time, I had started thinking that I was going to run over to
16  Econo Lodge and call the police.  But then traffic and stuff
17  started coming, and I got scared.  I just took off running.
18  Q    Did you see Alford when you took off running?
19  A    No.  When I first took off running, I didn't see him.  I
20  ran between the building and stuff and I cut across the street,
21  ran across Econo Lodge parking lot, the back part of the Econo
22  Lodge parking lot, and I came right there on -- Barraque -- I
23  mean, Walnut Street.  I came right there on Walnut Street.  And
24  I'm right there at the tracks, and I could see -- at this point
25  now I can see Alford running down the tracks.  I ran and I

5314  Respondent's Exhibit E

1    caught up with Alford behind Smart Chevrolet.   And I asked
2    Alford, I said, "What happened, man?" He said, "Man, I shot the
3    dude."   I said, "What's -- why did you shoot the dude?"   He
4    said, "I shot the dude because he told me, he said, 'what the
5    fuck do you want, Nigger, like that." So at that point, we kept
6    on running.   We ran to Alford's house.   We went in.   We went
7    straight to his bedroom.   He pulled the pistol out of his pants
8    -- out of his pants and he put the pistol up under his bed tick.
9    I had told him that I was going into the bathroom and wash my
10   face and stuff because I had been sweating and stuff.

11        So I go in the bathroom and I wash my face and everything.
12   By the time I come out of the bathroom, Alford, he done changed
13   clothes and everything.   He told me, he said, "Come on."   So
14   then we leave from his house and go around to my house.   And I
15   go in my house, and I take off all the clothes I got on and put
16   them in a sack, and I took the clothes that I had on around to
17   Alford's sister's house and gave them to his nephew and told him
18   to give this clothes to Vincent.   And we went over to Alford's
19   brother's girl friend's house that lived across the street on
20   Elm and we stayed over there all night.   We had told -- we had
21   talked and said, "If the police ask us anything about this" --
22   what had happened or anything and pick us up on it, we was going
23   to say we was over there all night.   And we stayed over there
24   until about 12 or 1 o'clock.

25   Q    When you and Alford were going over to this ATM machine,

1    did y'all ever discuss killing anybody?

2    A    No.

3    Q    Why did you fix the gun the way that you did?

4    A    In case -- when I -- I had the pistol.  And at this point,

5    I was, you know, I had filed the serial number off of the pistol

6    and everything.  I thought that, you know, I was -- at this

7    time, I had the pistol.  So I thought I was going to pull the

8    pistol.  So I had set the pistol in case, you know, when I go up

9    to the man at the machine and tell him that this is a robbery,

10   if he thought, you know, he thought we was going to rob and

11   everything, I was going to pull the thing back on the pistol and

12   everything.  So I did like, you know, if it was one of them old

13   lemon-squeeze pistol, you barely touch the trigger on it.  That

14   if it go off that it would hit one of them empty things and a

15   bullet wouldn't come out.  That's why I set it like that.  But

16   I wasn't the one to -- at that -- you know, when -- that's why

17   I sat the pistol like that.

18   Q    Was it your intention that anybody die?

19   A    No, sir.

20   Q    There were several days went by before you were arrested.

21   Is that right?

22   A    Yes, sir.

23   Q    How come you didn't leave town and take off running?

24   A    Because, you know, when everything had happened and

25   everything, you know, at this time, I didn't know, see what I'm

5316   Respondent's Exhibit E

1    saying, about this accomplice and all of this.  I didn't -- I
2    was looking at it like this, see what I'm saying.  If the police
3    pick me up, I'm not worried about nothing because I ain't killed
4    nobody.   See what I'm saying.   I don't think the police are
5    going to charge me with no murder charge 'cause I wasn't the
6    person that pulled the trigger.  But I didn't know that, you
7    know, accomplice and all this other stuff that both of y'all --
8    get a murder charge.  That's why I didn't leave town.  See what
9    I'm saying.
10   Q    Did you see Alford any more in the days after this incident
11   took place?
12   A    Yes.
13   Q    Do you know what happened to the pistol?
14   A    The next day that everything -- everything had happened
15   about -- Alford got off work at 3 something and come over to my
16   house.  It was about 4 or 4:30.  And I came outside and every-
17   thing.  He told me that the man had died.  And I shook my head.
18   I said, "Dang, man," like that.  I said, "What did you do with
19   the pistol?"  He told me -- at that point, he said, "Don't worry
20   about it.  I got it all tooken care of."  That's what he told
21   me.
22   Q    Did you know where the pistol got taken?
23   A    No, sir.
24   Q    You and Alford were arrested walking down the street
25   together.  Is that correct?

5317  Respondent's Exhibit E

1    A    Yes.

2    Q    And subsequently there were some statements that the Pine

3    Bluff Police detectives who have testified in this matter

4    testified that you gave to this police officers.  Is that right?

5    A    Yes.

6    Q    I think you were arrested on May the 10th.  Does that sound

7    right to you?

8    A    (Defendant nodding head.)

9    Q    Where were you taken after you were arrested?

10   A    The police, they had picked us up and they took us to the

11   Pine Bluff -- the old Pine Bluff Police Department.

12   Q    And while you were there, did you give a statement to any

13   of the officers who were there?

14   A    No, sir.

15   Q    Subsequently, the testimony has been that you were taken to

16   the Stuttgart jail because there wasn't any room at the Pine

17   Bluff jail.  Is that what happened?

18   A    Yes.

19   Q    Do you remember talking with the officers at that location?

20   A    Yes.

21   Q    The -- Officer Phillips testified that you gave him a

22   statement that was tape recorded and in that statement you told

23   a little bit different version of what happened than what you

24   have told today.  Is that right?

25   A    Uh, no.  What happened is that the police had me down at

5318 Respondent's Exhibit E

1    the Pine Bluff Police -- you know, at the station or whatever,
2    and they was questioning me and stuff.  So, you know, I wasn't
3    answering no question, and I told them that I was over at
4    Alford's brother girl friend's house on that day and everything.
5    And I told them that I didn't know nothing, you know, about what
6    had happened that night.

7        And they kept on questioning me and kept on telling me your
8    friend done already told us this and already told us that, and
9    I told -- I kept telling the police that, "I don't know what
10   they are talking about."  So it -- you know, they had kept
11   questioning me and stuff.  And the police, they told -- it was
12   about 11 o'clock at night they told me.  They said, "Okay.  We
13   are going to do it like this."  They said, "You can take -- you
14   take a lie detector test and the lie detector test we are going
15   to ask you did you kill this man or did you know that this man
16   was going to get killed or anything and it come back that you
17   pass the lie detector test, we'll let you go."

18   Q    Well, let me ask you this, Kenneth.  I'm wanting to talk
19   about the statements that took place over in Stuttgart.  Do you
20   remember giving a statement to one of the police officers who
21   came over there?  There were two detectives who have come in
22   here and testified the last day or say, Ivan Phillips and Terry
23   Addison.  Do you remember talking to them in Stuttgart?
24   A    Yes.
25   Q    The testimony from one of the officers is and the tran-

744

5319  Respondent's Exhibit E

1    scription of a tape that they have provided me indicates that

2    you told them another version that have some differences in it

3    of what happened compared to what you have testified today.  Do

4    you remember telling them a story about that?

5    A     About when we walked across the parking lot?

6    Q     You indicated that you were going to get a bag of weed from

7    a dope house.

8    A     See, that didn't -- it didn't -- that didn't happen.  I

9    didn't tell them that at Pine Bluff -- at the Stuttgart County

10   Jail.  I didn't tell them that at the Stuttgart County Jail.

11   Q     Okay.

12   A     I didn't make that statement there.  I made that at the lie

13   detector office.

14   Q     What  about  another  subsequent  conversation  where  the

15   officer indicated you called him collect and ask him to come get

16   you that you wanted to talk to him?  Is that what happened?

17   A     Yes.

18   Q     And did you tell the officer what happened when he came to

19   get you this time?

20   A     Yes.  At that point, you know, the officer had gave me a

21   card and he told me -- the night they took me there, he told me

22   that when was driving now, he asked me about the burglaries and

23   stuff that happened and the robberies and stuff that happened.

24   I told him, "I don't know what he talking about."  And then, you

25   know, he gave me a card and everything and told me if I wanted

745

1  to talk to him and let him know what happened and everything, to
2  call him and let him know.  So the next day, the -- when I was
3  at the Stuttgart County Jail, I asked the police if I could call
4  the Pine Bluff detective, you know, that gave me the card.  And
5  they wouldn't let me call him.  They wouldn't let me out of my
6  cell or nothing to call him.  So about 9 o'clock that night, the
7  detective came to the Stuttgart County Jail and asked me --
8  started asking me some questions about the statement that I had
9  made.  When they came in, you know, they started asking me --
10 they started -- they pulled out a tape recorder machine and a
11 little mic and stuff and he said that -- "Now, you know the
12 statement that you gave ain't nobody in the world going to
13 believe that.  So you might as well go on and tell us the truth.
14 Your friend done already told us the truth."  I said -- I told
15 them at that point, I said, "I'm telling you the truth now."  So
16 then he said, "Okay."  So then he go on started talking to me
17 about some burglaries -- the burglary that had happened and the
18 robbery at the ATM machine.  Then, you know, I -- you know, I
19 had started crying and stuff.  And, you know, and I told -- I
20 said, "All right.  You know, I'm going to go on and tell you the
21 truth," you know.  Then I said -- I told them, I said, "I ain't
22 killed that man."  So then he said, "Hold up."  He flipped the
23 tape over.  He told me to tell them what happened.  And that's
24 when I started telling them about the -- me and Alford had went
25 up there to pull off a robbery and stuff and during the course

746

1    of this robbery that this man had got shot.

2    Q    In that interview, you indicated that something had gone

3    wrong.  What did you mean by that?

4    A    When I told the police that, you know, I told them that

5    when we had went up there to pull this robbery and stuff, you

6    know, it went wrong.  You konw, the dude -- a man got killed.

7    See what I'm saying.  And I didn't know he was going to get

8    killed or nothing, you know.  I didn't know this was going to

9    happen.  I'm sorry that it happened and everything.  And -- and

10   --

11   Q    Is that what you meant when you said it went wrong?

12   A    Yes.

13   Q    Have you told us the truth about what happened?

14   A    Yes.

15   Q    In your testimony today?

16   A    Yes, sir.

17        MR. KIZER:  Pass the witness, your Honor.

18        THE COURT:  Ms. Billings.

19                    CROSS EXAMINATION

20   BY MS. BILLINGS:

21   Q    Kenneth, this sounds like version number three.

22        MR. KIZER:  Your Honor, I object.  That's not a

23   question.  That's argumentative.

24        THE COURT:  Don't argue with your witness.

25   MS. BILLINGS CONTINUING:

5322  Respondent's Exhibit E

1   Q    Your statement is that this time that you stole the pistol.

2   That's right, right?

3   A    Yes, ma'am.

4   Q    Okay.  And then you gave it to Alford?

5   A    Yes, ma'am.

6   Q    When was that?

7   A    The night that we was at Super Stop.

8   Q    Which -- you stole this pistol on the night of the 27th or

9   the early morning of the 28th, isn't that right?

10  A    Yes, ma'am.

11  Q    Okay.  And so when would you have given it to Alford?

12  A    It was a few days -- I had -- when I had stole the pistol,

13  I had it for a few days and then this incident happened at the

14  store.  That's when Alford got the pistol from me.  He had the

15  pistol.

16  Q    Okay.  So you had it that night of the 28th whenever y'all

17  went to the ATM the first time to rob it, right?

18  A    No, no.  At -- Alford had the pistol at his house at that

19  time.

20  Q    I thought you just stated you gave it to him a couple of

21  days later?

22  A    I did.  I gave it -- the pistol to Alford when the incident

23  at the store happened and Alford kept the pistol.  And then the

24  night of the robbery, that we was going to do the robbery, he

25  got -- he went and got the pistol wherever he had it at -- at

748

5323  Respondent's Exhibit E

1    his house.

2    Q    Which robbery?

3    A    At the ATM machine.

4    Q    The murder robbery or the other robbery?

5    A    The murder robbery.

6    Q    Okay.  But the day that the pistol was stolen was on the

7    28th?

8    A    Yes, ma'am.

9    Q    The day of the first robbery at the ATM was the 28th.  So

10   when did you give Alford the pistol?

11   A    It would be the -- we -- we did not -- the first robbery

12   didn't happen on the 28th.  It happened like about two or three

13   days after I had -- it happened, like, about two or three days

14   after I had stole the pistol.  I had the pistol from that point.

15   Q    So the police department is incorrect whenever they took a

16   statement from the victim in that case where he said it happened

17   on the 28th?

18   A    He --

19             MR. KIZER:  I object.  She's asking the witness to

20        speculate.  He wasn't there when that statement was given,

21        your Honor.

22             MS. BILLINGS:  Your Honor, I just wanted to know if

23        they were incorrect.  That's all I'm asking him.

24             THE COURT:  If he knows, he can answer; if he doesn't,

25        he doesn't.

5324 Respondent's Exhibit E