VOLUME 20

**PROPERTY OF ARKANSAS SUPREME COURT/COURT OF APPEALS**

# SUPREME COURT CR-17-654

KENNETH REAMS                                                  **APPELLANT(S)**

V. JEFFERSON COUNTY CIRCUIT COURT

   JOHN W COLE

   35CR-1993-301

STATE OF ARKANSAS                                             **APPELLEE(S)**

--

26 __ VOLUME RECORD LODGED

*__COUNSEL__*

ATTORNEY GENERAL  APPELLEE COUNSEL

323 CENTER STREET, SUITE 200

LITTLE ROCK AR 72201


CORINNE IRISH  APPELLANT COUNSEL

30 ROCKEFELLER PLAZA

NEW YORK NY 10112


DAVID ROBERT RAUPP  APPELLEE COUNSEL

323 CENTER STREET, SUITE 200

LITTLE ROCK AR 72201


GEORGE KENDALL  APPELLANT COUNSEL

30 ROCKEFELLER PLAZA

NEW YORK NY 10112


JIN HEE LEE  APPELLANT COUNSEL

40 RECTOR STREET, 5TH FLOOR

NEW YORK NY 10006


JOHN WINFRED WALKER  APPELLANT COUNSEL

1723 BROADWAY

LITTLE ROCK AR 72206

RECORD FILED AUGUST 4, 2017

**STACEY PECTOL, CLERK**

BY RENEE R. HERNDON, DEPUTY CLERK

VOLUME 20

Respondent's Exhibit E

Volume 20

PROPERTY OF ARKANSAS SUPREME COURT/COURT OF APPEALS

# CR 94 00558

KENNETH REAMS

v. Jefferson Circuit
  HON. FRED D. DAVIS JUDGE
  CR-93-301-3

STATE OF ARKANSAS

004 Volume(s)

Appellant(s)

**ORIGINAL**

Appellee(s)



EXHIBIT
1 D
Respondent's

Transcript Filed
26th day of May, 1994
Leslie W. Steen, Clerk
By Denise Parks

Volume 4

Respondent's Exhibit E

VOLUME IV

Respondent's Exhibit E

1    A    The -- it did not -- after I had stole the pistol from the

2    place, we didn't do the robbery the same -- the same -- you

3    know, the next following day.  It was like about two or three

4    days after.

5    Q    Did the days all run together?

6    A    I don't understand what you are saying.

7    Q    Did the days that you did these different things all run

8    together?

9    A    I still don't understand what you are saying.

10    Q    Okay.  You stole the pistol on the 28th.

11    A    Yes, ma'am.

12    Q    When did you try the robbery -- the first robbery that

13    didn't work?

14    A    About two days after I had stole the pistol.

15    Q    And you had the pistol for that one, right?

16    A    Yes, ma'am.

17    Q    You pulled the pistol at that one, right?

18    A    No, I did not.  I did not pull the pistol.  Alford had the

19    pistol.

20    Q    Well, what about in your statement where you told the

21    police officer that you had the pistol?

22    A    I told -- the reason why I told the police officers and

23    everything that I had pulled the pistol and stuff because I

24    didn't want to say Alford, you know, out there saying that he

25    did all this stuff because Alford had told me that night that

5327    Respondent's Exhibit E

```
 1   the murder had happened and everything that if I tell the police
 2   anything that he would shoot me, too.  That's why I didn't want
 3   to, you know, say Alford had did these things.
 4   Q    Were you trying to save Alford's neck?  Is that what you
 5   are saying?
 6   A    Yes, ma'am.
 7   Q    Okay.  Trying to save Alford's neck on one that -- where no
 8   one got hurt.
 9   A    Yes, ma'am.
10   Q    So you said that you had the pistol at the first one, but
11   you didn't really have it?
12   A    I didn't have it.  Alford had the pistol.
13   Q    But you told the police that you had it?
14   A    Yes, ma'am.
15   Q    Okay.  So then on the 29th, that was when the Greyhound Bus
16   Station was robbed.
17   A    Yes, ma'am.
18   Q    You didn't have the pistol then either, right?
19   A    Yes, I did.
20   Q    I thought you gave it to Alford?
21   A    No, I didn't -- I didn't give the pistol to Alford until --
22   it was like about -- I believe it was the same day that I had
23   pulled the robbery at the bus station.  That same night I had
24   pulled the robbery, I had the pistol and that's when I gave the
25   pistol to Alford -- Alford had got the pistol from me when we
```

5328   Respondent's Exhibit E

1    was walking from the store.

2    Q    So you're saying you pulled the bus station robbery at

3    night?

4    A    No, I pulled it in the morning.

5    Q    In the morning.

6    A    And that night that's when Alford got the pistol.

7    Q    The night of the bus station robbery --

8    A    Yes, ma'am.

9    Q    Is when Alford got the pistol?

10    A    Yes, ma'am.

11    Q    So you had possession of the pistol during the first ATM

12    robbery?

13    A    No, I -- yes, I had the pistol.  I had possession of it,

14    but I didn't pull the pistol.  It was -- I had --

15    Q    When did you give it to Alford to pull then?

16    A    Ma'am?

17    Q    When did you give it to Alford to pull then?

18    A    We walked up there -- me, Alford and Phillip walked up

19    there and Alford -- I gave the pistol -- I went in my auntie

20    room and got the pistol out of the drawer and gave the pistol to

21    Alford at my house.

22    Q    So you didn't really have the pistol at all?

23    A    No, ma'am.  It was -- it was at my house, though.

24    Q    And you gave it to Alford and he took it up to the first

25    ATM robbery?

                                   752


Respondent's Exhibit E

1    A    Yes, ma'am.

2    Q    But you just told the police that you had it just to cover

3    Alford?

4    A    Yes, ma'am.

5    Q    Whose idea was it to rob that first ATM?

6    A    Jermaine Brown.

7    Q    Jermaine Brown's idea?

8    A    Yes, ma'am.

9    Q    And did Jermaine go with you?

10   A    No, ma'am, he was supposed to go, but I don't -- he wasn't

11   around when we went up there.

12   Q    And then -- so you did the burglary on the 28th, the first

13   ATM robbery later that evening, the robbery the next morning at

14   the bus station.  Did anybody go with you there?

15   A    No, ma'am.

16   Q    You went there by yourself?

17   A    Yes, ma'am.

18   Q    What did you do?

19   A    When I walked up to the bus station and I went in through

20   the front door first, I was going to buy me a ticket to go to

21   Little Rock to a concert.  There wasn't nobody in there and

22   stuff.  I seen a lady counting money -- some money.  So, at that

23   point, I said I was going to rob her.  I left out of the bus

24   station, went through the back door, had the pistol at that

25   point.  I went through the back door, pulled the pistol out and

753

Respondent's Exhibit E

1    told her this was a robbery.  I told her to get on the floor and

2    asked her where the money.  She said the money was in the cash

3    register.  I got the money from out of the cash register and

4    took off running.  I ran home.

5    Q    What did you do then?

6    A    When I got home, I got the pistol and put it back in the

7    drawer in my auntie bedroom, and I pulled the money out of my

8    pocket and started counting the money.

9    Q    So, did you get your ticket?

10   A    No, ma'am.

11   Q    The next week then you went with Alford Goodwin at Alford's

12   idea to go rob the ATM again?

13   A    Yes, ma'am.

14   Q    And it was so that Alford could have money to graduate

15   with?

16   A    Yes, ma'am.

17   Q    You said something earlier, Mr. Reams, I'm curious about.

18   You said you worked for Ace Construction Company?

19   A    Yes, ma'am.

20   Q    What were your hours?

21   A    I worked -- I went to work every morning at about 8

22   o'clock, and I got off work about 4 o'clock.

23   Q    Every day?

24   A    Yes, ma'am.

25   Q    Then how did you have the time to go rob the Greyhound Bus

754

5331    Respondent's Exhibit E

1    Station?

2    A     I quit working.  I had quit working.

3    Q     Oh, you had quit work?

4    A     Yes, ma'am.

5    Q     When did you quit?

6    A     About a week -- about a half a week before I had did the

7    burglary.

8    Q     So you got here in February is that what you said?

9    A     Yes, it was -- yes, it was -- yeah, somewhere around

10   February.

11   Q     And when did you get this job?

12   A     Well, the first day I made it here in Pine Bluff.

13   Q     And you worked there from February until about three days

14   before you did the first robbery?

15   A     Yes, ma'am.

16   Q     So you went up there with him to rob this man at the ATM.

17   Is that right?

18   A     Yes, ma'am.

19   Q     And you carried the gun up there?

20   A     Alford carried it a few blocks.  It was right behind Smart

21   Chevrolet.  That's about three or four blocks.  And then he gave

22   the pistol to me 'cause he was fixing to switch his hood inside

23   out and he had the pistol inside his hood.

24   Q     Then why did you tell the detectives that you carried it

25   from home and you put it in your pants because your pants were

755

5332

Respondent's Exhibit E

1    better for carrying that kind of thing?

2    A    'Cause -- I told the police those things 'cause I didn't --

3    you know, at that time, I was, you know, scared and everything,

4    and I just wanted to tell the police these things so the police

5    will stop harassing me and hitting on me and things.

6    Q    Oh, you're saying they hit you?

7    A    Yes, ma'am.

8    Q    Where did they hit you?

9    A    All over.  One of them slapped me.  One of them grabbed me

10   by my neck.  One of them kicked me in the stomach with their

11   boots.  They did several things to me.

12   Q    So you made up things to tell them?

13   A    I was telling them things -- some of the things I was

14   telling them was true about what actually happened at the

15   robbery.  Some of the things wasn't.

16   Q    And this was during your tape-recorded statement?

17   A    Yes.  We had -- we went to Stuttgart.  That's when, you

18   know, the police had took the pistol out of his, you know,

19   holster and things.  And I thought, you know, the police was

20   fixing to start beating me up again.  So -- but I told the

21   police what really, really happened so they wouldn't start

22   beating me up again.

23   Q    So if we play the tape, we ought to hear you moaning and

24   screaming and carrying on in the middle of it because these

25   policemen are stomping on your stomach with their boots.  Is

756

5333

Respondent's Exhibit E

```
1    that right?

2    A    No, ma'am.

3    Q    No, ma'am.

4    A    No, ma'am.  The police, they didn't -- at the Stuttgart

5    County Jail, the police, they didn't -- they didn't beat me or

6    nothing like that.  They beat me at the Pine Bluff -- when I was

7    in Pine Bluff at the police department, the detectives.

8    Q    They didn't take your statement here.

9    A    I know.  They -- the reason why I made -- when the police

10   picked me up and they took me to Pine Bluff to the detective's

11   office, that's when they was beating me and stuff.  Then when

12   they came to the Stuttgart County Jail, you know, they had took

13   their guns out of, you know, things off and everything, and I --

14   that's what they had started doing when they started beating me

15   at Pine Bluff.  So I thought the police was going to start

16   beating me again.  That's when I started telling the truth.

17   Q    You called them, didn't you?

18   A    No, ma'am.

19   Q    You didn't call them?

20   A    No, ma'am.

21   Q    So if I get the jailer over here from Stuttgart to say you

22   did, is that -- or a message from you to call them?

23   A    Ma'am?  The -- I asked the jailer if I could call, but the

24   jailer wouldn't let me out.  The police -- I don't know if the

25   jailer called.  Somebody called.  I didn't call.  The jailer
```

757

5334

Respondent's Exhibit E

1    wouldn't even let me -- they wouldn't even let me out --

2    Q    They wouldn't let you out to use the phone, but they called

3    them, didn't they?

4    A    I don't know who called them.  But they came down there

5    about -- they wouldn't let me out and everything.  So I had got

6    mad at them 'cause I -- I wanted to talk to the police and

7    stuff.  So I had got mad at the jailer.  And I had went to sleep

8    about 9 or 10 o'clock that night, they woke me up and told me

9    the police said they wanted to talk to me.  I don't know if they

10   called or the police came on their own or what.

11   Q    Why were you mad at them?

12   A    'Cause I wanted to call the police.

13   Q    Okay.  Why did you want to talk to them?

14   A    The police told me that if I go ahead and make these

15   statements and everything, you know -- he didn't say nothing

16   about the murder.  He just basically talking about the robbery

17   that happened at the ATM machine, the robbery that happened at

18   the bus station and the burglary that he would try to help me

19   out if I, you know, go ahead and talk to them and tell them the

20   truth.  And he told me that tomorrow that they were going to

21   come down there and ship me back to Pine Bluff.  That's basical-

22   ly the reason why I wanted to call the police.

23   Q    Okay.  But you started telling them of your own -- after

24   you talked to them about that bus station and after you talked

25   to them about the burglary, you started telling them on your own

Respondent's Exhibit E

1   about the murder, didn't you?

2   A    They had asked me about it.  And at first, I wasn't -- you

3   know, making no -- I wouldn't talk to them about it.  Again,

4   that's when I started telling them what really happened.

5   Q    You told them what really happened.  So you told them you

6   were standing over on the other side of the parking lot whenever

7   you heard Alford shoot, right?

8   A    No, ma'am.  I did not make that statement.

9   Q    So the tape didn't just pick that up right.  Is that right?

10  A    I did not make that statement at Stuttgart County Jail.  I

11  made that statement at the state trooper's headquarter the night

12  they took me to -- to Stuttgart.  I made a -- the officer made

13  a written statement out and I signed my name to it after they

14  had came in there and told me that I flunked the lie detector

15  test, then he asked me -- he asked me did I want to go ahead,

16  you know, and make a statement and stuff.  That's when I made

17  the statement about I was across -- when I was walking, I heard

18  the gunshot.   And then that following night, they came to

19  Stuttgart and got the statements about the burglaries and stuff

20  like that.

21  Q    And at that time you told them again, "I was walking across

22  the other side of the parking lot.  I ain't had no idea nothing

23  like this was going to happen."

24  A    I did not tell the police that then.

25  Q    You didn't?

759

5336

Respondent's Exhibit E

1    A    No, ma'am.

2    Q    It's in your statement.

3    A    I made that -- I made a written statement -- the police

4    made a written statement.  He wrote the statement.  It was a

5    younger detective.  It wasn't nary (sic) one of these detectives

6    that came in here.  It was a younger detective.  Sat down at a

7    desk, wrote out the statement--wrote out the words that I was

8    saying and asked me to sign my name to it and sign my initials

9    to it, a two-page statement.

10   Q    This is the very same taped statement, Mr. Reams--taped

11   statement.  This is the very same statement your attorney, Mr.

12   Kizer, was asking the officers about yesterday where it says,

13   "Okay, Kenneth, is there anything else you want to say in your

14   statement?"

15   A    They --

16   Q    "No, I ain't killed a man."  Did you say that?

17   A    Yes, ma'am.

18   Q    You said that part, huh?

19   A    Yes, ma'am.

20   Q    "Which man?"  "That was at the teller.  I had no idea he

21   was going to get killed."  You said that, right?

22   A    Yes, ma'am.

23   Q    "Who killed him?"  "Alford."  Did you say that?

24   A    Yes, ma'am.

25   Q    "I ain't going to say Alford killed him, but the way it

760

1    went down Alford had to kill him because there wasn't nobody

2    else around."  Did you say that?

3    A    Yes, ma'am.

4    Q    "Which man are you talking about?"  "Uh, Mr. Turner."  "I

5    don't know.  I can't think of his first name right now."  "This

6    was at the teller machine there at Fifth and Chestnut."  You

7    said, "Yes."  "Who was there when this happened?"  "Nobody but

8    me and Alford.  I was walking across the other side of the

9    parking lot.  I ain't had no idea nothing like this was going to

10   happen."  Did they just throw that line?

11        MR. KIZER:  Your Honor, I object.  There is not a

12        question anywhere in what she just asked.  If she is going

13        to read the statement and testify, I'd like to be able to

14        cross examine her.  She's not asking any questions of him.

15        MS. BILLINGS:  I just asked my question, your Honor.

16        I ask him did they just throw that last line in there.

17   A    That's the statement I made at the --

18        MR. KIZER:  Just a minute.

19        THE COURT:  I think what she was doing was asking if

20        he, in fact, made those statements during the tape recorded

21        statement concerning the first ATM robbery.  I think the

22        question was, did he, in fact, make these statements at

23        that time.  That's the way I interpreted it.

24        MR. KIZER:  I didn't hear it that way.

25   MS. BILLINGS CONTINUING:

761

5338

Respondent's Exhibit E

1    Q    This wasn't about the first ATM robbery.   This was the
2    second one.   The one where the man was killed.
3    A    Yes, ma'am.
4            THE COURT:   It was a statement that was taken concern-
5         ing the first ATM robbery when the gratuitous statements,
6         as you are saying, were thrown in about the second one.
7            MS. BILLINGS:   Yes, sir.
8            THE COURT:   Isn't that right?
9            MS. BILLINGS:   Yes, sir.
10           THE COURT:   Thank you.
11   MS. BILLINGS CONTINUING:
12   Q    And you were talking to them about the second ATM robbery,
13   the one where the man was killed.   And you just said that all of
14   those things that were said leading up to that one line right
15   there where you said you were walking across the other side of
16   the parking lot, all of that is correct?
17   A    Yes, but I didn't make that statement at the Stuttgart
18   jail.   I made that statement at the headquarter's office.   When
19   they came to the Stuttgart jail, the only thing they asked me
20   about was -- they started asking me about the burglary.   After
21   they made statements on the burglary, the police said that --
22   "Now, you know" --
23   Q    Mr. Reams, let me stop you just a second.   Your problem is
24   just with where you made the statement?
25   A    Ma'am.


762


5339
Respondent's Exhibit E

1    Q    Your problem is just with where you made the statement?

2    A    I didn't understand what you are trying to say.

3    Q    That's what you are having a problem with, where you were

4    when you made the statement?

5    A    I know where I was at when I made these statements.

6    Q    Let's go on to something else.  You said that at the murder

7    you were going around the back of the ATM whenever you heard

8    Alford talking to this guy?

9    A    Yes, ma'am.

10   Q    And then you didn't hear what was said?

11   A    No, ma'am.  I heard them talking, but I really couldn't

12   make out what they was talking about.

13   Q    By the time that you got around the front of the ATM,

14   Alford was nowhere around?

15   A    No, ma'am, that is not what I said.

16   Q    What did you say then?

17   A    I said by the time I got around the teller -- the front

18   part of the teller -- where the truck was at, Alford was

19   standing there and that's when I went through the window.  And

20   then I -- you know, I turned off the switch and everything and

21   the man touched my hand and stuff, and when I was coming up out

22   of the truck, his head hit my shoulder and stuff and when I came

23   up out of the truck, I said, "Let's do this."  And then Alford

24   wasn't nowhere around.

25   Q    So you were there at the truck by yourself?

763

Respondent's Exhibit E

1    A    Yes, ma'am.

2    Q    And you stayed there for how long?

3    A    For about 30 seconds.

4    Q    And then you took off in a different direction?

5    A    I don't know which way Alford ran.  I know which way I ran.

6    Q    Okay.  How come when you come in here today, Mr. Reams, and

7    all of a sudden you are adding to every one of the statements

8    that you gave that instead of just saying the man said, "What

9    the fuck do you want," you've added, "What the fuck do you want,

10   Nigger"?

11   A    That's what I've been saying because that's what Alford

12   told me when we was running down along side the railroad tracks.

13   Q    Well, let me go back to your May 11th -- your May -- the

14   first statement that you gave on May the 11th.  The tape

15   recorded statement we just talked about, the one that was taken

16   over in Stuttgart.  It says in here -- or did you say this, "You

17   caught up with him" -- let's see.  Wait.  "I caught up with him

18   because there was a train on the track."

19   A    Yes, ma'am.  There was a train coming along side the tracks

20   when we was running.

21   Q    "That's the only reason I caught up with him."

22   A    No, ma'am, that -- I -- when I first -- the train was a

23   long ways down the track when I came across the track.  About

24   the time we got up to Pine Bluff Commercial, the train had met

25   us and going past us.

Respondent's Exhibit E

1    Q    And I said, "Man, why did you shoot that man?"

2    A    I said that way -- way before.  I said that as soon as we

3    came across -- as soon as I had came across Walnut Street, I had

4    made it to like about -- behind Smart Chevrolet.  That's when I

5    had caught up with Alford.

6    Q    And then you said, "You know, I was out of breath."  I

7    said, "Why did you shoot?"  And he said, "Because he told me,

8    what the fuck do you want."

9    A    "Nigger."

10   Q    Well, that's not on here.

11   A    That's what Alford told me.

12   Q    But everything else is correct?

13   A    Yes, ma'am.

14   Q    And then when you gave a statement later on that night, the

15   one where they flipped the tape over you told them, "Butterball

16   is running down the street telling me to come on."  Do you

17   recall saying that?

18   A    No, ma'am.

19   Q    Okay.  "And, you know, I got paranoid."  Did you say that?

20   A    I don't -- I told the police that I had got paranoid when

21   the man -- when the man was shot and everything and I came up

22   out of the truck.

23   Q    "I didn't know what to do; so, I took off behind him."  Is

24   that right?

25   A    No, ma'am.

765

Respondent's Exhibit E

1    Q    It's not.  "And I took off behind him and stuff and we were

2    running and stuff and I got up with him when we were running."

3    A    After the man had got shot and everything, I took off

4    running.   I caught up with him.   Yes, ma'am.   That's what

5    happened.

6    Q    And he was telling me, I said, "Man, why did you shoot the

7    man?"  Did you ask him that?

8    A    Yes, ma'am.

9    Q    And he said, "Because he asked me, what the fuck I wanted."

10   A    He said, "What the fuck do you want, Nigger?"

11   Q    Oh, that's left out of this one, too, then.

12   A    Yes, ma'am.

13   Q    And then the last one that you gave to Detective Addison

14   where you talked about your participation in the other robbery,

15   the first ATM robbery.

16   A    Yes, ma'am.

17   Q    The one that you had previously told you didn't take part

18   in.   Well, actually y'all didn't talk about it in that one.

19   From the two taped statements, everything is all right except

20   for what you said and that's been deleted -- I mean, from what

21   Alford said.   That's been deleted, right?

22   A    I don't understand what you are saying.

23   Q    The police department incorrectly transcribed your tape.

24   Is that right?

25   A    No.   Some of the things that they said on the tape is true

766

Respondent's Exhibit E

1    and some of the things they left out.

2    Q    So, if we played the tape, then they can hear it, right?

3    A    Yes, ma'am.

4    Q    They can hear exactly what you said?

5    A    Yes, ma'am.

6    Q    And that the words are in there just like you said?

7    A    Yes, ma'am.

8    Q    Okay.  You said you went home and you changed your clothes,

9    too?  Not only did Alford change his, but you changed yours,

10   too?

11   A    Yes, ma'am.

12   Q    Why did you do that?

13   A    Because the clothes that I had had on I took them off in

14   case -- you know, 'cause we was going to leave in case the

15   police started riding around looking for the person that -- that

16   they be looking for the person in these kind of clothes.  That's

17   why I took them off.

18   Q    Um-hum.  What -- you said something when Mr. Kizer was

19   asking you about -- about the way that you set the gun.  You

20   said something about a lemon-squeeze.

21   A    Yes, ma'am.

22   Q    What is that?

23   A    That's a term that some people use that I've heard.  When

24   you barely touch the thing that you -- the trigger thing that

25   you -- the pistol, if you've got it cocked back, the pistol will

767

1    shoot.

2    Q    Who have you heard talk about that?

3    A    Friends that I know from the streets.

4    Q    Have you ever seen one like that?

5    A    No, ma'am.

6    Q    You've never seen one like that?

7    A    I'm not too familiar with pistols.

8    Q    You're not?

9    A    No, ma'am.

10    Q    Where did you learn to set one over?

11    A    I didn't.  I learned -- when I was at the -- sitting down,
12    that's how I -- that's when I learned how to do it 'cause I was
13    doing it then.

14    Q    And you just came up with that on your own?

15    A    Yes, ma'am.

16    Q    Leave one hole --

17    A    It was -- it was a six-shot pistol, and it was three
18    bullets right there together, and there was three empty holes,
19    and I set the pistol to the middle and pulled it back and then
20    I pulled the trigger and it made a click sound.  So then I --
21    then if you pulled the trigger again, I had it so -- well, I
22    thought I had it so if you pull the trigger again and it hit one
23    of them empty -- when you pull the trigger, it hit one of them
24    empty shells.

25    Q    You just thought of that on your own.  Nobody has ever

Respondent's Exhibit E

1    shown you how to do that?

2    A    No, ma'am.

3    Q    But you were checking it to make sure that you have one

4    that you hit first that was a blank.

5    A    Yes, ma'am.

6    Q    And then the next one when you squeezed it --

7    A    It would be an empty one.

8    Q    It would be empty.  Why would you do that?

9    A    Because at this point, I thought I was going to be the one

10   to pull the pistol.  So if I was the one to pull the pistol, I

11   was going to pull it back and in case, like I said, if it was

12   one of them lemon-squeeze pistol, if it went off, it wouldn't

13   hit nary one of those one that had a bullet.  It would hit an

14   empty shell.  Nobody would get shot.

15   Q    Oh, so you thought about the possibility that somebody

16   would get shot?

17   A    No, ma'am -- yes, ma'am.

18            MS. BILLINGS:  Nothing further.

19            MR. KIZER:  No questions, your Honor.

20            THE COURT:  Thank you, Mr. Reams.  You may stand down.

21        Ladies and gentlemen, let's take about 10 minutes at this

22        point.  I'll ask you, certainly, not to discuss the case

23        among yourselves or with anybody else.  Let's be in recess

24        for about 10 minutes.

25   (A recess was taken at 10:34 a.m.)

Respondent's Exhibit E

1    (The following in-chambers record was made out of the presence
2    of the jury)
3         THE COURT:  I think I'm okay down to the 202, prior
4    inconsistent  statements  by  a  witness  other  than  the
5    accused.  I'm not sure if we had any, did we?  He was the
6    only one that gave inconsistent statements.  So, I don't
7    think that applies, does it?  And, of course, he testified
8    so we can take that -- 111 out.
9         Okay.   On  the  301  lesser  included,  now,  Maxie,
10   certainly we know that the lesser included first degree
11   manslaughter -- Maxie has offered a lesser included ag
12   robbery.  Have you seen -- have y'all seen these?
13        MS. BILLINGS:  I figured he might do that, your Honor.
14   The  case  law  basically  says  that  that  is  an  element  of
15   capital murder and that can't be a lesser included.
16        MR. KIZER:  It's the underlying event.
17        THE COURT:   Um-hum.   Okay.   Maxie,  do  you  want  to
18   argue for it?
19        MR. KIZER:  I couldn't find a case that told me that
20   I could come in and hand you.  I want to make a record on
21   it.   That's the only thing I'm trying to cover.
22        THE COURT:  Sure.  The defendant has tendered to the
23   Court an instruction basically 2102 AMCI instruction that
24   indicates  that  aggravated  robbery  is  a  lesser  included
25   offense with the transitional instruction that says -- 302

Respondent's Exhibit E

1    says, "If you have reasonable doubt of the defendant's
2    guilt on the charge of capital murder, you will then
3    consider the charge of ag robbery." And then the 2102 that
4    is submitted with that.  I'll put these in the record as an
5    exhibit to our hearing.
6         MR. KIZER:  Just show that they were proffered by the
7    defense, your Honor.
8         THE COURT:  Sure.  That's just what I was going to do
9    is hand them to the court reporter and the Court will
10   decline to give those instructions over the objection of
11   the defendant.
12        (WHEREUPON, THE AMCI 302, LESSER INCLUDED OFFENSES;
13   TRANSITIONAL INSTRUCTION AND AMCI 2102, AGGRAVATED ROBBERY,
14   PROFFERED BY THE DEFENSE AS A PROFFERED EXHIBIT NUMBER 1
15   WAS RECEIVED INTO EVIDENCE.  SEE PAGE NUMBER **966**.)
16        THE COURT:  Now, as to the lesser includeds that are
17   included in the packet furnished previously by the State,
18   it shows the lesser included offenses of first degree
19   murder and manslaughter and then we go to a 1501 capital
20   murder instruction.  "The State must prove the following
21   things beyond a reasonable doubt:  First, that Kenneth
22   Reams, acting alone or with one or more other perseons,
23   committed or attempted to commit the crime of robbery; and
24   that in the course of and in furtherance of that crime or
25   attempt or in immediate flight therefrom, Kenneth Reams or

771

Respondent's Exhibit E

1    a person acting with him caused the death of Gary Turner

2    under circumstances manifesting extreme indifference to the

3    value of human life." Should this be the crime of robbery

4    or aggravated robbery?

5           MS. BILLINGS:  I believe he is charged it as robbery.

6           THE COURT:  Robbery.  Okay.  Now, we'll want to take

7    up Mr. Kizer's motion that he previously made concerning

8    whether the proof is sufficient to warrant instructing them

9    on the capital murder.

10          MR. KIZER:  Since I've already told the Court that I'm

11   going to rest, would you also have the record reflect that

12   I renewed my motion.

13          THE COURT:  Right.

14          MR. KIZER:  I'll announce that when we go out, but I

15   would like to have the record reflect that I renewed my

16   motion for directed verdict.

17          THE COURT:  Right.  And that's what I thought we would

18   do at this time.  If you want to take that up now at the

19   conclusion of all of the evidence in the matter, it having

20   been announced to the Court, just as you said, that you

21   would rest when we go back in the courtroom.  We'll show

22   that your motion for directed verdict as to capital murder

23   is being renewed.  Anything else you want to say?

24          MR. KIZER:  No, sir.  Not with regard to the first

25   prong of my motion.  And the second prong, I stand on the

772

Respondent's Exhibit E

1    cases that were cited by Judge Eisele and that it's my

2    contention that reckless indifference has not been proven

3    in this circumstance that would justify submitting it for

4    the possibility that the death penalty would be considered.

5        THE COURT:  The Court is of the opinion at this point

6    that certainly in the State's case diminished the proof

7    that the State adduced in terms of satisfying the elements

8    of capital murder.   And I'll deny that portion of your

9    motion.

10       As to whether or not it is sufficient to warrant the

11   death penalty, I'm still mulling that over in my mind.

12       I will most likely want to re-read -- I have hurriedly

13   read Judge Eisele's opinion in those cases.   What I most

14   like what to do is go ahead and re-read those between now

15   and the time we get to that point.   I would reserve the

16   right to grant your motion notwithstanding the jury's

17   verdict in that matter if we hadn't finished all of that

18   when the jury is finished with their deliberation.

19       MR. KIZER:  Here, by the way, is the Eisele opinion

20   and the supporting cases.

21       THE COURT:  Thank you.   I have had a copy of that

22   around here and I could not lay my hands on it yesterday

23   when I was looking for it.   I'm glad you brought one.

24       Okay.  So the 1501 and then 1(a) is the definition of

25   robbery.  It says, "The State must prove beyond a reason-

Respondent's Exhibit E

1   able doubt that with the purpose of committing a theft of
2   resisting apprehension immediately thereafter, Kenneth
3   Reams, an accomplice employed or threatened to employ
4   physical force upon another.  The crime of robbery is not
5   proved to have been committed -- if it has not been proven,
6   he is not guilty of capital murder."  Okay.  And then the
7   transitional instruction for the lesser includeds with
8   first degree -- murder in the first degree.  To sustain
9   this charge, the State must prove beyond a reasonable doubt
10  that Kenneth Reams, acting alone or with one or more
11  persons committed or attempted to commit robbery and that
12  in the course of or in furtherance of or in immediate
13  flight, Kenneth Reams or another person did cause the death
14  of Gary Turner under circumstances manifesting extreme
15  indifference to the value of human life."  Which is
16  identical to the ag rob -- I mean, the capital murder
17  instruction except that the first degree it is just a
18  felony, and you have actually supplied which felony that is
19  in your instruction of your first degree.
20       MS. BILLINGS:  Oh, robbery.  It's the same thing.
21       THE COURT:  Right.  There is not any sense in my mind
22  why the legislature can't make enough of a distinction so
23  that we won't continually confuse juries with giving them
24  identical instructions on two different statutes.  The only
25  way to explain that to them, and I'm not sure it is the

774

Respondent's Exhibit E

1    Court's position or place to do that, the only way to

2    unconfuse them is to tell them that it is basically the

3    same crime but the State treats certain felonies different-

4    ly than a garden-variety felony, my words and not the

5    legislatures.  First degree murder is one that happens in

6    the course of any felony.  Capital murder is a murder that

7    occurs during the commission of certain enumerated felo-

8    nies.  And there ought to be a better way to ease that

9    confusion by instructed the jury just like I did.  That

10   there is a difference.  It can be the same, but there is a

11   difference.  Certain felonies advance you up a notch on the

12   scale.  But anyway, I'm not interested in being a trail

13   blazer today.

14        The next lesser included is manslaughter.  You've

15   looked these over, Maxie.

16        MR. KIZER:  Yes, sir, I have.

17        THE COURT:  They look all right, don't they?

18        MR. KIZER:  The only thing is I didn't catch it and

19   Carol handed to me -- have you gotten to 1501(A) yet, the

20   associated felon.

21        THE COURT:  Yeah, we fixed that.

22        MR. KIZER:  Have you already substituted that?

23        THE COURT:  Yeah.  That's what Carol brought me in the

24   first thing this morning.  There is the -- the rest of the

25   definition of robbery was included.

775

Respondent's Exhibit E

1          MR. KIZER:  Yeah, she gave me that.

2          THE COURT:  Yeah.  The other one has been disposed of.

3    Manslaughter looks the same.  6002, bifurcated trial.  And

4    the 6003, most of you must agree on the verdict.  Okay.

5    And then the verdict forms.  Capital murder, first degree -

6    -

7          MR. KIZER:  On first degree, I would respectfully

8    submit, your Honor, the Prosecution has never amended their

9    information to allege that my client is an habitual

10   offender.  I asked Ms. Billings either the first day or the

11   second day whether they were going to do that, and they

12   said no.

13         THE COURT:  No, I'm just talking about the verdict.

14         MR. KIZER:  Okay.

15         THE COURT:  I'm not on the sentence.  On the --

16         MS. BILLINGS:  They knocked the bottom out of it and

17   it doesn't make any difference.  You know, before it was

18   like 40 years or something and now it is back down to 10.

19         MR. KIZER:  Right.

20         THE COURT:  So we can talk about these later on as to

21   the punishment, but without allegation of habitual, these

22   would come out, would they not?  We have have to do

23   additional verdict forms, I think.

24         Now, there is one instruction that has been tendered

25   by Mr. Kizer as the affirmative defense to capital murder.

776

5353

Respondent's Exhibit E

1      Has the State looked this over?

2            MR. JUNEAU:  I read it over.  Have you seen it?

3            THE  COURT:    Any  objection?    Affirmative  defense

4      requires proof of the following things:  First, he was not

5      the only party to the offense; second, he did not commit

6      the  homicide  act;  and  third,  he  did  not  in  any  way,

7      solicit,  command,  induce,  procure,  counsel  or  aid  in  its

8      commission.    He  has  the  burden  of  proving  this  by  a

9      preponderance  unless  the  defense  so  prove  by  other  evi-

10     dence.    Preponderance  means  --  we  have  probably  already

11     told them -- no, we have not told them.  That's right.  We

12     have not told them that.  This is --

13           MR. JUNEAU:  Told them what?

14           THE  COURT:    About  what  preponderance  was  any  place

15     else.   "Greater  weight  is  not  necessarily  established  by

16     the greater number of witnesses" --

17           MS. BILLINGS:  Under that third prong, he wouldn't be

18     entitled to that based on the evidence.

19           MR. KIZER:  That's a jury question, whether he is or

20     not.

21           THE COURT:  Why not?

22           MS. BILLINGS:  Why not?  Whether he is entitled to the

23     instruction?  That's a matter of law.

24           THE COURT:  You must prove --

25           MR. KIZER:  Are you saying because it was demonstrated

777

5354

Respondent's Exhibit E

1    -- the evidence demonstrated that he can't meet the third

2    prong?

3        MS. BILLINGS:  Right.

4        MR. KIZER:  Well, then, that's -- that's a jury

5    question whether the evidence met it or not.

6        THE COURT:  Those are factual -- factual matters for

7    the jury to determine.  The State still has the burden of

8    establishing the guilt of Kenneth Reams upon the whole case

9    beyond a reasonable doubt.  I'm going to eliminate a "y."

10       MR. KIZER:  I could get a lot more people to plead if

11   I could eliminate a "y" a lot of times.

12       THE COURT:  Down to about a "c."  Okay.  This -- this

13   needs to be placed -- all right.  Now this 1501 -- all

14   right.  Should this -- should your affirmative defense go

15   between -- I mean, after the capital murder instruction and

16   before we go to the lesser of murder one.  Isn't that where

17   it goes?

18       MR. KIZER:  I think it does.

19       MR. JUNEAU:  I would think so, too.

20       THE COURT:  And then if you have a doubt about that --

21   okay.  All right.  And then the verdict form.  And that's

22   it.  And we'll talk about punishment later.

23       Now, any thoughts as to time limits as to arguments?

24       MR. KIZER:  Mine will be very brief.  I'm just going

25   to focus in on a couple of jury instructions and that's it.

778

Respondent's Exhibit E

1          THE COURT:  Okay.

2          MR. KIZER:  Are y'all going to split it up?  One of

3     you --

4          MR. JUNEAU:  No, Carol is going to do this.

5          THE COURT:  Okay.  Let's go through the whole set

6     right quick just to make sure I have everything and hadn't

7     -- okay.  101, general instructions; 103, personal observa-

8     tions; I modify 104 to make it gender neutral; 105, expert

9     witness;  106, circumstantial evidence;  107, burden of

10    proof; 108, filing of information is not evidence; 109, do

11    you want this one, Maxie, presumption of innocence?

12         MR. KIZER:  Let's go ahead and do that one.

13         THE COURT:  All right.  110, reasonable doubt; 301,

14    lesser included; 1501, capital murder; 1501A, the defini-

15    tion of the robbery; 1501D, the affirmative defense to

16    capital murder; 302, transitional to first degree; 302, for

17    manslaughter with the definition of negligently; bifurcated

18    trial; punishment not to be considered; closing instruc-

19    tions; with the verdict form consisting of capital murder,

20    first degree murder, manslaughter with guilty lines and

21    then not guilty.  Is that it?

22         MR. KIZER:  I believe it is.

23         THE COURT:  All right.  Anything further in chambers

24    before we go back?  It is your intention to rest.  And the

25    State has no rebuttal.  Is that correct?

779

Respondent's Exhibit E

1        MS. BILLINGS:  That's correct.

2        THE COURT:  Okay.  Thank you.

3    (Proceedings resumed in open court at 11:06 a.m. and began as

4    follows)

5        THE COURT:  All right.  We'll be back in session and

6    on the record.  Mr. Kizer, you may call your next witness.

7        MR. KIZER:  As I have previously informed the Court in

8    chambers, your Honor, the defense rests.

9        THE COURT:  Any rebuttal by the State?

10       MS. BILLINGS:  No, your Honor.

11       THE  COURT:  All  right.  Very  well,  that  having

12   concluded the taking of testimony and proof in this matter,

13   ladies and gentlemen, it is my job now to advise you of the

14   law applicable to this case by instructions.

15       First of all, I want to tell you that the faithful

16   performance of your duties as jurors is essential to the

17   administration of justice.

18       Now it is my duty as the judge to inform you of the

19   law that is applicable to this by these instructions.  It

20   is your duty to accept them as a whole, not singling out

21   any one instruction to the exclusion of any others.  Now

22   you would not consider any rule of law with which you may

23   be familiar unless it is included in these instructions.

24       Now it is your duty to determine the facts from the

25   evidence produced here in this trial.  You are to apply the

Respondent's Exhibit E

1       law as contained in these instructions to the facts as you

2       determine them to be and then render your verdict upon the

3       evidence and the law.  Now you should not permit sympathy,

4       prejudice, like or dislike of any party to this action or

5       of any attorney to influence your findings in the case.

6           In  deciding  the  issues  you  should  consider  the

7       testimony  of  the  witnesses  and  the  exhibits  received  in

8       evidence.    The   introduction   of   evidence   in   court   is

9       governed by law and you should accept without question my

10      rulings as to the admissibility or rejection of evidence,

11      and draw no inferences that by these rulings I have in any

12      manner indicated my views on the merits of the case.

13          Opening  statments,  remarks  during  the  trial,  and

14      closing arguments of the attorneys are not evidence.  they

15      are made only to help you in understanding the evidence and

16      applicable law, and any argument, any statement or remarks

17      of the attorneys having no basis in the evidence should be

18      disregarded by you.

19          Now I have not intended by anything I have said or

20      done,  or  by  any  questions  that  I  may  have  asked,  to

21      intimate or suggest what you should find to be the facts,

22      or  that  I  believe  or  disbelieve  any  witness  who  has

23      testified  and  if  anything  I  have  done  has  seem  to  so

24      indicate, you will please disregard that.

25          Now, ladies and gentlemen, in considering the evidence

781

Respondent's Exhibit E

1      in this case you are not required to set aside your common

2      knowledge.  But you have a right to consider all of the

3      evidence in the light of your own observations and experi-

4      ences in the affairs of life.

5          And you, ladies and gentlemen, are the sole judges of

6      the weight of the evidence and credibility of the witness-

7      es.  In determining the credibility of any witness and the

8      weight to be given the testimony, you may take into

9      consideration demeanor while on the witness stand, any

10     prejudice for or against a party, the means of acquiring

11     knowledge concerning any matter to which was testified, any

12     interest in the outcome of the case, the consistency or

13     inconsistency of the testimony, its reasonableness or

14     unreasonableness, and any other fact or circumstance

15     tending to shed light upon the truth or falsity of the

16     testimony.

17         An expert witness is a person who has special knowl-

18     edge, skill, experience, training or education on the

19     particular subject to which his testimony relates.

20         An expert witness may give his opinion on questions in

21     controversy.  You may consider his opinion in the light of

22     his qualifications and credibility, the reasons given for

23     his opinion and the facts and other matters upon which his

24     opinion is based.

25         You are not bound to accept an expert opinion as

782

Respondent's Exhibit E

1   conclusive, but should give it whatever weight you think it

2   should have.  You may disregard any opinion testimony if

3   you find it to be unreasonable.

4       Now, a fact in dispute may be proved by circumstantial

5   evidence as well as by direct evidence.  Now a fact is

6   established by direct evidence when, for example, it is

7   proved by witnesses who testify as to what they saw, what

8   they heard, or experienced.  A fact is established by

9   circumstantial evidence when its existence can reasonably

10  be inferred from other facts proved in the case.  However,

11  circumstantial evidence must be consistent with the guilt

12  of the defendant and inconsistent with any other reasonable

13  conclusion.

14      Now the State must prove beyond a reasonable doubt

15  each element of the offense charged.  But on the other

16  hand, the defendant is not required to prove his innocence.

17      Now the filing of an information, and that's the

18  document that I read to you at the beginning of this trial,

19  is merely the means by which a person is brought to trial.

20  It is not evidence and it is not to be considered by you in

21  determining the guilt or innocence of Kenneth Reams.

22      There is a presumption of the defendant's innocence in

23  a criminal prosecution.  Now, in this case, Kenneth Reams

24  is presumed to be innocent.  That presumption of innocence

25  attends and protects him throughtout this trial and should

783

Respondent's Exhibit E

1    continue and prevail in your minds until you are convinced

2    of his guilt beyond a reasonable doubt.

3        Now reasonable doubt is not a mere possible or

4    imaginary doubt.  It is a doubt that arises from your

5    consideration of the evidence and one that would cause a

6    careful person to pause and hesitate in the graver transac-

7    tions of life.  Now a juror is satisfied beyond a reason-

8    able doubt if after an impartial consideration of all of

9    the evidence he or she has an abiding conviction of the

10   truth of the charge.

11       Now Kenneth Reams is charged with capital felony

12   murder.  This charge includes the lesser offenses of first

13   degree murder and manslaughter.

14       You may find Mr. Reams guilty of one of these offenses

15   or you may acquit him outright.

16       If you have a reasonable doubt as to which offense the

17   defendant may be guilty of, you may find him guilty only of

18   a lesser offense.  If you have a reasonable doubt as to the

19   defendant's guilt of all offenses, you must find him not

20   guilty.

21       As I told you, Mr. Reams is charged with the offense

22   of capital felony murder.  Now to sustain this charge, the

23   State must prove the following things beyond a reasonable

24   doubt:

25       First:  That Kenneth Reams, acting alone or with one

784

5361

Respondent's Exhibit E

1     or more other persons, committed or attempted to commit the

2     crime of robbery; and

3          Second:  That in the course of an in furtheerance of

4     that crime or attempt or in immediate flight therefrom,

5     Kenneth Reams or another person acting with him caused the

6     death of Gary Turner under circumstances manifesting an

7     extreme indifference to the value of human life.

8          Now, as I told you as a part of the charge of capital

9     murder the State contends that the death of Gary Turner

10    occurred during the commission or attempted commission of

11    the crime of robbery by Kenneth Reams or an accomplice or

12    in immediately flight therefrom.

13         Now to prove robbery, the State must prove beyond a

14    reasonable doubt that with the purpose of committing a

15    theft or resisting apprehension immediately thereafter,

16    Kenneth Reams or an accomplice employed or threatened to

17    employ physical force upon another person.

18         Now if the crime of robbery is not proved to have been

19    committed by Kenneth Reams or an accomplice, he is not

20    guilty of capital murder.

21         Now I used certain terms that I need to define for you

22    now.  First of all, "purpose."  Our criminal code defines

23    "purpose" as a person acts with purpose with respect to his

24    conduct when it is his conscious object to engage in that

25    conduct.  And "physical force," that means any bodily

785

Respondent's Exhibit E

1    impact, restraint or confinement.

2        Mr. Reams asserts the affirmative defense to the

3    charge of capital murder.  To establish this affirmative

4    defense, Kenneth Reams must prove each of the following

5    things:

6        First:  That he was not the only party to the offense;

7        Second:  That he did not commit the homicide act; and

8        Third:   That he did not in any way solicit, comman,

9    induce, procure, counsel or aid in its commission.

10       Now Kenneth Reams has the burden of proving this

11   defense by a preponderance of the evidence.  Now "prepon-

12   derance of the evidence" means the greater weight of

13   evidence.  The greater weight of evidence is not necessari-

14   ly established by the greater number of witnesses testify-

15   ing to any fact or state of facts.  It is the evidence

16   which when weighed with that opposed to it, has the more

17   convincing force and is more probably true and accurate.

18   If the evidence with regard to this defense apepars to be

19   equally balanced, or if you cannot say upon which side it

20   weighs the heavier, then the defense has not been estab-

21   lished.  If you find that this defense has been established

22   by Kenneth Reams, then you shall find Kenneth Reams not

23   guilty of the offense of capital murder.

24       Whatever may be your finding as to this defense, you

25   are reminded that the State still has the burden of

786

Respondent's Exhibit E

1   establishing the guilt of Kenneth Reams upon the whole case

2   beyond a reasonable doubt.

3       Now if you have a reasonable doubt of Kenneth Reams'

4   guilt on the charge of capital felony murder, you would

5   then consider the charge of first degree murder.    To

6   sustain this charge the State must prove beyond a reason-

7   able doubt:

8       First:  That Kenneth Reams, acting alone or with one

9   or more other persons, committed or attempted to commit

10  robbery; and,

11      Second:  That in the course of and in furtherance of

12  that crime or in immediate flight therefrom, Kenneth Reams

13  or a person acting with him, caused the death of Gary

14  Turner under circumstances manifesting extreme indifference

15  to the value of human life.

16      Now if you have a reasonable doubt of Kenneth Reams'

17  guilt on the charge of first degree murder, you would then

18  consider the charge of manslaughter.    To sustain this

19  charge, the State must prove beyond a reasonable doubt:

20      First:  That Kenneth Reams, acting alone or with one

21  or more persons, committed or attempted to commit a felony;

22  and,

23      Second:  In the course of and in furtherance of that

24  crime or in immediate flight therefrom, he or a person

25  acting with Kenneth Reams negligently caused the death of

787

5364

Respondent's Exhibit E

1    the Gary Turner.

2         Now I used the term "negligently" in that instruction.

3    I'll define that for you now.  As used in this criminal

4    case that means more than it does in civil cases.  Now to

5    prove negligence in a criminal case, the State must show

6    that Kenneth Reams should have been aware of a substantial

7    and unjustifiable risk that the death would occur.  The risk

8    must have been of such a nature and degree that Kenneth

9    Reams' failuire to perceive it, considering the nature and

10   purpose of his conduct and the circumstances known to him,

11   involved a gross deviation from the standard of care that

12   a  reasonable  person  would  have  been  observed  in  his

13   situation.

14        Now, ladies and gentlemen, in your deliberations, the

15   subject of punishment is not to be discussed or considered

16   by you.  If you return a verdict of guilt, the matter of

17   punishment will be submitted to you separately.

18        Now, ladies and gentlemen, members of the jury, after

19   you hear arguments of counsel and retire to the jury room,

20   you should first elect one of your members as a foreman.

21   You will then consider and complete one of the following

22   verdict forms.  Now they are contained on one page.  I'll

23   read them to you now.  But you should complete only one of

24   these.  First of all, "We, the jury, find Kenneth Reams

25   guilty of the capital murder of Gary Turner."  The second

788

5365

Respondent's Exhibit E

1     form says, "We, the jury, find Kenneth Reams guilty of
2     first degree murder in the death of Gary Turner."
3     Thirdly, "We, the jury, find Kenneth Reams guilty of
4     manslaughter in the death of Gary Turner."  Or, fourth,
5     "We, the jury, find Kenneth Reams not guilty."  Now you'll
6     notice when you get in the jury room that there is only a
7     signature line for the foreman.  I'll remind you that all
8     12 of you must agree on the verdict, but only the foreman
9     should sign the verdict form.
10         Now, I'll repeat these closing instructions for you at
11    the conclusion of the arguments of the attorneys in this
12    matter.
13         Ms. Billings, you may go to the jury with your closing
14    arguments for the State.
15         MS. BILLINGS:  Thank you, your Honor.
16                    CLOSING ARGUMENT
17    BY MS. BILLINGS:
18         May it please the Court, counsel for the defense,
19    ladies and gentlemen.  The instruction that the Judge just
20    read to you, the instruction for capital murder, and I
21    think the best way is for us to go over it and show you
22    that we have proved the elements of it are to mark through
23    each one of those elements as we discuss it.
24         The first element is that Kenneth Reams.  Have we
25    identified Kenneth Reams?  Kenneth Reams identified himself

789

Respondent's Exhibit E

1    as being a participant in this particular crime.  Let's

2    mark Kenneth Reams off.

3        Acting alone or with one or more other persons.  Did

4    he act by himself or did he act with someone else?  He told

5    you he did.  He told you that he acted along with an Alford

6    Goodwin in this particular crime.  We can go ahead and mark

7    that one off.

8        Committed or attempted to commit the crime of robbery.

9    By his own testimony, that's what they were going to do

10   whenever he went down there to the ATM machine.  We can

11   mark that one off.

12       And in the course of and in furtherance of that crime

13   or attempt or in immediate flight therefrom, Kenneth Reams

14   or a person acting with him, caused the death of Gary

15   Turner.  Well, Gary Turner is dead.  So we know that that's

16   -- that's been satisfied.  Was it in the course of an in

17   furtherance of that crime?  Yes, it was.  He told you that

18   he was shot in the course of them trying to rob him.  We

19   can knock that one off.

20       Well, we can stop right here.  Kenneth Reams or a

21   person acting with him did it.  Is that what happened?  You

22   bet.  Kenneth said that Alford did it.  It doesn't matter.

23   It doesn't matter which one of them did it in this par-

24   ticular case.

25       Was it under circumstances manifesting an extreme

Respondent's Exhibit E

1   indifference to the value of human life?  Well, that's
2   where you have to put your common sense into gear.  Were
3   these circumstances manifesting extreme indifference to the
4   value of human life?  Any time you point a loaded gun at
5   someone, I submit to you that you are acting under circum-
6   stances manifesting an extreme indifference to the value of
7   human life.  By Kenneth Reams own testimony, a gun can have
8   one of those hair triggers.  A hair trigger that you just
9   touch it and it goes off.  Having it pointed at someone is
10  the very definition of circumstances manifesting an extreme
11  indifference to the value of human life.  He told you from
12  the stand there the reason he loaded it the way he did was
13  because there is a possibility that somebody could get
14  shot.  He knew it before he ever went across the street.

15       Have we satisfied the elements of capital murder?
16  There is not an element missing.  Not a single element
17  missing all the way through it.

18       Let's go back over what the testimony was.  Officer
19  Greg Taylor told you that he was called to that scene about
20  a robbery.  And when he arrived there, he found Mr.
21  Turner's vehicle in gear up here -- that it bounced forward
22  to the second window, the window that you notice in the
23  photograph is a deposit window, not the window where you
24  stick your ATM card in.  Remember when we passed around
25  this photograph to the jury?  Right here (INDICATING) is

791

Respondent's Exhibit E

1    where you put your ATM card in.  And over here to the right
2    of that is where Officer Taylor testified that he found the
3    window, basically, of Mr. Turner's vehicle.  But yet he
4    told you that he found outside the car -- when he got him
5    out of the car to put him in the ambulance because he was
6    still alive, his ATM card fell out of his hand; so, he knew
7    that that's what his purpose was in being there at that ATM
8    machine.  He was going to use it.

9       What else do we know from Officer Taylor's testimony
10   and from Kenneth Reams' testimony?  Is that that is exactly
11   what he had intended to do.  He had pulled up real close
12   there to that ATM machine because Officer Taylor told you
13   he couldn't get the door open really to get him out of
14   there.  He had to reach in under him to knock it out of
15   gear before he could even give assistance to Mr. Turner at
16   all.  He was so close to that machine.  Kenneth Reams told
17   you that he was so close to that machine, like you would be
18   if you were going to use your ATM card, that he couldn't
19   even get up there by Alford.  That he had to go around the
20   machine and come in from the other way.

21      Officer Taylor also told you that Mr. Nelson, who saw
22   this, came running across the street from the Econo Lodge
23   and said that he had seen two individuals standing at the
24   window.  Mr. Nelson told you this himself that he had seen
25   two individuals at the window of this vehicle whenever he

792

Respondent's Exhibit E

```
 1        heard the noise, the shots and that simultaneously they ran
 2        around each end of the vehicle and took off running.  He
 3        described the one at the back as the taller one.  The
 4        taller one that Officer Bud Phillips testified would have
 5        been Alford Goodwin.  That is true.  And that he would have
 6        had on -- Kenneth said he had on gray-hooded sweatshirt in
 7        his statement to Officer Phillips.  That's the same one
 8        that Mr. Nelson told you that he saw running on the back of
 9        that vehicle.  That only leaves one person at the front of
10        the vehicle even by Kenneth's testimony.  He ran around
11        from each way.  Did they take off together?  Yeah, they
12        did.  One ran this way (INDICATING) and one ran that way
13        (INDICATING) and they ran -- they both ran in front of my
14        car.  I asked him what was important about your car being
15        the color Ford Taurus.  He said it looks just like a cop
16        car.  Here he is coming down the street and these guys are
17        standing over there at the car and they see this thing that
18        looks like a cop car coming and naturally, they are going
19        to take off.  That's why there was no money taken from Mr.
20        Turner.  Is that they thought that they were about to be
21        had by a cop and they took off.  But that doesn't matter.
22        When we're proving a robbery, which is the underlying
23        felony in this particular case, we just have to show you
24        that with the purpose of committing a theft that this man
25        was killed.  Was that their purpose?  He told you that that
```

793

5370

Respondent's Exhibit E

1    was their purpose in going over there.  There purpose was

2    to steal money, he said, so that Alford could pay to

3    graduate from high school on Friday.  The very purpose was

4    to commit a theft.  They just didn't -- they didn't quite

5    get the money because they saw a cop car or what appeared

6    to be a cop car coming and took off running.

7        Officer Heroman told you that during the course of

8    their investigation they started getting all of these phone

9    calls telling them about who had committed this crime.

10   That it was a Butterball and a Ken that had committed the

11   crime.  Then as more calls came in, they made the connec-

12   tion with a Jermaine Brown who he tells you was in part of

13   the planning of the first ATM robbery finks on him.  And he

14   -- as a result of him telling on Kenneth and Alford, they

15   are arrested.  And when they go get a search warrant, less

16   than an hour or about an hour later after the time that

17   they had picked them up, what did they find in their home?

18   The items that Jermaine Brown described that would be at

19   their home, items out of the burglary at the Pine Bluff Dry

20   Cleaners, the same burglary that Kenneth Reams tells you

21   that he took the gun from.  Not only through his testimony,

22   but through the statements that he gave to Officer Bud

23   Phillips.  He said, "I took a .32 caliber gun out of that

24   robbery.  That was the same one that I used not only on

25   this ATM murder, it was the same one I used in the Grey-

794

Respondent's Exhibit E

1    hound Bus Station aggravated robbery.  It was the same one

2    I used whenever we went to rob Curtis Gilbert earlier at

3    the ATM robbery.  And it was the same one that I took out

4    of the burglary."  Where did they found that?  Well, they

5    found it out there in Alford's back yard.  Captain Heroman

6    told you that it was wrapped up in plastic under a bucket

7    by the fence.  And he also told you that there at Alford's

8    house they found one of the jackets that was taken out of

9    the Pine Bluff Dry Cleaners.

10        They go over to Kenneth's house and do a search

11    warrant over there and found three of the jackets taken out

12    of the Pine Bluff Dry Cleaners and the holster to the gun.

13        Now then you had the testimony of Dr. Sturner.  Dr.

14    Sturner tells you that when he did the autopsy of Gary

15    Turner he did a cross section of his head and this is what

16    he showed you.  This being the nose area up here (INDICAT-

17    ING) and this being the ear area over here (INDICATING),

18    the bullet entered right in front of his temple or right at

19    his temple on the left-hand side of Mr. Turner which would

20    have been the side that would be up against the ATM

21    machine.  That is consistent with what your witness, Mr.

22    Nelson, where he put the defendants in this case, and it is

23    consistent with what even Kenneth Reams said.  And then the

24    shot, he tells you, went from the left side of his head

25    over to the right side of his head at an angle.  Mr. Juneau

795

5372

Respondent's Exhibit E

1   asked what position that would have put the person in who -
2   - through his head, and he said to the left of Mr. Turner.
3       Mr. -- Dr. Sturner also told you that in doing his
4   autopsy he found stipling that was around that particular
5   wound.  And that that meant that there was gun powder in
6   there.  That the gun was so close, two to 12 inches, Dr.
7   Sturner said that it left the gun powder in there.  It
8   wasn't a distant shot from far away or anything like that.
9       Mr. Andrejack, he is the one who came in here last
10  this morning.  He compared the gun that was found in the
11  backyard of Alford Goodwin to the bullet that came out of
12  Mr. Turner's head.  And he told you that as a result of his
13  comparison, he could tell you, just like Berwin Monroe, who
14  checked it first and couldn't be here today, that that is
15  beyond a doubt the murder weapon that was used in this
16  case.  The right gun.
17      Detective Phillips testified that when he went over to
18  Stuttgart to interview Mr. Reams about the burglary at the
19  Greyhound Station and the aggravated robbery -- burglary at
20  the Pine Bluff Dry Cleaners and the aggravated robbery,
21  there are so many that I can't keep them straight, that he
22  also got to talking about the ATM murder.  And at that time
23  he told him that he was on the sidewalk across -- across
24  from where the truck whenever he heard the gunshot fired.
25      He also said that -- in fact, he said he was on Sixth

Respondent's Exhibit E

1    Street whenever he heard it fired.  And then whenever they
2    asked him about -- they flipped the tape over and started
3    talking in depth to you about what exactly happened at the
4    ATM murder, that's when he said, "Oh, well, now I was
5    coming around the teller and I heard the gun fire, and I go
6    up to the car and I look in there and I poke the man to see
7    if he moves and I stood there for a good minute and then I
8    took off running."

9          He tells him in there several times that the reason
10   that Mr. Turner was shot was because he said, "What the
11   fuck do you want?"  And then he also tells him that of all
12   of the things that were done, the burglary at the Pine
13   Bluff Dry Cleaners, he went in there and he did that all by
14   himself.  I asked Detective Phillips was what he told you
15   consistent with what happened?  He said he kicked the back
16   door in on that place.  Yes.  We went back and checked that
17   report.  As a matter of fact, the door was busted in back
18   there.  What was taken in that burglary?  We went back and
19   checked that report.  Yes, a .32 caliber H & R revolver was
20   taken in that burglary.  And then we asked him about the
21   Greyhound Bus Station aggravated robbery on the 29th.  What
22   was done in that particular case?  Kenneth said that he
23   went in there and pulled the gun on a woman and made her
24   get down on the floor and he went by himself when he did
25   this and told her that this was a robbery.  I want your

                          797

Respondent's Exhibit E

1    money.  And he took it and he ran.  He acted alone in that

2    one.

3         On the 28th, the same day that he stole the gun from

4    the Pine Bluff Dry Cleaners, his rendition of the dates is

5    a little bit off, but the detective testified that the

6    robbery of Mr. Curtis Gilbert at the ATM machine was, in

7    fact, on the night of April the 28th, the same night that

8    the gun was taken.  And what happened there?  In his

9    statement to Detective Phillips, he told him that I had the

10   gun at that one.  And at that one, Mr. Gilbert gunned the

11   car and took off before we could get the money.  He messed

12   up our plan.  But I had the gun at that one.

13        He comes in here today and tells you he didn't have

14   the gun at that one.  He just said that to cover Alford.

15        Well, you're going to have to use your common sense

16   whenever you get back there and start thinking about what's

17   been said today and what's been done and what's been said

18   in the past.

19        He says that at the ATM machine -- "Now this is the

20   truth this time." "This is the truth this time." Finally,

21   at the ATM machine, this is the final version of the truth.

22   He was going around the back of the ATM machine whenever he

23   heard the gunshot fired.  That he heard the man from back

24   there say -- heard Alford from back there say -- told the

25   man that he wanted his money.  That this was a robbery.

798

5375

Respondent's Exhibit E

1       And he wanted his money.  And then he hears a pow and comes

2       down, like I said, and looks in the window and pokes the

3       man and Alford is nowhere to be found.

4               Initially, when Officer Phillips asked him about his

5       participation in that first ATM robbery on Curtis Gilbert,

6       do you remember he said, "Oh, I didn't know anything about

7       that.  All I know is Alford did it."  Alford doesn't give

8       any details.  He's kind of a quiet.  He likes to keep the

9       details to himself, but I know Alford did that one.  And

10      then when Detective Addison went down there and talked to

11      him the next day at Kenneth's request, Kenneth tells him,

12      "Oh, by the way, I did participate in that first ATM

13      robbery.  I told y'all a bunch of lies."

14              He has told a bunch of lies.  And I submit to you that

15      he is still telling you a bunch of lies.  They are pointing

16      fingers at each other.

17              You are going to have to sift through what's been said

18      and determine what's been done.  At a minimum, whether you

19      find that that man right there shot Gary Turner or whether

20      you find that Alford Goodwin shot Gary Turner, either one

21      is a capital felony murder.  Every element of the crime has

22      been met.  Thank you.

23              THE COURT:  Mr. Kizer.

24              MR. KIZER:  Thank you, your Honor.

25                              CLOSING ARGUMENTS


                                  799

Respondent's Exhibit E

1    BY MR. KIZER:

2            Ladies and gentlemen, it has beena couple of days

3        since I've been able to talk with a few of you since the

4        voir dire process took so long.  I'm going to take the

5        opportunity to remind you of a few things.  When we were

6        back in chambers and we were talking and discussing in

7        earnest what your role would be if you were a juror, all of

8        you have been sworn to tell the truth when you came back

9        there and every one of you told me that you would consider

10       the full range of options that you had in this matter when

11       it came time for you to deliberate the guilt or innocence

12       of Kenneth Reams.

13           The second thing is that every one of you said that

14       you would honor your oath and most of you told me that you

15       take that oath very seriously.  And that oath is that you

16       will render a true verdict according to the law and to the

17       evidence.

18           The first thing that the Court tells you when the

19       Court reads the jury instructions to you is that you should

20       not permit sympathy, prejudice, like or dislike of any

21       party to this action or any attorney to influence your

22       findings.  And you have all sworn that you will do that.

23           It is a tragedy that Gary Wayne Turner is dead.  It is

24       a natural human inclination to feel sympathetic to Mr.

25       Turner and to his family.  But all of you agreed that you

800

5377        Respondent's Exhibit E

1    are going to do your level best to put that aside and to

2    make your decision based on the law and the evidence.

3        It is not inconceivable that you would do -- dislike

4    Kenneth Reams.  He sat up there and told you a number of

5    different things that he has done wrong.  He's paying the

6    price for doing those things wrong, too.  He's serving 40

7    years in the Department of Correction.

8        But you've told us and you've sworn that you will make

9    your decision based on the law and the evidence.  Not

10   whether you like him; not whether you agreed with what he

11   has done in the past; but the law and the evidence.

12       The law in this case requires that the Prosecution

13   prove its elements beyond a reasonable doubt.  As I told

14   you, the defendant doesn't have to prove anything.  That is

15   the way our system works.  Like it or not, that's the way

16   our system works.

17       The Prosecution finds itself, however, in a bind when

18   it comes time for them to try to prove each element of this

19   case.

20       As I mentioned to you in opening statement, there are

21   only three people who know -- who absolutely know what

22   happened.  Alford Goodwin has already plead guilty.  He's

23   in the pen.  Gary Wayne Turner is dead.  Kenneth Reams has

24   told you what happened.  The Prosecution is in a bind

25   because they have to use his statements in an effort to

801

5378

Respondent's Exhibit E

1    prove to you what those elements were of those offenses.

2    They find themselves in a bind because you've got to make

3    a decision.  If Kenneth Reams is a liar, then the Prosecu-

4    tion hasn't proved the elements that they are required to

5    prove.  They can't have it both ways.  Because if he is not

6    a liar, then you have to listen to what he had to say to

7    you in this courtroom, and that's the only evidence that

8    there is that tells you anything about whether Gary

9    Turner's life was taken with extreme indifference to the

10    value of human life.  Is he a liar?  If so, your vote has

11    got to be that they haven't proved their case beyond a

12    reasonable doubt on that element.  And they have to prove

13    every element.  If he's not a liar, and you've got to look

14    at it and honestly scrutinze and look at the only person

15    who was there who came to this courtroom and gave a

16    statement and testimony under oath and consider that

17    testimony, because everyone of you said you would, and make

18    your decision based on fallacy of both what the prosecution

19    has to say and the defense.

20        When he talked to those police officers, that wasn't

21    sworn testimony.  Nobody has come in here and said that he

22    was placed under oath when he talked to them.  The only

23    time he has ever been placed under oath and given testimony

24    is when he sat in the chair right there (INDICATING).  Does

25    that make a difference?  You can ask yourself the same

5379

Respondent's Exhibit E

1    question.

2        He gave statements early on to the police.  There are

3    some factors that are different.  At one point, he said,

4    "All right.  I'm tired of all of what's been going on.  I'm

5    going to tell you what happened."  And he told them exactly

6    what happened.  And it's not very different from the what

7    he came to this courtroom today and told you.

8        The Judge has told you that when you -- when it comes

9    time for you to judge credibility of those witnesses, you

10   consider their demeanor, you consider the reasonableness of

11   their testimony, you can consider things like recall, you

12   can consider the depth of their knowledge of what they are

13   telling you about, you can consider every detail.  He told

14   you in compelling terms exactly what went on that night.

15   He told you step by step by step by step.  We're not --

16   you're hearing it on your own.  You're not having to have

17   it regurgitated to you by a police office who may or may

18   not have heard right what was being said to him when they -

19   - the conversation had taken place back at the jail.  You

20   are hearing it on your own.

21       The prosecution said, "If we go back and play that

22   tape, there is a place in that tape will either show us one

23   way or another whether -- what was the content of your

24   discussion."  They didn't play the tape, did they?  We

25   don't have the benefit of that.  You have the benefit of

803

Respondent's Exhibit E

1      that sworn testimony.

2           There are ranges and options that you have.  You can

3      consider whether Kenneth Reams is guilty of capital felony

4      murder.  They have to prove every element.  If he is lying,

5      they can't prove those elements.  If he is telling you the

6      truth, then they've proved to you that acting alone or with

7      somebody else, he told you he and Alford Goodwin went to do

8      this.

9           Committed or attempted to commit the crime of robbery.

10     He's never denied that to anybody.  That's exactly what

11     they planned to do, to get a lick.

12          The second element, though, is that in the course of

13     or in furtherance of that crime or attempt or immediate

14     flight thereafter, Kenneth Reams or a person acting with

15     him caused the death of Gary Turner.  There is no doubt

16     Gary Turner is dead.  We've known that from the very

17     beginning.  We wouldn't be here today if he wasn't.

18          Then the last term is, under circumstances manifesting

19     an extreme -- see, I didn't write these jury instructions.

20     A Supreme Court Committtee did.  And this is what the law

21     is, an extreme indifference to the value of human life.

22     That's what we've got to consider and that's what we've got

23     to look at.

24          There is not one iota of evidence that says that

25     anybody other than Alford Goodwin had that gun when he went

804

Respondent's Exhibit E

1    up to pull that robbery. There is not one iota of evidence

2    that says that anybody other than Alford Goodwin is the

3    person who pulled that trigger. The State doesn't have any

4    evidence to that effect whatsoever. They are back in that

5    whip saw bind that they are in. Is he lying or is he not?

6        If he is lying, they can't prove to you who may have

7    done that. They've proven to you that the gun was recov-

8    ered is the -- fired the bullet that went through Mr.

9    Turner's head, but they haven't proven to you who did who.

10       Take a look at that gun. You can take this gun back

11   to the jury room with you if you so desire. This is a

12   cheap gun. This is a gun that if you will look at it,

13   consider what Kenneth Reams told you that he tried to do to

14   make sure that nobody got hurt. It had six holes, six of

15   them, and it only had three bullets. He had attempted to

16   put it where when you pull the trigger back if it acciden-

17   taly went off (Trigger pulled by defense attorney) it would

18   hit one of the empty ones. Have you noticed if you'll look

19   at this gun, this thing is so cheap, however, if you just

20   pull the hammer back, you don't even get it to where the

21   gun will fire, but guess what, the cylinder spins. It

22   spins from one all the way around to the next one.

23   Remember, he told you that he tried to put it and he did do

24   it the first time where when it clicked it clicked down on

25   an empty cylinder, and he tried to put it where it would do

805

5382

Respondent's Exhibit E

1   that click again.   Is that extreme indifference to the

2   value of human life?  Was he trying to make sure what he

3   told you was the case, that nobody would get hurt.

4         But what we don't know is what was going through

5   Alford Goodwin's mind.  Was Alford Goodwin nervous? Did he

6   click this gun like this (INDICATING) as he was walking up?

7   Take this gun back there and do that when you are back in

8   that jury room.  Guess what happens?  The cylinder spins.

9   That spins it right past that empty chamber and puts it

10  right on a live round.  Did Alford Goodwin, if indeed it

11  was said to Alford Goodwin by Mr. Turner, "What the fuck do

12  you want?" whether he said "nigger" or not, whether he said

13  that or not, did Alford Goodwin get mad and click the gun

14  twice and when he clicked it twice, it went off.  We don't

15  know that, do we?  If you don't know something, that's what

16  doubt is.  That's what reasonable doubt is.

17        Let me give you an example of what reasonable doubt

18  is.   Do a little experiment?   You have a box--it's a

19  cardboard box.  You put a cat in the box and you put a

20  mouse in that box and you put a top on it.  You come back

21  in an hour and there is no mouse.  It's gone.  Is it

22  reasonable to conclude that that cat ate the mouse?  Of

23  course it is.   If you do the same experiment again,

24  however, and this time when you go back after an hour, the

25  mouse is gone, but there is a hole this size (INDICATING)

806

5383          Respondent's Exhibit E

```
 1        that's in the side of that box.  Can you reasonably
 2        conclude that the cat ate the mouse?  Sure you can.  Can
 3        you also reasonably conclude that the cat -- that the mouse
 4        was pretty resourceful and figured a way to gnaw his way
 5        out of that box?  See, then you have to stop and you have
 6        to think.  Well, if you have to think, that's reasonable
 7        doubt.  That's what reasonable doubt means.
 8             You have a number of options and everyone of you said
 9        you would consider these options.  Has extreme indifference
10        to the value of human life been proven?  That's what you've
11        got to decide.
12             Curiously because of the way the law is in this State,
13        and I don't know the reason for it and the Court and I
14        discussed it as well as the Prosecuting Attorney, none of
15        us can seem to come up with a real good reason why this law
16        is that way, but that's the way it is.  The definition of
17        first degree murder is exactly the same is capital murder.
18        As I told you when we were talking before, a lesser
19        included offense is a less severe offense than one that the
20        person has been charged with.  It is exactly the same.  You
21        have the option, and all of you said you would consider it,
22        of finding him guilty if you choose to find him guilty of
23        anything, of first degree murder as well as capital murder.
24             If you will look at the next definition, and that is
25        manslaughter, manslaughter definition differs very little
```

807

Respondent's Exhibit E

1  from the first two definitions of this crime except it

2  says, "negligently caused the death of Gary Turner."

3  You'll have to consider, under the facts that you've heard,

4  and if he is lying, the Prosecution has proved nothing.  If

5  he is telling the truth, was it negligent?  He told you

6  from the very beginning we didn't want anybody to die.

7      Kenneth Reams has already told you he pulled two

8  aggravated robberies before.  Nobody died.  There is no

9  evidence that any shots were fired.  In fact, the other guy

10  drove away from them.  There is no evidence that anything

11  was done that harmed anyone.  If he is such a monster and

12  they meant to take somebody's life, how come nobody died in

13  those other two?  Was it fate?  Was it that he just didn't

14  have the guts at that time?  We don't know, do we?  And

15  when we don't know, that's reasonable doubt.  That's what

16  the law means by reasonable doubt.

17      The other option that you have is to consider the

18  affirmative defense.  Kenneth Reams has the burden of

19  proving to you what an affirmative defense is.  Some of you

20  have told me that you had served on a civil panel before.

21  And I told you that the burden of proof in a civil case is

22  a preponderance, meaning the greater weight of evidence.

23  In a criminal case, the burden of proof that the Prosecu-

24  tion has to meant is beyond a reasonable doubt and entirely

25  more severe and much more -- a much greater standard.

808

5385

Respondent's Exhibit E

1    When, however, in a criminal case, a defendant brings forth

2    the proposition, that being an affirmative defense, he has

3    to prove that to you by a preponderance of the evidence,

4    the greater weight, and not as the Prosecution does beyond

5    a reasonable doubt.  You have to consider all of these

6    things.  Many of you have educational backgrounds and job

7    backgrounds from looking at your questionnaires where you

8    have to make the same type of qualative and quantative

9    analysis every day in what you do for a living.  You can do

10   this when you go back in the jury room.  You consider what

11   the law is.  And on this preponderance of evidence, it

12   again comes down to if Kenneth Reams is lying, then we're

13   out of here because the Prosecution hasn't proved anything.

14   But if he is telling the truth, the Prosecution has proven

15   at least some of their elements, then he has also proved to

16   you this affirmative defense.  Because to have this

17   affirmative defense come into play, for you to find that it

18   is a viable action or alternative for you to take, there

19   are three propositions.  The first is that he was not the

20   only party to the offense.  We know Alford Goodwin was

21   there.  Number two, that he did not commit the homicidal

22   act.  If he is lying, we don't know, do we?  If he is

23   telling you the truth, he is -- he was not the one that

24   committed the homicidal act.  If he is lying, though, they

25   haven't proved their case.  And, number three, that he did

809

Respondent's Exhibit E

1   not in any way solicit, command, induce, procure, counsel

2   or aid in the commission.  He gave Kenneth Reams -- I mean,

3   he gave Alford Goodwin a gun that he thought that he had

4   fixed where nobody was going to get hurt.  There is not one

5   shred of evidence that he counseled or that he in anyway

6   tried to induce Alford Goodwin to shoot Gary Turner.  Why

7   Alford Goodwin did is only know to Alford Goodwin.  It

8   might have been a mistake.  It might have been in angry.

9   It might have been any number of things.  But it was not

10  the action of this man right here (INDICATING).

11      You've all said that you will consider these options.

12  We're going to hold you to your word.  Consider these

13  options.  Scrutinize them as closely as you possibly can

14  and scrutinize the evidence because that's what your jury

15  verdict is dependent upon.

16      You can't prove use a negative to prove a positive.

17  And that's what the Prosecution is trying to do.  They are

18  trying to offer only what they want to pick and choose out

19  of  Kenneth  Reams'  statements  and  by  using  the  other

20  allegations that he has made by saying he's lying, they

21  can't use a negative to prove a positive.  If Kenneth Reams

22  is lying, you must find that he is not guilty because the

23  State has failed.  If he is telling the truth, the affirma-

24  tive defense needs to be looked at very long and hard

25  because  we've  knocked  off  every  single  one  of  those

810

Respondent's Exhibit E

1          propositions.  If he was going to come into this courtroom
2          and tell you a lie, anyone of us in five minutes time could
3          come up with one heck of a better lie than what he came
4          into this courtroom and told you.  He told you step by step
5          how it went down.  He never meant for anybody to die.
6               Thank you.
7               THE COURT:  Any rebuttal by the State?
8               MS. BILLINGS:  Yes, your Honor.
9                    REBUTTAL CLOSING ARGUMENT
10     BY MS. BILLINGS:
11               May it please the Court, counsel for the defense.
12          Number one, let's go over the affirmative defense in this
13          case.  It doesn't even apply.  I submit that it doesn't
14          apply.  The three things that Mr. Kizer and the defendant
15          have to show in order to be able for this affirmative
16          defense of him not being find guilty of capital murder to
17          apply is that first he would have to show that he was not
18          the only party to the offense.  Well, he did show that.
19               He would have to show that he did not commit the
20          homicidal act.  Who knows?
21               Thirdly, he has to show that he did not in anyway
22          solicit, command, induce, procure, counsel or aid in its
23          commission.  This is not an optional thing that you would
24          prove one of these and this applies.  You have to prove all
25          three and you have to show that you did not in any way help

                                    811

Respondent's Exhibit E

1    or aid in the commission of that crime.  Did Kenneth Reams

2    offer aid in the commission of this crime?  He supplied the

3    gun.  He loaded the gun.  He carried the gun up there.  He

4    -- by his testimony, he gave a gun that he knew was loaded,

5    he knew had a lemon trigger -- possible lemon trigger on it

6    to a man that he described in his own statement as being a

7    real villian, somebody that had already killed all of these

8    people.  Did he aid in the commission of this crime?  There

9    isn't any doubt about that.  Let alone a reasonable doubt.

10   There isn't a doubt.  And who is he laying this all off on?

11   Alford Goodwin.  Who is still in high school, about to

12   graduate that week, had never had a criminal record in his

13   life.  This guy tells you he had been in nothing but

14   trouble in Forrest City, wound up in Missouri and all of a

15   sudden wound up here.  And what did he do in the course of

16   a week's time?  A burglary, a theft of property, an

17   aggravated robbery, an aggravated robbery and then a

18   murder.  Is his credibility an issue?  You bet it is.  But

19   are we proving a negative as Mr. Kizer said?

20        He's lying about his participation level.  That's what

21   I'm saying.  He's lying about how much he participated in

22   this crime.  But we can go back and take the police report

23   and verify the dates and the times that these things

24   happened and the manner that they happened in everywhere.

25   But you notice the first time that anyone gets hurt, all of

812

Respondent's Exhibit E

1    a sudden, Kenneth Reams is starting to shift the blame.

2    All of these other crimes, he acted alone.  He goes to the

3    dry cleaners and does a burglary.  He goes and pulls the

4    aggravated robbery at the bus station by himself where he

5    pulled a gun on somebody all by himself.  He told the

6    detectives in his statement that he had the gun at the

7    first ATM robbery.  That he pulled the gun at the ATM.  And

8    now all of a sudden, he's telling you, "I didn't have the

9    guts to pull the gun on anybody."  He's already pulled it

10    on two different people.  But he didn't have the guts to do

11    it this time; so, he handed it off to Alford.  And Alford

12    pulled it.  And Alford shoots this man.

13        Well, you're going to have to use some of your common

14    sense whenever we are talking about this crime again.

15        Take Dr. Sturner's example up here.  The one that we

16    talk about.  If you use Kenneth's statement, he wasn't up

17    here.  Dr. Sturner says this shot was fired from the left

18    of this man.  Not from the right where Alford Goodwin is

19    standing.  Not from the right where he puts Alford Goodwin.

20    The shot was fired from the left.  From the left of Mr.

21    Turner.  Who would have had to have been at the left of Mr.

22    Turner?  The man in the front.

23        I submit to you what happened in this case -- let me

24    back up just a minute.  Remember Officer Taylor told you

25    that that car was still in gear.  That it had popped

813

Respondent's Exhibit E

1   forward to the depository.  Kenneth is telling you that he

2   reached in there when he up there and he turned the key

3   off.   I submit to you what happened was he was standing

4   right up there at the front of that truck and if you do a

5   flip in your mind as to way that truck looks on the other

6   side, it has the mirror up there, too.  He's standing up

7   there and the first time that somebody doesn't do what he

8   wants them to do, remember the woman at the Greyhound Bus

9   Station, she got down on the floor.  She forked over the

10  money.  Curtis Gilbert was scared.  He got out of there.

11  He gunned that car and he got out of there.  But this time,

12  Kenneth Reams was determined that this man wasn't going to

13  take off without giving them any money.  And what does it

14  make more logical sense to do?  To come up behind somebody

15  with a gun or to come up right in front of them and point

16  it at them?  How are you going to know what's behind them?

17  That doesn't even make sense.

18       I submit to you that what happened was when Kenneth

19  Reams came up there with that gun and Gary Turner may very

20  well said, "What the fuck do you want"?  Who knows what he

21  said?  But it made Kenneth Reams mad.  And he shot that

22  gun.  And when he did, the car hopped forward because his

23  foot had to come off of the clutch.  And that car hopped

24  forward to the position that it was in.  That's how Alford

25  Goodwin made it over across the street just a little bit

814

Respondent's Exhibit E

1    faster than Kenneth Reams did.  Mr. Nelson told you, the

2    one with the hood ran just a little bit in front of the

3    other one, about as far -- I walked close to him, do you

4    remember, about as far as from me to you.  That's because

5    Kenneth was deterred by the car hopping forward.  He wasn't

6    expecting that.

7         You are the judges of the credibility of the witness-

8    es.  We've gone through these statements where he said, "I

9    was on the other side of the parking lot.  I didn't know

10   anything was going down."  Mr. Kizer tells you that, "Oh,

11   he said from the start he knew there was going to be a

12   robbery."  Well, that's just flat out not true.  He denied

13   knowing anything.  Do you remember what he said?  "Alford

14   was going to walk up there and get a light."  We were on

15   our way to buy a bag of dope."  "I didn't know anything was

16   going down."  He's lying about his level of participation

17   because he had a whole week to think about what he needed

18   to say.

19        At every turn -- who scratched the serial numbers off

20   the butt of the gun?  "Oh, Alford did that."  "Well, how do

21   you know Alford did it?"  "Well, I can't tell you how I

22   know Alford did it.  I just know that he did it."  "I can't

23   tell you when he did it or how he did it.  I just know that

24   Alford did it."

25        And then when you asked him about it later on, "Well,

815

Respondent's Exhibit E

1    now, I'm the one that scratched those serial number off of
2    the butt of that gun.  I'm sitting over there across the
3    street from the ATM and I scratched them off on the
4    concrete."  "Why did he scratch them off?"  "In case they
5    started looking for that gun."  He knew from the onset that
6    there was a possibility that somebody was going to get shot
7    because he sat there and told you that.  And he knew he had
8    to get the serial numbers off of that gun so it wouldn't
9    get traced back to him.

10        Why are you here today?  Because he don't want life
11   without parole.  He doesn't want a sentence of anything.
12   He wants to get back out there and walk back out on the
13   street.  He wants you to let him walk back out there in
14   public knowing that he committed an aggravated robbery, an
15   aggravated robbery and a murder.  He's committed a capital
16   murder.  The worst offense that you can commit in this
17   State.

18        Did he have knowledge of it?  You bet he had knowledge
19   of what was going down.  You heard.  He was dressed all in
20   black.  They watched Leathal Weapon before they went over
21   there.  They sat there and waited in this old building.
22   And then when Mr. Turner came up, they hit just like a
23   coiled snake.  He didn't even have the time to get his ATM
24   card in the machine.  It fell out on the ground.  There had
25   been no transaction.

<div align="center">816</div>

Respondent's Exhibit E

 1          One thing that really got me about him he sat there on
 2     the stand, "I gave the gun to Alford.  I don't know what he
 3     did with it afterward."  But in his very own statement that
 4     the detective read off to you he said that the gun was
 5     hidden in a bucket by the fence in the back of Alford's
 6     yard.  The detective told you that they had been separated
 7     the whole time since they had been arrested.  You tell me
 8     how that man knew that that gun was out there if he didn't
 9     put it there himself.
10          He's tried to set Alford up from the start, and he's
11     still trying to set Alford up.
12          Gary Turner lost his life for no reason.  This man is
13     guilty of capital murder all the way down the pike.  Thank
14     you.
15          THE COURT:  At this time, Ms. Silvey and Ms. Frye,
16     I'll thank you for y'all's attendance here today as our
17     alternate jurors.  I'll ask you to -- I think you've
18     probably got coats and stuff in the jury room.  I'll let
19     you leave your badges here on the rail if you would,
20     please, or give them to Mr. Daniels.  I'll excuse you,
21     again with our thanks, at this time.  (Alternate jurors
22     excused)
23          Ladies and gentlemen of the jury, when you reach the
24     jury room, now I've told you this before, but I want to
25     remind you, when you reach the jury room, you should elect

817

5394
Respondent's Exhibit E

1        one of your number as the foreman.  You will then consider

2        and complete one of the following verdict forms.  They are

3        contained on a single page.  First, "We, the jury, find

4        Kenneth Reams guilty of capital murder of Gary Turner."

5        Second, "We, the jury, find Kenneth Reams guilty of first

6        degree murder in the death of Gary Turner."  Third, "We,

7        the jury, find Kenneth Reams guilty of manslaughter in the

8        death of Gary Turner."  Or, lastly, "We, the jury, find

9        Kenneth Reams not guilty."  You should complete one of

10       those forms.  I would remind you that all 12 of you must

11       agree on the verdict, but only the foreman need sign the

12       verdict form.

13            Mr. Daniels, if you will now escort the jury to the

14       jury room where they will deliberate upon their verdict.

15            MR. KIZER:  May we approach the bench, please, your

16       Honor?

17            THE COURT:  In just a moment as soon as the jury --

18            MR. KIZER:  Before the jury goes out?

19            THE COURT:  All right.  Excuse me, just a moment.

20       (Counsel approached the bench)

21            MR. KIZER:  Considering it's the noon hour, do you

22       want to tell them about whether they can take a break or

23       how you want to go.  You just want to let it go through.

24            THE COURT:  Um-hum.

25            MR. KIZER:  Okay.

Respondent's Exhibit E

1      (Conclusion of bench conference)

2              THE COURT:  Thank you.

3      (Jury exited the courtroom at 12:05 p.m. to deliberate upon a

4      verdict.)

5              THE COURT:  Before anybody else leaves the courtroom,

6          the jury having now left the courtroom, I want to make one

7          thing perfectly clear to everybody here.  We have dealt

8          with now for the third day a very emotional case.  This is

9          a case that is going to have a bad result from somebody's

10         standpoint no matter what happens.  Somebody is not going

11         to like it.  There is no way that this jury or this Court

12         can do anything that is going to make everybody here happy.

13         I'm speaking to everybody here.  If you cannot conduct

14         yourself in a detached and appropriate manner from this

15         time forward, I'm going to ask you just not to be in the

16         courtroom.  There is time and place for grief.  I totally

17         understand that.  There is a time and place for wailing and

18         weeping.  The courtroom is not that place.  I'm going to

19         charge you with the responsibility of conducting yourself

20         and, again, I'm speaking to everybody here as an adult, and

21         I expect that to happen.  Think about it while the jury is

22         out, and if you feel like you can't do that, I'll under-

23         stand and I'll ask you to remain outside.  Outside the

24         courtroom is the time for comforting family and friends and

25         for the weeping and wailing that would naturally would go

819

Respondent's Exhibit E

1      along with whatever verdict comes back.  Please don't think

2      for a minute that I'm not sympathetic to everybody's

3      emotions here.  But the courtroom is where we're going to

4      conduct ourselves in an appropriate matter.  If anybody has

5      any questions in his own mind about that, just stay

6      outside.  Somebody will tell you what happened.  And I'll

7      put you on your honor to conduct yourself that way and if

8      that doesn't work, we'll do something else.  Thank you.

9      We'll be in recess.

10  (A recess was taken at 12:05 p.m.)

11  (Jury returned to the courtroom at 2:10 p.m.)

12          THE COURT:  Mr. Robinson, I'm informed that you won

13      the election and were elected foreman for this body.  Is

14      that correct?

15          FOREMAN ROBINSON:  That is correct.

16          THE COURT:  Has the jury arrived at a verdict?

17          FOREMAN ROBINSON:  The jury has arrived at a verdict.

18          THE COURT:  Would you pass it up through Mr. Daniels?

19      Oh, he's already got it.  I see.  Thank you.

20          This verdict form is signed by Dwight A. Robinson as

21      foreman.  It says, "We, the jury, find Kenneth Reams guilty

22      of capital murder of Gary Turner."  This is the unanimous

23      verdict, is it not, Mr. Robinson, of the jury?

24          FOREMAN ROBINSON:  It is a unanimous verdict, yes.

25          THE COURT:  I think that it would be appropriate for

820

Respondent's Exhibit E

1        the record that we have the jury polled in this situation.

2               MR. KIZER:  The defense does request that, your Honor.

3               THE COURT:  Okay.  I have announced the verdict signed

4        by Mr. Robinson, "We, the jury, find Kenneth Reams guilty

5        of capital murder of Gary Turner."  I'll now ask each one

6        of you ladies and gentlemen individually if this is, in

7        fact, your verdict.  First of all, Ms. Messina, is this

8        your verdict?

9               JUROR MESSINA:  Yes, it is.

10              THE COURT:  Ms. Horace, is this your verdict?

11              JUROR HORACE:  Yes, sir.

12              THE COURT:  Mr. Robinson, your signature is on here;

13       so, I take it it is your verdict?

14              FOREMAN ROBINSON:  Yes.

15              THE COURT:  And Ms. Johnson, is this your verdict?

16              JUROR JOHNSON:  Yes, your Honor.

17              THE COURT:  Mr. Hornsby, is this your verdict?

18              JUROR HORNSBY:  Yes, sir.

19              THE COURT:  Mr. Lindsey, is this your verdict?

20              JUROR LINDSEY:  Yes, sir.

21              THE COURT:  And Ms. Ruggeri, is this your verdict?

22              JUROR RUGGERI:  Yes, sir.

23              THE COURT:  And Mr. Tipton, is this your verdict?

24              JUROR TIPTON?  Yes, sir.

25              THE COURT:  Ms. Phillips, is this your verdict?

821

1           JUROR PHILLIPS:  Yes, sir.

2           THE COURT:  And Ms. Hoffman, is this your verdict?

3           JUROR HOFFMAN:  Yes, sir.

4           THE COURT:  And Ms. Hodges, is this your verdict?

5           JUROR HODGES:  Yes, sir.

6           THE COURT:  And Mr. Stelow, is this your verdict?

7           JUROR STELOW:  Yes, sir.

8           THE COURT:  All right.  Ladies and gentlemen, as you

9      were told during the jury selection process, the next stage

10     of this -- of this proceeding will involve punishment.

11     Before we proceed to that point, there will be an opportu-

12     nity for you to consider some additional evidence.  In

13     order for that to be organized, ladies and gentlemen, not

14     knowing exactly when those witnesses would be needed, they

15     are not necessarily right in hand and we will need to take

16     a break probably maybe as much as 30 minutes to take up

17     some matters in chambers as well as to allow the procure-

18     ment of additional witnesses, et cetera.

19        So, I'm going to ask you, again, not to discuss the

20     case any further at this point.  And ask you to remain

21     basically around the jury room and this end of the court-

22     house and we'll be in recess for probably about 30 minutes

23     at this time.  Thank you.

24   (A recess was taken at 2:12 p.m. and the following in-chambers

25   record was made out of the presence of the jury)

5399    Respondent's Exhibit E

1     (The following in-chambers record was made out the presence of
2     the jury.)
3          THE COURT:  Okay.  Mr. Kizer, you don't know, yet, how
4     many witnesses you might have, do you?
5          MR. KIZER:  I will know here in just a few minutes,
6     your Honor.
7          THE COURT:  Okay.  Will the State have additional
8     witnesses?
9          MS. BILLINGS:  No, your Honor.
10         THE COURT:  If y'all need me, I'll be in chambers.
11         MS. BILLINGS:  Do you want to go in there now or --
12         THE COURT:  Maxie just needs a little bit --
13         MR. KIZER:  I'd rather go ahead, and if you don't
14    mind, do our part so that will give me time to get orga-
15    nized.
16         THE COURT:  Okay.  Okay.  We are here in chambers out
17    of the presence of the jury for the purpose of taking up
18    some motions.  Mr. Kizer?
19         MR. KIZER:  Your Honor, I would first renew the motion
20    that I had made earlier that probably was not timely, but
21    I think certainly is timely now that under the ruling in
22    the cases -- line of cases cited by Judge Eisele that this
23    case should not be submitted to the jury for their consid-
24    eration of the death penalty.  That the proof is insuffi-
25    cient to support this case being submitted to the death

823

Respondent's Exhibit E

1   penalty specifically with regard to intent.  I would ask
2   the Court to make that ruling.
3       The second motion I have goes to a request that the
4   jury be instructed pursuant to Arkansas Code Annotated 5-4-
5   618 that the defendant has a sufficiently low IQ that he is
6   classified to be in the mild range of mental retardation.
7   According to this statute, someone with the IQ of 65 is
8   subject to the court making a finding or it being a de novo
9   finding by the jury that because of that IQ rating that he
10  should be subjected to the death penalty, but life without
11  parole imprisonment sentence should be imposed.  This
12  defendant rated a classification of 66 which is just one
13  above that cut-off number, but it is so close in proximity
14  that I believe it would be a proper submission to this jury
15  for their consideration.  I prepared a special jury form
16  verdict that I believe tracks the statute.  I tried to lift
17  the language right out of the statute.  And, of course, the
18  jury would have the option of not finding that to be the
19  case at all.
20      THE COURT:  Anything further?
21      MR. KIZER:  No, your Honor.
22      THE COURT:  What says the State?
23      MR. JUNEAU:  I have not seen his jury instruction, I
24  don't believe.
25      MR. KIZER:  It was attached, and I gave everybody a

824

Respondent's Exhibit E

1   copy.  It had the motion, the jury instruction, the verdict

2   form and a copy of the statute.  I had a -- since it is a

3   special jury verdict form and it has to be unanimous I had

4   a place for all of them to sign.  That may not be proper,

5   maybe just the foreman would be the appropriate one, but

6   that's the -- I wasn't sure which way to go on that.

7       THE COURT:  What is the cumulative supplement, 5-4-

8   618, is that --

9       MR. KIZER:  That's where you'll find it.  That's why

10  I photocopied it.

11      THE COURT:  Well, it didn't make it to the one I have,

12  I don't think.

13      MR. KIZER:  I could have sworn it is right there on

14  the back.

15      THE COURT:  Oh, okay.  This is a 1993 act.  What is

16  the effective date of this act?

17      MR. KIZER:  I don't think -- well, I take that back,

18  I think there was an emergency.  Seems like it came into

19  play in another case that came up.

20      THE COURT:  We have the session -- the '93 session

21  laws up there.  I don't guess they are out and bound yet,

22  are they?

23      MR. KIZER:  No.

24      MR. JUNEAU:  Well, if it is not in the statute, it's

25  not -- if it is not an emergency act, it wouldn't be

825

5402

Respondent's Exhibit E

1      effective until August.

2           THE COURT:  Until August.  That's correct.  Would that

3      be on CaseBase?

4           MR. KIZER:  I'm sure it would be.

5           MR. JUNEAU:  What's that?  The --

6           THE COURT:  Whether or not it was in effect as of this

7      -- this statute was already in effect.  Nothing I've got

8      here says that it had an emergency clause.

9           MR. KIZER:  Well, if it doesn't say it has an emergen-

10     cy clause, I think you'll have to assume that it does not.

11          THE COURT:  Well, that doesn't --

12          MR. JUNEAU:  It would say in the statute in some of

13     the notes underneath the statute, I believe.

14          THE COURT:  Well, suffice it to say that from the

15     proof that you intend to adduce, he would not fall within

16     the statute itself, but rather was close enough that you

17     want the Court to, nevertheless --

18          MR. KIZER:  If he came back 70, I wouldn't raise the

19     issue.

20          THE COURT:  I understand.

21          MR. KIZER:  Sixty-six is so close to 65.  I don't know

22     where they draw this number as included in the statute.

23          THE COURT:  The September 28 report from the Southeast

24     Arkansas Mental Health Center previously furnished the

25     Court by virtue of an order for examination of Mr. Reams,

Respondent's Exhibit E

1    I think ought to be probably put into the record in this
2    matter.
3        MR. KIZER:  I was going to do it through my witnesses.
4        THE COURT:  Yeah, that's fine.  The original is here
5    in the file.  I guess that's the original.
6        Ms. Billings has joined us.  We are here for the
7    purpose of taking up the motion to have the instructed as
8    to Mr. Reams' mild mental retardation pursuant to Arkansas
9    Code Section 5-4-618.  I'm trying to decide whether or not
10   that 1993 enactment of the legislature had the emergency
11   clause; whether or not it was in effect as of the time of
12   the commission of this offense.  Do you have any indepen-
13   dent knowledge of that, Ms. Billings?
14       MS. BILLINGS:  No, your Honor, but I have the act down
15   in my office and I can check it.
16       THE COURT:  Look on that, Mr. Juneau and see what act
17   of '93?
18       MR. JUNEAU:  420.
19       THE COURT:  Act 420.  Let's just suspend for a minute.
20       MR. KIZER:  May I ask a question?  I have previously
21   provided some school records from my client's schools.  I
22   think his attendance in Pine Bluff School System and over
23   in Forrest City.  I've previously provided a copy of those
24   to the Prosecution.  I would like to seek to introduce
25   those.  I have somebody on hold over in Forrest City and

827

Respondent's Exhibit E

1    I've also told somebody from Pine Bluff.  If they want me
2    to lay a foundation for them, I can get them up here for
3    it.   But I really just want the jury to have a chance to
4    see what his performance was in school as a factor to take
5    into consideration.  I also have school records from -- not
6    school  records,  but  he  had  went  through  a  place  for
7    troubled  youth  called  Sears  in  Poplar  Bluff,  Missouri.
8    There is a guy named Mike Moss that I've listed on my Rule
9    18.3 response who can be here in the morning from Poplar
10   Bluff, Missouri.  If I could introduce those records which
11   would include a mental health evaluation that will include
12   what he did while he was in the home, things along that
13   lines, and I basically wanted to find out, I haven't heard
14   from the Prosecution, whether they would agree that I could
15   go ahead and introduce those or whether you want to wait
16   and have me get the people here so I can lay a foundation
17   for it.

18       MR.  JUNEAU:   You don't have anybody here from that
19   organization.

20       MR. KIZER:  From Sears?

21       MR. JUNEAU:  Yes.

22       MR. KIZER:   No, Mike Moss had a doctor's appointment
23   in St. Louis today and the earliest he can here is the
24   first  thing  in  the  morning.   He  could  have  been  here
25   yesterday, but, of course, we wouldn't get to that yester-

828

Respondent's Exhibit E

1     day.   That's part of the problem of multi-day trials,

2     trying to figure out how to coordinate everybody.  In fact,

3     I would love to have him here.   He would make a good

4     witness for this part of the case.  But I'm willing to go

5     ahead and proceed if the Prosecution is willing to allow me

6     to introduce the records and let the records speak for

7     themselves.

8          THE COURT:  You've already furnished those copies to

9     the State?

10         MR. KIZER:  That's what we did yesterday.

11         MR. JUNEAU:  He has and Ms. Billings, I think, has

12     read over those things.  I saw where she highlighted some

13     things in the record.  I would prefer to wait and let her

14     decide since she is familiar with those records.

15         THE COURT:  Okay.  Let's just suspend for a minutes

16     then.  (Off the record)  Okay.  Back on the record for two

17     things.  Ms. Billings has retrieved for us a copy of Act

18     420 of 1993 as codified as Code Section 5-4-618 concerning

19     mental retardation.  It does not, in fact, have an emergen-

20     cy clause.  According to the best information available to

21     the Court, it would have gone into effect 90 days after the

22     signing -- adjournment of the legislature which has been

23     computed to be somewhere on or about August 13th.   The

24     proof in this matter indicates that this crime occurred on

25     or about May 5th, 1993.  And by its provisions, Section

Respondent's Exhibit E

1     1(B) talks in terms of a defendant with mental retardation

2     at the time of committing capital murder.  It's obvious

3     that the statute was not in effect as of that time.  What

4     Mr. Kizer's motion apparently is asking the Court to do is

5     to cause the 66 IQ attributed to Mr. Reams is so close to

6     the statutory cut-off of 65 as provided in Act 420 of 1993,

7     to nevertheless instruct the jury on mental retardation.

8     I don't think that the Court can instruct violation or

9     invoke a statutory provision that, one, was not in effect

10     as of the time of the commission of this offense; and, or,

11     two, that the facts in this case don't apply to it.

12     Admittedly, it is real close.  But it is not -- it's not

13     within the range as provided for in this statute.  So, I'm

14     going to deny his motion as to -- for that particular

15     instruction.

16          MR. KIZER:  May I show the instruction as proferred,

17     your Honor?

18          THE COURT:  Absolutely.  That's what I was going to

19     suggest that we do is put that in the record, the motion

20     and the instruction need to be made a part of the record.

21          (WHEREUPON, MOTION TO INSTRUCT THE JURY AS TO ALLEGA-

22     TION OF DEFENDANT'S MENTAL RETARDATION, THE INSTRUCTION AND

23     THE SPECIAL VERDICT FORM PROFERRED BY THE DEFENDANT AS

24     PROFERRED EXHIBIT NUMBER 2 WAS RECEIVED INTO EVIDENCE.  SEE

25     PAGE NUMBER 969.)

Respondent's Exhibit E

1      THE COURT:  Now, is there any argument that Mr. Kizer

2   will not be allowed to argue the low -- relatively low IQ

3   rating, et cetera and put on evidence to that effect and

4   argue that to the jury as a mitigating factor?

5      MS. BILLINGS:  No, sir.

6      MR. KIZER:  It's an enumerated.

7      THE COURT:  I understand.  There is no argument that

8   you can't do that.  But the Court cannot instruct, I don't

9   think, under this statutory provision under those circum-

10   stances that we've already ruled on.  Okay.

11      Now, the second part of the motion was as to whether

12   or not the proof as adduced in the trial was sufficient to

13   submit to the jury for consideration for the death penalty.

14   Is that right?

15      MR. KIZER:  That's correct, your Honor.

16      THE COURT:  Does anybody want to be heard further on

17   that?

18      MR. JUNEAU:  Your Honor, I think the State would make

19   a response based on Judge Eisele's opinion in the Fairchild

20   case that this case is easily distinguishable from Fair-

21   child.  It is my understanding, after reading Judge

22   Eisele's opinion, that he concluded and based his argument

23   that murder -- that death was not applicable in the

24   Fairchild case based -- and he looked at the Tyson case.

25   In that case, he concluded that the Supreme Court of the

831

Respondent's Exhibit E

1   United States has held in Tyson that a substantial partici-
2   pation in a violent felony under circumstances likely to
3   result in the loss of life even absent an intent to kill
4   was sufficient to qualify the defendant for death.   In
5   other words, the Tyson case holds the stance for the
6   proposition that an awareness that a killing may be the
7   result of a crime as sufficient to go to the jury for the
8   death penalty.   He says -- and then he looks at the
9   Fairchild case and he finds that, basically, the Court
10   convicted Fairchild and sentenced him to death on a
11   negative inference.   What I mean by that is that the
12   evidence was that, and Judge Eisele felt like that State
13   had failed to prove that the defendant murdered or aided or
14   abetted in the murder or intended that the victim be killed
15   or foresaw that the victim might be killed or was present
16   during the murder when it occurred, based on the testimony
17   that was adduced at trial.   He went on to say that based on
18   the evidence -- or he concluded that based on the evidence,
19   Fairchild did not contemplate the use of leathal force that
20   would be used; although he knew his accomplice had a -- was
21   armed and had a gun, he did know that leathal force would
22   be used in the murder.

23       The distinction in that case and this case is clear
24   because we have proved that Kenneth Reams had the gun,
25   possessed the gun prior to the murder.   He had the gun,

832

Respondent's Exhibit E

1   possessed the gun immediately before the murder.  That he

2   gave the gun, a loaded gun, in fact, loaded the gun and

3   gave the gun to the other accomplice, according to his

4   testimony, according to his testimony, right before the

5   robbery.  And that based on his statement to the police,

6   that he knew at the time that the person he gave the gun to

7   was a -- in his words, had killed some people before and is

8   likely to kill people straight up.  That goes to his

9   intent, state of mind at the time, and based on the Tyson

10   case would show that there may have been or there likely

11   would have been a killing involved in this armed robbery.

12       THE COURT:  Is that it?

13       MR. JUNEAU:  Yes.

14       THE COURT:  Okay.  Mr. Kizer.

15       MR. KIZER:  I'll just stand on my original argument,

16   your Honor.

17       THE COURT:  Seems like Judge Eisele's almost composing

18   a falls graft, foreseeability, type standard here.  The

19   distinction he appears to be making is if, in fact, a

20   defendant participates in a crime and it is foreseeable

21   that death or serious physical injury would or could be a

22   likely result, then if testimony is adduced to that effect

23   that it would satisfy the under circumstances involving

24   extreme indifference to human life and absent that, that it

25   would not apply.  It talks in terms of the Fairchild case

833

Respondent's Exhibit E

1    of the no way to think that there would be any leathal

2    force on Ms. Mason, et cetera, et cetera.  There was no

3    evidence that he was armed, contemplated the use of leathal

4    force.   There was -- there was no way -- nothing to

5    indicate that he contemplated that his accomplice would do

6    anything more than he himself had done.  What he had done

7    had not involved leathal force.

8        MR. JUNEAU:  Judge, in this particular case, given the

9    defendant's own testimony that he loaded the gun and handed

10   it to the accomplice, he had to have contemplated that

11   leathal force would be used.

12       MR. KIZER:  Clearly can't be the word that is applica-

13   ble here whenever -- if you are going to use his testimony,

14   you have to use all of it.  His testimony was that he tried

15   to insure that it would not be used.  So there is no

16   clearly to it.  It is all murky.  It may be clear from the

17   Prosecution's point of view, but it is not clear to the

18   defense.

19       THE COURT:  Well, I'm just not -- not convinced that

20   Judge Eisele's reasoning, one, is such that would be

21   binding on the Court; or, two, that it should be construed

22   to mean that in this case it is -- that this is the type of

23   case where there is no proof that there was any kind of

24   predictability for death to occur.  Mr. Kizer, if the Court

25   withholds the ruling on your motion at this point, is that

834

Respondent's Exhibit E

1   going to change the way you present your evidence?

2          MR. KIZER:  Well --

3          THE COURT:  You wouldn't put on any evidence if I

4   granted your motion.

5          MR. KIZER:  Yeah, we're going to be a while.  I've got

6   a bunch of people I'm going to have to put on.  You know,

7   we're talking about a man's life here.  I've got to -- I'm

8   going to have to make a very good record.

9          THE COURT:  I understand.  Well, I have read Judge

10  Eisele's opinion.  I have not finished reading all of the

11  cases that you furnished.  I'm going to continue to try to

12  read those.  Let's just go ahead and proceed and we'll see

13  how -- see where we are.

14         MR. KIZER:  Can we take up the other matter that we

15  discussed off the record, your Honor, now that Ms. Billings

16  is here?

17         THE COURT:  Yeah.

18         MR. KIZER:  Carol, I had mentioned to the Court a few

19  moments ago and Wayne said he preferred to wait until you

20  got here.  I have somebody from the Sear School, Mike Moss,

21  who had a doctor's appointment in St. Louis today.  He's

22  from Poplar Bluff, Missouri.  He's indicated he can be here

23  in the morning.  If you want me to lay a foundation to get

24  these records in, I will have him here in the morning and

25  we can do that.  I've asked that -- now that y'all have had

835

Respondent's Exhibit E

1    a chance to look at them, if we could stipulate to the
2    introduction of those records plus the school records that
3    I had previously given you, then that will cut out several
4    witnesses because I also have somebody on standby at
5    Forrest City to come over here so I can introduce those
6    school records from there.  The person from Pine Bluff High
7    can be here -- well, now, that it is -- it's just 3
8    o'clock.  I can probably call right now and try to get them
9    here.

10       MS. BILLINGS:  Are you going to introduce them as a
11   lump just like you gave them to me?

12       MR. KIZER:  Yeah.  There is a certification at the top
13   on each record from the custodian of those records.  And I
14   was going to introduce them just like that.  The jury can
15   make up their mind if they want to refer to them or not or
16   if they don't, that's up to them.

17       MS. BILLINGS:  Okay.  If you are going to introduce
18   them as a package like you presented them to me, I have no
19   objection to that.

20       MR. KIZER:  That's exactly -- that's probably what I
21   would do if I had the individuals here from the various
22   points.  I mean, Mr. Moss I would prefer to have here
23   because he knows something more about Kenneth personally,
24   but he was also here to get the records in.  So, if I could
25   go ahead, it would be agreed on, to submit them.

836

5413      Respondent's Exhibit E

1       THE COURT:  Okay.  Without objection, those will be

2  admissible then.  How much time do you need?

3       MR. KIZER:  Ten minutes.  I'm just going to go tell

4  the family and try to figure out who I'm going to call

5  first and all that sort of stuff.

6       THE COURT:  All right.  Is there any kind of Motion in

7  Limine concerning the sentence received by the co-defendant

8  in this matter?  Any objection?  I'm sure Mr. Kizer intends

9  to inform them of that.

10       MR. KIZER:  I've got a copy of the Judgment and

11  Commitment and I was going to get it certified by Dorothy.

12       THE COURT:  All right.

13       MS. BILLINGS:  I don't know, your Honor.  My gut

14  reaction is to object to that mainly because Alford is not

15  the one on trial here today.

16       MR. KIZER:  Well, the statute goes on to say that the

17  death penalty part of the trial is a lot different than the

18  guilt or innocence phase.

19       MS. BILLINGS:  Yeah.

20       THE COURT:  Can you think of any specific objection in

21  that regard?

22       MS. BILLINGS:  Just basically the rules of evidence.

23       THE COURT:  It don't seem right.

24       MS. BILLINGS:  Or the rules of criminal procedure that

25  say you don't -- that you are not supposed to be referring

837

Respondent's Exhibit E

1        to the sentence of the other person.

2            THE COURT:  The reason I raised it is because of what

3        Mr. Kizer said that in the sentencing phase, it's -- the

4        rules are somewhat altered moving to double jeopardy.

5            Unless there is a strong argument against it and

6        unless you can show me why not, that's the kind of thing,

7        especially when it is so -- one of these kind of deals,

8        both pointing to the other.  I think it is probably

9        something the jury ought to be able to take into consider-

10       ation.  Again, keeping in mind we're still not in effect

11       with all our truth and sentencing stuff, but that's the

12       direction that our legislature is pointing us and all of

13       our new enactments.  They ought to know -- they ought not

14       know anything but what the rules provide for in the guilt

15       or innocence phase.  When it comes down to sentencing, they

16       ought to know as much as they can about the --

17           MS. BILLINGS:  But where would that come in to

18       mitigating circumstances?  I understand aggravating --

19       falls under another category.

20           MR. KIZER:  Well, listen to some of these things.

21       Here's Hendrickson v. State, an '85 case.  Said the trial

22       court should the penalty phase of the trial the results of

23       polygraph exam given to the defendant.  While the rules of

24       evidence are not applicable to the penalty phase of the

25       trial, the evidence offered must be probative to some issue

838

Respondent's Exhibit E

1   to be properly considered in the penalty phase. Well, that
2   at least tells us that the rules of evidence aren't
3   applicable. If that is going to be thrown out, then it's
4   just going to be just like, I would think, a revocation
5   hearing or something like that. And --

6       MS. BILLINGS: I know. But it's still not a free-for-
7   all. We're talking about where -- we're limited to proof
8   of aggravating circumstances and it lists out what they
9   are, and then your mitigating circumstances are laid out
10  for you. And I thought that's all that they considered in
11  the penalty phase were the aggravating and mitigating
12  circumstances.

13      THE COURT: What are the enumerated aggravations?

14      MS. BILLINGS: Committed while Kenneth Reams was under
15  extreme mental or emotional disturbance or Kenneth Reams
16  was acting under unusual pressure or influences of under
17  the domination of another person. Committed while the
18  capacity of Kenneth Reams to appreciate the wrongfulness of
19  his conduct or to conform conduct to the requirements of
20  law was imparied as a result of mental disease or defect,
21  intoxication or drug abuse; the youthg; committed by
22  another person and he was an accomplice and his participa-
23  tion was relatively minor; has no significant history of
24  prior criminal activity; suffers from borderline mental
25  retardation; has abilities that would allow him to be a

839

Respondent's Exhibit E

1    productive member of society even in prison and other,

2    specify in writing.

3        THE COURT:  Where is the -- have you got the statutory

4    code section?  The ags and the mits.  Include but are not

5    limited to the following.  Hum.  So the fact that the jury

6    is not limited to specifically enumerated mitigating

7    factors accrues to the benefit of the defendant because it

8    gives the jury the greater opportunity to extend leniency

9    to him.

10       MS. BILLINGS:  It's all moot, your Honor.  They all

11    feel from emotional state or his criminal culpability.

12       THE COURT:  History.

13       MS. BILLINGS:  Yeah, history.

14       THE COURT:  Well, what it boils down to in my mind is

15    that it's an element of fairness.  You know, fair is fair;

16    right is right; and wrong is wrong.  He's wrong.  But what

17    we are going to try to do is fair.  And under the circum-

18    stances, I think what happened to a co-defendant is

19    something the jury ought to know about.  Again, a full

20    disclosure and all fairness so this jury may impose what it

21    feels like is a proper sentence in the light of all of the

22    circumstances.  If he asks to do that, and asks to submit

23    that, I'm going to let him do it under the -- I don't know,

24    under other.  I don't know if that is a mitigating factor,

25    but it's certainly an element of proof that I'm going to

Respondent's Exhibit E

1     let him do that for that reason.

2              MS. BILLINGS:  Could the record note our objection?

3              THE COURT:  You bet.  You bet.

4     (Proceedings were moved into the courtroom at 3:30 p.m, and

5     began as follows:)

6              THE COURT:  Ladies and gentlemen of the jury, we will

7        be back in session.  You have previously found Mr. Reams

8        guilty of capital murder.  As we alluded to during the jury

9        selection process, there is a second phase of this trial

10       which we will now undertake.  After hearing additional

11       testimony and argument of counsel, you will again retire to

12       deliberate and decide whether Mr. Reams is to be sentenced

13       to death by lethal injection or to life imprisonment

14       without parole.

15           Now in determining which sentence shall be imposed,

16       you m ay be required to make specific written findings as

17       to the existence or absence of aggravating or mitigating

18       circumstances.  Now appropriate forms will be provided for

19       you, and I will now instruct you on the procedures that you

20       must follow.

21           There are three for you to use in reaching your

22       decision, and a verdict form for you to use when your

23       verdict has been reached.

24           All right.  First of all, form 1, which will be handed

25       to you later, deals with aggravating circumstances.  Now

841

Respondent's Exhibit E

1    the appearance of any particular aggravating circumstnace
2    on the form does not mean that it actually existed in this
3    case.  These are specified by law and are the only aggra-
4    vating circumstances that you may consider.  Now the State
5    has the burden of proving beyond a reasonable doubt that
6    one or more of the listed aggravating circumstances existed
7    at the time of the commission of this capital murder.  Now
8    if you unanimously find and beyond a reasonable doubt that
9    one or more of these aggravating circumstancs existed, then
10   you will indicate your findings by checking the appropriate
11   spaces on form 1.  Now if you do not unanimously find
12   beyond a reasonable doubt the existence of any aggravating
13   circumstance, then you will cease deliberations at that
14   point and indicate on the verdict form that a sentence of
15   life imprisonment without parole is your verdict.

16        Okay.  Now, if you do unanimously find that one or
17   more aggravating circumstances exist, then you should move
18   on to and complete form 2 and that form deals with the
19   mitigating circumstances.  Form 2 lists some factors that
20   you may consider as mitigating circumstances.  However, you
21   are not limited to this list.  You may, in your discretion,
22   find other mitigating circumstances.

23        Now unlike an aggravating circumstance, you are not
24   required to be convinced of the existence of a mitigating
25   circumstance beyond a reasonable doubt.  A mitigating

842

Respondent's Exhibit E

1    circumstance is shown if you believe from the evidence that
2    it probably existed.
3          Now form 2, that's the one we're talking about
4    concerning the mitigating circumstances, is made up of four
5    parts.  Part A is a list of mitigating circumstances to be
6    checked only if you unanimously agree that a particular
7    mitigating circumstance existed.  Part B is a list to be
8    checked where some of you may think that a circumstance of
9    mitigating circumstances but all of you don't agree.  Then
10   Part C is a list to reflect circumstances of which there
11   may have been some evidence but no member feels that that
12   circumstance existed.  The last part, and that's Part D is
13   to be checked only if the jury concludes that there is no
14   evidence of mitigating circumstances.
15         Now if after making the determination required to
16   complete form 1 and 2, if necessary, you then move on to
17   and complete form 3.
18         Now in no event would you return a verdict imposing
19   the death penalty unless you unanimously make three
20   particular written findings on that form 3.  And they are:
21         First:  That one or more aggravating circumstances
22   existed beyond a reasonable doubt;
23         Second:  That such aggravating circumstances outweigh
24   beyond a reasonable doubt any mitigating circumstancese
25   that you have found to exist; and,

843

Respondent's Exhibit E

1    Third:   That the aggravating circumstances justify
2    beyond a reasonable doubt the sentence of death.
3        Now if you make those findings you may impose the
4    death penalty.  Otherwise, you will sentence the defendant
5    to life imprisonment without parole.
6        Now after you have made your determination on forms 1
7    and 2 and reflected on your conclusions on form 3, you then
8    must check the appropriate verdict on form 4.  And each of
9    you must sign the verdict form.
10       I'll just explain to you what the verdict form is at
11   this point.  The verdict form says, "We, the jury, after
12   careful deliberation have determined that for the capital
13   felony murder of Gary Turner that Kenneth Reams shall be
14   sentenced to: (a) life imprisonment without parole; or, (b)
15   death by lethal injection.  Now, each of you must sign
16   this.  You have to decide which form to check and check
17   that form, but each of you should sign this.  You know,
18   previously only the foreman signed it.  But each of you
19   should sign this at this point.
20       Now, I'll probably go over this again with you, ladies
21   and gentlemen, because those forms are relatively self-
22   explanatory, but also relatively confusing.
23       So after hearing arguments of counsel and some
24   additional testimony, we'll probably go back over those
25   instructions one more time before I send them back with

844

Respondent's Exhibit E

1       you.

2               Now, at this point, Ms. Billings, do you have any

3       opening remarks.

4               MS. BILLINGS:  Just very briefly, your Honor.

5                               OPENING REMARKS

6       BY MS. BILLINGS:

7               Ladies and gentlemen, I'd like to thank you for your

8       verdict.  This is the part of the trial that we talked to

9       you about at length during the voir dire process.  During

10      this stage, we will be introducing as statutorily set out,

11      aggravating circumstances that we talked about in the voir

12      dire process.  And we will be producing copies of documents

13      that show that these exist.  We won't have any new witness-

14      es to present to you.  So, our part may be fairly brief.

15              At the end of Mr. Kizer's introduction of any mitigat-

16      ing circumstances, we may put on some witnesses in rebuttal

17      at that point.  It just depends on what is produced.

18              THE COURT:  Mr. Kizer, any opening remarks?

19              MR. KIZER:  Very few, your Honor.

20                              OPENING REMARKS

21      BY MR. KIZER:

22              Ladies and gentlemen, we have reached the second

23      trial, and this will be a trial just like the first one

24      was.  There will be a presentation of evidence.  There will

25      be some physical evidence for you to concern yourself with

                                845

Respondent's Exhibit E

1    and there also will be some testimony.  Most of that will
2    come from the defense.

3         Now that you have decided that my client is guilty of
4    capital murder, we're not here to find any more facts with
5    regard to that particular issue.  We're here to decide
6    punishment.

7         It's my job to keep this man alive, if I can, and to
8    show you why he should be kept alive.  And I'm going to
9    attempt to do that by introducing evidence through the form
10   of testimony from a psychological examiner who tested my
11   client and found that he is mildly retarded.  He has a 66
12   IQ.  And this is -- my psychological examiner will explain
13   that in far more detail to you.  And you will find that
14   under the enumerated mitigation factors that that is a
15   factor that you can take into consideration.

16        You will find that his age is -- he was very young at
17   the time that this incident occurred.  That is a factor
18   which you can take into consideration.

19        I'm going to have some school records for you to take
20   a look at while my client was in school at Poplar Bluff and
21   while he was going through high school.  And there will be
22   some things that I will call your attention to.  I'm not
23   going to have someone here from the school to introduce
24   these records, but rather the Prosecution has agreed that
25   they can come in without me laying a foundation through a

846

Respondent's Exhibit E

1    school administrator.  And some of the things that I would
2    ask you to take a look at are some of the handwritten notes
3    by some of the teachers that show positive things about my
4    client's behavior while he was in school.  For example,
5    it'll show on one page that, "Kenny will show the ability
6    to accept positive criticism by changing the manner of
7    doing things out of time."  I would submit to you that that
8    is something you need to consider about whether life
9    without parole is appropriate and whether he can comport
10   his conduct to what would be an acceptable standard while
11   he is in the Arkansas Department of Correction.  It will
12   also show you that he was in remedial math that will back
13   up the findings by the psychological examiner that he is
14   borderline retarded and that his behavior disorder dysfunc-
15   tions were found to exist in the public school system
16   before he ever made it to the mental health center.

17        He got sent to a home for troubled youths in Missouri
18   arising out of a conviction where he was placed on parole
19   for burglary.  The Prosecution will introduce that record
20   to you.  And this will be a record that will show you
21   something about what he was like when he went to that
22   institution which was not all that long ago.  When you are
23   only 18 years of age, you don't have that much history.
24   You haven't been around on this earth long enough to do
25   that much.

847

5424
Respondent's Exhibit E

1          But it will give you some kind of insight into who

2          this human being is.

3          You will also have a certified copy of the record of

4          where the co-defendant, Alford Goodwin, entered a plea of

5          guilty to this charge and received life without parole as

6          the punishment which he is currently serving in the

7          Arkansas Department of Correction.  In a turn about is fair

8          play type of atmosphere, while that is not an enumerated

9          mitigation factor that is on that list, the Judge told you

10         you are not restricted to the enumerated mitigation

11         factors.

12         And, finally, there will be a report from the South-

13         east Arkansas Mental Health Center that will give you some

14         idea as to what their findings were.  The State has a --

15         has the physician subpoenaed who is a consulting physician

16         in this matter and he made certain findings about anti-

17         social personality and things along those lines.  This is,

18         we think, hopefully, give you a better idea about his make-

19         up, what Kenneth Reams is all about.

20         Before you can make a decision of this gravity of this

21         magnitude, the law believes it is only fair if you know

22         something more about this individual and that's what I'll

23         endeavor to do.

24         I will also encourage you to think long and hard, just

25         like I mentioned to you in the voir dire process, that when

5425

Respondent's Exhibit E

1    you are 18 years of age, as Kenneth Reams is, in this

2    country with a life expectancy of a male now tops 72 years.

3    Life without parole in the penitentiary is not an insignif-

4    icant sentence.  We're not talking about the death penalty

5    or nothing.  We're talking about the death penalty or the

6    rest of his life in the penitentiary; potentially, 50 or 60

7    years.   That is an incredibly long time and that is a

8    severe sentence and it is a legally permissible sentence

9    under the statute of this State.

10    So with that in mind, I'm trying to lay out for you

11    the ground work of how we'll proceed.   It will take a

12    little bit of time to present this to you.  And I hope you

13    give it the same due care and deliberation that you gave

14    the evidence in the guilt or innocence phase of this trial.

15    Thank you.

16    THE COURT:  Thank you.  Ms. Billings.

17    MS. BILLINGS:  Yes, your Honor.  Your Honor, at this

18    point, I'd like to introduce to the jury State's Exhibits

19    Number 18 and 19 which are certified copies of the aggra-

20    vating robbery convictions of Mr. Kenneth Reams.a

21    THE COURT:  Any objection?

22    MR. KIZER:  No, your Honor.

23    THE COURT:  Without objection, let them be received.

24    What's the case number of State's Number 18?

25    MS. BILLINGS:  Sir?

849

5426    Respondent's Exhibit E

1          THE COURT:  What is the case number?

2          MS. BILLINGS:  Eighteen is 93-300.

3          THE COURT:  And 19?

4          MS. BILLINGS:  93-299.

5          THE COURT:  All right.

6          (WHEREUPON, THE CERTIFIED COPY OF THE JUDGMENT AND

7    COMMITMENT OF KENNETH REAMS IN JEFFERSON COUNTY CIRCUIT

8    COURT NUMBER CR-93-300, PREVIOUSLY MARKED AS STATE'S

9    EXHIBIT NUMBER 18 WAS RECEIVED INTO EVIDENCE.  SEE PAGE

10   NUMBER 973.)

11         (WHEREUPON, THE CERTIFIED COPY OF THE JUDGMENT AND

12   COMMITMENT OF KENNETH REAMS IN JEFFERSON COUNTY CIRCUIT

13   COURT NUMBER 93-299, PREVIOUSLY MARKED AS STATE'S EXHIBIT

14   NUMBER 19 WAS RECEIVED INTO EVIDENCE.  SEE PAGE NUMBER 974

15   .)

16         MS. BILLINGS:  As I told you in my opening remarks, we

17   were alleging two aggravating circumstances in this case.

18   One of them was that murder was committed for pecuniary

19   gain.  That's one of the ones that the legislature has laid

20   out.  And I believe the testimony to you here today has

21   been sufficient to support this particular aggravating

22   circumstance there was testimony from the defendant himself

23   and from the officers that the purpose of this particular

24   robbery was, in fact, to get money.  That's what the

25   pecunairy gain aggravating circumstance is.  And that Mr.

850

Respondent's Exhibit E

1    Turner lost his life for mere money which they never
2    actually got.  That is considered a very callous reason to
3    lose your life is just for money.
4         The other statutorily set out circumstances we are
5    alleging and I submit that we have shown here with the
6    certified copies of the aggravated robbery convictions of
7    Mr. Reams is that Kenneth Reams previously committed
8    another felony, an element of which was the use of threat
9    of violence to another person or the creation of a substan-
10   tial risk of death or serious physical injury to another
11   person.
12        These are the two that we will set out on the forms
13   that when you go back in the jury room and you find either
14   one does exist or both of them, then you may go on to the
15   second step of the trial.
16        Thank you, your Honor.
17        THE COURT:  Mr. Kizer.
18        MR. KIZER:  Defense would call as the first witness,
19   David Nanak.  As we mentioned before the trial, I would ask
20   that the rule be invoked for the second stage.  I wasn't
21   sure if the Prosecution --
22        THE COURT:  Is there any request that the rule be
23   invoked in this stage of the trial?
24        MS. BILLINGS:  Yes, your Honor.
25        THE COURT:  All of the witnesses who are going to

5428                Respondent's Exhibit E

1   testify at this phase of the trial, other than Mr. Nanak,

2   he can come on around.  He's the first witness.  Any other

3   witnesses that are going to testify need to remain outside.

4   Ms. Whiteside.

5       MR. KIZER:   I'll go down the list, your Honor.

6   Beatrice Whiteside, Reverend George McDaniel, Amelia Reams.

7   She may already be outside, your Honor.  Patrick Caffey,

8   when he arrives.  And we may or may not hear again from Mr.

9   Reams.

10      THE COURT:  All right.  Thank you.

11      MR. KIZER:  May I proceed, your Honor?

12      THE COURT:  Please.

13                      DAVID NANAK

14  having been called at the instance of counsel for the defendant,

15  and after first having been duly sworn, testified as follows, to

16  wit:

17                  DIRECT EXAMINATION

18  BY MR. KIZER:

19  Q   Would you state your name for the record, please?

20  A   David Allen Nanak.

21  Q   What do you do for a living, Mr. Nanak?

22  A   I am the coordinator of psychological services for South-

23  east Arkansas Mental Health Center.  I am a licensed pyscholo-

24  gical examiner.

25  Q   Would you please inform us about your background and what

852

Respondent's Exhibit E

1    it took for you to become a licensed psychological examiner,

2    please?

3    A    I have a master's degree in pre-clinical psychology and to

4    get the license, I had to pass the State test.

5    Q    How long have you practiced in this area?

6    A    I've been licensed since '79.

7    Q    How long have you worked with the Southeast Arkansas Mental

8    Health Center?

9    A    Since that time.

10   Q    And in the course of your employment with the Southeast

11   Arkansas Mental Health Center, how many psychological evalua-

12   tions do you believe you have performed?

13   A    I have no way of estimating that.

14   Q    Over a hundred?

15   A    Easily.

16   Q    Probably over a thousand?

17   A    Yes, sir.

18   Q    Have you ever been qualified as an expert and given

19   testimony in a courtroom before?

20   A    Yes, sir.

21        MR. KIZER:  Your Honor, with that in mind, I would be

22        the introduction and recognition of Mr. Nanak as an expert

23        in the field of psychological examination.

24        THE COURT:  Any objection?

25        MS. BILLINGS:  No objection, your Honor.


853

Respondent's Exhibit E

1           THE COURT:  Let him be so recognized.

2           MR. KIZER:  Thank you, your Honor.

3   MR. KIZER CONTINUING:

4   Q    Mr. Nanak, with regard to the young man who is seated here

5   before you, Kenneth Reams, did you have the occasion to conduct

6   the psychological evaluation of him?

7   A    Yes, sir.

8   Q    And did you bring your records with you today that showed

9   the results of that examination?

10  A    I brought a copy of my report that was sent to the Court,

11  yes, sir.

12  Q    Okay.  Before we get into the actual report itself, would

13  you give us some background and some idea about what is involved

14  in psychological evaluation and testing?

15  A    In testing -- when we set up the battery of testing for

16  particularly this type of evaluation, we look at several

17  different features, primarily the intellectual level.  And we

18  also look at -- or try to rule out any organic type of involve-

19  ment, brain damage or something like this and also look at

20  personality features.

21  Q    And what tools of the trade do you use to be able to make

22  this type of evaluation?

23  A    Okay.  For this particular evaluation, the Wechsler Adult

24  Intelligence Scale was used, the Wide Range Achievement Test,

25  the House-Tree-Person, the Bender Visual-Motor Gestalt Test, and

854

Respondent's Exhibit E

1    then I also did a brief interview.

2    Q    Okay.  Without getting in too much detail, keeping in mind

3    that most of us in this courtroom are lay people, would you try

4    to give us an idea of what these tests -- what they are com-

5    prised of and what the goal is that you achieve by subjecting to

6    someone to this test?

7    A    Okay.  The first test mentioned, the Wechsler Intelligence

8    Scale, Wechsler Adult Intelligence Scale-Revised is just that.

9    It is an intellectual scale that breaks intelligence down into

10   two categories, verbal and non-verbal.  Try and get a feel for

11   the  intellectual  level  of  the  individual.    The  Wide  Range

12   Achievement Test is an academic achievement test.  I use this

13   test as the two scores should corrolate between the intelligence

14   test and the academic achievement test.  We look for a corro-

15   lation there.  The House-Tree-Person is a projective test that

16   is used to get at personality.  The Bender Visual-Motor Gestalt

17   Test is a visual motor test used to rule out organic problems,

18   brain damage and also get some personality factors.  And I do a

19   brief  intervew  to  look  at  alertness,  orientation,  and  other

20   factors I can use to either verify or disprove test findings.

21   Q    Okay.  And are these -- have these tests been recognized

22   within your profession as being qualified and standards in the

23   industry, so-to-speak?

24   A    Yes, sir.  Yes, sir.

25   Q    Have most of these tests, as a matter of fact, been around

855

Respondent's Exhibit E

1    for quite a number of years?

2    A    Yes, sir.

3    Q    Okay.  If we can turn to your evaluation of Mr. Reams,

4    please.  Would you tell us something about your involvement was

5    and what your findings were involving Mr. Reams?

6    A    Well, on the intelligence scale he tested out in the range

7    of what we call mild mental retardation.  He came up with -- his

8    full scale IQ score was that of 66.  The range for mild MR would

9    depend on which scale you use.  It starts at about 50 and goes

10   to about 70.

11   Q    Okay.  The test is composed of what scores?  I mean, what

12   does that 66 score, what does it mean?

13   A    The 66 is a composite of both the verbal and non-verbal

14   factors that when in to what we call full-scale IQ based on the

15   Wechsler system.

16   Q    Okay.  And IQ stands for what?

17   A    Intellectual Quotient.

18   Q    When someone is in the mild retarded range of intellectual

19   quotient, how does that normally affect their reasoning abili-

20   ties or their cognitive skills?

21   A    Generally, these people are a little bit slower as far as

22   learning and being able to function -- let me say, not necessar-

23   ily the quick thinkers.

24   Q    Okay.  With regard to the brief interview that you had with

25   Mr. Reams and the other tests that you performed, did that scale

Respondent's Exhibit E

1    -- that mean scale that you told us about, the mean reading of

2    66, does that appear to be consistent with the other findings?

3    A    His testing was consistently mild MR all throughout, yes.

4    Q    As I mentioned to you before you came into the courtroom

5    today, Arkansas has passed a statute that has not come into play

6    as of yet.  It's not the law in this state, yet, but it will be

7    here before too awfully long, and it provides that in death

8    penalty cases there is a factor, a quotient of 65 that is

9    important for the court or the jury to take into consideration

10   before somebody can be subjected to the death penalty.  What is

11   the significance of the number 65 in our intelligence quotient?

12   Do you have any idea in regards to the --

13   A    Why the number 65 was chosen, no, I do not know.  I had

14   received notification, you know, when we do these evaluations to

15   make sure the intellectual quotient is given because 65 is the

16   cut-off for the death penalty.

17   Q    Okay.  Now as far as the range that you told us about

18   earlier, where does 65 fall in that range of mild mental

19   retardation?

20   A    The range falls from roughly 50 to 70.  So, 65 would be

21   upper third.

22   Q    Okay.  As you indicated to me also that you felt like that

23   number might have some significance because of the deviation

24   factor?

25   A    There is a standard error of measurement built into most of

5434

Respondent's Exhibit E

1    the psychological tests.  On the Wechsler, the standard of error

2    of measurement runs about seven or eight points.  And, again,

3    with the different scales.  You know, Wechsler has his own scale

4    as far as mild and moderate MR and all of this DSM3R has a

5    slightly different scale.  They may have chosen the 65 to give

6    the benefit of the doubt picking a little bit lower into the

7    scale so just in they case they did happen to guess right on a

8    few or wrong on a few.  They would give them a few extra points

9    to make sure that they are dealing with a mentally retarded

10   individual.

11   Q    Okay.  If I could ask you to take a look at the first page

12   of the psychological evaluation in the bottom paragraph, I

13   assume that this information came about during your brief

14   interview?   Do you see where I'm referring to down at the

15   bottom?

16   A    Yes.

17   Q    Did you ask him something about whether he had had a full-

18   time job before?  Do you recall what his response was?

19   A    I believe he -- the first paragraph, I believe he stated he

20   had never held a full-time job.

21   Q    How about a driver's licence?

22   A    He stated that he had never had a driver's license, but he

23   was capable of driving a car and did drive some.

24   Q    And, according to your statement, says he can drive a car

25   a little bit.

5435   Respondent's Exhibit E

1    A    That's what he -- those were his words, he drives a little

2    bit.

3    Q    Okay.  What was his emotional -- how did he emotionally to

4    you when you asked about the charges that he was facing?

5    A    The first time -- I asked him about the charges twice.  The

6    first time he was fairly straight.  The second time, he broke

7    down, cried, saying that he had really messed up, he was really

8    in trouble and that he was going to spend the rest of his life

9    on death row for something he didn't do.

10   Q    You indicated on the second page some conclusions that he

11   drew from his HTP drawings.  What were those conclusions?  There

12   is a suggestion there.

13   A    Emotionally  immature  individual  with  poor  self-image.

14   Feelings of instability and ineffectiveness.  More of a self-

15   centered approach to life.  Some underlying anger and frustra-

16   tion that could increase the acting out or explosive behaviro.

17   Q    Okay.  And if you'll skil down two more paragraphs, I

18   believe that you drew a conclusion based on what you observed

19   behaviorally of Mr. Reams.  Would you relate that to the jury?

20   A    The behavioral section, emotionally immature individual,

21   problems with impulse control, low frustration tolerance.  There

22   is underlying anger and frustration which increases acting out

23   potential in an explosive manner.

24   Q    Okay.  And finally on the last paragraph I believe you

25   indicate that there is some impairment in the common sense

859

Respondent's Exhibit E

1    reasoning.  Is that correct, the last paragraph on that second

2    page?

3    A    Okay.  I'm sorry.  Common sense reasoning and judgment

4    appears to be limited; however, he was able to express the

5    difference between right and wrong.  He did express some remorse

6    over his situation he is currently involved in.

7    Q    When an individual gets tested in a psychological evalua-

8    tion, is there not built into the test some type of factoring

9    that would prevent someone from cheating on the test, so to

10   speak, or you being able to, at lest, detect that they were

11   being evasive and not answering truthfully on the questionnaire?

12   A    Yes.

13   Q    Okay.  Did you feel as though the responses that were given

14   by Mr. Reams to this examination lead you to be able to state

15   with confidence that you have a result that is certain?

16   A    I believe the results of the evaluation are valid.

17            MR. KIZER:  That's all the questions I have of this

18        witness, your Honor.

19            THE COURT:  Ms. Billings.  Mr. Juneau.

20                        CROSS EXAMINATION

21   BY MR. JUNEAU:

22   Q    Mr. Nanak, when did you say you did your test?

23   A    Beg your pardon?

24   Q    When did you do the test?

25   A    When?  September 27, 1993.

860

5437    Respondent's Exhibit E

1    Q    I've got your report September the 30th.  Is that what you
2    are referring to?
3    A    The test is dated September 27, 9-27-93.
4    Q    Okay.  Let me show you this report.
5              MR. JUNEAU:  Your Honor, may I approach the witness?
6              THE COURT:  Yes, sir.
7    MR. JUNEAU CONTINUING:
8    Q    We may be looking at a different --
9    A    Alford Goodwin.
10   Q    Okay.
11   A    Kenneth Reams.
12   Q    You interviewed both these people, didn't you, Alford
13   Goodwin and Kenneth Reams.
14   A    Yes.
15   Q    You said that he is functioning as mildly retarded.
16   A    Correct.
17   Q    Okay.  And the cut-off as retardation would be an IQ of 70?
18   A    Seventy on some scales is the bottom of the, what we call,
19   of course, is the borderline range.  Sixty-nine to 70, there is
20   a hair's difference in there.  But on the Wechsler scale, 69 is
21   mild MR; 70 is borderline.
22   Q    Okay.
23   A    Borderline is no longer considered retarded.
24   Q    Okay.  And he functioned at a 66 or a mild, is that
25   correct?

861

Respondent's Exhibit E

1   A    That's correct.

2   Q    Did I hear you say that he would know right from wrong?

3   A    He -- he is able to express the difference between right

4   and wrong.

5   Q    Okay.  So then whatever he does, he knows whether that

6   action is right or wrong or whether it is criminal or not

7   criminal?

8   A    Correct.

9   Q    You said he was functioning -- or people that function at

10  66 are a little slow.

11  A    Yes.

12  Q    Is that in everything that they do?

13  A    Generally, it is.  Now, it's not hard fast.  But --

14  Q    Some individuals may -- particularly, let's say, that

15  somebody has done something more than once.

16  A    Yes.  And with the mild range running from 70 to 50, a 67

17  or a 68 or 69 will be a higher functioning level than a 52 or a

18  53.

19  Q    Okay.  I understand.  But the more often somebody as

20  specific act it is more likely that they are able to function at

21  a higher level because they have repeated this thing?

22  A    Yes.  When we work with teaching people that are labeled

23  retarded, we find that repetition increases learning.

24         MR. JUNEAU:  Okay.  Thank you.

25                        REDIRECT EXAMINATION


862


5439

Respondent's Exhibit E

1    BY MR. KIZER:

2    Q    Mr. Nanak, I should have asked you before, the findings

3    that you made from this examination in September, the act for

4    which he is found guilty of occurred on May 5.  That's roughly

5    a four- or five-month gap of time.  Do you feel as though the --

6    at the time of the commission of the capital murder that he has

7    been convicted of that his intelligent quotient was roughly the

8    same?  I know it is hard to extrapolate back, but would you see

9    a great change one way or another.

10   A    I'm not aware of any intervening variables that would have

11   changed it.  So I would have to assume that yes it would be

12   within the same range.

13            MR. KIZER:  May I approach the witness, please, your

14        Honor.

15            THE COURT:  Yes, sir.

16   MR. KIZER CONTINUING:

17   Q    I have taken out of the full report what appears to be a

18   three-page copy signed by you of Mr. Reams' psychological

19   evaluation.  Does that appear to be an accurate photocopy?

20   A    Yes, it does.

21            MR. KIZER:  Your Honor, I would move to introduce this

22        as Defendant's 1.

23            THE COURT:  Any objection?

24            MS. BILLINGS:  No, your Honor.

25            THE COURT:  And that is the three-page report signed

863

Respondent's Exhibit E

1    by --

2         MR. KIZER:   I just slipped it out of the overall

3    evaluation.

4         THE COURT:   All right.

5         MR. KIZER:   May I publish it to the jury, please, your

6    Honor?

7         THE COURT:   You may.

8         (WHEREUPON, THE PHOTOCOPY OF THE THREE-PAGE PSYCHOLOG-

9    ICAL EVALUATION ON KENNETH REAMS DATED SEPTEMBER 27, 1993,

10   SIGNED BY DAVID A. NANAK, M.A., PSYCHOLOGICAL EXAMINER,

11   PREVIOUSLY MARKED AS DEFENDANT'S EXHIBIT NUMBER 1 WAS

12   RECEIVED INTO EVIDENCE.  SEE PAGE NUMBER 975.)

13        MR. KIZER:   That's all the questions I have of this

14   witness.

15        THE COURT:   Anything further?  Any recross?

16        MS. BILLINGS:   No, your Honor.

17        THE COURT:   Thank you, Mr. Nanak.  You may stand down.

18        MR. KIZER:   May he be excused?

19        THE COURT:   Any objection to Mr. Nanak being excused?

20        MR. JUNEAU:   No, sir.

21        THE COURT:   You may be excused.  You are free to go or

22   stay as you wish.

23        MR. KIZER:   May I call the next witness, your Honor?

24        THE COURT:   Yes, sir.

25        MR. KIZER:   I would like to call Reverend George

864

Respondent's Exhibit E

```
 1              McDaniel.  May I proceed, your Honor?
 2                   THE COURT:  Yes, sir.
 3                        REVEREND GEORGE MCDANIEL
 4    having been called at the instance of counsel for the defendant,
 5    and after first having been duly sworn, testified as follows, to
 6    wit:
 7                        DIRECT EXAMINATION
 8    BY MR. KIZER:
 9    Q    Would you state your name for the record, please?
10    A    Reverend George Solomon McDaniel.
11    Q    Where do you live, Mr. McDaniel?
12    A    Sikeston, Missouri.
13    Q    How long have you lived in that area?
14    A    Four years.
15    Q    What is your age?
16    A    Forty-two.
17    Q    And what is your educational and professional experience
18    and background?
19    A    I have a high school and I'm a minister and pastor of
20    Central Baptist Church, Poplar Bluff, Missouri.
21    Q    How long have you been engaged in that type of occupation?
22    A    Seven years.
23    Q    Is this a full-time occupation for you?
24    A    Yes, sir.
25    Q    And what is the denomination of your church?
```

865

5442

Respondent's Exhibit E

1   A   Baptist.

2   Q   The defendant in this matter, Kenneth Reams, have you had

3   the occasion to come in contact with him in the past?

4   A   Yes, sir, I have.

5   Q   Could you relate that to us, please; how you came in

6   contact with him and what that contact was?

7   A   He came to Central about two months after I was there, and

8   he came religiously.  And I don't remember the exact date, but

9   he decided that he wanted to give his life to Christ.

10  Q   Could you give us -- if you can't give us a date, could you

11  please give us a year when you think that would have been?

12  A   It would have been '92.

13  Q   Okay.  And he is 18 now.  That would put him approximately,

14  depending on when it fell in that year, he was 16 or 17 years of

15  age.

16  A   Right.

17  Q   Had you known him or any member of his family prior to him

18  beginning to attend your church?

19  A   No, sir.

20  Q   When he attended your church, did you have occasion to

21  counsel with him from time to time about life?

22  A   Yes, sir.

23  Q   How did you find his demeanor and the way that he ap-

24  proached matters when you counseled him?

25  A   Well, he came to me and we went into the office and we

866

5443

Respondent's Exhibit E

1   would sit down and we talked about some things.

2   Q    Okay.

3   A    About life.

4   Q    Did he appear to listen to what you had to say and try to

5   implement any suggestions that you may have had?

6   A    Well, I've never had any problems out of Kenny.   As a

7   matter of fact, he was on our usher board at the church.

8   Q    Did there come to be a time when he did not -- no longer

9   attended your church?

10  A    When he left and came home.

11  Q    Okay.  Could you give us a rough idea as to how many months

12  or years it would have been that he attended your church?

13  A    He was there about a year.

14  Q    Okay.  Did he participate in any extracurricular activities

15  at the church, any social functions or anything like that?

16  A    Well, just ushers is all that I know of.

17  Q    Okay.  Do you know whether he had formed any other rela-

18  tionships with any other members of the church while he attended

19  that church?

20  A    Yes.  One of the members, Sister Mack, Jenny Mack; he was

21  real close to her.

22  Q    Okay.  And I believe Mr. Reams has told us that Ms. Mack is

23  the mother of his girl friend.

24  A    Right.

25  Q    Is that correct?

Respondent's Exhibit E

1     A     Right.

2     Q     Did he ever talk to you about his girl friend or about that

3     relationship?

4     A     Not that I can remember.

5     Q     While he was in Poplar Bluff, Missouri, he encountered a

6     problem with the law and got placed on probation.   Were you

7     aware of that?

8     A     Yes, sir.

9     Q     Did you talk with him about that problem?

10    A     Yes, sir.

11    Q     He has indicated in his testimony in the other phase of

12    this trial that at least while he was in Pine Bluff he had used

13    alcohol and had used marijuana.   Were you aware of any type of

14    use to that extent when he was -- lived in Missouri?

15    A     No, sir.

16    Q     From time to time during my representation of Mr. Reams, I

17    have seen evidence of his artistic ability.   Have you also seen

18    evidence of that ability?

19    A     He did some drawings for us.

20    Q     Okay.   Were they free-hand type drawings where he just

21    observed something and then drew it?

22    A     Yeah.

23    Q     How would you gauge the quality of those drawings?

24    A     As much as I know about art, it looked good to me.

25    Q     Did you ever experience in the year that you were his

868

Respondent's Exhibit E

1    pastor, did you ever see a different side of Kenny, a violent

2    side or a disrespectful side or anything along those lines?

3    A    Not when he was around me.  He always respected me and if

4    he had a problem, he would always come into the office and we

5    would sit down and talk.

6    Q    Did you ever notice him acting out in any church function?

7    A    No.

8    Q    I think when he lived in Missouri, I believe I'm right in

9    saying he lived with an aunt while he was there, is that

10   correct?

11   A    That's right.

12   Q    Do you know his aunt that he lived with?

13   A    She is also a member of my parish.

14   Q    And what is her name?

15   A    Amelia Reams.

16   Q    Okay.  Do you know the circumstances that caused him to

17   come live with his aunt to begin with?

18   A    No, sir.

19   Q    As you know, this jury has a difficult decision about

20   should be the disposition of this matter involving Mr. Reams now

21   that he has been found guilty of capital murder.  Do you have an

22   opinion with regard to whether he has any type of abilities that

23   might enable him to be a productive member of society while he

24   is in the penitentiary?

25   A    Well, I -- I can say that Kenny is a good, young man and he

869

5446

Respondent's Exhibit E

1    has always been respectful to me.  And he has qualities.  He

2    does have qualities.  And I don't think that he is a hard-headed

3    young man.

4    Q    At your age in life, have you been able to observe, maybe,

5    contemporaries who may have had problems when they were younger

6    but grew out of those problems as they matured and got older?

7    A    I know -- I have a friend.

8    Q    None of us can predict the future, but knowing what you

9    know about Mr. Reams, is that the type of thing that you think

10   is possible for him?

11   A    I think it is from my heart.

12   Q    If that took place and based on what you know about his

13   personality and how he handles himself, do you feel as though he

14   could one day, perhaps, influence some other young person not to

15   follow down the same path that he has followed down?

16   A    I think that is the thing that Kenny has been through would

17   help a lot of people, a lot of young people that needs (sic)

18   help.

19          MR. KIZER:  I think that's all the questions I have,

20       your Honor.

21          THE COURT:  You may cross examine.

22                        CROSS EXAMINATION

23   BY MS. BILLINGS:

24   Q    Reverend McDaniel, did I understand you to say that during

25   your period of knowing Mr. Reams up there in Missouri that he

                              870

                    Respondent's Exhibit E

1    was never in any trouble to your knowledge?

2    A    No, I didn't say that.

3    Q    You didn't say that?

4    A    No.

5    Q    Well, was he in any trouble, to your knowledge?

6    A    Well, I know that he was in the Sears Boys Home.

7    Q    While he was there?

8    A    Yes.

9    Q    Was that during the time that you knew him?

10   A    Yes.

11   Q    Okay.  And you said that you knew him one year basically

12   starting in 1992?

13   A    More or less.

14   Q    Sir?

15   A    More or less.

16   Q    Okay.  When did you get there?

17   A    I came there in '91, November.

18   Q    November of '91?

19   A    Um-hum.

20   Q    And when is the last time that Kenneth was in your church?

21   A    Oh, I guess, I can't really give a date because people are

22   in and out all of the time.  But I can say this that when he did

23   -- after he left and came home, when he came back to Poplar

24   Bluff, he would always come by and see me.

25   Q    Okay.  Well, has he been there in the last year as a member

871

Respondent's Exhibit E

1   of your church or actively going to your church?

2   A    Well, I would have to get the records at the church to be

3   sure how long it has been.  I can't just say off the top of my

4   head.

5   Q    Well, since January, can you remember if he has been there

6   or not?

7   A    Well, he hasn't been there as a member -- I mean, coming to

8   church on Sunday morning, but in his constant visit back he

9   would come by.

10  Q    Last fall was he there as a regular member of your church?

11  A    Well, I just made the statement that I would have to look

12  at the records and if I looked at the records, I could tell you

13  the last time he came as a member.

14  Q    When Mr. Kizer asked you how long Kenneth had been to your

15  church, you said he was regularly there as an usher.  But you

16  don't have any idea when you are talking about?

17  A    Well, we have several ushers.  And I would have to look at

18  the records to tell you when he was there.  I mean there is more

19  than one.

20  Q    Are you aware of any trouble that Kenneth was into while

21  you were there and being his pastor during the 1992s and 1993?

22  A    Except for that that I've already stated.

23  Q    When he went to the Sears School.

24  A    (Witness nodding head)

25  Q    Were you aware of him being placed on probation for

872

5449

Respondent's Exhibit E

1    stealing?

2    A    No.

3    Q    You weren't?

4    A    No.

5    Q    In September of '92?

6    A    No.

7    Q    Were you aware that he absconded on his probation?

8    A    All I know is that he left Poplar Bluff.

9    Q    He left Poplar Bluff.  Did you know there is a warrant for

10   his arrest for absconding on his probation?

11   A    All I know is that he left Poplar Bluff.

12   Q    Did you know that there is another warrant dated March 15

13   of this year for a burglary and theft of property?

14   A    Here?

15   Q    No, sir, in Missouri.

16   A    All I know is that he left Poplar Bluff.

17        MS. BILLINGS:  Thank you, sir.

18        MR. KIZER:   That's all the questions I have, your

19   Honor.

20        THE COURT:  Thank you, Mr. McDaniel.  You may stand

21   down.  Call your next witness.

22        MR. KIZER:   Call Beatrice Whiteside, your Honor.

23   Beatrice Whiteside.  May I proceed, your Honor?

24        THE COURT:  Please.

25                    BEATRICE WHITESIDE


                              873

Respondent's Exhibit E

1    having been called at the instance of counsel for the defendant,

2    and after first having been duly sworn, testified as follows, to

3    wit:

4                        DIRECT EXAMINATION

5    BY MR. KIZER:

6    Q    Would you state your name, please?

7    A    Beatrice Whiteside.

8    Q    Ms. Whiteside, you are the mother, are you not, of Kenneth

9    Reams?

10   A    Yes.

11   Q    How many other children do you have?

12   A    Two.

13   Q    What are their names and ages?

14   A    Scott is ninie and Dominique is eight.

15   Q    Where do you live?

16   A    In Forrest City, Arkansas.

17   Q    Are you married?

18   A    Yes, sir.

19   Q    What's your husband's name?

20   A    Scott Whiteside.

21   Q    What age are you?

22   A    Thirty-eight.

23   Q    Mr. Whiteside, I believe, works over in Forrest City.  Is

24   that right?

25   A    Yes, sir.

874

Respondent's Exhibit E

1    Q    And do you work outside the home?

2    A    Do I work outside -- not now, no, sir.

3    Q    In the past, you have, is that right?

4    A    Yes, sir.

5    Q    What type of work have you done in the past?

6    A    Personal care aid for the Forrest City Health Department.

7    Q    Did you do some sitting in peoples' homes and that type of

8    thing?

9    A    Yes, sir.

10   Q    The -- you know the matter that we are here for today, do

11   you not?

12   A    Yes.

13   Q    You've been here and heard the testimony in the trial.

14   A    Yes.

15   Q    When did -- when did y'all live in Pine Bluff?  Kenneth has

16   told us he lived here until about the eighth grade.  Is that

17   right?

18   A    When we left Pine Bluff, Ken was in the fifth.

19   Q    Did you come back to Pine Bluff at some point?

20   A    Yes.

21   Q    Okay.  Is Jefferson County your home?

22   A    Yes, sir.

23   Q    Where did you grow up?

24   A    Altheimer, Arkansas.

25   Q    When you left while Kenny was in the fifth grade, where did

Respondent's Exhibit E

```
1    y'all go?  Where did you move to?

2    A    Poplar Bluff.  I'm sorry.  Utomwa, Iowa.

3    Q    And what was the reason for moving to Iowa?

4    A    We wanted to go some place we felt like would be -- well,

5    less crime would be at, you know, try to bring our family up.

6    Q    Okay.  I think you told me that your husband had a job

7    opportunity there also.  Is that right?

8    A    Yes, sir.

9    Q    Did the job opportunity work out for him?

10   A    Yes, sir.

11   Q    How long were you in Iowa before you returned south?

12   A    About six months.

13   Q    And did Kenneth go with you?

14   A    Yes.

15   Q    When you left Iowa, did you come back to Pine Bluff for a

16   time before you moved to Forrest City?

17   A    To live at Pine Bluff?

18   Q    Yes.  Uh-huh.

19   A    When we left Iowa, we went to Forrest City.

20   Q    Okay.  Have you been over there ever since?

21   A    Yes.

22   Q    All right.  Tell us something about Kenneth when he was

23   growing up and developed into a young man.  What was he like

24   around the home?  How would you describe him?

25   A    He was everything that a mother could ask for.  Ken -- he
```

876

Respondent's Exhibit E

1    never was disrespectful to me.

2    Q    When he got to a certain age, say, a teenager--in the

3    teenage years, did some problems develop in the home involving

4    Kenneth?

5    A    I don't understand what you are saying.

6    Q    Well, you told me at one point when we met and talked about

7    this earlier that something caused y'all to come to the conclu-

8    sion that he needed -- that it would be good for him to go live

9    with his aunt in Poplar Bluff, Missouri.

10   A    Yes.

11   Q    That's what I'm trying to get you to talk -- tell us about.

12   What all was going on then in your home?

13   A    He started changing.

14   Q    Could you pinpoint what it was that caused him change?

15   A    Going -- I felt like his friends had a lot to do with it,

16   the crowd that he hung out with.

17   Q    Was he easily influenced by other people?

18   A    Yes, sir.

19   Q    Was there, at any point, anything that you attempted to do

20   to get some help for him, maybe, like counseling or take him to

21   see a doctor or anything like that?

22   A    Yes, I did.

23   Q    The decision to send him to live with your aunt -- I mean,

24   with your sister, I think it is, is that right?  Is Amelia your

25   sister?

Respondent's Exhibit E

1    A    Yes, sir.

2    Q    Was that a difficult decision for you?

3    A    Very difficult.

4    Q    What kind of contact did you have with Kenneth when he went

5    to Poplar Bluff?

6    A    I would call him and talk on the telephone.  He would write

7    me letters.

8    Q    Did you ever go up and visit him while he was living there?

9    A    No.

10   Q    You've had transportation problems even getting to Pine

11   Bluff to talk with me and that sort of thing.  Has transporta-

12   tion been a problem in your family for a while?

13   A    Yes, sir.

14   Q    Did Kenneth show any type of behavior that -- as he got

15   older living in the home around his brothers and sisters -- I

16   mean his brothers, that concerned you?   Any aggressive or

17   violent behavior?

18   A    He never was violent in the home.

19   Q    You were aware, were you not, he picked up a burglary

20   charge up in Missouri and ended up being sent to the Sears Youth

21   Home?

22   A    Yes.

23   Q    Did you visit him in the Sears Youth Home?

24   A    No.

25   Q    Did you talk with any of the counselors there?

Respondent's Exhibit E

1   A    Yes.

2   Q    Did you see any changes or did you see any type of good

3   that came out of Kenneth being in the Sears Youth Home?

4   A    Yes.  Yes.

5   Q    I have talked with Mr. -- to Reverend McDaniel about this

6   and maybe you can enlighten us a little bit more.   What has

7   Kenneth demonstrated in the past by way of artistic ability?

8   Has he been drawing for quite a while?

9   A    Yes, always drawing even when he was small.

10  Q    Have you ever encouraged him to maybe get some instruction

11  in this area?

12  A    Yes.  Yes.

13  Q    Do you know whether he has received any type of instruction

14  in this area?

15  A    No.

16  Q    I note that you had an envelope in your purse when you came

17  to my office one day that appeared to have even drawing on the

18  outside of it.   Is that the type of thing that Kenneth would do?

19  A    Yes.

20  Q    What type of brother was he to his two younger brothers?

21  Was he ever mean or cruel to them?

22  A    No, sir.

23  Q    Could you trust him to watch the kids at home if you needed

24  to go to the store?

25  A    Yes.

879

Respondent's Exhibit E

1    Q    Kenneth has told us that he had a girl friend in Missouri

2    and her last name was Mack.  Were you aware of any interpersonal

3    relationship he had with any girls in the last couple of years?

4    A    No.

5    Q    If this jury finds that Kenneth is going to spend his time

6    in the penitentiary, do you feel like you and the family will be

7    able to visit with him there?

8    A    Yes.

9    Q    Is that something that you would cherish, that opportunity?

10    A    Yes, sir.

11    Q    The testing that -- the results of the testing that Mr.

12    Nanak testified to showed that Kenneth was slow.  Did Kenneth

13    have trouble in school during the time that he was in Forrest

14    City and then up in Poplar Bluff?

15    A    Well, when he was smaller grade, as far as being slow, me

16    teaching him.

17    Q    Um-hum.

18    A    Yeah, he was very slow.

19    Q    He's not very large is it?  Do you know what height he is?

20    A    About 5'8.

21    Q    I think I saw some place where it said five feet, four.

22    Does that sound about right to you?

23    A    Um-hum.

24    Q    Has his size posed a problem for him in dealing with his

25    friends and contemporaries?  Has he ever been taken advantage

880

Respondent's Exhibit E

1    of, that you know of, because of his size?

2    A    Yes.

3    Q    Have you noticed any type of over compensation, I guess it

4    is kind of cliche these days, that a lot of small men seems like

5    he has to fight more often and harder.  Have you noticed that

6    about Ken?

7    A    Yes.

8    Q    Has he ever come to you and complained to you that others

9    were taking advantage of him or trying to because of his size?

10   A    Yes, especially when he was in high school.

11   Q    Do you know whether he has any older friends or family

12   members that he would go and talk to if he had a problem?

13   A    Yes.

14   Q    Who would that be?

15   A    My older sister.

16   Q    And what is her name?

17   A    Amelia Reams.

18   Q    Okay.  And she's the lady that he lived with in Missouri.

19   Is that right?

20   A    Yes.

21   Q    Ms. Whiteside, do you feel as though that knowing what you

22   know about your son and his talents and his ability and what his

23   personality is like that he has the type of abilities that will

24   allow him to be productive while he is in the penitentiary?

25   A    Yes, sir.

881

Respondent's Exhibit E

1   Q    When he left to come over to Pine Bluff, that unfortunate
2   series of events that has landed him where he is right now, did
3   you know he was coming to Pine Bluff?

4   A    Yes, sir.

5   Q    Who was he coming over to stay with?

6   A    When Ken left, he wasn't coming to stay.  He was coming to
7   visit.

8   Q    Okay.  And who was he coming to visit?

9   A    My aunt -- my sister, his auntie.

10  Q    How long was he here all together before the problems that
11  ended up with him being convicted of some crimes?  Do you know
12  how long that took place that he was here living with her?

13  A    January, February.

14  Q    Okay.  Do you think that's when he came to Pine Bluff?

15  A    Yes.

16  Q    Did you know anything about the problems with the law that
17  he had gotten into?

18  A    Here in Pine Bluff?

19  Q    Yes.

20  A    It's all new to me.

21  Q    Ms. Whiteside, the choices facing this jury are not easy
22  ones.  And they are not, I know, for your family also.  Do you
23  believe Ken is worth society keeping around?

24  A    Yes.

25  Q    Is that what you are asking this jury to do?

882

Respondent's Exhibit E

1   A    Yes.

2            MR. KIZER:   That's all the questions I have, your

3        Honor.

4            THE COURT:   You may cross examine.

5            MS. BILLINGS:   Thank you, your Honor.

6                            CROSS EXAMINATION

7   BY MS. BILLINGS:

8   Q    Ms. Whiteside, you said that his criminal charges are all

9   new to you.  Is that right?

10  A    Here in Forrest City -- I mean, Pine Bluff.

11  Q    New to you as of when?

12  A    I can't remember the exact day, but the day that Ken was

13  picked up, the police picked him up and took him to jail.

14  That's the day when I found out -- you know, what was going on.

15  Q    Okay.  So that probably would have been May the 10th of

16  this year.  Is that right?

17  A    Somewhere in that area.

18  Q    How many times have you been to visit him here since then?

19  A    I haven't.

20  Q    When he lived with you -- or how long has it been since

21  he's lived with you?

22  A    February.

23  Q    How long did he live with you then?

24  A    Ken has lived with me all of his life except for about two

25  years.

Respondent's Exhibit E

1   Q    Okay.  But when he came there to live with you -- he came

2   there to live with you in February.  Is that right?

3   A    No, he came here in Pine Bluff in February.

4   Q    Okay.  When did he come to live with you that he would have

5   left there in February?

6   A    I don't remember, but Ken was at home a year before he came

7   to Pine Bluff.

8   Q    He was living with you there in Forrest City?

9   A    Yes, yes.

10  Q    Well, let me ask you something.  I have a judgment and

11  commitment out of the State of Missouri that says that he was in

12  Missouri in September of '92, which would have been last year.

13  Is that right?

14  A    I don't know about the dates.

15  Q    You don't know about any dates.  Well, this is from

16  September of '92 and they had him there in Missouri putting him

17  on probation for stealing and it shows he was there from,

18  basically, 4-20 of '92 at least until November 4 of '92.  So he

19  would have come to live with you some time after that.  Is that

20  right?

21  A    I don't know about the dates.

22  Q    Okay.

23  A    All I know is that Ken left home in February and came to

24  Pine Bluff.  Before he came to Pine Bluff, Ken had been home a

25  year.

884

Respondent's Exhibit E

1    Q    When did he go to live with your sister?

2    A    Ken was 16 when he went to live with my sister.

3    Q    And how long did he live with her?

4    A    Almost two years, about a year and a half, somewhere -- I'm

5    not sure.

6    Q    Wasn't it, in fact, in April of 1991 when he went to live

7    with her?

8    A    I don't know.  I've been through so much I -- I'm not good

9    on the dates.  I couldn't say.

10    Q    What is your reason that you say he left you to go live

11    with her?

12    A    Because the judge in Forrest City and I, we made that

13    decision and Kenneth.  I didn't want to -- I didn't want to make

14    the decision.  I really -- I felt like Ken was my child.  I was

15    responsible for him.  And I felt like I was the only one that I

16    could trust or know that would do all they could for Kenny.

17    Q    Isn't it true, Ms. Whiteside, that the authorities in

18    Forrest City told him not to come back to Arkansas?

19    A    Yes, ma'am.

20    Q    And that's why he went to live with your sister in Missou-

21    ri?

22    A    That's right.

23    Q    What is Kenneth's birthday?

24    A    12-21-74.

25    Q    So he's almost 19 years old instead of the 18 that we all

885

Respondent's Exhibit E

1    thought he was?

2    A    He'll be 19 on his birthday.

3              MS. BILLINGS:  Thank you.

4              MR. KIZER:  I don't have any further questions, your

5         Honor.

6              THE COURT:  Thank you, Ms. Whiteside.  You may stand

7         down.

8              MR. KIZER:  Your Honor, I need about two minutes and

9         then I should be ready to proceed at that point.

10             THE COURT:  All right.  Let's just suspend for a

11        couple of minutes.

12   (A recess was taken, after which time the following proceedings

13   resumed, to wit)

14             MR. KIZER:  Your Honor, the defense calls its next

15        witness, Ms. Amelia Reams.

16             THE COURT:  Okay.

17             MR. KIZER:  May I proceed, your Honor?

18             THE COURT:  Please.

19                        AMELIA REAMS

20   having been called at the instance of counsel for the defendant,

21   and after first having been duly sworn, testified as follows, to

22   wit:

23                     DIRECT EXAMINATION

24   BY MR. KIZER:

25   Q    Would you state your name for the record, please?

886

5463

Respondent's Exhibit E

```
 1    A     Amelia Reams.

 2    Q     Ms. Reams, how old are you?

 3    A     Thirty-eight.

 4    Q     And you have a sister who is present in the courtroom.   Is

 5    that correct?

 6    A     Yes.

 7    Q     What's her name?

 8    A     Beatrice Whiteside.

 9    Q     All right.  Is Jefferson County your home?

10    A     Yes, it is.

11    Q     Where did you make your home now?

12    A     Poplar Bluff, Missouri.

13    Q     How long have you lived in that part of the world?

14    A     It will be four years the last of this month.

15    Q     What do you in Poplar Bluff, Missouri?  Do you work outside

16    the home?

17    A     No, I don't.

18    Q     How many children do you have?

19    A     Two.  Two boys.

20    Q     What are their ages?

21    A     Nineteen and 20.

22    Q     You know Kenneth Reams, your nephew, do you not?

23    A     Yes.

24    Q     Would you tell us something about what it was like when he

25    came to live with you in, I think, in '92.  Is that right?  Or
```

887

Respondent's Exhibit E

1    was it '91?

2    A    I thought it was '90.

3    Q    '90.  I may have been just off base.  How did it come to be

4    that he lived with you and what went on when he came to Poplar

5    Bluff?

6    A    Well, he came -- Ken came -- he came and he told us about

7    he was having problems at home and he wanted to get his life

8    together and straighten up, and he was in trouble.  And I wanted

9    to help.  And so I went back home with Ken and I talked with the

10   people down there at the juvenile down there with Ken, and I

11   asked them if Ken would come and live with me and I would try

12   and help him out because I felt like he was missing some love or

13   some stability or somebody just to show him that somebody cared,

14   that loved him and wanted him to do better, do something

15   different with his life.

16   Q    How did he do when he first came to your home?  How did he

17   adjust?

18   A    We -- to me, Ken, he did all right.  He --

19   Q    How did he do with your other two children?  How did he

20   interact with them?

21   A    Oh, they all -- they got along.  They got along real good

22   like brothers.

23   Q    Did Ken start attending school there?

24   A    He -- yeah, he went to school.  He didn't miss school.  He

25   was crazy about going to school.

888

Respondent's Exhibit E

1   Q    How long did he live with you overall in Missouri?

2   A    Well, he was -- he came there in '90.  He left in -- this

3   is -- in '92, the last part of '93 -- yeah.  About two years.

4   Q    Okay.  And there was one stretch of time during that two

5   years, I believe, where he lived at the Sears Youth Home.  Is

6   that right?

7   A    Right.

8   Q    How did it come to be that he lived at the Sears Youth

9   Home?

10  A    He got some -- got to stealing.  He got to messing with

11  some boys and got influenced and he started stealing all over

12  again.

13  Q    Have you ever known Ken to use illegal drugs like marijua-

14  na?

15  A    Oh, no.

16  Q    Have you ever known him to be -- abuse alcohol?

17  A    No.

18  Q    Were you aware that while he was at the Sears Troubled

19  Youth Center that he received counseling for alcohol abuse and

20  for drug abuse?

21  A    Yes.

22  Q    Did you see him or visit him while he was there?

23  A    Uh-huh.

24  Q    Do you know how long all together he was at the Sears Youth

25  Home?

Respondent's Exhibit E

1    A    Oh, a year.  About a year.

2    Q    I believe he was placed there by the courts in Missouri.

3    Is that right?

4    A    Uh-huh.

5    Q    Would you say that Ken has been, during his lifetime,

6    easily influenced by others?

7    A    I would say.

8    Q    How about the crowd he ran with?  Was it a good crowd?

9    A    Well, at first, it was not so; but after he came out of the

10   youth center and started going to church and started messing

11   with people that started going to church and, you know, good boy

12   like to go to school and do -- go to movies and stuff like that.

13   And until this one time, he was with some boys and he was

14   walking -- he got into the car with these -- some friends of his

15   he knew and, anyway, the police saw it was Ken.  When he got in

16   the car with these boys, when they stopped the car, the car had

17   some marijuana in it and some -- a case of beer in the trunk and

18   they saw Ken when Ken got in this car.  So they ran -- they ran

19   the car down and stopped the car.  And when they stopped the

20   car, by it being Ken, they blamed -- put it all on Ken.  They

21   charged Ken with possession of alcohol and the marijuana and

22   they saw Ken when he got in this car.  And Ken -- that's when

23   Ken got scared.  He got scared and he panicked because we tried

24   to tell Ken that we would stick by him and that we would like --

25   not let them charge him with those charges.  He just got scared

890

Respondent's Exhibit E

1    and that's how he -- he ran.

2    Q    The time that he was in Missouri, he not only picked up the

3    charges that got him in the youth home, but he also had a

4    burglary or a theft of property --

5    A    Right.

6    Q    Charge that he picked up later.

7    A    Um-hum.

8    Q    You were aware of that?

9    A    Um-hum.

10   Q    Okay.  Has Ken ever exhibited any violent tendencies while

11   he has been in your home?

12   A    No, no.

13   Q    Or any time around you?

14   A    No.

15   Q    The -- how would Ken pass his time when he was in your

16   home?

17   A    Most -- Ken spent most of the time with his girl friend

18   listening to music, drawing, going to church.

19   Q    What was his girl friend's name?

20   A    Lorendo Mack.

21   Q    I think she is a college student at ASU.  Is that right?

22   A    Um-hum.

23   Q    Did Ken also develop a relationship with Ms. Mack, his girl

24   friend's mother?

25   A    Yes, he did.

891

Respondent's Exhibit E

1    Q    Do you know Ms. Mack?

2    A    Uh-huh, sure do.

3    Q    What type of person do you know her to be?

4    A    Oh, she -- she's -- really, she's a nice lady, and you

5    don't find too many people like her.  And she was real good.

6    She was just always there for us.  She's an outstanding person,

7    I would say.

8    Q    Based on what you know about Kenneth, do you feel as though

9    he has something that he can contribute to society even if he

10   has to do it behind prison walls?

11   A    Um-hum.

12   Q    The --

13   A    I think -- let me -- I think -- Ken has made a lot of

14   mistakes in his life and I think he -- when he can contribute to

15   a lot of these young kids nowadays and, hopefully, that he can

16   show them about the road he traveled, you know, the mistakes he

17   made and help somebody not to make the same mistakes that he

18   did.

19          MR. KIZER:   That's the questions I have of this

20          witness, your Honor.

21          THE COURT:  Ms. Billings, you may cross examine.

22          MS. BILLINGS:  Just briefly, your Honor.

23                        CROSS EXAMINATION

24   BY MS. BILLINGS:

25   Q    Ms. Reams, so your testimony is that you tried to help

                              892

1     Kenneth out?

2     A     I tried.

3     Q     Tried to straighten him out?

4     A     Um-hum.

5     Q     And when did he pick up this other charge that you were

6     talking about that they were going to charge him with, the

7     marijuana and the beer?

8     A     I believe that was -- let me see, Ken left and came in

9     April --  I believe it was about the last of '92.

10    Q     Okay.  So during that period prior to that, was he living

11    there with you?

12    A     Um-hum.

13    Q     Okay.  So you're familiar then with him being placed on

14    probation for the burglary and the stealing in September of '92.

15    Is that correct?

16    A     The burglary and stealing when he went to the juvenile?

17    Q     No, ma'am.  Adult probation, for stealing a pager from his

18    probation --

19    A     Okay.  Yeah.  Um-hum.

20    Q     You're familiar with that?

21    A     Uh-huh.

22    Q     Were you familiar with the fact that he was supposed to,

23    like, meet a probation officer every month and that type of

24    thing?

25    A     Um-hum.

893

Respondent's Exhibit E

1    Q    And then the fact that he ran off and didn't do that?

2    A    Yeah.

3    Q    What about in March of this year?  Did you see Ken at any

4    time this year?

5    A    March of this year?

6    Q    Yes, ma'am.

7    A    March, April -- yeah, I believe he came to visit.

8    Q    Okay.  The reason I asked is because were you aware that

9    the state of Missouri has a warrant for his arrest for burglary

10   and theft from March 15 of this year?

11   A    Of this year?

12   Q    Yes, ma'am.

13   A    The state of Missouri?

14   Q    Yes, ma'am.

15   A    No.

16        MS. BILLINGS:  I have nothing further, your Honor.

17        MR. KIZER:  That's all the questions I have, your

18   Honor.

19        THE COURT:  Thank you, Ms. Reams.  You may stand down.

20   Call your next witness.

21        MR. KIZER:  May we approach at this moment?

22        THE COURT:  Yes, sir.

23   (Counsel approached the bench)

24        MR. KIZER:  The last witness I was going to put on was

25        Patrick Caffey.  I don't know if he is here or not.  I

894

Respondent's Exhibit E

```
1        wouldn't recognize him.  I've only talked to him on the
2        phone.
3              THE COURT:  Get Mr. Daniels to sound his name.
4              MR. KIZER:  Can I just go back there and ask and see?
5              THE COURT:  Do you want to suspend a minute?
6              MS. BILLINGS:  Maxie, he wants to know if you want to
7        suspend a minute.
8              MR. KIZER:  For just a second, yeah.
9    (Conclusion of bench conference)
10             THE COURT:  We'll just suspend for just a minute to
11       see if an additional witness has made it to the courthouse.
12   (Counsel approached the bench)
13             MR. KIZER:  I'm going to move to introduce these and
14       then I'll rest at that point.  These are the stipulations
15       that we've had of the exhibits.  And Mr. Caffey is not
16       here, and I do want to pursue a contempt citation against
17       him.
18   (Conclusion of bench conference)
19             MR. KIZER:  May I address the Court, your Honor?
20             THE COURT:  Yes, sir.
21             MR. KIZER:  At this point, your Honor, I have no more
22       witnesses to call on behalf of the defendant.  But I would
23       like to introduce some exhibits, two of which have been
24       agreed to by the Prosecution by stipulation.  The first one
25       is some certified copy of records of Poplar Bluff Senior
```

Respondent's Exhibit E

```
 1        High School of Kenneth Reams showing his grade performance
 2        and comments of the teachers during the period of time that
 3        he  attended  school  there.    That  would  be  Defendant's
 4        Exhibit 2.
 5             Defendant's Exhibit 3 is a certified copy of State of
 6        Missouri, Department of Social Services, Division of Youth
 7        Services records during the period of time that Mr. Reams
 8        was committed to and lived at the Sears Home for Troubled
 9        Youth.
10             And then Defendant's Exhibit Number 4 is a certified
11        copy of the circuit clerk's record of the Judgment and
12        Commitment of Alford Goodwin showing that he entered a plea
13        of guilty to this charge and received life without parole.
14             THE COURT:  By prior agreement, let them be received.
15             (WHEREUPON,  THE  CERTIFIED  COPIES  OF  POPLAR  BLUFF
16        SENIOR HIGH SCHOOL RECORDS OF KENNETH REAMS, PREVIOUSLY
17        MARKED AS DEFENDANT'S EXHIBIT NUMBER 2 WAS RECEIVED INTO
18        EVIDENCE.  SEE PAGE NUMBER 978.)
19             (WHEREUPON,  THE  CERTIFIED  COPY  OF  THE  RECORDS  ON
20        KENNETH REAMS FROM THE STATE OF MISSOURI, DEPARTMENT OF
21        SOCIAL SERVICES, DIVISION OF CHILDREN AND YOUTH SERVICES,
22        PREVIOUSLY  MARKED  AS  DEFENDANT'S  EXHIBIT  NUMBER  3  WAS
23        RECEIVED INTO EVIDENCE.  SEE PAGE NUMBER 1000.)
24             (WHEREUPON, THE CERTIFIED COPY OF THE JUDGMENT AND
25        COMMITMENT FROM JEFFERSON COUNTY CIRCUIT COURT, JEFFERSON
```

896

Respondent's Exhibit E

1    COUNTY, ARKANSAS, CASE NUMBER CR-93-301-3 ON ALFORD

2    GOODWIN, PREVIOUSLY MARKED AS DEFENDANT'S EXHIBIT NUMBER 4

3    WAS RECEIVED INTO EVIDENCE. SEE PAGE NUMBER 1045.)

4         MR. KIZER: May I publish they be published to the

5    jury, your Honor?

6         THE COURT: Yes, sir. All right. Anything further?

7         MR. KIZER: Not for the defense, your Honor.

8         THE COURT: All right. Anything for the State?

9         MS. BILLINGS: Yes, your Honor. I'd like to introduce

10   a warrant from Missouri and the certified copy of the

11   judgment of probation and warrant on that because I've

12   referred to it so many times during the course of my --

13        THE COURT: All right. Number 20 is what now?

14        MS. BILLINGS: Twenty is the active warrant for

15   burglary and stealing.

16        THE COURT: Okay.

17        MS. BILLINGS: And 21 is the warrant for absconding

18   probation and the judgment and probation.

19        THE COURT: Judgment and probation and a warrant for

20   absconding probation?

21        MS. BILLINGS: Yes, sir.

22        THE COURT: Any objection?

23        MR. KIZER: I've previously seen the documents, and I

24   don't have any objection.

25        THE COURT: All right. Let them be received.

 Respondent's Exhibit E

```
1           (WHEREUPON, THE OUTSTANDING WARRANT FROM THE STATE OF
2      MISSOURI, CIRCUIT COURT OF BUTLER CO., ASSOCIATE DIV II,
3      PREVIOUSLY MARKED AS STATE'S EXHIBIT NUMBER 20 WAS RECEIVED
4      INTO EVIDENCE.  SEE PAGE NUMBER 1046)
5           (WHEREUPON, THE CERTIFIED COPY OF THE JUDGMENT AND
6      PROBATION AND WARRANT FOR ABSCONDING PROBATION, PREVIOUSLY
7      MARKED AS STATE'S EXHIBIT NUMBER 21 WAS RECEIVED INTO
8      EVIDENCE.  SEE PAGE NUMBER 1050)
9           THE COURT:  Okay.  Anything further from the State in
10     rebuttal?
11          MS. BILLINGS:  No, your Honor.
12          THE COURT:  All right.  I suppose at this point Ms.
13     Billings, you may go to the jury with any closing remarks.
14          MS. BILLINGS:  Thank you, your Honor.
15                         CLOSING REMARKS
16     BY MS. BILLINGS:
17          Ladies and gentlemen of the jury, as I told you
18     earlier, I believe we have shown that aggravating circum-
19     stances exist by the two judgment and commitments that we
20     have introduced to you that show you aggravated robbery
21     that Kenneth Reams committed just prior to the commission
22     of this murder.  And also the testimony of Kenneth Reams
23     himself and the officers showing the purpose of committing
24     this murder in the first place which was money.
25          And, at this point, I'd like to just go through the
```

5475
Respondent's Exhibit E

1   mitigating circumstances that Mr. Kizer has talked to you

2   about.

3       As you recall during the voir dire process, we told

4   you you have to weigh those two things when you go back

5   there.  This is up to you.  The seriousness of the crimes

6   that Mr. Reams has committed, the repetitious nature of

7   them, the fact they keep getting more and more and more

8   serious, more and more and more violent resulting, as you

9   saw, Mr. Turner's death.  Those are the things that you

10  have to weigh against any of the mitigating circumstancs

11  that you might find.

12      On the first one you are going to be looking was the

13  capital murder was committed while Kenneth Reams was under

14  extreme mental or emotional disturbance.  There's been no

15  evidence of anything of that nature.

16      That capital murder was committed while Kenneth Reams

17  was acting under unusual pressures or influences or under

18  the domination of another person.  His mother says he is

19  easily influenced, but then again, she hasn't seen him

20  since he has been in jail here and she's packed him off to

21  her sisters and everything and everywhere else.  Besides

22  that, she's his mother and that's what you would expect her

23  to say here today.

24      Capital murder was committed while the capacity of

25  Kenneth Reams to appreciate the wrongfulness of his conduct

Respondent's Exhibit E

1   or to conform his conduct to the requirements of law was

2   impaired as a result of mental disease, defect, intoxica-

3   tion or drug abuse.  Dr. Nanak himself said that they found

4   no evidence of any type of disease.  That Kenneth Reams has

5   testified that he had been drinking some that day and had,

6   in fact, injested some drugs.  But that's up to you to

7   weigh whether or not you feel like that's an excuse for

8   killing someone.  That's part of your duty when you go back

9   there.

10   The youth of Kenneth Reams at the time of the commis-

11   sion of the capital murder.  I know many of you -- we

12   thought that Kenneth Reams was 17 at the time he committed

13   this murder.  His mother straighten out his birthdate for

14   us today, and he is 18.  He will be 19 this month.  Whether

15   his youth had anything to do with it, most of you said back

16   there in the voir dire that the age of a person doesn't

17   matter.  That they are responsible for their actions at the

18   age that Kenneth Reams is age.

19   The capital murder was committed by another person and

20   Kenneth Reams was an accomplice and his participation

21   relatively minor.  That's up to you.  You heard the facts

22   and the circumstances of this particular murder.  That's

23   one of the decisions that you are going to have to make.

24   The State alleges, as you well know from the evidence that

25   we have put on, that Mr. Reams was, in fact, the shooter.

900

Respondent's Exhibit E

1          Kenneth Reams has no significant history of prior
2     criminal activity.  Well, you know you can't check that one
3     off.  You've got prior criminal activity that dates back as
4     far away as Missouri, absconded probation, came down here,
5     was on the run and came down here and committed this crime,
6     committed a burglary and theft at the Pine Bluff Dry
7     Cleaners followed by the robbery the same day--the aggra-
8     vated robbery at the ATM with Mr. Gilbert, followed the
9     next day by the Greyhound Bus Station aggravated robbery
10    and a week later by the murder of Mr. Turner.  You can't
11    check that one off.

12         Kenneth Reams suffers from borderline mental retarda-
13    tion.  Dr. Nanak tells you that he was 66.  But as you can
14    well see, he gets out there and he functions in society.
15    He goes where he wants to.  He does what he wants to.  He's
16    gone to school.  You've got his records.  And you can judge
17    whether or not you think that this an excuse for this crime
18    that he has committed.

19         Kenneth Reams has abilities that would allow him to be
20    a productive member of society even in prison.  There was
21    a little bit of testimony from some of the folks that he
22    can draw.  That's one of the things that you have to weigh
23    when you go back there and judge if you want to put Kenneth
24    Reams in prison for the rest of his life, or if you are
25    going to give Kenneth Reams what he gave Gary Turner.

901

Respondent's Exhibit E

1       Those are things you have to weigh when you go back there.

2             I suggest when you look at those -- that you actually

3       look at those records that you've been given when you go

4       back and the teachers' remarks on some of those.  Histori-

5       cal behaviors that his teachers noted.  He disregard rules.

6       He is defiant.  His current behaviors: anger, manipulative.

7       Those are the things that I suggest were shown by the

8       testimony that Kenneth Reams gave in this trial and the

9       statements that he gave to the police.  He tried to

10      manipulate each and every one of us in this trial.

11            You look at the records from the Sears School.  You

12      can see various things in there.  His own aunt believes

13      that he was very young when he began stealing.  He steals

14      more to impress others than actual financial gain.  Said he

15      is a hard core juvenile.  That he is notorious.  That his

16      aunt and uncle believe that he has been so socially

17      restricted in his mother's home that he is racing to catch

18      up with other youth in his age group and would go to

19      extreme to impress them and gain their acceptance.  He is

20      peer oriented and verbalizes he is a member of the gang-

21      sters and cycles in Forrest City, Arkansas.  He steals for

22      immediate gratification for himself and his peer.  It goes

23      on and on.  You can go through the records and see for

24      yourself.  Kenneth Reams has been a rolling hell on wheels

25      ever since he's been able to get out and get about.  It's

Respondent's Exhibit E

1    your determination whether you let him continue to be that,

2    either in the Department of Correction where his attorney

3    is asking you to sentence him to life without parole or

4    whatever you other decision may be.

5         Look at these records when you go back there.  You can

6    have a copy of them.  Mr. Kizer furnished them to you.  And

7    it is a very serious decision for you to make, but one that

8    our law provides for you to make and one that each and

9    every one of you told us that you could make if you were

10   put in this position.

11        Thank you.

12        THE COURT:  Mr. Kizer.

13                    CLOSING ARGUMENT

14   BY MR. KIZER:

15        Thank you, your Honor.  Ladies and gentlemen, hopeful-

16   ly, you got an idea -- you got a little more insight into

17   what Kenneth Reams is and what he is all about.  I differ

18   from apparently the position taken by the State.  The State

19   thinks that it is -- a human being, apparently, is like a

20   car.  If it goes bad, you get rid of it.  Human beings are

21   not that same way.  Human beings have the ability to redeem

22   themselves.  Human beings have the ability to contribute

23   something at some point in the future and not just be a

24   rusting car sitting out in a graveyard somewhere, but that

25   is what the State would have you believe.  The life he has

903

5480

Respondent's Exhibit E

1     led to this point, he's demonstrated he's never going to be
2     any good, just throw him away, out of sight, out of mind.
3     I would submit to you that within a short period of time,
4     sketched out at least 12 reasons you need to keep alive and
5     if that -- if you give more thought to it, you can come up
6     with more than that.

7         There's one thing I would like to tell you right off
8     the bat and that is that if you believe that giving the
9     death penalty to somebody is a deterent to other crimes in
10    the community and normally, if you have sat on a jury
11    before, the prosecutors are always yelling, "Send a message
12    out on the community."  We have had several, several
13    executions, extremely well publicized carried out in this
14    State in the last few years.  The murder rate in Arkansas
15    rises -- is up 25 percent more than what it has been in
16    years past.  Do you think that the death penalty is a
17    deterrent for anything?  It may be a deterrent for that one
18    individual, but that is something that you need to look at,
19    what kind of message are you sending?  You are not sending
20    a message anywhere to somebody who is troubled, to somebody
21    who is on the streets and to somebody who is fighting for
22    their survival every day and inclined to do something.
23    You're not sending a message to them.  Not at all.

24        I would ask you to also take into consideration that
25    the Defendant's Exhibit as given to you for the co-defen-

904

Respondent's Exhibit E

1   dant in this case.  He entered a plea of guilty and he got
2   life without parole.  Do you think for one moment from the
3   evidence that you've seen adduced in this case the Prosecu-
4   tion has had seven months to get ready for this that they
5   would have had more evidence, they would have shown you.
6   Is there any evidence that is clear, either way, other than
7   the testimony of this man right here who actually pulled
8   the trigger?  There is not any clear, convincing evidence
9   at all except for what he had to say and that is that he
10  didn't pull the trigger.  So you can either believe what he
11  had to say and he is not the trigger man and the trigger
12  man got life without parole, or, at best, you have a murky
13  set of circumstances where you don't know.  You're having
14  to guess.  If you guess right, you may give the death
15  penalty to somebody who pulled the trigger.  If you guess
16  wrong, Alford Goodwin is going to be sitting out in the
17  penitentiary for the rest of his days knowing that he's the
18  one that pulled the trigger.  A life is not something you
19  guess about.  Those are two prime reasons right there for
20  you to stop and think about what you are doing.

21      Some other factors that I would ask you to take into
22  consideration.  They may check off on that list that you
23  have, we're real big in this society on lists, there you
24  go.  You've got them.  You can take a look at it and you
25  can check off what you will.  But if you take a look

905

5482      Respondent's Exhibit E

1    whether they are on there on or not, the Judge is told you
2    you can consider other mitigating factors.  You can --
3    Kenneth Reams is not -- we're not sitting here telling you
4    that what he did or what he was involved is an excuse.  The
5    Prosecution made that comment a second ago is that an
6    excuse for killing.  We're not telling you that's an
7    excuse.  That was a reprehensible act for which you have
8    found him guilty.  Now we're talking about what is the
9    proper thing to do at this point.  We're not talking about
10   -- you have not heard any witness get on that stand and
11   offer an excuse for what happened.  The responsibility lays
12   right on his shoulders.  Y'all put it there.  And that's
13   where it is going to reside.  Consider, if you will, that
14   we start out with an individual who is slow, an individual
15   who tests out, even when he is 18 years of age, as being
16   mildly retarded.  Does that cause someone to start with a
17   little less of a chance in life than somebody else?  I
18   don't know.  You'll have to answer that question.  You take
19   somebody who is small, that is a small human being sitting
20   there in front of you.  William Faulkner, the writer, was
21   the same height as this young man.  William Faulkner was a
22   genius.  This young man is mildly retarded.  You've heard
23   the evidence of that.  William Faulkner was able -- size
24   didn't mean anything to him.  It did to this young man.  He
25   got picked on even when he was in school.  He didn't have

906

Respondent's Exhibit E

1    the intellectual capacity.  He didn't have the emotional

2    maturity.  He did not have any of the faculties that a

3    competent human being as a adult have to deal with that

4    situation.  So, he became somebody who was a rebel.  That's

5    what it came down.  He's been in trouble for a long period

6    of time.  He's also been easily influenced by others.  That

7    is something that was pointed out in psychological examina-

8    tion.  That is a finding that you can make about other

9    individuals.  Some of us are followers; some of us are

10   leaders; some of us are people who are confident enough

11   within ourselves that we can make a decision for ourselves

12   and not be easily swayed by someone else.  You've got to

13   consider which category he falls into.  You need to take a

14   look at the fact that he was 18 years of age.  If we're

15   sitting here talking about a 45-year-old man who has had

16   the experience of life and has had ups and downs and has

17   learned how to deal with them, you've got a different

18   situation than you do somebody who was intellectually slow

19   and very immature and not only in age, but in personality

20   and intellectual make-up.

21       You need to be looking at the fact that he has been

22   using drugs and alcohol.  That is a problem that permeates

23   every age and strata of our society and it is not an

24   excuse.  It is not an excuse.  It is something that is

25   reality, though, and it influences and impairs judgment.

907

Respondent's Exhibit E

1    Everyone here, even if you have never used alcohol or any

2    other type of drug, at least you know in your common

3    experience of life of observation and reading and every-

4    thing else that it impairs judgment.   The day this hap-

5    pened, he had smoked marijuana and he had drank.   That's

6    not an excuse.   It's a factor for you to consider.

7         You ought to also take a look at that he comes from

8    what appears to be a well-being family.   A well-being

9    family that, evidently, was not equipped in and of itself

10   to help deal with a rebel child or a child that is trou-

11   bled.   There are people in this world who are, as parents,

12   very competent human beings.   And when they know they have

13   a problem child, they get help.   They do something about

14   it.   They don't just sigh and wonder what they could have

15   done or even if they could have -- if there is something

16   that they could do individually.   You don't get to pick

17   your parents. My kids didn't get to pick me.  But I do the

18   best that I can by them, and I feel like everyone of you

19   do, too, as parents.   His parents didn't have, evidently,

20   the intellectual skills or the other sophisticated skills

21   that it takes to make it in this society in the best of

22   circumstances.   And they didn't have the best of circum-

23   stances.   They've had trouble with transportation for a

24   long period of time.   They've had a lot of problems.   And,

25   evidently, they lack the ability to adequately cope with

Respondent's Exhibit E

1   those things.  The people who can cope everyday maybe don't

2   understand that.  But stop and think about it and try to

3   put yourselves in their shoes.

4        Take a look at the fact that even though we have a

5   mildly retarded human being here and even though we have a

6   kid that has royally screwed his life and if you give him

7   life without parole, he will be there for time immemoriam

8   in the penitentiary.  He does have some redeeming skills as

9   far as interpersonal relationships go.  He's had a girl

10  friend before.  He's never exhibited violence within his

11  family.  He has maintained relationship with the girl's

12  mother.  He corresponds with her.  Those are factors that

13  you need to look at.  He's not an animal.  That is a human

14  being, flesh and blood sitting right there (INDICATING).

15  You need to take a look at the fact that he has some

16  artistic ability.  There have been and will be from as long

17  as we have prisons there will be people who flourish within

18  the confines of a set environment when they have some

19  ability that they can nuture.  The Birdman of Alcatraz,

20  it's a movie that perhaps some of y'all saw about the

21  ability -- orenthology was developed by that individual

22  when he was in San Quentin.  The same thing might apply to

23  this individual.  We don't know.  We don't know what any of

24  us are going to do 20 years from now.  It could be that is

25  this young man gets motivated and proper training he could

909

1     have an art exhibit somewhere one of these days.  He may

2     never do anything with it.  That's the gamble you take by

3     letting him live.  That's the gamble you take by not

4     treating him as a car that you throw away.

5          You've got to look at the fact that you don't have to

6     execute him to punish him.  You've don't have to execute

7     him for society to be benefitted.  There are a number of

8     factors.  I may have even missed one or two from just what

9     I wrote down.  But the bottom line is that you were all

10    chosen to be on those jury because we were impressed, both

11    the State, the Court and the defense with your reasonable-

12    ness, with your statement to us under oath that you would

13    consider the full range of opportunities that you have to

14    dispose of this matter and to impose punishment.  And

15    that's what we are asking you to do now.  Honor that oath.

16    And look within your hearts and your minds.  We're not

17    asking for sympathy.  We're not asking for any type of

18    consideration other than a calculated decision that all of

19    you can make.  A calculated decision that a life is worth

20    a life.  It's worth a chance.  Something may good come out

21    of it.  We don't know that.  Give him a chance to find out.

22    Thank you.

23          THE COURT:  Ladies and gentlemen, I think it would

24    probably be beneficial if I went through those instructions

25    again that I read you earlier on how to fill out the forms

910

5487    Respondent's Exhibit E

1   since there are several of them.  I think they should be
2   self-explanatory on their face, but, nevertheless, let me
3   go through these instructions again.
4        Having Mr. Reams guilty of capital murder I'll again
5   send you back to the jury room to deliberate and decide
6   whether Mr. Reams is to be sentenced to death by lethal
7   injection or to life imprisonment without parole.  Now,
8   when you determine which sentence to be imposed, you may
9   required and will be required to make specific written
10  findings as to the existence of aggravating and/or mitigat-
11  ing circumstances.  These forms will be provided for you.
12  There are three forms for you to reach in your decision and
13  a verdict form for to you use when your verdict has been
14  reached.
15       Now, Form 1 deals with aggravating circumstances.  The
16  appearance of any particular aggravating circumstance on
17  the form does not mean that it actually existed in this
18  case, but these are specified by law and these are the only
19  aggravating circumstances that you may consider in this
20  case.   The State has the burden of proving beyond a
21  reasonable doubt that one or more of the listed aggravating
22  circumstances existed at the time of the commission of this
23  capital murder.  Now if you find unanimously and beyond a
24  reasonable doubt that one or more of these aggravating
25  circumstancs existed, then you will indicate your findings

911

Respondent's Exhibit E

1 by checking the appropriate spaces on form 1.  Now if you

2 do not unanimously find beyond a reasonable doubt the

3 existence of any aggravating circumstance, you then just

4 stop your deliberations and indicate on the verdict form

5 that a sentence of life imprisonment without parole is what

6 your verdict is.

7  On the other hand, if you do unanimously find that one

8 or more aggravating circumstances exist, you should then

9 move on and complete form 2 which deals with the mitigating

10 circumstances.  Form 2 lists some factors that you may

11 consider as mitigating circumstances.  However, you are not

12 limited to this list.  You may, in your discretion, find

13 other mitigating circumstances.

14  Now unlike the aggravating circumstance, you are not

15 required to be convinced of the existence of a mitigating

16 circumstance beyond a reasonable doubt.  A mitigating

17 circumstance is shown if you believe from the evidence that

18 it probably existed.

19  Now, there are four parts to form 2.  Part A is the

20 listing of mitigating circumstances to be checked only if

21 you unanimously agree that a particular mitigating circum-

22 stance existed.  Now, Part B is a list to be checked where

23 some of you may think that a circumstance existed but all

24 of you don't agree, in other words, if it is not unanimous.

25 Then Part C is a list to reflect circumstances of which

912

Respondent's Exhibit E

1    there may have been some evidence but no member of the jury

2    feels that that circumstance existed.  The last part is to

3    be checked only if the jury concludes that there is no

4    evidence of mitigating circumstances.

5         After making the determination required to complete

6    form 1 and then form 2, if necessary, you then move on to

7    and complete form 3.

8         Now in no event would you return a verdict imposing

9    the death sentence unless you unanimously make three

10   particular written findings on that form 3.  And they are:

11        First:   That one or more aggravating circumstances

12   existed beyond a reasonable doubt;

13        Second:  That such aggravating circumstances outweigh

14   beyond a reasonable doubt any mitigating circumstances that

15   you have found to exist; and,

16        Third:   That the aggravating circumstances justify

17   beyond a reasonable doubt the sentence of death.

18        Now if you make those findings you may impose the

19   death penalty.  Otherwise, you should sentence the defen-

20   dant to life imprisonment without parole.

21        Now after you have made your determination on forms 1

22   and 2 and reflected on your conclusions on form 3, you must

23   then check the appropriate verdict on form 4.  Each of you

24   must sign the verdict form.

25        Now, form 4 is the verdict form.  I showed you that a

913

Respondent's Exhibit E

1      while ago.  It contains the two possible verdicts, and I've

2      explained to you previously that part a is life imprison-

3      ment without parole; part b is death by lethal injection

4      and those are to be checked by you and each of you should

5      sign the verdict form, whichever way it is.

6           Now, at this point, Mr. Daniels, if you would come

7      around, I'm going to hand to you the verdict forms.  Ladies

8      and gentlemen, I'm going to put these in this folder for

9      you and I will now let the jury retire and consider their

10     verdict.

11  (Jury exited the courtroom at 5:06 p.m. to deliberate upon a

12  verdict)

13  (Jury returned to the courtroom at 8:52 p.m.)

14          THE COURT:  All right.  We are back in session.  Mr.

15     Robinson, I'm informed that the jury has arrived at a

16     verdict.  Is that correct?

17          FOREMAN ROBINSON:  We have arrived at a verdict.

18          THE COURT:  All right.  Would you pass it up, please,

19     sir?  (Forms passed to the Court)  Ladies and gentlemen,

20     I'll announce to those spectators present similar comments

21     I made earlier this week and that is that no matter what

22     this jury's verdict and sentence is in this matter,

23     somebody is going to be disappointed.  We understand that.

24     And I'll pause at this time and remind you if anybody feels

25     that he or she cannot conduct himself in a restrained

914

Respondent's Exhibit E

1    manner, the time to leave the courtroom is right now.  I'll
2    point out to you that once again that I do understand.
3    Emotions are very important.  It's a part of life.  But the
4    place for it is not in the courtroom.  It's outside the
5    courtroom and in some other place.  It's not here, and I'm
6    going to charge you with the responsibility of comporting
7    yourself accordingly.

8          The Court has examined the forms as executed by the
9    jury.  They appear to be in order.  The jury having
10   executed form 1 and had it signed by Mr. Robinson.
11   Executed form 2 and signed by Mr. Robinson as foreman.
12   Executed form 3 and it is signed by Mr. Robinson.  Form 4,
13   the verdict form is, "We, the jury, after careful delibera-
14   tion have determined that for the capital felony murder of
15   Gary Turner that Kenneth Reams shall be sentenced to death
16   by lethal injection."  This is signed by the 12 members of
17   the jury panel.  I will go ahead, at this point, and poll
18   you ladies and gentlemen and ask if this, in fact, is your
19   verdict and your signature.  Mr. Robinson, is this your
20   verdict?

21         FOREMAN ROBINSON:  It is.

22         THE COURT:  And Mr. Lindsey, is this your verdict?

23         JUROR LINDSEY:  Yes, your Honor.

24         THE COURT:  Mr. Tipton, is this your verdict?

25         JUROR TIPTON:  It is.

5492      Respondent's Exhibit E

```
1              THE COURT:  Ms. Hoffman, is this your verdict?
2              JUROR HOFFMAN:  Yes, sir.
3              THE COURT:  Ms. Hodges, is this your verdict?
4              JUROR HODGES:  Yes, sir.
5              THE COURT:  Mr. Hornsby, is this your verdict?
6              JUROR HORNSBY:  Yes, it is.
7              THE COURT:  Ms. Ruggeri, is this your verdict?
8              JUROR RUGGERI:  Yes, it is.
9              THE COURT:  Ms. Phillips, is this your verdict?
10             JUROR RUGGERI:  It is.
11             THE COURT:  Ms. Messina, is this your verdict?
12             JUROR MESSINA:  Yes.
13             THE COURT:  And Mr. Stelow, is this your verdict?
14             JUROR STELOW:  Yes, it is.
15             THE COURT:  And Ms. Johnson, is this your verdict?
16             JUROR JOHNSON:  Yes, your Honor.
17             THE COURT:  And Ms. Horace, is this your verdict?
18             JUROR HORACE:  Yes.
19             THE COURT:  All right.  Ladies and gentlemen of the
20        jury, let me thank you again for your hard work you have
21        put in this week.  We are certainly sympathetic to the long
22        hours and the careful deliberation that you put in on this
23        matter, and I'll thank you very much for your attendance at
24        this time.  If there is nothing further at this time with
25        the jury, I'll excuse them.  Is there anything at this
```

916

5493   Respondent's Exhibit E

```
1        time?  (No response)  Ladies and gentlemen of the jury,
2        I'll excuse you.  I'll let you go out this way.  And I'll
3        ask all other spectators present in the courtroom to remain
4        seated and remain in place for a few moments until the jury
5        has passed in their juror's badges and exited the building.
6   (Jury exited the courtroom)
7             THE COURT:  Mr. Kizer, is there any desire that the
8        defendant's sentence be postponed?
9             MR. KIZER:  I know of no legal reason, your Honor.
10            THE COURT:  Okay.  The next thing I was going to ask
11       you is there any legal reason that you can think of that
12       the Court should not impose sentence at this time?
13            MR. KIZER:  None that I'm aware of, your Honor.
14            THE COURT:  Other than those that have previously been
15       raised.  All right.  Mr. Reams, will you stand up if you
16       would, pleas, sir.  Kenneth Reams, the jury of your peers
17       having considered the evidence in this case and having
18       found you guilty of the offense of the capital felony
19       murder and having again heard evidence and deliberated and
20       returned a sentence of death by lethal injection and no
21       legal reason having been shown to the Court why sentence
22       should not be imposed, it is the judgment and sentence of
23       the Court that you be remanded to the Sheriff of Jefferson
24       County and by him transported to the Department of Correc-
25       tion where on a day prescribed by the Governor of this
```

917

Respondent's Exhibit E

1    State, the Superintendent of the Department of Correction

2    will carry out the sentence of this Court and you will be

3    put to death by lethal injection.

4         You have 30 days in which -- within which to file a

5    notice of appeal.   The Court will not entertain a bond

6    setting in this matter in a capital case.

7         Anything further at this time?

8         MR. KIZER:  No, your Honor.

9         THE COURT:  Ladies and gentlemen, those of you that

10   are remaining.  Thank you.  If y'all would just remain for

11   a few moments in place.   It's been customary in this

12   jurisdiction for a long time to allow the juries to have

13   unhampered access to their vehicles and be allowed to go on

14   their way before we release the spectators.  Thank you very

15   much for you attendance at this trial, ladies and gentle-

16   men.  Thank you for your deportment, for lack of a better

17   word.  I think everybody that has been here has conducted

18   himself properly.  I -- all I said a while ago was very

19   true because it is a very emotional situation.  There is no

20   way that everybody could leave this courtroom happy.  There

21   are going to be some happy one and some sad ones, and I'm -

22   - my heart goes out to everybody concerned in this matter.

23   But I do appreciate very much for the system that everybody

24   acted, certainly, in a very dignified and refined manner,

25   and I'm thankful for that.  As soon as the deputy sheriff,

918

Respondent's Exhibit E

1        Pete Harrison, comes back and tells everything is okay, we

2        can be excused.

3            I've got a note.  I've got the instructions.  I've got

4        the one that they mistake on.  I've got the forms and I've

5        got all of these and all of that.

6            Tommy, is everything all right now?  We are adjourned.

7    (Court adjourned)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5496

Respondent's Exhibit E

H. K. "Ken" REED
TREASURER
JEFFERSON COUNTY
P. O. BOX 6645
PINE BLUFF, ARKANSAS 71611

Pine
★
Bluff

12/13/93

Judge Davis

Re: Request for Shirley Turley
to be excused from trial.

There are only eleven working days remaining
in this year after today. Our office is
now functioning well with only two employees
versus three when I came aboard 5 years ago.
Year end book closing is very critical to our
operation. We could be in a world of
hurt if Shirley were tied up in a lengthy
trial at this time.

Your consideration will be appreciated.

Sincerely
H.K. Reed
Treasurer
Jefferson County

920

5497   Respondent's Exhibit E

IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ARKANSAS

STATE OF ARKANSAS                                             PLAINTIFF

VS.                        NO. CR 93-301-3

KENNETH REAMS                                                 DEFENDANT

### SUPPLEMENTAL JUROR QUESTIONNAIRE

A jury must be selected from the panel of which you are a member to hear the above-captioned case.  As part of the jury selection process, the questions asked in this questionnaire could be asked in open court.  You are given more privacy by answering them in this questionnaire.  Please answer each question.  If you need more space, please use the back and so indicate on the front.

By court order, none of the information you reveal in response to these questions is to be used for any purpose other than the selection of qualified jurors to serve in this case. Attorneys will be required to return all copies of these questionnaires to the Clerk of the Court for destruction after a final resolution of this case.

NAME (PRINT):  _Turley_____  _Shirley_____  _B.___
                (Last)            (First)          (Middle)

ADDRESS: _1002 W. 34th_____ _Pine Bluff Ak._____
         (Street, P.O. Box)         (City)       (State)
OCCUPATION: _Deputy Treasurer - Jeff. Co Treasurer's off._
                      (If retired so indicate.)

SPOUSE'S OCCUPATION: _Self Employed Home Builder_____
                      (If retired so indicate.)

1.   Has your marital status changed in the last 10 years?
     Yes___  No _✓_  If yes, was that by:  Death of Spouse___
     Divorce___  Marriage___  Remarriage___

2.   Total number of children _2_ or stepchildren_____
     Number of boys _____      Their ages _____
     Number of girls _2_       Their ages _31 +34_____
     Have you ever had any foster children? _no_
     How many live with you? _____0_____

3.   Does anyone live in your home other than your spouse or
     children?  Yes ___   No _✓_

4.   What is your highest level of education? _High School_

5.   What is your spouse's highest level of education? _High School_

6.   Where did you attend high school? _Pine Bluff High_

### 921

Respondent's Exhibit E

If you attended college, name the college and its location.
_____
What was your major? _____
What was your minor? _____
If you attended graduate school? If so, name of institution
and degree obtained. _____
_____

7.  Please indicate by the organizations, clubs and religious
    activities in which you actively participate:

    Civic _____        Fraternal _____
    Religious ___✓_____     Volunteer _____
    Social _____✓_____       Other _____

8.  Have you or any member of your family been a party to a
    lawsuit?  Yes____ No_✓__ If yes, please specify _____
    _____

9.  Have you or any member of your family been a witness in a
    lawsuit?  Yes____ No_✓__ If yes, please specify _____
    _____

10. Have you ever been the victim of a crime?  Yes_✓__ No____
    Was the crime reported to the police or were the police
    involved?  Yes_✓_ No___  Was the crime prosecuted?  Yes___
    No_✓_  If yes, was it resolved to your satisfaction?_____
    _____

11. Has any member of your family ever been a victim of murder,
    manslaughter or negligent homicide?  Yes___ No_✓_ If yes,
    please specify and state whether resolved to your
    satisfaction. _____
    _____

12. Have you, any member of your family, or a close friend ever
    been accused of any action related to murder, manslaughter
    or negligent homicide?  Yes___ No_✓_

13. Have you ever been convicted of a crime other than traffic
    offenses?  Yes___ No_✓_

14. Have you ever been arrested and charged with any crime other
    than a traffic offense?  Yes___ No_✓_ If yes, please
    specify. _____
    _____

15. Have you, any member of your family, or close friend ever
    had any special training in law or law enforcement?  Yes___
    No_✓_ If yes, please specify. _____
    _____

2

92

Respondent's Exhibit E

16. Do you or any member of your family have personal or business relationships with any member or employee of the following state or county offices?

<u>PLEASE PLACE A CHECK IN THE APPROPRIATE BLANK</u>

|                                | Yes | No |
|--------------------------------|-----|----|
| Police Department              | ✓   |    |
| County Sheriff's Office        | ✓   |    |
| Other Law Enforcement Agency   |     |    |
| Prosecuting Attorney's Office  | ✓   |    |
| Arkansas Department of Correction |  |    |

17. Do you or any member of your family, or close friend, have any knowledge of or any personal relationship with *Reames*? Yes___ No ✓

18. Do you have any knowledge of or have you had any contact or relationship with any of the following individuals who may appear as witnesses in this case?  Please check the appropriate blank to indicate any relationship or knowledge you or any member of your family may have of that witnesses or any member of that witness' family.

| List of Witnesses | I have heard of | I know | I know member of witness' family | Family knows witness or family |
|-------------------|-----------------|--------|----------------------------------|--------------------------------|
| Greg Taylor       |                 |        |                                  |                                |
| James Nelson      |                 |        |                                  |                                |
| Taquante Nelson   |                 |        |                                  |                                |
| Bud Phillips      |                 |        |                                  |                                |
| Terry Addison     |                 |        |                                  |                                |
| Jo Ann Reams      |                 |        |                                  |                                |
| Dr. Sturner       |                 |        |                                  |                                |
| Ron Andrejack     |                 |        |                                  |                                |
| Phillip Curry     |                 |        |                                  |                                |
| Kenny Heroman     |                 |        |                                  |                                |
| David A. Nanak    |                 |        |                                  |                                |
| Patrick Coffey    |                 |        |                                  |                                |
| Elgin Anders      |                 |        |                                  |                                |
| Amelia Reams      |                 |        |                                  |                                |
| John Cone         |                 |        |                                  |                                |
| George McDaniel   |                 |        |                                  |                                |
| Jeannie Mack      |                 |        |                                  |                                |
| Mike Moss         |                 |        |                                  |                                |

19. Have you read any newspaper articles about this?  Yes ✓ No___   Have you formed any opinion regarding this case after reading the newspaper articles?  Yes ✓ No___

3

925

Respondent's Exhibit E

20. Have you discussed this case with anyone?  Yes___  No_✓_  If
yes, what was the nature of this discussion?  _____
_____
If yes, did anyone offer any opinions or facts about the
case?  Yes___  No___

21. Have you heard this case discussed by anyone even if you
were not a participate in the conversation?  Yes___  No_✓_
If yes, did anyone offer any opinions about it?  Yes___
No___

22. What opinions, if any, have you formed concerning this case?
Please explain in detail. *I was of the opinion that
I was satisfied that an arrest had been made
and felt that it was probably the correct
one,*

Have you expressed your opinion to others?  Yes___  No_✓_
If yes, to whom?  _____

23. Do you have any specific problems at home or on the job that
might cause you to lose concentration during the trial?
Yes___  No_✓_  If yes, please explain in detail.  _____
_____
_____
_____

24. Do you have any physical or emotional disabilities which
would make it difficult or impossible to serve on this jury?
Yes___  No_✓_  If yes, please explain in detail.  _____
_____
_____
_____

25. Are you taking any medication regularly?  Yes___  No_✓_  If
so, what?  _____
_____

4

92

Respondent's Exhibit E

26. Do you have religious, moral or philosophical beliefs which would prevent you from sitting in judgment on another person? Yes_____ No _✓_ If yes, please explain. _____

_____

27. Would your religious beliefs in any way make it difficult for you to serve as a juror on this case and to reach a verdict based on the laws of the State of Arkansas as given to you in this case by the Judge? Yes_____ No_____ If yes, please explain fully. *I dont think I could*

*sentence Any one to death*

28. Have you formed an opinion concerning what would be a desirable verdict in this case? Yes_____ No _✓_ If yes, what is that opinion? _____

_____

_____

29. What do you do in your spare time? *Church Activities*
*Bridge, Time with my Grand children, Cross Stitch*

30. What is the last book you have read? _____

31. Are there certain types of books you prefer to read over others (for example, mysteries, biographies, nonfiction?)

*Nonfiction*

32. What magazines do you read regularly? *McCalls, Ladies*
*Home Journal, Country Sampler,*

33. To what magazines do you subscribe? *Above*

34. Do you have a newspaper subscription? Daily _✓_ Weekly _✓_
What paper(s)? *P.B. Commercial, Ar Times*

35. How often do you watch television? *Daily*
Please estimate the number of hours per day. *4 or 5*

36. What kind of television shows do you watch (sports, movies, situation comedies, soap operas, talk shows?) _____
*Sports Talk Shoes*

37. Do you watch local news programs? Yes _✓_ No_____ How often? *Daily* _____ What channel(s)? *7*

38. Do you watch national news programs? Yes _✓_ No_____ How often? *Daily* _____ What channel(s)? *7 & 11*

5

92o

Respondent's Exhibit E

39. Do you know of any reason you could not serve as a fair and impartial juror in this particular case which involves a violent crime? Yes___ No ✓ If yes, please explain fully.

_____

_____

_____

40. Would you find it difficult to listen to or to concentrate on evidence relating to:

|     |                              | Yes   | No   |
| --- | ---------------------------- | ----- | ---- |
| (a) | Acts of violence             | Yes___ | No ✓ |
| (b) | Abnormal human behavior      | Yes___ | No ✓ |
| (c) | Psychological disorders      | Yes___ | No ✓ |
| (d) | Troubled or disturbed childhood | Yes___ | No ✓ |

41. Is there any reason why you feel that you would not want to serve on this jury? Yes___ No ✓ If yes, please explain fully. _____

_____

_____

42. Can you think of __any__ reason, no matter how insignificant it might seem to be, whether addressed in this questionnaire or not, why you could __not__ be a fair juror in this case? Yes ✓ No___ If yes, please explain fully. _____
_As I scated on #22_

_____

_____

I SWEAR THAT THE ANSWERS GIVEN ABOVE ARE TRUTHFUL TO THE SAME EFFECT AS IF I WERE SWORN UNDER OATH IN OPEN COURT TO GIVE TRUTHFUL ANSWERS TO THE SAME.

_Shirley Tinsley_
(Signature)

6

Respondent's Exhibit E

IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ARKANSAS

STATE OF ARKANSAS                                           PLAINTIFF

VS.                          NO. CR 93-301-3

KENNETH REAMS                                               DEFENDANT

### SUPPLEMENTAL JUROR QUESTIONNAIRE

A jury must be selected from the panel of which you are a member to hear the above-captioned case.  As part of the jury selection process, the questions asked in this questionnaire could be asked in open court.  You are given more privacy by answering them in this questionnaire.  Please answer each question.  If you need more space, please use the back and so indicate on the front.

By court order, none of the information you reveal in response to these questions is to be used for any purpose other than the selection of qualified jurors to serve in this case. Attorneys will be required to return all copies of these questionnaires to the Clerk of the Court for destruction after a final resolution of this case.

NAME (PRINT): *Thomas*          *Delois*          *J.*
                  (Last)              (First)            (Middle)

ADDRESS: *1400 War Eagle Dr. Pine Bluff    AR*
          (Street, P.O. Box)        (City)          (State)
OCCUPATION: *Ar Dept. of Human Services    Service Rep I*
                  (If retired so indicate.)

SPOUSE'S OCCUPATION: *Power Plant Operator of I.P.*
                        (If retired so indicate.)

1.  Has your marital status changed in the last 10 years?
    Yes *✓* No____ If yes, was that by: Death of Spouse____
    Divorce____ Marriage____ Remarriage *✓*

2.  Total number of children *2* or stepchildren *1*
    Number of boys *3*      Their ages *12 - 19 - 21*
    Number of girls ___      Their ages _____
    Have you ever had any foster children? *No*
    How many live with you? _____

3.  Does anyone live in your home other than your spouse or children? Yes ____ No *✓*

4.  What is your highest level of education? *14*

5.  What is your spouse's highest level of education? *College Degree*

6.  Where did you attend high school? *Dollarway*

If you attended college, name the college and its location.
_AMY M (MAPB_____
What was your major? _Business_____
What was your minor? _Liberal Studies_____
If you attended graduate school?  If so, name of institution
and degree obtained. _____
_____

7.   Please indicate by the organizations, clubs and religious
     activities in which you actively participate:

     Civic _____        Fraternal _____
     Religious _Catholic with a_    Volunteer _____
     Social _____       Other _____

8.   Have you or any member of your family been a party to a
     lawsuit?  Yes____  No _√_  If yes, please specify _____
     _____

9.   Have you or any member of your family been a witness in a
     lawsuit?  Yes____  No _√_  If yes, please specify _____
     _____

10.  Have you ever been the victim of a crime?  Yes _√_  No____
     Was the crime reported to the police or were the police
     involved?  Yes _√_  No____  Was the crime prosecuted?  Yes____
     No _√_  If yes, was it resolved to your satisfaction?_____

11.  Has any member of your family ever been a victim of murder,
     manslaughter or negligent homicide?  Yes____  No _√_  If yes,
     please specify and state whether resolved to your
     satisfaction. _____
     _____

12.  Have you, any member of your family, or a close friend ever
     been accused of any action related to murder, manslaughter
     or negligent homicide?  Yes____  No _√_

13.  Have you ever been convicted of a crime other than traffic
     offenses?  Yes____  No _√_

14.  Have you ever been arrested and charged with any crime other
     than a traffic offense?  Yes____  No _√_  If yes, please
     specify. _____
     _____

15.  Have you, any member of your family, or close friend ever
     had any special training in law or law enforcement?  Yes____
     No _√_  If yes, please specify. _____
     _____

2

JJC 927

Respondent's Exhibit E

16. Do you or any member of your family have personal or business relationships with any member or employee of the following state or county offices?

### PLEASE PLACE A CHECK IN THE APPROPRIATE BLANK

| | Yes | No |
|---|---|---|
| Police Department | ✓ | |
| County Sheriff's Office | | ✓ |
| Other Law Enforcement Agency | | ✓ |
| Prosecuting Attorney's Office | | ✓ |
| Arkansas Department of Correction | ✓ | ✓ |

17. Do you or any member of your family, or close friend, have any knowledge of or any personal relationship with _____ ?
Yes____  No ✓

18. Do you have any knowledge of or have you had any contact or relationship with any of the following individuals who may appear as witnesses in this case?  Please check the appropriate blank to indicate any relationship or knowledge you or any member of your family may have of that witnesses or any member of that witness' family.

| List of Witnesses | I have heard of | I know | I know member of witness' family | Family knows witness or family |
|---|---|---|---|---|
| Greg Taylor | | | | |
| James Nelson | | | | |
| Taquante Nelson | | | | |
| Bud Phillips | | | | |
| Terry Addison | | | | |
| Jo Ann Reams | | | | |
| Dr. Sturner | | | | |
| Ron Andrejack | | | | |
| Phillip Curry | | | | |
| Kenny Heroman | | | | |
| David A. Nanak | | | | |
| Patrick Coffey | | | | |
| Elgin Anders | | | | |
| Amelia Reams | | | | |
| John Cone | | | | |
| George McDaniel | | | | |
| Jeannie Mack | | | | |
| Mike Moss | | | | |

19. Have you read any newspaper articles about this?  Yes ✓  No____   Have you formed any opinion regarding this case after reading the newspaper articles?  Yes ✓  No____

3

   Respondent's Exhibit E

20. Have you discussed this case with anyone? Yes ✓ No___ If yes, what was the nature of this discussion? _About Crime in Pine Bluff_
If yes, did anyone offer any opinions or facts about the case? Yes ✓ No___

21. Have you heard this case discussed by anyone even if you were not a participate in the conversation? Yes___ No ✓
If yes, did anyone offer any opinions about it? Yes___ No ✓

22. What opinions, if any, have you formed concerning this case? Please explain in detail. _That the Defendant is guilty._
_____
_____
_____

Have you expressed your opinion to others? Yes ✓ No___
If yes, to whom? _My Husband_

23. Do you have any specific problems at home or on the job that might cause you to lose concentration during the trial?
Yes___ No ✓ If yes, please explain in detail. _____
_____
_____

24. Do you have any physical or emotional disabilities which would make it difficult or impossible to serve on this jury?
Yes___ No ✓ If yes, please explain in detail. _____
_____
_____

25. Are you taking any medication regularly? Yes___ No ✓ If so, what? _____
_____

4

938

5507     Respondent's Exhibit E

26. Do you have religious, moral or philosophical beliefs which would prevent you from sitting in judgment on another person? Yes ✓ No ___ If yes, please explain. *If the judgment has to do with the death penalty*

27. Would your religious beliefs in any way make it difficult for you to serve as a juror on this case and to reach a verdict based on the laws of the State of Arkansas as given to you in this case by the Judge? Yes ✓ No ___ If yes, please explain fully. *I could not sentence anyone to death.*

28. Have you formed an opinion concerning what would be a desirable verdict in this case? Yes ✓ No ___ If yes, what is that opinion? *Life without parol*

29. What do you do in your spare time? *Read*

30. What is the last book you have read? *Malcolm X*

31. Are there certain types of books you prefer to read over others (for example, mysteries, biographies, nonfiction?) *Biographies*

32. What magazines do you read regularly? *Essence*

33. To what magazines do you subscribe? *Essence*

34. Do you have a newspaper subscription? Daily ✓ Weekly ___ What paper(s)? *Pine Bluff Commercial & Arkansas Democrat*

35. How often do you watch television? *5 hrs* Please estimate the number of hours per day. ___

36. What kind of television shows do you watch (sports, movies, situation comedies, soap operas, talk shows?) *News 5:00, 5:30, 6:00, 10:00, (all) minates, 20/20 & more. It can be told, Mary One*

37. Do you watch local news programs? Yes ✓ No ___ How often? ___ What channel(s)? *4 - 7 - 11*

38. Do you watch national news programs? Yes ✓ No ___ How often? *Daily* What channel(s)? *11-4 & 7*

5

Respondent's Exhibit E

39.  Do you know of any reason you could not serve as a fair and impartial juror in this particular case which involves a violent crime?  Yes____  No _✓_ If yes, please explain fully.

_____
_____
_____

40.  Would you find it difficult to listen to or to concentrate on evidence relating to:

|     |                                |     |     |
|-----|--------------------------------|-----|-----|
| (a) | Acts of violence               | Yes____ | No _✓_ |
| (b) | Abnormal human behavior        | Yes____ | No _✓_ |
| (c) | Psychological disorders        | Yes____ | No _✓_ |
| (d) | Troubled or disturbed childhood | Yes____ | No _✓_ |

41.  Is there any reason why you feel that you would not want to serve on this jury?  Yes _✓_ No____   If yes, please explain, fully.  _He is a young black male I do not want to pass judgment on him, when I look at him I think about my own two sons._

42.  Can you think of <u>any</u> reason, no matter how insignificant it might seem to be, whether addressed in this questionnaire or not, why you could <u>not</u> be a fair juror in this case?  Yes____ No _✓_ If yes, please explain fully.  _____

_____
_____
_____

I SWEAR THAT THE ANSWERS GIVEN ABOVE ARE TRUTHFUL TO
THE SAME EFFECT AS IF I WERE SWORN UNDER OATH IN OPEN
COURT TO GIVE TRUTHFUL ANSWERS TO THE SAME.

_Heleih J. Thomas_
(Signature)

6

930

Respondent's Exhibit E

IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ARKANSAS

STATE OF ARKANSAS                                                    PLAINTIFF

VS.                              NO. CR 93-301-3

KENNETH REAMS                                                        DEFENDANT

### SUPPLEMENTAL JUROR QUESTIONNAIRE

A jury must be selected from the panel of which you are a member to hear the above-captioned case. As part of the jury selection process, the questions asked in this questionnaire could be asked in open court. You are given more privacy by answering them in this questionnaire. Please answer each question. If you need more space, please use the back and so indicate on the front.

By court order, none of the information you reveal in response to these questions is to be used for any purpose other than the selection of qualified jurors to serve in this case. Attorneys will be required to return all copies of these questionnaires to the Clerk of the Court for destruction after a final resolution of this case.

NAME (PRINT): _Austin_     _Katherine_     _Rebecca_
                (Last)              (First)              (Middle)

ADDRESS: _3206 Fir Apt. D24_     _Pine Bluff_     _AR_
           (Street, P.O. Box)         (City)         (State)
OCCUPATION: _School Teacher_
                     (If retired so indicate.)

SPOUSE'S OCCUPATION: _n/a_
                      (If retired so indicate.)

1. Has your marital status changed in the last 10 years?
   Yes___ No _X_ If yes, was that by: Death of Spouse___
   Divorce___ Marriage___ Remarriage___

2. Total number of children _0_ or stepchildren _0_
   Number of boys _0_      Their ages _____
   Number of girls _0_     Their ages _____
   Have you ever had any foster children? _No_
   How many live with you? _____

3. Does anyone live in your home other than your spouse or children? Yes _X_ No ___
   _Mother_

4. What is your highest level of education? _BSE_

5. What is your spouse's highest level of education? ___

6. Where did you attend high school? _Woodlawn High School_

If you attended college, name the college and its location.
_University of Arkansas at Monticello - Monticello, AR_
What was your major? _English_          _Education_
What was your minor? _Social Studies_
If you attended graduate school? If so, name of institution
and degree obtained. _____

7.   Please indicate by the organizations, clubs and religious
     activities in which you actively participate:

Civic _____      Fraternal _____
Religious _Pleasant Ridge Baptist Church_ Volunteer _____
Social _Delta Kappa Gamma_  Other _____
       _(Teacher Sorority)_

8.   Have you or any member of your family been a party to a
     lawsuit? Yes___ No _X_ If yes, please specify _____

9.   Have you or any member of your family been a witness in a
     lawsuit? Yes___ No _X_ If yes, please specify _____

10.  Have you ever been the victim of a crime? Yes _X_ No ___
     Was the crime reported to the police or were the police
     involved? Yes _X_ No___ Was the crime prosecuted? Yes___
     No _X_ If yes, was it resolved to your satisfaction? _____

11.  Has any member of your family ever been a victim of murder,
     manslaughter or negligent homicide? Yes___ No _X_ If yes,
     please specify and state whether resolved to your
     satisfaction. _____

12.  Have you, any member of your family, or a close friend ever
     been accused of any action related to murder, manslaughter
     or negligent homicide? Yes___ No _X_

13.  Have you ever been convicted of a crime other than traffic
     offenses? Yes___ No _X_

14.  Have you ever been arrested and charged with any crime other
     than a traffic offense? Yes___ No _X_ If yes, please
     specify. _____

15.  Have you, any member of your family, or close friend ever
     had any special training in law or law enforcement? Yes _X_
     No___ If yes, please specify. _Cousins are law_
     _enforcement officers. Neighbor is law officer._

2

932

Respondent's Exhibit E

16. Do you or any member of your family have personal or business relationships with any member or employee of the following state or county offices?

### PLEASE PLACE A CHECK IN THE APPROPRIATE BLANK

| | Yes | No |
|---|---|---|
| Police Department | ✓ | |
| County Sheriff's Office | | |
| Other Law Enforcement Agency | | ✓ |
| Prosecuting Attorney's Office | | ✓ |
| Arkansas Department of Correction | ✓ | |

17. Do you or any member of your family, or close friend, have any knowledge of or any personal relationship with _Reams_ ? Yes___  No ✓

18. Do you have any knowledge of or have you had any contact or relationship with any of the following individuals who may appear as witnesses in this case?  Please check the appropriate blank to indicate any relationship or knowledge you or any member of your family may have of that witnesses or any member of that witness' family.

| List of Witnesses | I have heard of | I know | I know member of witness' family | Family knows witness or family |
|---|---|---|---|---|
| Greg Taylor | | | | |
| James Nelson | | | | |
| Taquante Nelson | | | | |
| Bud Phillips | | | | |
| Terry Addison | | | | |
| Jo Ann Reams | | | | |
| Dr. Sturner | | | | |
| Ron Andrejack | | | | |
| Phillip Curry | | | | |
| Kenny Heroman | | | | |
| David A. Nanak | | | | |
| Patrick Coffey | | | | |
| Elgin Anders | | | | |
| Amelia Reams | | | | |
| John Cone | | | | |
| George McDaniel | | | | |
| Jeannie Mack | | | | |
| Mike Moss | | | | |

19. Have you read any newspaper articles about this?  Yes ✓ No___  Have you formed any opinion regarding this case after reading the newspaper articles?  Yes___  No ✓

3

933

Respondent's Exhibit E

20. Have you discussed this case with anyone? Yes ✓ No ___ If yes, what was the nature of this discussion? _General_ _Comments on Continued Crime in the city_) If yes, did anyone offer any opinions or facts about the case? Yes ✓ No ___

21. Have you heard this case discussed by anyone even if you were not a participate in the conversation? Yes ✓ No ___ If yes, did anyone offer any opinions about it? Yes ✓ No ___

22. What opinions, if any, have you formed concerning this case? Please explain in detail. _____
_____
_____
_____
_____

Have you expressed your opinion to others? Yes ___ No ✓ If yes, to whom? _____

23. Do you have any specific problems at home or on the job that might cause you to lose concentration during the trial? Yes ___ No ✓ If yes, please explain in detail. _____
_____
_____
_____

24. Do you have any physical or emotional disabilities which would make it difficult or impossible to serve on this jury? Yes ___ No ✓ If yes, please explain in detail. _____
_____
_____
_____

25. Are you taking any medication regularly? Yes ___ No ✓ If so, what? _____
_____

93

Respondent's Exhibit E

26. Do you have religious, moral or philosophical beliefs which would prevent you from sitting in judgment on another person? Yes____ No_✓_ If yes, please explain. _____
_____

27. Would your religious beliefs in any way make it difficult for you to serve as a juror on this case and to reach a verdict based on the laws of the State of Arkansas as given to you in this case by the Judge? Yes____ No_✓_ If yes, please explain fully. _____
_____

28. Have you formed an opinion concerning what would be a desirable verdict in this case? Yes____ No____ If yes, what is that opinion? *I tend to sympathize with victims — be that right or wrong!*
_____

29. What do you do in your spare time? *I enjoy reading, travelling, cooking.*

30. What is the last book you have read? *The Bridges of Madison County*

31. Are there certain types of books you prefer to read over others (for example, mysteries, biographies, nonfiction?) *Gothic novels, mysteries, dramas.*

32. What magazines do you read regularly? *Southern Living Time*

33. To what magazines do you subscribe? *Southern Living*

34. Do you have a newspaper subscription? Daily _✓_ Weekly____ What paper(s)? *Pine Bluff Commercial*

35. How often do you watch television? _____ Please estimate the number of hours per day. *2 hrs. per day*

36. What kind of television shows do you watch (sports, movies, situation comedies, soap operas, talk shows?) _____ *old movies*

37. Do you watch local news programs? Yes_✓_ No____ How often? *daily* What channel(s)? *4*

38. Do you watch national news programs? Yes_✓_ No____ How often? *daily* What channel(s)? *4*

5

Respondent's Exhibit E

39. Do you know of any reason you could not serve as a fair and impartial juror in this particular case which involves a violent crime? Yes___ No___ If yes, please explain fully. _I feel I am impartial in most cases, but once again, I am strongly in favor of victims' rights and am disgusted with amount of violent crimes throughout our country._

40. Would you find it difficult to listen to or to concentrate on evidence relating to:

    (a) Acts of violence                Yes ✓   No___
    (b) Abnormal human behavior         Yes ✓   No___
    (c) Psychological disorders         Yes ✓   No___
    (d) Troubled or disturbed childhood Yes ✓   No___

41. Is there any reason why you feel that you would not want to serve on this jury? Yes___ No___ If yes, please explain fully. _See # 40_____

42. Can you think of any reason, no matter how insignificant it might seem to be, whether addressed in this questionnaire or not, why you could not be a fair juror in this case? Yes___ No___ If yes, please explain fully. _See above_____


I SWEAR THAT THE ANSWERS GIVEN ABOVE ARE TRUTHFUL TO THE SAME EFFECT AS IF I WERE SWORN UNDER OATH IN OPEN COURT TO GIVE TRUTHFUL ANSWERS TO THE SAME.

_Katherine Rebecca Austin_
(Signature)

6

933

Respondent's Exhibit E

IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ARKANSAS

STATE OF ARKANSAS
                                                    PLAINTIFF

VS.                        NO. CR 93-301-3

KENNETH REAMS
                                                    DEFENDANT

### SUPPLEMENTAL JUROR QUESTIONNAIRE

A jury must be selected from the panel of which you are a
member to hear the above-captioned case.  As part of the jury
selection process, the questions asked in this questionnaire
could be asked in open court.  You are given more privacy by
answering them in this questionnaire.  Please answer each
question.  If you need more space, please use the back and so
indicate on the front.

By court order, none of the information you reveal in
response to these questions is to be used for any purpose other
than the selection of qualified jurors to serve in this case.
Attorneys will be required to return all copies of these
questionnaires to the Clerk of the Court for destruction after a
final resolution of this case.

NAME (PRINT): __Davis_____  __Nancy_____  __Lee____
              (Last)            (First)        (Middle)

ADDRESS: __302 West 27th_____  __Pine Bluff___  __AR___
         (Street, P.O. Box)     (City)         (State)
OCCUPATION: __Social Service Worker I_____
                        (If retired so indicate.)

SPOUSE'S OCCUPATION: _____
                        (If retired so indicate.)

1.   Has your marital status changed in the last 10 years?
     Yes___  No _✓_ If yes, was that by:  Death of Spouse___
     Divorce___  Marriage___  Remarriage___

2.   Total number of children _4_ or stepchildren _____
     Number of boys _____    Their ages _____
     Number of girls _4_      Their ages _30, 28, 27, 23_
     Have you ever had any foster children? _0_
     How many live with you? _1_

3.   Does anyone live in your home other than your spouse or
     children?  Yes ___  No _✓_

4.   What is your highest level of education? _College (Six years)_

5.   What is your spouse's highest level of education? _High School_

6.   Where did you attend high school? _Central High, Franklin, AR_

Respondent's Exhibit E

If you attended college, name the college and its location.
_University of Arkansas at Pine Bluff_
What was your major? _Herentology_
What was your minor? _____
If you attended graduate school? If so, name of institution
and degree obtained. _University of Arkansas at Little, AR_

7.  Please indicate by the organizations, clubs and religious
    activities in which you actively participate:

    Civic _____    Fraternal _____
    Religious ✓_____    Volunteer ✓_____
    Social _____    Other _____

8.  Have you or any member of your family been a party to a
    lawsuit? Yes____ No ✓ If yes, please specify _____
    _____

9.  Have you or any member of your family been a witness in a
    lawsuit? Yes____ No ✓ If yes, please specify _____
    _____

10. Have you ever been the victim of a crime?  Yes____ No ✓
    Was the crime reported to the police or were the police
    involved? Yes____ No____ Was the crime prosecuted? Yes____
    No____ If yes, was it resolved to your satisfaction?_____
    _____

11. Has any member of your family ever been a victim of murder,
    manslaughter or negligent homicide? Yes____ No ✓ If yes,
    please specify and state whether resolved to your
    satisfaction. _____
    _____

12. Have you, any member of your family, or a close friend ever
    been accused of any action related to murder, manslaughter
    or negligent homicide? Yes____ No ✓

13. Have you ever been convicted of a crime other than traffic
    offenses? Yes____ No ✓

14. Have you ever been arrested and charged with any crime other
    than a traffic offense? Yes____ No ✓ If yes, please
    specify. _____
    _____

15. Have you, any member of your family, or close friend ever
    had any special training in law or law enforcement? Yes____
    No ✓ If yes, please specify. _____
    _____

2

5517 938

Respondent's Exhibit E

16. Do you or any member of your family have personal or
business relationships with any member or employee of the
following state or county offices?

### PLEASE PLACE A CHECK IN THE APPROPRIATE BLANK

| | Yes | No |
|---|---|---|
| Police Department | | ✓ |
| County Sheriff's Office | | ✓ |
| Other Law Enforcement Agency | | ✓ |
| Prosecuting Attorney's Office | | ✓ |
| Arkansas Department of Correction | ✓ | |

17. Do you or any member of your family, or close friend, have
any knowledge of or any personal relationship with _____?
Yes____  No ✓

18. Do you have any knowledge of or have you had any contact or
relationship with any of the following individuals who may
appear as witnesses in this case?  Please check the
appropriate blank to indicate any relationship or knowledge
you or any member of your family may have of that witnesses
or any member of that witness' family.

| List of Witnesses | I have heard of | I know | I know member of witness' family | Family knows witness or family |
|---|---|---|---|---|
| Greg Taylor | | | | |
| James Nelson | | | | |
| Taquante Nelson | | | | |
| Bud Phillips | | | | |
| Terry Addison | | | | |
| Jo Ann Reams | | | | |
| Dr. Sturner | | | | |
| Ron Andrejack | | | | |
| Phillip Curry | | | | |
| Kenny Heroman | | | | |
| David A. Nanak | | | | |
| Patrick Coffey | | | | |
| Elgin Anders | | | | |
| Amelia Reams | | | | |
| John Cone | | | | |
| George McDaniel | | | | |
| Jeannie Mack | | | | |
| Mike Moss | | | | |

19. Have you read any newspaper articles about this?  Yes ✓
No____   Have you formed any opinion regarding this case after
reading the newspaper articles?  Yes____  No ✓

3

939

Respondent's Exhibit E

20. Have you discussed this case with anyone?  Yes___  No _✓_  If yes, what was the nature of this discussion? _____

If yes, did anyone offer any opinions or facts about the case?  Yes___  No___

21. Have you heard this case discussed by anyone even if you were not a participate in the conversation?  Yes _✓_  No___ If yes, did anyone offer any opinions about it?  Yes _✓_  No___

22. What opinions, if any, have you formed concerning this case? Please explain in detail. _____
_____
_____
_____

Have you expressed your opinion to others?  Yes___  No _✓_ If yes, to whom? _____

23. Do you have any specific problems at home or on the job that might cause you to lose concentration during the trial? Yes _✓_  No___  If yes, please explain in detail. _I am a_ _Case, Manager Manager at Department of Human_ _Services and I am in the process of getting a new case in_ _load and bring it up to date by next week while I am here_ _No one is working on my case load._

24. Do you have any physical or emotional disabilities which would make it difficult or impossible to serve on this jury? Yes___  No _✓_  If yes, please explain in detail. _____
_____
_____

25. Are you taking any medication regularly?  Yes___  No _✓_ If so, what? _____
_____

4

Respondent's Exhibit E

26. Do you have religious, moral or philosophical beliefs which would prevent you from sitting in judgment on another person?   Yes ✓   No____  (If yes, please explain.   *If it mean*
*Capital Punishment (death)*

27. Would your religious beliefs in any way make it difficult for you to serve as a juror on this case and to reach a verdict based on the laws of the State of Arkansas as given to you in this case by the Judge?   Yes ✓   No____   If yes, please explain fully.   *If the death penalty is to be*
*Considered*

28. Have you formed an opinion concerning what would be a desirable verdict in this case?   Yes____   No ✓   If yes, what is that opinion? _____

29. What do you do in your spare time?   *read, study, baby*
*sit, and participate in activities at Church*

30. What is the last book you have read?   *Guidepost*

31. Are there certain types of books you prefer to read over others (for example, mysteries, biographies, nonfiction)?   *the Bible and other religious books*

32. What magazines do you read regularly?   *Ebony*

33. To what magazines do you subscribe?   *Ebony, Guidepost*
*and Ladies' Home Journal*

34. Do you have a newspaper subscription?   Daily ✓   Weekly____
What paper(s)? _____

35. How often do you watch television?   *Daily*
Please estimate the number of hours per day.   *2 hrs.*

36. What kind of television shows do you watch (sports, movies, situation comedies, soap operas, talk shows?) _____

37. Do you watch local news programs?   Yes ✓   No____   How often?   *daily*   What channel(s)?   *4, 8, 11*

38. Do you watch national news programs?   Yes ✓   No____   How often? _____   What channel(s)?   *20*

5

Respondent's Exhibit E

39.  Do you know of any reason you could not serve as a fair and
     impartial juror in this particular case which involves a
     violent crime?  Yes ✓  No ___  If yes, please explain fully.
     _If the Death Penalty is to be included on the very death_
     _____

40.  Would you find it difficult to listen to or to concentrate
     on evidence relating to:

     (a)  Acts of violence            Yes___   No ✓
     (b)  Abnormal human behavior     Yes___   No ✓
     (c)  Psychological disorders     Yes___   No ✓
     (d)  Troubled or disturbed childhood  Yes___  No ✓

41.  Is there any reason why you feel that you would not want to
     serve on this jury?  Yes ✓  No ___  If yes, please explain
     fully.  _If the Death Penalty is sought, I will not_
     _be able to take part in it._

42.  Can you think of _any_ reason, no matter how insignificant it
     might seem to be, whether addressed in this questionnaire or
     not, why you could _not_ be a fair juror in this case?  Yes ✓
     No___  If yes, please explain fully.  _The same answer_
     _I gave in question 41_


        I SWEAR THAT THE ANSWERS GIVEN ABOVE ARE TRUTHFUL TO
        THE SAME EFFECT AS IF I WERE SWORN UNDER OATH IN OPEN
        COURT TO GIVE TRUTHFUL ANSWERS TO THE SAME.

                           _Nancy Davis_
                           (Signature)

Respondent's Exhibit E

IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ARKANSAS

STATE OF ARKANSAS                                                    PLAINTIFF

VS.                          NO. CR 93-301-3

KENNETH REAMS                                                        DEFENDANT

### SUPPLEMENTAL JUROR QUESTIONNAIRE

A jury must be selected from the panel of which you are a
member to hear the above-captioned case.  As part of the jury
selection process, the questions asked in this questionnaire
could be asked in open court.  You are given more privacy by
answering them in this questionnaire.  Please answer each
question.  If you need more space, please use the back and so
indicate on the front.

By court order, none of the information you reveal in
response to these questions is to be used for any purpose other
than the selection of qualified jurors to serve in this case.
Attorneys will be required to return all copies of these
questionnaires to the Clerk of the Court for destruction after a
final resolution of this case.

NAME (PRINT): *Weaver*          *John*          *Thomas*
              (Last)            (First)         (Middle)

ADDRESS: *1706 West 15th. ave Pine Bluff As*
         (Street, P.O. Box)          (City)      (State)

OCCUPATION: *Warehouseman*
                    (If retired so indicate.)

SPOUSE'S OCCUPATION: *Service for the Pb Blind*
                     (If retired so indicate.)

1.  Has your marital status changed in the last 10 years?
    Yes___  No _✓_  If yes, was that by:  Death of Spouse___
    Divorce___  Marriage___  Remarriage___

2.  Total number of children ___*0*___ or stepchildren ___*0*___
    Number of boys _____      Their ages _____
    Number of girls _____     Their ages _____
    Have you ever had any foster children? _____
    How many live with you? _____

3.  Does anyone live in your home other than your spouse or
    children?  Yes ___   No _✓_

4.  What is your highest level of education? *& grade 12*

5.  What is your spouse's highest level of education? *grade 12*

6.  Where did you attend high school? *J C S U*

Respondent's Exhibit E

If you attended college, name the college and its location. _____

What was your major? _____
What was your minor? _____
If you attended graduate school?  If so, name of institution
and degree obtained. _____
_____

7.  Please indicate by the organizations, clubs and religious
    activities in which you actively participate:

    Civic _____ Fraternal _____
    Religious _Presbyterian church_ Volunteer _____
    Social _____ Other _____

8.  Have you or any member of your family been a party to a
    lawsuit?  Yes____  No_✓_  If yes, please specify _____
    _____

9.  Have you or any member of your family been a witness in a
    lawsuit?  Yes____  No_✓_  If yes, please specify _____
    _____

10. Have you ever been the victim of a crime?  Yes_✓_ No___
    Was the crime reported to the police or were the police
    involved?  Yes_✓_  No___  Was the crime prosecuted?  Yes___
    No_✓_  If yes, was it resolved to your satisfaction?_____
    _____

11. Has any member of your family ever been a victim of murder,
    manslaughter or negligent homicide?  Yes___  No_✓_  If yes,
    please specify and state whether resolved to your
    satisfaction. _____
    _____

12. Have you, any member of your family, or a close friend ever
    been accused of any action related to murder, manslaughter
    or negligent homicide?  Yes___  No_✓_

13. Have you ever been convicted of a crime other than traffic
    offenses?  Yes___  No_✓_

14. Have you ever been arrested and charged with any crime other
    than a traffic offense?  Yes___  No_✓_  If yes, please
    specify. _____
    _____

15. Have you, any member of your family, or close friend ever
    had any special training in law or law enforcement?  Yes___
    No_✓_  If yes, please specify. _____
    _____

2

944
Respondent's Exhibit E

16. Do you or any member of your family have personal or business relationships with any member or employee of the following state or county offices?

<u>PLEASE PLACE A CHECK IN THE APPROPRIATE BLANK</u>

| | Yes | No ✓ |
|---|---|---|
| Police Department | _____ | ✓ |
| County Sheriff's Office | _____ | ✓ |
| Other Law Enforcement Agency | _____ | ✓ |
| Prosecuting Attorney's Office | _____ | ✓ |
| Arkansas Department of Correction | _____ | ✓ |

17. Do you or any member of your family, or close friend, have any knowledge of or any personal relationship with _____? Yes____ No ✓

18. Do you have any knowledge of or have you had any contact or relationship with any of the following individuals who may appear as witnesses in this case?  Please check the appropriate blank to indicate any relationship or knowledge you or any member of your family may have of that witnesses or any member of that witness' family.

| List of Witnesses | I have heard of | I know | I know member of witness' family | Family knows witness or family |
|---|---|---|---|---|
| Greg Taylor | _____ | _____ | _____ | _____ |
| James Nelson | _____ | _____ | _____ | _____ |
| Taquante Nelson | _____ | _____ | _____ | _____ |
| Bud Phillips | _____ | _____ | _____ | _____ |
| Terry Addison | _____ | ✓ | _____ | _____ |
| Jo Ann Reams | _____ | _____ | _____ | _____ |
| Dr. Sturner | _____ | _____ | _____ | _____ |
| Ron Andrejack | _____ | _____ | _____ | _____ |
| Phillip Curry | _____ | _____ | _____ | _____ |
| Kenny Heroman | _____ | _____ | _____ | _____ |
| David A. Nanak | _____ | _____ | _____ | _____ |
| Patrick Coffey | _____ | _____ | _____ | _____ |
| Elgin Anders | _____ | _____ | _____ | _____ |
| Amelia Reams | _____ | _____ | _____ | _____ |
| John Cone | _____ | _____ | _____ | _____ |
| George McDaniel | _____ | _____ | _____ | _____ |
| Jeannie Mack | _____ | _____ | _____ | _____ |
| Mike Moss | _____ | _____ | _____ | _____ |

19. Have you read any newspaper articles about this?  Yes ✓ No____  Have you formed any opinion regarding this case after reading the newspaper articles?  Yes____ No ✓

3

945

Respondent's Exhibit E

20. Have you discussed this case with anyone? Yes ✓ No___ If yes, what was the nature of this discussion? _just talked it over_ _about how bad it was and sin such it was_
If yes, did anyone offer any opinions or facts about the case? Yes___ No ✓

21. Have you heard this case discussed by anyone even if you were not a participate in the conversation? Yes___ No ✓ If yes, did anyone offer any opinions about it? Yes___ No___

22. What opinions, if any, have you formed concerning this case? Please explain in detail. ~~illegible~~
_____
_____
_____
_____

Have you expressed your opinion to others? Yes___ No___
If yes, to whom? _____

23. Do you have any specific problems at home or on the job that might cause you to lose concentration during the trial? Yes___ No ✓ If yes, please explain in detail. _____
_____
_____
_____

24. Do you have any physical or emotional disabilities which would make it difficult or impossible to serve on this jury? Yes ✓ No___ If yes, please explain in detail. _I am_ _an insulin dependent Diabetic and_ _I need to have my meals and medication_ _on a regular basis_

25. Are you taking any medication regularly? Yes ✓ No___ If so, what? _Insulin_

4

Respondent's Exhibit E

26.   Do you have religious, moral or philosophical beliefs which would prevent you from sitting in judgment on another person? Yes ✓ No___ If yes, please explain. _I dont_ _believe in Capital punishment_

27.   Would your religious beliefs in any way make it difficult for you to serve as a juror on this case and to reach a verdict based on the laws of the State of Arkansas as given to you in this case by the Judge? Yes ✓ No___ If yes, please explain fully. _____

28.   Have you formed an opinion concerning what would be a desirable verdict in this case? Yes___ No___ If yes, what is that opinion? _____

29.   What do you do in your spare time? _Work around the_ _house_

30.   What is the last book you have read?

31.   Are there certain types of books you prefer to read over others (for example, mysteries, biographies, nonfiction?) _Readers Digest_

32.   What magazines do you read regularly? _Readers Digest_

33.   To what magazines do you subscribe? _Readers Digest_

34.   Do you have a newspaper subscription? Daily ✓ Weekly ✓ What paper(s)? _Pine Bluff Commercial - Arkansas_

35.   How often do you watch television? _Daily_ Please estimate the number of hours per day. _3_

36.   What kind of television shows do you watch (sports, movies, situation comedies, soap operas, talk shows?) _Sports_ _Situation Comedies_

37.   Do you watch local news programs? Yes ✓ No___ How often? _Daily_ What channel(s)? _7_

38.   Do you watch national news programs? Yes ✓ No___ How often? _Daily_ What channel(s)? _7_

5

39. Do you know of any reason you could not serve as a fair and impartial juror in this particular case which involves a violent crime?  Yes___  No___  If yes, please explain fully.

_____

_____

40. Would you find it difficult to listen to or to concentrate on evidence relating to:

    (a)  Acts of violence              Yes ✓   No___
    (b)  Abnormal human behavior       Yes___  No___
    (c)  Psychological disorders       Yes___  No___
    (d)  Troubled or disturbed childhood  Yes___  No___

41. Is there any reason why you feel that you would not want to serve on this jury?  Yes ✓  No___  If yes, please explain fully.  *I don't believe in capital punishment*

_____

42. Can you think of any reason, no matter how insignificant it might seem to be, whether addressed in this questionnaire or not, why you could not be a fair juror in this case?  Yes___  No ✓  If yes, please explain fully.  _____

_____

_____

        I SWEAR THAT THE ANSWERS GIVEN ABOVE ARE TRUTHFUL TO
        THE SAME EFFECT AS IF I WERE SWORN UNDER OATH IN OPEN
        COURT TO GIVE TRUTHFUL ANSWERS TO THE SAME.

                    _____
                    (Signature)

6

948

Respondent's Exhibit E

STATE'S EXHIBIT NUMBER 1

ENLARGMENT OF THE DIAGRAM OF FIFTH AND CHESTNUT REMAINS IN THE
POSSESSION OF THE COURT REPORTER.

Respondent's Exhibit E

STATE'S EXHIBIT NUMBER 2



950

Respondent's Exhibit E

STATE'S EXHIBIT NUMBER 3



95

Respondent's Exhibit E

STATE'S EXHIBIT NUMBER 4



952

Respondent's Exhibit E

STATE'S EXHIBIT NUMBER 5



955

   Respondent's Exhibit E

STATE'S EXHIBIT NUMBER 6

## POLICE
## CRIMINAL COMPLAINT
### PINE BLUFF, ARK.

| | |
|---|---|
| Case Number | NO. 57408 |

ON Wed, The 12<u>th</u> Day of May 19 93 At 8:45 (AM) (PM)

Name Reams                Kenneth    L,
Last        (Please Print)  First         Middle

Street 1003 W 3rd

City - State Pine Bluff, ARK,

Age 18  Birth Date 2-21-74 Race B Sex M Ht 56" Wt 125

Hair BLK  Eyes Brn  Build med  Alias

Driver Lic. No                Social Security No

Place of Arrest Det Office        Officer Addison 1560

Charge Capital Murder

Statute No 5-10-101   Facts of Arrest Subject was arrested on probable cause for Capital Murder

Evidence Held By

Witness                Address

Witness                Address

Releasing Officer    Time    Date    Bond By

Court Appearance    Day of        19    at    M.
Address of Court - Civic Center, 200 E 8th St  Pine Bluff  Ark

I promise to appear in said Court at said time and place.

Signature physical arrest

935

Respondent's Exhibit E

DETECTIVE OFFICE I.D. SHEET

CASE # _93-205_

NAME _Reams_ _Kenneth_ _Lynnord_ SSN _____ DATE _5-10-93_
    (last)   (first)   (middle)

ALIAS _Ken - Kenny_ NICKNAME _____ DLN _None_

ADDRESS _1003 W 3rd_ CITY _P.B._ STATE _AR_

PHONE _535-5018_ RACE _B_ SEX _M_ DOB _12-21-74_ AGE _18_ (R) or L HANDED

EYES _BN_ HAIR _BK_ EMPLOYER _None_ OCCUPATION _Laborer_

PLACE OF BIRTH _Cenotia WI._ EDUCATION _11th_

SCARS, MARKS OR TATTOOS _Tatoo "Kenny" Left arm "+" Left hand_

PREVIOUS ARRESTS : (Y) or N DATE _____ PLACE _Forrest City_

PHOTO # _____ FINGERPRINT # _____ PBN # _____

FATHER _Dewight Revada_ ADDRESS _California_ PHONE
MOTHER _Beatrice Whiteside_ ADDRESS _Forrest City AR_ PHONE
SPOUSE _____ ADDRESS _____ PHONE
BROTHER _Scott Whiteside_ ADDRESS _Forrest City AR_ PHONE
BROTHER _Domonique Whiteside_ ADDRESS _" " "_ PHONE
OTHER _____ ADDRESS _____ PHONE
_____ _____ ADDRESS _____ PHONE
SISTER _____ ADDRESS _____ PHONE
SISTER _____ ADDRESS _____ PHONE

ARREST INFORMATION

DATE _5-10-93_ TIME _1600_ LOCATION _3rd between Elm + Oak_ OFFICER _Hopson/Bacon Hudgins_

VISUAL/PC _X_ WARRANT _____ (Circuit, Municipal, Juvenile) WARRANT # _____

TRANSPORTED TO WHICH JAIL _____ DATE _____ TIME _____

ADDITIONAL NOTES _____

| CITATION NUMBER | CHARGE DESCRIPTION |
|---|---|
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |

STATE'S EXHIBIT

Respondent's Exhibit E

PINE BLUFF POLICE DEPARTMENT

DETECTIVE OFFICE I.D. SHEET

CASE # 93-205

Goodwin   Alford _____ SSN 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   DATE 5-12-93
(Last)   (first)   (middle)

ALIAS _____ NICKNAME Butterball   DLN None

ADDRESS 314 S Oak   CITY Pine Bluff   STATE ARK.

PHONE _____ RACE Blk   SEX Male   DOB 2-3-74   AGE 19   R or (L) HANDED

EYES Blk   HAIR Blk   EMPLOYER US Post Office   OCCUPATION custodian

PLACE OF BIRTH Pine Bluff, ARK.   EDUCATION Pine Bluff High (2)

SCARS, MARKS OR (TATTOOS) LS on Right Arm

PREVIOUS ARRESTS : Y or (N)   DATE _____ PLACE _____

PHOTO # _____ FINGERPRINT # _____ PBN # _____

FATHER Alford Goodwin   ADDRESS Pine Bluff ARK.   PHONE _____
MOTHER Flossie McLemore   ADDRESS 314 S. Oak   PHONE _____
SPOUSE _____ ADDRESS _____ PHONE _____
BROTHER Charlie Blake   ADDRESS P.B. ARK   PHONE _____
BROTHER Randy Blake   ADDRESS P.B. ARK.   PHONE _____
_____ ADDRESS _____ PHONE _____
SISTER Cathern Washington   ADDRESS P.B. ARK.   PHONE _____
SISTER Stacy Bookee   ADDRESS 314 Oak   PHONE _____
SISTER _____ ADDRESS _____ PHONE _____

ARREST INFORMATION

DATE _____ TIME _____ LOCATION _____ OFFICER _____
VISUAL/PC _____ WARRANT _____ (Circuit, Municipal, Juvenile) WARRANT # _____
TRANSPORTED TO WHICH JAIL _____ DATE _____ TIME _____
ADDITIONAL NOTES _____

_____
_____
_____

CITATION                    CHARGE
NUMBER                   DESCRIPTION

STATE'S
EXHIBIT

5535                    956

Respondent's Exhibit E

STATE'S EXHIBIT NUMBER 9

THE H & R .32 CALIBER REVOLVER REMAINS IN THE
POSSESSION OF THE COURT REPORTER.

5536      Respondent's Exhibit E

STATE'S EXHIBIT NUMBER 10

THE DIAGRAM REMAINS IN THE POSSESSION OF THE
COURT REPORTER.

STATE'S EXHIBIT NUMBER 11



950

Respondent's Exhibit E

STATE'S EXHIBIT NUMBER 12



930

Respondent's Exhibit E

STATE'S EXHIBIT NUMBER 13



5540

Respondent's Exhibit E

STATE'S EXHIBIT NUMBER 14



Respondent's Exhibit E

STATE'S EXHIBIT NUMBER 15



Respondent's Exhibit E

STATE'S EXHIBIT NUMBER 16



Respondent's Exhibit E

STATE'S EXHIBIT NUMBER 17

THE ACTUAL BULLET WAS RECEIVED INTO EVIDENCE.
SAID BULLET REMAINS IN THE POSSESSION OF THE
COURT REPORTER.

955

Respondent's Exhibit E

LESSER INCLUDED OFFENSES:
TRANSITIONAL INSTRUCTION

If you have a reasonable doubt of the defendant's guilt on the charge of capital murder you will then consider the charge of aggravated robbery.

AMCI 302

936

Respondent's Exhibit E

## AGGRAVATED ROBBERY

Kenneth Reams is charged with the offense of aggravated robbery. To sustain this charge the State must prove the following things beyond a reasonable doubt:

First:  That, with the purpose of committing a theft, Kenneth Reams, employed physical force upon another; and

Second:  That Kenneth Reams and an accomplice were armed with a deadly weapon or represented by words or conduct that they were armed with a deadly weapon and attempted to inflict death or serious physical injury upon another person.

## DEFINITIONS

"Physical force" means any bodily impact, restraint, or confinement.

"Deadly weapon" means [a firearm or anything manifestly designed, made, or adapted for the purpose of inflicting death or serious physical injury] [anything that in the manner of its use or intended use is capable of causing death or serious physical injury].

"Serious physical injury" means physical injury that created a substantial risk of death or that causes protracted disfigurement, protracted impairment of health, or loss or protracted impairment of the function of any bodily member or organ.

"Purpose." - A person acts with purpose with respect to his conduct when it is his conscious object to engage in the conduct.

AMCI - 2102

VERDICT FORM - CLASS Y FELONY

We, the Jury find Kenneth Reams guilty of Aggravated Robbery and fix his sentence at:

A term of _____
        (not less than 10 years nor more than 40 years, or life)
in the Arkansas Department of Correction.

_____
FOREMAN

We, the Jury, find Kenneth Reams not guilty.

_____
FOREMAN

958

Respondent's Exhibit E

IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ARKANSAS

STATE OF ARKANSAS                                    PLAINTIFF

VS.                          NO. CR-93-301-3

KENNETH REAMS                                        DEFENDANT

## MOTION TO INSTRUCT THE JURY AS TO ALLEGATION OF DEFENDANT'S MENTAL RETARDATION

Comes the Defendant, Kenneth Reams, by and through his attorney, Maxie G. Kizer, pursuant to A.C.A. 5-4-618, and for his Motion, states:

1.    That pursuant to a report dated September 28, 1993, from the Southeast Arkansas Mental Health Center, a copy of which is in the Court's file, the Defendant was found to have a WAIS-R full scale IQ of 66, which categorizes him in the mild range of mental retardation, according to the Wechsler Classification System.

2.    Therefore, pursuant to A.C.A. 5-4-618, the Defendant respectfully moves this Court to instruct the jury by a special jury instruction that the jury may find by unanimous determination that the Defendant was mentally retarded at the time the commission of the offense of Capital Murder as charged in this matter; and, in so doing, the Defendant would be automatically sentenced to life in imprisonment without the possibility of parole.

Respondent's Exhibit E

WHEREFORE, the Defendant, Kenneth Reams, prays that he be granted the relief outlined above, and for all other relief to which he may be entitled.

KENNETH REAMS, Defendant

By: _____

MAXIE G. KIZER (83101)
Attorney at Law
Post Office Box 7423
Pine Bluff, Arkansas   71611
(501) 534-7004

## CERTIFICATE OF SERVICE

I, Maxie G. Kizer, do hereby certify that a copy of the foregoing Motion has been hand-delivered to Ms. Carol Billings, Prosecuting Attorney, Jefferson County Courthouse, Pine Bluff, Arkansas 71601, on this 14th day of December, 1993.

_____
MAXIE G. KIZER

970

Respondent's Exhibit E

INSTRUCTION NO. _____

Defendant has alleged that he was mentally retarded at the time of committing Capital Murder because of a low intelligence quotient.

The Defendant has the burden of proving mental retardation by preponderance of the evidence.

The jury may unanimously determine that the Defendant was mentally retarded at the time of the commission of Capital Murder, which will result in the Defendant being automatically sentenced to life in prison without the possibility of parole.

Respondent's Exhibit E

SPECIAL VERDICT FORM

We, the jury, unanimously determine that the Defendant, Kenneth Reams, was mentally retarded at the time of the commission of Capital Murder involving the death of Gary Wayne Turner.

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Respondent's Exhibit E

## JUDGMENT AND COMMITMENT ORDER

IN THE CIRCUIT COURT OF _____ JEFFERSON _____ COUNTY, ARKANSAS

_____ ELEVENTH _____ DISTRICT _____ WEST _____ THIRD _____ DIVISION

On September 30, 1993 the defendant personally appeared before the Court with legal counsel and, having been informed by the Court of the nature of the charge(s), of his constitutional and legal rights, of the effect of a guilty plea upon those rights, and of his right to make a statement before sentencing, the Court made the following findings: (check one applicable)

☒ Defendant voluntarily, intelligently, and knowingly entered a plea of ☒ guilty or ☐ Nolo Contendere to the charge(s) herein enumerated and acknowledged factual bases for charge(s);

☐ Defendant is found guilty of said charge(s) by the Court, sitting as trier of fact;

☐ Defendant was found guilty at jury trial.

| CHANGE OF VENUE FROM: | DEFENDANT'S FULL NAME | DATE OF BIRTH | RACE | SEX | SID NUMBER |
|---|---|---|---|---|---|
| | Kenneth Reams | 12/21/74 | B | M | |

| DEFENDANT'S ATTORNEY | | | PROSECUTING ATTORNEY OR DEPUTY | AT NUMBER |
|---|---|---|---|---|
| Maxie G. Kizer | ☐ PV  ☒ AP | ☐ PD  ☐ SELF | Carol Billings | 122602 |

There being no legal cause shown by the defendant, as requested, why judgment should not be pronounced against him, a judgment of conviction is hereby entered against the defendant on each charge enumerated and court costs assessed. The County Sheriff is hereby ordered and directed to transport the defendant to ☒ The Arkansas Department of Correction or ☐ _____ County Jail, where he is sentenced to hard labor for the term specified on each charge:

| STATUTE NO. | OFFENSE | OFFENSE DATE | DOCKET NO | COUNTS | F/M | CLASS | SENTENCE | SUSPENDED |
|---|---|---|---|---|---|---|---|---|
| 5-12-103 | Aggravated Robbery | 4/29/93 | 93-300-3 | 1 | F | Y | 40 years | |
| | | | | | | | | |
| | | | | | | | | |

If consecutive, explain:

TIME TO SERVE AT A.D.C.: Forty (40) years

OTHER SENTENCING PROVISIONS
☐ HABITUAL (5-4-501)
☐ FIREARM (5-4-505/16-90-120)
☐ DEADLY WEAPON (16-90-121)
☐ HABITUAL CHILD SEX OFFENDER (12-12-902)
☐ OTHER: _____

PAROLE PROVISIONS — ACT 378 ONLY
Alternative Services (Act 378) (16-93-502). The defendant knowingly and willingly consents to sentence provisions:
☐ 16-93-507(b)(4) — Eligible for parole immediately
☐ 16-93-507(b)(5) — Eligible for parole as normal

EXPLANATORY NOTES: This sentence shall run concurrent with the sentences received in Jefferson County Case Numbers CR-93-298-3 and CR-93-299-3.

OTHER: FINE $ _____      ☐ DEATH PENALTY
RESTITUTION $ _____
COURT COSTS $ _____      EXECUTION DATE: _____

☐ DEFENDANT INFORMED OF RIGHT TO APPEAL      BOND PROVISIONS: _____
JAIL TIME CREDIT: 143 Days ___ OR ☐ NONE

| DATE 9/30/93 | CIRCUIT JUDGE (Print or Type) FRED D. DAVIS, III | CIRCUIT JUDGE (Signature) |
|---|---|---|
| DATE | I certify this is a true and correct record of this Court with short report of circumstances attached. | CIRCUIT CLERK/DEPUTY       (SEAL) |
| DATE | I acknowledge receipt of judgment. | DEFENDANT (Signature) |

FILED

### SHERIFF'S RETURN

| DATE REL. ON APPEAL BOND | DATE RET. TO CUSTODY | I certify the defendant named within was delivered to: ☐ The A.D.C. or ☐ _____ County Jail | DATE | SHERIFF/DEPUTY SEP 30 1993 |
|---|---|---|---|---|

DOROTHY G. PEARSON
Circuit & Chancery Clerk
JEFFERSON COUNTY ARKANSAS

DISTRIBUTION:   White: A.D.C.   Blue: Court   Yellow: Sheriff's Return,   Pink: Defendant,   Golden Rod: Prosecutor

A TRUE COPY, I CERTIFY
DOROTHY G. PEARSON, Clerk

Respondent's Exhibit E

AJD #15 2/28/89
4955

## JUDGMENT AND COMMITMENT ORDER

IN THE CIRCUIT COURT OF ___JEFFERSON___ COUNTY, ARKANSAS

___ELEVENTH___ DISTRICT ___WEST___ ___THIRD___ DIVISION

On ___September 30, 1993___, the defendant personally appeared before the Court with legal counsel and, having been informed by the Court of the nature of the charge(s), of his constitutional and legal rights, of the effect of a guilty plea upon those rights, and of his right to make a statement before sentencing, the Court made the following findings: (check one applicable)

☒ Defendant voluntarily, intelligently, and knowingly entered a plea of ☒ guilty or ☐ Nolo Contendere to the charge(s) herein enumerated and acknowledged factual bases for charge(s);

☐ Defendant is found guilty of said charge(s) by the Court, sitting as trier of fact;

☐ Defendant was found guilty at jury trial.

| CHANGE OF VENUE FROM: | DEFENDANT'S FULL NAME | | DATE OF BIRTH | RACE | SEX | SID NUMBER |
|---|---|---|---|---|---|---|
| | Kenneth Reams | | 12/21/74 | B | M | |
| DEFENDANT'S ATTORNEY | ☐ PV  ☒ AP | PROSECUTING ATTORNEY OR DEPUTY | | | | AT NUMBER |
| Maxie G. Kizer | ☐ PD  ☐ SELF | Carol Billings | | | | 122564 |

There being no legal cause shown by the defendant, as requested, why judgment should not be pronounced against him, a judgment of conviction is hereby entered against the defendant on each charge enumerated and court costs assessed. The County Sheriff is hereby ordered and directed to transport the defendant to ☒ The Arkansas Department of Correction or ☐ ____ County Jail, where he is sentenced to hard labor for the term specified on each charge:

| STATUTE NO. | OFFENSE | OFFENSE DATE | DOCKET NO | COUNTS | F/M | CLASS | SENTENCE | SUSPENDED |
|---|---|---|---|---|---|---|---|---|
| 5-12-103 | Aggravated Robbery | 4/28/93 | 93-299-3 | 1 | F | Y | 40 years | |
| | | | | | | | | |
| | | | | | | | | |

If consecutive, explain:

TIME TO SERVE AT A.D.C.: ___Forty (40) years___

**OTHER SENTENCING PROVISIONS**
- ☐ HABITUAL (5-4-501)
- ☐ FIREARM (5-4-505/16-90-120)
- ☐ DEADLY WEAPON (16-90-121)
- ☐ HABITUAL CHILD SEX OFFENDER (12-12-902)
- ☐ OTHER: _____

**PAROLE PROVISIONS — ACT 378 ONLY**
Alternative Services (Act 378) (16-93-502). The defendant knowingly and willingly consents to sentence provisions:
- ☐ 16-93-507(b)(4) — Eligible for parole immediately
- ☐ 16-93-507(b)(5) — Eligible for parole as normal

EXPLANATORY NOTES: This sentence shall run concurrent with the sentences received in Jefferson County Case Numbers CR-93-298-3 and CR-93-300-3.

| OTHER: FINE | $ _____ | ☐ DEATH PENALTY |
| RESTITUTION | $ _____ | |
| COURT COSTS | $ _____ | EXECUTION DATE: _____ |

☐ DEFENDANT INFORMED OF RIGHT TO APPEAL          BOND PROVISIONS: _____

JAIL TIME CREDIT: ~~143 days~~ OR ☐ NONE

| DATE | CIRCUIT JUDGE (Print or Type) | CIRCUIT JUDGE (Signature) |
|---|---|---|
| 9/30/93 | FRED D. DAVIS, III | _[signature]_ |
| DATE | I certify this is a true and correct record of this Court with short report of circumstances attached. | CIRCUIT CLERK/DEPUTY          (SEAL) |
| DATE | I acknowledge receipt of judgment. | DEFENDANT (Signature)     FILED |

### SHERIFF'S RETURN

| DATE REL. ON APPEAL BOND | DATE RET. TO CUSTODY | I certify the defendant named within was delivered to: ☐ The A.D.C. or ☐ County Jail | DATE | SHERIFF/DEPUTY (Signature) |
|---|---|---|---|---|

SEP 3 0 1993

DOROTHY G. PEARSON
Circuit & Chancery Clerk
JEFFERSON COUNTY, ARKAN...

DISTRIBUTION:  White: Court File,  Blue: ADC,  Yellow: Sheriff's Return,  Pink: Defendant,  Golden Rod: Prosecutor

A TRUE COPY I CERTIFY
DOROTHY G. PEARSON, Clerk
_Anette P. Blanch_

AJD #15 2/28/89
A 4955

31/812

5553

Respondent's Exhibit E

PSYCHOLOGICAL EVALUATION



NAME:    KENNETH REAMS    #834222
DOT:     9/27/93
DOB:     12/21/74
CA:      18-9
DAN:ls   5830P

REASON FOR REFERRAL:  This 18-year-old black male is referred through Jefferson County Circuit Court for evaluation to aid in determining competency.

TESTS ADMINISTERED:

WECHSLER ADULT INTELLIGENCE SCALE-REVISED (WAIS-R)
WIDE RANGE ACHIEVEMENT TEST-REVISED (WRAT-R)
HOUSE-TREE-PERSON (HTP)
BENDER VISUAL-MOTOR GESTALT TEST
BRIEF INTERVIEW

Mr. Reams' testing began at 10:15 a.m. and ended at 12:00 noon.

NOTES AND OBSERVATIONS:  Mr. Reams entered the testing situation in a reserved manner.  Without speaking he seated himself in a chair in the examiner's office.  He easily established and maintained good eye contact with the examiner, however, he was not verbally spontaneous. His verbalizations were rather soft and shallow.  Mr. Reams was alert and oriented to time, date, place and person.  His responses seemed slow and guarded.  His speech was directed and not pressured.  At the start of the session, he was noted to be involved with some inappropriate laughter, but as the session progressed and he became more involved in tasks presented, the laughter ceased until there was a pause in the testing.

Mr. Reams states that he completed the 8th grade and was put out of school in the 9th grade for fighting when he hit a principal.  He stated that prior to his arrest, he was living with different friends for about the past two years.  He stated that he last attended school in Forrest City.  He added that is where his family is, but he moved to Pine Bluff about two years ago.

When asked about the current charges against him, he stated that he is being charged with murder.  He states that this is not the first time that he has been arrested, stating that he was arrested previously for stealing.  He stated in 1991 he was in a youthful offenders camp for stealing.  He states that he has never held a full-time job and does not have a driver's license, but can drive a car a little bit.  When I asked him again about the charges against him, he started crying, stating that he is really in trouble, that he is only 18 and he is going to spend the rest of his life on death row.  He stated that he did not do it, but that it was his gun.

CONFIDENTIAL

975

Respondent's Exhibit E

PAGE 2
PSYCHOLOGICAL EVALUATION
KENNETH REAMS

TEST RESULTS AND INTERPRETATION:  Mr. Reams attained a WAIS-R Full
Scale IQ of 66, which falls into the Mild range of Mental
Retardation, according to the Wechsler Classification System.  He
attained a Verbal IQ of 67 and a Performance IQ of 67, with both
scores falling in the same classification range and no significant
discrepancy noted among scores.

Mr. Reams, who claims to have an 8th grade education, attained the
following grade equivalent and standard scores on the WRAT-R:

           Reading        less than 3     57
           Arithmetic     3E              54

As noted, both grade equivalents are significantly behind his stated
8th grade educational level.  Mr. Reams' performance on the WRAT-R
would support mild mental retardation.

Mr. Reams completed his Bender-Gestalt in 2 minutes 24 seconds.  His
handling of this task suggests an individual who has problems with
impulse control and low frustration tolerance.

Mr. Reams completed his HTP drawings in a rather free and easy
manner.  His handling of this task suggests an emotionally immature
individual with a poor self-image.  Feelings of instability and
ineffectiveness are noted.  He may tend to take more of a
self-centered approach to life.  There appears to be some underlying
anger and frustration that he could act out in an explosive manner.

In general, Mr. Reams currently tested into the Mild range of Mental
Retardation, according to the Wechsler Classification System.  His
academic achievement level tested out at or below the 3rd grade
level.  He did demonstrate some visual-motor coordination problems
during this testing.

Behaviorally, Mr. Reams is seen as an emotionally immature
individual, who has problems with impulse control and low
frustration tolerance.  There is some underlying anger and
frustration which may increase his acting out potential in an
explosive manner.

Current psychological testing did not suggest the presence of any
active psychosis or severe psychopathology at this time.  Common
sense reasoning and judgement appear to be limited, however, he was
able to express the difference between right and wrong, and he did
express some remorse over the situation he is currently involved in.

Respondent's Exhibit E

PAGE 3
PSYCHOLOGICAL EVALUATION
KENNETH REAMS


Current testing suggests that Mr. Reams could be able to actively participate in his own defense.  It is recommended that communications with Mr. Reams be of a verbal nature as his reading is quite limited.  It is also recommended that Mr. Reams be questioned about his understanding to make sure that he does understand what is being said to him, and that he be allowed to completely express himself so he does not become confused.


_David A. Nanak_

David A. Nanak, M.A.
PSYCHOLOGICAL EXAMINER


_Patrick Caffey_

Patrick Caffey, Ph.D.
CONSULTING PSYCHOLOGIST

Respondent's Exhibit E

POPLAR BLUFF SENIOR HIGH SCHOOL, Highland Drive, Poplar Bluff, Missouri  63901
                     Accredited by North Central Association

CLASSIFICATION OF SCHOOL:  AAA    COLLEGE RECOMMENDING MARK:  C or M    PASSING MARK:  D or I

LENGTH OF PERIODS:  50 minutes   MISSOURI CONSTITUTION *no*   U.S. CONSTITUTION *passed*

EXPLANATION OF GRADING SYSTEM:  (Explanation of English and Math Marking System enclosed)

A or E:  95-100    B or S:  88-94    C or M:  76-87    D or I:  68-75    F:  Below 68

Math 2, 3  – Remedial Math    Math 5  – Algebra I    Math 7  – Algebra II
Math 4    – Functional Math   Math 6  – Geometry     Math 8  – Elem. Math Analysis
                                                     Math 9  – Calculus

                         OFFICIAL COPY

DATE *December 2, 1993*                    *[signature]*
                                          Principal, Senior High School

_____ Semester Rank  __/__             GPA_____

DEFENDANT'S
EXHIBIT
NO.

                                        0 9 7 8

Respondent's Exhibit E

# explanation of transcript

## (grading system)

A or E: 95-100     B or S: 88-94
C or M: 76-87      D or I: 68-75
F: below 68

Withdraw and Passing - WP - No Credit
Withdraw and Failing - WF - No Credit

Students are assigned to course levels in English and Mathematics, depending upon their previous achievement and ability.

English levels are as follows.

|            | Above Average | Average | Below Average |
|------------|---------------|---------|---------------|
| Juniors    | 11-7          | 11-6    | 11-5          |
| Sophomores | 10-6          | 10-5    | 10-4          |
| Freshmen   | 9-5           | 9-4     | 9-3           |

Mathematics levels are as follows:

| Math 2, 3 | Remedial Math |
|-----------|---------------|
| Math 4    | Functional Math |
| Math 5    | Algebra I |
| Math 6    | Geometry |
| Math 7    | Algebra II |
| Math 8    | Elem. Math Analysis |
| Math 9    | Calculus |

The school is in session 175 days per year and operates on a seven-period day. Each period is 50 minutes in net length.

Poplar Bluff High School is accredited by the North Central Association of Secondary Schools and Colleges and the Poplar Bluff R-1 Schools are rated AAA by the Elementary and Secondary Education Department of Missouri.

Rank in class as reported by Poplar Bluff High School is computed according to the recommendation of the National Association of Secondary School Principals.

## ACT SCORES

|         | National | Missouri | PBHS |
|---------|----------|----------|------|
| 1985-86 | 18.8     | 19.2     | 19.5 |
| 1986-87 | 18.7     | 19.2     | 20.0 |
| 1987-88 | 18.8     | 19.1     | 19.6 |
| 1988-89 | 18.6     | 19.0     | 19.9 |
| 1989-90 | 20.6     | 20.9     | 20.9 |

# POPLAR BLUFF

*A Progressive Community*

Poplar Bluff is the 13th largest metropolitan city in Missouri with a population of over 20,000. It has the advantages of a large city combined with the graciousness and friendliness of a small town.

It is recognized as the medical center of Southeast Missouri with three major hospitals and numerous other medical clinics.

Poplar Bluff is also the retail trade capital of some 165,000 people in Southeast Missouri and Northeast Arkansas.

Three Rivers Community College with an enrollment of 1800 students is also located in Poplar Bluff.

Poplar Bluff High School is a four-year comprehensive high school and serves a population of 30,000 in the Poplar Bluff R-1 School District. Enrollment usually runs 1400-1500 per year and is reasonably stable.

979

Respondent's Exhibit E

# TRANSCRIPT POLICY

Graduates of Poplar Bluff High School will receive two transcripts upon request courtesy of the Poplar Bluff R-1 School District. A $2.00 charge will be placed on requests after the second transcript. Please address requests to:

Office of Admissions & Records
Poplar Bluff High School
Highland Drive
Poplar Bluff, MO 63901
(314) 785-6471

office of admissions and records

Poplar Bluff High School
Poplar Bluff, Missouri

5559

Respondent's Exhibit E

# POPLAR BLUFF SENIOR HIGH - CUMULATIVE RECORD

## STUDENT INFORMATION

NAME: REAMS KENNETH LYNNORD
ID#: 431339971
BIRTH DATE: 12/21/74
BIRTHPLACE: KENOSHA, WI
PARENT1: AMELIA REAMS
PARENT2:
ADDRESS: 1000 COLE
CITY: POPLAR BLUFF    MO 6390
PHONE: 314/785-4048x

*95*
*94*

*W. E. Sears Youth Center, Poplar Bluff, MO.*

REAMS, KENNETH L.
ENTRY 04/23/91    WITHDRAWAL 12/11/91    GRADE-09

| COURSE TITLE | GRADE | CREDIT |
|---|---|---|
| VOCATIONAL PREPARATION | C | 1.750 |
| LIFE SKILLS | C | .625 |
| LANG ARTS (ENG I FRESH) | B | 1.000 |
| BASIC MATH (GEN, FUNCT) | B | 1.000 |
| GENERAL SCIENCE | B | 1.000 |
| CITIZENSHIP | C | 1.000 |
| BASIC SKILLS-CHAP 1 | B | .375 |
|  |  | 6.750 |

DAYS ABSENT 0    CREDITS 6 3/4

| DAYS ABSENT | CREDITS | DAYS ABSENT | CREDITS |
|---|---|---|---|

NOTE: (EN:8-24-90 9TH) (DR:12-6-90-MOV.1N)
(RE:1-25-91 9TH) (DR:4-24-91-Sears Youth Center)
(EN:8-19-92 10TH) (DR:4-10-92-SUSP Remainder Yr)
CONSTITUTIONS: MO _____  U.S. Passed

RANK IN CLASS/NUMBER IN CLASS _____

AVERAGE GRADES _____

DATE GRADUATED _____

TRANSCRIPT SENT TO: _____

556
930
Respondent's Exhibit E

| NAME | | |
|---|---|---|
| REAMS | KENNETH | LYNNORD |
| LAST | FIRST | MIDDLE |

HENMON-NELSON TESTS OF MENTAL ABILITY

REAMS KENNETH L

Date 11/90 Age 15-11 Grade 9 Count Info

Form 1 Level 9-12

| | | NATIONAL NORMS | | | | |
|---|---|---|---|---|---|---|
| | | BY GRADE | | | BY AGE | |
| Number Worked | Raw Score | PR | Stanine | Standard Score | PR | Stanine |
| 90 | 25 | 15 | 3 | 81 | 12 | 3 |

## BASIC ESSENTIALS SKILLS TEST

Each school district in Missouri is responsible for administering the Basic Essential Skills Test (BEST). The test is mandatory. Ninth-grade students who have not passed all subtests of the BEST shall have course credit withheld in the related subject areas until the subtests have been passed. [Note: R/L is Reading/Language; Math is Mathematics; G/E is Government/Economics.]

5561

Respondent's Exhibit E

POPLAR BLUFF PUBLIC SCHOOLS
POPLAR BLUFF, MISSOURI
SENIOR HIGH SCHOOL
NENT RECORD

NAME: REAMS KENNETH LYNNORD          95
                                      44
ID#: 431339971
BIRTH DATE: 12/21/74
BIRTHPLACE: KENOSHA, WI
PARENT1: AMELIA REAMS
PARENT2:
ADDRESS: 1000 COLE
CITY: POPLAR BLUFF          MO 6390
PHONE:   314/785-4048x

GRADES LISTED IN RED ARE FROM:
*FORREST CITY H.S. FORREST CITY, AR
**W.E. SEARS YOUTH CENTER, POPLAR BLUFF MO
OTHER REMARKS: (EN:8-24-90 9TH) (DR: 12-6-90-
MOVING) (RE:1-25-91 9th) (DR:4-24-91-Sears Youth
Center) PASSED U.S. Constitution
GRADE 7: (EN:1-6-92-10th) (DR 4-10-92-Susp Daniel)
(EN: 8.19.92 10th) (DR: 10-7-92 Moved to AR per Aunt)

DAYS ABSENT_____ TOTAL CREDITS_____

DAYS ABSENT_____ TOTAL CREDITS_____

GRADE 8:

| REAMS, KENNETH | GRADE 08 | | |
| SCHOOL YEAR 1989-90 | | | |
| COURSE TITLE | 1 | 2 | YEAR |
| HISTORY | C | D | D |
| SCIENCE | F | D | D |
| MATH | D | D | D |
| ENGLISH | F | F | F |
| BOYS PE | S | S | S |
| MUSIC | S | S | S |
| ENHANCED | F | F | F |

DAYS ABSENT_____ TOTAL CREDITS_____

GRADE 9:

| REAMS, KENNETH L | GRADE-09 | |
| ENTRY 04/23/91 | WITHDRAWAL 12/17/91 | |
| COURSE TITLE | GRADE | CREDIT |
| VOCATIONAL PREPARATION | C | 1.750 |
| LIFE SKILLS | C | .625 |
| LANG ARTS (ENG I FRESH) | B | 1.000 |
| ASIC MATH (GEN, FUNCT) | B | 1.000 |
| GENERAL SCIENCE | B | 1.000 |
| CITIZENSHIP | C | 1.000 |
| BASIC SKILLS-CHAP 1 | B | .375 |
| | | 6.750 |

DAYS ABSENT___0___ TOTAL CREDITS___6.75___

DAYS ABSENT_____ TOTAL CREDITS_____

DATE GRADUATED _____

Respondent's Exhibit E

WITHDRAWAL FORM
POPLAR BLUFF SENIOR HIGH SCHOOL
POPLAR BLUFF, MO 63901
314-785-6471

NAME Reams Kynnard Kenneth BIRTHDATE _____ GRADE 10 DATE 4-10-92

REASON FOR WITHDRAWAL  Mr. Daniels Request

Please grade student for work completed to date.   (GRADES IN INK, PLEASE!)

| PERIOD | TEACHER | SUBJECT | GRADE | TEACHER'S/ SIGNATURE | ROOM | BOOKS RET'D |
|--------|---------|---------|-------|----------------------|------|-------------|
| 1 | Uhron | Civics | F | | | NO | $8 00 |
| 2 | Bill | P.E. | F | Baron | | |
| 3 | Brey | Pre Alg | F | B | | OK |
| 4 | Garver | Biology | F | Garver | | NO | $8 00 |
| 5 | Coop | LA II-4 | F | Cooper | | OK |
| 6 | Pierce | Gen Shop | F | Pierce | | O.K. |
| 7 | Staff | Study Hall | | | | |

UPON COMPLETION, THIS FORM MUST BE RETURNED TO THE COUNSELING CENTER! EF 2 00
RECORDS WILL NOT BE FORWARDED UNTIL ALL OBLIGATIONS HAVE BEEN MET!!   Prev. Bal   8 00

LOCKER # 249 A   6-40-4   LIBRARY  OH   OFFICE USE:  2 Textbooks 16 00

COUNSELOR  EZM   PRINCIPAL _____   Total $26 00

---

WITHDRAWAL FORM
POPLAR BLUFF SENIOR HIGH SCHOOL
POPLAR BLUFF, MO 63901
314-785-6471

NAME Kenneth Reams   BIRTHDATE _____ GRADE 10 DATE 10-7-92

REASON FOR WITHDRAWAL _____

Please grade student for work completed to date.   (GRADES IN INK, PLEASE!)

| PERIOD | TEACHER | SUBJECT | GRADE | TEACHER'S SIGNATURE | ROOM | BOOKS RET'D |
|--------|---------|---------|-------|---------------------|------|-------------|
| 1 | Gray | Biology Bas | D | C Gray | | ok |
| 2 | Smith | Art I | C | LDSmith | | L |
| 3 | Morgan | PE | C | LSm | | L |
| 4 | Ryland | Pre Alg | B | Ryland | | NO | $8 00 |
| 5 | Cooper | LA II-4 | F | Cooper | | No | $8 00 |
| 6 | Smith | W. Geog Bas | F | T. Smith | #87-128 | $8 00 |
| 7 | Seifert | Drama | F | Seifert | | OK |

UPON COMPLETION, THIS FORM MUST BE RETURNED TO THE COUNSELING CENTER! Prev. Bal   $26
RECORDS WILL NOT BE FORWARDED UNTIL ALL OBLIGATIONS HAVE BEEN MET!!   Library #40724   7.95
Library #39506   12.95
LOCKER # _____   LIBRARY Yes two ✗   OFFICE USE:   1992-93 EF   2 00
COUNSELOR  Crane  ✗ PRINCIPAL   40724 - 12.95   Total $72.90
39506

Respondent's Exhibit E

*Duplicate Copy*

WITHDRAWAL FORM
POPLAR BLUFF SENIOR HIGH SCHOOL
POPLAR BLUFF, MO 63901
314-785-6471

NAME _Kenneth Reams_ BIRTHDATE _12-21-74_ GRADE _9_ DATE _12-6-90_

REASON FOR WITHDRAWAL _Moved to Arkansas_

Please grade student for work completed to date. (GRADES IN INK, PLEASE!)

| PERIOD | TEACHER | SUBJECT | GRADE | TEACHER'S SIGNATURE | ROOM BOOKS RET'D |
|--------|---------|---------|-------|---------------------|------------------|
| 1 | T. Smith | Civics - Basic | F | T. Smith 57% | OK |
| 2 | Brown | Phys. Ed. | C | Brown | OK |
| 3 | Rhodes | Study Hall | E | L. Rhodes | — |
| 4 | Wrinkle | Basic Biology | F | R.W. | OK |
| 5 | Fritts | LAI - 3 | F | Fritts | OK |
| 6 | Bray | Basic Math | F | B. Bray | $1^{st} | 
| 7 | McManus | Home Econ. I | D- | CMc | ✓ |

UPON COMPLETION, THIS FORM MUST BE RETURNED TO THE COUNSELING CENTER!
RECORDS WILL NOT BE FORWARDED UNTIL ALL OBLIGATIONS HAVE BEEN MET!!  $2.00 1990-91

LOCKER # _____ LIBRARY _held_ OFFICE USE: EF

COUNSELOR _OS_ PRINCIPAL _____

---

WITHDRAWAL FORM
POPLAR BLUFF SENIOR HIGH SCHOOL
POPLAR BLUFF, MO 63901
314-785-6471

NAME _Kenneth Reams_ BIRTHDATE _12-21-74_ GRADE _9_ DATE _4-24-91_

REASON FOR WITHDRAWAL _Transfer to Sears Youth Center_

Please grade student for work completed to date. (GRADES IN INK, PLEASE!)

| PERIOD | TEACHER | SUBJECT | GRADE | TEACHER'S SIGNATURE | ROOM BOOKS RET'D |
|--------|---------|---------|-------|---------------------|------------------|
| 1 | Bray | Basic Math - 1 | F | Bray | OK |
| 2 | Brown | Phys Ed | F | Brown | |
| 3 | Rhodes | Study Hall | — | L R Rhodes | — |
| 4 | Wrinkle | Basic Biology | F | R.W. | OK |
| 5 | Fritts | LAI - 3 | F | Fritts | OK |
| 6 | Sievers | Civics - Basic | F | D. Sievers | OK |
| 7 | McManus | Home Ec. I | F | CMc | ✓ |

N COMPLETION, THIS FORM MUST BE RETURNED TO THE COUNSELING CENTER!
ORDS WILL NOT BE FORWARDED UNTIL ALL OBLIGATIONS HAVE BEEN MET!! 1990-91 EF $2.00

LOCKER # _____ LIBRARY _Jauser_ OFFICE USE:

COUNSELOR _OS_ PRINCIPAL _____

5564    Respondent's Exhibit E    933

```
┌─────────┬─────────┬──────────────────────────────────────┬──────┬──────┬──────────┐
│12/05/90 │PBHS9091 │   POPLAR BLUFF SENIOR HIGH SCHOOL     │STA2  │LPT1  │ 8:55 Am  │
└─────────┴─────────┴──────────────────────────────────────┴──────┴──────┴──────────┘
```

Name: REAMS KENNETH                  Grade: 09  Counselor: 00    Enrolled:  08/24/90
D:    431339971    Age: 15           Sx:M Rc:B  Advisory:        Withdrawn: 12/06/9

```
Date      D 123456789 Hrs
12/04/90          E    0.8
11/13/90 F  AAAAAAA   5.8
11/12/90 F  0000000   5.8
11/09/90 F  0000000   5.8
11/08/90 F  0000000   5.8
10/31/90 F    EEEEE   4.2
10/23/90 F  AAAAAAA   5.8
10/17/90 F  AAAAAAA   5.8
10/10/90 F  AAAAAAA   5.8
```

F1-Next Student              F2-More Attendance      F3-Print Record
Esc-Return to Data Screen


```
┌─────────┬─────────┬──────────────────────────────────────┬──────┬──────┬──────────┐
│04/24/91 │PBHS9091 │   POPLAR BLUFF SENIOR HIGH SCHOOL     │STA2  │LPT1  │11:27 Am  │
└─────────┴─────────┴──────────────────────────────────────┴──────┴──────┴──────────┘
```

Name: REAMS KENNETH                  Grade: 09  Counselor: 00    Enrolled:  01/25/91
ID:   431339971    Age: 16           Sx:M Rc:B  Advisory:        Withdrawn: 4/24/91

```
Date      D 123456789 Hrs   Date      D 123456789 Hrs
04/18/91 F  AAAAAAA   5.8   10/17/90 F  AAAAAAA   5.8
04/15/91 F  AAAAAAA   5.8   10/10/90 F  AAAAAAA   5.8
04/08/91 F  AAAAAAA   5.8   08/24/90    ReInstate C 0
04/05/91 F  AAAAAAA   5.8
04/04/91 F  AAAAAAA   5.8
04/03/91 F  AAAAAAA   5.8
04/02/91 F  AAAAAAA   5.8
02/20/91 F  AAAAAAA   5.8
12/06/90    WWWWWWWWW C 2
12/04/90          E    0.8
11/13/90 F  AAAAAAA   5.8
11/12/90 F  0000000   5.8
11/09/90 F  0000000   5.8
11/08/90 F  0000000   5.8
10/31/90 F    EEEEE   4.2
10/23/90 F  AAAAAAA   5.8
```

F1-Next Student              F2-More Attendance      F3-Print Record
Esc-Return to Data Screen

985

5565   Respondent's Exhibit E

F1-Next Student      F2-Normal Grades      F3-Progress Grades
Esc-Return to Data Screen

```
  0/92  PBHS9192        POPLAR BLUFF SENIOR HIGH SCHOOL       TIKO  LPT1
Name: REAMS KENNETH LYNNORD     Grade: 10  Counselor: 00     Enrolled: 01/06/92
ID:   431333971   Age: 17           Sx:M Rc:B  Advisory:     Withdrawn: 04/10/92
Date        D 123456789 Hrs    Date        D 123456789 Hrs
04/09/92  F AAAAAAA    5.8    03/18/92          EEE    2.5
04/08/92  F AAAAAAA    5.8    03/17/92  F AAAAAAA    5.8
04/07/92  F AAAAAAA    5.8    03/16/92          EEE    2.5
04/06/92  F AAAAAAA    5.8    02/21/92  F AAAAAAA    5.8
04/03/92  F AAAAAAA    5.8    02/20/92  F AAAAAAA    5.8
04/02/92  F AAAAAAA    5.8    02/14/92  F AAAAAAA    5.8
04/01/92  F 0000000    5.0    02/12/92  F AAAAAAA    5.8
03/31/92  F 0000000    5.8    02/11/92  F AAAAAAA    5.8
03/30/92  F 0000000    5.8    02/10/92  F AAAAAAA    5.8
03/27/92  F 0000000    5.8    02/07/92  F AAAAAAA    5.8
03/26/92  F 0000000    5.8    02/06/92  F AAAAAAA    5.8
03/25/92  F 0000000    5.8    01/31/92          EEE    2.5
03/24/92  F 0000000    5.8    01/27/92      A         0.8
03/23/92  F 0000000    5.8    01/16/92      A         0.8
03/20/92  F 0000000    5.8
03/19/92          00    1.7
```

F1-Next Student      F2-More Attendance      F3-Print Record
Esc-Return to Data Screen

```
 10/07/92 PBHS9293      POPLAR BLUFF SENIOR HIGH SCHOOL       TIKO  LPT1
Name: REAMS KENNETH L          Grade: 10  Counselor: 00     Enrolled: 09/19/92
ID:   431333971   Age: ?2           Sx:M Rc:B  Advisory:     Withdrawn: 10/7/92
Date        D 123456789 Hrs    Date        D 123456789 Hrs
10/06/92  F AAAAAAA    5.8    09/01/92          EEE    2.5
10/05/92  F AAAAAAA    5.8
10/02/92  F AAAAAAA    5.8
10/01/92  F AAAAAAA    5.8
09/30/92  F AAAAAAA    5.8
09/29/92  F AAAAAAA    5.8
09/28/92  F AAAAAAA    5.8
09/25/92  F AAAAAAA    5.8
09/24/92  F AAAAAAA    5.8
09/23/92  F AAAAAAA    5.8
09/22/92  F AAAAAAA    5.8
09/21/92  F AAAAAAA    5.8
09/18/92        E      5.7
09/18/92  F AAAAAAA    5.8
09/ 9/92  F AAAAAAA    5.8
09/18/92      A        1.5
```

F1-Next Student      F2-More Attendance      F3-Print Record
Esc-Return to Data Screen

Respondent's Exhibit E

No 936

MISSOURI DEPARTMENT OF SOCIAL SERVICES
DIVISION OF YOUTH SERVICES
**SCHOOL RECORD**

The Division of Youth Services operates residential and educational facilities utilizing individualized curriculums. Grades assigned are based upon the students performance in relation to the student's aptitude and expected achievement levels.

PAGE 1

## 1. STUDENT IDENTIFICATION

| STUDENT'S FULL NAME, LAST NAME FIRST | | |
|---|---|---|
| LEANS | | |
| | KENNETH | L |

| EX | COMMON NAME | OTHER LAST NAMES USED | BIRTH DATE | SOC.SEC.NO |
|---|---|---|---|---|
| M | | | 12/21/74 | 1500-74-5184 |

DCN 28293900

### 2. SCHOOL IDENTIFICATION

| NAME |
|---|
| W. E. SEARS YOUTH CENTER |

| ADDRESS |
|---|
| 9400 SEARS LANE |

PARENT OR LEGAL GUARDIAN NAME
LEANS                          AMELIA

| ADDRESS |
|---|
| 618 NORTH D |

| CITY | STATE | ZIP |
|---|---|---|
| POPLAR BLUFF | MO | 63901 |

| CITY | STATE | ZIP | PHONE | SCHOOL CODE |
|---|---|---|---|---|
| POPLAR BLUFF | MO | 63901 | (314) - 686 - 1175 | 347-347-1050 |

## STUDENT'S ACADEMIC HISTORY

| GRADE-YRS | COURSES TAKEN (& SPECIAL LEVEL WHERE APPROPRIATE) | MARKS | CREDITS |
|---|---|---|---|
| 9TH 91 1996300 | VOCATIONAL PREPARATION | C | 1.750 |
| 9TH 91 1944020 | LIFE SKILLS (NON-CHAPTER 1) | C | .625 |
| 9TH 91 1054801 | LANGUAGE ARTS (ENGLISH 1-FRESHMAN LEVEL) | C | 1.000 |
| 9TH 91 1115820 | BASIC MATHEMATICS (GENERAL, FUNCTIONAL) | B | 1.000 |
| 9TH 91 1135000 | GENERAL SCIENCE | B | 1.000 |
| 9TH 91 1156610 | CITIZENSHIP | C | 1.000 |
| 9TH 91 1994010 | BASIC SKILLS-CHAP.1 | B | .375 |

(.750)

| TRANSCRIPT SENT TO | DATE |
|---|---|
| KATHY KASTNER, AYC | 12/20/91 |
| 9400 SEARS LANE | |
| POPLAR BLUFF              MO     63901 | |
| Poplar Bluff Senior High | 12-20-91 |
| Highland Drive | |
| Poplar Bluff, MO   63901 | |

Respondent's Exhibit E

937

MISSOURI DEPARTMENT OF SOCIAL SERVICES
DIVISION OF YOUTH SERVICES
SCHOOL RECORD

The Division of Youth Services operates residential and educational facilities utilizing individualized curriculums. Grades assigned are based upon the students performance in relation to the student's aptitude and expected achievement levels.

| NAME | KEAMS | KENNETH | L | PAGE 2 |
|------|-------|---------|---|--------|

TRANSCRIPT SENT TO                    DATE

| GRADE-YRS | COURSES TAKEN (& SPECIAL LEVEL WHERE APPROPRIATE) | MARKS | CREDITS |
|-----------|--------------------------------------------------|-------|---------|
| | | | |

REQUIRED COURSES

| | GRADE |
|---|-------|
| CONSTITU OF STATE OF MISSOURI | |
| CONSTITU OF THE UNITED STATES | |
| AMERICAN HISTORY & INSTI. | |
| AMER GOV & ELECTORAL PROCESS | P |

TOTAL CREDITS EARNED                     6.750

RECOMMENDED GRADE PLACEMENT FOR THE
1991 - 1992 SCHOOL YEAR    <=  10
                           =>  10

PREVIOUS SCHOOLS ATTENDED

| NAME OF SCHOOL | STREET ADDRESS | CITY | STATE | ZIP | FROM | | TO | |
|---------------|----------------|------|-------|-----|------|----|----|----|
| | | | | | MO | YEAR | MO | YEAR |
| POPLAR BLUFF SRHS | | | | | | | | |
| POPLAR BLUFF K-1 | | | | | | | | |

SIGNIFICANT    YES:   ENTRY 04/23/91    WITHDRAW 12/17/91    DAYS ATTENDED 160.850

Respondent's Exhibit E

MISSOURI DEPARTMENT OF SOCIAL SERVICES
DIVISION OF YOUTH SERVICES
**SCHOOL RECORD**

The Division of Youth Services operates residential and educational facilities utilizing individualized curriculum. Grades assigned are based upon the students performance in relation to the student's aptitude and expected achievement levels.

15. TEST SCORES (PRIMARILY GRADES 10 – 12)

KENNETH   L   PAGE   3

| CODE DESCRIPTION | DATE | SCORE | DATE | SCORE:MMAT: | MEANS |
|---|---|---|---|---|---|
| KAK WJ APTITUDE—KNOWLEDGE | 04/25/91 | 083 | | | |
| KAL WJ APTITUDE—WRITTEN LANG. | 04/25/91 | 075 | | | |
| KAM WJ APTITUDE—MATH | 04/25/91 | 078 | | | |
| KAR WJ APTITUDE—READING | 04/25/91 | 079 | | | |
| KBC WJ BROAD COGNITIVE ABILITY | 04/25/91 | 088 | | | |
| KBK WJ BROAD KNOWLEDGE | 04/25/91 | 077 | | | |
| KBL WJ BROAD WRITTEN LANGUAGE | 04/25/91 | 073 | | | |
| KBM WJ BROAD MATH | 04/25/91 | 091 | | | |
| KBR WJ BROAD READING | 04/25/91 | 085 | | | |
| SF WISC-FULL SCALE | 05/16/91 | 078 | | | |
| SP WISC-PERFORMANCE | 05/16/91 | 090 | | | |
| SV WISC-VERBAL | 05/16/91 | 070 | | | |

16. SOCIAL SERVICES RENDERED:

CHAPTER 1 BASIC SKILLS

17. ADDITIONAL STUDENT INFORMATION

ADDITIONAL INFORMATION ABOUT THIS STUDENT, AS CHECKED BELOW, IS PROVIDED EITHER IN THIS SPACE OR ON ATTACHED PAGES

A. INTERESTS, ACTIVITIES, AND ACHIEVEMENTS      B. SPECIAL FEATURES OF STUDENT'S PGM      C. SPECIAL PROBLEMS OR NEEDS
D. PERSONAL INVENTORY OR CHECKLIST     X  E. WRITTEN COMMENTS      F. OTHER

KENNY HAS LEARNED TO HANDLE HIMSELF IN THOSE AREAS WHICH CAUSED CONCERN FOR BEHAVIOR PROBLEMS.  HE HAS THE ABILITY TO MAKE APPROPRIATE CHOICES SHOULD HE CHOOSE TO CONTROL HIMSELF AND SHOULD HAVE SUPPORT FOR POSITIVE BEHAVIORS.  HIS GRADES ARE BASED ON USE OF MATERIALS APPROPRIATE TO KENNY'S READING LEVEL AND ABILITIES.  RECOMMENDATIONS:  CONSIDER CONTIN-UATION OF SPECIAL SERVICES.

18. SCHOOL OFFICIALS

| SCHOOL ADMINISTRATOR | CONTACT PERSON FOR ADDITIONAL DATA | SIGNATURE OF OFFICIAL CERTIFYING TRANSCRIPT |
|---|---|---|
| NAME: KENNY  W. BRUCE | NAME: DENNIS  M. GRA | NAME: Dennis M. Gray |
| TITLE: EDUC.  "A SUPERVISOR | TITLE: EDUCATION S  ISOR | TITLE: Education Super. |

Respondent's Exhibit E

938

_____
_____

Kenny has learned to handle himself in those areas which caused concern for behavior problems. He has the ability to make appropriate choices should he choose to control himself. He should have support for positive behaviors.

PRE AND POST TEST RESULTS;     TEST: _____

|  | Reading | Math | Written Language | Science | Social Studies | |
|---|---|---|---|---|---|---|
| PRE TEST: | 6.0 | 7.9 | 3.9 | 4.5 | 6.6 | DATE TESTED: 4-25-91 |

POST TEST: Released sooner than expected - no test     DATE TESTED: _____

GRADES AND CREDITS:

| COURSE CODE | COURSE TITLE | GRADE | CREDIT RECEIVED |
|---|---|---|---|
| 198200 | Behavior Disorder | B | |
| 193600-054801 | Learning Disability: Language Arts | B | |
| 193600-054840 | Learning Disability: Reading | A | |
| 994010 | Chapter Basic Skills | B | |
| 156610 | Civics | C | |
| 5820 | General Math | B | |
| 135000 | General Science | B | |
| 994020 | Life Skills | C | |
| 996300 | Vocational Preparation | | |

U. S. Constitution: passed 9-6-91     Missouri Constitution: _____

FINAL EVALUATION (COMMENTS): The above grades are based on use of materials appropriate to Kenny's reading level, and abilities.

_____
_____

RECOMMENDATION: Consider continuation of special services. for learning disabilities.

TYPE OF EDUCATIONAL SERVICES:

Basic
Behavior Disorder
Learning Disabilities: written expression/reading comprehension
Chapter
RELATED SERVICES:

PERCENT OF TIME IN REGULAR ROOM:  62½%

MMAT:  APPLICABLE _____     NA _____     IF NA, EXPLAIN:

U. S. CONSTITUTION NEEDED:   Yes (No) passed   MISSOURI CONSTITUTION NEEDED: (Yes) / No

COURSE OF STUDY:

| | COURSE CODE | COURSE TITLE | MATERIALS USED |
|---|---|---|---|
| 1. | 198200 | Behavior Disorder | All goals + objectives |
| 2. | 193600-054801 | Learning Disability:Language Arts | All goals + objectives |
| 3. | 193600-054840 | Learning Disability: Reading | |
| 4. | 994010 | Chapter Basic Skills | Gp lesson |
| 5. | 156610 | Civics | A variety of different |
| 6. | 115820 | General Math | educational |
| 7. | 135000 | General Science | material will be utilized to |
| 8. | 994020 | Life Skills | meet his own individual |
| 9. | 996300 | Vocational Preparation | instructional need. Group lesson |

PLAN PARTICIPANTS:

| SIGNATURE | ROLE | DATE |
|---|---|---|
| Wendy H. Long | Sp Ed Teacher III | 6/4/91 |
| Kenneth Reams | student | 6-4-91 |
| Dennis M. Crong | Educ Supv. | 6/4/91 |
| Thomas Daniel | Sp Ed Teacher III | 6-4-91 |
| Amelia Reams | Parent Legal Guardian | 6-10-91 |

Respondent's Exhibit E

Student Name: Kenny Reams                    Area: Vocational

Annual Goal: # 4    continued
=====================================================================
    ~t Term Objective: # 4e    Implementors: Wallace/Rickerson/Rublaitus/Reed

Date Started: 6-4-91          Progress:_____
Target Date:  6-92
Mastery Date: _____       _____
                                              Review Date:_____

Kenny will complete career exploration in Military: Marines and Buisness: Professional
(accountant) to address career preferences.


Special Materials or Equipment:

=====================================================================
Short Term Objective: # 4f    Implementors: Wallace/Rickerson/Rublaitus/Reed

Date Started: 6-4-91          Progress:_____
Target Date:  6-92
Mastery Date: _____       _____
                                              Review Date:_____

Kenny will demonstrate initative and eagerness in learning new vocational skills
4 out of 5 class periods as measured by teacher observation and/or worksheets.

Special Materials or Equipment:

=====================================================================
    ~t Term Objective: # 4g    Implementors: Wallace/Rickerson/Rublaitus/Reed

Date Started: 6-4-91          Progress: _____
Target Date:  6-92
Mastery Date: _____       _____
                                              Review Date:____

Kenny will attend to task in a productive manner and complete his task in a timely
manner as well as neatly 4 out of 5 vocational class periods as measured by teacher
observation and/or worksheets/projects.

Special Materials or Equipment:

=====================================================================
Short Term Objective: # 4h    Implementors: Wallace/Rickerson/Rublaitus/Reed

Date Started: 6-4-91          Progress:_____
Target Date: 6-92
Mastery Date: _____       _____
                                              Review Date:____

Kenny will demonstrate the ability to work with his peers, as well as develop and
mainttain interpersonal relationships with his classmates in the vocational shop
4 out of 5 class periods as measured by teacher observation.


Special Materials or Equipment:

=====================================================================

5572

Respondent's Exhibit E

PA

Student Name: __Kenny Reams__                    Area: __Vocational__

Annual Goal: # __4__   __To improve employability skills & realistic career exploration.__
=========================================================================
Short Term Objective: # __4a__      Implementors: __Wallace/Rickerson/Rublatius/Reed__

Date Started: __6-4-91__         Progress:_____
Target Date:  __10-91__
Mastery Date: _____         _____
                                                    Review Date:_____

Kenny will complete a personal data sheet with 80% accuracy as measured by teacher
observation and/or worksheets.

Special Materials or Equipment:

=========================================================================
Short Term Objective: # __4b__      Implementors: __Wallace/ Rickerson/Rublaitus/Reed__

Date Started: __6-4-91__         Progress:_____
Target Date:  __10-91__
Mastery Date: _____         _____
                                                    Review Date:_____

Kenny will accurately state the employee characteristics required by employers
at an 80% accuracy rate as measured by teacher observation and/or worksheets.

Special Materials or Equipment:

=========================================================================
Short Term Objective: # __4c__      Implementors: __Wallace/Rickerson/Rublaitus/Reed__

Date Started: __6-4-91__         Progress:_____
Target Date:  __12-91__
Mastery Date: _____         _____
                                                    Review Date:_____

Kenny will use his personal data sheet to accurately complete various job application
forms at an 80% accuracy rate as measured by teacher observation and/or worksheets.

Special Materials or Equipment:

=========================================================================
Short Term Objective: # __4d__      Implementors: __Wallace/Rickerson/Rublaitus/Reed__

Date Started: __6-4-91__         Progress:_____
Target Date:  __6-92__
Mastery Date: _____         _____
                                                    Review Date:_____

Kenny will demonstrate understanding of vocational reading assignments by accurately
answering comprehension questions 4 out of 5 class periods as measured by teacher
observation and/or worksheets.

Special Materials or Equipment:

=========================================================================

Respondent's Exhibit E

Student Name: Kenny _____

Annual Goal: I. ___ Kenny will demonstrate response to personal problem

====================================================

Short Term Objective: 1a ___        Implementors: Lang + Pine A Team
SCHEDULE 6 month                                  Support Teachers
Beginning Date: ___ 6-4-91 ___      Progress: Completed - discontinue
Ending Date: ___ 12-4-91 ___        _____
Date Mastered: _____      _____ (date) 12-18-91

| OBJECTIVE | CRITERIA | PROCEDURES |

Kenny will show the ability to take ownership for
his problems by being willing to discuss them; 8 out of 10
times as measured by the log book & classroom observation.

Special Materials or Equipment: NA

====================================================

Short Term Objective: 1b ___        Implementors: Lang, Pine A Team
SCHEDULE 6 Month                                  Support Teacher
Beginning Date: ___ 6-4-91 ___      Progress: Completed - discontinue
Ending Date: ___ 12-4-91 ___        _____
Date Mastered: _____      _____ (date) 12-18-91

| OBJECTIVE | CRITERIA | PROCEDURES |

Kenny will show the ability to accept positive criticism
by changing the manner of doing things 9 out of 10 times.
as measured by the log book & classroom observation.

Special Materials or Equipment: NA

====================================================

Short Term Objective: 1C ___        Implementors: Lang, Pine A Team
SCHEDULE 6 month                                  Support Teachers
Beginning Date: ___ 6-4-91 ___      Progress: Completed - discontinue
Ending Date: ___ 12-4-91 ___        _____
Date Mastered: _____      _____ (date) 12-18-91

| OBJECTIVE | CRITERIA | PROCEDURES |

Kenny will show the ability to listen to others
without getting defensive 9 out of 10 times as
measured by the log book & classroom observation

Special Materials or Equipment: NA

Respondent's Exhibit E

Student Name: _____   Handicap Are _____

Annual Goal: __2__ _To improve skills in Reading Comprehension_

Short Term Objective: __1__      Implementors: _Norma Daniel_ _and Terri Wenly, H. Frey_

SCHEDULE
Beginning Date: 6-4-91           Progress: (Completed
Ending Date: 12-9-91                      Discontinue )
Date Mastered: _____                                    (date) 12-12-91

| OBJECTIVE | CRITERIA | PROCEDURES |
|---|---|---|

When given a passage on instructional reading grade level student will use contextual clues and/or the dictionary to determine the meanings of 4 of 5 new words or the correct meaning of words with multiple meanings as measured by oral and written exercises

Special Materials or Equipment: Globe — Steck Vaughn

Short Term Objective: __2__      Implementors: _Norma Daniel_ _and Terri Wenly, H. Frey_

SCHEDULE
Beginning Date: 6-4-91           Progress: (Completed
Ending Date: 12-9-91                      Discontinue )
Date Mastered: _____                                    (date) 12-12-91

| OBJECTIVE | CRITERIA | PROCEDURES |
|---|---|---|

When given a passage written on instructional reading grade level, student will answer 4 of 5 comprehension questions as measured by oral and written exercises

Special Materials or Equipment: Globe

Short Term Objective: __3__      Implementors: _Norma Daniel_ _and Terri Wenly, H. Frey_

SCHEDULE
Beginning Date: 6-4-91           Progress: (Completed
Ending Date: 12-9-91                      Discontinue )
Date Mastered: _____                                    (date) 12-18-9

| OBJECTIVE | CRITERIA | PROCEDURES |
|---|---|---|

When given a passage written on instructional reading grade level, student will identify and supply antonyms and synonyms for 4 of 5 commonly used words as measured by oral and written exercises

Special Materials or Equipment: Globe

Respondent's Exhibit E

Annual Goal: _____

============================================================

Short Term Objective: ___1___          Implementors: _Norma Daniel_
                                          and/or _Wendy Ahr_
SCHEDULE
Beginning Date: _6-4-91_               Progress: _Completed_
Ending Date: _12-4-91_                 _Discontinue_
Date Mastered: _12_                    _____ (date) _12-11-91_

------------------------------------------------------------
OBJECTIVE                   CRITERIA                PROCEDURES

When given a passage on instructional grade level,
student will find and correct 4 of 5 errors in capitalization
(names and titles of persons, geographic names, main words in
titles and first word of a quote.) as measured by
written exercises.

------------------------------------------------------------
Special Materials or Equipment: _Steck Vaughn_

============================================================

Short Term Objective: ___2___          Implementors: _Norma Daniel_
                                          and/or _Wendy Ahr_
SCHEDULE
Beginning Date: _6-4-91_               Progress: _Completed_
Ending Date: _12-4-91_                 _Discontinue_
Date Mastered: _____                _____ (date) _12-12-91_

------------------------------------------------------------
OBJECTIVE                   CRITERIA                PROCEDURES

When given a passage on instructional grade level,
student will find and correct 4 of 5 errors in
punctuation (end punctuation, commas for words in a
series, introductory phrase, and last name written first)
as measured by written exercises.

------------------------------------------------------------
Special Materials or Equipment: _Steck Vaughn_

============================================================

Short Term Objective: ___3___          Implementors: _Norma Daniel_
                                          and/or _Wendy Ahr_
SCHEDULE
Beginning Date: _6-4-91_               Progress: _Completed_
Ending Date: _12-4-91_                 _Discontinue_
Date Mastered: _____                _____ (date) _12-18-91_

------------------------------------------------------------
OBJECTIVE                   CRITERIA                PROCEDURES

When given a writing assignment on instructional
grade level, student will spell correctly 4 of 5 spelling
words and use correct subject verb agreement 4 of 5
as measured by written exercises.

------------------------------------------------------------
Special Materials or Equipment: _Steck Vaughn_

5576                  Respondent's Exhibit E                9

exhibits reluctance/dislike for reading
seldom reads independently
reads at a slow rate
reads in a word-by-word manner

When observing his reading comprehension skills, it becomes evident that he
can be quite successful at:
understanding the words in a passage by using context
draw inferences/conclusions by using context
identify main idea of passage by using context
determining cause-effect within passage by using context
predicting outcomes by using context
retell story he read

On the other hand, he does have difficulty with these comprehension skills:
understanding synonyms/antonyms
understanding figurative language/idioms
recall facts from passage read (if closure type questions, rather than open)

It is understandable that synonyms/antonyms and/or figurative language are difficult
for him, since his sight vocabulary is weak.  Nevertheless, he can
comprehend these type if they are in context and not isolated exercises.  This
indicates he is using a strategy to aid his own comprehension.  Therefore, if his
vocabulary and his reading rate were imrpoved his comprehension would most likely
significantly increase.  Consequently, if his reading rate improved, he would
complete more assignments in other subjects on time.

When comparing testing scores and classwork, Kenny does achieve at or slightly above
aptitude level in reading comprehension.  However, if his
test scores and classwork are examined for basic reading skills, they show Kenny is
achieving below aptitude level in basic reading skills. Therefore,
it is my belief that Kenny meets the criteria for learning disability in written
language and basic reading skills, as well as behavior disorder and eligiible for
chapter services.

*Vicki Reed*

Vicki Reed, Guidance Counselor

Respondent's Exhibit E

Dissension Letter

The diagnostic team met on Kenny Reams 5-23-91.  Thier decision was:
handicapped: learning disability in written expression and reading comprehension;
ehavior disorder and chapter services.  I disagree with this decision.

I do agree that this is a dually diagnosed student and that he is eligible for
chapter services.  However, I disagree with the areas of specific learning
disability.

According to the Woodcock Johnson Psycho Educational Revised Battery Form A
administered 4-25-91:
Written Language Aptitude (standard score) 75
Dictation (standard score) 73
Writiing Samles (standard score) 69
Broad Written Language Achievement (standard score) 73

Reading Aptitude (standard score) 79
Letter Word Identification (standard score) 82
Passage Comprehension (standard score) 91
Broad Reading Achievement (standard score) 85

These scores indicate that Kenny is acheiveing slightly below aptitude level in
written language and above aptitude level in reading.

Kenny was administered the supplemental achievement battery to determine strengths
and concerns.  These scores were:

|                             | Grade Equivalent | Standard Score |
|-----------------------------|------------------|----------------|
| Word Attack                 | 1.6              | 59             |
| Reading Vocabulary          | 5.7              | 82             |
| Basic Reading Skills        | 3.3              | 73             |
| Reading Comprehension       | 6.3              | 86             |
| Proofing                    | 3.4              | 74             |
| Writing Fluency             | 3.6              | 68             |
| Punctuation/Capitalization  | 3.3              | 73             |
| Spelling                    | 4.3              | 78             |
| Usage                       | 4.7              | 81             |
| Handwriting                 | 5.8              | 92             |
| Basic Writing Skills        | 4.0              | 72             |
| Written Expression          | 3.1              | 67             |

These scores would suggest a learning problem in the areas of written expression and
basic reading skills rather than reading comprehension.

When one looks at his specific reading skills, it becomes obvious that he has
mastered numerous basic skills already:
book handling skills
understands letters/words
recognizes letters and can recite the alphabet
successful left-to-right sequencing when reading

On the other hand, Kenny is not successful at other basic skills:
has limited sight vocabulary
exhibits problems with word identification
 or phonic analysis
hasn't mastered sound-symbol relationships
demonstrates reliance on only one strategy
reluctant to risk errors when reading

995

Respondent's Exhibit E

Respondent's Exhibit E

understands what is read to him, but not what he silently reads
fails to finish assignment due to reading difficulties
fails to use capitalization correctly when writing
fails to punctuate correctly when writing
doesn't use appropriate subject-verb agreement when writing
fails to use verb tenses correctly when writing
doesn't compose complete sentences when writing
fails to organize writing activities
doesn't use word endings correctly when spelling
requires continued drikll/practice in order to master spelling words
fails to solve math problems involving factions/decimals
fails to correctly solve problems using measurement
doesn't understand the concept of time

   Family background information indicates parents are divorced and his mother has remarried. He indicates he has two male maternal half siblings Scott (6), and Dominique (5). Biological father resides in California while biological mother resides in Arkansas. Kenny resides with his maternal aunt in Missouri due to previous extensive juvenile record in Arkansas. He reportedly is a member of the "Disciples" gang. His referrals to Missouri juvenile authorities began 2-91 with a charge of escaping custody. His offenses quickly escalated in frequency and intensity.
   Although his environment has played a role in his development, it is viewed as a contributor rather than cause. At this time he is **not seen** as culturally and/or economically deprived. However, he does give the impression of unmet emotional needs.

   Available medical records reveal 20/20 vision as measured by Snellen chart, normal hearing as measured by the audiometric, and no speech problems (although Black dialect in noted). Under health is noted: minor acne.

   Vocationally, he indicates he has earned money outside of the home by selling stolen property. Mother is a LPN, and step-dad rebuilds televisions. Biological father's employment is unknown. Kenny's desire is to enter the Marines and eventually be an accountant.

   In conclusion when one compares his aptitude scores to his achievement scores, it becomes apparent that he is achieveing below level in written language and knowledge. He is achieving slightly above his aptitude level in reading and math. Nevertheless, his levels are not comensurate with his age. These scores are noticeable both in a one-to-one testing situation and daily classwork. At this time it is extremely difficult to determine which is the primary concern and which is secondary. His behavior does appear to be adversely affecting his performance. It is also difficult to determine if these inappropriate behaviors are transient or habitual. At times he does experience interpersonal difficulties as well as pervasive mood. Nevertheless, he does also experience specific learning difficulties. In order to best serve this student and address the learning difficulties as well as behavior, a dual diagnosis was reached. Although Kenny's behavior was more inappropriate in a public setting, it is felt that if we removed the tight structure of our program he would again experience the same difficulties. Therefore, it is our opinion that Kenny meets the criteria for both learning disabilities services (written expression and reading comprehension) and behavior disorder services. He also quailifies for Chapter Basic Skills.

Respondent's Exhibit E

Behavior Evaluation Scale-2 administered 5-22-91 yielded scaled scores of:

| | | | |
|---|---|---|---|
| Learning Problems | 10 | Interpersonal Difficulties | 9 |
| Inappropriate Behaviors | 9 | Unhappiness/Depression | 8 |
| Physical Symptoms/Fears | 9 | | |

Behavior Quotient = 93

Learning Disability Evaluation Scale administered 5-23-91 yielded scaled scores of:

| | | | | | |
|---|---|---|---|---|---|
| Listening | 13 | Thinking | 11 | Speaking | 9 |
| Reading | 6 | Writing | 8 | Spelling | 3 |
| Mathematical Caluclation | 9 | | | | |

Learning Quotient = 91

WISC-R administered on 5-16-91 yielded full scale IQ of 78, verabl IQ of 70, and performance IQ of 90.   Classification is borderline.

| Verbal | | Performance | |
|---|---|---|---|
| Information | 6 | Picture Completion | 9 |
| Similarities | 5 | Picture Arrangement | 6 |
| Arithmetic | 6 | Block Design | 9 |
| Vocabulary | 6 | Object Assembly | 10 |
| Comprehension | 3 | Coding | 9 |
| Digit Span | 5 | Mazes | 8 |

There exists a 20 point spread between the sacles.  Subtest scatter is noted on both scales.  Scores indicate facility may wish further evaluation to rule out ssible beginnings of affective disorder or depression, acting out tendencies, ..d/or left brain deficit (listening/language).  Strengths were: visual alertness to details, planning/following a visual pattern, immediate visual memory with motor coordination.  Concerns were: long term memory, word knowledge, social judgement, arithmetic, visual sequencing with some social interpretation, frustration tolerance, and learning style.

Second observation completed on 5-17-91 noted Kenny had difficulty getting and staying on task, as well as trouble with synonyms.  His strength seemed to be his ability to use the dictionary and neatness of work.

Historical behaviors noted in available records were:

| | | |
|---|---|---|
| disregards rules | defiant | rude |
| distractability | tardiness | negative peers |
| disresspectful | suspensions | lacks insight |

Current behaviors noted during our screening process were:

| | | |
|---|---|---|
| anxiety | short attention span | underactive |
| unwilling to accept change | overly reserved | withdrawal |
| avoidance | anger | silliness |
| moody | attention seeker | manipulative |
| abstraction difficulties | forgetful | needs repetitions |
| slow learning rate | trial/error style | weak study strategy |
| weak employability skill | weak job seeking skill | unrealistic goals |

Behaviors noted as occurring continuously throughout the day in the classroom were not observed.

Behaviors noted as occurring on a daily basis in the classroom were not observed.

Behaviors noted as occurring more than once a week in the classroom were:

Respondent's Exhibit E

demonstrates sudden/dramatic mood change
blames others/materials for own difficulties/failures

    Behaviors noted as occurring approximately once a week in the classroom were:
has difficulty attending to task
responds inappropriately to constructive criticism
makes derogatory/critical remarks about others
fails to participate in a group situation
avoids/has difficulty discussing perssonal problems
appears to be generally bored/disinterested in daily activities
exhibits excessive fatigue

    Behaviors noted as occurring approximately once a month in the classroom were:
doesn't grasp basic concepts/information related to academic tasks
seems unable/unwilling to communicate feelings/emotions to others
doesn't obey teacher's directives/classroom rules
fails to consider/disregards consequences of own behavior
demonstrates facial expression of displeasure
inddicates he isn't happy through physical expression

    Behaviors noted as occurring less than once a month in the classroom were:
fails classroom test/quiz
doesn't follow directions related to academic tasks
demonstrates difficulty/reluctance begiining a task
makes derogatory comments/inappropriate gestures to others
deliberately makes false statements
exhibits overly pessimistic/negative attitude
fails to demonstrate a sense of humor when appropriate
demonstrates no emotions
fails to participate in/demonstrate interest in special events

    Kenny has shown these behaviors over an extended period and to a marked degree.
Numerous behaviors seen in the public school are also seen in this
self-contained residential program.  These behaviors do seem to adversely affect his
school performannce.

    This seems to be further evidenced by academic behaviors noted as  occurring in
the classroom all or most of the time:
fails to demonstrate word attack skills
fails to recognize words on grade level
has difficulty with phonic skills when reading
fails to use spelling rules
has difficulty with phonetic approaches to spelling
omits,substitutes, adds, rearranges letters when spelling
has difficculty spelling words that do not follow the rules
has difficulty solving math word problems

    Academic behaviors noted as occurring in the classroom on an inconsistent
basiswere:
has difficulty concentrating
fails to demonstrate logical thinking
requires slow, sequential, broken down presentations
doesn't use appropriaate subject-verb agreement when speaking
fails to use verb tenses correctly when speaking
fails to correctly answer comprehension questions from reading activities
fails to demonstrate word comprehension
doesn't read independently

Respondent's Exhibit E

Diagnostic Summary

Historical preintervention attempts with this youth were: retention  (8th),and suspensions. These interventions appear mildly effective.

Current preintervention attempts with this youth were: small group instruction with structure and adjusted instructional levels.  These appear somewhat effective.

The testing administered at our facility that provided input into our diagnostic decision were:

Woodcock Johnson Psycho Educational Battery (Revised) Form A administered on 4-25-91 which yielded standard battery scores:

Cognition:

| | | | |
|---|---|---|---|
| Memory Names | 8.2 | Memory Sentences | 5.5 |
| Visual Matching | 6.9 | Incomplete Words | 5.4 |
| Visual Closure | 12.2 | Picture Vocabulary | 6.3 |
| Analysis-Synthesis | 4.0 | Broad Cognition-std | 6.3 |

Achievement:

| | | | |
|---|---|---|---|
| Letter Word Id | 5.4 | Passage Comprehension | 7.6 |
| Calculation | 8.9 | Applied Problems | 6.8 |
| Dictation | 4.6 | Writing Samples | 2.8 |
| Science | 4.5 | Social Studies | 6.6 |
| Humanities | 2.3 | Skills | 5.4 |
| Broad Reading | 6.0 | Broad Math | 7.9 |
| Broad Written Lang | 3.9 | Broad Knowledge | 4.5 |

Kenny was also administered the supplemental batteries of the Woodcock Johnson which yielded these scores:

Cognition:

| | | | |
|---|---|---|---|
| Visual Auditory | 3.1 | Memory Words | NA |
| Cross Out | NA | Sound Blending | 1.7 |
| Picture Recognition | NA | Oral Vocabulary | 4.2 |
| Concept Formation | 3.6 | | |
| Long Term Retrieval | 4.2 | Short Term Memory | NA |
| Processing Speed | NA | Auditory Processing | 2.7 |
| Visual Processing | NA | Comprehension-Know | 5.2 |
| Fluid Reasoning | 3.8 | Broad Cognition-ext | NA |
| Delay Names | NA | Delay Visual-Auditory | NA |
| Numbers Reversed | NA | Sound Patterns | NA |
| Spatial Relations | NA | Listening Comprehension | NA |
| Verbal Analogies | NA | Oral Language | NA |

Achievement:

| | | | |
|---|---|---|---|
| Word Attack | 1.6 | Reading Vocabulary | 5.7 |
| Quantative Concept | NA | Proofing | 3.4 |
| Writing Fluency | 3.6 | Punctuation/capital | 3.3 |
| Spelling | 4.3 | Usage | 4.7 |
| Handwriting | 5.8 | | |
| Basic Reading | 3.3 | Reading Comprehension | 6.3 |
| Basic Math | NA | Math Reasoning | NA |
| Basic Writing | 4.0 | Written Expression | 3.1 |

Respondent's Exhibit E

DIAGNOSTIC MEETING

Student Name: _Kenny Reams_          DYS # _____
Meeting Date: _5/23/91_

RESULT:                                    YES          NO

Visually Impaired Sighted                _____        __✓__
Speech and Language Disorder             _____        __✓__
Deaf/Blind                               _____        __✓__
Hearing Impaired                         _____        __✓__
Orthopedically Handicapped               _____        __✓__
Autistic                                 _____        __✓__
Mental Retardation                       _____        __✓__
Behavior Disorder                        __✓__         _____
Specific Learning Disability             __✓__         _____
Multi-handicapped                        _____        __✓__

This ~~youth is not handicapped~~: _____

This youth (is) handicapped: _BD & LD (Dual)_____

Areas of concern: written expression / reading comprehension /
unhappiness - depression / needs respects & auditory processing /
consideration of consequences & ownership / needs belongingness -
motivation to status conscience / impulsive

DIAGNOSTIC MEETING PARTICIPANTS:           YES          NO

Dennis M. Crane, Educ. Supv.             __✓__         _____
Norma Daniel, Sp Ed Teacher              __✓__         _____
Cassie Willey, Ch I  A T III             __✓__         _____
Dlonda McCoy, Lab Practicum              __✓__         _____
Wendy Long, Sp. Ed Teacher               __✓__         _____
Vicki Reed, Counselor                    ~~____~~        __✓__
Clifford Roberts, Voc. Teacher           __✓__         _____

OPPOSING COMMENTS: (see attached)

Respondent's Exhibit E

Present Level of Performance

Kenny is a 16.4 year old Black male who stands 5'5" and weighs 122 pounds. His cognition as measured by the WISC-R suggests borderline to low average ability range.

Verbal skills indicate slightly stronger expressive vocabulary than receptive vocabulary. However, both are considered weak. At times he struggles for words to express himself. He made need additional time to formulate his oral expressions. On the other hand, Kenny does have a tendency to use words that he doesn't completely comprehend. Therefore, it is important to make sure he does understand what he is saying as well as what others are saying. Although he will not like it, he would benefit by performing speeches or small group presentations in front of the class. It is highly unlikely that Kenny would ask for further clarification in simpler terms, therefore, it is extremely important to use his level of vocabulary.

Perceptual skills reveal stronger three dimensional skills than two dimensional. He does well with most hands on activities. Timed situations do seem to evoke anxiety.

Memory skills display stronger short term skills than long term skills. Nevertheless, both are weak. Integrating the visual and auditory modes significantly hinders his skills. Visual processing is significantly stronger than auditory processing. He is quite distractible which adversely affects his attention span. Sitting in the least distractible area or using a study carrel would be extremely helpful. He also needs to focus on study strategies and/or memory aids at increase his retention skills. He does remember items better, if they are itertaining in some way.

Reasoning skills demonstrate somewhat rigid cognition and problem solving strategies. He doesn't effectively utilize instruction and/or feedback. He has extreme problems with abstractions and and rule learning. He knows he does best with structure and rules, but he doesn't like them. The result is he does test limits. He appears to be a concrete learner. Social judgement shows poor knowledge as well as no real life follow through and application.

Self-expressed learning style preference is social group. Numerical choice is visual or auditory. Language preference is auditory. Expressiveness preference is written. Kinesthetic tactile mode is one of the least preferred modes.

Academically, he presents weak sight vocabulary, mediocre vocabulary comprehension, mediocre passage comprehension, and poor word attack skills. He does appear to use context clues to assist in his understanding of reading materials. Math calculation skills show knowledge of the four basic operataions. He does seem to do best with pencil/paper compuation rather than mental. He does make some carless errors. He does need to review fractions, decimals, and equations. He needs to double check his work before turning it in. Math application offers weakness with word problems involving measurement, time and percentages, but a slight strength with money. Oral language displays no major problems. Written language exhibits poor punctuation/capitalization, poor spelling, and poor word usage. Handwriting skills are adequate. Science knowledge indicates weak mastery of the physical and biological areas. Social Studies knowledge reveals sporadic

Respondent's Exhibit E

996

mastery of history, and government, but weak geography.   Humanities knowledge
displays narrow base of exposure with weakness in music, art and     literature.

    Vocationally, he reports he has never been formally employed.  Therefore, he
will need to develop his employability skills.  Assessment to compare aptitude to
interests would be helpful.  Career exploration should focus on Military: Marines
and Business: Professional to address preference for accountant.

    Social emotional development reveals a low self image student who has some
difficulty attending to task.  He also experiences some difficulty developing and/or
maintaining interpersonal relationships.  His mood vacillates between boredom and
unhappiness.  He does have a tendency to be somewhat impulsive.  He needs to learn
more effective methods of dealing with
frustration and/or failure.  His ability to self-help himself without some type of
therapeutic intervention is highly unlikely due to ingrained defenses.  His defense
mechanisms of choice seem to be: withdrawal,avoidance,
projection, and minimization.   He does have some attention needs.

    Behaviorally, Kenny will be restrained according to proper physical crisis
prevention intervention techniques, if he is hurting himself, hurting others,
destroying property, and/or attempting to escape from facility.

Respondent's Exhibit E

Department of Social Services   Division of Youth Services

INDIVIDUAL EDUCATION PLAN

( ) General Education          ( X ) Special Education

Name: Kenneth L. Reams          Birthdate: 12-21-74
DYS #: 5-4190 D       DCN #: _____
Parent/Guardian: Amelia Reams
Home Address: ~~1000 Cole Avenue~~ Poplar Bluff, MO 63901
Home Phone #: 1619 D Street PB MO   785-7612

Last School Attended: Poplar Bluff Senior High School
        School Address: Highland Drive Poplar Bluff, MO 63901
        School Phone #: 314-785-6471

Home School District: Poplar Bluff R-I      # 012-109
        School Address: 1316 Maud P.O. Box 47 Poplar Bluff, MO 63901
        School Phone #: 314-785-7751

Arrival Date: ____4-23-91____    Screening Date: ___5-3-91___
Diagnostic Date: 5-23-91    GEP/IEP Date: ____6-4-91____
Initation Date: __6-4-91__    Interim Date: _____
Re-evaluation Date: 10/91    Interim Review Date: _____
Release Date: _____

Grade Placement: ____9____    Previous Credits: 1¼ (Poplar Bluff)

Recommended Instructional Levels:

Reading ___6___   Written Language __4__   Social Studies ___7___
Science __5__   Math _8_   Vocational ___9___  Life Skills ___9___

Goals:
Education Plans: graduate or GED
Career Choice: short: Marines  Long: accountant   (undecided)
Hobbies/Interests: drawing

Parental/Guardian Contacts"

| Date | Method | Result |
|------|--------|--------|
| 5-28-91 | letter | Aunt came 6-10-91 |
|  |  | to discuss IEP. |
|  |  | Willing to try. |
|  |  |  |
|  |  |  |

Respondent's Exhibit E

# HEALTH APPRAISAL RECORD

*Pearce Reams*

Approved by The Arkansas Department of Health
and The Arkansas Department of Education

## School Entry Requirements

Birth Certificate ✓ M648/71
Immunizations complete ✓
Physical Examination ✓

**Name** Reams   Kenneth   Lynard
Last      First      Middle

**Birth Date** Dec. 21, 1924   **State of Birth** WISconsiN   **Race** B   **Sex** M

**Parent** Beatrice Reams   Guardian

**Relationship** Mother

**Home Address** 517 N Gordin
(Write in Pencil)

**Directions to Home**

**Phone** 535-4548 - hunt   **Emergency Phone**

**Child's Physician** Dr. Smith   **Phone**

**Alternate Physician** ___ **Phone**

**Dentist** ___ **Phone**

**Medical Care Information**

*Required by Act 244 of 1967 and 633 of 1973

### Immunizations and Tests (Enter dates. Describe severe reactions or difficulties in Progress Notes). *Dec 12-81*

| | (1) | (2) | (3) | (4) | (5) |
|---|---|---|---|---|---|
| DPT & TD* | 12-180 | 10-7-84 | 12-9-83 | 6-9-82 | |
| Oral Polio* | 8-1-80 | 10-7-84 | 12-9-80 | 6-9-82 | |
| Measles (Rubeola)* | 3-27-81 | | | | |
| Rubella* | 3-27-81 | | | | |
| Mumps | | | | | |
| Tetanus Boosters | (1) | (2) | (3) | (4) | (5) |
| TB Skin Test | (1) | (2) | (3) | (4) | (5) |
| Sickle-Cell Test | (1) | (2) | (3) | (4) | (5) |
| Hemoglobin/Hematocrit | (1) | (2) | (3) | (4) | (5) |
| Other (Specify) | | | | | |

### Height and Weight Record
(Record yearly in September and April)

| HEIGHT | WEIGHT | AGE to ½ year |
|---|---|---|
| | | |

### Vision Tests

| DATE | TEST | RIGHT | LEFT |
|---|---|---|---|
| 80-81 | | O | O |
| 4/81 | Titmus | OK | OK |
| 12-82 | " | OK | O |
| 11-84 | " | OK | OK |
| 12/87 | | OK | OK |

### Hearing Tests

| DATE | TEST | RIGHT | LEFT |
|---|---|---|---|
| 80-81 | | O | O |
| 4/81 | Maico | OK | OK |
| 12-82 | " | OK | OK |
| 11-84 | " | OK | OK |
| 10-30-86 | " | OK | OK |
| 12/87 | | | |

### Dental Card

| DATE | AGE | REFER TO DENTIST | CONDITION CORRECTED |
|---|---|---|---|
| | | | |

Respondent's Exhibit E



## IMMUNIZATIONS

| | Date | Physician/Clinic |
|---|---|---|
| DTP No. 1 | 11-1-80 | 2 C H D |
| Diphtheria No. 2 | 12-2-81 | 2 C H D |
| Tetanus No. 3 | 4-9-82 | 2 C H D |
| Pertussis Booster | | |
| Tetanus Booster | | |
| Trivalent No. 1 | 11-1-80 | 2 C H D |
| Oral Polio No. 2 | 12-2-81 | 2 C H D |
| Vaccine No. 3 | 4-9-82 | 2 C H D |
| Booster | | |
| Measles Booster | 3-27-81 | 2 C H D |
| Mumps | | |
| Rubella | | |
| Td | 6-9-82 | 2 C H D |
| Tetanus - | | |
| Diphtheria | | |

### OTHER IMMUNIZATIONS

| Other (Specify) | Date | Physician/Clinic |
|---|---|---|
| | | |

### IMMUNIZATION LAW REQUIREMENTS

| Vaccine | Minimum Number of Doses | | Exceptions |
|---|---|---|---|
| | Age 0-6 | Age 6 + | |
| DTP | 3 | Td 3 | |
| Polio | 3 | 3 | |
| Measles | 1 | 1* | *Girls over age 12 are exempt; boys are not. |
| Rubella | 1 | 1* | |
| Mumps | 1** | | **Not required by law but recommended for pre-school children |

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

KENNETH L. BEAMS

SIGNATURE

### Certification of Birth

STATE OF WISCONSIN
DEPARTMENT OF HEALTH AND SOCIAL SERVICES

NAME   * REAMS, KENNETH LYNNORD *   * MALE *

FILE NO. 148-00-064310

DATE FILED JANUARY 20, 1975

DATE OF BIRTH * DECEMBER 24, 1974 *

COUNTY OF BIRTH KENOSHA

DATE ISSUED OCTOBER 20, 1980

This is a true certification of name and birth facts on file in the Section of Vital Statistics.

R. D. NASHOLD, Ph.D.
STATE REGISTRAR

IOWA STATE DEPARTMENT OF HEALTH
PROVISIONAL CERTIFICATE OF IMMUNIZATION

EXPIRATION DATE 5-12-89

APPLICANT'S NAME _____

BIRTH DATE 12-31-74

**Name** (last) Beams   (first) Kenneth   (middle) Donald

**Name of Parent or Guardian** Beatrice Whiteside

Phone _____

OTTUMWA COMMUNITY

**Medicine taken regularly** _____

**MEDICAL HISTORY** Date (yr.)

| | | |
|---|---|---|
| Chickenpox | | |
| Convulsions | | |
| Hepatitis | | |
| Mononucleosis | | |
| Mumps | | |
| Pneumonia | | |
| Rheumatic Fever | | |
| Rubella | | |
| Rubeola | | |
| Scarlet Fever | | |

**Conditions that would have an effect on school p_____**

**IMMUNIZATIONS**
Iowa certificate of Immunization

Completed          Yes ___ No ___
Medical Exemption
Religious Exemption

**OTHER PERTINENT INFORMATION**

Signature of Doctor or Health Official

Jim Smith M.D. 1-12-89
DATE

The above named applicant qualifies to enroll provisionally because ☐ he or she is a transfer student from another school or ☐ he or she has received at least one dose of each of the required vaccines but has not completed all the required immunizations. A total of 120 days or the remainder of the current school semester is allowed to complete the remaining immunizations and submit a Certificate of Immunization.

Remaining immunizations required (if any) _____

A REPRESENTATIVE OF THE LOCAL BOARD OF HEALTH OR IOWA STATE DEPARTMENT OF HEALTH MAY REVIEW THIS CERTIFICATE FOR SURVEY PURPOSES.

SIGNATURE OF PARENT OR GUARDIAN

SCHOOL COPY

**SCOLIOSIS SCREENING**
2 neg 88 Rt

**VISION SCREENING**

| Grade Level | Age | Name of School | Vision — With Glasses | | Vision — No Glasses | | Date Referred | Comments |
|---|---|---|---|---|---|---|---|---|
| | | | R | L | R | L | | |
| K | 6 | | | | | | | |
| 1 | 7 | Birt | | | | | | |
| 2 | 8 | Myrtle Schools | | | Passed | | | |
| 3 | 9 | | | | | | | |
| 4 | 10 | | | | | | | |
| 5 | 11 | Birt | | | | | | |
| 6 | 12 | Eric Cliff | | | ✓ | ✓ | | |
| 7 | 13 | Eric Orlando | | | ✓ | ✓ | | |
| 8 | 14 | School Comm | | | ✓ | ✓ | 3/11/89 ref to Orleans | |

**HEIGHT AND WEIGHT RECORD**

| | Fall | | Spring | |
|---|---|---|---|---|
| Date | Ht. | Wt. | Ht. | Wt. |
| | | | | |

Respondent's Exhibit E



**MEL CARNAHAN**
GOVERNOR

**MISSOURI**
**DEPARTMENT OF SOCIAL SERVICES**
DIVISION OF CHILDREN AND YOUTH SERVICES
P.O. BOX 447
JEFFERSON CITY
65102-0447
TELEPHONE: 314-751-3324, FAX: 314-526-4494

**RELAY MISSOURI**
for hearing and speech impaired
TEXT TELEPHONE
1-800-735-2966
VOICE
1-800-735-2466



December 8, 1993

To:        Maxie G. Kizer, P.A.
           Attorney at Law
           721 Pine Street
           P. O. Box 7423
           Pine Bluff, AR  71611

From:      Mary Sue Scheulen, Administrative Analyst

Subject:   Kenneth REAMS
           DOB:  12-21-74

Please note the following:

        ___XXX___Find attached materials as requested.

        _____No record of this individual with DYS in
                 Missouri.

        _____Case closed.  Records have been destroyed.
                 Records are retained for five years only.

        _____Please send a signed authorization for release
                 of information from the individual.

If you have questions please call me at 314-751-1283.

ms

Attachments-YES

"AN EQUAL OPPORTUNITY/AFFIRMATIVE ACTION EMPLOYER"
services provided on a nondiscriminatory basis

5590                    Respondent's Exhibit E

DYS-2
8-15-74

STATE OF MISSOURI
DEPARTMENT OF SOCIAL SERVICES
Division of Youth Services

PERMIT FOR PLAN OF CARE

I.   Kenneth Reams, 5-4190DSYC _____ was received by this
agency   3-06-91 _____ after adjudication by the Juvenile Division
  36th ___ Judicial Circuit of Missouri.

The following plan of care is considered by the Department of Social
Services to be in the best interest of said youth and his rehabilitation.

II.   PRESENT ASSIGNMENT:
          Residing with: (AUNT) Ms. Amelia Reams, 619 No. "D" Street,
          Supervised by:   AYC- K. Kastner        Poplar Bluff, MO. 63901
          Effective from:   12-18-91 _____ to:  2-13-92

Check X
(  )   III.   TO AFTERCARE:
          From present assignment: _____
          To reside with: _____
          Under supervision of: _____
          Effective: _____ youth will be responsible to person
to whom assigned.  Satisfactory adjustment during plan of care may lead
to youth's discharge.  Failure to make satisfactory adjustment or breach
of conditions of aftercare may result in youth's being returned to DYS
facility.

(  )   IV.   REVOCATION OF AFTERCARE
          From present assignment to: _____ for
probable cause shown.

( XX )   V.   TERMINATION OF CUSTODY:

          From present assignment to:   TYPE "A" DISCHARGE
          It now appears that Kenneth Reams, 5-4190DSYC _____ has successfully
lived up to the conditions of release and/or for good cause shown is
recommended for termination of custody to this agency.

(  )   VI.   INTER AGENCY TRANSFER:
          From present assignment to: _____

(  )   VII.   OTHER:
          From present assignment to: _____

APPROVED:

_____                    2-13-92
     Regional Administrator                        Date

_____                    _____
Facility Superintendent or Manager                 Date

DISTRIBUTION:                                   RECEIVED
   White - (original) Facility or Institution - SYC
   Green - DYS, Jefferson City                    FEB 18 1992
   Canary - Aftercare Youth Counselor - K. Kastner
   Pink - Parent or Guardian                    W. E. SEARS YOUTH CENTER
   Goldenrod - Youth
   SERO

5591                     1002
                    Respondent's Exhibit E

DYS–Form 3A

STATE OF MISSOURI
DEPARTMENT OF SOCIAL SERVICES
Division of Youth Services

SUMMARY SUPPLEMENT

to

PERMIT FOR PLAN OF CARE
(Aftercare)

REQUEST FOR TERMINATION OF CUSTODY

NAME: Kenneth Reams
DYS#: 5-4190DSYC
DOB: 12/21/74

TERM: Indeterminate
DATE ADMITTED: 3/6/91
DATE RELEASED: 12/18/91

COUNTY: Butler
COURT: 36th Judicial
Circuit,
Juv. Div.
OFFENSE: Burglary, 2nd.,
Stealing, 2 Cts.,
Misd. Stealing

Kenneth Reams was committed to DYS on 3/6/91 for the above named offenses. He awaited placement at the Butler County Juvenile Detention Center until 4/23/91 at which time he was placed at W. E. Sears Youth Center for treatment.

While in the SYC program, Ken appeared to want to make changes, but for several months his fears and insecurities kept him from letting go of his image and reputation as a "ief. By the time Ken earned his releases on 12/18/91 he seemed to have made a great deal of positive changes.

On 12/18/91 Ken was transferred to Aftercare status in the home of his maternal aunt, Ms. Amelia Reams, 619 N. "D" Street, Poplar Bluff, MO. He is enrolled as a 10th grade student at Poplar Bluff High School where he is doing well.

Ken's adjustment in the home and community have been equally successful and there have been no reported law violations.

It is recommended that Kenny receive a Type "A" discharge from DYS supervision.
KK/pm



RECEIVED
FEB 18 1992
W. E. SEARS YOUTH C...



RECEIVED
FEB 1 3 1992
S. E. REGIONAL OFFICE
POPLAR BLUFF, MO 6...

1002

Respondent's Exhibit E

Page 2
DYS Form 3A

_Kathy Fustner_
INITIATING WORKER

_2-11-92_
DATE

APPROVED:

_Bona Real_
SUPERVISOR

_2-13-92_
DATE

Distribution:
White - (original) Institution or Facility
Yellow - Aftercare Youth Counselor
Green - Central Office, Jefferson City

Respondent's Exhibit E



JOHN ASHCROFT
GOVERNOR

MISSOURI
DEPARTMENT OF SOCIAL SERVICES
DIVISION OF YOUTH SERVICES
SOUTHEAST REGIONAL OFFICE
1903 Northwood Drive
Poplar Bluff, MO.   63901
314/785-8214
February 13, 1992

RECEIVED
FEB 18 1992
W. E. SEARS YOUTH CENTER

Honorable John Clark
Juvenile Judge, Division II
Butler Co. Courthouse
Poplar Bluff, MO.  63901

RE:  Kenneth Reams, 5-4190DSYC
% (AUNT) Amelia Reams, 619 North "D" Street
Poplar Bluff, MO.  63901

Dear Judge  Clark:

As required by RSMo 219.026 (6) Revised Statutes Missouri 1978,
we are notifying you that Kenneth Reams, 5-4190DSYC    has been
discharged from the Division of Youth Services effective 2-13-92

Respectfully,

Bill Vaughn
Regional Administrator

CC:  Juvenile Officer - Mildred Lunsford
     Central Office
     AYC - Kathy Kastner
     Facility - SYC
     Southeast Regional Office

DYS FORM 9
February 1, 1983

### MISSOURI DIVISION OF YOUTH SERVICES
### MONTHLY AFTERCARE PLANNING AND PROGRESS REPORT

Name *Kenneth Reams #5-4190 (SYC)*   YC *Kathy Kastner*

Region *Southeast*

Period of Report: *Nov. 6, 1991 to Dec. 6, 1991*

Contacts - Date:
*11/15 - Ken, Melvin Stewart, Gp. Ldr.*
*11/21 - attempted HV*

DEC 3 1 1991

S. E. REGIONAL OFFICE
POPLAR BLUFF, MO 63901

Summary of progress toward aftercare goals:

*Ken is reportedly doing much better in the program ... has taken on a leadership role, is staying on task, handling responsibilities, & encouraging & helping his Gp. members.*

*The treatment team sees him as being close to release.*

JAN - 2 2

W. E. SEARS, YOUTH CENTER

*Ken's difficulty "on the streets" will be in attempting to outlive his reputation among peers as a thief ... if he chooses to do so. Staff member Mike Moss is volunteering to serve as a sponsor for Ken.*

DISTRIBUTION:
- AYC
- Facility
- Regional (optional)

_____ *Bas Reid*
Supervisor

ATTACH A COPY OF AFTERCARE ITP TO INITIAL REPORT

1004

5595

Respondent's Exhibit E

DYS FORM 9
February 1, 1983

## MISSOURI DIVISION OF YOUTH SERVICES
### MONTHLY AFTERCARE PLANNING AND PROGRESS REPORT

Name _Kenneth Beans #5-4190 54C YC_   _Kathy Kastner_

Region _Southeast_

Period of Report: _Aug. 6, 1991  to  Sept. 6, 1991_

Contacts - Date: _8/3 - Ken 54C_

_8/20 - attempt. HV_

_8/29 - attempt HV_

Summary of progress toward aftercare goals:

Kenny's progress has been marginal during this reporting period. He verbalizes the need to change, but he appears to be having a difficult time letting go of the old negative "identity"... possibly afraid of letting go of his "status" in the community with his old peer group.

Kenny's Aunt Amelia has continued to visit him regularly although I have had difficulty finding her at home. I will schedule a visit w/her during the upcoming month to finalize placement.

DISTRIBUTION:
AYC
Facility
Regional (optional)

RECEIVED
SEP 24 1991

S. E. REGIONAL OFFICE
POPLAR BLUFF, MO 63901

_____
Supervisor

ATTACH A COPY OF AFTERCARE ITP TO INITIAL REPORT

1005
Respondent's Exhibit E

DYS FORM 9
February 1, 1983

RECEIVED
JUL 08 1991

MISSOURI DIVISION OF YOUTH SERVICES     S. E. REGIONAL OFFICE
MONTHLY AFTERCARE PLANNING AND PROGRESS REPORT POPLAR BLUFF, MO 6390.

Name Kenneth Beams 5-4109 (54C YC     Kathy Parrent Kastner
                    Region     Southeast

Period of Report:  June 6, 1991 to July 6, 1991
Contacts - Date:

6/13- Ken 54C

7/1 - Ken 54C

Summary of progress toward aftercare goals:

Ken has become much more verbal with me when we meet & is opening up much more about his family situation & feelings. During the past month he has had some communication w/ his mother, who he says has asked him to return to Ark. to live w/ her. He chooses, however, to remain with his Aunt Amelia in Poplar Bluff.

Ken has had an "eye opener" in that his two best friends (gang-members) in Ark. were shot ... one was killed, the other critically injured. He believes that had he stayed in Ark. he would soon be dead.

Ken appears to be seeing some value in change & his Aunt is creating a support system that can make change easier.

Bos Rain

DISTRIBUTION:
AYC
Facility
Regional (optional)

                                        Supervisor

ATTACH A COPY OF AFTERCARE ITP TO INITIAL REPORT

1016     Respondent's Exhibit E

DYS FORM 9
February 1, 1983

MISSOURI DIVISION OF YOUTH SERVICES
MONTHLY AFTERCARE PLANNING AND PROGRESS REPORT

Name _Kenneth Reams # 5-4109/540, Kathy Parent Kastner_

Region _Southeast_

Period of Report: _May 6, 1991 to June 6, 1991_

Contacts - Date:

5/9 - _Kenny_
- _Melvin Steward, Gp Ldr._

RECEIVED
JUL 0 8 1991

Summary of progress toward aftercare goals:

S. E. REGIONAL OFFICE
POPLAR BLUFF, MO 63901

Kenny appears to still be looking for ways to "get around" the treatment program, rather than to work his way through it. He is attempting to be slick & manipulative, which was his method of survival on the streets.

Kenny's Aunt Amelia visits Kenny almost every week & appears to be very supportive of him & of the program.

DISTRIBUTION:
AYC
Facility
Regional (optional)

_____
Supervisor

ATTACH A COPY OF AFTERCARE ITP TO INITIAL REPORT

1007
Respondent's Exhibit E

DYS FORM 9
February 1, 1983

## MISSOURI DIVISION OF YOUTH SERVICES
## MONTHLY AFTERCARE PLANNING AND PROGRESS REPORT

#5-4190 DAP

Name _Kenneth Beams_          YC _Kathy Parrent_

Region _Southeast_

Period of Report: _March 6, 1991   to April 6, 1991_

Contacts - Date:

4/1 - file rec'd.

RECEIVED
APR 2 2 1991

S. E. REGIONAL OFFICE
POPLAR BLUFF, MO 63901

Summary of progress toward aftercare goals:

File rec'd 4/1/91 — no contacts during this reporting period.

DISTRIBUTION:
∠AYC
∠Facility
∠Regional (optional)

_____
Supervisor

ATTACH A COPY OF AFTERCARE ITP TO INITIAL REPORT

1008

Respondent's Exhibit E

DYS-2
8-15-74

STATE OF MISSOURI
DEPARTMENT OF SOCIAL SERVICES
Division of Youth Services

PERMIT FOR PLAN OF CARE

I.   Kenneth Reams 5-4190D SYC _____ was received by this
agency   3/06/91   _____ after adjudication by the Juvenile Division
36th _____ Judicial Circuit of Missouri.

The following plan of care is considered by the Department of Social
Services to be in the best interest of said youth and his rehabilitation.

II.   PRESENT ASSIGNMENT:
          Residing with:   W.E. Sears Youth Center
          Supervised by:   Group Leader
          Effective from:  4/23/91 _____  to:  12/18/91

Check X
(XXX)    III.   TO AFTERCARE:
          From present assignment:   W.E. Sears Youth Center
          To reside with: Aunt: Amelia Reams, 619 N "D" St., Poplar Bluff, MO
          Under supervision of:  AYC Kathy Kastner       63901
          Effective:  12/18/91 _____ youth will be responsible to person
to whom assigned.  Satisfactory adjustment during plan of care may lead
to youth's discharge.  Failure to make satisfactory adjustment or breach
of conditions of aftercare may result in youth's being returned to DYS
facility.

(  )    IV.   REVOCATION OF AFTERCARE
          From present assignment to: _____ for
probable cause shown.

(  )    V.   TERMINATION OF CUSTODY:

          From present assignment to: _____
          It now appears that _____ has successfully
lived up to the conditions of release and/or for good cause shown is
recommended for termination of custody to this agency.

(  )    VI.   INTER AGENCY TRANSFER:
          From present assignment to: _____

(  )    VII.   OTHER:
          From present assignment to: _____

APPROVED:

_____              12-16-91
Regional Administrator                  Date

_____              _____
Facility Superintendent or Manager      Date

DISTRIBUTION:
   White - (original) Facility or Institution
   Green - DYS, Jefferson City
   Canary - Aftercare Youth Counselor
   Pink - Parent or Guardian
   Goldenrod - Youth

1000

Respondent's Exhibit E



**MISSOURI**
DEPARTMENT OF SOCIAL SERVICES
DIVISION OF YOUTH SERVICES

JOHN ASHCROFT
GOVERNOR

Southeast Regional Office
1903 Northwood Drive
Poplar Bluff, MO  63901

December 18, 1991

Honorable John Clark
Butler County Courthouse
Poplar Bluff, MO  63901

Re:  Kenneth Reams 5-4190D SYC
c/o Amelia Reams
619 North "D" St.
Poplar Bluff, MO  63901

Dear Judge Clark:

The above-named juvenile, under commitment by your court to the
Division of Youth Services has been released from the facility
on   12/18/91      into our aftercare services.  The worker
assigned to his case for aftercare supervision is:  Kathy Kastner,
9400 Sears Lane, Poplar Bluff, MO 63901 (314-686-1177).

Should the need arise, please feel free to contact  Mrs. Kastner
or this office.

Respectfully,

Bill W. Vaughn
Regional Administrator

cc:  Juvenile Officer  Mildred Lunsford
     Central Office
    ✓Facility  SYC
     AYC Kastner
     Regional Office

DYS-Form 3A

STATE OF MISSOURI
DEPARTMENT OF SOCIAL SERVICES
Division of Youth Services

SUMMARY SUPPLEMENT

to

PERMIT FOR PLAN OF CARE
(Aftercare)



RECEIVED
DEC 1 0 1991
S. E. REGIONAL OFFICE
POPLAR BLUFF, MO 63901

REQUEST FOR TRANSFER TO AFTERCARE

NAME:  Kenneth Reams
DYS#:  5-4190DSYC
DOB:   12/21/74

**Residence:**  Kenny will be returning to the home of his aunt (also his legal guardian), Amelia Reams, 619 North "D" Street, Poplar Bluff, MO  63901.

**Educational, Vocational, and Employment Needs:**  Ken, by choice, will be returning to the 10th grade in the Poplar Bluff public school system.  In the past Ken has not been highly motivated concerning his education, although he does have the ability to succeed.  Ken would also like to obtain part-time employment.

**Aftercare Impressions & Recommendations:**  Ken's future success will depend a great deal on whether he has actually overcome his need to "prove" himself to others by stealing.  If he has, there is nothing to stand in the way of his success.

KK/pm

1011

Respondent's Exhibit E

Page 2
DYS Form 3A

_Cathy Kastner, AYC_____   _12/5/91_____
INITIATING WORKER                DATE

APPROVED:

_____Bob Reid_____       _12-10-91_____
SUPERVISOR                       DATE

Distribution:
White - (original) Institution or Facility
Yellow - Aftercare Youth Counselor
Green - Central Office, Jefferson City

5603        Respondent's Exhibit E

MISSOURI DEPARTMENT OF SOCIAL SERVICES
DIVISION OF YOUTH SERVICES

# JUVENILE MOVEMENT (DYS-FORM 5)

☐ CORRECTED COPY

| IDENT NAME | RACE | DATE OF BIRTH | DYS NUMBER | DATE OF MOVE | REPORTING OFFICE/STAFF |
|---|---|---|---|---|---|
| REAMS, Kenneth L. | Blk | 12/21/74 | 5-4190DSYC | 12/18/81 | WESYC    bm |

## SECTION I   COMMITMENT INFORMATION

COUNTY OF COMMITMENT
Butler

☐ COMMITMENT     ☐ RECOMMITMENT ▶

OLD NUMBER

## SECTION II   PRE-PLACEMENT INFORMATION

**LOCATIONS**

☐ Awaiting Placement _____ Court _____ DYS
☐ Non-Paid Detention
☐ Paid Detention
☐ Contractual — Chemical Dependency
☐ Contractual — Inpatient Diagnostic
☐ Contractual — Inpatient Treatment
☐ Contractual — Residential Care
☐ Other Agency _____

**STATUSES**

☐ Classification Interview Held
☐ Location Change Out of _____ Into _____
☐ Furlough Release
☐ Furlough Release Return
☐ Runaway Occurrence
☐ Run Remarks: _____

☐ Runaway Apprehended
☐ Out of Pre-Placement Status/Placed In _____
☐ Release to Aftercare from Contractual

AYC

RELEASED TO

NAME _____ RELATION _____
ADDRESS _____
COUNTY _____

COMMENTS

## SECTION III   DYS PROGRAM INFORMATION

☐ Initial DYS Program Placement
☐ Transfer From — Facility
☐ Sheltered In From Aftercare
☐ Program Shelter In
☐ Return Parole Violator (After DYS 2 Completed)
☐ Run Apprehended _____ Under 15 days _____ 15 or More
☐ Furlough Release Return
☐ Location Change Out of _____
       Into _____

☒ AFTERCARE RELEASE   ☐ PRIMARY CARE   ☐ FURLOUGH RELEASE

RELEASED TO

AYC
NAME   Kathy Kastner
Amelia Reams                    RELATION Aunt
ADDRESS  619 N. "D" Street
Poplar Bluff, MO 63901          COUNTY Butler

☐ Transfer To — Facility
☐ Returned to Aftercare From Shelter
☐ Aftercare Shelter Moved to Another Facility _____
☐ Program Shelter Returning to Parent Facility
☐ Program Shelter Moved to Another Facility _____
☐ Run Occurrence (please provide details below)

COMMENTS

## SECTION IV   AFTERCARE INFORMATION

☐ Shelter Out of Aftercare into _____
☐ Abscondence from Placement
☐ Abscondence Returned to Placement

☐ Change of AYC:  From _____ To _____
☐ Change of Placement

ADDRESS/PLACEMENT CHANGE

NAME _____ RELATION _____
ADDRESS _____
COUNTY _____

COMMENTS

1012

Respondent's Exhibit E



**MISSOURI**
**DEPARTMENT OF SOCIAL SERVICES**
DIVISION OF YOUTH SERVICES

JOHN ASHCROFT
GOVERNOR

Southeast Regional Office
1903 Northwood Drive
Poplar Bluff, MO  63901

RECEIVED
DEC - 6 1991
W. E. SEARS YOUTH CENTER

December 5, 1991

Honorable John Clark
Butler County Courthouse
Poplar Bluff, MO  63901

Dear Judge Clark:

    Re:  Notification of Pending Release on  Kenneth Reams 5-4190DSYC

In accordance with RSMo 219.021, please consider this
notification of the pending release of the above youth.
Attached is a copy of the youth's final progress report.  If
you have objections to this youth's placement, please
register your concerns in writing directed to me at the
above address.  Should you register a formal objection to
this placement, the Division will consider your concerns and
respond to you within the mandated time frame giving you our
placement decision.

Should you have questions concerning this placement or need
further information, please feel free to contact me.

                    Sincerely,

                    Bill W. Vaughn
                    Regional Administrator

cc:  Juvenile Officer  Mildred Lunsford
     facility
     file

Attachment:  Progress Report

10.3

•• AN EQUAL OPPORTUNITY/AFFIRMATIVE ACTION EMPLOYER ••
5605 provided on a nondiscriminatory basis

Respondent's Exhibit E

INDIVIDUAL TREATMENT PLAN FOR AFTERCARE

Name___Kenneth Reams_____No_5-4190DSYC_____Date_September 12, 1991____

AYC____Kathy Kastner_____AYC Supervisor__Bob Reid_____

PLACEMENT - Ken will return to the home of his paternal aunt, Ms. Amelia Reams, 619 North "D" Street, Poplar Bluff, MO 63901.

EDUCATION - Will enroll in the 10th grade at Poplar Bluff High School.

WORK - Ken hopes to obtain part-time employment at a fast food restaurant.

COMMUNITY INFLUENCE - Ken has a poor reputation in the community as a thief and may have difficulty outliving this expectation.

SPECIAL SERVICES - SYC Youth Specialist Mike Moss has volunteered to act as a sponsor for Kenny in the community.

AYC CONTACTS - At least two per month until discharge.

GOALS -

1) To complete Aftercare within three months.
2) To complete the school year successfully.
3) To make a successful adjustment in his aunt's home.

OBJECTIVES -                                                    DATE COMPLETED

1) Ken will have no further law violations.                    _____
2) Ken will choose friends more carefully.                     _____
3) Ken will enroll in public school, will attend daily, and
   maintain passing grades. He will cooperate with school
   authorities.                                                _____
4) Ken will follow rules in Aunt Amelia's home. He will
   communicate with her openly.                                _____

STRATEGIES -

1) YC will provide assistance in school enrollment and will monitor Ken's progress
   by maintaining contact with school authorities.
2) YC will provide individual and family counseling.
3) Sponsor will provide a positive role model for youth.

KK/pm

DISTRIBUTION: Facility, AYC, Regional Office

1014

Respondent's Exhibit E

DYS - FORM 3

STATE OF MISSOURI

DEPARTMENT OF SOCIAL SERVICES

Department of youth services

SUMMARY SUPPLEMENT

to

PERMIT FOR PLAN OF CARE
(Facility)

KENNETH REAMS, 5-4190DSYC    DOB:  12-21-74          December 2, 1991

I.   PROGRESS AT FACILITY:

Kenny was received at Sears Youth Center on April 23, 1991 for the offense
of stealing.

Upon arrival at the Center, Kenny was evaluated for a period of thirty
days and then his individual treatment plan was developed.  According
to this plan, it was identified that much of his behavior was for accep-
tance.  He came from a family that had a lot of problems with alcohol
abuse.  He was allowed to run the streets at will.  He is a student who
is small in size for his age of 17 years old.  He tried to make up for his
size by trying to steal more than anyone else.  His statements were that
he was going to be the best thief in town.  He was told to leave the state
of Arkansas by the authorities.  He was sent to Poplar Bluff to live with
his aunt.  He was told not to come back to Arkansas.  During his seven
month stay at the Youth Center he had a lot of difficulty accepting advice
and direction from staff and peers alike.  He tried to get over on people
to get his way.  He has been able to work through a lot of hurt feelings over
his family situation.  He now appears more willing to listen and open to
change.  The treatment team and his peer group feel that much of his needs
can now be better met on the streets where he can become employed.  Through
group and individual counseling we believe that he has reached maximum
benefit from the treatment program and recommend that he be returned back
to the home of his aunt.

II.   PROBLEM AREAS AND RECOMMENDED TREATMENT:

Kenny will be returning to the home of his aunt in Poplar Bluff.  He will
have a lot of difficulty in the community due to his reputation of being
a thief.  He will need a strong sponsor.  Michael Moss, who worked with
him for the past seven months, will be working with him once he returns
home.

III.   SPECIAL EDUCATION OR TRAINING NEEDS

Kenny reports that he wants to return to school, however, for him to be able
to make it in school, he will need someone pushing him and watching who he
chooses as his friends.

IV.   PLACEMENT PLAN:

Kenny will be living with his aunt, Amelia Reams, 619 N. "D" St., Poplar Bluff
Missouri 63901.  According to all records, this placement has been approved
as final

/bm
c:  Kathy Kastner, AYC

1015

Respondent's Exhibit E

DYS – FORM 3                                                                PAGE 2

_(Initiating Worker)_                              12-2-91
                                                           DATE

APPROVED:

SUPERVISOR                                        12/4/91
                                                           DATE

DISTRIBUT ON:
White – ( riginal) Institution or Facility
Yellow – ..ftercare Youth Counselor
Green – Central Office, Jefferson City

Respondent's Exhibit E

DIVISION OF YOUTH SERVICES
W. E. SEARS YOUTH CENTER

LETTER # 7                    PROGRESS REPORT            November 25, 1991

Kenneth Reams, 5-419DDSYC
Committing Court:  Butler CO
Home Address:  Amelia Reams, 618 N "D" St., Poplar Bluff,MO 63901

Dear Judge Clark:

This will be the seventh progress report on Kenny since he entered
the group program on April 23, 1991 for the offense of burglary.

Kenny's teacher is really impressed in the way Kenny is dealing
with his behavior in the last month.  Mrs. Davis feels Kenny has
demonstrated good help to the group by making the group aware of
potential difficulties based on his own past experiences.  The
teacher also reports Kenny's grades have been on a steady incline.

As Kenny's personal counselor, and with the support of his
treatment team, we all see him as doing what it takes to return
home from the group program.  Kenny has made some big strides in
the last month as for as handling his problems.

Kenny's peers sees him holding all group responsibilities and sees
him as being ready to return home.

In summary, the treatment team sees him as being ready to return to
society in a better state of mind.  Kenny has been consistent in
all areas of the group program.  He still needs to talk and
continue his drug and alcohol counseling.

Respectfully,


Mike Moss                              Melvin  Stewart
Youth Specialist                       Group Leader

MM/MS:bm

c:  Mildred Lunsford, JO, Kathy Kastner, AYC, Parents, Student,
Group Leader, Youth Specialist, S. E. Reg. Off., Cottage
Supervisor, File

1016
Respondent's Exhibit E

DIVISION OF YOUTH SERVICES
W. E. Sears Youth Center

LETTER # 6              PROGRESS REPORT              October 29, 1991

Kenneth Reams,5-4190DSYC
Committing Court:  Butler County
Home Address:  Amelia Reams, 618 N. "D" St.,
                              Poplar Bluff, Missouri 63901

Dear Judge Clark:

This will be the sixth progress report on Kenny since he entered
the group program on April 23, 1991 for the offense of burglary.

Last month Kenny showed problems which came out of his "Authority".
The staff and group has talked to Kenny and told him what he needed
to do.  In the last two weeks, Kenny has shown a lot of frustration
due to the fact he has seen several group members go home.  Kenny
feels he has no hope and has begun to give up too easily.  Kenny's
peers have been telling and giving options on how to deal with
frustration, and not to give up on himself.  Kenny's peers sees him
holding all group responsibilities and showing the following
problems:

     Authority - Kenny needs to learn to accept authority from all
peers and staff.  Plus, he needs not to aggravate or play getbacks.

     Misleads Others - He needs not draw others into his negative
behaviors in order to look big in the eyes of others.

In summary, Kenny needs to settle down and work on the problems
listed above.  Kenny needs to be consistent in giving and receiving
help from his peers.  Kenny has been encouraged to continue his
drug and alcohol counseling.

Respectfully,



Mike Moss (Personal Counselor)          Melvin Stewart
Youth Specialist                        Group Leader

MM/MS:bm

c:  Mildred Lunsford, Juv. Off.  Kathy Kastner, AYC, Parent,
Student, Group Leader, Youth Specialist, S. E. Regional Office,
Cottage Supervisor, File

ル‐1017

Respondent's Exhibit E

INCIDENT/RESTRAINT REPORT

STUDENT _Keneth Roams_ # D-4190    COTTAGE/GROUP _Pine A_

ARE YOU AWARE (LOG OR VERBALLY) OF THE POSSIBILITY THIS INDIVIDUAL OR GROUP MIGHT "ACT OUT"? _Yes, He hAs Been out of for 2 dAys._

PROVIDE THE NAME OF THE STAFF PERSON SUPERVISING OR HANDLING THIS RESTRAINT OR INCIDENT. _Gary Kensen_

DESCRIPTION OF INCIDENT: _Group was confronting Kenny on his playful attitude, he had shown several problems + everytime the group would confront him he would argue or explain himself, during the last group call he was arguing a minimize his problems, Staff instructed him to have a seat, so group could complete a task. He was throwing things + moving all around, Staff had mike + Bryant to hold his arms to prevent any harm to self. he struggle + Bite mike in the side, "Kenny was angry"_

REASON FOR RESTRAINT:

___✓___HURTING OTHERS    _____ATTEMPTED ESCAPE

_____HURTING SELF    _____DESTRUCTION OF PROPERTY

DESCRIPTION OF STAFF RESPONSE: _Staff instructed group to fully restrain Kenny in a helping manner, and to watch his mouth, he was still trying to Bite._

RESULT OF INCIDENT: _Kenny finally got in ✓, he express to Staff that he had fears of returning home, but would talk openly to group._

REPORTED BY: _Gary Kerr_    DATE/TIME: _Oct-5-91  130pm -15%_

REVIEWED BY: _Milan Slimp_
GROUP LEADER        _Steve Theran_
                   SUPERVISOR

.../86
Revised 12/1/86
SP/pd

408.1
1018

Respondent's Exhibit E

## INCIDENT/RESTRAINT REPORT

STUDENT _Kenny Reams - D4190_          COTTAGE/GROUP _Pine A_

WERE YOU AWARE (LOG OR VERBALLY) OF THE POSSIBILITY THIS INDIVIDUAL OR GROUP MIGHT "ACT OUT"? _Yes_

PROVIDE THE NAME OF THE STAFF PERSON SUPERVISING OR HANDLING THIS RESTRAINT OR INCIDENT. _David Mc Daughey_

DESCRIPTION OF INCIDENT: _Kenny was out of check, sitting on the floor. He began kicking chairs, table, and group members. He was restrained. Also, he attempted to bite members and had a towel put across his mouth to prevent further biting + spitting._

REASON FOR RESTRAINT: _attempted_
✓ HURTING OTHERS          ATTEMPTED ESCAPE
  HURTING SELF          ✓ _attempted_ DESTRUCTION OF PROPERTY

DESCRIPTION OF STAFF RESPONSE: _Monitored the group to ensure safty of all._

RESULT OF INCIDENT: _Kenny got in ✓ + controled his behavior_

REPORTED BY: _David Mc Daughey_     DATE/TIME: _10-4-91 5:30-5:45_
REVIEWED BY: _Melvin Skinut_        _Steve Pregeau_
             GROUP LEADER              SUPERVISOR

7/1/86
Revised 12/1/86
SP/pd

INCIDENT/RESTRAINT REPORT

STUDENT _Kenny Resins_ # _5-4190 D_ COT... ...E/GROUP _Pine A_

...'? YOU AWARE (LOG OR VERBALLY) OF THE POSSIBILITY THIS INDIVIDUAL OR GROUP "ACT OUT"? _Yes_

PROVIDE THE NAME OF THE STAFF PERSON SUPERVISING OR HANDLING THIS RESTRAINT OR INCIDENT. _Mark Russell_

DESCRIPTION OF INCIDENT: _Kenny had been out of I for a couple of hours, group circled up with him and he wasn't taking in any help. Kenny fronted, tried to get others off and attempted to hit group members. Kenny was put in restraint to control him and stop any hurting behavior._

REASON FOR RESTRAINT: _Attempted_
___✓___ HURTING OTHERS    _____ ATTEMPTED ESCAPE
_____ HURTING SELF    _____ DESTRUCTION OF PROPERTY

DESCRIPTION OF STAFF RESPONSE: _Assisted group in putting Kenny in restraint and guided this help to him._

RESULT OF INCIDENT: _After 15 min, Kenny able to control himself and sit up and listen to his group. He remained out of I, but able to sit and not disturb the class._

15 MIN

REPORTED BY: _Mark Russell_    DATE/TIME: _9-23-91 12:15-12:30 pm_
REVIEWED BY: _Melvin Stewart_
    GROUP LEADER    _Anne Regan_
    SUPERVISOR

...ised 12/1/86
...pd

408.1

5613    1020
Respondent's Exhibit E

DIVISION OF YOUTH SERVICES
W. E. SEARS YOUTH CENTER

LETTER # 5                    Progress Report              September 24, 1991

Kenneth Reams, 5-4190DSYC
Committing Court:  Butler County
Home Address:  Amelia Reams, 618 N. "D" Street, Poplar Bluff, MO 63901

Dear Judge Clark:

This will be the fifth progress report on Kenny since he entered the group
program on April 23, 1991, for the offence of burglary.  Kenny has made
some big steps in the direction which pleases his peers and staff.  Kenny
has talked more about his stealing problem and seems  to be getting a better
attitude on trying to solve his problems in his life.

Last month Kenny had three problems on his progress letter that he needed to
work on and he has changed that.  Kenny's peers and staff see him with only
one problem and that is "Authority".  Kenny is beginning to take authority
without trying to aggravate or play getbacks.  Kenny has shown more control
over his authority and other problems that come out of him not wanting to
accept authority from peers.

In summary, Kenny has made the improvements he needed to go forward in the
group program.  As long as Kenny continues to   progress in this direction,
he will become an ideal person in the community.  Kenny is being encouraged
to. continue his drug and alcohol counseling.

Respectfully,


Mike Moss (Personal Counselor)
Youth Specialist


Melvin Stewart
Group Leader

MM:MS/bm

cc:  Mildred Lunsford, JO
     Kathy Kastner, AYC
     Parent
     Student
     Group Leader
     Youth Specialist
     S. E. Regional Office
     Cottage Supervisor
     File

                              1021

Respondent's Exhibit E

DIVISION OF YOUTH SERVICES
W. E. SEARS YOUTH CENTER

LETTER # 4                 PROGRESS REPORT                 August 25, 1991

Kenneth Reams, 5-4190DSYC
Committing Court: Butler County
Home Address: Amelia Reams, 618 N. "D" Street, Poplar Bluff, MO  63901

Dear Judge Clark:

This will be the fourth progress report on Kenny since he entered the group
program on April 23, 1991, for the offense of burglary.

As Kenny's personal counselor, I see him at a stand still in the program.  He
is at a point where he gives up on himself and figures why keep trying to do
better.  That shows me and others he has to come to a point in life for a change.
Kenny is handling group responsibility and doing what is expected of him most
of the time.  His school work is impressive and he seems to get the most out
of it.

His peers and staff see him with the following problems and these problems are
what he must work on before he can leave the group program:

   1)   Authority--Kenny must listen to his peers and needs to be for real
                 in his help to and from the group.

   2)   Aggravation--He wants to aggravate to play get-backs when feeling
                 bad about himself.

   3)   Stealing--He needs to learn stealing doesn't make him look good in
                 the eyes of others and he needs not lie and twist the
                 truth about it.

In summary, Kenny still has some problems he must take ownership of and work
on them.  Kenny must learn this program can help him, but he must be for real
when peers are seeking to help him.  I see him as a neat person in appearance
and if he can just change things his life can be the same way.  He must and
needs also to continue to work on his drug and alcohol problem.

Respectfully,


Mike Moss (Personal Counselor)
Youth Specialist


Melvin Stewart
Group Leader

MM:MS/pm

cc:  Mildred Lunsford, JO; Kathy Kastner, AYC; Parent, Student, Group Leader;
     Youth Specialist; SERO; Cottage Supervisor; File

1022
Respondent's Exhibit E

DIVISION OF YOUTH SERVICES

DYS Form 7
Rev. July 1982

Honorable  John Clark
Judge, Juvenile Division
36th  Judicial Circuit

RE: KENNETH L REAMS, 5-4190DSYC
DOB:   12/21/74
County from:   Butler

## REPORT OF RE-EXAMINATION

Period of this report:   3/6/91-8/6/91

In accordance with provisions of Section 219.021, 5, RSMo. 1978, as amended, the Division has completed a re-examination of the above-named youth for the purpose of determining whether existing dispositions should be modified or continued.  A study was made of his/her present treatment program, his/her personal and family situation and his/her progress made since the last study.

Upon the basis of this study, the following disposition is being made:

Kenneth was committed to the Division of Youth Services on 3/6/91, for the offense of stealing.  He was classified on 3/28/91 and received at Sears Youth Center on 4/23/91. During this reporting period, his progress has been somewhat slow due to his not always taking the program seriously.  He needs to put forth more effort into channeling his anger and not letting others' negative behavior influence him.  The teachers and cottage staff report that he is standing up more for himself and confronting people more often about their behavior.  Kenny still is easily drawn off task in school.  He has begun to listen more in his peer group meetings and is becoming more involved in the helping of others. When he has completed his goals and objectives as listed by his treatment team and peer group, they will recommend him for release to aftercare supervision; until then, they will continue to work with him.

Melvin B. Stewart
Examiner

August 12, 1991
Date

MBS:pd
cc:  Parent/Guardian
     Aftercare
     Regional Office
     Facility File

1035

Respondent's Exhibit E

INCIDENT/RESTRAINT REPORT

STUDENT _Kenny Reark_   # _5-4190 B_   COTTAGE/GROUP _PINE A_

WERE YOU AWARE (LOG OR VERBALLY) OF THE POSSIBILITY THIS INDIVIDUAL OR GROUP MIGHT "ACT OUT"? _yes_

PROVIDE THE NAME OF THE STAFF PERSON SUPERVISING OR HANDLING THIS RESTRAINT OR INCIDENT. _Mark Russell_

DESCRIPTION OF INCIDENT: _Kenny was setting on floor out of Walter started to help and Kenny tried to hit Walter. Walter showed EA, but stopped. Kenny put in restraint to stop any hurting._

FOR RESTRAINT: _Attemp_

____✓____ HURTING OTHERS   _____ ATTEMPTED ESCAPE

_____ HURTING SELF   _____ DESTRUCTION OF PROPERTY

DESCRIPTION OF STAFF RESPONSE: _Assisted group in restraint and guided their help to Kenny._

RESULT OF INCIDENT: _Kenny got in ✓ at 4:15 he started to talk about home but stopped, he told guys he would handle himself & talk in group meeting._

REPORTED BY: _Mark Russell_   DATE/TIME: _7-1-91 · 3:30 pm_

APPROVED BY: _Frank Hyd_

GROUP LEADER _____   _Steve Pierson_ SUPERVISOR

1/86
Revised 12/1/86

408.1   10

5617   Respondent's Exhibit E

DIVISION OF YOUTH SERVICES
W. E. SEARS YOUTH CENTER

LETTER # 3                    PROGRESS REPORT                July 24, 1991

Kenneth Reams, 5-4190DSYC
Committing Court:  Butler County
Home Address:  Amelia Reams, 618 N. "D" Street, Poplar Bluff, MO 63901

Dear Judge Clark:

This will be the third progress report on Kenny since he entered the group
program on April 23, 1991 for the offense of burglary.

As Kenny's personal counselor, I have seen an improvement in him in many
areas.  Authority has been Kenny's biggest problem in this program and I
see he has come to the point of accepting it.  Kenny shows other problems
out of not accepting authority, but he sees this and has worked hard to
change.  He has been handling responsibilities most of the time and trying
to do the same with the group.

His teacher reports Kenny has done better staying on task.  She feels he
has made a big step  forward in standing up for what he knows is right.
Overall, to her he has made an improvement in the right direction.

Kenny's staff and peers sees him with the following problems he  must
improve on to complete the program successfully:

    1.   Authority - needs to accept authority from his peers.

    2.   Fronting - He needs to start being for real and talk
             about his feelings more.

    3.   Aggravation - He needs to not aggravate to play get-backs.

In summary, a lot of Kenny's problems shown comes from one or more problems.
He shows the group that he is willing to do what it takes to work his way
through the program.  He still has some feeling about his stealing problem
that he needs to share with the group and by doing so, will help him overcome
the fear of going back on the streets.  He has shown he can be more  dependant
on himself, and at times, shows the program has made him take a step forward
in becoming a positive member in the group program.  Overall, Kenny has made
improvements and must continue to do so and also he must seek drug and alcohol
counseling to complete this program.

Respectfully,


Mike Moss (Personal Counselor)          Melvin Stewart
Youth Specialist                        Group Leader

MM:MS/bm

cc:  Mildred Lunsford, JO, Kathy Parrent-Kastner, AYC, Parent, Student,
Group Leader, Youth Specialist, S. E. Regional Office, Cottage Supv., File

1025
Respondent's Exhibit E

DIVISION OF YOUTH SERVICES
W. E. SEARS YOUTH CENTER

LETTER # 2                   PROGRESS REPORT              June 24, 1991

KENNETH REAMS, 5-4190DSYC
Committing Court:  Butler County
Home Address:  Amelia Reams, 618 N. "D" St, Poplar Bluff, MO 63901

Dear Judge Clark:

This will be the second progress report on Kenny since he entered
the group program on April 23, 1991 for the offense of burglary.

As Kenny's personal counselor, I see him working hard to do what is
right.  Even though he still has some difficulty in accepting
authority, I see some improvement in this area.  In the last month
he has made a big step talking to his peers concerning his stealing
and home situation.

After talking to his school teacher, she speaks of him working hard
in school.  She said Kenny stays on task and works hard with the
group.  He continues to be mature and respectful to staff.  He is
more willing to listen better to his peers and take their advice.

Kenny's peers sees him holding all group responsibilities and see
him needing to work on the following problems:

    1)   Authority - He is not willing to accept positive criticism
                     most of the time.
    2)   Easily Misled - He needs not to fall into others negative
                     behaviors.
    3)   Fronting -  He needs not to do things to look big in the
                     eyes of others.
    4)   Aggravation - He needs not to make unneeded comments.

In summary, Kenneth has made progress in the right direction.  He
has begun to accept the program for what it can do for him.  Even
though there has been some improvement, he still needs to work hard
on phases of this program.  Kenny has made progress in accepting
ownership of his problems and mistakes.  He needs to become more
concerned about his and not so much self concern.  Overall, he has
made some good decisions and working in the right direction.  He
must continue to do so to complete this program in a positive
manner.  I have encouraged him to seek drug and alcohol counseling
in the future.

Respectfully,


Mike Moss (Personal Counselor)      Melvin Stewart
Youth Specialist                    Group Leader

MM:MS/bm

cc: Lunsford, JO, Parrent-Kastner, AYC, Parent, Student, G.L.,
Y.S., S.E. Reg. Off.  Cott. Supv. File

1030
                              Respondent's Exhibit E

INCIDENT/RESTRAINT REPORT

STUDENT _Kenny Rooms_    # _5-4190 D_    COTTAGE/GROUP _Pine A_

J AWARE (LOG OR VERBALLY) OF THE POSSIBILITY THIS INDIVIDUAL OR GROUP
T "ACT OUT"?    _no_

IDE THE NAME OF THE STAFF PERSON SUPERVISING OR HANDLING THIS RESTRAINT
NCIDENT. _Chervenak_

RIPTION OF INCIDENT: _In hallway while getting breakfast
rays, Kenny + Walter starting arguing with
ch other. Group quickly separated them + returned
cottage. Kenny began to curse his group + threaten.
hen told to have a seat, he refused and
gan to swing at gp members. Walter jumped
- and tried to get at Kenny. The group
eparated the two + restrained Kenny for a
hort time. Walter quickly calmed down._

FOR RESTRAINT: _attempted_
__X__ HURTING OTHERS    _____ ATTEMPTED ESCAPE
_____ HURTING SELF    _____ DESTRUCTION OF PROPERTY

IPTION OF STAFF RESPONSE: _supervised group to prevent further
urting behavior, had group circle up to talk with
enny._

T OF INCIDENT: _Kenny first refused to talk, then again
egan to curse group + threaten others. Kenny was
ut with another group (Pine C) so his group
ould eat their breakfast._

TED BY: _Vicki J. Chervenak_    DATE/TIME: _6-13-91_
'D BY: _mlin Ernst_    _Steve Phjean_
      GROUP LEADER            SUPERVISOR

ed 12/1/86

408.1

5620    Respondent's Exhibit E

10

INCIDENT/RESTRAINT REPORT

DENT _Kenny Reams_ # 5 4190D         COTTAGE/GROUP _Pine A_

E YOU AWARE (LOG OR VERBALLY) OF THE POSSIBILITY THIS INDIVIDUAL OR GROUP
HT "ACT OUT"?  _Yes_

VIDE  THE NAME OF THE STAFF PERSON SUPERVISING OR HANDLING THIS RESTRAINT
INCIDENT.  _Robert Kielpinski_

CRIPTION OF INCIDENT: _Kenny was put with Pine "C"_
_because of acting out behavior. When Told_
_To have seat on Floor, he Refused. C Group_
_attempted To have him sit but he resisted_
_and The restraint ensured._

ON FOR RESTRAINT:

_X_ HURTING OTHERS        _____ ATTEMPTED ESCAPE

_____ HURTING SELF        _____ DESTRUCTION OF PROPERTY

CRIPTION OF STAFF RESPONSE: _Supervised restraint To ensure_
_proper procedures Followed And no hurting_
_behavior_

ULT OF INCIDENT: _AFTER 10 min Kenny was able To_
_sit up and TALK To The Group._

RTED BY: _____        DATE/TIME: _17 MAY 91. 9:30 PM_

ED BY: _____
        GROUP LEADER                    SUPERVISOR

36
sed 12/1/86
d
                        408.1
        5621            Respondent's Exhibit E        1028

INCIDENT/RESTRAINT REPORT

STUDENT _Kenny Reams_ # 5-4190 5   COTTAGE/GROUP _Pine A_

ERE YOU AWARE (LOG OR VERBALLY) OF THE POSSIBILITY THIS INDIVIDUAL OR GROUP
IGHT "ACT OUT"? _no_

ROVIDE  THE NAME OF THE STAFF PERSON SUPERVISING OR HANDLING THIS RESTRAINT
R INCIDENT. _____

ESCRIPTION OF INCIDENT: _Kenny's group confronted him_
_about not trying to help in a ball game._
_He got upset at this & called one group_
_member out (hurting behavior). He spit on_
_two of his group members also._

ON FOR RESTRAINT: _Attempted_

✓ HURTING OTHERS      _____ ATTEMPTED ESCAPE

_____ HURTING SELF      _____ DESTRUCTION OF PROPERTY

ESCRIPTION OF STAFF RESPONSE: _Directed gym to hold him_
_in proper restraint on gym floor._

SULT OF INCIDENT: _He got in sheets & brought his_
_aggravation problem then got on task._

RTED BY: _Waggoner_              DATE/TIME: _5-23-91_
EWED BY: _Melin Stewart_            _Steve Trejan_
         GROUP LEADER                  SUPERVISOR

1/86
vised 12/1/86
pd                          408.1

5622            Respondent's Exhibit E   1029

DIVISION OF YOUTH SERVICES
W. E. SEARS YOUTH CENTER

LETTER # 1                     PROGRESS REPORT                    May 29, 1991

Kenneth Reams, 5-4190DSYC
Committing Court:  Butler County
Home Address:  Amelia Reams, 1000 Cole, Poplar Bluff, MO 63901

Dear Judge Clark:

This will be the first progress report on Kenny since he entered the group
program on April 23, 1991 for the offense of burglary.

As his personal counselor, I see Kenny as having difficulty accepting authority
from his peers.  He does things just to look big in the eyes of others.  He
can and does handle responsibility most of the time in the cottage.

The teacher reports that he does not always stay on task in school.  He doesn't
always ask questions when he doesn't understand  something.  He does good work
when he is not on an attitude.

The following goals and objectives have been developed by the treatment team
and his peer group to help him solve his problems.

   1.  He will be able to make the right kinds of decisions on his own.

   2.  He will not stoop to stealing, even if he can get away with it
       and will see stealing as hurting others.

   3.  He will not have the need to act big to be accepted.

   4.  He will be able to accept advice and constructive criticism from
       those in authority.

   5.  He will be able to accept advice and direction from others without getting
       angry and will know how to control his anger and not let it control him.

   6.  He will see drugs and alcohol as hurting himself.

   7.  He will care enough about others that he will not annoy or hassle others.

In summary, he must learn to accept his problems and not always look for ways to
talk his way out of them.  He must be more willing to accept help on his problems
and stop covering up his feelings.

Respectfully,


Mike Moss (Personal Counselor)          Melvin Stewart
Youth Specialist                        Group Leader

MM:MS/bm

cc:Mildred Lunsford, JO, Kathy Parrent, AYC, Parent, Student, Group Leader,
   Youth Specialist, File

**1030**

Respondent's Exhibit E

PINE A TREATMENT TEAM MEET1
May 22, 1991

### KENNETH L. REAMS, 5-4190DSYC - INDIVIDUAL TREATMENT PLAN

*sys file*

RANK OF PROBLEMS:
1. EASILY MISLED: feeling of acceptance
2. STEALING; feeling of personal gain
3. FRONTING; feeling of acceptance
4. AUTHORITY; feeling of resentment
5. EASILY ANGERED; feeling of defense
6. DRUGS & ALCOHOL; feeling of acceptance
7. AGGRAVATION

PATTERN: Inconsiderate of others
GROUP REACTION: Annoyed, bothered, pestered, agitated, tend to remind, coax or plead.
NEED: Attention
FAULTY BELIEF: Whenever I feel like I don't belong, I try to gain worth or acceptance by being noticed or served.
TREATMENT GOAL: The individual will gain self-worth and feelings of usefulness by making helpful contributions through responsible involvement and interaction with others.

TREATMENT GOAL ATTAINMENT SCALE:
1. EASILY MISLED: Has no knowledge of feelings, but is drawn into negative behavior in certain situations.
2. STEALING: Steals and has no understanding of feelings or behavior.
3. FRONTING: Puts on an act rather than being real. Has no knowledge of feelings or behavior.
4. AUTHORITY: Has no knowledge of feelings, but does not want to be managed by others in specific situations.
5. EASILY ANGERED: Has no knowledge of feelings, but is easily provoked in specific situations.
6. DRUGS & ALCOHOL: Has no knowledge of feelings, but misuses substances only in specific situations.
7. AGGRAVATION: Has no knowledge of feelings, but treats others in negative ways only in specific situations.

GOALS:
1. EASILY MISLED: Will be able to make the right kind of decisions on his own.
2. STEALING: Will not stoop to steal, even if he can get away with it, and will see stealing as hurting others.
3. FRONTING: Will not have the need to act "big" for acceptance.
4. AUTHORITY: Will be able to accept advice and constructive criticism from those in authority.
5. EASILY ANGERED: Will be able to acccept advice and direction without getting angry and will know how to channel his anger productively.
6. DRUG & ALCOHOL: Will be able to see that drugs hurt and will not misuse substances to have friends.
7. AGGRAVATION: Will get no enjoyment out of hurting people by irritating or annoying them.

STRENGTHS: Kenny is respectful, polite, neat and has good verbal skills.
WEAKNESSES: Kenny has poor peer associates, is not goal directed, has poor reasoning skills, is defensive, manipulative and resentful.
INTERESTS: DRawing, music, materialistic, basketball.

WL/MBS:pd

Respondent's Exhibit E

MISSOURI DEPARTMENT OF SOCIAL SERVICES
DIVISION OF YOUTH SERVICES

## JUVENILE MOVEMENT (DYS-FORM 5)

☐ CORRECTED COPY

| STUDENT NAME | RACE | DATE OF BIRTH | DYS NUMBER | DATE OF MOVE | REPORTING OFFICE/STAFF |
|---|---|---|---|---|---|
| REAMS, Kenneth L. | Negro | 12/21/74 | 5-4190DSYC | 4/23/91 | WESYC    bm |

### SECTION I   COMMITMENT INFORMATION

| COUNTY OF COMMITMENT | | | OLD NUMBER |
|---|---|---|---|
| Butler | ☐ COMMITMENT | ☐ RECOMMITMENT ▶ | |

### SECTION II   PRE-PLACEMENT INFORMATION

**LOCATIONS**

- ☐ Awaiting Placement _____ Court _____ DYS
- ☐ Non-Paid Detention
- ☐ Paid Detention
- ☐ Contractual — Chemical Dependency
- ☐ Contractual — Inpatient Diagnostic
- ☐ Contractual — Inpatient Treatment
- ☐ Contractual — Residential Care
- ☐ Other Agency _____

**STATUSES**

- ☐ Classification Interview Held
- ☐ Location Change Out of _____ Into _____
- ☐ Furlough Release
- ☐ Furlough Release Return
- ☐ Runaway Occurrence
- ☐ Run Remarks: _____

- ☐ Runaway Apprehended
- ☐ Out of Pre-Placement Status/Placed In _____
- ☐ Release to Aftercare from Contractual

AYC

| | NAME | RELATION |
|---|---|---|
| RELEASED TO | ADDRESS | |
| | | COUNTY |

COMMENTS

### SECTION III   DYS PROGRAM INFORMATION

- ☒ Initial DYS Program Placement   SYC
- ☐ Transfer From — Facility _____
- ☐ Sheltered In From Aftercare
- ☐ Program Shelter In
- ☐ Return Parole Violator (After DYS 2 Completed)
- ☐ Run Apprehended ____ Under 15 days ____ 15 or More
- ☐ Furlough Release Return
- ☐ Location Change Out of _____
  Into _____

☐ AFTERCARE RELEASE   ☐ PRIMARY CARE   ☐ FURLOUGH RELEASE

AYC   Kathy Parrent

| | NAME | RELATION |
|---|---|---|
| RELEASED TO | ADDRESS | |
| | | COUNTY |

- ☐ Transfer To — Facility _____
- ☐ Returned to Aftercare From Shelter
- ☐ Aftercare Shelter Moved to Another Facility _____
- ☐ Program Shelter Returning to Parent Facility
- ☐ Program Shelter Moved to Another Facility _____
- ☐ Run Occurrence (please provide details below)

COMMENTS

### SECTION IV   AFTERCARE INFORMATION

- ☐ Shelter Out of Aftercare into _____
- ☐ Abscondence from Placement
- ☐ Abscondence Returned to Placement

- ☐ Change of AYC: From _____ To _____
- ☐ Change of Placement

| | NAME | RELATION |
|---|---|---|
| ADDRESS/ PLACEMENT CHANGE | ADDRESS | |
| | | COUNTY |

MMENTS

5625

1057
Respondent's Exhibit E

MISSOURI DEPARTMENT OF SOCIAL SERVICES
DIVISION OF YOUTH SERVICES

## JUVENILE MOVEMENT (DYS-FORM 5)

☐ CORRECTED COPY

| STUDENT NAME | RACE | DATE OF BIRTH | DYS NUMBER | DATE OF MOVE | REPORTING OFFICE/STAFF |
|---|---|---|---|---|---|
| REAMS, Kenneth L. | NEGRO | 12/21/74 | 5-4190D | 4/23/91 | SERO/JJ |

### SECTION I   COMMITMENT INFORMATION

COUNTY OF COMMITMENT
BUTLER CO.

☐ COMMITMENT     ☐ RECOMMITMENT ▶

OLD NUMBER

### SECTION II   PRE-PLACEMENT INFORMATION

**LOCATIONS**

☐ Awaiting Placement _____ Court _____ DYS
☐ Non-Paid Detention
☐ Paid Detention
☐ Contractual — Chemical Dependency
☐ Contractual — Inpatient Diagnostic
☐ Contractual — Inpatient Treatment
☐ Contractual — Residential Care
☐ Other Agency _____

**STATUSES**

☐ Classification Interview Held
☐ Location Change Out of _____ Into
☐ Furlough Release
☐ Furlough Release & Return
☐ Runaway Occurrence
☐ Run Remarks: _____

☐ Runaway Apprehended
☒ Out of Pre-Placement Status/Placed In   SYC
☐ Release to Aftercare from Contractual

RECEIVED APR 23 1991 SEARS YOUTH CENTER

AYC     KATHY PARRENT

| RELEASED TO | NAME | RELATION |
|---|---|---|
| | ADDRESS | |
| | | COUNTY |

COMMENTS
Negro Male Youth Moved FROM: 36th-DIAGNOSTIC SERVICES DETENTION CENTER in Poplar Bluff, MO.;

on 4-23-91;  TO:  Initial Placement @ W.E. SEARS YOUTH CENTER in Poplar Bluff, MO.

### SECTION III   DYS PROGRAM INFORMATION

☐ Initial DYS Program Placement
☐ Transfer From — Facility _____
☐ Sheltered In From Aftercare
☐ Program Shelter In
☐ Return Parole Violator (After DYS 2 Completed)
☐ Run Apprehended _____ Under 15 days _____ 15 or More
☐ Furlough Release Return
☐ Location Change Out of _____
_____ Into _____

☐ AFTERCARE RELEASE   ☐ PRIMARY CARE   ☐ FURLOUGH RELEASE

| AYC RELEASED TO | NAME | RELATION |
|---|---|---|
| | ADDRESS | |
| | | COUNTY |

☐ Transfer To — Facility _____
☐ Returned to Aftercare From Shelter
☐ Aftercare Shelter Moved to Another Facility
☐ Program Shelter Returning to Parent Facility
☐ Program Shelter Moved to Another Facility
☐ Run Occurrence (please provide details below)

COMMENTS

### SECTION IV   AFTERCARE INFORMATION

☐ Shelter Out of Aftercare into _____
☐ Abscondence from Placement
☐ Abscondence Returned to Placement

☐ Change of AYC:  From _____ To _____
☐ Change of Placement

| ADDRESS/PLACEMENT CHANGE | NAME | RELATION |
|---|---|---|
| | ADDRESS | |
| | | COUNTY |

COMMENTS

1033

MO 886-1340 (7-89)     DISTRIBUTION:   WHITE/CO RESEARCH & ANALYSIS   GOLDENROD/FACILITY FILE   PINK/AYC FILE   YELLOW/REGION FILE     DYS 5 (7-89)

Respondent's Exhibit E

MISSOURI DEPARTMENT OF SOCIAL SERVICES
DIVISION OF YOUTH SERVICES

**JUVENILE MOVEMENT (DYS-FORM 5)**    ☐ CORRECTED COPY

| IDENT NAME | RACE | DATE OF BIRTH | DYS NUMBER | DATE OF MOVE | REPORTING OFFICE/STAFF |
|---|---|---|---|---|---|
| REAMS, Kenneth L. | NEGRO | 12/21/74 | 5-4190D | 3/29/91 | SERO/ JJ |

**SECTION I   COMMITMENT INFORMATION**

| COUNTY OF COMMITMENT | | OLD NUMBER |
|---|---|---|
| BUTLER CO. | ☐ COMMITMENT     ☐ RECOMMITMENT ▶ | |

**SECTION II   PRE-PLACEMENT INFORMATION**

| LOCATIONS | STATUSES |
|---|---|
| ☐ Awaiting Placement _____ Court _____ DYS | ☐ Classification Interview Held |
| ☐ Non-Paid Detention | ☒ Location Change Out of 36th-PD DET  Into RUN (?) |
| ☐ Paid Detention | ☐ Furlough Release Butler Co. DIAG. SERVICES |
| ☐ Contractual — Chemical Dependency | ☐ Furlough Release Return |
| ☐ Contractual — Inpatient Diagnostic | ☐ Runaway Occurrence |
| ☐ Contractual — Inpatient Treatment | ☐ Run Remarks: |
| ☐ Contractual — Residential Care | |
| ☐ Other Agency _____ | ☐ Runaway Apprehended |
| | ☐ Out of Pre-Placement Status/Placed In _____ |
| | ☐ Release to Aftercare from Contractual |

AYC   Kathy Parrent

RELEASED TO:
NAME                                   RELATION
ADDRESS
                                        COUNTY

COMMENTS

**CTION III   DYS PROGRAM INFORMATION**

☐ AFTERCARE RELEASE   ☐ PRIMARY CARE   ☐ FURLOUGH RELEASE

| | AYC |
|---|---|
| ☐ Initial DYS Program Placement | |
| ☐ Transfer From — Facility _____ | NAME                        RELATION |
| ☐ Sheltered In From Aftercare | |
| ☐ Program Shelter In | ADDRESS |
| ☐ Return Parole Violator (After DYS 2 Completed) | |
| ☐ Run Apprehended _____ Under 15 days _____ 15 or More | COUNTY |
| ☐ Furlough Release Return | ☐ Transfer To — Facility _____ |
| ☐ Location Change Out of _____ | ☐ Returned to Aftercare From Shelter |
|   Into _____ | ☐ Aftercare Shelter Moved to Another Facility _____ |
| | ☐ Program Shelter Returning to Parent Facility |
| | ☐ Program Shelter Moved to Another Facility _____ |
| | ☐ Run Occurrence (please provide details below) |

COMMENTS

**SECTION IV   AFTERCARE INFORMATION**

| | |
|---|---|
| ☐ Shelter Out of Aftercare into _____ | ☐ Change of AYC:  From _____  To _____ |
| ☐ Abscondence from Placement | ☐ Change of Placement |
| ☐ Abscondence Returned to Placement | NAME                        RELATION |
| | ADDRESS |
| | COUNTY |

MMENTS

1034

MO 886-1340 (7-89)   DISTRIBUTION:   WHITE/CO RESEARCH & ANALYSIS   GOLDENROD/FACILITY FILE   PINK/AYC FILE   YELLOW/REGION FILE   DYS 5 (7-89)

Respondent's Exhibit E

## DIVISION OF YOUTH SERVICES FACE SHEET

( ) Classification file
( ) Management Information
( ) Region  S.E.
( ) Facility  S.Y.C.
( ) AYC  K. Parrent
( ) Family Therapist  NO
    (If Needed)

RECOMMITMENT: YES ____ NO X  IF YES: OLD DYS # _____  LAST FACILITY _____

SUBSECTION: 2 ____ 3 X ____  DYS WARD: YES ____ NO X ____

NAME: (L) REAMS _____ (F) Kenneth _____ (MI) L. ____

UNDER 5-41900 _____ SS# _____

JUV. CT. LIFETIME NUMBER 30004425 _____

ALIAS "Kenny" _____ PHONE 686-3658 _____ COUNTY OF COMMITMENT BUTLER CO. _____

ADDRESS: (STREET) 1000 Cole Avenue _____ (CITY AND STATE) Poplar Bluff, MO. 63901

COUNTY OF RESIDENCE BUTLER CO. _____

AGE 16 DOB 12/21/74 RACE Negro _____ SEX Male _____ RELIGION N/A _____

HT 5'5" WT 100 EYES Brown _____ HAIR Black _____ BUILD/ID MARKS Tatoo "Kenny" Lf. Arm/Small Tatoo + Tatoo "Kenny" Rt. Shoulder/ __ on Lf. Hand/

DATE OF COMMITMENT/ADMISSION 3/06/91 JUDGE Clark _____ CIR. 36th JUV. OFF. Mildred Lunsford

LIST COMMITTING OFFENSE(S) 14020 Burglary, 2nd/ 15010 Stealing, 2 Cts./ 15030 Mids. Stealing

| PREVIOUS OFFENSES (List Other Offenses in Addendum) | SUSTAINED YES/NO | DATE | PREVIOUS OFFENSES | SUSTAINED YES/NO | DATE |
|---|---|---|---|---|---|
| 1. 28090 Escape Custody | YES | 2/07/91 | 4. | | |
| 2. Prior Referrals in State of Arkansas | | | 5. | | |
| 3. | | | 6. | | |

LAST SCHOOL ATTENDED/ADDRESS  Poplar Bluff Sr. High School - Poplar Bluff, MO.

SCHOOL DISTRICT # 012-109 _____ ENROLLED YES (yes or no) GRADE LEVEL 9th

DATE OF INTERVIEW 3/27/91 DATE CLASSIFICATION COMPLETED 3/28/91 CLASSIFIED BY J. Dunivan

ASSIGNED AYC Kathy Parrent _____ FAM. THER. RECOMMENDED: YES ____ NO X  POTENTIAL HPC: YES ____ NO X

WAS NOTICE SENT TO PARENT AND YOUTH OF RIGHT TO PETITION?   YES X   NO ____

RECOMMENDED LEVEL OF CARE: PRIMARY CARE ____ GROUP HOME ____ PARK CAMP ____ SHORT-TERM ____

REGIONAL YOUTH CENTER 1 SPECIAL PROGRAM ____ OTHER ____

PREVIOUS INSTITUTIONS AND PLACEMENT DATA (Location/Date) No Previous Institutions but had a Suspended Commitment to Arkansas DYS 1/22/91

COURTS VIEWS AND RECOMMENDATIONS Would like for the State of Arkansas to Honor their Commitment Order since Youth's Mother is resident there.

PHYSICIAN N/A _____ DENTIST N/A _____

SPECIAL MEDICAL DATA N/A _____

INSURANCE N/A _____ STATE/FEDERAL BENEFITS N/A _____

CHRONIC ILLNESSES N/A _____

NEEDED MEDICATIONS: YES ____ NO X  IF YES: _____

MENTAL HEALTH: YES ____ NO X  IF YES: IN-PATIENT: YES ____ NO ____ OUT-PATIENT: YES ____ NO ____

7-16-90 _____ 506.1 _____ 1035

Respondent's Exhibit E

D.Y.S.: 6.4.1 (2) (MARCH 199')

HAS THE COURT APPOINTED A LEGAL GUARDIAN? (yes or no)   YES

CIRCLE THE RELATIONSHIP OF THE CUSTODIAL PARENT/LEGAL GUARDIAN TO THE YOUTH:

MOTHER      FATHER      LEGAL GUARDIAN      NO PARENT/LEGAL GUARDIAN

CUST. PARENT/LEGAL GUARDIAN   Amelia Reams, (Maternal Aunt), Poplar Bluff, MO. 63901      1000 Cole Avenue,

ADDRESS                                 PHONE   N/A

AT TIME OF COMMITMENT, YOUTH RESIDED WITH (CHECK AS MANY BLOCKS AS NECESSARY)

( ) FATHER   ( ) MOTHER   ( ) STEPFATHER   ( ) STEPMOTHER   (XX) LEGAL GUARDIAN   ( ) OTHER

FATHER   Dwight Reveda
SS#                    DOB                    ADDRESS   State of California                    PHONE
OCCUPATION                    EMPLOYER                    PHONE

MOTHER   Beatrice Whiteside
SS#                    DOB                    ADDRESS   635 Russell Avenue, Forrest City, Arkansas 72335   PHONE   501/633-2355
OCCUPATION                    EMPLOYER                    PHONE

GUARDIAN
SS#                    DOB                    ADDRESS                    PHONE
OCCUPATION                    EMPLOYER                    PHONE

STEPFATHER   Mickey Whiteside
SS#                    DOB                    ADDRESS                    PHONE
OCCUPATION                    EMPLOYER                    PHONE

STEPMOTHER
SS#                    DOB                    ADDRESS                    PHONE
OCCUPATION                    EMPLOYER                    PHONE

OTHER
SS#                    DOB                    ADDRESS                    PHONE
OCCUPATION                    EMPLOYER                    PHONE

*******************************************************************

| NAME OF SIBLINGS | AGE | RELATION | ADDRESS | POLICE REFERRAL (YES, NO, UNKNOWN) |
|---|---|---|---|---|
| Scotty Whiteside | 9 | ½ Brother | w/Mother in Arkansas | NO |
| Dominique Whiteside | 5 | ½ Brother | w/Mother in Arkansas | NO |

Respondent's Exhibit E

ADDENDUM FOR SNAPSHOT PURPOSES

Youth's Name _Kenneth Reams_

DYS Number _830004425_

Circle Appropriate Answer or Fill in Blank:

Commitment type:    Sub 2    (Sub 3 Prop)    Sub 3 Person

Prior Sub 2 Referrals:     YES    (NO)
Prior Sub 3 Property Referrals:    (YES)    NO
Prior Sub 3 Person Referrals:    YES    (NO)

Age at first delinquent/status court referral:    ~~16~~ 15

Age at first abuse/neglect referral:    _unk_

Was this youth ever treated in a mental health facility?    YES    (NO)

    If YES--    In-Patient        Out-Patient

    If yes, which hospital/facility_____

Does this youth have a history of drug use/abuse?    _NO_

    If YES--Prior Court Referral    Prior Treatment    Self-Report

    If prior treatment, which facility_____

Has this youth ever been placed in a residential setting other
than a mental health/drug treatment facility?    YES    (NO)

    If yes, name and type_____

At commitment, the family constellation was--choose one:

    Intact/biological parents        Intact/step parent
    Single-Parent                    ~~Other Relative~~
    None                             _M. Aunt/Legal Guardian_

DYS FORM 1A

RISK ASSESSMENT FORM

Name _Kenneth Peams_____  Number _5-4/90_____  Region _O_  Date _3/27/91_

1.  Age at first juvenile court referral (excluding CA/N)  _2_
    (consider both sustained and unsustained)
    12 and under                     5
    13-14                            3
    15                               2
    16 and over                      0

2.  Committing offense severity*     _5_
    Highest                          6
    High                             5
    Moderate                         3
    Low                              1

3.  Most serious prior juvenile court referral*    _5_
    (consider only sustained referrals)            ***
    Highest                          6             ***
    High                             5
    Moderate                         3
    Low                              1
    None                             0

4.  No. of prior juv. court referrals (excluding CA/N)  _2_
    (consider both sustained and unsustained)
    8 or more                        6
    5-7                              4
    3-4                              2
    2 or fewer                       0

5.  Most serious prior assaultive behavior          _0_
    Assault leading to sust. ct. referral      6    ***
    Assault on authority figure, no conviction 5
    Fighting resulting in injury or school susp 4
    None                                       0

6.  Most serious escapes/runaways (within past 12 mos)  _6_
    Escape from detention/institution/custody  6
    Run from group care/foster care            4
    Run or attempt from home                   2
    None                                       0

1

1037

  Respondent's Exhibit E

7.  Drug/chemical abuse                                                    _____ 0
      Chronic abuse                                      5
      Abuse resulting in some disruption                 3
      No known use/use with no interference              0


8.  Alcohol abuse                                                          _____ 0
      Chronic abuse                                      5
      Abuse resulting in some disruption                 3
      No known use/use with no interference              0


9.  Parental effectiveness                                                 _____ 4
      Little effectiveness                               4
      Inconsistent effectiveness                         2
      Generally effective                                0


10.  Most recent public school adjustment (prior to                        _____ 3
      (commitment)
      Not attending/expelled                             5
      Severe truancy, behavior problems                  3
      Problems handled at school level                   1
      Attending/graduated/GED                            0


11.  Peer relationships at time of commitment                              _____ 4
      Gang member                                        4
      Negatively influenced                              2
      Good support, positively influenced               0


                                    TOTAL SCORE          _____ 31

*See document titled "Risk Assessment Offense Codes" adopted
 5-17-90.

"Highest" means those offenses which involve aggressiveness and
are crimes against people.  Examples are:  homicide, rape,
assault, armed robbery, sodomy.

"High"  means those offenses which are serious property offenses.
Examples are:  burglary, stealing, arson, property damage, fraud.

"Moderate" means those offenses which do not involve aggressive
behavior.  These crimes may be either felonies or misdemeanors.
Examples are:  peace disturbance, weapon possession, possession
of drugs, public drunkenness, trespass, petty theft.

"Low" means status offenses or very minor law violations.  In
violation of court order commitments are included in this
category.

*** Proposed changes.


                                     2


                                                          1038

MISSOURI DIVISION OF YOUTH SERVICES
NEEDS ASSESSMENT--SCORE SHEET

Name _____ Number 5-4/91 Classifier _Juniwa__ Date 3/27/91

1) Drug/Chemical/Alcohol Abuse
   None, unknown, or no impairment
   Occasional abuse/some disruption of functioning
   Frequent abuse/serious disruption
   
   ⓪
   1
   2

2) Sexual adjustment
   Age appropriate adjustment and knowledge
   Moderate problems
   Severe problems
   
   ⓪
   1
   2

3) Special medical needs
   None
   Yes
   
   ⓪
   1

4) Family relationships
   NA or relatively stable relationships
   Some disorganization/stress but workable
   Major disorganization/stress
   
   0
   ①
   2

5) Peer relationships
   Age appropriate peer relationships
   Some conflicts/manipulation
   Will not or cannot interact appropriately with peers
   
   0
   ①
   2

6) Educational dysfunction (learning disabilities)
   Unknown or no dysfunction
   Documented or suspected minimal problems
   Documented educationally handicapped
   
   ⓪
   1
   2

7) Vocational/educational program performance
   Not a problem area
   Moderate problem area
   Severe problem area
   
   0
   1
   ②

8) Employment
   Not a need
   Moderate need
   Severe need
   
   0
   ①
   2

9) Social/emotional maturity
   Appropriate for age
   Periodic/sporadic acting out responses
   Severe responses which limits functioning
   
   0
   ①
   2

10) Mental health
    Unknown or no dysfunction
    Documented or suspected minimal history
    Documented major dysfunction
    
    ⓪
    1
    2

11) Special placement needs
    None
    Yes
    
    ⓪
    1

TOTAL SCORE __6____

Respondent's Exhibit E

1039

MISSOURI DIVISION OF YOUTH SERVICES
NEEDS ASSESSMENT - NARRATIVE

IDENTIFYING INFORMATION:  YOUTH:  Kenneth L. Reams     # 5-   41900     DATE:   3-27-91

CLASSIFIER:  Jirden Dunivan     CLASSIFICATION INTERVIEW OCCURRED:     3-27-91

WHO WAS INTERVIEWED:    Youth, Legal Guardian, Juvenile Court Personnel

1.  DRUG/CHEMICAL/ALCOHOL ABUSE:  Kenneth denies use or abuse of drugs, chemicals, or alcohol and there are no Court Referrals in reference to such.

2.  SEXUAL ADJUSTMENT:  Ok.

3.  SPECIAL MEDICAL NEEDS:  None.

4.  FAMILY RELATIONSHIPS:  Kenny's biological mother and two younger half-siblings continue to reside in Forrest City, Arkansas.  The State of Arkansas gave the maternal aunt, Amelia Reams, Legal Custody of Kenny on January 22, 1991, with the understanding that she would take him from the State of Arkansas, apparently in lieu of placing him in a facility.  The biological father, Dwight Revedes, apparently resides somewhere in the State of California, and there is no contact with him.  According to the aunt and Juvenile Court Personnel in the State of Arkansas, the biological mother in the State of Arkansas has shown little or no interest in Kenny and has not attempted to contact him during his problems here in Missouri.

5.  PEER RELATIONSHIPS:  Kenny is peer oriented and verbalizes he is a member of the gangsters Disciples in Forrest City, Arkansas.  Most of Kenny's offenses are committed in concert with his peers and are suspected to meet the material or monetary needs of Kenny or his peer associates.

6.  EDUCATIONAL DYSFUNCTION (Learning Disabilities):  None.

7.  VOCATIONAL/EDUCATIONAL PROGRAM PERFORMANCE:  Kenny was a student regular track in the Poplar Bluff School System at the time of his Commitment to the Division of Youth Services.  He has exhibited lots of behavioral problems such as defiance, rudeness, and unexcused tardies.  He's had several suspensions and has been placed in the OKIS Program on numerous occasions.  His grades basically are failing.

8.  EMPLOYMENT:  Employment is not an immediate priority with Kenny, however it may be so in the future since that would be better than stealing to meet his needs.

9.  SOCIAL/EMOTIONAL MATURITY:  Kenny is a physically small youth, 5' 5" and weighs 100 pound.  He has good social and street skills, is likeable, and has the ability to relate to others appropriately on a social basis.

10.  MENTAL HEALTH:  Ok.

11.  SPECIAL PLACEMENT NEEDS:  Kenny is negatively peer oriented, and admittedly a gang member.  He steals for immediate gratification for himself and his peer associates.  He has a Needs Score of 6 and a Risk Score of 31, and I'm sure there are additional referrals and offenses in the State of Arkansas that we are not aware of.  Kenny did have a Commitment to the Arkansas Division of Youth Services on 1-22-91, however, rather than place Kenny in a facility in the State of Arkansas, Arkansas Suspended the Commitment and gave Legal Custody to the maternal aunt in Poplar Bluff, MO., with the understanding that she would take him out of Forrest City area.  It did occur, however such did not go through the Interstate Compact on Juveniles and neither was the Juvenile Court in Butler County notified of the Suspended Commitment or Kenny's presence in Butler County until he had additional Referrals for Burglary and Stealing in Butler County.  The State of Arkansas refused to Honor their Order thus, Kenny was Committed by the 36th Judicial Circuit, Butler County to DYS.

Kenny is Classified for Assignment at Sears Youth Center.

JD/jj

Respondent's Exhibit E

MISSOURI DIVISION OF YOUTH SERVICES ———— DYS-31
INITIAL FAMILY EVALUATION

Name:   Kenneth Reams                No:   5-4190D AP
AYC:    Kathy Parrent               SS:
Date:   4/10, 4/11, 4/15,    Interview With:   Youth, Mildred
        1991                                   Lunsford, DJO,
                                               Mat. Aunt,
                                               Amelia Reams,
                                               Elgin Anders,
                                               Judge Baird
                                               Kinney, St.
                                               Francois County
                                               Arkansas Juve-
                                               nile Court Judge

**RECEIVED**

APR 1 9 1991

S. E. REGIONAL OFFICE
POPLAR BLUFF, MO 63901

1.   Family Relations:  At the time of his commitment to DYS,
Ken was living with his maternal aunt, Amelia Reams, and her
boyfriend, Elgin Anders, in Poplar Bluff.  Amelia's son's,
Bernard, age 17, and Andre, age 18, are also in the home.

Ken's mother, and stepfather, Beatrice and Mickey Whiteside,
live in Forrest City, Arkansas, and have shown no interest
in Ken since he left their home in August '90 to live with
his aunt.  Ken was an illegitimate child, while Mickey
Whiteside is the father of Ken's half-brothers, Scotty
Whiteside, age 6, and Dominique Whiteside, age 5.

According to Amelia and Elgin, both Ken's mother and
stepfather have treated Ken differently than they treat his
younger brothers.  Ken was made responsible for baby-sitting
his little brothers from the time they were infants while
his mom and step-dad "did their own thing."  As a result,
they report, Ken missed out on his own childhood and was not
allowed to play with peers his own age.  Amelia says that
his mom also frequently would take Ken out of school so that
he could watch the younger boys.

2.   Delinquency:  When Ken initially ran away from home to
come live with them, Amelia and Elgin say they did not
realize that he had been in trouble in Arkansas.  When they
found out, they returned him to Arkansas to face the
consequences.  As a result, Arkansas authorities committed
Ken as a delinquent to Arkansas Youth Services.  They stayed
the commitment, however, turned legal guardianship over to
Amelia.  Amelia believes that Ken was very young when he
began stealing, and that he steals more to impress others
than for actual financial gain.

When Ken was charged with numerous stealing offenses both in
Poplar Bluff and Cape Girardeau, Arkansas refused to honor

Respondent's Exhibit E1041

his commitment to their youth services, therefore, Missouri took over jurisdiction and committed him to Missouri Division of Youth Services.  Ken has spent over two months in the Butler County Juvenile Detention Center awaiting DYS placement.  He would have been placed at Sears Youth Center at least a month earlier, however, he absconded from detention and was on run for about two weeks before being returned.

In speaking with Judge Baird Kinney of the St. Francois County Arkansas juvenile court system he reports that Ken is a "hard-core delinquent" and that he is "notorious" in their county.  Judge Kinney will be forwarding documentation to our office in the near future.

3.  <u>Discipline:</u>  Amelia and Elgin report that in the home Ken has presented very few problems.  When they learned of his stealing in the community they grounded him, and he did not resist their discipline.

4.  <u>School/Work:</u>  At the time of commitment, Ken was enrolled as a 9th grade student at Poplar Bluff High School. During his short time in that school system, Ken displayed many behavioral problems, resulting in OKVS, out of school suspensions, and detention school placement.

5.  <u>Peers:</u>  Most of Ken's peer group are from middle to upper-middle class families, and were also involved with Ken in the many stealing and burglary incidences.  Ken's 17 year old cousin, Bernard, was involved in some of the incidences and has not yet gone to court.  A 17 year old, Frank Thompson, has been incarcerated on the same charges.  The other juveniles involved have not been placed under court supervision, and it appears, may have no immediate consequences as a result of their participation.

6.  <u>Community:</u>  Butler County juvenile authorities are quite upset that Arkansas did not honor their commitment order and return Ken to that state as a result of these new law violations.  This worker is attempting to acquire documentation and information concerning Ken's previous law violations while in Arkansas.  When this data is obtained it will be shared with all Staff involved.

DJO Lunsford reports that Ken is a moody, acting out youth. He has absconded from Butler County Detention for a two-week period of time and continues to be considered at high risk for runaway.

7.  Family Problems/Stress:  In interviewing Ken it was
clear that he feels that his natural mother has let him down
and he feels a great deal of anger and resentment toward
her.  Elgin believes that Ken steals hoping to gain his
mother's attention, yet nothing seems to solicit any kind of
reaction from her.  Elgin and Amelia also believe that he
has been so socially restricted in his mother's home that he
is "racing to catch up" with other youth in his age group
and would go to extremes to impress them and gain their
acceptance.

8.  Return:  As noted earlier, Ken's natural mother has
shown no interest in Ken and his maternal aunt, Amelia
Reams, has been made his legal guardian.  Ms. Reams and her
boyfriend, Elgin Anders, want Ken to return to their home
upon being released from a facility, and Ken expresses this
desire as well.

9.  Preliminary Impression:  Amelia Reams and Elgin Anders
are willing to provide placement for Ken and it appears that
they are his only means of encouragement and support.  It is
recommended that their home be Ken's primary placement, with
no supportive secondary placement option known to be
available at this time.

10. Rate overall support/stability of family:

     Home of natural mother:  Low

11. Rate the overall desirability of family as a residence
resource:

     Very undesirable

KP:pm

cc:  Facility
     Regional Office
     AYC File

MISSOURI DEPARTMENT OF SOCIAL SERVICES
DIVISION OF YOUTH SERVICES
**JUVENILE MOVEMENT (DYS-FORM 5)**

☐ CORRECTED COPY

| DENT NAME | RACE | DATE OF BIRTH | DYS NUMBER | DATE OF MOVE | REPORTING OFFICE/STAFF |
|---|---|---|---|---|---|
| REAMS, Kenneth L., 5-4190D | NEGRO | 12/21/74 | 5-4190D | 3/06/91 | SERO/JJ |

**SECTION I   COMMITMENT INFORMATION**

COUNTY OF COMMITMENT
BUTLER CO.

☒ COMMITMENT   ☐ RECOMMITMENT ▶     OLD NUMBER

**SECTION II   PRE-PLACEMENT INFORMATION**

**LOCATIONS**

☐ Awaiting Placement _____ Court _____ DYS
☐ Non-Paid Detention
☒ Paid Detention  36th-Butler Co. DIAG. SERVICES
☐ Contractual — Chemical Dependency
☐ Contractual — Inpatient Diagnostic
☐ Contractual — Inpatient Treatment
☐ Contractual — Residential Care
☐ Other Agency _____

**STATUSES**

☒ Classification Interview Held 3/27/91 by J. Dunivan
☐ Location Change Out of _____ Into _____
☐ Furlough Release
☐ Furlough Release Return
☐ Runaway Occurrence
☐ Run Remarks: _____

☐ Runaway Apprehended
☐ Out of Pre-Placement Status/Placed In _____
☐ Release to Aftercare from Contractual

AYC
Kathy Parrent

| | NAME | RELATION |
|---|---|---|
| RELEASED TO | Kathy Parrent | |
| | ADDRESS | COUNTY |

COMMENTS
Negro Male Youth Awaiting DYS Placement @ 36th-Butler Co. DIAGNOSTIC SERVICES Detention Center.

**SECTION III   DYS PROGRAM INFORMATION**

☐ Initial DYS Program Placement
☐ Transfer From — Facility _____
☐ Sheltered In From Aftercare
☐ Program Shelter In
☐ Return Parole Violator (After DYS 2 Completed)
☐ Run Apprehended _____ Under 15 days _____ 15 or More
☐ Furlough Release Return
☐ Location Change Out of _____
_____ Into _____

☐ AFTERCARE RELEASE   ☐ PRIMARY CARE   ☐ FURLOUGH RELEASE

AYC

| | NAME | RELATION |
|---|---|---|
| RELEASED TO | | |
| | ADDRESS | COUNTY |

☐ Transfer To — Facility _____
☐ Returned to Aftercare From Shelter
☐ Aftercare Shelter Moved to Another Facility _____
☐ Program Shelter Returning to Parent Facility
☐ Program Shelter Moved to Another Facility _____
☐ Run Occurrence (please provide details below)

COMMENTS

**SECTION IV   AFTERCARE INFORMATION**

☐ Shelter Out of Aftercare into _____
☐ Abscondence from Placement
☐ Abscondence Returned to Placement

☐ Change of AYC: From _____ To _____
☐ Change of Placement

| | NAME | RELATION |
|---|---|---|
| ADDRESS/PLACEMENT CHANGE | | |
| | ADDRESS | COUNTY |

MENTS

Respondent's Exhibit E

# JUDGMENT AND COMMITMENT ORDER

IN THE CIRCUIT COURT OF __JEFFERSON_____ COUNTY, ARKANSAS

_____ELEVENTH_____ DISTRICT ___WEST_____ _____THIRD___ DIVISION

On ___December 1, 1993_____, the defendant personally appeared before the Court with legal counsel and, having been informed by the Court of the nature of the charge(s), of his constitutional and legal rights, of the effect of a guilty plea upon those rights, and of his right to make a statement before sentencing, the Court made the following findings: (check one applicable)

☒ Defendant voluntarily, intelligently, and knowingly entered a plea of  ☒ guilty or  ☐ Nolo Contendere to the charge(s) herein enumerated and acknowledged factual bases for charge(s);

☐ Defendant is found guilty of said charge(s) by the Court, sitting as trier of fact;

☐ Defendant was found guilty at jury trial.

| CHANGE OF VENUE FROM: | DEFENDANT'S FULL NAME<br>Alford Goodwin | DATE OF BIRTH<br>2/3/74 | RACE<br>B | SEX<br>M | SID NUMBER |
|---|---|---|---|---|---|
| DEFENDANT'S ATTORNEY<br>Othello C. Cross | ☐ PV  ☒ AP<br>☐ PD  ☐ SELF | PROSECUTING ATTORNEY OR DEPUTY<br>Jane Townsend | | AT NUMBER<br>122562 | |

There being no legal cause shown by the defendant, as requested, why judgment should not be pronounced against him, a judgment of conviction is hereby entered against the defendant on each charge enumerated and court costs assessed. The County Sheriff is hereby ordered and directed to transport the defendant to ☒ The Arkansas Department of Correction or ☐ _____ County Jail, where he is sentenced to hard labor for the term specified on each charge:

| STATUTE NO. | OFFENSE | OFFENSE DATE | DOCKET NO | COUNTS | F/M | CLASS | SENTENCE | SUSPENDED |
|---|---|---|---|---|---|---|---|---|
| 5-10-101 | Capital Murder | 5/5/93 | 93-301-3 | 1 | F | Y | Life without Parole | |
| | | | | | | | | |
| | | | | | | | | |

If consecutive, explain:

TIME TO SERVE AT A.D.C.: __Life without parole__

OTHER SENTENCING PROVISIONS
☐ HABITUAL (5-4-501)
☐ FIREARM (5-4-505/16-90-120)
☐ DEADLY WEAPON (16-90-121)
☐ HABITUAL CHILD SEX OFFENDER (12-12-902)
☐ OTHER: _____

PAROLE PROVISIONS — ACT 378 ONLY
Alternative Services (Act 378) (16-93-502). The defendant knowingly and willingly consents to sentence provisions:
☐ 16-93-507(b)(4) — Eligible for parole immediately
☐ 16-93-507(b)(5) — Eligible for parole as normal

EXPLANATORY NOTES:

A TRUE COPY, I CERTIFY
DOROTHY G. PEARSON, Clerk

OTHER:  FINE        $ _____     ☐ DEATH PENALTY
     RESTITUTION  $ _____
     COURT COSTS $ _____     EXECUTION DATE: _____

☐ DEFENDANT INFORMED OF RIGHT TO APPEAL     BOND PROVISIONS: _____
JAIL TIME CREDIT: __201 days__ OR ☐ NONE

| DATE<br>12/3/93 | CIRCUIT JUDGE (Print or Type)<br>FRED D. DAVIS, III | CIRCUIT JUDGE (Signature) |
|---|---|---|
| DATE | I certify this is a true and correct record of this Court with short report of circumstances attached. | CIRCUIT CLERK/DEPUTY        (SEAL) |
| DATE | I acknowledge receipt of judgment. | DEFENDANT (Signature) |

FILED
DEC 3 1993

## SHERIFF'S RETURN

| DATE REL. ON APPEAL BOND | DATE RET. TO CUSTODY | I certify the defendant named within was delivered to:<br>☐ The A.D.C. or<br>☐ _____ County Jail | DATE | SHERIFF/DEPUTY (Signature)<br>DOROTHY G. PEARSON<br>Circuit & Chancery Clerk<br>JEFFERSON COUNTY, ARKANSAS |
|---|---|---|---|---|

White: Court File,   Blue: ADC,   Yellow: Sheriff's Return,   Pink: Defendant,   Golden Rod: Prosecutor

DEFENDANT'S EXHIBIT NO. 4

5639                    1045
                Respondent's Exhibit E

A 4955

WARRANT NUMBER
01V007829

STATE OF MISSOURI
WARRANT FOR ARREST

CASE NUMBER
CR36 0393-000328F

Circuit Court of Butler Co, Associate Div II

HE STATE OF MISSOURI TO ANY PEACE OFFICER IN THE STATE OF MISSOURI:

You are commanded to arrest:       KENNETH REAMS

Identified by :
  SSN   : 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              00000
  DOB   : 12/21/74  Sex:M  Race:U
  Other :     DL:                        UTT Number:
  Descr :                                OCN:



Who is charged with :
  BURGLARY IN THE SECOND DEGREE   RSMo: 569.170     COUNTS: 1
  CLASS C FEL OF STEALING          RSMo: 570.030     COUNTS: 1

Reason :      The Court finds reasonable belief that the defendant will
              not appear in response to a summons as provided by RSMo
              21.03.

and cause him/her  to be brought forth before this court to be dealt with
in accordance with the law, you, the officer serving this warrant, shall
execute in writing a return on this warrant to this court.

Conditions of release:
     PA RECOMMENDED BOND----2,000.00

WITNESS THE HONORABLE JOHN A. CLARK,
Judge of Said Court and the seal thereof, issued in the county and
                    state aforesaid on this day of APR  6,1993.

(Seal of Court)                    _____
                                   Judge of Said Court / Clerk by Order of Judg

                          RETURN
certify that I served the within warrant in the County of _____
kate of Missouri on _____  by arresting the within named
                                   and cause him to be brought before the
burt on _____

FEES    : _____        Arresting Officer _____
MILEAGE : _____
TOTAL   : _____        Title _____

1046
Respondent's Exhibit E

# Certificate of True Copy

[STAT]E OF MISSOURI    } ss.

[Co]unty of Butler

[Sta]te/ _____ Division Circuit Court in and for said County, hereby certify the above and foregoing to be a true

I, _____ BETTY WOODS _____, Clerk

[orig]inal WARRANT ST. VS. KENNETH REAMS, CR-3-93-328-F _____ as the same

[rec]ord in my office.

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed the seal of said Court at office in

Poplar Bluff this the 10th day of DECEMBER, 19____ 93

Betty Woods

Clerk, Associate/ _____ Division Circuit Court

By _____ D.C.

Respondent's Exhibit E

STATE OF MISSOURI      )
                       )SS.
COUNTY OF BUTLER       )

IN THE CIRCUIT COURT OF BUTLER COUNTY, MISSOURI

STATE OF MISSOURI            )
                             )
            Plaintiff,       )      Case No. *QR 3-93-328 F*
   vs.                       )
KENNETH REAMS                )      Division  II
DOB: 12-21-74                )
                             )
            Defendant,       )

CIRCUIT COURT ASSOCIATE
DIVISION II

APR 0 2 1993

FILED

## COMPLAINT

### COUNT I

The Prosecuting Attorney of the County of Butler, State of Missouri, charges that the defendant, either acting alone or knowingly in concert with another, in violation of Section 569. *14020* 170, RSMo., committed the class C felony of burglary in the second degree, punishable upon conviction under Sections 558.011. 1(3) and 560.011, RSMo., in that on or about the 15th day of March, 1993, in the County of Butler, State of Missouri, the defendant knowingly entered unlawfully in a building, located at 1347 Alice St. and possessed by Ruby Bratcher, for the purpose of committing stealing therein.

### COUNT II

The Prosecuting Attorney of the County of Butler, State of Missouri, charges that the defendant, either acting alone or *15010* knowingly in concert with another, in violation of Section 570. 030, RSMo., committed the class C felony of stealing, punishable upon conviction under Sections 558.011.1(3) and 560.011, RSMo., in that on or about the 15th day of March, 1993, in the County of Butler, State of Missouri, the defendant appropriated a diamond

ring, a cordless telephone, an opal necklace, a portable radio,
a watch and a cassette player, of a value of at least one hund-
red and fifty dollars, which said property was possessed by Ruby
Bratcher and defendant appropriated such property without the
consent of Ruby Bratcher and with the purpose to deprive her
thereof.

ERNIE J. RICHARDSON          21502
Prosecuting Attorney
County of Butler, State of Missouri

CIRCUIT COURT ASSOCIATE
DIVISION II
APR 0 2 1993
FILED

**1048**

Respondent's Exhibit E

Ernie J. Richardson, Prosecuting Attorney of the County of Butler, State of Missouri, being duly sworn, upon oath says that the facts stated in the above complaint are true, according to his best information, knowledge and belief.

ERNIE J. RICHARDSON        21502
Prosecuting Attorney
County of Butler
State of Missouri

Sworn and subscribed before me this 2nd day of April , 1993.

Clerk of the Circuit Court of the County of Butler, State of Missouri, Division II

By _Carolyn E Litmer_
Deputy Clerk

RECOMMENDED BOND:

$2,000.00

WITNESSES:
Ruby Bratcher—P.H.
1347 Alice St.
Poplar Bluff, MO.

Officer Dorr—P.H.
PBPD

David Harley—P.H.
602 Pershing St.
Poplar Bluff, MO.

CIRCUIT COURT ASSOCIATE
DIVISION II

APR 0 2 1993

1040

Respondent's Exhibit E

# Certificate of True Copy

STATE OF MISSOURI
County of Butler } ss.
of the Associate/
Division Circuit Court in and for said County, hereby certify the above and foregoing to be a true

I, ...... BETTY WOODS ......................................................................., Clerk

copy of original COMPLAINT--ST. VS. KENNETH REAMS   CR-3-93-328-F

appears of record in my office. ............................................................................................. as the same

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed the seal of said Court at office in

Poplar Bluff this the 10th day of DECEMBER ........., 19 93

*Betty Woods*

Clerk, Associate/          Division Circuit Court

By ................................................................................. D.C.

Respondent's Exhibit E

Form 1195-R                    © 1988 · ELKINS-SWYERS CO., SPRINGFIELD, MO. - T-9111                    CC

# Attestation of Keeper of Record

STATE OF MISSOURI,                    } ss.          **Office of the**   CIRCUIT   **Clerk,**

County of   BUTLER                                   at Poplar Bluff,         Mo.

December 8          , 19 93

I,    Wanda Ellsworth                              , Clerk of the    Circuit    Court
in and for County, and State of Missouri, do hereby certify the foregoing to be a true and accurate copy of

Docket Sheet, Warrant For Arrest, Information and Amended Information -
State of Missouri vs. Kenneth L. Reams - CR392-330FX

STATE'S
EXHIBIT
2

as the same appears of record in my office at    Poplar Bluff,      Missouri, ~~in Book xxxxxxxxpage~~

**In Testimony Whereof,** Witness my hand and seal of office at Poplar Bluff, Missouri, the date above.

(SEAL)                                          _Wanda Ellsworth_
                                                Clerk of the  Circuit       Court.

## CERTIFICATE OF   CIRCUIT   JUDGE

STATE OF MISSOURI,                    } ss.
County of    Butler                          I,          W. Robert Cope          , Judge
of the   Circuit   Court, do certify that   Wanda Ellsworth           , by whom the annexed
Record, Certificate and Attestation were made and given, and who, in h er   own proper handwriting,
has thereunto subscribed h er     name and affixed her     official seal, was at the time of so doing, and
is now, Clerk of the   Circuit       Court, duly commissioned and qualified, and that the said attestation is
in due form and made by the proper officer.

**In Testimony Whereof,** I have hereunto set my hand this   8th     day of   December   , 19 93

                                                _W. Robert Cope_
                                                Judge of the  Circuit    Court.

STATE OF MISSOURI,                    } ss.
County of    Butler                          I,    Wanda Ellsworth              , Clerk
of the    Circuit  Court, do hereby certify that   W. Robert Cope          , by whom the
foregoing Attestation was made, and whose name is thereto subscribed, was at the time of making the same, and
still is, Judge of the   Circuit     Court in and for         Butler          County, Missouri, duly
commissioned and qualified according to law.

**In Testimony Whereof,** I have hereunto set my hand and affixed the seal of said Court, this 8th
y of    December       , 19 93 .

(SEAL)                                          _Wanda Ellsworth_
                                                Clerk of the Circuit    Court.

**CRIMINAL DOCKET SHEET**
(Associate Division)

| COUNTY AND DIVISION NUMBER | CIRCUIT NO. | CASE NUMBER |
|---|---|---|
| BUTLER 11 | 36th | CR-3-92-330- *E1* |

DATE FILED
4-6-92

PROSECUTOR (Optional)

JUDGE NAME AND NUMBER AT FILING
JOHN A. CLARK  27430

STATE OF MISSOURI    vs.

DEFENSE ATTORNEY (Optional)
TODD SCHULTZ  *Rebecca Burke*

KENNETH L. REAMS

TYPE: 1. ___ Private     2. ___ Public Def.     3. ___ ProSe/Waived     9. ___ Other

(Assign a number if more than one defendant) # ___

| CHARGES (Description Optional) | | CHARGE CODES/ | OFFENSE CYCLE NUMBERS (OCN) | BOND INFORMATION: |
|---|---|---|---|---|
| 1. STEALING | | 1. 15010 | *91038798* | Date Posted: _____ |
| 2. | | 2. | | Amount $ _____ |
| 3. | | 3. | | 1. ___ Cash/Property |
| 4. | | 4. | | 2. ___ % Bond |
| 5. | | 5. | | 3. ___ Personal Recog. |

ORIGIN OF CASE

1. X ~~Information~~ Complaint     5. ___ Transferred In (New Location # _____)
4. ___ Change of Venue     7. ___ Remanded for Resentencing     9. ___ Other

WARRANT ISSUED AT FILING
Yes  X  No ___

4. ___ Prof. Surety
9. ___ Other

| DATE | DOCUMENTS FILED/ACTION TAKEN IN CASE |
|---|---|
| *8-31-92* | |
| 4/20/92 | Deft. in person.  APA Ellis in person. Deft. formally arraigned, advised of constitutional  rights including right to counsel.  Deft. requests and is referred to the Public Defender. Public Defender enters appearance. Set for 5/11/92 for ann. -- |

(SEPARATE DOCKET SHEET FROM OTHER FORMS BEFORE WRITING BELOW THIS LINE)

| | |
|---|---|
| 4-28-92 | Entry of App & Request for Disc - CB |
| 5-11-92 | Def. in person with Atty Schultz and Ellis; Continue for arrnt re: conflict 5-28-92 |
| 5-28-92 | Attys Dostr. and Schultz for Burke - for arrnt 6-11-92. |
| 6-11-92 | Def and Attys Burke + Dostr. - set for prelim hearing 7-16-92 1:00 pm |
| 7-16-92 | Def. and Atty Burke in person - continue for prelim hearing 8-17-92 1:00 pm over defs objection. |
| 8-17-92 | APA Ellis; Atty Burke; def., all in person: at States request and over defs objection continue for prelim hearing 8-31-92 1:00 p.m. |
| 8-31-92 | Def. with Atty waives prelim hearing - bound over to Div. I for further proceedings |

MO 116-0077 (8-91)

5647

105

Respondent's Exhibit E

| | |
|---|---|
| 8-31-92 | (cont'd) to appear 9-8-92 9:00 am - bond is to remain. JR |
| 9-1-92 | Information filed |
| 9-8-92 | Amended Information filed |
| 9-8-92 | Request for Discovery filed |
| 9/8/92 | Defendant in person and with his attorney Becky Burke. Ernie Richardson, Prosecuting Attorney, for State files Amended Information. Prosecuting Attorney gives punishment range on amended charge of Class C Felony of Possession of Stolen Property. Defendant waives arraignment on amended charge and also waives preliminary hearing on amended charge. Court gives defendant his rights to trial. Defendant enters plea of guilty as charged on the Amended Information. Statement of attorneys. State gives plea negotiations and recommends SIS and five (5) years supervised probation and will dismiss other pending case with special requirement for probation that defendant stay in school. Court interrogates defendant and finds that plea is freely and voluntarily given and is of factual basis and is therefore accepted by Court. Defendant waives pre-sentence investigation and is placed on five (5) years supervised probation under State Board rules and regulations. CVF judgment of $46.00 is assessed and defendant is to pay Court costs. Special conditions of probation - defendant is to stay in school, curfew of 10 P.M. on weekdays, do 100 hours community service and serve 60 days shock detention at discretion of probation officer. Court's special list of conditions of probation are placed in file. Public defender lien of $150.00 is granted. (WRC/be) |
| 11-4-92 | Court receives ~~[illegible]~~ report from Prob and Parole office - Capias Warrant to issue - Bond set at $10,000.00 - Clerk to notify PA, Def atty and Prob & Parole office - [illegible] |

*COF*

| WARRANT NUMBER | STATE OF MISSOURI | CASE NUMBER |
|---|---|---|
| 010004361 | WARRANT FOR ARREST | CR36 0392-000330F |

===========================================================================
Circuit Court of Butler Co, Associate Div II   *9204590*
===========================================================================

THE STATE OF MISSOURI TO ANY PEACE OFFICER IN THE STATE OF MISSOURI:

You are commanded to arrest:       KENNETH L REAMS
                                619 NORTH 'D' ST.
Identified by :                    POPLAR BLUFF, MO 63901
  SSN  : 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
  DOB  : 12/12/74  Sex:M  Race:B           UTT Number:
  Other :    DL:                           OCN:
  Descr : 5'6 125 LB.

Who is charged with :
  CLASS C FEL OF STEALING       RSMo: 570.030    COUNTS: 1

Reason :    The Court finds reasonable belief that the defendant will
               not appear in response to a summons as provided by RSMo
               21.03.

..d cause him/her  to be brought forth before this court to be dealt with
.n accordance with the law, you, the officer serving this warrant, shall
execute in writing a return on this warrant to this court.

Conditions of release:
    1,000.00 BOND

WITNESS THE HONORABLE JOHN A. CLARK,
Judge of Said Court and the seal thereof, issued in the county and
                    state aforesaid on this day of APR  6,1992.

(Seal of Court)

------------------------------------------------------------------------
                    Judge of Said Court / Clerk by Order of Judge
===========================================================================
                        RETURN
I certify that I served the within warrant in the County of *Butler*
State of Missouri on *04-13-92*      by arresting the within named
*Kenneth L Reams*                    and cause him to be brought before the
court on _____.

    FEES  :  *4.00*
    MILEAGE :              Arresting Officer *c Alphonso L Price*
    TAL  :                Title *Deputy*

**FILED**

*9103 8798*

5649   AUG 3 1 1992     1059
Respondent's Exhibit E
WANDA ELLSWORTH

STATE OF MISSOURI        )
                         )SS.
COUNTY OF BUTLER         )

            IN THE CIRCUIT COURT OF BUTLER COUNTY, MISSOURI

STATE OF MISSOURI,              )
                               )
               Plaintiff,      )    Case No. CR392-330FX
                               )
     vs.                       )    Division I
                               )
KENNETH L. REAMS,              )
                               )
               Defendant.      )

                            INFORMATION

     The Prosecuting Attorney of the County of Butler, State of

Missouri, charges that the defendant, either acting alone or know-

ingly in concert with another, in violation of Section 570.030, RSMo.,

committed the class C felony of stealing, punishable upon conviction

under Sections 558.011.1(3) and 560.011, RSMo, in that on or about

the 21st day of February, 1992, in the County of Butler, State of

Missouri, the defendant appropriated a Motorola pager, of a value

of at least one hundred and fifty dollars, which said property was

possessed by Mildred Lunsford, and defendant appropriated such property

without the consent of Mildred Lunsford and with the purpose to deprive

her thereof.

                                    _____
                                    ERNIE J. RICHARDSON     #21502
                                    Prosecuting Attorney
                                    County of Butler, State of Missouri


                          **FILED**

                       SEP  1 1992

                     WANDA ELLSWORTH
                      CIRCUIT CLERK

              105

        5650      Respondent's Exhibit E

Ernie J. Richardson, Prosecuting Attorney of the County of Butler, State of Missouri, being duly sworn, upon oath says that the facts stated in the above information are true, according to his best information, knowledge and belief.

ERNIE J. RICHARDSON        #21502
Prosecuting Attorney
County of Butler, State of Missouri

Sworn and subscribed before me this _1st_ day of _Sept._ , 19_92_ .

Wanda Ellsworth
Clerk of the Circuit Court-Div. I
County of Butler, State of Missouri

By Betty Ellsworth
Deputy Clerk

RECOMMENDED BOND:


WITNESSES:

Mildred Lunsford, Juvenile office
Jim Daniels, P. B. High  School
James Boyd, 323 Lester St., P.B.

```
STATE OF MISSOURI      )
                       )SS.
COUNTY OF BUTLER       )
```

IN THE CIRCUIT COURT OF BUTLER COUNTY, MISSOURI

```
STATE OF MISSOURI,            )
                              )
              Plaintiff,      )    Case No. CR392-330FX
                              )
     vs.                      )    Division I
                              )
KENNETH L. REAMS,             )
                              )
              Defendant.      )
```

AMENDED INFORMATION

The Prosecuting Attorney of the County of Butler, State of Missouri, charges that the defendant, either acting alone or knowingly in concert with another, in violation of Section 570.080, RSMo., committed the class C felony of receiving stolen property, punishable upon conviction under Sections 558.011.1(3) and 560.011, RSMo, in that on or about the 21st day of February, 1992, in the County of Butler, State of Missouri, the defendant, with the purpose to deprive the owner of a Motorola pager, received such property, of a value of at least one hundred and fifty dollars, knowing or believing that it had been stolen.

ERNIE J. RICHARDSON    21502
Prosecuting Attorney
County of Butler, State of Missouri

Ernie J. Richardson, Prosecuting Attorney of the County of Butler, State of Missouri, being duly sworn, upon oath says that the facts stated in the above information are true, according to his best information, knowledge and belief.

ERNIE J. RICHARDSON      #21502
Prosecuting Attorney
County of Butler, State of Missouri

Sworn and subscribed before me this _8th_ day of _Sept_____, 19_92___.

_Wanda Ellsworth_____
Clerk of the Circuit Court of Butler County, Missouri, Division I

By _Betty Ellsworth_____
Deputy Clerk

RECOMMENDED BOND:

WITNESSES:

Mildred Lunsford, Juvenile Office
Jim Daniels, P. B. High School
James Boyd, 323 Lester St., P.B.

Respondent's Exhibit E

<u>CERTIFICATE OF REPORTER</u>

STATE OF ARKANSAS

COUNTY OF JEFFERSON

I, Nevelyn K. Shollmier, Arkansas Supreme Court-Certified Court Reporter for the Eleventh Judicial District, Circuit-Chancery Court, Third Division, West, of which Jefferson County is a part, do hereby certify that the attached and foregoing pages of typewritten matter constitute a true, correct and complete transcription of jury trial held December 13, 1993, reported by me at the time, of the captioned cause, and the exhibits thereto, in the aforesaid Court.

WITNESS my hand and seal as such Arkansas Supreme Court-Certified Court Reporter this 24 day of May, 1994.

Nevelyn K. Shollmier, LS #244
Official Court Reporter of the
Eleventh Judicial District,
Third Division, West

My commission expires:
March 25, 2003

1057

5654   Respondent's Exhibit E

STATEMENT OF COSTS

TOTAL PAID TO COURT REPORTER                    $2,538.60

TOTAL PAID TO CLERK                                  0

TOTAL COSTS PAID                                $2,538.60

CERTIFICATE OF CLERK

STATE OF ARKANSAS

COUNTY OF JEFFERSON

I, Dorothy G. Pearson, Clerk of the Circuit Court in and for the County and State aforesaid, do hereby certify that the above amounts are the costs of the foregoing transcript.

DOROTHY G. PEARSON, CIRCUIT CLERK

BY:   _Brenda Hardin D.C._

1058

5655      Respondent's Exhibit E

<u>CERTIFICATE OF CLERK</u>

STATE OF ARKANSAS

COUNTY OF JEFFERSON

    DOROTHY G. PEARSON, Clerk of the Circuit Court in and for the County and State aforesaid, do hereby certify that the foregoing _1058_ pages of typewriting contain a true and complete transcript of the record and proceedings in the Jefferson County Circuit Court in the cause hereinabove stated.

    IN WITNESS WHEREOF, I have hereunto subscribed my name and affixed the seal of this Court, this _24_ day of May, 1994.

DOROTHY G. PEARSON, CIRCUIT CLERK

BY: _Brenda Hardin, D.C._

*1059*

Respondent's Exhibit E