**PROPERTY OF ARKANSAS SUPREME COURT/COURT OF APPEALS**

# SUPREME COURT CR-17-654

**APPELLANT(S)**

KENNETH REAMS

V. JEFFERSON COUNTY CIRCUIT COURT

JOHN W COLE

35CR-1993-301

STATE OF ARKANSAS

**APPELLEE(S)**

26   VOLUME RECORD LODGED

### *COUNSEL*

ATTORNEY GENERAL  APPELLEE COUNSEL
323 CENTER STREET, SUITE 200
LITTLE ROCK AR 72201

CORINNE IRISH  APPELLANT COUNSEL
30 ROCKEFELLER PLAZA
NEW YORK NY 10112

DAVID ROBERT RAUPP  APPELLEE COUNSEL
323 CENTER STREET, SUITE 200
LITTLE ROCK AR 72201

GEORGE KENDALL  APPELLANT COUNSEL
30 ROCKEFELLER PLAZA
NEW YORK NY 10112

JIN HEE LEE  APPELLANT COUNSEL
40 RECTOR STREET, 5TH FLOOR
NEW YORK NY 10006

JOHN WINFRED WALKER  APPELLANT COUNSEL
1723 BROADWAY
LITTLE ROCK AR 72206

RECORD FILED AUGUST 4, 2017
**STACEY PECTOL, CLERK**
BY RENEE R. HERNDON, DEPUTY CLERK

VOLUME 21
Respondent's Exhibit E

Volume 21



EXHIBIT
2 A
Respondent's
PENGAD 800-631-6989

ORIGINAL

# KENNETH REAMS

# VOLUME 1

**(Kizer's Files)**

Respondent's Exhibit E

# ARKANSAS STATE CRIME LABORATORY



SEP 10 1993



## MEDICAL EXAMINER DIVISION

Case No.: ME-327-93          Date of Examination: May 10, 1993

Name: TURNER, Gary Wayne

Age: 38 years     Race: White     Sex: Male

Place of Death: Jefferson Regional Med. Ctr.  County: Jefferson

### CONCLUSIONS

CAUSE OF DEATH: Gunshot wound of head.

MANNER OF DEATH: Homicide.

### LABORATORY RESULTS

TOXICOLOGY:

    %Carboxyhemoglobin-<5
    Blood ethanol-negative
    Drug screen:Blood-acidic/neutral/basic-no drugs detected.
    ADx screen:negative

SEROLOGY:

    Blood Type: A

Frank J. Peretti, M.D.
Associate Medical Examiner

William Q. Sturner, M.D. *
Chief Medical Examiner

* Pathologist of Record

09-03-93/laj

8 Page Report/Page 1

#3 Natural Resources Drive, P.O. Box 5274, Little Rock, Arkansas 72215
(501) 227-5747 • FAX: (501) 227-0713

Respondent's Exhibit E

NAME:  TURNER, Gary Wayne          DATE:  5-10-93      NO.:  ME-327-93

## EXTERNAL DESCRIPTION:

The body was that of a well developed, slender, adult white male, clad in no clothes with none accompanying the body. The body weighed 139 pounds, was 71 inches in height and appeared consistent with the reported age of 38 years. The body was cold to the touch. Rigor mortis was present and complete in all extremities. Lividity was red-purple and fixed on the posterior surface of the body except in areas exposed to pressure. The scalp hair was medium dark brown, long, straight and full. The irides were brown. The pupils were 7 mm. in diameter. The conjunctivae and sclerae showed pallor. The external nares and oral cavity revealed a moderate amount of blood. The teeth were natural and in good condition. The external auditory canals were dry. Examination of the neck revealed no evidence of injury. The chest was unremarkable. No evidence of injury of the ribs or the sternum was evident externally. Breasts were those of a normal adult male. The abdomen was flat and scaphoid. There were bilateral areas of green discoloration on the lower flanks of the abdomen. The external genitalia were of a normal adult male. The legs showed symmetrical configuration. The plantar surfaces were mildly callus. The upper extremities showed normal configuration. No tattoos, needle tracts or wrist scars were noted. The spine was intact. The anus was clean.

## EVIDENCE OF MEDICAL ATTENTION:

A nasogastric tube was present in the right nostril. Endotracheal tube was present in the right side of the mouth. IV injection site present in ventral right forearm. Foley catheter containing bag with 2,500 ml. of urine present in urethra. IV site on right lateral lower neck region. A band-aid covers IV sites in the right inguinal area.

## EVIDENCE OF OLD INJURY:

Two old scars present on the right cheek and one scar present in the mid chin.

8 Page Report/Page 2

02

NAME:  TURNER, Gary Wayne          DATE:  5-10-93      NO.:  ME-327-93

## EVIDENCE OF RECENT INJURY:

Four ecchymoses present on medial upper right forearm and right lateral shoulder and chest area. Small linear abrasion on dorsal area of knuckle, proximal fourth finger, left hand. Scrotal excoriation on left scrotum. Ecchymosis with mild to moderate swelling, left upper eyelid.

There is a gunshot wound of entry present in the left temple, 2 3/4 inches below the top of the head, 2 1/4 inches superior to the left external auditory meatus and 2 inches anterior to this landmark. A blood stained gauze dressing covers the left temple as the body is received and is removed prior to examination of the wound. The wound shows red stippling for a dimension of 2 inches vertical and 1 3/4 inches horizontal. The punctate lesions approximate 1/16 inch in diameter. Total dimension 1/4 inch by 1/4 inch. Perforation site 1/16 inch by 1/16 inch. No fouling identified.

There is a palpable bullet with minimal ecchymosis and slight tearing-type superficial lacerations in the right temple. It is 3 inches below the top of the head, 3 1/2 inches superior to the external auditory meatus and 1/2 inch anterior to this landmark. The bullet is incised and is subdermal in location. It is minimally deformed and of moderate size. It is photographed, placed in a labelled envelope and submitted for evidence. The path of the wound is, therefore, from left to right, and has little upwards or downwards or right to left deviation.

## INTERNAL EXAMINATION

The subcutaneous fat layer measured up to 1/4 inches. No adhesions or abnormal collections of fluid were present in the body cavities. Petechiae were not present on the thoracic organs. All body organs were present in normal anatomic position. The thymus was not identified. There was no internal evidence of blunt force or penetrating injury to the thoraco-abdominal region.

## HEIGHTS OF ORGANS:  (in grams)

| | | | |
|---|---|---|---|
| Brain – | 1,335 | Spleen – | 100 |
| Heart – | 340 | Pancreas – | 70 |
| Left lung – | 710 | Left kidney – | 150 |
| Right lung – | 750 | Right kidney – | 120 |
| Thymus – | not identified | Left adrenal – | not weighed |
| Liver – | 1,490 | Right adrenal – | not weighed |

8 Page Report/Page 3

03

   Respondent's Exhibit E

NAME: TURNER, Gary Wayne     DATE:  5-10-93     NO.:  ME-327-93

CARDIOVASCULAR SYSTEM:

The pericardial surfaces were smooth, glistening and unremarkable. The pericardial sac contained O ml. of fluid and there were no adhesions. The heart was normal in size, shape and configuration. The coronary arteries arose normally, followed the usual distribution and were widely patent, without evidence of significant atherosclerosis or thrombosis. The chambers and valves exhibited the usual size-position relationship and were unremarkable. The myocardium was dark red-brown, firm and unremarkable. The atrial and ventricular septa were intact. The aorta and its major branches arose normally, followed the usual course and were widely patent, free of significant atherosclerosis and other abnormality. The vena cava and its major tributaries returned to the heart in the usual distribution and were free of thrombi.

RESPIRATORY SYSTEM:

The pleural surfaces were smooth and glistening. The pulmonary arteries were normally developed, patent and without thrombus or embolus. The upper and lower airways were clear of debris and foreign material. The mucosal surfaces were smooth, of normal coloration and unremarkable. Hilar lymph nodes were not enlarged. The pulmonary parenchyma was somewhat engorged and edematous especially in the lower lobes. No focal lesions were noted.

NECK:

Examination of the soft tissues of the neck, including strap muscles, thyroid gland and large vessels, revealed no abnormalities or hemorrhage. The structures were moderately pale. The hyoid bone and larynx were intact. Salivary glands were identified. The epiglottis and vocal cords were smooth, glistening and free of disease.

ALIMENTARY TRACT:

The tongue showed recent bite marks in the anterior right tip. The esophagus was lined by gray-white, smooth mucosa. The gastric mucosa was gray-white and the lumen contained 15 cc. of green-brown fluid. The small and large bowel were unremarkable. The rectum was patent. No hemorrhoids were present. The appendix was present and atrophic in nature.

8 Page Report/Page 4

04

NAME:  TURNER, Gary Wayne         DATE:  5-10-93      NO.:  ME-327-93

## LIVER AND BILIARY SYSTEM:

The hepatic capsule was smooth, glistening and intact, covering brown-maroon parenchyma with no focal lesions noted. The edges were sharp. The gallbladder contained 15 cc. of green, mucoid bile. The mucosa was velvety and unremarkable. The extrahepatic biliary tree was patent, without evidence of calculi. Portal lymph nodes were not enlarged.

## PANCREAS:

The pancreas had a gray-tan lobulated appearance with patent ducts. Peripancreatic lymph nodes were not enlarged.

## GENITOURINARY SYSTEM:

The renal capsules were smooth and thin, semi-transparent and stripped with ease from the underlying smooth, red-brown cortical surface. The cortex was gray-tan-pink and sharply delineated from the medullary pyramids, which were red-purple. The calyces, pelves and ureters were unremarkable. The urinary bladder contained no urine. The mucosa was gray-tan and smooth. Prostate and testes were normal on sectioning.

## RETICULOENDOTHELIAL SYSTEM:

The spleen had a smooth, intact capsule covering tan-red, somewhat softened parenchyma. The white pulp was hyperdistinct. No accessory spleen identified. The thymus remnant was composed of fat.

## ENDOCRINE SYSTEM:

The pituitary, thyroid and adrenal glands were free of obvious disease. The thyroid was pale tan in color and the adrenal glands showed a moderate amount of periadrenal fat.

## MUSCULOSKELETAL SYSTEM:

Muscles were red and soft and slightly pale but otherwise showed normal development. No bone or joint abnormalities were noted. The cervical, thoracic, and lumbar spine showed no obvious old fractures or other abnormalities.

8 Page Report/Page 5

05

   Respondent's Exhibit E

NAME:  TURNER, Gary Wayne         DATE:  5-10-93      NO.:  ME-327-93

CENTRAL NERVOUS SYSTEM:

    The scalp showed extensive subgaleal hemorrhage on the right side and
minimal on the left side in the parietal frontal regions.  The calvarium
and base of the skull were normal with fractures noted in the left
frontal region at the sphenoid wing emanating from the entry site.  A
single fracture at the posterior right orbital plate and fractures
emanating from the exit site in the right middle fossa.  The dura mater
and falx cerebri were intact.  Epidural, subdural hemorrhage, and
subarachnoid hemorrhage were all present to a moderate degree.  The
leptomeninges were otherwise thin and delicate.  The cerebral hemispheres
were symmetric.  The cranial nerves were intact.  The circle of Willis
and related blood vessels were normal in caliber and distribution.
Sections through the cerebral hemispheres revealed hemorrhagic necrosis
in the upper cerebral hemispheres, the left somewhat more superior than
the right.  There was extensive pontine hemorrhage with softening and
blood clot filling the majority of the pons in an irregular fashion.  The
cerebellum, however, revealed no focal lesions or herniations.  There was
intermeningeal hemorrhage noted on sectioning.  The spinal cord was not
examined.

    Further examination of the base of the skull revealed an entry site
in the left sphenoid wing measuring 1/2 inch x 1/4 inch with mild
symmetrical bevelling noted in the inner table.  The exit site in the
right middle fossa revealed an absence of bevelling and a greatest
dimension of 1/2 inch and a least dimension of 3/8 of an inch.  The wound
tract of the brain passes left to right in the cerebral hemispheres.

TOXICOLOGY:

    Antemortem and postmortem blood, bile, urine, stomach contents,
vitreous saved for toxicologic studies.

8 Page Report/Page 6

06

NAME:  TURNER, Gary Wayne          DATE:  5-10-93     NO.:  ME-327-93

## FINDINGS:

1.  Gunshot wound of left temple penetrating left sphenoid wing, superior left cerebral hemisphere, mid right cerebral hemisphere, exiting right middle fossa; missile recovered in subdural region of right scalp.
    a.  Moderate symmetrical stippling of entry wound.
    b.  Marked intermeningeal and intraventricular hemorrhage.
    c.  Marked pontine hemorrhage.
    d.  Ecchymosis of left upper eyelid, diffuse, with moderate swelling.
    e.  Basilar skull fractures of right sphenoid, right frontal and left mid fossa regions.
2.  Evidence of medical attention.
    a.  Nasogastric tube in right nostril.
    b.  Endotracheal tube in right side of mouth.
    c.  IV sites of right lateral neck, right forearm and right femoral triangle region.
    d.  ID tags on arms.
    e.  2,200 ml. of urine present in bag attached to Foley catheter.
3.  Green discoloration of abdomen, autolytic, bilateral.
4.  Watch band pallor of right wrist.
5.  Moderate ephelides formation of face, trunk and extremities.
6.  Linear abrasion of fourth finger, left hand, dorsal aspect, superficial.
7.  Ecchymoses of right upper medial arm and right lower shoulder and lateral chest area, four.
8.  Contracted and empty urinary bladder.
9.  15 cc. of green-brown fluid in stomach.
10. Moderate pallor of internal viscera.
11. Moderate periadrenal fat, bilateral.
12. Mild to moderate atherosclerosis of lower aorta including the iliac artery origins.
13. Bite marks of tongue, right frontal, recent to fresh.
14. Old scars of right cheek and chin.

TOXICOLOGY:

    %Carboxyhemoglobin-<5
    Blood ethanol-negative
    Drug screen:Blood-acidic/neutral/basic-no drugs detected.
    ADx screen:negative

SEROLOGY:

    Blood Type:  A

8 Page Report/Page 7

5664 Respondent's Exhibit E

NAME:   TURNER, Gary Wayne          DATE:   5-10-93       NO.:  ME-327-93

---

OPINION:

   It is my opinion that Gary Wayne Turner, a 38 year old white male,
died from a gunshot wound to the head.  The victim was found sitting in
his pick-up truck, a blue Jeep, in front of an automated teller machine.
he had a single gunshot wound to the left temple according to hospital
records.  A witness told police that he heard what he thought was a
gunshot wound in the area of the teller machine.  He then saw two young
males fleeing the area.  The police believe this incident was an armed
robbery although apparently no money was taken.

   Autopsy findings revealed a gunshot wound of the left temple with
passage through the brain and exiting the right skull to be found in the
right subgaleal region of the right temple.  Evidence of close range
firing is noted by symmetrical stippling of the entry wound.  Hemorrhagic
necrosis of the brain, intraventricular hemorrhage and pontine hemorrhage
are identified at this examination.  Evidence of terminal medical
attention is noted.  No other significant natural disease processes or
significant patterns of injury are identified.  He had not consumed
alcoholic beverages prior to his demise.  Other toxicologic studies
revealed no drug substances in the body fluids.


MANNER OF DEATH:   Homicide.

Frank J. Peretti, M.D.                    William Q. Sturner, M.D.*
Assoc. Medical Examiner                   Chief Medical Examiner

* Pathologist of Record


8 Page Report/Page 8

08

LATENT PRINT IDENTIFICATION

*Did they check other prints from car? Steering wheel?*

ORIGINATING CASE NO.:  93/205

VICTIM:  Gary Wayne Turner

SUSPECT:  N/A, Idents pertain to the victim.

CRIME:  Capital Murder

LATENT(S) RECOVERED:  From victim's vehicle

PROCESSED BY:  Hubanks/Bacon                    DATE:  051093

KNOWN ROLLED IMPRESSIONS:  Post-mortem known, rolled impressions

belonging to Gary Wayne Turner


EXAMINER'S REPORT:  Known impressions belonging to Gary Wayne Turner
were received from the Arkansas State Crime Lab. Fingerprint Specialist
Ruby Ross took these impressions at my request. These known impressions
were compared with evidence latent prints taken from the victim's
vehicle. Latent prints recovered from the vertical strip between the
drivers door window and the wing window were positively identified as
belonging to the victim; specifically, the #9 and #10 fingers. These
latent prints have been eliminated from further comparison with suspect
impressions.

_____
JEFF HUBANKS
Detective Sergeant

_____
JAMES BACON
Detective Sergeant


_____
Charles Hendrix
Detective


09

# STATE CRIME LABORATORY

P.O. BOX 5274
Number 3 Natural Resources Drive
Little Rock, Arkansas 72215

Laboratory Services
227-5747

*REPORT OF LABORATORY ANALYSIS*

Medical Examiner
227-5936

Investigating Officer/Agency/Address

| | |
|---|---|
| Charles Hendrix<br>Pine Bluff Police Department<br>200 East 8th Street<br>Pine Bluff, AR 71601 | Laboratory Case Number: **93-05709**     Page 1 of 1<br>Date Received in Lab: **05/11/93**<br>How Evidence Received: **H C Cook**<br>Agency Case Number: **93/205** |

Suspect(s):
Kenneth Reams

Victim(s):
Gary Turner

Date of Report:  09/28/93

OFFENSE:  Homicide

EVIDENCE SPECIMENS:       FL-445-93:

E-1: (1)  .32 S & W Caliber, H & R, Inc., Model 732, 6-Shot, 2 1/2 Inch Barrel,
              Blue Revolver with serial number defaced, listed as E-18.
E-2: (1)  Mutilated Lead Bullet, labelled in part, "Head, Turner".

RESULTS OF EXAMINATION:

     The E-2 (1) bullet was microscopically compared with test bullets fired through the
barrel of the E-1 listed revolver with POSITIVE RESULTS. The E-2 bullet was fired through
the barrel of the E-1 listed revolver.

     Using the Acid-Etch Method a portion of the serial number was restored on the E-1 listed
revolver to 1 7 1 2 7 6. The number of characters in the serial number is undetermined.


*Berwin L. Monroe*
Berwin L. Monroe, Chief
Firearms/Toolmarks Examiner
BLM/af

I, Jim Clark, Executive Director of the Arkansas State Crime Laboratory, do hereby attest, as
required by Arkansas Code 12-12-313, that the information found in this report reflects a
true and accurate analysis of the aforementioned items, performed by the analyst listed above.


                                   Jim Clark, Executive Director

State of Arkansas
County of Pulaski
Subscribed and sworn to before me, the undersigned Notary Public on this 29 day
of *September*, 1993.
*Kim Shee*
My Commission Expires 7-30-2003

10

Respondent's Exhibit E



# WITNESS STATEMENT

NAME Taquante Nelson                    DOB 11/11/77

ADDRESS 3015 Mississippi           PHONE 534-3890

PLACE OF EMPLOYMENT_____   PHONE___--____

This statement is being written by Det.
Ivan Phillips as I tell it to him, Taquante Nelson
on 5-5-93 at about 2045 hours James
Nelson and I were driving west bound on 5th st
from Main street. Just after crossing Main st.
we heard what sounded like a gun shot.
we then saw two black males running North
across 5th Ave. from the Bank Card Machine
with at 5th and Chestnut. The two black males
ran into an alley way and we lost sight of them.
we went to the Bank Card Machine and
saw a blue Jeep truck with a white man in
it. The white man looked as if he had been
shot in the head. We then went to the
Econo Lodge and called the Police.
    One of the black males was 5'11" tall and
was wearing a Grey Sweat top with a hood.
The other one was shorter and had on a Grey white
T-shirt and black blue Jean shorts. (Taquante Nelson)

Compiled By _Ivan S. Phillips_   File No. 93-205 Date 05/05/93

Page one of 01

12

# S T A T E   C R I M E   L A B O R A T O R Y

P.O. BOX 5274
Number 3 Natural Resources Drive
Little Rock, Arkansas 72215

Laboratory Services
227-5747

*REPORT OF LABORATORY ANALYSIS*

Medical Examiner
227-5936

Investigating Officer/Agency/Address

| | |
|---|---|
| | Laboratory Case Number: 93-05709   Page 1 of |
| Lt. James Bacon | Date Received in Lab: 11/24/93 |
| Pine Bluff Police Department | |
| 200 East 8th Street | How Evidence Received: H C Castleberry |
| Pine Bluff, AR  71601 | |
| | Agency Case Number: 93-205 |

Suspect(s):
Kenneth Reams

Victim(s):
Gary Turner

Date of Report:      12/07/93

## EVIDENCE SPECIMENS:                    FL-551-93

## RE-EXAMINATION OF PREVIOUSLY SUBMITTED ITEMS:

E-1:    (1)   .32 S & W Caliber, H & R, Inc., Model 732, 6-shot, blue Revolver, serial number defaced, listed as E-18.

2:    (1)   Mutilated Lead Bullet, reported to be from head of victim, Gary Wayne Turner.

## RESULTS OF EXAMINATION:

The E-2 (1) bullet was microscopically compared to test bullets fired through the barrel of the submitted E-1 revolver with POSITIVE RESULTS.  This bullet was fired from the E-1 revolver.

The serial number located on the butt portion of the frame is defaced.  A partial serial number, which appears to be the last four (4) digits of the serial number, is visible and is as follows:

1 2 7 6

*[signature: Ronald J. Andrejack]*

Ronald J. Andrejack, Firearms/Toolmarks Examiner
RJA:re

State of Arkansas
County of Pulaski
Subscribed and sworn to before me, the undersigned Notary Public on this _____ day of _____, 1993.

My Commission Expires _____

13

Respondent's Exhibit E

# STATE CRIME LABORATORY
P. O. BOX 5274
Number 3 Natural Resources Drive
Little Rock, Arkansas 72215

## EVIDENCE SUBMISSION FORM

(FE)   1-25-4    1-2-(

| Investigating Officer/Agency/Address | FOR LABORATORY USE ONLY |
|---|---|
| Charles Hendrix 3019<br>Pine Bluff Police Department<br>200 E. 8th, Pine Bluff, Ar. 71601 | Laboratory Case No.: 93-05709 |
| | Date Rec'd in Lab.: |
| | How Evidence Rec'd: KC |
| | Agency Case No.: 93/205 |
| | Type of Offense: Capitol Murder |

| Suspect(s) | Victim(s) |
|---|---|
| Kenneth Reams | Gary Wayne Turner |

Has any evidence been previously submitted to the laboratory on this case? Yes xx  No ___

Location (City, County): Pine Bluff, Jefferson

Date of Offense: 5-5-93

| Item No. | List and describe evidence submitted: (Use back side if necessary) | Circle as needed |
|---|---|---|
| E-3 | One brown paper sack containing a white t-shirt, which have what appear to be bloodstains on it. SC/TR | Documents<br>Drug Analysis<br>( Firearms/Toolm )<br>Latent Prints<br>Medical Examiner<br>Photography<br>( Serology )<br>Toxicology<br>( Trace Evidence ) |
| E-18 | One brown paper sack containing one H & R Blue Steel revolver, Model # 732, with black plastic grips. FA | |

Type of Analysis Requested: Compare stains on E-3 to see if they match with the victim.  Also check E-3 for any trace evidence that belong to victims. Compare E-18 to the known bullet that was taken from victim's head in the Medical Examiners Office.

Summary of Crime:

14

I certify that I have submitted the evidence listed above.

Date: 1025HRS  Name: I.T. MACK Carr

5-11-02

Signature: ___

# STATE CRIME LABORATORY

P.O. BOX 5274
Number 3 Natural Resources Drive
Little Rock, Arkansas 72215

.oratory Services
227-5747

*REPORT OF LABORATORY ANALYSIS*

Medical Examiner
227-5936

Investigating Officer/Agency/Address

| | |
|---|---|
| | Laboratory Case Number:  93-05709   Page 1 of 1 |
| Lt. Addison/ Sgt. Bacon | Date Received in Lab:  05/10/93 |
| Pine Bluff Police Department | How Evidence Received:  M E / Matthew Elliott |
| 200 East 8th Street | |
| Pine Bluff, AR  71601 | Agency Case Number: |

Suspect(s):
Kenneth Reams

Victim(s):
Gary Turner

Date of Report:    06/03/93

## EVIDENCE SUBMITTED BY MEDICAL EXAMINER'S OFFICE:

K1  Blood sample from Gary Wayne Turner (ME 327-93)

## EVIDENCE SUBMITTED BY PINE BLUFF POLICE DEPARTMENT:

    T-shirt (E-3)
    Revolver (E-18)

## RESULTS OF EXAMINATION:

| ITEM | A&Q TYPE | ESD | ENZYMES PGM | GLO |
|---|---|---|---|---|
| K1  G. Turner | 'A' | 1 | 1 | 2 |
| Q1  T-shirt (1B) | 'A' | 2-1 | 2-1 | Inc |
| T-shirt (2B) | *Inc | 2-1 | 2-1 | Inc |
| T-shirt (3B) | 'A' | Inc | 2-1 | Inc |

    *Inc - Inconclusive

No blood was found on Q2.

*Kermit B. Channell II*
Kermit B. Channell, Jr. II
Serologist

KBC/jl

15

Brain 1335   *hemorr* *lat int* *out (R) temp*   Panniculus 4 4

Vessels ok

Skull ok

Cord ө   A+NB: *Severe pontine hemorrhage*

Ears ©

Heart 340   Aorta *+2 ath iliac*

Pericardial sac ө

LV ) OK   *No ath*

RV )

Muscle *OK pale*

Skeleton *No bis*

GI OK

Lung (left) 710

Left Pleural ө

Lung (right) 750

Right Pleural ө

Liver 1490

Bile 15 cc . green, *thick*

Spleen 100

Accessory ө

Pancreas 70

Nodes ө

Kidney (left) 150

Kidney (right) 120

Thymus ө

Fat +1

Adrenals: Left ) OK
         Right )

Cortex +2 Fat

4d

Appendix +

Gastric 15 cc green *mult lin ulcerat*

Prostate OK   Uterus

Fall. tubes

Ovaries

Cervix

Testes OK   Vagina

Urinary Bladder *empty No hem*

Larynx *No hyper*

Cords

Thyroid *pale tan*

Mouth OK

Tongue *bites +2*

Name  Ø Gary Turner

Date _____   Case No. 322-93

16.





Name _____ Gary Turner _____

Date _____   Case No. _327-93_

18



# S T A T E   C R I M E   L A B O R A T O R Y

P.O. BOX 5274
Number 3 Natural Resources Drive
Little Rock, Arkansas 72215

| Laboratory Services<br>227-5747 | *REPORT OF LABORATORY ANALYSIS* | Medical Examiner<br>227-5936 |
|---|---|---|

Investigating Officer/Agency/Address

Lt. James Bacon
Pine Bluff Police Department
200 East 8th Street
Pine Bluff, AR  71601

| | |
|---|---|
| Laboratory Case Number: | 93-05709 |
| Date Received in Lab: | 11/24/93 |
| How Evidence Received: | H C Castleberry |
| Agency Case Number: | 93-205 |

Page 1 of 1

Suspect(s):
Kenneth Reams

Victim(s):
Gary Turner

Date of Report:      12/07/93

---

EVIDENCE SPECIMENS:                    FL-551-93

RE-EXAMINATION OF PREVIOUSLY SUBMITTED ITEMS:

E-1:    (1)   .32 S & W Caliber, H & R, Inc., Model 732, 6-shot, blue Revolver, serial number defaced, listed as E-18.
E-2:    (1)   Mutilated Lead Bullet, reported to be from head of victim, Gary Wayne Turner.

RESULTS OF EXAMINATION:

The E-2 (1) bullet was microscopically compared to test bullets fired through the barrel of the submitted E-1 revolver with POSITIVE RESULTS. This bullet was fired from the E-1 revolver.

The serial number located on the butt portion of the frame is defaced. A partial serial number, which appears to be the last four (4) digits of the serial number, is visible and is as follows:

1 2 7 6

*Ronald J. Andrejack*

Ronald J. Andrejack, Firearms/Toolmarks Examiner
RJA:re

State of Arkansas
County of Pulaski
Subscribed and sworn to before me, the undersigned Notary Public on this _____ day of _____, 1993.

_____
My Commission Expires

20

# $ 5,000 REWARD

# FOR MURDER SUSPECTS

Worthen Bank has offer a $ 5000 reward for Information leading to the arrest and conviction of the suspects involved in the murder of Gary Turner.

Mr. Turner was shot and killed on May 5, 1993 at 8:30 pm while apparently making a transaction at the Worthen Bank Money Machine at 5th and Chestnut.

Anyone with information should contact the Pine Bluff Police Department Detective Division. All information will be kept confidential.

## Call 543-5111 or 543-5143.

21

Respondent's Exhibit E

May 7, 1993

Teachers:

   The Pine Bluff Police Department has requested your assistance in providing any information you may hear from students concerning the recent homicide at the ATM machine near Worthen Bank.

   The reward is $5,000 and is expected to increase.  We will be displaying reward posters in the school.

22

Case 4:22-cv-00825-KGB Document 13-26 Filed 11/02/22 Page 26 of 277

## PINE BLUFF POLICE FIELD CONTACT CARD

NAME *Kelo White*    NICKNAME *Kelo*

ADDRESS *203 W 27th Pine Bluff AR*    PHONE *535-6160*

AGE *16* | RACE *B* | SEX *M* | HEIGHT *6'0* | WEIGHT *170* | BUILD *Slender* | COMPLEXION *DARK*

DOB *4/12/76* | POB *Pine Bluff* | HAIR | EYES | MARKS OR SCARS

SOCIAL SECURITY NO. | DRIVERS LICENSE NO. | STATE | TYPE

DRESS *Blue Shorts / White T Shirt / BLK Ten-Sho*

MAKE OF CAR | YEAR | TYPE | COLOR | LICENSE NO. | STATE

OCCUPATION AND EMPLOYER OR SCHOOL

*Jack Robey 9th Grade*

## PINE BLUFF POLICE FIELD CONTACT CARD

NAME *Kendrick Baldwin*    NICKNAME *FCO*

ADDRESS *1304 E 5 w*    PHONE *6-5017*

AGE *16* | RACE *B* | SEX *M* | HEIGHT | WEIGHT *210* | BUILD *HVVI* | COMPLEXION *MED*

DOB *9/1/76* | POB *P-50 II* | HAIR *BLK* | EYES *BRN* | MARKS OR SCARS

SOCIAL SECURITY NO. | DRIVERS LICENSE NO. | STATE | TYPE

DRESS *Blu T Shirt / Caghy Pants / White Shoes*

MAKE OF CAR | YEAR | TYPE | COLOR | LICENSE NO. | STATE

OCCUPATION AND EMPLOYER OR SCHOOL

*Pine Blu! High School (10th)*

23

# NAMES FOR COMPARISON

1. MICHAEL RAGLON         # 12192          N/A  J.H.  05.07.93
2. PAUL JONES             ~~13305~~ 13365   N/A  J.H.  05.07.9.
3. PAUL FELLS             0277         N.I.F.
4. KENNETH SCARVER        12841            N/A  J.H.  05.07.93
5. RODRICK BELL           11716            N/A  J.H.  05.07.93
6. MARQUIS WILLIAMS       1275             N/A  J.H.  05.07.9.
7. EDDIE SCOTT            1287             N/A  J.H.  05.07.93
8. PAUL HARRIS            1011             N/A  J.H.  05.07.93
9. LAMONT JOHNSON         1277             N/A  J.H.  05.07.93
10. TONY BROWN            NO #
11. EDDIE LINDO           1288             N/A  J.H.  05.07.93
12. EDWARD JOHNSON        NO #
13. VINCENT LUSK          1285             N/A  J.H.  05.07.9.
14. ANTONIO SHAW          NO #
15. PATRICK DILLARD       1174             N/A  J.H.  05.07.9.
16. ANTONIO GOODWIN       0861             N/A  JB   5-8-93
17. MACK GOODWIN          1002             N/A  JB   5-8-93
18. CHRISTOPHER FOX       12413            N/A  JB   5-8-93
19. DARREN BRUCE          No #
20. CHARLES JACKSON       11883            N/A  JB   5-8-93
21. ALFORD GOODWIN                         N/A  JB   5-10-93
22. KENNETH REAMS                          N/A  JB   5-10-93
23. JERMAINE BROWN                         N/A  JB   5-10-93

24

5-08        112-764-0       William C A Charles
                            P.O. Box 9531        879-2713 hm.
            J.C. Penny

            Fishing

            Foreign

            Foreign

            421-082-4       Anthony N Wilkins    536-6463 m.
                            107 S Oregon         479-5311 off

            Dept. of Corrections

25



5-5-92          2030 HRS.

# B O L O

---

ARMED ROBBERY SUSPECTS
( VICTIM SHOT )

#1  B/M TEENS 5'11" THIN
BUILD, GRAY L/S SWEAT
SHIRT W/HOOD AND BLACK
SHORTS

#2  B/M TEENS 5'9" MEDIUM
BUILD, LT. COLOR T-SHIRT
AND BLACK SHORTS.

ONE OR BOTH SUSPECTS ARMED.
VICTIM SHOT W/SMALL CALIBER
WEAPON. LAST SEEN RUNNING
NORTH FROM WORTHEN TELLER
MACHINE @ 5TH & CHESTNUT.

P. TAYLOR #1913
2212

26



15:42          foreign

15:41          foreign

15:39          413 - 604 - 7      Richard L Adkins
                                  PO Box 9453    357-2705 hm.
                                                 357-2911

15:36          417 · 756 · 8      Amantare Thumbutu
               Shoneys / student  801 N Hazel   534-5298 hm.
                                                536-7663 wk

15:33          543 - 647 - 2      Patricia Washington
               Altheimer Schools  4401 Union  Apt. 11   535-6082 hm.

15:31          416 - 071 - 9      Mary Sykes or Laurence Sykes
               P.B. Schools District / Teacher   PO Box 1542   534-8494 hm

15:21          414 · 942 · 4      Dennis or LeAnn Owens
               Minister / Centennial Baptist Church   801 N Haley   247-2805 hm  267-4540 a

15:19          421 - 401 - 3      Stanley W. Staton    247-0937 hm.
               Century Tube       611 Hardin Reed Rd    535-6200 of

15:18          421 - 401 - 3      SAME

27

17:04   Foreign card

17:01   422-526-2

16:36   421-625-5

16:23   418-505-6

16:57   432-606-2   D-S

16:__   426-707-6

16:15   Foreign card

16:__   Foreign card

16:05   416-405-9   equal unknown

28

   Respondent's Exhibit E

STATE CRIME LABORATORY
P.O. BOX 5274
Number 3 Natural Resources Drive
Little Rock, Arkansas 72215
EVIDENCE SUBMISSION FORM

(AE) BBOX

| Investigating Officer/Agency/Address | FOR LABORATORY USE ONLY |
|---|---|
| Det. Sgt. Terry Hopson Pine Bluff Police Dept. 200 E 8th Pine Bluff, AR. 71603 543-5111 | Laboratory Case No.: 93-05709 |
| | Date Rec'd in Lab.: |
| | How Evidence Rec'd: |
| | Agency Case No.: 93-205 |
| | Type of Offense: Homicide |

| Suspect(s) | Victim(s) |
|---|---|
| None | Gary Turner |

| Has any evidence been previously submitted to the laboratory on this case? Yes X No ___ | Location (City, County) Pine Bluff Jefferson | Date of Offense 5-5-93 |

| Item No. | List and describe evidence submitted: (Use back side if necessary) | Circle as needed |
|---|---|---|
| E19 | Copper Jackets + Lead Projectiles | Documents |
| E27 | Silver Colored spent 9mm Casings | Drug Analysis |
| | | Firearms/Tools |
| | | Latent Prints |
| | | Medical Examiner |
| | | Photography |
| | | Serology |
| | | Toxicology |
| | | Trace Evidence |

93 MAY 10 STATE CRIME LABORATORY RECEIVED

Type of Analysis Requested: Firearms + Tool marks to determine caliber of projectiles, if Projectiles (E-1 thru E-19) came from E-20 thru E-27. Compare Projectile to bullet from Victim when Recovered + Hold E-20 thru E-27 to Compare to Weapon when it is recovered

Summary of Crime: Victim shot in head while at ATM machine.
29

| I certify that I have submitted the evidence listed above: | | |
|---|---|---|
| Date: 5-10-93 | Name: Rick Pritzen | Signature: Rick Pritzen |

Respondent's Exhibit E

WORTHEN
NATIONAL BANK
OF PINE BLUFF
P.O. BOX 6208
PINE BLUFF, ARKANSAS 71611

LAVENDABYN  C.  Wilber

Rt. 1  Box 152

Gould, Ar.  71643

ph. # 479-3435

30

LT ADDISON

8:19

GEORGE   HOWARD   CARD-1

\* BETER   T   HOWARD CARD-2
(Vetcr.)
1302   W   2ND

BALANCE INQUIRY   207.00

WITHDRAWL   10.00   #0862

HOLLY EDDING
666-9117

31

5689   Respondent's Exhibit E



## WORTHEN
### NATIONAL BANK

### FACSIMILIE COVER SHEET

TO:      (FAX Number)   543-5162

ATTN:    (Name)         Kenny Heroman

COMPANY:                PB Police Dept.

FROM: Bobby Graham          DATE: 5-7-93     TIME: 4:00

MESSAGE:

The following information is all we have at
this time.

TOTAL NUMBER OF PAGES TRANSMITTED, INCLUDING THIS PAGE: 3

IF YOU HAVE ANY PROBLEMS RECEIVING THIS TRANSMITTAL, PLEASE CALL

501-541-8000,                                        . THANK YOU.

32

# THE ARKANSAS BANKERS ASSOCIATION
# *PROTECTIVE BULLETIN*

### May 7, 1993

PB93-12

## TO: ALL MEMBER BANKS AND BANK HOLDING COMPANIES

## Peoples Bank & Loan Company, Lewisville, Reports Hot Check Activity on Closed Account

Venora Hooper, vice president and cashier of Peoples Bank & Loan Company, Lewisville, contacted The Arkansas Bankers Association this week to report hot check activity on a closed account. According to Ms. Hooper, Peoples Bank & Loan has received numerous checks written on an account styled "Larry or Helen Stultz" (Account #03-46225). The account has been closed due to check writing on non-sufficient funds.

The checks list the drivers license numbers of both joint accountholders: 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 and 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. To date, the hot checks have been passed in the Hope and Magnolia areas.

The Arkansas Bankers Association asks all member banks, especially those in the Lewisville, Magnolia and Hope areas, to be on the lookout for the checks described above. Banks are also urged to notify their staffs and commercial customers of this hot check activity. For further information contact Venora Hooper of Peoples Bank & Loan Company, Lewisville (Phone: 501/921-4244).

-30-

33

.00   foreign Card                    *Last*
                                   21:46   foreign card

20:07   113-577-5
        Evelyn or Lloyd Franklin
        PO Box 9412
        410 W 34th
H - 541-0953   W 541-7131   IRMC

20:11   417-309-0
        Scotty or Teresa Walker
        204 W 37th
#- 536-6141   W - 535-1842 - Meil Butcher

21:42   210-231-5
        Bennie or Audrey Sykes
        4310 - Lmy 4th
#- 536-4275   W - 535-6464   orre

21:43   210-231-5
        Same as above

34

WORTHEN NATIONAL BANK OF PINE BLUFF • P.O. BOX 6208 • PINE BLUFF, ARKANSAS 71611 • (501) 541-8000

17:59   Foreign Card

18:03   420-457.3
Emmett George
PO Box 6469
H- 534-1866
W - 543-1459   PB Commercial

18:13   209-210.7
Ellen Higgins
1223 N Palm
H- none
W- none

13:24   foreign card

18:41   408 730.5
Larry Potter
405 Bailey
H- [illegible]
W- none

35

18:50   421-543.5
Theorthy Brown
Carol Brown
H- 879.2782
W- 879.4262 — Wal Mart

18:51   641-003-1
Shirley Shelley
2200 E Pullen
H - 534-5848
W - 534-5333   Central Mkt

19:19   422-756.5
Zeri L Robinson
1200 University
H - 536 - 7126
W - 534-4400 - Milano

19:21   foreign card

19:25   foreign card

19:57   422-663-0

5693   Respondent's Exhibit E

+.2541
none

19:57   422-669-0
Gregory Hunter
3302 Tulip
H. 535-8760
W - 247-1200 - Calendar Wire

36



PERRY HARRAMAN

2003 transaction

Sue Sisson'
Metropolitan National Bank

Michael or Judy Dalby
1006 Boast Rd. — 71602
hm.   247-9483
Bus.   562-7203

37



| | | |
|---|---|---|
| | 415-611-9 | Oni Heffington |
| | | + Branch care |
| | 238-463-5 | Hinson Love |
| | | 2831 S. Cim   879-0734  hm |
| | 263-7751-0 | David or Pat Yarsley |
| | | 543-5150      Woethen Bank |
| | | P.B Fire Dept |
| | 979-244-9 | Doris A. Taggard |
| | | P. Box 8542      ph. 543-5145 off. |
| | | ou → City of Pine Bluff   ph 535-3651  hm. |
| | 411-618-6 | Doris A. Taggart |
| | 979-244-9 | Doris A. Taggart |
| | 211-263-9 | Thurman Chappell Jr. |
| | Corp of Engineer | 1570 Belmoor |
| | Ratliff Ent. | 536-0234 hm.   534-7373 off. |
| | | 534-1157 hm. |
| | 415-098-8 | Villa Eahns |
| | Tysons | 12030 S. Walnut |
| | | 534-1835 hm. /534-2354 |
| | 411-547-3 | Ted Barrow |
| | | P.O. Box 6008 |
| | Barrow Roof Systems | 536-6155 hm. |

38

| | | |
|---|---|---|
| | 422-977-0 | Arthur or Ruth Penn |
| | | 1302 Oak |
| | | H - 536-6305   or - 247-1225 |
| 1996 | 422-977-0 | empl - Dollarway School |
| 1995 | 416-944-1 | Florence Small |
| | | PO BN 1332 |
| | | H - 536- ---- - ------ |
| 1993 | 420-696-6 | Susan Bell |
| | | ---- Faulkner Rd. |
| | | --- - --- -- --- - 536-1952 |
| | 506-699-2 | Kenneth or ----- ------- |
| | | 1601 Albert---- |
| | | H - 534-8587   566-1946 |
| | 111-126-4 | ------- ------ |
| | | --- - ------- |
| | | H - 571-6420   ---- ------- |
| 1990 | 418-900-0 | Jackie Renee ------- |
| | | 4400 ------ Rd H |
| | | ------ - 534-1834 |
| | 641-371-4 | Terry Pascoe |
| | Camp-- Dr-- | 421 E 212 |
| | | 536-4171 - Home |
| 1987 | 113-050-1 | Gary Horne or |
| | | Karen Davenport |
| | | 712 6 201½ |
| | | H 536-6646   or - 541-0500 |

39 --- Music

OWNERS of JACKETS.

MICHAEL McCREE    6-4551

LT. TAN w/ INK
ROBBIE CHAMBERS        879-6230

Williams Edward Morrison
BOMBER STYLE JACKET    BUTCH'S SON   (OWNERS)

✓ Color spot   Linda O. Thomas    535-2540
13 year old daughter's jacket

40

# PINE BLUFF POLICE DEPARTMENT  Y  N  INVESTIGATION REPORT

| CRIME | LOCATION OF CRIME | BUS/RES | FROM DATE AND TIME | TO DATE AND TIME |
|---|---|---|---|---|
| Attempt Burg | 812 Poplar St | Bus | 4/27/93 2300Ph | 4/28/93 0652Am |

| DATE/TIME REPORTED | SHIFT | ZONE | REPORT AREA | OFFICER'S NAME | EMP. NO. | ASSISTING OFFICER | CASE FILE |
|---|---|---|---|---|---|---|---|
| 4/28/93 0652 | 1 | 6 | | Judy Brown | 1975 | Off Calhoun 3207 | 19728 |

**VICTIM OR BUSINESS**

| | | | | S S.# | | EMPLOYER OR SCHOOL | |
|---|---|---|---|---|---|---|---|
| NAME Tommy's | | | | | | | |
| ADDRESS 812 Poplar St | | | | HOME PHONE | | BUSINESS PHONE 534-9622 | |

| RACE | SEX | DATE OF BIRTH | WILL COMPLAINANT PROSECUTE ☒ YES ☐ NO | ☐ CORPORATION | ☐ PARTNERSHIP | ☒ SOLE OWNER |
|---|---|---|---|---|---|---|

Officer Calhoun found two pieces of the broken glass laying in a box beside the door. He checked the glass and found visible prints. I then assisted Officer Calhoun in using black powder and a brush to lift the prints from the glass. Officer Calhoun took the finger print cards to turn in to The Detective Office.

Mr Priakos Arrived and after checking the business, it was found that nothing was missing.

41

| STATUS | | NCIC Enter | No Yes ☐ ☐ |
|---|---|---|---|
| ☐ UNFOUNDED ☐ ARREST ADULT | | NCIC | No Yes |

5699   Respondent's Exhibit E

# PINE BLUFF POLICE DEPARTMENT — INVESTIGATION REPORT

CN0544-93-3208

| | |
|---|---|
| TIME REPORTED: 93-0652 | SHIFT: 1 | ZONE: 2 | REPORT AREA | OFFICER'S NAME: Self Brown | STAMP NO: 1973 | ASSISTING OFFICER: Off Calhoun #3207 |

**NAME:** Tommy's
**ADDRESS:** 812 Poplar St.
**BUSINESS PHONE:** 534-9622

**IS STOLEN PROPERTY TRACEABLE?** Y [ ] N [X]

| CODES | CODE | DESCRIPTION OF PROPERTY (SIZE, COLOR, MODEL, STYLE, BRAND, CONDITION) | SERIAL NO. | VALUE |
|---|---|---|---|---|
| STOLEN | D | Window | | 25.00 |

**VALUE DAMAGED:** $25.00

**IS SIGNIFICANT PHYSICAL EVIDENCE PRESENT?** Y [X] N [ ]

**I.D. WORK PERFORMED:** PERFORMED BY: Calhoun 3207   TYPE OF PROCESSING: Prints lifted

**NAME:** Off Calhoun #3207
**BUSINESS ADDRESS:** Pine Bluff Police Dept
**BUS. PHONE:** 543-5145

**NAME:** Tom Priakos
**BUSINESS ADDRESS:** 812 Poplar
**HOME PHONE:** 534-4123
**BUSINESS PHONE:** 534-9622

**ENTRY:** A   **METHOD USED TO COMMIT CRIME:** Broke window

**D. IS THERE SIGNIFICANT M.O. PRESENT?** Y [ ] N [X]
**E. CAN SUSPECT BE NAMED?** Y [ ] N [X]
**F. CAN SUSPECT BE LOCATED?** Y [ ] N [X]
**G. CAN SUSPECT BE DESCRIBED?** Y [ ] N [X]
**H. CAN SUSPECT BE IDENTIFIED?** Y [ ] N [X]
**I. WAS SUSPECT ARRESTED?** Y [ ] N [X]

**ADDITIONAL INFORMATION:** Officer Calhoun was on patrol, when he found a glass broke out of the back door. Entry was not gained because area broken out was too small and a key is needed to open the door. It is not known what was used to break the glass.

**STATUS:** [ ] UNFOUNDED [ ] ARREST—ADULT [ ] PENDING [ ] ARREST—JUVENILE [ ] INACTIVE [X] EXCEPTIONAL CLEAR

**OFFICERS SIGNATURE:** Cindy Brown

8 R 42

PINE BLUFF POLICE DEPARTMENT
DETECTIVE OFFICE I.D. SHEET

CASE # _93-28_

NAME _REAMS   KENNETH   LYNNARD_ SSN _unk_ _____ DATE _05_
        (last)      (first)   (middle)

ALIAS _KENNY_ _____ NICKNAME _____ DLN _____

ADDRESS _1003 WEST 3rd_ _____ CITY _PINE BLUFF_ ____ STATE _AR_

PHONE _N/A_ ____ RACE _B_ SEX _M_ DOB _12-21-74_ AGE _18_ (Rgt L Handed)

EYES _Brn_ ___ HAIR _BLK_ ____ EMPLOYER _N/A_ ____ OCCUPATION _N/A_

PLACE OF BIRTH _KENOSHAW_ ___ _Ws._ _____ EDUCATION _11th_

SCARS, MARKS OR TATTOOS _Tattoo Cross on left hand & "KENE" on left_
_arm_

PREVIOUS ARRESTS : (Y) or N   DATE _____ PLACE _____

PHOTO # _____ FINGERPRINT # _____ PBN # _____

FATHER _Dewyite   Reyoto_ __ ADDRESS _____ _CA._ PHONE _unk_
MOTHER _Beatris   Whiteside_ ADDRESS _411 E. Davis Farm City_ PHONE _N/A_
SPOUSE _N/A_ _____ ADDRESS _____ PHONE _____
BROTHER _Scott   Whiteside_ _ ADDRESS _''_ _''_ PHONE _____
OTHER _Dominik   Whiteside_ __ ADDRESS _''_ _''_ PHONE _____
BROTHER _____ ADDRESS _____ PHONE _____
SISTER _____ ADDRESS _____ PHONE _____
SISTER _____ ADDRESS _____ PHONE _____
SISTER _____ ADDRESS _____ PHONE _____

ARREST INFORMATION

DATE _____ TIME _____ LOCATION _____ OFFICER _____

VISUAL/PC _____ WARRANT _____ (Circuit, Municipal, Juvenile) WARRANT # _____

TRANSPORTED TO WHICH JAIL _____ DATE _____ TIME _____

ADDITIONAL NOTES _____
_____
_____
_____

| CITATION NUMBER | CHARGE DESCRIPTION |
|---|---|
| 43 | |

Criminal Intake Information

5701   Respondent's Exhibit E

# ARKANSAS ARREST / DISPOSITION REPORT

| DEFENDANT IDENTIFICATION | Pine Bluff Police Department | NCIC Code AR0350100 |
|---|---|---|

Last: WEAMS
First: KENNETH
Middle: LYNNORD

Aliases:

Street Address: 1003 W 3rd
Phone No:

City & State: Pine Bluff, Arkansas
Zip: 71601

Computer Use - CSN:
F B I No:
State I D No:

Social Security No:
Driver License No - State:
Local I D No:

Sex: ☒ M  ☐ F
Race: 1 ☐ White  2 ☒ Black  3 ☐ American Indian or Alaskan Native  4 ☐ Asian or Pacific Islander  5 ☐ Unknown
Ethnicity: ☐ Hispanic  ☐ Not Hispanic
Date of Birth: mo 12 day 21 yr 74
Age: 18
Place of Birth: Kenosha Wisconsin

Hair: BLK
Eyes: BRN
Weight: 125
Height: 5'6"
Scars and Marks: MISC "KENE" LEFT ARM   TATTOO OF a CROSS ON Left hand

Complexion: med
Build: slim
Employer/Occupation:

Notify In Case Of Emergency: Eddie Reams - Uncle
Phone No: 535-5018

Street Address:
City, State, Zip: Pine Bluff Ark. 71601

## ARREST          — PLEASE PRESS HARD —

Place of Arrest: Det. Office P.B. Police Dept.
Arresting Officers: Addison

Date of Arrest: 1-93
Time of Arrest: 8:45 PM
Bail Amount Set:
Offense No:
Agency Received From: Pine Bluff PD.
Agency Transferred To: JCDC

| No | Computer USE-SAN | Case Docket No | Statute No | Counts | Charge Desc | Law Enforcement Action | Date of Action |
|---|---|---|---|---|---|---|---|
| 1 | | 93-205 | 5-10-101 | 1 | Capital Murder | | |
| 2 | | | | | | | |
| 3 | | | | | | | |
| 4 | | | | | | | |

Facts of Arrest (Explain In Detail):
Sub was Arrested on above charge on Probable Cause-Hold on Probable Cause.

ATW Fingerprint personnell AR0350100

Fingerprint Card ☐ Yes ☐ No
More Charges ☐ Yes ☐ No

| Complainant and Witness Names | Address | Phone | Court Date | Court Trying Case |
|---|---|---|---|---|
| Complainant: Hy Case | Home | | | |
| | Business | | | |
| | Home | | | |
| | Business | | | |
| Witness: | Home | | | |
| | Business | | | |

Right Thumb Print

44

POLICE
CRIMINAL COMPLAINT
PINE BLUFF, ARK.

Case Number                    NO. 57409

ON Thur, The 13th Day of May 19 93 At 8:30 AM

Name Curry        Phillip        Dewayne
        Last   (Please Print) First   Middle

Street 1120 E 2nd

City - State Pine Bluff, Ark.

Age 18 Birth Date 1-25-75 Place B Sex M Ht 5'7" Wt 135

Hair Blk Eyes Blu Build Slim Abor.  D

Driver Lic No 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 Social Security No 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

Place of Arrest Det. Office Officer Addison 156C

Charge AGG. Robbery

Statute No 5-12-103 Facts of Arrest Above

Sub. was involved in the

AGG. Robbery of Curtis

Gilbert on 4-28-93


                    File


Evidence
Held By

Witness                        Address

Witness                        Address
Releasing
Officer                Time      Date      Bond By

Court Appearance           Day of        19    At    M
Address of Court - Civic Center 200 E 8th St  Pine Bluff Ark
I promise to appear in said Court at said time and place

Signature Phy, Arrest

45

RIGHTS FORM

READ TO: _PHILLIP DEWAYNE CURRY_     CASE # _93-205_

PLACE: _PINE BLUFF P.D. DET. OFFICE_

DATE: _5/13/93_

TIME: _1355 HRS_

BEFORE WE ASK YOU ANY QUESTIONS, YOU MUST UNDERSTAND YOUR RIGHTS.

YOU HAVE THE RIGHT TO REMAIN SILENT.

DO YOU UNDERSTAND? _YES    PC_

ANYTHING YOU SAY CAN AND WILL BE USED AGAINST YOU IN COURT.

DO YOU UNDERSTAND? _YES    PC_

YOU HAVE THE RIGHT TO HAVE AN ATTORNEY PRESENT BEFORE MAKING ANY

STATEMENT AND YOU MAY TALK WITH HIM DURING QUESTIONING.

    YOU UNDERSTAND? _YES    PC_

IF YOU CANNOT AFFORD AN ATTORNEY, ONE WILL BE PROVIDED FOR YOU

BEFORE YOU ARE ASKED ANY QUESTIONS, IF YOU SO DESIRE.

DO YOU UNDERSTAND? _YES    PC_

IF YOU WANT TO ANSWER QUESTIONS NOW, WITHOUT A LAWYER PRESENT,

YOU MAY DO SO;  HOWEVER, YOU HAVE THE RIGHT TO STOP THE QUESTIONING

AT ANY TIME.

DO YOU UNDERSTAND? _YES    PC_

                                      SIGNED: _Phillip D. Curry_

RIGHTS READ BY: _Capt. K.E. Hencon_

WITNESS: _____

WITNESS: _____

46

Respondent's Exhibit E

# RIGHTS FORM

MIRANDA RIGHTS READ TO *Phillip Duwayne Curry*

DATE *5/13/93*  TIME *8:15*  A or (P M)  PLACE *D.T. office*

Before we ask you any questions, you must understand your rights.

You have the right to remain silent.

      Do you understand?    Yes or No  *yes PC*

Anything you say can and will be used against you in court.

      Do you understand?    Yes or No  *yes PC*

You have the right to have an attorney present before making any statement and you may talk with him during questioning.

      Do you understand?    Yes or No  *yes PC*

If you cannot afford an attorney, one will be provided for you before you are asked any questions, if you so desire.

      Do you understand?    Yes or No  *yes PC*

If you want to answer questions now, without a lawyer present, you may do so.  However, you have the right to stop the questioning at any time.

      Do you understand?    Yes or No  *yes PC*

      Signature *Phillip D Curry*

Rights read by: *Lt. Terry Addison*

Witness: _____

Witness: _____

**47**

CASE NUMBER *93-205*

Respondent's Exhibit E

PINE BLUFF POLICE DEPARTMENT
DETECTIVE OFFICE I.D. SHEET

CASE # 93-205

NE Curry    Phillip    Dewayne    SSN 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    DATE 5/13/93
  (last)      (first)    (middle)

ALIAS _____    NICKNAME Det    DLN 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
ADDRESS 1120 E 20d    CITY Pine Bluff    STATE AR
PHONE 536-2445    RACE B    SEX M    DOB 1/25/75    AGE 18    R or L HANDED
EYES BR    HAIR BLK    EMPLOYER N/A    OCCUPATION N/A
PLACE OF BIRTH Pine Bluff, AR.    EDUCATION 12 yrs Adult ed
SCARS, MARKS OR TATTOOS Det / on Left top of Chest

PREVIOUS ARRESTS : Y or N    DATE _____    PLACE _____
PHOTO # _____    FINGERPRINT # _____    PEN # _____

FATHER Lee Willie Curry    ADDRESS 5005 W 2nd    PHONE 536-6058
MOTHER Merril Lee Curry    ADDRESS A.D.C.    PHONE _____
SPOUSE N/A    ADDRESS N/A    PHONE N/A
BROTHER /    ADDRESS /    PHONE /
  ER /    ADDRESS /    PHONE /
  R /    ADDRESS /    PHONE /
SISTER /    ADDRESS /    PHONE /
SISTER /    ADDRESS /    PHONE /
SISTER /    ADDRESS /    PHONE /

ARREST INFORMATION

DATE 5/13/93    TIME _____    LOCATION 314 S. OAK    OFFICER Sgt Fritzen
VISUAL/PC ✓    WARRANT _____    (Circuit, Municipal, Juvenile) WARRANT # _____
TRANSPORTED TO WHICH JAIL _____    DATE _____    TIME _____
ADDITIONAL NOTES _____
_____
_____

CITATION
NUMBER

CHARGE
DESCRIPTION

48

Respondent's Exhibit E

## ARKANSAS ARREST / DISPOSITION REPORT

| DEFENDANT IDENTIFICATION | Pine Bluff Police Department | NCIC Code AR0350100 |
| --- | --- | --- |

First Last: **MURRAY** First **PHILLIP** Middle **DEWAYNE**

Aliases:

Street Address: 1120 E 2ND

City & State: PINE BLUFF ARKANSAS     Phone No     Zip 71601

Computer Use - CSN:     FBI No:     State I.D No:

Social Security No: 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     Driver License No /State: 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 ARK     Local I.D No:

| Sex | Race | Ethnicity | Date Of Birth | Age | Place of Birth |
| --- | --- | --- | --- | --- | --- |
| ☒ M  ☐ F | ☐ 1 White  ☒ 2 Black  ☐ 3 American Indian or Alaskan Native  ☐ 4 Asian or Pacific Islander  ☐ 5 Unknown | ☐ hispanic  ☐ not hispanic | mo 01  day 25  yr 75 | 18 | Pine Bluff |

| Hair BLK | Eyes BRN | Weight 135 | Height 5'7" | Scars and Marks TATTOO ON CHEST  DE! |
| --- | --- | --- | --- | --- |

Complexion: Light     Build: Slim     Employer/Occupation: None

Notify In Case Of Emergency: Maggie Honorable     Grandmother     Phone No 536-2445

Street Address: 1120 E 2nd     City, State, Zip: Pine Bluff, ARK.

## ARREST                        PLEASE PRESS HARD -

Place of Arrest: Police Dept. Pine Bluff     Arresting Officers: Lt. Addison #1560

Date of Arrest: 5-13-93     Time of Arrest: 2030 hrs     Bail Amount Set:     Offense No:     Agency Received From: PBPD     Agency Transferred to: JDC

| Computer USE-SAN | Case Docket No | Statute No | Counts | Charge Desc | Law Enforcement Action | Date of Action |
| --- | --- | --- | --- | --- | --- | --- |
| 1 | 93/205 | 5-12-103 | 1 | AGG. Robbery | | |
| 2 | | | | | | |
| 3 | | | | | | |
| | | | | | | |

Facts of Arrest (Explain in Details): Sub. was involved in Robbery of Curtis Gilbert on 4-28-93     P.C. hold

| | Fingerprint Card ☐ Yes ☒ No | More Charges ☐ Yes ☒ No |
| --- | --- | --- |

ATN: Fingerprint Personnell AR0350100

| | Court Date | Court Trying Case | |
| --- | --- | --- | --- |
| Complainant and Witness Names | Address | Phone | Right Thumb Print |
| Complainant: City Case. | Home | | |
| | Business | | |
| Witness | Home | | |
| | Business | | |
| Witness | Home | | |
| | Business | | |

49

RIGHTS FORM

READ TO: _Alford  Goodwin_                    CASE # _93-205_

PLACE: _Dumas  Jail_

DATE: _5 - 12 - 93_

TIME: _11:45 AM_

BEFORE WE ASK YOU ANY QUESTIONS, YOU MUST UNDERSTAND YOUR RIGHTS.

YOU HAVE THE RIGHT TO REMAIN SILENT.

DO YOU UNDERSTAND? _yes_ A.G.

ANYTHING YOU SAY CAN AND WILL BE USED AGAINST YOU IN COURT.

DO YOU UNDERSTAND? _yes_ A.G.

YOU HAVE THE RIGHT TO HAVE AN ATTORNEY PRESENT BEFORE MAKING ANY

STATEMENT AND YOU MAY TALK WITH HIM DURING QUESTIONING.

YOU UNDERSTAND? _yes_ A.G.

IF YOU CANNOT AFFORD AN ATTORNEY, ONE WILL BE PROVIDED FOR YOU

BEFORE YOU ARE ASKED ANY QUESTIONS, IF YOU SO DESIRE.

DO YOU UNDERSTAND? _yes_ A.G.

IF YOU WANT TO ANSWER QUESTIONS NOW, WITHOUT A LAWYER PRESENT,

YOU MAY DO SO;  HOWEVER, YOU HAVE THE RIGHT TO STOP THE QUESTIONING

AT ANY TIME.

DO YOU UNDERSTAND? _yes_ A.G.          A.G

                              SIGNED: _Alford Goodwin_

RIGHTS READ BY: _LT. Terry Addison_

WITNESS: _____

WITNESS: _____

50

PINE BLUFF POLICE DEPARTMENT
DETECTIVE OFFICE I.D. SHEET

CASE # _93-205_

NAME _Goodwin   Alford_   SSN _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_   DATE _5-12-93_
   (last)   (first)   (middle)

ALIAS _____   NICKNAME _Butterball_   DLN _none_

ADDRESS _314 S Oak_   CITY _Pine Bluff_   STATE _ARK._

PHONE _____   RACE _Blk_   SEX _Male_   DOB _2-3-74_   AGE _19_   R or(L)HANDED

EYES _Blk_   HAIR _Blk_   EMPLOYER _US Post Office_   OCCUPATION _custodian_

PLACE OF BIRTH _P_ _Pine Bluff, ARK._   EDUCATION _Pine Bluff High_

SCARS, MARKS OR (TATTOOS) _LS on Right Arm_

PREVIOUS ARRESTS :   Y or(N)   DATE _____   PLACE _____

PHOTO # _____   FINGERPRINT # _____   PBN # _____

FATHER _Alford Goodwin_   ADDRESS _Pine Bluff ARK._   PHONE _____
MOTHER _Flossie McLemore_   ADDRESS _314 S. Oak_   PHONE _____
SPOUSE _____   ADDRESS _____   PHONE _____
BROTHER _Charlie Blake_   ADDRESS _P.B. ARK_   PHONE _____
BROTHER _Randy Blake_   ADDRESS _P.B. ARK._   PHONE _____
BROTHER _____   ADDRESS _____   PHONE _____
SISTER _Cathern Washington_   ADDRESS _P.B. Ark._   PHONE _____
SISTER _Stacy Buckie_   ADDRESS _314 Oak._   PHONE _____
SISTER _____   ADDRESS _____   PHONE _____

ARREST INFORMATION

DATE _____   TIME _____   LOCATION _____   OFFICER _____
VISUAL/PC _____   WARRANT _____   (Circuit, Municipal, Juvenile) WARRANT # _____
TRANSPORTED TO WHICH JAIL _____   DATE _____   TIME _____
ADDITIONAL NOTES _____
_____
_____
_____

| CITATION NUMBER | CHARGE DESCRIPTION |
|---|---|
| | |
| | |
| **51** | |

CRIMINAL CHARGE SHEET

OFFENSE: Burglary and Theft of Property      DATE OCCURRED: 04/28/93

AMOUNT OF LOSS: $558.00      EXTENT OF INJURIES: N/A

|  SUSPECT'S NAME | RACE/SEX | DOB or AGE | ARREST DATE |
|---|---|---|---|
| 1. Kenneth Reams | B/M | 12/21/74 | 05/10/93 |
| 2. | | | |
| 3. | | | |
| 4. | | | |

PRESENT LOCATION OF SUSPECTS: Stuttgart Jail

VICTIM: PB Dry Cleaners ADDRESS: 1009 S. Poplar   PHONE: 534-5310

LOCATION OF OFFENSE: 1009 S. Poplar      COUNTY: Jefferson

BRIEF NARRATIVE:  Suspect admitted to forcibly entering the premises of
  1009 Poplar (P.B. Dry Cleaners) and committing therein a theft of two
    ather jackets and one H&R .32 caliber revolver valued at $508.00.
    .mage was estimated at $50.00.

INFORMATION INCLUDED AS INDICATED:

x CASE SUMMARY
x ARRESTED SUBJECT'S IDENTIFICATION
x ARRESTED SUBJECT'S PERSONAL HISTORY
x ARRESTED SUBJECT'S STATEMENT
  VICTIM'S STATEMENT
x WITNESS INFORMATION FORM
x WITNESS STATEMENTS
x PHYSICAL EVIDENCE INFORMATION

x COPY OF SEARCH WARRANTS
  COPY OF CONSENT TO SEARCH
x COPY OF RIGHTS FORM
x COPY ALL OFFICERS REPORTS
  MEDICAL AND LAB REPORTS
  CRIME SCENE DIAGRAM
  OTHER

INVESTIGATING OFFICERS & AGENCIES:      PROSECUTOR'S NOTES:

Officer Clhoun, PBPD
Capt. Heroman, Lt. Cook and Lt. Addison, PBPD
Sgt.'s Hopson, Pritzen, Hubanks and Bacon, PBPD
Det.'s Hendrix, Phillips and Hill, PBPD
COMPILED BY: Det. Sgt. James Bacon      WARRANT NUMBER:

DATE: 05/11/93      CASE NUMBER: 93/205

52

CRIMINAL CHARGE SHEET

OFFENSE: ~~Capital Murder~~ Aggravated Robbery     DATE OCCURRED: 04/28/93

AMOUNT OF LOSS:  None          EXTENT OF INJURIES: N/A

| SUSPECT'S NAME | RACE/SEX | DOB or AGE | ARREST DATE |
|---|---|---|---|
| 1. Kenneth Reams | B/M | 12/21/74 | 05/10/93 |
| 2. Alford Goodwin | B/M | 02/03/74 | 05/10/93 |
| 3. | | | |
| 4. | | | |

PRESENT LOCATION OF SUSPECTS:  #1-Stuttgart Jail   #2-Dumas Jail

VICTIM: Curtis GIlbert ADDRESS: 303 Missouri Crossett PHONE: 364-5871

LOCATION OF OFFENSE: 5th and Chestnut          COUNTY: Jefferson

BRIEF NARRATIVE:  The above suspects approached Curtis Gilbert Jr. at
the Worthern ATM machine (5th and Chestnut) with the purpose of
robbing him. During the attempted robbery, one suspect displayed a
handgun and the other demanded money. Suspect #1 struck the victim in
the head with his fist. Both suspects have given statements as to
their participation in the attemtped robbery.

INFORMATION INCLUDED AS INDICATED:

x CASE SUMMARY                        x COPY OF SEARCH WARRANTS
x ARRESTED SUBJECT'S IDENTIFICATION   x COPY OF CONSENT TO SEARCH
x ARRESTED SUBJECT'S PERSONAL HISTORY x COPY OF RIGHTS FORM
x ARRESTED SUBJECT'S STATEMENT        x COPY ALL OFFICERS REPORTS
x VICTIM'S STATEMENT                    MEDICAL AND LAB REPORTS
  WITNESS INFORMATION FORM             CRIME SCENE DIAGRAM
x WITNESS STATEMENTS                   OTHER
x PHYSICAL EVIDENCE INFORMATION

INVESTIGATING OFFICERS & AGENCIES:         PROSECUTOR'S NOTES:

Officer Murray, PBPD
Capt. Heroman, Lt. Cook and Lt. Addison, PBPD
Sgt. Bacon, PBPD

COMPILED BY: Det. Sgt. James Bacon         WARRANT NUMBER:

DATE: 05/12/93                             CASE NUMBER: 93/205

53

CRIMINAL CHARGE SHEET

OFFENSE: Aggravated Robbery          DATE OCCURRED: 04/29/93

AMOUNT OF LOSS: $100.00      EXTENT OF INJURIES: N/A

    SUSPECT'S NAME          RACE/SEX        DOB or AGE        ARREST DATE

. Kenneth Reams              B/M            12/21/74         05/10/93

PRESENT LOCATION OF SUSPECTS:  Stuttgart Jail

VICTIM: Bonnie Phillips ADDRESS: 2609 Bay          PHONE: 534-6428

LOCATION OF OFFENSE: 221 West 4th          COUNTY: Jefferson

BRIEF NARRATIVE:  Suspect admitted to robbing the Greyhound Bus
    tation, where Bonnie Phillips was working as the clerk. Suspect was
    ned with handgun during the robbery.

INFORMATION INCLUDED AS INDICATED:

x CASE SUMMARY                          x COPY OF SEARCH WARRANTS
x ARRESTED SUBJECT'S IDENTIFICATION       COPY OF CONSENT TO SEARCH
x ARRESTED SUBJECT'S PERSONAL HISTORY   x COPY OF RIGHTS FORM
x ARRESTED SUBJECT'S STATEMENT          x COPY ALL OFFICERS REPORTS
x VICTIM'S STATEMENT                       MEDICAL AND LAB REPORTS
x WITNESS INFORMATION FORM                CRIME SCENE DIAGRAM
x WITNESS STATEMENTS                      OTHER
x PHYSICAL EVIDENCE INFORMATION

INVESTIGATING OFFICERS & AGENCIES:          PROSECUTOR'S NOTES:

Officer Sanders, PBPD
St. Addison, PBPD
Sgt. Bacon, PBPD

COMPILED BY: Det. Sgt. James Bacon          WARRANT NUMBER:

DATE: 05/11/93                              CASE NUMBER: 93/205

54

Respondent's Exhibit E

## CRIMINAL CHARGE SHEET

OFFENSE: Capital Murder                    DATE OCCURRED: 05/05/93

AMOUNT OF LOSS:  None          EXTENT OF INJURIES: Death of Victim

| SUSPECT'S NAME | RACE/SEX | DOB or AGE | ARREST DATE |
|---|---|---|---|
| 1. Kenneth Reams | B/M | 12/21/74 | 05/10/93 |
| 2. Alford Goodwin | B/M | 02/03/74 | 05/10/93 |
| 3. | | | |
| 4. | | | |

PRESENT LOCATION OF SUSPECTS:  #1-Stuttgart Jail    #2-Dumas Jail

VICTIM: Gary W. Turner  ADDRESS: 2619 S. Cherry    PHONE: 536-4544

LOCATION OF OFFENSE: 5th and Chestnut          COUNTY: Jefferson

BRIEF NARRATIVE:  The above suspects approached Gary Wayne Turner at
the Worthen ATM machine (5th and Chestnut) with the purpose of robbing
him. During the course of their actions, Turner was killed from a
single gunshot wound to the head. Statements of participation are
included in this file.

### INFORMATION INCLUDED AS INDICATED:

x CASE SUMMARY                           x COPY OF SEARCH WARRANTS
x ARRESTED SUBJECT'S IDENTIFICATION      x COPY OF CONSENT TO SEARCH
x ARRESTED SUBJECT'S PERSONAL HISTORY    x COPY OF RIGHTS FORM
x ARRESTED SUBJECT'S STATEMENT           x COPY ALL OFFICERS REPORTS
  VICTIM'S STATEMENT                       MEDICAL AND LAB REPORTS
x WITNESS INFORMATION FORM                 CRIME SCENE DIAGRAM
x WITNESS STATEMENTS                       OTHER
x PHYSICAL EVIDENCE INFORMATION

INVESTIGATING OFFICERS & AGENCIES:          PROSECUTOR'S NOTES:

Officer G. Taylor, PBPD
Capt. Heroman, Lt. Cook and Lt. Addison, PBPD
Sgt.'s Hopson, Pritzen, Hubanks and Bacon, PBPD            No Bond
Det.'s Hudgins, Dorman, Powell, Hill, Phillips, Hendrix,     af
COMPILED BY: Det. Sgt. James Bacon          WARRANT NUMBER:   Jac

DATE: 05/11/93                              CASE NUMBER: 93/205

55

## CRIMINAL CHARGE SHEET

OFFENSE: ~~Aggravated~~ Aggravated Robbery          DATE OCCURRED: 04/28/93

AMOUNT OF LOSS:  None          EXTENT OF INJURIES: N/A

| SUSPECT'S NAME | RACE/SEX | DOB or AGE | ARREST DATE |
|---|---|---|---|
| 1. Kenneth Reams | B/M | 12/21/74 | 05/10/93 |
| 2. Alford Goodwin | B/M | 02/03/74 | 05/10/93 |
| 3. | | | |
| 4. | | | |

PRESENT LOCATION OF SUSPECTS:  #1-Stuttgart Jail     #2-Dumas Jail

VICTIM: Curtis GIlbert ADDRESS: 303 Missouri Crossett PHONE: 364-5871

LOCATION OF OFFENSE: 5th and Chestnut          COUNTY: Jefferson

BRIEF NARRATIVE:  The above suspects approached Curtis Gilbert Jr. at
the Worthern ATM machine (5th and Chestnut) with the purpose of
bbing him. During the attempted robbery, one suspect displayed a
handgun and the other demanded money. Suspect #1 struck the victim in
the head with his fist. Both suspects have given statements as to
their participation in the attemtped robbery.

### INFORMATION INCLUDED AS INDICATED:

x CASE SUMMARY
x ARRESTED SUBJECT'S IDENTIFICATION
x ARRESTED SUBJECT'S PERSONAL HISTORY
x ARRESTED SUBJECT'S STATEMENT
x VICTIM'S STATEMENT
  WITNESS INFORMATION FORM
x WITNESS STATEMENTS
x PHYSICAL EVIDENCE INFORMATION

x COPY OF SEARCH WARRANTS
x COPY OF CONSENT TO SEARCH
x COPY OF RIGHTS FORM
x COPY ALL OFFICERS REPORTS
  MEDICAL AND LAB REPORTS
  CRIME SCENE DIAGRAM
  OTHER

INVESTIGATING OFFICERS & AGENCIES:

Officer Murray, PBPD
Capt. Heroman, Lt. Cook and Lt. Addison, PBPD
Sgt. Bacon, PBPD

COMPILED BY: Det. Sgt. James Bacon

DATE: 05/12/93

PROSECUTOR'S NOTES:

WARRANT NUMBER:

CASE NUMBER: 93/205

56

PINE BLUFF POLICE DEPARTMENT — INVESTIGATION REPORT

| DATE/TIME REPORTED | SHIFT | ZONE | REPORT AREA | REPORTING OFFICERS NAME | EMP/NO | ASSISTING OFFICER | CASE FILE |
|---|---|---|---|---|---|---|---|
| 93 2032 | 2 | 4 | | G. T. TAYLOR | 1913 | S. McCULLOUGH | 212 05 |

**VICTIM OR BUSINESS:** GARY WAYNE TURNER  S.S.# 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

**EMPLOYER OR SCHOOL:**

619 SOUTH CHERRY STREET    HOME PHONE 536-4544    BUSINESS PHONE

SEX M   DATE OF BIRTH 08-16-54   WILL COMPLAINANT PROSECUTE ☒ YES ☐ NO   ☐ CORPORATION ☐ PARTNERSHIP ☐ SOLE OWNER

INJURED PERSON JRMC   TAKEN TO JRMC   TRANSPORTED BY LUSBY'S AMB   ADMITTED ☐ YES ☐ NO   ATTENDING DOCTOR

**A IS STOLEN PROPERTY TRACEABLE?** Y ☐ N ☒

CODES / CODE / DESCRIPTION OF PROPERTY (SIZE, COLOR, MODEL, STYLE, BRAND, CONDITION)   SERIAL NO.   VALUE

STOLEN   CHIEF BRADSHAW   S-4366   RANDY TAYLOR   534 6717
RECOVERED
LOST   GENE HASTINGS
DAMAGED

**B IS SIGNIFICANT PHYSICAL EVIDENCE PRESENT?** Y ☒ N

PERFORMED BY SGT. J. BACON / LT. T. ADDISON   TYPE OF PROCESSING PHOTOGRAPHS / LATENT PRINTS

| | NAME | ADDRESS | HOME PHONE |
|---|---|---|---|
| W | JAMES L. NELSON | 1006 SOUTH HOLLY ST | 536-9170 |
| SEX M  DATE OF BIRTH 07-23-71 | BUSINESS ADDRESS UNEMPLOYED | | BUS. PHONE |
| W | TAQUANTE NELSON | 2718 KENWOOD DR., APT #12 | 534-3890 |
| SEX M  DATE OF BIRTH 11-11-77 | BUSINESS ADDRESS 16TH AVENUE SCHOOL (2-4 GRADE) | | |

POINT OF ENTRY   METHOD USED TO COMMIT CRIME HANDGUN

**D IS THERE SIGNIFICANT M.O. PRESENT?** Y N ☒

| | RACE B | SEX M | AGE | DATE OF BIRTH | WEIGHT | HEIGHT 5'11 | HAIR COLOR | EYE COLOR |
|---|---|---|---|---|---|---|---|---|

**E CAN SUSPECT BE NAMED?** Y N ☒

**F CAN SUSPECT BE LOCATED?** Y N ☒

| | RACE B | SEX M | AGE | DATE OF BIRTH | WEIGHT | HEIGHT 5'0 | HAIR COLOR | EYE COLOR |
|---|---|---|---|---|---|---|---|---|

**G CAN SUSPECT BE DESCRIBED?** Y ☒ N

**H CAN SUSPECT BE IDENTIFIED?** Y N ☒

**I WAS SUSPECT ARRESTED?** Y N ☒

ADDITIONAL INFORMATION

AT 2036 HOURS, I WAS SENT TO THE WESTERN TELLER MACHINE AT WEST 5TH
AVENUE AND CHESTNUT STREET IN REFERENCE TO AN ARMED ROBBERY OF AN
INDIVIDUAL. WHILE EN ROUTE, I WAS TOLD BY RADIO THAT THE SUSPECTS
WERE TWO BLACK MALES. ONE SUSPECT WAS LAST SEEN RUNNING NORTH

STATUS: ☐ UNFOUNDED ☐ ARREST—ADULT ☐ PENDING ☐ ARREST—JUVENILE ☐ INACTIVE ☐ EXCEPTIONAL CLEAR

INV. OFFICERS SIGNATURE   #1913   NCIC ENTRY ☐ YES ☐ NO   PAGE 1 OF 3   REVIEWER 075

ASSIGNED DETECTIVE

WHITE – RECORDS    CANARY – DETECTIVE

PBPD FORM 101    57    57-15    Respondent's Exhibit E

BLUFF POLICE DEPARTMENT

| CRIME | LOCATION OF CRIME | Y | N | INVESTIGATION REPORT | | |
|---|---|---|---|---|---|---|
| | | BUS/RES | FROM DATE AND TIME | TO DATE AND TIME | | |
| ~RED ROBBERY | 200 BLOCK OF WEST 5TH AVE. | BUS | 5-5-93 2030 | 5-5-93 2032 | | |

| /TIME REPORTED | SHIFT | ZONE | REPORT AREA | OFFICER'S NAME | EMP NO | ASSISTING OFFICER | CASE FILE |
|---|---|---|---|---|---|---|---|
| 5-93 2032 | 2 | 4 | | G.T. TAYLOR | 1913 | S. McCOLLOUGH | 21205 |

VICTIM OR BUSINESS

| NAME | | | | | S.S.# | | EMPLOYER OR SCHOOL | |
|---|---|---|---|---|---|---|---|---|
| GARY WAYNE TURNER | | | | | 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 | | | |
| ADDRESS | | | | | HOME PHONE | | BUSINESS PHONE | |
| 2619 SOUTH CHERRY STREET | | | | | | | | |
| RACE | SEX | DATE OF BIRTH | WILL COMPLAINANT PROSECUTE | | | | | |
| W | M | 08-16-54 | ☒ YES ☐ NO | ☐ CORPORATION | ☐ PARTNERSHIP | ☐ SOLE OWNER | | |

TOWARD THE GREYHOUND BUS STATION AND WAS WEARING A LONG
SLEEVE GRAY SWEATSHIRT WITH A HOOD. THE SECOND SUSPECT, ALSO
RUNNING NORTH, WAS WEARING A LIGHT COLORED T-SHIRT AND BLACK
SHORTS.

As I ARRIVED ON THE SCENE, RADIO OPERATOR BUMPASS ADVISED
ME THAT THERE HAD BEEN SHOTS FIRED WITH ONE DOWN AND THAT
AN AMBULANCE WAS EN ROUTE.

WHEN I ARRIVED, I SAW A BLUE JEEP PICKUP, WITH AR LPN TMC408
PARKED AT THE TELLER MACHINE AND A GOLD COLORED FORD TAURUS PARKED
ON THE PARKING LOT ON THE SOUTHEAST CORNER OF THE TELLER
MACHINE. WHEN I APPROACHED THE DRIVER'S SIDE OF THE PICKUP, I
COULD SEE A WHITE MALE SLUMPED FORWARD INSIDE WITH HIS FORE-
HEAD AGAINST THE STEERING WHEEL. THE WHITE MALE WAS BLEEDING
FROM A WOUND TO THE LEFT TEMPLE AREA OF HIS HEAD. AT THIS
TIME, A BLACK MALE WALKED UP TO ME AND SAID THAT HE HAD SEEN
TWO BLACK MALES RUN FROM THE SCENE AFTER HEARING A SHOT FIRED.
THE WITNESS IDENTIFIED HIMSELF TO ME AS BEING JAMES NELSON, AND
SAID THAT HE HAD CALLED THE POLICE FROM ECONO LODGE. I THEN
CALLED BY RADIO FOR THE AMBULANCE TO STEP IT UP AND THAT I NEEDED
A DETECTIVE UNIT AT MY LOCATION A.S.A.P.

WHILE I WAS CHECKING ON THE VICTIMS' CONDITION, OFFICER
SCOTT McCOLLOUGH ARRIVED ON THE SCENE AND SPOKE WITH THE WITNESS
AND OBTAINED A DESCRIPTION OF THE SUSPECTS TO GIVE TO THE OTHER
UNITS RESPONDING TO THE AREA.

LUSBY'S AMBULANCE ARRIVED AT ABOUT 2046 (ACCORDING TO LUSBY'S
DISPATCH RECORDS) AND REMOVED THE VICTIM FROM HIS VEHICLE AND BEGAN
EMERGENCY MEDICAL TREATMENT. I HAD BEEN UNABLE TO OBTAIN A
RESPONSE FROM THE VICTIM, HOWEVER HE WAS BREATHING VERY
LABORIOUSLY.

AT THIS TIME, OTHER UNITS ARRIVED ON THE SCENE AND BEGAN CONDUCTING
SEARCH OF THE AREA FOR POSSIBLE SUSPECTS.

| STATUS | | | NCIC | No Yes | | |
|---|---|---|---|---|---|---|
| ☐ UNFOUNDED ☐ ARREST-ADULT | | | Enter | ☐ ☐ | | |
| ☐ PENDING ☐ ARREST-JUVENILE | | | NCIC | No Yes | | |
| ☐ INACTIVE ☐ EXCEPTIONAL CLEAR | | | Cancelled | ☐ ☐ | | |
| ASSIGNED DETECTIVE | | OFFICER'S SIGNATURE | PAGE 2 OF 3 | REVIEWER | | |

| BLUFF POLICE DEPARTMENT | | | | Y | N | | INVESTIGATION REPORT | |
|---|---|---|---|---|---|---|---|---|
| CRIME | LOCATION OF CRIME | | | BUS/RES | FROM DATE AND TIME | | TO DATE AND TIME | |
| ARMED ROBBERY | 200 BLOCK OF WEST 5TH AVE. | | | Bus. | 5-5-93  2030 | | 5-5-93  2032 | |
| DATE/TIME REPORTED | SHIFT | ZONE | REPORT AREA | OFFICER'S NAME | | EMP. NO | ASSISTING OFFICER | CASE FILE |
| 5-5-93  2032 | 2 | 4 | | G. T. TAYLOR | | 1913 | S. McCOLLOUGH | 21205 |

VICTIM OR BUSINESS

| NAME | | | | | | EMPLOYER OR SCHOOL | |
|---|---|---|---|---|---|---|---|
| GARY WAYNE TURNER | | | S.S. 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 | | | | |
| ADDRESS | | | HOME PHONE | | | BUSINESS PHONE | |
| 2119 SOUTH CHERRY STREET | | | | | | | |

| RACE | SEX | DATE OF BIRTH | WILL COMPLAINANT PROSECUTE | | CORPORATION | PARTNERSHIP | SOLE OWNER |
|---|---|---|---|---|---|---|---|
| W | M | 08-16-54 | ☒ YES  ☐ NO | | ☐ | ☐ | ☐ |

WHEN DETECTIVES (LT. ADDISON, SGT. BACON, DET. HILL) ARRIVED, I TOLD THEM WHAT I HAD FOUND OUT UP TO THEN AND THEY BEGAN SECURING THE VICTIMS' VEHICLE AND THE TELLER MACHINE FOR PROCESSING.

MR. NELSON SAID THAT HE WAS DRIVING WEST ON WEST 5TH AVENUE WHEN HE HEARD A LOUD NOISE, THEN WHAT SOUNDED LIKE A GUNSHOT FROM THE TELLER MACHINE. HE SAID THAT WHEN HE LOOKED TOWARD THE MACHINE, HE SAW TWO BLACK MALES (JR. HIGH SCHOOL AGED) RUN FROM THE DRIVERS' SIDE OF THE PICKUP, THEN NORTH ACROSS 5TH AVE. AND EAST OF THE BUILDING AT 219 W. 5TH ST. MR. NELSON SAID THAT HE STOPPED AT THE TRUCK TO CHECK ON THE MAN THERE AND SAW THAT HE WAS BLEEDING FROM THE HEAD. WHEN MR. NELSON COULDN'T GET A RESPONSE FROM THE MAN, HE SAID HE WENT TO ECONO-LODGE AND CALLED THE POLICE. MR. NELSON SAID THAT HE THEN CIRCLED THE BLOCK, LOOKING FOR THE TWO BLACK MALES HE HAD SEEN RUNNING AWAY, BUT COULD NOT FIND THEM. MR. NELSON SAID HE THEN WENT BACK TO THE TELLER MACHINE TO CHECK ON THE VICTIM. MR. NELSON SAID THAT WHEN HE LOOKED CLOSER AT THE WOUND TO THE VICTIMS' HEAD, HE COULD TELL THAT HE HAD BEEN SHOT. MR. NELSON THEN RAN ON FOOT, BACK TO ECONO-LODGE AND CALLED THE POLICE TO REPORT HIS FINDINGS. WHEN HE RETURNED BACK AT THE TELLER MACHINE, MR. NELSON SAID, WAS WHEN THIS OFFICER ARRIVED.

MR. TURNER, THE VICTIM, WAS TRANSPORTED TO JRMC BY LUSBY'S AMBULANCE AND IS STILL ALIVE AT THE TIME OF THIS REPORT.

| | 59 | STATUS | | | NCIC Enter | No ☐ Yes ☐ | |
|---|---|---|---|---|---|---|---|
| ASSIGNED DETECTIVE | | ☐ UNFOUNDED  ☐ ARREST-ADULT  ☐ PENDING  ☐ ARREST-JUVENILE  ☐ INACTIVE  ☐ EXCEPTIONAL CLEAR | | ___ #1913 OFFICER'S SIGNATURE | NCIC Cancelled  PAGE _ OF _ | No ☐ Yes ☐ | 12/11/075 REVIEWER |

# ARKANSAS ARREST / DISPOSITION REPORT

| NDANT IDENTIFICATION | Jefferson County Sheriff's Office | NCIC Code | AR0350000 |
|---|---|---|---|

**Last:** A M S  **First:** K E N N E T H  **Middle:**

Aliases:

**Street Address:** 1 0 0 3   W E S T   3 R D        **Phone No**

**City & State:** P I N E   B L U F F   A R        **Zip:** 7 1 6 0 1

**Computer Use - CSN:**     **F.B.I. No:**     **State I.D. No:**

**Social Security No:**     **Driver License No /State:**     **Local I.D. No:**

| Sex | Race | Ethnicity | Date of Birth | Age | Place of Birth |
|---|---|---|---|---|---|
| ☒ M 1 ☐ White  3 ☐ American Indian or Alaskan Native | 5 ☐ Unknown | ☐ Hispanic | mo 1 2  day 2 1  yr 7 4 | 18 | |
| ☐ F 2 ☒ Black  4 ☐ Asian or Pacific Islander | | ☐ Not Hispanic | | | |

| Hair | Eyes | Weight | Height | Scars and Marks |
|---|---|---|---|---|
| BLK | BRN | 120 | 5-5 | "KENE" ON LEFT FOREARM   TATOO OF CROSS ON BACK OF LEFT HAND |

| Complexion | Build | Employer/Occupation |
|---|---|---|
| LIGHT | SMALL | NONE |

**Notify In Case Of Emergency:** JOANN REAMS        **Phone No**

**Street Address:** 1003 W. 3RD    **City, State, Zip:** PINE BLUFF AR 71601

## ARREST          PLEASE PRESS HARD -

**Place of Arrest:** 3RD AND OAK        **Arresting Officers:** #1931 BACON / HOTSON

| Date of Arrest | Time of Arrest | Bail Amount Set | Offense No | Agency Received From | Agency Transferred to |
|---|---|---|---|---|---|
| /93 | 1600 | | 5-36-106 | PBPD | |

| | Computer USE-SRN | Case/Docket No | Statute No | Counts | Charge Desc | Law Enforcement Action | Date of Action |
|---|---|---|---|---|---|---|---|
| 1 | | | 5-36-106 | 1 | THEFT BY REC (FELONY) | | |
| 2 | | | | | | | |
| 3 | | | | | | | |

**Facts of Arrest (Explain in Detail):** P/C    **Fingerprint Card** ☐ Yes ☐ No   **More Charges?** ☐ Yes ☐ No

| | Court Date | Court Trying Case | | |
|---|---|---|---|---|

| Complainant and Witness Names | Address | | Phone | Right Thumb Print |
|---|---|---|---|---|
| Complainant CITY CASE | Home | | | |
| | Business | | | |
| | Home | | | |
| | Business | | | |
| Witness | Home | | | |
| | Business | | | 60 |

PINE BLUFF POLICE DEPARTMENT

Robbery - Strong Arm — Bus 534-2893 2105 534-2893 2105

| DATE & TIME REPORTED | SHIFT | ZONE | REPORT AREA | OFFICER'S NAME | EMP. NO. | ASST'G OFFICER | CASE FILT |
|---|---|---|---|---|---|---|---|
| 534-2893 2195 | 2 | 6 | | Murray | 1490 | | |

VICTIM OR BUSINESS: Curtis T Gilbert Jr
S.S.# 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  Student UAPB
303 N Missouri Crossett AK
HOME PHONE 501-364-5871  BUSINESS PHONE

SEX F/M  DATE OF BIRTH 8-8-73  WILL COMPLAINANT PROSECUTE ☐ YES ☐ NO  ☐ CORPORATION  ☐ PARTNERSHIP  ☐ SOLE OWNER

INJURED PERSON: VICTIM TAKEN TO  TRANSPORTED BY  ADMITTED ☐ YES ☐ NO  ATTENDING DOCTOR

**A IS STOLEN PROPERTY TRACEABLE? Y ☐ N ■**

| CODES | CODE | QUANTITY | DESCRIPTION OF PROPERTY (SIZE, COLOR, MODEL, STYLE, BRAND, CONDITION) | SERIAL NO. | VALUE |
|---|---|---|---|---|---|
| STOLEN | | | (Wednesday) | 534-9740 | Hunt Hall |
| RECOVERED | | | Crossett 364-5871 | | |
| LOST | | | | | |
| DAMAGED | | | | | |

REP. FILED FOR INSURANCE ONLY ☐ YES ☐ NO  DISPOSITION OF PROPERTY  VALUE DAMAGED  VALUE RECOVERED  TOTAL VALUE STOLEN

**B IS SIGNIFICANT PHYSICAL EVIDENCE PRESENT? Y ☐ N ■**

R  PERSON REPORTING: Curtis T Gilbert  ADDRESS DAO's 877-2662  HOME PHONE 364-582
M  DATE OF BIRTH 8-8-73  BUSINESS ADDRESS Student UAPB  WORK # EXT 301  BUS. PHONE
E  NAME  ADDRESS Or EX 326  9.30 Break  12.00 Lunch

877-2662

**D IS THERE SIGNIFICANT M.O. PRESENT? Y ☐ N X**

POINT OF ENTRY  METHOD USED TO COMMIT CRIME: Att: Robbery Victim

**E CAN SUSPECT BE NAMED? Y ☐ N X**

| | RACE | SEX | AGE | DATE OF BIRTH | WEIGHT | HEIGHT | HAIR COLOR | EYE COLOR |
|---|---|---|---|---|---|---|---|---|
| | B | M | | | | | | |

**F CAN SUSPECT BE LOCATED? Y ☐ N X**

| | RACE | SEX | AGE | DATE OF BIRTH | WEIGHT | HEIGHT | HAIR COLOR | EYE COLOR |
|---|---|---|---|---|---|---|---|---|
| | B | M | | | | | | |

**G CAN SUSPECT BE DESCRIBED? Y ■ N ☐**

**H CAN SUSPECT BE IDENTIFIED? Y ☐ N X**

| | RACE | SEX | AGE | DATE OF BIRTH | WEIGHT | HEIGHT | HAIR COLOR | EYE COLOR |
|---|---|---|---|---|---|---|---|---|
| | B | M | | | | | | |

**I WAS SUSPECT ARRESTED? Y ☐ N X**

ADDITIONAL INFORMATION: Mr Gilbert stated that he pulled in to the express banking machine at Simmons First National Bank and put his money card in while he started to push his code in three to four B/m's approached him from behind one of the subjects put a gun beside his head and ...

| STATUS |
|---|
| ☐ UNFOUNDED  ☐ ARREST-ADULT |
| ☐ PENDING  ☐ ARREST-JUVENILE |
| ☐ INACTIVE  ☐ EXCEPTIONAL CLEAR |

OFFICERS SIGNATURE  Edw J R Murray

61

WHITE - RECORDS  CANARY - DETECTIVE

PBPO FORM 101

| CRIME | LOCATION OF CRIME | | BUS/RES | FROM DATE AND TIME | TO DATE AND TIME |
|---|---|---|---|---|---|
| Att. Robbery | 5th & Pine | | Bus | 4-28-93 2105 | 4-28-93 2105 |

| DATE/TIME REPORTED | SHIFT | ZONE | REPORT AREA | OFFICER'S NAME | EMP. NO | ASSISTING OFFICER | CASE FILE |
|---|---|---|---|---|---|---|---|
| 4-28-93 2145 | 2 | 6 | | Murray | 1490 | | 19855 |

**VICTIM OR BUSINESS**

| NAME Curtis I. Gilbert | S.S. 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 | EMPLOYER OR SCHOOL Student UAPB |
|---|---|---|
| ADDRESS 303 N Missouri Crossett Ar | HOME PHONE 501-364-5821 | BUSINESS PHONE |

| RACE B | SEX M | DATE OF BIRTH 8-8-73 | WILL COMPLAINANT PROSECUTE ☒ YES ☐ NO | Joel ☐ CORPORATION ☐ PARTNERSHIP ☐ SOLE OWNER |
|---|---|---|---|---|

Give me everything you got, Mr. Gilbert said when He Tried
Get His Code in So He could give them some money. Another
Subject struck Him in the mouth with His Fist And stated
Give me what you Got. Mr. Gilbert said At this time He
Looked At the weapon And didn't see Any Bullets in the Pistol
, Then pushed the Pistol Away From His Head And drove
Away At A High Rate of speed leaving His money Card
in the money machine.

        Mr. Gilbert said All the suspects Had Hands
Over There Head except one of them.

| STATUS | | NCIC | |
|---|---|---|---|
| ☐ UNFOUNDED ☐ ARREST—ADULT | | Enter No ☐ Yes ☐ | |
| ☐ PENDING ☐ ARREST—JUVENILE | INV. OFFICER'S SIGNATURE | NCIC Cancelled No ☐ Yes ☐ | Tms 1745 |
| ☐ INACTIVE ☐ EXCEPTIONAL CLEAR | | PAGE 2 OF 2 | REVIEWED |
| ASSIGNED DETECTIVE | | | |

CURTIS T GILBERT JR.

WORTHEN ACCOUNT. CHECKING ACCOUNT.

DID NOT MAKE TRANSACTION ON 4/28/93

4/25/93 or 4/24/93

PONTIAC 2000

3 or 4 or 5

one from front & one from back

one from back had pistol & put it to the temple i, his head. Left side

on from front did talking at front of door

Head or heads of at least two of them including one in front.

Pulled the gun down.

One at front hit him in the mouth one time.

16 TO 18

PISTOL CHROME/NICKEL.
LARGE 38. 6" BARREL

63

SWEAT SHIRT  BLACK or Blue
TACKING
SHORTER THAN ME

FRONT                          BACK

ME 5'11 TO MY CHIN          TALL AS ME

MY WEIGHT                    LIGHT WEIGHT

SHOULDERS BROADER            190    200

16-18                        TALL / SLIM

DON'T TOUCH STICK

I DON'T KNOW WHAT

YOU GOT.

64

INTERVIEW WITH CURTIS T. GILBERT JR.
5/6/93

1ST SUSPECT                                    PISTOL / BACK
                5'11   6'
                190   200
        TALL & SLIM
        DARK   COMPLEXION
        WEARING   HOOD   BLUE or BLACK
        FACIAL   HAIR   DON'T REMEMBER SEEING ANY


2nd SUSPECT         5'7 — 5'9   TALKING / FRONT
                150 LBS — 170 LBS
        SHOULDER BROADER THAN MINE
        16 — 18   YRS of AGE
        LIGHT COMPLEXION


WEAPON   38 CAL REVOLVER   NICKLE /
        4" or 6" BARREL   NOT SHINNY

65

INTERVIEW WITH CURTIS T. GILBERT JR.

5/6/93

1ST SUSPECT                                    PISTOL / BACK

5'11    6'

190   200

TALL & SLIM

DARK   COMPLEXION

WEARING  HOOD  BLUE or BLACK

FACIAL  HAIR  DON'T  REMEMBER  SEEING  ANY


2nd SUSPECT      5'7 - 5'9    TALKING / FRONT

150 LBS - 170 LBS

SHOULDER BROADER THAN MINE

16 - 18  YRS OF AGE

LIGHT  COMPLEXION


WEAPON    38 CAL  REVOLVER    NICKLE /

4" or 6" BARREL    NOT / SHINNY


66

 Respondent's Exhibit E

# PINE BLUFF POLICE DEPARTMENT — INVESTIGATION REPORT

N0542-93   202   Y

| TYPE CRIME | LOCATION, CRIME | BUS/RES | FROM DATE AND TIME | TO DATE AND TIME |
|---|---|---|---|---|
| BURGLARY | P.B. Dry Cleaners/1009 S. Poplar | Bus. | 4/27/93 TO 17:15 | 4/28/93 TO 05:45 |

| DATE/TIME REPORTED | SHIFT | ZONE | REPORT AREA | OFFICER'S NAME | EMP. NO. | ASSISTING OFFICER | CASE FILE |
|---|---|---|---|---|---|---|---|
| 93 06:30 | 3 | 6 | | M. Calhoun | 3207 | | 19724 |

**VICTIM OR BUSINESS**
Pine Bluff Dry Cleaners
ADDRESS: 1009 S. Poplar

BUSINESS PHONE: 534-5310
SOLE OWNER

WILL COMPLAINANT PROSECUTE? ☒ YES ☐ NO

**A  IS STOLEN PROPERTY TRACEABLE?  Y ☐ N ☒**

| CODES | DOOR | DESCRIPTION OF PROPERTY | SERIAL NO. | VALUE |
|---|---|---|---|---|
| STOLEN | S | H+R .32 cal Revolver Blue steel | unk. | 100.00 |
| STOLEN | S | 2 - leather jackets - Bomber style - Brown | — | 400.00 |
| STOLEN | S | Approx. $8 in various change | — | 8.00 |
| DAMAGED | D | Rear door - East side entrance | — | 50 |

DISPOSITION OF PROPERTY: Stolen/Damaged
VALUE DAMAGED: 50   VALUE RECOVERED: -0-   TOTAL VALUE STOLEN: 508.00

**B  IS SIGNIFICANT PHYSICAL EVIDENCE PRESENT?  Y ☐ N ☒**

| PR | William E. Morrison | ADDRESS: 2819 Kimberly P.B. | HOME PHONE: 879-4777 |
|---|---|---|---|
| SEX M | DATE OF BIRTH 10/17/44 | BUSINESS ADDRESS: P.B. Dry Cleaners | BUS PHONE: 534-5310 |

POINT OF ENTRY: Rear door
METHOD USED TO COMMIT CRIME: Bodily Force

**D  IS THERE SIGNIFICANT M.O. PRESENT?  Y ☐ N ☒**
**E  CAN SUSPECT BE NAMED?  Y ☐ N ☒**
**F  CAN SUSPECT BE LOCATED?  Y ☐ N ☒**
**G  CAN SUSPECT BE DESCRIBED?  Y ☐ N ☒**
**H  CAN SUSPECT BE IDENTIFIED?  Y ☐ N ☒**
**I  WAS SUSPECT ARRESTED?  Y ☐ N ☒**

ALIAS: Unknown

**ADDITIONAL INFORMATION**

Mr. Morrison said when he came to work this morning he found the bottom panel of the back door had been kicked out. He said the above listed items were missing.

The back door of the business where entry was gained, had been

| STATUS | NY OFFICERS SIGNATURE | | PAGE 1 OF 2 |
|---|---|---|---|
| ☐ UNFOUNDED ☐ ARREST-ADULT | | 3207 | |
| ☐ PENDING ☐ ARREST-JUVENILE | M. Calhoun | | |
| ☐ INACTIVE ☐ EXCEPTIONAL CLEAR | | | |

67

5725   Respondent's Exhibit E

WHITE - RECORDS   CANARY - DETECTIVE

| E BLUFF POLICE DEPARTMEN | | | | | INVESTIGATION REPORT | | |
|---|---|---|---|---|---|---|---|
| CRIME | LOCATION OF CRIME | | | % BUS/RES % | 1 FROM DATE AND TIME | | TO DATE AND TIME |
| Burglary | P.B. Cleaners / 1009 S. Poplar | | | Bus. | 4/27/93 17:45 | | 4/28/93 05:45 |
| TE/TIME REPORTED | SHIFT | ZONE | REPORT AREA | OFFICER'S NAME | EMP. NO. | ASSISTING OFFICER | CASE FILE |
| 28/93 06:30 | 3 | 6 | | N. Gillium | 3207 | | 19724 |

| NAME | | | VICTIM OR BUSINESS | | |
|---|---|---|---|---|---|
| Pine Bluff Dry Cleaners | | | S.S.# | | EMPLOYER OR SCHOOL |

| ADDRESS | | | | HOME PHONE | | BUSINESS PHONE |
|---|---|---|---|---|---|---|
| 1009 S. Poplar | | | | | | 534-5310 |

| RACE | SEX | DATE OF BIRTH | WILL COMPLAINANT PROSECUTE | | | | |
|---|---|---|---|---|---|---|---|
| | | | ☒ YES ☐ NO | ☐ CORPORATION | ☐ PARTNERSHIP | ☒ SOLE OWNER |

Nailed shut. Entry was gained through a small hole made when the bottom panel of the door was kicked out. The door was not visible from the road or the parking lot of the business.

The leather jackets were hanging up in the rear of the store. The money was taken from the cash register at the front of the store and the pistol was under the counter also at the front of the store.

The business was equipped with an old model audible alarm but the alarm was not functioning properly.

68

| STATUS | | | | NCIC Enter | No ☐ Yes ☐ | 281 |
|---|---|---|---|---|---|---|
| ☐ UNFOUNDED ☐ ARREST—ADULT, | | | 3207 | | | |
| ☐ PENDING ☐ ARREST—JUVENILE | | | | NCIC Cancelled | No ☐ Yes ☐ | |
| ☐ INACTIVE ☐ EXCEPTIONAL CLEAR | INV. OFFICER'S SIGNATURE | | | PAGE 2 OF 2 | | REVIEWER |
| ASSIGNED DETECTIVE | | | | | | |

# PINE BLUFF POLICE DEPARTMENT — INVESTIGATION REPORT

| CRIME | LOCATION CRIME | BUS/RES | FROM | AM/PM | TO | AM/PM |
|---|---|---|---|---|---|---|
| Robbery #221 W 4th | Bus | 4-29-93 | 0800 | | 4-29-93 | 0811 |

| DATE/TIME REPORTED/WHO | SHIFT | ZONE | REPORT AREA | REPORTING OFFICER'S NAME | EMP. NO. | ASSISTING OFFICER | CASE FILE |
|---|---|---|---|---|---|---|---|
| 4-29-93 0813 | 1 | 6 | | SANDERS | 3138 | | 19913 |

VICTIM OR BUSINESS: Greyhound Bus Station
ADDRESS: 221 W. 4th
S.S. #:
HOME PHONE:
BUSINESS PHONE: 535-1020
EMPLOYER OR SCHOOL:

WILL COMPLAINANT PROSECUTE: ☑ YES ☐ NO
☑ CORPORATION ☐ PARTNERSHIP ☐ SOLE OWNER

**A. IS STOLEN PROPERTY TRACEABLE?** Y ☐ N ☑

| CODES | CODE | DESCRIPTION OF PROPERTY | SERIAL NO. | VALUE |
|---|---|---|---|---|
| STOLEN | S | Cash | | 100⁰⁰ |

DISPOSITION OF PROPERTY:
VALUE DAMAGED: Ø
VALUE RECOVERED: Ø
TOTAL VALUE STOLEN: 100

**B. IS SIGNIFICANT PHYSICAL EVIDENCE PRESENT?** Y ☑ N ☐
WORK PERFORMED: ☑ YES ☐ NO   PERFORMED BY: SANDERS   TYPE OF PROCESSING: Fingerprints

PERSON REPORTING:
PR. Bonnie Phillips   ADDRESS: 2009 Bay   Pine Bluff   HOME PHONE: 531-6428
DOB: 10-19-41   221 W. 4th   Pine Bluff AR   BUS. PHONE: 535-1020

POINT OF ENTRY: Rear door
METHOD USED TO COMMIT CRIME: Demanded Money with hand gun
**D. IS THERE SIGNIFICANT M.O. PRESENT?** Y ☑ N ☐

| | RACE | SEX | AGE | DATE OF BIRTH | WEIGHT | HEIGHT | HAIR COLOR | EYE COLOR |
|---|---|---|---|---|---|---|---|---|
| | B/M | M | unknown | | 135 | 5'7" | Black | Brown |

**E. CAN SUSPECT BE NAMED?** Y ☐ N ☑
**F. CAN SUSPECT BE LOCATED?** Y ☐ N ☑
**G. CAN SUSPECT BE DESCRIBED?** Y ☑ N ☐
**H. CAN SUSPECT BE IDENTIFIED?** Y ☐ N ☑
**I. WAS SUSPECT ARRESTED?** Y ☐ N ☑

ADDITIONAL INFORMATION: Ms. Phillips stated that while she was sitting behind desk reading a magazine a young black male came through the rear door and said "I need money Pitch." Ms. Phillips...

**STATUS**
☐ UNFOUNDED ☐ ARREST-ADULT
☐ PENDING ☐ ARREST-JUVENILE
☐ INACTIVE ☐ EXCEPTIONAL CLEAR

PD FORM 101   WHITE - RECORDS   CANARY - DETECTIVE

| PINE BLUFF POLICE DEPARTMENT | | | | | | | INVESTIGATION REPORT | |
|---|---|---|---|---|---|---|---|---|
| CRIME | LOCATION OF CRIME | | | | BUS/RES | FROM DATE AND TIME | TO DATE AND TIME | |
| Agg. Robbery | 221 W. 4th | | | | Bus | 4-29-93 to 0000 AM PM | 4-29-93 to 0011 AM PM | |
| DATE/TIME REPORTED | SHIFT | ZONE | REPORT AREA | | OFFICER'S NAME | EMP. NO | ASSISTING OFFICER | CASE FILE |
| 29-93   0213 | 1 | 6 | | | SANDERS | 3138 | | 19913 |

NAME Greyhound Bus Station    S.S.    EMPLOYER OR SCHOOL

ADDRESS 221 W. 4th    Pine Bluff Ar    HOME PHONE

RACE  SEX  DATE OF BIRTH    WILL COMPLAINANT PROSECUTE    BUSINESS PHONE 535-1020

☑ YES  ☐ NO    ☒ CORPORATION  ☐ PARTNERSHIP  ☐ SOLE OWNER

Kept asking Ms Phillips "Where's all the money." Ms. Phillips stated that the suspect went through her purse looking for money. And then went to the office where the safe was. Ms. Phillips stated that the safe was locked so the suspect left out the back door of the business. At that time, she called the police. Ms. Phillips stated that the suspect kept saying that he would kill her if she moved.

Ms. Phillips described the suspect as being: a small young black male (teens to early 20's), wearing a black Raiders ball cap, Green loose jacket, light brown baggy pants.

Ms. Phillips stated that the suspect was armed with a small hand gun (revolver), Ms. Phillips also stated that the money taken was in one (1) and five (5) dollar increments.

| STATUS | | | | | NCIC | No | Yes | |
|---|---|---|---|---|---|---|---|---|
| ☐ UNFOUNDED | ☐ ARREST—ADULT | | | | Enter | ☐ | ☐ | |
| ☐ PENDING | ☐ ARREST—JUVENILE | | #3138 | | NCIC | No | Yes | |
| ☐ INACTIVE | ☐ EXCEPTIONAL CLEAR | INV. OFFICER'S SIGNATURE | | | Cancelled | ☐ | ☐ | |
| ASSIGNED DETECTIVE | | | | | PAGE 2 OF 2 | | | REVIEWER |

PINE BLUFF POLICE DEPARTMENT          Y          N          INVESTIGATION REPORT

| CRIME | LOCATION OF CRIME | BUS/RES | FROM DATE AND TIME | TO DATE AND TIME |
|---|---|---|---|---|
| Criminal Mischief | 5th + Chestnut at W 120 w. 5th | Bus | | 5-7-93  9:25am |

| TE/TIME REPORTED | SHIFT | ZONE | REPORT AREA | OFFICER'S NAME | EMP. NO. | ASSISTING OFFICER | CASE FILE |
|---|---|---|---|---|---|---|---|
| 5-7- 915am | 1 | 6 | | E. Turner | 1822 | J. Bunting | 21530 |

VICTIM OR BUSINESS

NAME ② Worthen Bank ATM Machine     S.S.     EMPLOYER OR SCHOOL

ADDRESS 120 W. 5th     HOME PHONE     BUSINESS PHONE 5 41-82 51

| RACE | SEX | DATE OF BIRTH | WILL COMPLAINANT PROSECUTE ☐ YES ☐ NO | ☐ CORPORATION | ☐ PARTNERSHIP | ☐ SOLE OWNER |
|---|---|---|---|---|---|---|

On the above date and time officers were stopped by Worthen Bank officials. At 5th Chestnut the ATM money machine had been damaged by gunfire. Worthen officials stated they were installing mirrors on the machine and noticed the front had a number of gun shots. The machine had been shot 8-10 times. Capt. Herrman arrived with Sgt. Hopson. Officer J. Bunting located a number of empty 9mm shell casings on 5 Street. These cases were photed and taken into evidence by Sgt. Hopson. A search of the area did not yield anymore evidence. Officers talked with a number of people in the area. No one stated they saw or heard anything.

Mr. Mike Parette, a Worthen official (541-8251) was present at the scene. Mr. Mike Dennis of Harmon Dixie Glass was also present.

The crime scene was turned over to the detective division for processing.

| 71 | STATUS | | | NCIC Enter ☐No ☐Yes | |
| ASSIGNED DETECTIVE | UNFOUNDED   ARREST-ADULT   PENDING   ARREST-JUVENILE   INACTIVE   EXCEPTIONAL | OFFICER'S SIGNATURE | | NCIC Cancelled ☐No ☐Yes | REVIEWER |
| | | | | PAGE 1 OF 1 | |

# PINE BLUFF POLICE DEPARTMENT

## INVESTIGATION REPORT

| CRIME | LOCATION OF CRIME | BUS/RES | FROM DATE AND TIME | TO DATE AND TIME |
|---|---|---|---|---|
| Information | 424 Chestnut #3 | Res | 5-6-93 2330 | |

| DATE/TIME REPORTED | SHIFT | ZONE | REPORT AREA | OFFICER'S NAME | EMP NO. | ASSISTING OFFICER | CASE FILE |
|---|---|---|---|---|---|---|---|
| ?-93, 0940 | 1 | 6 | | R. Riggins | 1782 | | 21716 |

### VICTIM OR BUSINESS

| NAME | | S S # | | EMPLOYER OR SCHOOL |
|---|---|---|---|---|
| ADDRESS | | HOME PHONE | | BUSINESS PHONE |

| RACE | SEX | DATE OF BIRTH | WILL COMPLAINANT PROSECUTE ☐ YES ☐ NO | ☐ CORPORATION ☐ PARTNERSHIP ☐ SOLE OWNER |
|---|---|---|---|---|

I was dispatched to the above location to meet with Mr. Mike Stokes w-m 7-8-69 the resident of 424 Chestnut #3. Mr. Stokes advised me that on 5-6-93 at 2330 hours he had just gone to bed when he heard six shots. Mr. Stokes jumped out of bed, looked out his window on the east side of his apartment and saw a white S-10 Chevrolet Truck parked on Chestnut Street just north of 5th Street. The truck was described as being lowered with chrome wheels and wide tires and also had a black stripe or moulding on the truck. The truck was occupied by two black males and the driver was partially hanging out of the window when first observed by Mr. Stokes. The truck then sped away westbound on 5th Street with it's lights off. Mr. Stokes was escorted to the Detective Office where he gave a written statement to Sgt. Hopson about the incident. Later I escorted Mr. Stokes to Smart Chevrolet where he showed me a 1993 S-10 Chevrolet Truck that he described as identical to the truck he saw with the exception of the tires and wheels. I photographed this truck and turned the pictures over to Sgt. Hopson.

| STATUS | | NCIC Enter | No ☐ Yes ☐ |
|---|---|---|---|
| ☐ UNFOUNDED ☐ ARREST—ADULT | | NCIC Cancelled | No ☐ Yes ☐ |
| ☐ PENDING ☐ ARREST—JUVENILE | | PAGE 1 OF 1 | |
| ☐ INACTIVE ☐ EXCEPTIONAL CLEAR | | | |

| ASSIGNED DETECTIVE | INV. OFFICER'S SIGNATURE | REVIEWER |
|---|---|---|

Respondent's Exhibit-E

7-2

PINE BLUFF POLICE DEPARTMENT  Y  N  INVESTIGATION REPORT

| CRIME | LOCATION OF CRIME | BUS/RES | FROM DATE AND TIME | TO DATE AND TIME |
|---|---|---|---|---|
| INFO / ARREST | 5TH AND BEECH | BUS | 5/5/93 2110 | 5/5/93 2120 |

| ATE/TIME REPORTED | SHIFT | ZONE | REPORT AREA | OFFICER'S NAME | EMP. NO. | ASSISTING OFFICER | CASE FILE |
|---|---|---|---|---|---|---|---|
| 5/5/93 2120 | 2 | 6 | | J. PHILLIPS | 3195 | | 21205 |

VICTIM OR BUSINESS

| NAME | | S S # | | EMPLOYER OR SCHOOL |
|---|---|---|---|---|
| ADDRESS | | HOME PHONE | | BUSINESS PHONE |

| RACE | SEX | DATE OF BIRTH | WILL COMPLAINANT PROSECUTE ☐ YES ☐ NO | | ☐ CORPORATION | ☐ PARTNERSHIP | ☐ SOLE OWNER |
|---|---|---|---|---|---|---|---|

While on patrol in the area of 4th and Walnut I heard 3 shots being fired from the area of 4th and Olive. As I looked in the area where the shots came from I saw a blue vehicle (later identified as a blue Chev 4dr LPN WWG 501) driven by Erick Lamont Green B/M DOB 4/20/71 SSN #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 address 314 S. Olive Apt "B" Pine Bluff AR 71602 PH # 534-1734. The vehicle was also occupied by his wife Sandra Yvette Wimbley (Green) who was sitting in the front passenger seat. Also in the vehicle was their infant child Erica Deshundra Green DOB 7/2/91. The infant was being held in Ms Green's lap. The vehicle turned west on 4th street from Olive and then south on Beech. I then stopped the vehicle in the area of 5th and Beech.

I was assisted by several officers in the area. After the vehicle was stopped Officers Knowlton and Files approached the vehicle and opened the passenger side door. After the door was opened I immediately smelled a strong odor of burnt gun powder. Ms Green was then asked to exit the vehicle. She did so carrying the infant and moved to the back of the car. Ms Green admitted to firing the weapon and that the weapon was in her purse. The weapon was removed from her purse and placed into evidence. The weapon had one round in the chamber and two rounds remaining in the magazine. The weapon was identified as a Lorcin Mod L25 25 cal. Auto SER # 179689.

Ms Green advised that she had just bought the gun today and wanted to test fire the gun. She and Mr Green both asked when they would get the gun back. She also said that she did not know that it was illegal to discharge a weapon within this city limits.

| | STATUS | | | NCIC Entered | No Yes |
|---|---|---|---|---|---|
| 73 | ☐ UNFOUNDED ☐ ARREST-ADULT | | | | ☐ ☐ |
| | ☐ PENDING ☐ ARREST-JUVENILE | | | | ☐ ☐ |
| ASSIGNED DETECTIVE | ☐ INACTIVE ☐ EXCEPTIONAL CLEAR | INV. OFFICER'S SIGNATURE | | | REVIEWER |

| POLICE DEPARTMENT | | Y | N | | INVESTIGATION REPORT | |
|---|---|---|---|---|---|---|
| NAME | LOCATION OF CRIME | | BUS/RES | FROM DATE AND TIME | TO DATE AND TIME | |
| ARREST | 5th and Broad | | Bus | 5/5/93 2110 | 5/5/93 2120 | |
| TIME REPORTED | SHIFT | ZONE | REPORT AREA | OFFICER'S NAME | EMP. NO. | ASSISTING OFFICER | CASE FILE |
| 43 2120 | 2 | 6 | | J. Phillips | 3145 | | 21205 |

| VICTIM OR BUSINESS | | | |
|---|---|---|---|
| NAME | | S.S.# | EMPLOYER OR SCHOOL |
| ADDRESS | | HOME PHONE | BUSINESS PHONE |

| RACE | SEX | DATE OF BIRTH | WILL COMPLAINANT PROSECUTE ☐ YES ☐ NO | ☐ CORPORATION | ☐ PARTNERSHIP | ☐ SOLE OWNER |
|---|---|---|---|---|---|---|

Ms Green was then arrested for carrying and discharging a firearm in the city (cit# 56185 & 56186)

All of the occupants were detained and transported to the area of 5th and Chestnut for interviews with Capt Hogeman in reference to an earlier incident.

All three subjects were then transported to the 400 office, where Ms Green was fingerprinted and released (OR).

Mr Green's vehicle was towed by a Steve's Wrecker to 4720 W Barraque P.B. Ar, from the area of 5th and Broad. A witness at the scene (5th & Chestnut) advised that he knew Mr Green on sight and that he was not a suspect.

| STATUS | | NCIC Enter | No Yes ☐ ☐ | 7A |
|---|---|---|---|---|
| ☐ UNFOUNDED ☐ ARREST—ADULT | | NCIC Cancelled | No Yes ☐ ☐ | |
| ☐ PENDING ☐ ARREST—JUVENILE | 3145 | | | |
| ☐ INACTIVE ☐ EXCEPTIONAL CLEA | | | | |
| ASSIGNED DETECTIVE | N.V. OFFICER'S SIGNATURE | PAGE 2 OF 2 | REVIEWER | |

PINE BLUFF POLICE DEPARTMEN,      Y     N     INVESTIGATION REPORT

| CRIME | LOCATION OF CRIME | | BUS/RES | FROM DATE AND TIME | TO DATE AND TIME | |
|---|---|---|---|---|---|---|
| Information | | | | 5-11-93 0200 | 5-11-93 0300 | |

| DATE/TIME REPORTED | SHIFT | ZONE | REPORT AREA | OFFICER'S NAME | EMP NO. | ASSISTING OFFICER | CASE FILE |
|---|---|---|---|---|---|---|---|
| | 3 | | | David Hudson | 3227 | Lt. T. Addison | |

VICTIM OR BUSINESS

| NAME | | S S # | | EMPLOYER OR SCHOOL |
|---|---|---|---|---|
| ADDRESS | | HOME PHONE | | BUSINESS PHONE |

| RACE B | SEX M | DATE OF BIRTH | WILL COMPLAINANT PROSECUTE ☐ YES ☐ NO | ☐ CORPORATION | ☐ PARTNERSHIP | ☐ SOLE OWNER |
|---|---|---|---|---|---|---|

I (OFFICER Hudson) Assisted Lt. Addison in transporting a suspect (Kenneth Reams) To Stuttgart, For detention. While we were enroute, Lt. Addison asked the Suspect if he Knew about a robbery at the Greyhound Station? At first the suspect said, "No". After a short time the suspect said, "I did the Robbery." Lt. Addison asked, who did you rob? Suspect Said, "a middle aged heavy set woman." Lt. Addison asked how much money did you get? Suspect said, "Forty dollars" Lt. Addison asked what about the burglary at the Pine Bluff Cleaners? Suspect said, "I didn't do it." Lt. Addison asked, How did you get all the items taken in the burglary? Suspect said "I did The Burglary, I Kicked the back door in." Lt. Addison asked what did you get? Suspect said, "I got three coats, some clippers, a gun, and $10.00 or so in change."

| STATUS | | NCIC | No Yes |
|---|---|---|---|
| '75 | ☐ UNFOUNDED ☐ ARREST—ADULT ☐ PENDING ☐ ARREST—JUVENILE ☐ INACTIVE ☐ EXCEPTIONAL CLEAR | David Hudson 3227 | Enter ☐ ☐ |
| ASSIGNED DETECTIVE | | INV. OFFICER'S SIGNATURE | NCIC Cancelled ☐ ☐ PAGE 1 OF 1 REVIEWER |

```
  DKT011              Pine Bluff Police Department
  23:15:46               Master Name Search        5/08/93
                         Name Return Screen
```

| | |
|---|---|
| Name/ SUMMERVILLE,MACK | Race/ B   Sex/ M   DOB/ 1/03/42 |
| Hgt/ 509   Wgt/ 165   Eye/ | Hair/ |
| Address/ 2810 INDIANA | City/ PINE BLUFF   State/ AR |
| FBN/  94182  SSN/ | DLN/ 901793853   DL State/ AR |
| Fingerprint Card Number/ | |

```
          INSTRUCTIONS:
          1. CMD1 to return to the Main Search Screen.
          2. CMD2 to view Current Traffic & Misdemeanor Criminal Record.
          3. CMD4 "Do they have a Felony Criminal Record?"
          4. CMD5 to view Active Warrants (if any).
          5. CMD8 to Search Master Alias File.


  CMD7 - End of Job
```

76

On 05/09/93 I was contacted by Lt. Whitfield and advised of the following information:

        According to Ray Smith, the two suspect wanted for the homicide at 5th and Chestnut are a black male known as "Butterball" (Alfred Green) and a black male named "Ken or Kenny". According to Smith, after the shooting, the two went to "Butterball's" house behind the Pine Bluff Commercial and changed clothes.
        Smith reports that the house is the second white house from the corner of 3rd and Oak behind the Commercial.

        Along this same information, Det, Hendrix began an investigation on a suspect called "Butterball" (first name reported as Albert), but coulld never locate the suspect or verify his identity. The victim, Terry Benjamin pointed out the residence of 316 Oak as being where "Butterball" lived.
        The address of 316 Oak is a yellow house with a fenced in yard at the corner of 4th and Oak. The house directly north of this location would be the second white house from 3rd and Oak.

So she could have been of one house; or Smith could be off one.


                                    Det. Sgt., James Bacon




Benjamin has since moved + we don't know where.

5735    Respondent's Exhibit E

PINE BLUFF POLICE DEPARTMENT                Y        N         INVESTIGATION REPORT

| CRIME | LOCATION OF CRIME | | BUS/RES | FROM DATE AND TIME | | TO DATE AND TIME | |
|---|---|---|---|---|---|---|---|
| ✓Homicide | 5th and Chestnut | | | | TO | AM PM | TO | AM PM |

| TIME REPORTED | SHIFT | ZONE | REPORT AREA | OFFICER'S NAME | EMP. NO. | ASSISTING OFFICER | CASE FILE |
|---|---|---|---|---|---|---|---|
| 5-7-93 1420 | | | | Lt. Mack Cook | 1766 | | |

VICTIM OR BUSINESS

| NAME | | S.S.# | EMPLOYER OR SCHOOL |
|---|---|---|---|
| ADDRESS | | HOME PHONE | BUSINESS PHONE |

| RACE | SEX | DATE OF BIRTH | WILL COMPLAINANT PROSECUTE ☐ YES ☐ NO | ☐ CORPORATION | ☐ PARTNERSHIP | ☐ SOLE OWNER |
|---|---|---|---|---|---|---|

Information received this date FROM reliable Informant: There are two young black males that both live in apartment 27 of the South Shore Apts. They are named as Tony Brown, Born in 1978 and Edward Johnson, Born in 1980. The run with a light skin Black Male known only at this time as Simone. Simone is discribed as 5'10" to 6' tall and lives at 212 South Olive St. He is also discribed as a gangster. All are reported to possess hand guns of unknown calibers. Simone is known to hang in the area and is observed on a Bike regularly.

| STATUS | | | INV. OFFICER'S SIGNATURE | NCIC Enter | No Yes ☐ ☐ | |
|---|---|---|---|---|---|---|
| ☐ UNFOUNDED | ☐ ARREST—ADULT | | | NCIC Cancelled | No Yes ☐ ☐ | |
| ☐ PENDING | ☐ ARREST—JUVENILE | | | | | |
| ☐ INACTIVE | ☐ EXCEPTIONAL CLEAR | | | PAGE / OF / | | REVIEWER |

ASSIGNED DETECTIVE

78

5736   Respondent's Exhibit E

# POLICE
## CRIMINAL COMPLAINT
### PINE BLUFF, ARK.

| Case Number | NO. | 57405 |
|---|---|---|

ON _MON_ the _10_ Day of _MAY_ 19 _93_ At _1600_ AM

Name _KEATHS_ _KENNETH_
Last / (Please Print) First Middle

Street _1003_ _W._ _3rd_

City - State _PINE BLUFF_ _AR_

Age _18_  Birth Date _12-21-74_  Race _B_  Sex _M_  Ht  Wt

Hair _BLK_  Eyes _BRN_  Build  Alias

Driver Lic No  Social Security No

Place of Arrest _3rd / OAK_  Officer _BACON 1931_

Charge _THEFT BY REC._

Statute No _5-36-106_  Facts of Arrest

_SUBJ WAS IN POSSESSION OF_
_TWO LEATHER JACKETS STOLEN_
_FROM P.B. CLEANERS ON 4-23-93_
_IN A BURGLARY._

_FELONY_

Evidence Held By _BACON_

Witness  Address

Witness  Address

Releasing Officer  Time  Date  Bond By

Court Appearance  Day of  19  at  M
Address of Court : Civic Center, 200 E 8th St , Pine Bluff, Ark
I promise to appear in said Court at said time and place

Signature _PHYS ARREST_

79

| WARRANT NUMBER | STATE OF MISSOURI | CASE NUMBER |
|---|---|---|
| 019007829 | WARRANT FOR ARREST | CR36 0393-00032BF |

## Circuit Court of Butler Co, Associate Div II

THE STATE OF MISSOURI TO ANY PEACE OFFICER IN THE STATE OF MISSOURI:

You are commanded to arrest:     KENNETH REAMS

Identified by :                        ,     00000
   SSN   : 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
   DOB   : 12/21/74  Sex:M  Race:U          UTT Number:
   Other :    DL:                              OCN:
   Descr :

Who is charged with :
   BURGLARY IN THE SECOND DEGREE   RSMo: 569.170     COUNTS: 1
   CLASS C FEL OF STEALING         RSMo: 570.030     COUNTS: 1

Reason :    The Court finds reasonable belief that the defendant will
            not appear in response to a summons as provided by RSMo
            21.03.

and cause him/her  to be brought forth before this court to be dealt with
in accordance with the law, you, the officer serving this warrant, shall
execute in writing a return on this warrant to this court.

Conditions of release:
   PA RECOMMENDED BOND---2,000.00

WITNESS THE HONORABLE JOHN A. CLARK,
Judge of said court and the seal thereof, issued in the county and
            state aforesaid on this day of APR  6,1993.

(Seal of Court)

Judge of Said Court / Clerk by Order of Judge

RETURN
I certify that I served the within warrant in the County of _____
State of Missouri on _____  by arresting the within named
                                    and cause him to be brought before the
court on _____.

   FEES   : _____
   MILEAGE : _____          Arresting Officer _____
   TOTAL  : _____
                                       Title              _____

80

Respondent's Exhibit E

# FAX TRANSMISSION

TRANSMISSION DATE 5-11-93

ADDITIONAL NOTES OR COMMENTS

SENT TO Pine Bluff Ar. PD

ATTENTION Lt Cook

ATT FAX NUMBER 501-543-5162

---

Form 846

-921578W-

BUXIN & WYCKS CO., SPRINGFIELD, MO

No. 5012

Class 00

## Capias Warrant on Information

CR392-330FX

THE STATE OF MISSOURI,

To the Sheriff of ___ BUTLER ___ County, Missouri——Greeting:

You are hereby commanded to take the body of ___ KENNETH L. REAMS ___

if ___ he ___ be found in your county, and ___ him ___ safely keep so that you have ___ his ___ bod_y_ before the Honorable Judge of our ___ Circuit ___ Court, at the Court House in the County of ___ BUTLER ___ Instanter

___ KENNETH L. REAMS ___

then and there to answer unto the State of Missouri, an information returned against ___ HIM ___ by the Prosecuting Attorney of ___ BUTLER ___ County, for ___ STEALING ___

PROBATION VIOLATION

___ contrary to the Statute in such cases made and provided, and against the peace and dignity of the State.

IN TESTIMONY WHEREOF, I, ___ WANDA ELLSWORTH ___ Clerk of said

___ CIRCUIT ___ Court, have hereunto subscribed my name and affixed the seal of the said Court, at office in ___ POPLAR BLUFF, ___ this ___ 5TH ___ day of ___ NOVEMBER ___ 19 _92_.

WANDA ELLSWORTH

By ___[signature]___ Clerk

___ D.C.

BOND SET AT $10,000.00

---

5739

Respondent's Exhibit E

PROBABLE CAUSE DETENTION
of
KENNETH REAMS

On 04/28/93 P.B. Dry Cleaners reported a Burglary in which they reported two brown leather "bomber" jackets and one H&R .32 caliber revolver as being stolen. On 05/10/93 a Search Warrant was executed at the address of 1003 West 3rd (Kenneth Reams' residence), and two brown leather jackets and one holster were recovered. Reams was then booked into the Stuttgart Jail for Theft by Receiving.

During interviews, Kenneth Reams gave a Voluntary Statement saying that he had committed the Burglary and theft of the items. Reams further added that the gun was presently in the possession of Alford Goodwin.

On 05/12/93 I Det. Sgt. Bacon contacted Judge _STEVE DALRYMPLE_ and after advising him of the above information, Judge _STEVE DALRYMPLE_ found Probable Cause to detain Kenneth Reams until formal charges could be filed through the Prosecuting Attorney's Office.

_____
Det. Sgt. James Bacon

Sworn to and subscribed before me this
_12_ day of _MAY_ 1993 at _2:30 Pm_ hours.

_____
Judicial Officer

PROBABLE CAUSE DETENTION
of
ALFORD GOODWIN


On 04/28/93 P.B. Dry Cleaners reported a burglary in which two brown leather "bomber" jackets and one H&R .32 caliber revolver were stolen. On 05/10/93 Goodwin was arrested and subsequently gave a Consent to Search of his Premises and the stolen H&R .32 caliber revolver was located in his back yard underneath a bucket, where Alford Goodwin stated that he had placed the gun. Goodwin was subsequently transported to the Dumas Jail and booked for Theft by Receiving.

On 05/12/93 I Det. Sgt. James Bacon contacted Judge STEVE Dalrymple and after a review of the above information Judge STEVE Dalrymple found Probable Cause to detain Alford Goodwin until formal charges could be filed through the Prosecuting Attorney's Office.


_____
Det. Sgt. James Bacon


Sworn to and subscribed before me this
12 day of May 1993 at 2:30 Pm hours.


_____
Judicial Officer


83

STAKE OUT    5/7/93

| | | |
|---|---|---|
| 402 | SGT. HOPSON | TOP OLD AP&L BUILDING |
| 404 | DET. HUDGINS | TOP OLD AP&L BUILDING |
| 414 | DET. WILLIAMS | 5th & CHESTNUT NEW AP&L |
| 610 | OFFICER SUMNER | ECONO LODGE N.W |

| | | |
|---|---|---|
| 403 | DET. DORMAN | CATCH 1 |
| 407 | DET. DOUTHIT | CATCH 1 |

| | | |
|---|---|---|
| 970 | OFFICER GARRETT | CATCH 2 |
| 506 | DET. DYKES | CATCH 2 |

NO RADIO TRAFFIC EXCEPT
ROBBERY / SHOOTING OF ATM

SHOTS FIRED SEE SUSPECTS
FIRE SHOTS

2nd & OLIVE
3rd & OLIVE
4th & OLIVE

5th & CHESTNUT / EAST ON 5th

4/28/93       5/5/93       5/6/93
9:05          8:30         10:49

CONTACT UAPB CURTIS GILBERT

✓ STATEMENT RUBY REAMS SWORN

✓ PHILLIPS ⟷ STATEMENT ALFORD GOODWIN TAPED

✓ Burglary WITNESS D. GIBSON STATEMENT ADDISON
VICTIM
Burglary VICTIM STATEMENT LARRY MORRISON
WM MORRISON

TUE; ✓ (PISTOL CRIME LAB + T-SHIRT)

PHOTO SPEARD JAME NELSON FINGER PRINT +
ASK ABOUT BUDDY
W/ HM

PHOTO SPEARD CUTIS GILBERT JR

STATEMENT ARRIAN LOVE

CLOTHING TO CRIME LAB FIBERS

✓ T-SHIRT

WITNESS STATEMENT OWNERS A Jacket
COT CISI ASK ME ABOUT IT.

STATEMENT OF STACEY BOOKER TERMAINE BROWN'S GIRLFRIEND

✓ GET KEY BACK TO NANCY BRAKEBILL

85
GET KEY 15443C Respondent's Exhibit E MIKE PARROTT ?

Return Search Warrant

✓ Call Judge Davis.

Surveillance report Cook + Pritzen ✓

Interview ✓ EDDIE RINGO AGAIN

↓ ANDREA LOVE AGAIN

↓ STACY BOOKER

PHOTO SPREAD CURTIS GILBERT
HIS DAD WILL CALL 5/12/93
Don't ATTEMPT TO CONTACT JR.

INTERVIEW TAUHEED BROWN JOMAIN BROWN

POLYGRAPH SET FOR TOMORROW
5/12/93

86

 Respondent's Exhibit E

SUSIE

~~GXLOX MOORE~~

SUSIE'S INFO

#462 PHOTO #

1ST SUSPECT    PAUL    HARRIS    1117 W 3RD

2ND SUSPECT    MOSS OR MOORE

WHITE CHICAGO T-SHIRT

MONEY OUT OF PANT POCKET

APTS. CHECKED W/ 2 + 1 holding

NO ONE AT #3

MIKE STOKES CHECK W

87

ECONO LODGE

B/F SHORT HAIR

LEFT TOWARDS

534-6100

DARK SKIN

LONGISH FACE

5'6

16 or 17

SCOOPY SWEATER

HOTEL

LONG FINGERS

ELIZABETH BROWN
CLERK NIGHT

Hm 576-8063

6216
OSAGE RD.

5746   Respondent's Exhibit E

Lisa Haynes #4 - works at Ava Agency on Ava

Mrs Fletcher is her boss

Apt # 1  C.C. Collins                                    5-8228
Apt # 2  Paul Jones  = works Hospital    1-11-62   425-0461S
Apt # 3  Mike Staßles
Apt # 4  Lisa Haynes


Petal Shop - 247-2206
PSX 792


White Plymouth 62 mall  just setting in front of apartment


Sunset Rd =


89

   Respondent's Exhibit E

PINE BLUFF POLICE DEPARTMENT

| CRIME | LOCATION OF CRIME | | Y | N | INVESTIGATION REPORT | | |
|---|---|---|---|---|---|---|---|
| Item to Summary | | | | BUS/RES | FROM DATE AND TIME | TO DATE AND TIME | |
| TIME REPORTED | SHIFT | ZONE | REPORT AREA | OFFICER'S NAME | | | TO   AM PM |
| 5-7-93 | | | | Hopson | EMP. NO. 2022 | ASSISTING OFFICER Hudgins | CASE FILE |

NAME  93-205

VICTIM OR BUSINESS   S.S.#

ADDRESS   HOME PHONE   EMPLOYER OR SCHOOL

RACE   SEX   DATE OF BIRTH   WILL COMPLAINANT PROSECUTE   BUSINESS PHONE
☐ YES ☐ NO   ☐ CORPORATION   ☐ PARTNERSHIP   ☐ SOLE OWNER

While on special assignment on top of the building on the northwest corner of 6th + Pine from 1900 hrs. until 0040 hrs. I heard two gunshots. One was from a purple colored Cadilac from the area of about 8th + Pine and appeared to be from a small caliber weapon at about 2130 hrs. and the other was about 2230 from what appeared to be south of the convention center from a larger caliber weapon.

We observed about 4 seperate individuals, 3 B/m's and 1 w/m traveling on foot and 4 B/m's on Bicycles. These individuals were not lingering around but were moving at a quick pace. None of these were together. I observed 4 cars pull up to the Simmons A.T.M. on 6th between main + state streets. All vehicles made wide sweeps with their headlights to cover the dark areas. These vehicles came through about 45 minutes to 1 hour apart.

Sgt. Ty Hopson

| STATUS | | NCIC Enter | No Yes ☐ ☐ | 90 |
|---|---|---|---|---|
| ☐ UNFOUNDED ☐ ARREST—ADULT | | | | |
| ☐ PENDING ☐ ARREST—JUVENILE | NCIC Cancelled | No Yes ☐ ☐ | | |

ASSIGNED DETECTIVE

5748   Respondent's Exhibit E

PINE BLUFF POLICE DEPARTMENT                                    INVESTIGATION REPORT

| CRIME | LOCATION OF CRIME | Y | N BUS/RES | FROM DATE AND TIME | TO DATE AND TIME |
|---|---|---|---|---|---|
| Information | 200 E. 8th | | Bus | 5/08/93 TO 1800 PM | 5/08/93 TO 2300 PM |

| DATE/TIME REPORTED | SHIFT | ZONE | REPORT AREA | OFFICER'S NAME | EMP. NO. | ASSISTING OFFICER | CASE FILE |
|---|---|---|---|---|---|---|---|
| | | | | Sgt. R. Pritzen | 0300 | Det. Belvedresi | 93-205 |

VICTIM OR BUSINESS

| NAME | S.S.# | EMPLOYER OR SCHOOL |
|---|---|---|
| Gary Wayne Turner | | |

| ADDRESS | HOME PHONE | BUSINESS PHONE |
|---|---|---|

| RACE | SEX | DATE OF BIRTH | WILL COMPLAINANT PROSECUTE ☐ YES ☐ NO | ☐ CORPORATION ☐ PARTNERSHIP ☐ SOLE OWNER |
|---|---|---|---|---|

On 05/08/93 (Sunday) Det. D. Belvedresi and myself assisted in the investigation of the homicide of Gary Wayne Turner.  On this date, our assignment was the surveillance of the Automatic Teller Machine (ATM) located at 5th & Chestnut.  This particular machine is a Worthen Bank ATM, and is where the homicide of Mr. Turner took place.  Also, we were observing the Simmons First National Bank ATM located at E.6th & State Sts.  Our vantage point overlooking both these locations, was atop the Financial Building, located at W. 6th & Pine Sts.

During this tour of duty, we observed only three vehicles pull into the Simmons ATM. All three appeared to make normal banking transactions and drove away.

At the Worthen ATM, one black male, driving a white late model Chevrolet Corvette, parked behind the machine and walked around to the front.  When he saw that the ATM was not in working order ( the front was boarded up) he returned to his vehicle and drove away.  It seemed that this person was also attempting to make a normal banking trans-action.  When he exited the Corvette, he had what appeared to be a banking card in his right hand.

Outside of the above mentioned occurances, the only foot traffic in the area that night was a young black male who was seen walking in a northerly direction on Pine St. from W. 6th.  He continued this route until he reached either W. 2nd or Barreque St.  At this time we lost eye contact with him.

A black male, a black female (both appearing to be in their late twenties) and a young black female child on a tricycle were observed on W. 6th Ave.  This party turned north on Pine St. , then turned west and travelled through the Worthen Bank parking lot. Eye contact with these subjects was lost when they turned north onto Walnut St. at W. 5th.

No other traffic, either vehicular or pedestrian, was observed at the two ATM locations.  The surveillance was terminated due to severe weather moving into the area.

| 91 | STATUS | | NCIC Enter | No Yes ☐ ☐ | | |
|---|---|---|---|---|---|---|
| ASSIGNED DETECTIVE | ☐ UNFOUNDED ☐ ARREST–ADULT ☐ PENDING ☐ ARREST–JUVENILE ☐ INACTIVE ☐ EXCEPTIONAL CLEAR | Sgt. R. Pritzen INV. OFFICER SIGNATURE | NCIC Cancelled | No Yes ☐ ☐ | PAGE / OF / | REVIEWER |

5749   Respondent's Exhibit E

LOCATION OF INCIDENT  4th & WALNUT

DATE AND TIME OF CONTACT  2110  5/5/93

CONTACTS SIGNATURE  + Robert White

OFFICER REPORTING  3195

COMMENTS  Also WEARING Malcolm "X" Medinas
(LEATHER BLACK) Sub, was calm But
SHIRT was sticking to His Body. Sub,
APPEARED to HAVE BEEN SWEATING.

---

LOCATION OF INCIDENT  4th & WALN

DATE AND TIME OF CONTACT  2110  5/5/93

CONTACTS SIGNATURE

OFFICER REPORTING  3195

COMMENTS  WAS IN THE AREA JUST AFTER
THE INCIDENT AT 5th & CHESTNUT,
Sub, WAS CALM BUT HIS SHIRT WAS
STICKING TO HIS Body, Sub, APPEARED
to HAVE BEEN SWEATING. HAIR WAS
LONG ON TOP (AFRO Style)

02

# POLICE
## CRIMINAL COMPLAINT
### PINE BLUFF, ARK.

Case Number

NO. 57406

ON MON the 10 Day of MAY 19 93 At 1600 AM/PM

Name GOODWIN ALFORD
　　Last　(Please Print)　First　Middle

Street

City · State PINE BLUFF AR

Age 19 Birth Date 2-3-74 Race B Sex M Ht Wt

Hair BLK Eyes BRN Build Alias

Driver Lic No Social Security No 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

Place of Arrest 3RD/OAK Officer BALEN 1931

Charge THEFT BY REC

Statute 5-36-106 Facts of Arrest

SUBJ WAS IN POSS OF A
.32 REVOLVER STOLEN FROM
P.B. CLEANERS ON 4-25-93 IN
A BURGLARY

(FELONY)

Evidence
Held By

Witness Address

Witness Address

Arresting Officer Time Date Bond By

Court Appearance Day of
Address of Court · Civic Center 200 E 8th St Pine Bluff, Ark
I promise to appear in said Court at said time and place 19 at M

Signature PHYS ARREST

93

Respondent's Exhibit E

PINE BLUFF POLICE DEPARTMENT
DETECTIVE OFFICE I.D. SHEET

CASE # 93-205

*ILFORD Goodwin* SSN *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* DATE *5-10-93*
(last)      (first)    (middle)

_IAS _____ NICKNAME "*ButterBall*" DLN *None*

_DDRESS *314 South OAK ST.* CITY *Pine Bluff* STATE *ARK*

_ONE *None* RACE *B* SEX *M* DOB *2-3-74* AGE *19* R or *L* HANDED

_ES *BRN* HAIR *BLK* EMPLOYER *Pine Bluff High* OCCUPATION *Student*

_ACE OF BIRTH *Pine Bluff, ARK* EDUCATION *12 yrs*

_ARS, MARKS OR TATTOOS *Tattoo "Lashonda" Rt Arm*

_REVIOUS ARRESTS : Y or Ⓝ DATE _____ PLACE _____

_OTO # _____ FINGERPRINT # _____ PBN # _____

| | | | |
|---|---|---|---|
| _THER | *Alford Goodwin Sr* | ADDRESS *Unknown* | PHONE *536-9707* |
| _OTHER | *Flosie McLemore* | ADDRESS *314 So. OAK* | PHONE *None* |
| _POUSE | *N/A* | ADDRESS _____ | PHONE _____ |
| _ROTHER | *Steve Washington* | ADDRESS _____ | PHONE *5* |
| _ _ER | *Randy Blake* | ADDRESS _____ | PHONE _____ |
| | *Charlie Blake* | ADDRESS _____ | PHONE _____ |
| _ISTER | *Katherine Washington* | ADDRESS *Elm St* | PHONE _____ |
| _ISTER | _____ | ADDRESS _____ | PHONE _____ |
| _ISTER | _____ | ADDRESS _____ | PHONE _____ |

ARREST INFORMATION

_ATE *5-10-93* TIME *1600* LOCATION *3rd d OAK ST* OFFICER *Brich/Hepsn*

_ISUAL/PC *✓* WARRANT _____ (Circuit, Municipal, Juvenile) WARRANT #

_RANSPORTED TO WHICH JAIL *JcDC / Dumas* DATE *5-11-93* TIME *0345*

_DDITIONAL NOTES *Subject was taken to JcDC then transported to Dumas City Jail*

CITATION
NUMBER

CHARGE
DESCRIPTION

_____ _____

_____ _____

_____ _____

**94**

Respondent's Exhibit E

## ARKANSAS ARREST / DISPOSITION REPORT

| DEFENDANT IDENTIFICATION | Jefferson County Sheriff's Office | NCIC Code  AR0350000 |
|---|---|---|

**Name**  Last GOODWIN  First ALFORD  Middle (NONE)

**Street Address** 514 South OAK    **Phone No** N/A

**City & State** PINE BLUFF   **State** AR   **Zip**

**Computer Use - CSN**    **F B I No**    **State I D No**

**Social Security No** 430 21 8695    **Driver License No /State** N/A    **Local I. D. No**

| Sex: ☒M ☐F | Race: 1☐White  2☒Black  3☐American Indian or Alaskan Native  4☐Asian or Pacific Islander  5☐Unknown | Ethnicity: ☐Hispanic ☐Not Hispanic | Date of Birth mo 02 day 03 yr 74 | Age 19 | Place of Birth Pine Bluff |

**Hair** BLK   **Eyes** Brn   **Weight**   **Height**   **Scars and Marks** "LaSharda" Right Arm

**Complexion** MED   **Build** Slim   **Employer/Occupation** U.S. Post Office

**Notify in Case Of Emergency** Flosie McLemore (Mother)   **Phone No** N/A

**Street Address** 314 S. OAK   **City - State, Zip** PINE Bluff   AR.

### ARREST                    - PLEASE PRESS HARD -

**Place of Arrest** 31st & OAK  PINE BLUFF  AR   **Arresting Officers** Bacon + Hopson

**Date of Arrest** 5-10-93   **Time of Arrest** 1600   **Bail Amount Set** T.C.   **Offense No**   **Agency Received From** P.B.P.D.   **Agency Transferred to**

| | Computer USE-SRN | Case-Docket No | Statute No | Counts | Charge Desc | Law Enforcement Action | Date of Action |
|---|---|---|---|---|---|---|---|
| 1 | | | 5-36-105 | 1 | Theft by Rec. | | |
| 2 | | | | | | | |
| 3 | | | | | | | |
| 4 | | | | | | | |

**Facts of Arrest (Explain in Detail)**   Fingerprint Card ☐Yes ☐No   More Charges? ☐Yes ☐No

The Subject is being held on P.C. For
Theft by Rec.  Felony

ATT: Fingerprint Personel ORI # AR0350100

| Complainant and Witness Names | Address | Phone | Right Thumb Print |
|---|---|---|---|
| Complainant | Home | | |
| | Business | | |
| Witness | Home | | |
| | Business | | |
| Witness | Home | | |
| | Business | | |

95

ARKANSAS DEPARTMENT OF CORRECTION

JEFFERSON COUNTY DETENTION CENTER

CUSTODY RECEIPT

SO# 02788

DETAINEE'S NAME: Aljreh Bird

CHARGE: F. J. Rev.

DATE REMOVED: 5-11-93

TIME REMOVED: 3:30 Am.

DUTY JAILER: Line Fox

REASON REMOVED: Left this office (illegible)

I acknowledge receipt of the above named detainee and am responsible
for returning him to jail or reporting his/her release or other
disposition to the Duty Jailer.

SIGNATURE: J.F. Mayfield

TIME RETURNED:

DATE RETURNED:

JAILER'S SIGNATURE:

ACI-7156

Respondent's Exhibit E

96

Reference to: _Agg. Robbery_ _____ 93-205

Date and time: _5-13-93_ _____

Place: _100 6 S. Holly_ _____

#1. _Eddie Ringo_ ___ Address: _#33_ ___

#2. _Jermaine Brown_ Address: _#2335_ ___

#3. _Kenneth Reams_ Address: _____

#4. _Alford Goodwin Jr_ Address: _____

#5. _Dexter Knox_ ___ Address: _#2377_ ___

#6. _Leroy Harris_ ___ Address: _#2241_ ___

#7. _____ Address: _____

I, _____, did view the above lineup and I

identified # _____, Signed: _____

Witness: _Hayward_ _____

Witness: _____

Remarks: _I could not tell if that was one_
_of the guys or not._ _____

_____

_____

_____

Signed: _James Nelson_ _____

97

Respondent's Exhibit E

Lineup

'erence to: AGG ROBBERY

Date and time: 4/28/93     9:05 P.M.

Place: 5th + CHESTNUT   ATM

#1.  Marcus McCoy          Address: #46
#2.  Kenneth Reams         Address: 2445
#3.  Marcus Byers          Address: #17
#4.  Phillip Curry         Address: #1025
#5.  Alford Goodwin        Address: 2446
#6.  Vincent Lust          Address: #52
#7. _____        Address: _____

I, CURTIS GILBERT JR, did view the above lineup and I
'entified# 4 & #2              Signed: + Curtis T. Gilbert, Jr.
witness: P.A. Heron
Witness: Jerry Addeity
WITNESS: Curtis T. Gilbert

Remarks: #4 or #2 LOOKS LIKE THE B/M THAT
STOOD AT THE FRONT OF MY DRIVER'S DOOR +
HIT ME IN THE MOUTH.

_____

_____

                              Signed: P.A. Heron

                    X Curtis T. Gilbert Jr

98

U. S. Secret Service
Photo Display Folder

*Bacon*













99

5757













U. S. Secret Service
Photo Display Folder

Bacon

POLICE
CRIMINAL COMPLAINT
PINE BLUFF, ARK.

Case Number

NO. 57408

ON Wed. the 12th Day of May 19 93 at 8:45 AM

Name Reams        Kenneth    L.
          Last    (Please Print) First    Middle

Street 1007 W 3rd

City - State Pine Bluff, ARK.

Age 18  Birth Date 2-31-74 Race B  Sex M  Ht 5'6" Wt 12

Hair BlK  Eyes Brn  Build med  Alias

Driver
Lic No                          Social
                                Security No

Place of Arrest Det Office    Officer Addison 1568

Charge Capital Murder

Statute
No 5-10-101   Facts of Arrest Subject was

arrested on probable cause

for Capital Murder

Evidence
Held By

Witness                         Address

Witness                         Address

Releasing
Officer              Time        Date    Bond By

Court Appearance        Day of              19    at    M
Address of Court  Civic Center  200 E 8th St  Pine Bluff Ark
promise to appear in said Court at said time and place

Signature

5759  Respondent's Exhibit E

DETECTIVE OFFICE I.D. SHEET          CASE #_____

_eams_ Kenneth Lynnord    SSN_____    DATE 5-10-93
st)  (first)  (middle)

..1AS Ken - Kenny _____    NICKNAME_____    DLN None

DDRESS 1003 W 3ᴿᴰ _____    CITY P.B.    STATE AR

ONE 535-5018    RACE B    SEX M    DOB 12-21-74 AGE 18    (R) or L HANDED

ES BN    HAIR BK    EMPLOYER NONE    OCCUPATION Laborer

ACE OF BIRTH Conotia WI.    EDUCATION 11th

ARS, MARKS OR TATTOOS Tatoo 'Kenny' Left arm "+" Left hand

EVIOUS ARRESTS : (Y) or N    DATE_____    PLACE Forrest City

IOTO #_____    FINGERPRINT #_____    PBN #_____

THER Dewight Revada    ADDRESS California    PHONE
THER Beatrice Whiteside    ADDRESS Forrest City AR.    PHONE
POUSE    ADDRESS    PHONE
ROTHER Scott Whiteside    ADDRESS Forrest City AR    PHONE
ROTHER Domenique Whiteside    ADDRESS " " " "    PHONE
R    ADDRESS    PHONE
    ADDRESS    PHONE
ISTER    ADDRESS    PHONE
ISTER    ADDRESS    PHONE

ARREST INFORMATION

ATE 5-10-93    TIME 1600    LOCATION 3ᴿᴰ between Elm+Oak OFFICER Hopson/Bacon Hudgins

ISUAL/PC X    WARRANT    (Circuit, Municipal, Juvenile) WARRANT #_____

RANSPORTED TO WHICH JAIL_____    DATE_____    TIME_____

DDITIONAL NOTES_____

CITATION
NUMBER

CHARGE
DESCRIPTION

102

CONSENT TO SEARCH
PINE BLUFF POLICE DEPARTMENT

Date Consent Was Signed: _5 - 10 - 93_

Location Where Consent Was Signed: _Det. OFFICE_

I, _Kenneth Reams_                                    , having been informed
of my constitutional right not to have a search made of the premises
hereinafter mentioned without a search warrant and of my right to
refuse to consent to such a search, hereby authorize officer(s)

_____, _____,
and, _____ of the Pine Bluff Police

Department to conduct a complete search of my premises/auto located
at _1003 W 3RD_

These officers are authorized by me to take from my premises / auto
any letters, papers, materials, or other property which they may
desire.

I understand that I have the right to stop this search at any
time after my consent is given.

This written permission is being given by me to the above-named
officers voluntarily and without threats or promises of any kind.


X _Kenneth L. Reams_
Signature of Person Giving Consent


WITNESS: _Sgt. Z Hopson_

WITNESS: _____

103

5761   Respondent's Exhibit E

## DETECTIVE BUREAU SUMMARY

SUMMARY IN REFERENCE TO:  Homicide at 5th and Chestnut

CRIME:  Capt. Murder

ARKANSAS STATE STATUTE NO:  5-10-101          FILE NO:  93/205

DATE AND TIME OF INCIDENT:  05/05/93  2030 hours

VICTIM:  Gary Turner

INVESTIGATING OFFICERS:

INVESTIGATING DETECTIVE:  DET. Ivan L. Phillips

On the night of May the 5th 1993 I was working in my office, when Det. Rick Hill brought two black males in.  Detective Hill advised me that there had been a shooting at 5th and Chestnut, and that the two black males with him were witnesses.  One of the subjects was Taquante Nelson, and I took a witness statement from him.

Taquante said that he and James Nelson were driving on 5th avenue en they heard what sounded like a gunshot.  Shortly after hearing the gunshot, he saw two black males running North across 5th avenue, from the A.T.M. machine at 5th and Chestnut.  After losing sight of the two black males, they went to the A.T.M. machine where they saw a blue jeep truck parked.  Inside the truck they saw a white male who looked as if he had been shot in the head.  They then went to the Econo Lodge and called the police.

Taquante described one of the black males as being 5'11" tall and wearing a grey sweat top with a hood.  The other black male was shorter and was wearing a greyish white T-shirt and black blue jean shorts.

Taquante's statement was turned over to Detective Sgt. James Bacon.

**104**

Detective Bureau Summary
Summary in Reference to:
Page 2

On 05/05/93 at about 1800 hours I was asked to interview Alford Goodwin, in reference to this homicide. I went into the interview room and spoke with Mr. Goodwin. While speaking with him I asked him for consent to search his residence and property. Mr. Goodwin agreed to the search and signed a consent to search form. I gave the consent form to Sgt. Bacon and he took charge of searching Mr. Goodwin's residence.

After signing the consent form I spoke with Mr. Goodwin about the homicide and who was involved in it. Mr. Goodwin told me that he knew who had done it and named Ken Reams and Jermaine Brown. Mr. Goodwin said that Jermaine had brought the gun that was used, to him and he had hidden it in his back yard under a bucket, by the chain link fence. Mr. Goodwin then took me to the location of the gun and it was recovered. After returning from recovering the gun, Mr. Goodwin gave a taped statement which was turned over to Sgt. Bacon.

Later that night I asked Mr. Goodwin if he would take a polygraph exam. Mr. Goodwin agreed and was transported to the Arkansas State Police Headquarters, where he was turned over to Investigator John Howell.

While I was waiting at the A.S.P. Headquarters, Investigator Howell came out of his office and told me that Mr. Goodwin had requested to speak with me. I went in the office and Mr. Goodwin gave me a second statement. In this statement Mr. Goodwin said on 05-05-93 at about 8:15 p.m. Ken, Jermaine and himself were at his house. Alford said that Ken told them that he needed some money. Alford said that Ken told them they would go to the ATM machine and wait for someone to drive up and use their money card, then they would rob them. Alford said that they asked him if he would watch their back and he did. Alford said that Jermaine had the gun and they walked to the ATM machine and a man in a blue jeep

Detective Bureau Summary
Summary in Reference to:
Page 3

'uck pulled up to the machine. Alford said that Jermaine and Ken went to the driver's side of the truck and he was going to the passenger's side to get the keys so the man could not drive off. Alford said that when he was crossing 5th street to go to the truck he heard a shot. He said that he continued toward the truck and when he got about ten feet from the truck he saw the man slumped over the steering wheel. Alford said that he and Jermaine ran North across 5th Street and Jermaine had the gun in his hand. Alford said that Ken was standing at the rear driver's side of the truck yelling to them about his fingerprints being on the truck. Alford said that he stopped and told Ken to come on it was to late now. Alford said that Jermaine kept running until he got to the railroad tracks, then turned and ran toward Main Street. Alford said Ken caught up with them and they ran across the Econo Lodge parking lot. Alford said that Ken went to Alford's house and he went to his girl-friend's house. About 20 'nutes later Jermaine showed up at Alford's girl-friend's house and told Alford to give the gun back to Ken. Jermaine then said that he was going to his Aunt's house in Grady. 'Alford took the gun and hid it under a bucket in his back yard. Alford said that Ken had gotten the gun and three jackets from the cleaners, some where around Cherry street. After giving this statement, Alford Goodwin was transported to the Dumas City jail.

All of the statements that I have taken in this case, were turned over to Sgt. james Bacon. All of the evidence that I collected in this case was turned over to Det. Charles Hendrix.

PINE BLUFF POLICE DEPARTMENT

IVAN L. PHILLIPS
DETECTIVE

106

ADDITION TO SUMMARY


Homicide / Gary Wayne Turner

5th & Chestnut Worthen ATM

05/05/93


On 5/5/93 at about 2030 hours, I responded to 5th & Chestnut to a reported call of an armed robbery with one down. I arrived at 5th & Chestnut and was advised by Lt. Addison that the victim a white male had been transported by ambulance to Jefferson Regional Medical Center. I observed a blue Jeep Truck parked just west on the Worthen ATM Machine. The truck and immediate area were being photographed by Sgt. Bacon.

Officer G. Taylor, the first responding officer was interviewing James L. Nelson. I assisted in the interviewing of Mr. Nelson. He had observed two (2) black males standing near the victim's truck as he was traveling west on 5th. Nelson heard a thud sound then a shot, Nelson saw two (2) black males run north across 5th street. Nelson traveled on to the Econo Lodge located at 5th & Walnut and called the police. Nelson then got back in his vehicle and drove back to the ATM Machine. He walked up to the truck saw blood and the victim's head on the steering

107

- 1 -

Respondent's Exhibit E

wheel, he then ran back to the Econo Lodge and phoned the police again.

Nelson's written witness statement was taken by Det. Hill. A copy of the 911 calls to the Police desk were recorded. (See Officer Taylor's report)

Patrol units in the area observed shots being fired from a vehicle. The vehicle was stopped and a weapon was recovered. Two subjects were arrested and brought to my location at 5th & Chestnut along with a .25 caliber pistol.

The first subject, Sandra Yvette Wimbley (Green) admitted to shooting the pistol. She stated that she had bought the pistol earlier that day at Dick Warriner's Pawn Shop. She advised that she was only test firing the pistol.

The second subject Erick Lamont Green, black male DOB: 4-20-71, Address 314 S. Olive, apartment B stated that his wife Sandra had shot the pistol out of the window. I questioned Green about why his wife felt the need to purchase a weapon, Green advised for protection. I also questioned him about any problems he had in his neighborhood. He stated that the only problem he had was a small incident with a black male by the first name of Gaberial. Green was advised by this detective to contact me if he heard any information about the shooting. Green and Wimbely were placed back in the patrol unit and transported to the station.

This detective after interviewing above subjects began a search of the area north and northeast of the ATM

- 2 -

GARY T. 766 Respondent's Exhibit E

108

Machine.   I   discovered  a  9mm  federal  shell box at the
northeast  corner  of  the lot of 424 Chestnut.   This shell
box  was  located  next  to  a  dumpster and could be only a
discarded  box,  however  these  items  were  taken  in  as
evidence and turned over to Sgt. Bacon.

Detective Carnel Williams  was assigned to recover the
victim's  clothing from Jefferson  Regional  Medical Center
Emergency  Room.   Sergeant  Bacon  and  Sgt.  Hubanks took
custody of the truck for latent print processing.

This  detective  traveled  to  the Emergency  Room and
observed  the victim Gary Wayne Turner in the X-Ray area.  I
checked  Turner's forearms and hands for defense  wounds and
found none.  I also  observed  X-Rays of the victim's head.
X-Rays  revealed  what  appeared  to  be an in tact, small,
caliber bullet in the head.

On 5/6/93 at about 0500 hours, I was contacted at home
by Sgt. Roby, he  advised me  that  Turner had been removed
from  life  support  systems and had  died from the gunshot
wound to the head.

I contacted  Detective Douthit at  about 0630.  He was
advised to contact  Det. Dorman and advise him to report to
the  office  as soon as  possible.  Detectives  Douthit and
Dorman  were  assigned to check the area north and  east of
5th & Chestnut  for a  pistol or  other possible evidence.
This search was  to include all dumpsters in the area.  (See
Dorman's Summary).

109

GARY W. TURNER
5767 Respondent's Exhibit E

Detective Hudgins' assignment was to verify the story given by Sandra (Green) Wimberly as to purchasing the .25 caliber pistol on 5/5/93 at Warriner's Pawn Shop.

Sergeant Hopson was advised to contact UAPB Security and find Curtis T. Gilbert Jr. Gilbert was the victim of an attempted Robbery at the same AT, Machine which occurred on 4/28/93. This detective hoped that Gilbert could have been the victim of the same suspects and could possibly give us a better description.

Detective Powell was advised to begin a canvass of the surrounding area. She was to begin her questioning at the apartment over the office of Wanda Batman properties. These apartments are located across from the ATM Machine. (See Powell's summary)

This detective on 5/5/93 requested from Worthen Officials, information about the card holders who used the ATM Machine prior to the discovery of Gary Wayne Turner. This information was received sometime shortly after 0900 hours, on 5/6/93. A list of customers who used the ATM Machine was passed on to Det. Hudgins. He was to make contact to ascertain if possibly they had observed anyone around the area during their transaction. (See Det. Hudgins summary) The subjects on this list who could not be located were passed on to Lt. Addison for him to attempt to make contact.

Reports were gathered of two additional crimes that had occurred in the same general area. An attempted

- 4 -

GARY W. TURNER
5768   Respondent's Exhibit E

110

robbery at the Econo Lodge and an aggravated robbery of the Greyhound Bus Station.

Worthen Bank officials committed to a $5,000.00 reward for the arrest and prosecution of the suspects responsible for the murder of Gary Turner. Fliers were printed and posted offering a $5,000.00 reward for stated information.

Sergeant Hopson advised me that a Mrs. Gant at Indiana Street School had passed by the ATM Machine at about the time Turner was shot. Sergeant Hopson spoke with Ms. Gant and reported back to me what she had observed. The information that Sgt. Hopson related to me appeared to have been the actions of the witness, James Nelson. Mrs. Gant also described a vehicle similar to the type vehicle Nelson was driving. Sergeant Hopson returned to the school with photos of our witness James Nelson, dressed as he was the night before and a photo of one of the Detective units which is a Ford Taurus the same type vehicle Nelson was driving. Ms. Gant stated that it looked like that type of car and possibly the person she saw.

On 5/6/93 at 2:00 p.m. Curtis T. Gilbert Jr. was interviewed by this detective reference the attempted robbery on 4/28/93. Several attempts had been made to contact Gilbert upon this office receiving the attempted robbery report on 4/29/93. Mr. Gilbert could not be located. Mr. Gilbert stated to me that he was a student at UAPB. He was leaving school and going back to Crossett. He wanted to just leave and be done with it. Mr. Gilbet

**111**

Respondent's Exhibit E

related to me that he pulled up to the ATM Machine in a friends Pontiac 2000 and noticed three (3), four (4) or five (5) black males approaching from the back of his car. One of them walked around the ATM Machine and came to the front of his driver's door. A second subject stood just behind the drivers door and put a pistol to the left temple area of his head. Gilbert never saw any of the other suspects he assumed they or he were look-outs. Gilbert described the subject at the front of his door who did all the talking as 5'7 to 5'9, 150 to 170 pounds, light complexion 16 to 18 years of age. The subject with the pistol was described as 5'11 to 6', 190 to 200 pounds, tall and slim, dark complexion, wearing a hood. Gilbert described the pistol as Nickel, not shinny, revolver, 4 to 6 inch barrel, .38 caliber.

Mr. Gilbert followed Lt. Cook and myself to 5th & Chestnut where he showed us to the best of his memory what had occurred. This detective knew that there was a curb next to the ATM Machine. This curb could effect Gilbert's perception of how tall the suspects were. Taking the curb into account, Mr. Gilbert maintained the same heights. He remembered suspects stepping up and down on the curb. The description Gilbert gave were consistent in parts with the descriptions obtained from witness, James Nelson.

Information was received by this investigator that a clean up crew from Failla Janitorial was at the old A P & L building at the time of the shooting. Detectives Hill and

5770 Respondent's Exhibit E

112

Williams were assigned to meet with these employees at 6:00 p.m. and interview all persons that were there on 5/5/93. (See Det. Hill's Summary).

On 5/7/93 this investigator was advised to meet officers at 5th & Chestnut. I arrived at about 0920 and observed several holes to the front of the ATM Machine. I personally counted (12) twelve holes. Also found in front of the machine were several pieces of lead bullet fragments. Located in the south lane of West 5th were several 9mm spent cartridges. Photographs were taken and evidence was gathered by Sgt. Hopson and Det. Hudgins.

A computer list was obtained from department files containing all black males age 15 to 19 with a fingerprint card.

On 5/7/93 Lt. Cook obtained a list of absentees from both Pine Bluff High School and Jack Roby Jr. High. This list contained the students who were absent on 5/6/93 the day following the shooting. Reward fliers were also posted at the schools. Mr. Elgie Goss was also contacted and a memo was sent out to all teachers to report any information they heard regarding the shooting.

5/7/93 beginning at 1900 hours, 7:00 p.m. surveillance was set up for the ATM Machine and surrounding area. Surveillance was conducted until 0300 hours. Surveillance continued again on 5/8/93 from 1900 to 0300 hours and on 5/9/93 from 1900 to 2300 hours. ( See Surveillance assignments and logs.)

113

577 **Respondent's Exhibit E**

On 5/10/93 a subject called the Pine Bluff Police Department Detective Office and stated that he had heard three people talk about their involvement in the shooting of the man at the ATM Machine. This subject agreed to meet with investigators. He was brought to the prosecutor's office where he gave a sworn statement. The subject identified himself as Tauheed Brown. Mr. Brown stated that he was walking behind Alford Goodwin, Kenneth Reams and Eddie Ringo who were in front of Pine Bluff News. He heard Kenneth Reams say he was struggling with the guy and how he tried to jump into the driver's side. He then heard one of them say I shot. On the following day Brown saw Kenneth Reams with a pistol. Kenneth Reams told Brown that the pistol was a .32. The sworn statement was completed and Sgt. Pritzen handed me a note advising that the bullet recovered at the crime lab from the victims head was a .32 caliber. Be advised that during the sworn statement Tauheed Brown at one point referred to himself as Jermaine but immediately corrected himself.

Detective Hudgins was advised to take Tauheed ( Jermaine ) Brown by the residence of Kenneth Reams. Detective Hudgins was to obtain a description of the residence in order that a search warrant could be obtained. Brown, while in route to the residence, pointed out both Reams and Goodwin to Detective Hudgins. This investigator, based on information from three different sources, plus the sworn statement, had decided to arrest

the subjects as they went to school on the following morning and simultaneously execute a search warrant on the residence of Kenneth Reams. A decision was made to arrest them at this time since two of the three suspects were together. The suspects were arrested by Sgt. Hopson and Sgt. Bacon.

The suspects were separated and advised of their rights. I immediately put the information we had gathered on a affidavit for a search warrant. Judge Fred Davis III was located and the search warrant was signed by Judge Davis.

On 5/10/93 at 1800 hours, the warrant was executed at the residence of Kenneth Reams. (See Search warrant and return). Although several items were seized the most significant were three leather jackets and a brown small caliber holster. These items were consistent with items taken in Pine Bluff Dry Cleaners burglary reported 4/28/93. Sergeant Bacon had received information that the weapon used in the murder was taken in a burglary of a cleaners.

On 5/11/93 I tried to make contact with Curtis Gilbert Jr. through his father. On 5/12/93 at 8:46 p.m. Mr. Gilbert called and left a message that he would locate his son and call the following morning. Mr. Gilbert was advised that arrest had been made and we needed his son to look at a photo spread to try and identify his attempted robbery suspects.

**115**

On 5/13/93   I   returned   the   search   warrant   to   the Circuit  Clerks   Office.  Mr.  Gilbert called and stated   the he would have  his son in  my office at 3:30 p.m. on Friday 5/14/93.

On 5/14/93 a  taped  witness statement  was taken from Curtis T. Gilbert Jr. (See statement)  Mr. Gilbert viewed a photo line up and  could only  say that the light complexed suspect that did the talking was  Kenneth Reams  or Phillip Curry.

On 5/11/93 charge sheets were prepared and sent to the prosecutor for Capital Murder  on  Kenneth Reams and Alford Goodwin.


Capt. Kenny Heroman
DETECTIVE DIVISION

GARY W. TURNER

5774   Respondent's Exhibit E

**116**

LATENT PRINT IDENTIFICATION

ORIGINATING CASE NO.:  93/205

VICTIM:  Tommy's Restaurant   (812 Poplar)

SUSPECT:  Kenneth Reams B/M

CRIME:  Burglary

LATENT(S) RECOVERED:  taken from broken glass at back door (POE)

PROCESSED BY:  Officer Calhoun            DATE:  04/28/93

KNOWN ROLLED IMPRESSIONS:  Sgt. J. Hubanks


EXAMINER'S REPORT:  On 04/28/93 a Burglary was reported at Tommy's Restaurant in which the point of entry was the back door. Officer Calhoun processed the broken glass in the door and recovered three latent prints. These prints were placed on file in the Fingerprint Laboratory.
    On 05/15/93 the latents were compared to the known rolled inked impressions of Kenneth Reams. This was done because Reams' had already been charged in another Burglary that occurred the same date (04/28) only two blocks away (1009 Poplar).
    Two latents were POSITIVELY IDENTIFIED with the known impressions of Kenneth Reams. One latent identified with the #1 finger (right thumb) and the second with the Left Palm.


_____            _____
JEFF HUBANKS                           JAMES BACON
Detective Sergeant                     Detective Sergeant

                                       _____
                                       CHARLES HENDRIX
                                       Detective


117

Respondent's Exhibit E

DETECTIVE BUREAU SUMMARY

ᴸₐRY IN REFERENCE TO:  Kenneth Reams

ᴹE:  Various

ᴬNSAS STATE STATUTE NO:  Various          FILE NO:  93/205

ᴇ AND TIME OF INCIDENT:  Ref: 04/28/93

ᴛIM:  Ref: Tommy's Restaurant  (812 Poplar)

ᴠESTIGATING OFFICERS:  J. Brown and Calhoun

ᴠESTIGATING DETECTIVE:  Hendrix, Hubanks and Bacon

ADDITIONAL INFORMATION TO FILE 93/205

REFERENCE ADDITIONAL CHARGE OF CRIMINAL ATTEMPT BURGLARY

On 04/28/93 while on patrol, Officer Calhoun located a broken window
ᴇ back door of Tommy's Restaurant (812 Poplar). A search and
ᴇnt building check showed that entry had not been completed, but
at the broken pieces of window had been removed and placed into a box
ying on the ground beside the door. These pieces of glass were
ocessed, and the latent prints turned into the Fingerprint Laboratory.

During interviews by Lt. Addison, Reams admitted to committing a
ᴦglary of P.B. Dry Cleaners (1009 Poplar) also dated as occurring on
/28/93. Items from this burglary were recovered on a Search Warrant at
03 West 3rd and a Consent to Search of 314 South Oak.

Because of the similarities of entry in both burglaries (POE at back
or), the close proximity of the two businesses and the date of
currences, on 05/15/93 the latent prints on file were compared to the
own impressions of Kenneth Reams.

118

ective Bureau Summary
mary in Reference to:
e 2

wo latents were POSITIVELY IDENTIFIED with the known impressions of
neth Reams. One latent identified with the #1 finger (right thumb) and
second with the Left Palm.

Reams is currently incarcerated at the Regional Jail and has not
n questioned in reference to this incident.

On 05/16/93 a Charge Sheet was prepared for Criminal Attempt
rglary against Kenneth Reams. This will be added to the file with all
her charges and be forwarded to the Prosecuting Attorney's Office to
termine if the additional charge will be filed against him.

PINE BLUFF POLICE DEPARTMENT

Det. Sgt. James Bacon #1931
Detective Division

119

SUMMARY BY LIEUTENANT TERRY ADDISON

FILE NO:   93/205

INVESTIGATING DETECTIVES:  LT. TERRY ADDISON, SERGEANT JEFF HUBANKS,
SERGEANT JAMES BACON, CAPTAIN K.L. HEROMAN AND DETECTIVE IVAN PHILLIPS


On 4-28-93, at about 6:30 A.M., William Morrison, co-owner of
Pine Bluff Dry Cleaners, which is located at 1009 South Poplar,
reported a burglary of his business.  Mr. Morrison said someone had
forced open the back door, entered the business and had stolen several
items.  Mr. Morrison said an H & R 32 caliber revolver, blue steel,
which was in a brown leather holster, was taken along with at least
two leather bomber style jackets and approximately eight dollars in
change.

On April the 28th, 1993, at 2145 hours, a Curtis T. Gilbert, Jr.
reported an attempted aggravated robbery.  Mr. Gilbert said he was
attempting to use the money machine at 5th and Chestnut, when at least
three black males came up to his vehicle, one carrying a pistol,
demanding that he give them some money.  He said one of the suspects
't into the vehicle with him, through the driver's window and hit him
. the mouth.  Mr. Gilbert said he then drove off, leaving all three
of them standing back there.

On the same day, April the 28th, 1993, at about 2248 hours,
Elizabeth Brown, who is the night clerk at the Econo Lodge, located at
321 West 5th Avenue, reported three black males wearing masks,
attempted to open the North side door of the lobby.  She said the
suspects couldn't gain entry, due to the doors being locked, so they
turned and ran West.  She said one of the suspects was wearing blue
jeans, a plaid shirt and a blue baseball cap.  At that time she did
not see a weapon.

On April the 29th, 1993, at 0811 hours, the Greyhound Bus
Station, located at 221 West 4th, was robbed.  The clerk there, a Miss
Bonnie Phillips, stated an unknown black male entered the rear door
and demanded money and that he was carrying a hand gun.  She said the
suspect got approximately one hundred dollars ($100.00), then left.
Miss Phillips described the suspect as being a small, young black
male, teens to early twenties.  She said he was wearing a black
Raider's ball cap, green loose jacket and light brown baggy pants.
Miss Phillips stated the suspect was armed with a small hand gun,
revolver type.

On May the 5th, 1993, at about 2030 hours, Gary Wayne Turner was
at the Worthen money machine, which is located at 5th and Chestnut,
apparently to use the money machine, when at least two black males
proached his vehicle and one of them carrying a gun, shot Mr. Turner

5778   Respondent's Exhibit E

in the left side of the head.  A witness described the two black males, one being 5'11", the other one approximately 5'9".  The witness said one suspect was thin built, wearing a gray long sleeved sweat shirt with a hood and black shorts.  He said the second suspect was medium built, wearing a light colored t-shirt and black shorts.  He last saw them running North from the teller machine, going in between the law office building and the building they are tearing down on 5th Street.

On 5-10 of 93, at about 1800 hours, a search warrant was executed at 1003 West 3rd, which is where Kenneth Reams resides.  During this search warrant, several items were seized.  Such items as a small caliber brown leather holster and three leather jackets.  This was some of the items they picked up.  A consent to Search was also done at 314 South Oak.  This is the residence of Alford Goodwin.  Officers found one leather jacket inside the house and a 32 caliber revolver, wrapped in a piece of plastic, under a bucket in the back yard of this residence.

Also on this date, 5-10 of 93, I called a Dee Ann Gibson.  She is an employee and also a relative of the owners of Pine Bluff Dry Cleaners and asked her to come to the Detective Office, which she did.  Ms. Gibson positively identified the holster as being the one that was taken in the burglary at the dry cleaner's on the 28th.  Ms. Gibson also identified the 32 caliber revolver and at least one of the leather jackets, as being some of the items stolen in the burglary.  One of the leather jackets was a light color and had ink markings on it.  Ms. Gibson advised she had told the owner about the ink markings and that they probably would not be able to get them off.  At this time Kenneth Reams and Alford Goodwin were both arrested for Theft By Receiving.  Sergeant Hopson read Kenneth Reams his rights at 1623 hours.

On 5-10 of 93, Kenneth was transported to Arkansas State Police Headquarters, where Trooper John Howell read him his rights again.  This was about 10:50 P.M.  After Investigator Howell finished interviewing Kenneth Reams, I, along with David Hudson, who is a Pine Bluff Police Officer, transported Kenneth to the Stuttgart City Jail, due to the fact Jefferson County Detention Center was already full.  During the transportation trip, I talked with Kenneth in reference to a robbery at the Greyhound Bus Station and the burglary at Pine Bluff Dry Cleaners.  Kenneth said he had robbed a middle aged lady at the Greyhound Bus Station.  However, Kenneth advised there was only about forty two dollars ($42.00) taken.  Kenneth said he used the 32 caliber revolver, which he had stolen from the Pine Bluff Dry Cleaners on the 28th.  Kenneth stated he had kicked the back door to the Pine Bluff Dry Cleaners in, stolen the pistol, some coats, a little bit of money, about ten dollars ($10.00), some hair clippers and some stamps.  Once we got to the Stuttgart jail, I gave Kenneth Reams my card and advised him if he wanted to talk with me later about the crimes that he had just told me about, to tell the jailer in Stuttgart to call me collect sometime around 4:00 P.M., which is the time I come to work.  At that time we left Stuttgart and came back to Pine Bluff.

121                                    2

On 5-11 of 93, about 9:30 P.M., I again arrived at the Stuttgart jail, where I was advised by the jailer there that Kenny had asked him to call me on at least two different occasions this date. The jailer said, however, he had not had time, as of yet, to do this. So at about 10:00 P.M., I read Kenny Reams his rights again and he said he did understand them and that he wanted to talk to me about the incidents we had already discussed earlier. At this point, I advised Kenny that we were going to make a taped statement, which he agreed to. On the statements, he admitted to the robbery of the Greyhound Bus Station and the burglary of the Pine Bluff Dry Cleaners. Kenny also made a statement in reference to a murder at the ATM machine at 5th and Chestnut. On the same date, 5-11-93, at about 10:45 P.M., myself and Detective Phillips interviewed Kenneth, in reference to this murder he was talking about. We again reminded him of his rights, which he again said he understood, but still wanted to talk with us. At this time Kenneth went into more detail on his and Alford Goodwin's involvement in the May 5th shooting and attempted robbery of Gary Wayne Turner. For details of this interview, see the transcribed tape, marked number two of Kenneth Reams on 5-11 of 93.

On 5-12 of 93, I went to the Dumas jail, somewhere around 11:00 in the morning. I read Alford Goodwin his rights and Alford said he understood those rights and signed the rights form, indicating he did understand them. Alford gave an interview after he fully understood his rights. Alford tells about his involvement in the robbery, murder of Gary Wayne Turner on 5-5-93 and also the robbery of Curtis Gilbert 4-28 of 93 and also the attempted robbery of the Econo Lodge on the me night. For the details on these, see the transcribed tape, marked number three, with Alford Goodwin.

On 5-12 of 93, at around 4:00 P.M., I received a collect phone call from Kenneth Reams. At this time he told me, on the phone, again about what he had done and I told Kenneth that I would be down later to pick him up and transport him to Jefferson County Regional Jail. That they now had an open cell and I would be placing him in there. I went to Stuttgart to pick Kenneth up and about 7:40 P.M., we arrived back at the Detective Office. I still had to photograph and fingerprint Kenneth. I again read him his rights in my office and once again, he said he did understand them. He still wanted to talk to me about something and once again, Kenneth gave another statement with a few more details and for these details, see transcribed tape number four. At this time I transported Kenneth to J.C.D.C.

On 5-12 of 93, Larry Morrison, who is co-owner of Pine Bluff Dry Cleaners, came to my office and identified a brown leather holster, which I had. Larry said that this one was the one taken in the burglary of his business back on the 28th of April, 1993. Mr. Morrison also looked at a picture of an H & R 32 revolver. This was the revolver recovered at Alford Goodwin's house, under a bucket in his back yard. I had already sent it to the Crime Lab, so all I had was pictures. Mr. Morrison looked at it and advised that the gun looked like the one that was taken from his store. However, he would have to see the real thing to be positive. He also looked at some own leather jackets and he said those also appeared to be the items

3

122

taken in the burglary of his business. Mr. Morrison said when the
jackets came in, they put safety pins with tickets on them, inside the
jackets. However, all the tickets were gone, but there was one safety
pin still left in one of the jackets. Mr. Morrison stated that it is
where they usually place those safety pins. However, he would have to
check with the owners of the jackets to be one hundred per cent
positive.

Back on 5-10 of 93, myself and Detective Phillips took a photo
line up, containing six photos to Bonnie Phillips. Bonnie Phillips
was the victim of the robbery at the Greyhound Bus Station. She was
the clerk, working during that time. Ms. Phillips could not pick any
particular photo out of the six photos in the line up. However, she
continually looked and pointed at Kenneth Reams picture. Kenneth's
picture was in the line up, along with five other ones, which were
Eddie Ringo, Jermaine Brown, Alford Goodwin, Jr., Dexter Knox and
Leroy Harris. Ms. Phillips could not say for sure that was him, but
with her facial expressions and pointing at his picture, she had
definitely seen some possibility there.

On 5-13 of 93, Phillip Curry was brought to the Detective Office
and at about 5:15 P.M., I got him in my office and read him his
rights. Mr. Curry indicated he understood his rights by signing the
rights form and at that time said he wanted to talk to me about what
happened. Mr. Curry gave me a taped statement about the aggravated
robbery at 5th and Chestnut, on Curtis Gilbert. Mr. Curry said that
himself, along with Alford Goodwin and Kenny Reams, did attempt to rob
Mr. Gilbert. Mr. Curry also gave a verbal statement about what he
knew about Kenneth Reams and Alford Goodwin on the robbery, homicide
of Gary Wayne Turner, which happened on 5-5-93, at the same teller
machine. Phillip Curry later gave me and John Cone both, another
verbal statement about what he knew about the robbery, homicide.
After that, I took Phillip Curry to Jefferson County Detention Center
under the aggravated robbery charge of Curtis Gilbert and the next
day, 5-14 of 93, Phillip gave a taped sworn statement to John Cone and
Wayne Juneau on the robbery, murder.

On 5-14 of 93, Curtis Gilbert came to the Detective Office and
gave Captain Heroman a statement and then looked at a photo line up,
containing six photos. Mr. Gilbert picked out Phillip Curry and
Kenneth Reams as being two that looked just like the ones that was at
the front of his vehicle and the one that had hit him in the mouth
during his robbery.

123

4

<u>DETECTIVE BUREAU SUMMARY</u>

UMMARY IN REFERENCE TO:  Kenneth Reams and Alford Goodwin

RIME:  Capital Murder;     Burglary and Theft; Theft by Receiving

RKANSAS STATE STATUTE NO:  Various          FILE NO:  93/205

ATE AND TIME OF INCIDENT:  05/05/93; 04/28/93

ICTIM:  Gary Wayne Turner   and   P.B. Dry Cleaners

NVESTIGATING OFFICERS:  Numerous

NVESTIGATING DETECTIVE:  Det. Sgt. Bacon


On 05/05/93 the Pine Bluff Police Department received a call
eporting a shooting at the Worthen Bank ATM located at 5th and Chestnut.
pon arrival, officers located a white male sitting in his vehicle, with
is head leaning against the steering wheel with what appeared to be a
  t wound to the head. In order for the ambulance crew to administer
iedical aid, the truck was pushed forward away from the ATM. The vehicle
'as then secured for processing.

Lt. Addison and I responded and took custody of the scene. The area
'as taped off to ensure security of the scene. I then took photographs of
:he area around the ATM, the truck and its contents. At this point, we
ittempted to locate someone from Worthen Bank to gain access to the ATM
:or a check of the last transactions and to check the camera. The truck
'as towed by Steve's Wrecker Service and taken to the Pine Bluff Police
)epartment for Processing.

Mr. Mike Parrett of Worthen Bank then arrived at the scene and
informed us that the camera in the ATM did not have any film in it so
:here would be no photographs. It was determined at this point that the
  n's money card had not been inserted into the machine, because the
:omputer showed no transactions with his card number. Records were

124

Detective Bureau Summary
Summary in Reference to:
Page 2

ained from Worthen Bank on all transactions for one hour prior to the

shooting on 05/05 and during the same time period on 05/04.

On 05/06/93 shortly after midnight, Sgt. Hubanks and I began to

process the victim's truck for latent prints. The truck was wrapped for

fuming with Cyanoacrylate Ester and then treated with a fluorescent dye

(Basic Yellow). The truck was then examined with a PoliLight and all

latents recovered were photographed. The latents were then also processed

with black powder and lifted. All photographs and latents are currently

on file in the Fingerprint Laboratory.

A search of the interior showed that the victim's glasses were

laying in the seat beneath the steering wheel. The victim's checkbook was

laying in the middle of the seat. The steering wheel and seat had blood

on them, consistent with the position of the victim as reported by

icer Taylor and Det. Alexander. There was no casing found inside of

the vehicle (nor outside at the scene), which would be consistent with a

revolver.

On 05/06/93 around 0430 hours, I was contacted by Deputy Coroner

Larry Levine and advised that the victim was being removed from all

assistance of life support, due to the fact there was no blood flow to or

through the brain. Levine stated that it was just a matter of time before

Turner would succumb to his injuries. Levine also informed me that the

family wanted to donate all organs to AUROA. I explained to Levine that

although the thought was appreciative, this could not be done, as the

victim's body was evidence and would need to be sent to the State Crime

Lab in tact. The official time of death is not known to this detective,

but will be noted on records obtained from the Jefferson County Coroner's

Office.

125

Detective Bureau Summary
Summary in Reference to:
Page 3

On 05/06/93 a report was filed through the Police Department that the Worthen ATM located at 5th and Pine had been shot several times. Several projectiles and hulls were located at the scene and collected as evidence.

Over the next couple of days, information was being received from various C.I.'s and anonymous callers stating that the two people involved in the shooting were a subject known as "Butterball" and "Ken". All of these calls were documented by the officers receiving information and are apart of this file.

On 05/10/93 a C.I. contacted the Pine Bluff Police Detective Division and advised that he had overheard a conversation between "Butterball" and "Ken", in which they told about the attempted robbery and the shooting. The C.I. identified Butterball as: Alford Goodwin and ified "Ken" as: Kenneth Reams. The C.I. also stated that the day after the shooting, Kenneth had showed him the gun used in the shooting and described it as a .32 caliber revolver. (NOTE: DURING THIS TIME PERIOD, SGT. PRITZEN HAD BEEN AT THE STATE CRIME LAB AND RECEIVED INFORMATION THAT THE PROJECTILE REMOVED FROM THE VICTIM WAS A .32 CALIBER BULLET.) Based upon this information, the C.I. was transported to the Prosecuting Attorney's Office and a sworn statement was obtained by Deputy Prosecutor Wayne Juneau. A copy of this statement is contained in this file.

With the information gathered from various callers and the information from the sworn statement, Captain Heroman began to prepare a Search Warrant for the residence of 1003 West 3rd. This was the residence of Kenneth Reams. But, before this could be done, Det. Hudgins reported g both suspects walking east on 3rd from Elm Street. Sgt. Hopson and

126

etective Bureau Summary
ummary in Reference to:
age 4

͞re in the area and responded. We exited our vehicle and directed both

o lay face down on the ground and they complied. The subjects were

dentified as Kenneth Reams and Alford Goodwin and then transported to

he Detective Office.

Around 1730 hours, I received a call from another C.I., that said he

ad not been able to find out what caliber of gun was used in the

omicide, but said that the gun was stolen from a cleaners about a week

r a week and a half earlier. We then located a report dated 04/28/93,

rom P.B. Cleaners (1009 S. Poplar) in which they reported a H&R .32

aliber revolver stolen along with two leather "bomber" jackets.

Captain Heroman then completed his Affidavit for Search Warrant and

ontacted Judge Fred Davis III. Upon receiving a signed Search Warrant,

etectives of the Major Crime Unit then went to 1003 West 3rd and

͞cuted the Warrant. Captain Heroman attempted to locate the owner of

he house, but was unable to do so. Therefor, entry was gained by an open

indow on the front porch. Once inside, several items of evidence were

ollected. (For full details, see Det. Hendrix's Summary and Evidence

heets.)

At the residence, two leather jackets and one small brown holster

ere recovered. These items were collected and later shown to Donna

ipson of P.B. Dry Cleaners for positive identification. The holster was

dentified as the same one the H&R .32 caliber was in when it was stolen.

ased upon the earlier C.I. information, this helped to start connecting

. .32 caliber gun to the suspects.

The interview with Alford Goodwin was started by Lt. Cook and I, but

as later completed by Det. Phillips and Investigator John Howell of the

127

Detective Bureau Summary
Summary in Reference to:
Page 5

.sas State Police. For complete details of the Interview see Det. Phillips' Summary which is apart of this file.

Based upon Det. Phillips' interview, Alford Goodwin signed a Consent to Search of his premises located at 314 South Oak. Sgt. Hopson, Det. Hendrix, Det. Dorman and I then went to the residence along with Flossie McLemore (Alford's mother). At this location, a brown leather jacket, a gray hooded sweat jacket along with other items were collected. For additional information see Det. Hendrix's Summary.

At the same time, Det. Phillips, along with Lt. Cook, Sgt. Pritzen and Det. Hill took Alford Goodwin to where he had hidden the H&R .32 caliber revolver. Goodwin took them to the back side of his property were he directed them to a plastic bucket just inside his fence. When Lt. Cook lifted the bucket up, he located the gun underneath it, wrapped in ic. The gun was photographed and collected. Also, see Det. Phillips' Summary for details of this information.

The interview of Kenneth Reams was conducted by Sgt. Hopson and concluded by myself and Investigator John Howell of the Arkansas State Police. During the interview with Investigator John Howell, Reams gave a Voluntary Statement as to his participation and agreed to give a written Statement. A copy of the statement is included in this file.

According to Reams, he and "Butterball" (who he identified as Alford Goodwin) were walking towards the old County Market Store downtown. They were going to buy some "weed", but added that Butterball already had one "joint". Reams said that Butterball saw a man drive up to the money machine and went to ask him for a light. Reams said that he kept walking away, and then heard a gunshot, so he went back to look because he it the man had shot Butterball. Reams said that he saw Butterball

128

Detective Bureau Summary
Summary in Reference to:
Page 6

ning away, and he looked and saw the man sitting in the truck with his head leaning against the steering wheel and blood coming out.

Reams said that he then ran and caught up with Butterball and asked why he shot the man. According to Reams, Butterball said that the man said "What the fuck do you want?" so he shot him. Reams said that they then went and changed clothes and the next day Butterball told him that he hid the gun in his backyard under an old rusty bucket. Reams also said that Butterball was wearing a gray hooded sweatshirt the night of the shooting, which was consistent with the information received from the witness, James Nelson. (A copy of his statement is also contained in this file.)

Reams was then transported to Stuttgart Jail by Lt. Addison on the charge of Theft by Receiving, in connection with the two leather ·kets.. According to Lt. Addison, while in route, Reams admitted to the Burglary of P.B. Dry Cleaners and an Aggravated Robbery of the Greyhound Bus Station. The clerk from the bus station had come to the office earlier in the evening and looked at a photo line-up including a photograph of Kenneth Reams and Alford Goodwin. Although Bonnie Phillips could not identify either of them, she continually pointed at the photograph of Kenneth Reams. For further details of this information, see Lt. Addison's report.

During the interview of Alford Goodwin by Investigator John Howell, Goodwin admitted being present when the attempted robbery was committed and the shot was fired that killed Gary Wayne Turner. Goodwin stated that he did not know which one did the shooting, because he wasn't sure who had the gun. Goodwin stated that he along with Kenneth Reams and Jermaine own went to the money machine to rob the man, but that he was across

129

Detective Bureau Summary
Summary in Reference to:
Page 7

   street when the shooting happened. Goodwin said that they all then
   .. off and he later hid the gun under a bucket in his back yard. For
further details of this information see Det. Phillips' Summary. A copy of
the statement is included in this file. Goodwin was then transported to
the Dumas Jail on the charge of Theft by Receiving, in connection with
the stolen gun.

   Although Goodwin implicated Jermaine Brown in the incident, Reams
stated that he was not present. Reams told me that he had told Goodwin if
he didn't keep his mouth shut they were going to get caught. Reams said
that Goodwin had told a subject named Jermiane, Adrian and another he did
not know. Reams said that Goodwin probably told on Jermaine because he
figured that he "snitched them off".

   Jermaine is schedule for further interviews by Investigator John
  '1 of the Arkansas State Police on 05/12/93. A complete report on
 . .s interview will be added to this file when completed.

   Sgt. Hubanks and I also made several comparisons to the latent
prints on file with all the suspects listed above, along with others
whose names are documented in the case file. No identifications were made
with Goodwin, Reams or Brown. Latents were identified with the victim
Gary Wayne Turner. The latents will remain on file in the Fingerprint Lab
and comparisons will be made with all officers, witnesses and Ambulance
Personnel for elimination.

   On 05/11/93 Charge Sheets were prepared against Kenneth Reams for
the following:


   1. Burglary and Theft of Property    (P.B. Dry Cleaners)

   2. Aggravated Robbery    (Greyhound Bus Station-Bonnie Phillips)


                                                              130

Detective Bureau Summary
Summary in Reference to:
Page 8

3. Capital Murder    (Gary Wayne Turner)


NOTE: Burglary and Theft of Property is based upon the fact that he gave a Voluntary Statement admitting to the Burglary and Theft, and the fact that property was recovered at his residence on a Search Warrant. The Aggravated Robbery is based upon his admission to the robbery. The Capital Murder is based upon the fact that during the course of attempting to commit a robbery of Gary Wayne Turner, actions of the suspects resulted in the death of Gary Wayne Turner.


On 05/11/93 Charge Sheets were prepared against Alford Goodwin for the following:


1. Theft by Receiving    (P.B. Dry Cleaners)
2. Capital Murder    (Gary Wayne Turner)


NOTE: Theft by Receiving is based upon the fact that Goodwin admitted being in possession of the stole gun and on a Consent to Search the gun was located on the property of his residence. The Capital Murder is based upon the fact that during the course of attempting to commit a robbery of Gary Wayne Turner, actions of the suspects resulted in the death of Gary Wayne Turner.


PINE BLUFF POLICE DEPARTMENT


Det. Sgt. James Bacon #1931
Detective Division

131

DETECTIVE BUREAU SUMMARY

SUMMARY IN REFERENCE TO:  Gary Wayne Turner

CRIME:  Capital Murder

ARKANSAS STATE STATUTE NO:  5-10-101          FILE NO:  93-205

DATE AND TIME OF INCIDENT:  05-05-93 2032 hrs.

VICTIM:  Gary Wayne Turner

INVESTIGATING OFFICERS:  Officer Greg Taylor

INVESTIGATING DETECTIVE:  Sgt. Hopson


On 05-05-93 Gary Wayne Turner was shot in the head while at the
Worthen A.T.M. machine at the south east corner of 5th. and Chestnut. On
05-06-93 Capt. Heroman assigned the day shift detectives various duties
and leads to follow up on.

I contacted Chief Grice of the U.A.P.B. campus security and asked
if he could locate Curtis Gilbert, B/M, D.O.B. 08-08-73, who is a
student at U.A.P.B. Gilbert had reported an attempted robbery at the
above location on 04-28-93 with the same M.O.

Grice contacted Gilbert and then contacted me via Police Radio and
advised me that Gilbert had been located. I asked Grice to tell Gilbert
to come to the detective office to look at the photo books and to give a
statement in reference to the incident in which he was a victim and
Gilbert stated that he would come to the office.

Gilbert came to the detective office around 1400 hrs. and was
interviewed by Capt. Heroman.

At approximately 1000 hrs. Sgt. Silas came to the detective office
and told me that he had been contacted by Faye Gant, the principal of
Indiana Street School. She told him that she and her daughter had driven
ie A.T.M. on 05-05-93 around 2030 hrs. and saw a small blue pick-up

132

Detective Case 4:23-cv-00699-LPR-JTR   Document 19-29   Filed 11/02/22   Page 136 of 277
Summary in Reference to:
Page 2

~uck pulled up to the machine and saw a black male walking up to the
ck from behind the machine. I then called Gant and set up an interview
with her at her office.

At approximately 1030 hrs. I met with Gant in her office. She told
me that she was very afraid to tell me what she had seen and wanted to
make sure that her name was no way mentioned in the press. I told her
that my summary would be a part of the case file and that she may have to
testify in court if her information led to an arrest. Gant then
reluctantly gave me her account of what she had seen.

Gant stated that she and her daughter were driving west on 5th.
street from Main and as they passed the A.T.M. on the corner of 5th and
Chestnut, she noticed a small blue pick-up truck that was stopped at the
machine as if the driver was using the machine. She stated that she saw
~hat looked like to her, a Ford Taurus or comparable passenger car, that
⁊ believed to be blue or gray in color. She stated that the vehicle was
parked at an angle at the south east corner, behind the machine, but
would not be visible to the driver of the truck. She saw a black male, in
his twenties, that she described as slender, 5'7" to 5'10", wearing a
ball cap, off white or beige colored T-shirt and blue jeans walking from
the vehicle towards the truck, and approached from behind the truck. She
stated that she felt as though the male was going to rob the man in the
truck and she was going to circle the block but became afraid and
continued to drive west and went home.

Gant stated that she saw the blue truck on the news and learned of
the shooting and felt she needed to tell the Police.

She added that she did not know if she could identify the male again
'f she saw him.

**133**

etective Bureau Summary
ummary in Reference to:
age 3

obtained two pictures of James Nelson, a witness who had found
urner in his truck, who owns a Ford Taurus which is gold in color. I
howed the pictures to Gant and also a picture of Unit 403 which is
omparable to Nelson's car. She could not tell if Nelson was the one she
ad seen but stated the car was like the one she had seen but the color
ras not like the one she had seen although she was not sure of the color
he had seen.

At approximately 1300 hrs. I received a call from a Bart Baily,W/M,
:elephone number543-4380, who had made a transaction at the A.T.M. at
ipproximately 1950 hrs. on 05-05-93. He stated that he had not seen
inything or anybody at the machine when he was there and is always
:autious to look and notice before he uses the machines. He stated that
ie observed a red Toyota truck that was parked on 5th. street across from
.T.M.

At approximately 1345 hrs. I spoke with Jay Fakouri owner of
Fakouri's Lounge at 6th. and Missouri street. He stated that on 05-05-93
Turner had been to his business at about 2000 hrs. Turner told him that
he had been cutting grass and had came to the bar to have a couple of
beers. Fakouri stated that Turner was a very close friend of his and that
he had bought Turner three beers while he was at the bar. Turner told him
that he was going home to clean up and that he was going to have supper
with his wife and would probably come back to Fakouri's after they ate.
Fakouri stated that Turner never pulled his bill fold out while in his
bar and he did not know if Turner had any money on his person. He further
stated that there were two white females and and a white male in the bar
when Turner was in there and those three continued to stay after Turner

134

Detective Bureau Summary
Summary in Reference to:
Page 4

...ft. Fakouri stated that he was contacted at approximately 0030 hrs. by
.. ...ner's family and advised that Turner had been shot.

At approximately 1400 hrs. Myself and Det. Hudgins went to he area
of 4th. and Olive and knocked on doors and spoke with residents of the
area. We spoke with several residents who had heard a single gun shot at
about 2030 hrs. and later heard two more shots after that. Det. Hudgins
talked to a black female who lives on the north west corner of 4th. and
Olive who refused to give her name. She told Hudgins that she saw two
black males on bicycles traveling west on 4th. at a high rate of speed
about 2030 hrs. and thought that one of them may have been wearing a gray
sweat shirt with a hood but was not sure.

We were unable to locate anyone else who had seen anything
suspicious in the area.

While in the area we also handed out reward posters to the residents.

On 05-07-93 at approximately 1000 hrs. I assisted Capt. Heroman and
Det. Hudgins at the A.T.M. machine. Sometime during the night unknown
person(s) fired several rounds from a firearm into the face of the
A.T.M., disabling the machine. There were several penetrations and
several impact points where projectiles had not penetrated.

On the driveway in front (north) of the machine I recovered several
projectiles and fragments along with several copper jackets from
projectiles. These items were photographed and bagged separately for
evidence.

On 5th. street just north of the A.T.M. we recovered 8 spent 9mm
casings. The casings appeared to have been driven over by passing
vehicles and were damaged. All of the casings were bagged and labeled as
evidence.

135

etective Bureau Summary
ummary in Reference to:
age 5

.t approximately 1800 hrs. Capt. Heroman briefed myself and other
.etectives and a surveillance operation was organized. Myself and Det.
iudgins were stationed on top of the building located on the north west
:orner of 5th and Pine. We observed the area from 1900 hrs. until 0220
irs. without incident.

On 05-08-93 Officer Riggins informed me that he had spoken with a
1/M, Michael Stokes who lives in an upstairs apartment across (north) the
street from the A.T.M. Riggins brought Stokes to the detective office at
approximately 1030 hrs. and he gave a statement in reference to the
shooting of the A.T.M.

Stokes stated that on 05-06-93 at approximately 2330 hrs. he had
just gone to bed and he heard six shots fired, in rapid succession, near
nis apartment. He went to his kitchen window and saw a white, newer model
olet S-10 pick-up occupied by two black males. The truck was on
Chestnut facing south on the north side of 5th. The driver was getting
back into the drivers window as if he had been leaning out of the window.
The vehicle left traveling west on 5th. street at a high rate of speed
with the lights off.

I wrote Stokes' statement for him as he relayed it to me and it will
be added to the case file.

                    PINE BLUFF POLICE DEPARTMENT


                    Det. Terry Hopson

136

DETECTIVE BUREAU SUMMARY

MMARY IN REFERENCE TO:  Gary Wayne Turner

IME:  Capital Murder

KANSAS STATE STATUTE NO:  5-10-101        FILE NO:  93-205

TE AND TIME OF INCIDENT:  05-05-93 2032 hrs.

CTIM:  Gary Wayne Turner

VESTIGATING OFFICERS:  Officer Greg Taylor

VESTIGATING DETECTIVE:  Sgt. Hopson


On 05-05-93 Gary Wayne Turner was shot in the head while at the
cthen A.T.M. machine at the south east corner of 5th. and Chestnut. On
-06-93 Capt. Heroman assigned the day shift detectives various duties
ɔ leads to follow up on.

I contacted Chief Grice of the U.A.P.B. campus security and asked
.f he could locate Curtis Gilbert, B/M, D.O.B. 08-08-73, who is a
ɔdent at U.A.P.B. Gilbert had reported an attempted robbery at the
ɔve location on 04-28-93 with the same M.O.

Grice contacted Gilbert and then contacted me via Police Radio and
ʋised me that Gilbert had been located. I asked Grice to tell Gilbert
come to the detective office to look at the photo books and to give a
ʌtement in reference to the incident in which he was a victim and
.bert stated that he would come to the office.

Gilbert came to the detective office around 1400 hrs. and was
:erviewed by Capt. Heroman.

At approximately 1000 hrs. Sgt. Silas came to the detective office
ɔ told me that he had been contacted by Faye Gant, the principal of
.iana Street School. She told him that she and her daughter had driven
e A.T.M. on 05-05-93 around 2030 hrs. and saw a small blue pick-up

**137**

Detective Bureau Summary
Summary in Reference to:
2

pulled up to the machine and saw a black male walking up to the
truck from behind the machine. I then called Gant and set up an interview
with her at her office.

At approximately 1030 hrs. I met with Gant in her office. She told
me that she was very afraid to tell me what she had seen and wanted to
make sure that her name was no way mentioned in the press. I told her
that my summary would be a part of the case file and that she may have to
testify in court if her information led to an arrest. Gant then
reluctantly gave me her account of what she had seen.

Gant stated that she and her daughter were driving west on 5th.
street from Main and as they passed the A.T.M. on the corner of 5th and
Chestnut, she noticed a small blue pick-up truck that was stopped at the
machine as if the driver was using the machine. She stated that she saw
it looked like to her, a Ford Taurus or comparable passenger car, that
believed to be blue or gray in color. She stated that the vehicle was
parked at an angle at the south east corner, behind the machine, but
would not be visible to the driver of the truck. She saw a black male, in
his twenties, that she described as slender, 5'7" to 5'10", wearing a
ball cap, off white or beige colored T-shirt and blue jeans walking from
the vehicle towards the truck, and approached from behind the truck. She
stated that she felt as though the male was going to rob the man in the
truck and she was going to circle the block but became afraid and
continued to drive west and went home.

Gant stated that she saw the blue truck on the news and learned of
the shooting and felt she needed to tell the Police.

She added that she did not know if she could identify the male again
if she saw him.

138

Detective Bureau Summary
Summary in Reference to:
Page 3

I obtained two pictures of James Nelson, a witness who had found
Turner in his truck, who owns a Ford Taurus which is gold in color. I
showed the pictures to Gant and also a picture of Unit 403 which is
comparable to Nelson's car. She could not tell if Nelson was the one she
had seen but stated the car was like the one she had seen but the color
was not like the one she had seen although she was not sure of the color
she had seen.

At approximately 1300 hrs. I received a call from a Bart Baily,W/M,
telephone number 543-4380, who had made a transaction at the A.T.M. at
approximately 1950 hrs. on 05-05-93. He stated that he had not seen
anything or anybody at the machine when he was there and is always
cautious to look and notice before he uses the machines. He stated that
he observed a red Toyota truck that was parked on 5th. street across from
e A.T.M.

At approximately 1345 hrs. I spoke with Jay Fakouri owner of
Fakouri's Lounge at 6th. and Missouri street. He stated that on 05-05-93
Turner had been to his business at about 2000 hrs. Turner told him that
he had been cutting grass and had came to the bar to have a couple of
beers. Fakouri stated that Turner was a very close friend of his and that
he had bought Turner three beers while he was at the bar. Turner told him
that he was going home to clean up and that he was going to have supper
with his wife and would probably come back to Fakouri's after they ate.
Fakouri stated that Turner never pulled his bill fold out while in his
bar and he did not know if Turner had any money on his person. He further
stated that there were two white females and and a white male in the bar
when Turner was in there and those three continued to stay after Turner

139

Detective Bureau Summary
Summary in Reference to:
e 4

..c. Fakouri stated that he was contacted at approximately 0030 hrs. by Turner's family and advised that Turner had been shot.

At approximately 1400 hrs. Myself and Det. Hudgins went to he area of 4th. and Olive and knocked on doors and spoke with residents of the area. We spoke with several residents who had heard a single gun shot at about 2030 hrs. and later heard two more shots after that. Det. Hudgins talked to a black female who lives on the north west corner of 4th. and Olive who refused to give her name. She told Hudgins that she saw two black males on bicycles traveling west on 4th. at a high rate of speed about 2030 hrs. and thought that one of them may have been wearing a gray sweat shirt with a hood but was not sure.

We were unable to locate anyone else who had seen anything suspicious in the area.

While in the area we also handed out reward posters to the residents.

On 05-07-93 at approximately 1000 hrs. I assisted Capt. Heroman and Det. Hudgins at the A.T.M. machine. Sometime during the night unknown person(s) fired several rounds from a firearm into the face of the A.T.M., disabling the machine. There were several penetrations and several impact points where projectiles had not penetrated.

On the driveway in front (north) of the machine I recovered several projectiles and fragments along with several copper jackets from projectiles. These items were photographed and bagged separately for evidence.

On 5th. street just north of the A.T.M. we recovered 8 spent 9mm casings. The casings appeared to have been driven over by passing vehicles and were damaged. All of the casings were bagged and labeled as ance.

140

Detective Bureau Summary
Summary in Reference to:
Page 5

At approximately 1800 hrs. Capt. Heroman briefed myself and other detectives and a surveillance operation was organized. Myself and Det. Hudgins were stationed on top of the building located on the north west corner of 5th and Pine. We observed the area from 1900 hrs. until 0220 hrs. without incident.

On 05-08-93 Officer Riggins informed me that he had spoken with a W/M, Michael Stokes who lives in an upstairs apartment across (north) the street from the A.T.M. Riggins brought Stokes to the detective office at approximately 1030 hrs. and he gave a statement in reference to the shooting of the A.T.M.

Stokes stated that on 05-06-93 at approximately 2330 hrs. he had just gone to bed and he heard six shots fired, in rapid succession, near his apartment. He went to his kitchen window and saw a white, newer model Chevrolet S-10 pick-up occupied by two black males. The truck was on Chestnut facing south on the north side of 5th. The driver was getting back into the drivers window as if he had been leaning out of the window. The vehicle left traveling west on 5th. street at a high rate of speed with the lights off.

I wrote Stokes' statement for him as he relayed it to me and it will be added to the case file.

On 05-10-93 at approximately 1320 hrs. I was at the front desk of the detective office and answered a telephone call from one of the outside lines. The caller, who I could tell was a black male, told me that he wished to give information in reference to the shooting at the money machine. He told me that Kenneth Reams of 1003 Poplar was the one who had done the shooting and Eddie Ringo was with him when he did. He told me that he had over heard Reams and Ringo talking with Butterball,

**141**

Detective Bureau Summary
Summary in Reference to:
6

no he told me was Alfred Goodwin. He also stated that he had seen Reams with a 32 caliber pistol that was used to shoot the victim. The caller stated that he would give a sworn statement at the prosecutors office and then gave me a clothing description of what he had on and told me that he was at the welfare office. He told me that he did not have a problem with a detective picking him up as long as it was not in a Police car.

Det. Hudgins then went to he welfare office and picked up the subject who identified himself to us as Tahead Brown. He transported Brown to the prosecutors office and Brown gave a sworn statement to Wayne Juneau as Lt. Cook and Capt. Heroman asked the questions. Myself and Detective Hudgins sat in on the interview but did not participate.

At approximately 1545 hrs. myself and Sgt. Bacon drove by 1003 W. which is the address of Reams, to obtain a description of the residence for a search warrant. Hudgins was taking Brown home at the same time and Brown pointed out Goodwin and Reams, who were walking south on Elm between 2nd and 3rd, to Hudgins as we were in the area. Hudgins advised me via Police Radio that he felt as though the two had identified him as a Police Officer and thought that they were about to run. Lt. Cook advised us to keep the two in sight and Sgt. Bacon and myself saw the suspects walking east on 3rd. street from Elm. We approached from the east and stopped the suspects about mid way between Elm and Oak on the north side of the street. Both were taken down in a felony stop, secured for weapons and handcuffed. Capt. Heroman and Lt. Cook arrived and transported Goodwin and Hudgins transported Reams to the detective office.

At approximately 1623 hrs. I, Sgt. Hopson, read Kenneth Reams his Miranda Rights in the detective office. Reams acknowledged that he

142

Detective Bureau Summary
Summary in Reference to:
Page 7

_nderstood his rights and then signed and initialed the rights form which will be added to the file. Reams then agreed to talk with me about the shooting at the money machine and stated that he had heard about it but knew nothing of it first hand. After several hours of questioning Reams continued to deny, to me, any knowledge of the incident.

During the interview, I asked Reams of his knowledge of a burglary at the Pine Bluff Cleaners on 04-28-93. He denied knowledge of this also. He also denied any knowledge of the Grey Hound Bus Station robbery on 04-29-93. Jackets and a holster were found at Reams residence that were identified as being taken in the burglary and Reams told me that he had found the items at in a vacant house in his neighborhood.

At approximately 2200 hrs. Reams agreed to take a polygraph which was to be administered by Investigator Howell of the State Police and Reams was transported to the A.S.P. headquarters by Sgt. Bacon and Capt. Heroman.

PINE BLUFF POLICE DEPARTMENT

Det. Terry Hopson

143

DETECTIVE BUREAU SUMMARY

SUMMARY IN REFERENCE TO:  Kenneth Reams/Alford Goodwin

CRIME:  Capital Murder

ARKANSAS STATE STATUTE NO:  5-10-101          FILE NO:  93/205

DATE AND TIME OF INCIDENT:  050593

VICTIM:  Gary Wayne Turner

INVESTIGATING OFFICERS:  Greg Taylor

INVESTIGATING DETECTIVE:  Major Crime Unit


    050593

    A shooting was reported at the Worthen ATM located at 5th and Pine
-t  ets. Sgt. James Bacon communicated with me regarding forensic
    ace on the victim's vehicle. I moved needed equipment to the police
bay area and met the Meeks wrecker that transported the victim's
vehicle.


    I used a "Polylight" brand alternate light source in the 505
nanometer range to search for fibers that may have been transferred to
the vehicle by the suspect(s). Several fibers flouresced along the left
front fender and driver door area of the vehicle and were recovered in to
a paper envelope. No fiber evidence from the interior of the vehicle was
recovered as blood/serum from the victim's wounds caused difficulty in
the search.


    The front half of the victim's vehicle was tented in plastic
.ng and subjected to cyanoacrylate esther fumes. The front half

                                                          **144**

Detective Bureau Summary
Summary in Reference to:
Page 2

concentrated on as it was deduced that evidence would more likely be found in this area due to the position of the vehicle at the scene and the likely actions of a suspect in shooting the victim. Several latent prints were developed on the vehicle as a result of the cyanoacrylate esther treatment. The vehicle was then uncovered and the partially developed latent prints allowed to dry and set.

A mixture of rhodamine 6G with petroleum ether was then prepared and used to stain the partially developed prints. The stained areas were then examined with light in the 505 to 530 nanometer range. Several prints were noted, however, they failed to flouresce sufficiently to photograph.

An additional staining agent of basic yellow #40 with isopropyl alcohol was applied to he suspected area and rinsed with distilled water. Latent prints were then noted to flouresce strongly and were photographed.

After photography, these prints were processed with standard black powder and secured to cards as evidence.

All photos were printed and filed for subsequent comparison with suspects.

I received the victim's ATM card and also processed this item with cyanoacrylate esther and a staining agent. These photographs were led with those from the vehicle.

145

Several comparisons of latent prints with known, rolled impressions

possible suspects were done. As of this writing, no suspect

impressions have been identified. A detailed list of persons compared

with evidence prints is included in this case file. Some of the evidence

prints were identified as belonging to the victim. An additional report

of these specific identifications is included in this file.

PINE BLUFF POLICE DEPARTMENT

Jeffrey Eubanks
Detective

146

## DETECTIVE BUREAU SUMMARY

SUMMARY IN REFERENCE TO:  Homicide at 5th and Chestnut

CRIME:  Capt. Murder

ARKANSAS STATE STATUTE NO:  5-10-101          FILE NO:  93/205

DATE AND TIME OF INCIDENT:  05/05/93  2030 hours

VICTIM:  Gary Turner

INVESTIGATING OFFICERS:

INVESTIGATING DETECTIVE:  DET. Ivan L. Phillips

On the night of May the 5th 1993 I was working in my office, when Det. Rick Hill brought two black males in.  Detective Hill advised me that there had been a shooting at 5th and Chestnut, and that the two black males with him were witnesses.  One of the subjects was Taquante Nelson lson, and I took a witness statement from him.

Taquante said that he and James Nelson were driving on 5th avenue when they heard what sounded like a gunshot.  Shortly after hearing the gunshot, he saw two black males running North across 5th avenue, from the A.T.M. machine at 5th and Chestnut.  After losing sight of the two black males, they went to the A.T.M. machine where they saw a blue jeep truck parked.  Inside the truck they saw a white male who looked as if he had been shot in the head.  They then went to the Econo Lodge and called the police.

Taquante described one of the black males as being 5'11" tall and wearing a grey sweat top with a hood.  The other black male was shorter and was wearing a greyish white T-shirt and black blue jean shorts.

Taquante's statement was turned over to Detective Sgt. James Bacon.

**147**

Detective Bureau Summary
Summary in Reference to:
Page 2

On 05/05/93 at about 1800 hours I was asked to interview Alford Goodwin, in referance to this homicide.  I went into the interview room and spoke with Mr. Goodwin.  While speaking with him I asked him for consent to search his residence and property.  Mr. Goodwin agreed to the search and signed a consent to search form.  I gave the consent form to Sgt. Bacon and he took charge of searching Mr. Goodwin's residence.

After signing the consent form I spoke with Mr. Goodwin about the homicide and who was involved in it.  Mr. Goodwin told me that he knew who had done it and named Ken Reams and Jermaine Brown.  Mr. Goodwin said that Jermaine had brought the gun that was used, to him and he had hidden it in his back yard under a bucket, by the chain link fence.  Mr. Goodwin then took me to the location of the gun and it was recovered.  After returning from recovering the gun, Mr. Goodwin gave a taped statement was turned over to Sgt. Bacon.

Later that night I asked Mr. Goodwin if he would take a polygraph exam.  Mr. Goodwin agreed and was transported to the Arkansas State Police Headquarters, where he was turned over to Investigator John Howell.

While I was waiting at the A.S.P. Headquarters, Investigator Howell came out of his office and told me that Mr. Goodwin had requested to speak with me.  I went in the office and Mr. Goodwin gave me a second statement.  In this statement Mr. Goodwin said on 05-05-93 at about 8:15 p.m. Ken, Jermaine and himself were at his house. Alford said that Ken told them that he needed some money. Alford said that Ken told them they would go to the ATM machine and wait for someone to drive up and use their money card, then they would rob them. Alford said that they asked him if he would watch their back and he did. Alford said that Jermaine he gun and they walked to the ATM machine and a man in a blue jeep

5806   Respondent's Exhibit E

Detective Bureau Summary
Summary in Reference to:
Page 3

~~ick pulled up to the machine. Alford said that Jermaine and Ken went to

the driver's side of the truck and he was going to the passenger's side

to get the keys so the man could not drive off. Alford said that when he

was crossing 5th street to go to the truck he heard a shot. He said that

he continued toward the truck and when he got about ten feet from the

truck he saw the man slumped over the steering wheel. Alford said that he

and Jermaine ran North across 5th Street and Jermaine had the gun in his

hand. Alford said that Ken was standing at the rear driver's side of the

truck yelling to them about his fingerprints being on the truck. Alford

said that he stopped and told Ken to come on it was to late now. Alford

said that Jermaine kept running until he got to the railroad tracks, then

turned and ran toward Main Street. Alford said Ken caught up with them

and they ran across the Econo Lodge parking lot. Alford said that Ken

~~nt to Alford's house and he went to his girl-friend's house. About 20

minutes later Jermaine showed up at Alford's girl-friend's house and told

Alford to give the gun back to Ken. Jermaine then said that he was going

to his Aunt's house in Grady. Alford took the gun and hid it under a

bucket in his back yard. Alford said that Ken had gotten the gun and

three jackets from the cleaners, some where around Cherry street. After

giving this statement, Alford Goodwin was transported to the Dumas City

jail.

All of the statements that I have taken in this case, were turned

over to Sgt. james Bacon. All of the evidence that I collected in this

case was turned over to Det. Charles Hendrix.

PINE BLUFF POLICE DEPARTMENT

149

IVAN L. PHILLIPS
DETECTIVE

DETECTIVE BUREAU SUMMARY

SUMMARY IN REFERENCE TO:Kenneth Reams and Alford Goodwin

CRIME:Capitol Murder

ARKANSAS STATE STATUTE NUMBER:  5-10-101  FILE NUMBER:93/205

DATE AND TIME OF INCIDENT:5-5-93  Approximately 2030 hours

VICTIM:Gary Wayne Turner

INVESTIGATING OFFICER(S):

INVESTIGATING DETECTIVE(s):Sgt. Bacon, Hendrix and Detective Division

On 5-10-93 at approximately 1700 hours, Mr. Kenneth Reams and Mr. Allford Goodwin were arrested in connection with the murder of Gary Wayne Turner. A search warrant was obtained for Mr. Reams residence at 1003 W. 3rd and I, Det. Hendrix along with Capt. Heroman, Sgt. Bacon, Sgt. Pritzen, Det. Hill and Det. Dorman executed the warrant at 1800 hours. The following is a list of the items that were found and confiscated during a search of the residence.

E-1,   One Georgetown baseball cap, black in color with gray stripes, found on top of the chest of drawers in the N.E. bedroom.

E-2,   One brown small caliber handgun holster, found in the top drawer of the chest of drawers in the N.E. bedroom.

E-3,   One white T-shirt with what appear to be several blood stains on it found in the dirty clothes basket next to the chest of drawers in the N.E. bedroom.

E-4,   One pair of black shorts found in the dirty clothes basket next to the chest of drawers in the N.E. bedroom.

E-5,   One yellow T-shirt found hanging on the bathroom door.

150

E-6,   Two black pairs of jeans and two black T-shirts found in the
       dirty clothes basket in the bathroom.

E-7,   One metal can containing a plastic bag which contained several
       off white rock like substances which appear to be crack cocaine
       and a plastic bag which contained a green vegetable material
       believed to be marijuana. This evidence was found in the
       cabinet in the bathroom.

E-8,   One brown leather jacket (Rock Creek, size Extra Large) found
       in the kitchen lying in one of the table chairs.

E-9,   One Tan suede Jacket (size small), found lying on the bed in
       the N.E. bedroom.

E-10, One brown leather jacket (Traditions L.T.D., size regular),
       found hanging on the North wall in the N.E. bedroom.

   All items with the exception of E-7 and E-8, were found by
myself. E-7 and E-8 were found by Det. Dorman and turned over to me
for evidence.

   On 5-10-93 at approximately 2000 hours, Det. Phillips obtained a
written consent to search for the residence at 314 S. Oak from Alford
Goodwin. During a search of the residence conducted by Sgt. Hopson,
Sgt. Bacon, Det. Dorman, Det. Phillips and I, the following items
were confiscated for evidence.

E-11,  One gray hooded army sweat shirt, found in the S.W. bedroom in
       a nylon bag.

E-12,  One black and blue Duke university baseball cap found in the
       S.W. bedroom.

E-13,  One brown (IZZI) leather jacket found in the closet in the

151

E-14,   S.W. bedroom.
One blue bandanna found in the S.W. bedroom.

E-15,   One black jacket hood found in the S.W. bedroom on top of the chest of drawers.

E-16,   One black coat hood found on top of the chest of drawers in the S.W. bedroom.

E-17,   One small Browning bone handle knife found in the closet in the S.W. bedroom.

E-18,   One H&R blue steal revolver with black plastic grips found in the back yard of the residence next to the fence.

Sgt. Bacon found the item labeled E-13, Sgt. Hopson found items labeled E-11, E-12, E-14, E-15 and E-16, Det. Dorman found Item labeled E-17 and Det. Phillips found item E-18.

All evidence from the search warrant and the consent to search was turned over to this Detective and subsequently tagged with red evidence tags and turned into the evidence room.

Item E-3 from the search warrant at 1003 W. 3rd and Item E-18 from the consent to search at 314 S. Oak, were not turned into the evidence room as they were sent to the Arkansas State Crime Lab so that the blood stains on E-3 could be compared to the victim and the gun (E-18) could be compared with the bullet that was removed from the victim.

A receipt for property seized on the search warrant was left at the residence and a receipt for property seized on the consent to search was left with Mrs. Flossie McLemore.

152

DET. CHARLES HENDRIX #3019

153

DETECTIVE BUREAU SUMMARY

..ARY IN REFERENCE TO:  Gary Turner

CRIME:  Capital Murder

ARKANSAS STATE STATUTE NO:  5-10-101          FILE NO:  93/205

DATE AND TIME OF INCIDENT:  5/05/93     20:00 through 20:30 hours

VICTIM:  Gary Turner

INVESTIGATING OFFICERS:

INVESTIGATING DETECTIVE:  Dorman, Douthit


In the evening hours of 5-05-93, a homicide occurred at the automatic teller machine at Worthen Bank located at 5th and Chestnut.

On 5/06/93 at approximately 06:40 hours, I was contacted at my residence by Captain Heroman and he advised me to come on in to work as soon as I could get there and he asked me to wear some old clothes. When ·ived at the Detective Office at approximately 07:20 hours, Captain Heroman instructed Detective Douthit and me to go to the area of 5th and Chestnut and start a search of the area from Pine to Beech, and north from 5th to the Expressway. Detective Douthit and I checked numerous vacant buildings and vehicles in the area for any evidence that may have been dropped or thrown down by the suspects. We were assisted in the search by Investigators Foster and Bradley of the Jefferson County Sheriff's Office.

At approximately 08:20 hours, as I was searching the alley between Pine and Chestnut and 3rd and 4th, I located a blue sweat shirt concealed inside a metal storage type cabinet. It appeared that the shirt had not been in the metal cabinet for very long because it was dry and it was not covered by dirt and dust like the other items that were there. The sweat ·: was photographed by Detective Hudgins and it was placed into

**154**

Detective Bureau Summary
Summary in Reference to:
Page 2

dence. Detective Douthit and I checked all of the trash dumpsters in the area but we were unable to locate any evidence in any of them because they were emptied during the early morning hours of 5/06/93.

Detective Douthit and I left copies of the suspect information at each of the businesses located on the corner of Barraque and Walnut. The clerk at the Shell Git and Go at Barraque and Walnut gave Detective Douthit a VCR tape that showed all of the customers that came into the store after 18:30 hours on 5/05/93. The clerk said that she did not know if there was anything on the tape that we needed, but for us to take it and see.

At approximately 10:30 hours, I spoke with the managers of the Greyhound Bus Terminal. I was told by Mr. Phillips that his son James Phillips had closed the business the night before. At approximately 3:00 hours, I met with James Phillips at his residence. James said that he had closed the business at approximately 19:25 hours, and he had been in the office with Dr. Carey Wynn. James said that he and Dr. Wynn were praying and meditating in the office when they heard someone at the front door of the business. James said that Dr. Wynn went to the door and spoke with Corine Jones of 1412 Missouri. James said that Corine Jones wanted to get a key that she had left inside a locker earlier in the evening. James said that Jones was let inside and she got the key before leaving. James said that he did not leave the office area until the Police knocked on the door and asked some questions that night. James said that Dr. Wynn lives at 1709 King. I was unable to speak with Dr. Wynn because he was out of town during the day, but Detective Carnel Williams spoke with him later. I was not able to locate Corine Jones and I passed the information to Captain Heroman.

155

*Ronald Damon*

Respondent's Exhibit E

DETECTIVE BUREAU SUMMARY

SUMMARY IN REFERENCE TO:

CRIME:  Homicide

ARKANSAS STATE STATUTE NO:                    FILE NO:  93/205

DATE AND TIME OF INCIDENT:  05-05-93

VICTIM:  Gary Turner

INVESTIGATING OFFICERS:

INVESTIGATING DETECTIVE:  Arless Hudgins

On 05-06-93 at 0820 hours Detective Douthit called me via police radio and asked me to come to West 4th and Chestnut to photograph a blue sweatshirt that he had found. I went to the area and met Detective Dorman in the alley located between West 4th and West 3rd, just east of

-nut. Detective Dorman showed me a large metal box with the top opened. Inside the box was a blue sweatshirt. I used a Canon AE-1 35 MM camera, with a 50 MM Macro lens to photograph the shirt. The shirt was then collected by Detective Dorman and will be placed into evidence.

On 05-06-93 Capt. Heroman gave me a list of names consisting of six people. These people had made transactions at the Worthen bank money machine, located at West 5th and Chestnut, just before the shooting occurred. I made contact with four of the people on the list. Each person denied seeing anything suspicious during their time at the money machine. The list of names given to me will be made a part of this file.

On 05-06-93 about 1430 hours Sgt. Hopson and Myself went to South Olive Street between West 3rd and West 4th. We then went door to door asking people if they had seen or heard anything on 05-05-93 around 8:30

1. I spoke to one Black Female at West 4th and Olive. She refused to tell me her name. She told me that she saw two young black males riding

156

Detective Bureau Summary
Summary in Reference to:
Page 2

ᴸ  ycles west on West 4th at a high rate of speed about 8:30 on 05-05-93.

She said one of the black males was wearing what appeared to be a gray

shirt with a hood on it. All the other people I spoke with told me that

they go inside their homes when it begins to get dark. They said they saw

nothing and heard nothing.

### ADDITION TO SUMMARY

On 05-07-93 at 1230 hours Sgt. Hopson and myself went to 3501 Olive

and spoke with Michelle Boykins. Ms. Boykins said on 05-05-93 about 2125

hours she was driving west on West 5th. She said she saw the police

around the ATM at Worthen bank, so she turned right onto Chestnut Street.

She said after she made her turn she looked towards Econo Lodge and saw

two black males beside the dumpster.She said they threw something into

the dumpster and then squatted down beside it. The black males appeared

be wearing dark clothing, but one of them was wearing a lighter

colored shirt. One of the black males appeared to be about 5 feet 8

inches tall and the other one about 6 feet tall. Ms. Boykins could tell

me nothing else about the two people that she saw.

### ADDITION TO SUMMARY

On 05-10-93 Sgt. Hopson received a phone call from a citizen telling

him about the shooting that occurred at the Worthen bank ATM machine.

Sgt. Hopson ask the subject if he would be willing to come to the

prosecutors office and give us a sworn statement. After agreeing to do

this the subject was asked where he was and what he was wearing. The

subject told Sgt. Hopson that he was at the Department of Human Services

and that he was wearing green shorts and a Pistons jacket. I got into my

pick up truck and went to the area and picked the subject up and

transported him to the prosecutors office where he was questioned by

157

Detective Bureau Summary
Summary in Reference to:
Page 3

Heroman, Lt. Cook, and Wayne Juneau. The subject told us of two people who he had overheard talking about the shooting. He said their names were Kenny Reams and Butterball. After getting his statement I was transporting the subject back to his home when we saw two black males walking south on Elm street. The subject told me they were the two who had done the shooting. I let the subject out of my truck at West 4th and Elm street and told Sgt. Hopson via police radio about the two black males. Sgt. Hopson told me that we would attempt to take the suspects into custody. I was told by Lt. Cook to keep an eye on the suspects and not to loose them. The suspects continued to walk south on Elm and turned east onto West 3rd Ave. At this time Sgt. Hopson and Sgt. Bacon were going West on West 3rd. We took the suspects into custody at West 3rd and Elm street about 1545 hours. Butterball was transported to the Detective

ꞏce by Lt. Cook and Capt. Heroman. Kenny Reams was transported to the Detective office by Detective Hudgins.

PINE BLUFF POLICE DEPARTMENT

Arless Hudgins Detective

158

 Respondent's Exhibit E

On 05/08/93 I received a phone call from a black male
identifying himself as Mack Summerville. Summerville requested
to remain anonymous, but gave the following information about
the homicide at 5th and Chestnut:

    According to Summerville the two suspects involved are a
black male named "Butterball" and another he did not know.
According to Summerville, the two approached the man at the ATM
machine and Butterball either reached in through a window or got
in the truck, but either way he had a struggle with the man and
then the other one shot him in the head. Summerville said that
Butterball was scared and was thinking about turning himself in
because he hadn't been the one to do the shooting.
    Summerville also said that he would try to find out the
other persons name and try to find out Butterball's real name.

    On 05/09/93 I received a second call from Summerville.
Summerville sated that he had been mistaken, and that Butterball
was the one that had shot the man in the head. He could not find
out his real name, but said he thought the other one's name was
Tyrone. Summerville also said that they lived around Barraque
and Oak and that Butterball was staying with his mother because
he was scared.

                                      Det. Sgt. James Bacon

159

# RIGHTS FORM

MIRANDA RIGHTS READ TO *Kenneth Leonard Reams*

DATE *5/10/93* TIME *1623* A or P M    PLACE *Det. Office*

Before we ask you any questions, you must understand your rights.

You have the right to remain silent.

> Do you understand?    Yes or No  *Yes KR*

Anything you say can and will be used against you in court.

> Do you understand?    Yes or No  *yes KR*

You have the right to have an attorney present before making any statement and you may talk with him during questioning.

> Do you understand?    Yes or No  *yes KR*

If you cannot afford an attorney, one will be provided for you before you are asked any questions, if you so desire.

> Do you understand?    Yes or No  *yes KR*

If you want to answer questions now, without a lawyer present, you may do so. However, you have the right to stop the questioning at any time.

> Do you understand?    Yes or No  *yes KR*

> Signature *Kenneth Reams*

Rights read by: *Sgt. C. Gibson*

Witness:_____

Witness:_____

CASE NUMBER *93-205*

160

## YOUR RIGHTS

NAME: _Kenneth Reams_          PLACE _Pine Bluff PD_

DATE _5-16-93_

TIME _10:46 AM_

Before we ask you any questions, you must understand your rights.

1.   Do you understand that you have the right to remain silent?

Response _yes K.R._

2.   Do you understand that anything you say can and will be used against you in court?

Response _yes K.R._

3.   Do you understand that you have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning?

Response _yes K.R._

4.   Do you understand that if you cannot afford a lawyer, one will be appointed for you before any questioning if you wish, at no cost to you?

Response _yes K.R._

5.   Do you understand that if you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time?  You also have the right to stop answering at any time until you talk to a lawyer.

Response _yes K.R._

## WAIVER OF RIGHTS

I have read this statement of my rights and I understand what my rights are.  I am willing to make a statement and answer questions.  I do not want a lawyer at this time.  I understand and know what I am doing.  No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

SIGNED X _Kenneth L. Reams_

WITNESS _J Howell_

WITNESS _____

_8-9640-93_
_case job only_
_John Howell_

161

CRIMINAL INVESTIGATION DIVISION

ASP-3-A

DATE:           5-11-93
DICTATED BY:    INV. JOHN HOWELL
DATE TYPED:     5-13-93 LDH
COPIES TO:      SGT. TERRY HOPSON,
                PINE BLUFF POLICE DEPARTMENT

<u>INTERVIEW OF SUSPECT</u>

KENNETH REAMS
B/M  DOB: 12-21-74
1003 W. 3RD
PINE BLUFF, AR

MR. REAMS was interviewed at the State Police CID office in Pine Bluff, Arkansas at 10:50 p.m. on 5-10-93 by Inv. JOHN HOWELL.

The subject's rights were described to him on a CID 116 form.  His responses were recorded on that form.  A copy of the rights waiver has been forwarded to the Little Rock office to be made a permanent part of this file.  After being advised of rights and signing the rights waiver, the subject gave the following information.

MR. REAMS first statements concerning this matter were essentially the same as given other investigators.  MR. REAMS then stated that he found the .32 revolver, and two bomber jackets in a vacant house.  He stated that he told the investigators that he found only one bomber jacket, but actually he said he found two.  This investigator asked MR. REAMS how long ago was it that he found these items.  He said approximately two weeks ago.  This investigator then asked MR. REAMS what would your response be if this .32 revolver comes back as the weapon that was used in this shooting?  MR. REAMS stated that it will be the correct weapon.  MR. REAMS stated that approximately two or three days after he found the gun he was at the Super Shell Station at Walnut and Barrique, and he was with ALFORD GOODWIN.  He stated that while he was at the Super Shell Station he got into it with an unknown (dude).  He stated that this guy kept mouthing at him and he pulled out this .32 revolver and when he did ALFORD GOODWIN, AKA " BUTTERBALL", took this revolver away from him.  He stated that he has not seen this revolver since.  MR. REAMS went on to state that he was not at 5th and Chestnut on 5-5-93 when MR. TURNER was shot.

FILE  BER: 89-640-93                      CRIME:   CAPITAL FELONY MURDER

162

ASP-119

ARKANSAS STATE POLICE

CRIMINAL INVESTIGATION DIVISION

POLYGRAPH RELEASE FORM

DATE: _5-10-93_

I, _Kenneth Reams_

do hereby volunteer, without duress, coercion, or promise of
reward or immunity, to submit to examination by the Polygraph
Instrument.  Having had the same explained to me, I hereby release,
absolve, and forever hold harmless the Arkansas State Police, its
Polygraph Examiner, and all other employees from any and all claims.

SIGNED: _Kenneth L. Reams_

Witnessed by:

_____

_____

_____

163



**State of Arkansas**

# ARKANSAS  STATE  POLICE

Post Office Box 5901   •   Little Rock, Arkansas  72215

Bill Clinton • Governor      Colonel T.L. Goodwin • Director      Lt. Col. Richard C. Rail • Ass't. Director

May 13, 1993


CONFIDENTIAL

Sgt. Terry Hopson
Pine Bluff Police Department
200 E. 8th
Pine Bluff, AR  71601

ARRANGEMENTS

At your request, MR. KENNETH REAMS was administered a polygraph examination at the
State Police CID office in Pine Bluff, Arkansas on May 10, 1993 by Investigator
John Howell.

MR. REAMS was being tested to determine his knowledge or involvement in a homicide
which occurred in Pine Bluff, Arkansas on May 5, 1993.

PRE-TEST INTERVIEW

The pre and post test interviews were conducted on interview of suspect form which
will be made a permanent part of this file.

EXAMINATION

MR. REAMS was administered three polygraph examinations, all of which consisted
of the MGQT Test Technique in which the following questions were asked, along
with other irrelevant and control questions.

Q-3.  Did you plan with anyone to rob a man on the evening of May 5th, which lead
      to his death?

A.    No.

Q-5.  Did you fire the shot that caused the death of GARY WAYNE TURNER on May 5th?

A.    No.

Q-8.  On the evening of May 5th, did you attempt to rob a man at 5th & Chestnut?

A.    No.

Q-9.  Do you know who shot GARY WAYNE TURNER causing his death?

A.    No.


164

Page Two

Polygraph Examination
Kenneth Reams
May 13, 1993

FINDINGS

The physiological responses noted on this subject's polygraph charts are in such a pattern as to indicate that the subject, MR. REAMS, has not been completely truthful in answering the above questions.

Based on information furnished this examiner, interviews with the subject, and evaluation of the subject's polygraph charts; it is the opinion of this examiner that MR. REAMS has not been completely truthful.

Respectfully submitted,

Inv. John Howell
Polygraph Examiner
Company "G"
Arkansas State Police

JH/lh

xc:  Case File #89-640-93

165

CRIMINAL INVESTIGATION DIVISION

ASP-3-A

DATE:           5-11-93
DICTATED BY:    INV. JOHN HOWELL
DATE TYPED:     5-13-93 LDH
COPIES TO:      SGT. TERRY HOPSON,
                PINE BLUFF POLICE DEPARTMENT


<u>INTERVIEW OF SUSPECT</u>

KENNETH REAMS
B/M  DOB: 12-21-74
1003 W. 3RD
PINE BLUFF, AR

This was a post test interview at the State Police CID office in Pine Bluff, Arkansas on 5-10-93 by Inv. JOHN HOWELL.

MR. REAMS was advised by this investigator that he was deceptive in his polygraph examination.  MR. REAMS stated well we did not plan on robbing anybody that night. He stated that himself and ALFORD GOODWIN, AKA "BUTTERBALL", were walking close to 5th and Chestnut and that they had a joint.  He stated that AKA "BUTTERBALL", saw a pickup truck parked near the Worthern teller machine, and that GOODWIN, AKA "BUTTERBALL", walked up to the pickup truck and asked the driver for a light. He stated that the driver stated what in the fuck do you want, and at that time GOODWIN shot the driver.  He stated that he ran over to the vehicle and saw that the driver was bleeding.  This investigator asked MR. REAMS, was it possible that he got blood on him, and he stated he might have.

This investigator then turned MR. REAMS over to Sgt. BACON of the Pine Bluff Police Department who took a statement from MR. REAMS.


FILE    BER: 89-640-93                        CRIME: CAPITAL FELONY MURDER

166

Voluntary
~~WITNESS~~ STATEMENT

NAME ___Kenneth Reams_____ DOB _12/21/74_

ADDRESS ___1003 W. 3rd_____ PHONE____--____

PLACE OF EMPLOYMENT_____ PHONE____--____

THE FOLLOWING IS WRITTEN BY SGT. BACON AS I
RELAY TO HIM.  X _Kennette Reams_

BUTTERBALL AND I WERE WALKING TOWARDS
THE OLD COUNTY MARKET STORE, GOING TO BUY
SOME WEED AT HOUSE IN THAT AREA. WE WERE
AROUND THE BANK AND SAW A TRUCK PULL UP
TO THE BANK MACHINE. BUTTERBALL WENT UP
TO THE TRUCK TO ASK FOR A LIGHT FOR A
JOINT THAT HE ALREADY HAD. BUTTERBALL WALKED
UP AT THE FRONT OF THE TRUCK AND I KEPT
WALKING ACROSS THE PARKING LOT. THEN I HEARD
A GUN SHOT AND I THOUGHT THE MAN HAD SHOT
BUTTERBALL SO I WENT BACK TO CHECK.
BUTTERBALL HAD ALREADY TOOK OFF RUNNING AND
I STOPPED AND LOOKED IN THE TRUCK I SAW
THE MAN'S HEAD ON THE STEERING WHEEL AND
BLOOD COMING OUT. THEN I RAN TO CATCH
UP WITH BUTTERBALL. WHEN I ASKED HIM WHY
HE SHOT HIM, BUTTERBALL SAID THAT THE MAN
SAID "WHAT THE FUCK DO YOU WANT" AND HE
SHOT HIM. WE DIDN'T GO UP TO TRY AND ROB

K.L.R

Compiled By _~~signature~~_     File No. _93-205_ Date _5/11/93_

Page one of _2_

5826   Respondent's Exhibit E

K.L.R.

## WITNESS STATEMENT (continued)

HIM, AND I DON'T KNOW WHY BUTTERBALL

SHOT HIM. THEN WE WENT BUTTERBALL'S

HOUSE AND HE CHANGED CLOTHES. HE HAD

BEEN WEARING A SWEAT SHIRT WITH A HOOD

AND IT WAS GRAY. THEN WE WENT TO MY HOUSE

AND I CHANGED CLOTHES. BUTTERBALL TOLD ME

THE NEXT DAY THAT HE HAD HID THE GUN

UNDER AN OLD RUSTY BUCKET IN HIS BACKYARD.

I DON'T KNOW IF BUTTERBALL AND THE MAN HAD

ANY OTHER WORDS OR NOT.

BUTTERBALL'S NAME IS ALFORD GOODWIN.

X Kenneth L. Reams

Compiled By _____ File No. 93-205 Date 5/11/93

Page 2 of 2

168

MAY 18, 1993

ON MAY 11, 1993 THE PINE BLUFF POLICE DEPARTMENT
BROUGHT KENNETH REAMS FOR US TO HOLD OVERNIGHT

MY INSTRUCTIONS REGARDING HIM HAVING TELEPHONE CALLS
WAS TO BE SURE THAT THERE BE A POLICE OFFICER
PRESENT WHEN HE CAME OUT OF HIS CELL.

AT APPROXIMENTLY 4:00 P.M. MR. REAMS REQUESTED
TO MAKE A TELEPHONE TO A DETECTIVE IN PINE BLUFF.
I INFORMED HIM THAT HE COULD AS SOON AS AN
OFFICER WAS AVAILABLE TO COME TO THE STATION.
AT THIS TIME ALL OUR OFFICERS WERE TIED UP ON A
COUPLE OF CALLS THAT WERE TIME CONSUMING.

MR. REAMS AGAIN REQUESTED TO MAKE THE TELEPHONE
TO THE PINE BLUFF DETECTIVE AT APPROXIMENTLY 5:00 P.M.
AGAIN ALL OUR OFFICERS WERE ON CALLS AND COULD
NOT COME TO THE POLICE STATION.

BY THE TIME AN OFFICER WAS AVAILABLE TO COME TO
THE STATION TWO DETECTIVES FROM PINE BLUFF
ARRIVED TO TALK TO MR. REAMS. THIS WAS AT
APPROXIMENTLY 9:20 P.M.

Mickey P. Stroud
JAILER
STUTTGART POLICE DEPARTMENT

169

RIGHTS FORM

READ TO: _Kenneth Reams_          CASE # _93-205_

PLACE: _Stuttgart City Jail_

DATE: _5-11-93_

TIME: _10 PM_

BEFORE WE ASK YOU ANY QUESTIONS, YOU MUST UNDERSTAND YOUR RIGHTS.

YOU HAVE THE RIGHT TO REMAIN SILENT.

DO YOU UNDERSTAND? _Yes K.R._

ANYTHING YOU SAY CAN AND WILL BE USED AGAINST YOU IN COURT.

DO YOU UNDERSTAND? _Yes K.R._

YOU HAVE THE RIGHT TO HAVE AN ATTORNEY PRESENT BEFORE MAKING ANY

STATEMENT AND YOU MAY TALK WITH HIM DURING QUESTIONING.

DO YOU UNDERSTAND? _Yes K.R._

IF YOU CANNOT AFFORD AN ATTORNEY, ONE WILL BE PROVIDED FOR YOU

BEFORE YOU ARE ASKED ANY QUESTIONS, IF YOU SO DESIRE.

DO YOU UNDERSTAND? _Yes K.R._

IF YOU WANT TO ANSWER QUESTIONS NOW, WITHOUT A LAWYER PRESENT,

YOU MAY DO SO;  HOWEVER, YOU HAVE THE RIGHT TO STOP THE QUESTIONING

AT ANY TIME.

DO YOU UNDERSTAND? _Yes K.R._

SIGNED: _Kenneth Reams_

RIGHTS READ BY: _Lt. Terry Addison_

WITNESS: _Wm S. _____

WITNESS: _____

170

INTERVIEW WITH KENNETH REAMS

LT. TERRY ADDISON
DET. IVAN PHILLIPS
KENNETH REAMS

TA:  Today's date is May 11, 1993.  It is 10:00 p.m.  We are at the
     Stuttgart City Jail conducting an interview with Kenneth Reams.
     In this interview is myself, Lt. Addison, and also Det. Bud
     Phillips.  Kenneth the first thing I am going to do is read you
     your rights.  I know they have been read to you several times in
     the last day, but I'm going to read them again and I need a
     verbal answer so that I know that you understand them.  You have
     the right to remain silent.  Do you understand that?
KR:  Yes.
TA:  Anything you say can and will be used against you in court.  Do
     you understand that?
KR:  Yes.
TA:  You have the right to have an attorney present before making any
     statements.  And you may talk with him during questioning, do
     you understand that?
KR:  Yes.
TA:  If you cannot afford an attorney one will be provided for you
     before you are asked any questions, if you so desire.  Do you
     understand that?
KR:  Yes.
TA:  If you want to answer questions now without a lawyer present you
     may do so, however you have the right to stop the questioning at
     any time.  Do you understand that?
KR:  Yes.
TA:  I need you to sign your name right there at the bottom of that
     Rights Form.  And put your initials by each one of the, those
     answers that you just answered.  Alright Kenneth we'll start out
     with this robbery at the bus station that happened on April 29,
     1993.  Did you take part in that?
KR:  Yes.
TA:  Okay, can you explain to me what happened there?
KR:  Ah, it was early in the morning.  I forgot which morning it
     was.  About 8:00, I believe around eight or something, I went in
     to the bus station with a 32 and robbed them.  I was by myself.
     And got about $42.00 dollars.  And that's it.
TA:  And there wasn't anybody with you?
KR:  No.
TA:  Alright did you use a mask or any kind of disguise?
KR:  No.
TA:  How much money did you get?
KR:  $42.00 dollars.
TA:  Alright on this report it is showing $100.00 dollars taken.
     You're saying you didn't quite get that much?
KR:  No.
TA:  Alright, what kind of weapon was it?
KR:  32.
TA:  Alright, who did you get the money from in there?
KR:  Ah, I got it out of a cash register.

171

TA: Who was watching the cash register?
KR: The woman that was in the back.  The white lady that was in the back.  That was, I guess had control of it at the time.
TA: A white lady?.
KR: Yes.
TA: Was it a young lady or ....
KR: Kind of old, like she was about 30's, late 30's.
TA: Okay.  Can you describe her any way?
KR: Ah, she was kind of heavy set, I can't I can't really remember what color hair she had.  I can't describe her to well.
TA: Would you recognize her again if you saw her?
KR: Yes.
TA: When you went in there did you tell her anything?
KR: I told her that this was a robbery.  I asked her where the money at.  And she she she ah pointed.  I told her to get on the floor.  She got on the floor, I took the money and I left.
TA: Where did she point to where the money was?
KR: In a drawer.
TA: Did you open the drawer or did she?
KR: She did.
TA: And you got the money out?  You told her to get on the floor?
KR: Yes.
TA: Did she do that?
KR: Yes.
TA: So then you left out.  Which door did you go out?
KR: Back door.
TA: Where did you go from there?
KR: I ran down 3rd.
TA: Where to?
KR: To my house on 3rd and Poplar.
TA: Alright you say you got, you used a 32?
KR: Yes.
TA: Is this an automatic or revolver or what?
KR: Revolver.
TA: Revolver.  Where did you get it?
KR: Out of a burglary.
TA: A burglary that you did?
KR: Yes.
TA: Was anybody with you on that cne?
KR: No.
TA: Alright.  Where was that at?
KR: On Poplar at the clean, at cleaners on Poplar Street.
TA: Alright I'm holding a police report of a burglary at Pine Bluff Dry Cleaners, 1009 South Poplar, that happened, looks like on April 27, 1993.  Is this the one in which you're talking about?
KR: Yes.
TA: Okay how did you get in there?
KR: Kicked the back door in.
TA: About what time was this?
KR: About 1:30 in the morning.
TA: And you're by yourself?
KR: Yes.
TA: What did you get out of there?

172

KR: Ah, $10.00 dollars in change, a roll of stamps, three leather coats, some clippers and a pistol. A 32.

TA: This pistol, is this the one that you used in the robbery?

KR: Yes.

TA: And it was a 32 revolver?

KR: Yes.

TA: Do you know what brand?

KR: No.

TA: Do you know the serial number on it?

KR: No.

TA: Okay. In fact they got a 32 pistol that the serial number was filed off on the bottom of it when I got it, is that the one we're in question about?

KR: Yes.

TA: Did you file the numbers off that?

KR: No.

TA: Do you know who did?

KR: Alfred.

TA: Alfred? Alfred who?

KR: Goodwin.

TA: When did he do this?

KR: Ah, I don't know.

TA: Okay let's go back to the burglary.

KR: I'm not, I'm not so sure if he filed it off or not. I didn't file it off, but the gun was in his possession. And he had told me that ah the serial number had been filed off the gun.

TA: Okay we'll get back to that in a minute. Let's right now go back to this burglary. You said you got a 32 caliber, some leather jackets, some stamps, some money, ah and some clippers. What kind of clippers are you talking about?

KR: Hair clippers.

TA: Hair clippers? Alright. What did you do with the hair clippers?

KR: I, they still at my house.

TA: Okay. What about the leather jackets?

KR: Still at, they was still at my house.

TA: How many of them were there?

KR: Ah, three.

TA: Do you know what color?

KR: Brown.

TA: And the pistol, where is it at?

KR: I don't know.

TA: Alright when you got it what did you do with it? Well I know you did this robbery earlier, but after the robbery of the bus station, what did you do with the pistol?

KR: I kept it with me for about four, for about four days. And ah, when, till I went to the store one day and when ah I went to the store ah buterball he got the gun from me, cause ah I had ah flashed it at the store and ah he told me I don't need to be flashing no pistol at no store like that cause they'll call the police, ah he got the gun from me and ah he, it was in his possession every since then.

TA: Okay what store did you flash this gun at?

KR: At ah this store on Barraque and Walnut. I don't know the name of the store.

```
TA:   That Shell .....
KR:   Shell yeah.
TA:   Alright did anybody in there see you flash the gun?
KR:   Not in the store.
TA:   Oh okay.  It was just kind of flashing it between you and
      butterball?
KR:   And then, yeah and the person that I flashed it, ah he seen, I
      believe, I am not for sure if he seen it or not.
TA:   Who was that?
KR:   I don't know his name.  I don't even remember.
TA:   Alright in fact butterball, you're talking about butterball,
      what is his real name?
KR:   Alfred Goodwin.
TA:   Okay.  So from there you gave it to butterball and when was the
      next time you saw the pistol?
KR:   Ah, that night that we had ah, we was going to walk and go ah
      buy a bag of weed from this dope house.
TA:   Do you remember what night that was?
KR:   No.
TA:   At that time you saw it, butterball still had it?
KR:   Yes.
TA:   Detective Phillips is there anything else you want to ask him?
IP:   No.
TA:   Okay, Kenneth is there anything else that you want to say ah in
      your statement?
KR:   No.  I ain't killed that man.
TA:   Which man?
KR:   That was at the teller.  I had no idea that he was going to get
      killed.
TA:   Who killed him?
KR:   Alfred.
TA:   Alfred.
KR:   I ain't going to say Alfred killed him, but ah the way it went
      down Alfred had to kill him cause wasn't nobody else around.
TA:   Which man are you talking about?
KR:   Ahhh, ahhh, Mr. Turner on, I don't, I can't ah think of his
      first name right now.
TA:   Okay this was at the teller machine there at 5th and Chestnut?
KR:   Yes.
TA:   Who, who was there when this happened?
KR:   Nobody but me and Alfred.  I was on the other, I was walking
      across the other side of the parking lot, I ain't had no idea
      nothing like this was going to happen.
TA:   Nobody else was up there at the, at the, at his vehicle except
      Alfred and the owner of the vehicle?
KR:   The owner of the vehicle.  He told, we, we was, we was walking
      and he say he was going to ask the man for a light.  Cause I
      thought the man was black, when he went around the teller you
      know drove around and came back up this way, and ah by the time
      I got on 6th Street by the sidewalk I heard a pow, so you know I
      thought Alfred had got shot at first.  So I ran back to the ah
      teller.  And I seen the man laying you know and I looked over in
      the truck you know and I just got all paranoid.  I looked up and
      I seen Alfred running and I took off behind Alfred.  I caught up
```

174

with him cause it was a train on the track.  That's the only reason I caught up with him.  And I asked, I say man why you shoot that man.  You know I was out of breath, I, why you shoot.  He said cause he ah told me ah he said what the fuck you want.  That's what he told me.  I don't know if they had any other kind of conversation or nothing like that.  And he told me don't tell.  And I ain't, I told one person.  That was my auntie.

TA:  Which auntie you talking about?

KR:  Joann Reams.  I started getting paranoid.  I didn't know what to do.  I started to leave town at first.  I said for what.

TA:  Okay is there anything else you want to add on this?

KR:  No.

TA:  Okay at this time we will conclude the interview and it is 10:15 p.m. same date, May 11, 1993.

TRANSCRIBED BY STEFANIE HAWKINS   MAY 12, 1993

175

Krw's
markings)

INTERVIEW WITH KENNETH REAMS

LT. TERRY ADDISON
DET. IVAN PHILLIPS
KENNETH REAMS

TA: Today's date is May 11, 1993.  It is 10:00 p.m.  We are at the
    Stuttgart City Jail conducting an interview with Kenneth Reams.
    In this interview is myself, Lt. Addison, and also Det. Bud
    Phillips.  Kenneth the first thing I am going to do is read you
    your rights.  I know they have been read to you several times in
    the last day, but I'm going to read them again and I need a
    verbal answer so that I know that you understand them.  You have
    the right to remain silent.  Do you understand that?
KR: Yes.
TA: Anything you say can and will be used against you in court.  Do
    you understand that?
KR: Yes.
TA: You have the right to have an attorney present before making any
    statements.  And you may talk with him during questioning, do
    you understand that?
KR: Yes.
TA: If you cannot afford an attorney one will be provided for you
    before you are asked any questions, if you so desire.  Do you
    understand that?
KR: Yes.
TA: If you want to answer questions now without a lawyer present you
    may do so, however you have the right to stop the questioning at
    any time.  Do you understand that?
KR: Yes.
TA: I need you to sign your name right there at the bottom of that
    Rights Form.  And put your initials by each one of the, those
    answers that you just answered.  Alright Kenneth we'll start out
    with this robbery at the bus station that happened on April 29,
    1993.  Did you take part in that?
KR: Yes.
TA: Okay, can you explain to me what happened there?
KR: Ah, it was early in the morning.  I forgot which morning it
    was.  About 8:00, I believe around eight or something, I went in
    to the bus station with a 32 and robbed them.  I was by myself.
    And got about $42.00 dollars.  And that's it.
TA: And there wasn't anybody with you?
KR: No.
TA: Alright did you use a mask or any kind of disguise?
KR: No.
TA: How much money did you get?
KR: $42.00 dollars.
TA: Alright on this report it is showing $100.00 dollars taken.
    You're saying you didn't quite get that much?
KR: No.
TA: Alright, what kind of weapon was it?
KR: 32.
TA: Alright, who did you get the money from in there?
KR: Ah, I got it out of a cash register.

176

TA: Who was watching the cash register?
KR: The woman that was in the back.  The white lady that was in the back.  That was, I guess had control of it at the time.
TA: A white lady?
KR: Yes.
TA: Was it a young lady or ....
KR: Kind of old, like she was about 30's, late 30's.
TA: Okay.  Can you describe her any way?
KR: Ah, she was kind of heavy set, I can't I can't really remember what color hair she had.  I can't describe her too well.
TA: Would you recognize her again if you saw her?
KR: Yes.
TA: When you went in there did you tell her anything?
KR: I told her that this was a robbery.  I asked her where the money at.  And she she ah pointed.  I told her to get on the floor.  She got on the floor, I took the money and I left.
TA: Where did she point to where the money was?
KR: In a drawer.
TA: Did you open the drawer or did she?
KR: She did.
TA: And you got the money out?  You told her to get on the floor?
KR: Yes.
TA: Did she do that?
KR: Yes.
TA: So then you left out.  Which door did you go out?
KR: Back door.
TA: Where did you go from there?
KR: I ran down 3rd.
TA: Where to?
KR: To my house on 3rd and Poplar.
TA: Alright you say you got, you used a 32?
KR: Yes.
TA: Is this an automatic or revolver or what?
KR: Revolver.
TA: Revolver.  Where did you get it?
KR: Out of a burglary.
TA: A burglary that you did?
KR: Yes.
TA: Was anybody with you on that one?
KR: No.
TA: Alright.  Where was that at?
KR: On Poplar at the clean, at cleaners on Poplar Street.
TA: Alright I'm holding a police report of a burglary at Pine Bluff Dry Cleaners, 1009 South Poplar, that happened, looks like on April 27, 1993.  Is this the one in which you're talking about?
KR: Yes.
TA: Okay how did you get in there?
KR: Kicked the back door in.
TA: About what time was this?
KR: About 1:30 in the morning.
TA: And you're by yourself?
KR: Yes.
TA: What did you get out of there?

177

TA:  That Shell .....
KR:  Shell yeah.
TA:  Alright did anybody in there see you flash the gun?
KR:  Not in the store.
TA:  Oh okay.  It was just kind of flashing it between you and butterball?
KR:  And then, yeah and the person that I flashed it, ah he seen, I believe, I am not for sure if he seen it or not.
TA:  Who was that?
KR:  I don't know his name.  I don't even remember.
TA:  Alright in fact butterball, you're talking about butterball, what is his real name?
KR:  Alfred Goodwin.
TA:  Okay.  So from there you gave it to butterball and when was the next time you saw the pistol?
KR:  Ah, that night that we had ah, we was going to walk and go ah buy a bag of weed from this dope house.
TA:  Do you remember what night that was?
KR:  No.
TA:  At that time you saw it, butterball still had it?
KR:  Yes.
TA:  Detective Phillips is there anything else you want to ask him?
IP:  No.
TA:  Okay, Kenneth is there anything else that you want to say ah in your statement?
KR:  No.  I ain't killed that man.
TA:  Which man?
KR:  That was at the teller.  I ain't no idea that he was going to get killed.
TA:  Who killed him?
KR:  Alfred.
TA:  Alfred.
KR:  I ain't going to say Alfred killed him, but ah the way it went down Alfred had to kill him cause wasn't nobody else around.
TA:  Which man are you talking about?
KR:  Ahhh, ahhh, Mr. Turner on, I don't, I can't ah think of his first name right now.
TA:  Okay this was at the teller machine there at 5th and Chestnut?
KR:  Yes.
TA:  Who, who was there when this happened?
KR:  Nobody but me and Alfred.  I was on the other, I was walking across the other side of the parking lot, I ain't had no idea, nothing like this was going to happen.
TA:  Nobody else was up there at the, at the, at his vehicle except Alfred and the owner of the vehicle?
KR:  The owner of the vehicle.  He told, we, we was, we was walking and he say he was going to ask the man for a light.  Cause I thought the man was black, when he went around the teller you know drove around and came back up this way, and ah by the time I got on 6th Street by the sidewalk I heard a pow, so you know I thought Alfred had got shot at first.  So I ran back to the ah teller.  And I seen the man laying you know and I looked over in the truck you know and I just got all paranoid.  I looked up and I seen Alfred running and I took off behind Alfred.  I caught up

178

with him cause it was a train on the track.  That's the only reason I caught up with him.  And I asked, I say man why you shoot that man.  You know I was out of breath, I, why you shoot.  He said cause he ah told me ah he said what the fuck you want.  That's what he told me.  I don't know if they had any other kind of conversation or nothing like that.  And he told me don't tell.  And I ain't, I told one person.  That was my auntie.

TA:   Which auntie you talking about?

KR:   Joann Reams.  I started getting paranoid.  I didn't know what to do.  I started to leave town at first.  I said for what.

TA:   Okay is there anything else you want to add on this?

KR:   No.

TA:   Okay at this time we will conclude the interview and it is 10:15 p.m. same date, May 11, 1993.


TRANSCRIBED BY STEFANIE HAWKINS  MAY 12, 1993

179

INTERVIEW WITH KENNETH REAMS

DET. IVAN PHILLIPS
LIEUTENANT TERRY ADDISON
KENNETH REAMS

IP:  The date is May the 11th of 1993.  I'm Detective Ivan Phillips
     of the Pine Bluff Police Department.  Conducting a voluntary
     statement interview with Kenneth Reams.  Kenneth is a black
     male, date of birth 12/21/74.  He is eighteen years of age.
     Present in this interview is of course myself, Detective
     Lieutenant Terry Addison and Mr. Reams.  This interview is in
     reference to a robbery/homicide that occurred at the Worthen ATM
     Machine at 5th and Chestnut on May the 5th of 1993.  Kenneth do
     you remember earlier this evening at 10:00 p.m. when we first
     came down here to Stuttgart Jail to speak with you Lieutenant
     Addison advised you of your Miranda Rights?

KR:  Yes.

IP:  Alright and you signed this form acknowledging ...

KR:  Yes.

IP:  that you understood those rights?

KR:  Yes.

IP:  Okay.  What I'm going to do I'm going to ask you just to start
     from the beginning and in your own words tell exactly what
     happened involving the situation at the ATM Machine on the 5th
     of this month.

KR:  Alright, now this is the truth straight off.  This the honest to
     God truth.  Ain't no lies no nothing.

180

IP:  Alright.

KR:  This is the truth, this is exactly how it happened.  Earlier it
was, Butterball had came over to my house, we, he had got out of
school..

IP:  Alright now give Butterball's real name.

KR:  Alfred Goodwin.

IP:  ·Alfred Goodwin?

KR:  Came over my house about three, about three thirty, close to
four o'clock almost.  Somewhere up in that time.  And we, we
had, ah he had came over my house, we walked to the store and
bought scme beer, me and him, then we walked back to Al house,
he live on ah 2nd and Elm in them apartments.

IP:  Who?

KR:  Al.  Her names Al.  You know we was outside sitting on the ah
steps you know, drinking and stuff, and ah he was telling me you
know he needed scme money and stuff you know, fifty seven
dollars and ah fifty seven dollars and seventeen cents I believe
tc pay for his graduation ah stuff Friday.

IP:  Who was telling you this?

KR:  Alfred.

IP:  Alright.

KR:  He was telling me he needed some money to pay for his stuff
Friday.  Ah so he can graduate you know.  You know he was
thinking where he you know he could get some money and stuff.
And ah so you know we had got up and left and stuff and ah he
had told me when we was walking around his house he told me that
ah he know where we can get some money from.  A lot of money.

**181**

That's what he, he told me he know where we can some money from, a lot of money. But ah we got ah we got ah rob somebody. I was like ah what we going to do you know. He ain't tell me, he ask me, he ask me ah did I want to do it you know and I was like what we going to do. He said ah rob this ah, somebody coming to a teller. And I was like ah, at first you know it hit me for a minute, then I was thinking, I was thinking back in my mind I was like you know I ain't got no money to wash no clothes and stuff you know, I ain't had no food at the crib cause my auntie was living around the corner with this dude and stuff you know and I didn't like going over there, I didn't have no food in the crib or nothing you know, I was eating over butterball house every day you know. And I go home, I just go home to sleep cause you know there wasn't nothing else you know wasn't nothing else to do around the house but to do you know, and so I said alright. And you know he told me that ah Jermaine was going to go with us. And he said we was going to, as soon as, as soon as it get dark, which would be around about eight thirty, that we was going to go. I said alright. So you know he told me to call Jermaine we was going to be at the house about eight o'clock. So I said alright. Then we went around his house and we was watching Lethal Weapon. And ah it was about...

TA:  You went to whose house?

KR:  Butterball, Alfred house.

TA:  Who went with you to Butterball's?

KR:  Me and Butterball. Went to his house.

TA:  Oh okay.

182

KR:  We was watching Lethal Weapon. It went off about eight o'clock
and it was, it had just started to get dark. And ah Jermaine
had came home you know, his brother had dropped Jermaine and
them off, I mean Jermaine off, you know Jermaine was drunk and
stuff so you know he said Jermaine ain't going to go. So I said
alright. And it was about, about eight o'clock, something
around eight o'clock straight up, and I told him I said come on
man let's just go on and wait till eight thirty then we going to
go up there, cause it ain't really, really dark yet. So we ah,
we went ahead and walked up there anyway, you know. We got up
there I say it was around about eight fifteen.

TA:  Who walked up there?

KR:  Me and Alfred. We walked up there, and it was around about
eight fifteen. We sat down across the street where these old
buildings, something like that, they had tore this old building
down, sat over there and waited for about five minutes. And we
seen this truck pull up. And ah first I was going to pull the
pistol, then I told Butterball I said naw man I don't want to
pull the pistol you know. I ain't I ain't I ain't you know I
don't know man, just you know, I ain't have you know the guts
you know just to pull no pistol on nobody so just give me what
you got. So you know I said ah, I told Alfred, well he said ah
you know it ain't no thing I'll pull it. So I gave the, ah he
had gave me the pistol, so I gave the pistol to Alfred. I gave
the pistol back to Alfred. He walked over there and ah he went
around, he went like the teller sitting like in a square right.
He went from the back of the truck and I went around the tail,

to the front part of it so I can come to the front of the truck. And ah by the time I got half way around on the other side of the tail I heard Alfred telling the man just ah just ah give me everything you got. You know, give me your money cause this is a robbery. And the man said ah what the fuck you want. About the time I got around to the front of the tail you know where I can you know really see everything that was going on, I just heard a pow. You know, I heard the gunshot and everything you know, I came back around there. By the time when I got around around right there where the truck where the door was at, Alfred was running across the street you know, and I was leaning on the truck looking you know. I was paranoid. You know, looking at this man. He, I just seen his head fall in slow motion man, it hit the steering wheel. And I ain't seen nothing but blood coming out you know, and I, I stayed at the truck for about a minute, a good minute, before I even took off running. Butterball was running down the street telling me to come on. And you know I, I got paranoid man. I didn't know what to do so you know I took off behind him. And ah I took off behind him and stuff and we was running and stuff when I caught up with him we was running, he was telling me that ah, I said, I said man why you shoot the man, he said cause he asked me what the fuck I want. Just like that. And ah he said, he said I don't know man. He said I don't know man. He said I don't know man I ain't mean for that dude to get shot, but you know, it just, you know it just happened the wrong way and everything. I don't know man.

184

IP: Where did you lean up against, up on the truck at?

KR: Door. Door of the truck.

IP: Driver's door?

KR: Yeah. Man I ain't know that dude was going to die or get shot. I swear I never would of (lowers voice and mumbles - Check this portion of tape) I started to turn myself in at first, then I got paranoid. Butterball told me don't tell nobody. I told my auntie. He told if I tell somebody he'd find out. Then he was going to kill me straight up. And you know I believe him, cause he a real (inaudible). I believed it. I told my auntie, I told her don't tell nobody. She told Jermaine and the word got back to Jermaine. She told Jermaine and some how Jermaine told something and and ah Jermaine told, we was sitting on the picnic table there one day and Jermaine told us, your auntie told me you told her. You know I tried to play it off like man you know I don't know what you talking about man. Cause I was really scared man. I didn't know what to do. Start to leave town and I said naw. I didn't know what to do. Started to shoot myself, I didn't know what to do man.

IP: Are you absolutely 100 per cent sure that Jermaine did not walk down there after ya'll left, he didn't follow you, or any....

KR: Jermaine, Jermaine was, Jermaine was to drunk man. Jermaine was drunk. Period. He was drunk. Couldn't even move. Jermaine was drunk. Jermaine didn't have nothing to do with it, it was just me and Butterball. Jermaine didn't have nothing to do with it. But he knew, he knew we was going to ah rob the teller. And he wanted to go, but when he came home he was so drunk, so,

when he came home he was so drunk he laid down on the couch and I ah I told Jermaine I said man it's getting, when we was watching (inaudible) I told him man it's getting close to time, if you're going man you ah you know you messed up and stuff you know you need to go on and walk outside, walk around or something cause you know don't need to make no mistake.  And ah Butterball said just let him go on and lay down and go to sleep man.  We got back to the crib and stuff and Jermaine was still on the couch asleep.

IP:   Where did you go after the man got shot and you left running, where did you go?

KR:   Ran to Butterball house.  Washed my face.

IP:   Why did you wash your face?

KR:   I don't know.  I was paranoid, didn't know what to do man.  I didn't know what to do.

TA:   Did you get inside that truck any at all?   Where you would have got your prints or anything on it?

KR:   No.

IP:   Did you touch it anywhere with your hands?

KR:   The truck?

IP:   Um hum.

KR:   Yeah I touched the truck.

IP:   Where did you touch it at?

KR:   On the ah steering wheel.  Cause when ah the man, I ain't I ain't think he was dead at first, cause you know when I when I ran up to the truck and I looked and you know I seen his head there, you know and I pushed it, and I touched it and the

186

brother didn't want move man, he ain't moved.  He ain't moved.
He didn't move a bit.  Then he went to the hospital and they
said that he went to hospital I was thinking oh he ain't dead
man he ain't dead.  Then that evening Butterball came around my
house and said the dude had died.  That's when I, that's when I
started thinking man, cause Dee had told me that day,

IP:  Who is Dee?

KR:  One our other friend's that be in the neighborhood, he about my
skin complexion, about my height and everything.  We almost look
like brothers.  Told me you know ah, Dee you know, we you know
Dee he ain't know that for a fact we had did it, but you know he
said you know you know, he knew, he ain't know for a fact but he
knew, he said yeah Kenny and Butterball did that.  He told us
man that day he told us, that day that next day he seen us, he
told us he said man ya'll crazy man.  Ya'll crazy.  HE said, but
ya'll going to jail for that.  That's when I started thinking, I
said man I should go on and just blow my brains out man.  Cause
I don't want to go to jail for no murder man.  But I stuck
around.  Stuck around.  He told me I was going to jail.

IP:  Yeah.  Is there anything else you can think of that happened?
Earlier, or I believe it was yesterday, you had give a detective
a statement about you and Butterball were walking across that
lot from where the ATM Machine was and had a joint,...

KR:  Naw that was just a lie man.

IP:  None of that was true?

KR:  Naw.  But it was true that that ah we shot, well I ain't saying
we, Butterball shot, I was with him, so you might as well say I

187

and him shot that dude, what I said we was going to a dope house
and all that, that was just a lie man.

IP: Alright. Is there anything else on this particular incident
Lieutenant that you want to ask?

TA: What did you do with the gun after the incident?

KR: Butterball had full control of the gun. After, you know, we
fleed and stuff, I don't, see I can't remember, I can't remember
him doing nothing with it see cause when we left we went to his
house, he went in there and put on clothes, I mean changed
clothes, I was washing my face in the bathroom you know, and I
had went back in there and sat on the couch and you know I guess
the gun stayed in the house until he came back home, because you
know he ain't, he, oh he told me had put it in his bedroom under
his bed (inaudible) and then the next day I asked him what did
he do with the pistol, he say that he ah got it hid in his back
yard. He just, he said he got it hid in his back yard under a
old bucket by the fence. That's, that's what he told me. I
don't know where it was located or nothing, but that's what he
told me. I don't know if it was true or not, but that's what he
told me.

TA: When you gave the gun to him, do you know how many rounds of
ammo was in it?

KR: Ah it was one, four.

TA: Do you know what happened to those four? I realize he fired
that one at the  .....

KR: The next day he ah had the bullets in his pocket. The next day
he had the bullets in his pocket. I don't know what he did with

188

the bullets after then.  I don't know what he did with the bullets after then.  Cause I, I put the bullets in the gun you know and I set the set the gun so when you pull the trigger that it, I thought I had set the gun so when you pull the trigger that, when you pull the trigger that it would hit one of them empty holes, you know, where no bullet was at, but I guess I set it wrong.  I mean unless he you know, and I don't think he had no other time you know to switch it around that night, cause if he did I didn't see him.

IP:   When did you end up giving him the gun before this?  Was it while you were sitting in that vacant building?

KR:   See when we ah...

IP:   When you decided that you didn't want to pull the gun?  And you said you gave Butterball the gun?

KR:   Yeah, he had got the gun from me right, and then ah..

TA:   When did he get the gun from you the first time?

KR:   At the store.  He had got the gun from me right.  And then that day when we ah did that you know, when we went up to the teller, that night you know he had gave me the gun, cause I had on some pants you know where I could just put it in my ah down in my pants right, you know so it won't fall or nothing.  And we walked, when we walked all the way up to the ah to there across the street and stuff you know, we was sitting down waiting on somebody to come, we was talking, I said man I don't want to pull the pistol.  He said alright.  That's when I gave the gun back to him.

IP: What did you do with your clothes that you had on when the man got killed?

KR: Took em off. Just took em off at home.

IP: You took them off at home?

KR: Yeah, I don't I don't even think they are around the house no more. I don't know.

IP: Did they have anything on them?

KR: I had on, what did I have on. I can't remember. I had ah ah a pair a black, black ah Nike pants. They wasn't mine. They was somebody else's. I had borrowed from this dude. And I had a black shirt. I believe a, I think it was a black shirt. I had it turned on backwards.

TA: These Nike pants you're talking about. Are they short pants?

KR: Naw.

TA: Long pants? What did Alfred have on?

KR: I can't remember what kind of jeans he had on, but he had on a gray hood, a gray hood.

TA: Okay we found a t-shirt over at your house with a lot of blood on it. Was this the t-shirt you was wearing that night?

KR: I don't think so because I don't, I got to see the t-shirt to tell you what, if it was the t-shirt or not.

TA: Well have you been cut any where lately though that this blood would have been all over that shirt?

KR: Not that I know of. Cause you know I got, naw I ain't been, I ain't been cut or nothing.

IP: Has anybody that stays at the house where you live got cut?

100

KR:   Got cut or nothing.  Not that I, if they have I don't know
      nothing about it.  If I see it, I can remember the t-shirt I had
      on, if I see the shirt I can tell you.

TA:   This is a white t-shirt, pull over shirt, with I think it's got
      some red rings around the sleeve or something.  May be even some
      kind of design, I'm not sure.  It's not a regular t-shirt like...

KR:   It's white?

TA:   Yeah.

KR:   No, that ain't the t-shirt.  I had on all black.  With a black
      and gray hat.

TA:   Do you know anything about, okay the next night after this, that
      money machine was shot up.

KR:   Naw, I heard about it though.  I heard about it.  I was hoping
      that the people (laughs) the people who shot that money machine
      up was the one that get caught up for this.  That was what I was
      hoping.  I don't know nothing about that.  I heard...

IP:   Do you have any idea who did it?

KR:   Uh huh.  Cause ah that day, ah this this, see I, when we did
      that I ain't go no where near that place or no where till ah
      Friday, I believe it was.  Alfred got paid and he had to go to
      the bank and ah cash his check.  And we drove the car up there
      and stuff and I seen that thing up there you know saying that
      they was closed.  I said man why, why they got that teller
      closed.  And ah his, his nephew said that ah somebody ah had
      shot that machine up.  I don't know nothing about that machine
      that got shot up.

IP:   Anything else that you would like to say?  Anything at all?

191

Alright.  Let me before we end this interview, earlier you had mentioned something about, or the Lieutenant here had mentioned something about an attempted robbery that had taken place at the teller machine earlier, do you know anything about any other attempted robberies or anything that had taken place up there before...

KR: No but ah it had ah, I know that it had ah been tried before.

IP: Who...

KR: Butterball, Butterball said that ah tried to ah rob it once, but you know it didn't work out.

IP: When was that?

KR: I don't, I don't know.  He said, he said it was what ah, a week, that same week.  I don't know...

IP: When did Butterball tell you that is what I'm asking?

KR: That same day.

IP: The same day that..

KR: Yeah, yeah.

IP: Did he tell you anything about it?

KR: Nope.  Butterball talk about like, like if you ain't, you wasn't with him when he done it, he ain't going to let you know to much about nothing.  He ain't going to let you know too much about nothing.  He done did a lot though, brother, believe me.  He done did a lot.  Probably ain't the first person he done killed.

TA: And do you have any idea who would have been with him when he tried that before?  Or have you ever seen him with any kind of mask?

KR: Naw.

192

IP: Anything that would go down over his face, cover his face up?

KR: Naw, every, every, every, every, every ah every time he do something like he use a scarf, what you call them scarfs. That's all...

IP: Them hair scarves kind of things. What are you talking about a scarf?

KR: Panty hose scarves.

IP: Okay.

TA: Where, what have you known him to use them before?

KR: I don't. I'm talking about you know when that that ah night he ah he had got a scarf, but I don't think he put it on. I can't remember if he put it on or not that night. Cause he had that hood on when he walked up to the truck. I don't know if he had it on or not.

TA: Who else does he run around with besides you?

KR: Me, Dee and Jermaine and every since I been in town that's really all he hangs with you know. Unless there's somebody else he be kicking it with when he go to school and get out of. Cause you know them are just people in the neighborhood. I don't leave out the neighborhood.

TA: Well you said that he had told you he had tried it before over there?

KR: It had been tried before.

TA: It had been tried before. And he gave you no kind of details at all?

KR: No.

193

TA: He just said it had been tried.  It hadn't succeeded but it had been tried.

IP: For the last time, anything else you would like to say before we end this?  Anything at all?  Anything on your mind you would like to say or..

KR: I ain't, man I ain't no that man was going to get killed.  Man if I, if I knew stuff like that would have happened man, happened so quick.

IP: This will conclude this interview with Kenneth Reams.  The date is still May 11th, 1993.  The time is now 2308 hours.


Transcribed by Stefanie Hawkins
05/12/93

194



# CITY OF PINE BLUFF, ARKANSAS
### POLICE DEPARTMENT





JOE THOMAS
Chief of Police

DALE HOPPER
Assistant Chief

## FAX SHEET

DATE: _12-09-93_

TO: _Carol Billings_

FROM: _Det Phillips_

FAX: _____

TRANSMITTAL CONSISTS OF __15__ PAGES EXCLUDING COVER SHEET.

COMMENTS:

_____ Ree: Corrected Copy of Kenneth
_____ Ream's Statement
_____
_____
_____
_____
_____

200 East 8th          Phone: 501-543-5100          Fax: 501-543-5161

195

5854   Respondent's Exhibit E

INTERVIEW WITH KENNETH REAMS

DET. IVAN PHILLIPS


IP:  The date is May the 11th of 1993.  I'm Detective Ivan Phillips
     of the Pine Bluff Police Department.  Conducting a voluntary
     statement interview with Kenneth Reams.  Kenneth is a black
     male, date of birth 12/21/74.  He is eighteen years of age.
     Present in this interview is of course myself, Detective
     Lieutenant Terry Addison and Mr. Reams.  This interview is in
     reference to a robbery/homicide that occurred at the Worthen ATM
     Machine at 5th and Chestnut on May the 5th of 1993.  Kenneth do
     you remember earlier this evening at 10:00 p.m. when we first
     came down here to Stuttgart Jail to speak with you Lieutenant
     Addison advised you of your Miranda Rights?

KR:  Yes.

IP:  Alright and you signed this form acknowledging ...

KR:  Yes.

IP:  that you understood those rights?

KR:  Yes.

IP:  Okay.  What I'm going to do I'm going to ask you just to start
     from the beginning and in your own words tell exactly what
     happened involving the situation at the ATM Machine on the 5th
     of this month.

KR:  Alright, now this is the truth straight off.  This the honest to
     God truth.  Ain't no lies no nothing.


196

IP:  Alright.

KR:  This is the truth, this is exactly how it happened.  Earlier it was, Butterball had came over to my house, we, he had got out of school..

IP:  Alright now give Butterball's real name.

KR:  Alfred Goodwin..

IP:  Alfred Goodwin?

KR:  Came over my house about three, about three thirty, close to four o'clock almost.  Somewhere up in that time.  And we, we had, ah he had came over my house, we walked to the store and bought some beer, me and him, then we walked back to Al house, he live on ah 2nd and Elm in them apartments.

IP:  Who?

KR:  Al.  Her names Al.  You know we was outside sitting on the ah steps you know, drinking and stuff, and ah he was telling me you know he needed some money and stuff you know, fifty seven dollars and ah fifty seven dollars and seventeen cents I believe to pay for his graduation ah stuff Friday.

IP:  Who was telling you this?

KR:  Alfred.

IP:  Alright.

KR:  He was telling me he needed some money to pay for his stuff Friday.  Ah so he can graduate you know.  You know he was thinking where he you know he could get some money and stuff. And ah so you know we had got up and left and stuff and ah he had told me when we was walking around his house he told me that ah he know where we can get some money from.  A lot of money.

2

197

That's what he, he told me he know where we can some money from, a lot of money. But ah we got ah we got ah rob somebody. I was like ah what we going to do you know. He ain't tell me, he ask me, he ask me ah did I want to do it you know and I was like what we going to do. He said ah rob this ah, somebody coming to a teller. And I was like ah, at first you know it hit me for a minute, then I was thinking, I was thinking back in my mind I was like you know I ain't got no money to wash no clothes and stuff you know, I ain't had no food at the crib cause my auntie was living around the corner with this dude and stuff you know and I didn't like going over there, I didn't have no food in the crib or nothing you know, I was eating over butterball house every day you know. And I go home, I just go home to sleep cause you know there wasn't nothing else you know wasn't nothing else to do around the house but to do you know, and so I said alright. And you know he told me that ah Jermaine was going to go with us. And he said we was going to, as soon as, as soon as it get dark, which would be around about eight thirty, that we was going to go. I said alright. So you know he told me to call Jermaine we was going to be at the house about eight o'clock. So I said alright. Then we went around his house and we was watching Lethal Weapon. And ah it was about...

TA:   You went to whose house?

KR:   Butterball, Alfred house.

TA:   Who went with you to Butterball's?

KR:   Me and Butterball. Went to his house.

TA:   Oh okay.

3

198

Respondent's Exhibit E

KR:   We was watching Lethal Weapon.  It went off about eight o'clock
      and it was, it had just started to get dark.  And ah Jermaine
      had came home you know, his brother had dropped Jermaine and
      them off, I mean Jermaine off, you know Jermaine was drunk and
      stuff so you know he said Jermaine ain't going to go.  So I said
      alright.  And it was about, about eight o'clock, something
      around eight o'clock straight up, and I told him I said come on
      man let's just go on and wait till eight thirty then we going to
      go up there, cause it ain't really really dark yet.  So we ah,
      we went ahead and walked up there anyway, you know.  We got up
      there I say it was around about eight fifteen.

TA:   Who walked up there?

KR:   Me and Alfred.  We walked up there, and it was around about
      eight fifteen.  We sat down across the street where these old
      buildings, something like that, they had tore this old building
      down, sat over there and waited for about five minutes.  And we
      seen this truck pull up.  And ah first I was going to pull the
      pistol, then I told Butterball I said naw man I don't want to
      pull the pistol you know.  I ain't I ain't I ain't you know I
      don't know man, just you know, I ain't have you know, the guts
      you know just to pull no pistol on nobody so just give me what
      you got.  So you know I said ah, I told Alfred, well he said ah
      you know it ain't no thing I'll pull it.  So I gave the, ah he
      had gave me the pistol, so I gave the pistol to Alfred.  I gave
      the pistol back to Alfred.  He walked over there and ah he went
      around, he went like the teller sitting like in a square right.
      He went from the back of the truck and I went around the teller,

4

199

to the front part of it so I can come to the front of the truck. And ah by the time I got half way around on the other side of the teller, I heard Alfred telling the man just ah just ah give me everything you got. You know, give me your money cause this is a robbery. And the man said ah what the fuck you want. About the time I got around to the front of the teller you know where I can you know really see everything that was going on, I just heard a pow. You know, I heard the gunshot and everything you know, I came back around there. By the time when I got around around right there where the truck where the door was at, Alfred was running across the street you know, and I was leaning on the truck looking you know. I was paranoid. You know, looking at this man. He, I just seen his head fall in slow motion man, it hit the steering wheel. And I ain't seen nothing but blood coming out you know, and I, I stayed at the truck for about a minute, a good minute, before I even took off running. Butterball was running down the street telling me to come on. And you know I, I got paranoid man. I didn't know what to do so you know I took off behind him. And ah I took off behind him and stuff and we was running and stuff when I caught up with him we was running, he was telling me that ah, I said, I said man why you shoot the man, he said cause he asked me what the fuck I want. Just like that. And ah he said, he said I don't know man. He said I don't know man. he said I don't know man, I ain't mean for that dude to get shot but you know, it just you know it just happened the wrong way and everything. I don't know man.

5

IP: Where did you lean up against, up on the truck at?

KR: Door. Door of the truck.

IP: Driver's door?

KR: Yeah. Man I ain't know that dude was going to die or get shot. I swear I never would of (lowers voice and mumbles - Check this portion of tape) I started to turn myself in at first, then I got paranoid. Butterball told me don't tell nobody. I told my auntie. He told if I tell somebody he'd find out. Then he was going to kill me straight up. And you know I believe him, cause he a real villain. I believed it. I told my auntie, I told her don't tell nobody. She told Jermaine and the word got back to Jermaine. She told Jermaine and some how Jermaine told something and and ah Jermaine told, we was sitting on the picnic table there one day and Jermaine told us, your auntie told me you told her. You know I tried to play it off like man you know I don't know what you talking about man. Cause I was really scared man. I didn't know what to do. Start to leave town and I said naw. I didn't know what to do. Started to shoot myself, I didn't know what to do man.

IP: Are you absolutely 100 per cent sure that Jermaine did not walk down there after ya'll left, he didn't follow you, or any....

KR: Jermaine, Jermaine was, Jermaine was to drunk man. Jermaine was drunk. Pure Dee drunk. Couldn't even move. Jermaine was drunk. Jermaine didn't have nothing to do with it, it was just me and Butterball. Jermaine didn't have nothing to do with it. But he knew, he knew we was going to ah rob the teller. And he wanted to go, but when he came home he was so drunk, so, when he

6

201

came home he was so drunk he laid down on the couch and I ah I told Jermaine I said man it's getting, when we was watching (inaudible) I told him man it's getting close to time, if you're going man you ah you know you messed up and stuff you know you need to go on and walk outside, walk around or something cause you know don't need to make no mistake. And ah Butterball said just let him go on and lay down and go to sleep man. We got back to the crib and stuff and Jermaine was still on the couch asleep.

IP:  Where did you go after the man got shot and you left running, where did you go?

KR:  Ran to Butterball house. Washed my face.

IP:  Why did you wash your face?

KR:  I don't know. I was paranoid, didn't know what to do man. I didn't know what to do.

TA:  Did you get inside that truck any at all? Where you would have got your prints or anything on it?

KR:  No.

IP:  Did you touch it anywhere with your hands?

KR:  The truck?

IP:  Um hum.

KR:  Yeah I touched the truck.

IP:  Where did you touch it at?

KR:  On the ah steering wheel. Cause when ah the man, I ain't I ain't think he was dead at first, cause you know when I when I ran up to the truck and I looked and you know I seen his head there, you know and I pushed it, and I touched it and the

7

5861   Respondent's Exhibit E

brother didn't want move man, he ain't moved. He ain't moved. He didn't move a bit. Then he went to the hospital and they said that he went to hospital I was thinking oh he ain't dead man he ain't dead. Then that evening Butterball came around my house and said the dude had died. That's when I, that's when I started thinking man, cause Dee had told me that day,

IP:   Who is Dee?

KR:   One our other friend's that be in the neighborhood, he about my skin complexion, about my height and everything. We almost look like brothers. Told me you know ah, Dee you know, we you know Dee he ain't know that for a fact we had did it, but you know he said you know you know, he knew, he ain't know for a fact but he knew, he said yeah Kenny and Butterball did that. He told us man that day he told us, that day that next day he seen us, he told us he said man ya'll crazy man. Ya'll crazy. HE said, but ya'll going to jail for that. That's when I started thinking, I said man I should go on and just blow my brains out man. Cause I don't want to go to jail for no murder man. But I stuck around. Stuck around. He told me I was going to jail.

IP:   Yeah. Is there anything else you can think of that happened? Earlier, or I believe it was yesterday, you had give a detective a statement about you and Butterball were walking across that lot from where the ATM Machine was and had a joint,...

KR:   Naw that was just a lie man.

IP:   None of that was true?

KR:   Naw. But it was true that that ah we shot, well I ain't saying we, Butterball shot, I was with him, so you might as well say I

8

203

and him shot that dude, what I said we was going to a dope house and all that, that was just a lie man.

IP:  Alright.  Is there anything else on this particular incident Lieutenant that you want to ask?

TA:  What did you do with the gun after the incident?

KR:  Butterball had full control of the gun.  After, you know, we fleed and stuff, I don't, see I can't remember, I can't remember him doing nothing with it see cause when we left we went to his house, he went in there and put on clothes, I mean changed clothes, I was washing my face in the bathroom you know, and I had went back in there and sat on the couch and you know I guess the gun stayed in the house until he came back home, because you know he ain't, he, oh he told me had put it in his bedroom under his bed tic and then the next day I asked him what did he do with the pistol, he say that he ah got it hid in his back yard. He just, he said he got it hid in his back yard under a old bucket by the fence.  That's, that's what he told me.  I don't know where it was located or nothing, but that's what he told me.  I don't know if it was true or not, but that's what he told me.

TA:  When you gave the gun to him, do you know how many rounds of ammo was in it?

KR:  Ah it was one, four.

TA:  Do you know what happened to those four?  I realize he fired that one at the  .....

KR:  The next day he ah had the bullets in his pocket.  The next day he had the bullets in his pocket.  I don't know what he did with

9

204

the bullets after then. I don't know what he did with the
bullets after then. Cause I I put the bullets in the gun you
know and I set the set the gun so when you pull the trigger that
it I thought I had set the gun so when you pull the trigger
that when you pull the trigger that it would hit one of them
empty holes, you know, where no bullet was at, but I guess I set
it wrong. I mean unless he you know, and I don't think he had
no other time you know to switch it around that night, cause if
he did I didn't see him.

IP:   When did you end up giving him the gun before this? Was it
      while you were sitting in that vacant building?

KR:   See when we ah...

IP:   When you decided that you didn't want to pull the gun? And you
      said you gave Butterball the gun?

KR:   Yeah, he had got the gun from me right, and then ah..

TA:   When did he get the gun from you the first time?

KR:   At the store. He had got the gun from me right. And then that
      day when we ah did that you know, when we went up to the teller,
      that night you know he had gave me the gun, cause I had on some
      pants you know where I could just put it in my ah down in my
      pants right, you know so it won't fall or nothing. And we
      walked, when we walked all the way up to the ah to there across
      the street and stuff you know, we was sitting down waiting on
      somebody to come, we was talking, I said man I don't want to
      pull the pistol. He said alright. That's when I gave the gun
      back to him.

Respondent's Exhibit E

IP: What did you do with your clothes that you had on when the man got killed?

KR: Took em off. Just took em off at home.

IP: You took them off at home?

KR: Yeah, I don't I don't even think they are around the house no more. I don't know.

IP: Did they have anything on them?

KR: I had on, what did I have on. I can't remember. I had ah ah a pair a black, black ah Nike pants. They wasn't mine. They was somebody else's. I had borrowed from this dude. And I had a black shirt. I believe a, I think it was a black shirt. I had it turned on backwards.

TA: These Nike pants you're talking about. Are they short pants?

KR: Naw.

TA: Long pants? What did Alfred have on?

KR: I can't remember what kind of jeans he had on, but he had on a gray hood, a gray hood.

TA: Okay we found a t-shirt over at your house with a lot of blood on it. Was this the t-shirt you was wearing that night?

KR: I don't think so because I don't, I got to see the t-shirt to tell you what, if it was the t-shirt or not.

TA: Well have you been cut any where lately though that this blood would have been all over that shirt?

KR: Not that I know of. Cause you know I got, naw I ain't been, I ain't been cut or nothing.

IP: Has anybody that stays at the house where you live got cut?

11

206

Respondent's Exhibit E

KR:   Got cut or nothing.  Not that I, if they have I don't know
      nothing about it.  If I see it, I can remember the t-shirt I had
      on, if I see the shirt I can tell you.

TA:   This is a white t-shirt, pull over shirt, with I think it's got
      some red rings around the sleeve or something.  May be even some
      kind of design, I'm not sure.  It's not a regular t-shirt like...

KR:   It's white?

TA:   Yeah.

KR:   No, that ain't the t-shirt.  I had on all black.  With a black
      and gray hat.

TA:   Do you know anything about, okay the next night after this, that
      money machine was shot up.

KR:   Naw, I heard about it though.  I heard about it.  I was hoping
      that the people (laughs) the people who shot that money machine
      up was the one that get caught up for this.  That was what I was
      hoping.  I don't know nothing about that.  I heard...

IP:   Do you have any idea who did it?

KR:   Uh huh.  Cause ah that day, ah this this, see I, when we did
      that I ain't go no where near that place or no where till ah
      Friday, I believe it was.  Alfred got paid and he had to go to
      the bank and ah cash his check.  And we drove the car up there
      and stuff and I seen that thing up there you know saying that
      they was closed.  I said man why, why they got that teller
      closed.  And ah his, his nephew said that ah somebody ah had
      shot that machine up.  I don't know nothing about that machine
      that got shot up.

IP:   Anything else that you would like to say?  Anything at all?


                              12

5866   Respondent's Exhibit E

Alright.  Let me before we end this interview, earlier you had
mentioned something about, or the Lieutenant here had mentioned
something about an attempted robbery that had taken place at the
teller machine earlier, do you know anything about any other
attempted robberies or anything that had taken place up there
before...

KR:   No but ah it had ah, I know that it had ah been tried before.

IP:   Who...

KR:   Butterball, Butterball said that ah tried to ah rob it once, but
      you know it didn't work out.

IP:   When was that?

KR:   I don't, I don't know.  He said, he said it was what ah, a week,
      that same week.  I don't know...

IP:   When did Butterball tell you that is what I'm asking?

KR:   That same day.

IP:   The same day that..

KR:   Yeah, yeah.

IP:   Did he tell you anything about it?

KR:   Nope.  Butterball talk about like, like if you ain't, you wasn't
      with him when he done it, he ain't going to let you know to much
      about nothing.  He ain't going to let you know too much about
      nothing.  He done did a lot though, brother, believe me.  He
      done did a lot.  Probably ain't the first person he done killed.

TA:   And do you have any idea who would have been with him when he
      tried that before?  Or have you ever seen him with any kind of
      mask?

KR:   Naw.

13

208

IP:  Anything that would go down over his face, cover his face up?

KR:  Naw, every, every, every, every, every ah every time he do something like he use a scarf, what you call them scarfs. That's all...

IP:  Them hair scarves kind of things.  What are you talking about a scarf?

KR:  Panty hose scarves.

IP:  Okay.

TA:  Where, what have you known him to use them before?

KR:  I don't.  I'm talking about you know when that that ah night he ah he had got a scarf, but I don't think he put it on.  I can't remember if he put it on or not that night.  Cause he had that hood on when he walked up to the truck.  I don't know if he had it on or not.

TA:  Who else does he run around with besides you?

KR:  Me, Dee and Jermaine and every since I been in town that's really all he hangs with you know.  Unless there's somebody else he be kicking it with when he go to school and get out of. Cause you know them are just people in the neighborhood.  I don't leave out the neighborhood.

TA:  Well you said that he had told you he had tried it before over there?

KR:  It had been tried before.

TA:  It had been tried before.  And he gave you no kind of details at all?

KR:  No.

14

TA:  He just said it had been tried.  It hadn't succeeded but it had
been tried.

IP:  For the last time, anything else you would like to say before we
end this?  Anything at all?  Anything on your mind you would
like to say or..

KR:  ~~I~~, ~~I~~ ~~didn't~~ ~~man~~ ~~I~~ ~~ain't~~ ~~no~~ ~~that~~ ~~man~~ ~~was~~ ~~going~~ ~~to~~ ~~get~~ ~~killed~~  Man
if I, if I knew stuff like that would have happened man,
happened so quick.

IP:  This will conclude this interview with Kenneth Reams.  The date
is still May 11th, 1993.  The time is now 2308 hours.


Transcribed by Stefanie Hawkins
05/12/93


15

210

 Respondent's Exhibit E

RIGHTS FORM

READ TO: _Kenneth   Reams_____     CASE # _93-205_

PLACE: _Detective   Office_____

DATE: _5-12-93_____

TIME: _1945 hours_____

BEFORE WE ASK YOU ANY QUESTIONS, YOU MUST UNDERSTAND YOUR RIGHTS.

YOU HAVE THE RIGHT TO REMAIN SILENT.

DO YOU UNDERSTAND? _yes K.R._

ANYTHING YOU SAY CAN AND WILL BE USED AGAINST YOU IN COURT.

DO YOU UNDERSTAND? _yes K.R._

YOU HAVE THE RIGHT TO HAVE AN ATTORNEY PRESENT BEFORE MAKING ANY

STATEMENT AND YOU MAY TALK WITH HIM DURING QUESTIONING.

   YOU UNDERSTAND? _yes K.R._

IF YOU CANNOT AFFORD AN ATTORNEY, ONE WILL BE PROVIDED FOR YOU

BEFORE YOU ARE ASKED ANY QUESTIONS, IF YOU SO DESIRE.

DO YOU UNDERSTAND? _yes K.R._

IF YOU WANT TO ANSWER QUESTIONS NOW, WITHOUT A LAWYER PRESENT,

YOU MAY DO SO;  HOWEVER, YOU HAVE THE RIGHT TO STOP THE QUESTIONING

AT ANY TIME.

DO YOU UNDERSTAND? _yes K.R._

                         SIGNED: _Kenneth L Reams_

RIGHTS READ BY: _LT, Addison_

WITNESS: _____

WITNESS: _____

**211**

Respondent's Exhibit E

TAPED INTERVIEW WITH KENNETH REAMS


CONDUCTED BY DETECTIVE LIEUTENANT TERRY ADDISON


TA:  Today's date is May the 12th, 1993.  It's 1945 hours.  I'm in the Detective Office, in Pine Bluff, Arkansas, fixing to conduct an interview with Kenneth Reams.  I'm Lieutenant Addison.  Kenneth, before I have this interview with you, I want to read your rights.  I need a verbal answer.  You need to speak up so that the tape player can pick it up, okay?  You have the right to remain silent.  Do you understand that?

KR:  Yes

TA:  Anything you say, can and will be used against you in Court.  Do you understand that?

KR:  Yes

TA:  You have the right to have an attorney present before making any statement and you may talk with him during questioning.  Do you understand that?

KR:  Yes

TA:  If you cannot afford an attorney, one will be provided for you, before you are asked any questions, if you so desire.  Do you understand that?

KR:  Yes

TA:  If you want to answer questions now, without a lawyer present, you may do so.  However, you have the right to stop the questioning at any time.  Do you understand?

KR:  Yes

TA:  Alright Kenneth, I need you to sign your name right there.  Put your initials by each one of these answers, showing that you understand your rights.  Alright Kenneth, where have you been for the last day or so?

KR:  In Stuttgart jail.  I don't know if it was City or the County Jail or not.

TA:  Okay, two or three hours ago, you made a collect call to me, is this correct?

212

KR:   Yes

TA:   You said you wanted to talk to me?

KR:   Yes

TA:   Alright, I, in fact, came to Stuttgart.  It is a City jail, picked you up and we're now back in Pine Bluff.  What is it you want to talk to me about now?

KR:   About uh, the, I don't know what you call it, attempted robbery, robbery or whatever that went on a while back.  About two weeks ago, maybe, maybe been three weeks ago.

TA:   Alright, where was this at?

KR:   Uh, first one was at uh, the teller on 5th and Chestnut.

TA:   Alright, that was the first one?

KR:   Yes

TA:   Okay, where was the other one at?

KR:   Uh, at the Econo Lodge Hotel.

TA:   Alright, was there any more?

KR:   No

TA:   Okay, let's back up to this first one you're talking about at 5th and Chestnut, is actually where the teller machine is that, I think that's the Worthen Bank.  I'm holding a police report.  In fact, it says attempted robbery, 5th and Pine.  This is at a teller machine. Is this the attempted robbery you're talking about?

KR:   Yes

TA:   Okay tell me, go ahead and tell me about that.

KR:   Uh, it was me, Alford Goodwin and uh, Phillip Curry.  We was at this uh, teller and uh, we was going to rob this dude at the teller, but things, things didn't go the way we planned it, way we thought they was going to go.  I ain't going to say planned it, but what we thought they was going to go.  We went up there, oh, I had to piss, I had to piss so then we went up there to the uh, to this man car.  He told me to give us his money and he, and he said he ain't, he ain't got no money, but five dollars that he depositing at the thing and uh, I asked him again, I say, give me all your money and uh and he said, let me write you a hundred dollar check out.  We said, we don't want no check.  And he drove off.  Just like that, he just drove off.

TA:   Okay, you said you had the pistol?

KR:   Yes

TA:   What pistol is this?

KR:   It was a 32.

TA:   You know what brand?

KR:   No, it was a revolver.

TA:   Where did you get this pistol?

KR:   At the burglary that I did at the dry cleaners.

TA:   Okay and who else was with you at this attempted robbery?

KR:   Phillip and Butterball, Alford Goodwin.

TA:   Okay, were ya'll sitting back, waiting for a car to come in there?

KR:   No, as soon as we got up there, the car was there.

TA:   Do you know what color car it was?

KR:   I can't remember.  I believe it was a blue one.

TA:   Alright, was it a male, female?

KR:   Male

TA:   Black or white?

KR:   Black

TA:   A black male?

KR:   Yes

TA:   Alright you said, we said, give, give us your money.

KR:   Yea, all three of us said it.

TA:   Everybody did?  Who did most of the talking?

KR:   All of us.

TA:   Okay, did anybody have any masks on of any kind?

KR:   No, not that I remember.  Not that I remember.  Yea, yea, yea, I
believe, I can't really remember, cause when we uh, did that uh, at
the, at the uh, at the Hotel, we had a mask on.  I can't remember if
we had the masks at the, oh yea, we had a mask.  We had masks on.

TA:   What kind of masks?

214                    (Reams-Interview)
                            3

KR:   Stockings.

TA:   All three of you?

KR:   Yes

TA:   What color stockings?

KR:   Black

TA:   Okay, did these stocking masks have holes cut in them or were they tore or...

KR:   Yes, they had eyes, for the eyes.

TA:   For the eyes?   Alright, in this report, the man says that somebody hit him in the mouth.  You know who did that?

KR:   I don't, I can't remember who hit him in the mouth.

TA:   You can't remember?  Do you remember what color clothes you had on?

KR:   No

TA:   Do you remember what color anybody had on?

KR:   No

TA:   Okay, did you get any money from this guy?

KR:   No

TA:   Did you get anything from him?

KR:   Nothing

TA:   Why didn't you?

KR:   Cause he pulled off.

TA:   Just left ya'll standing there?

KR:   Yea

TA:   Do you know what happened to his money card?

KR:   No, I guess it was still in the machine, cause we didn't get nothing.  The machine was making some kind of aah, aah sound, you know.  We didn't take, we didn't get no, no money, not a cent.

TA:   Okay, there was only three of you there?

KR:   Yes

TA: And it was you, Phillip Curry.
KR: Yes

TA: And Alford Goodwin. Where had you met up with Alford and Phillip at? About what time had all ya'll got together that evening?

KR: It was kind of early in the evening, like about five o'clock. I don't remember where we met up at.

TA: Okay, but from about five o'clock until this happened, ya'll are still all together?

KR: Yea

TA: What did you do with the gun or what time was this, did this happen, here at the teller?

KR: It was about, I believe about, about nine something.

TA: Okay when, when he drove off, what did ya'll do?

KR: Took off running. Well, we ran, we ran behind some apartments, in a alley and sat down on a ice box.

TA: What kind of ice box?

KR: Old, it was a old raggedy ice box, just sitting there.

TA: You mean like an ice box that goes in a house some where? Okay, where did you go from there?

KR: Uh, we stayed there and then we walked up to the store, to the uh, uh, uh, uh, what was the name of that store? Uh, that store on Barraque and Walnut. On the corner of Barraque and Walnut.

TA: Okay, could that be the Shell Git-N-Go Store?

KR: Yea, the Shell, yea.

TA: Okay, from there, where did you go?

KR: Then we walked back down to the uh, to uh, we, we just, we just walked, we just walked, really. We went over by Al's house. Then we just walked. Then we just said let's go, uh Butterball said, let's go, let's go to the uh, to the uh, uh, Hotel. He said, then we just walked up to this Hotel.

TA: What did you want to walk to the Hotel for?

KR: We was going to rob the Hotel.

TA: The Hotel you're talking about is....

(Reams-Interview)
5

216

KR:  Econo Lodge.

TA:  Econo Lodge, on West 5th?

KR:  Yes

TA:  What happened there, when ya'll got up there?

KR:  We uh, had on our little masks and everything.  We walked through that first door and it was unlocked and we made it to the second door and it was locked.  Then Phillip and them said that the woman seen us, so we turned around.  We turned around from there and uh, took off running.  Then we made it half way down the street and we, we said, we was asking did, did the woman really see, cause, you know, I, I ain't really see the woman that good.  I, I don't know if she seen me or not.  And we was saying, oh, she probably didn't see nothing in there, cause the police ain't there yet.  So we turned back around and we was going to walk up there.  And we seen the police, so we uh just, you know, took off back towards the neighborhood.  Just left everything like it was.

TA:  Who all was with you on that one?

KR:  Uh, me, Butterball and D.

TA:  Okay, in fact, who is Butterball?

KR:  Alford Goodwin.

TA:  And who is D?

KR:  Phillip Curry.

TA:  Okay, when ya'll walked up to that one, who had the gun?

KR:  Uh, who had the pistol?  Who had the pistol?  I can't, I can't remember who had the pistol.  Can't remember who had the pistol.  Who had the pistol, I can't remember who had the pistol.

TA:  Alright, did you have masks on in that one?

KR:  Yes

TA:  What kind were they?

KR:  Stockings.

TA:  What color?

KR:  Black

TA:  Alright, did all three of you go through this first door?

KR:  Yes

5876  Respondent's Exhibit E

TA: And what stopped you there?

KR: The second door was locked.

TA: So that's when ya'll took out?

KR: Yes

TA: When you saw the police, where were ya'll at?

KR: Uh, on uh, on 4th Street.

TA: Just walking down the middle of the street?

KR: Yes

TA: Okay Kenneth, is there anything else you want to tell me about those two attempted robberies?

KR: No

TA: Alright, I know you've already given me a statement on the other incident at the teller machine.  Is there anything else that you've thought of that you want to tell me about that?

KR: No

TA: Okay while we recovered this pistol, I noticed the serial number's scratched off of it.  Do you know how that got, how that happened?

KR: I scratched it off on the concrete.

TA: Where at?

KR: Across the street from the teller.

TA: You remember when you did that?

KR: Uh, that night.  Uh, when we was fixing to rob that man.

TA: Okay, which one now?  There was two of them at...

KR: The first one, I mean, the second one, it was the second one.

TA: On the one that got shot?

KR: Yes

TA: On that night you scratched it off on the sidewalk?

KR: Yea, on the concrete.

TA: Where at?

KR:  Uh, it was, it was like in a alley like, you know.  It was like a drive way.  We was sitting down on the, on the, on the curb like and I was just was rubbing it against the concrete.

TA:  Okay, is there anything else that you want to say on this interview, anything at all?

KR:  Yea, first of all I want to say that uh, I ain't mean for, you know, if I, if I'd a had control of the pistol, he wouldn't of never got shot in the first place, cause I ain't, I ain't, I ain't got the, you know, the guts just, you know, to shoot nobody.  Well, I don't think I got the guts just to shoot nobody, you know.  I know I was wrong for doing it, you know.  I did the crime.  As you know, they say you do the crime, so you got to do the time.  I feel that you know, I did these crimes, so I got to do the time.  I didn't kill the man, you know, and I don't, and I don't feel, you know, that my life should be taken, cause you know, his life was taken.  I didn't take his life, you know and I don't feel my life should be taken.  I know, I understand, you know, I did the crime so you know, I'm going to do the time and you know, I'm glad that I got caught, cause you know, I was getting paranoid, you know, for a minute.  You know, I ain't know what to do.  I'm glad that I got caught when I got caught, cause if I wouldn't of, probably if I wouldn't have got caught when I got caught, I'd a probably did some more crimes, you know.  Just, just went on a spree, you know.  That's why I'm glad I got caught, you know.  But, you know, if I do ever see the streets again, you know, which I hope I do, you know, I'm going to try to change my life around, cause, you know, living life like this, it ain't, it ain't worth, it ain't worth having it, you know.  I, I tried before to change.  Things working out for a minute, you know.  Got baptized and stuff.  Then I started getting in trouble again.  Started going down the wrong road, hanging around the wrong people.  But if I have a second chance, I'm going to change.  That's all I, that's all really I want to say, you know.  I wish I could go to the old boy funeral, but I probably, you know, I know I can't.  I hate it happened man, I do.  And I'm sorry for you know, telling so many lies and stuff, but you know, I just, you know, I just, I don't know, I, I get a funny feeling, you know, when I talk about it, you know.  I don't know man.  It's just, my life, my whole life messed up for me ever since I been living.

TA:  At this time, we're going to conclude the interview.  The time is 8:10 P.M. and it's still May the 12th, 1993.

5878 Respondent's Exhibit E

STATE'S
EXHIBIT

_11_

TAPED INTERVIEW WITH KENNETH REAMS

CONDUCTED BY DETECTIVE LIEUTENANT TERRY ADDISON

TA:  Today's date is May the 12th, 1993.  It's 1945 hours.  I'm in the
Detective Office, in Pine Bluff, Arkansas, fixing to conduct an
interview with Kenneth Reams.  I'm Lieutenant Addison.  Kenneth,
before I have this interview with you, I want to read your rights.  I
need a verbal answer.  You need to speak up so that the tape player
can pick it up, okay?  You have the right to remain silent.  Do you
understand that?

KR:  Yes

TA:  Anything you say, can and will be used against you in Court.  Do
you understand that?

KR:  Yes

TA:  You have the right to have an attorney present before making any
statement and you may talk with him during questioning.  Do you
understand that?

KR:  Yes

TA:  If you cannot afford an attorney, one will be provided for you,
before you are asked any questions, if you so desire.  Do you
understand that?

KR:  Yes

TA:  If you want to answer questions now, without a lawyer present,
you may do so.  However, you have the right to stop the questioning at
any time.  Do you understand?

KR:  Yes

TA:  Alright Kenneth, I need you to sign your name right there.  Put
your initials by each one of these answers, showing that you
understand your rights.  Alright Kenneth, where have you been for the
last day or so?

KR:  In Stuttgart jail.  I don't know if it was City or the County
Jail or not.

TA:  Okay, two or three hours ago, you made a collect call to me, is
this correct?

220

KR:   Yes

TA:   You said you wanted to talk to me?

KR:   Yes

TA:   Alright, I, in fact, came to Stuttgart.  It is a City jail, picked you up and we're now back in Pine Bluff.  What is it you want to talk to me about now?

KR:   About uh, the, I don't know what you call it, attempted robbery, robbery or whatever that went on a while back.  About two weeks ago, maybe, maybe been three weeks ago.

TA:   Alright, where was this at?

KR:   Uh, first one was at uh, the teller on 5th and Chestnut.

TA:   Alright, that was the first one?

KR:   Yes

TA:   Okay, where was the other one at?

KR:   Uh, at the Econo Lodge Hotel.

TA:   Alright, was there any more?

KR:   No

TA:   Okay, let's back up to this first one you're talking about at 5th and Chestnut, is actually where the teller machine is that, I think that's the Worthen Bank.  I'm holding a police report.  In fact, it says attempted robbery, 5th and Pine.  This is at a teller machine. Is this the attempted robbery you're talking about?

KR:   Yes

TA:   Okay tell me, go ahead and tell me about that.

KR:   Uh, it was me, Alford Goodwin and uh, Phillip Curry.  We was at this uh, teller and uh, we was going to rob this dude at the teller, but things, things didn't go the way we planned it, way we thought they was going to go.  I ain't going to say planned it, but what we thought they was going to go.  We went up there, oh, who had the pistol?  I had the pistol, so then we went up there to the uh, to this man car.  He told me to give us his money and he, and he said he ain't, he ain't got no money, but five dollars that he depositing at the thing and uh, I asked him again, I say, give me all your money and uh and he said, let me write you a hundred dollar check out.  We said, we don't want no check.  And he drove off.  Just like that, he just drove off.

TA:   Okay, you said you had the pistol?

KR:   Yes

TA:   What pistol is this?

KR:   It was a 32.

TA:   You know what brand?

KR:   No, it was a revolver.

TA:   Where did you get this pistol?

KR:   At the burglary that I did at the dry cleaners.

TA:   Okay and who else was with you at this attempted robbery?

KR:   Phillip and Butterball, Alford Goodwin.

TA:   Okay, were ya'll sitting back, waiting for a car to come in there?

KR:   No, as soon as we got up there, the car was there.

TA:   Do you know what color car it was?

KR:   I can't remember.  I believe it was a blue one.

TA:   Alright, was it a male, female?

KR:   Male

TA:   Black or white?

KR:   Black

TA:   A black male?

KR:   Yes

TA:   Alright you said, we said, give, give us your money.

KR:   Yea, all three of us said it.

TA:   Everybody did?  Who did most of the talking?

KR:   All of us.

TA:   Okay, did anybody have any masks on of any kind?

KR:   No, not that I remember.  Not that I remember.  Yea, yea, yea, I
believe, I can't really remember, cause when we uh, did that uh, at
the, at the uh, at the Hotel, we had a mask on.  I can't remember if
we had the masks at the, oh yea, we had a mask.  We had masks on.

TA:   What kind of masks?

222

(Reams-Interview)
3

KR:   Stockings.

TA:   All three of you?

KR:   Yes

TA:   What color stockings?

KR:   Black

TA:   Okay, did these stocking masks have holes cut in them or were they tore or...

KR:   Yes, they had eyes, for the eyes.

TA:   For the eyes?   Alright, in this report, the man says that somebody hit him in the mouth.  You know who did that?

KR:   I don't, I can't remember who hit him in the mouth.

TA:   You can't remember?  Do you remember what color clothes you had on?

KR:   No

TA:   Do you remember what color anybody had on?

KR:   No

TA:   Okay, did you get any money from this guy?

KR:   No

TA:   Did you get anything from him?

KR:   Nothing

TA:   Why didn't you?

KR:   Cause he pulled off.

TA:   Just left ya'll standing there?

KR:   Yea

TA:   Do you know what happened to his money card?

KR:   No, I guess it was still in the machine, cause we didn't get nothing.  The machine was making some kind of aah, aah sound, you know.  We didn't take, we didn't get no, no money, not a cent.

TA:   Okay, there was only three of you there?

KR:   Yes

TA:  And it was you, Phillip Curry.

KR:  Yes

TA:  And Alford Goodwin.  Where had you met up with Alford and Phillip at?  About what time had all ya'll got together that evening?

KR:  It was kind of early in the evening, like about five o'clock.  I don't remember where we met up at.

TA:  Okay, but from about five o'clock until this happened, ya'll are still all together?

KR:  Yea

TA:  What did you do with the gun or what time was this, did this happen, here at the teller?

KR:  It was about, I believe about, about nine something.

TA:  Okay when, when he drove off, what did ya'll do?

KR:  Took off running.  Well, we ran, we ran behind some apartments, in a alley and sat down on a ice box.

TA:  What kind of ice box?

KR:  Old, it was a old raggedy ice box, just sitting there.

TA:  You mean like an ice box that goes in a house some where?  Okay, where did you go from there?

KR:  Uh, we stayed there and then we walked up to the store, to the uh, uh, uh, uh, what was the name of that store?  Uh, that store on Barraque and Walnut.  On the corner of Barraque and Walnut.

TA:  Okay, could that be the Shell Git-N-Go Store?

KR:  Yea, the Shell, yea.

TA:  Okay, from there, where did you go?

KR:  Then we walked back down to the uh, to uh, we, we just, we just walked, we just walked, really.  We went over by Al's house.  Then we just walked.  Then we just said let's go, uh Butterball said, let's go, let's go to the uh, to the uh, uh, Hotel.  He said, then we just walked up to this Hotel.

TA:  What did you want to walk to the Hotel for?

KR:  We was going to rob the Hotel.

TA:  The Hotel you're talking about is....

224

KR:   Econo Lodge.

TA:   Econo Lodge, on West 5th?

KR:   Yes

TA:   What happened there, when ya'll got up there?

KR:   We uh, had on our little masks and everything.  We walked through that first door and it was unlocked and we made it to the second door and it was locked.  Then Phillip and them said that the woman seen us, so we turned around.  We turned around from there and uh, took off running.  Then we made it half way down the street and we, we said, we was asking did, did the woman really see, cause, you know, I, I ain't really see the woman that good.  I, I don't know if she seen me or not.  And we was saying, oh, she probably didn't see nothing in there, cause the police ain't there yet.  So we turned back around and we was going to walk up there.  And we seen the police, so we uh just, you know, took off back towards the neighborhood.  Just left everything like it was.

TA:   Who all was with you on that one?

KR:   Uh, me, Butterball and D.

TA:   Okay, in fact, who is Butterball?

KR:   Alford Goodwin.

TA:   And who is D?

KR:   Phillip Curry.

TA:   Okay, when ya'll walked up to that one, who had the gun?

KR:   Uh, who had the pistol?  Who had the pistol?  I can't, I can't remember who had the pistol.  Can't remember who had the pistol.  Who had the pistol, I can't remember who had the pistol.

TA:   Alright, did you have masks on in that one?

KR:   Yes

TA:   What kind were they?

KR:   Stockings.

TA:   What color?

KR:   Black

TA:   Alright, did all three of you go through this first door?

KR:   Yes

TA:   And what stopped you there?

KR:   The second door was locked.

TA:   So that's when ya'll took out?

KR:   Yes

TA:   When you saw the police, where were ya'll at?

KR:   Uh, on uh, on 4th Street.

TA:   Just walking down the middle of the street?

KR:   Yes

TA:   Okay Kenneth, is there anything else you want to tell me about those two attempted robberies?

KR:   No

TA:   Alright, I know you've already given me a statement on the other incident at the teller machine.  Is there anything else that you've thought of that you want to tell me about that?

KR:   No

TA:   Okay while we recovered this pistol, I noticed the serial number's scratched off of it.  Do you know how that got, how that happened?

KR:   I scratched it off on the concrete.

TA:   Where at?

KR:   Across the street from the teller.

TA:   You remember when you did that?  ·

KR:   Uh, that night.  Uh, when we was fixing to rob that man.

TA:   Okay, which one now?  There was two of them at...

KR:   The first one, I mean, the second one, it was the second one.

TA:   On the one that got shot?

KR:   Yes

TA:   On that night you scratched it off on the sidewalk?

KR:   Yea, on the concrete.

TA:   Where at?

226

5885 Respondent's Exhibit E

KR:  Uh, it was, it was like in a alley like, you know.  It was like a drive way.  We was sitting down on the, on the, on the curb like and I was just was rubbing it against the concrete.

TA:  Okay, is there anything else that you want to say on this interview, anything at all?

KR:  Yea, first of all I want to say that uh, I ain't mean for, you know, if I, if I'd a had control of the pistol, he wouldn't of never got shot in the first place, cause I ain't, I ain't, I ain't got the, you know, the guts just, you know, to shoot nobody.  Well, I don't think I got the guts just to shoot nobody, you know.  I know I was wrong for doing it, you know.  I did the crime.  As you know, they say you do the crime, so you got to do the time.  I feel that you know, I did these crimes, so I got to do the time.  I didn't kill the man, you know, and I don't, and I don't feel, you know, that my life should be taken; cause you know, his life was taken.  I didn't take his life, you know and I don't feel my life should be taken.  I know, I understand, you know, I did the crime so you know, I'm going to do the time and you know, I'm glad that I got caught, cause you know, I was getting paranoid, you know, for a minute.  You know, I ain't know what to do.  I'm glad that I got caught when I got caught, cause if I wouldn't of, probably if I wouldn't have got caught when I got caught, I'd a probably did some more crimes, you know.  Just, just went on a spree, you know.  That's why I'm glad I got caught, you know.  But, you know, if I do ever see the streets again, you know, which I hope I do, you know, I'm going to try to change my life around, cause, you know, living life like this, it ain't, it ain't worth, it ain't worth having it, you know.  I, I tried before to change.  Things working out for a minute, you know.  Got baptized and stuff.  Then I started getting in trouble again.  Started going down the wrong road, hanging around the wrong people.  But if I have a second chance, I'm going to change.  That's all I, that's all really I want to say, you know.  I wish I could go to the old boy funeral, but I probably, you know, I know I can't.  I hate it happened man, I do.  And I'm sorry for you know, telling so many lies and stuff, but you know, I just, you know, I just, I don't know, I, I get a funny feeling, you know, when I talk about it, you know.  I don't know man.  It's just, my life, my whole life messed up for me ever since I been living.

TA:  At this time, we're going to conclude the interview.  The time is 8:10 P.M. and it's still May the 12th, 1993.

Respondent's Exhibit E

# RIGHTS FORM

MIRANDA RIGHTS READ TO _Alford Goodwin JR_

DATE _5/10/93_ TIME _1610_   A or P (M)   PLACE _P.B.P.D. Detective Office_

Before we ask you any questions, you must understand your rights.

You have the right to remain silent.

      Do you understand?     Yes or No _YES_ A.G.

Anything you say can and will be used against you in court.

      Do you understand?     Yes or No _YES_ A.G.

You have the right to have an attorney present before making any statement and you may talk with him during questioning.

      Do you understand?     Yes or No _YES_ A.G.

If you cannot afford an attorney, one will be provided for you before you are asked any questions, if you so desire.

      Do you understand?     Yes or No _YES_ A.G.

If you want to answer questions now, without a lawyer present, you may do so. However, you have the right to stop the questioning at any time.

      Do you understand?     Yes or No _YES_ A.G.

               Signature X _Alford Goodwin Jr._

Rights read by: _Lt. Mack Cook_

Witness: _Juan Z Tilly_

Witness: _____

CASE NUMBER _93-205_

Respondent's Exhibit E

228

TAPED INTERVIEW WITH ALFORD GOODWIN, JR.


CONDUCTED BY DETECTIVE IVAN PHILLIPS


IP:  Ivan Phillips
RP:  Rick Pritzen
AG:  Alford Goodwin


IP:  I'm Detective Ivan Phillips of the Pine Bluff Police Department.
The date is 5-10 of 93.  The time is 2107 hours.  I'm conducting an
interview with Alford Goodwin, Jr.  Present in this interview, of
course is myself, Mr. Goodwin Jr., and Detective Sergeant Rick
Pritzen.  This interview is in reference to a homicide, that occurred
on 5-5 of 93, in the evening hours of that date.  Mr. Goodwin, earlier
today you were advised of your rights, is that correct?

AG:  Yes sir.

IP:  Alright, Lieutenant Cook advised you of your rights and you
filled out a rights form, is that correct?

AG:  Yes sir.

IP:  And in this form, it explained that you had the right to remain
silent and you didn't, and you had the right to an attorney and so
forth, before you gave a statement, is that correct?

AG:  Yes sir.

IP:  Did you sign this form?

AG:  Yes sir.

IP:  Alright Mr. Goodwin, if you would, I'm just going to ask you what
occurred on the evening of, or on the day of the 5th of May this year
and let you tell us what knowledge you have of this.

AG:  Well, earlier that day, earlier in the evening, about, about ten
after twelve, two of my friends came by.

IP:  Is that ten after twelve at noon?

AG:  At noon, yes sir.  Two of my friends came by and told me that
later on that evening, that they was going to rob a store.

IP:  Who were those friends?

AG:  Kenneth Reams and Jermayne Brown.

229

IP:   Who?

AG:   Kenneth Reams and Jermayne Brown.

IP:   Kenneth Reams?

AG:   Yes sir.

IP:   And Jermayne Brown?

AG:   Yes sir.

IP:   Okay

AG:   And told me that they would see me after I get off of work, so they left and I left and went on to work and so right before it was time for me to leave, before it was time for me to go to work, they came back and said that they couldn't do that, cause they have cameras in the store.

IP:   About what time was that, that they came back?

AG:   About twelve, about twelve thirty something.

IP:   Alright, what store was they going to go rob?

AG:   Consumer's and uh so...

IP:   Where is that store located at?

AG:   On the corner of 6th Street.

IP:   Okay

AG:   And uh, so then they, after that, they told me that they would see me as soon as I got off from work.  That they would meet me at the house and so when I got off, they said, they met me at my house and Jermayne and them said, he said that they was just going to walk around and see what they could find.

IP:   What time did you get off work?

AG:   About three, about three, three thirty, four.  Well about four, yea, it was four o'clock.

IP:   So they came by your house....

AG:   About four.  They was there when I got there.

IP:   Okay

AG:   And uh, so they said they was going to walk around and see what was happening and they would meet me back there later.  So later on that night, Ken, Kenny, he caught up with me about five something that

evening.  Jermayne wasn't with them then.  So we went around my sister-in-law house and she was cooking chicken and rice and she told us that we could stay if we wanted to and eat something.  So we stayed and ate and Kenneth said he was going to go to the store to get him a pop.  So I told him to bring me something to drink back.  And when he left, I ain't see him no more until later on that night, I saw Jermayne.  Jermayne came over to my girl friend house and told me that, what had happened, about they had just robbed a man at the teller.

IP:  Where does your girl friend live at?

AG:  On the corner, on the corner of 2nd and Poplar.

IP:  Okay

AG:  Well, she stay right down the street from Kenneth and I asked them where Ken was and he never said and so he asked me would I hold his pistol for him for a little while.  I told him, yea, I would.  And I asked him what did they do?  And he said, it was a man just dead up there at the teller and that he would talk to me about it later.  So he left and I ain't see him no more that night.  I ain't see Ken neither.  Then the next day I went over to Ken house and I asked Ken what happened.  He said, I told him, he said, that nothing didn't happen, they didn't do nothing.  And I told him Jermayne had already told me what had happened.  And he said, he didn't do nothing, so he don't want to hear about it no more after that day.

IP:  What did Jermayne tell you happened up at the teller's?

AG:  He just said, he said they was, they was heading back from over there on the East side and they was heading back this a way and they just seen a man.  He was pulling up in a truck and he just like cut off and started talking about other things.  Asked me would I keep the pistol and how long....

IP:  Well what did he say that they had done up there?

AG:  He didn't, he didn't rightly say.  He just said, only thing he left me with was, it's a man dead up there at the teller.

IP:  He just said that there was a man dead at the teller and he brought you his gun?

AG:  Yes sir, and told me to keep it.  So I told him, I said, well, you know where I'm going to put it, so won't nobody know but me and you.  He say, yea.

IP:  Well, when these, when Ken and Jermayne told you that they were going to go rob the Consumer store.

AG:  Yes sir.

IP:  Who had the gun?

AG:  Nary one of them had a gun then.  It was around Ken house.
That's where the gun usually stayed out, was Ken...

IP:  The gun's at Ken's house?

AG:  Yes sir.

IP:  How long has Ken had this gun?

AG:  It ain't Ken gun.

IP:  Who's is it?

AG:  It's Jermayne owns it.

IP:  How long do you know that this gun has been around with Jermayne
or Ken?

AG:  I don't, cause Jermayne got so many guns, I don't know.  I don't
know how long he had that one.

IP:  How did you know that this particular gun was at Ken's house?

AG:  Cause like I said, it was about three weeks ago, we was all over
there playing dominoes and Ken needed, he wanted some, he had, some
dudes was messing with, some little old boys in the neighborhood was
messing with him, so he wanted a gun.  So he said he was going to get
one from Jermayne and then, so he was walking around and he asked this
other dude named LaRon, who stay over there, for some bullets to go to
a 32.

IP:  Alright, how do you know that when they said they were going to
go rob this Consumer's, that they didn't have a gun?

AG:  I really don't.  I don't really know that, but I was just
assuming, cause I don't think they would have done it that early in
the day, so I was just assuming.

RP:  Okay Alford, just clarify something for me.  Ken was the one, if
I heard you correctly, who asked you to hold the gun for him?

AG:  No sir, Jermayne is the one that asked me to hold the gun.

RP:  Jermayne?

AG:  Yes sir.

IP:  What, what did you do with the gun when Jermayne had you hold it?

AG:  Well, I sat outside my girl friend's house for a little while
longer.  Then I seen all the police riding around, so I told her to
come walk around my house with me.  And we walked around my house, so
I just went and put it back there by this fence by my house.

IP:  Alright, earlier you said, you mentioned that, that Jermayne had said something about a man in a blue truck.

AG:  He didn't never say what color.  He didn't say if he was in a truck or not.  He just said there was a man dead at the teller.

IP:  Alright, did he say which teller machine?

AG:  No sir.

RP:  Do you know where either Jermayne or Ken got their bullets for the gun?

AG:  No, no sir.  Cause last I know, he said he was going to go ask LaRon.  I don't think LaRon had none, so I don't know what, if LaRon didn't have, I don't think he got none from LaRon, so I don't know where he got the bullets, cause I don't think LaRon had any.

IP:  When Jermayne come up to you and gave you this gun, did you notice anything about him?

AG:  About him?

IP:  Uh huh

AG:  No, except he just, not really.  He was acting the same.  He was acting his old normal self.

IP:  Did you notice anything different about his clothing?

AG:  No, he had the same clothes on.

IP:  Did he have any blood on his clothes or anything at all?

AG:  I don't know.  It was dark.  I wasn't looking at him very hard. I really don't know.

RP:  What kind, what kind of clothes was Jermayne wearing that night?

AG:  I don't remember.  I don't remember that.  I don't even remember.

IP:  And when you took this gun, you say that after you got the gun, that, noticed that the police was around.  You and your girl friend walked around.

AG:  Yes sir.

IP:  Did you look down where the police were at?

AG:  Well, no, because when we got to my house, and I went to put it up.  Then that's when we, we was on our way back around by her house. That's when we heard them two shots.  So she said she was going on home.  So I told her, that sounded awfully close to my house, so I was going to walk her, see what was happening.  Then when I got around

233

there, my sister and them, they was all going to where all the police's was. I ran and caught up with them and we walked on around there together.

IP:   Alright, and where did you put this gun?

AG:   By a fence, by a fence, right behind my house.

IP:   And where, describe...

AG:   Right up under this old rusty bucket, old rusty brake bucket.

IP:   Alright, was it in your yard or...

AG:   Yes sir, it was in my yard.  All in my yard.

IP:   Okay, is that the same gun that you took us out and we recovered while ago underneath the bucket by the fence?

AG:   Yes sir.

IP:   That's the same gun that Jermayne had gave you...

AG:   Yes sir.

IP:   The night of the 5th, the night the man got shot?

AG:   Yes sir.

RP:   Now Alford, earlier you said that you told Jermayne, when he gave you the gun to hold, that you would put it there so only you and him would know where it was at.

AG:   Yes sir.

RP:   Is that a common place for them to  hide their pistol?

AG:   Well no, see Jermayne, he, he daytime.  He make a lot of money, so when he scared, that was like his little bank, his little hiding place, cause didn't nobody never go in my back yard, cause we had them dogs.  So whatever he had that he wanted to hide, he would always just hide it back there and he would tell, he would tell me that it was there.  He would always hide everything he had back there.

RP:   So it may have been a weapon or money or anything he wanted to hide.

AG:   Whatever he had, whatever he had that he, that he wanted to hide, he would put it back there.

IP:   Have you seen Jermayne since then?

AG:   Yea, I seen him once.  When was that?  I think that was day before yesterday, I seen him at the store.

IP:   Which store?

AG:   This store right from, from my house, Walnut Git-N-Go.  He didn't say, he just threw his head up at me like nothing wasn't going on and all that.

IP:   Did you talk to him?

AG:   He just waved at me and said, what's up and he kept on going out the door.  He didn't stop and ask me about his pistol or nothing.

IP:   Where does Jermayne live at?

AG:   He stay here and there.  Most of the time he stay with his Grandma though.

RP:   Where's that at?

AG:   Down on 2nd.  That's all I know, it down on 2nd.  I don't know the address, but I know it's down on 2nd.

IP:   What color house is it?

AG:   I think it's light beige.

RP:   Is that East 2nd or West 2nd?

AG:   East 2nd.

IP:   He stays on East 2nd?

AG:   That's where his Grandma stay.  That's mostly where he stay.

RP:   Like you're going toward the Cottonbelt Shops?

AG:   Yea, like you're going toward the museum.

IP:   The railroad museum?

AG:   Yea, yes sir.

RP:   If you're going toward the railroad museum on 2nd,...

AG:   It's on the, it's on...

RP:   It's on the right...

AG:   The right hand side.

RP:   On the South side of the street?

AG:   Yes sir.

RP:   Beige looking house?

235

AG:  Light beige.

IP:  Are you absolutely sure that Ken never said anything about what happened?

AG:  Ken, he, he didn't even want to talk about it.  He ain't never said what happened.  He wouldn't even tell me if they did it or not.

RP:  Alford, what you've told us here, I need to ask you, did you have any other knowledge, or did you partake in any part of this?

AG:  No sir.  I wasn't with them when they done it.  That's why I was, when he was saying that they had my picture from the teller, I mean where he was saying it was somebody looked like me, I knew right then it couldn't have been me, cause I wasn't there.  So I mean, I already knew who it was.

RP:  So you wasn't there when Jermayne and Ken went up to the teller machine?

AG:  No sir.

RP:  And then Jermayne came back and gave you the gun and told you to hold it for him.

AG:  Yes sir.

RP:  So you had no active part in this crime?

AG:  Not beside knowing it and just not saying nothing.

IP:  Did Jermayne ever say who shot the guy?

AG:  No sir.  I mean, once he said, he just stopped at all of a sudden.  He said that it was a guy at the teller dead.  Then that's when he jumped to the subject of, would you hold my pistol?  He never said which one of them shot him or what.  He just changed the subject all at once.

RP:  Who usually has possession of that pistol?  Once you said Jermayne asked you to hold it for him, but just a few nights before, I believe you said it was over at Ken's house.

AG:  Over Ken's, well, it Jermayne pistol so I, Jermayne, I don't know, cause Jermayne have so many pistols.  Like I said, this one of his first times doing something like this though.  He got a lot of friends, so he don't have nothing to worry about.  So I don't, I don't really know who really keep it most.

RP:  Do you have any idea how long Jermayne's had that particular pistol?

AG:  No sir.

IP:  But you say that you know that it's been, it was at Ken's house about, maybe two or three weeks ago?

AG:  Yea, when, when them, some little boys in the neighborhood had threatened him and he had gotten escape, so he had asked Jermayne could he hold it for a minute.  Jermayne let him hold it.  I don't know did he ever get it back to Jermayne.

RP:  Where did Ken keep it when it was at his house, do you know that?

AG:  I think in the bedroom.

IP:  I'm going to ask the same question Sergeant Pritzen asked just a minute ago.  Do you, is there any other information about this crime that you have not told us at this time?  Anything at all?  Even if it might not seem like it would mean anything to you.  Just anything at all?

AG:  That I know of?

IP:  That you were told by either of these people or that you may have seen, anything whatsoever.

AG:  No sir.

IP:  That you have not told us?

AG:  No sir.

IP:  Alright

RP:  I have nothing further.

IP:  Jermayne, if you would, go ahead and tell us your address.

AG:  Alford, my name Alford inaudible.

IP:  Correction, Alford, if you would, go ahead and tell us your address and your date of birth.

AG:  314 South Oak.  2-3 of 74.

IP:  Alright, that will conclude the interview with Alford Goodwin, Jr.  The time is now 2123 hours.

(Goodwin-Interview)
9

5-13-93

CRIMINAL INVESTIGATION DIVISION

ASP-3-A

DATE:            5-11-93
DICTATED BY:     INV. JOHN HOWELL
DATE TYPED:      5-13-93 LDH
COPIES TO:       SGT. TERRY HOPSON,
                 PINE BLUFF POLICE DEPARTMENT

INTERVIEW OF SUSPECT

ALFORD GOODWIN
AKA "BUTTERBALL"
B/M  DOB: 2-3-74
314 SOUTH OAK
PINE BLUFF, AR

MR. GOODWIN was interviewed at the State Police CID office in Pine Bluff, Arkansas at 1:07 a.m. on 5-11-93 by Inv. JOHN HOWELL.

The subject's rights were described to him on a CID 116 form.  His responses were recorded on that form.  A copy of the rights waiver has been forwarded to the Little Rock office and will be made a permanent part of this file.  After being advised of rights and signing the rights waiver, the subject gave the following information.

MR. GOODWIN'S statements concerning this matter were essentially the same as given other investigators.  He stated that JERMAINE BROWN brought the .32 caliber revolver to his residence and gave it to him.  He stated that he has had the gun a couple of days.  He stated that he was not at the crime scene when the shooting occurred.

FILE  BER:  89-640-93                    CRIME:   CAPITAL FELONY MURDER

238

Respondent's Exhibit E



**State of Arkansas**

# ARKANSAS STATE POLICE

Post Office Box 5901  •  Little Rock, Arkansas  72215

Bill Clinton • Governor    Colonel T.L. Goodwin • Director    Lt. Col. Richard C. Rail • Ass't. Director

May 13, 1993

CONFIDENTIAL

Sgt. Terry Hopson
Pine Bluff Police Department
200 E. 8th
Pine Bluff, AR

ARRANGEMENTS

At your request, MR. ALFORD GOODWIN was administered a polygraph examination at the State Police CID office in Pine Bluff, Arkansas on May 11, 1993 by Investigator John Howell.

MR. GOODWIN was being tested to determine his knowledge or involvement in a homicide which occurred at 5th & Chestnut in Pine Bluff, Arkansas on May 5, 1993.

PRE-TEST INTERVIEW

The pre and post test interviews were conducted on interview of suspect form which will be made a permanent part of this file.

EXAMINATION

MR. GOODWIN was administered three polygraph examinations, all of which consisted of the MGQT Test Technique in which the following questions were asked, along with other irrelevant and control questions.

Q-3.  Did you plan with anyone to rob a man at 5th and Chestnut causing his death?
A.    No.

Q-5.  On May 5th, did you fire the shots that caused the death of GARY WAYNE TURNER?
A.    No.

Q-8.  When the man was shot on May 5th, were you there?
A.    No.

Q-9.  Do you know the name of the person who shot the man at 5th and Chestnut?
A.    No.

239

Page Two


Polygraph Examination
Alford Goodwin
May 13, 1993


FINDINGS

The physiological responses noted on this subject's polygraph charts are in such a pattern as to indicate that the subject, ALFORD GOODWIN, has not been completely truthful in answering the above questions.

Based on information furnished this examiner, interviews with the subject, and evaluation of the subject's polygraph charts; it is the opinion of this examiner that MR. GOODWIN has not been completely truthful.

Respectfully submitted,


Inv. John Howell
Polygraph Examiner
Company "G"
Arkansas State Police

JH/lh

xc:  Case File #89-640-93

CRIMINAL INVESTIGATION DIVISION

ASP-3-A

DATE:              5-12-93
DICTATED BY:       INV. JOHN HOWELL
DATE TYPED:        5-13-93 LDH
COPIES TO:         SGT. TERRY HOPSON
                   PINE BLUFF POLICE DEPARTMENT

INTERVIEW OF SUSPECT

ALFORD GOODWIN
AKA "BUTTERBALL"
B/M  DOB: 2-3-74
314 SOUTH OAK
PINE BLUFF, AR.

This was a post test interview after a polygraph examination at the State Police
CID office in Pine Bluff, Arkansas on May 11, 1993 by Inv. JOHN HOWELL.

MR. GOODWIN was advised by this investigator that he was deceptive in his
polygraph examination.  MR. GOODWIN admitted to this investigator that he was
at 5th and Chestnut when MR. TURNER was shot.  He stated that he tried to get
the keys out of MR. TURNER'S truck, in an attempted robbery, but he did not
shoot MR. TURNER.  He states that JERMAINE BROWN shot MR. TURNER.

This investigator then turned MR. GOODWIN over to Detective BUD PHILLIPS of the
Pine Bluff Police Department who took a statement from MR. GOODWIN.

FILE   BER: 89-640-93                          CRIME: CAPITAL FELONY MURDER

241

  Respondent's Exhibit E

## VOLUNTARY STATEMENT

Date _05/11/93_ Time _0300_ Place _A.S.P. Headquarters_
I, _Alford Goodwin_ of _314 S. Oak   P.B._ being _19_
years of age, and born _02-03_, 19_74_, do hereby make the following
statement to _Det. Ivan Phillips_ of the _Pine Bluff Police Dept._

X _This statement is being written by Det._
_Ivan Phillips as I tell it to him. xA.G._
_On 05-05-93 at about 8:15 pm. Ken, Jermaine_
_and I were at my house. Ken said he needed_
_some money. He said that we would go to the_
_A.M.T. machine and wait for some one to drive up_
_and use their money card and Rob them of the money_
_that was gotten from the machine. They asked me, if_
_I would go and watch their back for them, and I did._
_Jermaine had the gun and we walked to the AMT_
_machine and a man in a blue Jeep truck pulled up to it._
_Jermaine and Ken went to the driver's side of the_
_truck and I was going to the passenger's $ side to_
_get the keys out of the truck. We wanted the keys_
_to make sure he did not drive off. I.P. If I got up to_
_~~ten feet from the passenger's door when I heard the~~_
_~~gun shot.~~ I.P. When I was crossing 5th St, to go to xA.G._

I have read this statement consisting of _02_ page(s) and the facts contained herein are true and correct.

WITNESS _____     xAlford Goodwin
                                        Signature Of Person Giving Voluntary Statement

WITNESS _____     Ivan S. Phillips
                                        Signature Of Person Writing This Statement

                                        Page One Of _02_ Pages

Respondent's Exhibit E

5902

242

Voluntary
~~WITNESS~~ STATEMENT (continued)

A.G.X the passenger's side of the truck I heard the
gun shot. I continued up toward the truck, and
when I got about TEN FEET from it, I SAW the
man slumped over the steering wheel.
    JERMAINE AND I ran North across 5th st, and
JERMAINE had the gun in his hand. KEN was
Standing at the rear driver's side of the truck
yelling to us about his fingerprints being on the
truck. I stopped and told KEN to come on
it was to later. JERMAINE kept running until
he got to the rail road tracks, then turned and
ran toward Main street. KEN caught up with
me and we ran across the Econo Lodge parking
lot. KEN went to my house and I went
to my girlfriends house. About 20 minutes
later JERMAINE showed up at my girlfriend's
house and told me to give the gun back to
KEN. JERMAINE Said he was going to his
Aunt's house in Grady. I took the gun
home and hid it under the bucket in my back
yard. KEN had gotten the gun and 3 jackets
from the CLEANERS some where around cherry street. xAlbord Jocelin

Compiled By _Jean S. Phillips_          File No. _93-205_ Date _05/11/93_

Page _22_ of _22_

243

TAPED INTERVIEW WITH ALFORD GOODWIN, JR.


CONDUCTED BY DETECTIVE LIEUTENANT TERRY ADDISON


TA:  Today's date is May the 12th, 1993.  It is 12:50 P.M.  I'm conducting an interview in Stuttgart, or correction, Dumas City Jail. In this interview, myself, Lieutenant Addison and Alford Goodwin. Starting off, in reference to Attempted Robbery, Homicide, which occurred on May the 5th, 1993 in Pine Bluff.  Kenneth, I've already read you your rights back several times.  I'll read them once again, just to make sure you still understand them and I need a verbal answer.

AG:  You called me Kenneth.  My name is Alford.

TA:  I mean Alford.  I'm going to read them to you again.  I need a verbal answer, okay?

AG:  Yes sir.

TA:  You have the right to remain silent.  Do you understand that?

AG:  Yes sir.

TA:  Anything you say can and will be used against you in court.  Do you understand that?

AG:  Yes sir.

TA:  You have the right to have an attorney present, before making any statement and you may talk with him during questioning.  Do you understand that?

AG:  Yes sir.

TA:  If you cannot afford an attorney, one will be provided for you, before you are asked any questions, if you so desire.  Do you understand that?

AG:  Yes sir.

TA:  If you want to answer questions now, without a lawyer present, you may do so.  However, you have the right to stop the questioning at any time.  Do you understand that?

AG:  Yes sir.

TA:  Okay Alford, in fact you made a statement earlier in reference to all this and now you want to make another statement.  The first one,

5904   Respondent's Exhibit E

there was some things in it that wasn't totally correct and it's in fact, been bothering you?

AG:   Yes sir.

TA:   You're now wanting to tell the truth and get it off your chest, is this correct?

AG:   Yes sir.

TA:   Let's start with this first incident that happened over here on the 5th, where Mr. Turner, Gary Turner was at the teller in Pine Bluff.  Go ahead and start from that day and tell me what you know about it.

AG:   Well, me and Kenneth, we sat in between, in between the Jefferson Child Support Office and this abandoned building.

TA:   Okay, let's back up just a little bit further.  Why were you even over there?

AG:   Cause, well, Kenneth said he knew where to get some quick money from.

TA:   Alright, when was this?

AG:   This was earlier that day.  Earlier the same day.

TA:   Alright, who all were ya'll talking this with?

AG:   Me, him and Jermaine Brown.

TA:   You and who?

AG:   Me, Kenneth and Jermaine Brown.

TA:   Okay, ya'll were discussing that?

AG:   Yes sir.

TA:   Alright, start from there, where ya'll, you three were discussing that.

AG:   And uh, so uh, at first I had to go to work, so him and Jermaine was going to go and rob Consumer's Drug Store.  When I got off work, they told me that uh, they couldn't do it, cause it had cameras in it.  So Ken said, well, we can go to the teller again.  And Jermaine said he wasn't going.  So later on that evening, when we got ready to go, Jermaine was still with us and when we got ready to go, he left. So me and Ken, we went on down there.  It was about, we left my house at about 8:15 and we went and sat in between them two buildings.  It was already a car there, so we waited for a minute and they left.  And then we sat down and so Ken had the pistol in his pants.  So then that's when this blue truck pulled up.  He say, well, there, there go

the lick right there.  So we got up and went over there.  Ken was going to go on the side of the truck and I was supposed to go all the way around the teller to try to, to try to get him to turn the truck off.  So I, I made it all the way around the teller to the side of the teller and I heard Ken say, freeze.  Then I came on around and he said, what the hell ya'll want?  So I reach my hand in to, to try to turn the truck off.  Then he started wrestling with me and I, next thing I know, I heard something go POW and I just felt him fall over my back.  So I raised up out of the truck and I seen blood running down his, running down his head and then I start saying, Kenny, you shot him, you shot him.  So Kenneth said, let's go, let's go.  And then that's when we looked up and two cars was there and coming past us, so we gave them time to pass and then we started running down Walnut and turned off Walnut, across the Econo Lodge parking lot.  Then we went to my house from there.

TA:  Okay, when you were in the truck, what were you trying to do?

AG:  Turn the truck off.

TA:  What color clothes did you have on?

AG:  A gray sweater with a hood and some light green pants.

TA:  After he got shot and you backed up out of the truck, was the door open, or were you going through the window?

AG:  I was going through the window.

TA:  Okay, did Kenny ever get in the window, or did you see him go through the window?

AG:  No sir.

TA:  What was Kenny wearing, do you know?

AG:  No sir, I don't really recall.  All I know is he had on a blue hat.

TA:  Alright, when you got home, what happened with the gun?

AG:  Ken told me to put the gun up, so I emptied it.  I gave him the empty shell and I took the three bullets and put them up in my room and I tore a piece, I run in my garage.  I was fixing to hide it in there.  Then I just grabbed a piece of plastic, tore it off and put the pistol in the plastic and hid it in my back yard.

TA:  Where's the bullets at now, that were still in the gun?

AG:  In my house.

TA:  Where at?

AG:  Up over, on the ledge, over my window.

TA:  Now what about the one hull that was fired?

AG:  We was walking.  Kenneth said he was going to go throw it in a dumpster, across the street from my house.

TA:  Did you see him throw it in there?

AG:  I seen him when he, yes sir.  Well, I didn't actually see him throw it in there.  I seen him when he went over there and tossed something in there.  I'm not quite sure...

TA:  Who was this?

AG:  Ken

TA:  Alright, as far as you know, the other three bullets are still at the, at your window?

AG:  They still there, yes sir.

TA:  Did you actually get anything from this guy?

AG:  No sir.

TA:  Nothing at all?

AG:  No sir.

TA:  Now, in an earlier statement you said Jermaine was involved.  Now you're just saying that he wasn't at all?

AG:  No sir, he was not involved.

TA:  Why were you saying he was involved before?

AG:  Trying to keep Ken out of trouble.  I figured maybe by saying that he pulled the trigger, then Ken wouldn't get blamed for it, or me.

TA:  Okay, when ya'll were discussing the, this robbery, the three of you together, where were you?

AG:  At my house.

TA:  Was anybody else there?

AG:  No sir.  Well, yes sir, my sister and them was in the house, but we was outside on the picnic table from my house.

TA:  Who is your sister?

AG:  Stacy Booker.

TA:  Is this Stacy Booker, is that Jermaine's girl friend?

247

(Goodwin-Interview)
4

AG:   Yes sir.

TA:   In fact, when ya'll started to leave, to go do the robbery, that's when Jermaine stayed there at your house?

AG:   Yes sir.

TA:   With Stacy?

AG:   Yes sir.

TA:   Alright, so you're saying that you did not pull the trigger...

AG:   Yes sir.

TA:   On this deal here.  Who did?

AG:   Kenneth

TA:   Where was Kenneth standing when you were, had your body half way through the truck?

AG:   He was, he was like sideways to the truck and had the gun already at the man's head.

TA:   Okay, was he on your left side or would he be on your....

AG:   He was on my right side.

TA:   He would be on your right?  Kind of behind you then?

AG:   Yes sir.  No, he was on the side, I was in the truck and he was like, right there at the beginning of the tail gate.

TA:   On the right?

AG:   Yes sir.

TA:   Alright, when you came across the street, both of you came across the street together?

AG:   Yes sir.

TA:   Did both of you come up from behind the truck there, or how, just how did you approach this vehicle?

AG:   Ken came up from behind the truck.  I went all the way on the side of, I went all the way around the teller.

TA:   Okay, did you say anything to the guy?

AG:   No sir.

TA:   Did Ken say anything to the guy?

(Goodwin-Interview)
5

248

AG:  He told him to freeze.

TA:  That's all?

AG:  Yes sir.

TA:  Why did he want him to freeze?  I mean, he...

AG:  He said, freeze, turn the, then when I got all the way around, he said, turn the truck off.  But the man had already said, what the hell ya'll want?

TA:  Well, that man said, what the hell do ya'll want?

AG:  Yes sir.

TA:  What happened then?

AG:  That's when I dived in, in the window.

TA:  And why were you going in?

AG:  To turn the truck off.

TA:  Okay, was this guy trying to hit you or anything while you were doing that?

AG:  No sir.

TA:  Okay, is there anything else you want to say about that incident?

AG:  I'm sorry it happened.  I didn't mean for it to happen like that and I'm really regretting it now.  It's hurting so bad.

TA:  In fact, when ya'll planned this up, you didn't plan to go down there and shoot anybody, did you?

AG:  No sir.

TA:  Just went down there to rob them?

AG:  Yes sir.

TA:  Okay Alford, in reference to another incident that happened on the 28th and basically at the same teller machine, you know what incident I'm talking about there?

AG:  Yes sir.

TA:  Can you explain that one to me?

AG:  Well, we went there and D had the gun that night.

TA:  Now, who is D?

AG:  Dewayne Curry and when he told, he told the man to draw us some money out, when he told him to draw him some money out and the man said, let me write ya'll a check out and D told him, hell no, he didn't want no check.   Nobody said nothing that night, except D. Then, but Ken hit the man in the mouth that night and D got mad, cause he asked him why in the hell did he hit him in the mouth?   That's about basic what happened, cause dude drove off.

TA:  Okay, about what time was this?

AG:  I think it was, it was going on nine.   About eight something, going on nine, cause it was dark, I know that.

TA:  Okay, who all went up there for, on this deal?

AG:  Me, Kenneth and D.

TA:  You're saying Kenneth, Kenneth who?

AG:  Kenneth Reams.

TA:  And D?

AG:  Dewayne Curry.

TA:  Dewayne Curry?

AG:  Yes sir.

TA:  And yourself?

AG:  Yes sir.

TA:  Where did ya'll make plans for this one?

AG:  Well, we didn't really plan this one.   It was just, we was walking and D said, let's do it.

TA:  D said, let's do it?

AG:  Yes sir.

TA:  How did he end up with the gun, so he could do this?

AG:  We went to Kenneth's house and got it.

TA:  Why did you go to the house to get the gun?

AG:  To, to rob the man.

TA:  At the teller machine?

AG:  Yes sir.

(Goodwin-Interview)
7

5910   Respondent's Exhibit E

TA:  Alright, when you got the gun, who actually got the gun out?

AG:  Kenneth, Kenneth Reams.

TA:  Alright, he got it out of his house?

AG:  Yes sir.

TA:  And what did he do with it?

AG:  He kept it till we got down there, then everybody was debating over who was going to hold the gun and D said let him do it.

TA:  So, in fact, he ended up with it?

AG:  Yes sir.

TA:  Alright, was this a male, a female or...

AG:  Male, black male.

TA:  Do you know what kind of car he was in?

AG:  No sir, I don't.  Uh, no sir, I don't.

TA:  You know what color car?

AG:  If I'm not mistaken, blue.  I just, I know it was a dark colored car.

TA:  Alright, is there anything else that you remember about the car?

AG:  That it was a stick.

TA:  A stick shift?

AG:  Yes sir.

TA:  Alright, you said somebody hit the guy in the mouth.

AG:  Kenneth hit him, Kenneth Reams hit him in the mouth.

TA:  Why did, do you know why he hit him in the mouth?

AG:  No sir.

TA:  Okay, when the guy drove off, left ya'll standing there, which way did he go?

AG:  Toward uh, toward 6th Street.

TA:  Okay, there was, ya'll used something else that night too.  Some type of mask.

AG:  Yes sir.

TA:  What was that?

AG:  Some stockings.

TA:  Stockings?

AG:  Yes sir.

TA:  Who had those?

AG:  Me and D had on, me and D, I mean me and Kenneth had on the masks.

TA:  You and Kenneth?

AG:  Kenneth had a partial mask on.  It wasn't really a mask, cause it was half way tore and D had on a partial mask, but his was better than Ken's.  You couldn't see his face, but you could see Ken's face.

TA:  What kind of masks are we talking about?

AG:  Some dark stockings.

TA:  Okay, and you're saying actually all three of you had one on?

AG:  Yes sir, except Ken's was all tore.  He had on one, but it wasn't covering his face up.

TA:  You could, in fact, you could tell what he looked like?

AG:  Yes sir.

TA:  Alright, so you didn't get anything from this guy.  Nobody got really hurt?

AG:  No sir.

TA:  He drove off and left ya'll standing there.  What happened then?

AG:  Then we ran to Kenneth's house for a while and then Kenneth said he knew something else.  He told us walk with him.  So we walked with him and we went to the Econo Lodge Hotel and he told us to come on.  He was going to go in and we was supposed to go in back of him, but D said he didn't think it was a good idea, cause he say he think they have Security there, so we told Ken we wasn't going to do it.  And he say well, he dumb.  So he went on and we started walking toward D Auntie house and stayed, not too far from the Econo Lodge.  By the time we made to this Printing Company there, Ken was catching back up with us and saying the door was locked and that the woman seen him with a mask on.  So then he said, well, so we said, well, where you fixing to go now?  And he said, with ya'll.  So we was proceeding to walk on.  Then we looked back and we seen the police going up there.

TA: You saw the Police going up to the Econo Lodge?

AG: Yes sir.

TA: Right after the attempt was made?

AG: Yes sir.

TA: Alright, what were you wearing that night at the Econo Lodge and the attempted one over there at the teller machine?

AG: A black shirt and my blue pants, some blue pants.

TA: Alright, do you know what D or Ken either one, was wearing?

AG: I'm not really sure.

TA: What about a cap?

AG: Kenneth had on a cap. He always wore a cap.

TA: Kenneth had one on, a cap on?

AG: Yes sir.

TA: Do you what kind or color it was?

AG: A blue Atlanta Braves hat.

TA: Alright, you're saying Kenneth went up to the Econo Lodge, actually to the door, by himself?

AG: Yes sir. He had the same mask on, so I'm quite sure she could identify his face.

TA: Alright, was this a wooden door, a glass door, a...

AG: I ain't, I ain't sure.

TA: You didn't pay too much attention? And when that one went bad, ya'll went on down to, you said a...

AG: We went over D's Auntie house.

TA: Okay, what did you do when you got over there?

AG: Well, sat down for a while and then her boy friend asked us did we want to drink a beer?

TA: Alright, is there anything else you want to tell me about either one of these attempted robberies or any other case that you know about, that you want to try and get off your chest?

AG: No sir.

253                          (Goodwin-Interview)
                                      10

TA:  We'll, right quickly, go back over part of this, on where the man got shot.  You're saying you, Kenneth and Jermaine made plans to go down there and rob somebody and it ended up Jermaine stayed at home.

AG:  Yes sir.

TA:  And just you and Kenneth went down there on that?

AG:  Yes sir.

TA:  And then at the earlier date, there was attempted robbery of a black male at that same teller machine and you and D, or Phillip Curry and Kenneth attempted that one?

AG:  Yes sir.

TA:  And then, nobody got hurt and no money was taken or anything was taken there and then you and D and Jermaine went to basically the Econo Lodge, where Kenneth tried to go in on the door there and it was locked, so that one went bad also.  He didn't get anything out of there.

AG:  Yes sir.

TA:  From there you went, went on home, kind of ended it.

AG:  Yes sir.

TA:  After the shooting incident over there, you got the gun from, you said from Kenneth and hid it under a bucket in your back yard, wrapped in some plastic.  You got the bullets out of it.  There was only three left in there.  There was one, which was fired at Mr. Turner.  That made four.  Do you in fact know where the other two rounds, or what happened to the other two rounds?

AG:  I don't know what happened to the first one, but the second one, Ken, when he robbed the bus station, he said that he had fired one and then missed the old lady and hit something.

TA:  Now you're in reference to the robbery that Kenneth did at the Greyhound Bus Station?

AG:  Yes sir.

TA:  That one was on the 29th of April, approximately eight o'clock in the morning.  I've got the report here.  In fact, somebody did rob them with a hand gun.  Course in the report, there's nothing says anything about where a shot was fired, but you're saying that Kenneth told you he fired a round after that robbery, or during that robbery?

AG:  Yes sir.

TA:  Okay Alford, is there anything else that you want to say, while we're still on tape here?

AG:  I'm sorry all this happened.  I should have been, it shouldn't
have happened to me.  And I'm sorry I did all of it.  I promise, no
matter what happens or how long I go to prison or if I do get the
electric chair, whatever I get coming, I think I got it, I think I
deserve it and I just want to say to his family that I'm, I'm sorry
and I know how they feel, cause I never, I grew up without my dad
around me and I know how his little kids going to feel and I'm sorry.

TA:  Alright, it's ten minutes after one.  At this time we're
concluding the interview.

255

5915    Respondent's Exhibit E

TAPED SWORN STATEMENT WITH JOANN REAMS

CONDUCTED BY DETECTIVE LIEUTENANT MACK COOK

MC:  Mack Cook
WJ:  Wayne Juneau
JR:  JoAnn Reams

MC:  My name's Lieutenant Cook.  We're at the Pine Bluff Police
Department Detective office.  The date's 5-10-93.  It's nine minutes
to ten in the evening.  Present is Mr. Wayne Juneau, of the Jefferson
County Prosecutor's Office.  Also, JoAnn Reams.  Ms. Reams, would you
state your address?

JR:  1003 West 3rd.

MC:  And are you known by another name?

JR:  Nick name, Ruby.

MC:  So they call you Ruby Reams and JoAnn Reams?

JR:  Family members.  Only family members.

MC:  Okay, Mr. Juneau.

WJ:  Ms. Reams, raise your right hand please.  Do you swear to tell
the truth and nothing but the truth, in the matter before you today?

JR:  Yes, I do.

WJ:  Okay, we've just explained to you that you've taken an oath.  The
same oath you would take if you were in front of a Judge and a Judge
swore you in at a jury trial, do you understand that?

JR:  Yes, I do.

WJ:  You understand that you're subject to the penalty of perjury,
should you make a false statement?

JR:  Yes

WJ:  And you understand perjury is a felony offense and you can go to
prison for making a false statement today?

JR:  Yes

WJ:  Okay.

256

MC:  We're investigating a homicide that occurred at Worthen Bank, down town at the automatic teller machine, which we call the ATM machine.  I understand that there's a young man living with you, at 1003 West 3rd.  What is his name?

JR:  Kenneth Reams.

MC:  Is he related?

JR:  That's my nephew.

MC:  Okay, I want to ask you about a week or so ago, one evening at your house.  Can you tell me anything about a, a gun or something that Kenny showed up with?

JR:  Yes, my nephew told me that he had a gun and we was outside and he showed it to me and I asked him could I feel it and then I got the gun and then I asked him can I shoot it and I shot it one time up in the air and then I gave it back to him.

MC:  Describe the gun to me the best you can remember.

JR:  It was all black, what I could see.  I guess it was about like a 38.

MC:  Was it a big one or a little one?

JR:  I've seen smaller guns than that before.  It was, it was small, medium, medium size.

MC:  Do you know very much about pistols?

JR:  No, not at all.

MC:  Need to speak up.

JR:  Not at all.

MC:  Did he have a holster with it?

JR:  I don't know.

MC:  What did he do after he got the gun back?

JR:  Like I said, when he got, when I gave him the pistol back, he opened up his jacket and just stuck it in there, so I don't know whether or not he had a holder or just put it in his pocket.

MC:  Okay, did ya'll take a walk after that?

JR:  Yes, we did.

MC:  Tell me what happened.

JR:  As we was walking, I'd say we was getting ready, we had crossed Cherry and 2nd, from the Convenience Store, called Quick Stop, and two, two men, two college men were walking and coming toward us and Ken said to me, Ruby, I ought to hit them.  They look like they got some money.  I ought to rob them, you know and I told him, I said, Ken, come on here.  I said, that man ain't got no money.  I said, you don't need to be doing them like that no way.  And that was it.

MC:  Did he have a pistol on him?

JR:  I believe he did, cause he had, like I say, he had just got through showing it to me.

MC:  Okay, several days passed and the night that the man was shot at the automatic teller at Worthen Bank, did you stay at home that night?

JR:  No, I didn't.

MC:  What time did you get home in the morning?

JR:  About ten minutes till seven.

MC:  Did you hear anything on the radio?

JR:  Yes, I did.

MC:  Okay, tell me what you heard on the radio.

JR:  I heard the announcement, saying that a man at ATM Teller Machine had just got shot.

MC:  Okay, talking about that night?

JR:  Uh huh

MC:  That night, so you pretty well know that was the following morning from the shooting...

JR:  Yes

MC:  Because of the radio?

JR:  Yes

MC:  Just go ahead and describe in your own words, what happened that morning.

JR:  Okay, I was at my table, ironing my clothes.  I had just put my kids in the bath tub.  I got through ironing.  I was getting ready to go take the kids they clothes and then all of a sudden, like I said, that's when I heard the announcer talking about the shooting and I stopped and I was looking at the radio, you know, toward that way, listening to it and Ken was standing up there at the radio and after they, after the man got through announcing, like I say, I went and

258

turned the radio off and Ken was crying.  And I asked him what was wrong with him and he wouldn't tell me.

MC:  Sunday, this past Sunday, which would have been the 9th, were you at home that afternoon or that day or the night?

JR:  Yes, I was.

MC:  Tell me about some jackets.

JR:  Well, like I said, I mentioned, I noticed the jacket's and like I said, I knew that he had one leather jacket and I noticed the jackets.  I said, oh, Kenny's coming up with all these sharp nice leather jackets and he picked up one of them and he said that this one is gangster style and he put it on.  He said, this one is gangster style.  And that was it.

MC:  How many jackets did you notice?

JR:  I think three.

MC:  You saw three coats?

JR:  I saw two for a fact, but I think he had another one.  I really didn't, I didn't just go and just start looking at it.

MC:  Did he have anything else other than the jackets?

JR:  No, that's it.

MC:  These are jackets that he hadn't had...

JR:  Since...

MC:  Or that you hadn't seen.

JR:  Right

MC:  Describe the jackets to me.

JR:  One of them look like a brown jacket coat like.  It got a hood on it.  It got a string on it, a string you tie it up with.  It got the buttons on it.  One of them is greenish yellow.  Them the only two I seen.

MC:  Okay, but you...

JR:  Them the only two I paid attention to.

MC:  You think he might have a third one, but you can't remember what it looks like?

259

JR: No, all I know is, I just, his leather jacket that he came with, was hanging up with another jacket and I didn't, never did look at that.

MC: After this morning that you heard this news cast and you said that Kenny started crying. Did anything else come up in the course of your being around in the neighborhood, that caused you to be concerned about, if Kenny had anything to do with this?

JR: Yes, a lot of people's was talking about it. One particular evening, a friend of Ken's, we was sitting on the porch and like I say, I had sense of what he had said to these, about these other two dudes be walking down the street, so I decided, you know, play like that I knew something about it and try to get some information out of this young boy named Jermayne and so I told him, I said, we was talking about the shooting and talking about the reward and all that and then I told him, I said, Jermayne, I said, ain't no sense in you playing. I said, I know Ken told you that he shot that man just sort of like that. I said, cause he told me, you know, just like that. And then, and then he said, yea.

MC: Had in fact, Kenny told you about him shooting?

JR: He didn't tell me.

MC: Who is Kenny's closest running mate right, right now?

JR: I don't know his real name, but they call him Butterball.

MC: Can you describe Butterball?

JR: He about 5'8", no, about 5'7", 5'6".

MC: Is he quite a bit taller than Kenny?

JR: Yea, yea.

MC: Does he live pretty close in the neighborhood?

JR: I think he lives down the street from my house.

MC: How much are they together?

JR: Every day.

MC: So they're pretty, pretty close friends at this point?

JR: Yes

MC: They run around together at night?

JR: Yes, like at the times I have been there, they always have been at, been at the house.

260

MC:  All, all kind of congregate at your house?

JR:  Yea

MC:  At 1003 West 3rd?

JR:  Uh huh

MC:  Mr. Juneau, you got anything?

WJ:  JoAnn, what made you think that Kenny shot this man?

JR:  Like I said, cause it was, cause of the, cause of the way how he had acted and we were walking down the street, about them two men and talking about robbing, shooting them and you know.  Well, he didn't say shoot them, but taking they money and I know he had the pistol and so and I know that when you robbing somebody, they going to automatically pull a pistol, if you got one or whatever.  And the crying he did when, when I heard the news and he couldn't never be still after that and lot of people talking and just some things that he just, little dirty rotten child, cold hearted.

WJ:  He is?

MC:  Did...

WJ:  Wait a minute Mack, I didn't quite understand what you meant. He's cold hearted?

JR:  Seem like it to me.

WJ:  Why is that?

JR:  The things he says to me.

WJ:  Like what?

JR:  We got in an argument.  He got mad at me, cause I told him that I didn't want all them boys all in my house and he got mad and started talking nasty to me.  I pulled them out of my house and when he was leaving, he was saying that I'm not none of his family.  Talking about if my momma died today, I wouldn't go to her funeral and all kind of mess like that.  Talking about, I don't care nothing about nothing, nobody.  Butterball the only friend, Butterball my family.  You ain't, ya'll ain't none of my family.  That's why I say it.

MC:  After the news on the radio that morning, when he was crying, did his old habits, did they change any?  Did he change his habits, like what he did, the hours he kept?  Did his disposition or personality change?  You said he acted different.

JR:  Well, like I said, I, I feel like he's a cool hard cookie.  He always have acted really excited.  That's how he really always have acted, strange.

WJ:   Do you know whether he carried that gun with him, from the first time you saw it, throughout that period of time?

JR:   Do I know worry?

WJ:   Did you, do you know whether he carried it on him?

JR:   Like I said, the first time I seen it and that was the last. Like I say, he got the gun and put it in the inside of his jacket.

WJ:   And you never saw it again?

JR:   Never did.

WJ:   How long was that before you heard about this shooting at the ATM?

JR:   A week before.

WJ:   One week?

JR:   Uh huh

MC:   Ms. Reams, how much are you at home?

JR:   Well, like I said, Ken had came there and, and like I say, he kept bringing all them boys to my house and I, he, I really hated to putt hem out, so I just started going over my boy friend house.

MC:   What you're telling me is, that you, over the past few weeks, that you haven't spent a whole lot of time there...

JR:   Right

MC:   At your house?

JR:   Right

MC:   I can't think of anything else.

WJ:   I can't either.

MC:   This concludes your interview.   It's five minutes after ten.



**State of Arkansas**

# ARKANSAS STATE POLICE

Post Office Box 5901 • Little Rock, Arkansas 72215

Bill Clinton • Governor    Colonel T.L. Goodwin • Director    Lt. Col. Richard C. Rail • Ass't. Director

May 14, 1993

CONFIDENTIAL

Sgt. Terry Hopson
Pine Bluff Police Department
200 E. 8th
Pine Bluff, AR

ARRANGEMENTS

At your request, MR. JERMAINE BROWN was administered a polygraph examination at
the State Police CID office in Pine Bluff, Arkansas on May 12, 1993 by Investigator
John Howell.

MR. BROWN was being tested to determine his knowledge or involvement in a homicide
which occurred in Pine Bluff, Arkansas on May 5, 1993.

PRE-TEST INTERVIEW

The pre-test interview was recorded on interview of witness form which will be
made a permanent part of this file.

EXAMINATION

MR. BROWN was administered two polygraph examinations, both of which consisted
of the You Phase Test Technique in which the following questions were asked,
along with other irrelevant and control questions.

Q-39.   Regardless whether or not you were there when GARY was shot, do you
        intend to answer truthfully each question about that?

A.      Yes.

Q-33.   On May 5th, were you at 5th and Chestnut when GARY TURNER was shot?

A.      No.

Q-35.   When GARY TURNER was shot on May 5th, were you there?

A.      No.

263

   Respondent's Exhibit E

264

Page Two


Polygraph Examination
Jermaine Brown
May 14, 1993


<u>FINDINGS</u>

The physiological responses noted on this subject's polygraph charts are in such a pattern as to indicate that the subject, MR. BROWN, has been essentially truthful in answering the above questions.

Based on information furnished this examiner, interviews with the subject, and evaluation of the subject's polygraph charts; it is the opinion of this examiner that MR. BROWN has been essentially truthful.


Respectfully submitted,

Inv. John Howell
Polygraph Examiner
Company "G"
Arkansas State Police

JH/lh

xc:   Case File #89-640-93

265



### State of Arkansas

# ARKANSAS STATE POLICE

Post Office Box 5901 • Little Rock, Arkansas 72215

Bill Clinton • Governor     Colonel T.L. Goodwin • Director     Lt. Col. Richard C. Rail • Ass't. Director

May 14, 1993

CONFIDENTIAL

Lt. Mac Cook
Pine Bluff Police Department
200 E. 8th
Pine Bluff, AR  71601

ARRANGEMENTS

At your request, MR. JERMAINE BROWN was administered a polygraph examination at the State Police CID office in Pine Bluff, Arkansas on May 12, 1993 by Investigator John Howell.

MR. BROWN was being tested to determine his knowledge or involvement in an attempted aggravated robbery on April 28, 1993 in Pine Bluff, Arkansas.

PRE-TEST INTERVIEW

The pre-test interview was recorded on interview of suspect form which will be made a permanent part of this file.

EXAMINATION

MR. BROWN was administered two polygraph examinations, both of which consisted of the You Phase Test Technique in which the following questions were asked, along with other irrelevant and control questions.

Q-39.   Regardless whether or not you attempted to rob a man at the Worthern teller machine on April 28th, do you intend to answer truthfully each question about that?

A.      Yes.

Q-33.   On April 28th did you attempt to rob a man at the Worthern teller machine?

A.      No.

Q-35.   Did you attempt to rob a man at the Worthern teller machine on April 28th?

A.      No.

265

Respondent's Exhibit E

Page Two


Polygraph Examination
Jermaine Brown
May 14, 1993


FINDINGS

The physiological responses noted on this subject's polygraph charts are in such a
pattern as to indicate that the subject, MR. BROWN, has been essentially truthful
in answering the above questions.

Based on information furnished this examiner, interviews with the subject, and
evaluation of the subject's polygraph charts; it is the opinion of this examiner
that MR. BROWN has been essentially truthful.

Respectfully submitted,

Inv. John Howell
Polygraph Examiner
Company "G"
Arkansas State Police

JH/lh

xc:  Case File #89-642-93

267

CRIMINAL INVESTIGATION DIVISION

ASP-3-A

DATE:            5-13-93
DICTATED BY:     INV. JOHN HOWELL
DATE TYPED:      5-14-93 LDH
COPIES TO:       SGT. TERRY HOPSON
                 PINE BLUFF POLICE DEPARTMENT

INTERVIEW OF WITNESS

JERMAINE BROWN
B/M  DOB: 12-21-72
1132 E. 2ND
PINE BLUFF, AR

MR. BROWN was interviewed at the State Police CID office in Pine Bluff, Arkansas at 12:16 p.m. on 5-12-93 by Inv. JOHN HOWELL.

The subject's rights were described to him on a CID 116 form. His responses were recorded on that form. A copy of the rights waiver has been forwarded to the Little Rock office to be made a permanent part of this file. After being advised of rights and signing the rights waiver, the subject gave the following information.

MR. BROWN stated to this investigator that on the evening of 5-6-93 ALFORD GOODWIN, AKA "BUTTERBALL" and KENNETH REAMS discussed doing a hit at GOODWIN'S residence. This investigator asked MR. BROWN what he meant by a 'hit' and BROWN stated that they talked about burglarizing some houses. The rest of the statement was essentially the same as given other investigators.

'E   BER: 89-640-93                         CRIME: CAPITAL FELONY MURDER

268

Respondent's Exhibit E

CRIMINAL INVESTIGATION DIVISION

ASP-3-A

DATE:            5-13-93
DICTATED BY:     INV. JOHN HOWELL
DATE TYPED:      5-14-93 LDH
COPIES TO:       LT. MAC COOK
                 PINE BLUFF POLICE DEPARTMENT

INTERVIEW OF SUSPECT

JERMAINE BROWN
B/M  DOB: 12-21-72
1132 E. 2ND
PINE BLUFF, AR

MR. BROWN was interviewed at the State Police CID office in Pine Bluff, Arkansas at 1 p.m. on 5-12-93 by Inv. JOHN HOWELL.

The subject's rights were described to him on a CID 116 form.  His responses were recorded on that form.  A copy of the rights waiver has been forwarded to the Little Rock office to be made a permanent part of this file.  After being advised of rights and signing the rights waiver, the subject gave the following information.

MR. BROWN stated that on the evening of 4-28-93 ALFORD GOODWIN, AKA "BUTTERBALL" and KENNETH REAMS told him that they attempted to rob a man at the Worthern teller machine at 5th and Chestnut.  He stated that the man got away, before they could get any money from him.  He stated that he was not there when this occurred.

FILE  NBER:  89-642-93                    CRIME: AGGRAVATED ROBBERY

269

 Respondent's Exhibit E

05/12/93

I Germain Brown give this state-
ment. On the 28th day of April, I, Germain Brown,
was at Kenneth Reams house on 1003 W. 3rd.
There with me was Phillip Curry, Willie Clay,
Steve Hudson, Kenneth Reams, & Alford Godwin. There
we were playing spades and drinking beer. While
doing so Kenneth said he needed money to
get back to St. Louis. So he said he wanted
to hold someone up. So Alford, (Butta Ball) said he needed
money too. ⬤ We talked about hitting houses first,
then Kene said that he needed money then, right now.
Butta Ball asked him what he wanted to do, and
Kene replied, "Hold someone up." He was saying he
wanted to catch someone in a car so he could
get money & a way back to St. Louis.
    So by that time it was 12:30 pm. ᴬᶠᵗᵉʳⁿᵒᵒⁿ I left
and went around the corner to my girlfriend's
house on Oak. I remained there until about
ᵐⁱᵈⁿⁱᵍʰᵗ 12:00 Am. I went to Steve's house and picked
him up. And we went back to Kene's house.
There we met Butta Ball & Kene. And about 5
minutes after we got there Phillip Curry arrived.
Then Butta Ball called me & Phillip into the
living room. Kene began to tell us how they
almost had some money. He said they had
a guy at the teller machine, he didn't
270 say what really happened but he did say

that they didn't get any money or
they couldn't take the car. So Steve walked
into the room and everyone got quiet.
Nothing else about the matter was said.

Witness: H. Mark Cook      X. Germaine Brown

Case #93-201

John Howell

271