**PROPERTY OF ARKANSAS SUPREME COURT/COURT OF APPEALS**

# SUPREME COURT CR-17-654

KENNETH REAMS                                                    **APPELLANT(S)**

V. JEFFERSON COUNTY CIRCUIT COURT

  JOHN W COLE

  35CR-1993-301

STATE OF ARKANSAS                                               **APPELLEE(S)**

26__ VOLUME RECORD LODGED

### *COUNSEL*

ATTORNEY GENERAL  APPELLEE COUNSEL

323 CENTER STREET, SUITE 200

LITTLE ROCK AR 72201


CORINNE IRISH  APPELLANT COUNSEL

30 ROCKEFELLER PLAZA

NEW YORK NY 10112


DAVID ROBERT RAUPP  APPELLEE COUNSEL

323 CENTER STREET, SUITE 200

LITTLE ROCK AR 72201


GEORGE KENDALL  APPELLANT COUNSEL

30 ROCKEFELLER PLAZA

NEW YORK NY 10112


JIN HEE LEE  APPELLANT COUNSEL

40 RECTOR STREET, 5TH FLOOR

NEW YORK NY 10006


JOHN WINFRED WALKER  APPELLANT COUNSEL

1723 BROADWAY

LITTLE ROCK AR 72206

RECORD FILED AUGUST 4, 2017

**STACEY PECTOL, CLERK**

BY RENEE R HERNDON, DEPUTY CLERK

Respondent's Exhibit E

VOLUME 22

Volume 22

TAPED SWORN STATEMENT WITH TAUHEED BROWN

CONDUCTED BY DEPUTY PROSECUTING ATTORNEY, WAYNE JUNEAU

**ORIGINAL**

WJ: Wayne Juneau
KH: Kenneth Heroman
MC: Mack Cook
TH: Terry Hopson
AH: Arless Hudgins

WJ: This is Wayne Juneau, Deputy Prosecuting Attorney. I'm in my office, at the Prosecuting Attorney's office, with Captain Kenny Heroman, Lieutenant Mack Cook, Sergeant Hopson and Arless Hudgins and along with us is Mr. Tauheed Brown. Mr. Brown, we've talked a little bit about you and I've explained that we're going to take a sworn statement. Do you agree to give a statement today?

TB: Yes sir.

WJ: Okay, raise your right hand please. Do you swear to tell the truth and nothing but the truth, in the matter before you today?

TB: Yes sir.

WY: You understand that you've just taken an oath. That oath would be the same oath as you would in a court of law.

TB: Yes sir.

WJ: And if you were in front a jury, testifying, ⸱      ⸱e the same oath. Do you understand that?

TB: Yes sir.

WJ: Alright, you understand that you are subject to the penalty of perjury, should you make a false statement today?

TB: Yes sir.

WJ: Alright, I'm going to let the officer's ask questions of you. During the time they ask questions, you are under oath.

TB: Yes sir.

WJ: Ya'll go ahead.

KH: Okay, this is Captain Heroman and we're here to talk with Tauheed Brown, in reference to a homicide that occurred on 5-5 of 93, the

272

Respondent's Exhibit E

victim being Gary Wayne Turner.   You have some information in
reference to that, Tauheed?

TB:   Yes sir.

KH:   Would you tell us what you heard, where you were and who you
heard say what they said?

TB:   Yes sir.   One night, it was, I guess it was about 10:30, close to
11:00, I, my girl friend and her niece, we were walking to the store
and okay, on the way back, we overheard, well, I overheard Butterball,
which is Alfred Goodwin, Kenneth Reams and Eddie Ringo talking about
an incident that happened.   I heard Kenneth say something about how he
was struggling with a guy.   How he tried to jump in the driver's side
and uh, to get the keys out and he was struggling with him and one of
them said, I don't know what was going on, so I shot.   So then they
walked on and they turned off and went to Butterball's house and
changed clothes.   Well, Butterball changed clothes there and by the
time we got there, Butterball and Kenneth walked, were on their way
back around, going to Kenneth's house.

KH:   Okay, you said that they were talking about an incident.

TB:   Yes sir.

KH:   When did that incident happen?   Was it the same night?

TB:   Yes sir.

KH:   How do you know it was the same night?

TB:   Because earlier, before we walked to the store, we saw the police
pull over a guy in a car over by the Hundai Shop on 5th Street and he,
we heard the police tell the news lady to go back down by the
automatic teller machine, cause that's where she could get more
information.   So we walked on and walked to the store and like I say,
by the time we were getting back from the store, that's when we met up
with them, Butterball and Kenneth and Eddie Ringo.

KH:   Okay, where were these three?   Were they all three together when
you first saw them?

TB:   No sir, it was just Butterball and Kenneth together first.
That's when they saw Eddie Ringo, right in front of Pine Bluff News.

KH:   Okay, you said that one of them said that he was trying to get
the keys and struggling.

TB:   Yes sir.

KH:   And then you heard, that I shot.

TB:   Yes sir.

(Brown-Interview)
2

Respondent's Exhibit E

KH:  Who said that they were trying to get the keys and struggling, which one?

TB:  Kenneth Reams said he jumped in the driver's side.  The door wasn't, wasn't open, so he jumped through the window, trying to get the keys out the ignition and he said they were struggling and all I know is somebody said, I shot.

KH:  Do you know Kenneth made that first statement?

TB:  I know, I know he made that first statement.

KH:  Could Kenneth have also said, I shot?

TB:  He could have.

KH:  Could Butterball have said that?

TB:  Either one of them could have said it.

KH:  Could Eddie have said it?

TB:  Yes sir.

MC:  Tauheed, what do you remember that, how Kenneth was dressed that night?

TB:  I know he had on some black pants.  I don't remember what kind of shoes, but I know he had on a black cap.  I don't remember what kind of shirt he had on.

MC:  Okay, how was Butterball dressed?

TB:  Butterball had on some light short pants, a gray sweater like, with a hood on it and I don't know if he had a cap or not.

MC:  Okay, how was Eddie Ringo dressed?

TB:  In some khaki pants and I don't remember what kind of shirt.

MC:  Were they short pants?

TB:  Yes sir.

MC:  And how long have you known Kenneth Reams?

TB:  I've known him for about a month and a half or two months now.

MC:  You've been over on occasion and had a cook out or something, where he was present?

TB:  Yes sir.

274

(Brown-Interview)
3

Respondent's Exhibit E

MC:  Is he related to any of the young ladies that you were with that night?

TB:  No sir.

MC:  Who is his Aunt?

TB:  That's who he lives with, over on 103 Barraque, I mean 103 Poplar.

MC:  He lives at 103.

TB:  1003 Poplar.

MC:  1003 Poplar Street?

TB:  Yes sir.

KH:  Near 10th and Poplar?

TB:  No sir, it's right there on 3rd.  Right there on the corner of 3rd.

MC:  Okay, so that's what I was trying to get.  He lives right there real close to South Shore Apartments, right in that area?

TB:  That's where I had seen him, yes sir.

MC:  Okay, so it would be basically, 103 Poplar?

TB:  Yes, 1003 Poplar.  It's right there on the corner.

MC:  How long have you known Butterball?

TB:  I've known Butterball for a while.

MC:  Are you presently dating or going out with a relative of his?

TB:  Yes sir, his sister.

MC:  Okay, so you know him pretty well?

TB:  Yes sir.

MC:  Where, where is he living?

TB:  On oak.  I don't know exactly the address, but it's between 3rd and 4th and Oak.  Okay, the Pine Bluff Commercial is in front of their house and there's a house on each side of his house.

MC:  You mentioned that you have seen one of the guys with a hand gun.

TB:  Yes sir.

MC:  Who was the guy that you saw with a hand gun?

(Brown-Interview)
4

:275

Respondent's Exhibit E

TB:  Kenneth Reams.

MC:  Did he tell you what kind of gun it was?

TB:  Yes sir.

MC:  Would you tell us what he told you?

TB:  He just said it was a 32.

MC:  When did you see this, see this gun?

TB:  The next day.

MC:  You talking about...

TB:  After the incident.

MC:  The day after...

TB:  After the incident, yes sir.

MC:  The day after the incident, you saw him with this gun.

TB:  Yes sir.

MC:  Would you describe it to me?

TB:  The gun was a dull gray looking gun.  I, I, I know it was a revolver, cause I know how a revolver looks and a automatic, but it was a dull gray looking, like it had been stored up or somewhere, like it was kind of rusty like.

MC:  How, how long was the barrel, do you recall?

TB:  I don't remember how long the barrel...

MC:  Was it real short or real long?

TB:  I couldn't tell you.

MC:  Did you hear about another incident that this Kenneth Reams was involved in, prior to this shooting at the ATM Machine?

TB:  Yes sir.

MC:  Could you tell us about that?

TB:  One morning, I was walking my girl friend's son to the bus stop and Kenneth Reams was telling me that he was getting ready to go down to the bus stop and rob them, so I saw him about ten minutes later. He said that he wasn't going to do it yet.  He was going to wait until about noon, so and that was the last I heard of that.  He told me that he got a hundred dollars after he did it, though.

276

(Brown-Interview)
5

Respondent's Exhibit E

MC:  So you talked with him after...

TB:  Yes sir.

MC:  Whenever after he told you that...

TB:  Yes sir.

MC:  How long ago was, was this, that you talked with him about the robbery at the bus station?

TB:  I guess it was about two to three weeks.

MC:  Okay, have you had an occasion to be with them since, since this happened at the ATM machine, where they're all together?

TB:  Well, Kenneth and Butterball were not with Eddie Ringo.

MC:  Well tell me about that, what you saw and heard then.

TB:  They wasn't talking about it then.  That's the day we had the barbecue, Friday and Saturday.

MC:  And nothing was mentioned, that you heard?

TB:  Nothing was mentioned about that I heard.

KH:  Were you over on Oak Street when the police came by?

TB:  Yes sir.

KH:  You were?

TB:  Yes sir.

KH:  What was said?

TB:  They were asking questions if anybody know of what happened and everybody was just looking like, no, we don't know what happened.  And then Ms. McLemore, which is Butterball's mom, said, I don't care if it was my son, I would turn him in.  So that's when Adrian and Stacy said, well, I guess we'll be telling on Uncle Butterball.

KH:  Who was there when, when Adrian and Stacy said that, who was there?

TB:  Butterball's mother and his brother and me.

KH:  Who's his brother?

TB:  James, I don't know his last name.  They call him Junior.

KH:  How long had the Detectives been gone, when Adrian and Stacy made that statement?

TB:   They, I don't even think they were gone yet.

KH:   They weren't even gone?

TB:   They weren't even gone.

KH:   Did they say it where the Detective's could hear it?

TB:   They said it and then they started laughing about it, like it was a joke or something.

KH:   How tall is Kenneth Reams?

TB:   He's about 5'7" or 5'8".

KH:   Okay, why don't you stand up, okay?  Is he taller than me?  He's not as tall as I am?

TB:   He's about that tall.

KH:   Okay, okay.  So he's about to my shoulder, right?

TB:   Yes sir.

KH:   Okay, how much does he weigh?

TB:   I would say he weigh about one forty.

KH:   Is he dark skinned, medium, light?

TB:   Light, he's light skinned.

KH:   He's light skinned?

TB:   Yes sir.

KH:   How old is he?

TB:   Seventeen or eighteen.

KH:   Does he have a mustache or beard or...

TB:   A real light mustache, like real fuzzy.

KH:   Okay, light mustache or light beard?

TB:   Light, light beard.

KH:   Describe Butterball to me, or Alfred.

TB:   Butterball, he's about 6 feet.  He's dark skinned and he has a mustache, kind of, kind of dark.

KH:   Dark mustache?

278                        (Brown-Interview)
                               7

TB: Yes sir.

KH: How much does he weigh?

TB: About one fifty something, I'm not sure.

KH: How much do I weigh?

TB: I would say about one fifty, one sixty.

KH: One fifty or one sixty?

TB: Yes sir.

KH: Butterball's about my size.

TB: Yes sir.

KH: Describe Eddie.

TB: Eddie, he's short and I would, he's a little taller than Kenneth though.  He has a tall hair style.  He's got one of those box like hair styles.  He wear glasses.  He don't have a beard or a mustache, but one of his teeth are messed up, like crooked, in his mouth.

KH: ·He's, he's taller than Kenneth, but he's not as tall as Butterball?

TB: But he's shorter, right.

KH: How much does he weigh?

TB: He would weigh about one forty five to one fifty.

KH: Dark, medium, light complected?

TB: Medium

KH: Medium?

TB: Yes sir.

KH: Mack

MC: Where does Kenneth keep that gun, do you have any idea?

TB: No sir.

MC: But you saw him, he had it on his person?

TB: Yes sir, I have.  I saw him when he had it on him.

MC: The only other question I've got is, Tauheed, you know, you contacted the Detective office....

TB:  Yes sir.

MC:  With this information.  Why did you do it?

TB:  Well, I, I don't know how some people feel about it, but I felt
that that was cold blooded, how it was done, you know.  Cause it
looked, the way it looked, is like they just went up there and shot
him, just, just to be shooting, cause they didn't take no money, no
nothing.  That, at least that's what the paper is saying, but I don't
know.  Then I, then I got to thinking about that I need some things
for my baby, cause I don't have a job right now and that would help me
out a lot.

MC:  Okay, so you're telling me, number one, that you did it because
in your heart, you knew it wasn't right?

TB:  Yes sir.

MC:  And number two, the money could help your child?

TB:  Yes sir.

MC:  I have nothing further.

KH:  I've got one more question for you and I want you to be sure
about this when you answer.

TB:  Yes sir.

KH:  Did you say that Butterball was wearing a gray sweater with a
hood?

TB:  Yes sir.

KH:  And you're sure of that?

TB:  I'm sure.

KH:  Okay

WJ:  Wait a minute, I've got, let me ask you a couple of questions.
What time, about what time of night did this conversation that you
over heard, take place?

TB:  It was about 10:30 or close to 11:00.

WJ:  How do you know the time?  Why would you know the time?

TB:  Because we were trying to catch the store before it closed.

WJ:  What time does the store close?

TB:  Twelve

(Brown-Interview)
9

Respondent's Exhibit E

KH:   And they knew who you and Stacy were?

TB:   Yes sir.

KH:   Okay

WJ:   Is that all the questions you have?  Okay, Tauheed, you understand that you've been under oath during, during your statement?

TB:   Yes sir.

WJ:   Is there anything you want to change or clarify?

TB:   No sir.

WJ:   Everything you've told has been the truth?

TB:   Yes sir.

WJ:   Well, that will conclude this statement then.  Thank you.

(Brown-Interview)
13

281

Respondent's Exhibit E

Respondent's Exhibit E

TAPED SWORN STATEMENT BY STACY BOOKER

CONDUCTED BY DEPUTY PROSECUTING ATTORNEY, JOHN CONE

JC:   John Cone
JB:   James Bacon
SB:   Stacy Booker

JC:   Raise your right hand.  Do you solemnly swear to tell the truth
and nothing but the truth, so help you God?

SB:   Yes

JC:   State your name please.

SB:   Stacy Booker.

JC:   Miss Booker, I just spent about twenty five minutes talking to
you and explaining to you, how under Arkansas law, that as a Deputy
Prosecuting Attorney, I have the authority to bring you, have you come
down here and take a Sworn Statement from you, is that correct?

SB:   Yes

JC:   I explained to you, that under the law of the State of Arkansas,
that if you committed, if you take an oath, just as you did, and
knowingly tell me something, tell me a lie, tell me something that you
know to be a lie, you will have committed a crime, do you understand
that?

SB:   Yes, I do.

JC:   And you now understand that you're under oath and you're under
penalty of perjury?

SB:   Uh huh

JC:   State your name for me, once more.

SB:   Stacy Booker.

JC:   Where do you live, Miss Booker?

SB:   314 Oak.

JC:   And you've lived in, how old are you?

SB:   Twenty five.

Respondent's Exhibit E

JC:  You've lived in Pine Bluff all your life?

SB:  No

JC:  Where all have you lived?

SB:  New Orleans and Milwaukee.

JC:  How long have you lived here in Pine Bluff, the last time you came back?

SB:  Last year, I've just been back this year.

JC:  You stay, I believe you said, when we were discussing this earlier, you stay with your mother?

SB:  Yes

JC:  And your brother, Alford...

SB:  Goodwin

JC:  Goodwin, lives there?

SB:  Uh huh

JC:  He also goes by the nick name of Butterball?.

SB:  Uh huh

JC:  I asked you also, if you knew a fellow by the name of Kenneth Reams and you said that you did?

SB:  Yes

JC:  Today is May the 12th and it is now, at this time, approximately 6:52 P.M.  We're down here at the Pine Bluff Police Department Detective Office.  As I talked to you before we started the tape, you told me that you had first met Kenneth Reams, you remembered the date even.  It was April the 8th.

SB:  Uh, yes.

JC:  About a month and four days ago?

SB:  Uh huh

JC:  Why was it that you remembered the date?

SB:  Cause that's the day my mother and them left and went to Milwaukee.

JC:  Can you remember what kind of a day that was?  Monday, Tuesday, Wednesday, Thursday, Friday, Saturday?

283

(Booker-Interview)

5945

Respondent's Exhibit E

SB:  It was Thursday.

JC:  Best you can remember?

SB:  Uh huh

JC:  And Kenneth Reams, how, this you say, is the first time you ever saw him.  How did you, describe to me what happened that first time you saw him.

SB:  Momma asked Butterball who was there, cause that was my first time seeing him.

JC:  So he came over to the house where you were staying?

SB:  Uh huh

JC:  Your mother's house?

SB:  Yes

JC:  Who all was there, besides you and your brother, Butterball?

SB:  My little boy.

JC:  How old is he?

SB:  Six

JC:  Did you have much of a conversation with Kenneth Reams?

SB:  No

JC:  Today, like I said, is May the 12th and the time we're talking about is about a month and four days ago.  In that last month and four days, how often have you seen Ken Reams?

SB:  Mostly every day.

JC:  You're saying then, that he was a pretty good friend of your brother, Alford?

SB:  Uh huh

JC:  He was over at your house almost every day?

SB:  Uh huh

JC:  Did you ever date or go out with Ken?

SB:  No

JC:  Did you ever have any long conversations with him?

SB: No

JC: Did you ever see Ken Reams with a gun, at your house?

SB: No

JC: Any sort of a gun?  A rifle, a shotgun or a pistol?

SB: No

JC: Have you ever seen your brother with a gun?

SB: No

JC: Now I'm going to ask you in particular, today again is May the 12th.  The shooting incident that occurred one week ago today, which would have been May the 5th, at approximately eight o'clock at night, between eight and nine o'clock at night, I asked you if you knew where your brother was on that night.

SB: Uh huh

JC: Tell me about, was Ken, Ken Reams at your house that night?

SB: Uh huh

JC: About what time did he get there?

SB: Let's see, the game came on at eight o'clock.  They was sitting up there at eight and then they left.

JC: Let me stop you for a second.  What game came on at eight o'clock?

SB: A basketball game.  I don't know who was playing, but it was a basket ball game came on that night.

JC: And it started at eight o'clock?

SB: The game?

JC: Yea

SB: Uh huh

JC: How long had they been there, before the game came on?

SB: They was there before the game came on.

JC: Okay, about how long?

SB: About, I'd say they was there about twenty minutes.

JC: Do you have any idea where they were until they showed up at the house at twenty minutes till eight?

285

SB:   No

JC:   So they showed up, your brother and Ken?

SB:   Uh huh

JC:   Did they have anyone with them?

SB:   No one, no one, nobody but them.

JC:   You saw no one else that night?

SB:   No, wasn't nobody there but me, him and Ken.

JC:   Do you know a fellow by the name of Phillip Curry?

SB:   Phillip Curry, no.

JC:   Never met anybody by that name?

SB:   Huh uh

JC:   And he wasn't there that night?

SB:   No

JC:   Was your little boy there that night?

SB:   No, he was around to my sister house.

JC:   So what were you doing, before they showed up?

SB:   Nothing, sitting up in the window.

JC:   So they came in.  Did they tell you where they had been?

SB:   No, all they did was sit down and say the game was fixing to come on.

JC:   But you cannot remember what, what game it was?

SB:   No, all I know is a basket ball game.

JC:   Were you sitting there with them when they turned the...

SB:   Uh huh

JC:   The t.v. on?

SB:   Uh huh

JC:   Who turned the t.v. on?

SB:   It was already on, cause I was, I was there.

JC:  Okay, did they have to turn the channel?

SB:  No

JC:  Okay, then what channel was it on?

SB:  Four

JC:  So you're saying a basket ball game had started at Channel Four, at eight o'clock?

SB:  Uh huh

JC:  No one else was there?

SB:  No one else.

JC:  And you're sure of this and you're swearing to it, under penalty of perjury, you're telling the truth?

SB:  Well, then after they left.

JC:  Now wait a minute.  I haven't got to that yet.

SB:  Oh, okay.

JC:  We just turned the, the game came on.

SB:  Uh huh

JC:  It's a basket ball game and it's Channel Four.

SB:  Uh huh

JC:  Okay, and there's nobody there but you, Ken and your brother?

SB:  Yes

JC:  How long did they watch the basket ball game?

SB:  At least to about to eight fifteen.

JC:  Fifteen minutes is all they watched the game?

SB:  Uh huh

JC:  And yet they came to your house, just specifically to watch it and they only watched it fifteen minutes?

SB:  Uh huh

JC:  Why did they leave?

SB:  I don't know.

237

(Booker-Interview)

5949

Respondent's Exhibit E

JC:   Well, surely they said something.

SB:   You think they actually going to say something?

JC:   Well, you say that they came in and said, the game's about to
start.   Then they started watching the game and a basket ball game
lasts an hour to two hours.

SB:   I know that.

JC:   And they got up at eight fifteen?

SB:   Uh huh

JC:   And what did they do?

SB:   That's what I say, they walked around towards Ken house.   Then
Ken didn't come back.   Then Butterball came home.

JC:   Alright, about what time did he get back?

SB:   Butterball?   Eight thirty.

JC:   What did he do when he got back to the house?

SB:   Nothing, he walked over to, alright, somebody had got stopped on
5th Street, so me...

JC:   Wait, wait, wait, now this is eight, they left at eight fifteen.
Can you remember what he was wearing that night?

SB:   Uh, some green shorts and a black shirt.

JC:   Green shorts and a black shirt.   Do you remember what Ken was
wearing that night?

SB:   He was wearing some blue jeans, some blue jeans and a black shirt
with some writing in, in the front.   I think it said, cross colors.

JC:   So they left about eight fifteen and you say your brother got
back at eight thirty?

SB:   Uh huh

JC:   Did he leave your sight during that fifteen minutes or could you
see him?   You say he walked towards Ken's.   Did he walk so far that
you couldn't see him?

SB:   No, I seen which way they went.   Towards Ken house.

JC:   Well, how far, how long does it take to walk from your house to
Ken's house?

SB:   Cause, well...

(Booker-Interview)
Respondent's Exhibit E

288

JC:   Just, just inaudible.

SB:   Well, that's like, well, five minutes.

JC:   So five minutes, he walked over there.  He stayed five minutes and then he took five minutes to walk back?  He got back in the house at eight thirty?

SB:   Uh huh

JC:   And this is the Wednesday night, the night that the shooting took place?  And you're telling me that you later heard some police cars or something?

SB:   Some police cars had stopped this car and arrested two guys.  It was a blue car and so me and Butterball and my next door neighbor walked down there and my friend guy that had came over.

JC:   So who's the next door neighbor that walked down with you?

SB:   Her name's Virginia.

JC:   Virginia what?

SB:   Wilkins, Wilkins I...

JC:   And what side of the street does she live on?  What's her address:

SB:   She stay next door.  I don't know the address, but I know she, she's next door to us.

JC:   What is your address?

SB:   314

JC:   She's on the same side of the street that you're on?

SB:   Uh huh

JC:   And her name is Virginia Wilkins?

SB:   Uh huh

JC:   And what time was it that the three of you walked down to see that?

SB:   Oh, it had to be going on at least nine o'clock.

JC:   So when Butterball walked back at eight thirty, did ya'll both sit there and watch the basket ball game?

SB:   No, we sat outside.  It was me, him and this boy named Jermaine.

JC:   Who?

289

8

Respondent's Exhibit E

SB:  Jermaine

JC:  Jermaine?

SB:  Uh huh

JC:  Jermaine who?

SB:  Brown

JC:  How do you know Jermaine?

SB:  Cause he came over.

JC:  Did you know him in years past?

SB:  Huh uh

JC:  You've never met him before that night?

SB:  Uh huh

JC:  Okay, how long had you known him?

SB:  Let's see, I met him, I've been knowing him for like two months now.

JC:  Okay, so you met him about a month before you first met Ken?

SB:  Yes

JC:  Jermaine, did you date Jermaine or go out with him?

SB:  Yes

JC:  Was he showing up for a date that night?

SB:  Well, he came over here, but we didn't go out on no date.

JC:  Let me ask you this.  Did he show up while Butterball was gone, or was it after Butterball came back?

SB:  No, Butterball was there.

JC:  So it would have been after eight thirty, but before nine o'clock?

SB:  Uh huh

JC:  So Butterball comes back, you're there, the two of you are there together, Jermaine comes up.

SB:  Uh huh

JC: And some time later a woman by the name of Virginia, your next door neighbor, how did she get over there?

SB: Cause she the one came, she the one came and I was standing outside. She said she heard some gun shots. She said she heard two gun shots. And then she seen the, a lot of police out there, so me and her and Jermaine and Butterball walked over there.

JC: And Jermaine and Butterball never said a word to you about anything? You had no idea what was going on?

SB: No

JC: Okay, when you walked over there, what did you find?

SB: Nothing, but the police was arresting some, some guys that was in a car and he was searching the car and there was a Pine Bluff Commercial woman over there, trying to get notes, ask what happened. But we had just walked down there and there was some old man down there. He said he had heard the shots too. He said it was two shots and he was out there too, looking. That's why he had came out.

JC: Did you actually go down to where the money machine is, where the shooting took place? You know where that is, between...

SB: Uh huh, but we wasn't down there. This, this, where we walked to is right there across the street from Smart Chevrolet.

JC: How far is it from, you know where the money machine is?

SB: Uh huh

JC: It's on 5th Street, between Pine and Chestnut.

SB: Uh huh

JC: How far is that from your house?

SB: I'd say that's about three, four blocks.

JC: Four blocks? What street, it's on 5th Street, what's the street going East and, or, yea, East and West would you be on, 4th, 5th, 6th? Which one runs closet to your house?

SB: 4th

JC: 4th?

SB: Uh huh

JC: So you're one block down and how far off to the West, how many blocks, three blocks off to the West, four blocks off to the West?

291

SB:  I, well, I thought it was five, cause that's a long ways from my house to, over to that Bank.

JC:  Okay, about five blocks?

SB:  Uh huh

JC:  Is that the direction that your brother, Butterball, was walking when he left with Ken?

SB:  No

JC:  What direction was he walking?  That would have been to the East, right?  To get to the money machine, he'd have had to gone East.  You understand what I'm saying?

SB:  Uh huh

JC:  If this is your house here, the money machine is here.  And he didn't, he didn't walk in this direction?

SB:  No

JC:  Did he go South, West or North?

SB:  He was going back towards North way.

JC:  Okay and he wasn't gone but fifteen minutes?

SB:  Yes

JC:  Okay, when the four of you got over and you heard these shots, you...

SB:  I didn't hear them.  My next door neighbor heard them, so...

JC:  Virginia heard them...

SB:  And so I said, come on, let's go walk over there and see what happened.

JC:  And how long had Jermaine been there at your house when that happened?

SB:  He had been there like ten minutes.

JC:  And when he was there, Ken was not there?

SB:  Huh uh, no.

JC:  Ken had already left?

SB:  Ken had already left.

JC: You never saw Jermaine, Ken and your brother together that night?

SB: No

JC: They were never talking with each other, watching t.v. or discussing anything?

SB: No

JC: You're saying that under oath?

SB: Uh huh, they was not together that night.

JC: When the four of you walked over and you say, you walked over and there was a car stopped by the police...

SB: Uh huh

JC: And there was an old man. Do you know that old man?

SB: No

JC: Do you know the lady from the...

SB: Commercial? No.

JC: What did she look like?

SB: She was short, brown hair. All she was trying, all she was trying to get was some information. It happened, it happened where the police stopped this car at, uh, she wasn't down there by the teller machine then. She was asking us do we know what happened? So we said, no, cause we just been down there. So she went on to one of the police and the police told her to go down to the Bank.

JC: Because that's where the shooting had taken place?

SB: Yea, I guess so.

JC: Did you hear him say that or not?

SB: Huh uh, cause she walked over there to them.

JC: When did you find out that the shooting had taken place there at the Bank?

SB: The next day.

JC: The next day when you read it in the paper?

SB: Uh huh

JC: So you read it in the paper the very next day after this happened?

293

SB:  Yes

JC:  So what did the four of you do then, when you were there and you saw these things and the lady, you talked to the lady at the Commercial and she left, what did the four of you do?

SB:  Nothing.  When the police took them guys to jail and so we just came, walked on back to the house and sat on the table outside.

JC:  How long did ya'll sit out there?

SB:  Well, my next door neighbor, she left and went home.  So then wasn't nobody left out there but me, Butterball and Jermaine.

JC:  Okay, how long did ya'll stay out there?

SB:  Oh, we sat out there till about ten thirty.

JC:  Then what happened?

SB:  Nothing, went in the house.

JC:  All three of you?

SB:  Yes

JC:  Okay, how long did you stay together in the house?

SB:  We didn't leave back out.

JC:  Jermaine spent the night there that night?

SB:  Uh huh

JC:  Never left again?

SB:  No

JC:  Okay and the next morning is when you read it in the paper, and you found out that the shooting had taken place?  Do you get the paper?

SB:  Yes

JC:  Okay, so it was on the front page of the paper?

SB:  Uh huh

JC:  Did you talk to Butterball or Jermaine?  Did either one of you say, hey, look what happened last night?

SB:  Huh uh

JC:  Did they say anything about it?

SB:   No

JC:   Detective Bacon, he's been here, also present during this interview.  Do you have anything else that you think needs to be asked?

JB:   You say, what did you say that Butterball was wearing this night?

SB:   Some green shorts.

JB:   What else?

SB:   A black shirt.

JB:   Okay, is that all he wore all day long?

SB:   Uh huh

JB:   Let's back up a week before that, two weeks ago, on the 28th. Did ya'll have a house full over there?

SB:   On the 28th?

JB:   Playing Spades?

SB:   At my house?

JB:   Yea

SB:   No

JC:   What would the 28th have been?

JB:   That would have been on a Wednesday.

JC:   Just about be...

JB:   Two weeks ago.

SB:   No

JC:   The Wednesday before this week.

JB:   You didn't have a house full over there, playing Spades, that night?

SB:   No

JC:   Ken, Ken Reams wasn't there and he didn't play, have you ever had, played cards with Kenny Reams?

SB:   Yes, but not in my momma house.

JC:   Where?

SB:   At uh, at uh, this boy named Steve's house.

JC:   Okay, was it at Steve's house that ya'll were playing cards two weeks before?

SB:   Uh huh

JC:   Who all was there?

SB:   It was Steve, Jermaine, Butterball, Ken and some more, I don't know them.

JC:   Okay, this boy Steve, this is the first time I've heard him mentioned, what's, what's his last name?

SB:   Hudson

JC:   Steve Hudson?

SB:   Uh huh, but we, we was playing cards outside then.

JC:   Okay, where is Steve Hudson's house located in relationship to your momma's?

SB:   Uh, he stays on, on Barraque.  I don't know the address.

JC:   Were you with Jermaine that night?

SB:   Uh huh

JC:   So it's pretty safe to say that in this last two months, you've been dating Jermaine?

SB:   Yes

JC:   Did either Ken or your brother, Butterball, or Jermaine, during that, that, not last week, when the shooting when you walked down to the, before that when you were over at Steve's house, playing cards, did they ever discuss robbing somebody or breaking in on somebody and stealing anything?

SB:   No

JC:   Never said a word about it?

SB:   Huh uh

JC:   You never heard them say it?

SB:   No

JC:   And you've never seen any of them with a gun?

SB:   Never

JC:  And this is all sworn.  You'll swear to this, this is the absolute truth?

SB:  Yes, it's the absolutely truth.

JB:  And the day after, or last Thursday, when you found out about the shooting at the money machine.

SB:  Uh huh

JB:  Nobody, Kenneth, Butterball, nobody has said anything to you about it?

SB:  No

JC:  What time is it?

JB:  It is 7:10.

JC:  7:10, so we're going to go ahead and end the interview, unless you can think of something that you wanted to add or subtract, one way or the other, about your statement.  Anything that's refreshed your memory while you've been talking?

SB:  No

JC:  Okay, I'm going to end the interview.

297

# Witness Subpoena

OFFICE OF

## The Prosecuting Attorney

Eleventh Judicial District
Jefferson County Courthouse
Pine Bluff, Arkansas

No. _____

The State of Arkansas to the Sheriff

or other authorized official of ____ Jefferson ____ County-greeting:

You are commanded to summon:

Stacy Booker
314 Oak
Pine Bluff, Ar.

to attend before the Prosecuting Attorney at ___ AS SOON AS POSSIBLE ___

Jefferson County Courthouse, Main & Barraque, Pine Bluff, Ar.

Arkansas on the __12__ day of __MAY__ A.D., 19_93_ at _1815_ A.M., P.M.

and testify in the matter of investigation then to be conducted by the said Prosecuting

Attorney growing out of a representation that _____ ha___

committed the crime of _____ in said County.

Witness my hand this __12th__ day of __May__ A.D., 19_93_.

WAYNE MATTHEWS
Prosecuting Attorney

By_____
Deputy Prosecuting Attorney

Respondent's Exhibit E

TAPED SWORN STATEMENT WITH PHILLIP DEWAYNE CURRY


CONDUCTED BY DEPUTY PROSECUTING ATTORNEY, WAYNE JUNEAU


WJ:  Wayne Juneau
JC:  John Cone
PC:  Phillip Curry

WJ:  This is Wayne Juneau, Deputy Prosecuting Attorney.  We are, I am at the Pine Bluff Police Detective's Office.  In the office with me today is Chief Deputy Prosecuting Attorney, John Cone and is your name Phillip Curry?

PC:  Phillip, yes sir.

WJ:  Okay

PC:  Phillip Dewayne Curry.

WJ:  You need to pull that chair up here, Mr. Curry and again you need to speak loud and clear, so that we can get your testimony on this tape.  You understand I'm going to swear you in.  The oath that you take will be the same oath as if a Judge gave it to you in a court room.  You understand that?

PC:  Yes sir.

WJ:  Okay, and you understand that you swear to tell the truth and that, should you make a false statement, knowingly lie on this tape, that you could be convicted of perjury.  Do you understand?

PC:  Yes sir.

WJ:  Do you know what perjury is?

PC:  No

WJ:  Okay, well, perjury is a criminal offense where a person knowingly makes a false statement under oath.  That's a Class D Felony and you can go to prison up to six years.

JC:  It's a Class C Felony and you can go from three to ten years.

WJ:  You understand?

PC:  Yes sir.

WJ:  Okay

Respondent's Exhibit E

299

JC:  Perjury means, in just a moment, when he swears you in and you swear to tell the truth, if you tell something that you know is a lie, you will have committed perjury.  Do you understand that?  Yes or no?

PC:  Yes sir.

JC:  You understand it's a Felony?

PC:  Yes sir.

JC:  Okay

WJ:  You know you have to answer loud on this tape, so we can pick up your, your testimony.  Raise your right hand.  Do you swear to tell the truth and nothing but the truth, in the matter before you today?

PC:  Yes sir.

WJ:  Okay, tell me your name and how old you are.

PC:  Phillip Dewayne Curry and I'm eighteen.

WJ:  Mr. Curry, you know we're here to investigate a crime of shooting, at the automatic teller machine at Worthen Bank on 5th Street.  You understand?

PC:  Yes sir.

WJ:  Okay, do you know something about that crime?

PC:  Yes sir.

WJ:  Do you know Ken or Kenny Reams?

PC:  Yes sir.

WJ:  What's his name?

PC:  Kenneth Reams.

WJ:  Do you also know a man who's nick name is Butterball?

PC:  Yes sir.

WJ:  And what's his name?

PC:  Alford Goodwin.

WJ:  Okay, how long have you known those two people?

PC:  I've known Kenneth since the seventh grade and I know Butterball all my life.

Respondent's Exhibit E

WJ: Are you familiar with an incident that happened on, I think it would have been the, April 27th, which would involve a burglary at ome dry cleaner's store?

PC: Yes sir.

WJ: Okay, tell us what you know about that particular burglary.

PC: Well, I was coming from home. I went over one of my friend's house and uh, Kenneth was there and he told me he had something to tell me or something to show me rather. So we walked down to his house and uh, you know, went in the house and he showed me the coats, some coats that he had gotten and a pistol and he told me that he broke in a cleaner's and got it.

WJ: Okay, who's house were you at when you met Kenneth Reams?

PC: At uh, Steven Hudson.

WJ: About what time of day was that?

PC: It was in the evening.

WJ: And you ran into Kenneth Reams there at Hudson's house?

PC: Yes sir.

WJ: He asked you to go to his house and he had something to show you?

PC: Yes sir.

WJ: Did ya'll walk to his house?

PC: Yes sir.

WJ: And when you got to his house, what, again, what did he show you?

PC: Some leather coats and a gun.

WJ: What color were the coats?

PC: Brown

WJ: And what kind of gun was it?

PC: A black gun.

WJ: Did you hold the gun?

PC: Yes sir.

WJ: Did it look like it was a revolver or an automatic?

PC: A revolver.

(Curry-Sworn Statement)
3

Respondent's Exhibit E                    301

WJ:  Do you know what a revolver and an automatic look like?

PC:  Yes sir.

WJ:  What color was the gun?

PC:  Black

WJ:  And where did Kenneth Reams say he got the coats and the gun?

PC:  From the dry cleaners.

JC:  Did he give you any information as to which dry cleaners it was?

PC:  Yes sir, the one located behind the high school track.  The Pine Bluff High School track.

WJ:  Okay, what did ya'll do after he showed you those, the gun and the coats?

PC:  We walked back around to Steve's house.

WJ:  Okay and who did you, who was at Steve's house when ya'll got back over there?

PC:  Same people that was there, but when we got there, we stood out in the yard for a minute, but everybody was getting ready to leave. So me, Jermaine, Butterball and Ken left walking and went around to Butterball's house.

WJ:  Now when you say Jermaine, who, who is that?

PC:  Jermaine Brown.

WJ:  Okay, ya'll went back to who's house?

PC:  Alford Goodwin.

WJ:  Who is Butterball?

PC:  Yes

WJ:  And then what, what did ya'll do there?

PC:  We just sat around for a minute.

WJ:  Then what happened?

PC:  And then we left.

WJ:  Where did ya'll go?

PC:  To the store.

(Curry-Sworn Statement)
4

5964    Respondent's Exhibit E

WJ:   Now who is, who is we?

PC:   Me, Butterball and Kenneth.

WJ:   Which store did you go to?

PC:   Shells

WJ:   There on the corner of...

PC:   Walnut and Barraque.

WJ:   What did ya'll do after ya'll went to that store?

PC:   Just walked around for a little while until it started getting dark.  Then we went back over to Kenneth's house.

JC:   When you got to Kenneth's house, was there anybody there?

PC:   No sir.

JC:   Does Kenneth, does he live in this house by himself, or do other people live in that house?

PC:   No, his Aunt stays there.

JC:   But there wasn't nobody there when you got there?

PC:   No sir.

*Plan*
*Lebury*
WJ:   Okay, what happened when you got to his house?  *(Reams house)*

PC:   Uh, we just sat around and talked for a minute and uh, and then came to a decision we want to do a robbery.

WJ:   And who's idea was it that, how did this subject of robbery come up?

PC:   Well, Kenneth brought it up, you know, he brought up we needed some money.  We need to hit a lick or something and Butterball, you know, he wanted to rob the liquor store.

WJ:   Which liquor store?

PC:   On Walnut.

WJ;   Okay

*uky's*
*idea to*
*b ATM*
PC:   But I said, no and then Kenneth wanted to rob Ritchey's.  I said, no.  So then I came up with the idea to rob the ATM Machine.  So after we sat there for a while, then that's where we went.

WJ:   Okay, where did ya'll go?

PC:  To the, to the building, behind the building across from the ATM Machine on 5th Street.

WJ:  Now, on the corner of that, there's a, I think, a law firm there?

PC:  Yes

WJ:  There's also a building that they're now tearing down.

PC:  Yes sir.

WJ:  Was that building being torn down at that time?

PC:  Yes sir.

WJ:  And where did ya'll go?

PC:  We sat right between there.

WJ:  Between what?

PC:  The two buildings.  The one being torn down and the other one.

WJ:  And a law firm?

PC:  Uh huh

WJ:  How long did ya'll sit there?

PC:  About a, it wasn't long before we saw a truck drive up and then, you know, we said, let's go, you know, there was somebody right there, so we walked across and uh, Kenneth had the gun, but he was scared to do it, so the man had left, so we went back across the street.  So we sat for a few minutes.

JC:  Let me ask you something, cause I've heard this before.  How close to the truck did ya'll actually get?

PC:  Well, we did it like, you know, we, the truck was at the teller, so we walked by, you know, and we got behind the teller like and stood there for a second like, come on, come on, let's do it, let's do it.  But we was scared like, so we didn't do it.  You know, the truck had drove on off.  So then that's when we went back across the street.

JC:  Okay

PC:  And sat for a few minutes and then that's when the next car came up.  So uh, Butterball said, give me the gun, cause Kenneth, he was scared to do it.  So that's when we went over there, jogged on across the street.

WJ:  You need to speak up.

PC: Jogged on across the street and then, you know, Kenneth went around the teller and came up to the front of the car and Alford went up beside it and I was up behind him and you know, he pulled the gun on him, say uh, you know, demanded money. Kenneth was trying to turn the car off and the dude just, you know, holding his hands up, saying, I ain't got no money, I ain't go no money.

JC: Did you ever remember the man saying anything about, I'll write you a check?

PC: A check?

JC: The man that's in the car, being robbed?

PC: Check, I don't know. They was just hollering, it was like just hollering and I was hollering too, telling them to come on, come on, you know. I couldn't, I couldn't hear every thing.

JC: Okay

PC: All I can hear was give me the money, I ain't got none, you know, like that.

WJ: Okay now, now let's take, stop just a minute. Where was, where was Butterball standing at the time, at that time?

PC: He was standing right at the driver's window, between me and Kenneth. Kenneth was at the front of the window and he was holding a gun on him. Kenneth was trying to reach in there and, you know, turn the car off.

WJ: Who was holding the gun?

PC: Butterball

WJ: And where was he holding the gun at, where did he have the gun pointed?

PC: I don't know, he was just pointing at the dude. I was standing at the back of the car, telling them to come on.

JC: Is Butterball standing between the ATM Machine and the car?

PC: Yea, all of us was.

JC: Okay

WJ: And Kenneth was trying to reach in the window?

PC: Yea

WJ: Is that what you're saying?

PC:  To turn the car off.  So dude, after while, dude just threw the car in gear and just took off.  You know, just snatching us off the car and stuff.  So then we, you know, ran on back to Kenneth's house. Well, we sat down for a little while, you know and rested up and then, you know, kind of, you know, thought about the motel.

WJ:  Which motel is that?

PC:  Econo Lodge, so...

WJ:  You need to speak up again.

PC:  Alright, so Kenneth said, we need some masks this time, so we got some stockings, put them on our head and stuff.  So this time I had the gun and I was going to do it and they was just going to, Ken was going to get the money and Butterball was going to look out for us. And uh, after we tried to do it, we couldn't, so we left.

WJ:  Why couldn't you do it?

PC:  Because the, we went in the first door, but the second door was locked.  So that's when we left.

WJ:  Where did ya'll go?

PC:  Well, we ran over to Olive Street and it was dark.  And we stood over there for a second, cause they wanted to go back, but, you know, I was telling them, no man, no.  They wanted to go back.  So we stood, I said, just wait for a while, just wait.  And we stood up there and then a police came up there, so we went on home then.

WJ:  Okay, and who's home was that?

PC:  Over at Kenneth's house.

WJ:  What happened when you got to Kenneth's house?

PC:  We just, you know, we just sat down and stuff, you know, trying to cool off and that's...

WJ:  Was there any conversation about robbing another place at that time?

PC:  Yes sir.

WJ:  What was that?

PC:  You know, Kenneth just said, man, we messed up, we messed up man.  He said, I'm going to hit the bus station tomorrow, I don't care what nobody says.

WJ:  He says what now?

PC:  He going to hit the bus station in the morning.

(Curry-Sworn Statement)
8

Respondent's Exhibit E

WJ:   Okay

PC:   So early that morning...

WJ:   Well, did you stay there that night?

PC:   Yes sir, I spent the night over there.

JC:   Did Butterball spend the night there?

PC:   Yes sir.

JC:   Okay

PC:   And uh, then after that, you know, he went and robbed it.

WJ:   Well, what happened when you woke up that morning?

PC:   Well, he said he just got up. Kenneth had got up and he said, man, I'm fixing to go, I'll be back. We said, where you going? He said uh, I'm going to go hit the bus station.

WJ:   Did you see him with the gun?

PC:   No, I guess he already had it in his pants or whatever and uh...

WJ:   You need to speak up and be a little clearer in what you're saying.

PC:   Alright

JC:   The reason we're asking you that, there's some people walking up and down the hall and coughing and every thing and that may drown you out, so...

PC:   Okay, so uh, he left and he went and robbed the station. When he came back, we was still, I was still laying on the couch.

WJ:   Where was Butterball?

PC:   He was on the couch asleep.

WJ:   Okay

PC:   And uh, he just came back, counting the money and he said, dang, I didn't get but ninety five dollars, a hundred or something. It was between ninety five and a hundred dollars.

WJ:   Did you see the money?

PC:   Yes sir.

WJ:   And what kind of bills was it?

PC:  Fives and ones.

JC:  How long was he gone from the time he said, I'm going, to the time he got back?

PC:  Dude got down there and back in about ten minutes and I ain't exactly sure, about ten minutes, cause I didn't believe he was back, he came back so fast.

JC:  But he had this wad of money?

PC:  Yes sir.

JC:  Did he have it in his hand?  Did he pull it out of his pocket?

PC:  No, he was pulling out his, when he got in the house, just started pulling it out of his pocket.  He counted it.

JC:  So you said you didn't believe he did it and you asked him, how did he say he did it?

PC:  He just say, I told ya'll I was going to do it.  You know and he came back, but then he say, you know, dang, didn't get but a hundred dollars, ninety five dollars, something.  It wasn't a lot of money.

JC:  Did he give you any details about what happened when he got to the Greyhound Bus Station?

PC:  Yes sir, he just say he walked in the back and when he walked in there, the lady turned around and said, what's you doing here?  He just told her, give, give me all your money, like that.'  And you know, she opened the thing and just start, you know, getting the money out and then he left, took off running.

WJ:  When he got back to the house with the money, did you see the gun?

PC:  Yes sir.

WJ:  Was that the same gun that he showed you?

PC:  Yes sir.

WJ:  Or was that the same, was that the same gun that he, that he said he got from that burglary at the dry cleaners?

PC:  Yes sir, it was the same one.

WJ:  Is that the same gun ya'll had the night before, at the ATM Machine and at the Econo Lodge?

PC:  Yes

JC:  Was Butterball awake?  Did he see him come in with the gun and the money?

(Curry-Sworn Statement)
10

Respondent's Exhibit E

PC: No, he was still asleep.

WJ: What happened then after, after he counted the money out?

PC: Well, nothing. He just sat in the chair and started watching t.v. and I sat there for a little while and then I said, I'm fixing to go to the house, you know and I left.

WJ: Did he keep all the money for himself?

PC: Yes sir.

WJ: You left then?

PC: Yes sir.

WJ: Where did you go?

PC: Home

JC: Where do you live, I mean, you're saying home, but this tape doesn't know...

PC: 720 East 2nd.

WJ: Okay, then when did you, when was the next time you saw Butterball or Kenny Reams?

PC: Next time I saw them was the day after the, the murder at the ATM Machine.

WJ: Had you talked to them over the phone or anything between this time? Between the time he robbed the bus station and you left, after he counted the money?

PC: No sir.

JC: Did you mention that, we talked to you a little bit before the tape started, that you thought you had bumped into them at the Shell Git-N-Go once and talked to them?

PC: Uh huh

JC: When did that happen, as best you can remember?

PC: When that happened, that was, yea, yea, that was it. Yea, I saw them again, but I ain't talk to them on no phone. I saw them at the station, the Shell station.

JC: Was that a day or two, or three days after the morning that you left, that he robbed the Greyhound? Can you remember about how long...

PC: It was a few days, cause it, it was like almost a week before I even went back down that way. Four or five days.

(Curry-Sworn Statement)
11
Respondent's Exhibit E

5971

309

JC:   And who all did you see?

PC:   I just seen Butterball and Kenneth.

JC:   And how long did the conversation that you had with them, last?

PC:   I didn't have a conversation with them.

JC:   What did you say to them?

PC:   We just spoke to each other and kept on walking.

JC:   The next time that you saw them then, is the day after the ATM shooting took place?

PC:   Yea

JC:   I want you to think back about the time that the ATM shooting took place.  When was the first time that you learned that there had been a shooting at the ATM.?

PC:   On the ten o'clock news.

JC:   You were at home?

PC:   Yes

JC:   What did you see on the ten o'clock news?  What did it show?

PC:   It showed the machine and the truck in front of it and all that stuff.

JC:   When you saw that at that particular ATM Machine, what did you think?

PC:   I was just saying to myself, you know, I hope that wasn't them, you know.  I was just hoping that it wasn't them that did it.

JC:   Did you go look them up the next day?

PC:   I wasn't looking for them.

JC:   Tell me how you happened to run into them then the next day.

PC:   I was riding with one of my partners.

JC:   Okay, describe the person that you were riding with.

PC:   It's my Aunt's boy friend's brother.

JC:   What's his name?

PC:   Cleodis

310

(Curry-Sworn Statement)
12

5972

Respondent's Exhibit E

JC:  What's the, this is the brother of your Aunt's boy friend. What's your Aunt's boy friend's name?

PC:  Gabriele.

JC:  I didn't hear...

PC:  Gabriele.

JC:  Gabriele?

PC:  Yea

JC:  And his last name?

PC:  Colbert

JC:  So you were riding with Cleodis?

PC:  Yea

JC:  About what time of the day was it?

PC:  It was in the evening.

JC:  Now tell me, or tell the tape there, what contact you had with Ken or Butterball or both, or either one.

PC:  When we was riding, we seen them at the apartments and I got out and talked to them.

JC:  What apartments are you talking about?

PC:  On Elm Street.

WJ:  Did Cleodis get out of the car?

PC:  No

WJ:  He stayed in, while you got out and talked to them?

PC:  Yea

WJ:  Who was there, who, who did the talking?  You, who was present? You and who else?

PC:  Butterball and Ken.

WJ:  Alright and did Butterball say anything to you about this robbery?

PC:  Yea

JC:  What did they say?

PC:   They said they got something to tell me.

WJ:   And what was that?

PC:   They didn't have to tell me, cause I, I told them I already know.

WJ:   So what did they tell you?

PC:   Nothing, they just say they ain't mean to.

WJ:   Well, did they tell you how it happened?

PC:·  Yea, say uh, you know, when they went up there to rob the dude,
Ken was trying to jump out in the car and stuff and turn it off and
dude was struggling with him and uh, Butterball say he couldn't see
what was happening and gun just shot.

WJ:   Okay, who had, who said they had the gun?

PC:   Butterball

JC:   Did both Butterball and Ken talk to you?

PC:   Yea, they was there.

JC:   No, did they both say things to you?

PC:   Ken wasn't hardly talking.

JC:   So most of the things that were said, were said by Butterball?

PC:   Yea

JC:   Is it Butterball that told you that Ken and this guy were
fighting and I shot or did Ken tell you that I was fighting with the
guy and Butterball shot?  Which one said, which one told you the
events or related it to you?

PC:   Ken, he said he was all in the car and stuff.  He said he just
heard a loud pop, you know.  That's all he had said.  And then
Butterball said, I told Ken not to, you know, get in between, you
know, the gun and the person, like that.

JC:   Did Butterball say that he shot?

PC:   Yea

JC:   Why did he say that he shot?

PC:   Cause he couldn't see what was happening.  You know, what was
going on.

JC:   What else was said?

312

PC:  That's it.

JC:  You didn't talk to them any more?

PC:  Yea, not about nothing like that, though.

JC:  Well, how long did you stand there and talk to them?

PC:  I didn't stay there long and talk to them.  I left.

JC:  Why?

PC:  Cause dude was blowing for me, was ready to go, ready to go.

JC:  You say the dude was blowing.  You talking about Cleodis blew the horn of the car?

PC:  Yea

JC:  Wanted you to get back in the car?

PC:  Yea

WJ:  Speak up, you need to talk a little louder.

JC:  See, the tape recorder can't pick you up.

PC:  Yea

JC:  So you're driving with Cleodis, it's the next day.  You see Ken and you see Butterball.  Did they wave you down or did you see them and make Cleodis pull over and go talk to them?

PC:  I pulled, I told him to pull over and let me out of there right quick.

JC:  So when you pulled over and got out and went over to talk to them, had they seen you?  Did they even know you were there, until you jumped out of the car and ran up to them?

PC:  No

JC:  They didn't wave to you in any way, like come over here?  You saw them and you had him pull over and you ran up to them.

PC:  Yea

JC:  What's the first words that were said to you?  Which one of them said something to you, Ken or Butterball?

PC:  Both of them.  They just said, we got something to tell you, like that.

JC:  What did you say to that?

PC:   I just told them, I already know.

JC:   So was it then Butterball or Ken that talked to you next?

PC:   Butterball

JC:   What did he say?

PC:   I just told you, man.

JC:   What did he say?

PC:   He just say, we did it, man.  And I told them, I already know.
Are you trying to get me to say did he shoot the man?

JC:   No, I'm just asking for you to remember.  You told me...

PC:   I'm telling what he say.

JC:   They said this or that.  I'm trying to get it down to which one
said it, that's all I'm trying to have you remember.  Which one said
what.  Cause you tend to run and you say, well, they said that.
Butterball said, we shot him.  You said, you don't have to tell me, I
know?

PC:   No, he didn't say we shot him.  He said, we did it.

JC:   We did it, okay.  What was the next thing that was said?

PC:   I just told them, I know, I already know.

JC:   Okay, then what was said?

PC:   That's basically it.  You know, after that, he told me what
happened and stuff and I left.

JC:   How, who told you what, about what happened?

PC:   They told me they was at the machine.

JC:   I don't want they.  I want you to tell me which person said what.

PC:   I don't know man.  I'm talking to both of them.  They told me
they was at the machine and uh, and then told me what happened.  They
tried to rob the dude and they got to struggling and the gun shot and
they left.

JC:   Did Ken tell you who did the shooting?

PC:   No

JC:   Did Butterball tell you who did the shooting?

PC:   He just say the gun shot.

314

(Curry-Sworn Statement)
16

Respondent's Exhibit E

5976

WJ:  Did Ken or Butterball say who had the gun during that robbery?

PC:  Yea

WJ:  Who said that?

PC:  They said, Butterball say he had the gun.  But he didn't tell me he shot him.  He just said, he just saying the gun shot.  They didn't say who shot him.

WJ:  But Butterball told you, during this conversation, that he was the one that had the gun during the robbery?

PC:  Yea

WJ:  And somebody said that Ken had tried to get in the window and turn the car off?

PC:  Yea

WJ:  Who said that?

PC:  Well, both of them said it.  Ken, you know, no, see, Butterball said Ken, you know, Ken was all, he was saying Ken was all in the way and stuff and you know, he was just saying, I was trying to get in there and cut the car off and stuff, you know, like that.

WJ:  And so Ken, so Butterball...

PC:  And they got to struggling.

WJ:  Okay, so Ken was trying to explain why, what he was doing in the car?

PC:  Yea

WJ:  Okay, and then what did Butterball say about that?

PC:  See, when he say he tried to get in the car, that's when they started struggling and stuff, cause dude trying to get them out the car.

WJ:  Okay, and then did Butterball say, that's when, when I shot him?

PC:  No, he didn't say that.

WJ:  What did he say?

PC:  He said, then the gun just shot.

WJ:  The gun just shot?

PC:  The gun just shot.

WJ:  And you understood, through this conversation, that Butterball was the one who had the gun?

PC:  Yea

WJ:  Why?

PC:  Cause he told me he had the gun.

WJ:  Okay

PC:  But I didn't hear him tell me he shot him.  He say he had the gun.  Anybody could have got the gun and shot him.  He told me he had the gun.

JC:  What time is it?  Go ahead and you got in the car, you say, cause Cleodis honked the horn and you got in the car and drove off?

PC:  Yea

JC:  Did you set the time?

WJ:  No, I didn't set the time.

JC:  So, at this point, we're going to end the interview.

(Curry-Sworn Statement)
18

5978

Respondent's Exhibit E

Respondent's Exhibit E

TAPED INTERVIEW WITH CURTIS GILBERT, JR.

CONDUCTED BY DETECTIVE CAPTAIN K.L. HEROMAN

KH: Today's date is May the 14th, 1993. The time is 1545. Doing a taped interview. Present is myself, Captain K.L. Heroman, Curtis T. Gilbert, Jr. and his father, Curtis T. Gilbert, Sr. We're here to get a taped statement about an incident that occurred on 4-28 of 93, at 2105 hours, which is 9:05. Okay Curtis Jr., if you would, tell me what happened on 4-28 of 93, the best that you remember.

CG: Uh, I drove to the ATM machine and there were three or four, maybe five black guys who approached me and...

KH: Okay, let me, let me back up. What ATM machine were you at?

CG: The one on Main Street.

KH: Okay, on Main or on 5th?

CG: I believe it was 5th.

KH: Is it Worthen's ATM machine?

CG: Yes

KH: Okay, is it about a block from the Econo Lodge?

CG: Yes

KH: Is it on the same street as the Econo Lodge?

CG: Yes sir.

KH: Could it be 5th and Chestnut?

CG: Yes sir.

KH: Okay, alright, tell me what happened.

CG: Alright, the guys, as they were walking across the lot, they uh, they noticed me looking at them and then, I guess, you know, maybe they got scared or whatever, you know, thought that it was too late for them to back off, so they had to go ahead and, I guess, take up, take, you know, take, went ahead with the procedure and every thing and they uh, one went around to the front of the car and one went to the back of the car. The guy that went to the front of the car, he went around the ATM machine and he, he uh came, he was the one doing

317

Respondent's Exhibit E

all the talking.  I can't actually tell you word for word what he
aid, but uh, and in the midst of his talking, he hit me in the mouth
and...

KH:  Okay, when you were sitting in your vehicle at the ATM machine,
where were these black males when you first saw them?

CG:  At the rear of the car.

KH:  At the rear of the car?

CG:  Right

KH:  Do you know which direction they came from?

CG:  Looked to me as if they were coming from my right.

KH:  From your right?

CG:  From my right and the ATM machine was on my left.  They was
coming over.

KH:  Okay, so they were coming from your right, which would make them
coming from, actually the direction of 5th Street, because 5th
Street's on your right too.  Okay, so they would be coming kind of
from the North and you saw them in your rear view mirror?

CG:  Yes sir.

KH:  Alright, tell me, describe to me what the person at the front of
the car looked like.

CG:  All I remember is, he was a bright skinned black male, is all I
really remember.

KH:  Okay and about how tall was he?

CG:  He was 5'7" to 5'11", somewhere around in there.

KH:  Okay, did that person have a pistol?

CG:  No sir.

KH:  Not that you saw, right?

CG:  Not that I saw.

KH:  Okay, describe the person to the back of your car.

CG:  He was a dark skinned male.  He was uh, looked to me as if he had
on a hood, but I'm not for sure.  I really can't, can't say that he
had on a hood.  He was holding a silver pistol and put it to my head.
I don't remember him saying anything.  Of course, my attention was not
directed to him.  It wasn't really directed towards anyone.

KH:  Okay, the person with the pistol, was he larger or smaller than the one doing the talking?

CG:  He was, he was taller than the one doing the talking.

KH:  Okay, did he ever put the pistol, did you ever feel the pistol to your head?

CG:  Yes sir.

KH:  He actually touched the pistol to your head, is that correct?

CG:  Yes sir.

KH:  Okay what, what kind of complexion was the one to the rear, based to the one to the front?  Was he medium complected, darker, lighter?

CG:  Darker

KH:  He was darker than the one, alright now you said there were three, four or five of them.  Did you get a close look at any of the rest of them?

CG:  No sir.

KH:  Okay, so mainly just these two?

CG:  Just these two.

KH:  That you could actually describe?

CG:  Right

KH:  Alright, so one of them's doing the talking and one of them's holding a pistol to your head.  Did you, at any time, try to resist this robbery or fight them in any way?

CG:  Well, I really couldn't resist, but I did move the guy, the gun from my head and uh, I pushed it down beside the door and from there, the guy hit, the guy in the front, he hit me in the mouth one time. And from there, I really don't remember.

KH:  Okay, what happened after that?

CG:  I, I don't remember.

KH:  How did you get out of there?  Did they get any money from you?

CG:  No sir.

KH:  Okay, did you leave your car there?  Did you drive off?

CG:  I drove off.

(Gilbert-Interview)
3

Respondent's Exhibit E

KH:  You drove off?  Is there anything else you can remember?

CG:  No sir.

KH:  Do you remember some what of what was said by the light skinned, smaller subject, who was at the front of your car?

CG:  Uh, seems as if he told to uh, to give him, I can't remember if it was him or the guy standing behind me, I don't remember.  One of the guys said to give me all of my value, give them all of my valuables, every thing.  That was just about it.

KH:  Did you give them anything?

CG:  They never would let me get any money out of the machine.

KH:  Did you offer to give them anything?  Did you offer to give them any money or say, here's my watch or anything like that?

CG:  Uh, I offered, well, I can't actually remember, but I do know that I told them that I couldn't give them anything unless they let me punch the numbers in the machine.

KH:  Okay, so at one point you were trying to comply with their demands, right?

CG:  Right

H:  Do you remember anything else that was said, other than that he wanted your valuables?  I think you told me...

CG:  No sir.

KH:  I think you told me, prior to us getting on this taped statement, that there was something about the gear shift or, did you...

CG:  Oh yes, uh, one of the guys, I was just reaching down, as a reflex, touching the gear shift and the guy told me, don't, don't touch the shift, gear shift.  I really don't remember what he said, but he said something like, we really don't know what you have or anything.  He said, don't touch it any more.  So...

KH:  Okay, when you say the gear shift.

CG:  I mean the...

KH:  Okay, you were driving a standard?

CG:  Standard

KH:  Okay, now you said that there was one to the front and one to the back.

CG:  Right

Respondent's Exhibit E

320

KH:   Okay, what do you mean by the front?   Were they in front of the hood of the car or the front of the door?   Where were they?

CG:   He was standing right over the windshield, with his head bent down over the door, talking to me through the window.

KH:   Okay, so he was at the front of the door?

CG:   Right, over the windshield.

KH:   Alright, and obviously he was close enough that he didn't have to come at you.   He could just reach out and hit you when he hit you, is that right?

CG:   Right, right.

KH:   Okay, and then there was one to the back?

CG:   Right

KH:   Alright, and he was at the back of the door?

CG:   He was at the back of my door.

KH:   Okay

CG:   At the back of the uh, driver door and I, I can't tell you if he was at the, at the rear door or at the, what door he was at, but he was close enough where he could touch me with the gun.

KH:   He was close enough that if he reached his arm out with a pistol in it, it could touch your head, right?

CG:   Right

KH:   Okay, so they were really kind of to the front of the door and the back of the door?

CG:   Right

KH:   Is there anything else that you can remember about either one of these subjects?   Anything you can remember about any of the others that you, that you saw?

CG:   No sir.

KH:   Time now is 1553, 5-14 of 93 and this concludes the interview.

(Gilbert-Interview)

Respondent's Exhibit E

Respondent's Exhibit E

## WITNESS STATEMENT

NAME _James L. Nelson_                      DOB _02/23/71_

ADDRESS _1006 S. Holly St Pine Bluff_      PHONE _536--8170_

PLACE OF EMPLOYMENT_____   PHONE ___-___

THIS STATEMENT IS BEING WRITTEN FOR ME BY DET. HILL
AT MY REQUEST. _James Nelson_

WHILE I (JAMES NELSON) WAS TRAVELING WEST BOUND ON
5TH STREET, I NOTICED A BLUE COLORED PICKUP AT THE
WORTHEN MONEY MACHINE. JUST AS I REACHED THE PICKUP
I HEARD A NOISE AS IF SOMEONE HAD BEEN PUSHED INTO
THE MONEY MACHINE. A FEW SECONDS LATER I HEARD WHAT
APPEARED TO BE A GUN SHOT AT THE PICKUP. AFTER I HEARD
THE SHOT, I SAW TWO BLACK MALES RUN NORTH FROM
THE TRUCK, BESIDE THE CHILD SUPPORT BUILDING. (1) HAD ON
BLACK COLORED SHORTS, GREY LONG SLEEVE SWEATER WITH
A HOOD ON IT. HE WAS APPROX 5'12", 130 POUNDS 16 TO 17 YEARS
OLD. THE SECOND SUBJECT WAS WEARING BLACK SHORTS AND
A LIGHT COLORED T-SHIRT, HE IS APPROX 5'10", 160 POUNDS AND
APPROX. 16 TO 17 YEARS OLD

I DID NOT KNOW THE PERSON HAD BEEN SHOT UNTIL I WALKED
UP TO THE VEHICLE. I CHECKED ON THE PERSON BECAUSE IT
LOOKED ODD, THE TWO SUBJECTS LEAVING THEIR TRUCK AT
THE MONEY MACHINE.

Compiled By _R. Hill_          File No. _93-205_ Date _05 / 05 / 93_

Page one of _1_

5986          Respondent's Exhibit E

Wilmos — Kenneth Reams

David A. Nanak, M.A.  Psychological Examiner
Patrick Coffey, Ph.D  Consulting Psychologist
Allen Johnson, ACSW, LCSW, Psychiatric Social Worker
Ahsan Syed, M.D.  Staff Psychiatrist

Elgin Anders
Amelia Reams
Rev. George McDaniel

Phillis Curry —
JO ANN REAMS
Jeanine Mack
Mike Moss

323

Respondent's Exhibit E

12/6/93

Greg Taylor
James / Taguante Nelson
Jermaine Brown
Bud Phillips
Terry Addison
Jo Ann Reams
Dr. Sturner
Ron Andrejack
Phillip Curry
~~Clifford Goodwin~~
Kenny Heroman

Respondent's Exhibit E

## WITNESS STATEMENT

NAME _Michelle Boykin_____ DOB _8 / 24 /67_

ADDRESS ___812 W.22_____ PHONE _536--2552_

PLACE OF EMPLOYMENT_____ PHONE _534-- 6421_

this is being written by detective R. Hudgins.
on 05-05-93 about 9:25 Pm I was traveling west on
west 5th. when I got to 5th + pine I saw people + Police,
I turned Right onto Chestnut st. I saw some movement
around the dumpster on econo-lodge and saw two
Black males. they appeared to be wearing dark clothing,
one of them was wearing a lighter colored shirt. they
appeared to be between 5'8" to 5'11" one of them
was around 167 lbs. they stood up beside the dumpster
but one of them threw something into the dumpster.
they then squatted beside the dumpster. ————
                                        — Michelle Boykin

Do Not Release
To Press - Hudgins

Compiled By _R. Hudgins_____ File No. _93/205_ Date _5/07/93_
                                            12 letters
                                    Page one of _one_

Respondent's Exhibit E

5989                                              325

# WITNESS STATEMENT

NAME  Derrick Johnson                              DOB 02/03/63

ADDRESS 1407 Alabama (Mbhs)  424 Chestnut #4    PHONE 535-8228

PLACE OF EMPLOYMENT  AUTO-District        PHONE ___--___

This statement is being written at my request by Det. Powell. X Derrick Johnson 5-6-93

I looked out my window from the apartment and I saw a man walking around the ATM machine. The man was approximately 6'0 tall and probably weighed between 175-185 pounds. I could not tell if the man was white or black. There was not a vehicle parked in front of the ATM machine, but there was a vehicle parked on the street in front of the ATM machine. The vehicle was a small truck possibly a Nissan or Toyota and it was black in color. It was a new looking truck. A short time later I heard two gun shots and I looked out the window again and I saw a police car jumping the railroad tracks at 4th and Walnut and another police car was going down 5th in front of the apartment. This all happened around 8:30p.m. on 5-5-93 and the police car come as I described around 9:00p.m. X D.J.

X Derrick Johnson

Compiled By Danny S Powell    File No. 93-205  Date 05/06/93

Page one of 1

326

Respondent's Exhibit E

9:30 A.M.

...reements made shall be binding upon either party ... being understood and agreed that this Apartment Lease may be modified only in writing signed by the party against whom enforcement is sought.

IN WITNESS WHEREOF, the parties hereto have signed and sealed this Apartment Lease on the date before written.

"MANAGEMENT" ______________________ (SEAL)

"RESIDENT" ______________________ (SEAL)

______________________ (SEAL)

Resident has examined the Apartment and accepts it "as is", and agrees to keep it in good condition and return it to Management at the end of the term in the same condition, normal wear and tear expected. As security for the return of Apartment and payment of all rent, Resident herewith pays to Management the sum of $ 200 as a Security Deposit as security for Resident's performance of this Apartment Lease and against any damages

327

Respondent's Exhibit E

# WITNESS STATEMENT

NAME  LISA HAYNES                          DOB  05/10/64

ADDRESS  424 Chestnut Apt 4               PHONE 535-1202

PLACE OF EMPLOYMENT  Area Agency on Aging   PHONE  --

This statement is being written at my request by Det. Powell. X ~~this~~ Lesa Hayne

This morning around 2:00 a.m, I looked out my window and noticed a white older model car sitting on 5th street. I don't know who parked the car, nor do I know who owed the car. I had never seen the car parked in front of the apartments before. I did not see or hear anything unusual last night. Lesa Haynes 5-6-93

Compiled By Donna S. Powell      File No. 93-205   Date 05/06/93

Page one of  1

328

1347 HLS

## WITNESS STATEMENT

NAME _Rita Renee GATES_ DOB _3 / 1 / 69_

ADDRESS _1805 W. 25ᵗʰ Pine Bluff_ PHONE _534--6657_

PLACE OF EMPLOYMENT _Shell Sta. Barry Walnut_ PHONE _6--9188_

While at work at the shell sta. at about
10:30 P.M. (The night of the murder) I saw a B/m
known to me only as "Wayne" drove his truck
onto the parking lot of the store. Wayne came
in and was talking to other customers about
what he saw at the A.T.M. money machine.
He said that he was parked on Wanda Bate-
man's parking lot across the street from the
money machine. This statement was written
by Det. WADE Douthit as it was told to me
by Ms. Rita GATES. X Rita Renee Gates

Compiled By _Det. WADE Douthit_ File No. _93-205_ Date _5/7/93_

Page one of _1_

## WITNESS STATEMENT

NAME _Mike Stokes_  DOB _05 / 08 / 69_

ADDRESS _424 Chestnut ST Apt #3. P.B. Ark_  PHONE _543 -- 2563_

PLACE OF EMPLOYMENT _Wal-Mart Pines Mall_  PHONE _534 -- 4516_

THIS STATEMENT IS BEING WRITTEN FOR ME AT MY
REQUEST BY DET. HILL & M. _(signature)_
ON 05-06-93, AT APPROX. 8:30 P.M., WHILE I WAS IN
MY LIVING ROOM AT 424 CHESTNUT #3, I HEARD A NOISE
AS IF SOMEONE WAS THROWING ROCKS. AT THIS POINT
I LOOKED OUT MY LIVINGROOM WINDOW (SOUTHSIDE FRONT
WINDOW) AND SAW A PICKUP TRUCK PARKED AT THE
MONEY MACHINE AT 5TH & CHESTNUT ST. I DID NOT SEE
ANYONE AROUND THE TRUCK SO I SAT BACK DOWN, APPROX
1 MINUTE LATER I HEARD WHAT APPEARED TO BE A THIRD
ROCK BEING THROWN.

WHEN I LOOKED OUT THE WINDOW ABOUT 10 MINUTES
LATER, I SAW THE POLICE AT THE MONEY MACHINE.

Compiled By _R. Hill_  File No. _93-205_  Date _05 / 06 / 93_

Page one of _1_

330

Respondent's Exhibit E

## phone message

FOR _Marie_ DATE 12-6 TIME 3:00 A.M./P.M.

M _Elgin Anders_

OF

PHONE (314) 686-2271
AREA CODE   NUMBER   EXTENSION

MESSAGE

_Re: Kenneth Reams_

SIGNED

- PLEASE CALL BACK ☓

---

## phone message

FOR _Marie_ DATE 12-6 TIME 1:30 A.M./P.M.

M _Stanley Hendon_

OF

PHONE ( ) 536-4350
AREA CODE   NUMBER   EXTENSION

MESSAGE _Call him today — he needs to talk about what you want him to do. He will be out of his office tomorrow._

SIGNED

---

## phone message

FOR _Marie_ DATE 12-6 TIME 3:50 A.M./P.M.

M _Dr. Cathy_

OF

PHONE ( ) 224-5522
AREA CODE   NUMBER   EXTENSION

MESSAGE _He did not see Reams. Dr. David Novak saw him. Dr. Cathy supervised Dr. Novak. Dr. Cathy will be in L.R. on Wednesday after 1:00 pm_

SIGNED

Respondent's Exhibit E    331

## WITNESS STATEMENT

NAME _MIKE STOKES_                                    DOB _7 18 169_

ADDRESS _424 Chestnut #3_                             PHONE ___--___

PLACE OF EMPLOYMENT _Wal-Mart P. Mall_   PHONE ___--___

This statement TS being written by Sgt. Hapson
as I relay it to him. I Mike Sto
Last Thursday night around 11:30 p.m. I had just
gone to bed. I had been in bed about 5 minutes
and all of a sudden I heard 6 gunshots, which
where fired quickly. I looked out of my kitchen
window and saw a white, newer model, chevrolet
S-10 pick-up w/a black stripe that went around
the middle of the tailgate, all the way around
the truck. It had low profile tires and chrome
rims and the tires stuck out about 4 to 6 inches
from the fenders. The truck was at 5th +
chestnut on the north side of 5th facing south
and on the west side of chestnut. TBH There
were two B/m's in the truck. The driver appeared
to be getting back into the driver's window (door
closed) as if he had leaned out of the window.
When he got back into the truck he ⟨TBH⟩ left
going west on 5th street at a high rate of speed.
The trucks lights were off during the incident. Side
windows were tinted. Nothing was in the bed. + mrs.

Compiled By _Hapson_              File No. _93-205_   Date _5 8 93_

Page one of _2_

332

Respondent's Exhibit E

WITNESS STATEMENT CONTINUED

My apartment TW is on the second floor of the building and the area that I was looking into was very well lit. I met Scott

COMPILED BY Hopson          FILE NO. 93-205  DATE 5-8-93

p. 2 of 2

Respondent's Exhibit E

# WITNESS STATEMENT

NAME __E.C. Collins__                                          DOB __09/22/18__

ADDRESS __424 Chestnut #1__                          PHONE ___--___

PLACE OF EMPLOYMENT_____     PHONE ___--___

This statement is being written at my
request by Det. Powell. X COLLINS

This morning around 7:00a.m I saw a
white older Plymouth parked on the north side
of 5th street headed west. The reason I
noticed the car parked there is because nobody
ever parks in that area. The lady in apt #4
and I talked briefly this morning about the
car because we had not seen it here before.

X E. C. Collins 5-6-95

Compiled By _Donna B. Powell_ File No._____ Date_05/06/93_

Page one of _1_

334

Respondent's Exhibit E   10:05am

## WITNESS STATEMENT

NAME _Larry Morrison_                               DOB _08, 18, 49_

ADDRESS _Rt 7 6306 Granada Trail 71603_        PHONE _82-9 4989_

PLACE OF EMPLOYMENT _Cotton Belt Railroad_     PHONE _1-800-356-2494_

_I Larry Morrison, on September 29, 1993 at 1ᵖᵐ observed a pistol at the Detectives office in Pine Bluff. Upon looking at the pistol, other that some rust on the pistol it looked identical to the pistol that was taken in a robbery of Pine Bluff Dry Cleaners_

                        _Larry Morrison   9-29-93_

Compiled By _Lt. M. Cook_          File No. _93-215_  Date _9-29-93_

Page one of ___

Respondent's Exhibit E        335

WITNESS STATEMENT

NAME _Robbie Chambers_            DOB _2 /25/49_

ADDRESS _7907 S. Pinewood_        PHONE_879 6230_

PLACE OF EMPLOYMENT _Watson Chapel School_ PHONE _8793656_
_(Sulphur Springs Elementary)_

I took my daughters' leather
jacket to Pine Bluff Dry Cleaners
to be cleaned in late March.
I learned about eight weeks later,
after contacting the cleaners, that the
jacket had been stolen in a robbery.
The jacket was brought time today
Sept. 29 to identify. There is no doubt
that the jacket is mine from the
marker and ink spots and the
familiar lining I distinctly remember.
I purchased the jacket from
Dillards in December for Christmas
1993.

Robbie L Chambers
Sept. 29, 1993

Compiled By _R. M. Cork_            File No. _93-205_  Date _9/28/93_

336                                      Page one of _1_

6000          Respondent's Exhibit E

# WITNESS STATEMENT

NAME _Larry Merrison_

DOB _08, 18, 49_

ADDRESS _Rt 7 6306 Granada Trail 71603_

PHONE _82-9 4989_

PLACE OF EMPLOYMENT _Cotton Belt Railroad_

PHONE _1800-356-2494_

I Larry Merrison, on September 29, 1993 at 1pm observed a pistol at the Detective's office in Pine Bluff. Upon looking at the pistol, other that Some rust on the pistol it looked identical to the pistol that was taken in a robbery of Pine Bluff Dry Cleaners

Larry Merrison 9-29-93

Compiled By _Lt. M. Cole_

File No. _93-215_

Date _9-29-93_

Page one of ___

Respondent's Exhibit E

## WITNESS STATEMENT

NAME _Robbie Chambers_      DOB _2 /25/49_

ADDRESS _7907 S. Pinewood_      PHONE _8796230_

PLACE OF EMPLOYMENT _Watson Chapel School_ PHONE _8293656_
_(Sulphur Springs Elementary)_

I took my daughters' leather
jacket to Pine Bluff Dry Cleaners
to be cleaned in late March.
I learned about eight weeks later,
after contacting the cleaners, that the
jacket had been stolen in a robbery.
The jacket was brought to me today
Sept. 29 to identify. There is no doubt
that the jacket is mine from the
marker and ink spots and the
familiar lining I distinctly remember.
I purchased the jacket from
Dillards in December for Christmas
1993

_Robbie L Chambers_
_Sept. 29, 1993_

Compiled By _____   File No. _93-205_ Date _9/28/93_

338

Respondent's Exhibit E

6002

# WITNESS STATEMENT

NAME _Larry Morrison_  DOB _02-18-48_

ADDRESS _Rt 7 6300 Granada Trail 71603_   PHONE _87-9 4989_

PLACE OF EMPLOYMENT _Cotton Belt Railroad_   PHONE _1800-356-2494_

I, Larry Morrison, on September 29, 1993 at 1pm observed a pistol at the Detectives office in Pine Bluff. Upon looking at the pistol, other than some rust on the pistol it looked identical to the pistol that was taken in a robbery of Pine Bluff Dry Cleaners.

Larry Morrison   9-29-93

Conducted By _R. M. Cox_   File No _93-2015_   Date _9-29-93_

Page one of ____

Respondent's Exhibit E

## WITNESS STATEMENT

NAME _Robbie Chambers_  DOB _2-25-49_

ADDRESS _7907 S. Pinewood_  PHONE _8746230_

PLACE OF EMPLOYMENT _Watson Chapel School_ PHONE _8293656_
_(Sulphur Springs Elementary)_

I took my daughters leather
jacket to Pine Bluff Dry Cleaners
to be cleaned in late March.
I learned about eight weeks later
after contacting the cleaners, that the
jacket had been stolen in a robbery.
The jacket was brought to me today
Sept 29 to identify. There is no doubt
that the jacket is mine from the
marker and ink spots and the
familiar lining I distinctly remember.
I purchased the jacket from
Dillards in December for Christmas
1993

Robbie L Chambers
Sept. 29, 1993

Compiled By _JL M Ford_       File No. _93-205_  Date _9-28-93_

340

# VICTIM STATEMENT

NAME _LARRY MORRISON_                 DOB _8, 18, 49_

ADDRESS _Rt 7 6306 Granada Trail_      PHONE _87-94989_

PLACE OF EMPLOYMENT _Cotton Belt Railroad_   PHONE ___-___

I Larry Morrison (son of Ed Morrison) owner of Pine Bluff Dry Cleaners was aware of a Burglary that took place at Pine Bluff Cleaners on the date of 4-27-93 or early morning of 4-28-93. W.D. closed the Cleaners at 5:30 PM on the 27th of April and opened up at 6:30 AM on the 28th of April and discovered that we had been broken in to.

I'm aware of some items that were taken and they include one a H&R 32 cal. pistol and Brown holster that snaps to hold pistol in holster. Also at least 2 leather jackets and some change from the cash register.

On 5-12-93 I Larry Morrison came to Pine Bluff Police Dept. and looked at some items to identify them. They are a Brown leather holster and a picture of a 32 cal. H&R pistol and some Suede & leather jackets. All these items Larry Morrison _____

Compiled By _Lt. Terry Miller_   File No._____   Date _5 / 12 / 93_

Page one of _Two_

Respondent's Exhibit E

## VICTIM STATEMENT

NAME _Larry Morrison_          DOB _8/18/47_

ADDRESS _RT 7  6306  Granada Trail_  PHONE _874-4989_

PLACE OF EMPLOYMENT _Cotton Belt Railroad_  PHONE _____-_____

_appear to me to be the items or some
of the items taken from Pine Bluff
Dry Cleaners._

_Larry Morrison_

Compiled By _Lt. Larry Alding_ ____ File No. _____  Date _05/12/93_
                                                              _3pm_
                                                     Page one of _Two_
                                                              _Two_

342

Respondent's Exhibit E

# PINE BLUFF POLICE DEPARTMENT

## INVESTIGATION REPORT

| CRIME | LOCATION OF CRIME | | Y | N | BUS/RES | FROM DATE AND TIME | TO DATE AND TIME |
|---|---|---|---|---|---|---|---|
| nfo/Homicide | 5th and Chestnut | | | | | 5-5-93 2032 AM PM | TO AM PM |

| DATE/TIME REPORTED | SHIFT | ZONE | REPORT AREA | OFFICER'S NAME | EMP. NO. | ASSISTING OFFICER | CASE FILE |
|---|---|---|---|---|---|---|---|
| | | | | LT. Mack Cook | 1766 | | |

| NAME | VICTIM OR BUSINESS | | |
|---|---|---|---|
| ADDRESS | | S.S.# | EMPLOYER OR SCHOOL |
| | | HOME PHONE | BUSINESS PHONE |

| RACE | SEX | DATE OF BIRTH | WILL COMPLAINANT PROSECUTE ☐ YES ☐ NO | | ☐ CORPORATION | ☐ PARTNERSHIP | ☐ SOLE OWNER |
|---|---|---|---|---|---|---|---|

On 5-6-93 at approximately 0945 I interviewed Ms Veter Howard via phone at her place of imployment in Little Rock, (324-9710). She is employed at the Arkansas Adult Probation Commission. Ms Howard was a customer at the Worthern Bank Teller Machine at the Corner of 5th and Chestnut shortly before a homicide occured with Gary Turner as the victim. Ms Howard states that she and her 13 and 4 year old daughters were there and stopped a short distance from the machine where she got out of her car and got her purse from the trunk where it was locked. She stated that she had looked the area over before getting out of her vehicle. She stated that the only thing she remembers is a dark colored (black) truck discribed as like a Toyota parked on the street next to the machine. This was stated to be West 5th Ave. She said she did not observe any persons or other activity in the area. She made her transaction at 2019 hours according to bank records.

| STATUS | | | | NCIC Enter | No Yes ☐ ☐ |
|---|---|---|---|---|---|
| ☐ UNFOUNDED | ☐ ARREST—ADULT | | | | |
| ☐ PENDING | ☐ ARREST—JUVENILE | | NCIC Cancelled | No Yes ☐ ☐ |

Respondent's Exhibit E

343

ASSIGNED DETECTIVE

# PINE BLUFF POLICE DEPARTMENT

Y      N

## INVESTIGATION REPORT

| CRIME | LOCATION OF CRIME | BUS/RES | FROM DATE AND TIME | TO DATE AND TIME |
|---|---|---|---|---|
| Information | 321 West 5th | Bus | 5-5-93 to AM PM | TO AM PM |

| DATE/TIME REPORTED | SHIFT | ZONE | REPORT AREA | OFFICER'S NAME | EMP. NO. | ASSISTING OFFICER | CASE FILE |
|---|---|---|---|---|---|---|---|
| 5-6-93 | | | | Lt. Addison | 1560 | | |

VICTIM OR BUSINESS

| NAME | S.S.# | | EMPLOYER OR SCHOOL |
|---|---|---|---|
| Worthen Bank Money Machine | | | |

| ADDRESS | HOME PHONE | BUSINESS PHONE |
|---|---|---|
| | | |

| RACE | SEX | DATE OF BIRTH | WILL COMPLAINANT PROSECUTE ☐ YES  ☐ NO | ☐ CORPORATION  ☐ PARTNERSHIP  ☐ SOLE OWNER |
|---|---|---|---|---|
| | | | | |

On 5-6-93, at about 10:00 P.M., I talked with Mike and Jody Jolly of 1006 Boast Road. (247-9843)  Mr. Boast said he and his wife went to the money machine at 5th and Chestnut at 8:03 P.M. on 5-5-93.  Mr. Jolly said he drove all the way around the machine before stopping and did not see anyone in the area.  Mr. Jolly said after making his transaction, he left going South on Chestnut and saw five or six kids, 13 years of age and younger, walking North on Chestnut from 6th.

| 344 | STATUS | | NCIC Enter | No Yes ☐ ☐ |
|---|---|---|---|---|
| | ☐ UNFOUNDED  ☐ ARREST—ADULT  ☐ PENDING  ☐ ARREST—JUVENILE | | NCIC | No Yes ☐ ☐ |

Respondent's Exhibit E

6008

## WITNESS STATEMENT

NAME _WILLIAM (BUTCH) MORRISON_ DOB _10/19/46_

ADDRESS _2819 KIMBERLY_ PHONE _879-4777_

PLACE OF EMPLOYMENT _COTTON BRT / PINE BLUFF DRY CLEANER_ PHONE _541-1722_ _COTTON BEL._ _534-5310 - CLEANERS_

THIS STATEMENT IS BEING WRITTEN BY CAPT. K.L. HEROMAN AT THE REQUEST OF WILLIAM (BUTCH) MORRISON DOB 10/19/46. DATE 5/13/93 0900.

ON 4/28/93 I REPORTED A BURGLARY OF MY BUSINESS, PINE BLUFF DRY CLEANERS TO THE PINE BLUFF POLICE. TAKEN IN THE BURGLARY WAS A 32 CAL REVOLVER WHICH WAS IN A BROWN HOLSTER. ON 5/13/93 I CAME TO THE PINE BLUFF P.D DETECTIVE OFFICE. I IDENTIFIED A SMALL BROWN HUNTING HOLSTER THAT WAS BEING HELD AS EVIDENCE BY K.L. HEROMAN. I ALSO LOOKED AT A BROWN LEATHER JACKET THAT LOOKED LIKE THE ONE THAT I PLACED IN THE CLEANERS FOR MY SON. THERE WAS AT LEAST TWO LEATHER JACKETS ALSO TAKEN IN THE BURGLARY. I WILL HAVE MY SON COME TO THE DETECTIVE OFFICE TO ALSO LOOK AT THE JACKET.

X William Morrison

5/13/93

Compiled By _K.L. Heroman_     File No. _93-205_ Date _5/13/93_

Page one of _1_

Respondent's Exhibit E    345

## VICTIM STATEMENT

NAME Dee ANN Gibson                                    DOB _/_/_

ADDRESS Glendale   ARK                            PHONE 357-8176

PLACE OF EMPLOYMENT PB Dry Cleaners          PHONE 534-5310

Lt. Addison is writing my statement as
I relay it to him.

On 4-27-93 — 4-28-93 The Pine Bluff
Dry Cleaners was broken into. I am the
Desk clerk there for past 6 or 7 years.
The night the store was broken into
There was at least 3 bomber Jackets
Taken along with my uncles H&R 32
cal. Revolver. On 5-10-93 at about
1945 hours Lt. Addison called me and
ask me to come to the Police Dpt.
To see if I could identify some items.
Once I arrived Lt. Addison showed
me four bomber jackets but I could
only identify Two of the jackets for
sure, one was a light colored one with
ink marks on it and the other one
was a dark brown suel suede Type
jacket, one other one is brown in color
but I'm not sure and won't be untill
I check the Tickets at The store. Lt.
Addison also showed me a brown leather

Compiled By Lt. Addison          File No. 93-205  Date 5/10/93

- 346                                                    Page one of Two

Respondent's Exhibit E

## VICTIM STATEMENT

NAME _Dee Ann Gibson_                    DOB _3 / 3 / 65_
ADDRESS _Glendale_                       PHONE _357 - 8176_
PLACE OF EMPLOYMENT _P.B. Dry Cleaners_   PHONE ___ - ___

holster which I identified as being the
one stolen from the cleaners (which
belonged to my uncle) LT Addison also
showed me a blue steel 32 cal Revolver
which had also been stolen from the
store (which had also belonged to my uncle)

Compiled By _L. Tony Holding_     File No. _93-205_ Date _5 /10 /93_

Page ~~one~~ of _Two_
      Two

Respondent's Exhibit E

347

11

Respondent's Exhibit E



# RETURN
## SEARCH WARRANT

STATE OF ARKANSAS    }
                     } ss·
COUNTY OF _Jefferson_ }

_____Captain K.L. Heroman, P.B.P.D._____ received the attached

Search Warrant on the __10th__ day of __MAY_____, 19_93_, at _1734_ o'clock hrs.

____M., and the person(s), premises, or vehicle(s) were search as follows: _____

_Daylight search as prescribed in request. Residence as described in request._
(Give description of things searched and describe facts and circumstances of execution)
_Occupants of dwelling not present at the time of search. One outbuilding_

_situated within the curtelage of the described residence was also searched;_

_however, nothing was seized. Entry to residence made by open window._

A copy of the search warrant and a receipt for the items were left:

( X ) at _Residence as described in warrant request._
      (Address of premises searched)
(   ) with __none present to receive copy._
      (Name and address of person receiving copy)

The following is an inventory of the items seized: __See P.B.P.D. form attached_

_to this return for list of property seized._

_____

_____

_____

_____

_____

FILED

MAY 1 3 1993

DOROTHY G. PEARSON
Circuit & Chancery Clerk
JEFFERSON COUNTY, ARKANSAS

6013          Respondent's Exhibit E          348

_____

_____

_____

This inventory was made in the presence of: <u>No items Siezed</u>

_____

(Name and address of person(s) present during inventory)

<u>No items Siezed</u>
(Person receiving inventory list)

I swear that the facts and circumstances stated above are true and correct to the best of my present knowledge and belief, and that the above is a complete and correct inventory of all items seized.

_____
(Executing Officer)

Subscribed, sworn and returned before me this ____ day of _____, 19____,

at _____ o'clock ____M.

_____
(Issuing Judicial Officer) (Clerk)

## THIS RETURN MUST BE MADE WITHIN FIVE (5) DAYS
## AFTER EXECUTION OF WARRANT.

Inv.-23

349

Respondent's Exhibit E

# AFFIDAVIT FOR SEARCH WARRANT

STATE OF ARKANSAS    )
                       ) ss

COUNTY OF Jefferson  )

BEFORE _Fred D. Davis III_____
                                  [Name of Judicial Officer]

The undersigned being duly sworn, deposes and says: That he
[has reason to believe]
[is positive]                  that (on the person) (in the vehicle) and/or
                                    (on the premises known as)

[1] _314 S. Oak, A white wood frame single family dwelling._

in the City of _Pine Bluff_____, County of ___Jefferson_____
State of Arkansas, there is now being concealed certain property,

or persons, namely[2] _Three (3) live .32 cartridges of undetermined brand._

_These cartridges are the remains of those loaded originally in_

_the weapon prior to the suspects obtaining it._

(is)[3]
which (are) _Evidence in a Capital Murder case #93-205._

and that the facts tending to establish the foregoing grounds for issuance of a Search
Warrant are as follows:[4] SEE ATTACHMENT

(If the warrant cannot be executed between the hours of 6 a.m. and 8 p.m., then the officer
should state the facts below which will support a finding of reasonable cause to believe
that:

1. the place to be searched is difficult of speedy access; or
2. the objects to be seized are in danger of imminent removal; or

**FILED**

MAY 17 1993

DOROTHY G. PEARSON
Circuit & Chancery Clerk
JEFFERSON COUNTY, ARKANSAS

    Respondent's Exhibit E

350

3. The warrant can only be safely or successfully executed at nighttime or under circumstances, the occurrence of which is difficult to predict with accuracy.[5]

DAYLIGHT SEARCH

_____

_____

_____

_____ [6]

x _L_r. _Terry_ _____

(Signature of affiant)

_Lt. OBPD_

(Official Title, if any)

Sworn to before me and subscribed in my presence

this __12__ day of ____May____, 19_93_.

_____

(Signature of Judicial Officer)

1. If premise, give street address, location, position on the street, color and type of building, and if multi-family dwelling, give position of room(s) to be searched, its number, if any, and the floor level; if a person or vehicle, make description as complete as possible.
2. Describe, with particularity, person(s) or property to be seized.
3. State alleged grounds for Warrant, (i.e. contraband, stolen goods, etc.).
4. State, with *particularity*, the reasonable (probable) cause relied on for issuance of the Search Warrant. State facts and circumstances tending to show that the persons or things are in the places, or the things are in the possession of the person to be searched. DO NOT state mere conclusions. If informant is used as the basis for this warrant, state facts which establish his reliability and the means by which the information was obtained, if possible.
5. If any of the circumstances exists as listed in "1", "2", or "3" above, then set forth the facts and circumstances which will allow the Judicial Officer to authorize the execution of the warrant at any time; otherwise, the warrant must be executed between the hours of 6 a.m. and 8 p.m.
6. Attach additional sheet if necessary.

351

Respondent's Exhibit E

RE: AFFIDAVIT FOR SEARCH WARRANT REQUEST:

On 05/10/93 ALFORD GOODWIN JR. was arrested in connection with the murder of GARY WAYNE TURNER. The murder having been committed on 05/05/93.

AFORD GOODWIN JR. subsequently gave a statement and a consent to search the residence of 314 South Oak, where the suspected murder weapon was recovered. GOODWIN further gave an additional statement as to the disposition of the rounds. According to GOODWIN one round was discharged during the robbery attempt of GARY WAYNE TURNER which resulted in his death. According to GOODWIN, this round was removed from the gun and thrown in a dumpster behind the Pine Bluff Commercial. GOODWIN further said that the final three rounds were removed from the gun and placed on the window sill of his bedroom window. Additionally, the co-defendant, Kenneth Reams said that his aunt had test fired one round from the gun prior to the shooting of GARY WAYNE TURNER. This accounts for all five rounds from the weapon.

X Lt. Terry Addison
Affiant

Lt. Terry Addison, PBPD

Sworn to and subscribed before me this _12_ day of May 1993 at _17:33_ hours.

Judicial Officer

FILED

MAY 17 1993

DOROTHY G. PEARSON
Circuit & Chancery Clerk

6017   Respondent's Exhibit E

352

# SEARCH WARRANT

STATE OF ARKANSAS )
                ) ss
COUNTY OF Jefferson )

TO ANY OFFICER OF THE STATE OF ARKANSAS:

I, _Fred D. Davis, III_

                     (Name of Judicial Officer)

on this _12_ day of _May_, 19_93_, at _17:33_ __ __

at _211 Park Place Pine Bluff, Ar_____ hereby find that

           (Location where application was made)

there is reasonable cause to search ___ 314 S. Oak street, a white wood frame

[describe the particular person(s), premises, and/or vehicle(s) to be searched, and the exact location and designation of the places to

    single family dwelling.

be searched]

located in _Pine Bluff_____, County of ____Jefferson____

              (City)

and State of ARKANSAS, and that my findings of reasonable cause

is based on the following: _That a suspect charged with Capital Murder in_

[State with particularity the facts relied on in the affidavits and testimony which support this finding]

   the death of Gary Wayne Turner admits that the remaining three

  rounds of ammo from the murder weapon are currently located on

  a window sill in this residence. NOTE: The actual murder weapon, _according to_

was recovered from this address.

   THEREFORE,
   YOU ARE HEREBY COMMANDED to search forthwith the person(s), premises,
and/or vehicle(s) described above for the following:

   Three (3) .32 caliber cartridges of undetermined brand.

[Set forth the person(s) or thing(s) which constitute the object of the search and are authorized to be seized]

FILED

MAY 17 1993

353

DOROTHY G. PEARSON
Circuit & Chancery Clerk
JEFFERSON COUNTY, ARKANSAS

Respondent's Exhibit E

and if said person(s) or thing(s) are found, to seize the person(s) or thing(s), leave a copy of this warrant and a receipt listing the items seized with the person in apparent control of the property, or post it on the premises if no such person is present, and make due return to me no later than five (5) days after execution hereof.

This warrant shall be executed between the hours of 6 a.m. and 8 p.m. The preceding sentence may be disregarded if the Judicial Official issuing this warrant makes a finding that there is reasonable cause to believe that the following circumstances exist, and checks one or more of the reasons below:

☐ the place to be searched is difficult of speedy access; or
☐ the objects to be seized are in danger of imminent removal; or
☐ the warrant can only be safely or successfully executed at nighttime or under circumstances, the occurrence of which is difficult to predict with accuracy.

If any of the above boxes are checked, this warrant may be executed at any time, day or

night, based on the following finding: _____ DAYLIGHT SEARCH _____
(State the facts relied on in determining the reasonable cause to believe one or more of the circumstances listed above exists)

This warrant must be executed within a reasonable time, not to exceed sixty (60) days, and must be returned to the issuing judicial officer within five (5) days after it's execution.

_____
(Signature of Issuing Judicial Official)

354

# RETURN
# SEARCH WARRANT

STATE OF ARKANSAS          }
                           } ss
COUNTY OF_____   )

I, Lt. Terry Addison _____ received the attached

Search Warrant on the ___12___ day of May _____, 1993 , at 1733 o'clock

___P_M., and the person(s), premises, or vehicle(s) were search as follows: _____

314 Oak street, a white wood frame dwelling _____
(Give description of things searched and describe facts and circumstances of execution)

_____

_____

_____

A copy of the search warrant and a receipt for the items were left:

( ✓ ) at _314 Oak_____
      (Address of premises searched)

( ✓ ) with _Flossie McLemore_____
      (Name and address of person receiving copy)

The following is an inventory of the items seized: _No items Siezed_____

_____

_____

_____

_____

_____

FILED

MAY 17 1993

DOROTHY G. PEARSON
Circuit & Chancery Clerk
JEFFERSON COUNTY, ARKANSAS

355

Respondent's Exhibit E

_____

_____

_____

This inventory was made in the presence of: <u>Officers of the P.B.P.D.- Capt. Heroman,</u>

<u>Sgt. Bacon, Det. Hendrix, Sgt. Pritzen, Det. Dorman, Det. Hill.</u>

(Name and address of person(s) present during inventory)

None Present
_____
(Person receiving inventory list)

I swear that the facts and circumstances stated above are true and correct to the best of my present knowledge and belief, and that the above is a complete and correct inventory of all items seized.

_____
(Executing Officer)

Subscribed, sworn and returned before me this _____ day of _____, 19____,

at _____ o'clock ____M.

_____
(Issuing Judicial Officer) (Clerk)

## THIS RETURN MUST BE MADE WITHIN FIVE (5) DAYS
## AFTER EXECUTION OF WARRANT.

Inv.-23

356

Respondent's Exhibit E

# AFFIDAVIT FOR SEARCH WARRANT

STATE OF ARKANSAS        }
                         } ss
COUNTY OF Jefferson      }

BEFORE  *Fred D. Davis, III*
_____
                    (Name of Judicial Officer)


The undersigned being duly sworn, deposes and says: That he
(has reason to believe)                that (on the person) (in the vehicle) and/or
(is positive)                          (on the premises known as)

1  A large wood frame dwelling, white in color with no address

displayed. Situated on the North-West corner of 3rd. and Poplar

streets; the only residence on this corner.
in the City of Pine Bluff_____, County of Jefferson_____,
State of Arkansas, there is now being concealed certain property,

or persons, namely[2] __Black "Raiders" baseball cap, grey sweatshirt with

hood and long sleeves, Black shorts, .32 caliber handgun.
_____

_____
(is)[3]
which (are) Clothing believed to have been worn the night of the murder,

 and the weapon believed to have been used to kill Gary Turner.
_____
and that the facts tending to establish the foregoing grounds for issuance of a Search
Warrant are as follows:[4]    SEE ATTACHMENT

(If the warrant cannot be executed between the hours of 6 a.m. and 8 p.m., then the officer
should state the facts below which will support a finding of reasonable cause to believe
that:

1. the place to be searched is difficult of speedy access; or
2. the objects to be seized are in danger of imminent removal; or

357

Respondent's Exhibit F

3. The warrant can only be safely or successfully executed at nighttime or under circumstances, the occurrence of which is difficult to predict with accuracy.[5]

DAYLIGHT SEARCH

_____

_____

_____

_____ [6]

_____
(Signature of affiant)

_____
(Official Title, if any)

Sworn to before me and subscribed in my presence

this __10__ day of ___May_____ 19 _93_ .

_____
(Signature of Judicial Officer)

_____
    1. If premise, give street address, location, position on the street, color and type of building, and if multi-family dwelling, give position of room(s) to be searched, its number, if any, and the floor level; if a person or vehicle, make description as complete as possible.
    2. Describe, with particularity, person(s) or property to be seized.
    3. State alleged grounds for Warrant, (i.e. contraband, stolen goods, etc.).
    4. State, with *particularity*, the reasonable (probable) cause relied on for issuance of the Search Warrant. State facts and circumstances tending to show that the persons or things are in the places, or the things are in the possession of the person to be searched. DO NOT state mere conclusions. If informant is used as the basis for this warrant, state facts which establish his reliability and the means by which the information was obtained, if possible.
    5. If any of the circumstances exists as listed in "1", "2", or "3" above, then set forth the facts and circumstances which will allow the Judicial Officer to authorize the execution of the warrant at any time; otherwise, the warrant must be executed between the hours of 6 a.m. and 8 p.m.
    6. Attach additional sheet if necessary.

On 050593, Gary Wayne Turner, W/M, was murdered as he apparently was about to use the Worthen ATM machine located at 5th and Chestnut streets. On 050893, information was received from a confidential informant that a black male known by the street name "Butterbal" and a black male by the first name "Ken", last name unknown, were the two that killed the man at the ATM machine. Ken, lnu, had done the shooting.
On 050893, information from a separate subject advised that a black male by the name of "Butterball" and an unknown black male were responsible for the  killing at the ATM machine.
On 050993, information was received from a third subject by way of a uniformed officer that a black male known as "Butterball" who he thought was ALFRED GREEN, and a black male first name "Ken" or "Kenny" lnu did the shooting.
On 051093, a sworn statement was taken from an individual who stated that he overheard three subjects talking about being involved in the shooting. Two of the three subjects were ALFRED GOODWIN and KENNY REAMS. Kenny Reams was overheard saying that he reached into the window of the truck and struggled with he victim. He also stated that the following day, 050693, he observed Kenny Reams with a .32 caliber revolver.
On 051093, the autopsy of Gary Wayne Turner revealed that the victim died of a .32 caliber bullet to the head.
NOTE: Kenny Reamsresides at the address noted in the warrant request.

AFFIANT
Capt. K.C. Heroman


SWORN AND SUBSCRIBED BEFORE ME THIS 10th DAY OF MAY 1993,
AT _17:34 hrs pm.

JUDICIAL OFFICER

Respondent's Exhibit B

# SEARCH WARRANT

STATE OF ARKANSAS     }
} ss
COUNTY OF _Jefferson_   }

TO ANY OFFICER OF THE STATE OF ARKANSAS:

I, __Fred D. Davis, III_____,
             (Name of Judicial Officer)

on this _10_ day of _____May_____, 19_93_, at _17:34 hrs_ M.,

at _211 Park Place, Pine Bluff, Ar._____ hereby find that
      (Location where application was made)

there is reasonable cause to search __A large wood frame dwelling, white in
(describe the particular person(s), premises, and/or vehicle(s) to be searched, and the exact location and designation of the places to
_color with no address displayed. Situated on the North-West corner_
be searched)
_of 3rd. and Poplar streets; the only residence on this corner._

located in _Pine Bluff_____, County of _____Jefferson_____
          (City)

and State of ARKANSAS, and that my findings of reasonable cause

is based on the following: _Two statements from seperate and anonymous_
(State with particularity the facts relied on in the affidavits and testimony which support this finding)
_sources, a statement from a confidential informant and a sworn_

_statement from a subject all implicating KENNY REAMS as the_

_person involved or responsible for the murder of Gary Wayne Turner._

THEREFORE,
    YOU ARE HEREBY COMMANDED to search forthwith the person(s), premises,
and/or vehicle(s) described above for the following:

_Black "Raiders" base ball cap, grey sweatshirt with long sleeves_
(Set forth the person(s) or thing(s) which constitute the object of the search and are authorized to be seized)

_and hood, black shorts, .32 caliber handgun._

and if said person(s) or thing(s) are found, to seize the person(s) or thing(s), leave a copy of this warrant and a receipt listing the items seized with the person in apparent control of the property, or post it on the premises if no such person is present, and make due return to me no later than five (5) days after execution hereof.

This warrant shall be executed between the hours of 6 a.m. and 8 p.m. The preceding sentence may be disregarded if the Judicial Official issuing this warrant makes a finding that there is reasonable cause to believe that the following circumstances exist, and checks one or more of the reasons below:

☐ the place to be searched is difficult of speedy access; or
☐ the objects to be seized are in danger of imminent removal; or
☐ the warrant can only be safely or successfully executed at nighttime or under circumstances, the occurrence of which is difficult to predict with accuracy.

If any of the above boxes are checked, this warrant may be executed at any time, day or

night, based on the following finding: _____
(State the facts relied on in determining the reasonable cause to believe one or more of the circumstances listed above exists)
                    DAYLIGHT SEARCH

_____

_____

_____

   This warrant must be executed within a reasonable time, not to exceed sixty (60) days, and must be returned to the issuing judicial officer within five (5) days after it's execution.

                                        _____
                                        (Signature of issuing Judicial Official)

361

6026

Respondent's Exhibit E

PINE BLUFF POLICE DEPARTM.

SEARCH WARRANT

LOCATION  1003  W. 3rd

DATE SERVED 5-10-93   TIME SERVED 1800   TIME CONCLUDED 1845

SERVING AGENCIES  P.B.P.D.

OFFICER IN CHARGE  HENDRIX

### ITEMS SEIZED

| ITEM NO. | DESCRIPTION OF ITEMS SEIZED | EMP. NO. | LOCATION FOUND |
|---|---|---|---|
| E-1 | ONE GEORGETOWN BALL CAP (BLACK W/ GRAY STRIPES | 3019 | TOP OF CHEST OF DRAWERS N.E. BEDROOM |
| E-2 | ONE BROWN SMALL CAL. HOLSTER | 3019 | TOP DRAWER IN CHEST OF DRAWERS |
| E-3 | WHITE T-SHIRT W/ BLOOD ON IT | 3019 | DIRTY CLOTHES N.E. BEDROOM |
| E-4 | ONE PAIR OF BLACK SHORTS | 3019 | DIRTY CLOTHES N.E. BEDROOM |
| E-5 | YELLOW T-SHIRT | 3019 | ON DOOR IN BATHROOM |
| E-6 | TWO BLACK PAIR OF JEANS + TWO BLACK T-SHIRTS | 3019 | DIRTY CLOTHES IN BATHROOM |
| E-7 | ONE METAL CAN CONTAINING OFF WHITE ROCK LIKE SUBSTANCES AND A PLASTIC BAG OF GREEN VEGETABLE MATERIAL | 2087 2087 | CABINET IN BATHROOM |
| E-8 | ONE BROWN LEATHER JACKET | 2087 | KITCHEN CHAIR |
| E-9 | ONE TAN JACKET | 3019 | N.E. BEDROOM |
| E-10 | ONE BROWN LEATHER JACKET | 3019 | N.E. BEDROOM |
| | | | |
| | | | |
| | | | |

DATED this  10  day of  MAY  , 1993.

LEFT AT RESIDENCE
PERSON RECEIVING INVENTORY LIST

Charles H...  3019
DETECTIVE, P.B.P.D.

Rowland Dorman  2087
DETECTIVE, P.B.P.D.

PBPD F335

362

Respondent's Exhibit E

CONSENT TO SEARCH
PINE BLUFF POLICE DEPARTMENT

Date Consent Was Signed: _05-10-93_

Location Where Consent Was Signed: _Detective Office  200 E  8th_

I, _Alford Goodwin_, having been informed
of my constitutional right not to have a search made of the premises
hereinafter mentioned without a search warrant and of my right to
refuse to consent to such a search, hereby authorize officer(s)
_Sgt. JAMES Bacon_, _Sgt. Hopson_,
and, _____ of the Pine Bluff Police
Department to conduct a complete search of my premises/auto located
at _714 S. OAK St._

These officers are authorized by me to take from my premises / auto
any letters, papers, materials, or other property which they may
desire.

I understand that I have the right to stop this search at any
time after my consent is given.

This written permission is being given by me to the above-named
officers voluntarily and without threats or promises of any kind.


_albert Goodwin_
Signature of Person Giving Consent


WITNESS: _____
WITNESS: _____


6029

Respondent's Exhibit E

363

INE BLUFF POLICE DEPARTME

SEARCH WARRANT

LOCATION _314  OAK_

DATE SERVED _5-10-93_  TIME SERVED _2000_  TIME CONCLUDED _2030_

SERVING AGENCIES _P.B.P.D_

OFFICER IN CHARGE _BACON_

ITEMS SEIZED

| ITEM NO. | DESCRIPTION OF ITEMS SEIZED | EMP. NO. | LOCATION FOUND |
|---|---|---|---|
| E-11 | ONE HOODED (GRAY) SWEAT SHIRT | 2022 | S.W. BEDROOM IN BAG |
| E-12 | ONE BLK/BLUE DUKE BASEBALL CAP. | 2022 | S.W. BEDROOM |
| E-13 | ONE BROWN LEATHER JACKET | 1931 | S.W. BEDROOM. CLOSET |
| E-14 | ONE BLUE BANDANNA | 2022 | |
| E-15 | ONE BLACK HOOD (JACKET HOOD) | 2022 | S.W. BEDROOM |
| E-16 | ONE BLACK COAT HOOD WITH STARTER WRITTEN IN IT | 2022 | S.W. BEDROOM |
| E-17 | ONE BROWING KNIFE | 2087 | S.W. BEDROOM CLOSET |
| E-18 | ONE H&R 32 CALIBER BLUE STL REVOLVER UNKNOWN SERIAL NUMBER | 2008 | FOUND IN BACK YARD OF 314 S OAK BY FACE |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

DATED this _10_ day of _MAY_, 199 _3_.

_____
PERSON RECEIVING INVENTORY LIST

_____ 3019
DETECTIVE, P.B.P.D.

_____
DETECTIVE, P.B.P.D.

364

PBPD F--5

Respondent's Exhibit E

PINE BLUFF POLICE DEPARTMENT
PROPERTY – EVIDENCE RECORD

CLASSIFICATION:
Evidence _✓_ Found___ Safekeeping ___ Other_____

| Brought in by:<br>Rowland Dorman | Investigating Officer:<br>_____ | CID Case Number<br>93/205 |
|---|---|---|

Circumstances or Charge:                          Evidence Control Numb
Homicide

| SUSPECT(S) NAME: | RACE | SEX | DATE OF BIRTH |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

| VIM(S) NAME: | RACE | SEX | DATE OF BIRTH |
|---|---|---|---|
| Gary Turner | W | m |  |

| ITEM # | DESCRIPTION | BIN NUMBER |
|---|---|---|
| E-1 | One sweat shirt Blue in color |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

Respondent's Exhibit E

PINE BLUFF POLICE DEPARTMENT

CASE: _____93-205_____

| C H A I N   O F   C U S T O D Y | | |
|---|---|---|
| ITEM(S) NUMBER E-18 | TO: Charles Helsig | FROM: Jason S. Mulligan |
| | DATE & TIME: 05-10-93  2050 | REASON: Evidence |
| ITEM(S) NUMBER E-18 | TO: Lt. M. Cash | FROM: Charles Helsig |
| | DATE & TIME: 5-10-93  2230 | REASON: Evidence sent to crime lab |
| ITEM(S) NUMBER | TO: Nicole C Storms | FROM: Lt. Mark Cash |
| | DATE & TIME: 5/11/93  10:28 | REASON: Lab analysis |
| ITEM(S) NUMBER | TO: | FROM: |
| | DATE & TIME: | REASON: |
| ITEM(S) NUMBER | TO: | FROM: |
| | DATE & TIME: | REASON: |

366

Respondent's Exhibit E

PBPD F200/1007-105

E1   projectile lead - east end of driveway in front of Atm

E2   Copper jacket   drive way center of Atm

E3   Copper jacket   Driveway of Atm

E4   lead projectile   center of Atm Driveway

E5   Two lead projectile   Drive way west of Atm

E6   Copper jacket   Driveway west of Atm

E7   lead projectile - sidewalk center Atm

E8   Copper jacket   Driveway east of Atm

E9   Projectile - Center Driveway Atm

E10   lead projectile - south Driveway center Atm

E11   Projectile + Jacket North side of Drive way east of Atm

E12   copper jacket   center Atm center Driveway

E13   copper jacket   west of Atm center of driveway

E14   copper jacket   inside Front Atm under video screen

E15   copper jacket   east end of light above video screen on Atm

E16   copper coated lead projectile - south wall inside Atm

E17   copper jacket - from top of Atm inside

E18   lead fragment - from south wall inside Atm

E19   copper coated lead projectile - from inside Atm

E-20   one 9mm casing - east most Hull south lane   W. 5th ave

E-21   9mm casing   - south lane "Turner"

E-22   9mm casing   - north lane "east of Bunting"

E-23   9mm casing   - south lane "east of Bunting"

E-24   9mm casing   - center lane   "Bunting"

E-25   9 mm casing   center lane   "Bunting"

E-26   9 mm casing   south lane   "in front of Turner"

E-27   9 mm casing   center lane   east of Turner

E-28   video screen

6033

Respondent's Exhibit E

367



# KENNETH REAMS

# VOLUME 2

## (Kizer's Files)

Respondent's Exhibit E



NAACP LEGAL DEFENSE
AND EDUCATIONAL FUND, INC.

National Office
Suite 1600
99 Hudson Street
New York, N.Y. 10013-2897   (212) 219-1900   Fax: (212) 226-7592

May 13, 1996

Maxie G. Kizer, Esq.
721 Pine Street
Post Office Box 83101721
Pine Bluff, AK 71611

Dear Mr. Kizer:

I am enclosing a release executed by Kenneth Reams so that you can provide me with your files from his trial and direct appeal. If copying the entire contents would be unduly expensive, we would be happy to use our copying facilities and return whatever materials you request.

Thanking you again for your cooperation.

Sincerely,

George Kendall
Associate Counsel

308

368

tributions are
ctible for U.S.
me tax purposes.

The NAACP Legal Defense & Educational Fund, Inc. (LDF) is not part
of the National Association for the Advancement of Colored People
(NAACP) although LDF was founded by the NAACP and shares its
commitment to equal rights. LDF has had, since 1957, a separate
Board, program, staff, office and budget.

Regional Offices

Suite 301
1275 K Street, NW
Washington, DC 20005
(202) 682-1300
Fax: (202) 682-1312

Suite 208
315 West Ninth Street
Los Angeles, CA 90015
(213) 624-2405
Fax: (213) 624-0075

Respondent's Exhibit E

6035

## AUTHORIZATION FOR RELEASE OF INFORMATION

TO:   Maxie G. Kizer, Esq.:

I, _Kenneth Reams_ DOB _12/21/74_, hereby request, authorize and direct that you send to attorneys George H. Kendall, L. Song Richardson, and Mitchell A. Kamin, 99 Hudson Street, 16th Floor, New York, NY 10013, the entire case file generated during your representation of me in my capital murder prosecution that resulted in affirmance in *Reams v. State*, 322 Ark. 336, 909 S.W.2d 324 (1995).  I have retained the services of Mr. Kendall, Ms. Richardson and Mr. Kamin to assist me with seeking review of my case before the Supreme Court of the United States.

Done this _8th_ day of May, 1996.

_Kenneth Reams_

Sworn and subscribed before me

this _8_ day of May, 1996

_John D. Llewis_

My commission expires: _July 18, 2001_

369

Respondent's Exhibit E

6036

## MAXIE G. KIZER, P.A.

ATTORNEY AT LAW

721 PINE STREET
P. O. BOX 7423
PINE BLUFF, ARKANSAS 71611

MAXIE G. KIZER
BAR NO.
63101

November 1, 1996

TELEPHONE:
(501) 534-7004
FAX NO.
(501) 534-7010

Mr. Mitchell Kamin
NAACP Legal Defense and Educational
 Fund, Inc.
99 Hudson Street
New York, NY  10013

     Re:   Kenneth Reams

Dear Mr. Kamin:

     Enclosed please find the video tape which we previously discussed.  I hope this will be of some help to you.

     Sincerely,

MAXIE G. KIZER, P.A.

MGK:kb
Enclosure

370



**NAACP LEGAL DEFENSE
AND EDUCATIONAL FUND, INC.**

Suite 1600
99 Hudson Street
New York, N.Y. 10013-2897   (212) 219-1900   Fax: (212) 226-7592

March 19, 1996

Mr. Maxie Kizer
721 Pine Street
P. O. Box 7423
Pine Bluff, AR  71611

RE:   Kenneth Reams

Dear Mr. Kizer:

This office has agreed to file a petition for writ of certiorari in the United States Supreme Court for Mr. Reams.  The petition is due in early May.

Deborah Salling informed me that you are in possession of Mr. Reams' record.  Would you please send the record of all the trial and appellate proceedings to this office at your earliest convenience.

Thanks for your assistance with this matter.

Very truly yours,

George H. Kendall
Assistant Counsel

*Contributions are deductible for U.S. income tax purposes.*

The NAACP Legal Defense & Educational Fund, Inc. (LDF) is not part of the National Association for the Advancement of Colored People (NAACP) although LDF was founded by the NAACP and shares its commitment to equal rights. LDF has had for over 30 years a separate Board, program, staff, office and budget.

*Regional Offices*

Suite 301
1275 K Street, NW
Washington, DC 20005
(202) 682-1300
Fax: (202) 682-1312

Suite 208
315 West Ninth Street
Los Angeles, CA 90015
(213) 624-2405
Fax: (213) 624-0075

Respondent's Exhibit E
6038

Respondent's Exhibit E



OFFICE OF

# The Prosecuting Attorney

### Eleventh Judicial District

**WAYNE MATTHEWS**
Prosecuting Attorney

Jefferson County Courthouse
P. O. Box 8051
Pine Bluff, Arkansas
71611
Phone (501) 541-5387

August 30, 1993

Maxie Kizer
P.O. Box 7423
Pine Bluff, AR    71611

Re: State v. Kenneth Reams, CR-93-298-3, 93-299-3, 93-300-3 & 93-301-3

Dear Maxie,

    The first of the above-referenced cases is set for trial September 30.  If your client rejects the enclosed offer and we go to trial, we will be seeking the death penalty.  Therefore, it is vital that I know what his decision is by the cut-off date of September 15 on the plea offer.

Sincerely,

Carol Billings
Carol Billings
Deputy Prosecuting Attorney

372

Respondent's Exhibit E

IN THE CIRCUIT COURT OF JEFFERSON/LINCOLN COUNTY, ARKANSAS

STATE OF ARKANSAS                                               PLAINTIFF

VS.                              CR-__93-301-3_____
                                                                DEFENDANT
KENNETH REAMS

### REPORT OF PLEA NEGOTIATIONS

Now on this day comes the parties hereto, the State of Arkansas, by the Prosecuting Attorney, and the Defendant, and his/her attorney, and report the results of their negotiations.

Subject to the approval of this honorable Court, the above-styled case will be disposed of by:

__X__ Plea of Guilty to __CAPITAL MURDER_____

_____

_____

_____

_____

with the State's recommendation of:

__X__ Term of Years in Arkansas Department of Correction of:_____

LIFE WITHOUT PAROLE

_____

_____

_____

_____ Other Special Provisions: _____

_____

APPROVED:

WAYNE MATTHEWS
PROSECUTING ATTORNEY                        DEFENDANT

BY:_____    _____
DEPUTY PROSECUTING ATTORNEY      DEFENDANT'S ATTORNEY

DATE OFFERED:_____    DATE ACCEPTED:_____

Respondent's Exhibit E

373

6041

# MAXIE G. KIZER, P.A.

### ATTORNEY AT LAW

721 PINE STREET
P. O. BOX 7423
PINE BLUFF, ARKANSAS 71611

MAXIE G. KIZER
BAR NO.
83101

TELEPHONE:
(501) 534-7004
FAX NO.
(501) 534-7010

September 13, 1993

Ms. Carol Billings
Deputy Prosecuting Attorney
Post Office Box 8051
Pine Bluff, AR 71611

    Re:  State of Arkansas v. Kenneth Reams
        Jefferson Circuit No.: CR-93-298-3; 93-299-3; 93-300-3
              and 93-301-3

Dear Carol:

    Please notify me in writing of our agreement to try these
cases chronologically, and notify me in writing if you intend to
seek the death penalty.

    I look forward to hearing from you.

Sincerely,

By: _____
      MAXIE G. KIZER

MGK:kfb

374

Respondent's Exhibit E

OFFICE OF

# The Prosecuting Attorney

### Eleventh Judicial District

WAYNE MATTHEWS
Prosecuting Attorney

Jefferson County Courthouse
P. O. Box 8051
Pine Bluff, Arkansas
71611
Phone (501) 541-5387

September 21, 1993

Maxie Kizer
P.O. Box 7423
Pine Bluff, AR   71611

Re: State v. Kenneth Reams   CR-93-298-3, 93-299-3, 93-300-3 & 93-301-3

Dear Maxie,

We will be trying these cases in chronological order as they were filed. This means the Pine Bluff Dry Cleaners burglary will be the first on September 30, 1993; Curtis Gilbert, ATM, second; Bonnie Phillips, Greyhound Bus Station, third; and the ATM murder, Gary Turner, fourth.

I know Mr. Reams rejected our offer of life without parole, which had a cutoff date of September 15, 1993. It will not be offered again and we will seek the death penalty.

Yours truly,

Carol Billings
Deputy Prosecuting Attorney

375

Respondent's Exhibit E

Respondent's Exhibit E

# ARKANSAS DEATH PENALTY RESOURCE CENTER, INC.

1500 Riverfront Drive, Suite 118
Little Rock, Arkansas 72202

AJ Schay, Executive Director

(501) 663-1440
Fax (501) 663-2612

Staff Attorney
Deborah R. Sallings

Tommy Crosthwait
Investigator

November 2, 1993

Mr. and Mrs. Scott Whiteside
411 East Davis
Forrest City, AR  72335

　　　　Re:  Kenneth Reams

Dear Mr. and Mrs. Whiteside:

　　　Our office is consulting with your son Kenneth's lawyer, Mr.
Maxie Kizer, in his representation of Kenneth on capital murder
charges in Pine Bluff, Arkansas.  In order to prepare for trial,
it is essential that I talk with you as soon as possible.  The
charge is very serious, and your help is needed to prepare a case
for Kenneth.

　　　I would like for you to call me as soon as possible so that
we can discuss Kenneth's case and what can be done for him.
Please call me, collect, any time.  My number at the office is
663-1440, and I am here between 8:00 and 5:00.  My home number
for the next week or so is 663-9587. After that it will be 330-
2686.  Please try both home numbers, because I will be moving
some time soon but I am not exactly sure when.

　　　It is very important to Kenneth that I talk with you. I will
be waiting for your call.

　　　　　　　　　　Very truly yours,

　　　　　　　　　　*Deborah Sallings*

　　　　　　　　　　Deborah R. Sallings

DRS/dr

cc:  Maxie Kizer, Esq.

Respondent's Exhibit E

376

# ARKANSAS DEATH PENALTY RESOURCE CENTER, INC.

1500 Riverfront Drive, Suite 118
Little Rock, Arkansas 72202

Al Schay, Executive Director

(501) 663-1440
Fax (501) 663-2612

Staff Attorney
Deborah R. Sallings

Tommy Crosthwait
Investigator

November 2, 1993

Ms. Amelia Reams
308 Roxie Dr.
Poplar Bluff, MO  63901

            Re:  Kenneth Reams

Dear Ms. Reams:

    Our office is consulting with your nephew Kenneth Reams's
lawyer, Mr. Maxie Kizer, in his representation of Kenneth on
capital murder charges in Pine Bluff, Arkansas.  In order to
prepare for his trial, it is essential that I talk with you as
soon as possible.  The charge is very serious, and your help is
needed to prepare a case for Kenneth.

    I would like for you to call me as soon as possible so that
we can discuss Kenneth's case and what can be done for him.
Please call me, collect, any time.  My number at the office is
663-1440, and I am here between 8:00 and 5:00.  My home number
for the next week or so is 663-9587. After that it'will be 330-
2686.  Please try both home numbers, because I will be moving
some time soon but I am not exactly sure when.

    It is very important to Kenneth that I talk wit you.  I will
be waiting for your call.

                        Very truly yours,

                        Deborah Sallings

                        Deborah R. Sallings

DRS/dr

cc:  Maxie Kizer, Esq.

377

Respondent's Exhibit E

# ARKANSAS DEATH PENALTY RESOURCE CENTER, INC.

1500 Riverfront Drive, Suite 118
Little Rock, Arkansas 72202

Al Schay, Executive Director

(501) 663-1440
Fax (501) 663-2612

Staff Attorney
Deborah R. Sallings

Tommy Crosthwait
Investigator

November 2, 1993

Ms. Joanne Reams
1003 W. Third St.
Pine Bluff, AR  71601

 Re:  Kenneth Reams

Dear Ms. Reams:

 Our office is consulting with your nephew Kenneth Reams's lawyer, Mr. Maxie Kizer, in his representation of Kenneth on capital murder charges in Pine Bluff, Arkansas.  In order to prepare for his trial, it is essential that I talk with you as soon as possible.  The charge is very serious, and your help is needed to prepare a case for Kenneth.

 I would like for you to call me as soon as possible so that we can discuss Kenneth's case and what can be done for him. Please call me, collect, any time.  My number at the office is 663-1440, and I am here between 8:00 and 5:00.  My home number for the next week or so is 663-9587.  After that it will be 330-2686.  Please try both home numbers, because I will be moving some time soon but I am not exactly sure when.

 It is very important to Kenneth that I talk wit you.  I will be waiting for your call.

      Very truly yours,

      Deborah R. Sallings

DRS/dr

cc:  Maxie Kizer, Esq.

Respondent's Exhibit E

# ARKANSAS DEATH PENALTY RESOURCE CENTER, INC.

1500 Riverfront Drive, Suite 118
Little Rock, Arkansas 72202

Al Schay, Executive Director

(501) 663-1440
Fax (501) 663-2612

Tommy Crosthwait
Investigator

Staff Attorney
Deborah R. Sallings

November 8, 1993

Mr. and Mrs. Scott Whiteside
411 East Davis
Forrest City, AR   72335

Re:  Kenneth Reams

Dear Mr. and Mrs. Whiteside:

This will confirm our appointment on Thursday, November 11, 1993, at 9:00 a.m. at the office of Mr. Maxie Kizer, 721 Pine Street, Suite 5 in Pine Bluff, Arkansas.

I look forward to meeting you.

Very truly yours,

Deborah R. Sallings

DRS/dr

cc:  Maxie G. Kizer, Esq.

379

Respondent's Exhibit E

6048

## MAXIE G. KIZER, P.A.

ATTORNEY AT LAW

721 PINE STREET
P. O. BOX 7423
PINE BLUFF, ARKANSAS 71611

MAXIE G. KIZER
BAR NO.
83101

TELEPHONE:
(501) 534-7004
FAX NO.
(501) 534-7010

November 12, 1993

Ms. Jo Ann Reams
1119 East Second Street
Pine Bluff, Arkansas   71601

    Re:   State of Arkansas v. Kenneth Reams;
         Jefferson Circuit No. CR-93-301-3

Dear Ms. Reams:

    Please be advised that I am the attorney representing your nephew, Kenneth, regarding the above matter.   It would be appreciated if you would please call my office as soon as possible and set up an appointment to visit with me concerning this matter.

        Sincerely,

        MAXIE G. KIZER, P.A.

MGK:kb

380

Respondent's Exhibit E

## MAXIE G. KIZER, P.A.

**ATTORNEY AT LAW**

721 PINE STREET
P. O. BOX 7423
PINE BLUFF, ARKANSAS 71611

MAXIE G. KIZER
BAR NO.
83101

TELEPHONE:
(501) 534-7004
FAX NO.
(501) 534-7010

24 November 1993

Mr. & Mrs. Scott Whiteside
411 East Davis
Forrest City, Ar 72335

Re:  State of Arkansas vs. Kenneth Reams
     Jefferson Circuit No. CR-93-301-3

Dear Mr. & Mrs. Whiteside:

Please be advised that I met with Kenneth today at the
Varner Unit of the Department of Corrections.  The Prosecuting
Attorney has offered a plea negotiation.  If he will plead guilty
to the Capital Murder charge, he will receive a sentence of
Life in the Pen without Parole.  He has to let me know if he
wants to accept this offer by Monday.  As you know, if we pro-
ceed to trial in this case, the State will seek the Death Penalty.

Kenneth would like to see you and discuss this matter with
you.  If it is at all possible, please make arrangements to
visit with him at the Varner Unit this weekend.  I tried to
reach you by phone at the number you had given me, 633-7355,
but it is disconnected.

Please call me at home at 879-4336 should you want to
discuss this matter further.

Sincerely yours,

Maxie G. Kizer

mgk

381

Respondent's Exhibit E



Respondent's Exhibit E

*Kenneth*
*Reams*
*file*

# BYNUM & KIZER

### ATTORNEYS AT LAW
A PARTNERSHIP OF PROFESSIONAL ASSOCIATIONS

721 PINE, SUITES 3, 4 & 5
P. O. BOX 7268
PINE BLUFF, ARKANSAS 71611

F. WILSON BYNUM, JR., P.A.
MAXIE G. KIZER, P.A.

TELEPHONE:
(501) 536-4444
(501) 534-7004
FAX NO.
(501) 534-7010

## FAX COVER SHEET

===========================================================

TO: _____ Mrs. King _____

FAX NO.: _____ 314 - 785 - 6471 ext : 18 _____

FROM: _____ Karen _____

DATE: _____ 12-1-93 _____

RE: _____ Kenneth Reams DOB : 12-21-74 _____

COMMENTS: _____

TOTAL NUMBER OF PAGES (INCLUDING COVER PAGE) _____ 3 _____

## CONFIDENTIALITY NOTICE

The information contained in this facsimile message is legally
privileged and confidential information intended only for the use
of the individual or entity named above.  If the reader of this
message is not the intended recipient, you are hereby notified that
any dissemination, distribution or copy of this telecopy is
strictly prohibited. If you have received this telecopy in error,
please immediately notify us by telephone and return the original
message to us at the address via the U.S. Postal Service.

IF YOU DID NOT RECEIVE ALL THE PAGES OR EXPERIENCED RECEPTION
PROBLEMS, PLEASE CALL (501) 534-7004.

382

Respondent's Exhibit E

## MAXIE G. KIZER, P.A.

**FAX SENT**

ATTORNEY AT LAW

721 PINE STREET
P. O. BOX 7423
PINE BLUFF, ARKANSAS 71611

MAXIE G. KIZER
BAR NO.
83101

TELEPHONE:
(501) 534-7004
FAX NO.
(501) 534-7010

December 1, 1993

BY FACSIMILE

Poplar Bluff School System
Attention:  Mrs. King
Poplar Bluff, Missouri  63901

     Re:  State of Arkansas v. Kenneth Reams;
         Jefferson County, Arkansas, Circuit No. CR-93-301-3

Dear Mrs. King:

    Pursuant to my telephone conversation today, please find enclosed an Information Release executed by Mr. Reams.  We are presently represent Mr. Reams concerning a criminal matter here in Pine Bluff, Arkansas, which is set for trial on December 13, 1993. With that in mind, it would be appreciated if you would forward to me any and all school records you may have pertaining to Mr. Reams. His date of birth is December 21, 1974.

    If there is a charge for these records, please forward your statement along with this information and I will promptly remit.

    Thank you for your assistance in this matter.

    Sincerely,

MAXIE G. KIZER, P.A.

MGK:kb
Enclosure

383

Respondent's Exhibit E

## INFORMATION RELEASE AUTHORIZATION

TO: POPLAR BLUFF SCHOOL DISTRICT

DATE: 11-18-93

RE: KENNETH REAMS

You are hereby authorized and requested to furnish to **MAXIE G. KIZER, P.A.**, Attorney at Law, any and all information and materials regarding any contact, dealings or association of _____ POPLAR BLUFF SCHOOL DISTRICT _____ with the above named agency. Such information and materials should include all contents of files and should embrace any forms, reports, records, correspondence, memoranda, statements, applications, guarantees or any other materials available to you.

SIGNATURE: *Reams, Kenneth*

ADDRESS : *Varner Unit*

*P.O. Box 600*

*Gradey, Ark 71644 - 0600*

384

Respondent's Exhibit E



# Poplar Bluff Public Schools

### OFFICE OF THE SUPERINTENDENT
### P. O. BOX 47
### POPLAR BLUFF, MISSOURI 63901

JAMES F. DANIELS
PRINCIPAL
SENIOR HIGH SCHOOL
785-6471

December 2, 1993

Maxie G. Kizer, P.A.
Attorney at Law
721 Pine Street
P.O. Box 7423
Pine Bluff, AR  71811

Dear Ms. Kizer:

Enclosed are the copies of the complete file on Kenneth Lynnord
Reams.

Charges are as follows:

| | |
|---|---|
| 21 sheets @ 20 cents per copy | $ 4.20 |
| postage | 5.00 |
| see attached bill | 72.90 |
| | $82.10 |

Sincerely,

*Thelma King*

Thelma King
Records Clerk

Kearns, Kenneth

| | | | 95 94 |
|---|---|---|---|
| 1990-91 | Test, Math 76  # 86-230 | | $8 °° |
| 1991-92 | Civics Textbook  #    007 | | 8 °° |
| " | Biology  " | | 8 °° |
| " | Enrollment Fee | | 2 °° |
| | | | $26 °° |
| 1992-93 | Enrollment Fee | | 2 °° |
| " | Pre-Algebra | | 8 °° |
| " | SA II-4 | | 8 °° |
| " | W. Geog.- Bio  # 87-128 | | 8 °° |
| " | Library  # 40724 | | 7.95 |
| " | Library  # 39506 | | 12.95 |
| | | | $72.90 |

Kenneth still owes $72.90 made payable

☆

POPLAR BLUFF SENIOR HIGH SCHOOL
HIGHLAND DRIVE
POPLAR BLUFF, MISSOURI   63901

386

Respondent's Exhibit E

# BYNUM & KIZER

### ATTORNEYS AT LAW
A PARTNERSHIP OF PROFESSIONAL ASSOCIATIONS

721 PINE, SUITES 3, 4 & 5
P. O. BOX 7288
PINE BLUFF, ARKANSAS 71611

F. WILSON BYNUM, JR., P.A.
MAXIE G. KIZER, P.A.

TELEPHONE:
(501) 536-4444
(501) 534-7004
FAX NO.
(501) 534-7010

## FAX COVER SHEET

=================================================================

TO: _Sears Youth Center - Central Office. Jefferson City. MO_

FAX NO.: _(314) 526-4494_

FROM: _Maxie G Kizer_

DATE: _12-1-93_

RE: _Kenneth Reens_

COMMENTS: _We were told by Poplar Bluff office to forward_
_this to your office._

TOTAL NUMBER OF PAGES (INCLUDING COVER PAGE) _3_

## CONFIDENTIALITY NOTICE

The information contained in this facsimile message is legally
privileged and confidential information intended only for the use
of the individual or entity named above.  If the reader of this
message is not the intended recipient, you are hereby notified that
any dissemination, distribution or copy of this telecopy is
strictly prohibited. If you have received this telecopy in error,
please immediately notify us by telephone and return the original
message to us at the address via the U.S. Postal Service.

IF YOU DID NOT RECEIVE ALL THE PAGES OR EXPERIENCED RECEPTION
PROBLEMS, PLEASE CALL (501) 534-7004.

387

# MAXIE G. KIZER, P.A.

### FAX SENT

**ATTORNEY AT LAW**

721 PINE STREET
P. O. BOX 7423
PINE BLUFF, ARKANSAS 71611

MAXIE G. KIZER
BAR NO.
63101

TELEPHONE:
(501) 534-7004
FAX NO.
(501) 534-7010

November 30, 1993

<u>**BY FACSIMILE**</u>

Sears Youth Home
9400 Sears Lane
Poplar Bluff, Missouri  63901

      Re:  State of Arkansas v. Kenneth Reams;
           Jefferson County, Arkansas, Circuit No. CR-93-301-3

Dear Sirs:

     Please be advised that I represent Kenneth Reams here in Pine
Bluff, Arkansas, concerning a capital murder charge he has pending
in Jefferson County, which is set for trial on December 13, 1993.
To that end, it would appreciated if you would please forward to me
as soon as possible a complete copy of any and all records which
you may have concerning Kenneth Reams at your facility.  If there
is a charge for these records, please forward a bill for your
services and I will promptly remit same.

     Thank you for your assistance in this matter.

               Sincerely,

               MAXIE G. KIZER, P.A.

MGK:kb
Enclosure (Information Release Authorization)

388

Respondent's Exhibit E

## INFORMATION RELEASE AUTHORIZATION

TO: SEARS YOUTH CENTER

DATE: 11-18-93

RE: KENNETH REAMS

You are hereby authorized and requested to furnish to MAXIE G. KIZER, P.A., Attorney at Law, any and all information and materials regarding any contact, dealings or association of _____

SEARS YOUTH CENTER _____ with the above named agency. Such information and materials should include all contents of files and should embrace any forms, reports, records, correspondence, memoranda, statements, applications, guarantees or any other materials available to you.

SIGNATURE: *Reams, Kenneth*

ADDRESS: *Varner Unit*

*P.O. Box 600*

*Gardy, Ark 71644 - 0600*

389

Respondent's Exhibit E



**SOUTHEAST ARKANSAS**

**MENTAL HEALTH CENTER, INC.**

2500 Rike Drive
P.O. Box 1019
Pine Bluff, AR 71613
501/534-1834
800/272-2008
FAX 501/534-5798

CLARENCE W. PERKINS
*Administrator*

BOARD OF DIRECTORS
MRS. ANN SHELTON
*President*
MRS. JANELLE POWELL
*Vice-President*
MRS. M.C. ARRANT
*Secretary*
MRS. NOVELLE B. CLARK
*Treasurer*
MRS. EDWARD E. BROWN
STEVE BROWN
MR. NOEL F. "BUD" BRYANT
MRS. FRANCES HARPER
MRS. JAMES R. HOPSON
MRS. GEORGE HOWARD, JR.
J.B. JOHNSON, ED.D.
JUDGE BERLIN JONES
JUDGE JACK JONES
MRS. CAROL MARTIN
JOHN McCLANAHAN, PH.D.
RICHARD RILEY
THOMAS E. TOWNSEND, M.D.

WILLIAM JOE JAMES, M.D.
*Medical Director*

J.L. CARLTON, M.D.
*Assistant Medical Director*

LLOYD YOUNG, M.D.
*Child/Adolescent Psychiatrist*

September 28, 1993

Judge Fred Davis
Jefferson County Circuit Court
Jefferson County Courthouse
Barraque at Main Streets
Pine Bluff, Arkansas  71601

Re:  State of Arkansas
     vs. Kenneth Reams
     No. CR-93-298-3;  CR-93-299-3;
         CR-93-300-2;  CR-93-301-3

Dear Judge Davis:

    As directed by the Order entered in the above-captioned matter, Kenneth Reams was seen for evaluation at the Southeast Arkansas Mental Health Center to determine competency to stand trial.

    Enclosed are the individual evaluation reports prepared by our staff after interviews conducted with Mr. Reams.  These reports include a Social History, Psychological Evaluation, and Psychiatric Evaluation.

    If we may be of further assistance to the Court in this matter, please let us know.

                    Sincerely,

                    *Clarence Perkins*

                    Clarence W. Perkins
                    ADMINISTRATOR

CWP:kh - encs.

cc: w/encs.

Prosecuting Attorney

Mr. Maxie Kizer
Attorney at Law

330  Mr. Billy Burris
     Division of Mental Health Services

THIS AGENCY IS COMMITTED TO THE NON-DISCRIMINATORY DELIVERY OF SERVICES AND IS AN AFFIRMATIVE ACTION-EQUAL OPPORTUNITY EMPLOYER

6060

Respondent's Exhibit E

43224622

## PSYCHOLOGICAL EVALUATION

NAME:    KENNETH REAMS    #834222
DOT:     9/27/93
DOB:     12/21/74
CA:      18-9
DAN:ls   5830P

REASON FOR REFERRAL:  This 18-year-old black male is referred through Jefferson County Circuit Court for evaluation to aid in determining competency.

TESTS ADMINISTERED:

WECHSLER ADULT INTELLIGENCE SCALE-REVISED (WAIS-R)
WIDE RANGE ACHIEVEMENT TEST-REVISED (WRAT-R)
HOUSE-TREE-PERSON (HTP)
BENDER VISUAL-MOTOR GESTALT TEST
BRIEF INTERVIEW

Mr. Reams' testing began at 10:15 a.m. and ended at 12:00 noon.

NOTES AND OBSERVATIONS:  Mr. Reams entered the testing situation in a reserved manner.  Without speaking he seated himself in a chair in the examiner's office.  He easily established and maintained good eye contact with the examiner, however, he was not verbally spontaneous. His verbalizations were rather soft and shallow.  Mr. Reams was alert and oriented to time, date, place and person.  His responses seemed slow and guarded.  His speech was directed and not pressured.  At the start of the session, he was noted to be involved with some inappropriate laughter, but as the session progressed and he became more involved in tasks presented, the laughter ceased until there was a pause in the testing.

Mr. Reams states that he completed the 8th grade and was put out of school in the 9th grade for fighting when he hit a principal.  He stated that prior to his arrest, he was living with different friends for about the past two years.  He stated that he last attended school in Forrest City.  He added that is where his family is, but he moved to Pine Bluff about two years ago.

When asked about the current charges against him, he stated that he is being charged with murder.  He states that this is not the first time that he has been arrested, stating that he was arrested previously for stealing.  He stated in 1991 he was in a youthful offenders camp for stealing.  He states that he has never held a full-time job and does not have a driver's license, but can drive a car a little bit.  When I asked him again about the charges against him, he started crying, stating that he is really in trouble, that he is only 18 and he is going to spend the rest of his life on death row.  He stated that he did not do it, but that it was his gun.

391

Respondent's Exhibit E

PAGE 2
PSYCHOLOGICAL EVALUATION
KENNETH REAMS

TEST RESULTS AND INTERPRETATION: Mr. Reams attained a WAIS-R Full Scale IQ of 66, which falls into the Mild range of Mental Retardation, according to the Wechsler Classification System. He attained a Verbal IQ of 67 and a Performance IQ of 67, with both scores falling in the same classification range and no significant discrepancy noted among scores.

Mr. Reams, who claims to have an 8th grade education, attained the following grade equivalent and standard scores on the WRAT-R:

| | | |
|---|---|---|
| Reading | less than 3 | 57 |
| Arithmetic | 3E | 54 |

As noted, both grade equivalents are significantly behind his stated 8th grade educational level. Mr. Reams' performance on the WRAT-R would support mild mental retardation.

Mr. Reams completed his Bender-Gestalt in 2 minutes 24 seconds. His handling of this task suggests an individual who has problems with impulse control and low frustration tolerance.

Mr. Reams completed his HTP drawings in a rather free and easy manner. His handling of this task suggests an emotionally immature individual with a poor self-image. Feelings of instability and ineffectiveness are noted. He may tend to take more of a self-centered approach to life. There appears to be some underlying anger and frustration that he could act out in an explosive manner.

In general, Mr. Reams currently tested into the Mild range of Mental Retardation, according to the Wechsler Classification System. His academic achievement level tested out at or below the 3rd grade level. He did demonstrate some visual-motor coordination problems during this testing.

Behaviorally, Mr. Reams is seen as an emotionally immature individual, who has problems with impulse control and low frustration tolerance. There is some underlying anger and frustration which may increase his acting out potential in an explosive manner.

Current psychological testing did not suggest the presence of any active psychosis or severe psychopathology at this time. Common sense reasoning and judgement appear to be limited, however, he was able to express the difference between right and wrong, and he did express some remorse over the situation he is currently involved in.

392

Respondent's Exhibit E

PAGE 3
PSYCHOLOGICAL EVALUATION
KENNETH REAMS


Current testing suggests that Mr. Reams could be able to actively
participate in his own defense.  It is recommended that
communications with Mr. Reams be of a verbal nature as his reading
is quite limited.  It is also recommended that Mr. Reams be
questioned about his understanding to make sure that he does
understand what is being said to him, and that he be allowed to
completely express himself so he does not become confused.


David A. Nanak, M.A.                    Patrick Caffey, Ph.D.
PSYCHOLOGICAL EXAMINER                  CONSULTING PSYCHOLOGIST

393

Respondent's Exhibit E

COURT-ORDERED SOCIAL HISTORY

KENNETH REAMS      #834222
9/27/93
AJ:ls   14264


Time:  9:00 a.m. to 10:00 a.m.


IDENTIFYING INFORMATION:  Mr. Reams is an 18-year-old, single black
male, currently incarcerated in the city jail locally.  He is charged
with Capital Murder I.

PRESENTING PROBLEMS:  Mr. Reams stated that he was walking several
weeks ago with two friends, whose ages approximate his own,
identified as "Butterball and Jermaine."  He indicated they were on
the way to "get some dope", when apparently the friend identified as
Butterball saw a pickup truck, he thought he identified as being one
of his friends.  He stated that they were all smoking cigars, but did
not have any matches, so he approached the truck to ask for a light.
He stated the next thing he heard was a "shot."  Apparently,
Butterball and Jermaine left the scene.  Mr. Reams stated that he
approached the truck and saw "this white guy shot."  He stated that
he assumed that the man was dead.  The truck apparently continued to
move so he entered the vehicle with the intent of bringing it to a
halt.  He decided to leave the truck and noticed that the two friends
had left the scene and he could not locate them.  He stated that he
left the area and was arrested a short time later "down the street
from my house."

Mr. Reams stated that the gun used in this homicide belonged to him,
but he had "loan it to Butterball" a few days earlier.  He denies
emphatically that he shot this victim.  He stated that at the time
of the incident he was on probation for burglary, but could not
recall with any accuracy circumstances involved in this alleged
crime.  He was arrested and allegedly beat up by the detectives, whom
he stated tied him up with a rope, slapped him around, picked him up
by his neck, and threatened to have him killed by the Klu Klux Klan.
Mr. Reams stated that he signed a confession based on harassment and
coercion by the arresting officers.

FAMILY BACKGROUND:  Mr. Reams is a very poor historian, and I was
unable to decipher accurate information with regard to his
background.  He answered many questions with "I just don't know."

Mr. Reams stated that he raised himself from a child and does
remember living from time to time with grandparents and an aunt.  He
stated that he never knew his father; with regard to his mother, he
merely stated, "I miss her."  He stated that he does not remember
his birth date.

394                        CONFIDENTIAL

Respondent's Exhibit E

PAGE 2
COURT-ORDERED SOCIAL HISTORY
KENNETH REAMS


He lists the last school attended in Forrest City and stated that he thinks he completed the 9th grade, although he was expelled several times for behavioral problems.  He claims that he was ridiculed by his peers in school and was referred to as being "loco."  Hence, he adopted the name "Loco G."  He stated that he attended special education and flunked out of most courses that were offered.  He stated that he was also referred to as "Super Stupid."

Mr. Reams stated that he has two younger brothers, but their whereabouts are unknown.  He claims to have resided in Pine Bluff five months prior to his arrest, having visited an aunt and uncle.  He claims he had been "running from the police."  He claims that he has not seen his mother for several years.  He states that he has hitchiked to the following states: Illinois, Iowa, Missouri and Wisconsin.

MARITAL HISTORY:  Mr. Reams has never married, nor has he fathered any children, by his own admission.  He does state that he has a girlfriend but does not know her whereabouts.  He prefers heterosexual relationships and states that he has never been involved in a homosexual affair.

EMPLOYMENT HISTORY:  His employment history is negative for gainful employment.  Mr. Reams stated that he has "dealt in drugs."  He stated that he has earned up to $2,000 per week and "gave most of it away."  He stated that he was a member of gangs ("The Folks" and "The Disciples").

MEDICAL HISTORY:  The medical history is negative for hospitalizations or surgeries.  He claims that he is in good health.  He has numerous scars and bruises from fights he has been engaged in since early childhood.  He claims that he had to fight in order to survive a rather hostile environment.

When asked to identify the day, month and year, he stated, "I hope it's a good day."  In regard to the month, he states, "I believe it's the month that Labor Day is in."  He correctly identified the year as 1993.  He is unable to identify the president, mayor, or any state representative.

Mr. Reams stated that he hears voices all of the time, "Like somebody talking to me."  He does appear somewhat preoccupied and his long-term and short-term memory seems grossly impaired.

Respondent's Exhibit E

PAGE 3
COURT-ORDERED SOCIAL HISTORY
KENNETH REAMS

CURRENT SITUATION:  Mr. Reams has been charged with capital murder.
He was incarcerated along with a friend, whom he accuses of being the
perpetrator of this crime.  Mr. Reams stated that he has never killed
anyone.  He does admit to a rather lengthy antisocial background,
including being on probation for burglary at the time of the alleged
incident.

Mr. Reams is unable to recall with any accuracy important develop-
ments of his childhood.  He apparently was raised by relatives other
than his biological parents.  He states that he does not have a
father and indicates that it has been several years since he has
seen his mother.

He admits to using marijuana and other unidentified pills.  He stated
that he drinks a lot, although he does deny being an alcoholic.  He
stated that he has been arrested on numerous occasions but has never
spent time in the Boys Training School.

Mr. Reams stated that he felt alienated and isolated most of his
life.  He states that people refer to him as "Super Stupid."  He
adopted the name "Loco G" because the children called him that so
much until he thought it was his real name.  He has also been
referred to as "Crazy Kenneth."

TREATMENT AND RECOMMENDATIONS:  Completed reports will be forwarded
to the appropriate components.


_Allen Johnson, ACSW_

Allen Johnson, ACSW, LCSW
PSYCHIATRIC SOCIAL WORKER


396

Respondent's Exhibit E

PSYCHIATRIC EVALUATION
(CIRCUIT COURT)

NAME:  Kenneth Reams      #834222
DATE:  09-27-93
AS:sbg    7263Y

Time In:   1:00 p.m.
Time Out:  2:30 p.m.

IDENTIFICATION OF PATIENT:  Kenneth Reams is an 18-year-old, single, black male who has been referred here by Circuit Court Judge Fred D. Davis, III, for an evaluation to determine whether or not he lacks the capacity to understand the proceedings against him and to effectively assist in his own defense.  His charges are: (1) Burglary and Theft of Property;  (2) Aggravated Robbery; and (3) Capital Murder.

Mr. Reams presents as a sullen, withdrawn 18-year-old male appearing his stated age.  His attitude was evasive and eye contact very erratic and poor.  He was noted to at times giggle inappropriately and response to questions was very brief and at times monosyllabic. He appeared rather resistive and somewhat uncooperative with the interview process ("Why are you asking me these questions?  I've been through this before.").

PRESENTING PROBLEM:  When questioned as to what his charges were, his response was, "I'm in jail for murder and I didn't do it.  The police said that I have robbed a man and killed him.  I am charged because they beat me.  I don't know how my fingerprints got on the gun and on the truck that the man was in.  They are going to fry me for another man's action."

When he was asked to give an account of what had really happened since he was denying his charges, he was rather vague in his presentation and had to stop frequently as though he was having memory lapses.  He states, "All I remember is that this dude and I were going to buy some weed from the man in the truck, but when I got there I heard a bang like a gunshot.  It turned out to be my gun that was fired and I don't know how my fingerprints got on the gun or on the truck.  Police beat me up and insisted that I had killed him."

BACKGROUND INFORMATION:  Mr. Reams reports that he was born in Pine Bluff and that he was the oldest son of his parents.  He reports having two younger brothers ages 6 and 7 respectively.  He said he was raised in Forrest City and went to Forrest City High School.  He describes his interpersonal relationships with his parents as very distant and that they would beat him and there were frequent arguments and fights over trivial things.  He, himself, was involved in frequent fights and got involved in drinking alcohol and doing drugs at an early age.  He would hang around in gangs and

CONFIDENTIAL
Respondent's Exhibit E

397

PAGE 2
PSYCHIATRIC EVALUATION
(CIRCUIT COURT)
KENNETH REAMS

would sell drugs.  He would be involved in fights in school and
reportedly punched the principal of his school when he was in the
9th grade and never went back to school again.  There has been a
history of antisocial behavior right from early adolescence.  He
denies any legal charges prior to his present ones.  He denies a
past psychiatric history or being hospitalized for any reason other
than for a head injury many years ago.

FAMILY HISTORY:  He reports that a maternal uncle has a history of
mental illness.  No details are obtainable at this time.

MEDICAL HISTORY:  The patient denies any medical problems.  He is
not on any routine medications and does not have any allergies.

SUBSTANCE ABUSE HISTORY:  Mr. Reams reports drinking alcohol almost
on a daily basis since the age of 16 and smoking marijuana very
often.  He could not quantify the frequency or length of usage.  He
denied other street drugs or intravenous drug abuse.

Mr. Reams has been at the County Jail in Pine Bluff since the
beginning of 1993.

MENTAL STATUS:  This is a somewhat withdrawn, 18-year-old, black
male who appears rather resistive with the examination.  He was
noted to laugh inappropriately, with response to questions being
rather vague and searching as though he has problems with his
memory.  However, he is alert and oriented in all three spheres.
His recent and remote memory are intact.  He was able to recollect
the names of three unrelated objects after ten minutes, though he
had a little difficulty.  His speech was clear, coherent, and of
normal rate, volume, and prosody.  There was no evidence of a
thought disorder.  He was goal directed.  There was no
disorganization, tangentiality, or circumstantiality.  He denied
auditory or visual hallucinations or any perceptual distortions.
His mood was somewhat withdrawn and affect was appropriate to his
mood.  His general fund of knowledge was poor.  Serial 7s were
inaccurate.  Serial 3s were done with great difficulty and were
inaccurate.  He was very concrete with the interpretation of
proverbs, similarities, and differences and seemed to be functioning
in the mildly mentally retarded range.

IMPRESSION:  Though Mr. Reams denies his charges and appears to be
mildly mentally retarded, he does have the mental capacity to
appreciate the criminality of his conduct and to conform his conduct
to the requirements of the law.  He knows what the outcome of
murdering a person is.

398

Respondent's Exhibit E

6068

PAGE 3
PSYCHIATRIC EVALUATION
(CIRCUIT COURT)
KENNETH REAMS

He does understand the nature and purpose of this examination. He knows that this has been ordered by the court. His knowledge of the judicial system is somewhat limited, but I believe he has the capacity to understand the proceedings against him and to assist effectively in his own defense. Though he denies his legal charges, his account of what actually transpired was very vague and unconvincing. He is able to distinguish right from wrong and what is legal and unlawful and knows what the outcome of murdering a person is.

DIAGNOSIS:
        Axis I   -  Alcohol Abuse
                 -  Cocaine Abuse
        Axis II  -  Mild Mental Retardation
                 -  Antisocial Personality
        Axis III-   None
        Axis IV  -  Moderate/Moderate

OPINION:  Though Mr. Reams appears mildly mentally retarded and is denying his legal charges, he does have the capacity to distinguish what is legal from criminal and understands what the outcome of committing a murder is.

---------------------------------------
Ahsan Syed, M.D.
STAFF PSYCHIATRIST

399

Respondent's Exhibit E

Respondent's Exhibit E

# MAXIE G. KIZER, P.A.

### ATTORNEY AT LAW

721 PINE STREET
P. O. BOX 7423
PINE BLUFF, ARKANSAS 71611

MAXIE G. KIZER
BAR NO.
83101

TELEPHONE:
(501) 534-7004
FAX NO.
(501) 534-7010

November 12, 1993

Mr. Kenneth Reams
ADC No. 102054
Varner Unit
Post Office Box 600
Grady, Arkansas  71644-0600

     Re:   State of Arkansas v. Kenneth Reams;
          Jefferson Circuit No. CR-93-301-3

Dear Kenneth:

    Please find enclosed an Information Release.  Please sign this
and return it to me as soon as possible in the enclosed, self-
addressed, stamped envelope.  We will need this in order to get
some necessary background information to help us prepare your
defense.

               Sincerely,

               MAXIE G. KIZER, P.A.

MGK:kb
Enclosure

400

Respondent's Exhibit E

## MAXIE G. KIZER, P.A.

### ATTORNEY AT LAW

721 PINE STREET
P. O. BOX 7423
PINE BLUFF, ARKANSAS 71611

MAXIE G. KIZER
BAR NO.
83101

TELEPHONE:
(501) 534-7004
FAX NO.
(501) 534-7010

November 17, 1993

Mr. Kenneth Reams
ADC No. 102054
Varner Unit
Post Office Box 600
Grady, Arkansas  71644-0600

      Re:  State of Arkansas v. Kenneth Reams;
          Jefferson Circuit No. CR-93-310-3

Dear Kenneth:

    On the day that you entered your plea before the Court and received a sentence of 40 years I tendered to you a complete copy of your capital murder case file.  I have plans to be visiting the Varner Unit next week and I will make arrangements to visit you when I am there.

    I look forward to talking with you soon.

                Sincerely,

                MAXIE G. KIZER, P.A.

MGK:kb

401

Respondent's Exhibit E

# MAXIE G. KIZER, P.A.

ATTORNEY AT LAW

721 PINE STREET
P. O. BOX 7423
PINE BLUFF, ARKANSAS 71611

MAXIE G. KIZER
BAR NO.
83101

TELEPHONE:
(501) 534-7004
FAX NO.
(501) 534-7010

February 4, 1994

Mr. Kenneth Reams
#S.K 927
2501 State Farm Road
Tucker, Arkansas  72168-9503

        Re:  State of Arkansas v. Kenneth Reams

Dear Kenneth:

        I have asked for the transcript to be prepared in your case.
As soon as I receive it, I will send you a copy.

                        Sincerely,

                        MAXIE G. KIZER, P.A.

MGK:kb

Respondent's Exhibit E

## MAXIE G. KIZER, P.A.

### ATTORNEY AT LAW

721 PINE STREET
P. O. BOX 7423
PINE BLUFF, ARKANSAS 71611

MAXIE G. KIZER
BAR NO.
83101

TELEPHONE:
(501) 534-7004
FAX NO.
(501) 534-7010

October 24, 1994

Mr. Kenneth Reams
SK927
Maximum Security Unit
2501 State Farm Road
Tucker, Arkansas   72168

 Re:   Reams v. State of Arkansas

Dear Kenneth:

 Please find enclosed a copy of the argument portion of your brief.

      Sincerely,

      MAXIE G. KIZER, P.A.

MGK:kb
Enclosure

**403**

Respondent's Exhibit E

# MAXIE G. KIZER, P.A.

ATTORNEY AT LAW

721 PINE STREET
P. O. BOX 7423
PINE BLUFF, ARKANSAS 71611

MAXIE G. KIZER
BAR NO.
83101

TELEPHONE:
(501) 534-7004
FAX NO.
(501) 534-7010

November 10, 1994

Mr. Kenneth Reams, SK927
2501 State Farm Road
Tucker, Arkansas  72168

    Re:  Kenneth Reams v. State of Arkansas;
        Supreme Court No. CR-94-558

Dear Kenneth:

    Please find enclosed a copy of your Abstract and Brief filed
in the above matter.

        Sincerely,

        MAXIE G. KIZER, P.A.

MGK:kb
Enclosure

**404**

Respondent's Exhibit E

# MAXIE G. KIZER, P.A.

### ATTORNEY AT LAW

721 PINE STREET
P. O. BOX 7423
PINE BLUFF, ARKANSAS 71611

MAXIE G. KIZER
BAR NO.
83101

TELEPHONE:
(501) 534-7004
FAX NO.
(501) 534-7010

July 18, 1995

Mr. Kenneth Reams
S. K. 927
2501 State Farm Road
Tucker, Arkansas 72168

     Re:   Kenneth Reams v. State of Arkansas
          Appeal No. CR-94-558

Dear Kenneth:

    Please find enclosed another Motion for an Extension of Time
in which to File the Appellee's Brief received in the above
matter.

                 Sincerely,

                 MAXIE G. KIZER, P.A.

MGK:kb
Enclosure

cc:  Mr. Ted Holder

405

Respondent's Exhibit E

# MAXIE G. KIZER, P.A.

### ATTORNEY AT LAW

721 PINE STREET
P. O. BOX 7423
PINE BLUFF, ARKANSAS 71611

MAXIE G. KIZER
BAR NO.
83101

TELEPHONE:
(501) 534-7004
FAX NO.
(501) 534-7010

September 18, 1995

Mr. Kenneth Reams
ADC No. 00927
Maximum Security Unit
2501 State Farm Road
Tucker, Arkansas   72168

     Re:   Kenneth Reams v. State of Arkansas;
          Appeal No. CR-94-558

Dear Kenneth:

    Please  find enclosed the Appellee's Brief filed in the above
matter.

               Sincerely,

               MAXIE G. KIZER, P.A.

MGK:kb
Enclosure

406

Respondent's Exhibit E

6077

# MAXIE G. KIZER, P.A.

ATTORNEY AT LAW

721 PINE STREET
P. O. BOX 7423
PINE BLUFF, ARKANSAS 71611

MAXIE G. KIZER
BAR NO.
83101

TELEPHONE:
(501) 534-7004
FAX NO.
(501) 534-7010

December 14, 1995

Mr. Kenneth Reams
ADC No. SK927
Maximum Security Unit
2501 State Farm Road
Tucker, Arkansas 72168

     Re:    Kenneth Reams v. State of Arkansas;
           Case No. CR-94-00558

Dear Kenneth:

    Please find enclosed a copy of the Supreme Court's ruling wherein your petition for rehearing was denied and where the motion for entry of appearance and petition for stay of mandate was granted.

                Sincerely yours,

                MAXIE G. KIZER, P.A.

MGK:kb
Enclosure

407

Respondent's Exhibit E

Hello Mr. Kizer,                                    2-1-94

How are you doing? Well I
hope your doing okay. Well I'm doing fine. The
reason I'm writing is because I have been trying
to call you but they want except my call. I
wrote the NAACP in N.Y., New York asking for some
help with my case and they said that they are
willing to help you review my case. I would like
you to send me a copy of all the issues
that you are going to raise on my appeal.
And a copy of everything you have filed in
my Capitol Murder case, as soon as possible.
I will the calling Mr. Hawkin this week
to talk to him about some things, I'm going
to give him your phone # number so he can
call you. The one in Washington D.C. may
help also, I'm waiting to here something now
any day. Well keep in touch. And send me
the copies and other things I asked for
right away, as soon as possible.

                              Sincerly,
                              Reams

W/B/A/S/P

Respondent's Exhibit E

What do you think about when you pick up a newspaper and read articles like this:

> A jury returned a guilty verdict Wednesday in the capital mur-
> der trial of a Pine Bluff boy, age 18, accused of a shooting
> death during a robbery attempt at an automatic teller machine.
> The jury returned at 9 p.m. with a sentence of death by lethal
> injection.

What goes through your mind when you read or hear something like this? What really goes through your mind, how do you feel, or do you even care?

Well, the story I just talked about is what happened in my life on December 15, 1993. My name is Kenneth L. Reams, and I was sentenced to die by lethal injection just six days before my 19th birthday, and it was the worst thing that had ever happened in my life. Something that I never thought would ever happen to me.

What if it was your mom, your sister, your aunt, your best friend, or even you? What would you do?

Many times I wish I could turn back the clock or even be a little kid again. As we all know, though, those things are not possible, and a second chance is hard to get.

So why put the chance you have now on the line for another chance you may never see? When will you wake up and realize that life is not a joke or a game? Why wait until you are paralyzed, lose your leg, lose family, end up in the penitentiary for the rest of your life, or on Death Row, when you have a chance to change now?

I'm writing this because I want to help people who are doing the same things I once did. Stealing, dealing drugs, gang banging, robbing, burglarizing stores, and many other things. I care, unlike some other people. I don't want to see you ruin your life or end up here on Death Row. This place is not a playland nor is it a walk in the park.

You have a chance to be somebody, to go places, to see things. Take advantage of

409

Respondent's Exhibit E

your chance and don't misuse it. 'Cause once you're here, you're here. It will be too late to say I wish I had done this or that. Take it from me, your homies don't care. Trust me. I wouldn't lie to you.

If you are doing wrong, please stop, 'cause if you don't you will end up like me, if not dead. You cannot beat the system, the system will only beat you and it may just kill you. Don't think it won't, you see, 'cause I thought the same thing. But look where I'm at now.

I really hope you listen to what I have to say and I hope you take heed to the things I've said, 'cause freedom is more than you think it is.

Death Row Inmate # 927

*Kenneth Reams*

Kenneth Reams

If you have any questions or something you would like to talk about, please write to:

KENNETH REAMS, SK 927
2501 State Farm Road
Tucker, AR 72168-9503

P.S. HELP THE PROBLEM, DON'T HURT IT.

410

Respondent's Exhibit E

733169

Dear Mr. Kizer,                                      12-3-97

          These 3 typed letters I'm
sending to you, is what I've been doing
since I've been on death row. I send
them out just about every day. They have
touched the lives of many. They are all
over this world by now. Many write to
me from places like Alaska, TN., Ohio, Mo.
New York, Ill, AZ., Texas, from everywhere.
I have been help young people in group
homes - boys schools, first time jailers -
These letter have been in Newspaper, newsletter,
books, all type of things. I gave my life
to God three days after being here. I've
been trying to help others every since
then, and I have. I just wanted to
let you know this.

                              Kenneth Reams

411

Respondent's Exhibit E

The reason why I'm writing this letter is because I'm hoping to reach or change someone life, and their way of thinking. Praying that they will turn and start living for the Lord, while He is calling them before something very bad happens in their life. So please listen to me, not just the young, but also the old.

My name is Kenneth Reams, I just turned 19-years old only three days ago. I'm a young black male about five feet five and I have great art skills and can do many things other's can't, and I have many things to be thankful for. One, is that I'm still alive, and I thank God for that.

I've told you a few things about me now let me ask you a very, very important question, and be very honest. Are you living for the Lord?

The reason why I'm asking you these question is cause I had a chance to do these things, but I turned to the streets instead, and that's why Im here. You may say where, but don't rush I'm getting to that. I'm taking my time to write this letter because the Lord sent someone to me and asked me if I would do it. So, I'm hoping this letter reachies someone if not you, maybe the person next to you, or someone behind you.

Listen you have a chance to do whats right, to live a wonderful life, to go places and see things, and most of all you have a chance to be something and somebody in life. Listen, a chance is all some people would love to have again. The Lord God is calling you, You have a chance to go to Him. So please use that chance while He's calling.

I didn't use my chance the wise way when He was calling for me. He called me many times once I went to see what He wanted and He told me I need to change my life, so I did. I joined a church, got baptized I was even on the usher board. At that point my life was wonderful. I would say it was the best years of my LIFE since I've been living. But I stoped going to church, started back breaking the law, in other words, SINNING. Dealing dope, stealing, shooting at peoples, and robbing peoples. When I started doing these things I let God go, which was the biggest mistake in my life. And many times I wish I could go back, But we all know we can't go back into time. But like I said, everyone get a chance, I miss-used mine and look what happened to my life.

On December 15, 1993 I was sentenced to the Arkansas Department of Correction, to die by lethal injection, for the shooting death of a Pine Bluff Ark. Man during a robbery attempt at an automatic teller machine. And it's hard for me to deal with it. At the time I was only 18-years old and I've only been here for nine days, and I'm the youngest inmate on death row, waiting to die.

Every day that I wake up, I often find myself asking the Lord God why me Lord, why me Lord. But I have no one to blame but myself, because He called me but I didn't answer. I turned around and now look where I'm at, on death row. I never though that a thing like this would happen to me, but it was cause I turn my back on the Lord. Only if I would have stayed with the Lord, I wouldn't be here. How do I know this, Because the Lord, says if I'm leading you, you don't need to know where your going.

**412**

Respondent's Exhibit E

That's why I'm writing this, because the Lord is calling you also, because He see where you are headed, that's why I'm asking you to please don't pass up your chance. Some people would love to have the chance you have. Please turn to the Lord and not from Him. If you are out there selling dope, stealing, smoking dope, robbing or doing wrongs, take it from me and stop. Please Stop! Because there is only one future in it, and that's death. But there's only one way out and that's to go to the Lord. He have sent me to tell you these things. Salvation is Free, But only to those who ask for it. Salvation is not a matter of trying, But Trusting, Jesus is the only way out. No one is to bad to be forgiven. Please listen to my last words, If you don't listen to anything else I say. God care more about the size of you heart then the size of your bank roll.

He is calling you now!

Death Row Inmate

*Reams, Kenneth*
Kenneth Reams #927

*Kenneth Reams*

If you have anything to say or talk about, write to the below add.

Kenneth Reams SK-927
2501 State Farm Rd.
Tucker, Arkansas. 72168

PS, Haonest means never having to look over your shoulders

413

Respondent's Exhibit E

Today I sat back and looked at the things that are going on in the world today. My main focus was on kids killing kids, how they live, and why they live the way they live. Why they rob, steal, sell drugs, and kill. People say life is rough, but I believe life is what you make it. I can truly say I know what some kids go through. Why they want to be this, why they want to have that, and why they want to be that. You see, I'm still a young kid myself.

My name is Kenneth Reams. I'm nineteen years old, but the messed up thing about it all is, I'm on Death Row. I haven't really even lived a life yet, and I'm on Death Row. All because I wanted to be this, that, and have the things others had. True enough, I could have had the things I saw and the things I wanted. But I went the wrong way about getting them. I robbed, stole, sold drugs. I did almost all the things you can name. After being sentenced to death, I asked myself why I did all these things. The reason is because I was lost and didn't know which way to go.

For three whole days after being sentenced to death, I asked myself, how can I find myself if I am lost. It so happened I picked up a book called the Bible and just opened it up and saw these words: "For the Son of Man is come to save that which was lost." I jumped up, looked in the mirror, and said these words, "LOOK, BOY, HE'S TALKING TO YOU." I fell to my knees with quickness and told God this, "If You save me, if You help me find myself, I will give You my time, life, and try to live by Your words and help others." Guess what. He heard my prayer, and from that day on I started to see who I was and who I am. I started caring for others, wanting to help, wanting to give, and most of all, wanting others to know what I had received from God.

I'm here to tell you that He will do the same for you also, but you've got to give Him a chance. It makes no difference who you are, where you are, or what you have done. Let me tell you what He told me. "All that ever came before me are thieves and robbers. I am the door. By me, if any man enter in, he shall be saved, and shall go in and out and find pasture." (John 10:8-9)

If you're tired of living the way you live, enter in that door. I'm here to tell you, He will give you life, joy, love, and peace. He will comfort you, and He will be there at all times, strong and ready to help you. He did it for me, a robber, thief, and drug dealer. I know He will do it for you, if you give Him that chance.

Since I've given Him full control of my life, things have started to change for me. You have tried everything else, but have you tried Him? Let me tell you, He will provide more than you ask for. Trust and believe what I'm telling you. Give Him a chance. It may just save your life.

Believe these words,

*Kenneth Reams*

Kenneth Reams

Respondent's Exhibit E

414

If you would like to respond, please write to:

    Kenneth Reams, SK 927
    2501 State Farm Rd.
    Tucker, AR  72168

Romans 10:9, 11, 13
Hebrews 13:3, 19
James 4:7

        **What you give out, rest assured, you'll get it back!**

415

Respondent's Exhibit E

Respondent's Exhibit E

# ARKANSAS DEATH PENALTY RESOURCE CENTER, INC.

1500 Riverfront Drive, Suite 118
Little Rock, Arkansas 72202

Al Schay, Executive Director

(501) 663-1440
Fax (501) 663-2612

Staff Attorney
Deborah R. Sallings

Tommy Crosthwait
Investigator

October 7, 1993

Maxie G. Kizer, Esq.
BYNUM & KIZER
721 Pine Street, Suite 5
P.O. Box 7268
Pine Bluff, AR   71611

> Re:   Pending Capital Murder Cases - Robert Lewis,
> Kenneth Reams, Nakia Davis, Calvin Porter, Willie
> Moorehead

Dear Maxie:

At our meeting last week, we discussed ways in which we could
help you prepare for the trials in these cases.  We are reviewing
the records of these folks to be able to suggest motions to be
filed, investigation to be done, and penalty phase strategy.  It
will be helpful for me, particularly in working with you on
penalty phase issues, to visit with these men at some point in
the near future.

At this point, however, to begin to prepare for the penalty
phase, I would suggest that you obtain as much information as you
can about their families, their school and community
associations, any connections they have had with social workers,
social services and/or juvenile court, any foster care
placements, any treatment facilities they have been to,
ministers, Sunday school teachers or public school teachers who
have influenced them (or who can offer insight into their
development and/or behavior), Big Brothers, friends (particularly
ones who have not been involved in criminal activity), etc., who
have had any contact with them at all.  We will need to know
their criminal history, as well as what their brothers, sisters,
mothers, fathers, uncles and aunts do, where they are, and
whether they have any observations about the personalities of
these men.  Also, medical information - doctors who have treated
them, the illnesses or injuries they may have had - can often
provide useful mitigating evidence in these cases.

It has been my experience that many lawyers find that preparation
for and conducting the penalty phase of trials is more difficult
than preparing for the guilt phase.  The penalty phase is a
different kind of proceeding, and it involves issues that are not

**416**

Respondent's Exhibit E

Maxie Kizer, Esq.
October 7, 1993
Page 2

normally a part of other criminal trials.  We have a lot of
information on conducting penalty phases and can refer you to
articles and other information if you need help.

We have not received the case file on Robert Lewis.  We of course
will need to review that before we can do much more.  I
understood from our conversation that Mr. Lewis was going to
Rogers Hall this week.  Do you know if he was taken?  If he was,
I may be able to visit him while he's there.

Also, we do not have the felony informations in all these cases.
Could you send us copies of them as soon as possible?  We also
need the dates for the trial and pre-trial hearings in these
cases, which we have not yet received.

As we review these cases, we will be able, I believe, to address
more specifically the issues that appear fruitful.  Please feel
free to call us any time to discuss the cases and direct us as to
how we can help you.

                              Very truly yours,

                              Deborah R. Sallings

DRS/

417

# ARKANSAS DEATH PENALTY RESOURCE CENTER, INC.

1500 Riverfront Drive, Suite 118

Little Rock, Arkansas 72202

Al Schay, Executive Director

(501) 663-1440

Fax (501) 663-2612

Staff Attorney

Deborah R. Sallings

Tommy Crosthwait

Investigator

November 4, 1993

Maxie G.Kizer, Esq.
BYNUM & KIZER
712 Pine Street, Suite 5
P.O.Box 7268
Pine Bluff,AR 71611

Re: Ken Reams

Dear Maxie:
        The following are some of the thing that I feel should be
checked.
    1. The fingerprints:
(a)Where they were found on the vehicle.
(b)Was there a match,if so to who?

    2. Alford Goodwin: His height and weight.

    3. Jermaine Brown:
(a)His height and weight.
(b)Has he ever been arrested,if so what for.
(c)Where was he at the time of the crime.
(d)Was his prints checked to those found on the vehicle?
(e)Checked with his Aunt in Grady,Did he go there the night of
    the crime? If so what time did he arrive, How did he arrive?
(f)Does he have a vehicle,If so what kind and what color?


If you have any questions please do not hesitate to call me.

Very Truly Yours

Tommy Crosthwait

418

Respondent's Exhibit E

# ARKANSAS DEATH PENALTY RESOURCE CENTER, INC.

1500 Riverfront Drive, Suite 118
Little Rock, Arkansas 72202

Al Schay, Executive Director

(501) 663-1440
Fax (501) 663-2612

Staff Attorney
Deborah R. Sallings

Tommy Crosthwait
Investigator

<u>**VIA FACSIMILE**</u>
**534-7010**

November 4, 1993

Maxie G. Kizer, Esq.
BYNUM & KIZER
721 Pine Street, Suite 5
P.O. Box 7268
Pine Bluff, AR  71611

Re:  State v. Kenneth Reams

Dear Maxie:

Enclosed is a copy of a motion that is in our death penalty motion file.  It deals with the issue you raised with us yesterday with respect to whether to insist upon having Kenneth's trial before his co-defendant's.  I think the points raised in this motion have merit and counsel not going to trial first, and I wanted you to have this to weigh in your decision.

If you have any questions, please don't hesitate to call me.

Very truly yours,

Debbie

Deborah R. Sallings

DRS/dr

419

Respondent's Exhibit E

## MOTION TO COMPEL STATE TO CONDUCT
### TRIAL OF CO-DEFENDANT PRIOR TO TRIAL OF DEFENDANT

Comes now the defendant,   , by and through counsel,   , and for his motion states:

1.    Defendant is currently charged with Capital Felony Murder along with _____ and set for jury trial on _____ .

2.    The State has announced its intent to seek the death penalty in this case against both the Defendant and _____ .

3.    The State's file and the interviews of witnesses tend to indicate a lesser degree of culpability on the Defendant's part. <u>Tison v. Arizona</u>, 481 U.S. 137 (1987).

4.    Any conviction and penalty received by _____ would be relevant in the trial and penalty phase of the Defendant, in that, if _____ is not convicted of Capital Murder, this Defendant cannot be convicted as an accomplice or if _____ is convicted of Capital Murder and does not receive death, such a sentence would be mitigation at the Defendant's penalty trial.

5.    Defendant's counsel has tried Capital cases in which a defendant's lesser culpability was offered as and found to be mitigation.  Additionally, the fact that a co-defendant or co-defendants did not receive the death penalty has been found to be a mitigating circumstance.

6.    To hold the Defendant's trial before _____ would violate his rights under the Sixth, Eighth and Fourteenth Amendment to the United States Constitution and would or could

<u>tryd.2d</u>

420

Respondent's Exhibit E

deprive him of viable and significant evidence of mitigation. <u>Eddings v. Oklahoma</u>, 455 U.S. 104, 102 S.Ct. 869 (1982); <u>Lockett v. Ohio</u>, 438 U.S. 586, 98 S.Ct. 2954 (1978).

WHEREFORE, the defendant,   , respectfully requests that this Court require the State to proceed to trial on _____ prior to the Defendant's trial.

<u>tryd.2d</u>                              -2-

421

6093                    Respondent's Exhibit E

# ARKANSAS DEATH PENALTY RESOURCE CENTER, INC.

1500 Riverfront Drive, Suite 118
Little Rock, Arkansas 72202

Al Schay, Executive Director

Staff Attorney
Deborah R. Sallings

(501) 663-1440
Fax (501) 663-2612

Tommy Crosthwait
Investigator

## VIA FACSIMILE

November 8, 1993

Maxie G. Kizer, Esq.
BYNUM & KIZER
721 Pine Street, Suite 5
P.O. Box 7268
Pine Bluff, AR  71611

      Re:  State v. Reams

Dear Maxie:

      As I told Kaye, I heard from Ken's step-father this morning.
We ·are set to talk to Mr. and Mrs. Whiteside this Thursday
morning at 9:00 in your office.

      Over the weekend, I also heard from Amelia Reams, Ken's aunt
he lived with in Poplar Bluff, Missouri. I believe she will have
a lot of helpful information about Ken.  She knew several people
who might prove to be good penalty phase witnesses for Ken, as
well as knowing a great deal herself.  It is going to be
necessary to go to Poplar Bluff to talk with her and the people
she knows as soon as possible.  Since you have not prepared for a
penalty phase before, if you would like, I would be happy to
visit with you before you meet with these people to give you my
thoughts on how they can help.

      Amelia can be reached by leaving a message with her sister,
Norma, at 314-686-2271, or with her mother, Mrs. Raney, at 314-
686-3658.  Amelia does not work, so she should be able to return
your call fairly quickly.  She is very interested in helping Ken,
and I ascertained from our conversation that she knows a lot
about Ken's relationship with his mother and step-father, which I
gathered was not always very good.

      While Ken was living with her, he attended Sears Youth
Center in Poplar Bluff.  Amelia says both Mike Moss and Mark
Russell, the counselors I told you about, still work there.  She
believes that Ken had a good relationship with them, particularly
Mike.  Some time after Ken was released from Sears, he talked to
Mike about going back, because he felt they helped him and he was

422

Respondent's Exhibit E

Maxie G. Kizer, Esq.
November 8, 1993
Page 2

not going to be able to make it without their help.
Unfortunately, the only way to get into Sears was to do something
to get sentenced there, and therefore, he could not return.   I
suspect they will have some important information about Ken.  You
will, of course, need to obtain a release from Ken in order to
talk to them and get their records on him.

    Other people Amelia thought of just in the short time we
talked were Ms. Jeannie (sp?) Mack, 314-686-2943, who is a friend
of the family.  (Ken once dated her daughter.)  According to
Amelia, Ms. Mack is a "Christian lady who tried to help Ken."
Also, while Ken was in Poplar Bluff, he joined the Central
Baptist Church and attended regularly.  The pastor there is Bro.
Saul McDaniel, who may also be able to help.

    Amelia wants very much to talk to you "face to face".  She
wants to help Ken, she obviously cares about him, and I believe
she will be a good resource.

    I have not heard from Ken's other aunt, Joanne Reams, who
lives there in Pine Bluff, but I am sure you can contact her
without my involvement.

    I hope this is helpful to you.  Again, I know preparing a
penalty phase is unlike other kinds of trial work, but it is
every bit as important as the guilt phase.  If I can help you at
all, please let me know.

    I look forward to seeing you Thursday.

                              Very truly yours,

                              *Debbie*

                              Deborah R. Sallings

DRS/

423

Respondent's Exhibit E

# ARKANSAS DEATH PENALTY RESOURCE CENTER, INC.

1500 Riverfront Drive, Suite 118
Little Rock, Arkansas 72202

Al Schay, Executive Director

(501) 663-1440
Fax (501) 663-2612

Tommy Crosthwait
Investigator

Staff Attorney
Deborah R. Sallings

## VIA FACSIMILE

November 8, 1993

Maxie G. Kizer, Esq.
BYNUM & KIZER
721 Pine Street, Suite 5
P.O. Box 7268
Pine Bluff, AR  71611

      Re:  State v. Reams

Dear Maxie:

      As I told Kaye, I heard from Ken's step-father this morning.
We are set to talk to Mr. and Mrs. Whiteside this Thursday
morning at 9:00 in your office.

      Over the weekend, I also heard from Amelia Reams, Ken's aunt
he lived with in Poplar Bluff, Missouri. I believe she will have
a lot of helpful information about Ken.  She knew several people
who might prove to be good penalty phase witnesses for Ken, as
well as knowing a great deal herself.  It is going to be
necessary to go to Poplar Bluff to talk with her and the people
she knows as soon as possible.  Since you have not prepared for a
penalty phase before, if you would like, I would be happy to
visit with you before you meet with these people to give you my
thoughts on how they can help.

      Amelia can be reached by leaving a message with her sister,
Norma, at ~~314-686-2271~~, or with her mother, ~~Mrs. Raney at 314-686-3658~~.  Amelia does not work, so she should be able to return
your call fairly quickly.  She is very interested in helping Ken,
and I ascertained from our conversation that she knows a lot
about Ken's relationship with his mother and step-father, which I
gathered was not always very good.

      While Ken was living with her, he attended Sears Youth
Center in Poplar Bluff.  Amelia says both Mike Moss and Mark
Russell, the counselors I told you about, still work there.  She
believes that Ken had a good relationship with them, particularly
Mike.  Some time after Ken was released from Sears, he talked to
Mike about going back, because he felt they helped him and he was

(314) 686-6904

(314) 840-9280

Both Counselors are out
today. Call Monday.

424

6096

Respondent's Exhibit E

Maxie G. Kizer, Esq.
November 8, 1993
Page 2

not going to be able to make it without their help.
Unfortunately, the only way to get into Sears was to do something
to get sentenced there, and therefore, he could not return.  I
suspect they will have some important information about Ken.  You
will, of course, need to obtain a release from Ken in order to
talk to them and get their records on him.

Other people Amelia thought of just in the short time we
talked were Ms. Jeannie (sp?) Mack, ~~314 686 2843~~, who is a friend
of the family.  (Ken once dated her daughter.)  According to
Amelia, Ms. Mack is a "Christian lady who tried to help Ken."
Also, while Ken was in Poplar Bluff, he joined the ~~Central~~
~~Baptist Church~~ and attended regularly.  The pastor there is ~~Bro's~~
~~Paul McDaniel~~, who may also be able to help. *(314) 785-7461*
*called left mess. on machine*

Amelia wants very much to talk to you "face to face".  She
wants to help Ken, she obviously cares about him, and I believe
she will be a good resource.

I have not heard from Ken's other aunt, Joanne Reams, who
lives there in Pine Bluff, but I am sure you can contact her
without my involvement.

I hope this is helpful to you.  Again, I know preparing a
penalty phase is unlike other kinds of trial work, but it is
every bit as important as the guilt phase.  If I can help you at
all, please let me know.

I look forward to seeing you Thursday.

Very truly yours,

*Debbie*

Deborah R. Sallings

DRS/

# ARKANSAS DEATH PENALTY RESOURCE CENTER, INC.

1500 Riverfront Drive, Suite 118
Little Rock, Arkansas 72202

Al Schay, Executive Director

(501) 663-1440
Fax (501) 663-2612

Staff Attorney
Deborah R. Sallings

Tommy Crosthwait
Investigator

**VIA FACSIMILE**

November 16, 1993

Maxie G. Kizer, Esq.
**ATTN:  Karen**
BYNUM & KIZER
721 Pine Street, Suite 5
P.O. Box 7268
Pine Bluff, AR  71611

        RE:  Ken Reams

Dear Karen:

        This is an outline of some of the issues that occur to me
that you may want to investigate in your interviews of the people
in Poplar Bluff, especially the Sears Youth Center personnel.  I
am sure you will have thought of most if not all of this, and no
doubt other areas to explore will arise in your discussions with
these people.  Nevertheless, I will offer you what I can in the
way of suggestions.

        Before starting, though, I want to give you my philosophy of
capital sentencing, so that you will have an idea of where I am
coming from in my suggestions.  Basically, I believe all
information is potentially helpful, even that which appears to be
negative.  It can't be emphasized too much that the purpose of
the penalty phase is not to defend, justify or excuse the murder
but to establish understandable and cogent reasons why Ken should
not die.  Period.  It would be nice if there were "sympathetic"
mitigating factors in this case, such as Ken being a good kid who
inadvertently got involved in a bad situation, but that isn't the
case, nor is it likely to be in very many death cases.

        The issue is punishment, not guilt.  The question is not
death or no punishment at all, but life imprisonment without
parole or death.  Ken is going to be severely punished for
capital murder (assuming he is convicted), and that fact should
be emphasized repeatedly, starting at jury selection.  The jury
is going to need to agree, accept and be comfortable with the
idea that sending an 18 year old, mentally retarded kid to
Cummins for the rest of his life is true, terrible, and legally

**426**

Respondent's Exhibit E

Maxie G. Kizer, Esq.
November 16, 1993
Page 2

acceptable punishment for capital murder.

Since you cannot portray Ken as a Boy Scout, it will be important, for credibility purposes and because it is not "bad" in punishment theory, to acknowledge that Ken's behavior was inappropriate, unacceptable, and anti-social (all persons who commit murder have acted inappropriately, unacceptably and "anti-socially", but we don't kill everyone who commits murder), and focus the penalty phase on showing how Ken got that way.

Showing that as a youngster Ken was easily influenced by others and therefore needed but was deprived of (because his parents, although well-meaning, lacked the ability to recognize the need for and the resources to obtain help from others) the necessary structure and discipline to teach him how to control impulsive behavior, can present a rational explanation of how he could become involved in the commission of a robbery that developed into a murder. When that evidence is presented in conjunction with evidence that he may not have been the triggerman, that there were circumstances that created a tension not normally involved in "ordinary" robberies (i.e., a victim who placed himself in jeopardy by challenging and insulting the robbers), as well as evidence of mental retardation, youth and alcohol abuse, you have gone a long way toward explaining (not excusing) his conduct, i.e., in creating mitigation, in such a way that a jury can be comfortable with imprisonment rather than death. Then, if you can add some good facts about him, such as his supportive and loving (if somewhat dysfunctional and ineffectual) family; his ability to sustain a relationship with someone or at least have as a friend someone who is "socially acceptable" (such as Laronda and/or her mother) who finds value in his life; his talents; and favorable testimony from friends and ministers to indicate that there is more to him than the murder and that he has a potential to turn his life around and contribute to society even in the confines of the penitentiary, then you are developing a picture of a person who does not need to be executed to protect society.

Which (finally) leads to my suggestions on what you need to be looking for in Poplar Bluff.

<u>Sears Center</u>

Get as much information as you can about the Center, who runs it, its purposes, how long it's been established, the qualifications of its employees and counselors (particularly those who worked directly with Ken), and how it is set up. Find out what kinds of treatment it offers, whether it is all in-house or if there are referral programs available at local mental health facilities, Outward Bound, Big Brothers, etc., and was Ken

427

Respondent's Exhibit E

Maxie G. Kizer, Esq.
November 16, 1993
Page 3

referred to any of these programs?  Do they seem to know, and
more important, do they like what they're doing (or is it just a
job to them, are they burned out from all the juvenile
delinquents they've dealt with, bored, racist, etc.).

     Then focus on Ken.  Why was he sent there? How long was he
there?  What is their assessment of him?  On what is it based?
What testing was done?  Obtain copies of their records, including
tests, if possible. What kinds of treatment did he receive?  Was
there individual counseling as well as group?  Which was more
effective?  How did he react to counseling?  What worked?  What
didn't?  How many counselors did he have?  What kind of
relationship did he have with them?  Would they be surprised to
learn that he has a lot of respect for Mike Moss and believes he
helped him, wanted him to help him some more?  You need to find
out from Mike, if at all possible, whether Ken talked to him
about getting back in Sears because of his inability to handle it
outside Sears.  I think that evidence, if it exists, is very
telling.  Did he participate in activities, counseling sessions?
Did they involve the family, school, churches?  Did he have any
insight into what his problems were, any desire to change his
behavior?  What kept him from changing?  Was he influenced by
others or was he the ringleader?  Did he do any positive things,
make any positive contributions, changes, etc.?

     You also need to get a feel for whether these folks liked
Ken.  If they seem to believe that there was nothing they could
do for him, that he was just a bad dude, remember that some macho
antisocial kids are harder to reach than others and require
additional (often herculean) efforts that some people may be too
lazy, or because of a personality clash, not interested enough to
make.  Try to determine whether this might explain their attitude
toward Ken (if it's bad).

     If they liked him, find out why.  What did they see in him?
What were his good points?  (Even if they didn't like him, they
surely found some good in him.  Press hard on this.)  Do they see
him as having any potential for change, for conforming, for
developing his good qualities, particularly given the fact that
he will be in the penitentiary probably for the rest of his life.
That is, can the structure of penitentiary life have a positive
effect on him?   Has it on others they have known?

     What you want to show with the Sears information is that by
the time someone, even a teenager, commits a serious crime or
two, like burglary, it is very hard to modify that behavior, and
that programs such as theirs offer some help to people like Ken
but are not always successful.  They can, however, offer insights
into Ken's makeup, his abilities, his interests, and ways that
would have been and still can be most effective to help him

423

Respondent's Exhibit E

Maxie G. Kizer, Esq.
November 16, 1993
Page 4

manage his behavior (particularly the need for a very structured
environment).  These folks surely know the ingredients for
creating a teenager who can commit serious crimes, the kinds of
treatment that is most effective, the need to intervene in
families early and often, and I suspect they know that a great
deal of this was lacking in Ken's early development.

    They also should be aware of any psychological problems -
not necessarily psychoses or mental disorders - that could affect
Ken's ability to conform his conduct to the law.  He knows right
from wrong, but his ability to do the right thing nevertheless
can be hampered by his psychological problems, and the Sears
people should have had a lot of experience with such disorders.

<u>Family and Friends</u>

    I think you get the picture from all of this I've suggested.
You're looking for people who know Ken well enough to recognize
that he's no saint but care about him anyway and can articulate
why.  His aunt seems to know some things about his mother and
stepfather that may be helpful.  See what she knows, how she
knows it, what she did about it.  When did Ken start going to
church, before or after Sears?  Again, a lot of this you will
need to play by ear.  Think of things that you would want to know
about Ken if you were trying to justify not killing him.

    Ken is not a "good kid gone wrong" but a kid who never to
started.  But he isn't lost, and that's the message to get to the
jury.  This part of the trial is and must be very personal.  It
is my humble opinion that Maxie is going to have to like Ken (in
a death case, it is critical that the defendant be more than just
a "client") to convince others that his life should be spared -
he (and you, if you're gathering information that is to be
helpful to Maxie) have to believe that Ken should live to
convince anyone else that he should.  The only way I know to do
that is to get to know him as well as you can so that the jury
can know him as well as they can.  It is a lot harder to kill a
living, breathing human being, even one with serious warts, than
it is to kill a one-dimensional "murderer".  You've got to find
and Maxie has to bring out the dimensions of Ken.

    I hope this is at least somewhat helpful to you.  I realize
it's a long letter, but I didn't believe it would be as useful
just to give you a laundry list of questions to ask without
telling you what it is you're looking for.  I'll be here all
afternoon, if you have any questions.  Also, if after you get to
Poplar Bluff you want to discuss anything with me, please feel
free to do so.

429

Respondent's Exhibit E

Maxie G. Kizer, Esq.
November 16, 1993
Page 5


     Good luck.

                          Very truly yours,

                          Deborah R. Sallings

DRS/dr

430

Respondent's Exhibit E

RESOURCE CENTER, INC.

(501) 663-1440

Tomas Crosthwait
Investigator

... death penalty
... the issue you raised with us
... to insert your having Kenneth's
... I think the points raised in
... not being ... dial first, and
... to weigh in your decide

... Please don't hesitate ... call me.

Warmest Regards

431

Respondent's Exhibit E

Aug.19 '94 13:42        ˜ DEATH PENALTY        TEL 501-663-1440        P. 1

# Arkansas Death Penalty Resource Center, Inc.

Suite 118
1500 Riverfront Drive
Little Rock, Arkansas 72202

(501) 663-1440
fax (501) 663-7012

Dianne Raphael, Secretary

Deborah R. Sallings, Dir.
Thomas Crosthwait, Inv.

# FAX MESSAGE COVER SHEET

DATE:   8/19/94                    ___ A.M. CST
                               1:45 P.M. CST

FROM:   Deborah Sallings

TO:     Maxie Kizer

REMARKS:

            i m P O R T A N T !!

TO FAX NO.:   534-7010

OFFICE PHONE:  534-1004

2  Page(s), including cover
IF YOU DO NOT RECEIVE ALL OF THIS MESSAGE, PLEASE CONTACT ME AT THE NUMBER

THIS TELECOPY TRANSMISSION IS CONFIDENTIAL, BELONGS TO THE SENDER AND IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED ABOVE. IF YOU ARE NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTING OR ANY ACTION IN RELIANCE ON THE CONTENTS OF THIS TELECOPY IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS TELECOPY IN ERROR, PLEASE CALL THE ABOVE NUMBER TO ARRANGE FOR RETURN OF THE ORIGINAL TRANSMISSION TO US.

432

Respondent's Exhibit E

# Arkansas Death Penalty Resource Center, Inc.

Suite 118
1500 Riverfront Drive
Little Rock, Arkansas 72202

Al Schay, Executive ...

Deborah R. Sallings, Staff Attorney
Thomas Crouthwell, Investigator

(501) 663-1440
Fax: (501) 663-2612

Diuane Raphael, Secretary

## VIA FACSIMILE:  534-7010

August 19, 1994

Maxie G. Kizer, Esq.
BYNUM & KIZER
721 Pine St., Suite 5
Pine Bluff, AR  71611

Re:  Kenneth Reams

Dear Maxie:

Since we had difficulty in our "telephone tag" over the past couple of days, I wanted to make certain you were aware that Sandy McMath's firm has been talking to Kenneth Reams. (I'm sure you know that Sandy is representing the Gary Turner family in a lawsuit against Worthen for failing to provide adequate security for the ATM machine.) Ken called me late Wednesday afternoon to tell me that two lawyers (he couldn't remember their names but they told him they worked for Sandy McMath) had been to Tucker to interview him about the ATM robbery and that they taped the interview. Kenneth wasn't real clear about it, but he said he thought they told him that you had said it would be OK to talk to him. They produced nothing in writing to that effect, however, and Ken said that he had not talked with you about the interview being scheduled or about what it would entail, which makes me think that they had not contacted you. (Your secretary, Karen, told me when I called for you that she didn't think you had been contacted by Sandy or anyone about inter-viewing Ken, and I am assuming that you weren't or you would have either told them to do their discovery with someone who isn't on Death Row with appeals still pending, or at least not to interview him without your being present.) The questions they asked, according to Ken, could be pretty damaging if the information were to get out to the police and/or prosecutors. They asked him things like whether he would have robbed Mr. Turner had there been security lights or cameras there, etc. Of course, Ken (who has become very cooperative and open since he's been on the Row) told them whatever they wanted to know.

I am very concerned about this as I am sure you are. Ken doesn't need to be talking to anyone about his case except his lawyer. (I advised him, if they come back to see him or if someone on his staff or anyone else] contacts him, to simply tell them that he has retained you on this matter and will not discuss it unless he talks to his lawyer and his

Respondent's Exhibit E                    433

ect to call Sandy (or his "associates")
nstruct him not to contact Ken again
be).

ou further, because if these people
think something needs to be done.  But
(I am not adverse to calling Sandy
I wanted to make sure I have all the

v truly yours,

orah R. Sallings

434

Respondent's Exhibit E

Respondent's Exhibit E

SEP-29-93 WED 13:34     PROS ATTY 11 W          FAX NO. 5015363613              P. 01



OFFICE OF

### The Prosecuting Attorney

### Eleventh Judicial District

WAYNE MATTHEWS
Prosecuting Attorney

Jefferson County Courthouse
P. O. Box 6051
Pine Bluff, Arkansas
71611
Phone (501) 541-5387

FAX # 501-536-3613

DATE _____ *9-29-93* _____

ATTENTION: *MAXIE KIZER* _____

COMPANY NAME: _____

FAX #: _____

TOTAL NUMBER OF PAGES (Including Cover Sheet) *3* _____

REMARKS: *Remnants on ATM, etc.* _____

_____

_____

_____

_____

_____

_____

_____

FROM: *Cb* _____

435

Respondent's Exhibit E



Respondent's Exhibit E

436



437

Respondent's Exhibit E






Respondent's Exhibit E

438






Respondent's Exhibit E



Respondent's Exhibit E

440



441

Respondent's Exhibit E






Respondent's Exhibit E

 

 

443

Respondent's Exhibit E






Respondent's Exhibit E

444







445

Respondent's Exhibit E






446

Respondent's Exhibit E



446A

Respondent's Exhibit E






(DUPLICATE)

93-205
PHOTO LINE-UP
SLOT #1 - PHOTO #33 (EDDIE RINGO)

(DUPLICATE)

93-205
PHOTO LINE-UP
SLOT #5 - PHOTO #7377 (DENVER A. )

147

Respondent's Exhibit E

Respondent's Exhibit E

IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ARKANSAS

STATE OF ARKANSAS                                        PLAINTIFF

VS.                    NO. CR-93-298-3; CR-93-299-3;
                           CR-93-300-3; CR-93-301-3

KENNETH REAMS                                            DEFENDANT

## MOTION TO SUPPRESS STATEMENT

Comes now the Defendant, Kenneth Reams, by and through His attorney, Maxie G. Kizer, and for his Motion to Suppress Statement, states:

1.   The Defendant is charged with the offenses of Burglary, Theft of Property, Aggravated Robbery and Capitol Felony Murder.

2.   That the prosecuting attorney plans to introduce into evidence at the Defendant's trial a confession allegedly obtained from the Defendant on May 11, 1993.

3.   The Defendant also claims that the signature on this document was obtained from him by force exerted upon him by police officers of the city of Pine Bluff.

4.   In order to be admissible into evidence, a confession obtained by a police officer must be voluntary, i.e., "the product of a rational intellect and of free will"; and if the Defendant's will was overcome the confession is involuntary under Townsend v. Sane, 372 U.S. 293, 83 S. Ct. 745; 9 L. Ed. 2nd 770 (1963) and other cases.

5.   The Defendant's constitutional rights were violated in that his signature on this document was not voluntary.

FILED

SEP 10 1993

DOROTHY G. PEARSON
Circuit & Chancery Clerk
JEFFERSON COUNTY, ARKANSAS

WHEREFORE, the Defendant, Kenneth Reams, prays that the Court suppress the Defendant's confession; and for all other proper relief to which he may be entitled.

Respectfully Submitted:

KENNETH REAMS, Defendant

By: _____
MAXIE G. KIZER (83101)
Attorney at Law
Post Office Box 7423
Pine Bluff, Arkansas  71611
(501) 534-7004


## CERTIFICATE OF SERVICE

I, Maxie G. Kizer, do hereby certify that a copy of the foregoing Motion to Suppress Statement has been forwarded to Ms. Carol Billing, Depputy Prosecuting Attorney, Jefferson County Courthouse, Pine Bluff, Arkansas 71601, this 10 day of September, 1993.

_____
MAXIE G. KIZER

449

Respondent's Exhibit E

IN THE CIRCUIT COURT OF LINCOLN COUNTY, ARKANSAS

STATE OF ARKANSAS                                    PLAINTIFF

    VS.                    NO. CR-93-301-3

KENNETH REAMS                                        DEFENDANT

### MOTION TO COMPEL STATE TO CONDUCT
### TRIAL OF CO-DEFENDANT PRIOR TO TRIAL OF DEFENDANT

Comes now the defendant, Kenneth Reams, by and through counsel, Maxie G. Kizer, and for his motion states:

1. Defendant is currently charged with Capital Felony Murder along with Alford Goodwin and set for jury trial on December 13, 1993.

2. The State has announced its intent to seek the death penalty in this case against both the Defendant and Alford Goodwin.

3. The State's file and the interviews of witnesses tend to indicate a lesser degree of culpability on the Defendant's part. Tison v. Arizona, 481 U.S. 137 (1987).

4. Any conviction and penalty received by Alford Goodwin would be relevant in the trial and penalty phase of the Defendant, in that, if Alford Goodwin is not convicted of Capital Murder, this Defendant cannot be convicted as an accomplice or if Alford Goodwin is convicted of Capital Murder and does not receive death, such a sentence would be mitigation at the Defendant's penalty trial.

5. Defendant's counsel has tried Capital cases in which a defendant's lesser culpability was offered as and found to be mitigation. Additionally, the fact that a co-defendant or co-defendants did not receive the death penalty has been found to be

Respondent's Exhibit E

a mitigating circumstance.

6.   To hold the Defendant's trial before Alford Goodwin would violate his rights under the Sixth, Eighth and Fourteenth Amendment to the United States Constitution and would or could deprive him of viable and significant evidence of mitigation.   Eddings v. Oklahoma, 455 U.S. 104, 102 S.Ct. 869 (1982); Locksett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954 (1978).

WHEREFORE, the Defendant, Kenneth Reams, respectfully requests that this Court require the State to proceed to trial on Alford Goodwin prior to the Defendant's trial.

Respectfully Submitted,

KENNETH REAMS, Defendant

By:_____
    Maxie G. Kizer (83101)
    Attorney at Law
    Post Office Box 7423
    Pine Bluff, AR 71611
    (501) 534-7004

## CERTIFICATE OF SERVICE

I, Maxie G. Kizer, do hereby certify that a copy of the foregoing pleading has been forwarded to the Deputy Prosecuting Attorney, Jefferson County, Courthouse, Pine Bluff, Arkansas 71601, on this ___ day of _____, 1993.

_____
MAXIE G. KIZER

451

# MAXIE G. KIZER, P.A.

ATTORNEY AT LAW

721 PINE STREET
P. O. BOX 7423
PINE BLUFF, ARKANSAS 71611

MAXIE G. KIZER
BAR NO.
83101

TELEPHONE:
(501) 534-7004
FAX NO.
(501) 534-7010

September 20, 1993

**HAND-DELIVERED**

The Honorable Fred D. Davis, III
Third Division Circuit/
   Chancery Judge
Post Office Box 9140
Pine Bluff, Arkansas  71601

    Re:  State of Arkansas v. Kenneth Reams;
        Jefferson Circuit Nos. CR-93-298 through 301-3

Dear Judge Davis:

    I met with my client in the above named matter recently at the County Jail and learned from him that he has still not been taken for his mental evaluation to the Southeast Arkansas Mental Health Center arising out of this Court's Order dated June 14, 1993. Further, I have filed a Motion to Suppress the Defendant's statements on behalf of the Defendant in this matter, a copy of which is attached, that I would like to have heard prior to the trial matter of September 30, 1993, if at all possible.

    Please advise me in light of the foregoing how the Court wishes to proceed.

        Sincerely,

        MAXIE G. KIZER, P.A.

MGK:kb
Enclosure
cc:  Ms. Carol Billings
    Mr. Wayne Juneau

452

Respondent's Exhibit E

Respondent's Exhibit E

IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ARKANSAS

STATE OF ARKANSAS                                           PLAINTIFF

VS.                              CR-93-298-3

KENNETH REAMS                                               DEFENDANT

## NOTICE

Comes now the State of Arkansas by and through the Office of the Prosecuting Attorney, and in its notice to Defendant states:

That the State intends to proffer evidence of a burglary at Tommy's Restaurant that occurred the same night as the burglary of Pine Bluff Dry Cleaners in this case.  The method of entry was the same, the businesses are located within a half-block of each other and the defendant's fingerprints were found at Tommy's on the broken glass.  The State will be offering the evidence of the other burglary pursuant to A.R.E. 404(b), evidence of other crimes, wrongs or acts, for the purposes of method of operation and more specifically, identity.

The State submits that said evidence shows the same basic modus operandi, is far more than general similarities, relevant, and is absolutely crucial to the State's case in chief as it is highly probative of the identity of Kenneth Reams as the person who burglarized Pine Bluff Dry Cleaners.

The admission of such evidence has been repeatedly upheld by the Arkansas Supreme Court, as they noted in Tarkington v. State, 250 Ark. 972, 469 S.W.2d 93 (1971).

In Tarkington, a rape case, the judge prohibited the State from

-1-

FILED

SEP 2 7 1993

DOROTHY G. PEARSON
Circuit & Chancery Clerk
JEFFERSON COUNTY, ARKANSAS

Respondent's Exhibit E                          453

-2-

introducing testimony from a second rape victim, which the prosecution was offering for the purpose of showing a course of conduct. The defendant was convicted anyway and appealed on other issues, but the Court noted in that case that the trial judge should have allowed the testimony to come in. The Court stated, "We have long recognized that evidence of other conduct by a defendant which shows other crimes by him is admissible when relevant to show mode or methods of operation, habits and practices of the defendant and to identify him as the person who committed the crime for which he is on trial."

Dated this _27th_ day of September, 1993.

_Wayne Matthews_
WAYNE MATTHEWS
PROSECUTING ATTORNEY

BY: _Carol Billings_
DEPUTY PROSECUTING ATTORNEY

CERTIFICATE OF SERVICE
I, the undersigned, certify that I have served a copy of the foregoing pleading upon the attorney(s) of record for all other parties in this action, either by mailing or by personally delivering same on the 27th day of September, 1993.

_Wayne Matthews_
WAYNE MATTHEWS
PROSECUTING ATTORNEY
BY _Carol Billings_
DEPUTY PROSECUTING ATTORNEY

454

Respondent's Exhibit E

IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ARKANSAS

ʃATE OF ARKANSAS                                        PLAINTIFF

VS.                           CR-93-298-3

KENNETH REAMS                                          DEFENDANT

## BRIEF IN SUPPORT OF 404(b) MOTION

Comes now the State of Arkansas by and through the Office of the Prosecuting Attorney and in support of its 404(b) Motion herein states:

1.   That the State has notified the Defendant that it intends to use evidence of an attempted burglary at Tommy's Restaurant pursuant to A.R.E. 404(b) as going to the defendant's identity in the burglary of Pine Bluff Dry Cleaners.   Both burglaries occurred the same evening, using the same method of operation, i.e., entry through the back door, and were located within a half-block of each other. Further, the defendant's fingerprints were recovered at the burglary of Tommy's, placing him in the area.   The defendant initially denied knowledge of either burglary, and, despite confessions to the contrary since, is asserting general denial as a defense in the case set for trial Thursday.   Therefore, the evidence is circumstantially valuable in proving the defendant's guilt in this case.

2.   In support of its motion, the State would direct the Court's attention not only to Tarkington v. State, 250 Ark. 972, 469 S.W.2d 93 (1971), but to Dowling v. United States, 110 S.Ct. 668 (1990) and Prince v. Lockhart, 971 F.2d 118 (8th Cir. 1992), cert. denied, 1394

-1-

FILED

SEP 2 7 1993

DOROTHY G. PEARSON
Circuit & Chancery Clerk
JEFFERSON COUNTY, ARKANSAS

6131             Respondent's Exhibit E                455

-2-

S.Ct. 113 (1993), for direction. <u>Tarkington</u> is replete with instances where the Arkansas Supreme Court has said it was not an abuse of discretion to allow such evidence in. The <u>Dowling</u> case the involved evidence from a burglary being used for purposes of identification and the <u>Prince</u> case involved evidence from a drug charge being used in a burglary trial to show identity.

In <u>Dowling</u>, the defendant was being tried for bank robbery and eye witnesses were unable to put him at the scene. A victim in a home burglary occurring two weeks after the bank robbery could however positively identify him and that he wore a ski mask, was like-armed and could connect him to another person in the bank robbery. The evidence was allowed to come in as going to his identity.

In <u>Prince</u>, drugs that were confiscated during a drug raid and subsequent possession with intent charge were later used along with the fact that the defendant had been caught in possession of them to convict the defendant in a burglary of a pharmacy.

The Eighth Circuit's willingness to accept other crimes evidence goes back a long way. In <u>U.S. v. Maestas</u>, 554 F.2d 834 (8th Cir. 1977), cert. denied, 97 S.Ct. 2936 (1977), a prosecution for counterfeit checks, the court allowed fingerprints to be admitted that appeared on counterfeit checks two months earlier in other towns as going to the defendant's identity as the person who committed a separate crime now being charged. The Court talked quite a bit about probative value and undue prejudice and stated that its duty is to assess relevancy and probative value of evidence admitted pursuant to

456

Respondent's Exhibit E

-3-

R.E. 404(b) and that it will not reverse a lower court's decision to allow said evidence to come in unless the prejudice substantially outweighs the probative value.

In that case, they noted that some of the circuits were being too restrictive in admission of other crimes evidence and quoted from its holding in U.S. v. Gocke, 507 F.2d 820 (8th Cir. 1974), cert. denied, 420 U.S. 979 (1975):

"We do not require in each case that evidence be of an identical offense.  It is enough that the evidence be of similar involvement reasonably related to the offending conduct and be presented in a manner in which prejudice does not outweigh probative value."  The Court explained itself on "presenting evidence in a way that does not outweigh its probative value" in Footnote 4, saying a relevant consideration is "the amount of time and evidence required during the trial to develop the evidence of the other criminal activity."

The Court also noted in Footnote 7 of Maestas that "unfair prejudice" is an undue tendency to suggest a decision on an improper basis, commonly, though not necessarily, an emotional one.  The State submits that introduction of the aforestated evidence in this case does not constitute an "unfair prejudice" under such definition.

The criteria for allowing in 404(b) evidence was cited in U.S. v. Ball, 868 F.2d 989 (8th Cir. 1989), rehearing denied (1989):

1.  The evidence must be admissible on a material issue raised;

2.  The evidence must be similar in kind and reasonably close in time to the charge on trial;

457

Respondent's Exhibit E

3.   Evidence of other crimes or bad acts must be clear and convincing; and

4.   Prejudice to the defendant must be outweighed by the probative value of the evidence.

Any evidence the State is ever going to offer would be "prejudicial" to the defendant because it would all weigh in favor of the guilt of the defendant.   The Court's duty is to assess whether the means of offering evidence is the most probative method when weighed against undue prejudice to the defendant.   The defendant's own fingerprints are certainly indicative of his whereabouts, identity and credibility, all of which are crucial to the State's case.

WHEREFORE, the State respectfully requests that this honorable Court grant the State's motion to use identification and modus operandi evidence from the burglary of Tommy's Restaurant in the trial of the defendant for the burglary of Pine Bluff Dry Cleaners.

Dated this 27ᵗʰ day of September, 1993.

_Wayne Matthews_
WAYNE MATTHEWS
PROSECUTING ATTORNEY

BY: _Carol Billings_
DEPUTY PROSECUTING ATTORNEY

CERTIFICATE OF SERVICE
I, the undersigned, certify that I have served a copy of the foregoing pleading upon the attorney(s) of record for all other parties in this action, either by mailing or by personally delivering same on the 27ᵗʰ day of September, 1993

_Wayne Matthews_
WAYNE MATTHEWS
PROSECUTING ATTORNEY
BY _Carol Billings_
DEPUTY PROSECUTING ATTORNEY

458

6134

Respondent's Exhibit E

Respondent's Exhibit E

IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ARKANSAS
ELEVENTH JUDICIAL DISTRICT, WEST, THIRD DIVISION

STATE OF ARKANSAS                                    PLAINTIFF

V.                              NO.   CR-93-299-3

KENNETH REAMS
ALFORD GOODWIN                                       DEFENDANTS

                ORDER SETTING CASE FOR JURY TRIAL

    This case is hereby set for a jury trial on **Thursday,
September 30, 1993, at 9 a.m.**

    There will be no continuance except on written motion and for
good cause shown.

    Prior to trial, the following rules will apply:

    1.  The State of Arkansas will respond to Motions for
Discovery within 20 days and will supplement disclosures
to the defendant 30 days prior to trial, and the defen-
dant will respond to the State's Motion for Discovery
pursuant to Rule 18.3 of the Arkansas Rules of Criminal
Procedure within 10 days of trial, and supplement
disclosures as soon as received by defendant.  Failure to
do so will result in sanctions provided for in Rule 19.7
of the Arkansas Rules of Criminal Procedure.

    2.  The State will advise the defense counsel no later
than **September 2, 1993**, what its recommendation would be
to the Court in return for a plea of guilty.  If the
State has no recommendation, it will so advise defense
counsel.  The State will make its offer in writing to the
defense counsel with copies to the Clerk and the Court.

    3.  The defense counsel will have until **September 16,
1993**, to negotiate a plea.  In the event a plea is
negotiated, that fact will be immediately reported to the
Court.

    4.  After **September 16, 1993**, no negotiated plea will be
accepted by the Court.  If the defendant elects to change
his plea to one of guilty after this date, the Court will

*From "pleadings"
file*

FILED

AUG  9 1993

DOROTHY G. PEARSON
Circuit & Chancery Clerk
JEFFERSON COUNTY, ARKANSAS

459

6136        Respondent's Exhibit E

accept the plea and sentence then or sentencing may be deferred pending receipt and consideration of the pre-sentence report.

5.  The State will prepare the Court's jury instructions and verdict forms.  The defense will prepare any instruc-tions on any affirmative defense it intends to rely upon. There will be sufficient copies of all instructions to furnish to opposing counsel.

The Prosecuting Attorney and the defendant's counsel will be present in the Court's chambers at 8:30 a.m. on the day of the trial.  The State and defense will have available for submission to the Court a list of witnesses and a list of exhibits in the order they are to be offered.

IT IS SO ORDERED this ___9___ day of August, 1993.

FRED D. DAVIS, III
CIRCUIT-CHANCERY JUDGE

xc:   Prosecuting Attorney

      Mr. Maxie G. Kizer
      Bynum and Kizer, P. A.
      P. O. Box 7268
      Pine Bluff, AR 71611-7268

      Mr. Othello C. Cross
      Cross, Kearney and McKissic
      P. O. Box 6606
      Pine Bluff, AR 71611-6606

2

Respondent's Exhibit E                    460

IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ARKANSAS
ELEVENTH JUDICIAL DISTRICT, WEST, THIRD DIVISION

STATE OF ARKANSAS                                    PLAINTIFF

V.                          NO.  CR-93-298-3

KENNETH REAMS                                        DEFENDANT

## ORDER SETTING CASE FOR JURY TRIAL

This case is hereby set for a jury trial on Thursday, September 30, 1993, at 9 a.m.

There will be no continuance except on written motion and for good cause shown.

Prior to trial, the following rules will apply:

1.   The State of Arkansas will respond to Motions for Discovery within 20 days and will supplement disclosures to the defendant 30 days prior to trial, and the defendant will respond to the State's Motion for Discovery pursuant to Rule 18.3 of the Arkansas Rules of Criminal Procedure within 10 days of trial, and supplement disclosures as soon as received by defendant. Failure to do so will result in sanctions provided for in Rule 19.7 of the Arkansas Rules of Criminal Procedure.

2.   The State will advise the defense counsel no later than September 2, 1993, what its recommendation would be to the Court in return for a plea of guilty. If the State has no recommendation, it will so advise defense counsel. The State will make its offer in writing to the defense counsel with copies to the Clerk and the Court.

3.   The defense counsel will have until September 16, 1993, to negotiate a plea. In the event a plea is negotiated, that fact will be immediately reported to the Court.

4.   After September 16, 1993, no negotiated plea will be accepted by the Court. If the defendant elects to change his plea to one of guilty after this date, the Court will accept the plea and sentence then or sentencing may be

FILED

AUG 9 1993

DOROTHY G. PEARSON
Circuit & Chancery Clerk
JEFFERSON COUNTY, ARKANSAS

461

Respondent's Exhibit E

deferred pending receipt and consideration of the pre-sentence report.

5.  The State will prepare the Court's jury instructions and verdict forms.  The defense will prepare any instructions on any affirmative defense it intends to rely upon. There will be sufficient copies of all instructions to furnish to opposing counsel.

The Prosecuting Attorney and the defendant's counsel will be present in the Court's chambers at 8:30 a.m. on the day of the trial.  The State and defense will have available for submission to the Court a list of witnesses and a list of exhibits in the order they are to be offered.

IT IS SO ORDERED this  9  day of August, 1993.

FRED D. DAVIS, III
CIRCUIT-CHANCERY JUDGE

xc:   Prosecuting Attorney

    Mr. Maxie G. Kizer
    Bynum and Kizer, P. A.
    P. O. Box 7268
    Pine Bluff, AR 71611-7268

2

462

Respondent's Exhibit E

IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ARKANSAS
ELEVENTH JUDICIAL DISTRICT, WEST, THIRD DIVISION

STATE OF ARKANSAS                                        PLAINTIFF

V.                              NO.  CR-93-300-3

KENNETH REAMS                                           DEFENDANT

## ORDER SETTING CASE FOR JURY TRIAL

This case is hereby set for a jury trial on Thursday, September 30, 1993, at 9 a.m.

There will be no continuance except on written motion and for good cause shown.

Prior to trial, the following rules will apply:

1.   The State of Arkansas will respond to Motions for Discovery within 20 days and will supplement disclosures to the defendant 30 days prior to trial, and the defendant will respond to the State's Motion for Discovery pursuant to Rule 18.3 of the Arkansas Rules of Criminal Procedure within 10 days of trial, and supplement disclosures as soon as received by defendant.  Failure to do so will result in sanctions provided for in Rule 19.7 of the Arkansas Rules of Criminal Procedure.

2.   The State will advise the defense counsel no later than September 2, 1993, what its recommendation would be to the Court in return for a plea of guilty.  If the State has no recommendation, it will so advise defense counsel.  The State will make its offer in writing to the defense counsel with copies to the Clerk and the Court.

3.   The defense counsel will have until September 16, 1993, to negotiate a plea.  In the event a plea is negotiated, that fact will be immediately reported to the Court.

4.  After September 16, 1993, no negotiated plea will be accepted by the Court.  If the defendant elects to change his plea to one of guilty after this date, the Court will accept the plea and sentence then or sentencing may be

FILED

AUG - 9 1993

DOROTHY G. PEARSON
Circuit & Chancery Clerk
JEFFERSON COUNTY, ARKANSAS

463

Respondent's Exhibit E

deferred pending receipt and consideration of the pre-
sentence report.

5.   The State will prepare the Court's jury instructions
and verdict forms.  The defense will prepare any instruc-
tions on any affirmative defense it intends to rely upon.
There will be sufficient copies of all instructions to
furnish to opposing counsel.

The Prosecuting Attorney and the defendant's counsel will be

present in the Court's chambers at 8:30 a.m. on the day of the

trial.  The State and defense will have available for submission to

the Court a list of witnesses and a list of exhibits in the order

they are to be offered.

IT IS SO ORDERED this ___9___ day of August, 1993.

FRED D. DAVIS, III
CIRCUIT-CHANCERY JUDGE

xc:  Prosecuting Attorney

Mr. Maxie G. Kizer
Bynum and Kizer, P. A.
P. O. Box 7268
Pine Bluff, AR 71611-7268

2

464

Respondent's Exhibit E

IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ARKANSAS
ELEVENTH JUDICIAL DISTRICT, WEST, THIRD DIVISION

STATE OF ARKANSAS

V.                                                              PLAINTIFF

                          NO.   CR-93-301-3

KENNETH REAMS
ALFORD GOODWIN

                                                              DEFENDANTS

## ORDER SETTING CASE FOR JURY TRIAL

This case is hereby set for a jury trial on <u>Monday, December 13, 1993, at 9 a.m.</u>

There will be no continuance except on written motion and for good cause shown.

Prior to trial, the following rules will apply:

1.   The State of Arkansas will respond to Motions for Discovery within 20 days and will supplement disclosures to the defendant 30 days prior to trial, and the defendant will respond to the State's Motion for Discovery pursuant to Rule 18.3 of the Arkansas Rules of Criminal Procedure within 10 days of trial, and supplement disclosures as soon as received by defendant. Failure to do so will result in sanctions provided for in Rule 19.7 of the Arkansas Rules of Criminal Procedure.

2.   The State will advise the defense counsel no later than <u>November 15, 1993</u>, what its recommendation would be to the Court in return for a plea of guilty. If the State has no recommendation, it will so advise defense counsel. The State will make its offer in writing to the defense counsel with copies to the Clerk and the Court.

3.   The defense counsel will have until <u>November 29, 1993</u>, to negotiate a plea. In the event a plea is negotiated, that fact will be immediately reported to the Court.

4.   After <u>November 29, 1993</u>, no negotiated plea will be accepted by the Court. If the defendant elects to change his plea to one of guilty after this date, the Court will

FILED

SEP 1 5 1993

DOROTHY G. PEARSON
Circuit & Chancery Clerk
JEFFERSON COUNTY, ARKANSAS

465

Respondent's Exhibit E

accept the plea and sentence then or sentencing may be deferred pending receipt and consideration of the pre-sentence report.

5.   The State will prepare the Court's jury instructions and verdict forms.  The defense will prepare any instructions on any affirmative defense it intends to rely upon. There will be sufficient copies of all instructions to furnish to opposing counsel.

The Prosecuting Attorney and the defendant's counsel will be present in the Court's chambers at 8:30 a.m. on the day of the trial.  The State and defense will have available for submission to the Court a list of witnesses and a list of exhibits in the order they are to be offered.

IT IS SO ORDERED this __15__ day of September, 1993.

_____
FRED D. DAVIS, III
CIRCUIT-CHANCERY JUDGE

xc:   Prosecuting Attorney

Mr. Maxie G. Kizer
Bynum and Kizer, P. A.
P. O. Box 7268
Pine Bluff, AR 71611-7268

Mr. Othello C. Cross
Cross, Kearney & McKissic
P. O. Box 6606
Pine Bluff, AR 71611-6606

2

466

Respondent's Exhibit E

IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ARKANSAS
ELEVENTH JUDICIAL DISTRICT, WEST, THIRD DIVISION

STATE OF ARKANSAS                                        PLAINTIFF

V.                                    NO.   CR-93-299-3

KENNETH REAMS
ALFORD GOODWIN                                          DEFENDANTS

## ORDER RE-SETTING CASE FOR JURY TRIAL

On oral motion of the State of Arkansas, by and through its
Deputy Prosecuting Attorney, Carol Billings, this case is hereby
re-set for a jury trial from the present trial date of September
10, 1993, to Monday, December 6, 1993, at 9 a.m.

There will be no continuance except on written motion and for
good cause shown.

Prior to trial, the following rules will apply:

1.   The State of Arkansas will respond to Motions for
Discovery within 20 days and will supplement disclosures
to the defendant 30 days prior to trial, and the defen-
dant will respond to the State's Motion for Discovery
pursuant to Rule 18.3 of the Arkansas Rules of Criminal
Procedure within 10 days of trial, and supplement
disclosures as soon as received by defendant. Failure to
do so will result in sanctions provided for in Rule 19.7
of the Arkansas Rules of Criminal Procedure.

2.   The State will advise the defense counsel no later
than November 8, 1993, what its recommendation would be
to the Court in return for a plea of guilty. If the
State has no recommendation, it will so advise defense
counsel. The State will make its offer in writing to the
defense counsel with copies to the Clerk and the Court.

3.   The defense counsel will have until November 22,
1993, to negotiate a plea. In the event a plea is
negotiated, that fact will be immediately reported to the
Court.

FILED

SEP 1 5 1993

DOROTHY G. PEARSON
Circuit & Chancery Clerk
JEFFERSON COUNTY, ARKANSAS

467

6144        Respondent's Exhibit E

4.   After <u>November 22, 1993</u>, no negotiated plea will be accepted by the Court.  If the defendant elects to change his plea to one of guilty after this date, the Court will accept the plea and sentence then or sentencing may be deferred pending receipt and consideration of the pre-sentence report.

5.   The State will prepare the Court's jury instructions and verdict forms.  The defense will prepare any instruc-tions on any affirmative defense it intends to rely upon. There will be sufficient copies of all instructions to furnish to opposing counsel.

The Prosecuting Attorney and the defendant's counsel will be present in the Court's chambers at 8:30 a.m. on the day of the trial.  The State and defense will have available for submission to the Court a list of witnesses and a list of exhibits in the order they are to be offered.

IT IS SO ORDERED this __15__ day of September, 1993.

FRED D. DAVIS, III
CIRCUIT-CHANCERY JUDGE

xc:   Prosecuting Attorney

Mr. Maxie G. Kizer
Bynum and Kizer, P. A.
P. O. Box 7268
Pine Bluff, AR 71611-7268

Mr. Othello C. Cross
Cross, Kearney & McKissic
P. O. Box 6606
Pine Bluff, AR 71611-6606

2

Respondent's Exhibit E

IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ARKANSAS
ELEVENTH JUDICIAL DISTRICT, WEST, THIRD DIVISION

STATE OF ARKANSAS                                                    PLAINTIFF

V.                                          NO.   CR-93-300-3

KENNETH REAMS                                                        DEFENDANT

## ORDER RE-SETTING CASE FOR JURY TRIAL

On oral motion of the State of Arkansas, by and through its
Deputy Prosecuting Attorney, Carol Billings, this case is hereby
re-set for a jury trial from the present trial date of September
10, 1993, to <u>Tuesday, December 7, 1993, at 9 a.m.</u>

There will be no continuance except on written motion and for
good cause shown.

Prior to trial, the following rules will apply:

1.   The State of Arkansas will respond to Motions for
Discovery within 20 days and will supplement disclosures
to the defendant 30 days prior to trial, and the defen-
dant will respond to the State's Motion for Discovery
pursuant to Rule 18.3 of the Arkansas Rules of Criminal
Procedure within 10 days of trial, and supplement
disclosures as soon as received by defendant. Failure to
do so will result in sanctions provided for in Rule 19.7
of the Arkansas Rules of Criminal Procedure.

2.   The State will advise the defense counsel no later
than <u>November 9, 1993</u>, what its recommendation would be
to the Court in return for a plea of guilty. If the
State has no recommendation, it will so advise defense
counsel. The State will make its offer in writing to the
defense counsel with copies to the Clerk and the Court.

3.   The defense counsel will have until <u>November 23,
1993</u>, to negotiate a plea.  In the event a plea is
negotiated, that fact will be immediately reported to the
Court.

FILED

SEP 1 5 1993

DOROTHY G. PEARSON
Circuit & Chancery Clerk
JEFFERSON COUNTY, ARKANSAS

469

Respondent's Exhibit E

4.  After November 23, 1993, no negotiated plea will be
accepted by the Court.  If the defendant elects to change
his plea to one of guilty after this date, the Court will
accept the plea and sentence then or sentencing may be
deferred pending receipt and consideration of the pre-
sentence report.

5.  The State will prepare the Court's jury instructions
and verdict forms.  The defense will prepare any instruc-
tions on any affirmative defense it intends to rely upon.
There will be sufficient copies of all instructions to
furnish to opposing counsel.

The Prosecuting Attorney and the defendant's counsel will be
present in the Court's chambers at 8:30 a.m. on the day of the
trial.  The State and defense will have available for submission to
the Court a list of witnesses and a list of exhibits in the order
they are to be offered.

IT IS SO ORDERED this __15__ day of September, 1993.

<div style="text-align: right;">

_____
FRED D. DAVIS, III
CIRCUIT-CHANCERY JUDGE

</div>

xc:  Prosecuting Attorney

Mr. Maxie G. Kizer
Bynum and Kizer, P. A.
P. O. Box 7268
Pine Bluff, AR 71611-7268

2

470

Respondent's Exhibit E

IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ARKANSAS
ELEVENTH JUDICIAL DISTRICT, WEST, THIRD DIVISION

STATE OF ARKANSAS                                              PLAINTIFF

V.                              NO.   CR-93-299-3
                                      CR-93-301-3

ALFORD GOODWIN
KENNETH REAMS                                                 DEFENDANTS

## ORDER SETTING CASE FOR HEARING

This case is hereby set for a hearing on <u>Wednesday, December 1, 1993, at 10 a.m.</u>

There will be no continuance except on written motion and for good cause shown.

The information furnished to us indicates that this hearing should take no more than one hour.

IT IS SO ORDERED this __18__ day of November, 1993.

_____
FRED D. DAVIS, III
CIRCUIT-CHANCERY JUDGE

xc:  Ms. Carol Billings
     Chief Deputy Prosecuting Attorney

     Mr. Gene McKissic
     Cross, Kearney & McKissic
     P. O. Box 6606
     Pine Bluff, AR 71611

     Mr. Maxie G. Kizer
     Bynum & Kizer, P. A.
     P. O. Box 7268
     Pine Bluff, AR 71611-7268

FILED
NOV 18 1993
DOROTHY G. PEARSON
Circuit & Chancery Clerk
JEFFERSON COUNTY, ARKANSAS

471

Respondent's Exhibit E

IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ARKANSAS

STATE OF ARKANSAS                                          PLAINTIFF

VS.                            NO. CR-93-301-3

KENNETH REAMS                                              DEFENDANT

## STAY OF EXECUTION

Now on this day comes on the above named matter and the State of Arkansas, appeared by and through it Prosecuting Attorney, Carol Billings and the Defendant, Kenneth Reams, appeared by and through his attorney, Maxie G. Kizer, and from the pleadings, the arguments of counsel, and other matters of fact and law properly before the Court, the Court doth find and order as follows:

1.   That the Defendant was found guilty at a jury trial held in this matter on December 13-15, 1993, of the crime of Capital Murder and was sentenced to death by lethal injection.

2.   That an Amended Judgment and Commitment Order was filed on the 29th day of December, 1993, setting the Defendant's execution date for January 14, 1994.

3.   That subsequently on the 5th day of January, 1994, the Defendant filed a Notice of Appeal in this matter for review of this case by the Arkansas Supreme Court.

4.   Therefore, the Court's Order of Execution in this matter is hereby stayed pending the completion of the appeal to the Arkansas Supreme Court.

FILED

JAN 1 0 1994

DOROTHY G. PEARSON
Circuit & Chancery Clerk
JEFFERSON COUNTY, ARKANSAS

Respondent's Exhibit E                        472

IT IS SO ORDERED this __10__ day of __January__, 1994.

_____
FRED D. DAVIS, III, Circuit Judge

473

Respondent's Exhibit E

IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ARKANSAS
ELEVENTH JUDICIAL DISTRICT, WEST, THIRD DIVISION

STATE OF ARKANSAS                                          PLAINTIFF

V.                              NO.   CR-93-301-3

KENNETH REAMS                                              DEFENDANT

### ORDER OF BODY ATTACHMENT

Now on this day the above cause came on to be heard, the Defendant, Kenneth Reams, appearing by and through his attorney, Maxie G. Kizer, and from the matters and things before the Court, the Court doth find and order as follows:

That the Sheriff of Jefferson County, Arkansas is hereby ordered and directed to take Patrick Caffey into custody and incarcerate him until such time that a hearing can be held to show cause, if any he can, why he should not be held in contempt of this Court for his failure to honor a subpoena.

IT IS SO ORDERED this _14_ day of January, 1994.

_____
FRED D. DAVIS, III
CIRCUIT-CHANCERY JUDGE

xc:   Prosecuting Attorney

      Mr. Maxie G. Kizer
      Bynum and Kizer, P. A.
      P. O. Box 7268
      Pine Bluff, AR 71611-7268

      Jefferson County Sheriff

FILED

JAN 1 4 1994

DOROTHY G. PEARSON
Circuit & Chancery Clerk
JEFFERSON COUNTY, ARKANSAS

6151         Respondent's Exhibit E

474

IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ARKANSAS
ELEVENTH JUDICIAL DISTRICT, WEST, THIRD DIVISION

STATE OF ARKANSAS                                           PLAINTIFF

V.                              NO.   CR-93-301-3

KENNETH REAMS                                               DEFENDANT

<u>ORDER</u>

On December 17, 1993, the Defendant/Appellant, filed a Notice of Appeal in the above-captioned case.  The deadline for filing the transcript is March 17, 1994.

On March 14, 1994 Defendant/Appellant having filed Notice of Appeal in this case and it being shown to the satisfaction of the Court that it is impossible to file the Court's Reporter transcript of the evidence and proceedings included in the designation of record on appeal within the statutory period after taking of appeal, the time within which the appellant may file the Court's Reporter transcript of the evidence and the proceedings is hereby extended for 90 days from March 17, 1994.

IT IS SO ORDERED THIS 14 DAY OF MARCH, 1994.

_____
FRED D. DAVIS, III
CIRCUIT-CHANCERY JUDGE

xc:  Ms. Carol Billings
     Mr. Wayne Juneau
     Deputy Prosecuting Attorneys
     Jefferson County Courthouse
     Pine Bluff, AR 71601

     Mr. Maxie G. Kizer
     Attorney at Law
     P. O. Box 7423
     Pine Bluff, AR 71611-7808

FILED

MAR 1 4 1994

DOROTHY G. PEARSON
Circuit & Chancery Clerk
JEFFERSON COUNTY, ARKANSAS

475

Respondent's Exhibit E

Judge
Rulins

State vs REAMS                          12/14/93

ORDERS

1. Copying — granted
2. Additional time — moot
3. Agreement — granted
4. Sentencing provision —      ?      May impose
   unconstitutional                    must cited △
5. Cross section jury △ granted   moot by compliance
6. motion to quash — dny
7. motion to compell △ granted
8. prohibit seeking death △ dny
9. motion to prohibit death — dny
10. motion — circumstances — grant △ Comply
11. full recordation — granted
12. motion - sentencing unconstitutional — duplicative —
    dbty w/ ruling —
13. unconstitutional — dny
14. Aggravating — granted
15. discovery — granted
16. Investigative △ granted
17. victim impact — granted - State not seeking
18. Pecuniary gain — dny
19. Discovery △ granted
20. Witnesses sequestered — granted
21. Individual voir dire — granted
22. Batson — dnied - no binding - granted -
23. Aggravating — dnied -

Respondent's Exhibit E   476

IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ARKANSAS

STATE OF ARKANSAS                                                    PLAINTIFF

VS.                                    NO. CR 93-301-3

KENNETH REAMS                                                      DEFENDANT

### SUPPLEMENTAL JUROR QUESTIONNAIRE

A jury must be selected from the panel of which you are a member to hear the above-captioned case. As part of the jury selection process, the questions asked in this questionnaire could be asked in open court. You are given more privacy by answering them in this questionnaire. Please answer each question. If you need more space, please use the back and so indicate on the front.

By court order, none of the information you reveal in response to these questions is to be used for any purpose other than the selection of qualified jurors to serve in this case. Attorneys will be required to return all copies of these questionnaires to the Clerk of the Court for destruction after a final resolution of this case.

NAME (PRINT): _____
                    (Last)              (First)         (Middle)

ADDRESS: _____
              (Street, P.O. Box)        (City)        (State)
OCCUPATION: _____
                         (If retired so indicate.)

SPOUSE'S OCCUPATION: _____
                            (If retired so indicate.)

1.   Has your marital status changed in the last 10 years?
     Yes___  No___  If yes, was that by: Death of Spouse___
     Divorce___  Marriage___  Remarriage___

2.   Total number of children_____ or stepchildren_____
     Number of boys _____    Their ages _____
     Number of girls _____   Their ages _____
     Have you ever had any foster children? _____
     How many live with you? _____

3.   Does anyone live in your home other than your spouse or
     children? Yes ___ No ___

4.   What is your highest level of education? _____

5.   What is your spouse's highest level of education? _____

6.   Where did you attend high school? _____

477

Respondent's Exhibit E

If you attended college, name the college and its location.
_____
What was your major? _____
What was your minor? _____
If you attended graduate school? If so, name of institution
and degree obtained. _____
_____

7.  Please indicate by the organizations, clubs and religious
    activities in which you actively participate:

    Civic _____     Fraternal _____
    Religious _____     Volunteer _____
    Social _____     Other _____

8.  Have you or any member of your family been a party to a
    lawsuit?  Yes____  No____  If yes, please specify _____
    _____

9.  Have you or any member of your family been a witness in a
    lawsuit?  Yes____  No____  If yes, please specify _____
    _____

10. Have you ever been the victim of a crime?  Yes____  No____
    Was the crime reported to the police or were the police
    involved?  Yes____  No____  Was the crime prosecuted?  Yes____
    No____  If yes, was it resolved to your satisfaction?_____
    _____

11. Has any member of your family ever been a victim of murder,
    manslaughter or negligent homicide?  Yes____  No____  If yes,
    please specify and state whether resolved to your
    satisfaction. _____
    _____

12. Have you, any member of your family, or a close friend ever
    been accused of any action related to murder, manslaughter
    or negligent homicide?  Yes____  No____

13. Have you ever been convicted of a crime other than traffic
    offenses?  Yes____  No____

14. Have you ever been arrested and charged with any crime other
    than a traffic offense?  Yes____  No____  If yes, please
    specify. _____
    _____

15. Have you, any member of your family, or close friend ever
    had any special training in law or law enforcement?  Yes____
    No____  If yes, please specify. _____
    _____

2

4'78

Respondent's Exhibit E

16. Do you or any member of your family have personal or business relationships with any member or employee of the following state or county offices?

### PLEASE PLACE A CHECK IN THE APPROPRIATE BLANK

| | Yes | No |
|---|---|---|
| Police Department | | |
| County Sheriff's Office | | |
| Other Law Enforcement Agency | | |
| Prosecuting Attorney's Office | | |
| Arkansas Department of Correction | | |

17. Do you or any member of your family, or close friend, have any knowledge of or any personal relationship with _____ ? Yes____  No____

18. Do you have any knowledge of or have you had any contact or relationship with any of the following individuals who may appear as witnesses in this case?  Please check the appropriate blank to indicate any relationship or knowledge you or any member of your family may have of that witnesses or any member of that witness' family.

| List of Witnesses | I have heard of | I know | I know member of witness' family | Family knows witness or family |
|---|---|---|---|---|
| Greg Taylor | | | | |
| James Nelson | | | | |
| Taquante Nelson | | | | |
| Bud Phillips | | | | |
| Terry Addison | | | | |
| Jo Ann Reams | | | | |
| Dr. Sturner | | | | |
| Ron Andrejack | | | | |
| Phillip Curry | | | | |
| Kenny Heroman | | | | |
| David A. Nanak | | | | |
| Patrick Coffey | | | | |
| Elgin Anders | | | | |
| Amelia Reams | | | | |
| John Cone | | | | |
| George McDaniel | | | | |
| Jeannie Mack | | | | |
| Mike Moss | | | | |

19. Have you read any newspaper articles about this?  Yes____  No____  Have you formed any opinion regarding this case after reading the newspaper articles?  Yes____  No____

3

479

Respondent's Exhibit E

20. Have you discussed this case with anyone?  Yes___  No___  If yes, what was the nature of this discussion?  _____
_____
If yes, did anyone offer any opinions or facts about the case?  Yes___  No___

21. Have you heard this case discussed by anyone even if you were not a participate in the conversation?  Yes___  No___
If yes, did anyone offer any opinions about it?  Yes___ No___

22. What opinions, if any, have you formed concerning this case? Please explain in detail.  _____
_____
_____
_____
_____

Have you expressed your opinion to others?  Yes___  No___
If yes, to whom?  _____

23. Do you have any specific problems at home or on the job that might cause you to lose concentration during the trial? Yes___  No___  If yes, please explain in detail.  _____
_____
_____
_____

24. Do you have any physical or emotional disabilities which would make it difficult or impossible to serve on this jury? Yes___  No___  If yes, please explain in detail.  _____
_____
_____
_____

25. Are you taking any medication regularly?  Yes___  No___  If so, what?  _____
_____

4

Respondent's Exhibit E

480

26.  Do you have religious, moral or philosophical beliefs which would prevent you from sitting in judgment on another person?  Yes___  No___  If yes, please explain. _____
_____
_____

27.  Would your religious beliefs in any way make it difficult for you to serve as a juror on this case and to reach a verdict based on the laws of the State of Arkansas as given to you in this case by the Judge?  Yes___  No___  If yes, please explain fully. _____
_____
_____

28.  Have you formed an opinion concerning what would be a desirable verdict in this case?  Yes___  No___  If yes, what is that opinion? _____
_____
_____
_____

29.  What do you do in your spare time? _____
_____

30.  What is the last book you have read? _____

31.  Are there certain types of books you prefer to read over others (for example, mysteries, biographies, nonfiction?)
_____
_____

32.  What magazines do you read regularly? _____
_____

33.  To what magazines do you subscribe? _____
_____

34.  Do you have a newspaper subscription?  Daily___  Weekly___
What paper(s)? _____

35.  How often do you watch television? _____
Please estimate the number of hours per day. _____

36.  What kind of television shows do you watch (sports, movies, situation comedies, soap operas, talk shows?) _____
_____

37.  Do you watch local news programs?  Yes___  No___  How often?_____  What channel(s)? _____

38.  Do you watch national news programs?  Yes___  No___  How often?_____  What channel(s)? _____

5

481

39.  Do you know of any reason you could not serve as a fair and impartial juror in this particular case which involves a violent crime?  Yes____  No____   If yes, please explain fully.

_____
_____
_____

40.  Would you find it difficult to listen to or to concentrate on evidence relating to:

(a)  Acts of violence                    Yes____    No____
(b)  Abnormal human behavior             Yes____    No____
(c)  Psychological disorders             Yes____    No____
(d)  Troubled or disturbed childhood     Yes____    No____

41.  Is there any reason why you feel that you would not want to serve on this jury?  Yes____  No____   If yes, please explain fully.  _____

_____
_____

42.  Can you think of any reason, no matter how insignificant it might seem to be, whether addressed in this questionnaire or not, why you could not be a fair juror in this case?  Yes____ No____  If yes, please explain fully.  _____

_____
_____
_____

I SWEAR THAT THE ANSWERS GIVEN ABOVE ARE TRUTHFUL TO THE SAME EFFECT AS IF I WERE SWORN UNDER OATH IN OPEN COURT TO GIVE TRUTHFUL ANSWERS TO THE SAME.

_____
(Signature)

6

482

Respondent's Exhibit E

CAPITAL MURDER--BIFURCATED TRIAL--

PUNISHMENT

MEMBERS OF THE JURY, YOU HAVE FOUND KENNETH REAMS GUILTY OF CAPITAL MURDER. AFTER HEARING ARGUMENTS OF COUNSEL, YOU WILL AGAIN RETIRE TO DELIBERATE AND DECIDE WHETHER HE IS TO BE SENTENCED TO DEATH BY LETHAL INJECTION OR TO LIFE IMPRISONMENT WITHOUT PAROLE.

IN DETERMINING WHICH SENTENCE SHALL BE IMPOSED, YOU MAY BE REQUIRED TO MAKE SPECIFIC WRITTEN FINDINGS AS TO THE EXISTENCE OR ABSENCE OF AGGRAVATING OR MITIGATING CIRCUMSTANCES. APPROPRIATE FORMS WILL BE PROVIDED FOR YOU, AND I WILL NOW INSTRUCT YOU ON THE PROCEDURES THAT YOU MUST FOLLOW.

THERE ARE THREE FORMS FOR YOU TO USE IN REACHING YOUR DECISION, AND A VERDICT FORM FOR YOU TO USE WHEN YOUR VERDICT HAS BEEN REACHED.

FORM 1, WHICH WILL BE HANDED TO YOU LATER, DEALS WITH AGGRAVATING CIRCUMSTANCES. THE APPEARANCE OF ANY PARTICULAR AGGRAVATING CIRCUMSTANCE ON THE FORM DOES NOT MEAN THAT IT ACTUALLY EXISTED IN THIS CASE. THESE ARE SPECIFIED BY LAW AND ARE THE ONLY AGGRAVATING CIRCUMSTANCES THAT YOU MAY CONSIDER. THE STATE HAS THE BURDEN OF PROVING BEYOND A REASONABLE DOUBT THAT ONE OR MORE OF THE LISTED AGGRAVATING CIRCUMSTANCES EXISTED AT THE TIME OF THE COMMISSION OF THE CAPITAL MURDER. IF YOU FIND UNANIMOUSLY AND BEYOND A REASONABLE DOUBT THAT ONE OR MORE OF THESE AGGRAVATING CIRCUMSTANCES EXISTED, THEN YOU WILL INDICATE YOUR FINDINGS BY

483

   Respondent's Exhibit E

-2-

CHECKING THE APPROPRIATE SPACES ON FORM 1. IF YOU DO NOT UNANIMOUSLY FIND BEYOND A REASONABLE DOUBT THE EXISTENCE OF ANY AGGRAVATING CIRCUMSTANCE, THEN YOU WILL CEASE DELIBERATIONS AND INDICATE ON THE VERDICT FORM A SENTENCE OF LIFE IMPRISONMENT WITHOUT PAROLE.

IF YOU DO UNANIMOUSLY FIND ONE OR MORE AGGRAVATING CIRCUMSTANCES, YOU SHOULD THEN COMPLETE FORM 2, WHICH DEALS WITH MITIGATING CIRCUMSTANCES. FORM 2 LISTS SOME FACTORS THAT YOU MAY CONSIDER AS MITIGATING CIRCUMSTANCES. HOWEVER, YOU ARE NOT LIMITED TO THIS LIST. YOU MAY, IN YOUR DISCRETION, FIND OTHER MITIGATING CIRCUMSTANCES.

UNLIKE AN AGGRAVATING CIRCUMSTANCE, YOU ARE NOT REQUIRED TO BE CONVINCED OF THE EXISTENCE OF A MITIGATING CIRCUMSTANCE BEYOND A REASONABLE DOUBT. A MITIGATING CIRCUMSTANCE IS SHOWN IF YOU BELIEVE FROM THE EVIDENCE THAT IT PROBABLY EXISTED.

FORM 2 IS MADE UP OF FOUR PARTS. PART A IS A LIST OF MITIGATING CIRCUMSTANCES TO BE CHECKED ONLY IF YOU UNANIMOUSLY AGREE THAT A PARTICULAR CIRCUMSTANCE EXISTED. PART B IS A LIST TO BE CHECKED WHERE SOME OF YOU THINK A CIRCUMSTANCE EXISTED, BUT ALL DO NOT AGREE. PART C IS A LIST TO REFLECT CIRCUMSTANCES OF WHICH THERE MAY HAVE BEEN SOME EVIDENCE BUT NO MEMBER OF THE JURY FEELS

,483A

Respondent's Exhibit E

-3-

THAT THE CIRCUMSTANCE EXISTED.  THE LAST PART D IS TO BE CHECKED ONLY IF THE JURY CONCLUDES THAT THERE IS NO EVIDENCE OF MITIGATING CIRCUMSTANCES.

AFTER MAKING THE DETERMINATIONS REQUIRED TO COMPLETE FORM 1 AND FORM 2, IF APPLICABLE, YOU WILL THEN COMPLETE FORM 3.

IN NO EVENT WILL YOU RETURN A VERDICT IMPOSING THE DEATH PENALTY UNLESS YOU UNANIMOUSLY MAKE THREE PARTICULAR WRITTEN FINDINGS ON FORM 3.  THESE ARE:

FIRST:    THAT ONE OR MORE AGGRAVATING CIRCUMSTANCES EXISTED BEYOND A REASONABLE DOUBT;

SECOND:   THAT SUCH AGGRAVATING CIRCUMSTANCES OUTWEIGH BEYOND A REASONABLE DOUBT ANY MITIGATING CIRCUMSTANCES FOUND TO EXIST; AND

THIRD:    THAT THE AGGRAVATING CIRCUMSTANCES JUSTIFY BEYOND A REASONABLE DOUBT THE SENTENCE OF DEATH.

IF YOU MAKE THOSE FINDINGS YOU WILL IMPOSE THE DEATH PENALTY. OTHERWISE YOU WILL SENTENCE THE DEFENDANT TO LIFE IMPRISONMENT WITHOUT PAROLE.

AFTER YOU HAVE MADE YOUR DETERMINATION ON FORMS 1 AND 2 AND HAVE REFLECTED YOUR CONCLUSIONS ON FORM 3, THEN YOU MUST CHECK THE APPROPRIATE VERDICT ON FORM 4.  EACH OF YOU MUST SIGN EACH VERDICT FORM.

YOU MAY NOW RETIRE TO CONSIDER YOUR DECISION.

Respondent's Exhibit E

FORM 1

AGGRAVATING CIRCUMSTANCES

WE, THE JURY, AFTER CAREFUL DELIBERATION, HAVE UNANIMOUSLY DETERMINED THAT THE FOLLOWING AGGRAVATING CIRCUMSTANCE EXISTED BEYOND A REASONABLE DOUBT AT THE TIME OF THE COMMISSION OF THE CAPITAL MURDER.

1. ( )    THE CAPITAL MURDER WAS COMMITTED FOR PECUNIARY GAIN.

2. ( )    KENNETH REAMS PREVIOUSLY COMMITTED ANOTHER FELONY, AN ELEMENT OF WHICH WAS THE USE OR THREAT OF VIOLENCE TO ANOTHER PERSON OR THE CREATION OF A SUBSTANTIAL RISK OF DEATH OR SEROUS PHYSICAL INJURY TO ANOTHER PERSON.

_____
FOREMAN

485

Respondent's Exhibit E

FORM 2

## MITIGATING CIRCUMSTANCES

A. (   )   WE UNANIMOUSLY FIND THAT THE FOLLOWING MITIGATING CIRCUMSTANCES PROBABLY EXIST:   (CHECK THE APPLICABLE CIRCUMSTANCES AND SPECIFY ANY ADDITIONAL ONES.)

1. (   )   THE CAPITAL MURDER WAS COMMITTED WHILE KENNETH REAMS WAS UNDER EXTREME MENTAL OR EMOTIONAL DISTURBANCE.

2. (   )   THE CAPITAL MURDER WAS COMMITTED WHILE KENNETH REAMS WAS ACTING UNDER UNUSUAL PRESSURES OR INFLUENCES OR UNDER THE DOMINATION OF ANOTHER PERSON.

3. (   )   THE CAPITAL MURDER WAS COMMITTED WHILE THE CAPACITY OF KENNETH REAMS TO APPRECIATE THE WRONGFULNESS OF HIS CONDUCT OR TO CONFORM HIS CONDUCT TO THE REQUIREMENTS OF LAW WAS IMPAIRED AS A RESULT OF MENTAL DISEASE OR DEFECT, INTOXICATION, OR DRUG ABUSE.

4. (   )   THE YOUTH OF KENNETH REAMS AT THE TIME OF THE COMMISSION OF THE CAPITAL MURDER.

5. (   )   THE CAPITAL MURDER WAS COMMITTED BY ANOTHER PERSON AND KENNETH REAMS WAS AN ACCOMPLICE AND HIS PARTICIPATION RELATIVELY MINOR.

6. (   )   KENNETH REAMS HAS NO SIGNIFICANT HISTORY OF PRIOR CRIMINAL ACTIVITY.

486

   Respondent's Exhibit E

FORM 2

MITIGATING CIRCUMSTANCES - PAGE 2

7. (  )   KENNETH   REAMS   SUFFERS   FROM   BORDERLINE   MENTAL
         RETARDATION.

8. (  )   KENNETH REAMS HAS ABILITIES THAT WOULD ALLOW HIM TO BE
         A PRODUCTIVE MEMBER OF SOCIETY EVEN IN PRISON.

9. (  )   OTHER:   SPECIFY   IN   WRITING._____
         ___*co - A - received* _____
         _____


B. (  )  ONE OR MORE MEMBERS OF THE JURY BELIEVED THAT THE FOLLOWING
MITIGATING  CIRCUMSTANCES  PROBABLY  EXIST,  BUT  THE  JURY  DID  NOT
UNANIMOUSLY AGREE:

   1. (  )    THE CAPITAL MURDER WAS COMMITTED WHILE KENNETH REAMS
             WAS UNDER EXTREME MENTAL OR EMOTIONAL DISTURBANCE.

   2. (  )    THE CAPITAL MURDER WAS COMMITTED WHILE KENNETH REAMS
             WAS ACTING UNDER UNUSUAL PRESSURES OR INFLUENCES OR
             UNDER THE DOMINATION OF ANOTHER PERSON.

   3. (  )    THE CAPITAL MURDER WAS COMMITTED WHILE THE CAPACITY OF
             KENNETH REAMS TO APPRECIATE THE WRONGFULNESS OF HIS
             CONDUCT OR TO CONFORM HIS CONDUCT TO THE REQUIREMENTS
             OF LAW WAS IMPAIRED AS A RESULT OF MENTAL DISEASE OR
             DEFECT, INTOXICATION, OR DRUG ABUSE.

487

Respondent's Exhibit E

FORM 2

MITIGATING CIRCUMSTANCES - PAGE 3

4. ( )   THE YOUTH OF KENNETH REAMS AT THE TIME OF THE COMMISSION OF THE CAPITAL MURDER.

5. ( )   THE CAPITAL MURDER WAS COMMITTED BY ANOTHER PERSON AND KENNETH REAMS WAS AN ACCOMPLICE AND HIS PARTICIPATION RELATIVELY MINOR.

6. ( )   KENNETH REAMS HAS NO SIGNIFICANT HISTORY OF PRIOR CRIMINAL ACTIVITY.

7. ( )   KENNETH REAMS SUFFERS FROM BORDERLINE MENTAL RETARDATION.

8. ( )   KENNETH REAMS HAS ABILITIES THAT WOULD ALLOW HIM TO BE A PRODUCTIVE MEMBER OF SOCIETY EVEN IN PRISON.

9. ( )   OTHER:   SPECIFY   IN   WRITING._____,
_____
_____

C. ( )   THERE WAS EVIDENCE OF THE FOLLOWING MITIGATING CIRCUMSTANCES, BUT THE JURY UNANIMOUSLY AGREED THAT THEY DO NOT EXIST:

1. ( )   THE CAPITAL MURDER WAS COMMITTED WHILE KENNETH REAMS WAS UNDER EXTREME MENTAL OR EMOTIONAL DISTURBANCE.

2. ( )   THE CAPITAL MURDER WAS COMMITTED WHILE KENNETH REAMS WAS ACTING UNDER UNUSUAL PRESSURES OR INFLUENCES OR UNDER THE DOMINATION OF ANOTHER PERSON.

488

Respondent's Exhibit E

FORM 2

MITIGATING CIRCUMSTANCES - PAGE 4

3. (  )    THE CAPITAL MURDER WAS COMMITTED WHILE THE CAPACITY OF
           KENNETH REAMS TO APPRECIATE THE WRONGFULNESS OF HIS
           CONDUCT OR TO CONFORM HIS CONDUCT TO THE REQUIREMENTS
           OF LAW WAS IMPAIRED AS A RESULT OF MENTAL DISEASE OR
           DEFECT, INTOXICATION, OR DRUG ABUSE.

4. (  )    THE  YOUTH  OF  KENNETH  REAMS  AT  THE  TIME  OF  THE
           COMMISSION OF THE CAPITAL MURDER.

5. (  )    THE CAPITAL MURDER WAS COMMITTED BY ANOTHER PERSON AND
           KENNETH REAMS WAS AN ACCOMPLICE AND HIS PARTICIPATION
           RELATIVELY MINOR.

6. (  )    KENNETH REAMS HAS NO SIGNIFICANT HISTORY OF PRIOR
           CRIMINAL ACTIVITY.

7. (  )    KENNETH  REAMS  SUFFERS  FROM  BORDERLINE  MENTAL
           RETARDATION.

8. (  )    KENNETH REAMS HAS ABILITIES THAT WOULD ALLOW HIM TO BE
           A PRODUCTIVE MEMBER OF SOCIETY EVEN IN PRISON.

9. (  )    OTHER:   SPECIFY  IN  WRITING._____

           _____

           _____

489

Respondent's Exhibit E

FORM 2

MITIGATING CIRCUMSTANCES - PAGE 5

D. (   )   THERE WAS NO EVIDENCE OF ANY MITIGATING CIRCUMSTANCE.
(CHECK IF APPLICABLE).

_____
                        FOREMAN

490

FORM 3

CONCLUSIONS


THE JURY, HAVING REACHED ITS FINAL CONCLUSIONS, WILL SO INDICATE BY HAVING ITS FOREMAN PLACE A CHECK MARK ( ) IN THE APPROPRIATE SPACE IN ACCORDANCE WITH THE JURY'S FINDINGS.  IN ORDER TO CHECK ANY SPACE, YOUR CONCLUSIONS MUST BE UNANIMOUS.  THE FOREMAN OF THE JURY WILL THEN SIGN AT THE END OF THIS FORM.

WE THE JURY CONCLUDE:

(A)   ( ) ONE OR MORE AGGRAVATING CIRCUMSTANCES DID EXIST BEYOND A REASONABLE DOUBT AT THE TIME OF THE COMMISSION OF THE CAPITAL MURDER.

(IF YOU DO NOT UNANIMOUSLY AGREE TO CHECK PARAGRAPH (A) THEN SKIP (B) AND (C), AND SENTENCE KENNETH REAMS TO LIFE IMPRISONMENT WITHOUT PAROLE ON FORM 4.)

(B)   ( ) THE AGGRAVATING CIRCUMSTANCES OUTWEIGH BEYOND A REASONABLE DOUBT ANY MITIGATING CIRCUMSTANCES.

(IF YOU DO NOT UNANIMOUSLY AGREE TO CHECK PARAGRAPH (B) THEN SKIP (C) AND SENTENCE KENNETH REAMS TO LIFE IMPRISONMENT WITHOUT PAROLE ON FORM 4.)

(C)   ( ) THE AGGRAVATING CIRCUMSTANCES JUSTIFY BEYOND A REASONABLE DOUBT A SENTENCE OF DEATH.

(IF YOU DO NOT UNANIMOUSLY AGREE TO CHECK PARAGRAPH (C) THEN SENTENCE KENNETH REAMS TO LIFE IMPRISONMENT WITHOUT PAROLE ON FORM 4.)

491

FORM 3

CONCLUSIONS - PAGE 2

*you may*

IF YOU HAVE CHECKED PARAGRAPHS (A), (B), AND (C), THEN SENTENCE
KENNETH REAMS TO DEATH BY LETHAL INJECTION ON FORM 4.

_____
                                        FOREMAN

Respondent's Exhibit E

FORM 4

VERDICT


WE, THE JURY, AFTER CAREFUL DELIBERATION, HAVE DETERMINED THAT FOR THE CAPITAL FELONY MURDER OF GARY TURNER THAT KENNETH REAMS SHALL BE SENTENCED TO:

A.   (   )   LIFE IMPRISONMENT WITHOUT PAROLE.

B.   (   )   DEATH BY LETHAL INJECTION.


(EACH JUROR MUST SIGN THIS VERDICT.)

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

493

   Respondent's Exhibit E

## LESSER INCLUDED OFFENSES:
## INTRODUCTORY INSTRUCTION

Kenneth Reams is charged with Capital Murder.  This charge includes the lesser offense of Aggravated Robbery.

You may find the defendant guilty of one of these offenses or you may acquit him outright.

If you have a reasonable doubt as to which offense the defendant may be guilty of, you may find him guilty only of the lesser offense.  If you have a reasonable doubt as to the defendant's guilt of both offenses, you must find him not guilty.

AMCI 301

*Proffered By A Denied By Court*

494

## LESSER INCLUDED OFFENSES:
## TRANSITIONAL INSTRUCTION

If you have a reasonable doubt of the defendant's guilt on the charge of capital murder you will then consider the charge of aggravated robbery.

AMCI 302

495

Respondent's Exhibit E

## AGGRAVATED ROBBERY

Kenneth Reams is charged with the offense of aggravated robbery. To sustain this charge the State must prove the following things beyond a reasonable doubt:

First: That, with the purpose of committing a theft, Kenneth Reams, employed physical force upon another; and

Second: That Kenneth Reams and an accomplice were armed with a deadly weapon or represented by words or conduct that they were armed with a deadly weapon and attempted to inflict death or serious physical injury upon another person.

### DEFINITIONS

"Physical force" means any bodily impact, restraint, or confinement.

"Deadly weapon" means [a firearm or anything manifestly designed, made, or adapted for the purpose of inflicting death or serious physical injury] [anything that in the manner of its use or intended use is capable of causing death or serious physical injury].

"Serious physical injury" means physical injury that created a substantial risk of death or that causes protracted disfigurement, protracted impairment of health, or loss or protracted impairment of the function of any bodily member or organ.

"Purpose." - A person acts with purpose with respect to his conduct when it is his conscious object to engage in the conduct.

AMCI - 2102

496

Respondent's Exhibit E

VERDICT FORM - CLASS Y FELONY

We, the Jury find Kenneth Reams guilty of Aggravated Robbery and fix his sentence at:

A term of _____
        (not less than 10 years nor more than 40 years, or life)

in the Arkansas Department of Correction.

                              _____
                              FOREMAN

We, the Jury, find Kenneth Reams not guilty.

                              _____
                              FOREMAN

497

Respondent's Exhibit E

AMCI 6110

VERDICT FORM

BIFURCATED TRIAL - FIRST STAGE

WE, THE JURY, FIND KENNETH REAMS GUILTY OF THE CAPITAL MURDER OF GARY TURNER.

<div style="text-align: right">_____<br>FOREMAN</div>

WE, THE JURY, FIND KENNETH REAMS GUILTY OF FIRST DEGREE MURDER IN THE DEATH OF GARY TURNER.

<div style="text-align: right">_____<br>FOREMAN</div>

WE, THE JURY, FIND KENNETH REAMS GUILTY OF MANSLAUGHTER IN DEATH OF GARY TURNER.

<div style="text-align: right">_____<br>FOREMAN</div>

WE, THE JURY, FIND KENNETH REAMS NOT GUILTY.

<div style="text-align: right">_____<br>FOREMAN</div>

498

Respondent's Exhibit E

AMCI 1508

PUNISHMENT--NON-CAPITAL HOMICIDE

YOU HAVE FOUND KENNETH REAMS GUILTY OF THE OFFENSE OF FIRST DEGREE MURDER.   NORMALLY YOU WOULD HAVE BEEEN ASKED TO FIX HIS PUNISHMENT AT THE TIME YOU DETERMINED HIS GUILT OR INNOCENCE OF THAT CHARGE.   IN THIS CASE, HOWEVER, THE STATE HAS ALSO ALLEGED THAT KENNETH REAMS IS SUBJECT TO AN EXTENDED TERM OF IMPRISONMENT AS AN HABITUAL OFFENDER.

IT IS MY DUTY TO INSTRUCT YOU THAT KENNETH REAMS HAS --- PRIOR FELONY CONVICTIONS AND IS CLASSIFIED AS AN HABITUAL OFFENDER.

THE OFFENSE OF FIRST DEGREE MURDER WHEN COMMITTED BY AN HABITUAL OFFENDER IS PUNISHABLE BY IMPRISONMENT IN THE ARKANSAS DEPARTMENT OF CORRECTION FOR A TERM OF NOT LESS THAN 10 YEARS NOR MORE THAN LIFE.

499

Respondent's Exhibit E

AMCI 1508

PUNISHMENT - NON-CAPITAL HOMICIDE

YOU HAVE FOUND KENNETH REAMS GUILTY OF THE OFFENSE OF MANSLAUGHTER. NORMALLY YOU WOULD HAVE BEEEN ASKED TO FIX HIS PUNISHMENT AT THE TIME YOU DETERMINED HIS GUILT OR INNOCENCE OF THAT CHARGE. IN THIS CASE, HOWEVER, THE STATE HAS ALSO ALLEGED THAT KENNETH REAMS IS SUBJECT TO AN EXTENDED TERM OF IMPRISONMENT AS AN HABITUAL OFFENDER.

IT IS MY DUTY TO INSTRUCT YOU THAT KENNETH REAMS HAS --- PRIOR FELONY CONVICTIONS AND IS CLASSIFIED AS AN HABITUAL OFFENDER.

THE OFFENSE OF MANSLAUGHTER WHEN COMMITTED BY AN HABITUAL OFFENDER IS PUNISHABLE BY IMPRISONMENT IN THE ARKANSAS DEPARTMENT OF CORRECTION FOR A TERM OF NOT LESS THAN THREE (3) YEARS NOR MORE THAN 30 YEARS.

500

Respondent's Exhibit E

AMCI 7004

VERDICT FORM--HABITUAL OFFENDER--STATUS UNDISPUTED

FIRST DEGREE MURDER


WE, THE JURY, FIX THE SENTENCE OF KENNETH REAMS AT:


A TERM OF_____ (NOT LESS THAN TEN YEARS

NOR MORE THAN LIFE) IN THE ARKANSAS DEPARTMENT OF CORRECTION.



_____
           FOREMAN

501

AMCI 7004

VERDICT FORM--HABITUAL OFFENDER--STATUS UNDISPUTED

MANSLAUGHTER


WE, THE JURY, FIX THE SENTENCE OF KENNETH REAMS AT:


A TERM OF_____ (NOT LESS THAN THREE YEARS
NOR MORE THAN THIRTY YEARS) IN THE ARKANSAS DEPARTMENT OF
CORRECTION.


_____
FOREMAN

502

Respondent's Exhibit E

AMCI 103

JURY--PERSONAL OBSERVATIONS AND EXPERIENCES


IN CONSIDERING THE EVIDENCE IN THIS CASE YOU ARE NOT REQUIRED TO SET ASIDE YOUR COMMON KNOWLEDGE, BUT YOU HAVE THE RIGHT TO CONSIDER ALL THE EVIDENCE IN THE LIGHT OF YOUR OWN OBSERVATIONS AND EXPERIENCES IN THE AFFAIRS OF LIFE.


AMCI 104

CREDIBILITY OF WITNESSES


YOU ARE THE SOLE JUDGES OF THE WEIGHT OF THE EVIDENCE AND THE CREDIBILITY OF THE WITNESSES.  IN DETERMINING THE CREDIBILITY OF ANY WITNESS AND THE WEIGHT TO BE GIVEN HIS TESTIMONY, YOU MAY TAKE INTO CONSIDERATION HIS DEMEANOR WHILE ON THE WITNESS STAND, ANY PREJUDICE FOR OR AGAINST A PARTY, HIS MEANS OF ACQUIRING KNOWLEDGE CONCERNING ANY MATTER TO WHICH HE TESTIFIED, ANY INTEREST HE MAY HAVE IN THE OUTCOME OF THE CASE, THE CONSISTENCY OR INCONSISTENCY OF HIS TESTIMONY, ITS REASONABLENESS OR UNREASONABLENESS, AND ANY OTHER FACT OR CIRCUMSTANCE TENDING TO SHED LIGHT UPON THE TRUTH OR FALSITY OF HIS TESTIMONY.

503

Respondent's Exhibit E

AMCI 105

EXPERT WITNESS

AN EXPERT WITNESS IS A PERSON WHO HAS SPECIAL KNOWLEDGE, SKILL, EXPERIENCE, TRAINING, OR EDUCATION ON THE SUBJECT TO WHICH HIS TESTIMONY RELATES.

AN EXPERT WITNESS MAY GIVE HIS OPINION ON QUESTIONS IN CONTROVERSY.   YOU MAY CONSIDER HIS OPINION IN THE LIGHT OF HIS QUALIFICATIONS AND CREDIBILITY, THE REASONS GIVEN FOR HIS OPINION, AND THE FACTS AND OTHER MATTERS UPON WHICH HIS OPINION IS BASED.

YOU ARE NOT BOUND TO ACCEPT AN EXPERT OPINION AS CONCLUSIVE, BUT SHOULD GIVE IT WHATEVER WEIGHT YOU THINK IT SHOULD HAVE.   YOU MAY DISREGARD ANY OPINION TESTIMONY IF YOU FIND IT TO BE UNREASONABLE.

504

AMCI 106

CIRCUMSTANTIAL EVIDENCE

A FACT IN DISPUTE MAY BE PROVED BY CIRCUMSTANTIAL EVIDENCE AS WELL AS BY DIRECT EVIDENCE. A FACT IS ESTABLISHED BY DIRECT EVIDENCE WHEN, FOR EXAMPLE, IT IS PROVED BY WITNESSES WHO TESTIFY TO WHAT THEY SAW, HEARD, OR EXPERIENCED. A FACT IS ESTABLISHED BY CIRCUMSTANTIAL EVIDENCE WHEN ITS EXISTENCE CAN REASONABLY BE INFERRED FROM OTHER FACTS PROVED IN THE CASE. HOWEVER, CIRCUMSTANTIAL EVIDENCE MUST BE CONSISTENT WITH THE GUILT OF THE DEFENDANT AND INCONSISTENT WITH ANY OTHER REASONABLE CONCLUSION.

AMCI 107

BURDEN OF PROOF

THE STATE MUST PROVE BEYOND A REASONABLE DOUBT EACH ELEMENT OF THE OFFENSE CHARGED. ON THE OTHER HAND, THE DEFENDANT IS NOT REQUIRED TO PROVE HIS INNOCENCE.

505

Respondent's Exhibit E

AMCI 108

## FILING OF INFORMATION NOT TO BE CONSIDERED AS EVIDENCE

THE FILING OF AN INFORMATION IS MERELY THE MEANS BY WHICH A PERSON IS BROUGHT TO TRIAL.  IT IS NOT EVIDENCE AND IS NOT TO BE CONSIDERED BY YOU IN DETERMINING THE GUILT OR INNOCENCE OF KENNETH REAMS.

AMCI 109

## PRESUMPTION OF INNOCENCE

THERE IS A PRESUMPTION OF THE DEFENDANT'S INNOCENCE IN A CRIMINAL PROSECUTION.  IN THIS CASE KENNETH REAMS IS PRESUMED TO BE INNOCENT.  THAT PRESUMPTION OF INNOCENCE ATTENDS AND PROTECTS HIM THROUGHOUT THE TRIAL AND SHOULD CONTINUE AND PREVAIL IN YOUR MINDS UNTIL YOU ARE CONVINCED OF HIS GUILT BEYOND A REASONABLE DOUBT.

AMCI 110

## REASONABLE DOUBT

REASONABLE DOUBT IS NOT A MERE POSSIBLE OR IMAGINARY DOUBT.  IT IS A DOUBT THAT ARISES FROM YOUR CONSIDERATION OF THE EVIDENCE AND ONE THAT WOULD CAUSE A CAREFUL PERSON TO PAUSE AND HESITATE IN THE GRAVER TRANSACTIONS OF LIFE.  A JUROR IS SATISFIED BEYOND A REASONABLE DOUBT IF AFTER AN IMPARTIAL CONSIDERATION OF ALL THE EVIDENCE HE HAS AN ABIDING CONVICTION OF THE TRUTH OF THE CHARGE.

506

Respondent's Exhibit E

AMCI 111

RIGHT OF THE DEFENDANT NOT TO TESTIFY


A DEFENDANT HAS AN ABSOLUTE CONSTITUTIONAL RIGHT NOT TO TESTIFY. THE FACT THAT KENNETH REAMS DID NOT TESTIFY IS NOT EVIDENCE OF GUILT OR INNOCENCE AND UNDER NO CIRCUMSTANCES SHALL BE CONSIDERED BY YOU IN ARRIVING AT YOUR VERDICT.

507

Respondent's Exhibit E

AMCI 202

PRIOR INCONSISTENT STATEMENTS BY A WITNESS OTHER THAN

THE ACCUSED


EVIDENCE THAT A WITNESS PREVIOUSLY MADE A STATEMENT WHICH IS INCONSISTENT WITH HIS TESTIMONY AT THE TRIAL MAY BE CONSIDERED BY YOU FOR THE PURPOSE OF JUDGING THE CREDIBILITY OF THE WITNESS BUT MAY NOT BE CONSIDERED BY YOU AS EVIDENCE OF THE TRUTH OF THE MATTER SET FORTH IN THAT STATEMENT.

Respondent's Exhibit E

AMCI 301

LESSER INCLUDED OFFENSES:

INTRODUCTORY INSTRUCTION


KENNETH REAMS IS CHARGED WITH CAPITAL FELONY MURDER. THIS CHARGE INCLUDES THE LESSER OFFENSES OF FIRST DEGREE MURDER AND MANSLAUGHTER.

YOU MAY FIND THE DEFENDANT GUILTY OF ONE OF THESE OFFENSES OR YOU MAY ACQUIT HIM OUTRIGHT.

IF YOU HAVE A REASONABLE DOUBT AS TO WHICH OFFENSE THE DEFENDANT MAY BE GUILTY OF, YOU MAY FIND HIM GUILTY ONLY OF A LESSER OFFENSE. IF YOU HAVE A REASONABLE DOUBT AS TO THE DEFENDANT'S GUILT OF ALL OFFENSES, YOU MUST FIND HIM NOT GUILTY.

1501-A

CAPITAL MURDER--ASSOCIATED FELONY

AS A PART OF THE CHARGE OF CAPITAL MURDER, THE STATE CONTENDS THAT THE DEATH OF GARY TURNER OCCURRED DURING THE COMMISSION OR ATTEMPTED COMMISSION OF THE CRIME OF ROBBERY BY KENNETH REAMS OR AN ACCOMPLICE OR IN IMMEDIATE FLIGHT THEREFROM.

TO PROVE ROBBERY, THE STATE MUST PROVE BEYOND A REASONABLE DOUBT THAT WITH THE PURPOSE OF COMMMITTING A THEFT OR RESISTING APPREHENSION IMMEDIATELY THEREAFTER, KENNETH REAMS OR AN ACCOMPLICE EMPLOYED OR THREATENED TO EMPLOY PHYSICAL FORCE UPON ANOTHER.

IF THE CRIME OF ROBBERY IS NOT PROVED TO HAVE BEEN COMMITTED BY KENNETH REAMS OR AN ACCOMPLICE, HE IS NOT GUILTY OF CAPITAL MURDER.

DEFINITION

"PURPOSE" - A PERSON ACTS WITH PURPOSE WITH RESPECT TO HIS CONDUCT WHEN IT IS HIS CONSCIOUS OBJECT TO ENGAGE IN THE CONDUCT.

"PHYSICAL FORCE" - MEANS ANY BODILY IMPACT, RESTRAINT, OR CONFINEMENT.

510

1501-A

## CAPITAL MURDER--ASSOCIATED FELONY

AS A PART OF THE CHARGE OF CAPITAL MURDER, THE STATE CONTENDS THAT THE DEATH OF GARY TURNER OCCURRED DURING THE COMMISSION OR ATTEMPTED COMMISSION OF THE CRIME OF ROBBERY BY KENNETH REAMS OR AN ACCOMPLICE OR IN IMMEDIATE FLIGHT THEREFROM.

TO PROVE ROBBERY, THE STATE MUST PROVE BEYOND A REASONABLE DOUBT THAT WITH THE PURPOSE OF COMMMITTING A THEFT, KENNETH REAMS OR AN ACCOMPLICE EMPLOYED PHYSICAL FORCE UPON ANOTHER.

IF THE CRIME OF ROBBERY IS NOT PROVED TO HAVE BEEN COMMITTED BY KENNETH REAMS OR AN ACCOMPLICE, HE IS NOT GUILTY OF CAPITAL MURDER.


## DEFINITION

"PURPOSE" - A PERSON ACTS WITH PURPOSE WITH RESPECT TO HIS CONDUCT WHEN IT IS HIS CONSCIOUS OBJECT TO ENGAGE IN THE CONDUCT.

"PHYSICAL FORCE" - MEANS ANY BODILY IMPACT, RESTRAINT, OR CONFINEMENT.

511

Respondent's Exhibit E

AMCI 6003

CLOSING INSTRUCTIONS

(

MEMBERS OF THE JURY, WHEN YOU REACH THE JURY ROOM YOU WILL ELECT ONE OF YOUR MEMBERS AS FOREMAN.

YOU WILL CONSIDER AND COMPLETE ONE OF THE FOLLOWING VERDICT FORMS.

(Here the appropriate verdict forms are to be

read to the jury.)

ALL TWELVE OF YOU MUST AGREE ON THE VERDICT, BUT ONLY THE FOREMAN MUST SIGN THE VERDICT FORM.

THE JURY WILL NOW RETIRE TO THE JURY ROOM TO DELIBERATE.

(

(

512

Respondent's Exhibit E

AMCI 6002

BIFURCATED TRIAL-JURY NOT TO CONSIDER PUNISHMENT


IN YOUR DELIBERATIONS THE SUBJECT OF PUNISHMENT IS NOT TO BE DISCUSSED OR CONSIDERED BY YOU.   IF YOU RETURN A VERDICT OF GUILTY, THE MATTER OF PUNISHMENT WILL BE SUBMITTED TO YOU SEPARATELY.

513

Respondent's Exhibit E

oath is fairly

hang this + lop?

State vs. REAMS

Beyond a reasonable doubt ↑

consider full range of options 12/15/93 available to you →

Closing - Carol -

* We don't know is Goodwin pulled trigger twice - thereby rotating cylinder until a live round was reached - or is he was manipulating the gun w/o pulling the ~~trigger~~ trigger back far enough to lock the gun.

[Other crimes had been committed using the gun - No one harmed -]

What the fuck do you want - Aldred may have gotten angry -

We don't know - that is what doubt is all about - →

can't prove a positive by a negative

State is stuck w/ ~~the~~ problem statements

Why evidence - statements - police - bothered not awaren

the facts 1st so dont 1 so last →

can't use a negative to prove a positive

I you have to think about it - that it is a reasonable doubt →

514

Respondent's Exhibit E

AMCI 1508

PUNISHMENT--FIRST DEGREE MURDER

YOU HAVE FOUND KENNETH REAMS GUILTY OF THE OFFENSE OF FIRST DEGREE MURDER.

I TURN NOW TO THE PUNISHMENT THAT MAY BE IMPOSED FOR THIS CRIME. MURDER IN THE FIRST DEGREE IS PUNISHABLE BY IMPRISONMENT IN THE DEPARTMENT OF CORRECTION FOR NOT LESS THAN 10 YEARS NOR MORE THAN 40 YEARS, OR BY IMPRISONMENT FOR LIFE.

515

Respondent's Exhibit E

AMCI 7004

VERDICT FORM -- FIRST DEGREE MURDER


WE, THE JURY, FIX THE SENTENCE OF KENNETH REAMS AT:

A TERM OF_____ (NOT LESS THAN 10 YEARS

NOR MORE THAN 40 YEARS OR LIFE) IN THE ARKANSAS DEPARTMENT OF

CORRECTION.


_____
FOREMAN

Respondent's Exhibit E

AMCI 1508

PUNISHMENT--MANSLAUGHTER

YOU HAVE FOUND KENNETH REAMS GUILTY OF THE OFFENSE OF MANSLAUGHTER.

I TURN NOW TO THE PUNISHMENT THAT MAY BE IMPOSED FOR THIS CRIME. MANSLAUGHTER IS PUNISHABLE BY IMPRISONMENT IN THE DEPARTMENT OF CORRECTION FOR NOT LESS THAN 3 YEARS NOR MORE THAN 10 YEARS.

517

Respondent's Exhibit E

AMCI 7004

VERDICT FORM -- MANSLAUGHTER


WE, THE JURY, FIX THE SENTENCE OF KENNETH REAMS AT:

A TERM OF_____ (NOT LESS THAN 3 YEARS

NOR MORE THAN 10 YEARS) IN THE ARKANSAS DEPARTMENT OF

CORRECTION.


_____
FOREMAN


518

Respondent's Exhibit E

## CAPITAL MURDER - AFFIRMATIVE DEFENSE

Kenneth Reams asserts an affirmative defense to the charge of capital murder. To establish this affirmative defense, Kenneth Reams must prove each of the following things:

First:    That he was not the only party to the offense;

Second:   That he did not commit the homicide act; and

Third:    That he did not in any way solicit, command, induce, procure, counsel or aid its commission.

Kenneth Reams has the burden of proving this defense by a preponderance of the evidence, unless the defense is so proved by other evidence in the case. "Preponderance of the evidence" means the greater weight of evidence. The greater weight of evidence is not necessarily established by the greater number of witnesses testifying to any fact or state of facts. It is the evidence which, when weighed with that opposed to it, has more convincing force and is more probably true and accurate. If the evidence with regard to this defense appears to be equally balanced, or if you cannot say upon which side it weighs heavier, then the defense has not been established. If you find that this defense has been established by Kenneth Reams then you shall find Kenneth Reams not guilty of the offense of capital murder.

Whatever may be your finding as to this defense, you are reminded that the State still has the burden of establishing the guilt of Kenneth Reams upon the whole case beyond a reasonable doubt.

AMCI 1501-D

519

AMCI 101

RESPECTIVE DUTIES OF JUDGE AND JURY--

CAUTIONARY INSTRUCTIONS

(A)  THE FAITHFUL PERFORMANCE OF YOUR DUTIES AS JURORS IS ESSENTIAL TO THE ADMINISTRATION OF JUSTICE.

(B)  IT IS MY DUTY AS JUDGE TO INFORM YOU OF THE LAW APPLICABLE TO THIS CASE BY INSTRUCTIONS, AND IT IS YOUR DUTY TO ACCEPT AND FOLLOW THEM AS A WHOLE, NOT SINGLING OUT ONE INSTRUCTION TO THE EXCLUSION OF OTHERS.  YOU SHOULD NOT CONSIDER ANY RULE OF LAW WITH WHICH YOU MAY BE FAMILIAR UNLESS IT IS INCLUDED IN MY INSTRUCTIONS.

(C)  IT IS YOUR DUTY TO DETERMINE THE FACTS FROM THE EVIDENCE PRODUCED IN THIS TRIAL.  YOU ARE TO APPLY THE LAW AS CONTAINED IN THESE INSTRUCTIONS TO THE FACTS AND RENDER YOUR VERDICT UPON THE EVIDENCE AND LAW.  YOU SHOULD NOT PERMIT SYMPATHY, PREJUDICE, OR LIKE OR DISLIKE OF ANY PARTY TO THIS ACTION OR OF ANY ATTORNEY TO INFLUENCE YOUR FINDINGS IN THIS CASE.

(D)  IN DECIDING THE ISSUES YOU SHOULD CONSIDER THE TESTIMONY OF THE WITNESSES AND THE EXHIBITS RECEIVED IN THE EVIDENCE. THE INTRODUCTION OF EVIDENCE IN COURT IS GOVERNED BY LAW. YOU SHOULD ACCEPT WITHOUT QUESTION MY RULINGS AS TO THE ADMISSIBILITY OR REJECTION OF EVIDENCE, DRAWING NO INFERENCES THAT BY THESE RULINGS I HAVE IN ANY MANNER INDICATED MY VIEWS ON THE MERITS OF THE CASE.

520

Respondent's Exhibit E

-2-

(E)     OPENING STATEMENTS, REMARKS DURING THE TRIAL, AND CLOSING ARGUMENTS OF THE ATTORNEYS ARE NOT EVIDENCE BUT ARE MADE ONLY TO HELP YOU IN UNDERSTANDING THE EVIDENCE AND APPLICABLE LAW.  ANY ARGUMENT, STATEMENTS, OR REMARKS OF ATTORNEYS HAVING NO BASIS IN THE EVIDENCE SHOULD BE DISREGARDED BY YOU.

(F)     I HAVE NOT INTENDED BY ANYTHING I HAVE SAID OR DONE, OR BY ANY QUESTIONS THAT I MAY HAVE ASKED, TO INTIMATE OR SUGGEST WHAT YOU SHOULD FIND TO BE THE FACTS, OR THAT I BELIEVE OR DISBELIEVE ANY WITNESS WHO TESTIFIED.  IF ANYTHING THAT I HAVE DONE OR SAID HAS SEEMED TO SO INDICATE, YOU WILL DISREGARD IT.

521

Respondent's Exhibit E

AMCI 302

LESSER INCLUDED OFFENSES: TRANSITIONAL INSTRUCTION


IF YOU HAVE A REASONABLE DOUBT OF KENNETH REAMS' GUILT ON THE CHARGE OF FIRST DEGREE MURDER YOU WILL THEN CONSIDER THE CHARGE OF MANSLAUGHTER.  TO SUSTAIN THIS CHARGE THE STATE MUST PROVE BEYOND A REASONABLE DOUBT:

FIRST:   THAT KENNETH REAMS, ACTING ALONE OR WITH ONE OR MORE PERSONS, COMMITTED OR ATTEMPTED TO COMMIT A FELONY; AND,

SECOND:  IN THE COURSE OF AND IN FURTHERANCE OF THAT CRIME OR IN IMMEDIATE FLIGHT THEREFROM, HE OR A PERSON ACTING WITH KENNETH REAMS NEGLIGENTLY, CAUSED THE DEATH OF GARY TURNER.


DEFINITION

THE TERM "NEGLIGENTLY," AS USED IN THIS CRIMINAL CASE MEANS MORE THAN IT DOES IN CIVIL CASES.  TO PROVE NEGLIGENCE IN A CRIMINAL CASE THE STATE MUST SHOW THAT KENNETH REAMS SHOULD HAVE BEEN AWARE OF A SUBSTANTIAL AND UNJUSTIFIABLE RISK THAT THE DEATH WOULD OCCUR.  THE RISK MUST HAVE BEEN OF SUCH A NATURE AND DEGREE THAT KENNETH REAMS'S FAILURE TO PERCEIVE IT, CONSIDERING THE NATURE AND PURPOSE OF HIS CONDUCT AND THE CIRCUMSTANCES KNOWN TO HIM, INVOLVED A GROSS DEVIATION FROM THE STANDARD OF CARE THAT A REASONABLE PERSON WOULD HAVE OBSERVED IN HIS SITUATION.

Respondent's Exhibit E

AMCI 302

LESSER INCLUDED OFFENSES: TRANSITIONAL INSTRUCTION

IF YOU HAVE A REASONABLE DOUBT OF KENNETH REAMS'S GUILT ON THE CHARGE OF CAPITAL FELONY MURDER YOU WILL THEN CONSIDER THE CHARGE OF FIRST DEGREE MURDER. TO SUSTAIN THIS CHARGE THE STATE MUST PROVE BEYOND A REASONABLE DOUBT:

FIRST:    THAT KENNETH REAMS, ACTING ALONE OR WITH ONE OR MORE OTHER PERSONS, COMMITTED OR ATTEMPTED TO COMMIT ROBBERY; AND,

SECOND:    THAT IN THE COURSE OF AND IN FURTHERANCE OF THAT CRIME OR IN IMMEDIATE FLIGHT THEREFROM, KENNETH REAMS OR A PERSON ACTING WITH HIM, CAUSED THE DEATH OF GARY TURNER UNDER CIRCUMSTANCES MANIFESTING EXTREME INDIFFERENCE TO THE VALUE OF HUMAN LIFE,

523

Respondent's Exhibit E

AMCI 1501

CAPITAL MURDER

KENNETH REAMS IS CHARGED WITH THE OFFENSE OF CAPITAL FELONY MURDER. TO SUSTAIN THIS CHARGE, THE STATE MUST PROVE THE FOLLOWING THINGS BEYOND A REASONABLE DOUBT:

FIRST:     THAT KENNETH REAMS, ACTING ALONE OR WITH ONE OR MORE OTHER PERSONS, COMMITTED OR ATTEMPTED TO COMMIT THE CRIME OF ROBBERY; AND

SECOND:    THAT IN THE COURSE OF AND IN FURTHERANCE OF THAT CRIME OR ATTEMPT OR IN IMMEDIATE FLIGHT THEREFROM, KENNETH REAMS OR A PERSON ACTING WITH HIM CAUSED THE DEATH OF GARY TURNER UNDER CIRCUMSTANCES MANIFESTING AN EXTREME INDIFFERENCE TO THE VALUE OF HUMAN LIFE.

524

Respondent's Exhibit E

Respondent's Exhibit E

IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ARKANSAS

STATE OF ARKANSAS                                              PLAINTIFF

VS.                          NO. CR-93-301-3

KENNETH REAMS                                                  DEFENDANT

DEFENDANT'S RESPONSE TO RULE 18.3
OF THE ARKANSAS RULES OF CIVIL PROCEDURE MOTION

Comes the Defendant, Kenneth Reams, by and through his attorneys, Bynum & Kizer, and as and for his response, states:

1.   That he intends to call as witnesses the following people:

a.   David A. Nanak, M.A., Psychological Examiner
b.   Patrick Coffey, Ph.D., Consulting Psychologist
c.   Elgin Anders, Poplar Bluff, MO.
d.   Amelia Reams, Aunt, Poplar Bluff, MO.
e.   Reverand George S. McDaniel, Poplar Bluff, MO.
f.   Phillip Curry, Department of Corrections
g.   Jo Ann Reams, Aunt, Pine Bluff, AR.
h.   Beatrice Whiteside, Mother
i.   Scott Whiteside, Step-Father
j.   Jeannie Mack, Poplar Bluff, MO.
k.   Mike Moss, Sears Youth Center, Poplar Bluff, MO.

2.   The Defendant will raise as his defense at the trial of this matter that he did not commit the actus reus, nor did he have the requisite mens rea necessary for conviction in this case.

IT IS SO STATED this _10_ day of December, 1993.

KENNETH REAMS, Defendant

By: _____
MAXIE G. KIZER (83101)
Attorney at Law
Post Office Box 7423
Pine Bluff, Arkansas  71611
(501) 534-7004

FILED

DEC 10 1993

DOROTHY G. PEARSON
Circuit & Chancery Clerk
JEFFERSON COUNTY, ARKANSAS

525

Respondent's Exhibit E

<u>CERTIFICATE OF SERVICE</u>

I, Maxie G. Kizer, do hereby certify that a copy of the foregoing Response to Motion has been hand delivered to Ms. Carol Billings, Deputy Prosecuting Attorney, Jefferson County Courthouse, Pine Bluff, Arkansas 71601, on this _10_ day of December, 1993.

                                   _____
                                   MAXIE G. KIZER

Respondent's Exhibit E

KENNETH REAMS

11/11/93

① OMNIBUS HEARING
② SUBPOENA
  Ⓐ DRS FROM MENTAL HEALTH

(girlfriend)

*Loraysha MACKS          2ⁿᵈ YEAR
  P.O. BOX 1633             ASU
State Un        72467
OF ARK           501-972-2705

John
Bunch       A   Kwight Rewada   "Sonny"  (father)
DOC             1400 Cotton St.
murder          Austin Texas   78702
Forrest         512-472-7713
City

527

Respondent's Exhibit E

KENNETH KEANS                                    11/11/93

\* Met w/ Δ's family — his MOTHER
plus Father — @ my office —
Plus — DEBBIE Stallings

Respondent's Exhibit E

6207

I would like to know if I can have a copy of everything you have about on my capital murder case as soon as possible. Will you please do this for me.

Sincerly,
Kenneth Reams

Please
Respond
As soon
as
possible

Send To:
Kenneth Reams
Varner Unit
Post Office Box 600
Grady, Ar.
71644-0600

529

Respondent's Exhibit E