**PROPERTY OF ARKANSAS SUPREME COURT/COURT OF APPEALS**

# SUPREME COURT CR-17-654

KENNETH REAMS                                                          **APPELLANT(S)**

V. JEFFERSON COUNTY CIRCUIT COURT

   JOHN W COLE

   35CR-1993-301

   STATE OF ARKANSAS                                                  **APPELLEE(S)**

26__ VOLUME RECORD LODGED

*COUNSEL*

ATTORNEY GENERAL  APPELLEE COUNSEL
323 CENTER STREET, SUITE 200
LITTLE ROCK AR 72201

CORINNE IRISH  APPELLANT COUNSEL
30 ROCKEFELLER PLAZA
NEW YORK NY 10112

DAVID ROBERT RAUPP  APPELLEE COUNSEL
323 CENTER STREET, SUITE 200
LITTLE ROCK AR 72201

GEORGE KENDALL  APPELLANT COUNSEL
30 ROCKEFELLER PLAZA
NEW YORK NY 10112

JIN HEE LEE  APPELLANT COUNSEL
40 RECTOR STREET, 5TH FLOOR
NEW YORK NY 10006

JOHN WINFRED WALKER  APPELLANT COUNSEL
1723 BROADWAY
LITTLE ROCK AR 72206

RECORD FILED AUGUST 4, 2017
**STACEY PECTOL, CLERK**
BY RENEE R. HERNDON, DEPUTY CLERK
**Respondent's Exhibit E**
VOLUME 23

Volume 23

3:30 Wed

INTERVIEW 11-1-93 AT VARNER UNIT, ADC

ORIGINAL

KENNETH REAMS, DOB: 12/21/74
ADC # 1020584

Mother & Stepfather:    Beatrice & Scott Whiteside
                        411 East Davis
                        Forrest City, AR  72335
                        633-7358 not correct # ; no # in Information

KR hasn't lived with them for several years.  Mom sent him to
Poplar Bluff to live with aunt because KR was getting into
trouble in Forrest City

Mom works at Forrest City Health Center; step-dad works for
AirTherm; formerly worked for Sanyo   KR has 2 brothers,
Dominick (9yo) and Scott (8yo)

Aunt:        Joanne Reams
             1003 W. 3d
             Pine Bluff, AR
             No Phone          KR was visiting her at time of
                               murder; had been there about 4 wks.

Aunt: 1:30   Amelia Reams
             308 Roxie Dr.
             Poplar Bluff, MO   KR was living with her before coming
                                to Pine Bluff to visit Joanne; had
                                lived with her about 6-7 years
                                — 1032 Rooney Street

Criminal History:   Charged as juvenile in FC with burglary.  KR
                    says it was "thrown out".  He was charged with
                    burglary in Poplar Bluff & received a 5 yr.
                    sentence, suspended.  Has pleaded guilty to
                    AR, burglary & TOP in Pine Bluff (related to
                    CFM charge) & is doing 40 yrs.

                    Date of Aggravated Robbery?  Before or after the murder?
                    If after, or if part of same criminal episode, object to
                    using it as aggravating circumstance!!!!

(3;4) 840-9280.        (9400 Sears Lane
KR attended "Sears" youth program in Poplar Bluff for 7 months
after being charged with the burglary.  Attended school & counseling
sessions.  Counselors there:  Mike Moss & Mark Russell.

He worked for the Poplar Bluff Housing Authority for about 6 mos.
He had to quit when the family moved; he had no transportation to
the job.

Has not received mental health treatment or counseling, although
juvenile authorities recommended it.  He wouldn't attend because he
didn't think he was "crazy".

Respondent's Exhibit E                                    530

Friends to contact:

Laronda Mack, a student at Arkansas State University, studying social work.
Hosea Rooks, lives in Memphis.

Completed 9th grade in Poplar Bluff; had started 10th grade. Liked art.

Denies drug use, admits to occasional alcohol use

Says his record in DOC so far is good.

**THINGS TO DO:**

1.  Interview his parents, aunts
2.  Obtain consents for release of information, & orders if necessary
3.  Need:
    School records from Poplar Bluff, Pine Bluff, Forrest City
    Juvenile records from Poplar Bluff, Forrest City
    Prison records
    Records from Sears Home
4.  Locate & interview Laronda Mack & Hosea Rooks
5.  Interview Sears House caseworkers

**THEORY FOR PENALTY PHASE**

KR is very young looking.  Youth should be submitted as a mitigating factor.  He is also a very scared kid and probably has some remorse for what he did.  Need to work with him about this. Determine co-def. responsibility, influence on KR.  Why were they together, is he older, etc.?  Also, drug or alcohol usage on the night this happened.  I suspect KR was neglected as a kid; he's certainly been passed around his family.  Why?  Was he abused? Where's his natural father?

This was apparently a part of an escalating crime spree.  What happened?  He shouldn't be asked to forfeit his life because of what occurred in such a short span of time.  LWOP is sufficiently harsh punishment; too young to write him off entirely.  Need to find someone who will say that he's got something in him worth saving.  Family friends, ministers, someone.  His age is going to be important, also his lack of past violence.  No attempts made to reach him when he was young & reachable.  He says he decided not to attend Mental Health counseling.  He wasn't very old at the time; where was mom?

He's trying to be a tough guy, but he isn't tough.  He needs to cry early and often at trial and not be a bad dude.  His family – parents and aunts need to be there every day if at all possible.

2

531

Respondent's Exhibit E

Possible aggravating circumstances:
1.   Pecuniary gain (object - Middlebrooks)
2.   Previous violent felony - object if it's the AR that was committed around the same time as the murder
3.   Avoid apprehension (no evidence)

Possible mitigating circumstances:
1.   Youth
2.   Alcohol influence
3.   Influence of others
4.   Life has value
5.   Poor upbringing
6.   Sears House info

3

Jeannie Mack cannot make it Wednesday.  Neither can Mike Moss (he has a Dr. appt. in St. Louis.  However, any other day this week they can be available.

If they could both testify Thursday they would come down here together.

533

Respondent's Exhibit E

Information from Beatrice Whitside

Jo Ann Leone
1119 East 2nd
Pine Bluff, AR 71601
no Phone

Kenneth has a record at SE A MH
maybe '86 — Ruth Rice was the
person who saw him — 535-6600
is her number.

Respondent's Exhibit E

Central Office
Jefferson City, MO
(314) 526-4494

} 'Reams'

Sears
Youth
Center

595

Respondent's Exhibit E

6214

8336 -
8558

Amelia Regins - Kenneth's Aunt                    11/18/93
     Elgin — (William Louis)
Good        — Eligin Anders —


Mike Moss 米
Very Emotional
Alot of Potential
Enjoyed School + Church    Jerry  Brother
     right you             (Davis)
     put but wouldn't
          do it myself

Jeannie Mack 米

Joined Church after Sears
Sears — 8-9 mths

Laurda & Kenny got along real - goods

Respondent's Exhibit E

536



Respondent's Exhibit E

9/30/93                    KENNETH REAMS

= 18-yrs-old → did Not Finish 11th Grade

* Whitesides- Mother & Father
= of △ present in courtroom

                    B        C
EPG·    Burglary - TOP          3-10
                                5-20
        Agg ROBBERY - Y         10-40 or life
        Agg ROBBERY - Y         10-40 or life

Bonnie Phillips - victim -

                Order · 10-10
                        40-40
                        Concurrent

KENNETH REAMS

11/11/93

① OMNIBUS HEARING
② SUBPOENA
   Ⓐ DRS FROM MENTAL HEALTH

(girlfriend)

✱ Cerassa MACKS          2ND YEAR
   P.O. BOX 1633                ASU
State Un    72467
Of ARK          801-972-2705
   on campus - University Hall
             Downstairs 2705 - 6:00

John    ✱ Dwight Revada    "Tommy"  (father)
Bunch    1400 Cotton St.
DOC      Austin TEXAS  78702
number      512-472-7713
Forrest
City

539

Respondent's Exhibit E

6218

9/30/93

Scott Whiteside      (BEATRICE)
411 East Davis
Forrest City, Ark 72335
633 - 7335

sent copy of file to
Clients parents

Respondent's Exhibit E

540

6219

2, USE        12/15/93        State vs. Reams

For
Killing

① Easily Influenced By Others
② Not the trigger man — or at least
the evidence is so unclear ~~that~~ as to
who was the trigger man —
        CO-D got life w/o
Not a good
kid soma → ③ Inability to control compulsive Behavior
and → ④ mild Mental Retardation
        ⑤ ~~Ordinary Robbery~~
        ⑤ Youth
Main → ⑥ Drug & Alcohol usage at time
Creator        of Crime
        ⑦ Came from a well-meaning family —
But evidently the family did Not
have the Resources to get help —
        ⑧ He has sustained interpersonal
relationships — girlfriend / relatives
        ⑨ Contribute to Society from P.V. —
May influence others from prison
        ⑩ Artistic Ability —
        ⑪ He does Not Need to Be Executed to
protect Society —
        ⑫ ~~Send a message — Death Penalty
is a deterrent~~
        Murder Rate is up Now More
541    Than ever — despite Well Publicized
Executions

Respondent's Exhibit E

State vs. REAMS                          12/15/93

State's closing

He shot the gun ▷

O

[Alfred Goodwin]

Prosecutorial misconduct          a head Rotates

mistrial                          360° —

The two are pointing fingers at one another ▷

Prosecutor Not to be criticized ▷

△ ▷ ⊘ △

Commenting on evidence Not in Record ▷

implied

▷ O △ ▷

i Ste w/o parole ▷     essential ▷     outside scope —     of △'s Argument

Respondent's Exhibit E

542

6221

State vs. Psams

12/14/9~

Bud Phillips

PBPD - Det

Where were statements given?
Circumstances?
Talk w/ him @ PB Station -

of Comment
Arrest -

Separate Rooms → o
Didn't → o
10:00 pm → o

Nervous? →
of willingly talked →

543

Alfred Goodwin — plead guilty 12/14/93
Life w/o parole

\* Constitutional safeguards

\* Δ testimony

\* Δ's priors          — only 3 people know
                          what happened — Δ
Burglary — dry cleaners
Agg robbery — bus station
Agg robbery — ATM

\* state's evidence — Δ

Respondent's Exhibit E

544

6223

12/13/93   Voir Dire

2 part trial
2 trials

① Constitutional Safeguards
   Ⓐ Presumption of Innocense
   Ⓑ State - Burden of Proof - Each element
      Beyond a Reasonable doubt
   Ⓒ Right of Δ Not to testify
   Ⓓ Filing of Information Not to be considered as
                                            Evidence

② Testimony of Police officer vs.
      ordinary citizen

Scripturally Based - Pine St.!

Pre-trial Publicity - [Δ plead Civil suit]

Not here to do something
   about crime in P.B. -

Accomplices - "equally"
Who pulled trigger - does that make difference to you?

will & truly try this case :
Render a true verdict according
to law & evidence -

Previous felony convictions - of Δ?

work @ Worthen? Bank there. Δ

Lesser Included offenses?

Race:
Victim - white
       - Black Δ

State goes first -
weigh both sides of evidence

① 545

Respondent's Exhibit E

6224



6/9/93

KENETT REAMS

① mental evaluation →

② copy of file - sent out to △

Motion to suppress

ATTn John OFFICERS

Beatrice
Whiteside
mom
Pearcest City 72338

(SN.) 633 - 7315 Burglary

Grandmother

Paul Crawford 10p

411 East Davis Ass Robbery

Capital murder

Ass ✓

mitigations

"Stamp"

"

Respondent's Exhibit E                    546

George S.
Rev. McDaniels                    Exhibit 34 - 472 - 462

Critical Baptist    11/18

Knew about you.
— Regular — Usher at —
— Avg. 14 yr old —
— Obedient — always did what was told. —

Michael Harris — Pop Bluff

Mad problem w/mother
Stayed w/aunt
Iron Forest City —

Every time the aunt there
Jekyll/Hyde
Depressed — when she got back.
Talked with him about (family problems)
/mother

Didn't really care for nothin'
— Cried — Wouldn't open up.
Would always come by & talk.
Always at Church

Basically good kid. Fights — normal problems
ask for prayers

547

Respondent's Exhibit E

6226

Wanted to go back to Sears.

Blamed him — she had new boyfriend.

Depressed.

First week of
trial.

Uses him to blame actions on.
Don't really want to go see him in
jail.

One hit him.

11/18/93 - Laroucca Mark -

4 yrs.

Low Esteem
Self-
Basically
good guy

Confused - Wants things his way
Can be nice + considerate

Argued alot - She wouldn't let him have this way.

didn't mention real dad

Her + mom + aunt only family he had
Mom didn't care - wouldn't call
S-F didn't like K.R. - KR said he hated him.

Could be violent. - <-> Not enough to kill someone.

More talk then anything.

Shows - Didn't help much - for awhile easily influenced.

Doesn't have courage kill someone

Was potential to have a chance - not dull
Very intelligent - Doesn't apply himself

Went to church fairly regularly.

Erwin
in art

549                    Respondent's Exhibit E

6228



11-12-93

Re:  Kenneth Reams

Kay:                                                    686-2271

     I have left a message with Norma, Amelia Reams' sister to have
Amelia call here collect.

     I have also left a message on an answering machine for Pastor
Saul McDaniel to call collect.

     I spoke with the Sears Youth Program.  However, both Mike Moss
and Mark Russell are out today.  Mark Russell's day off is Friday.

     If Amelia Reams calls, try and get a time and a place set for
Thursday.  Maybe she can get the Pastor to be there also.  Ask her
if there is a motel/hotel there to meet.  Both the church and her
home may be in a part of town I probably don't want to go by
myself.  However, I don't think Poplar Bluff is very big.  (I
looked in a book we have.  There is a Holiday Inn there.  I have it
marked.)

     I thought Thursday would be best since Mark Russell is off on
Friday.  I will call the Sears Youth Program back on Monday and try
and get that set up for Thursday also.

     I also sent his aunt, Jo Ann, a letter and Kenneth a release
to sign.

     If you don't hear from Amelia Reams you may want to call her
mother.  I didn't leave a message with her.

     I haven't talked with girlfriend or father yet either.


*Thrift Inn —*
*Holiday Inn — 785-7711*
*4 hours drive*
*Amelia Called, I will talk to you about this,*
*Thursday is a good time.*

551

Respondent's Exhibit E

9/2/94

① Carolyn Phillips - WF

② Dorothy Hodges - WF

RACE MAKE UP OF JURY
ONE BLACK

TED Holder
374-4407

Linda Messina - WF
Della M. Fisher Moore - BF
Dwight Robinson - WM
Mary Johnson   WF
Bruce Hornsby - WM
Jerry Lindsey - WM
Kelly Buggie   WF
Larry Dipten   WM
Carolyn Phillips - WF
Mary Hoffman - WF
Dorothy Hodges - WF
David Stelaw - WM
Brenda Silvey - WF
Darlene Frye - WF

553

Respondent's Exhibit E

6232

**phone message**

FOR _Maxie_       DATE _12-14_ TIME _5:00_ ☑ A.M.

M _Rev. Mc Daniel_

OF _____

PHONE ( )_314-472-4621_
   AREA CODE        NUMBER        EXTENSION

MESSAGE _Re: Kenneth Reams_

_____

_____

SIGNED _____

| | |
|---|---|
| URGENT | |
| PHONED | |
| RETURNED YOUR CALL | |
| PLEASE CALL BACK | ✓ |
| WILL CALL AGAIN | |
| WAS IN | |
| WANTS TO SEE YOU | |

12/20

KARN
MAKE SURE
WE KNOW if
KEAMS Judgment
is modified or
Amended at

Respondent's Exhibit E

554

6233

11-18-93 - <u>INTERVIEWS CONCERNING KENNETH REAMS</u>

1.   <u>Jeannie Mack</u>

Ms. Mack was pretty much self-explanatory on the tape.  I took only a few notes, none of which are not on the tape.

Will be at trial.

2.   <u>Amelia Reams, Elgin Anders and William Louis</u>

Mr. Louis, a friend of Kenneth's said we might want to talk with his brother, Tony Louis.  Ms. Reams and Mr. Anders both seem fairly racist.  They think he was <u>railroaded</u> out of Poplar Bluff and the same is happening to him in Pine Bluff.  (Kenneth doesn't do anything, everyone just picks on him.)

Will be at trial.  Friend, William will also try to be there.

3.   <u>Mike Moss</u>

Mr. Moss stated that Kenneth was a very emotional kid.  He does think he has alot of potential.  He said he enjoyed school and church and attended church regularly.

He feels that Kenneth is more of a watcher than a doer.  "He might dare someone to do something, but wouldn't take a dare."

Mr. Moss would like to come to the trial.

4.   <u>Reverand George S. McDaniels</u>

Kenneth attended Church regularly.  He was an Usher at the Church.

He was an average 16 year old.  Kenneth always did what he was told to do (at least what the Rev. told him to do)  He was very obediant.

Kenneth had a good friend by the name of Michael Harris, who was also an Usher at the Church.

Kenneth talked to the Rev. on several occasions concerning his mother.  There were definite problems there.

Everytime he went to Forrest City and came back he was like "Dr. Jekyl and Mr. Hyde"  He would seem very depressed when he got back.

Rev. McDaniels indicated that Kenneth didn't really care much for his mother. He would often cry when he started to talk about his mother. However, he wouldn't open up much about it.

Whenever he was in town he would always come by and talk and was always at Church.

The Rev. said he was basically a good kid.

The Rev. is from Hot Springs. He has been in Poplar Bluff for approximately 4 years. He said he is very close with all of the kids at Church. He lives in Sikestown (314) 472-4621.

5.  Laronda Mack

Ms. Mack has known Kenneth for about four years. She thinks he is a very confused person. She said as long as he got things his way he was okay. Otherwise they would often argue and fight.

She did say he had a tendency to be violent. However, not violent enough to kill a person. He has on one occasion hit her.

Kenneth never mentioned his real father. He often told her that she and her mother were the only family he had. His mother didn't care about him. She never called him. His step-father didn't like Kenneth and therefore his mother would side with the step-father.

Ms. Mack feels that Kenneth is more talk than anything. She didn't think the Sears program helped him much.

She feels his is very easily influenced by others.

She does think he does have some potential. He could be very intelligent but he doesn't apply himself. She did say he excels in art.

Kenneth did indicate to her that he would like to go back to the Sears program for additional help.

She would like to come to the trial but she has finals the week of December 13th.

Respondent's Exhibit E

556

* ROBERT WHITE — Need to Petition the
Court to be relieved as Atty — Cite
a conflict in the defenses (between)
White + Willis —

* Robert Gould — Need mental evaluation —
Don Sturtit + hired my family —

* Kenneth Rowe —

* Adrian Lowe —          * Showed him
Oak St                    pictures —
Lives w/ Alfred Godwin    of KKK —

* Tim Perry
100 3 West 3rd            Beat △ up —
PB, Ark

Ceril to Suppress Statements —
Lie Detector Test △

Testimony — 40 yrs (△)
Exchange for Testimony —

1/14/93

RE: MET W/ △ @ JAIL

① MOTION — SUPPRESS

had been
previously
ed motion
asked to enter — WITNESSES
but – nobody
[illegible] is not
that the case.

Adrian LOVE — 314 South Oak

Lives @ SAME address @ Alfred Goodwin

Tim Perry
1003 West 3rd
PB, ARK

☀ Mental Health Evaluation
   6/14/93

Burglary      CR-93-298    Tried First

Ass Robbery   CR-93-299    Bus Station

Agg Robbery   CR-93-300    ATM

Capital Murder CR-93-301    ATM — Turner

9:00AM
Thursday

Respondent's Exhibit E

6237                                              558

9/29/93

TO KW
REAMS
1003 West 3
PB. ARK - PNH
Close to Charry St.

MET W/ KENNETH REAMS -

PENNY

Adrian Love - Attends Jack Robey
    Jr High School -

Statements - Testimony to be offered
    By ∆ @ suppression Hearing

Officers - beat him, choked him
    threatened him w/ death
    Penalty = showed him
    pictures of KKK

∆ agreed to take lie detector
test about 2:00 am after being
arrested @ 3:00 pm previous day -
Told he flunked test - ∆ said he
would now tell truth -

Jermaine -

559

Respondent's Exhibit E

6238

Death Penalty Resources Center
1500 Riverfront Drive
Suite 118
Rebesamen Building
Little Rock, AR

Phone: 663-1400 - Diane

Mr. Al Schay - Director

Bring any discovery that you have.

Diane could not think of the car dealership name, but you turn
right off Cantrell between the dealership and Harvest Foods store
which is located at 14901 Cantrell.  The Rebesamen Building has a
clock on top.

Mr. Schay would like to have the case numbers on the cases you want
help with.  Also, he will be there all morning, so whatever time
you finish your hearing, just go there.

Respondent's Exhibit E

560

6239



S&W
Caliber → 12/14/93

upon what do
you base your
opinion →

1/5/93
3rd day
of trial

① Lesser Included - Agg Robbery
② Affirmative Defense - Capital Murder
③ Eissle's opinion -
    Ⓐ Copy of Cases
④ Motion for Directed Verdict -
    No proof of Reckless
    Indifference to value of human life

2-2969.7
3000
488.82
408.97

$7500
7500
15,000
7100
7900
3500
$7400

2296.97

camiel is kansas as ckannk is to ark whoo
Spence Kizer
NO
FEAR

561

Respondent's Exhibit E

6240



Alyssa
19
5'11
170 lbs

12/14/93

GREG TAYLOR     PBPD          * He though he
JAMES NELSON,                   had gun fixed so
KENNY HERDMAN  PBPD   Capt.    hammer will fall
                                on an empty

314 So.
Oak

SEARCH
WARRANT

Physical Evidence
Direct Evidence

Arrest - Probable Cause -
3rd : Elm - Both walking

003
1st 3rd

Jermaine
Brown -

NELSON - did NOT see either suspect w/ a gun
No fingerprints - Car
small Caliber Bullet - .32 cal      .32 cal H&R
Kenneth had gun in his possession -    REVOLVER
murder Bullet recovered

Pistol
was observed
Kenneth's
Residence

Search
Warrant

1003 WEST 3rd - FL -
April 27  Brown leather holster .32 size
or 28   (2) leather jackets - BOMBER

Consent to
Search
314 So. Oak
hooded gray sweatshirt -
.32 H&R REVOLVER - under Bucket/wrapped plastic   Backyard
Brown leather jacket -

serial # - scratched out

Respondent's Exhibit E

Debbie Sullings →          6663 - 1440

Jim Rueton ⟷ Phil McMath
   + assoc.            ↓
                  repr. Duncan v. Worthen

Went to see Kenneth Reans
Told him they had your approval.

563

Respondent's Exhibit E

Motion To Instruct Jury
As To the Issue of
Mental Ret

How many Blacks do you Think
We have in Next 20?

## phone message

FOR _Nancy_

M _Nancy Edans_

OF _SEA MH_ Kathy

PHONE ( ) _534-1834_

MESSAGE _Re: Kenneth Reams_
_Case — what day do you_
_expect to need someone to_
_____ ?_

| | |
|---|---|
| URGENT | |
| PHONED | |
| RETURNED YOUR CALL | |
| PLEASE CALL BACK | ✓ |
| WILL CALL AGAIN | |
| WAS IN | |
| WANTS TO SEE YOU | |

DATE _12-2_  TIME _9:55_ A.M. P.M.

Kay    12/3

Put with KENNETH
REAMS INFO —

565

Respondent's Exhibit E

6244

**PHONE MESSAGE**    DATE 11-14    TIME 9:15 A.M./P.M.

FOR _Marie_

93-31CCA

M _Client Miller_

OF _attorney General's office_

PHONE ( ) 682-3657   EXT.

☐ FAX  ☐ MOBILE  ☐ PAGER ( )

MESSAGE _Re: Kenneth Reams_
_He is handling the case for_
_the attorney Generals office — he_
_needs to get 45 day extension —_
_do you object? If not_
_Call him._

☐ URGENT
☐ PHONED
☐ RETURNED YOUR CALL
☑ PLEASE CALL BACK
☐ WILL CALL AGAIN
☐ WAS IN
☐ WANTS TO SEE YOU

AVERY

SIGNED ___

---

**phone message**

FOR ___    DATE 11/23   TIME ___ A.M./P.M.

M _Jeannie Meeks_

OF ___

PHONE (314) (686 - 2943)
AREA CODE    NUMBER    EXTENSION

MESSAGE ___

_Ken Reams_

SIGNED ___

URGENT
PHONED
RETURNED YOUR CALL
PLEASE CALL BACK
CALL AGAIN
TO SEE YOU

---

Respondent's Exhibit E

6245

566

## INFORMATION RELEASE AUTHORIZATION

TO: _____          DATE: _____

_____

_____          RE: _____

_____          _____

You are hereby authorized and requested to furnish to MAXIE G.
KIZER, P.A., Attorney at Law, any and all information and materials
regarding any contact, dealings or association of _____
_____ with the above
named agency.  Such information and materials should include all
contents of files and should embrace any forms, reports, records,
correspondence, memoranda, statements, applications, guarantees or
any other materials available to you.

SIGNATURE: _Reems, Kenneth_ _____

ADDRESS  : _Varner Unit_ _____

_P.O. Box 600_ _____

_Grady, Ark 71644 - 0600_ _____

567

Respondent's Exhibit E

6246

INFORMATION RELEASE AUTHORIZATION

TO: _____     DATE: _____

_____

_____     RE: _____

_____          _____

You are hereby authorized and requested to furnish to MAXIE G.
KIZER, P.A., Attorney at Law, any and all information and materials
regarding any contact, dealings or association of _____
_____ with the above
named agency.  Such information and materials should include all
contents of files and should embrace any forms, reports, records,
correspondence, memoranda, statements, applications, guarantees or
any other materials available to you.

SIGNATURE: _Reams, Kenneth_____

ADDRESS  : _Varner Unit_____

_P.O. Box 600_____

_Grady, Ark._____
71644 - 0600

568

Respondent's Exhibit E

6247

©1993, Donrey Media Group

**113th Year No. 243**

# Jury Condemns 18-Year-Old In ATM Killing

**By Rudolph Bischof**
OF THE COMMERCIAL STAFF

After almost four hours of deliberation, the jury in the capital murder trial of Kenneth Reams, 18, returned a guilty verdict Wednesday and sentenced Reams to death by lethal injection.

"He had the chance for life without parole and he wanted the trial — and he got it," said Maxie Kizer, Reams' defense attorney.

While Circuit Judge Fred Davis III polled the jurors on their verdicts, several members of Reams' family filed quietly out of the courtroom and quickly left the Jefferson County Courthouse.

After Davis' poll, Francis and Daisy Turner, the parents of Gary Wayne Turner, tearfully embraced and also left the building, along with Turner's widow, Catherine Turner.

Reams and Alford Goodwin, 19, were arrested in connection with the May 5 fatal shooting of Gary Wayne Turner at a Worthen National Week automatic teller machine at Fifth Avenue and Chestnut Street. Goodwin pleaded guilty to capital murder last week and was sentenced to life in prison without parole.

"There'll be tons of appeals. They'll go the next seven or 10 years," Kizer said. "We'll go through the state courts up to the federal courts."

A spokesman for Reams' family, Rev. George S. McDaniel, who is pastor at a church in Poplar Bluff, Missouri, that Reams once attended, said the family is looking to appeal immediately.

"All we can do is pray for him and hope for the best," McDaniel said.

The jury returned with the death sentence almost four hours after they returned with the guilty verdict.

After the verdict was read by Davis, the defense called a psychological examiner as part of additional testimony for the jury to hear before sentencing Reams.

The psychological examiner from the Southeast Mental Health Center, David Nannack, told the jury he found Reams to be "mildly mentally retarded" when he evaluated Reams after his arrest.

Nannack said Reams' IQ is 66 and that 70 is the borderline between the highest level of mild mental retardation and normalcy.

Nannack told Deputy Prosecutor Wayne Juneau during cross-examination that Reams did, however, know the difference between right and wrong.

Reams' mother, aunt and pastor all appeared before the jury for additional testimony before the

See TRIAL on Page 2A

*ne Bluff Commercial*
*2/16/93*
*P. 1*

*569*

**Fight**

A Pine Bl

# Fire

**By Agn**
OF THE COMME

A fire, space ho home of on Wed

Respondent's Exhibit E

6248

Case 4:22-cv-00699-LPR-JTR   Document 28-31   Filed 11/8/2022   Page 42 of 276

## Trial

From Page 1A

jury considered whether to sentence him to death.

"He was everything a mother could ask for," Reams' mother, Beatrice Whiteside, 38, testified. "Ken was never disrespectful to me."

Whiteside said she and a judge in Forrest City, where she lives, decided about three years ago to send Reams to live with his aunt, because Reams was getting in trouble.

While in Missouri, Reams spent nine months, from March to November 1992, in a youth home for stealing, Beatrice Whiteside said when questioned by Billings.

Amelia Reams said Kenneth Reams lived with her in Missouri for two years. Amelia Reams said Kenneth Reams stole because he was easily influenced by other youths. Amelia Reams said her nephew left Poplar Bluff for Forrest City after he was arrested for riding in a car with marijuana and beer in it.

Amelia Reams said she knew nothing about burglary and theft of property warrants issued for

Kenneth Reams when he returned to visit her in March.

"Ken has made a lot of mistakes in his life," Amelia Reams said during a request also made by Whiteside and McDaniel to the jury to sentence Kenneth Reams to life without parole. "Hopefully, he can show these young kids the road he travelled and tell them not to make the same mistakes he did."

Reams testified Tuesday that he was present during what he thought was going to be an armed robbery of Turner. Reams said Goodwin shot Turner.

When Kizer asked Reams why

he did not leave town after the murder, Reams said: "At that time, I didn't know about this accomplice and all this. I didn't, kill him and didn't know I could be charged with murder."

Billings told the jury it should convict Reams because in the week before Turner's death, Reams committed two aggravated robberies and a burglary for which he later was convicted.

Davis ordered Jefferson County deputies to take Reams to the Department of Correction, where he will await appeals or the governor's authorization for lethal injection.

## Retire

From Page 1A

Harbor ... strial District and 15
in Jeffer
Othe ... jects in. Jefferson

excellent financial condition and have the resources necessary to sustain development efforts," he said.

As the owner and developer of the Harbor Industrial District, the surr ...

commitment to the organizations and the community.

"It is no secret Pine Bluff has long ... the envy of a lot of ... es in Arkansas and ...

work on behalf of Pine Bluff will be missed. But, his expertise is not lost to the community. We are grateful for that," Trotter said.

A successor for Gieringer has not been named by either organi-

Exhibit E

# Teen convicted in murder at ATM sentenced to death

Democrat-Gazette Pine Bluff Bureau

PINE BLUFF — A jury returned a guilty verdict Wednesday in the capital murder trial of Kenneth Reams, 18, accused in the shooting death of a Pine Bluff man during a robbery attempt at an automatic teller machine.

The jury returned at 9 p.m. with a sentence of death by lethal injection, according to defense attorney Maxie Kiser. Kiser said an appeal to the state Supreme Court is automatic in death penalty cases.

Pine Bluff authorities had charged Reams and another man, Alford Goodwin, 19, with capital murder in the May 5 shooting death of Gary Wayne Turner, 38, at a Worthen National Bank automatic teller.

Goodwin pleaded guilty to capital murder Dec. 2. Circuit Judge Fred Davis III sentenced him to life in prison with possibility of parole.

The state sought the death penalty for Reams, but the jury could have recommended a sentence of life in prison without parole.

Reams testified in his own behalf Wednesday in what Deputy Prosecuting Attorney Carol Billings described as an account sounding like a third-hand version of what happened. She said that Reams, under cross-examination, began getting facts mixed up and sounded unsure of his story.

Reams and Goodwin are serving 40-year sentences after pleading guilty last month to aggravated robbery in the attempted robbery of a Crossett (Ashley County) man at the same automatic teller machine a week before the Turner shooting.

## Court faults judge's remark, overturns conviction

The state _____ overturned _____ drunken-d____ Wednesday ____ marks made ____ the trial.

Leon Call___ ed in Lawre____ Court of four ____ while intoxi____ ving with a s____ license. He ____ four years in ____ $1,000 on the ____ and 10 days ____ suspended ____ charge.

In the unanimous opinion, the appeals court remanded the DWI conviction and affirmed the suspended driver's license conviction.

The court found that a remark made by Circuit Judge

Maxie
Kiser
Arkansas
Democrat
Gazette
12/16/93
p. 7B

There's a Method to this Mess!

"It is inappropriate for the trial judge to comment on the evidence," the appeals court found.

"The verdict of the jury should not be biased or affected by expressed opinions of the trial judge."

Newport ___ as inappro___

____rguments, ____d that peo___ ____ drinking ____ vehicles. ____ objected, ____secutor's ____ to testi___

____e objec___ ___roblem is ____ driving ve___ ___at we have

## Court of Appeals

OF DEC. 15, 1993
N E. JENNINGS

_ee Miller vs. State, from
___ins and Mayfield,

_tfires vs. State, from Pu-
vision. Affirmed. Robbins
gree.

_ssen vs. John McNamara
_ary. Affirmed. Cooper and

MAUZY PITTMAN

Craig Maronay vs. State,
_uit. Affirmed. Cooper and

ES R. COOPER

Curtis Robinson vs. State,
_it. Affirmed. Pittman and

_tels vs. Shelter Mutual In-
_ Garland Circuit. Affirmed.
_ld, JJ., agree.
_tchey Sage et al. vs. Billie
Boone Chancery. Affirmed.
_s, JJ., agree.
_ittington vs. Cheryl F. Mar-
_Chancery, Fort Smith Dis-
_an and Mayfield, JJ., agree.
N B. ROBBINS

_b and Clarence Triplett vs.
_m Circuit, 1st Division. Af-
_J., and Rogers, J., agree.
_vs. Arkansas Department
_n Workers' Compensation
_rmed. Jennings, C.J., and

_bert vs. Baldor Electric from
_ation Commission. Affirmed.
_d Rogers, J., agree.
LVIN MAYFIELD

_allahan vs. State, from
_Affirmed in part; reversed in
_J., and Robbins, J., agree.
_B. Westphal vs. Richard
_ens and Palmer Inc.,
_ho __, Jennings, C.J., and

_llion vs. James Thomas
_ Marian Scallion, from Jef-
_4th Division. Reversed and
_ngs, C.J., and Robbins, J.,

_yons vs. Arkansas Depart-
_Services, from Sebastian
_d. Jennings, C.J., and Rob-

_jes vs. Director, Employment
_ent, from Board of Review.
_emanded in part. Jennings,
_J., agree.

JUDITH ROGERS

_el Gritus vs. State, from Se-
_ffirmed. Jennings, C.J., and

_d O. Daniel vs. State, from
_ffirmed. Jennings, C.J., and

_Seabrook Smith vs. Pulaski
_Department and Sedgwick
_ns Inc., from Workers' Com-
_ission. Affirmed. Jennings,
_s, J., agree.
_r Bratcher et al. vs. Norma
_om Pulaski Chancery, 1st Di-
_n part; reversed in part. Jen-
_Mayfield, J., agree.
RIAM ORDERS

_ED: Petitions for rehearing
_dnesday in the following cas-

_Lawhon Jr. vs. State, from

_Yankey vs. State, from Pope

_ice Mauldin vs. State, from
_Motion of Eugene B. Hale for
_Granted. Allowed $60.
_m Bosley vs. State, from Hot
_lotion of Phyllis J. Lemons for
_Granted. Allowed $550.
_en Scott vs. State, from Chicot
_bert P. Remet for attor

CA93-873. Mary Beseff McDougal vs. Richard Lynn
McDougal, from Crittenden Chancery. Appellant's motion to supplement the record and to stay brief time. Granted. Brief due Dec. 22, 1993. Pittman, J., not participating.
CA93-873. Mary Beseff McDougal vs. Richard Lynn
McDougal, from Crittenden Chancery. Appellant's motion to certify to the Supreme Court. Denied. Pittman, J., not participating.
CA93-1057. Asplundh Tree Expert Co. et al. vs.
Michael Corder, from Workers' Compensation Commission. Appellant's motion to stay brief time. Granted. Brief due Jan. 17, 1994.
CA93-1114. Tom Andrews et al. vs. Environmental
Systems Co., from Pulaski Circuit. Appellant's motion to file a belated brief. Granted. Brief due Dec. 20, 1993.
CA93-1122. Anna Loretta Ellis vs. Bill Cole Ellis,
from Sebastian Chancery, Fort Smith District. Appellant's motion to supplement the record. Granted.
CA93-1122. Sammy Thomas Boren vs. Pamela
M. Boren, from Lonoke Circuit. Appellant's motion to certify to the Supreme Court. Denied.
CA93-1128. In the matter of the guardianship of
Thelma Woodard, from Carroll Probate. Appellee pro se motion for brief time. Granted.
This case is called for a dismissal for failure to file briefs. Rule 4-5.
CA93-689. Ronald G. Pense vs. Edna McGill, from
Benton Chancery. Dismissed.

**MOTIONS SUBMITTED**
Petitions for rehearing:
CA92-998. Coleman's Service Center Inc. vs.
Southern Inns Management Inc. et al., from Monroe Circuit.
CA92-1141. White Consolidated et al. vs. Alonzo
Rooney et al., from Workers' Compensation Commission.

* * *

CACR92-1155. Nathaniel Williams a.k.a. Daniel
Tucker Jr. vs. State, from Nevada Circuit. Motion of Eugene B. Hale for attorney's fees.
CACR92-1337. Carl Pierce vs. State, from Miller
Circuit. Motion of Thomas A. Potter for attorney's fees.
CACR-235. Rodney Cottrell vs. State, from Hot
Spring Circuit. Motion of Robert N. Jeffrey for attorney's fees.
CACR93-413. Ricky Larry Curry vs. State, from
Jefferson Circuit. Motion of Maxie G. Kizer for attorney's fees.
CACR93-702. Louis Crawford vs. State, from Mis-
sissippi Circuit. Motion of John H. Bradley for attorney's fees.
CACR93-945. Bennie Mitchell Jr. vs. State, from
Miller Circuit. Appellant's motion for brief time.
CACR1286. Walker Hagar Jr. vs. City of Fort Smith,
from Sebastian Circuit. Appellant's motion for brief time.
CA93-155. Cecil M. Buffalo Jr. vs. Shelby Black-
mon, from Pulaski Chancery, 1st Division. Appellee's motion for attorney's fees.
CA93-605. Charles Culver et ux. vs. Planters Bank
and Trust Co., from St. Francis Chancery. Appellee's motion to supplement the record and for brief time.
CA93-713. Jane Doe et al. vs. Central Arkansas
Transit Authority, from Pulaski Chancery, 4th Division. Appellant's motion to submit additional legal authority.
CA93-1080. Travis Lumber Co. vs. Thomas Lan-
nigan, from Workers' Compensation Commission. Appellee's motion for brief time.
CA93-1150. Nabholz Construction Corp. vs. Dan-
ny Graham, from Searcy Circuit. Appellant's motion to certify to the Supreme Court.

**SUBMISSIONS**
CACR92-1371. Ray Anthony Lewis vs. State, from
Pulaski Circuit, 1st Division.
CACR92-1372. Ray Anthony Lewis vs. State, from
Pulaski Circuit, 1st Division.
CACR93-23. Robert Shelton vs. State, from Union
Circuit, 1st Division.
CAC93-29. Diane L. Eberlein vs. State, from
Arkansas Circuit, Northern District.
CA93-32. David L. Eberlein Jr. vs. State, from
Arkansas Circuit, Northern District.
CA93-69. Patrick Brian Clark vs. State, from
Jefferson Circuit.
CA93-235. Rodney Cottrell vs. State, from Hot
Spring Circuit.
CA93-413. Ricky Larry Curry vs. State, from
Jefferson Circuit.

# Candy

• Continued from Page 1B

ter turned in the proceeds, but agreed to suspend the school officials were demanding "because I can't beat them ... and I don't want to get in trouble"

with 25 computer stations.

Haltom said he could put cute the pupils, who range first through fifth grades, b thought it was "proper" to name the parents as suspects because they signed permission slips allowing their children to participate in the fund-raiser.

In past interviews, Haltom

Respondent's Exhibit E

# HENDON INVESTIGATIONS

P. O. Box 2761
PINE BLUFF, ARKANSAS 71613
Phone: (501) 536-4350

*censed*
*Private Investigations*
*Background Investigations*
*Fire Investigations*
*Financial Fraud*
*Accident Injuries*
*Photography*

*Retired F.B.I.*
*32 Years Experience*
*Fingerprint Expert*
*Bomb Technician*
*Accountant*
*Consultant*

February 10, 1994

Maxie G. Kizer, P. A.
Attorney at Law
721 Pine Street
Pine Bluff, Arkansas  71601

Re: Calvin Porter

Enclosed herewith is the following:

1. Bill for services

2. Daily Time Sheet

Sorry the Porter case did not turn out better.

For your information the accounting of the $1,500. advance is as follows:

Reams case       $568.20

Porter case      991.50
                 --------
     Total       $1,559.70

Balance owed     $59.70

You indicated that the next case is the Moorehead case scheduled for the near future.

If you have any questions please contact me at 536-4350.

Sincerely

Stanley Hendon

572

# HENDON INVESTIGATIONS

P. O. Box 2761
PINE BLUFF, ARKANSAS 71613
Phone: (501) 536-4350

February 10,1994

TO:      Maxie G. Kizer, P. A.
         Attorney at Law
         721 Pine Street
         Pine Bluff, Arkansas  71601

FROM:    Hendon Investigations

TITLE:   Calvin Porter

### DAILY TIME SHEET

| DATE | WORK & TRAVEL PERFORMED | TIME | HOURS | MILES TRAVEL | PHONE CALLS | MISC. |
|---|---|---|---|---|---|---|
| 12/21/93 | Review files | 9:00A | 4 hrs | | | |
| /'1/94 | Interview Calvin Porter | 8:00A | 4 hrs | 71 | | |
| 1/13/94 | Conf Kizer | 9:30A | 2 hrs | 7 | | |
| 1/13/94 | Tel call Alex | | | | 1.00 | |
| 1/19/94 | " | | | | 1.00 | |
| 1/20/94 | " | | | | 1.00 | |
| 1/21/94 | " | | | | 1.00 | |
| 1/24/94 | " | | | | 1.00 | |
| 1/26/94 | " | | | | 1.00 | |
| 1/27/94 | Interview Edward White, Alexanderia | 2:00P | 3½ hrs | 109 | | |
| 2/3/94 | Interview-Priakas, & Rawls | 2:30P | 2 hrs | 7 | | |
| 2/7/94 | Attempt Locate Aaron Johnson | 1:45P | 1 hr | 8 | | |
| 2/7/94 | Reinterview Priakas Rawls | 5:30P | 2 hrs | 5 | | |
| ?/8/94 | Tria | 1:00P | ? hrs | 3 | | |

Respondent's Exhibit E

573

# HENDON INVESTIGATIONS

P. O. Box 2761
PINE BLUFF, ARKANSAS 71613
Phone: (501) 536-4350


January 19, 1994

TO:       Maxie G. Kizer, P.A.
          Attorney at Law
          721 Pine Street,
          Pine Bluff, Arkansas  71601

FROM:     Hendon Investigations

TITLE:    Kenneth Reams – CR-93-298 & 299 & 300 & 301-3

DAILY TIME SHEET


| DATE | WORK & TRAVEL PERFORMED | TIME | HOURS | MILES TRAVEL | PHONE CALLS | MISC. |
|---|---|---|---|---|---|---|
| 10/27/93 | Review Case file | 8:00A | 3 hours | | | |
| 10/27/93 | Conference Kizer | 4:00P | 2 hours | 7 | | |
| /2/93 | Conf-Kizer,Bradley, Crosthwait | 2:00P | 3 hours | 7 | | |
| 11/23/93 | Interview Kenneth Reams | 10:00A | 4 hours | 80 | | |

FILED

JAN 26 1994

DOROTHY G. PEARSON
Circuit & Chancery Clerk
JEFFERSON COUNTY, ARKANSAS

574

Respondent's Exhibit E

6254

# HENDON INVESTIGATIONS

P. O. Box 2761
PINE BLUFF, ARKANSAS 71613
Phone: (501) 536-4350

January 19, 1994

TO:      Maxie G. Kizer, P. A.
         Attorney at Law
         721 Pine Street
         Pine Bluff, Arkansas  71601

FROM:    Hendon Investigations

TITLE:   Kenneth Reams - CR-93-298 & 299 & 300 & 301-3

## BILLING

Professional Services  12 hours @ $45.00.........$540.00

Travel  94 miles @ .30............................  28.20
                                                  ---------
                           Total       $568.20
                           Advance funds.....  1,500
                                               --------
                           Balance     $931.80
                                               --------
                                               --------

IRS number 71-0688696

FILED

JAN 2 6 1994

DOROTHY G. PEARSON
Circuit & Chancery Clerk
JEFFERSON COUNTY, ARKANSAS

Respondent's Exhibit E                    575

# HENDON INVESTIGATIONS

P. O. Box 2761
PINE BLUFF, ARKANSAS 71613
Phone: (501) 536-4350

*..censed*
*Private Investigations*
*Background Investigations*
*Fire Investigations*
*Financial Fraud*
*Accident Injuries*
*Photography*

*Retired F.B.I.*
*32 Years Experience*
*Fingerprint Expert*
*Bomb Technician*
*Accountant*
*Consultant*

January 19, 1994

Maxie G. Kizer, P. A.
Attorney at Law
721 Pine Street
Pine Bluff, Arkansas  71601

Re: Kenneth Reams

Enclosed herewith are the following:

1. Daily time sheet

2. Bill for services

Mr. Kizer the enclosed bill for services is the usual manner in which I account for advanced funds on an investigative matter. If you need additional information please contact me.

Investigation is continuing regarding the defendent Calvin Porter.

Sincerely

Stanley Hendon

576

Respondent's Exhibit E

6256

# MAXIE G. KIZER, P.A.

ATTORNEY AT LAW

721 PINE STREET
P. O. BOX 7423
PINE BLUFF, ARKANSAS 71611

VXIE G. KIZER
BAR NO.
83101

TELEPHONE:
(501) 534-7004
FAX NO.
(501) 534-7010

September 22, 1993

The Honorable Jack Jones
County Judge
Jefferson County Courthouse
Pine Bluff, Arkansas   71601

Dear Judge Jones:

Pursuant to Paragraph No. 2(e) of our Contract for 1993, the County agreed to pay me an additional $5,000 fee for every case in which the State of Arkansas sought the death penalty during my representation of indigents under this contract.

Please find attached letters from the Prosecuting Attorney's office in the following files: State v. Calvin Porter, CR-93-382-2 and State v. Kenneth Reams, CR-93-301-3.

I will bill the County for payment under this provision when these cases are completed.

Sincerely,

MAXIE G. KIZER, P.A.

MGK:kb
Enclosure
cc:   The Honorable H. A. Taylor
      The Honorable Fred D. Davis, III

Respondent's Exhibit E

577

# MAXIE G. KIZER, P.A.

ATTORNEY AT LAW

721 PINE STREET
P. O. BOX 7423
PINE BLUFF, ARKANSAS 71611

MAXIE G. KIZER
BAR NO.
83101

February 17, 1996

TELEPHONE:
(501) 534-7004
FAX NO.
(501) 534-7010

Mr. Leslie W. Steen
Clerk of the Court
625 Marshall Street
Justice Building
Little Rock, Arkansas  72201

    Re:  Kenneth Reams v. State of Arkansas;
        Supreme Court No. CR-94-00558

---

## STATMENT

---

FOR PROFESSIONAL SERVICES RENDERED:

| | |
|---|---|
| Attorney's Fees | $3,600.00 |
| Costs | 59.40 |
| TOTAL: | $3,659.40 |

578

Respondent's Exhibit E

| Name and Address of Payee | WARRANT NO. |
|---|---|
| Maxie G. Kizer<br>P.O. Box 7268<br>Pine Bluff, AR          71611 | 1995-96 |

FISCAL YEAR

*Robin Warne*

DISBURSING OFFICER

**TO THE AUDITOR OF STATE:**

As the bonded disbursing officer, or his authorized agent, of the state agency shown on this voucher, I hereby certify that the amount set out herein is a legal account due by the State of Arkansas for services rendered to, or purchases made by, this agency for which payment has not heretofore been made; that said account has been found correct with consideration given to all allowable discounts and other credits; that such claim is in compliance with the applicable state purchasing and fiscal laws and regulations on the subject, and is within the provisions and limitations of funds available to this agency. I further certify that all required supporting papers, attached to this voucher, have been furnished or certified by the payee, that detail tickets or other substantiating evidence have been checked by this agency and found to agree with the statements attached, and that all original papers and detail supporting evidence for this account are on file in this agency for audit purposes.

| DESCRIPTION OF SERVICES OR PURCHASES | EXPENDITURE CODE | AMOUNT |
|---|---|---|
| EL<br>legal services rendered case no.<br>CR94-552. Kenneth Reams v. State | 26036 | 3,659.40 |

| TION CODE | DATE | FUND CODE | AGENCY CODE | APPRO. CODE | CHARACTER CODE | VOUCHER NUMBER | VOUCHER AMOUNT |
|---|---|---|---|---|---|---|---|
| 41 | 02 23 96 | HSC | 032 | 008 | 40 | 00041 | 3,659.40 |

| T T | APP ALL | COST CENTER | | | | EXPD. CODE | ENC/COM NUMBER | F P | PROGRAM | | | GRANT ID | GRT. YR. | FED. GRANT | | | AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | ACT | SEC. | UN | EL | | | | ST. | DPT. | AGY. | | | FNC | SF | SSF | |
| | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | |

REV. 7-1-79

VENDOR'S COPY   Respondent's Exhibit E          579

# MAXIE G. KIZER, P.A.

### ATTORNEY AT LAW

721 PINE STREET
P. O. BOX 7423
PINE BLUFF, ARKANSAS 71611

MAXIE G. KIZER
BAR NO.
83101

February 17, 1996

TELEPHONE:
(501) 534-7004
FAX NO.
(501) 534-7010

Mr. Leslie W. Steen
Clerk of the Court
625 Marshall Street
Justice Building
Little Rock, Arkansas  72201

     Re:  Kenneth Reams v. State of Arkansas;
           Supreme Court No. CR-94-00558

---

### STATMENT

---

FOR PROFESSIONAL SERVICES RENDERED:

| | |
|---|---|
| Attorney's Fees | $3,600.00 |
| Costs | 59.40 |
| | |
| TOTAL: | $3,659.40 |

580

Form **W-9**
(Rev July 1984)
Department of the Treasury
Internal Revenue Service

## Payer's Request for Taxpayer Identification Number and Certification

Give this form to the Payer, Middleman, Broker, or Barter Exchange

Name as shown on account (if joint account, list first and circle the name of the person or entity whose number you enter in Part I below.)

*Please print*

Name: Dixie College, PA

Address: PO Box 7423

City, State, and ZIP code: Pin Bluff, AR 71611

List account number(s) here

| **Part I** Taxpayer Identification Number—For All Accounts | **Part II** For Payees Exempt From Backup Withholding (See Instructions) |
|---|---|

Enter your taxpayer identification number in the appropriate box. For most individuals, this is your social security number. If you do not have a number, see *How to Obtain a TIN*.

**Note:** *If the account is in more than one name, see the chart on page 2 for guidelines on which number to give the payer.*

Social security number

OR

Employer identification number: 71 068 4898

**Certification.**—Under penalties of perjury, I certify that:

(1) The number shown on this form is my correct Taxpayer Identification Number (or I am waiting for a number to be issued to me), and

(2) I am not subject to backup withholding either because I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or the IRS has notified me that I am no longer subject to backup withholding.

**Certification Instructions.**—You must cross out item (2) above if you have been notified by IRS that you are subject to backup withholding because of underreporting interest or dividends on your tax return. However, if after being notified by IRS that you were subject to backup withholding you received another notification from IRS that you are no longer subject to backup withholding, do not cross out item (2). (Also see *Certification* under *Specific Instructions*.)

*Please sign here*

Signature ▶    Date ▶ 2/17/96

## Instructions
*(Section references are to the Internal Revenue Code.)*

### Purpose of Form
Complete this form and give it to the payer of interest, dividends, and certain other payments (including broker and barter exchange transactions) so that you will not be subject to the 20% backup withholding that became effective January 1, 1984.

Use this form to report and certify your taxpayer identification number (TIN) to the payer, to certify that you are not subject to backup withholding because of underreporting interest and dividends on your tax return, and to claim exemption from backup withholding if you are an exempt payee.

If you do not complete this form properly and return it to the payer, the payer may be required to withhold 20% of payments made to you.

**Note:** *If a payer gives you a form other than a W-9 to request your TIN, you must use the payer's form.*

### What Is Backup Withholding
The Interest and Dividend Tax Compliance Act of 1983 requires payers to withhold and pay to IRS 20% of payments of interest, dividends, and certain other payments under certain conditions. This is called "backup withholding." If you give the payer your correct TIN when required, and report all your taxable interest and dividends on your tax return, your payments will not be subject to backup withholding.

Payments you receive will be subject to backup withholding if:

(1) You do not furnish your TIN to the payer, or

(2) IRS notifies the payer that you furnished an incorrect TIN, or

(3) You are notified by IRS that you are subject to backup withholding because you failed to report all your interest and dividends on your tax return (for interest and dividend accounts only), or

(4) You fail to certify to the payer that you are not subject to backup withholding under (3) above (for interest and dividend accounts opened after 1983 only), or

(5) You fail to certify your TIN. This applies only to interest, dividend, broker, or barter exchange accounts opened after 1983, or broker accounts considered inactive in 1983.

For other payments, you are subject to backup withholding only if (1) or (2) above applies.

Certain payees and payments are exempt from backup withholding and information reporting. See *Payees and Payments Exempt from Backup Withholding*, on this page, and *Exempt Payees and Payments* under *Specific Instructions*, on page 2, if you are an exempt payee.

### How to Obtain a TIN
If you do not have a TIN, you should apply for one immediately. To apply for the number obtain Form SS-5, Application for a Social Security Number Card (for individuals), or Form SS-4, Application for Employer Identification Number (for businesses and all other entities), at your local office of the Social Security Administration or the Internal Revenue Service. Complete and file the appropriate form according to its instructions.

If you do not have a TIN, write "Applied For" in the space for the TIN in Part I, sign and date the form, and give it to the payer. You will then have 60 days to obtain a TIN and furnish it to the payer. During the 60-day period, the payments you receive will not be subject to the 20% backup withholding. However, if the payer does not receive your TIN from you within 60 days, backup withholding will begin and continue until you furnish your TIN to the payer.

**Note:** *Writing "Applied For" on the form means that you have already applied for a TIN, OR that you intend to apply for one in the near future.*

As soon as you receive your new TIN, complete another Form W-9, include your new TIN, sign and date the form, and give it to the payer.

### Payees and Payments Exempt from Backup Withholding
The following lists payees that are exempt from backup withholding and information reporting. For interest and dividends, all listed payees are exempt. For broker transactions, payees listed in (1) through (13), and a person registered under the Investment Advisers Act of 1940 who regularly acts as a broker are exempt. Payments subject to reporting under sections 6041 and 6041A are generally exempt from backup withholding only if paid to payees described in items (1) through (6), except that a corporation that provides medical and health care services or bills and collects payments for such services is not exempt from backup withholding or information reporting. Only payees described in items (2) through (6) are exempt from backup withholding for barter exchange transactions, patronage dividends, and payments by certain fishing boat operators.

Form **W-9** (Rev. 7-84)

Office of The Clerk
Supreme Court of The State of Arkansas
Arkansas Court of Appeals
Justice Building
625 Marshall Street
Little Rock, AR 72201

Leslie W. Steen
Clerk

Robin Horne
Chief Deputy Clerk

Melissa Fuller
Chief Deputy Clerk

Janie Owen
Office Administrator

Jeanne Matthews
Records Supervisor

FEBRUARY 16, 1996

Deputy Clerks:

Denise Parks

Greta Houston

Daniel Dodson

Holli North

Ginger Mullins

Todd Hill

Joan Owens

Mr. Maxie G. Kizer
Attorney at Law
721 Pine Street
Pine Bluff, AR   71611

    RE:   CR   94 00558   KENNETH REAMS v.
       STATE OF ARKANSAS

Dear Mr. Kizer:

    The Supreme Court has allowed you attorney's fees in the amount of $3,600.00 and costs in the amount of $59:40 for a total of $3,659.40 in the above styled case.

    Please send invoice in triplicate for this amount and upon receipt, payment will be made.

        Sincerely,

        Robin Horne

/rh
Enclosure (W-9)

582

Respondent's Exhibit E



Respondent's Exhibit E

## MAXIE G. KIZER, P.A.

ATTORNEY AT LAW

721 PINE STREET
P. O. BOX 7423
PINE BLUFF, ARKANSAS 71611

MAXIE G. KIZER
BAR NO.
83101

TELEPHONE:
(501) 534-7004
FAX NO.
(501) 534-7010

December 17, 1993

Ms. Nevelyn Shollmier
Court Reporter
Post Office Box 9140
Pine Bluff, Arkansas   71611

     Re:   State of Arkansas v. Kenneth Reams;
           Jefferson Circuit No. CR-93-301-3

Dear Nevelyn:

    Please find enclosed copy of Notice of Appeal and Designation
of Record which we have filed in the above styled matter.  With
that in mind, it would be appreciated if you would provide me with
a copy of the record, including opening and closing arguments and
voir dire, at your earliest convenience.

    Thank you for your assistance in this matter.

           Sincerely,

           MAXIE G. KIZER, P.A.

MGK:kb
Enclosure
cc:  Ms. Dorothy Pearson, Clerk

583

Respondent's Exhibit E

6264

IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ARKANSAS

STATE OF ARKANSAS                                              PLAINTIFF

VS.                          NO. CR-93-301-3

KENNETH REAMS                                                  DEFENDANT

### NOTICE OF APPEAL AND DESIGNATION OF RECORD

Comes now the Defendant, Kenneth Reams, by and through his attorney, Maxie G. Kizer, and for his notice, states:

1.    That he hereby appeals his conviction in the above named matters stemming from the jury trial held on December 13-15, 1993, and the entry of the judgment and commitment order on December 18, 1993, to the Arkansas Supreme Court.

2.    That he hereby designates the entire record of the proceedings.

IT IS SO STATED this __17__ day of December, 1993.

                          KENNETH REAMS, Defendant

                          By: _____
                              MAXIE G. KIZER (83101)
                              Attorney at Law
                              Post Office Box 7423
                              Pine Bluff, Arkansas   71611
                              (501) 534-7004

FILED

DEC 1 7 1993

DOROTHY G. PEARSON
Circuit & Chancery Clerk
JEFFERSON COUNTY, ARKANSAS

Respondent's Exhibit E                    584

6265

## CERTIFICATE OF SERVICE

I, Maxie G. Kizer, do hereby certify that a copy of the foregoing Notice of Appeal and Designation of Record has been forwarded to Ms. Carol Billings, Prosecuting Attorney, Jefferson County Courthouse, Pine Bluff, Arkansas 71601, this 17 day of December, 1993.

MAXIE G. KIZER

585

Respondent's Exhibit E

IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ARKANSAS

STATE OF ARKANSAS                                         PLAINTIFF

VS.                        NO. CR-93-301-3

KENNETH REAMS                                             DEFENDANT

SECOND
<u>NOTICE OF APPEAL AND DESIGNATION OF RECORD</u>

Comes now the Defendant, Kenneth Reams, by and through his attorney, Maxie G. Kizer, and for his notice, states:

1.   That he hereby appeals his conviction in the above named matters stemming from the jury trial held on December 13-15, 1993, and the entry of the Amended Judgment and Commitment Order on December 29, 1993, to the Arkansas Supreme Court.

2.   That he hereby designates the entire record of the including, opening and closing arguments of the attorneys and voir dire.

IT IS SO STATED this 5 day of January, 1994.

KENNETH REAMS, Defendant

By: _____
MAXIE G. KIZER (83101)
Attorney at Law
Post Office Box 7423
Pine Bluff, Arkansas   71611
(501) 534-7004

FILED

JAN 5 1994

DOROTHY G. PEARSON
Circuit & Chancery Clerk
JEFFERSON COUNTY, ARKANSAS

Respondent's Exhibit E                    586

<u>CERTIFICATE OF SERVICE</u>

I, Maxie G. Kizer, do hereby certify that a copy of the foregoing Notice of Appeal and Designation of Record has been forwarded to Ms. Carol Billings and Mr. Wayne Juneau, Deputy Prosecuting Attorneys, Jefferson County Courthouse, Pine Bluff, Arkansas 71601, this 6th day of January, 1994.

MAXIE G. KIZER

587

Respondent's Exhibit E

6268



# STATE OF ARKANSAS

### Office of the Attorney General

December 22, 1993

Winston Bryant
Attorney General

Telephone:
(501) 682-2007

The Honorable Fred D. Davis
Circuit Judge, 3rd Division
Jefferson County Courthouse
Pine Bluff, AR  71601

    Re:  Stay of execution in Kenneth Reams v. State

Dear Judge Davis:

    I do not know if your court has set a date for the
execution of Kenneth Reams.  If not, it will be necessary for
Reams' counsel, Maxie Kizer, to obtain from your court an
order staying Reams' scheduled execution if Reams intends to
pursue a direct appeal to the Arkansas Supreme Court.  In my
experience, often defense counsel mistakenly assume that the
filing of a notice of appeal in a death penalty case acts an
automatic stay of the defendant's death sentence.  This is
not so.  In order for an execution to be stayed, a court
order specifically staying the execution must be obtained by
the defendant's counsel.

    I hope that you will forgive me for sticking my nose into
this case a little earlier than is usual for the Attorney
General's Office --however, I only do so because of the
concerns of our clients at the Arkansas Department of
Correction who are responsible for supervising the condemned
prisoners on Death Row at the Maximum Security Unit.  For
obvious reasons, they become very agitated when an execution
date is fast approaching on the calender for a Death Row
inmate who is pursuing his initial appeal and no court order
staying the execution has been obtained.  I have learned the
hard way that it is a good idea to remind defense counsel in
death penalty cases that it is necessary for them to obtain
from the circuit court a stay of the defendant's scheduled
execution date if they intend to pursue a direct appeal to
the Arkansas Supreme Court.

200 Tower Building, 323 Center Street ● Little Rock, Arkansas 72201-2610

Respondent's Exhibit E

588

Letter to Judge Davis
Page 2
December 22, 1993


        Thank you very much for your cooperation in this matter.
Please feel free to give me a telephone call if I can be of
any further assistance to you.

                            Sincerely yours,

                            CLINT MILLER
                            Acting Deputy Attorney General
                            682-3657

CM/bg
cc:   Maxie Kizer
      Attorney at Law
      P.O. Box 7423
      Pine Bluff, AR  71611

      Jack Gillean
      Senior Advisor on Criminal Justice
      Capitol Building, Suite 011
      Little Rock, AR  72201

      Carla Slayden
      Records Supervisor
      Maximum Security Unit
      2501 State Farm Road
      Tucker, AR  72168-9503

      Bruce Collins, Warden
      Maximum Security Unit
      2501 State Farm Road
      Tucker, AR  72168-9503

589

Respondent's Exhibit E

# Theodore Holder, Esq.

2311 State Street
Little Rock, Arkansas 72206
Telephone & Fax
501 / 374-4107

11 February 1994

Maxie G. Kizer, Esq.
721 Pine Street
Post Office Box 7423
Pine Bluff, Arkansas 71611

Dear Maxie,

It was good to talk to you today. As per our telephone conversation, I look forward to writing briefs for you in selected cases in which you feel you will not have time to write them yourself. I already do that for other lawyers, and I look forward to working with you.

Thanks for the Business.

Very truly yours,

Theodore Holder

Respondent's Exhibit E

6271

5C0

# MAXIE G. KIZER, P.A.

ATTORNEY AT LAW

721 PINE STREET
P. O. BOX 7423
PINE BLUFF, ARKANSAS 71611

MAXIE G. KIZER
BAR NO.
83101

TELEPHONE:
(501) 534-7004
FAX NO.
(501) 534-7010

May 31, 1994

Mr. Theodore Holder, Esq.
2311 State Street
Little Rock, Arkansas  72206

     Re:  Kenneth Reams v. State of Arkansas;
          Arkansas Supreme Court No. CR-94-00558

Dear Ted:

    Please find enclosed a copy of the Notice of Filing of Appeal in the above matter.  The Appellant's brief is due on July 5, 1994; however, please feel free to extend the time, however please notify of same.

    It is my understanding that you will check out the transcript from the Clerk's office.  If you have any questions, give me a call.

                     Sincerely,

                     MAXIE G. KIZER, P.A.

MGK:kb
Enclosure

591

Respondent's Exhibit E

Theodore Holder, Esq.

2311 State Street
Little Rock, Arkansas 72206
Telephone & Fax
501 / 374-4107

5 June 1994

Maxie G. Kizer, Esq.
P..O. Box 7423
Pine Bluff, Arkansas  71611-7423

Re: *Reams v. State*, Ark. Sup. Ct. No. CR 94-558

Dear Maxie:

I have the record in the referenced case and will start on it in a week or so.  I anticipate moving for a 45 to 60 days' extension of time in the case, which I see as no problem.  What I will do is to get the AG's office to consent and then file a motion in your name, signing your name.  I will send you a copy of the motion.

Now that this is starting, I want to get our agreement down in writing.  I agree to completely research and write the brief-in-chief and any reply brief deemed necessary, to deliver to the Supreme Court the requisite number of copies and all else.  What I will give you is a completed product that you can use well in oral argument, which I assume you will ask for because this is a death penalty.  I will be ghost writing for you.  Your name will be on it.  You will receive a draft of the argument in time to make any decisions about arguments.

In return, you agree to give me whatever is awarded in fees.  I will keep track of my time and file a motion for attorney's fees in a timely fashion, again signing your name.  After the Supreme Court writes you a check, you agree to deposit it and then write me a check for the same amount less any time you spent on oral argument, which will be a maximum of three (3) hours' time billed @ the hourly rate the Court awards.

By signing this letter, I agree to the terms set out above.  If you agree to these terms, please signify by signing below and returning this letter to me.  If there are any questions, feel free to call me at 324-9260 during weekday business hours.  Hoping this meets with your approval, I remain,

Very truly yours,

Theodore Holder

I, Maxie G. Kizer, agree to the terms of the agreement set out above by affixing my signature below, this ___ day of June, 1994.

Maxie G. Kizer

592

Respondent's Exhibit E

# MAXIE G. KIZER, P.A.

### ATTORNEY AT LAW

721 PINE STREET
P. O. BOX 7423
PINE BLUFF, ARKANSAS 71611

MAXIE G. KIZER
BAR NO.
.83101

TELEPHONE:
(501) 534-7004
FAX NO.
(501) 534-7010

October 19, 1994

Mr. Theodore Holder
2311 State Street
Little Rock, Arkansas  72206

Re: Kenneth Reams v. State of Arkansas;
Supreme Court No. CR-94-558

Dear Mr. Holder:

I was informed recently that my Motion to file a belated brief in the above named matter was granted by the Supreme Court. Why didn't you let me know ahead of time that you were going have to do this type of action? When we entered into our contract for you to handle this type of legal matter for me, it was implied that we would do things timely and I would not run the risk of getting by butt in a crack for missing filing dates. Also, it was my understanding that I would have the opportunity to review the brief prior to it being filed. At this point, I have seen nothing.

Please send me a copy of the brief filed on behalf of Mr. Reams so I can relay one to the client at your next earliest opportunity.

I look forward to hearing from you soon.

Sincerely,

MAXIE G. KIZER, P.A.

MGK:kb

593

Respondent's Exhibit E

# Theodore Holder, Esq.

2311 State Street
Little Rock, Arkansas 72206
Telephone & Fax
501 / 374-4107

20 October 1994

Maxie G. Kizer, Esq.
721 Pine Street
Post Office Box 7423
Pine Bluff, Arkansas 71611

Re:   *Reams v. State*, CR 94-55

Dear Maxie:

I received your letter today about the referenced case and can understand your consternation, but there was never any danger of you or Kenneth Reams getting in any kind of crack. The oversized brief, which has not been filed but tendered as of this date, was (3) minutes late. It was time stamped in at 5:03. Because it is oversized, it is not filed, but tendered. The odds are that the motion to waive the 25 page limit will be denied, to which I will file a motion for reconsideration. Chances are that it will have to be cut back to 25 pages in the end, anyway. So there is still time to change it, if you want to, although I cannot imagine any viable change. If there were anything else to argue, I think that between me, Debbie Sallings of the Death Penalty Resource Center and Steve Hawkins of the NAACP Legal Defense Fund in New York, it would have been argued.

One of the reasons it was late was that I worked up until and through the day it was due the things being done by Steve Hawkins. He is responsible for most of the point about mental retardation, but he did not get me anything until the week before the brief was due. The last two arguments he delivered to me on the morning it was due. It is my understanding that Debbie Sallings of the Death Penalty Resource Center has forwarded a copy of the argument to Kenneth. I am not including the abstract because it is 154 pages long, and I doubt that you will want to read it. The entire brief is 195 pages long.

By the time you get this letter, we might have spoken on the telephone, but I thought it best to write in case you were hard to get at the office, which is often the case with busy trial lawyers. If we have not spoken by the time you get this letter, you will probably have a message to call me. You can always call me during the day at 324-9260. I am usually there.

I am sorry for not keeping you abreast of these events. Things were pretty hectic the two weeks before the brief was due. I ended up using two days of vacation and an entire weekend on this thing, but I think it will pay off. I feel really good about the *Batson* issue in Point I and the proportionality issue in Point IV. The mental retardation issue in Point II would be stronger if there were more evidence that Reams is mentally retarded to the extent that it significantly

Respondent's Exhibit E

594

Letter to Maxie G. Kizer, Esq.
20 October 1994
Page 2

impairs his ability to operate in society. Hawkins was really insistent on that issue, and maybe it is the wave of the future. Point III on pecuniary gain might win if other cases going to the United States Supreme Court on this issue turn up soon. Also, the Arkansas Supreme Court could consider the argument and adopt it, although I doubt it. The other points are points that Hawkins thought were necessary to raise in case we do not get a reversal.

Everything is taken care of. Everything is on time, your reputation is intact and chances of reversal look good to me. (Debbie Sallings agrees on the *Batson* issue.) I will talk to you soon, if I haven't done so already.

Sincerely,

Theodore Holder

595

Respondent's Exhibit E

IN THE SUPREME COURT OF ARKANSAS

KENNETH REAMS                                                                                      APPELLANT

v.                                                No. CR 94-558

STATE OF ARKANSAS                                                                          APPELLEE

## MOTION FOR EXTENSION OF TIME IN WHICH TO FILE BRIEF

Comes now the appellant, by and through counsel, Maxie G. Kizer, and for his motion for an extension of time, states:

I.

The appellant is before this court on appeal from a conviction of capital murder and a sentence of death by lethal injection. He has previously requested a extension of sixty (60) days' duration, thus making it due to be filed with the court on or before 3 September 1994.

II.

The last extension of time was sought due to the enormity of the task before counsel, including the abstracting of the over 1,000 page record in compliance with Ark.Sup.Ct.R. 4-3(h) and the making of the many arguments contained in that record in counsel's busy trial schedule. The abstracting of the record is virtually complete at present, but the crafting of the arguments is not. As was stated in the last motion for extension of time, the writer is spending a great deal of time on this brief, but not great periods of time due to his schedule. Looking ahead at what is left to be done on this brief and what is on the writer's schedule, it is clear that a quality brief of use to the court is not realistically possible by September 3. It is also clear that, barring unforeseen circumstances of great proportions, no other extension of time will be needed.

1994 AUG 22 P 4: 45

Respondent's Exhibit E

596

III.

Senior Assistant Attorney General Clint Miller, has given his permission to state in this motion that the appellee has no objection to the requested extension of time and will file no response thereto.

WHEREFORE, the appellant respectfully prays the court to grant it an extension of thirty (30) days' duration, thus making the brief for the appellant due to be filed with the court on or before 3 October 1994.

Respectfully submitted,

Maxie G. Kizer
Ark. Bar Reg. No. 83101
721 Pine Street
P. O. Box 7423
Pine Bluff, Arkansas  71611
(501) 534-7004

*Attorney for Appellant*


CERTIFICATE OF SERVICE

I, Maxie G. Kizer, do hereby certify that I have served this motion on counsel for the appellee by placing a copy of the same in the box placed in the office of the Clerk of the Arkansas Supreme Court and Court of Appeals for the purpose of receiving service of papers filed in that office on this 22nd day of August, 1994.

Maxie G. Kizer

2

597

Respondent's Exhibit E

IN THE ARKANSAS SUPREME COURT

KENNETH REAMS                                            APPELLANT

V.                              No. CR 94-558

STATE OF ARKANSAS                                        APPELLEE

### MOTION FOR AN EXTENSION OF TIME IN WHICH TO FILE THE APPELLEE'S BRIEF

Comes now the petitioner/appellee, the State of Arkansas, by and through counsel, Winston Bryant, Attorney General, and Clint Miller, Acting Deputy Attorney General, and for its motion requesting an extension of time in which to file its appellee's brief, states:

I.

The appellee's brief is due to be filed with this Court on or before November 28, 1994. The appellee has not previously received any extension of the time in which it is to file its brief. The appellee respectfully requests an extension of thirty-nine (39) days in which to file its brief. If this Court grants the appellee such an extension, then its brief will be due to this Court on or before January 6, 1995.

Due to the large number of State's briefs and other matters currently assigned to the appellee's counsel, Acting Deputy Attorney General Clint Miller, counsel has not had sufficient time in the month of November, 1994 in which to prepare the appellee's brief in the above-styled case. Preparation of the appellee's brief in the above-styled case

Respondent's Exhibit E                                   598

will be especially time consuming because appellee Reams is appealing his conviction for capital murder and the imposition on him of the penalty of death.  On appeal, Reams has raised seven allegations of error.  At least six of the allegations of error that Reams has raised present complicated Eighth Amendment issues having to do with the validity of the death sentence that was imposed on Reams. Moreover, the record on appeal in Reams's case is approximately 1,056 pages in length and this record will have to be reviewed pursuant to this Court's Rule 4-3(h).  Review of an appellate court record pursuant to this Court's Rule 4-3(h) is very time consuming in that Rule 4-3(h) requires that each page of the record on appeal be reviewed in order to make certain that the appellee has abstracted all rulings made by the trial court below that were adverse to the appellee.  Moreover, the State's counsel, Acting Deputy Attorney General Clint Miller, has spoken with appellee Reams's counsel, the Honorable Maxie G. Kizer, and Mr. Kizer has graciously stated that he has no objection to an extension of the time in which the State is to file its appellee's brief in the above-styled case.

### III.

WHEREFORE, the State, as petitioner/appellee, respectfully requests that the time within which it is to file its brief in the above-styled case be extended by thirty-nine (39) days, thereby making the State's appellee's

Respondent's Exhibit E

brief due to be filed with this Court on or before January 6, 1995.  This motion is made in good faith and is not made merely for purposes of delay.

Respectfully submitted,

WINSTON BRYANT
Attorney General

BY: CLINT MILLER
Arkansas Bar No. 83126
Acting Deputy Attorney General
200 Tower Building
323 Center Streets
Little Rock, Arkansas 72201
(501) 682-3657

ATTORNEYS FOR PETITIONER/
APPELLEE

<u>CERTIFICATE OF SERVICE</u>

I, Clint Miller, Acting Deputy Attorney General, do hereby certify that I have served a copy of the foregoing pleading for petitioner/appellee, to Maxie G. Kizer, Attorney at Law, P.O. Box 7423, Pine Bluff, AR  71611, this <u>14th</u> day of November, 1994.

CLINT MILLER

-3-

Respondent's Exhibit E

600

6281

IN THE ARKANSAS SUPREME COURT

KENNETH REAMS                                          APPELLANT

V.                              No. CR 94-558

STATE OF ARKANSAS                                      APPELLEE

## MOTION FOR AN EXTENSION OF TIME IN WHICH TO FILE THE APPELLEE'S BRIEF

Comes now the petitioner/appellee, the State of Arkansas, by and through counsel, Winston Bryant, Attorney General, and Clint Miller, Acting Deputy Attorney General, and for its motion requesting an extension of time in which to file its appellee's brief, states:

I.

The appellee's brief is due to be filed with this Court on or before January 6, 1995. The appellee has previously received one extension of the time in which it is to file its brief. The appellee respectfully requests an extension of fifty-six (56) days in which to file its brief. If this Court grants the appellee such an extension, then its brief will be due to this Court on or before March 3, 1995.

Due to the large number of State's briefs and other matters currently assigned to the appellee's counsel, Acting Deputy Attorney General Clint Miller, counsel has not had sufficient time in the month of December, 1994 and will not have sufficient time in the months of January and February, 1995 in which to prepare the appellee's brief in the above-styled case. Preparation of the appellee's brief in

C01

Respondent's Exhibit E

the above-styled case will be especially time consuming because appellee Reams is appealing his conviction for capital murder and the imposition on him of the penalty of death.  On appeal, Reams has raised seven allegations of error.  At least six of the allegations of error that Reams has raised present complicated Eighth Amendment issues having to do with the validity of the death sentence that was imposed on Reams.  Moreover, the record on appeal in Reams's case is approximately 1,056 pages in length and this record will have to be reviewed pursuant to this Court's Rule 4-3(h).  Review of an appellate court record pursuant to this Court's Rule 4-3(h) is very time consuming in that Rule 4-3(h) requires that each page of the record on appeal be reviewed in order to make certain that the appellee has abstracted all rulings made by the trial court below that were adverse to the appellee.  Moreover, the State's counsel, Acting Deputy Attorney General Clint Miller, has spoken with appellee Reams's counsel, the Honorable Maxie G. Kizer, and Mr. Kizer has graciously stated that he has no objection to an extension of the time in which the State is to file its appellee's brief in the above-styled case.

### III.

WHEREFORE, the State, as petitioner/appellee, respectfully requests that the time within which it is to file its brief in the above-styled case be extended by fifty-six (56) days, thereby making the State's appellee's

Respondent's Exhibit E

602

brief due to be filed with this Court on or before March 3, 1995.   This motion is made in good faith and is not made merely for purposes of delay.

Respectfully submitted,

WINSTON BRYANT
Attorney General

BY: _____
CLINT MILLER
Arkansas Bar No. 83126
Acting Deputy Attorney General
200 Tower Building
323 Center Streets
Little Rock, Arkansas 72201
(501) 682-3657

ATTORNEYS FOR PETITIONER/
APPELLEE

CERTIFICATE OF SERVICE

I, Clint Miller, Acting Deputy Attorney General, do hereby certify that I have served a copy of the foregoing pleading for petitioner/appellee, to Maxie G. Kizer, Attorney at Law, P.O. Box 7423, Pine Bluff, AR  71611, this 3rd day of January, 1995.

_____
CLINT MILLER

Respondent's Exhibit E

IN THE ARKANSAS SUPREME COURT

KENNETH REAMS                                        APPELLANT

V.                          No. CR 94-558

STATE OF ARKANSAS                                     APPELLEE

<u>MOTION FOR AN EXTENSION OF TIME IN</u>
<u>WHICH TO FILE THE APPELLEE'S BRIEF</u>

Comes now the petitioner/appellee, the State of Arkansas, by and through counsel, Winston Bryant, Attorney General, and Clint Miller, Deputy Attorney General, Senior Appellate Advocate, and for its motion requesting an extension of time in which to file its appellee's brief, states:

I.

The appellee's brief is due to be filed with this Court on or before March 24, 1995.  The appellee has previously received three extensions of the time in which it is to file its brief. The appellee respectfully requests an extension of twenty-one (28) days in which to file its brief.  If this Court grants the appellee such an extension, then its brief will be due to this Court on or before April 21, 1995.

Due to the large number of State's briefs and other matters currently assigned to the appellee's counsel, Deputy Attorney General, Senior Appellate Advocate, Clint Miller, counsel has not had sufficient time in the months of February and March, 1995 in which to prepare the appellee's brief in the above-styled case.  Preparation of the appellee's brief in the above-styled case will be especially time consuming

Respondent's Exhibit E

604

because appellee Reams is appealing his conviction for capital murder and the imposition on him of the penalty of death.  On appeal, Reams has raised seven allegations of error.  At least six of the allegations of error that Reams has raised present complicated Eighth Amendment issues having to do with the validity of the death sentence that was imposed on Reams.  Moreover, the record on appeal in Reams's case is approximately 1,056 pages in length and this record will have to be reviewed pursuant to this Court's Rule 4-3(h).  Review of an appellate court record pursuant to this Court's Rule 4-3(h) is very time consuming in that Rule 4-3(h) requires that each page of the record on appeal be reviewed in order to make certain that the appellee has abstracted all rulings made by the trial court below that were adverse to the appellee.  Moreover, the State's counsel, Deputy Attorney General, Senior Appellate Advocate, Clint Miller, has spoken with appellee Reams's counsel, the Honorable Maxie G. Kizer, and Mr. Kizer has graciously stated that he has no objection to an extension of the time in which the State is to file its appellee's brief in the above-styled case.

III.

WHEREFORE, the State, as petitioner/appellee, respectfully requests that the time within which it is to file its brief in the above-styled case be extended by twenty-eight (28) days, thereby making the State's appellee's

605

Respondent's Exhibit E

brief due to be filed with this Court on or before April 21, 1995.  This motion is made in good faith and is not made merely for purposes of delay.

Respectfully submitted,

WINSTON BRYANT
Attorney General

BY: _____
CLINT MILLER
Arkansas Bar No. 83126
Deputy Attorney General
Senior Appellate Advocate
200 Tower Building
323 Center Streets
Little Rock, Arkansas 72201
(501) 682-3657

ATTORNEYS FOR PETITIONER/
APPELLEE

CERTIFICATE OF SERVICE

I, Clint Miller, Acting Deputy Attorney General, do hereby certify that I have served a copy of the foregoing pleading for petitioner/appellee, to Maxie G. Kizer, Attorney at Law, P.O. Box 7423, Pine Bluff, AR 71611, this 22nd day of March, 1995.

_____
CLINT MILLER

-3-

Respondent's Exhibit E                                606

6287

IN THE ARKANSAS SUPREME COURT

KENNETH REAMS                                                    APPELLANT

V.                           No. CR 94-558

STATE OF ARKANSAS                                               APPELLEE

<u>MOTION FOR AN EXTENSION OF TIME IN
WHICH TO FILE THE APPELLEE'S BRIEF</u>

Comes now the petitioner/appellee, the State of Arkansas,
by and through counsel, Winston Bryant, Attorney General, and
Clint Miller, Deputy Attorney General, Senior Appellate
Advocate, and for its motion requesting an extension of time
in which to file its appellee's brief, states:

I.

The appellee's brief is due to be filed with this Court
on or before April 21, 1995.  The appellee has previously
received four extensions of the time in which it is to file
its brief. The appellee respectfully requests an extension of
twenty-one (21) days in which to file its brief.  If this
Court grants the appellee such an extension, then its brief
will be due to this Court on or before May 12, 1995.

Due to the large number of State's briefs and other
matters currently assigned to the appellee's counsel, Deputy
Attorney General, Senior Appellate Advocate, Clint Miller,
counsel has not had sufficient time in the months of March
and April, 1995 in which to prepare the appellee's brief in
the above-styled case.  Preparation of the appellee's brief
in the above-styled case will be especially time consuming

607

Respondent's Exhibit E

because appellee Reams is appealing his conviction for capital murder and the imposition on him of the penalty of death.  On appeal, Reams has raised seven allegations of error.  At least six of the allegations of error that Reams has raised present complicated Eighth Amendment issues having to do with the validity of the death sentence that was imposed on Reams.  Moreover, the record on appeal in Reams's case is approximately 1,056 pages in length and this record will have to be reviewed pursuant to this Court's Rule 4-3(h).  Review of an appellate court record pursuant to this Court's Rule 4-3(h) is very time consuming in that Rule 4-3(h) requires that each page of the record on appeal be reviewed in order to make certain that the appellee has abstracted all rulings made by the trial court below that were adverse to the appellee.  Moreover, the State's counsel, Deputy Attorney General, Senior Appellate Advocate, Clint Miller, has spoken with appellee Reams's counsel, the Honorable Maxie G. Kizer, and Mr. Kizer has graciously stated that he has no objection to an extension of the time in which the State is to file its appellee's brief in the above-styled case.

### III.

WHEREFORE, the State, as petitioner/appellee, respectfully requests that the time within which it is to file its brief in the above-styled case be extended by twenty-one (21) days, thereby making the State's appellee's

Respondent's Exhibit E

608

brief due to be filed with this Court on or before May 12, 1995.  This motion is made in good faith and is not made merely for purposes of delay.

Respectfully submitted,

WINSTON BRYANT
Attorney General

BY: _____

CLINT MILLER
Arkansas Bar No. 83126
Deputy Attorney General
Senior Appellate Advocate
200 Tower Building
323 Center Streets
Little Rock, Arkansas 72201
(501) 682-3657

ATTORNEYS FOR PETITIONER/
APPELLEE

## CERTIFICATE OF SERVICE

I, Clint Miller, Acting Deputy Attorney General, do hereby certify that I have served a copy of the foregoing pleading for petitioner/appellee, to Maxie G. Kizer, Attorney at Law, P.O. Box 7423, Pine Bluff, AR  71611, this 17th day of April, 1995.

_____
CLINT MILLER

609

-3-

Respondent's Exhibit E

6290

IN THE ARKANSAS SUPREME COURT

KENNETH REAMS                                                          APPELLANT

V.                                      No. CR 94-558

STATE OF ARKANSAS                                                      APPELLEE

## MOTION FOR AN EXTENSION OF TIME IN WHICH TO FILE THE APPELLEE'S BRIEF

Comes now the petitioner/appellee, the State of Arkansas, by and through counsel, Winston Bryant, Attorney General, and Clint Miller, Deputy Attorney General, Senior Appellate Advocate, and for its motion requesting an extension of time in which to file its appellee's brief, states:

I.

The appellee's brief is due to be filed with this Court on or before May 12, 1995.  The appellee has previously received five extensions of the time in which it is to file its brief. The appellee respectfully requests an extension of fourteen (14) days in which to file its brief.  If this Court grants the appellee such an extension, then its brief will be due to this Court on or before May 26, 1995.

Due to the large number of State's briefs and other matters currently assigned to the appellee's counsel, Deputy Attorney General, Senior Appellate Advocate, Clint Miller, counsel has not had sufficient time in the months of April and May, 1995 in which to prepare the appellee's brief in the above-styled case.  Preparation of the appellee's brief in the above-styled case will be especially time consuming

Respondent's Exhibit E                              610

because appellee Reams is appealing his conviction for capital murder and the imposition on him of the penalty of death.  On appeal, Reams has raised seven allegations of error.  At least six of the allegations of error that Reams has raised present complicated Eighth Amendment issues having to do with the validity of the death sentence that was imposed on Reams.  Moreover, the record on appeal in Reams's case is approximately 1,056 pages in length and this record will have to be reviewed pursuant to this Court's Rule 4-3(h).  Review of an appellate court record pursuant to this Court's Rule 4-3(h) is very time consuming in that Rule 4-3(h) requires that each page of the record on appeal be reviewed in order to make certain that the appellee has abstracted all rulings made by the trial court below that were adverse to the appellee.  Moreover, the State's counsel, Deputy Attorney General, Senior Appellate Advocate, Clint Miller, has spoken with appellee Reams's counsel, the Honorable Maxie G. Kizer, and Mr. Kizer has graciously stated that he has no objection to an extension of the time in which the State is to file its appellee's brief in the above-styled case.

### III.

WHEREFORE, the State, as petitioner/appellee, respectfully requests that the time within which it is to file its brief in the above-styled case be extended by fourteen (14) days, thereby making the State's appellee's

-2-

611

Respondent's Exhibit E

brief due to be filed with this Court on or before May 26, 1995.  This motion is made in good faith and is not made merely for purposes of delay.

Respectfully submitted,

WINSTON BRYANT
Attorney General

BY: _Clint Miller_

CLINT MILLER
Arkansas Bar No. 83126
Deputy Attorney General
Senior Appellate Advocate
200 Tower Building
323 Center Streets
Little Rock, Arkansas 72201
(501) 682-3657

ATTORNEYS FOR PETITIONER/
APPELLEE

## CERTIFICATE OF SERVICE

I, Clint Miller, Acting Deputy Attorney General, do hereby certify that I have served a copy of the foregoing pleading for petitioner/appellee, to Maxie G. Kizer, Attorney at Law, P.O. Box 7423, Pine Bluff, AR  71611, this 12th day of May, 1995.

_Clint Miller_

CLINT MILLER

-3-

Respondent's Exhibit E

612

IN THE ARKANSAS SUPREME COURT

KENNETH REAMS                                      APPELLANT

V.                          No. CR 94-558

STATE OF ARKANSAS                                  APPELLEE

## MOTION FOR AN EXTENSION OF TIME IN WHICH TO FILE THE APPELLEE'S BRIEF

Comes now the petitioner/appellee, the State of Arkansas, by and through counsel, Winston Bryant, Attorney General, and Clint Miller, Deputy Attorney General, Senior Appellate Advocate, and for its motion requesting an extension of time in which to file its appellee's brief, states:

I.

The appellee's brief is due to be filed with this Court on or before June 16, 1995.  The appellee has previously received seven extensions of the time in which it is to file its brief. The appellee respectfully requests an extension of twenty-one (21) days in which to file its brief.  If this Court grants the appellee such an extension, then its brief will be due to this Court on or before July 7, 1995.

Due to the large number of State's briefs and other matters currently assigned to the appellee's counsel, Deputy Attorney General, Senior Appellate Advocate, Clint Miller, counsel has not had sufficient time in the month of June, 1995 in which to prepare the appellee's brief in the above-styled case.  Preparation of the appellee's brief in the above-styled case will be especially time consuming because

613

Respondent's Exhibit E

appellee Reams is appealing his conviction for capital murder and the imposition on him of the penalty of death.   On appeal, Reams has raised seven allegations of error.   At least six of the allegations of error that Reams has raised present complicated Eighth Amendment issues having to do with the validity of the death sentence that was imposed on Reams.   Moreover, the record on appeal in Reams's case is approximately 1,056 pages in length and this record will have to be reviewed pursuant to this Court's Rule 4-3(h).   Review of an appellate court record pursuant to this Court's Rule 4-3(h) is very time consuming in that Rule 4-3(h) requires that each page of the record on appeal be reviewed in order to make certain that the appellee has abstracted all rulings made by the trial court below that were adverse to the appellee.   Moreover, the State's counsel, Deputy Attorney General, Senior Appellate Advocate, Clint Miller, has spoken with appellee Reams's counsel, the Honorable Maxie G. Kizer, and Mr. Kizer has graciously stated that he has no objection to an extension of the time in which the State is to file its appellee's brief in the above-styled case.

III.

WHEREFORE, the State, as petitioner/appellee, respectfully requests that the time within which it is to file its brief in the above-styled case be extended by twenty-one (21) days, thereby making the State's appellee's

-2-

Respondent's Exhibit E

6 1 4

brief due to be filed with this Court on or before July 7, 1995. This motion is made in good faith and is not made merely for purposes of delay.

Respectfully submitted,

WINSTON BRYANT
Attorney General

BY: _Clint Miller_

CLINT MILLER
Arkansas Bar No. 83126
Deputy Attorney General
Senior Appellate Advocate
200 Tower Building
323 Center Streets
Little Rock, Arkansas 72201
(501) 682-3657

ATTORNEYS FOR PETITIONER/
APPELLEE

## CERTIFICATE OF SERVICE

I, Clint Miller, Acting Deputy Attorney General, do hereby certify that I have served a copy of the foregoing pleading for petitioner/appellee, to Maxie G. Kizer, Attorney at Law, P.O. Box 7423, Pine Bluff, AR 71611, this 16th day of June, 1995.

_Clint Miller_

CLINT MILLER

-3-

615

Respondent's Exhibit E

IN THE ARKANSAS SUPREME COURT

KENNETH REAMS                                                      APPELLANT

v.                                      No. CR 94-558

STATE OF ARKANSAS                                                  APPELLEE

<u>MOTION FOR AN EXTENSION OF TIME IN
WHICH TO FILE THE APPELLEE'S BRIEF</u>

Comes now the petitioner/appellee, the State of Arkansas,
by and through counsel, Winston Bryant, Attorney General, and
Clint Miller, Deputy Attorney General, Senior Appellate
Advocate, and for its motion requesting an extension of time
in which to file its appellee's brief, states:

I.

The appellee's brief is due to be filed with this Court
on or before July 7, 1995.  The appellee has previously
received eight extensions of the time in which it is to file
its brief. The appellee respectfully requests an extension of
seven (7) days in which to file its brief.  If this Court
grants the appellee such an extension, then its brief will be
due to this Court on or before July 14, 1995.

Due to the large number of State's briefs and other
matters currently assigned to the appellee's counsel, Deputy
Attorney General, Senior Appellate Advocate, Clint Miller,
counsel has not had sufficient time in the month of June,
1995 in which to prepare the appellee's brief in the above-
styled case.  Preparation of the appellee's brief in the
above-styled case will be especially time consuming because

Respondent's Exhibit E

616

appellee Reams is appealing his conviction for capital murder and the imposition on him of the penalty of death.  On appeal, Reams has raised seven allegations of error.  At least six of the allegations of error that Reams has raised present complicated Eighth Amendment issues having to do with the validity of the death sentence that was imposed on Reams.  Moreover, the record on appeal in Reams's case is approximately 1,056 pages in length and this record will have to be reviewed pursuant to this Court's Rule 4-3(h).  Review of an appellate court record pursuant to this Court's Rule 4-3(h) is very time consuming in that Rule 4-3(h) requires that each page of the record on appeal be reviewed in order to make certain that the appellee has abstracted all rulings made by the trial court below that were adverse to the appellee.  Moreover, the State's counsel, Deputy Attorney General, Senior Appellate Advocate, Clint Miller, has spoken with appellee Reams's counsel, the Honorable Maxie G. Kizer, and Mr. Kizer has graciously stated that he has no objection to an extension of the time in which the State is to file its appellee's brief in the above-styled case.

III.

WHEREFORE, the State, as petitioner/appellee, respectfully requests that the time within which it is to file its brief in the above-styled case be extended by seven (7) days, thereby making the State's appellee's brief due to be filed with this Court on or before July 14, 1995.  This

-2-

617

Respondent's Exhibit E

motion is made in good faith and is not made merely for

purposes of delay.

Respectfully submitted,

WINSTON BRYANT
Attorney General

BY: _Clint Miller_
CLINT MILLER
Arkansas Bar No. 83126
Deputy Attorney General
Senior Appellate Advocate
200 Tower Building
323 Center Streets
Little Rock, Arkansas 72201
(501) 682-3657

ATTORNEYS FOR PETITIONER/
APPELLEE

## CERTIFICATE OF SERVICE

I, Clint Miller, Acting Deputy Attorney General, do
hereby certify that I have served a copy of the foregoing
pleading for petitioner/appellee, to Maxie G. Kizer,
Attorney at Law, P.O. Box 7423, Pine Bluff, AR  71611, this
6th day of July, 1995.

_Clint Miller_
CLINT MILLER

-3-

Respondent's Exhibit E

618

IN THE ARKANSAS SUPREME COURT

KENNETH REAMS                                          APPELLANT

v.                              No. CR 94-558

STATE OF ARKANSAS                                      APPELLEE

## MOTION FOR AN EXTENSION OF TIME IN WHICH TO FILE THE APPELLEE'S BRIEF

Comes now the petitioner/appellee, the State of Arkansas, by and through counsel, Winston Bryant, Attorney General, and Clint Miller, Deputy Attorney General, Senior Appellate Advocate, and for its motion requesting an extension of time in which to file its appellee's brief, states:

I.

The appellee's brief is due to be filed with this Court on or before July 14, 1995.  The appellee has previously received nine extensions of the time in which it is to file its brief. The appellee respectfully requests an extension of fourteen (14) days in which to file its brief.  If this Court grants the appellee such an extension, then its brief will be due to this Court on or before July 28, 1995.

Due to the large number of State's briefs and other matters currently assigned to the appellee's counsel, Deputy Attorney General, Senior Appellate Advocate, Clint Miller, counsel has not had sufficient time in the month of July, 1995 in which to prepare the appellee's brief in the above-styled case.  Preparation of the appellee's brief in the above-styled case will be especially time consuming because

619

Respondent's Exhibit E

appellee Reams is appealing his conviction for capital murder
and the imposition on him of the penalty of death.  On
appeal, Reams has raised seven allegations of error.  At
least six of the allegations of error that Reams has raised
present complicated Eighth Amendment issues having to do with
the validity of the death sentence that was imposed on
Reams.  Moreover, the record on appeal in Reams's case is
approximately 1,056 pages in length and this record will have
to be reviewed pursuant to this Court's Rule 4-3(h).  Review
of an appellate court record pursuant to this Court's Rule
4-3(h) is very time consuming in that Rule 4-3(h) requires
that each page of the record on appeal be reviewed in order
to make certain that the appellee has abstracted all rulings
made by the trial court below that were adverse to the
appellee.  Moreover, the State's counsel, Deputy Attorney
General, Senior Appellate Advocate, Clint Miller, has spoken
with appellee Reams's counsel, the Honorable Maxie G. Kizer,
and Mr. Kizer has graciously stated that he has no objection
to an extension of the time in which the State is to file its
appellee's brief in the above-styled case.

III.

WHEREFORE, the State, as petitioner/appellee,
respectfully requests that the time within which it is to
file its brief in the above-styled case be extended by
fourteen (14) days, thereby making the State's appellee's

-2-

Respondent's Exhibit E

620

brief due to be filed with this Court on or before July 28, 1995.   This motion is made in good faith and is not made merely for purposes of delay.

                              Respectfully submitted,

                              WINSTON BRYANT
                              Attorney General


                    BY:   _Clint Miller_____
                          CLINT MILLER
                          Arkansas Bar No. 83126
                          Deputy Attorney General
                          Senior Appellate Advocate
                          200 Tower Building
                          323 Center Streets
                          Little Rock, Arkansas 72201
                          (501) 682-3657

                          ATTORNEYS FOR PETITIONER/
                          APPELLEE

                    CERTIFICATE OF SERVICE

     I, Clint Miller, Acting Deputy Attorney General, do hereby certify that I have served a copy of the foregoing pleading for petitioner/appellee, to Maxie G. Kizer, Attorney at Law, P.O. Box 7423, Pine Bluff, AR  71611, this 14th day of July, 1995.

                    _Clint Miller_____
                    CLINT MILLER

621                      -3-

Respondent's Exhibit E

IN THE ARKANSAS SUPREME COURT

KENNETH REAMS                              RESPONDENT/APPELLANT

V.                            No. CR 94-558

STATE OF ARKANSAS                          PETITIONER/APPELLEE

<u>APPELLEE'S MOTION REQUESTING PERMISSION
TO FILE ENLARGED BRIEF</u>

Comes now the petitioner/appellee, by and through
counsel, Winston Bryant, Attorney General, and Clint Miller,
Deputy Attorney General, Senior Appellate Advocate, and for
its motion to file an enlarged brief states that:

I.

Pursuant to Ark. Sup. Ct. R. 4-1(b), the State's brief
may not contain an argument section that exceeds twenty-five
pages unless this Court grants permission to file an enlarged
brief.  The State, as appellee, formally requests permission
to file an enlarged brief in the above-styled case.

II.

With this motion, the State has tendered a brief in the
above-styled case that has thirty-five pages of argument,
which is ten pages over the twenty-five page limitation set
for Rule 4-1(b).  The State respectfully submits that the ten
additional pages are necessary because appellant Reams has
raised seven allegations of error that appellee must answer.
At least six of the allegations of error that Reams has
raised present complicated Eighth Amendment issues having to
do with the validity of the death sentence that was

Respondent's Exhibit E

622

imposed on Reams.  Because this case is a death penalty case, the State has raised one additional issue.

The appellee's counsel, Clint Miller, Deputy Attorney General, Senior Appellate Advocate, has made a good faith effort to comply with the twenty-five page limitation set forth in Rule 4-1(b), but is unable to reduce the thirty-five page argument section of the State's brief down to twenty-five pages.  The State's counsel is unable to do so because he believes, in good faith, that reduction of the State's brief would result in prejudice to the appellee and in additional work for this Court in terms of marshalling the pertinent facts of the case and the applicable principles of law.  The State's counsel, in his reasonable professional judgment, believes that it is necessary to argue the State's case in the instant case in thirty-five pages in order to properly present the State's position and to assist the Court.  This Court can grant a waiver of the twenty-five page limit set forth in Rule 4-1(b) if counsel has made a good faith effort to comply with the twenty-five page limitation.  See Pemberton v. State, 291 Ark. 198, 723 S.W.2d 372 (1987).

### III.

WHEREFORE, the State, as appellee, respectfully requests that this Court grant it permission to file an enlarged brief in the instant case that consists of an argument section that is thirty-five pages in length.

623

-2-

Respondent's Exhibit E

Respectfully submitted,

WINSTON BRYANT
Attorney General

BY: *Clint Miller*

CLINT MILLER
State Bar #83126
Deputy Attorney General
Senior Appellate Advocate
200 Tower Building
323 Center Street
Little Rock, Arkansas 72201
(501) 682-3657

ATTORNEYS FOR APPELLEE

CERTIFICATE OF SERVICE

I, Clint Miller, Deputy Attorney General, Senior Appellate Advocate, do hereby certify that I have served a copy of the foregoing pleading for appellee, to the Honorable Maxie Kizer, Attorney at Law, P.O. Box 7423, Pine Bluff, AR 71611, this 28th day of July, 1995.

*Clint Miller*

CLINT MILLER

-3-

Respondent's Exhibit E

624

Office of The Clerk
Supreme Court of The State of Arkansas
Arkansas Court of Appeals
Justice Building
625 Marshall Street
Little Rock, AR 72201

Leslie W. Steen
Clerk

Robin Horne
Chief Deputy Clerk

Melissa Fuller
Chief Deputy Clerk

Janie Olwen
Office Administrator

Jeanne Matthews
Records Supervisor

OCTOBER 17, 1994

Deputy Clerks:

Denise Parks

Rae Millerd

Greta Houston

Daniel Dodson

Holli North

Ginger Mullins

Todd Hill

Maxie G. Kizer
Attorney at Law
P. O. Box 7423
Pine Bluff, AR    71611

        RE:    CR    94 00558   KENNETH REAMS v.
               STATE OF ARKANSAS

Dear Mr. Kizer:

    The Arkansas Supreme Court made the following order today in
the above styled case:

    "Appellant's motion to file belated brief is
    granted."

Appellant's brief is filed this date.

                            Sincerely,

                            Leslie W. Steen, Clerk

LWS:rh

cc:  Clint Miller

625

Respondent's Exhibit E

Office of The Clerk
Supreme Court of The State of Arkansas
Arkansas Court of Appeals
Justice Building
625 Marshall Street
Little Rock, AR 72201

Leslie W. Steen
Clerk

Robin Horne
Chief Deputy Clerk

Melissa Muller
Chief Deputy Clerk

Janie Olvern
Office Administrator

Jeanne Matthews
Records Supervisor

OCTOBER 24, 1994

Deputy Clerks:

Denise Parks

Rae Millerd

Greta Houston

Daniel Dodson

Holli North

Ginger Mullins

Todd Hill

Maxie G. Kizer
Attorney at Law
P. O. Box 7423
Pine Bluff, AR    71611

     RE:   CR   94 00558   KENNETH REAMS v.
             STATE OF ARKANSAS

Dear Mr. Kizer:

    The Arkansas Supreme Court made the following order today in
the above styled case:

    "Appellant's motion to file enlarged brief
    is granted."

Appellant's brief is filed this date.

                  Sincerely,

                  Leslie W. Steen, Clerk

LWS:rh

cc:  Clint Miller

626

Respondent's Exhibit E

# SUPREME COURT
## COURT OF APPEALS
STATE OF ARKANSAS
Justice Building
625 Marshall Street
Little Rock, AR 72201

## NOTICE OF FILING OF APPEAL

Little Rock, Ark., 26th day of May, 1994

Transcript was filed today in the case of

KENNETH REAMS

vs          No. CR   94 00558

STATE OF ARKANSAS

Appellant's brief due  5th day of July, 1994

Appellee's brief due 30 days after appellant's brief filed

Reply brief due 15 days after appellee's brief filed

Pursuant to Supreme Court Rule 11(g), if you are a court appointed
attorney, you must file the original brief with the Clerk's office
and submit two (2) copies of your brief to the Attorney General's
Office along with a letter requesting that they print the additional
copies needed for filing.

By per curiam order of February 1, 1993, the Arkansas Supreme Court
adopted the revised Rules of the Supreme Court and Court of Appeals
that became effective May 1, 1993.  Your attention is called to Article
4 of the rules that contain several significant changes relative to the
filing of briefs.

LESLIE W. STEEN, CLERK

By: Denise Parks

627

Respondent's Exhibit E

SUPREME COURT
COURT OF APPEALS
STATE OF ARKANSAS
Justice Building
625 Marshall Street
Little Rock, AR 72201

August 24th, 1994

KENNETH REAMS

vs        No. CR   94 00558

STATE OF ARKANSAS

Attorneys of Record:

The time allowed for filling the appellant's brief in the above case
has been extended to 10/03/1994.

Leslie W. Steen
Clerk
By: Todd Hill, D.C.

Respondent's Exhibit E

628

6309

SUPREME COURT
COURT OF APPEALS
STATE OF ARKANSAS
Justice Building
625 Marshall Street
Little Rock, AR 72201

June 27th, 1994

KENNETH REAMS

vs        No. CR    94 00558

STATE OF ARKANSAS

Attorneys of Record:

The time allowed for filling the appellant's brief in the above case
has been extended to 09/03/1994.

Leslie W. Steen
Clerk
By: Todd Hill, D.C.

629

Respondent's Exhibit E

SUPREME COURT
COURT OF APPEALS
STATE OF ARKANSAS
Justice Building
625 Marshall Street
Little Rock, AR 72201

January 5th, 1995

KENNETH REAMS

vs          No. CR  94 00558

STATE OF ARKANSAS

Attorneys of Record:

The time allowed for filling the appellee brief in the above case has
been extended to 03/03/1995.

Leslie W. Steen
Clerk
By: Dan Dodson, D.C.

Respondent's Exhibit E

630

SUPREME COURT
COURT OF APPEALS
STATE OF ARKANSAS
Justice Building
625 Marshall Street
Little Rock, AR 72201

_13-3169_

March 6th, 1995


KENNETH REAMS

   vs      No. CR 94 00558

STATE OF ARKANSAS

Attorneys of Record:

The time allowed for filling the appellee brief in the above case has
been extended to 03/24/1995.


                                        Leslie W. Steen
                                        Clerk
                                        By: Dan Dodson, D.C.

631

Respondent's Exhibit E

SUPREME COURT
COURT OF APPEALS
STATE OF ARKANSAS
Justice Building
625 Marshall Street
Little Rock, AR 72201

May 26th, 1995

KENNETH REAMS

vs        No. CR  94 00558

STATE OF ARKANSAS

Attorneys of Record:

The time allowed for filling the appellee's brief in the above case has
been extended to 05/26/1995.

Leslie W. Steen
Clerk
By: Todd Hill, D.C.

Respondent's Exhibit E

632

Office of the Clerk
SUPREME COURT
COURT OF APPEALS
STATE OF ARKANSAS
Justice Building
625 Marshall Street
Little Rock, AR 72201

May 31st, 1995

KENNETH REAMS

vs    No. CR  94 00558

STATE OF ARKANSAS

Attorneys of Record:

The time allowed for filling the appellee's  brief in the above case
has been extended to 06/16/1995.

Leslie W. Steen
Clerk
By: Todd Bill, D.C.

633

Respondent's Exhibit E

SUPREME COURT
COURT OF APPEALS
STATE OF ARKANSAS
Justice Building
625 Marshall Street
Little Rock, AR 72201



June 19th, 1995

KENNETH REAMS

vs          No. CR   94 00558

STATE OF ARKANSAS

Attorneys of Record:

The time allowed for filling the appellee brief in the above case has
been extended to 07/07/1995.

Leslie W. Steen
Clerk
By: Dan Dodson, D.C.

Respondent's Exhibit E

634

Office of the Clerk

SUPREME COURT
COURT OF APPEALS
STATE OF ARKANSAS
Justice Building
625 Marshall Street
Little Rock, AR 72201

July 17th, 1995

KENNETH REAMS

   vs      No. CR  94 00558

STATE OF ARKANSAS

Attorneys of Record:

The time allowed for filling the appellee brief in the above case has
been extended to 07/28/1995.

Leslie W. Steen
Clerk
By: Dan Dodson, D.C.

635

Respondent's Exhibit E



# STATE OF ARKANSAS

Office of the Attorney General

September 12, 1995

Winston Bryant
Attorney General

Telephone:
(501) 682-2007

Mr. Leslie Steen, Clerk
Supreme Court of Arkansas
Justice Building
Little Rock, Arkansas 72201

     RE:  Kenneth Reams v. State of Arkansas
           No.  CR 94-558

Dear Mr. Steen:

    This is to certify that I have today served copies of the brief for appellee in the above-styled case to Circuit Judge Fred Davis, Prosecuting Attorney Betty Dickey, and Maxie Kizer, attorney for appellant.

                Respectfully submitted,

                WINSTON BRYANT
                Attorney General

        By:  _Clint Miller_____
                CLINT MILLER
                Deputy Attorney General
                Senior Appellate Advocate

CM/bg
cc:  The Honorable Fred Davis
     Circuit Judge, Third Division
     P.O. Box 9140
     Pine Bluff, AR  71611

     The Honorable Betty Dickey
     Prosecuting Attorney
     Jefferson County Courthouse
     100 West Barraque Street
     Pine Bluff, AR  71601

     Maxie Kizer
     Attorney at Law
     P.O. Box 7423
     721 Pine Street
     Pine Bluff, AR  71611

200 Tower Building, 323 Center Street • Little Rock, Arkansas 72201-2610

Respondent's Exhibit E

636

11-13-95

Re:   KENNETH REAMS

I spoke with Ted Holder.  He is already preparing a motion for rehearing.  He and Debbie Sallings have it under control.

637

# SUPREME COURT OF ARKANSAS

No. CR94-558

Opinion Delivered NOV 6 1995

KENNETH REAMS,

APPELLANT,

V.

STATE OF ARKANSAS,

APPELLEE.

APPEAL FROM THE CIRCUIT COURT
OF JEFFERSON COUNTY, ARKANSAS,
NO.   CR-93-301-3;   HONORABLE
FRED D. DAVIS, CIRCUIT JUDGE

AFFIRMED

TOM GLAZE, Associate Justice

Kenneth Reams appeals from his capital felony conviction
sentence for which he was sentenced to death.  He raises seven
points on appeal, but only four are properly preserved.  Upon
review, we conclude none of the points are meritorious.

We first consider Reams's suggestion that we conduct a
proportional review.  Such a review is not required.  *Sasser v.
State*, 321 Ark. 438, _____ S.W.2d _____ (1995); *Williams v. State*,
321 Ark. 344, _____ S.W.2d _____ (1995).  However, this court has
said that, in death penalty cases, it will continue to review the
aggravating and mitigating circumstances presented to the jury and
a harmless error review of the jury's findings.  *Id*.  In reviewing
those circumstances, we point out that the jury unanimously found
two aggravating and no mitigating circumstances.  The two
aggravating circumstances were that (1) Reams had committed the
murder in issue in order to realize a pecuniary gain and (2) he had
previously committed another felony, an element of which was the

Respondent's Exhibit E

638

violence to another person or the creation of a                    clude blacks

death or serious physical injury to another                    ) S.W.2d 235

                                                                cedures when

s own testimony supported the first aggravating

ims, who was charged as an accomplice with Alford          se that

rder of Gary W. Turner, testified that he and              llenge.

commit an aggravated robbery at a bank automatic           se, the

ecause Goodwin said, "He needed the money for              ge was

ms admitted that he and Goodwin, who was armed             prima

r, waited at a local automatic teller machine for          eutral

up so they could rob them.  He further described           onduct

n approached Turner's vehicle at the machine; he

dwin shot Turner.  Regarding the jury's second             d of review

mstance, Reams was shown to have previously been           ial court's

ravated robbery offenses and these offenses, by            e evidence.

, reflect Reams had committed prior crimes

reat of violence to another.  *See Whitmore v.*            prima facie

08, 756 S.W.2d 890 (1988); Ark. Code Ann. § 5-12-          is of the

)3).                                                        rk. 88, 733

the review of mitigating circumstances, we note           may make a

ome evidence of six mitigating circumstances, but          he relevant

sly agreed that those mitigating circumstances did         urpose, (2)

ffice it to say, the record supports the jury's            egroes from

                                                            stions and

---

e considered but not unanimously found by the jury

llowing:  (1)  the capital murder was committed

nder extreme mental or emotional disturbance; (2)

der was committed while Reams was acting under

s or influences or under the domination of another

-2-                      CR94-558                      CR94-558

639

Respondent's Exhibit E

In this appeal, Reams cites *Franklin v. State*, 314 Ark. 329, 863 S.W.2d 268 (1993), in support of his argument that he made a prima facie case by objecting to the prosecutor's peremptory strike of the first venire person, Irma Johnson, who was black.   Of course, no strike pattern or discriminatory purpose was evident merely because the first juror called and struck happened to be black.   Nonetheless, the trial court assured Reams that, if a pattern developed later, it would require the prosecutor to provide a race-neutral explanation for striking Johnson.  Reams never later renewed his objection regarding Johnson.   Contrary to Reams's suggestion, the *Franklin* decision is unhelpful here, because there, four other jurors had been voir dired when the first black juror was called and subsequently challenged by the state, and by the time the court ruled on the *Batson* objection, the jury was composed of only white jurors.

In sum, no strike pattern was shown when Johnson was struck by the state, nor did the state's questions asked of her reflect a racially discriminatory motive.  In fact, had the prosecutor been requested to provide an explanation for his decision to peremptorily excuse Johnson, he undoubtedly would have related Johnson's concessions that her brother had been unsuccessfully prosecuted for robbery in 1988, her nephew had robbed a store in 1992 and her sister had been charged for a drug offense in federal court in 1992.

Reams next argues that the trial court erred in upholding the state's peremptory challenge of black venireman, Matthew Henry.  At

-6-                    CR94-558

Respondent's Exhibit E

640

this stage of voir dire, the state had used four peremptory challenges, including the one striking Mr. Henry -- two strikes involved black jurors, Johnson and Henry, and two involved white jurors.   Again the trial court ruled no prima facie "pattern" of discrimination was exhibited by the prosecutor, but it also delved into the state's "race neutral" explanation for its peremptory strike of Henry.

Reams couches his argument on appeal in terms suggesting that the state's disparate treatment of venire members not only established a pattern, but also showed the specious nature of the state's explanation in striking Henry.   Reams points out that the state purportedly wanted assurances from the potential jurors that they were aware of accomplice liability and could find an accomplice as guilty as the person who actually shot the victim.   He argues white venire members Linda Messina, Carolyn Phillips and Dorothy Hodges had indicated the person who actually shot the victim should be punished more severely, but the state accepted them after each finally concluded that she could impose the death penalty, if accomplice liability was established.   Reams asserts that, contrary to its treatment of Messina, Phillips and Hodges, the state struck Henry even though Henry indicated he could impose the death penalty if an accomplice was found guilty of capital murder.

Reams's argument breaks down when examining Henry's answer when voir dired by defense counsel.   While he previously said that he could impose the death penalty, he steadfastly adhered to his

-7-                              CR94-558

641

Respondent's Exhibit E

belief that "[he] could consider the level of participation of the defendant or the role he played in the crime when it came to punishment if he could discern the difference in the state of mind." He further said, "I could do that if I could by some way see the difference in the state of mind and understand it or what is going to happen or whatever." After Henry's remarks, the prosecutor explained he wished to strike Henry because he believed Henry was of the opinion that, if Reams was not the shooter, he could not impose the death penalty.

The trial court voiced dissatisfaction with the state's explanation of striking Henry, and instead ruled Reams showed no prima facie case. While we agree with the trial court's ruling finding no discriminatory purpose or pattern, we also conclude the state's explanation was clearly race neutral.

Reams's *Batson* argument also included black venire member, Muriel M. Hayes, who the state struck because of her reservations about imposing the death penalty. Mrs. Hayes said, "I really do not want to be a person who would cause someone being put to death, I would not want a guilty conscience, I would not want to feel guilty, and I would not want to be a part of saying that this person gets the electric chair."[2] The prosecutor's explanation here was clearly based on something other than Ms. Hayes's race and without anything more, his reason offered in striking her must be deemed race neutral. *See Hernandez v. New York*, 500 U.S. 352

---

[2]Reams suggests Ms. Hayes was rehabilitated when she agreed she could consider the death penalty, but, at the same time, she again stated that she would rather not do so.

CR94-558

Respondent's Exhibit E                            642

(1991). For the reasons above, we affirm the trial court's *Batson* rulings.

As previously mentioned, Reams argues three additional points on appeal, but those arguments were not argued or preserved below. His arguments are that (1) the jury did not adequately consider his youth (age 18 years) as a mitigating circumstance, (2) form 2, as a part of the verdict form, violated the Eighth and Fourteenth Amendments, and (3) jury members were given inadequate instructions on non-statutory mitigating evidence. Although we see no merit in these issues, it is unnecessary to discuss them further, since even in death penalty cases, a defendant must have raised the allegations of error at the trial court level by having made a specific, timely objection. *See Parker v. State*, 292 Ark. 421, 731 S.W.2d 756 (1987).

The record has been examined in accordance with Ark. Sup. Ct. R. 4-3(h), and it has been determined that there were no rulings adverse to Reams which constituted prejudicial error. Therefore, we affirm.

-9-                                                    CR94-558

643

Respondent's Exhibit E

6324

IN THE SUPREME COURT OF ARKANSAS

KENNETH REAMS                                                   APPELLANT

v.                                      CR 94-558

STATE OF ARKANSAS                                              APPELLEE

PETITION FOR REHEARING

· Comes now the appellant, by and through counsel, Maxie G. Kizer, and for his petition for

rehearing, states:

İ.

In its November 6 opinion affirming the conviction and sentence in this case, the court made

several errors of law and fact in its ruling on the argument based on *Batson v. Kentucky*, 476 U.S. 79

(1986). The first error is the court's application of *Franklin v. State*, 314 Ark. 329, 863 S.W.2d 268

(1993). That case was cited by the appellant for the proposition that one peremptory strike exercised

for racial reasons was enough to make out a prima facie case under *Batson*. In *Franklin* the first black

venire person called was struck by the state in a case where there were racial overtones. It was the

appellant's position that the same thing happened in this case. As noted on page 6 of the appellant's

brief, there were racial overtones in this case, also. It was known by the parties during voire that the

victim was white and the appellant black and that there would be testimony later that the co-

defendant, the actual shooter, told the appellant that he shot the victim because the white victim

called him a "nigger." (T. 740)

The court misunderstood the point being made when on page 6 of the opinion it distinguished

*Franklin* by saying that in that case the first black venire person was not the first venire person called

and that this court's decision was based on the eventual seating of an all white jury. First of all, it

makes no difference to the decision in *Franklin* or here whether the first black venire person called is

Respondent's Exhibit E

644

the first venire person called or not. The point of the decision is that exercising a peremptory strike in such a racially charged atmosphere established a prima facie case of the unconstitutional use of peremptory strikes along racial lines. Granted, the jury in *Franklin* was all white, but it was not all white at the time a prima facie case under *Batson* was made, and it was held to have been made after the first black venire person was struck by use of a peremptory.

II.

The court next made a factual error in its treatment of the *voire dire* examination of Venireman Matthew Henry, one of two blacks the appellant contends was unconstitutionally excluded by the use of a peremptory challenge for racial reasons. Although it is not completely clear, it appears that on pages 7 and 8 of the opinion that the court found that Mr. Henry actually said that he could not impose the death penalty if the appellant were not shown to have been the trigger man. That is not a conclusion that is supported by the record. As noted on page 2 of the appellant's brief, when asked by the prosecutor if he would require the state to show that the appellant had been the person who pulled the trigger in this case, Mr. Henry stated, "That wouldn't be necessary." (T. 451, 452) When the trial court stated that it was not satisfied with the state's so-called race neutral explanation, it was obviously as much a ruling on the examination of Mr. Henry and the facts in that regard as it was of the prosecutor's explanation.

By ruling as it did, the court disregarded an implicit ruling of the trial court that Mr. Henry did not say that he would require the state to prove the appellant to have been the trigger man in order to impose the death penalty. As is so fundamental as to require no citation of authority, this court does not overturn the exercise of a trial court's discretion in the absence of a clear abuse thereof. In this case, where the trial court heard and saw this venire person examined, it cannot be said that the trial court's ruling in this regard was an abuse of discretion.

2

645

Respondent's Exhibit E

III.

Pursuant to Ark.Sup.Ct.R. 2-3(g), the case is not be reargued in a petition for rehearing.

Errors of law and fact are to be pointed out. Further, pursuant to Ark.Sup.Ct.R. 2-3(h), errors of fact

said to have been overlooked are not to be pointed out unless those facts were properly abstracted in

accordance with the rules of this court. The appellant has pointed out both legal and factual errors in

the court's opinion, and the facts referred to were clearly abstracted.

WHEREFORE, the appellant respectfully prays the court to grant his petition for rehearing,

vacate its opinion and reverse and remand this case to the lower court for a new trial.

Respectfully submitted,

Maxie G. Kizer, Esq.
Ark. Bar Reg. No. 83101
721 Pine Street - Post Office Box 7423
Pine Bluff, Arkansas 71611
(501) 534-7004

*Attorney for Appellant*

## CERTIFICATE OF MERIT

I, Maxie G. Kizer, do hereby certify my belief that there is merit in this petition and further
state that it is not filed for the purpose of delay.

Maxie G. Kizer

## CERTIFICATE OF SERVICE

I, Maxie G. Kizer, do hereby certify that I have served this petition on the appellee herein by
placing a copy of the same in the box in the office of the clerk used by the Attorney General's office to
accept service of pleadings on this 22th day of November, 1995.

Maxie G. Kizer

3

Respondent's Exhibit E                646

IN THE SUPREME COURT OF ARKANSAS

KENNETH REAMS                                    PETITIONER/APPELLANT

V.                               CASE NO.  CR 94-558

STATE OF ARKANSAS                               RESPONDENT/APPELLEE

## RESPONSE TO PETITION FOR REHEARING

Comes now the State, as respondent/appellee, by and through counsel,

Winston Bryant, Attorney General, and Clint Miller, Deputy Attorney General, and

for its response to petitioner/appellant Reams' petition for rehearing, states:

I.

On November 6, 1995, this Court handed down an opinion in the above-

styled case.  In this Court's November 6, 1995 opinion, this Court affirmed

petitioner/appellant Reams' capital murder conviction and death sentence.

Reams has filed a petition for rehearing in which he asked this Court to

reconsider its affirmance of his capital murder conviction and death sentence.

The State, as respondent/appellee, respectfully submits that this Court should

deny Reams' petition for rehearing.

This Court should deny Reams' petition for rehearing because it is

meritless.  In his petition Reams asserts that this Court erred in rejecting his

allegation of error that the trial court had erred in denying his challenge to the

State's exercise of two of its peremptory challenges to remove two venire-

persons who were black, Irma Johnson and Matthew Henry.  In his petition for

rehearing, petitioner/appellant Reams argues, in effect, that the State

647

Respondent's Exhibit E

established a pattern of using its peremptory challenges in a discriminatory manner when the State peremptorily excused venirewoman Irma Johnson and Matthew Henry.

In his petition for rehearing, petitioner/appellant Reams argues, in effect, that the State established a pattern of using its peremptory challenges in a discriminatory manner when the State peremptorily excused venirewoman Irma Johnson, the first venireperson that the State excused peremptorily. According to Reams, the State's strike of Ms. Johnson established a pattern of discriminatory use by the State of its peremptory challenges despite the fact that Ms. Johnson was the first black person peremptorily excused by the State, because Reams' capital murder trial had "racial overtones." Reams cites no authority in support of this proposition of law and the State is unaware of any such case authority.

With regard to the State's peremptory excusal of venireperson Matthew Henry, petitioner/appellant Reams asserts in his petition that this Court simply misinterpreted the answers that Mr. Henry gave during voir dire when asked whether he could impose the death penalty on a defendant who was the accomplice of a co-defendant who actually killed the victim. The State submits that this Court did not err in its evaluation of the answers that Matthew Henry gave with regard to whether he could impose the death penalty on an accomplice in a capital murder case who did not actually kill the victim. This Court correctly pointed out in its November 6, 1995, opinion that Mr. Henry

2

Respondent's Exhibit E

648

consistently stated that he would attach significance to the possible difference in the state of mind of the principal and the accomplice with regard to the principal's causing the death of the victim. This Court correctly concluded that these answers given by Mr. Henry provided a race neutral basis for the State to peremptorily excuse him.

II.

WHEREFORE, the State, as respondent/appellee, respectfully requests that the Court deny petitioner/appellant Reams' petition for rehearing. The State respectfully requests further that this Court deny Reams any relief whatsoever.

Respectfully submitted,

WINSTON BRYANT
Attorney General

BY: _____
CLINT MILLER
Deputy Attorney General
Arkansas Bar No. 83126
200 Tower Building
323 Center Street
Little Rock, Arkansas 72201
(501) 682-3657

ATTORNEYS FOR
RESPONDENT/APPELLEE

CERTIFICATE OF SERVICE

I, Clint Miller, Deputy Attorney General, do hereby certify that I have served a copy of the foregoing pleading for respondent/appellee, by mailing a copy of same, by U.S. Mail, postage prepaid, to Maxie G. Kizer, Attorney at Law, 721 Pine Street, P.O. Box 7423, Pine Bluff, Arkansas 71611, and Debbie

649

3

Respondent's Exhibit E

Sallings, Attorney at Law, 1500 Riverfront Drive, Suite 118, Little Rock, Arkansas 72202, this 7th day of December, 1995.

CLINT MILLER

4

LAW OR CHANCERY MANDATE

STATE OF ARKANSAS,   )
                     )      SCT.
In the Supreme Court)


BE IT REMEMBERED, That at a session of the Supreme Court of the State of Arkansas, begun and held in the City of Little Rock, on the 11th day of December, 1995, amongst others were the following proceedings, to-wit:


No.·CR   94 00558


KENNETH REAMS
                          Appellant(s)


vs.   Appeal from Jefferson Circuit - (CR-93-301-3)


STATE OF ARKANSAS
                          Appellee(s)


          Motion for entry of appearance is granted.
          Petition for stay of mandate is granted.


               IN TESTIMONY, That the above is a true copy of the order of
               said Supreme Court, rendered in the case herein stated, I,
               Leslie W. Steen, Clerk of said Supreme Court, hereunto set
               my hand and affix the seal of said Supreme Court, at my
               office in the city of Little Rock, this 11th day of
               December, 1995.

                                                              CLERK

                         BY_____
                                                              D.C.

Original to Clerk
CC:  Deborah Sallings
     Maxie G. Kizer
     Clint Miller
     Hon. Fred D. Davis


651

Respondent's Exhibit E



EXHIBIT
2 C
Respondents

# KENNETH REAMS

# VOLUME 3

### (Kizer's Files)

30

Charles Laverne
SINGLETON, Petitioner,

v.

A.L. LOCKHART, Respondent.

No. PB–C–82–165.

United States District Court,
E.D. Arkansas,
Pine Bluff Division.

Aug. 28, 1986.

State prisoner, sentenced to death by electrocution for capital felony-murder, and life imprisonment for aggravated robbery, whose conviction and death sentence were affirmed by the Arkansas Supreme Court, 274 Ark. 126, 623 S.W.2d 180, sought federal habeas corpus relief. The District Court, Eisele, Chief Judge, held that presence of invalidating aggravating circumstance required that death sentence be set aside. In subsequent order, the District Court held that double jeopardy prevented state from asking jury to reimpose death penalty.

Order accordingly.

1. Criminal Law ⟐1213.8(7)

Use of aggravating circumstance that murder was committed for pecuniary gain, which duplicated element of capital felony-murder where robbery was underlying felony involved, violated Eighth Amendment. U.S.C.A. Const.Amend. 8.

2. Habeas Corpus ⟐45.3(1.50)

Cause existed for failure to raise issue that use of aggravating circumstance that murder was committed for pecuniary gain, which duplicated element of felony-murder based upon robbery, violated Eighth Amendment, thus, issue was not waived for federal habeas corpus purposes, where at time of trial, six years before Court of Appeals ruled on pecuniary gain issue in similar case, there was no reasonable basis upon which petitioner's counsel should have been expected to predicate pecuniary gain argument. U.S.C.A. Const.Amend. 8.

3. Courts ⟐100(1)

Magnitude of constitutional issues involved required retroactive application of rule that use of aggravating circumstance that murder was committed for pecuniary gain, which duplicated element of crime of felony-murder based upon burglary violated Eighth Amendment. U.S.C.A. Const. Amend. 8.

Order

4. Criminal Law ⟐189

Double jeopardy clause prevented state from asking jury to impose death penalty on habeas petitioner; state had sought death penalty based on single invalid aggravating circumstance, thereby effectively failing to provide basis for capital sentence imposed by jury. U.S.C.A. Const. Amend. 5.

5. Criminal Law ⟐189

State may resentence convicted murderer whose death penalty has been set aside, provided that no court has determined that state failed to prove any other basis upon which second death sentence might rest.

6. Criminal Law ⟐1206.3(2)

Court may not rely upon subsequent amendments in statutory aggravating circumstances to find basis for death sentence that could not have been imposed under controlling state law at time jury considered aggravating circumstances.

7. Criminal Law ⟐192

Defendant who was "acquitted" by reviewing court is entitled to no less protection from double jeopardy than defendant who was acquitted at trial court by jury. U.S.C.A. Const.Amend. 5.

Jeffrey M. Rosenzweig, Little Rock, Ark., for petitioner.

Jack Gillean, Asst. Atty. Gen., Little Rock, Ark., for respondent.

MEMO

EISELE, C

On October tenced to dea felony murde aggravated r death sentenc firmed by th but the aggr sentence wer grounds. Sir 623 S.W.2d 1 nied by the l Petitioner th ceed under R of Criminal P nied by the an execution The Arkansa tioner's requ On June 1, 1 tioner a stay first petition filed. Petit amended pet responded. held to resul

The facts Arkansas Su 29, 623 S.W.

The victim dered in 1 burg on Ju of blood a in her nec The evider whelming. tive Singl approxima crime. , Si heard Mr. help. Ch Patti ther ness, Len ton exit t witnessed and had b door. Po first to s Mrs. Yor rear of t

## MEMORANDUM OPINION

EISELE, Chief Judge.

On October 30, 1979, petitioner was sentenced to death by electrocution for capital felony murder, and life imprisonment for aggravated robbery. The conviction and death sentence for capital murder were affirmed by the Arkansas Supreme Court, but the aggravated robbery conviction and sentence were vacated on double jeopardy grounds. *Singleton v. State*, 274 Ark. 126, 623 S.W.2d 180 (1981). Certiorari was denied by the United States Supreme Court. Petitioner then sought permission to proceed under Rule 37 of the Arkansas Rules of Criminal Procedure. Permission was denied by the Arkansas Supreme Court and an execution date was set for June 4, 1982. The Arkansas Supreme Court denied petitioner's request for a stay of execution. On June 1, 1982, this Court granted petitioner a stay of execution and petitioner's first petition for writ of habeas corpus was filed. Petitioner subsequently filed an amended petition. The State of Arkansas responded. An evidentiary hearing was held to resolve the factual issues.

The facts of the case were stated by the Arkansas Supreme Court, 274 Ark. at 128–29, 623 S.W.2d 180, as follows:

The victim, Mary Lou York, was murdered in York's Grocery Store at Hamburg on June 1, 1979. She died from loss of blood as a result of two stab wounds in her neck.

The evidence of guilt in this case is overwhelming. Patti Franklin saw her relative Singleton enter York's Grocery at approximately 7:30 p.m. on the day of the crime. Shortly after he entered Patti heard Mrs. York scream, "Patti go get help. Charles Singleton is killing me." Patti then ran for help. Another witness, Lenora Howard, observed Singleton exit the store and shortly thereafter witnessed Mrs. York, who was "crying and had blood on her," come to the front door. Police Officer Strother was the first to arrive at the scene and found Mrs. York lying in a pool of blood in the rear of the store. The officer testified

Mrs. York told him that Charles Singleton "came in the store, said this is a robbery, grabbed her around the neck, and went to stabbing her." She then told Officer Strother that "there's no way I can be all right, you know I'm not going to make it. I've lost too much blood." Mrs. York was taken to the hospital in an ambulance and was attended by her personal physician, Dr. J.D. Rankin. While enroute to the hospital, she told Dr. Rankin several times that she was dying and that Singleton did it. Mrs. York died before reaching the emergency room of the hospital. Officer Strother also testified that during examination of the premises, he found a money bag on the floor near the cash register which was empty, except for about $2.00 in change. He also stated that the cash register had only a small amount of change in it.

Petitioner's grounds for the writ are briefly summarized as follows:

1. Petitioner was denied a jury panel of a cross-section of the community because the jury panel was selected in a racially discriminatory manner.

2. Petitioner was denied a jury of a cross-section of the community because of the manner in which potential jurors were summoned.

3. The jury was "death qualified."

4. The trial court failed to grant petitioner's motion for a change of venue.

5. Petitioner was denied effective assistance of counsel because his counsel:

a. Failed to challenge certain veniremen for cause;

b. Failed to conduct an adequate voir dire re challenges for cause;

c. Wrongly assented to the exclusion of a potential juror under *Witherspoon* who should not have been excluded;

d. Failed to make an adequate appellate record for review of voir dire;

e. Did not rehabilitate, for *Witherspoon* purposes, potential jurors excluded under that case.

it    al issues in-
ti    pplication of
ating circumstance
tted for pecuniary
ement of crime of
n burglary violat-
U.S.C.A. Const.

lause prevented
to impose death
oner; state had
d on single inval-
ce, thereby effec-
basis for capital
U.S.C.A. Const.

convicted mur-
y has been set
ourt has deter-
prove any other
h sentence

2)
on subsequent
ggravating cir-
death sentence
imposed under
ime jury con-
tances.

quitted" by re-
o less protec-
han defendant
ourt by jury.

Little Rock,

Gen., Little

**1116**    **653 FEDERAL SUPPLEMENT**

6. Petitioner's rights at the guilt phase of trial were violated by:

a. The proposition of inconsistent defenses;

b. Failure to seek additional psychiatric examination;

c. The admission of purported dying declarations of the victim;

d. Admission of certain photographs of the deceased.

7. Petitioner's arrest and the introduction of certain evidence seized from him violated his Fourth and Fourteenth Amendment Rights.

8. The evidence adduced at trial was insufficient to support a conviction.

9. The Arkansas statutory scheme is void for vagueness and violative of the Constitution because of the overlapping definitions of capital and first degree murder.

10. The Arkansas statutory scheme is impermissibly vague in its element of "extreme indifference to the value of human life."

11. Petitioner's constitutional rights were violated at the *penalty* phase of the trial by:

a. Counsel's failure to prepare or present evidence in mitigation;

b. Counsel's making an inadequate and improper closing argument;

c. The jury's ignoring evidence of mitigating circumstances;

d. The vagueness of the definition of the term "pecuniary gain."

e. The failure to comply with procedural requisites.

12. The death penalty in this case violates the Constitution in that:

a. It was imposed despite the absence of valid and non-vague aggravating circumstances in that only one aggravating circumstance was argued by the prosecution;

b. The sentence was not in proportion to other death sentences. More aggravating circumstances were involved in other

cases where death sentences were not given;

13. The death penalty itself is unconstitutional.

14. Petitioner is not mentally competent to be executed and to execute him would violate the Constitution under these circumstances.

Most of the questions presented by Mr. Singleton's petition for habeas corpus are questions of law based upon an established record. The hearing was devoted principally to issues relating to Mr. Wellenberger's effectiveness as Mr. Singleton's attorney and with respect to the manner in which the jurors were originally placed on the list of 800 and, later, chosen to serve on the Singleton panel.

Apparently, Mr. Singleton is not seriously challenging Mr. Wellenberger's effectiveness during the actual trial of his guilt or innocence. He does, however, raise questions about his effectiveness in challenging the jury selection system, in voir diring the jury, and in the handling of the penalty phase of the trial.

The standard governing the Sixth Amendment right to effective assistance of counsel was recently articulated in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 2064–2065, 80 L.Ed.2d 674 (1984), in which the United States Supreme Court held:

A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence re-

sulted
sary p
unrelia

•

When a
the ine
ance, t
counsel
jective
More sp
ate. Th
ply to
require
relies i
mainten
justify
sel will
process
See *Mi*
100–101
83] (195
ney per.
ableness
norms.

With re
dice," the
104 S.Ct.

An erroi
ly unrea
ting asi
proceedii
the judg
*rison, 4*
665, 667
purpose
tee of co
ant has
fy relia
ceeding.
counsel's
dicial to
tute inef
stitution

•

Accordin
prejudic
materiali
not disch
cution, [
[97], at
2397, 24(

Respondent's Exhibit E

654

sulted from a breakdown in the adversary process that renders the result unreliable.

* * * * *

When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness. More specific guidelines are not appropriate. The Sixth Amendment refers simply to counsel, not specifying particular requirements of effective assistance. It relies instead on the legal profession's maintenance of standards sufficient to justify the law's presumption that counsel will fulfill the role in the adversary process that the Amendment envisions. See *Michel v. New York*, 350 U.S. 91, 100–101 [76 S.Ct. 158, 163–164, 100 L.Ed. 83] (1955). The proper measure of attorney performance remains simply reasonableness under prevailing professional norms.

With respect to the element of "prejudice," the Court had the following to say, 104 S.Ct. 2067–2068:

An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment. *Cf. United States v. Morrison*, 449 U.S. 361, 364–365, 101 S.Ct. 665, 667–668, 66 L.Ed.2d 564 (1981). The purpose of the Sixth Amendment guarantee of counsel is to ensure that a defendant has the assistance necessary to justify reliance on the outcome of the proceeding. Accordingly, any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution.

* * * * *

Accordingly, the appropriate test for prejudice finds its roots in the test for materiality of exculpatory information not disclosed to the defense by the prosecution, *United States v. Agurs*, 427 U.S. [97], at 104, 112–113, 96 S.Ct. [2392], at 2397, 2401–2402 [49 L.Ed.2d 342 (1976) ],

and in the test for materiality of testimony made unavailable to the defense by Government deportation of a witness, *United States v. Valenzuela-Bernal*, 458 U.S. [858], at 872–874, 102 S.Ct. [3440], at 3449–3450 [73 L.Ed.2d 1193 (1982) ]. The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

In making the determination whether the specified errors resulted in the required prejudice, a court should presume, absent challenge to the judgment on grounds of evidentiary insufficiency, that the judge or jury acted according to law.

In *Kellogg v. Scurr*, 741 F.2d 1099 (1984), the Eighth Circuit had the following to say about claims of ineffective assistance of counsel:

To succeed on a sixth amendment ineffective assistance of counsel claim, a defendant must show that his or her attorney failed to provide reasonably effective assistance which resulted in prejudice to the defense. *Strickland v. Washington* [466 U.S. 668], 104 S.Ct. 2052, 2064 [80 L.Ed.2d 674] (1984). Reasonably effective assistance may be defined as "the skill and diligence that a reasonably competent attorney would exercise under similar circumstances * * *." *Thomas v. Lockhart*, 738 F.2d 304, 307 op. at 4 (8th Cir. July 5, 1984). Because "[t]here are countless ways to provide effective assistance in any given case," *Strickland*, 104 S.Ct. at 2066, and to offset the "distorting effects of hindsight," *id.* at 2065, there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *id.* at 2066. *See Wallace v. Lockhart*, 701 F.2d 719, 726 (8th Cir.), *cert. denied*, [464 U.S. 934], 104 S.Ct. 340 [78 L.Ed.2d 308] (1983); *Comer v. Parratt*, 674 F.2d 734, 736 (8th Cir.), *cert. denied*, 459 U.S. 856 [103 S.Ct. 125, 74 L.Ed.2d 108] (1982). To establish that an attor-

ney's inadequacy was also prejudicial, a defendant must show that there exists a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Strickland*, 104 S.Ct. at 2068.

An ineffective assistance of counsel claim presents a mixed question of law and fact. *Eldridge v. Adkins*, 665 F.2d 228, 236 n. 5 (8th Cir.1981), *cert. denied*, 456 U.S. 910 [102 S.Ct. 1760, 72 L.Ed.2d 168] (1982). Therefore, the presumption of correctness accorded the factual determinations of the state court under 28 U.S.C. § 2254(d), and those of the district court under the clearly erroneous standard of Fed.R.Civ.P. 52(a), applies only to the historical facts underlying the attorney's performance but not to the ultimate conclusion as to whether or not effective assistance has been rendered. *Thomas*, at 307 n. 3; *Strickland*, 104 S.Ct. at 2070. *Cf. Sumner v. Mata*, 455 U.S. 591, 597 [102 S.Ct. 1303, 1306, 71 L.Ed.2d 480] (1982).

•    •    •    •    •    •

We recognize that while no single error of an attorney may violate the sixth amendment, multiple errors viewed cumulatively may be constitutionally infirm. *Harris* [*v. Housewright*], 697 F.2d [202] at 206 [8th Cir.1982].

The record makes it clear that there was virtually no penalty phase trial. The question is: who was responsible for the failure to present evidence relating to mitigating factors at the penalty phase trial?

The Court credits the testimony of Mr. Wellenberger that he was concerned with and worked on the penalty phase from the time of his first conference with Mr. Singleton on June 14. He began preparation for that phase of the trial on June 14. He explained the penalty phase to Mr. Singleton long before the trial and also at the trial. He requested Mr. Singleton to provide him with a personal history and the names of persons who could provide mitigating evidence. And the Court accepts Mr. Wellenberger's testimony that he in

fact subpoenaed a witness to testify at the penalty phase and had also planned to use Singleton and/or his mother. The Court is further convinced, and so finds, that Mr. Singleton alone made the decision not to put on any evidence even though this was against the direct and specific advice of Mr. Wellenberger. And Mr. Singleton was adamant in regard to this decision.

Mr. Wellenberger suggested that if Mr. Singleton chose not to testify he should nevertheless permit Mr. Wellenberger to put on a witness concerning Singleton's consumption of alcohol and marijuana and to try to get the Court to admit his handwritten personal history or, in the alternative, to call his mother for that purpose.

The Court also accepts Mr. Wellenberger's testimony that his client admitted that he killed Mary Lou York and that Respondent's Exh. 1 is Mr. Singleton's statement of the true facts made to his attorney and not—as stated by Mr. Singleton—simply a statement of what he "told" the police. Such an admission to one's lawyer is an important circumstance which affects strategy decisions.

The penalty phase was clearly deficient so the Court's decision turns upon the question of law: does the defendant or his attorney have the right to decide if evidence of mitigating circumstances should be introduced at the penalty phase? The Court is firmly convinced that Mr. Wellenberger would have put on such evidence if he had believed that the decision was his to make. However, he was convinced that under the law his client had the right and the authority to make that decision and therefore, after protest, accepted his decision.

Before discussing this issue, it is important to note the charges against Mr. Singleton, the Arkansas statutory basis therefor, and the Arkansas statutory procedures governing the trial thereof.

Mr. Singleton was charged by the Prosecuting Attorney in an Information filed on the 4th of June, 1979. Omitting the formal portions thereof it accuses:

[T]he defen ton of the a Class A to-wit: The of June, 19 sas, did un robbery wh in Hamburg with the pu armed with commission on the prop Youk, by st gravated ro

Thereafter, a day, the prose information in

[T]he defen SINGLETO MURDER, mitted as f fendant on t Ashley Cou ly, commit alone or wit he did rob o cery Store i Arkansas; a furtherance cause the d stabbing her stances mani to the value der is a Clas

This latter ch Stat.Ann. § 41 pertinent part:

A person co acting alone persons, he mit ... robb and in furthe ... causes th circumstance ference to t

The trial of murder is gov out in Ark.Sta pertinent part

[T]he defendant Charles Lavern Singleton of the crime of aggravated robbery, a Class A Felony committed as follows, to-wit: The said defendant on the 1st day of June, 1979, in Ashley County, Arkansas, did unlawfully, commit aggravated robbery when he entered York's Grocery in Hamburg, Ashley County, Arkansas, with the purpose of committing a theft armed with a deadly weapon, and in the commission of said theft did inflict death on the proprietor of said store, Mary Lou Youk, by stabbing her in the throat. Aggravated robbery is a Class A. Felony.

Thereafter, apparently later on the same day, the prosecutor filed a capital murder information in which he accused:

[T]he defendant CHARLES LAVERN SINGLETON of the crime of CAPITAL MURDER, A CLASS A FELONY committed as follows, to-wit: The said defendant on the 1st day of JUNE, 1979, in Ashley County, Arkansas, did unlawfully, commit capital murder when acting alone or with one or more other persons, he did rob or attempt to rob York's Grocery Store in Hamburg, Ashley County, Arkansas; and in the course of and in furtherance of the said felony, he did cause the death of May Lou York by stabbing her in the throat, under circumstances manifesting extreme indifference to the value of human life. Capital murder is a Class A Felony.

This latter charge was based upon Ark. Stat.Ann. § 41–1501(1)(a) which states in pertinent part:

A person commits capital murder if: (a) acting alone or with one or more other persons, he commits or attempts to commit ... robbery, ..., and in the course of and in furtherance of the felony, ..., he ... causes the death of any person under circumstances manifesting extreme indifference to the value of human life....

The trial of persons charged of capital murder is governed by the procedure set out in Ark.Stat.Ann. § 41–1301 (1947) in pertinent part as follows:

The following procedures shall govern trials of persons charged with capital murder:

(1) The jury shall first hear all evidence relevant to the charge or charges and shall then retire to reach a verdict of guilt or innocence.

•   •   •   •   •   •

(3) If the defendant is found guilty of capital murder, the same jury shall sit again in order to hear additional evidence as provided by subsection (4) hereof, and to determine sentence in the manner provided by section 1302 [§ 41–1302]; except that, if the state waives the death penalty, stipulates that no aggravating circumstance exists, or stipulates that mitigating circumstances outweigh aggravating circumstances, no such hearing shall be required, and the trial court shall sentence the defendant to life imprisonment without parole.

(4) In determining sentence, evidence may be presented to the jury as to any matters relating to aggravating circumstances enumerated in section 1303 [§ 41–1303] or any mitigating circumstances. Evidence as to any mitigating circumstances may be presented by either the state or the defendant regardless of its admissibility under the rules governing admission of evidence in trials of criminal matters; but the admissibility of evidence relevant to the aggravating circumstances set forth in section 1303 [§ 41–1303] shall be governed by the rules governing the admission of evidence in such trials. The state and the defendant or his counsel shall be permitted to present argument respecting sentencing. [Acts 1975, No. 280, § 1301, p. 500.]

The findings that are required to support a sentence of death are set forth in section 41–1302, Ark.Stat.Ann. (1947) as follows:

(1) The jury shall impose a sentence of death if it unanimously returns written findings that:

(a) aggravating circumstances exist beyond a reasonable doubt; and

Respondent's Exhibit E

(b) aggravating circumstances outweigh [outweigh] beyond a reasonable doubt all mitigating circumstances found to exist; and

(c) aggravating circumstances justify a sentence of death beyond a reasonable doubt.

(2) The jury shall impose a sentence of life imprisonment without parole if it finds that:

(a) aggravating circumstances do not exist beyond a reasonable doubt; or

(b) aggravating circumstances do not outweigh [outweigh] beyond a reasonable doubt all mitigating circumstances found to exist; or

(c) aggravating circumstances do not justify a sentence of death beyond a reasonable doubt.

(3) If the jury does not make all findings required by subsection (1), the court shall impose a sentence of life imprisonment without parole. [Acts 1975, No. 280, § 1802, p. 500; 1977, No. 474 § 11, p.—.]

"Aggravating circumstances" are identified and limited by section 41–1303 of Ark. Stat.Ann. (1947).

Aggravating circumstances shall be limited to the following:

(1) the capital murder was committed by a person imprisoned as a result of a felony conviction;

(2) the capital murder was committed by a person unlawfully at liberty after being sentenced to imprisonment as a result of a felony conviction;

(3) the person previously committed another felony an element of which was the use or threat of violence to another person or creating a substantial risk of death or serious physical injury to another victim;

(4) the person in the commission of the capital murder knowingly created a great risk of death to a person other than the victim;

(5) the capital murder was committed for the purpose of avoiding or preventing an arrest or effecting an escape from custody;

(6) the capital murder was committed for pecuniary gain; or

(7) the capital murder was committed for the purpose of disrupting or hindering the lawful exercise of any government or political functions. Acts 1975, No. 280 § 1303, p. 500; 1977 No. 474 § 12, p.—.]

(8) the capital murder was committed in an especially heinous, atrocious or cruel manner. [Acts 1975, No. 280, § 1303, p. 500; 1977, No. 474, § 12, p. 1127; 1985, No. 833, § 1, p.—.]

Certain "mitigating circumstances" are identified in section 41–1304, but that section does not restrict such mitigating circumstances to those enumerated therein. Section 41–1304 states:

Mitigating circumstances shall include, but are not limited to the following:

(1) the capital murder was committed while the defendant was under extreme mental or emotional disturbance;

(2) the capital murder was committed while the defendant was acting under unusual pressures or influences or under the domination of another person;

(3) the capital murder was committed while the capacity of the defendant to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect, intoxication, or drug abuse;

(4) the youth of the defendant at the time of the commission of the capital murder;

(5) the capital murder was committed by another person and the defendant was an accomplice and his participation relatively minor;

(6) the defendant has no significant history of prior criminal activity. [Acts 1975, No. 280, § 1304, p. 500.]

The legislative intent pertaining to the enactment of the above statutes, 41–1301—41–1307, is set forth in section 41–1308 which provides in part as follows:

It is the intention of the General Assembly of the State of Arkansas, in enacting sections 1301–1307 [§§ 41–1801—41–1307] of Chapter 13 of the Arkansas

Criminal (
and stand
tencing bo
determinat
of death i
tion of cap

Section 41–
are only two
convicted of
imprisonmen

The case
mations quo
of aggravat
murder. It
Mr. Singlet
charges, the
later set asi
ted robbery

The trial
structions w
capital mur

Charles L
the offens
tain this
the follow
doubt:

First: Th
committed
crime of r

Second: '
furtheran
vern Sing
Lou York
ing an ex
of human

As a part
der, the S
Mary Lou
mission of
bery by C
immediate
robbery,
reasonabl

That, wit
theft, or
ately ther
ton emplo
er.

If the cri
have beer

**SINGLETON v. LOCKHART**                    **1121**
Cite as 653 F.Supp. 1114 (E.D.Ark. 1986)

committed for

. . .
committed for
or hindering
government or
.975, No. 280
14 § 12, p.—.]
committed in
:ious or cruel
80, § 1303, p.
. 1127; 1985,

:tances" are
but that sec-
itigating cir-
ated therein.

hall include,
e following:
s committed
der extreme
. ..

mmitted
cting under
ces or under
erson;

committed
lefendant to
of his con-
duct to the
paired as a
fect, intoxi-

dant at the
the capital

mmitted by
dant was an
ion relative-

nificant his-
rity. [Acts
.]

to the en-
, 41–1301—
on 41–1308
rs:

l Assem-
nacting
301–41–
Arkansas

Criminal Code to specify the procedures and standards pursuant to which a sentencing body must conform in making a determination as to whether a sentence of death is to be imposed upon a conviction of capital murder.

Section 41–1351 makes it clear that there are only two possible penalties for a person convicted of a capital offense: death or life imprisonment without parole.

The case went to trial on *both* the Informations quoted above, i.e., on the charges of aggravated robbery and also capital murder. It will be recalled that, although Mr. Singleton was convicted on both charges, the Supreme Court of Arkansas later set aside his conviction for aggravated robbery on double jeopardy grounds.

The trial court gave the following instructions with respect to the offense of capital murder:

Charles Lavern Singleton is charged with the offense of capital murder. To sustain this charge, the State must prove the following things beyond a reasonable doubt:

First: That Charles Lavern Singleton committed or attempted to commit the crime of robbery; and

Second: That in the course of and in furtherance of that crime, Charles Lavern Singleton caused the death of Mary Lou York under circumstances manifesting an extreme indifference to the value of human life.

As a part of the charge of capital murder, the State contends that the death of Mary Lou York occurred during the commission or attempted commission of robbery by Charles Lavern Singleton, or in immediate flight therefrom. To prove robbery, the State must prove beyond a reasonable doubt:

That, with the purpose of committing a theft, or resisting apprehension immediately thereafter, Charles Lavern Singleton employed physical force upon another.

If the crime of robbery is not proved to have been committed or attempted by

Charles Lavern Singleton, he is not guilty of capital murder.

In order to find that Charles Lavern Singleton is guilty of capital murder, you must find that he had the purpose to commit robbery and that he formed that intention before committing the homicide.

It is not necessary that this state of mind to commit robbery or aggravated robbery existed for any particular length of time, but it is necessary that it was formed before the homicide act was committed. It is the existence of this state of mind to commit robbery which distinguishes capital murder from other homicides.

When a death occurs during the commission or attempted commission of another crime or in immediate flight therefrom, capital murder is proved only if that other crime constituted robbery and all other elements of capital murder are proved.

After the arguments of the attorneys and an explanation of the verdict forms, the jury retired and, after deliberating, returned with their verdicts. They found Mr. Singleton guilty of aggravated robbery and on that charge, sentenced him to both a term of life imprisonment and a fine of $15,000. They also found him guilty of capital felony murder. Thereupon, Mr. Wellenberger, Mr. Singleton's attorney, requested a short recess before proceeding to the penalty phase of the trial. This was opposed by the prosecutor. The court then decided to allow the defendant "about five minutes recess." Shortly, Mr. Wellenberger announced that the defendant was ready to proceed. The following then occurred:

THE COURT: Very well. Proceed, Mr. Gibson.

MR. GIBSON: Does the Court feel it should do the instructions at this time or are you asking the parties if they want to put in any additional evidence?

Respondent's Exhibit E

**1122**          653 FEDERAL SUPPLEMENT

THE COURT: I think you should put on any additional—

MR. GIBSON: The State has no additional evidence, Your Honor.

MR. WELLENBERGER: The Defense has no additional evidence, Your Honor.

THE COURT: Ladies and gentlemen, members of the jury, you have found Charles Lavern Singleton guilty of capital murder.

•     •     •     •     •     •

THE COURT: ... After hearing arguments of counsel, you will again retire to deliberate and decide whether he is to be sentenced to death by electrocution or to life imprisonment without parole.

In determining which sentence shall be imposed, you may be required to make specific written findings as to the existence or absence of aggravating or mitigating circumstances. Appropriate forms will be provided for you and I'm going to instruct you on the procedures that you must follow.

The court went on to explain "aggravating circumstances" and "mitigating circumstances," and then stated:

In no event will you return a verdict imposing the death penalty unless you unanimously make three particular written findings of Form Three. These are:

First: That one or more aggravating circumstances existed beyond a reasonable doubt.

Second: That such aggravating circumstances outweigh beyond a reasonable doubt any mitigating circumstances found to exist; and

Third: That the aggravating circumstances justify beyond a reasonable doubt the sentence of death.

If you make those findings, you will impose the death penalty. Otherwise, you will sentence the defendant to life imprisonment without parole.

After you have made your determinations on Forms One and Two and have reflected your conclusions on Form Three, then you must check the appropriate verdict on Form Four. Each of you must sign the verdict form.

Thereupon the prosecutor, Mr. Gibson, asked if he could argue the "circumstances." Mr. Wellenberger objected, stating that "there had been no evidence introduced concerning these circumstances." After further discussion of the verdict forms, the court permitted argument over Mr. Wellenberger's objection. After reviewing the law with respect to "aggravating circumstances," Mr. Gibson stated:

I submit to you only one existed and that is the murder was committed for pecuniary gain, that the Defendant at the time of the commission of the murder—although it wasn't, we don't have any evidence as to the amount—the evidence is beyond a doubt that he was in the commission of a robbery, that he intended to steal money.

So that aggravating circumstance presents itself. And I'm sure you have already found that to have existed.

You will now be asked to retire to make that specific finding as to whether or not you have found that. And if you cannot find that, then you cannot impose the death penalty.

Form Two has a list of six possible mitigating circumstances, and a place for you to specify any others that you may find existed. I submit to you there has been no evidence of any mitigating circumstances, none whatsoever in this case.

•     •     •     •     •

Now, a lot of the people feel that when a person puts another person to death that he should suffer the same punishment. The State of Arkansas provides death by electrocution. And Mary Lou York suffered a worse death at the hands of this defendant.

The entire argument of the defendant's attorney, Mr. Wellenberger, was the following:

MR. WELLENBERGER: Ladies and gentlemen, it's been a long trial. You've sat and listened to the evidence and you've made your decision. I don't believe any one of you would like to take a

Respondent's Exhibit E

man's life and I think you will do what's proper. I know you are people of conviction, and if it is required then that's what you'll do. If you don't think it's required, you will not. I know that none of you will make this decision lightly. I have absolutely nothing to say to you in regard to it. I do not envy you having to make the decision. And I trust that you would deliberate now and reach what you feel is proper in this case.

After the jury retired to commence its deliberations upon the penalty, the following occurred:

MR. WELLENBERGER: At the conclusion of the guilt phase of the trial and after the jury had rendered its verdict, I asked the Court for a short recess so I could confer with my client concerning the evidence that he wanted introduced into the record concerning mitigating circumstances. I have available a witness that would testify as to the fact that he was under the influence of alcohol and drugs which is a mitigating circumstance. I advised him of this but he said he did not want to enter any evidence whatsoever concerning anything; that he wanted to allow them to just go on and do what they wanted to do. Over my objections and against my advice, he insisted that I maintain that position and that I say nothing further.

After deliberating, the jury returned and sentenced Mr. Singleton to death by electrocution.

The verdict forms revealed that the jury found one aggravating circumstance beyond a reasonable doubt, to wit: "The capital murder was committed for pecuniary gain." The jury also found "there was no evidence of any mitigating circumstances."

The Court has carefully reviewed all of the arguments and points raised by the petitioner which challenge his conviction for the crime of capital murder and concludes that none of them have merit. The Court was concerned during the hearing about the jury empaneling and selection procedures but the evidence presented by the state has removed any effective challenge based upon that ground.

There are three issues relating to the penalty phase of the trial which deserve discussion, one of which requires the court to set aside the death sentence imposed upon the petitioner. The other two involve questions of statutory construction which have not yet been dealt with by the courts of the state of Arkansas.

## CLIENT OR ATTORNEY: WHO HAS THE RIGHT TO DECIDE IF EVIDENCE OF MITIGATING CIRCUMSTANCES, WHERE AVAILABLE, WILL BE INTRODUCED PURSUANT TO SECTION 14–1301, *et seq.?*

As the Court pointed out in its discussion above, Mr. Wellenberger, the attorney for the petitioner, did not put on evidence of mitigating circumstances, although he had some such evidence, because he was instructed not to do so by his client, Mr. Singleton. Mr. Wellinberger was convinced that, under the law, his client had the right to make that decision. The Court will discuss the law which pertains to that issue.

The State contends that the issue should be controlled by those cases dealing with the right of a person, *previously convicted,* to terminate further appeals or habeas petitions.

One of the leading cases dealing with that issue is *Gilmore v. Utah,* 429 U.S. 1012, 97 S.Ct. 436, 50 L.Ed.2d 632 (1976). The facts were that on November 14, 1976, Gary Mark Gilmore was convicted of murder and sentenced to death after a jury trial in a Utah court. On December 3, 1976, the Supreme Court of the United States entered a stay of execution pending the filing of a response by the State of Utah together with the transcripts of various hearings. On December 13, 1976, the Supreme Court entered its Order and Opinion upon the issues raised. The Order stated, inter alia:

After carefully examining the materials submitted by the State of Utah, the Court is convinced that Gary Mark Gilmore made a knowing and intelligent

Respondent's Exhibit E

**1124**          653 FEDERAL SUPPLEMENT

waiver of any and all federal rights he might have asserted after the Utah trial court's sentence was imposed, and, specifically, that the State's determinations of his competence knowingly and intelligently to waive any and all such rights were firmly grounded.

Accordingly, the stay of execution granted on December 3, 1976, is hereby terminated.

The Supreme Court divided 5 to 4 in its decision to terminate the stay of execution.

The background is interesting. On December 2, 1976, Bessie Gilmore, the mother of Gary Mark Gilmore, filed the application for a stay of execution as her son's "next friend." On December 8, 1976, Gary Mark Gilmore filed a response challenging the standing of Bessie Gilmore to initiate any proceedings on his behalf. Chief Justice Burger and Justice Powell were of the opinion that, assuming the Court would otherwise have jurisdiction with respect to a "next friend" concept, that "jurisdiction would arise only if it were demonstrated that Gary Mark Gilmore is unable to seek relief in his own behalf." They went on to state that in view of Gary Mark Gilmore's own response of December 8, 1976, the "next friend" concept would be inapplicable to the case:

> Since Gary Mark Gilmore has now filed a response and appeared in his own behalf, through his retained attorneys, any basis for the standing of Bessie Gilmore to seek relief in his behalf is necessarily eliminated. The only possible exception to this conclusion would be if the record suggested, despite the representations of Gary Mark Gilmore's attorneys, that he was incompetent to waive his right of appeal under state law and was at the present time incompetent to assert rights or to challenge Bessie Gilmore's standing to assert rights in his behalf as "next friend."

After examining the transcripts and reports of the state's proceedings and Gary Mark Gilmore's response of December 8, 1976, Justices Burger and Powell were convinced that Gary Mark Gilmore, knowingly and intelligently, with full knowledge of his rights to seek appeal to the state of Utah, had waived that right. Those justices further agreed that the state's determinations of Gilmore's competence to waive his rights knowingly and intelligently "were firmly grounded." With this record, the Court went on to state:

> It is plain that the Court is without jurisdiction to entertain the "next friend" application filed by Bessie Gilmore. This Court has jurisdiction pursuant to Act III of the Constitution only over "cases and controversies," and we can issue stays only in aid of our jurisdiction. 28 U.S.C. §§ 1651, 2101(f). There is no dispute, presently before us, between Gary Mark Gilmore and the State of Utah, and the application of Bessie Gilmore manifestly fails to meet the statutory requirements to invoke this Court's power to review the action of the Supreme Court of Utah. No authority to the contrary has been brought to our attention, and nothing suggested in dissent bears on the threshold question of jurisdiction.

Justices Stevens and Rehnquist concurred that Gilmore was competent to waive his right to an appeal but they went on to emphasize also that "his access to the courts is entirely unimpeded and therefore a third party has no standing to litigate an Eighth Amendment claim—or indeed any other claim—on his behalf." They concluded that, "without a proper litigant before it, this Court is without power to stay the execution."

A similar problem was dealt with by the Ninth Circuit in *Lenhard, et al. v. Wolff*, 603 F.2d 91 (1979), where an appeal was taken from the district court's denial of a writ of habeas corpus and of an emergency application for stay of execution. Mr. Lenhard and Mr. Fransen, deputy public defenders of Clark County, Nevada, attempting to appeal as next friend acting on behalf of Jessie Walter Bishop, who had been sentenced to death, filed the application for stay and the appeal. It appeared that Bishop pled guilty to nine felony charges including murder and was sentenced to death on February 10, 1978. During the course

of the arraignment, Bishop moved to dismiss his court-appointed counsel, the public defenders, making known that he desired to plead guilty to all of the charges. The court ordered a psychiatric examination of his competence to do so. He was examined by three psychiatrists and, based upon their conclusions, was found to be competent to enter a guilty plea, to discharge his attorneys, and to represent himself. The trial court permitted Bishop then to act as his own counsel but ordered the public defenders to stand by to render any assistance that Bishop requested. After a penalty hearing before a three-judge panel, Bishop was sentenced to death. On the mandatory appeal to the Nevada Supreme Court, Bishop at first consented to being represented by the public defenders, but later changed his mind and then sought to have the appeal dismissed. The Nevada Supreme Court declined to dismiss and ruled on the merits affirming the conviction.

Lenhard and Fransen, acting under ethical and moral obligations, filed the petition for writ of habeas corpus and the stay of execution. The district judge denied the petitions on the ground that Lenhard and Fransen had no standing to act as "next friend" of Bishop. The Ninth Circuit Court of Appeals stated:

Bishop himself has steadfastly maintained that he does not wish to seek relief in the federal courts and refuses to authorize any petition for habeas corpus or stay of execution to be filed on his behalf. Most recently he appeared in open court at the hearing before the district court on August 23, 1979 and declared that he believes he has a constitutional right to waive any rights to a federal appeal and desires to do so. He maintained he was intelligently and competently exercising his right to refrain from seeking relief from the federal courts.

The petitioners concede that if Bishop is competent he may indeed refuse to pursue relief in the federal courts, acknowledging that this is in accord with the holding of *Gilmore v. Utah*, 429 U.S. 1012, 97 S.Ct. 436, 50 L.Ed.2d 632 (1976).

The issue as framed by the petitioners is that the execution should be stayed until a competency hearing can be held to determine Bishop's competence to waive possible relief in the federal courts. Petitioners contend this is mandated by *Rees v. Peyton*, 384 U.S. 312, 86 S.Ct. 1505, 16 L.Ed.2d 583 (1966), wherein the Supreme Court remanded for such a hearing. In *Rees*, however, there was conflicting psychiatric evidence concerning the competence of Rees. In that case Rees had been found by one psychiatrist to be mentally incompetent.

[1] In this case, in contrast, there has been no showing of Bishop's incompetence.

The Court, after reviewing the evidence bearing on Bishop's competence, stated, "We find that there has been no evidence sufficient to warrant a hearing on the issue." The court concluded:

[2] It is clear from the testimony of Bishop before the district court that he does not authorize and in fact contests the right of these petitioners to bring the writ of habeas corpus or to request stay of execution. Therefore, under the holding of *Gilmore v. Utah*, 429 U.S. 1012, 97 S.Ct. 436, 50 L.Ed.2d 632 (1976), petitioners lack standing to bring the writ or request the stay.

The application for stay of execution is denied and the appeal from the denial of a writ of habeas corpus is dismissed. Judge Snead concurred, pointing out that *Rees v. Peyton*, did not control, "because there exists on the record now before us no evidence that causes us to experience doubt concerning Bishop's capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation."

This Court recently ruled in the case of *Fairchild v. Lockhart*, Case No. PB–C–85–282, that *Gilmore* and *Lenhard* gave Fairchild the right to abandon his habeas corpus petition if the Court was convinced that Fairchild was competent and was making the decision with full knowledge of all the pertinent facts and circumstances. All that

Respondent's Exhibit ____

**1126**          **653 FEDERAL SUPPLEMENT**

is needed is a knowing and an intelligent decision made by a person whose competence has been firmly grounded.

But the Court is convinced that *Gilmore* and *Lenhard* do not control the issue presently before the Court. In both of those cases, the entire trial, including both the guilt and penalty phases, had been completed. Here, it is argued that there is a fundamental defect in the penalty phase of Singleton's trial: no evidence was, submitted of mitigating circumstances, as contemplated by the Arkansas statute, although such mitigating circumstance evidence was available. Should the decision not to participate in the penalty phase of the trial belong only to the defendant, or does the state have an independent interest in requiring the production of evidence of mitigating circumstances so that the sentencing body will have all of the evidence contemplated by the statute (i.e., the evidence of both the aggravating and the mitigating circumstances) before making the choice between the penalty of death and life without parole?

The case of *Trimble v. State*, 693 S.W.2d 267 (Mo.App.1985) dealt with a strikingly similar factual situation. There, Mr. Trimble was convicted of capital murder and the jury imposed the death sentence. The conviction and sentence were affirmed upon direct appeal to the Supreme Court of Missouri. In his post-conviction proceeding he raised fourteen points relative to the sentencing or penalty phase and eight relating to the determination of guilt. Because of its finding of ineffectiveness of counsel at the guilt-innocence phase, the Missouri Court of Appeals ordered a new trial but it nevertheless went on to deal extensively with the claimed errors in the sentencing process. The Court began its discussion by describing the factual background:

> Movant, at trial, at sentencing, and in this Rule 27.26 proceeding, has resisted all efforts by his counsel to raise any issue with respect to the imposition of the death penalty. There can be no doubt of movant's settled intention to instruct his counsel in this area. At trial, he specifically instructed counsel that no

evidence in mitigation be offered and that no argument be made in the penalty phase of the trial.

One of the differences between this case (Singleton's) and Mr. Trimble's case should be noted. When the conflict between the attorney and client arose in the latter case the trial judge was apprised of the situation. He thereupon conducted an extensive hearing to determine that Trimble was making a voluntary and informed choice in instructing his attorney not to present evidence or argument in mitigation.

The trial court found that Mr. Trimble had in effect made a knowing and voluntary waiver of counsel in directing his attorney not to present evidence or argument at the sentencing hearing. In the Missouri Court of Appeals, Trimble's attorney asserted this to be error, although Trimble himself, pro se, reiterated his desire not to challenge the sentencing phase. Other alleged deficiencies in the sentencing phase were also asserted on the appeal. The Missouri Court of Appeals stated:

> These claims are aggregated because a single issue is dispositive of them all. Movant's settled purpose to not raise these claims and his equally strong and unequivocal direction to counsel to refrain from action at the trial and appellate levels cannot be doubted. The question posed is the ineffectiveness of counsel in failing to take action to introduce and argue the following evidence, despite that direction.

In *Trimble* there was apparently much evidence which could have been introduced by way of mitigation, whereas in the case here (Singleton), this potential was limited to testimony concerning the defendant's background and his use of alcohol and marijuana prior to the murder.

The attorneys for Trimble argued that, in criminal cases, there are only three decisions which must be made by the client: (1) what plea to make; (2) whether to waive a jury trial; and (3) whether to testify on his own behalf. They contended that all other strategic and tactical decisions were within

[right column cut off]
the exclusive p...
decide after co...
The state resp...
cases like *Gilm*...
trolled. The Mi...
distinguished tho...

> The cited autho...
> not fully addre...
> because these c...
> oner's choice a...
> normal defense...
> The cases cited...
> the right of ap...
> instant case atte...
> itself, which pro...

The court then we...
of the U.S. Suprem...
ing the constituti...
which the death pe...
ly be imposed. C...
grew the bifurcate...
which the sentencin...
formation relevant...
the standards to gu...
mation. The Missou...
capital murder stat...
U.S. Supreme Cour...
Court of Appeals no...

> It is not the bifurc...
> vital. Rather, it i...
> guidance given to ...
> ty which enables it...
> in imposing the c...
> random, freakish,...
> sults. *Gregg* [*v. S*...
> *pra*, 428 U.S. [153]...
> at 2909 [49 L.Ed.2...

These procedures ...
tection to the indivi...
serve an entirely ...
must be remembere...
idated the death ...
about 89 states an...
penalty for hundred...
ing trial and execut...
utes. In validating ...
statutes, the *Gregg* ...
sentencing procedur...
dividualized informa...
fendant and guidelin...
information, vitiated...
proportionate imposi...

the exclusive province of the lawyer to decide after consultation with his client. The state responded by asserting that cases like *Gilmore* and *Lenhard* controlled. The Missouri Court of Appeals distinguished those authorities as follows:

The cited authority and the argument do not fully address the issue posed here because these cases all relate to the prisoner's choice after a trial in which the normal defense function has occurred. The cases cited relate to the question of the right of appeal. The claim in the instant case attacks the trial proceeding itself, which presents a different issue.

The court then went through a discussion of the U.S. Supreme Court cases establishing the constitutional parameters within which the death penalty might appropriately be imposed. Out of these principles grew the bifurcated system of trial under which the sentencing authority receives information relevant to sentencing and also the standards to guide its use of that information. The Missouri Legislature passed a capital murder statute responsive to the U.S. Supreme Court case. The Missouri Court of Appeals noted:

It is not the bifurcated proceeding that is vital. Rather, it is the information and guidance given to the sentencing authority which enables it to exercise discretion in imposing the death penalty without random, freakish, or discriminatory results. *Gregg [v. State of Georgia], supra,* 428 U.S. [153] at 153, 96 S.Ct. [2909] at 2909 [49 L.Ed.2d 859 (1976)].

These procedures are, of course, a protection to the individual accused, but also serve an entirely separate purpose. It must be remembered that *Furman* invalidated the death penalty statutes of about 39 states and avoided the death penalty for hundreds of prisoners awaiting trial and execution under those statutes. In validating subsequently enacted statutes, the *Gregg* court stressed that a sentencing procedure, giving the jury individualized information about the defendant and guidelines for applying that information, vitiated the random and disproportionate imposition of the death

penalty, and thus avoided the constitutional attack made in *Furman*.

Essential to the Missouri statutes' application of the death penalty, is the finding by the jury that the aggravating circumstances outweigh the mitigating circumstances. The finding of an aggravating circumstance is but the threshold question. The jury must then weigh the evidence before it imposes the death penalty.

The Missouri statute thus presupposes the constitutional requirement and embodies it in the statute.

The court accepted that the jury function was neglected in the sentencing phase of the trial because only Trimble's age was submitted in mitigation. If this deficiency had been occasioned by the decision of Trimble's attorney, then it is clear that ineffectiveness would have been established under the *Strickland* test. The Missouri Court of Appeals then reached its decision using the following analysis:

The difficulty in the case arises from the manner in which the issue is posed. Here, we have no inadvertence or neglect of counsel. Trial counsel was prepared to offer the evidence and argument, and urged his client, movant, to permit that effort. Movant was obdurate. He did not want that course pursued. Even the trial court's warning that movant's chosen course of action would, in all probability, result in the death penalty, failed to persuade him.

The issue is thus to determine trial counsel's duty in this unusual situation. The state urges that counsel had no duty to act, as the client has essential control of the case. It buttresses the argument by citing Missouri Supreme Court Rule 4, Code of Professional Responsibility, E.C. 7–7 and 7–8, asserting these ethical canons make it plain that the decision was for the client, and the lawyer must accept the client's determination, even though contrary to the lawyer's advice. Movant's counsel asserts that ABA Standard for Criminal Justice Sec. 4–52 restricts the client's control to plea entry,

Respondent's Exhibit E

**1128**         653 FEDERAL SUPPLEMENT

jury waiver, and right to testify. The state says that the ABA Standards have not been approved, and that *State v. Thomas*, 625 S.W.2d 115 (Mo.1981), is on all fours with the present case. In *Thomas*, the defendant directed his attorney not to present insanity or diminished capacity, a defense which counsel suggested was viable in the case. The court held an extensive hearing and counsel complied with defendant's direction. On appeal, the claim was made that counsel was ineffective. The court quoted and relied upon Missouri Supreme Court Rule 4, E.C. 7–7, holding it was not a breach of duty for the lawyer to accede to the client's demands after fully informing him of his rights. The court further held:

> While a defendant has a Sixth Amendment right to effective assistance of counsel, he may not be forced to accept this assistance if his decision to represent himself is informed and voluntary. *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). Similarly, he may not be forced to accept major decisions of trial strategy if he is fully informed and voluntarily decides not to follow the advice of his lawyer. It would be absurd to say that a defendant may waive the assistance of counsel entirely and yet may not waive the benefit of counsel's advice with respect to a particular decision, such as whether or not to assert a particular defense. The Court in *Faretta* stated that the Sixth Amendment 'speaks of the "assistance" of counsel, and an assistant, however expert, is still an assistant.' *Id.* at 820, 95 S.Ct. at 2533.

*State v. Thomas, supra,* 625 S.W.2d at 124.

The state is not fully correct in asserting the ABA Standards have not been approved. In *State v. Fitzpatrick*, 676 S.W.2d 831 (Mo. banc 1984), the court cited *Jones v. Barnes*, 463 U.S. 745, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983), and the standards utilized therein, and upheld counsel's right to decide, independently of the client's wishes, whether to request a mistrial. The *Fitzpatrick* rationale and holding run contrary to the rationale and holding in *Moore*. These cases demonstrate the continuing difficulty in determining defense counsel's role in the criminal trial. Many cases protect counsel from claims of ineffectiveness on the ground of a tactical choice made despite the client's wishes. On the other hand, when situations such as *Moore* are presented, the courts talk in terms of waiver. Thus, the cases find no error when counsel accedes to client demand, even though the accession may not be a wise choice. On the other hand, the lawyer's choice made contrary to the client's wishes will also be approved, even where the wisdom, in hindsight, may be dubious, on the ground that counsel has control of the decisional process and must have such control to be effective. Despite pious pronouncements about the necessity for independence of counsel, *Strickland, supra,* 104 S.Ct. at 1064, the surest way to avoid a claim of ineffectiveness is to abdicate to the client's wishes, no matter how ill-advised, and to make a record. There is more than a little hint that the courts are concerned with counsel and client "sand bagging" the court with error predicated upon counsel and client agreeing upon a course of conduct which demonstrates egregious harm to the defendant. In *Lahmann v. State*, 509 S.W.2d 791 (Mo. App.1974), the court held that a client's and counsel's joint decision for counsel to sit mute through the trial could not serve to vitiate the trial. The *Lahmann* court cited *Thomas v. State*, 475 S.W.2d 98 (Mo.1971), where counsel, with the defendant's agreement, failed to act as counsel, eschewing cross-examination, tender of evidence, and argument. The court held that, if error could be predicated upon such conduct, the defendant and his counsel could present an absolute barrier to conviction.

[8] The facts of the instant case present, in sharp relief, a conflict be-tween t
*Gregg* a
guide the
ment rig
clean sla
precedent
The dec
however,
counsel
ing in th
the evide
ment sta

As will be
some misg
Missouri d
S.W.2d, 11
615 S.W.2d

Two imp
can be dra
suming th
Missouri c
penalty ph
that mitig
be present
(2) that t
violate any
should be
almost relu
felt obliga
preme Cou
contrary to
as, had it
slate," the
wise.

Before t
to note tha
it relied, a
situation.
the trial, t
ney not to
diminished
ney felt tha
After am o
the defend
comply wit
appeal, the
was ineffec
to stand tr
ney, can lit
the right t
any, he wil
critical iss

tween the constitutional principle of *Gregg* and the principles developed to guide the application of the Sixth Amendment right to counsel. Writing upon a clean slate, the decision might be to give precedence to the principle of *Gregg*. The decisions in *Moore* and *Thomas*, however, require this court to find that counsel was not ineffective in acquiescing in the movant's desires concerning the evidence and argument at the punishment stage of the trial.

As will be noted, the Missouri Court, with some misgivings, went along with the two Missouri decisions, *State v. Thomas*, 625 S.W.2d, 115 (Mo.1981) and *State v. Moore*, 615 S.W.2d 108 (Mo.App.1981).

Two important, unavoidable inferences can be drawn from the *Trimble* case, assuming that case is correct: (1) that the Missouri capital murder statute with its penalty phase procedures does not require that mitigating evidence, when available, be presented at the sentencing phase, and (2) that the result in *Trimble* does not violate any constitutional requirements. It should be noted that the court in *Trimble* almost reluctantly reached its decision. It felt obligated to follow the Missouri Supreme Court cases which it believed to be contrary to the teaching of *Gregg*, whereas, had it been "writing upon a clean slate," the decision might have been otherwise.

Before leaving *Trimble*, it is important to note that the *Thomas* case, upon which it relied, arose out of a different factual situation. At the guilt-innocence phase of the trial, the defendant directed his attorney *not* to present evidence of insanity or diminished capacity even though his attorney felt that such defenses might be viable. After an extensive hearing on the issue, the defendant's attorney was permitted to comply with his client's instructions. On appeal, the claim was made that counsel was ineffective. If the client is competent to stand trial and to work with his attorney, can it be said that he does not have the right to determine which defenses, if any, he wishes to present? In *Trimble* the critical issue did not arise until *after* the

defendant's conviction of capital murder. The state's interest, after conviction, in requiring the penalty phase to meet statutory or constitutional requirements is different.

A conclusion directly contrary to *Trimble* was reached in *People v. Burgener*, 41 Cal.3d 505, 224 Cal.Rptr. 112, 714 P.2d 1251 (1986). The factual background was stated by the court:

Defendant did not participate in the penalty phase of his trial, and defense counsel presented no mitigating evidence or argument on his behalf during this stage of the proceeding. Defense counsel made clear to the court, in a discussion held in chambers, that he had proposed to call in mitigation a psychiatrist, the defendant's parents, and a person who served in prison at the same time as defendant, but that defendant had instructed him not to do so. Defendant personally confirmed these instructions. The People then presented evidence of incidents of defendant's violent behavior during prior periods of incarceration as well as evidence of prior felony convictions for such charges as battery, robbery, and attempted murder. Defense counsel, acting on direction of his client, stipulated to the evidence.

At the conclusion of the prosecutor's argument, the defendant's attorney read a short statement prepared by his client in which he requested the jury to return a sentence of death. The court decided the issue as follows:

In *People v. Deere*, supra, 41 Cal.3d 353, 222 Cal.Rptr. 13, 710 P.2d 925 [1985], we recently held that the failure of defense counsel to present any mitigating evidence in the penalty phase of a capital trial, in obedience to his client's request, required that the penalty be set aside. We emphasized the state's interest in a reliable penalty determination, and observed: "To allow a capital defendant to prevent the introduction of mitigating evidence on his behalf withholds from the trier of fact potentially crucial information bearing on the penalty decision no

Respondent's Exhibit E

**1130**            **653 FEDERAL SUPPLEMENT**

less than if the defendant was himself prevented from introducing such evidence by statute or judicial ruling." (*Id.*, at p. 364, 222 Cal.Rptr. 13, 710 P.2d 925.) And, we concluded: "We have no doubt that a judgment of death imposed in such circumstances constitutes a miscarriage of justice (Cal. Const., art. VI, § 13): not only did defendant not have a fair penalty trial—in effect he had no penalty trial at all." (*Id.*, at p. 368, 222 Cal.Rptr. 13, 710 P.2d 925.)

•      •      •      •      •      •

The fact that defense counsel deliberately refrained from introducing any evidence in support of a lesser penalty than death, though such evidence was available, in itself requires penalty reversal under *Deere.*

The case, *People v. Deere*, 41 Cal.3d 353, 222 Cal.Rptr. 13, 710 P.2d 925 (1985), upon which the court relied in *Burgener*, discussed the problem in considerably more detail. In the *Deere* case the court explicitly makes the distinction between guilt phase decisions and penalty phase decision. The court stated:

Appellate counsel now suggests that defendant's very acts of pleading guilty to a capital offense and waiving a jury trial amounted to a "suicide attempt" which disclosed his incompetence. The record does indicate that defendant felt great remorse for his offenses and was prepared to suffer the consequences of a judgment of death. But that attitude does not necessarily demonstrate an incompetence to stand trial or to plead guilty. His plea and waiver were concurred in by counsel. As stated in [*People v.*] *Teron*, at the guilt phase a defendant bears no duty to present a defense or to rebut the People's case, and the fact that he declines to present a defense does not demonstrate a lack of capacity to waive his rights. (23 Cal.3d [103] at p. 115, 151 Cal.Rptr. 633, 588 P.2d 773 [1979].)

Then the court turned its attention to the contention that the sentence of death must be set aside because of the failure of the defense counsel to offer any mitigating evidence during the penalty phase of the trial apart from the defendant's own statement and some testimony at a preliminary investigation and a suppression hearing. The client's statement was to the effect that he knew he had done wrong, believed in an eye for an eye, and felt that he should die for his crime. The attorney went along with Deere's instructions "based on his desires and my conclusion that I have no right whatsoever to infringe on his decisions about his own life."

The opinion in *Deere* first discusses the case of *People v. Stanworth*, 71 Cal.2d 820, 80 Cal.Rptr. 49, 457 P.2d 889 (1969) where the defendant not only sought to waive a jury trial on penalty but also attempted to dismiss his attorney so that no evidence would be presented on his behalf. He also made it clear that he wanted to die. The *Deere* court then stated:

Stanworth cited *People v. Werwee* (1952) 112 Cal.App.2d 494, 500, 246 P.2d 704, for the proposition that " 'Although a defendant may waive rights which exist for his own benefit, he may not waive those which belong also to the public generally.' " (*People v. Stanworth*, supra, 71 Cal.2d at p. 834, 80 Cal.Rptr. 49, 457 P.2d 889.) It further quoted (ibid.) from *People v. Blakeman* (1959) 170 Cal. App.2d 596, 598, 339 P.2d, 202, the view that " 'The fallacy of this argument is that we are not dealing with a right or privilege conferred by law upon the litigant for his sole personal benefit. We are concerned with a principle of fundamental public policy. The law cannot suffer the state's interest and concern in the observance and enforcement of this policy to be thwarted through the guise of waiver of a personal right by an individual. "Any one may waive the advantage of a law intended [solely] for his benefit. But a law established for a public reason cannot be contravened by a private agreement." (Civ. Code, § 3513.)' "

To permit a defendant convicted of a potentially capital crime to bar his coun-

sel from ...
at the pe ...
die, as di ...
violate t ...
against r ...
commit a ...
also prev ...
its consti ...
review a ...
complete ...
significan ...
appropria ...
missing.

This defi ...
another p ...
"in capita ...
strong int ...
mistaken ...

•

To allow ...
the introd ...
on his beh ...
fact poten ...
ing on the ...
the defen ...
from intro ...
ute or judi ...
state's int ...
termination ...
Finally, th ...
but mistal ...
right what ...
[client's] d ...
erated to d ...
effective a ...
counsel sh ...
comply wit ...
maximum ...
gal and e ...
not—contra ...
tion—a me ...
cently four ...
"Once an a ...
sent a clien ...
and duty to ...
*scope of th* ...
*ters such a* ...
*call*, wheth ...
examination ...
reject, what ...
other strate ...

ny mitigating
phase of the
it's own state-
a preliminary
sion hearing.
to the effect
rong, believed
that he should
ey went along
sed on his de-
it I have no
on his deci-

discusses the
71 Cal.2d 820,
(1969) where
it to waive a
attempted to
no evidence
alf. He also
to die. The

e (1952)
4b P.2d 704,
'Although a
which exist
y not waive
the public
mworth, su-
Cal.Rptr. 49,
quoted (ibid.)
959) 170 Cal.
02, the view
argument is
h a right or
pon the liti-
enefit. We
le of funda-
law cannot
d concern in
nent of this
h the guise
by an indi-
the advan-
ely] for his
shed for a
avened by a
iv, Code,

d of a
ir his coun-

sel from introducing mitigating evidence at the penalty phase because he wants to die, as did this defendant, would likewise violate the fundamental public policy against misusing the judicial system to commit a state-aided suicide. It would also prevent this court from discharging its constitutional and statutory duty to review a judgment of death upon the complete record of the case, because a significant portion of the evidence of the appropriateness of the penalty would be missing.

This deficiency of the record implicates another paramount concern of the state: "in capital cases ... the state has a strong interest in reducing the risk of mistaken judgments."

⁕ ⁕ ⁕

To allow a capital defendant to prevent the introduction of mitigating evidence on his behalf withholds from the trier of fact potentially crucial information bearing on the penalty decision no less than if the defendant was himself prevented from introducing such evidence by statute or judicial ruling. In either case the state's interest in a reliable penalty determination is defeated.

Finally, the defense attorney's honest but mistaken believe that he had "no right whatsoever to infringe upon his [client's] decision about his own life" operated to deny defendant his right to the effective assistance of counsel. While counsel should of course endeavor to comply with his client's wishes to the maximum extent consistent with his legal and ethical responsibilities, he is not—contrary to popular misconception—a mere "mouthpiece." As we recently found it necessary to reiterate, "Once an attorney is appointed to represent a client, he assumes the authority and duty to control the proceedings. *The scope of this authority extends to matters such as deciding what witnesses to call*, whether and how to conduct cross-examination, what jurors to accept or reject, what motions to make, and most other strategic and tactical determina-

tions." (*People v. McKenzie* (1983) 34 Cal.3d 616, 631, 194 Cal.Rptr. 462, 668 P.2d 769, italics added.)

The rule clearly applies to the issue before us. In *People v. Frierson* (1979) 25 Cal.3d 142, 164–167, 158 Cal.Rptr. 281, 599 P.2d 587, we held that when mitigating testimony can be produced with due diligence, failure to call witnesses to give such evidence in the penalty phase of a capital trial deprives the defendant of effective assistance of counsel. A thorough review of this question concludes that at the penalty phase defense counsel has a critical obligation to present a case in mitigation, first, "to assure reliability in capital sentencing," and second, "to attempt to convince the sentencer that, notwithstanding the defendant's guilt, he or she is a person who should not die." (Goodpaster, *The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases* (1983) 58 N.Y.U.L.Rev. 299, 317–318 [hereafter Goodpaster, *The Trial for Life* ].) "Where potentially beneficial mitigating evidence exists and counsel has not presented it, counsel has precluded the sentencer from considering mitigating factors. Through failure to discover or present such evidence, counsel has 'create[d] the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty.'" (Id. at p. 319, quoting from *Lockett v. Ohio*, [1978], supra, 438 U.S. [586] at p. 605, 98 S.Ct. [2954] at p. 2965 [57 L.Ed.2d 973].)

⁕ ⁕ ⁕

When the sentencer in a capital case is deprived of all or a substantial part of the available evidence in mitigation, "the potential for prejudice is too obvious to require proof." (Goodpaster, *The Trial for Life*, supra p. 350.) Indeed, "short of substituting a verdict of its own, there is no way for a reviewing court to determine what effect unpresented mitigating evidence might have had on the sentencer's decision." (Id. at p. 354.) We have no doubt that a judgment of death imposed in such circumstances constitutes a

Respondent's Exhibit E

**1132**          **653 FEDERAL SUPPLEMENT**

miscarriage of justice (Cal.Const., art. VI, § 13): not only did defendant not have a fair penalty trial—in effect he had no penalty trial at all.

The judgment was therefore reversed as to penalty.

Justice Broussard concurred with the majority decision in *Deere* that:

> The State of California asserts an interest, independent from that of the defendant, in the accuracy of the penalty determination at a capital trial. (See *People v. Stanworth* (1969) 71 Cal.2d 820, 830–834, 80 Cal.Rptr. 49, 457 P.2d 889.) Both the 1977 death penalty law and the 1978 initiative plainly envision that this interest will be protected by an adversary proceeding in which the prosecuting attorney will present the aggravating evidence and defense counsel will present the mitigating evidence.

* * * *

> A penalty trial at which all mitigating evidence is withheld is inadequate to safeguard the state's interest in the reliability of penalty decisions; as the majority point out, it is equivalent to "no penalty trial at all." (at p. 934.)

However, Justice Broussard did not believe that the case should be considered one involving "ineffective assistance of counsel," stating:

> I hesitate, however, to describe this case as one involving "the ineffective assistance of counsel." The constitutional right to the effective assistance of counsel belongs to defendant personally. A man facing the awful alternatives of execution or life imprisonment without possibility of parole could rationally prefer execution, or at least feel that the comparative advantage of life imprisonment was not worth the humiliation and loss of dignity he believes entailed in the presentation of mitigating evidence. Here counsel satisfied himself that his client was making a rational, knowing, and intelligent decision, and then acted in accord with his client's wishes. I do not believe his conduct violated any constitutional right of defendant.

> Although counsel in this case fulfilled his obligations to his client, he failed to perform a role assigned to him by the state, that of presenting the mitigating evidence necessary to assure the reliability of the penalty determination. But the fact that the state assigns defense counsel a role which may require him to act contrary to his client's wishes on a matter of such vital importance to the client presents a troubling picture. The defense of a capital case often requires a close and trusting relationship between counsel and client; yet our decision requires counsel to violate that trust, to take a position against his client, and perhaps to present evidence revealed to him in confidence by his client.

> Trial courts should explore methods of alleviating this conflict. In some cases it might be desirable for counsel, in addition to presenting mitigating evidence, to inform the jury of defendant's personal position. In other cases, the court might permit the defendant himself to address the jury. Alternatively, the court could call persons with mitigating evidence as its own witnesses, or appoint new counsel to call them, and thereby place on the record the mitigating evidence essential to a careful, balanced penalty determination.

> In sum, both the state's need to assure the fairness and reliability of the penalty determination, and defendant's rights to personal choice and dignity, command respect. It is essential that the penalty trial constitute a balanced presentation of aggravating and mitigating evidence, but this goal should be achieved, as far as possible, with respect and accommodation for defendant's personal values and for his relationship with counsel.

> I therefore join in reversing the penalty judgment, not on the ground of incompetency of counsel, but because no steps were taken to assure a fair and balanced penalty trial. I am confident that we would not reverse a penalty judgment after the trial court had taken independent steps to assure a fair and balanced

penalty tria[...]
evidence w[...]
counsel.

It is clear [...]
and *Deere* th[...]
upon statutor[...]
these cases [...]
tory and stat[...]
Implicitly the [...]
was doing the [...]
of necessity, w[...]
constitutionalit[...]
interpreted.

The Arkans[...]
in both Misso[...]
Arkansas court[...]
pass upon this [...]
construction. [...]
sue would aris[...]
California analy[...]

It is not nece[...]
solve this issue [...]
tioner relief fro[...]
the *Collins* doc[...]
if the Court is [...]
issue would hav[...]

**MERCY O[...]
JUR[...]**

Section 41-13[...]
provides:

(1) The jury s[...]
death if it un[...]
findings that:

(a) aggravat[...]
beyond a reaso[...]

(b) aggravati[...]
weight [outwei[...]
doubt all mitiga[...]
to exist; and

(c) aggravati[...]
a sentence of d[...]
doubt.

It is clear under *[...]*
a jury finds one [...]
cumstances and t[...]
cumstances outw[...]

1. But even if the s[...]
ed, a jury might [...]
impose such a sent[...]

ılfilled his
led to per-
the state,
ating evi-
reliability

But the
ınse coun-
him to act
on a mat-
the client

The de-
requires a
p between
ecision re-
t trust, to
client, and
evealed to

ıethods of
ne cases it
el. in addi-
ce, to
ь ersonal
ourt might
to address
ourt could
vidence as
new coun-
lace on the
e essential
determina-

l to assure
the penalty
's rights to
ommand re-
he penalty
resentation
g evidence,
ved, as far
accommoda-
values and
ısel.

the penalty
of incompe-
se no steps
nd balanced
that we
ıdgment
:en indepen-
nd balanced

penalty trial, even though the mitigating
evidence was not presented by defense
counsel.

It is clear from a reading of *Burgener*
and *Deere* that those decisions are based
upon statutory law. The court in both of
these cases was interpreting state statu-
tory and state constitutional provisions.
Implicitly the Missouri Court of Appeals
was doing the same thing in *Trimble* but,
of necessity, was also upholding the federal
constitutionality of the state statute as so
interpreted.

The Arkansas law is very similar to that
in both Missouri and California and the
Arkansas courts have not had occasion to
pass upon this particular issue of statutory
construction. No federal constitutional is-
sue would arise if Arkansas follows the
California analysis.

It is not necessary for the Court to re-
solve this issue because it is granting peti-
tioner relief from the death penalty under
the *Collins* doctrine, *see infra*. However,
if the Court is wrong on *Collins*, then this
issue would have to be dealt with.

## MERCY OR NULLIFICATION
## JURY VERDICTS

Section 41–1302(1), Ark.Stat.Ann. (1947)
provides:

(1) The jury shall impose a sentence of
death if it unanimously returns written
findings that:

(a) aggravating circumstances exist
beyond a reasonable doubt; and

(b) aggravating circumstances out-
weight [outweigh] beyond a reasonable
doubt all mitigating circumstances found
to exist; and

(c) aggravating circumstances justify
a sentence of death beyond a reasonable
doubt.

It is clear under Arkansas law that even if
a jury finds one or more aggravating cir-
cumstances and that the aggravating cir-
cumstances outweigh the mitigating cir-

cumstances, the jury may nonetheless
choose to impose a life sentence. *Williams
v. State*, 274 Ark. 9, 621 S.W.2d 686 (1981);
*Clines, et al. v. State* (1983), 280 Ark. 77,
656 S.W.2d 684. It is not clear under Ar-
kansas law, however, whether if a jury also
finds that the aggravating circumstances
justify a sentence of death, the jury may
nonetheless choose as an act of mercy to
impose a sentence of life even though the
statute states that the death penalty
"shall" be imposed by the jury under such
circumstances. Compare *State v. Melson*,
638 S.W.2d 342 (Tenn.1982), *cert. denied*
459 U.S. 1137, 103 S.Ct. 770, 74 L.Ed.2d 989
and *Commonwealth v. Maxwell*, 505 Pa.
152, 477 A.2d 1309 (1984), *cert. denied*, 469
U.S. 971, 105 S.Ct. 370, 83 L.Ed.2d 306,
with *People v. Brown*, 40 Cal.3d 512, 230
Cal.Rptr. 834, 726 P.2d 516 (1986) and *Peo-
ple v. Easley*, 34 Cal.3d 858, 196 Cal.Rptr.
309, 671 P.2d 813 (1983).

If the language of the statute providing
that if the three conditions are met, a death
sentence "shall be imposed" were strictly
interpreted, a jury could not under Arkan-
sas law choose to show mercy to a defend-
ant where a death sentence is justified.[1]
Or, put another way, if the jury made the
three requisite findings but nevertheless
imposed a sentence of life without parole,
would the Court be entitled to, or indeed be
required to, set aside that sentence and
impose a sentence of death?

In view of the Arkansas Supreme Court's
views on the sanctity of jury verdicts in
criminal cases and in view of the nullifica-
tion doctrine, it might interpret the phrase
"where aggravating circumstances justify
a death sentence" broadly to effectively
mean "where because of aggravating cir-
cumstances the jury feels it should impose
the death sentence." Or, the Court might
interpret the phrase "shall be imposed"
broadly to mean "may be imposed." In
either case, "mercy verdicts" would be per-
mitted. And if such interpretations of the
Arkansas statute are correct, then the

---

1. But even if the statute were strictly interpret-
ed, a jury might arguably still be entitled to
impose such a sentence under the nullification

doctrine, and a defendant might be entitled to
an instruction so informing the jury.

Respondent's Exhibit E

1134          653 FEDERAL SUPPLEMENT

presently used jury instructions are wrong. Note the language of the charge in this case: "If you make those findings, you will impose the death penalty."

Because the Court is granting petitioner relief from the death penalty on the basis of the *Collins* doctrine, *see infra*, it is unnecessary for the Court to resolve this issue of statutory construction. If the Court is wrong on the application of *Collins*, then this issue would, of course, have to be dealt with.

## COLLINS ISSUE

Petitioner's habeas claim predates the Eighth Circuit Court of Appeals' decision in *Collins v. Lockhart*, 754 F.2d 258 (1985), which suggests an important constitutional basis for the petitioner's claim. The Court has been researching the issue. On August 22, 1986, petitioner's counsel wrote a letter to the Court directly raising and arguing the point. It is therefore incumbent upon the Court to review the *Collins* case.

Collins was charged with capital felony murder by an information alleging that he had killed John Welch "while engaged in the attempt and perpetration of robbery of John Welch." *Id.* at 262. The Washington County, Arkansas jury found Collins guilty in 1974 as charged. At the conclusion of the sentencing phase and pursuant to Arkansas statutory law, the jury further found three aggravating circumstances present, that these aggravating circumstances outweighed the mitigating circumstance of Collins' age, that these aggravating circumstances justified imposition of the death sentence, and that Collins should be executed for the offense. The three aggravating circumstances were (1) that Collins had committed a prior violent crime; (2) that he had created a substantial risk of death or serious physical injury to a person other than the victim; and (3) that he committed the murder for pecuniary gain. *Id.* at 262. The Arkansas Supreme Court affirmed his conviction and sentence upon remand from the Supreme Court of the United States which had ordered reconsideration in light of *Gregg v. Georgia*, 428

U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). Collins' post-conviction petition for relief was subsequently denied. He then filed for federal habeas corpus relief in the Eastern District of Arkansas. The district court rejected all of the petitioner's claims and denied the requested relief. On appeal, Collins' case was initially sent back to the state supreme court for a determination of whether the sentence imposed was disproportionate when compared to those imposed in similar cases. The Arkansas Supreme Court held that it was not. Collins then went back to the United States District Court which again denied his claim. In his second appeal to the Eighth Circuit, Collins argued, *inter alia*, that the third aggravating circumstance found by the jury that had sentenced him to die, namely that he had killed "for pecuniary gain," was an essential element of the capital felony murder charge for which he was convicted and would apply to every person who was convicted of capital felony murder where robbery was the underlying felony involved. In other words, Collins claimed that pecuniary gain was *always* a circumstance that would exist in capital felony cases involving robbery and its automatic presence thus could not provide the jury with any basis for distinguishing capital murders which deserved the death sentence from others that did not. *Id.* at 261. In sum, Collins argued, the use of the statutory aggravating circumstance of pecuniary gain did not assist the jury in applying the death penalty in a manner deemed constitutionally acceptable in *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) and *Gregg*, *supra*. And, since the appellate court could not determine what impact this allegedly flawed circumstance may have had upon the jury's conclusion (in view of the fact that the jurors also had before them two other aggravating circumstances and one mitigating circumstance), Collins asked the court to set aside his death sentence.

The Eighth Circuit first considered whether or not the Arkansas court had passed on this question. *Id.* at 262. Although there was no express finding with

Ed.2d 859
etition for
He then
lief in the
he district
r's claims
. On ap-
nt back to
leterminal-
osed was
to those
Arkansas
not. Col-
ed States
his claim.
h Circuit,
the third
by the
, namely
y gain,"
e capital
he was
y person
der
, ony
claimed
circum-
l felony
itomatic
he jury
capital
entence
61. In
e statu-
pecuni-
pplying
ed con-
an v.
26, 33
supra.
ald not
egedly
l upon
e fact
m two
ad one
ed the
idered
t had
l-
h

the Arkansas Supreme Court's decision, the circuit court inferred that the Arkansas court had rejected this novel theory. *Id.* at 262. Collins' trial counsel did make what the Eighth Circuit labeled the "pecuniary-gain argument" at the trial but the matter was not pursued on appeal. However, as the Eighth Circuit noted, it is the practice of the Arkansas Supreme Court to take up and consider all objections raised at trial. Since the Arkansas court held, after considering all possible errors, that the defendant had received a fair trial, the Eighth Circuit thus deduced that the Arkansas court had reviewed but found no merit in the argument. *Id.* at 262. Having thus determined that the highest court in the state had construed the Arkansas statute as permitting the practice of offering pecuniary gain as an aggravating circumstance upon conviction for capital felony murder where robbery is the underlying felony, the court of appeals turned to analyze the constitutionality of such an application of the Arkansas law. While this Court might anticipate that the Arkansas Supreme Court would read the state statute differently if the issue were overtly and squarely presented to it, the Court shall nevertheless accept the Eighth Circuit's inference that state law permits the use of "pecuniary gain" as an aggravating circumstance in such cases. It follows that this Court must also reach the federal constitutional issues.

In *Collins* the court noted that the prosecutor essentially admitted that the aggravating circumstance of pecuniary gain applied automatically to anyone convicted of robbery murder. As the prosecutor suggested in his argument to the jury, a finding of this aggravating circumstance required nothing more than the jury's reaffirming one of the elements upon which the defendant's conviction rested:

THE PROSECUTING ATTORNEY: You are instructed by the law that another aggravating circumstance that you shall consider is whether or not the commission of this particular crime was for pecuniary gain. *You have already determined that yesterday that this crime* *was committed by the defendant for money, for pecuniary gain.* I submit to you that is the third most aggravating circumstance in this case.

*Id.* at 263.

The prosecutor in the case before the Court sounded a strikingly similar theme when he argued the "pecuniary gain" circumstance to the jury which sentenced Singleton:

I submit to you only one [aggravating circumstance] existed and that is the murder was committed for pecuniary gain, that the Defendant at the time of the commission of the murder—although it wasn't, we don't have any evidence as to the amount.—the evidence is beyond a doubt that he was in the commission of a robbery, that he intended to steal money. So that aggravating circumstance presents itself. *And I'm sure you have already found that to have existed.* [emphasis added]

[1] This acknowledged use of an aggravating circumstance which "duplicates an element of [the] crime itself" violates the Eighth Amendment of the Constitution as applied to the states through the Fourteenth Amendment. *Id.* at 263. As explained by Judge Arnold, writing for the Eighth Circuit:

Aggravating circumstances, in order to comply with the Eighth Amendment, must "genuinely narrow the class of persons eligible for the death penalty and ... reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." [*Zant v. Stephens,* 462 U.S. 862, 103 S.Ct. 2733, 2742–43 77 L.Ed.2d 235 (1983).] An aggravating circumstance is an objective criterion that can be used to distinguish a particular defendant on whom the jury has decided to impose the death sentence from other defendants who have committed the same underlying capital crime. Aggravating circumstances serve to reduce the danger that the death penalty will be wantonly or arbitrarily imposed, a danger that was

673

Respondent's Exhibit E

uppermost in the Court's mind when *Furman v. Georgia*, [citation omitted] was decided. Thus, in *Godfrey [v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980)] the Court struck down an aggravating circumstance that was so vaguely and generally worded that it failed to narrow the class of persons eligible for the death penalty. "(S)tatutory aggravating circumstances play a constitutionally necessary function at the state of legislative definition: they circumscribe the class of persons eligible for the death penalty." *Zant*, 103 S.Ct. at 2743.

We see no escape from the conclusion that an aggravating circumstance which merely repeats an element of the underlying crime cannot perform this narrowing function. Every robber-murderer has acted for pecuniary gain. A jury which has found robbery murder cannot rationally avoid also finding pecuniary gain. Therefore, the pecuniary-gain aggravating circumstance cannot be a factor that distinguishes some robber-murderers from others. In effect, a robber-murderer enters the sentencing phase with a built-in aggravating circumstance.

* * * * *

We conclude that pecuniary gain may not be used as an aggravating circumstance in this case, and that if no other statutory aggravating circumstances had been found, the death sentence would have to be set aside.

*Collins* at 264–265.

Because the Arkansas death penalty statute requires the jury to weigh aggravating circumstances against any possible mitigating circumstances, the *Collins* court further held that the presence of an invalid aggravating circumstance under Arkansas law meant that the sentencing verdict was entirely defective. This distinguishes the Arkansas law from those of Georgia and Florida which were addressed by the Supreme Court in *Zant* and *Barclay v. Florida*, 463 U.S. 939, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983), respectively.

The instant case is exactly analogous to *Collins* with the exception that the jury found only *one* aggravating circumstance in petitioner Singleton's case as opposed to the three in *Collins*.

Thus, if the Court applies the holding of *Collins* to this case, petitioner's death sentence must be set aside. Before doing that, however, the Court will consider possible procedural objections which might arguably prevent the application of *Collins* to this case.

The Court notes that Singleton, unlike the petitioner in *Collins*, did not raise the "pecuniary gain" issue at trial. Nor did he ever raise it until the eleventh hour of this habeas corpus proceeding. In accordance with the principles of *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), petitioner must show the requisite "cause" for this failure to comply with the state procedural obligation that all objections must be asserted at trial in order to be preserved.

The aim of *Wainwright* is to force the criminal defendant to assert all of his issues at the state trial level and remove any incentive he might have to "sandbag" there in the hope of saving some objections which he might use later to obtain a second shot in a federal forum. *Id.* 97 S.Ct. at 2508. So procedural defaults that result from tactical calculations will not constitute "cause," and the objection will be deemed waived. However, where the failure to make the objection is attributable to the "novelty" of the constitutional issue "at the time of the state court proceeding," the cause requirement of the *Wainwright* test is satisfied. *Reed v. Ross*, 468 U.S. 1, 104 S.Ct. 2901, 2909, 82 L.Ed.2d 1 (1984).

The Supreme Court in *Ross* found that if the issue was "reasonably unknown" to counsel, then it would be fair to presume that no intentional "strategic motives" lay behind the default. Thus the Court held:

[W]here a constitutional claim is so novel that its legal basis is not reasonably available to counsel, a defendant has cause for his failure to raise the claim in

analogous to
that the jury
circumstance
as opposed to
♭) ⌐↑ :

the holding of
g's death sen-
Before doing
consider pos-
hich might ar-
on of Collins

⌐ ↗ : .
gleton, unlike
not raise the
ll. Nor did he
h hour of this
In 'accordance
ainwright v.
.Ct. 2497, 53
r must show
his failure to
: )bligation
ise: ed at trial

s to force the
: all of his is-
nd remove any
andbag" there
me objections
btain a second
d. 97 S.Ct. at
ts that result
ill not consti-
ction will be
where the fail-
attributable to
itutional issue
t proceeding,"
e Wainwright
ss, 468 U.S. 1,
d.2d 1 (1984).

s found that if
unknown" to
ir to presume
c motives" lay
he Court held:
aim is so novel
reasonably
ac endant has
se the claim in

accordance with applicable state proce-
dures."

*Ross* 104 S.Ct. at 2910.

**[2]**  In the instant case, petitioner's trial
counsel had very little if any indication that
the "pecuniary gain" argument might in-
here somewhere in the Supreme Court's
decisions in *Gregg* and *Furman*. The
Court knows of no line of either state or
federal decisions that would have pointed
petitioner's counsel in the direction of the
*Collins* result. Thus, the Court concludes
that there was no "reasonable basis" upon
which petitioner's counsel should have been
expected to predicate the pecuniary gain
argument at the time of his state court
trial.

It is worth noting that the *Ross* case
dealt with the retroactive application of an
intuitively more apparent constitutional
principle that had been unrecognized at the
time of the state trial.  In that instance,
the Supreme Court considered whether the
petitioner should have objected that the
state law required him to carry the burden
of proving that he acted in passion or prov-
ocation and without malice when he killed
the victim. *Id.* at 2904. The Court found
that he could not have been expected to
make this argument (which eventually
felled the state statute), namely, that plac-
ing this burden upon the criminal defend-
ant excused the prosecution from establish-
ing beyond a reasonable doubt all the es-
sential elements of the crime charged. The
Court so held notwithstanding the fact that
one circuit court had overturned a similar
state law prior to the petitioner's trial. By
comparison, at the time of Singleton's trial,
as far as this Court is aware, no court had
accepted the *Collins* argument.  And,
moreover, the Court believes that the con-
stitutional principle established in this cir-
cuit by the *Collins* opinion is surely more
subtle than that which the Supreme court
labelled "novel" in *Ross*.

**[3]**  The Court anticipates that the state
might also contend that the *Collins* deci-
sion should not be applied retroactively.
The *Collins* opinion was delivered in Janu-
ary 1985. Although Singleton was tried

and convicted on October 30, 1979, his ha-
beas review was pending at the time *Col-
lins* was decided.  Since the instant claim
had not been decided, it is by no means
clear that the retroactivity doctrine even
applies here. But in any event, the magni-
tude of the constitutional issues involved
requires the Court to conclude that *Collins*
should be applied, and retroactively, to this
case. "Complete retroactive effect is most
appropriate where a new constitutional
principle is designed to enhance the accura-
cy of criminal trials." *Solem v. Stumes*,
465 U.S. 638, 104 S.Ct. 1338, 1342, 79
L.Ed.2d 579 (1984).

Clearly then the instant case is governed
by *Collins* and petitioner's death penalty is
invalid.  If there were other aggravating
circumstances that the state had previously
relied upon, the state would be free to
conduct another sentencing phase trial and
seek a valid death sentence.  However,
since the state here offered evidence of no
other aggravating circumstances, removal
of the lone "pecuniary gain" circumstance
leaves the state with no basis in the trial
record for the death sentence.

The question remains whether the state
may retry the sentencing issue when it
failed to prove at least one aggravating
circumstance in the first trial as required
by state law. In *Collins* it was arguable
that the invalid aggravating circumstance
of pecuniary gain was superfluous and that
the jury could have imposed the death sen-
tence based on the two other aggravating
circumstances proved. But that is not the
case here as there were no other aggravat-
ing circumstances submitted.

The question can only arise if the prose-
cution has evidence of other "aggravating
circumstances" that it did not choose to use
at the trial and if the prosecutor desires a
retrial of the penalty phase. If the answer
is "yes" to both of these propositions then
the Court would have to determine if *Nel-
son v. Lockhart*, 641 F.Supp. 174 (E.D.
Ark., 1986), and *Bullington v. Missouri*,
451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270
(1981), foreclose that option on double jeop-
ardy grounds.

675

Respondent's Exhibit E

Since the issue is not presently before the Court and has not been argued or briefed by the parties, the Court will withhold action on this issue for a short period. The state will advise the Court by September 30, 1986, whether it wishes to have a retrial of the penalty phase. If it does it will identify the aggravating circumstance or circumstances that it will attempt to prove and explain why it did not offer evidence thereof at the first trial. It will also brief the double jeopardy issue discussed in *Nelson* and explain why, under the law, it should be permitted a second opportunity to produce such evidence. The respondent will have until October 14, 1986, to file his brief in response.

The Court concludes that petitioner's challenges to his conviction for capital murder are without merit and that said conviction should in all respects be reaffirmed.

It is therefore ORDERED that petitioner's complaint attacking his conviction for the crime of capital felony murder be, and it is hereby, dismissed, said conviction being hereby in all respects reaffirmed.

It is further ORDERED that the death penalty imposed upon the petitioner on October 30, 1979, be, and it is hereby, set aside.

It is further ORDERED that the state advise the Court and the petitioner on or before September 30, 1986, whether it wishes to have a retrial of the penalty phase of the case. If it seeks such a retrial, it will also, by said date, file a brief and argument on the double jeopardy issue described above. The petitioner will have until October 14, 1986, to file any response required.

### ORDER

[4] On August 28, 1986, the Court entered an order setting aside petitioner's death sentence. By that order the Court required the parties to submit additional pleadings with respect to questions as to whether the state wished to resentence petitioner and, if so, whether the Double Jeopardy Clause of the Fifth Amendment to the Constitution would prevent the respondent from asking a jury to impose the death penalty on petitioner again. The state has recently notified the Court that it does wish to retry the sentencing phase of petitioner's trial and would therein seek a capital sentence. The state's decision therefore requires the Court to address the double jeopardy issue suggested in the earlier order. Upon review of the parties' briefs and the recent caselaw, the Court is convinced that the state may *not* subject petitioner to the death penalty, again. Accordingly, the Court will order the state to reduce petitioner's sentence to life without parole. This Court's ruling on this issue at this time will permit a prompt appellate review of the important underlying issue.

To review briefly, the petitioner was convicted of capital felony murder in state court. Following his conviction, the state sought the death penalty, arguing to the jury a *single* aggravating circumstance: that the petitioner acted for pecuniary gain. The petitioner offered no mitigating circumstances and the jury found that the state had proved the one aggravating circumstance, "pecuniary gain," beyond a reasonable doubt; that this outweighed any mitigating circumstances; and that the petitioner should be executed.

After reviewing the petitioner's conviction and sentence pursuant to his habeas corpus petition, the Court affirmed the conviction but found that the state had not relied upon a valid aggravating circumstance and therefore imposition of the death sentence was unconstitutional. Governed by the Eighth Circuit's decision in *Collins v. Lockhart,* 754 F.2d 258 (1985), this Court held that the state had used a previously established element of the robbery-murder charge in offering "pecuniary gain" as an aggravating circumstance. Because there were no other aggravating circumstances offered upon which the jury might conceivably have relied, this Court concluded that the state had effectively failed to provide a basis for the capital sentence imposed by the jury.

Now the Court must consider whether the fact that the state relied at trial *solely*

upon an invalid aggravating circumstance precludes a second penalty phase trial in which the state would attempt to offer evidence of other aggravating circumstances that could support a death sentence. The state rightly concedes that the nature of the Arkansas death penalty statute does cause it to trigger double jeopardy considerations pursuant to the United States Supreme Court opinion in *Bullington v. Missouri,* 451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981). However, the state asserts that in this particular situation jeopardy has not yet attached to the sentencing phase of petitioner's case because this Court has simply found that the one aggravating circumstance was "improper," that there has been no acquittal, and that resentencing is therefore permissible.

Regardless of the manner in which it is characterized, the fact is that the state at the original trial failed to prove circumstances that would justify imposition of the death sentence. Use of "pecuniary gain" was indeed "improper," and this invalid reliance leaves the respondent with absolutely no basis in the record for its attempt to prove the aggravation that recent Supreme Court decisions require before imposition of a capital sentence. *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). Thus, for purposes of the double jeopardy analysis, it must be said that the state failed to prove the requisite aggravation and that therefore the petitioner was effectively "acquitted" with respect to the state's case that he should be executed. Having been "acquitted" by virtue of this Court's decision on habeas review of the sentence, petitioner may not be forced to "run the gauntlet" of a second state effort to prove some proper aggravating circumstance or circumstances that might convince a new jury to impose the death sentence on petitioner. *Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978), *Bullington v. Missouri, supra.*

The respondent relies chiefly on the recent Supreme Court decision in *Poland v.* *Arizona,* — U.S. —, 106 S.Ct. 1749, 90 L.Ed.2d 123 (1986), to support its claim that the state may resentence petitioner. The Court has carefully reviewed the *Poland* opinion and concludes that the Supreme Court's May 1986 ruling does not sanction resentencing in the instant case. In *Poland* the petitioners were convicted of a double murder arising out of the robbery of a currency courier. During the penalty phase, the Arizona prosecutor argued that two aggravating circumstances were present and justifed imposition of the death sentence. The trial judge, who had the responsibility for sentencing under the Arizona law, rejected the prosecution's first circumstance of pecuniary gain on the theory that the applicable Arizona statute required proof of a contract murder, not simple evidence that the convicted individual intended to derive something of pecuniary value through his criminal act. The prosecution had offered no evidence that the defendants were hired killers. The judge did find, however, that the state had proved the other aggravating circumstance, namely that the murders were "especially heinous, cruel or depraved," and that this circumstance outweighed any mitigating circumstances. Thus the trial court sentenced the petitioners in *Poland* to death.

On appeal the Arizona Supreme Court held that the trial judge had, in essence, found the wrong reason for what may have been a lawful imposition of the death penalty. The court said that the sentencing court erred by finding sufficient evidence to support the aggravating circumstance of "heinous, cruel or depraved." But the Arizona Supreme Court also held that the trial judge had mistakenly construed the "pecuniary gain" statute when he ruled that it only applied to murder for hire, suggesting the possibility that, under the proper interpretation, he might find this circumstance present and issue a death sentence. Because the court also overturned the petitioners' underlying conviction, the case was remanded for a new trial.

Petitioners were again convicted and, again, the trial court imposed the death

Respondent's Exhibit E

penalty, relying on the aggravating circumstances of "pecuniary gain" and "heinous, cruel or depraved." Petitioners appealed to the Arizona Supreme Court a second time, arguing, *inter alia*, that the Double Jeopardy Clause barred a second sentencing phase since the Arizona court had reversed the trial judge's previous finding of the "heinous, cruel or depraved" circumstance that had supported the first death sentence. This, petitioner argued, constituted an acquittal on the death sentence by the Arizona Supreme Court. The Arizona court rejected that double jeopardy claim and affirmed the death sentence on the finding of the "pecuniary gain" factor. The Arizona court again determined that there was insufficient evidence to support the "heinous, cruel or depraved" circumstance and tossed out that factor. The United States Supreme Court granted certiorari to settle the question of

> whether the Double Jeopardy Clause bars a further capital sentencing proceeding when, on appeal from a sentence of death, the reviewing court finds the evidence insufficient to support the only aggravating factor on which the sentencing judge relied, but does not find the evidence insufficient to support the death penalty. *Poland* at 1751.

In short, the Supreme Court determined that double jeopardy did *not* preclude resentencing the petitioners in *Poland*. A brief glance at the holding might first suggest that *Poland* authorizes the respondents in the instant case to resentence Singleton. Closer inspection of the opinion, however, reveals that there was no former jeopardy in the Arizona Supreme Court's ruling because the appellate court did not conclude that the record lacked any evidence to support the requested death penalty but merely struck the sentencing court's finding with regard to a particular aggravating circumstance. Thus, the *Poland* case is distinguishable from the instant case in a critical way. Namely, this Court found nothing else in the record to support the death sentence after it was determined that "pecuniary gain" was invalidly offered. The Arizona Supreme Court, in contrast, after finding insufficient evidence on the "heinous, cruel or depraved" circumstance, went on to also find that the trial court had wrongly interpreted the "pecuniary gain" statute. It further concluded that had the trial court properly construed this state statute, the sentencing court might have imposed the death sentence on the basis of the evidence placed in the record by the prosecutor:

> Upon retrial, if the defendants are again convicted of first degree murder, the court may find the existence of this [pecuniary gain] aggravating circumstance. *Poland* at 1752, citing 132 Ariz., at 286 [645 P.2d 784]

It should be noted, in addition, that the trial court had plainly stated that, although he had found the "pecuniary gain" circumstance to apply only to contract killings, "if this presumption is inaccurate, the evidence shows the defendants received something of pecuniary value," and further indicated that such evidence "would be an aggravating circumstance." *Poland* 106 S.Ct. at 1752.

On this record, the U.S. Supreme Court found that neither the sentencing court nor the Arizona Supreme Court had held that there was no basis for the death sentence. Thus there had been no "acquittal," at either level, and the Supreme Court could conclude that jeopardy had not attached:

> At no point during petitioners' first capital sentencing hearing and appeal did either the sentencer or the reviewing court hold that the prosecution had "failed to prove its case" that petitioners deserved the death penalty. Plainly, the sentencing judge did not acquit, for he imposed the death penalty. While the Arizona Supreme Court held that the sentencing judge erred in relying on the "especially heinous, cruel, or depraved" aggravating circumstance, it did not hold that the prosecution had failed to prove its case for the death penalty. Indeed, the court clearly indicated that there had been no such failure by remarking that "the trial court mistook the law when it did not find that the defendants 'commit-

ted the offense as consideration for the receipt, or in expectation of the receipt, of anything of pecuniary value,'" and that "upon retrial, if the defendants are again convicted of first-degree murder, the court may find the existence of this aggravating circumstance," [citations omitted]. *Poland* at 1754-55.

[5] This Court reads *Poland* to mean that the state may resentence a convicted murderer whose death penalty has been set aside, provided that no court has determined that the state failed to prove any other basis upon which a second death sentence might rest. In other words, if either the trial court or a reviewing court finds that, after removal of any infirm factors, the residual evidence offered by the state at the initial proceeding will not support a death verdict, then the state has failed in its proof and may not try again. Thus, as the Supreme Court stated, "the proper inquiry is whether the sentencer or reviewing court has 'decided that the prosecution has not proved its case' *that the death penalty is appropriate.*" [emphasis in original]. *Poland* at 1755. Removal of one invalid factor leads to this conclusion *only* if there were no other valid factors adduced at trial that might have independently formed a proper basis for a death sentence.

In deciding *Poland,* the Court distinguished its earlier decision in *Arizona v. Rumsey.* 467 U.S. 203, 104 S.Ct. 2305, 81 L.Ed.2d 164 (1984). In the latter case a 7–2 majority reaffirmed *Bullington, supra,* and held that the state could *not* resentence a convicted murderer when, on appeal, the Arizona Supreme Court determined that the trial court had erred in rejecting the prosecution's evidence of aggravating circumstances. As the trial judge in *Poland* had done, the trial court in *Rumsey* erroneously believed that the "pecuniary gain" circumstance was meant to apply in cases of contract killings only. Although the state court overturned that ruling, the state could not attempt to have the trial court resentence Rumsey because the trial court had found no basis for the death penalty. To do so would have ex-

posed the defendant to double jeopardy. Thus, the distinction between *Rumsey* and *Poland* was that some court, the trial judge in this particular instance, had determined that there was no evidence in the record to warrant the death sentence. And notwithstanding that an error in interpreting the state law undergirded that determination, the Supreme Court deemed the trial judge's findings as former jeopardy:

> In making its findings, the trial court relied on a misconstruction of the statute defining the pecuniary gain aggravating circumstance. Reliance on an error of law, however, does not change the double jeopardy effects of a judgment that amounts to an acquittal on the merits. *Rumsey* 104 S.Ct. at 2310.

For purposes of the Double Jeopardy Clause, the only significant difference between the *Rumsey* case and the case pending before this Court is the source of the determination that the prosecution had not proved any basis for the death sentence. In *Rumsey* it was the trial judge; in the instant case, a federal court acting pursuant to habeas corpus review made the determination. This difference does not alter the double jeopardy consequences, as the Supreme Court has attested:

> If the District Court had so held in the first instance, as the reviewing court said it should have done, a judgment of acquittal would have been entered and, of course, petitioner could not be retried for the same offense. [citations omitted]. Consequently, as Mr. Justice Douglas correctly perceived in *Sapir,* [v. *United States,* 348 U.S. 373, 75 S.Ct. 422, 99 L.Ed. 426 (1955) ], it should make no difference that the reviewing court, rather than the trial court, determined the evidence to be insufficient. [citations omitted].... To hold otherwise would create a purely arbitrary distinction between those in petitioner's position and others who enjoy the benefit of a correct decision by the District Court. *Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 2147, 57 L.Ed.2d 1 (1978).

Respondent's Exhibit E

A recent Eleventh Circuit case illustrates this principal. *Young v. Kemp*, 760 F.2d 1097 (1985). Like the instant case, *Young* involved a federal habeas appeal of a state conviction. The district court upheld the petitioner's conviction but set aside the death penalty on the grounds that there was "no evidence that Young had formed the intent to rob his victim prior to the killing, and thus, the murder was not perpetrated while Young was engaged in another capital felony (i.e., armed robbery), nor for the purpose of receiving money." *Young* at 1100. On appeal, the circuit court reversed the district court's finding with regard to the validity of the conviction. Because it held that petitioner's trial counsel had been unconstitutionally ineffective, the appellate court ordered a new trial. The circuit court merely noted the district court's finding concerning the sentence but did not address this aspect of the lower court ruling.

In advance of the retrial, the state indicated that it would again seek the death sentence. Young argued that for the state to do so would constitute double jeopardy since the district court had found the previous death sentence unsupported by the evidence. The Eleventh Circuit agreed with the petitioner, concluding:

that the previous judgment of this court left intact the district court's finding of insufficient evidence to support the death sentence. That being the case, the double jeopardy principles announced in *Burks v. United States*, and *Bullington v. Missouri*, prevent the state from seeking the death penalty in Young's retrial. "[citations omitted].

*Young* at 1101.

This Court's August 28, 1986, finding that the petitioner's death sentence rested on a single, aggravating factor which is invalid under *Collins*, places the instant case within the *Rumsey* and *Young* classifications, rather than that of *Poland*. By removing the sole aggravating factor and determining that the record is devoid of any other basis for a death penalty verdict, this Court effectively acquitted the peti-

tioner of the case brought against him during the penalty phase. As *Poland* affirms, the state would have every right to resentence petitioner if this Court's nullification of the pecuniary gain factor had not reduced the quantum of statutorily designated aggravating evidence put forward at trial to zero. The Court notes that the facts present in *Poland* more closely resemble the situation in this Court's recently decided case of *Perry v. Lockhart*, 656 F.Supp. 46, also decided on August 28, 1986, wherein the Court invalidated a death sentence because *one of the three* aggravating factors relied on was invalid but permitted the state to resentence Perry because of the presence of other factors in the record that would support a death penalty.

The state contends that, in fact, the record still contains evidence that would justify a death sentence if Arkansas' present death penalty statute is considered. The state claims that the penalty phase adduced evidence that petitioner's conviction involved a murder that was "committed in an especially heinous, atrocious or cruel manner," and that such evidence constitutes an aggravating circumstance upon which the death sentence might be imposed under current law. Ark.Stat.Ann. § 41-1303(8). The state concedes that the law did not provide for this particular aggravating circumstance when petitioner was sentenced, but nevertheless contends that the fact that Arkansas has recently created this aggravating circumstance means that this Court can now conclude that there is a basis in the existing record of the penalty phase upon which a death sentence could be rested.

[6] The state's theory is severely flawed in the Court's view. It is unmistakably clear that the Court may not rely upon subsequent amendments in the statutory aggravating circumstances to find a basis for a death sentence that could not have been imposed under the controlling state law at the time the jury considered the aggravating circumstances in petitioner's case. The Arkansas death penalty statute

in effect
sentencin
cumstance

Aggrava
ited to

(1) the
a perso
felony

(2) the
a person
sentence
a perso

(3) the
other fe
use or t
son or
death or
er perso

(4) the
capital
great ri
than the

(5) the c
the purp
arrest or
dy;

(6) the c
pecuniar

(7) the c
the purp
the lawf
political
Ark.Stat.

To these
eighth agg
"(8) the ca
an especial
manner."
available at
submitted f
ber 6, "pec
ed that this
yond a reas
But assume
had determi
gain was in
ly determine
mined, by
otherwise i
was commit
fashion ever

Respondent's Exhibit E

in effect at the time of the petitioner's sentencing set forth seven aggravating circumstances:

Aggravating circumstances shall be limited to the following:

(1) the capital murder was committed by a person imprisoned as a result of a felony conviction;

(2) the capital murder was committed by a person unlawfully at liberty after being sentenced to imprisonment as a result of a felony conviction;

(3) the person previously committed another felony an element of which was the use or threat of violence to another person or creating a substantial risk of death or serious physical injury to another person;

(4) the person in the commission of the capital murder knowingly created a great risk of death to a person other than the victim;

(5) the capital murder was committed for the purpose of avoiding or preventing an arrest or effecting an escape from custody;

(6) the capital murder was committed for pecuniary gain; or

(7) the capital murder was committed for the purpose of disrupting or hindering the lawful exercise of any government or political function.

Ark.Stat.Ann. § 41–1303, Acts 1975, 280.

To these the General Assembly added an eighth aggravating circumstance in 1985: "(8) the capital murder was committed in an especially heinous, atrocious or cruel manner." But of the seven which were available at the time, the prosecution only submitted for the jury's consideration number 6, "pecuniary gain." The jury concluded that this circumstance was present beyond a reasonable doubt and nothing else. But assume for the moment that the jury had determined that reliance on pecuniary gain was invalid, as this Court subsequently determined, and that they had also determined, by noting on the verdict form or otherwise indicating it, that the murder was committed in an especially heinous fashion even though that factor was not

actually submitted by the prosecutor. Arkansas law, as it read then, would not have allowed the jury to impose a death sentence on the basis of that conclusion. What the state proposes by its argument that the new aggravating circumstance be considered in this case is that the state be allowed to return to the penalty phase with the benefit of the new list of aggravating circumstances and claim that the record can now be read to justify a death sentence, notwithstanding that the jury could not have returned a death verdict if they ignored the invalid circumstance of pecuniary gain, regardless of the evidence that the crime was "especially heinous, atrocious and cruel." The "especially heinous" aggravating circumstance simply was not a factor under the law at the time. That it now is one of the factors that may be introduced makes no difference to the situation which existed at the point when Singleton was sentenced and therefore has no impact upon the double jeopardy analysis in this situation.

The folly of the state's argument is exposed by considering the following hypothetical case. Assume that the state tries to convict an individual for an alleged statutory violation requiring proof of four elements but that the jury, finding only three of the elements, acquits the defendant. Shortly thereafter the legislature amends the statute by paring one of the previously required elements, leaving the three elements that the jury had found with respect to the now-acquitted defendant's case.

[7] No one would seriously suggest that the Double Jeopardy Clause would allow the government to go back and ask for a conviction of this individual based on the three elements which the jury had found and based on the legislature's amending the statute so as to eliminate any requirement of the fourth. Yet, in effect, that is exactly what respondent here would have the Court do by asking this Court to conclude that the amended death penalty statute may be used to establish a basis in the pre-existing record for the imposition of a death sentence, such that the Court

Respondent's Exhibit E

**1144**                 **653 FEDERAL SUPPLEMENT**

should not find that the Double Jeopardy Clause bars resentencing of petitioner. The only difference between the hypothetical case and the instant facts is that in this case the reviewing court, rather than the jury in the trial court, determined that the record did not contain sufficient evidence of aggravating circumstances under the law to provide a basis for the verdict requested by the government, namely the death sentence. As *Kemp, supra,* and *Burk, supra,* both make plain, this is an immaterial distinction and the defendant who is "acquitted" by the reviewing court is entitled to no less protection from Double Jeopardy than the defendant who is acquitted at the trial court by the jury. Thus the Court rejects respondent's contention that the record as developed in the original sentencing might still support a death sentence, even after removal of the pecuniary gain matter, and that this case is therefore like the situations presented in *Perry* and *Poland.*

In short, the difference between the outcome in *Perry* and *Poland* on the one hand, and this case on the other, is that the order toppling the death sentences in the former cases did not remove from the record every possible basis for the death sentence. In both the *Poland* case and this Court's decision in *Perry,* the review of the death sentence resulted only in a finding that the death sentence was flawed, not that there was no basis for it. By contrast, the state is bound in the instant case by its previous effort because there were no aggravating factors proved in the initial trial other than the one deemed invalid in the August order. Thus the Double Jeopardy Clause prevents the states from attempting to sentence the petitioner to death for a second time. The Court further notes that an analysis of the respondent's argument pursuant to the Ex Post Facto Clause of the Constitution would lead to the same conclusion.

It is therefore ORDERED that the respondent shall be, and it is hereby, prohibited from retrying the death penalty phase of petitioner's case.

It is further ORDERED that the respondent be, and it is hereby, required to reduce the petitioner's sentence to life without parole.



---

BEVERAGE MANAGEMENT,
INC., Plaintiff,

v.

COCA–COLA BOTTLING
CORP., Defendant.

No. C–1–84–1300.

United States District Court,
S.D. Ohio, W.D.

Aug. 29, 1986.

Soft drink bottler brought action alleging that competitor's feature advertisement programs with retailer violated antitrust laws. On bottler's motion for preliminary injunction, the District Court, Rice, J., held that: (1) bottler failed to show probability of success on its antitrust claims, and (2) issuance of preliminary injunction would not serve public interest.

Motion denied.

1. Injunction ⚖=138.18
    Movant is not entitled to preliminary injunctive relief, absent showing of probability of success on the merits, even if balance of hardships weighs in favor of granting preliminary injunction.

2. Monopolies ⚖=24(7)
    Soft drink bottler failed to establish probability of success on its claim that competitor's feature advertisement programs with retailer constituted exclusive dealing contracts, for purpose of obtaining preliminary injunction, where retailers were free to participate in competitor's programs,

Citation                    Rank(R)              Database            Mode
840 S.W.2d 317              R 1 OF 1             TN-CS               Page
(Cite as: 840 S.W.2d 317)

STATE of Tennessee, Plaintiff/Appellee,
v.
Donald Ray MIDDLEBROOKS, Defendant/Appellant.
Supreme Court of Tennessee,
at Nashville.
Sept. 8, 1992.

Defendant was found guilty of first-degree felony-murder and aggravated kidnapping and sentenced to death following jury trial before the Criminal Court, Davidson County, Ann Lacy Johns, J. Defendant appealed.  The Supreme Court, Anderson, J., held that:  (1) defendant knowingly and voluntarily waived his Miranda rights;  (2) trial court's instructions did not improperly remove jury's discretion in deciding whether to impose death penalty;  (3) any error with respect to court's failure to exclude challenged jurors for cause was harmless;  (4) defendant's racially biased statement was admissible under state of mind exception to hearsay rules;  (5) other statements were relevant on issue of premeditation and motive;  (6) any error in admitting officer's lay opinion testimony was harmless;  (7) photographs were properly admitted;  (8) refusal to allow defendant to examine witness' psychiatric records did not violate right to cross-examine witness;  (9) refusal to give missing witness instruction was not error;  (10) when defendant is convicted of first-degree murder solely on basis of felony-murder, felony-murder aggravating circumstance does not narrow class of death eligible murderers and is unconstitutionally applied;  and (11) use of that aggravating circumstance was not harmless beyond reasonable doubt in case where jury found one additional aggravating circumstance to be present.

Conviction affirmed;  reversed and remanded for resentencing.

Dwota, J., filed opinion concurring in part and dissenting in part, in which O'Brien, J., concurred.

Reid, C.J., filed opinion concurring in part and dissenting in part, in which Daughtrey, J., concurred.

[1] CRIMINAL LAW k517.2(3)
110k517.2(3)
Defendant's confession was not involuntary on grounds that he was inadequately advised of his rights;  defendant was advised of his Miranda rights three times--at time of his arrest when he was being escorted to patrol car, in patrol car on his way to hospital when he started to volunteer statement, and again, after he had been treated and released by hospital.  U.S.C.A. Const.Amends. 5, 14;  Const. Art. 1, s 9.

[2] CRIMINAL LAW k517.2(3)
110k517.2(3)
Defendant suffered "no material injury" as result of dog bites incurred in his arrest that affected his ability to understand his Miranda rights;  defendant was alert and oriented on the three occasions he was advised of his rights prior to confessing.  U.S.C.A. Const.Amends. 5, 14;  Const. Art. 1, s 9.

[2] CRIMINAL LAW k525
110k525

COPR. (C) WEST 1993 NO CLAIM TO ORIG. U.S. GOVT. WORKS

683

Respondent's Exhibit E

Defendant suffered "no material injury" as result of dog bites incurred in his arrest that affected his ability to understand his Miranda rights; defendant w  alert and oriented on the three occasions he was advised of his rights to confessing.  U.S.C.A. Const.Amends. 5, 14;  Const. Art. 1, s 9.

[3] CRIMINAL LAW k525
110k525
Defendant's educational level and mental illness did not prevent him from understanding his Miranda rights, so as to render his confession involuntary. U.S.C.A. Const.Amends. 5, 14;  Const. Art. 1, s 9.

[4] CRIMINAL LAW k519(8)
110k519(8)
Defendant's confession was not involuntary as result of delay in taking him before magistrate following his arrest where there was no evidence that coercive influences were exerted upon him during time period between his release from hospital, for dog bite injuries suffered during his arrest, and taped confession, except for inherently compelling atmosphere of being in police custody, which alone was not sufficient to vitiate voluntariness of confession;  defendant was adequately apprised of his rights in six and one half hours between his arrest and being taken before magistrate.  U.S.C.A. Const.Amends. 5, 14;  Const. Art. 1, s 9;  Rules Crim.Proc., Rule 5(a).

[5] HOMICIDE k311
203k311
Trial judge's instructions in sentencing phase of capital murder prosecution, which merely tracked language of statute by instructing that sentence "shall" h  death if aggravating circumstances were not outweighed by any mitigating  umstances, did not deprive jury of its Tennessee constitutional power to  se its own decision.  Const. Art. 1, s 19;  T.C.A. s 39-2-203(g).

[6] HOMICIDE k311
203k311
Trial judge's instructions in sentencing phase of capital murder trial, which merely tracked statute by instructing that jury "shall" impose death penalty if statutory aggravating circumstances were not outweighed by any mitigating circumstances, did not remove jury's discretion or deprive defendant of "judgment of his peers" in violation of section of Tennessee Constitution. T.C.A. s 39-2-203(g);  Const. Art. 1, s 8.

[7] HOMICIDE k351
203k351
Death penalty sentencing statute does not impose presumption of death upon finding of one aggravating circumstance, so as to improperly shift burden of proof from state to defendant.  T.C.A. s 39-2-203(i)(7) (now s 39-13-204(i)(7));  U.S.C.A. Const.Amend. 14.

[8] JURY k110(14)
230k110(14)

COPR. (C) WEST 1993 NO CLAIM TO ORIG. U.S. GOVT. WORKS

Respondent's Exhibit E

Failure to correctly exclude juror for cause is grounds for reversal only if defendant exhausts all his peremptory challenges and incompetent juror is forced upon him;  error in failing to remove juror for cause is harmless unl` ~
` y who heard case was not fair and impartial.  U.S.C.A. Const.Amend. 6;
`_.st. Art. 1, s 9.

[9] CRIMINAL LAW k1166.16
110k1166.16
Defendant was not deprived of opportunity to impanel fair and impartial jury, even assuming that he was improperly forced to exhaust all his peremptory challenges on jurors that should have been excused for cause, where he did not show how he was prejudiced by not being able to peremptorily challenge any of jurors who ultimately heard case.  U.S.C.A. Const.Amend. 6;  Const. Art. 1, s 9.

[10] CRIMINAL LAW k412(3)
110k412(3)
In murder prosecution involving black victim, defendant's statement, made on morning of murder, that he disliked blacks came within state of mind exception to hearsay rule.  Rules of Evid., Rule 803(3);  Const. Art. 1, ss 8, 16.

[10] CRIMINAL LAW k419(2.20)
110k419(2.20)
In murder prosecution involving black victim, defendant's statement, made on morning of murder, that he disliked blacks came within state of mind exception to hearsay rule.  Rules of Evid., Rule 803(3);  Const. Art. 1, ss 8, 16.

[11] CRIMINAL LAW k406(5)
`'`0k406(5)
 murder trial involving black victim, defendant's out-of-court statements that he disliked blacks, was member of Ku Klux Klan, and had once busted black man in mouth for saying "Hi" to him were admissions, regardless of whether statements were treated as exception to hearsay evidence rule, or as admission not governed by rule.  Const. Art. 1, ss 8, 16.

[12] HOMICIDE k156(2)
203k156(2)
Defendant's statements that he disliked blacks, was a member of the Ku Klux Klan, and once had busted black man in mouth for saying "Hi" to him were relevant in capital murder prosecution to show premeditation and motive and to contradict defendant's statement that third party was leader in commission of crime.  Const. Art. 1, ss 8, 16.

[12] HOMICIDE k158(1)
203k158(1)
Defendant's statements that he disliked blacks, was a member of the Ku Klux Klan, and once had busted black man in mouth for saying "Hi" to him were relevant in capital murder prosecution to show premeditation and motive and to contradict defendant's statement that third party was leader in commission of crime.  Const. Art. 1, ss 8, 16.

COPR. (C) WEST 1993 NO CLAIM TO ORIG. U.S. GOVT. WORKS

685

Respondent's Exhibit E

[13] CRIMINAL LAW k338(7)
110k338(7)
.dicial effect did not substantially outweigh probative value of
u.fendant's statements, for purposes of their admission in capital murder
prosecution involving black victim; witness testified that defendant told
witness, on morning of murder, that he was member of Ku Klux Klan, that he
disliked blacks, and that he once had busted black man in mouth for saying "Hi"
to him. U.S.C.A. Const.Amends. 6, 14; Const. Art. 1, ss 8, 16.

[14] CRIMINAL LAW k1169.9
110k1169.9
Admitting police detective's lay opinion, in murder prosecution, that bloody T-
shirt around neck of victim had been used as gag, even assuming it was
inadmissible lay opinion, was harmless error where defendant admitted in his
taped confession that victim was gagged. Const. Art. 1, ss 8, 16; U.S.C.A.
Const.Amends. 6, 14.

[15] CRIMINAL LAW k438(2)
110k438(2)
Photograph of knife defendant had in his possession at time of arrest was
relevant to rebut defendant's claim in capital murder case that he was unjustly
attacked by police dogs during arrest, and its probative value was not
substantially outweighed by its prejudicial effect; photograph depicted common
butcher knife, rather than a specially designed knife such as murder weapon
employed in crime. Const. Art. 1, ss 8, 16; U.S.C.A. Const.Amends. 6, 14.

[15] CRIMINAL LAW k438(7)
438(7)
.ograph of knife defendant had in his possession at time of arrest was
relevant to rebut defendant's claim in capital murder case that he was unjustly
attacked by police dogs during arrest, and its probative value was not
substantially outweighed by its prejudicial effect; photograph depicted common
butcher knife, rather than a specially designed knife such as murder weapon
employed in crime. Const. Art. 1, ss 8, 16; U.S.C.A. Const.Amends. 6, 14.

[16] HOMICIDE k358(1)
203k358(1)
Photographs of victim's body were relevant to prove aggravating circumstance
that murder was especially heinous, atrocious or cruel in that it
involved torture or depravity of mind in penalty phase of capital murder
prosecution. Const. Art. 1, ss 8, 16; U.S.C.A. Const.Amends. 6, 14; T.C.A. s
39-2-203(i)(5) (now s 39-13-204(i)(5)).

[17] HOMICIDE k358(1)
203k358(1)
Probative value of photographs of victim's body substantially outweighed their
prejudicial effect in sentencing phase of capital murder prosecution where they
were relevant to prove one of aggravating circumstances, that murder was

COPR. (C) WEST 1993 NO CLAIM TO ORIG. U.S. GOVT. WORKS

Respondent's Exhibit E

**Cite as: 840 S.W.2d 317)**
especially heinous, atrocious or cruel in that it involved torture or depravity
of mind.  Const. Art. 1, ss 8, 16;  U.S.C.A. Const.Amends. 6, 14;  T.C.A. s 39-
2-?03(i)(5)  (now s 39-13-204(i)(5)).

[10] HOMICIDE k18(1)
203k18(1)
There was no requirement that murder occur as proximate cause of kidnapping
before murder could be deemed first degree pursuant to first-degree murder
statute requiring that murder be "committed in the perpetration of"
kidnapping.  T.C.A. s 39-2-301(a);  s 39-2-202(a)  (now s 39-13-202(a)).

[19] HOMICIDE k235
203k235
Evidence was sufficient to sustain conviction of first-degree felony-murder
involving kidnapping of victim, who was taken to wooded area against his will,
and there beaten and stabbed to death.  T.C.A. s 39-2-301(a);  s 39-2-
202(a)  (now s 39-13-202(a)).

[20] CRIMINAL LAW k662.1
110k662.1
Confrontation clause of Sixth Amendment provides two types of protection for
criminal defendants--right to physically face those who testify against
defendants, and right to cross-examine witnesses.  U.S.C.A. Const.Amend. 6.

[20] CRIMINAL LAW k662.7
110k662.7
Confrontation clause of Sixth Amendment provides two types of protection for
criminal defendants--right to physically face those who testify against
? 'endants, and right to cross-examine witnesses.  U.S.C.A. Const.Amend. 6.

[21] CRIMINAL LAW k662.4
110k662.4
Sixth Amendment right to cross-examine witnesses does not include power to
require pretrial disclosure of any and all information that might be useful in
contradicting unfavorable testimony.  U.S.C.A. Const.Amend. 6.

[21] CRIMINAL LAW k662.7
110k662.7
Sixth Amendment right to cross-examine witnesses does not include power to
require pretrial disclosure of any and all information that might be useful in
contradicting unfavorable testimony.  U.S.C.A. Const.Amend. 6.

[22] CRIMINAL LAW k662.7
110k662.7
Right to confront witnesses is satisfied if defense counsel receives wide
latitude at trial to cross-examine, because confrontation clause only
guarantees opportunity for effective cross-examination, not cross-examination
that is effective in whatever way, to whatever extent, defense might wish.
U.S.C.A. Const.Amend. 6.

                    COPR.  (C) WEST 1993 NO CLAIM TO ORIG. U.S. GOVT. WORKS

687

Respondent's Exhibit E

[23] CRIMINAL LAW k627.6(6)
110k627.6(6)
Trial court erred in denying defense counsel's motion to look at recent
r    iatric hospitalization records of prosecution witness without first
.uucting in camera inspection of records to determine what, if any, probative
information regarding witnesses' veracity they contained;  psychiatric records
pertained to mental instability of witness that existed within reasonable time
before testimony was given, which was relevant in determining veracity.

[23] CRIMINAL LAW k627.8(4)
110k627.8(4)
Trial court erred in denying defense counsel's motion to look at recent
psychiatric hospitalization records of prosecution witness without first
conducting in camera inspection of records to determine what, if any, probative
information regarding witnesses' veracity they contained;  psychiatric records
pertained to mental instability of witness that existed within reasonable time
before testimony was given, which was relevant in determining veracity.

[24] CRIMINAL LAW k662.4
110k662.4
Defendant was not denied opportunity to effectively cross-examine prosecution
witness in violation of his constitutional rights when he was denied access to
witness' recent psychiatric hospitalization records where records indicated
that witness was hospitalized at time of trial for what were essentially
behavioral problems and information contained in record had little relevance to
witness' credibility or probative value of his testimony;  nor was defense
counsel prevented from asking witness about his hospitalization.  U.S.C.A.
Const.Amend. 6;  Const. Art. 1, s 9.

    CRIMINAL LAW k700(3)
1..Jk700(3)
Defense counsel was not entitled to review psychiatric hospitalization records
of prosecution witness under Brady where there was no showing that records
contained any material evidence favorable to defendant.  U.S.C.A. Const.Amend.
14.

[26] CRIMINAL LAW k627.6(6)
110k627.6(6)
Defendant was not entitled to discovery of psychiatric records of prosecution
witness pursuant to rule entitling defendant to inspect physical or mental
examinations or other records "within possession, custody or control" of state,
since there was no evidence that psychiatric hospital, in which witness was
hospitalized and which generated records, was connected in any way with state;
additionally, there was no showing that information contained in
records was material to preparation of defense.  Rules Crim.Proc., Rule
16(a)(1)(D).

[27] CRIMINAL LAW k7211/2(1)
110k7211/2(1)
Under missing witness rule, party is entitled to argue, and have jury
                COPR. (C) WEST 1993 NO CLAIM TO ORIG. U.S. GOVT. WORKS

Respondent's Exhibit E

688

Cite as: 840 S.W.2d 317)

instructed, that if other party has it peculiarly within his power to produce witness whose testimony would naturally be favorable to him, failure to call that witness creates adverse inference that testimony would not favor his c :entions.

[27] CRIMINAL LAW k788
110k788
Under missing witness rule, party is entitled to argue, and have jury instructed, that if other party has it peculiarly within his power to produce witness whose testimony would naturally be favorable to him, failure to call that witness creates adverse inference that testimony would not favor his contentions.

[28] CRIMINAL LAW k1037.1(2)
110k1037.1(2)
Issue of whether failure to instruct jury and allow comment on missing witnesses impermissively shifted burden of proof was not preserved for review where defendant did not raise argument during guilt phase of capital murder trial.   Rules App.Proc., Rule 3(e).

[28] CRIMINAL LAW k1038.2
110k1038.2
Issue of whether failure to instruct jury and allow comment on missing witnesses impermissively shifted burden of proof was not preserved for review where defendant did not raise argument during guilt phase of capital murder trial.   Rules App.Proc., Rule 3(e).

[29] HOMICIDE k358(1)
2` `k358(1)
L  endant was properly precluded from using missing witness rule during sentencing phase of capital murder trial with respect to separately tried accomplices, notwithstanding argument that ruling precluded him from taking advantage of adverse inference to prove statutory mitigating circumstance that defendant was accomplice and that his participation in murder was relatively minor;  nothing suggested that co-defendants, who had already been convicted, were naturally inclined to testify favorably for state;  there was no pending plea bargain agreement between them and state at time of defendant's trial and no evidence that it was peculiarly within power of state to produce co-defendants to testify.   T.C.A. s 39-2-203(j)(5) (now s 39-13-204(j)(5)).

[30] CRIMINAL LAW k829(1)
110k829(1)
Trial court did not improperly refuse defendant's request for special instructions in capital murder prosecution where some of proposed instructions incorrectly stated law, while other proposed instructions were adequately covered in actual charge to jury.

[30] CRIMINAL LAW k835
110k835
Trial court did not improperly refuse defendant's request for special
COPR. (C) WEST 1993 NO CLAIM TO ORIG. U.S. GOVT. WORKS

689

Respondent's Exhibit E

**Cite as: 840 S.W.2d 317)**

instructions in capital murder prosecution where some of proposed instructions incorrectly stated law, while other proposed instructions were adequately covered in actual charge to jury.

[ ] CRIMINAL LAW k1213.8(8)
110k1213.8(8)
Death penalty in and of itself is not cruel and unusual punishment under State or Federal Constitutions. U.S.C.A. Const.Amend. 8; Const. Art. 1, ss 8, 16.

[32] HOMICIDE k144
203k144
Prosecution was not required to prove elements of malice, deliberation and premeditation, or that defendant intended to kill victim, under Tennessee's statutory definition of felony-murder; where offense was committed in perpetration of designated felony, elements of malice, deliberation and premeditation were implied. T.C.A. s 39-2-202(a) (now s 39-13-202(a)).

[33] HOMICIDE k18(5)
203k18(5)
Defendant who was willing and active participant in robbery becomes accountable for all consequences flowing from robbery and may be convicted of first-degree murder where coperpetrator of felony is actual killer. T.C.A. s 39-2-202(a) (now s 39-13-202(a)).

[34] HOMICIDE k18(1)
203k18(1)
Result of felony-murder doctrine in Tennessee is to impose rule of strict liability allowing underlying felonious intent to supply required mens rea for homicidal actus reus and to impose vicarious liability for acts of another. T.C.A. s 39-2-202(a) (now s 39-13-202(a)).

[35] HOMICIDE k18(1)
203k18(1)
Tennessee's felony-murder statute allowed convictions for first-degree felony-murder of those who commit accidental killings, and of persons who did not kill victim and may not have intended that victim be killed or suffer any physical harm. T.C.A. s 39-2-202(a) (now s 39-13-202(a)).

[36] CRIMINAL LAW k1213.8(8)
110k1213.8(8)
Death penalty is only permissible under Eighth and Fourteenth Amendments for one who himself kills, attempts to kill, or intends that killing take place or that legal force will be imposed, or for one whose personal involvement in underlying felony is substantial and who exhibits reckless disregard or indifference to value of human life--although there is no intent to kill. U.S.C.A. Const.Amends. 8, 14.

[36] HOMICIDE k357(12)
203k357(12)
Death penalty is only permissible under Eighth and Fourteenth Amendments for

COPR. (C) WEST 1993 NO CLAIM TO ORIG. U.S. GOVT. WORKS

Respondent's Exhibit E

690

40 S.W.2d 317
(Cite as: 840 S.W.2d 317)
one who himself kills, attempts to kill, or intends that killing take place or
that legal force will be imposed, or for one whose personal involvement in
underlying felony is substantial and who exhibits reckless disregard or
   ifference to value of human life--although there is no intent to kill.
U.S.C.A. Const.Amends. 8, 14.


[37] HOMICIDE k357(7)
203k357(7)
Death penalty for felony-murder in Tennessee does not per se violate Tennessee
Constitution.   Const. Art. 1, s 16.


[38] HOMICIDE k356
203k356
After restricting class of death eligible offenses, state must utilize
additional procedures that assure reliability in determination that death is
appropriate punishment in given capital case.   U.S.C.A. Const.Amend. 8.


[39] HOMICIDE k356
203k356
To meet requirement in capital murder case that death be appropriate
punishment, state must permit sentencer to make individualized determination on
basis of character of individual and circumstances of case;   defendant is thus
entitled to present and have sentencer fully consider all relevant evidence in
mitigation of sentence, and state is allowed, but not required, to present wide
range of evidence in aggravation, so long as it is relevant to sentencing
decision and promotes reliability of determination.   U.S.C.A. Const.Amend. 8.


[40] CRIMINAL LAW k1213.8(8)
    )k1213.8(8)
. .ate, in order to satisfy Eighth Amendment criteria for imposition of death
penalty, must not only genuinely narrow class of death eligible defendants, but
must do so in way that reasonably justifies imposition of more severe sentence
on defendant compared to others found guilty of murder;   proper narrowing
device must differentiate death penalty in case in objective, evenhanded and
substantially rational way from many murder cases in which death penalty may
not be imposed.   U.S.C.A. Const.Amend. 8.


[41] HOMICIDE k357(4)
203k357(4)
Since absence of reckless indifference constitutionally immunizes defendant
from death penalty, presence of reckless indifference cannot meaningfully
further narrow class of death eligible defendants and thereby serve as
permissible aggravating circumstance in felony-murder case.   U.S.C.A.
Const.Amend. 8.


[42] CRIMINAL LAW k1213.8(8)
110k1213.8(8)
When defendant is convicted of first-degree murder solely on basis of felony-
murder, felony-murder aggravating circumstance does not narrow class of death
eligible murderers sufficiently to satisfy Eighth Amendment and Tennessee
                     COPR. (C) WEST 1993 NO CLAIM TO ORIG. U.S. GOVT. WORKS


691

Respondent's Exhibit E

Constitution;  thus that aggravating circumstance is unconstitutionally applied
where death penalty is imposed upon conviction of felony-murder, and should not
be given;  overruling State v. Smith, 754 S.W.2d 757.

[ 5] HOMICIDE k345
203k345
Resentencing was required in capital murder case in which defendant was
convicted of felony-murder and one of two aggravating circumstances found by
jury, was duplicative felony-murder aggravating circumstance;  although
evidence amply supported additional aggravating circumstance of murder being
especially heinous, atrocious or cruel in that it involved torture or depravity
of mind, reviewing court was unable to conclude that elimination of felony-
murder aggravating circumstance was harmless error beyond reasonable doubt.
T.C.A. s 39-2-203(i)(5, 7) (now s 39-13-204(i)(5, 7)).
**322** Lionel R. Barrett, Jr., Richard McGee, Paul G. Whetstone, Nashville,
for defendant-appellant.
Charles W. Burson, Atty. Gen. & Reporter and Kathy M. Principe, Asst. Atty.
Gen., Nashville, for plaintiff-appellee.

OPINION

ANDERSON, Justice.
In this capital case, the defendant, Donald Ray Middlebrooks, was found
guilty of first-degree felony murder and aggravated kidnapping, but found not
guilty of premeditated first-degree murder, armed robbery, and aggravated
sexual battery.  In the sentencing hearing, the jury found two aggravating
circumstances:  (1) that the murder was heinous, atrocious or cruel in that it
involved torture;  and (2) that it was committed while defendant was engaged in
committing a felony.  Tenn.Code Ann. **323** s 39-2-203(i)(5) and (7) (1982).
The jury found the aggravating circumstances sufficiently substantial to
outweigh the mitigating circumstances and sentenced the defendant to death by
electrocution.  The defendant was also sentenced to 60 years for aggravated
kidnapping.
On appeal, the defendant raises numerous issues for our review, which involve
alleged errors occurring at trial in both the guilt and sentencing phases.  We
have carefully considered the defendant's contentions as to the guilt phase and
find no error.  We, therefore, affirm the defendant's guilt. [FN1]  With
respect to the sentence, we wish to address an issue not directly raised by the
parties--the constitutionality of the death penalty as punishment for felony
murder.  A majority of the Court--Justices Anderson, Drowota, and O'Brien--
conclude that it is constitutional under both the state and federal
constitutions to impose the death penalty for felony murder under Tennessee's
death penalty statute.  Justices Daughtrey and Reid dissent.  A majority of the
Court--Justices Anderson, Daughtrey, and Reid--have determined, however, that
the statute as applied in this case does not sufficiently narrow the population
of death-eligible felony murder defendants under the Eighth Amendment to the
U.S. Constitution, and Article I, s 16 of the Tennessee Constitution, because
the aggravating circumstance set forth in Tenn.Code Ann. s 39-2-
203(i)(7) (1982), that the defendant was engaged in committing a felony,
essentially duplicates the elements of the offense of first-degree felony
murder set out in Tenn.Code Ann. s 39-2-202(a) (1982) and Tenn.Code Ann. s 39-

COPR. (C) WEST 1993 NO CLAIM TO ORIG. U.S. GOVT. WORKS

**Cite as: 840 S.W.2d 317, *323)**
2-202(a)(1) (Supp.1988).   Justices Drowota and O'Brien dissent.

   FN1. This Opinion has been divided into three parts for easier reference.
   The three parts are:   Part I, "Guilt Phase--Trial Errors," found on page
   326 of the Opinion;   Part II, "Constitutionality of the Death Penalty for
   Felony Murder," found on page 335 of the Opinion;   and Part III,
   "Sentencing Phase--Constitutional Application of Aggravating
   Circumstances," found on page 341 of the Opinion.   All Justices concur in
   Part I of the Opinion.   Justices Anderson, Drowota, and O'Brien concur in
   Part II of the Opinion, and Justices Reid and Daughtrey dissent.   Justices
   Anderson, Daughtrey, and Reid concur in Part III of the Opinion, and
   Justices O'Brien and Drowota dissent.

As a result of this determination and because the jury has found two
aggravating circumstances are supported by the evidence beyond a reasonable
doubt, it is necessary for this case to be remanded for resentencing.   Although
the evidence amply supports the aggravating circumstance found by the jury that
the murder was especially heinous, atrocious, or cruel in that it involved
torture or depravity of mind, Tenn.Code Ann. s 39-2-203(i)(5), we are unable to
conclude that the elimination of the other aggravating circumstance (i)(7) from
jury consideration is harmless error beyond a reasonable doubt.   We, therefore,
reverse the sentence on the grounds that the aggravating circumstance set out
in Tenn.Code Ann. s 39-2-203(i)(7) is unconstitutionally applied under the
Eighth Amendment to the U.S. Constitution and Article I, s 16 of the Tennessee
Constitution where the death penalty is imposed for felony murder, and remand
this case for a resentencing hearing, in which the State will be free to reseek
the death penalty if it so desires.
   Under our holding today, felony murder continues as a death-eligible
offense.   It requires, however, a finding of one of the eleven other
aggravating circumstances other than the duplicative circumstance of Tenn.Code
Ann. s 39-2-203(i)(7).

FACTUAL BACKGROUND

   The State's proof introduced at the guilt phase of the trial demonstrated that
on the evening of Sunday, April 26, 1987, around 7:00 p.m., the victim, Kerrick
Majors, a 14-year-old black male, was with four friends on Gallatin Road in
East Nashville, Tennessee, when they saw a table with a "lot of stuff" being
set up across the street as a flea market by three homeless street persons:
the defendant, Donald Middlebrooks (a 24-year-old white male);   his wife, 17-
year-old Tammy Middlebrooks;   and their companion, 16-year-old Roger
Brewington.   The five boys ran across Gallatin Road and were looking at the
flea market when Tammy *324 Middlebrooks called out, "Hey, leave our stuff
alone!"   The boys started running.   The defendant and Brewington chased them
until they caught Majors.   Brewington grabbed Majors in a "sleeper hold" around
his neck and head.   The defendant held his hand.   When Majors said, "Hey man,
you know me," Brewington responded, "Shut up, you nigger."   Shannon Stewart and
another of the boys, Tony Watson, saw the two men drag Majors toward the table
and observed the defendant strike him in the face, knocking him to the ground.
Frightened, the boys took off running.   Later that evening, they reported these
events to the victim's mother, who called the police.
   The next afternoon, Kerrick Majors' nude body was discovered lying face up in

                    COPR. (C) WEST 1993 NO CLAIM TO ORIG. U.S. GOVT. WORKS

                    Respondent's Exhibit E

a dry creek bed under a foam mattress in a heavily wooded area behind a
drugstore on Gallatin Road in the area where the defendant and Brewington had
caught Majors.  A bloodstained T-shirt was tied around his neck.  A red rope
was tied around Majors' left wrist, and there was a two-inch laceration in
his right wrist.  Abrasions, swelling, and bruising were present on the
victim's head, his left eye, his nose, his lips, and inside his mouth.  An "X"
with a vertical line running through it had been cut into his chest.  The
forensic pathologist, Dr. Charles Harlan, testified that these incisions had
been made while Majors was alive.  There were two deep stab wounds in the
center of the body.  One of these penetrated the left lung and pulmonary artery
and caused the victim to bleed to death over a period of ten to thirty minutes,
during part of which Majors was conscious.  Investigating officers noticed a
smell of urine about the face, and there were bruises and skinned areas on the
back.  A wooden stick with blood stains on one end was found lying close to the
victim's head.

  Around 1:10 a.m. on April 28, police investigators met Brewington at a
doughnut shop several miles from the Gallatin Road area.  Brewington directed
the officers to the location of a knife with a brass knuckle handle, which was
bloodstained.  Dr. Harlan testified that this knife could have inflicted the
deep stab wounds on the victim's body.  Brewington also directed the police to
a wooded area between Gallatin Road and Ellington Parkway in Nashville where,
around 7:00 a.m. on April 28, Donald and Tammy Middlebrooks were apprehended at
a small plywood shack.  The defendant, who resisted the arresting officers, had
a knife with him.  He was arrested with the aid of police dogs, taken to the
hospital for treatment of the dog bites, and later transported to police
headquarters.

  At 12:30 p.m. that day, the defendant gave a lengthy video-taped
statement about his involvement in the death of Kerrick Majors.  The defendant
admitted participating in the beating and mistreatment of Majors, but described
his role as minor and depicted Roger Brewington as the primary perpetrator of
the offense.  After Majors was caught, Middlebrooks said Brewington suggested
they "have some fun," and the three of them took Majors back into the woods.
His hands were tied.  Brewington slapped him, beat him with the knife's brass
knuckles, hit him with a stick, and urinated into his mouth.  The defendant
admitted striking Majors with his open hand and on the leg with a switch.
Defendant said that his wife Tammy had slapped Majors and burned Majors' nose
with a cigarette lighter as Brewington urged her on.  Brewington hit Majors on
his testicles, threatened to cut "it" open, stuck a stick up Majors' anus, hit
him some more with the brass knuckles, wiped the victim's blood on himself,
beat his mouth and tongue with a stick, dropped the knife on him, gagged him,
and slashed his wrist.  Finally, when the defendant asked Brewington to stop
because the victim's crying and pleading were getting on his nerves, Brewington
gave the victim "the kiss of death" on the forehead.  Brewington then gave the
defendant the knife and told him to stab Majors.  When the defendant refused,
Brewington stabbed Majors.  The defendant then reluctantly stabbed the victim,
according to him, "to prove to Roger that I guess I was cooler" and to put
Majors out of his misery.  In a previous statement, however, the defendant had
said that he had stabbed Majors twice.  The *325 victim's ordeal began at
7:30 p.m. and ended at 11:00 p.m. that night with the stabbing.

  The next day, the defendant said he and Brewington went back to where they had

COPR. (C) WEST 1993 NO CLAIM TO ORIG. U.S. GOVT. WORKS

Respondent's Exhibit E

left the body. Brewington kicked it and made the "X" lacerations at this
time. The defendant said he then covered Majors with a foam mattress. The
defendant admitted that before beating and killing Majors, he and Brewington
drunk alcohol and smoked marijuana.

The defendant presented no proof.

Based on this evidence, the jury found the defendant guilty of first-degree
murder in the perpetration of a felony and aggravated kidnapping, but not
guilty of premeditated first-degree murder, armed robbery, or aggravated sexual
battery.

In the sentencing phase of the trial, the state incorporated the evidence
presented at the guilt phase and introduced photographs of the victim's body
and of Roger Brewington. The defendant's main theory was that he was mentally
ill and that infliction of prolonged torture like that perpetrated on the
victim was inconsistent with his personality. His younger half-sister, Sharon
Fuchs, described their deprived and unstable childhood growing up in Texas.
According to her, the defendant's father had died when he was four, and he had
been subjected to mistreatment by his mother's husbands and boyfriends. The
crucial change in his personality, however, had occurred after he was sodomized
in his early teens by an adult male cousin who had been baby-sitting him and
his sister. After that, his grades dropped at school, he began to run away
from home, and becoming emotionally disturbed, was committed to the Waco State
Home for Children but ran away from that institution. Eventually, defendant
was imprisoned for his role in stealing a combine. While confined, he was
stabbed in the head with an ice pick. He then began having grand mal
seizures. The defendant had a history of admissions to mental hospitals and
mental health facilities in Texas. His sister described him as passive and
nonviolent and related how they had been cared for by a black woman, whom the
defendant had loved. She said her brother had had black friends and was not a
racist.

n Fuchs' cross-examination, the state introduced a document written by
Middlebrooks entitled "Debow's Revenge," in which the defendant listed Texas
law enforcement officers upon whom he planned vengeance for their offenses
against him. In a section called "Justified Death Plan," the defendant
described the tortures he intended to inflict upon these persons. Fuchs
explained that the document was written after the defendant had been released
in May 1986 from the Austin State Hospital, where he had been undergoing
psychiatric treatment, and testified that her brother had never acted on the
threats in the document.

Dr. Jay Woodman, a clinical psychologist, also testified that he had
interviewed, tested, and evaluated the defendant. He diagnosed the defendant
as suffering from a severe borderline personality disorder, with a secondary
diagnosis of an adjustment disorder with depressed mood, malingering,
polysubstance abuse, antisocial personality disorder, and a seizure disorder by
history. Dr. Woodman described the defendant as a passive follower, impulsive,
and unable to engage in inflicting torture for any protracted period of time.
Dr. Woodman said the defendant's intelligence was in the low-average category,
and that he had reviewed "Debow's Revenge" and thought that it was consistent
with the fantasies generated by the intense inner-personal anger of someone
suffering from a borderline personality disorder. Dr. Woodman felt that with
the proper medication, the defendant could behave in the structured environment

COPR. (C) WEST 1993 NO CLAIM TO ORIG. U.S. GOVT. WORKS

695

Respondent's Exhibit E

**Cite as: 840 S.W.2d 317, *325)**
of a prison if given a life sentence.

Based on the proof, the jury found the existence of two aggravating circumstances beyond a reasonable doubt.  The jury found that (1) the murder specially heinous, atrocious, or cruel in that it involved torture or depravity of mind, Tenn.Code Ann. s 39-2-203(i)(5) (1982), and that (2) the murder was committed while the defendant was engaged in committing *326 a felony, Tenn.Code Ann. s 39-2-203(i)(7) (1982).  In addition, the jury found that the two aggravating circumstances outweighed the mitigating circumstances.  As a result, the jury sentenced the defendant to death.

## PART I.
## GUILT PHASE--TRIAL ERRORS
### A. Motion To Suppress Confession

The first issue raised on this appeal is whether the trial court correctly overruled the defendant's motion to suppress his taped confession.  The defendant contends that his taped confession is inadmissible under the Fifth, Sixth, and Fourteenth Amendments to the U.S. Constitution, and Article I, s 9 of the Tennessee Constitution, because he did not knowingly and voluntarily waive his rights.  The defendant argues that the confession was involuntary because:  (1) he was not adequately apprised of his rights, (2) the circumstances surrounding his arrest, his low educational level, and his mental illness made it difficult for him to understand his rights, and (3) the police did not take the defendant before a magistrate "without unnecessary delay" as required by Tenn.R.Crim.P. 5(a).  We find no merit to this argument.

The Fifth Amendment to the U.S. Constitution, which is applicable to the states through the Fourteenth Amendment, see Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964), gives an accused the right not to be "compelled in any criminal case to be a witness against himself."  The Sixth Amendment to the U.S. Constitution, which is also applicable to the states through the Fourteenth Amendment, see Klopfer v. North Carolina, 386 U.S.

87 S.Ct. 988, 18 L.Ed.2d 1 (1967), gives an accused in all criminal prosecutions "the right ... to have the assistance of counsel for his defense."  Under the corresponding provisions of the Tennessee Constitution, "the accused hath the right to be heard by himself and his counsel ... and shall not be compelled to give evidence against himself."  Tenn. Const. art. I, s 9.

Although the right to counsel and the right against self-incrimination are constitutional rights, they may be waived provided the waiver is made "voluntarily, knowingly, and intelligently."  Miranda v. Arizona, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694, 706 (1966).  See also State v. Smith, 834 S.W.2d 915 (Tenn.1992).  In determining whether a confession has been made knowingly and voluntarily, courts must look to the totality of the circumstances.  Oregon v. Elstad, 470 U.S. 298, 318, 105 S.Ct. 1285, 1298, 84 L.Ed.2d 222, 238 (1985);  State v. Kelly, 603 S.W.2d 726, 728-29 (Tenn.1980).

Before there can be a voluntary and knowing waiver, "the accused must be adequately and effectively apprised of his rights."  Miranda, supra, 384 U.S. at 467, 86 S.Ct. at 1624, 16 L.Ed.2d at 719;  Smith, supra, 834 S.W.2d at 918.  At a minimum, the accused must be warned that he has the right to remain silent, that any statement made may be used as evidence against him, and that he has the right to have an attorney, whether retained or appointed,

COPR. (C) WEST 1993 NO CLAIM TO ORIG. U.S. GOVT. WORKS

Respondent's Exhibit E

696

present during questioning.  Miranda, supra, 384 U.S. at 444, 86 S.Ct. at
1612, 16 L.Ed.2d at 706;  Smith, supra, 834 S.W.2d at 918.

[1] The first argument made by the defendant is that his taped confession
v  involuntary, because he was not adequately advised of his rights.  The
e  lence presented at the hearing on the motion to suppress, however,
demonstrates that the defendant was more than adequately advised of his rights.
The defendant was advised of his Miranda rights three times before he gave
the taped confession.  The first was at the time of his arrest, when he was
being escorted to a patrol car from the wooded area where he was apprehended.
Although he was complaining about the dog bites at that time, the defendant
acknowledged that he understood his rights.  The second time was shortly after
he was placed in a patrol car to be transported to the hospital.  When he
started to say something to the transporting officer, he was immediately
advised of his rights and once again acknowledged that he understood them.
*327 The third and final time the defendant was advised of his rights
was shortly before the taped confession, after he had been treated and released
from the hospital.  After being advised for the third time, the defendant
acknowledged that he understood his rights and waived them by signing the
waiver of rights form read to him by Detective Pridemore.  Moreover, after
signing the waiver form, the defendant had one hour to think about his rights
and decide whether to confess while the officers were taking the statement of
Tammy Middlebrooks.  During this hour, the defendant was permitted to eat a
snack, drink a soda, and smoke a cigarette.

[2] Although he had been advised of his rights three times, the defendant
contends that the circumstances surrounding his arrest, particularly the dog
bites, prevented him from understanding his rights.  In addition, Middlebrooks
contends that his low educational level and his mental illness prevented him
from understanding his constitutional rights.

*n State v. Workman, 667 S.W.2d 44 (Tenn.1984), cert. denied, 469 U.S.
, 105 S.Ct. 226, 83 L.Ed.2d 155 (1984), this Court addressed a similar
a.gument in the context of a confession challenged on the basis that the
defendant was in no condition to waive his rights as a result of pain from dog
bites and a blow to the head.  In rejecting this argument, the Workman court
found that the defendant suffered "no material injury," and as a result, he was
alert and oriented when he was advised of his rights.  Id., 667 S.W.2d at
48.

As in Workman, we find that the defendant suffered no material injury
affecting his ability to understand his Miranda rights.  The evidence
presented at the suppression hearing demonstrates that Middlebrooks was alert
and oriented every time he was advised of his rights.

[3] With respect to the argument that his education level and mental illness
prohibited him from understanding his rights, we find no evidence in the
transcript of the motion to suppress to support such a contention.  Although
there is evidence in the trial transcript regarding the defendant's mental
capacity, no such evidence was presented during the suppression hearing.
Moreover, we are not convinced from the evidence presented at trial, or the
defendant's demeanor during the video-taped confession, that his mental
disabilities prevented him from understanding his rights.

[4] The final contention made by the defendant regarding the admissibility
of his confession is that it was involuntary, because the police failed to take
COPR. (C) WEST 1993 NO CLAIM TO ORIG. U.S. GOVT. WORKS

Respondent's Exhibit E

him before a magistrate "without unnecessary delay," as required by
Tenn.R.Crim.P. 5(a).  The defendant argues he should have been taken before a
magistrate during the three-hour time period between his release from the
hospital and the confession.  If he had been taken before a magistrate during
that time, the defendant contends that he might not have confessed.
  In making this argument, the defendant urges this Court to construe
Tenn.R.Crim.P. 5(a) in a manner similar to Fed.R.Crim.P. 5(a).  Rule 5(a) of
the Federal Rules of Criminal Procedure is construed by 18 U.S.C.A. s
3501(c) (1985), which provides that a confession made while in the custody of
law enforcement officers is not inadmissible solely because of delay in
bringing that person before a magistrate, if the confession was given within
six hours immediately following his arrest or other such detention.  Applying
this construction to Rule 5(a) of the Tennessee Rules of Criminal Procedure,
the defendant contends that his confession is inadmissible because he was
arrested at 7:00 a.m. and was not taken before a magistrate until after the
taping of his confession concluded at 1:30 p.m., six and one-half hours after
his arrest.
  This argument, however, was addressed and rejected in State v.
Readus, 764 S.W.2d 770 (Tenn.Crim.App.1988), appeal denied, id.
(Tenn.1989).  In Readus, after noting that Tennessee does not have a statute
similar to 18 U.S.C.A. s 3501(c), the Court of Criminal Appeals held that:
  [t]he better reasoned cases interpreting "unreasonable delay" in this context
say that it is one factor to be taken into *328 account in evaluating the
voluntariness of a confession;  and that if the totality of the circumstances
indicates that a confession was voluntarily given, it shall not be excluded
from evidence solely because of delay in carrying the confessor before a
magistrate.
  Id., 764 S.W.2d at 774.  See also State v. Taylor, 771 S.W.2d 387
(Tenn.1989).
  Applying this standard, we find that the defendant's confession was not
involuntary as a result of the delay in taking him before a magistrate.  There
is no evidence that coercive influences were exerted upon him during the time
period between his release from the hospital and the taped confession, except
for the inherently compelling atmosphere of being in police custody.  As stated
in State v. Smith, supra, 834 S.W.2d at 920, this single factor alone is not
sufficient to vitiate the voluntariness of a confession.  In addition,
Middlebrooks was adequately apprised of his rights and there is no evidence
that he failed to understand those rights.
  Accordingly, under the totality of the circumstances, we hold that the
defendant knowingly and voluntarily waived his constitutional rights and
voluntarily confessed his involvement in the murder of Kerrick Majors.  We
therefore affirm the trial court's denial of the motion to suppress.
                    B. Jury Discretion To Impose The Death Penalty
  [5] The next issue presented on this appeal is whether the trial court's
instructions removed the jury's discretion in deciding whether to impose the
death penalty in violation of the defendant's rights under Article I, ss 8, 16,
and 19 of the Tennessee Constitution.  The defendant contends that the trial
judge made the death penalty mandatory by instructing potential and actual
jurors, through both the juror information sheets and the jury instructions,
that if aggravating circumstances outweigh mitigating circumstances, the

                    COPR. (C) WEST 1993 NO CLAIM TO ORIG. U.S. GOVT. WORKS

                              Respondent's Exhibit E                    698

40 S.W.2d 317

Cite as: 840 S.W.2d 317, *328)

sentence shall be death.  We find no merit to this argument.
  In its instructions, the trial court tracked the language of Tenn.Code Ann. s
39-2-203(g) (1982), the governing sentencing statute at that time, which
provided that:
    [i]f the jury unanimously determines that at least one statutory aggravating
circumstance or several aggravating circumstances have been proved by the state
beyond a reasonable doubt, and said circumstance or circumstances are not
outweighed by any mitigating circumstances, the sentence shall be death.
  Therefore, the defendant's challenge to the court's instructions is really an
attack upon the sentencing statute.
  The defendant first argues that "the sentence shall be death" portion of the
statute violates Article I, s 19 of the Tennessee Constitution, which requires
that "in all indictments for libel, the jury shall have the right to determine
the law and the facts, under the direction of the court, as in other criminal
cases."  The defendant contends that the "shall" language of s 39-2-203(g)
deprives the jury of its constitutional powers under Article I, s 19, to impose
its own decision.  We disagree.
  This argument was recently addressed in State v. Black, 815 S.W.2d
166 (Tenn.1991), where we found that Tenn.Code Ann. s 39-2-203(g) does not
violate Article I, s 19 of the Tennessee Constitution.  Accordingly, we hold
that the judge's instructions, which merely tracked the language of the
statute, did not remove the jury's discretion in violation of Article I, s 19.
  [6] Along the same lines, the defendant argues that the judge's instructions
violated Article I, s 8 of the Tennessee Constitution, which provides "[t]hat
no man shall be taken or imprisoned, or disseized of his freehold, liberties or
privileges, or outlawed, or exiled, or in any manner destroyed or deprived of
his life, liberty or property, but by the judgment of his peers or the law of
the land."  Other than just citing the provision, however, counsel for the
defendant does not tell us how the instructions or the statute violates Article
I, s 8.  We can only surmise that counsel for the defendant believes that the
"shall" language of the statute removes the jury's discretion and deprives the
defendant of a "judgment of his peers."
  *329 We find the rationale of State v. Black, supra, under Article I, s
19, to be equally applicable to Article I, s 8.  Accordingly, we hold that
Tenn.Code Ann. s 39-2-203(g) does not remove the jury's discretion and deprive
the defendant of a "judgment of his peers" in violation of Article I, s 8.
  [7] The defendant further contends that the jury instructions created a
presumption of death, whereby the jury had to automatically impose the death
penalty as soon as it found him guilty of kidnapping, a statutory aggravating
circumstance under Tenn.Code Ann. s 39-2-203(i)(7) (1982).  As a result, the
defendant argues that the presumption created by the instructions improperly
shifted the burden of proof from the State to the defendant.
  Once again, this argument was recently addressed and rejected in State v.
Boyd, 797 S.W.2d 589 (Tenn.1990), where we found that the statute clearly
outlines where the burden of proof lies and does not impose a presumption of
death upon the finding of one aggravating circumstance.  Id., 797 S.W.2d at
596.  As a result, we hold that the judge's instructions did not create a
presumption of death and shift the burden of proof to the defendant.
                  C. Jury Voir Dire and Challenges For Cause
  The next issue we address is whether the trial court erred in failing to
                  COPR. (C) WEST 1993 NO CLAIM TO ORIG. U.S. GOVT. WORKS

699

Respondent's Exhibit E

strike certain jurors for cause.  The defendant contends that he had to exhaust his peremptory challenges on jurors that should have been excused for cause because their admitted beliefs in favor of the death penalty would have prevented them from following the law.  Since he had to exhaust his peremptory challenges on those jurors, the defendant argues that he was deprived of the opportunity to empanel a fair and impartial jury in violation of the Sixth Amendment to the U.S. Constitution, and Article I, s 9 of the Tennessee Constitution.

[8] Irrespective of whether the trial judge should have excluded the seven challenged jurors for cause, any error in this respect is harmless unless the jury who heard the case was not fair and impartial.  State v. Thompson, 768 S.W.2d 239, 246 (Tenn.1989).  It is a long-settled principle that a defendant who disagrees with a trial court's ruling on for cause challenges must, in order to preserve the claim that the ruling deprived him of a fair trial, exercise peremptory challenges to remove the jurors.  Even then, however, the failure to correctly exclude a juror for cause is grounds for reversal only if the defendant exhausts all of his peremptory challenges and an incompetent juror is forced upon him.  Ross v. Oklahoma, 487 U.S. 81, 89, 108 S.Ct. 2273, 2279, 101 L.Ed.2d 80, 91 (1988);  and State v. Jones, 789 S.W.2d 545, 549 (Tenn.1990).

[9] In this case, there is no claim, and the record does not show, that an incompetent juror was forced upon the defendant.  Although counsel for the defendant argues that he had to exhaust all of his peremptory challenges on jurors that should have been excluded for cause, he does not tell us how Middlebrooks was prejudiced by not being able to peremptorily challenge any of the jurors who ultimately heard the case.  The voir dire transcripts demonstrate that each juror hearing the case was competent, and there is no evidence that the defendant was deprived of a fair and impartial jury.  Accordingly, we find no merit to the defendant's argument.

### D. Admissibility of Evidence

The defendant further argues that the trial court erred in permitting certain evidence to be introduced at trial, thereby effectively denying Middlebrooks his right to a fair trial in violation of the Sixth and Fourteenth Amendments to the U.S. Constitution, and Article I, ss 8 and 16 of the Tennessee Constitution.  Specifically, the defendant challenges the admission of Shannon Stewart's testimony, the admission of Detective Moore's testimony, and the admission of photographs during the guilt and penalty phases of the trial.

The defendant contends that the trial court erred in allowing Shannon Stewart to testify that Middlebrooks told him on the morning of the murder that he was a member *330 of the Ku Klux Klan, that he disliked "niggers," and that he once busted a black man in the mouth for saying "hi" to him.  The defendant argues that this testimony is inadmissible hearsay, that it is irrelevant, and that its probative value is substantially outweighed by its prejudicial effect.  We find no merit to this argument.

[10] We conclude that the elicited testimony regarding the defendant's statement that he dislikes blacks fits within the state of mind exception of Tenn.R.Evid. 803(3), which provides in part, that "[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health)" is admissible hearsay.  Although the Tennessee Rules of

COPR. (C) WEST 1993 NO CLAIM TO ORIG. U.S. GOVT. WORKS

Respondent's Exhibit E

700

Evidence were not in effect at the time of trial, the rule merely restates the common law state of mind exception which has long been recognized by Tennessee courts.   Tenn.R.Evid. 803(3), Advisory Commission Comments.   Accordingly, the trial court correctly admitted Stewart's testimony about the defendant's statement evidencing his dislike for blacks under the state of mind exception to the hearsay rule.

[11] In addition, we find that all three of the defendant's statements were admissions, and are therefore admissible.   Under the Tennessee common law rules of evidence, the statements would be admissible as an exception to the hearsay rule.   State v. Jones, 598 S.W.2d 209, 223 (Tenn.1980).   On the other hand, under the Federal Rules of Evidence, the statements would be admissible non-hearsay.   Fed.R.Evid. 801(d)(2). Regardless, however, "whether a criminal defendant's own statement[s] be treated as an exception to the hearsay evidence rule, or as an admission not governed by the rule, the result is the same.   The admission is competent proof."   State v. Jones, supra, 598 S.W.2d at 223.

With respect to the other objections, the trial court ruled that the defendant's statements were relevant to the issue of premeditation, and that the probative value of the statements outweighed their prejudicial effect.   We agree.

[12][13] The testimony is clearly relevant to show premeditation and a motive for the victim's brutal slaying.   The testimony is also relevant to contradict the defendant's statement that Roger Brewington was the leader in the commission of the offense.   In addition, given the relevancy of the statements, we find that the prejudicial effect did not substantially outweigh their probative value.   State v. Banks, 564 S.W.2d 947, 951 (Tenn.1978). Accordingly, we hold that the trial court correctly admitted Shannon Stewart's testimony about these statements.

[14] The defendant next contends that the trial court erred in admitting the testimony of Detective Moore with respect to the issue of whether the bloody shirt around the victim's neck had been used as a gag.   Although he had not been offered as an expert, Detective Moore testified that the bloody T-shirt had been used as a gag.   After defense counsel objected and a bench conference was held, the trial judge allowed Detective Moore to testify as to whether the bloodstains on the T-shirt "appeared to correspond consistent with its use as a gag."   The defendant contends that this testimony is inadmissible lay opinion, which improperly encroaches upon the jury's fact-finding function.

A non-expert witness must ordinarily confine his testimony to a narration of facts based on first-hand knowledge and avoid stating mere personal opinions. Blackburn v. Murphy, 737 S.W.2d 529, 531 (Tenn.1987).   The purpose of this rule is "to preserve the primary fact-finding role of the jury, since '[i]t is the function of the witness to state evidentiary facts and the function of the jury to draw such conclusions as the facts warrant.' "   Id. (quoting Wilson v. Nashville, Chattanooga & St. Louis Ry., 16 Tenn.App. 695, 705, 65 S.W.2d 637, 643 (1933)).

Nevertheless, there are exceptions to the general rule.   "Non-expert opinion testimony can be admissible when 'such testimony describes observed facts in the only way in which they can be clearly described.' "   Id., 737 S.W.2d at 532 (quoting National Life & Accident Ins. Co. v. Follett, 168 Tenn. *331 647, 662, 80 S.W.2d 92, 98 (1935)).   Therefore, admissible lay opinion

COPR. (C) WEST 1993 NO CLAIM TO ORIG. U.S. GOVT. WORKS

701

Respondent's Exhibit E

testimony is limited to those circumstances

    [w]here facts perceived by the senses are numerous, and it is difficult to describe them adequately to the jury, and the conclusion or ~. ence to be drawn from such facts is simple and within the range of common .. erience, and the witness can relate what he has seen more accurately and more easily by stating his conclusion than by attempting to detail the [evidentiary] facts.

    Id. (quoting Reed v. Allen, 522 S.W.2d 339, 343 (Tenn.App.1974)).

    In this case, there is a close question as to whether Detective Moore's testimony crossed the line between permissible and impermissible lay opinion. However, even assuming it was inadmissible lay opinion, we find that any error in admitting his testimony was harmless. "An error is harmless or prejudicial depending on the extent to which the proof in the record exceeds the standard necessary to sustain a jury decision.... Thus, the more convincing the evidence, the less prejudicial the error." State v. Bobo, 727 S.W.2d 945, 955-56 (Tenn.1987). Since the defendant admitted in his taped confession that the victim was gagged, any error in admitting Detective Moore's testimony about the bloody T-shirt being used as a gag was harmless.

    The defendant further argues that the trial court erred in admitting prejudicial photographs during the trial. The defendant contends that it was error for the trial court to admit, during the guilt phase, a photograph of the knife he had in his possession when he was arrested. In addition, the defendant argues that it was error for the trial court to admit photographs of the victim during the penalty phase of the trial.

    Before admitting photographs, a trial judge must determine whether they are relevant, and whether their probative value is substantially outweighed by their prejudicial effect. State v. Banks, 564 S.W.2d 947, 949-51 (Tenn.1978). These determinations lie within the discretion of the trial ~ ~., and the trial court's rulings will not be disturbed on appeal unless ... is a clear showing of an abuse of discretion. Id., 564 S.W.2d at 949.

    [15] After examining the photographs, we find that the trial judge did not abuse her discretion by admitting them into evidence. The photograph of the knife was relevant to rebut the defendant's claim that he was unjustly attacked by the police dogs. Moreover, we fail to see how the defendant was prejudiced by admission of the photograph since it depicted a common butcher knife, rather than a specially designed knife such as the murder weapon, lying in the floor of the defendant's make-shift home.

    [16][17] The photographs of the victim's body were properly admitted during the penalty phase because they were relevant to prove one of the aggravating circumstances, i.e. that "the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind." Tenn.Code Ann. s 39-2-203(i)(5) (1982). Moreover, although Detective Moore testified as to the wounds and condition of the body, the photographs supplement his testimony and show the brutality employed by the killer in inflicting numerous wounds on the victim. State v. Miller, 771 S.W.2d 401, 404 (Tenn.1989); State v. Harbison, 704 S.W.2d 314, 318 (Tenn.1986). Accordingly, despite the fact that the photographs are graphic, we hold that their probative value is not substantially outweighed by their prejudicial effect.

        E. Felony Murder--Nexus Between Felony and Murder

    The next issue for our determination is whether the trial court

COPR. (C) WEST 1993 NO CLAIM TO ORIG. U.S. GOVT. WORKS

Respondent's Exhibit E

correctly overruled the defendant's motion for a judgment of acquittal.  The
defendant contends that the court should have granted the motion with respect
to the felony murder count of the indictment on the basis that there was an
" 'ufficient nexus" between the kidnapping and the murder, such that the
k..napping could not have been the proximate cause of the murder.  This
argument is clearly without merit.

*332 [18] The statute provides that "[e]very murder ... committed in the
perpetration of, or attempt to perpetrate, any ... kidnapping ... is murder in
the first degree."  Tenn.Code Ann. s 39-2-202(a) (1982 & Supp.1988).  Nowhere
in the statute is there a requirement that the murder occur as a proximate
cause of the kidnapping.  The statute only requires that the murder be
"committed in the perpetration of" a kidnapping, which is defined as the
unlawful seizure, confinement, or abduction of another with the felonious
intent to cause the other to be confined or detained secretly against his
will.  Tenn.Code Ann. s 39-2-301(a) (1982 & Supp.1988).

[19] The record clearly demonstrates that Kerrick Majors was seized in a
headlock and taken to a wooded area against his will.  The record also shows
that during the period he was being held against his will, Kerrick was beaten
and stabbed to death.  As a result, it is clear that the murder of Kerrick
Majors was "committed in the perpetration of" a kidnapping.

F. Psychiatric Records of Witness For Cross-Examination
The defendant argues that the trial court erred in refusing to allow defense
counsel access to the confidential psychiatric records of Shannon Stewart for
cross-examination.  Toward the end of the State's examination of Stewart,
defense counsel informed the court that he had just learned that morning that
Stewart was presently undergoing psychiatric care at Cumberland Hall
Psychiatric Hospital in Nashville.  As a result, defense counsel moved to
review Stewart's records from this hospitalization before beginning cross-
- mination to ascertain if his mental condition interfered with his memory of
, t events.

After reviewing Stewart's prior statements and his testimony at Roger
Brewington's trial, the trial court found that they were consistent with and
contained no substantial variation from his testimony at this trial to warrant
turning the records over to the defense, and denied defense counsel's motion.
For the purposes of appellate review, however, the trial court ordered a
transcript of Stewart's testimony at the Brewington trial and a sealed copy of
his psychiatric records to be made exhibits to the trial record.

The defendant contends that the trial court's failure to allow counsel to
examine Stewart's records deprived him of the opportunity to confront witnesses
against him, in violation of his rights under the Sixth and Fourteenth
Amendments to the U.S. Constitution, and Article I, s 9 of the Tennessee
Constitution.  In addition, the defendant contends that he was entitled to
review the records under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10
L.Ed.2d 215 (1963), and Tenn.R.Crim.P. 16(a)(1)(D).

The Sixth Amendment to the U.S. Constitution, which is applicable to
the States through the Fourteenth Amendment, see Pointer v. Texas, 380 U.S.
400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965), provides that "[i]n all criminal
prosecutions, the accused shall enjoy the right ... to be confronted with the
witnesses against him."  The corresponding provision of the Tennessee
Constitution provides "[t]hat in all criminal prosecutions, the accused hath

COPR. (C) WEST 1993 NO CLAIM TO ORIG. U.S. GOVT. WORKS

703

Respondent's Exhibit E

the right ... to meet the witnesses face to face." Tenn. Const. art. I, s 9.
Although the language is not identical, this Court has previously adopted the
standards of the U.S. Supreme Court under the Sixth Amendment in determining
whether there has been a violation of the confrontation clause of Article I, s
. State v. Armes, 607 S.W.2d 234, 237 (Tenn.1980).

[20][21][22] The confrontation clause of the Sixth Amendment provides two
types of protection for criminal defendants:  the right to physically face
those who testify against him, and the right to cross-examine witnesses.
Pennsylvania v. Ritchie, 480 U.S. 39, 51, 107 S.Ct. 989, 998, 94 L.Ed.2d 40,
53 (1987).  The right to cross-examine witnesses, however, does not include the
power to require the pretrial disclosure of any and all information that might
be useful in contradicting unfavorable testimony.  Id., 480 U.S. at 53, 107
S.Ct. at 999, 94 L.Ed.2d at 54.  Therefore, the right to confront witnesses is
satisfied if defense counsel receives wide latitude at trial to cross-
*333 examine, because the confrontation clause only guarantees "an
opportunity for effective cross-examination, not cross-examination that is
effective in whatever way, and to whatever extent, the defense might wish."
Id. (quoting Delaware v. Fensterer, 474 U.S. 15, 20, 106 S.Ct. 292, 294,
88 L.Ed.2d 15, 19 (1985)).

[23][24] In this case, we find that the defendant was not denied the
opportunity to effectively cross-examine Shannon Stewart.  The trial court
denied defense counsel's motion without conducting an in camera inspection of
the records to determine what, if any, probative information they contained.
This was error because the psychiatric records pertained to the mental
instability of a witness that existed within a reasonable time before the
testimony was given, which is relevant in determining veracity.  State v.
Barnes, 703 S.W.2d 611, 617-18 (Tenn.1985).  However, the error was harmless
because if the trial court had reviewed the records, as we have done, it would
have found that they contained very little information probative of Stewart's
credibility.

The records indicate that Stewart was hospitalized at the time of trial for
what were essentially behavioral problems.  As a result, the information
contained in the records had little relevance to Stewart's credibility or the
probative value of his testimony.  In addition, there is nothing in the trial
record to demonstrate that defense counsel was prevented from asking Stewart
about his hospitalization.  We therefore conclude that the defendant was not
denied the opportunity "to expose to the jury the facts from which jurors ...
could appropriately draw inferences relating to the reliability of the
witness."  Davis v. Alaska, 415 U.S. 308, 318, 94 S.Ct. 1105, 1111, 39
L.Ed.2d 347, 355 (1974).

[25] The defendant next argues that his counsel was entitled to
review the psychiatric records under Brady v. Maryland, 373 U.S. 83, 83
S.Ct. 1194, 10 L.Ed.2d 215 (1963).  In Brady, the Supreme Court held that it
is a violation of the due process clause of the Fourteenth Amendment for the
prosecution to suppress evidence favorable to an accused after a request for
disclosure "where the evidence is material either to guilt or to punishment,
irrespective of the good faith or bad faith of the prosecution."  Id., 373
U.S. at 87, 83 S.Ct. at 1196-97, 10 L.Ed.2d at 218.  Since there has been no
showing that records contained any material evidence favorable to the
defendant, we find no merit to this argument.

COPR. (C) WEST 1993 NO CLAIM TO ORIG. U.S. GOVT. WORKS

704

Respondent's Exhibit E

[26] The final argument raised by the defendant regarding the psychiatric records is that he was entitled to review them under Tenn.R.Crim.P. 16(a)(1)(D), which provides that:

'u]pon request of a defendant the state shall permit the defendant to inspi copy or photograph any results or reports of physical or mental examinations, and of scientific tests or experiments, or copies thereof, which are within the possession, custody or control of the state, the existence of which is known, or by the exercise of due diligence may become known, to the district attorney general and which are material to the preparation of the defense or are intended for use by the state as evidence in chief at the trial.

We find no merit to this argument because there is no evidence that Cumberland Hall is connected in any way with the State so that the records could be considered "within the possession, custody or control of the state" for discovery purposes under Rule 16(a)(1)(D).   State v. Fox, 733 S.W.2d 116, 118 (Tenn.Crim.App.1987).   In addition, there has been no showing that the information contained in the records was "material to the preparation of the defense."

Accordingly, we affirm the trial court's decision to deny counsel for the defendant access to Shannon Stewart's confidential psychiatric records.

### G. Jury Argument--Death Penalty Deterrence

The next issue raised by the defendant is whether the trial court erred in overruling the defendant's motion, prior to the sentencing phase, to prohibit the State from arguing to the jury the deterrent effect of the death penalty. In overruling the motion, *334 the trial judge indicated that she would allow argument on specific deterrence, i.e., deterrence of the defendant, as opposed to general deterrence, since the defendant had put on proof that, if properly medicated, he would function well under a life sentence.   The defendant contends that since defense counsel cannot argue that the death penalty has no deterrent effect under this Court's holding in State v. nson, 632 S.W.2d 542, 547-48 (Tenn.1982), then the State should not be allowed to argue that the death penalty does have a deterrent effect.

This argument is completely without merit.   We are unable to find, and counsel for the defendant has not pointed out, anywhere in the State's argument to the jury a reference to either the specific or general deterrent effect of the death penalty.

### H. Missing Witness Rule

[27] The defendant next argues on appeal that the trial court erred in refusing to give the jury instructions on the missing witness rule due to the absence of testimony from Middlebrook's co-defendants;  and whether the trial court erred in preventing defense counsel from commenting upon the absence of the co-defendants.   Under the missing witness rule, a party is entitled to argue, and have the jury instructed, that if the other party has it peculiarly within his power to produce a witness whose testimony would naturally be favorable to him, the failure to call that witness creates an adverse inference that the testimony would not favor his contentions.   State v. Francis, 669 S.W.2d 85, 88 (Tenn.1984);  State v. Jones, 598 S.W.2d 209, 224 (Tenn.1980).   Before the missing witness rule can be invoked, however, the evidence must show that "the witness had knowledge of material facts, that a relationship exists between the witness and the party that would naturally incline the witness to favor the party and that the missing witness was

COPR. (C) WEST 1993 NO CLAIM TO ORIG. U.S. GOVT. WORKS

705

Respondent's Exhibit E

available to the process of the Court for trial." Delk v. State, 590 S.W.2d 135, 440 (Tenn.1979).

[     ] The defendant contends that during the guilt phase of the trial, se counsel should have been able to comment upon, and have the jury tructed upon, the absence of testimony from Roger Brewington and Tammy Middlebrooks under the missing witness rule. The defendant argues that the trial court's refusal to instruct the jury and allow comment upon the missing witnesses left him with the only option of calling the co-defendants to testify, thereby impermissibly shifting the burden of proof in violation of the due process clause of the Fourteenth Amendment to the U.S. Constitution, and Article I, ss 8 and 17 of the Tennessee Constitution.

We find no merit to this argument because defense counsel expressly disavowed any intent to rely on the missing witness rule during the guilt phase. After closing argument, while arguing his motion for a mistrial, defense counsel stated that "I did not seek the missing witness charge because I did not think it was appropriate." Since defense counsel did not raise this issue during the trial or in the motion for new trial, the issue is waived and cannot be raised for the first time on appeal to this Court. Tenn.R.App.P. 3(e).

[29] Next, the defendant contends that the trial court erred in granting the State's motion to prevent defense counsel from arguing the missing witness rule to the jury during the sentencing phase. The defendant argues that the trial court's ruling was incorrect, and prevented him from taking advantage of the adverse inference to prove one of the statutory mitigating circumstances, i.e., that "[t]he defendant was an accomplice in the murder committed by another person and the defendant's participation was relatively minor." Tenn.Code Ann. s 39-2-203(j)(5) (1982). As a result, the defendant contends that the trial court's incorrect ruling denied him of his constitutional right to a fair trial and resulted in the arbitrary and capricious imposition of the death p    ty.

ind no merit to this argument because the trial court correctly ruled that the defendant could not argue the missing witness rule to the jury during the sentencing phase. After reviewing the requirements for invoking the missing witness rule, the trial court ruled that the defendant *335 had not met the requirements of expected favorable testimony and exclusive availability. We agree.

There is nothing in the record to indicate that a relationship existed between the State and either Roger Brewington or Tammy Middlebrooks such that would naturally incline them to testify favorably for the State. The co-defendants had already been convicted, and there was no pending plea bargain agreement between them and the State at the time of the defendant's trial. In addition, there is no evidence that it was peculiarly within the power of the State to produce the co-defendants to testify. Accordingly, we affirm the trial court's ruling on this issue.

### I. Requests For Jury Instructions

[30] The next issue for us to consider is whether the trial court erred in refusing to instruct the jury pursuant to the defendant's request for special instructions. The defendant contends that the trial court's refusal to instruct the jury in accordance with twelve special requests deprived him of his constitutional right to a fair trial.

After reviewing the proposed instructions and the actual jury charge, we find

COPR. (C) WEST 1993 NO CLAIM TO ORIG. U.S. GOVT. WORKS

Respondent's Exhibit E

706

no error in the trial court's refusal to give the proposed instructions.  Some of the proposed instructions incorrectly state the law, while the other proposed instructions were adequately covered in the judge's actual charge to t   jury.  Accordingly, since "[i]t is not error to refuse a special request where the charge as given fully and fairly states the applicable law," Edwards v. State, 540 S.W.2d 641, 649 (Tenn.1976), we affirm the trial court on this issue.

## PART II.

## CONSTITUTIONALITY OF THE DEATH PENALTY FOR FELONY MURDER

[31] The final issue raised on this appeal is whether the trial court erred in overruling the defendant's motion to dismiss the indictment on the basis that the death penalty is unconstitutional.  The defendant challenges the death penalty itself as cruel and unusual punishment under the Eighth Amendment to the U.S. Constitution, and Article I, s 16 of the Tennessee Constitution.  We find no merit to this argument.  It has been considered and rejected many times by this Court.  State v. Black, 815 S.W.2d 166, 185 (Tenn.1991);  and State v. McCormick, 778 S.W.2d 48, 53 (Tenn.1989).

Although the defendant has not directly raised the issue, we wish to address the issue of the constitutionality of Tennessee's death penalty statute as punishment for felony murder.  A majority of the present Court has held that the death penalty per se does not violate Article I, s 16 of the Tennessee Constitution, see State v. Black, supra, 815 S.W.2d at 189-91, but we have not yet considered the issue of the constitutionality of the death penalty as punishment for felony murder.

The imposition of the death penalty for the crime of murder has a long history of acceptance both in the United States and in England.  The common-law rule imposed a mandatory death sentence on all convicted murderers. McGautha v. California, 402 U.S. 183, 197-198, 91 S.Ct. 1454, 1462-1463, 28 L.Ed.2d 711 (1971).  And the penalty continued to be used into the 20th cent most American States, although the breadth of the common-law rule was diminished, initially by narrowing the class of murderers to be punished by death and subsequently by widespread adoption of laws expressly granting juries the discretion to recommend mercy.  Id., at 199-200, 91 S.Ct., at 1463-1464.  See Woodson v. North Carolina, 428 U.S. 280, 289-292, 96 S.Ct. 2978, 2984-2985, 49 L.Ed.2d 944.

Gregg v. Georgia, 428 U.S. 153, 176-77, 96 S.Ct. 2909, 2927, 49 L.Ed.2d 859, 876-77 (1976).

In Tennessee, under the pre-1989 law, first-degree murder was defined as follows:

[e]very murder perpetrated by means of poison, lying in wait, or by other kinds of willful, deliberate, malicious, and premeditated killing, or committed in the perpetration of, or attempt to perpetrate, any murder in the first degree, *336 arson, rape, robbery, burglary, larceny, kidnapping, aircraft piracy, or the unlawful throwing, placing or discharging of a destructive device or bomb....

Tenn.Code Ann. s 39-2-202(a) (1982 & Supp.1988) (emphasis added). With the exception of the inclusion of different underlying felonies over the years, the so-called felony murder statute remains essentially the same as that enacted in s 3 of Chapter 23 of the Public Acts of 1829. [FN2]  The 1829 Act was modeled on the Pennsylvania Act of 1794, 1794 Pa.Laws, ch. 1766, s 2, which

COPR. (C) WEST 1993 NO CLAIM TO ORIG. U.S. GOVT. WORKS

Respondent's Exhibit E

Cite as: 840 S.W.2d 317, *336)

divided the common-law offense of murder into two degrees in order to achieve proportionality in punishment and to restrict the imposition of the death penalty. See Keedy, History of the Pennsylvania Statute Creating Degrees of Murder, 97 U.Pa.L.Rev. 759 (1949); see also Bratton v. State, 29 Tenn. 103, 110 (1849) (recognizing the Pennsylvania statute is almost identical to Tennessee's).

   FN2. Norris held that the felony murder statute's failure to require intent to kill or express malice was not unconstitutional in a noncapital case. Agreeing, this Court has held that the felony murder statute does not violate the due process clause of the Fifth Amendment to the United States Constitution by elevating accidental killings, or those in self-defense, or a lesser degree of homicide to first-degree murder, if committed during one of the listed felonies. State v. Barber, 753 S.W.2d 659, 671 (Tenn.1988).

[32] Under Tennessee's statutory definition of felony murder, prior to the 1989 Code Revision, the prosecution is not required to prove the elements of malice, deliberation and premeditation, or that the defendant intended to kill the victim. State v. Johnson, 661 S.W.2d 854, 861 (Tenn.1983); Farmer v. State, 201 Tenn. 107, 115, 296 S.W.2d 879, 883 (1956); State v. Hopper, 695 S.W.2d 530, 535 (Tenn.Crim.App.1985); Tosh v. State, 527 S.W.2d 146, 147-48 (Tenn.Crim.App.1975). Instead, where the offense is committed in the perpetration of a designated felony, the elements of malice, deliberation and premeditation are implied. See State v. Barber, 753 S.W.2d 659, 671 (Tenn.1988); State v. Norris, 684 S.W.2d 650, 653 (Tenn.Crim.App.1984). [FN3]

   FN3. Norris held that the felony murder statute's failure to require intent to kill or express malice was not unconstitutional in a noncapital case. Agreeing, this Court has held that the felony murder statute does not violate the due process clause of the Fifth Amendment to the United States Constitution by elevating accidental killings, or those in self-defense, or a lesser degree of homicide to first-degree murder, if committed during one of the listed felonies. State v. Barber, 753 S.W.2d 659, 671 (Tenn.1988).

[33] The Tennessee offense extends both to the killer and his accomplices. A defendant who is a willing and active participant in a robbery becomes accountable for all of the consequences flowing from the robbery and may be convicted of first-degree murder where a co-perpetrator of the felony is the actual killer. Dupes v. State, 209 Tenn. 506, 512, 354 S.W.2d 453, 456 (1962); Woodruff v. State, 164 Tenn. 530, 537, 51 S.W.2d 843, 845 (1932); Moody v. State, 46 Tenn. 299, 305-307 (1869); State v. Brown, 756 S.W.2d 700, 703 (Tenn.Crim.App.1988); State v. Hopper, supra, 695 S.W.2d at 535.
[34][35] The result of the felony murder doctrine in Tennessee is thus to impose a rule of strict liability allowing the underlying felonious intent to supply the required mens rea for the homicidal actus reus and to impose vicarious liability for the acts of another. See, generally, Comment, The Constitutionality of Imposing the Death Penalty for Felony Murder, 15
                COPR. (C) WEST 1993 NO CLAIM TO ORIG. U.S. GOVT. WORKS

Respondent's Exhibit E

40 S.W.2d 317

Hous.L.Rev. 356, 366-369 (1978).  Therefore, Tennessee's statute allows convictions for first-degree felony murder of those who commit accidental killings, and of persons who did not kill the victim and may not have intend  ̊ t ̇  ̇ the victim be killed or suffer any physical harm.

 ̇ urts have often stated that the purpose of the felony murder rule is to deter felons from accidentally or negligently killing in the course of felonies by holding them strictly liable for the results of their dangerous conduct. See, e.g., People v. Washington, 62 Cal.2d 777, 781, 44 Cal.Rptr. 442, 445, 402 P.2d 130, 133 (1965);  State v. Lashley, 233 Kan. 620, 631, 664 *337 P.2d 1358, 1369 (1983);  Payne v. State, 81 Nev. 503, 506, 406 P.2d 922, 924 (1965).  Consistent with that purpose, many courts have limited the scope of the rule to felonies that are dangerous to human life. [FN4]

> FN4.  The rationale for limiting the rule to dangerous felonies is that in order for the potential felon to be deterred, he must foresee the possibility of death or injury resulting from the commission of the felony.

The felony murder doctrine has been frequently and negatively criticized by courts and legal commentators, the criticism by commentators becoming even more intense when felony murder is used to make a defendant death eligible.  See, e.g., People v. Aaron, 409 Mich. 672, 299 N.W.2d 304 (1980);  Finkel, Capital Felony-Murder, Objective Indicia, and Community Sentiment, 32 Ariz.L.Rev. 819 (1990);  Rosen, Felony Murder and the Eighth Amendment Jurisprudence of Death, 31 B.C.L.Rev. 1103 (1990);  Roth & Sundby, The Felony-Murder Rule:  A Doctrine at Constitutional Crossroads, 70 Cornell L.Rev. 446 (1985);  Comment, The Constitutionality of Imposing the Death Penalty for Felony Murder, 15 Hous.L.Rev. 356 (1978).

As more refined standards of culpability have developed, some courts and c ̃ mmentators have said that the intent to commit a felony is not equivalent ( ̇  other mental states associated with murder.  See W. LaFave and A. Scott, Handbook on Criminal Law, s 71, at 554 (1972).  As a result of this and other criticisms, some jurisdictions have abolished the felony murder rule by statute or by judicial action. [FN5]

> FN5. The rule was abolished in England in 1957.  See Homicide Act 1957, 5 & 6 Elizabeth II, ch. 11, s 1.  Alaska, Hawaii, and Kentucky have abolished the felony murder rule by statute, requiring that the killing be intentional or knowing.  In Michigan, the judiciary abrogated the rule in People v. Aaron, 409 Mich. 672, 299 N.W.2d 304 (1980).  Legislatures in other jurisdictions have responded to the criticisms by requiring proof of a higher degree of culpability.  For example, Arkansas and New Hampshire require proof of recklessness in addition to commission of a felony.  See Ark.Stat.Ann. s 41-1502 (1977) and N.H.Rev.Stat.Ann. s 630:1, subd. I(a), (b) (1974).

Nonetheless, the vast majority of states that have the death penalty permit it to be imposed in cases of felony murder under some circumstances.  Few legislatures have repealed the doctrine, and the courts have generally continued to enforce it.  There are thirty-six states which allow the imposition of the death penalty, and thirty-two of these states allow the death

COPR. (C) WEST 1993 NO CLAIM TO ORIG. U.S. GOVT. WORKS

Respondent's Exhibit E

penalty for felony murder.  Finkel, Capital Felony-Murder, Objective Indicia, and Community Sentiment, 32 Ariz.L.Rev. at 890.  Most states impose the dr  h penalty only where killings perpetrated during felonies are intentional, ?  erate, purposeful or knowing.  The number of states allowing capital ṭ ⅛ shment for pure felony murder, or felony murder simpliciter, is a distinct minority.  Tennessee moved out of that status in 1989 by amending its first-degree murder statute to provide that first-degree murder occurs only where a killing in the perpetration of one of the listed felonies is reckless.  See Tenn.Code Ann. s 39-13-202(a)(2) (1991). [FN6]

> FN6.   "Reckless" is defined as the actions of one who acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur.  The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as reviewed from the accused person's standpoint.
> Tenn.Code Ann. s 39-11-106(a)(31).

The minimum standards for determining whether a sentence of death may be constitutionally imposed under the United States Constitution for felony murder are indicated by the United States Supreme Court in Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), and Tison v. Arizona, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987), which dealt with the problem of imposing the death penalty in cases of vicarious liability for felony murder, i.e., where an accomplice in the felony, one who did not actually kill the victim, is convicted of murder under the felony murder (  ·ine and receives the death penalty.

  , [36] Under the rules of those cases, the death penalty is only permissible under the Eighth and Fourteenth Amendments for one who himself kills, attempts to kill, or intends that a killing take place or that lethal force will be imposed, Enmund, 458 U.S. at 797, 102 S.Ct. at 3376, 73 L.Ed.2d at 1151, or for one whose personal involvement in the underlying felony is substantial and who exhibits a reckless disregard or indifference to the value of human life--although there is no intent to kill, Tison, 481 U.S. at 157-58, 107 S.Ct. at 1687-88, 95 L.Ed.2d at 144.

[37] These federal standards do not, however, answer the question under the state constitution.  As Justice Brock observed in his dissent in State v. Dicks, 615 S.W.2d 126, 132 (Tenn.1981), we may not impinge upon the minimum level of protection established by Supreme Court interpretations of the federal constitutional guarantee, but may impose higher standards and stronger protections than those set by the federal constitution.

The present Court first examined the constitutionality of the imposition of capital punishment under Article I, s 16 of the state constitution in State v. Black, 815 S.W.2d 166 (Tenn.1991).  There, we elected to follow the analysis of Gregg v. Georgia, supra, under which three inquiries are required:

  First, does the punishment for the crime conform with the contemporary standards of decency?  Second, is the punishment grossly disproportionate to the offense?  Third, does the punishment go beyond what is necessary to

                    COPR. (C) WEST 1993 NO CLAIM TO ORIG. U.S. GOVT. WORKS

Respondent's Exhibit E

710

accomplish any legitimate, penological objective?
  State v. Ramseur, 106 N.J. 123, 169, 524 A.2d 188, 210 (1987) (citing
Gregg v. Georgia, 428 U.S. at 173, 96 S.Ct. at 2925, 49 L.Ed.2d at 874-75).

     Black, a majority of the present Court reaffirmed the prior holdings of
this Court that the death penalty does not per se violate Article I, s 16, of
the Tennessee Constitution.  815 S.W.2d at 190-91.  As a part of our
analysis, we said that the legislative and constitutional history of Tennessee
indicates a clear intent that the death penalty is, in some cases, an
appropriate form of punishment, and that by reason of the language of the
Constitution, the framers recognized the acceptability of capital punishment.
Id., 815 S.W.2d at 188.  In addition, we noted that nothing in the
constitutional legislative history mandates that death is invalid per se as
cruel and unusual punishment under Article I, s 16.  Id.
  In determining whether the death penalty conforms with contemporary
standards of decency for the crime of felony murder, we recognize that an
assessment of contemporary values is relevant and that the standards of decency
are not static, but are evolving as society matures.  See Trop v. Dulles,
356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630, 642 (1958).  As Gregg v.
Georgia teaches, this assessment of contemporary values is not subjective, but
an examination of objective indicia that reflect the public attitude towards a
given sanction.  428 U.S. at 173, 96 S.Ct. at 2925, 49 L.Ed.2d at 874.
  It is evident that a large proportion of Tennessee society continues to find
the death penalty for felony murder an appropriate and necessary criminal
sanction.  This approval is clearly evidenced by the actions of the General
Assembly in re-enacting the 1977 felony murder statute after the 1972 decision
of the United States Supreme Court in Furman v. Georgia, 408 U.S. 238, 92
S.Ct. 2726, 33 L.Ed.2d 346 (1972), and our own state court decisions declaring
the prior statute allowing the death penalty unconstitutional.  See Collins
     State, 550 S.W.2d 643 (Tenn.1977), cert. denied sub nom. Morgan v.
Tennessee, 434 U.S. 905, 98 S.Ct. 303, 54 L.Ed.2d 192 (1977);  State v.
Hailey, 505 S.W.2d 712 (Tenn.1974).  The General Assembly's response to these
court actions was to enact new statutes addressing the concerns expressed by
the Furman court, but which continued to provide for the death penalty for
felony murder.  Legislatures of at least thirty-four other states took similar
actions.  See Gregg v. Georgia, 428 U.S. at 179-80, 96 S.Ct. at 2928, 49
L.Ed.2d at 878.  As recently as 1989, the General Assembly reaffirmed that
position.  See Revised *339 Criminal Code of 1989, 1989 Tenn.Pub.Acts, ch.
591, s 1.
  Examination of other state systems reveals that capital punishment for felony
murder in some circumstances is acceptable in at least thirty-two of the
thirty-six states with the death penalty.  Finkel, Capital Felony-Murder,
Objective Indicia, and Community Sentiment, 32 Ariz.L.Rev. at 890.  In four
states--Florida, Georgia, South Carolina, and Wyoming--there is presently no
requirement of culpability.  See Fla.Stat.Ann. s 782.04, and s
921.141(5)(d) (West Supp.1992);  Ga.Code Ann. s 26-1101 and s 27-2534.1 (Michie
1988);  S.C.Code Ann. s 16-3-20(C)(a)(1) (Law.Co-op.Supp.1991);  and
Wyo.Stat. s 6-2-101(a) and s 6-2-102(h)(iv) (Supp.1991).  Tennessee, as noted
above, was previously a member of this minority position.
  In addition to the legislative response, as Gregg v. Georgia points out,
the jury is a significant and reliable objective index of contemporary values
                COPR. (C) WEST 1993 NO CLAIM TO ORIG. U.S. GOVT. WORKS

711

because it is so directly involved and because it maintains a link between contemporary community values and the penal system.  428 U.S. at 181, 96 S. Ct. at 2929, 49 L.Ed.2d at 879.  Since the reimposition of the death penalty for felony murder in 1977, juries have consistently imposed the death penalty for that offense.  See, e.g., State v. Boyd, 797 S.W.2d 589 (Tenn.1990); State v. Irick, 762 S.W.2d 121 (Tenn.1988);  State v. Bell, 745 S.W.2d 858 (Tenn.1988);  State v. Sparks, 727 S.W.2d 480 (Tenn.1987);  State v. Goad, 707 S.W.2d 846 (Tenn.1986);  State v. Hartman, 703 S.W.2d 106 (Tenn.1985);  State v. Matson, 666 S.W.2d 41 (Tenn.1984);  State v. Simon, 635 S.W.2d 498 (Tenn.1982);  State v. Coleman, 619 S.W.2d 112 (Tenn.1981).

The second question that must be answered under the Black test, adopted from Gregg, is whether the punishment of death is disproportionate in relation to the crime for which it is imposed.  We are concerned here only with the imposition of capital punishment for the crime of felony murder in the abstract.

As stated earlier, under the statute prior to the 1989 revision, a person was guilty of first-degree murder under the felony murder doctrine without regard to intent to kill so long as the killing occurred during the perpetration of a felony.  Yet, this absence of intent does not render the death penalty disproportionate.  As Justice O'Connor observed, writing for the majority in Tison v. Arizona, 481 U.S. at 157, 107 S.Ct. at 1688, 95 L.Ed.2d at 144:

 [S]ome nonintentional murderers may be among the most dangerous and inhumane of all--the person who tortures another, not caring whether the victim lives or dies, or the robber who shoots someone in the course of the robbery utterly indifferent to the fact that the desire to rob may have the unintended consequence of killing the victim as well as taking the victim's property.  This reckless indifference to the value of human life may be every bit as shocking to the moral sense as an intent to kill.

 (Emphasis added.)  See also Schad v. Arizona, 501 U.S. ----, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991).

In the early case of State v. Pritchett, 621 S.W.2d 127 (Tenn.1981), the defendant argued that felony murder resulted

 in imposition of the death penalty in the absence of premeditation and in cases involving the least, rather than the most 'blameworthy' of murderers, because, it is insisted, the statute contains no guidelines for ascertaining culpability or the degree of culpability that will prevent disproportionate application of the death penalty.

Id., 621 S.W.2d at 140.  This Court replied,

 [t]he short answer to the issue posed by defendant is that, conceding such a result may be possible in the trial court, it is the statutory and inherent obligation of this Court to correct the error on appeal.  An integral part of the death penalty statute that must be construed in pari materia is the automatic review of every death sentence by this Court.  T.C.A. s 39-2406. Subsection (c) of that statute enumerates our duties that include eliminating any arbitrary, excessive, *340 or disproportionate imposition of the death penalty....

Id.

Accordingly, rather than an absolute rule of per se disproportionality, this Court has in the past relied on its statutory duty of review under Tenn.Code

COPR. (C) WEST 1993 NO CLAIM TO ORIG. U.S. GOVT. WORKS

Respondent's Exhibit E

Ann. s 39-2-205 [now s 39-13-206] to assure that the sentence in each case is
not disproportionate or excessive.  We agree with that approach and with
Justice Blackmun's rejection of the per se proportionality approach in his
( sent in Lockett v. Ohio, 438 U.S. 586, 613-19, 98 S.Ct. 2954, 2969-71, 57
L..d.2d 973, 995-98.  He observed in that connection that a sentence in felony
murder should be based on evidence of a particular defendant's participation in
homicide and his mens rea in regard to the homicidal act.
  We, therefore, reaffirm the rejection of a per se proportionality
approach in favor of the required statutory proportionality review.
  The third question for the Court under the Black test is whether the
infliction of the death penalty for felony murder goes beyond that necessary to
accomplish any legitimate penological objective.  On the one hand it has been
argued that, because felony murder encompasses unintentional and accidental
murders, the legitimate penological objective of deterrence is not satisfied.
In response, we observe that the legislature may decide that the death penalty
is even more effective in deterring felony murders than simple atrocious
murders since an experienced felon is more likely to assess the consequences of
his acts than other murderers who are more likely to act on passion or impulse,
unmindful of the consequences of their actions.  Gray v. Lucas, 677 F.2d
1086, 1104 (5th Cir.1982) (replying to an equal protection/due process
challenge to capital felony murder).  See Crump & Crump, In Defense of the
Felony Murder Doctrine, 8 Harv.J.L. & Pub.Pol'y 359 (1985).
  "The death penalty is said to serve two principal social purposes:
retribution and deterrence of capital crimes by prospective offenders." ·
Gregg v. Georgia, supra, 428 U.S. at 183, 96 S.Ct. at 2929-30, 49 L.Ed.2d at
880.  As we commented in Black:
    [w]hile increasingly questioned, retribution remains a valid penological
justification for the death penalty.
    'C]apital punishment is an expression of society's moral outrage at
   ticularly offensive conduct.  This function may be unappealing to many, but
it is essential in an ordered society that asks its citizens to rely on legal
processes rather than self-help to vindicate their wrongs.
  Gregg v. Georgia, 428 U.S. at 183, 96 S.Ct. at 2930.  Channeling man's
natural instinct for retribution "serves an important purpose in promoting the
stability of a society governed by law" for "the seeds of anarchy are sown"
when "people begin to believe that organized society is unwilling or unable to
impose upon criminal offenders the punishment they 'deserve.' "  Furman v.
Georgia, 408 U.S. at 308, 92 S.Ct. at 2761 (Stewart, J., concurring).
  State v. Black, 815 S.W.2d at 190.
  Indeed, the decision that capital punishment may be the appropriate sanction
in extreme cases is an expression of the community's belief that certain crimes
are themselves so grievous an affront to humanity that the only adequate
response may be the penalty of death.
  Gregg v. Georgia, 428 U.S. at 184, 96 S.Ct. at 2930, 49 L.Ed.2d at 880-81.
  We conclude that the death penalty for felony murder in Tennessee does not per
se violate Article I, s 16 of the Tennessee Constitution.  As we observed in
Black, the issue of whether or not the death penalty constitutes cruel and
unusual punishment is, in the last analysis, a moral question which has been
resolved in this State by our legislature as the representative of the people.
It is not the role of this Court to "superimpose personal morality" in
                    COPR. (C) WEST 1993 NO CLAIM TO ORIG. U.S. GOVT. WORKS

713

Respondent's Exhibit E

difficult issues, State v. Campbell, 103 Wash.2d 1, 34, 691 P.2d 929, 948 (1984), nor to act as "a good reflex of a democratic society." Dennis v. United States, 341 U.S. 494, 525, 71 S.Ct. 857, 875, 95 L.Ed. 1137, 1161 [ ] (Frankfurter, J., concurring). *341 For these reasons, we reaffirm [ ] prior holdings of this Court that the death penalty in felony murder does not per se violate Article I, s 16 of the Tennessee Constitution.

PART III.

SENTENCING PHASE--CONSTITUTIONAL APPLICATION OF AGGRAVATING CIRCUMSTANCES
A corollary to the general argument that imposing the death penalty for felony murder is not constitutional is that Tennessee's death penalty statute does not sufficiently narrow the population of death-eligible defendants under the Eighth Amendment to the U.S. Constitution, and Article I, s 16 of the Tennessee Constitution. The argument is that it fails to narrow by allowing the use of Tenn.Code Ann. s 39-2-203(i)(7) as an aggravating circumstance in sentencing.
As applied in this case, prior to the revision of the Criminal Code of 1989, the aggravating circumstance of committing a murder during a felony essentially duplicated the elements of the offense of first-degree felony murder. Tenn.Code Ann. s 39-2-202(a)(1) (Supp.1988) provided, in part, that "[e]very murder ... committed in the perpetration of, or attempt to perpetrate, any murder in the first degree, arson, rape, robbery, burglary, larceny, kidnapping, aircraft piracy, or the unlawful throwing, placing or discharging of a destructive device or bomb, is murder in the first degree." The aggravating circumstance set forth in Tenn.Code Ann. s 39-2-203(i)(7) (1982), allowed a sentence of death upon a conviction of first-degree murder where

   [t]he murder was committed while the defendant was engaged in committing, or was an accomplice in the commission of, or was attempting to commit, or was fleeing after committing or attempting to commit, any first degree murder, a n, rape, robbery, burglary, larceny, kidnapping, aircraft piracy, or l .ful throwing, placing or discharging of a destructive device or bomb.

This duplication of the elements of the offense by one of the aggravating factors has been challenged by capital defendants in the past. Some of the earlier attacks were based on double jeopardy and the argument that conviction under the felony murder aspect of s 39-2-202 required an automatic or mandatory death penalty because the jury had already found beyond a reasonable doubt the existence of an aggravating circumstance at the guilt phase of the trial. These arguments were rejected by the Court. State v. Barnes, 703 S.W.2d 611, 618 (Tenn.1985); State v. Laney, 654 S.W.2d 383, 387 (Tenn.1983); State v. Pritchett, 621 S.W.2d 127, 139-40 (Tenn.1981); Houston v. State, 593 S.W.2d 267, 276 (Tenn.1980). Our legislature, however, has seen fit to prohibit such duplication by statute in non-capital sentencing, see Tenn.Code Ann. s 40-35-111 (1982) and s 40-35-114 (1990), and we are of the opinion that Article I, s 16 of the Tennessee Constitution prohibits such duplication in capital sentencing, as well.
Our sister state of North Carolina has accepted the double-counting challenge to its death penalty statute, which contained similar duplicative aggravating circumstances. In State v. Cherry, 298 N.C. 86, 257 S.E.2d 551 (1979), the North Carolina Supreme Court pointed out that their felony murder aggravating circumstance would always be supported by the evidence in a felony murder conviction, since the felony murder, by definition, must have occurred during

COPR. (C) WEST 1993 NO CLAIM TO ORIG. U.S. GOVT. WORKS

Respondent's Exhibit E

'714

Cite as: 840 S.W.2d 317, *341)

the commission or attempted commission of one of the enumerated felonies. Id., 298 N.C. at 112, 257 S.E.2d at 567.   The North Carolina court held:

The problem here presented arises because [the felony murder aggravating] circumstance is inherent in, and a necessary element of, the capital felony, to-wit, felony murder.

... A defendant convicted of a felony murder, nothing else appearing, will have one aggravating circumstance "pending" for no other reason than the nature of the conviction.   On the other hand, a defendant convicted of a premeditated and deliberated killing, nothing else appearing, enters the sentencing phase *342 with no strikes against him.   This is highly incongruous, particularly in light of the fact that the felony murder may have been unintentional, whereas, a premeditated murder is, by definition, intentional and preconceived.

....

We are of the opinion that, nothing else appearing, the possibility that a defendant convicted of a felony murder will be sentenced to death is disproportionately higher than the possibility that a defendant convicted of a premeditated killing will be sentenced to death due to the "automatic" aggravating circumstance dealing with the underlying felony.   To obviate this flaw in the statute, we hold that when a defendant is convicted of first-degree murder under the felony murder rule, the trial judge shall not submit to the jury at the sentencing phase of the trial the aggravating circumstance concerning the underlying felony.

State v. Cherry, 298 N.C. at 113, 257 S.E.2d at 567-68.   See also, State v. Silhan, 302 N.C. 223, 275 S.E.2d 450 (1981);   State v. Oliver, 302 N.C. 28, 274 S.E.2d 183 (1981).

In Zant v. Stephens, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983), the United States Supreme Court said that in order to comply with the Eighth Amendment, aggravating circumstances must "genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder."   Id., 462 U.S. at 877, 103 S.Ct. at 2742, 77 L.Ed.2d at 249-50.   It seems obvious that Tennessee's statute fails to narrow the class of persons eligible for the death penalty because:

Automatically instructing the sentencing body on the underlying felony in a felony-murder case does nothing to aid the jury in its task of distinguishing between first-degree homicides and defendants for the purpose of imposing the death penalty.   Relevant distinctions dim, since all participants in a felony-murder, regardless of varying degrees of culpability, enter the sentencing stage with at least one aggravating factor against them.

....

A comparison of the sentencing treatments afforded first-degree-murder defendants further highlights the impropriety of using the underlying felony to aggravate felony-murder.   The felony murderer, in contrast to the premeditated murderer, enters the sentencing stage with one aggravating circumstance automatically charged against him.   This disparity in sentencing treatment bears no relationship to legitimate distinguishing features upon which the death penalty might constitutionally rest.

Engberg v. State, 686 P.2d 541, 560 (Wyo.1984) (Rose, J., dissenting).   See also Wiley v. Mississippi, 479 U.S. 906, 107 S.Ct. 304, 93 L.Ed.2d 278 (1986) (Marshall, J., dissenting);   Engberg v. Meyer, 820 P.2d

COPR. (C) WEST 1993 NO CLAIM TO ORIG. U.S. GOVT. WORKS

715

Respondent's Exhibit E

70 (Wyo.1991) (adopting Justice Rose's position).
In his thoughtful article analyzing the jurisprudence of death, Professor Richard Rosen correctly notes that the movement by the U.S. Supreme Court to constitutionally narrow the class of persons eligible for the death penalty began in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), a case in which a majority of the Justices held the existing systems of capital punishment constitutionally deficient at that time.   Richard A. Rosen, Felony Murder and the Eighth Amendment Jurisprudence of Death, 31 B.C.L.Rev. 1103, 1106 (1990).   The pre-Furman capital sentencing statutes in the various states were similar in that the defendant was made eligible for capital punishment by the substantive law of homicide.   Id., 31 B.C.L.Rev. at 1107. After a guilty finding, then the sentencer, usually as part of the same proceeding, was given unfettered discretion to impose the death penalty.   Id., 31 B.C.L.Rev. at 1107-08.   The Justices in the majority in Furman focused on the random, arbitrary, capricious, and discriminatory application of the death penalty under these statutes.   Id., 31 B.C.L.Rev. at 1108.

*343 In reviewing the statutes passed by states since Furman, the Court's focus has been on the process of selecting those to be killed, with the over-arching goal of ensuring that those defendants chosen for execution be in some way worse, or materially more depraved, than those other first-degree murderers not executed.   Id., 31 B.C.L.Rev. at 1109-10 (citing Godfrey v. Georgia, 446 U.S. 420, 433, 100 S.Ct. 1759, 1767, 64 L.Ed.2d 398, 409 (1980)). The Court has relied primarily on procedural protections to realize its Eighth Amendment goals.   Id., 31 B.C.L.Rev. at 1110.   A state first must narrow the class of homicide defendants who are eligible for the death penalty to ensure that even if some materially more depraved murderers manage to avoid the death penalty, those chosen will, at least, be among the worst offenders.   Id.   This narrowing, however, is insufficient by itself to satisfy the Eighth Amendment.

The Court has prohibited a mandatory death penalty for even the narrowest class of murder defendants.   See, e.g., Sumner v. Shuman, 483 U.S. 66, 107 S.Ct. 2716, 97 L.Ed.2d 56 (1987).   Instead, after restricting the class of death-eligible offenses, a state must utilize additional procedures that assure reliability in the determination that death is the appropriate punishment in a given capital case.   Woodson v. North Carolina, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976).

[39] To meet this reliability requirement, a state must permit the sentencer to make an individualized determination on the basis of the character of the individual and the circumstances of the crime.   Zant v. Stephens, supra, 462 U.S. at 879, 103 S.Ct. at 2744, 77 L.Ed.2d at 251 (1983).   The defendant thus is entitled to present and have the sentencer fully consider all relevant evidence in mitigation of sentence.   Skipper v. South Carolina, 476 U.S. 1, 4, 106 S.Ct. 1669, 1670-71, 90 L.Ed.2d 1, 6 (1986).   The state also is allowed, but not required, to present a wide range of evidence in aggravation, as long as it is relevant to the sentencing decision and promotes the reliability of that determination.   See, e.g., Barefoot v. Estelle, 463 U.S. 880, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983).   In theory, both the restriction of discretion attendant upon the narrowing requirement and the increase in discretion caused by the full and unfettered consideration of mitigation, serve the underlying goal of weeding out those who do not convincingly deserve the death penalty.

COPR. (C) WEST 1993 NO CLAIM TO ORIG. U.S. GOVT. WORKS

716

Respondent's Exhibit E

Cite as: 840 S.W.2d 317, *343)
Rosen, Felony Murder and the Eighth Amendment Jurisprudence of Death, 31
B.C.L.Rev. at 1111.

[40] As a constitutionally necessary first step under the Eighth
Amendment, the Supreme Court has required the states to narrow the sentencer
consideration of the death penalty to a smaller, more culpable class of
homicide defendants than the pre-Furman class of death-eligible murderers.
See Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984).  A
state, however, must not only genuinely narrow the class of death eligible
defendants, but must do so in a way that reasonably justifies the imposition of
a more severe sentence on the defendant compared to others found guilty of
murder.  Zant v. Stephens, supra, 462 U.S. at 877, 103 S.Ct. at 2742, 77
L.Ed.2d at 249-50.  A proper narrowing device, therefore, provides a principled
way to distinguish the case in which the death penalty was imposed from the
many cases in which it was not, Godfrey v. Georgia, supra, 446 U.S. at 433,
100 S.Ct. at 1767, 64 L.Ed.2d at 409, and must differentiate a death penalty
case in an objective, even-handed, and substantially rational way from the many
murder cases in which the death penalty may not be imposed.  Zant, supra,
462 U.S. at 879, 103 S.Ct. at 2744, 77 L.Ed.2d at 251.  As a result, a proper
narrowing device insures that, even though some defendants who fall within the
restricted class of death-eligible defendants manage to avoid the death
penalty, those who receive it will be among the worst murderers--those whose
crimes are particularly serious, or for which the death penalty is peculiarly
appropriate.  See Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d
859 (1976).

The critical role played by this narrowing requirement is especially
significant in *344 light of the discretion which the Court has mandated for
the sentencing body in a capital case.  Because a capital sentencer now must be
allowed wide discretion--a discretion not unlike that used before Furman--to
impose a life sentence based upon any mitigating evidence concerning the
character of the defendant or the circumstances of the crime, the sentencer
should be restricted to using this discretion on a class of murderers that is
demonstrably smaller and more blame worthy than the class of pre-Furman
murderers eligible for the death penalty.

States have adopted different methods to narrow the class of death-eligible
defendants, but in the large majority of states, the class is narrowed by
aggravating circumstances.  Rosen, Felony Murder and the Eighth Amendment
Jurisprudence of Death, 31 B.C.L.Rev. at 1122.  Tennessee has not chosen to
narrow the class of death-eligible defendants by re-defining its murder
statute, but rather has chosen to do so by listing a number of specific
aggravating factors and expressly requiring the finding of a least one
aggravating circumstance beyond a reasonable doubt before the death penalty can
be imposed.  It joins 24 other states in that requirement.  Special Project,
Capital Punishment in 1984:  Abandoning the Pursuit of Fairness and
Consistency, 69 Cornell L.Rev. 1129, 1240, n. 732 (1984).

A few states have chosen to narrow the class of death-eligible
defendants by providing restrictive definitions of first-degree, or capital,
murder.  Rosen, Felony Murder, 31 B.C.L.Rev. at 1123.  In Lowenfield
v. Phelps, 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988), the Supreme
Court approved this alternative approach, holding that no requirement existed
for narrowing the class at the sentencing stage, provided that the class of
COPR. (C) WEST 1993 NO CLAIM TO ORIG. U.S. GOVT. WORKS

717

Respondent's Exhibit E

leath-eligible defendants is, in fact, genuinely narrowed at the definitional
stage.  Id., 484 U.S. at 244-46, 108 S.Ct. at 554-55, 98 L.Ed.2d at 581-83.
Rec ˜nizing that Tennessee has not chosen to narrow at the definitional stage,
i  �›uld be noted that the legislature has, in fact, broadened its first-
i ˌ.ee murder statute by adding death by child abuse, which makes the class
even larger than pre-Furman.  See Tenn.Code Ann. s 39-2-
202(a)(2) (Supp.1988) and Tenn.Code Ann. s 39-13-202(a)(4) (1991).  But see
State v. Hale, 840 S.W.2d 307 (Tenn.1992), in which this Court held the
statute unconstitutionally deprived the defendant of due process under Article
I, s 8 of the Tennessee Constitution.
 In addition to having different methods for narrowing the class of death
eligible defendants, states have different definitions of first-degree felony
murder.  As noted earlier, some states are pure felony murder states;  that is,
they allow the defendants to be sentenced to death solely because the killing
took place during an accompanying felony.  Tennessee was one of those states
before 1989 [FN7].  In these states, a defendant first can be convicted of
first-degree murder because of the felony.  Then, the defendant can be
sentenced to death because the felony is used as an aggravating circumstance,
unqualified at either stage by any mens rea requirement.  Rosen, Felony
Murder, 31 B.C.L.Rev. at 1125-26.

    FN7. The Tennessee legislature amended its capital punishment statute,
    effective November 1, 1989, to require recklessness during the felony
    before death can be imposed, thereby removing Tennessee from the class of
    pure felony murder states.  See supra note 6 and accompanying text.

 Rosen points out that in those states, which includes Tennessee,
 the felony murder narrowing device fails to meet both the quantitative and
σ  ‘tative requirements for a narrowing device.  It provides no meaningful
    ›wing and, to the extent that narrowing does exist, it does not serve to
iuentify the defendants most deserving of death.  In these states, felony
murderers are treated essentially the same as they were pre-Furman ... the
simple fact of the accompanying felony makes the defendant death-eligible [and]
the jury then can exercise its unfettered discretion to determine whether
defendant is to live or die.
 Id., 31 B.C.L.Rev. at 1127.
 Commentators have always criticized the felony murder rule for its
bootstrapping *345 effect.  Id.  It vaults an offense into the class of
murders without the malice finding usually required, and then, still without
any culpability finding, elevates what otherwise might not be a murder to
first-degree murder.  Id.  In addition, in pure felony murder states, such as
Tennessee before 1989, a third level of bootstrapping arises as the felony
murder defendant is moved up into the supposedly restricted class of defendants
eligible for death.  Id.
 The perverse result of the felony murder narrowing device is even more
troubling because the usual class of first-degree murderers is made up largely
of two groups of defendants--felony murderers and premeditated and deliberated
murderers.  The only defendants who are eliminated by the felony murder
narrowing device are those who kill with premeditation and deliberation--i.e.,
in cold blood--but not during the course of a felony.  A simple felony murder
            COPR. (C) WEST 1993 NO CLAIM TO ORIG. U.S. GOVT. WORKS

Respondent's Exhibit E

718

unaccompanied by any other aggravating factor is not worse than a simple, premeditated, and deliberate murder. If anything, the latter, which by definition involves a killing in cold blood, involves more culpability.

few states qualify their felony murder narrowing devices by requiring that a defendant possess a specified mens rea of recklessness or culpable negligence at either the guilt or sentencing stage. Tennessee has done so since 1989. See 1989 Tenn.Pub.Acts, ch. 591, s 1. All felony murderers, however, potentially meet a recklessness standard; that is, one who purposely undertakes a felony that results in a death, almost always can be found reckless. Therefore, the narrowing devices in these states are essentially no different from those in the pure felony murder states.

[41] Furthermore, the Supreme Court case of Tison v. Arizona, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987), now places a nationwide threshold of culpability at the reckless indifference level, meaning that a defendant who acts without reckless indifference is not constitutionally eligible for the death penalty. Id., 481 U.S. at 157-58, 107 S.Ct. at 1687-88, 95 L.Ed.2d at 144-45. Therefore, since the absence of reckless indifference constitutionally immunizes a defendant from the death penalty, its presence cannot meaningfully further narrow the class of death-eligible defendants.

In Collins v. Lockhart, 754 F.2d 258 (8th Cir.1985), the 8th Circuit Court of Appeals relied on Zant, supra, and the principles of Godfrey, supra, to hold that duplication by an aggravating circumstance of the underlying capital felony violated the Eighth Amendment of the U.S. Constitution. [FN8] The Court commented:

> FN8. Collins involved the Arkansas death penalty statute existing in 1974, which defined certain kinds of murder as capital, and used aggravating circumstances to let the jury determine whether the death penalty should be imposed. Collins was subsequently deemed to have been overruled by Lowenfield v. Phelps, supra, on the basis that the Arkansas statute sufficiently narrowed the class of death eligible defendants by narrowly defining capital murder. Perry v. Lockhart, 871 F.2d 1384, 1393 (8th Cir.1989).

The question, rather, is whether use of an aggravating circumstance that duplicates an element of crime itself is a violation of the Eighth Amendment, as applied to the states by the Due Process Clause of the Fourteenth Amendment. Two recent Supreme court opinions, Godfrey v. Georgia, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980) (plurality opinion), and Zant v. Stephens, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983), clearly indicate that such a violation has occurred here. Aggravating circumstances, in order to comply with the Eighth Amendment, must "genuinely narrow the class of persons eligible for the death penalty and ... reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." Id. [462 U.S. at 875-878,] 103 S.Ct. at 2742-43 (footnote omitted). An aggravating circumstance is an objective criterion that can be used to distinguish a particular defendant on whom the jury has decided to impose the death sentence from other defendants who have committed the same underlying capital crime. Aggravating circumstances serve to reduce the danger that the death penalty will be *346 wantonly or arbitrarily imposed, a

COPR. (C) WEST 1993 NO CLAIM TO ORIG. U.S. GOVT. WORKS

719

danger that was uppermost in the Court's mind when Furman v. Georgia ... was
decided....

    see no escape from the conclusion that an aggravating circumstance
merely repeats an element of the underlying crime cannot perform this
rowing function.

Id., 754 F.2d at 263-64.

This Court has previously refused to follow the Collins rationale by
finding it inapplicable under the Tennessee Constitution.  See State v.
Smith, 755 S.W.2d 757, 768 (Tenn.1988);  State v. King, 694 S.W.2d 941, 946
(Tenn.1985);  State v. Laney, 654 S.W.2d 383, 387 (Tenn.1983);  and State
v. Pritchett, 621 S.W.2d 127, 139-40 (Tenn.1981).  In State v. Smith, supra,
the Court's reason for rejecting the Collins rationale was as follows:

  This precise question, however, was before the Supreme Court of the United
States in Lowenfield v. Phelps, 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568
(1988), cert. granted 483 U.S. 1005, 107 S.Ct. 3227, 97 L.Ed.2d 734 (1987).
There the Court upheld the position that we have taken herein and in
Pritchett and King, supra, that use of the underlying felony, in this
case armed robbery, as an aggravating circumstance upon which the jury may base
a death penalty is constitutionally permissible.

Id., 755 S.W.2d at 768.

The difficulty with that conclusion is that in Lowenfield v. Phelps, supra,
the United States Supreme Court held that the Louisiana death penalty statute
sufficiently narrowed the class of death eligible murderers by narrowly
defining capital murder so that the class of death eligible defendants did not
have to be further narrowed by aggravating circumstances.  484 U.S. at 244-
46, 108 S.Ct. at 554-55, 98 L.Ed.2d at 581-83.  Since the statute sufficiently
narrowed the class of death eligible by narrowly defining capital murder, the
Court upheld the constitutionality of the Louisiana statute, despite the fact
that the sole aggravating circumstance found was identical to an element of the
_al crime of which the petitioner had been convicted.  Id.

In upholding the Louisiana statute, the Court concluded that the narrowing
function required may be performed by jury findings at either the sentencing
phase of the trial or the guilt phase, and that the legislature may itself
narrow the definition of capital offenses, as Louisiana has done, or the
legislature may more broadly define capital offenses and provide for narrowing
by jury findings of aggravating circumstances at the penalty phase.  Id.,
484 U.S. at 244-45, 108 S.Ct. at 554, 98 L.Ed.2d at 581-82.

It is clear that Tennessee has a broad definition of murder and has not
narrowed in the definitional stage.  Accordingly, Lowenfield is inapposite
and provides no rationale for constitutionality under the Tennessee
Constitution.

[42] We have determined that in light of the broad definition of felony
murder and the duplicating language of the felony murder aggravating
circumstance, no narrowing occurs under Tennessee's first-degree murder
statute.  We hold that, when the defendant is convicted of first-degree murder
solely on the basis of felony murder, the aggravating circumstance set out in
Tenn.Code Ann. ss 39-2-203(i)(7) (1982) and 39-13-204(i)(7) (1991), does not
narrow the class of death-eligible murderers sufficiently under the Eighth
Amendment to the U.S. Constitution, and Article I, s 16 of the Tennessee
Constitution because it duplicates the elements of the offense.  As a result,

            COPR. (C) WEST 1993 NO CLAIM TO ORIG. U.S. GOVT. WORKS

Respondent's Exhibit E

we conclude that Tenn.Code Ann. s 39-2-203(i)(7) is unconstitutionally applied under the Eighth Amendment to the U.S. Constitution and Article I, s 16 of the Tennessee Constitution where the death penalty is imposed for felony murder. ; ordingly, we expressly overrule State v. Smith, 755 S.W.2d 757 (Jenn.1988), and its progeny on this issue.

As stated at the beginning of this Opinion, under our holding today, felony murder continues to be a death-eligible offense. However, a finding of an aggravating circumstance other than Tenn.Code Ann. s 39-2-203(i)(7) (1982) and s 39-13-204(i)(7) \*347 (1991) is necessary to support death as a penalty for that crime.

[43] Because, in this case, the jury has found two aggravating circumstances are supported by the evidence beyond a reasonable doubt, it is necessary for this case to be remanded for re-sentencing. Even though the evidence amply supports the aggravating circumstance of the murder being especially heinous, atrocious, or cruel in that it involved torture or depravity of mind, Tenn.Code Ann. s 39-2-203(i)(5) (1982), we are unable to conclude that the elimination of the aggravating circumstance (i)(7) is harmless error beyond a reasonable doubt. Therefore, we remand this case for re-sentencing where the State will be free to reseek the death penalty if it so desires. The costs of this appeal are taxed to the State of Tennessee.


DROWOTA and O'BRIEN, JJ., concurring in Parts I and II and dissenting in Part III. See separate Opinion.


REID, C.J., and DAUGHTREY, J., concurring in Parts I and III and dissenting in Part II. See separate Opinion.


DROWOTA, Justice, concurring and dissenting.

would affirm the Defendant's conviction of first-degree felony murder and sentence of death; therefore, I concur in part and dissent in part. I concur with Part I of Justice Anderson's majority opinion, in which all members of this Court find that there is no error in the guilt phase. I also concur with Part II of Justice Anderson's opinion, in which he finds the death penalty may constitutionally be imposed upon conviction under the felony-murder statute, T.C.A. s 39-2-202(a) (1982). As the majority opinion reveals, the Defendant did not raise the issue of the constitutionality of Tennessee's death penalty statute as punishment for felony murder. However, we wish to address this question because the present Court has not yet considered this important issue. As members of the former Court, Justice O'Brien and I have previously upheld the constitutionality of capital punishment for felony murder. Today, a three-member majority of the present Court reaffirms the prior holdings of this Court on this issue, beginning with State v. Dicks, 615 S.W.2d 126 (1981).

I would like to acknowledge that, although prior decisions of this Court have held the death penalty in felony murder to be constitutional, no former opinion of this Court has articulated in such depth and scholarly manner the issue now before us, as has Justice Anderson in Part II of this opinion. The dissent of Chief Justice Reid, joined by Justice Daughtrey, to Part II of the majority opinion states: "[T]he statute still does not effectively limit the class of death-eligible defendants (which is a group different from those actually executed) to those most deserving of death as punishment and, therefore, it

COPR. (C) WEST 1993 NO CLAIM TO ORIG. U.S. GOVT. WORKS

721

violates the Tennessee constitutional prohibition against cruel and unusual punishment." I respond only by saying I respectfully disagree with the ... ysis found in the dissent filed by my colleagues, including the simplistic ... orization of cases based on the presence of intent to kill.

... dissent from Part III of the majority opinion which holds that use of the aggravating circumstance in T.C.A. s 39-2-203(i)(7) (1982) [now s 39-13-204(i)(7) (1991) ] to impose a sentence of death in cases of felony murder violates the Eighth Amendment to the United States Constitution and Article I, s 16, of the Tennessee Constitution. This same position, under the various guises of double jeopardy, mandatory death penalty and inadequate narrowing, has previously been rejected by this Court. See, e.g., State v. Smith, 755 S.W.2d 757, 768 (Tenn.1988); State v. Barnes, 703 S.W.2d 611, 618 (Tenn.1985); State v. Zagorski, 701 S.W.2d 808, 816 (Tenn.1985); State v. Smith, 695 S.W.2d 954, 959-960 (Tenn.1985); State v. King, 694 S.W.2d 941, 946 (Tenn.1985); State v. Laney, 654 S.W.2d 383, 387 (Tenn.1983); State v. Pritchett, 621 S.W.2d 127, 139-141 (Tenn.1981); Houston v. State, 593 S.W.2d 267, 276 (Tenn.1980). In State v. Pritchett, 621 S.W.2d at 140-141, the Court rejected the rationale of State v. Cherry, 298 N.C. 86, 257 S.E.2d 551 (1979), now adopted by *348 the Court; and in State v. Smith, 755 S.W.2d at 768, we held that our statute complied with the constitutional requirement of "narrowing" under Lowenfield v. Phelps, 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988).

No intervening law compels that we abandon these former decisions. I find disturbing the tendency of members of this Court to disregard long established precedents in capital punishment decisions. Consistency in the law is of utmost importance, particularly in this area of the law. Inconsistency creates questions and concerns that leave the bench and bar without any confidence that what was said yesterday will hold true for tomorrow.

disagreement with the majority is not based solely on the principle of ... e decisis, however. It also arises from my conviction that these previous decisions are not in error and that the statute does not contravene the requirements of either the Eighth Amendment or Article I, s 16. As was pointed out in Pritchett, the United States Supreme Court has implicitly approved an identical application of the felony element of the offense of felony murder as a valid aggravating circumstance for imposition of the death penalty in Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976). There the Court held that the Florida capital sentencing system, upon which our statute was in part closely modeled, on its face satisfied the constitutional deficiencies identified in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). Cf. Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (upholding death penalty under Georgia statute effectively allowing similar duplication under the facts of the case). The United States Supreme Court has also explicitly held that there is no Eighth Amendment prohibition against using an element necessary to the conviction of first-degree murder as an aggravating circumstance to support the death penalty. Lowenfield v. Phelps, supra; see also State v. Cauthern, 778 S.W.2d 39, 47 (Tenn.1989).

The majority, however, finds that the statute fails to "narrow" the class of death eligible defendants sufficiently to satisfy the cruel and unusual clauses of the two constitutions because, in the case of felony murder,

COPR. (C) WEST 1993 NO CLAIM TO ORIG. U.S. GOVT. WORKS

Respondent's Exhibit E

722

the statute returns our sentencing scheme to the days before Furman, when the jury was given unfettered discretion to determine who lived and who died. This is neither a correct assessment of the statute nor of Furman and its progeny. The concern in Furman was that the death penalty not be imposed under sentencing procedures that created a substantial risk that it would be inflicted in an arbitrary and capricious manner. Gregg v. Georgia, 428 U.S. at 188, 96 S.Ct. at 2932. Its guiding principle was that the sentencer's discretion must be suitably directed and limited and must be exercised in an informed manner. Id. at 189, 96 S.Ct. at 2932. The sentencer must have relevant information under fair procedural rules and be provided with standards to guide its use of this information. Id. at 195, 96 S.Ct. at 2935. As stated in Proffitt v. Florida, "the requirements of Furman are satisfied when the sentencing authority's discretion is guided and channeled by requiring examination of specific factors that argue in favor of or against imposition of the death penalty, thus eliminating total arbitrariness and capriciousness in its imposition." 428 U.S. at 258, 96 S.Ct. at 2969.

Furman nowhere mentions the concept of "narrowing" as understood by the majority. Aggravating factors are considered "means of confining the sentencers' discretion--giving them something specific to look for rather than leaving them to wander at large among all aggravating circumstances." Walton v. Arizona, 497 U.S. 639, 650, 110 S.Ct. 3047, 3063, 111 L.Ed.2d 511 (1990) (Scalia, J., concurring). So long as the aggravating circumstance is not unconstitutionally vague, i.e., so vague as to fail adequately to channel the sentencing patterns of juries, it may serve as the basis for imposing capital punishment. See Zant v. Stephens, 462 U.S. 862, 877, 103 S.Ct. 2733, 2742, 77 L.Ed.2d 235 (1983).

But aggravating factors are not the only component of a capital sentencing system assuring that the commands of Furman are met. The system must be examined as *349 a whole just as it works as a whole. In addition to aggravating factors, our statute further guides and channels the sentencer's discretion by providing a bifurcated proceeding, requiring consideration of mitigating circumstances, explicitly directing the manner in which the jury must weigh the various sentencing factors, and mandating meaningful appellate review. See Zant v. Stephens, 462 U.S. at 875, 103 S.Ct. at 2741; Proffitt v. Florida, 428 U.S. at 252-253, 96 S.Ct. at 2967; Gregg v. Georgia, 428 U.S. at 191, 96 S.Ct. at 2933. The cumulative effect of these procedural safeguards assures that our statute's use of the underlying felony as an aggravating circumstance does not violate the principles of Furman.

As its reliance on the quoted language from State v. Cherry discloses, the majority decision is based to a large extent upon the potential problems of disproportionality inherent in allowing capital punishment for felony murder. Allowing the underlying felony to act as an aggravating circumstance does not, however, result in imposition of the death penalty in a disproportionate manner. First of all, it is well-settled that under the Eighth Amendment death is not a disproportionate punishment for felony murder so long as the defendant in fact killed, attempted to kill, or intended that a killing take place or that lethal force be used, or the defendant was a major participant in the felony and exhibited reckless indifference to human life. Tison v. Arizona, 481 U.S. 137, 158, 107 S.Ct. 1676, 1688, 95 L.Ed.2d 127 (1987); Enmund v. Florida, 458 U.S. 782, 797, 102 S.Ct. 3368, 3376-3377, 73

COPR. (C) WEST 1993 NO CLAIM TO ORIG. U.S. GOVT. WORKS

Respondent's Exhibit E

..Ed.2d 1140 (1982).  Yet the majority's decision removes wholesale this
:ategory of persons [FN1], unquestionably death eligible under the Eighth
ir dment, from the list of those upon whom the state can impose capital
,· iment unless some factor beyond the commission of the felony is present in
. crime.  I cannot, however, consider "unreasonable, unjust or
inconstitutional" the legislature's determination that killings perpetrated
luring a felony occur under circumstances of enhanced culpability sufficient to
expose the perpetrator and certain accomplices to a death sentence.  See
Whalen v. State, 492 A.2d 552, 567 (Del.1985).  I believe that, applied
under the constitutional restrictions set forth in Tison and Enmund,
T.C.A. s 39-2-203(i)(7) constitutionally narrows the category of death eligible
defendants in the case of felony murder at the sentencing stage.  To the extent
that the majority's decision rests upon concerns that the death penalty is
disproportionate punishment for some types of conduct falling under the felony
murder statute, our sentencing system, created to meet the mandates of
Furman, may be trusted to discern and remove those persons perpetrating
these less egregious forms of felony murder from the list of those condemned to
death.

     FN1. See, e.g., State v. Smith, 695 S.W.2d 954 (1985);  State v.
     Matson, 666 S.W.2d 41 (Tenn.1984);  State v. Laney, 654 S.W.2d 383
     (Tenn.1983);  State v. Simon, 635 S.W.2d 498 (Tenn.1982).  In the above
     felony murder cases, the sole aggravating factor was (i)(7).

It is here that this Court's obligations under T.C.A. s 39-13-206 [formerly s
39-2-205] become critical.  In order to prevent the execution of all but the
most deserving of murderers and to avoid arbitrary and capricious sentencing,
the Court reviews all felony-murder cases to assure that a sentence of death
I    not been arbitrarily imposed, that the evidence supports the jury's
·    .ngs and that the sentence of death is not disproportionate.  For purposes
o.. the death penalty, a distinction must be drawn in felony-murders between
cold-blooded, execution-style murders and accidental, unforeseen killings or
accomplice killings.  However, the mechanical narrowing adopted by the Court
today bears no relationship to these considerations. [FN2]  Following a
jurisprudence of case specific proportionality review, on the other hand,
ensures that the dictates of the Eighth and Fourteenth *350 Amendments and
their state counterparts, Article I, ss 16 and 8, are met in capital felony
murders.

     FN2. In disallowing the jury from considering aggravating circumstance
     (i)(7) at the sentencing stage in all felony murder convictions, over one
     third of the persons on death row may have their sentences reviewed, first
     for a harmless error analysis, and upon a finding of harmful error as in
     this case, then for a remand to the trial court for resentencing.

Applying these principles to the present case, I would find:  that the
sentence of death was not imposed in an arbitrary fashion;  that the evidence
supports the jury's findings of two statutory aggravating circumstances;  and
that the evidence supports the jury's finding of the absence of mitigating
circumstances sufficiently substantial to outweigh the aggravating
                    COPR. (C) WEST 1993 NO CLAIM TO ORIG. U.S. GOVT. WORKS

Respondent's Exhibit E

724

circumstances so found.  The sentence is neither excessive nor disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the Defendant.  See State v. Alley, 776 S.W.2d 506 (Tenn.1989); State v. Miller, 771 S.W.2d 401 (Tenn.1989);  State v. West, 767 S.W.2d 3.. (Tenn.1989);  State v. Hartman, 703 S.W.2d 106 (Tenn.1985);  State v. Coe, 655 S.W.2d 903 (Tenn.1983);  State v. Groseclose, 615 S.W.2d 142 (Tenn.1981).  The defendant's culpability also meets the criteria of Tison and Enmund, supra.  The aggravating circumstances applied are constitutionally valid.  This torture-murder of a kidnapped child unquestionably is one of the most aggravated killings that this Court has seen.  The fourteen-year-old victim's ordeal, as described in the majority opinion, began at 7:30 p.m. and ended at 11 p.m.  This brutal and tragic murder is certainly one of the "worst of the bad."

I would affirm the judgment both as to the defendant's guilt and his sentence of death.  I am authorized to state that Justice O'BRIEN concurs in this opinion.


REID, Chief Justice, concurring and dissenting.

I concur in Part I of the majority Opinion affirming the conviction of first degree murder.

My position with regard to Part II is that even if the death penalty is not per se cruel and unusual punishment prohibited by Article I, Section 16 of the Tennessee Constitution, the imposition of death upon a conviction of felony murder is not a single constitutional issue that can be resolved "in the abstract";  Article I, Section 16 imposes a standard of proof higher than the federal standard of reckless indifference;  and, therefore, T.C.A. s 39-2-203 (1982), as construed in the majority Opinion violates Article I, Section 16.

I concur in Part III of the majority Opinion's holding that the use of felony murder as an aggravating circumstance when the offense of which the defendant convicted is felony murder does not accomplish the constitutional objecti of narrowing the class of death-eligible murderers, and therefore T.C.A. s 39-13-204(i)(7) is constitutionally invalid.

This holding based on Article I, Section 16 of the Tennessee Constitution is a step toward limiting the jury's discretion in imposing capital punishment to a "demonstrably smaller and more blameworthy" class of murderers.  Maynard v. Cartwright, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988).  However, even with the felony murder aggravating circumstance eliminated, the Tennessee sentencing statute still includes in the class of death-eligible defendants accidental and unintentional murderers whose culpability is minimal.  It still allows convictions for first degree felony murder of persons who killed accidentally or unintentionally and those who did not kill, did not intend to kill and did not intend that any person suffer any physical harm.  The statute still does not effectively limit the class of death-eligible defendants (which is a group different from those actually executed) to those most deserving of death as punishment and, therefore, it violates the Tennessee constitutional prohibition against cruel and unusual punishment.  Consequently, the statute falls short of the constitutional mandate that the death penalty be imposed upon only those murderers who are the "worst of the bad."

The evil identified by the United States Supreme Court cases construing and implementing the Eighth Amendment prohibition against cruel and unusual

COPR. (C) WEST 1993 NO CLAIM TO ORIG. U.S. GOVT. WORKS

Respondent's Exhibit E

unishment is not the death penalty itself but, as discussed in the majority
pinion, the random, arbitrary, capricious, and discriminatory
3'  application of the death penalty.  So long as a state under its law
    ; to impose the death penalty, the United States Constitution mandates
  ..rness and proportionality in the imposition.  The procedure followed by a
tate must, as stated in Lowenfield v. Phelps, 484 U.S. 231, 108 S.Ct. 546,
,54 (quoting Zant v. Stephens, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235
1983)), "genuinely narrow the class of persons eligible for the death penalty
ind must reasonably justify the imposition of a more severe sentence on the
iefendant compared to others found guilty of murder."  The constitutional
ibjective is that the sentence imposed "reflect a reasoned moral response to
:he defendant's background, character, and crime."  Penry v. Lynaugh, 492
J.S. 302, 318, 109 S.Ct. 2934, 2947, 106 L.Ed.2d 256 (quoting California v.
3rown, 479 U.S. 538, 545, 107 S.Ct. 837, 841, 93 L.Ed.2d 934 (1987))
(concurring opinion) (emphasis in original).
The United States Supreme Court has recognized that this "reasoned moral
response" is determined by "the evolving standards of decency that mark the
progress of a maturing society."  Trop v. Dulles, 356 U.S. 86, 99, 78 S.Ct.
590, 597, 2 L.Ed.2d 630 (1958).  See State v. Black, 815 S.W.2d 166, 188
(Tenn.1991).  The standards of decency are reflections of the essential
character of the people of the state, their virtues, their faults.  To be
constitutional, the process must insure the effective application of society's
present standards of decency.  Implicit in death penalty jurisprudence is the
recognition that the standards of decency are not static but evolving, that
society is not stale but maturing, and that the level of community morality
will continue to rise until the reasoned moral response of the people of
Tennessee will be, if it is not already, that the death penalty is cruel and
unusual punishment.  Until that standard is recognized, the focus must be on
f  1ess and proportionality among those that the process allows to be
   ..uted.
The process whereby the death penalty may be imposed in Tennessee consists of
three stages--the determination that the defendant is not in a category of
murderers upon whom the death penalty may not be imposed regardless of the
other circumstances of the case;  the minimum proof regarding the defendant and
the crime that will support a jury's imposition of the death penalty;  and the
comparative proportionality review on appeal mandated by statute.
Certain categories of defendants are not subject to the death penalty
regardless of the circumstances of the murder.  T.C.A. s 39-13-204 limits the
imposition of the death penalty to the offense of first degree murder.
T.C.A. s 39-13-203 prohibits the imposition of a sentence of death upon any
mentally retarded defendant.  T.C.A. s 37-1-134-(a)(1)(A) protects juveniles
from the sentence of death.  This decision adds to those categories in which
the defendant is not death-eligible:  those charged only with felony murder
with felony murder as the only aggravating circumstance.
The second stage is the jury trial.  Juries may impose the death
penalty only upon those defendants who are members of the class of death
eligibles.  In cases in which the defendant is not in a category exempt from
the sentence of death, the minimum standards for determining whether a sentence
of death may be constitutionally imposed for felony murder under the federal
constitution are those set by the United States Supreme Court in Enmund v.
            COPR. (C) WEST 1993 NO CLAIM TO ORIG. U.S. GOVT. WORKS

Respondent's Exhibit E

                                                    726

PAGE 45

40 S.W.2d 317

Cite as: **840 S.W.2d 317, \*351)**

Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), and Tison v. Arizona, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987).  Those cases dealt with the problem of imposing the death penalty in cases of vicarious l   ility for felony murder, i.e., where an accomplice in the felony, one who did not actually kill the victim, is convicted of murder under the felony murder doctrine and receives the death penalty.  Under the rules of those cases the death penalty is only permissible under the Eighth and Fourteenth Amendments for one who himself kills, attempts to kill, or intends that a killing take place or that lethal force will be imposed (Enmund ), or for one whose personal involvement in the underlying felony is substantial and who exhibits a reckless disregard or indifference to the value of human life (Tison ).

**\*352** As discussed in the majority Opinion, Tennessee does not narrow the death-eligible class by the statutory definition of first-degree felony murder.  Under the Tennessee felony statute, proof of malice, deliberation, and premeditation, or that the defendant intended to kill the victim, is not necessary to support a death sentence.  State v. Johnson, 661 S.W.2d 854, 861 (Tenn.1983);  Farmer v. State, 201 Tenn. 107, 296 S.W.2d 879 (1956);  State v. Hopper, 695 S.W.2d 530, 535 (Tenn.Crim.App.1985);  Tosh v. State, 527 S.W.2d 146, 147–48 (Tenn.Crim.App.1975).  Consequently, there are included in the class of death-eligible felony murderers those who killed accidentally or unintentionally and those who did not kill, did not intend to kill, and did not intend that any person suffer physical harm.  Since the felony murder statute by definition does not narrow the class of death-eligible defendants, narrowing must be accomplished, if at all, at the sentencing phase of the trial when the jury, pursuant to T.C.A. s 39-13-204(i), (j), considers the relevant aggravating and mitigating circumstances.

The majority Opinion presents a compelling case for its conclusion that to be  nstitutional a sentencing process must insure that only those defendants  ust deserving" will be executed.  It states that in selecting those defendants to be executed the over-reaching goal is to insure that those chosen be in some way worse or materially more depraved than those other first degree murderers not executed.  See majority Opinion at 343.  The Opinion recognizes that in order to pass constitutional muster the procedure "first must narrow" the class of death-eligible defendants to insure that those executed "will be among the worst offenders," and, further, acknowledges that the reckless indifference standard accomplishes no meaningful limitation on the class of defendants eligible for the death penalty.  However, rather than stating the quantum of proof required by the constitution to genuinely narrow the class of death eligibles and thus support a jury verdict imposing the death sentence, it invalidates as unconstitutional only that section of the statute that allows felony murder as an aggravating circumstance for the conviction of felony murder.  The rationale is that "T.C.A. ss 39-2-203(i)(7) (1982) and 39-13-204(i)(7) (1991) do not narrow the class of death-eligible murderers sufficiently under the Eighth Amendment to the U.S. Constitution and Article I, Section 16 of the Tennessee Constitution because they duplicate the elements of the offense."  Id. at 346.  It should be noted that the constitutional deficiency is that the aggravating circumstance does not narrow the class, not that it duplicates the elements of the offense.  Justice Drowota's dissent misses this essential point, stating, "There is no constitutional prohibition

COPR. (C) WEST 1993 NO CLAIM TO ORIG. U.S. GOVT. WORKS

727

Respondent's Exhibit E

gainst using an element of the offense as an aggravating circumstance."
rowota, J., dissenting at 348. The result then is illogical: an aggravating
i⟩ ⟩stance that fails to narrow the class because it duplicates the elements
. offense is unconstitutional, but aggravating circumstances that fail to
⟵ ⟶ow the class for other reasons are not unconstitutional. The logical
onclusion from the majority Opinion's analysis would be that any provision of
he statute that fails to accomplish the constitutional imperative to narrow
he class is invalid.

The Opinion acknowledges that the felony murder doctrine has been
everely criticized as being harsh and unjust and that in most jurisdictions in
hich felony murder has not been abolished, the death penalty can be imposed
nly where killings perpetuated during felonies are intentional, deliberate,
urposeful, or knowing. Id. at 337. The Opinion, however, finds that death as
 penalty for felony murder conforms with contemporary standards of decency in
'ennessee and, therefore, that "in the abstract" the sentence of death for
'elony murder is not per se cruel and unusual punishment. The standards of
lecency supporting this conclusion, the Opinion says, are evidenced by the act
)f the legislature enacting the statute and the acts of juries imposing that
)enalty in felony murder cases. At the appropriate time, this subject should
)e fully discussed. Perhaps sufficient for the present are the observations
:hat the legislature is essentially a *353 political body and that citizens
vho refuse to consider the sentence of death as punishment are disqualified as
jurors. In addition, the legislature enacted that portion of the statute,
T.C.A. s 39-13-204(i)(7), found by the majority Opinion to be unconstitutional
und the jury imposed the sentence of death on the defendant in this case based
ipon that statute. This evidence hardly supports the conclusion that imposing
the death penalty upon a felony murder conviction does not per se violate
Ar+icle I, Section 16. More importantly, that conclusion does not preclude
⊃ deration of those cases in which the imposition of the death penalty does
: .itute cruel and unusual punishment and it does not relieve the Court of
the responsibility for determining the proof necessary to support a jury's
sentence of death. Without this standard, prosecutors can continue to seek the
death penalty and juries can continue to impose the death penalty upon no ›
greater proof than that of reckless indifference.

In determining that standard, the Court need look no further than its reported
decisions. Without independently examining the requirements of the state
constitution, this Court has, by its decisions, recognized a higher standard of
culpability than that of reckless indifference set by the United States Supreme
Court. Analysis of our cases indicates that this Court, while not specifically
adopting a bright-line rule, has found that a felony murderer is death eligible
only where the killing is deliberate or intentional or accompanied by a
conscious purpose of producing death or a conscious realization that death will
likely occur. Since 1979, this Court has reviewed and released opinions in
approximately 84 cases in which the jury imposed a sentence of death. Review
of these opinions shows that the sentence was clearly based only on a
conviction of felony murder in 28 cases. [FN1] The proof in 16 of those 28
cases shows an intent to kill. [FN2] In six of the cases proof of the method
of killing or other evidence would support a finding of intent to kill, [FN3]
even though the issue was disputed. Two cases involved struggles in which the
intent to kill was not clearly shown, [FN4] in one case the defendant confessed

COPR. (C) WEST 1993 NO CLAIM TO ORIG. U.S. GOVT. WORKS

Respondent's Exhibit E

728

to the killing, [FN5] and one case is on remand. [FN6]  In only two of the 28 felony murder convictions is the intent to kill seriously in doubt. [FN7]

FN1. State v. Boyd, 797 S.W.2d 589 (Tenn.1990);  State v. Cauthern, 778 S.W.2d 39 (Tenn.1989);  State v. Taylor, 774 S.W.2d 163 (Tenn.1989);  State v. Irick, 762 S.W.2d 121 (Tenn.1988);  State v. Hines, 758 S.W.2d 515 (Tenn.1988);  State v. Smith, 755 S.W.2d 757 (Tenn.1988);  State v. Poe, 755 S.W.2d 41 (Tenn.1988);  State v. Barber, 753 S.W.2d 659 (Tenn.1988);  State v. Bobo, 727 S.W.2d 945 (Tenn.1987);  State v. Sparks, 727 S.W.2d 480 (Tenn.1987);  State v. King, 718 S.W.2d 241 (Tenn.1986);  State v. Goad, 707 S.W.2d 846 (Tenn.1986);  State v. Barnes, 703 S.W.2d 611 (Tenn.1985);  State v. Hartman, 703 S.W.2d 106 (Tenn.1985);  State v. Smith, 695 S.W.2d 954 (Tenn.1985);  State v. King, 694 S.W.2d 941 (Tenn.1985);  State v. McKay, 680 S.W.2d 447 (Tenn.1985);  State v. Sample, 680 S.W.2d 447 (Tenn.1984);  State v. Sheffield, 676 S.W.2d 542 (Tenn.1984);  State v. Workman, 667 S.W.2d 44 (Tenn.1984);  State v. Matson, 666 S.W.2d 41 (Tenn.1984);  State v. Campbell, 664 S.W.2d 281 (Tenn.1984);  State v. Laney, 654 S.W.2d 383 (Tenn.1983);  State v. Simon, 635 S.W.2d 498 (Tenn.1982);  State v. Strouth, 620 S.W.2d 467 (Tenn.1981);  State v. Coleman, 619 S.W.2d 112 (Tenn.1981);  State v. Dicks, 615 S.W.2d 126 (Tenn.1981);  State v. Cozzolino, 584 S.W.2d 765 (Tenn.1979).

FN2. Cauthern;  Taylor;  Hines;  Barber;  Sparks;  King (1986);  King (1985);  McKay;  Sample;  Sheffield; Matson;  Campbell;  Simon;  Strouth;  Dicks;  Cozzolino.

FN3. Poe;  Bobo;  Goad;  Laney;  Hartman;  Workman.

FN4. Boyd;  Smith (1985).

FN5. Coleman.

FN6. Smith (1988).

FN7. Irick;  Barnes.

The conclusion to be gathered from a review of these cases is that the jury verdicts imposing the death penalty upon convictions of felony murder were supported by proof that the killings were the proximate result of acts accompanied by an intent to kill, a conscious purpose to produce death, or a conscious realization that death likely would occur.  This standard requires an intent with respect to the killing, not just the underlying felony, and reflects a moral culpability greater than reckless indifference.  I would hold that Article I, *354 Section 16 requires proof of at least this standard.
 At the third stage of the process, sentences of death, based upon sufficient proof as discussed above, are then subject to a case-specific proportionality analysis in which this Court reviews evidence of the defendant's participation in the homicide and his mens rea in regard to the homicidal act.  Lockett v. Ohio, 438 U.S. 586, 612-17, 98 S.Ct. 2954, 2969-71, 57 L.Ed.2d 973 (1978),
                    COPR. (C) WEST 1993 NO CLAIM TO ORIG. U.S. GOVT. WORKS

Respondent's Exhibit E

(Blackmun, J., dissenting).  The review focuses on the defendant's character
and the circumstances of the crime and thus accomplishes the statutory mandate
th this Court determine whether the sentence of death imposed in each case
' xcessive or disproportionate to the penalty imposed in similar cases,
sidering both the nature of the crime and the defendant." T.C.A. s 39-13-
206(c)(1)(D).  In accomplishing the comparative proportionality review, the
Court makes three inquiries:  (1) whether the punishment for the crime conforms
with contemporary standards of decency, (2) whether the punishment is grossly
disproportionate to the offense, and (3) whether the imposition of the death
penalty accomplishes any legitimate penological objective.  State v. Black,
815 S.W.2d 166 (Tenn.1991).
The majority Opinion, despite having found that the constitution requires
genuine narrowing of the class of death-eligible defendants and, further, that
narrowing may not occur at the sentencing stage, nevertheless states, "We,
therefore, reaffirm the rejection of a per se proportionality approach in favor
of the required statutory proportionality review." Main Opinion at 340.  The
effect of this decision is that prosecutors may indict and juries may convict
on proof of reckless indifference, leaving the constitutional requirement for
narrowing to appellate review.  Both the majority Opinion and Justice Drowota's
dissent agree that the only constitutional safeguard is review by this Court.
Main Opinion at 340;  Drowota, J., dissenting at 349.  It is at the appellate
review stage that the process in Tennessee is the most deficient.
The Court is required to perform two distinct functions, in addition to the
consideration of the assignments of error.  It must determine, upon
consideration of the evidence regarding aggravating and mitigating
circumstances, whether the proof supports the sentence of death;  and it must
determine, upon consideration of the nature of the crime and the defendant,
whether the sentence is excessive or disproportionate in comparison with the
lty imposed in similar cases.  T.C.A. s 39-13-206(c)(1)(A), (B), (C), (D).
itial to the performance of the first function is the determination of the
quantum of proof required by the constitution or the statute to impose the
death penalty.  As previously discussed, the majority Opinion concludes,
erroneously in my view, that proof of reckless indifference is sufficient.
Performance of the second function, comparative proportionality review,
requires a determination different from that of ascertaining the parameters of
the death-eligible class.  It requires a consideration not only of the case
before the Court but the spectrum of sentences in similar cases throughout the
state.  See State v. Harris, 839 S.W.2d 54 (Tenn.1992), Reid, C.J.,
dissenting.  Unfortunately, the reported decisions do not reflect strict
performance of this function because they do not include a disciplined
proportionality review.  What passes for a comparative proportionality review
is essentially a reiteration of the facts surrounding the commission of the
offense, followed by a conclusory statement that the death penalty is not
disproportionate in that particular case.  Only rarely has the Court even
reviewed the facts of other cases in which the death penalty has been
affirmed.  See e.g., State v. Barber, 753 S.W.2d 659 (Tenn.1988).
The only way to judge the effectiveness of the death penalty process is to
examine the results.  If it "includes defendants who are not necessarily more
deserving of the death penalty and excludes those who are not necessarily less
deserving," the process fails to genuinely narrow the class of death-eligible
          COPR. (C) WEST 1993 NO CLAIM TO ORIG. U.S. GOVT. WORKS

Respondent's Exhibit E            730

defendants. Rosen, Felony Murder and the Eight Amendment Jurisprudence of Death, 31 B.C.L. Review 1103, 1125 (1990). This determination can be *355 made only by comparing murderers sentenced to death with those given ? ; severe sentences, a procedure not followed in past reported decisions. T... Court obviously has substituted for the proportionality review required at this third stage of the proceedings a finding that the proof shows the defendant to be a member of the death-eligible group which, under the federal constitution and the Tennessee statute, includes all cases in which the proof meets the threshold standard of reckless indifference. This practice is acknowledged by the statement in Justice Drowota's dissent that the death penalty is not disproportionate punishment so long as the reckless indifference standard of Enmund and Tison is met. Drowota, J., dissenting at 349. Consequently, the Court has not found the punishment disproportionate in any of the 84 cases in which the sentence of death has been imposed since 1977. This fact alone would suggest there has been no effective proportionality review on appeal. It also places in doubt Justice Drowota's confident assertion that, "Our sentencing system, created to meet the mandates of Furman may be trusted to discern and remove those persons perpetrating these less egregious forms of felony murder from the list of those condemned to death." Drowota, J., dissenting at 349.

The result is that the class of death-eligible defendants is not genuinely narrowed by the statutory definition of felony murder; the sentencing statute by its terms fails to narrow the class; Article I, Section 16, as interpreted by the majority in this decision, does not invalidate those provisions of the statute which do not effect narrowing; and the appellate review mandated by statute has been limited to a finding that the proof meets the threshold standard of reckless indifference.

I concur that the judgment of conviction be affirmed and that the case remanded for sentencing.

am authorized to state that Justice DAUGHTREY concurs in this Opinion.

ND OF DOCUMENT

COPR. (C) WEST 1993 NO CLAIM TO ORIG. U.S. GOVT. WORKS

731

Respondent's Exhibit E

...will not be necessary to resubmit evidence which was admitted at time of trial. New evidence can be adduced in the form of a supplemented record. *See Rich v. Martin Marietta Corp., supra,* 522 F.2d at 347.

Reversed and remanded for further proceedings consistent with this opinion.

ROSS, Circuit Judge, concurring in part and dissenting in part.

I agree with the majority that the trial court should have permitted this action to proceed as a class action. I do not agree, however, with the determination that the trial court erred in dismissing appellant's individual claim. The specific findings as to credibility and as to the facts concerning the appellant's personal case are set forth at length in Judge Devitt's opinion, *Donaldson v. Pillsbury Co.,* 406 F.Supp. 1210 (D.Minn.1976), and, in my opinion, are not clearly erroneous.

The majority suggests that appellant's claim be reconsidered in light of "relevant evidence of discriminatory patterns and practices by Pillsbury." But unless the trial court erred in some or all of its specific detailed findings of fact, the general statistical evidence will not change the fact that Pillsbury proved that it was fully justified in discharging the appellant for nondiscriminatory reasons. I do not agree that the fact that some evidence was admitted nunc pro tunc subsequent to trial is any indication that the trial court failed to give it full consideration as it related to appellant's individual case.

I have serious reservations concerning the ability of the plaintiff to properly represent the class she seeks to represent in view of the fact that her own case was so completely without merit. However, I do agree that the failure of the class representative to prevail on her own claim does not necessarily disqualify her from representing the class.



---

UNITED STATES of America, Appellee,

v.

Mary Delores MAESTAS, Appellant.

No. 76–1624.

United States Court of Appeals,
Eighth Circuit.

Submitted Dec. 13, 1976.

Decided April 14, 1977.

As Amended June 2, 1977.

Certiorari Denied June 13, 1977.
See 97 S.Ct. 2936.

Defendant was convicted in the United States District Court for the District of Nebraska, Warren K. Urbom, Chief Judge, of two counts of interstate transportation of falsely made, forged or counterfeit securities, and she appealed. The Court of Appeals, Webster, Circuit Judge, held: (1) that evidence of other crimes was admissible as proof of identity, common plan or scheme and absence of mistake, and (2) that an affidavit for a warrant to search defendant's apartment contained ample reliable information to show probable cause for the search.

Affirmed.

1. Criminal Law ⟷ 369.15, 371(1), 372(14), 374

In prosecution for interstate transportation of falsely made, forged or counterfeit securities, evidence that defendant's fingerprints appeared on other forged checks was admissible as proof of identity, common plan or scheme and absence of mistake; such evidence did not so overshadow principal case against defendant as to confuse jury or unduly prejudice defendant, and was not inadmissible because Government failed to prove every element of each of other crimes concerning which such evidence was introduced. 18 U.S.C.A. § 2314; Federal Rules of Evidence, rules 403, 404(b), 28 U.S.C.A.

2. Criminal Law ⟷ 404(2)

In prosecution for interstate transportation of falsely made, forged or counterfeit

---

securities, other cr... of counterfeit driv... ty cards and corp... fendant's apartm... duced where posse... would be of use i... feit checks, was hi... ant's participatio... quantity in which cated that defend... materials by mist... U.S.C.A. § 2314; dence, rule 403, 2

3. Searches and S...

Affidavit in search apartment in interstate transpo... forged or counte... ample reliable inf... ing of probable quantity of count... session at her § 2314.

4. Criminal Law

In prosecutio... state transportati... or counterfeit se... to make fair tria... when proser...ti... cashed cou... fendant, referrec... another trial and had" by defend...

Patrick J. O'D... appellant.

Jeffrey A. Bog... ha, Neb., for ap... U. S. Atty., Om...

Before MATT... and STEPHENS... cuit Judges.

WEBSTER, C

Mary Delores ... tion on two coun... tion of falsely m... securities, in vic... She challenges

UNITED STATES v. MAESTAS 835

Cite as 554 F.2d 834 (1977)

securities, other crimes evidence, consisting of counterfeit drivers' licenses, social security cards and corporate checks found in defendant's apartment, was properly introduced where possession of such items, which would be of use in scheme to pass counterfeit checks, was highly probative of defendant's participation in such scheme and quantity in which they were found indicated that defendant did not possess such materials by mistake or inadvertence. 18 U.S.C.A. § 2314; Federal Rules of Evidence, rule 403, 28 U.S.C.A.

3. Searches and Seizures ⇐3.6(2)

Affidavit in support of warrant to search apartment of person suspected of interstate transportation of falsely made, forged or counterfeit securities contained ample reliable information to support finding of probable cause that suspect had quantity of counterfeit materials in her possession at her residence. 18 U.S.C.A. § 2314.

4. Criminal Law ⇐1169.1(2)

In prosecution of defendant for interstate transportation of falsely made, forged or counterfeit securities, prejudice such as to make fair trial impossible did not result when prosecution witness, bank teller who cashed counterfeit check presented by defendant, referred during her testimony to another trial and stated that she had "been had" by defendant. 18 U.S.C.A. § 2314.

———

Patrick J. O'Donnell, Lincoln, Neb., for appellant.

Jeffrey A. Bogue, Asst. U. S. Atty., Omaha, Neb., for appellee; Daniel E. Wherry, U. S. Atty., Omaha, Neb., on brief.

Before MATTHES, Senior Circuit Judge, and STEPHENSON and WEBSTER, Circuit Judges.

WEBSTER, Circuit Judge.

Mary Delores Maestas appeals her conviction on two counts of interstate transportation of falsely made, forged, or counterfeit securities, in violation of 18 U.S.C.§ 2314. She challenges the admission of other

crimes evidence and of certain evidence seized in a search pursuant to a warrant. She contends also that she was entitled to a mistrial as a result of a witness's prejudicial comments. We find no error, and affirm the conviction.

The indictment charged the transportation of two falsely made, forged, and counterfeit cashier's checks, each in the amount of $4,144.67 and both drawn on the Harris Trust and Savings Bank, of Chicago. At trial, the government proved that each check was cashed by a woman, one on June 3, 1975, in North Platte, Nebraska, and the other on June 6, 1975, in Kearney, Nebraska. Each transaction occurred at a bank; on each occasion the woman who cashed the check deposited a portion of the proceeds to the account of a legitimate depositor and received the remainder in cash. Both checks went through normal banking channels to Chicago, where they were found to be counterfeit.

Appellant's fingerprints were found on the check cashed in North Platte and on both the check and deposit slip used in Kearney. The government proved that appellant was in Kearney on June 4. However, there was no eyewitness identification of appellant as the person who cashed either check.

The government introduced substantial evidence of appellant's participation in other criminal activity. On May 9, 1975, a bogus Harris check was passed in El Paso, Texas. The check bore appellant's fingerprints, and a teller identified appellant as the person who cashed it. On April 16, 1975, a counterfeit check drawn on the National Bank of Austin, of Chicago, was cashed in Denver. A suspicious teller took a picture of the woman who cashed it. An FBI agent later showed the picture to appellant, who said the picture made her look "awfully heavy."

In four more transactions involving counterfeit Harris Trust checks, appellant's fingerprints were found on either the check or the deposit slip. All these transactions occurred in April or May of 1975. All the

733

checks bore notations indicating that they had been presented for payment in Chicago. One Harris check was introduced which did not bear appellant's fingerprints. The check was payable to Sylvia Ram. The government was allowed to prove that Ms. Ram's mail had been tampered with prior to the cashing of this check, and that a fingerprint of appellant was found on a personal check which had been tampered with.

The District Court[1] also allowed the government to introduce evidence seized in a search of appellant's apartment made pursuant to a search warrant. This evidence included counterfeit drivers' licenses, social security cards, and corporate checks.

On this evidence, the jury found appellant guilty on both counts with which she was charged.

## I.

Appellant's principal contention is that the other crimes evidence was improperly admitted. Admissibility of this evidence is governed by Fed.R.Evid. 404(b), which provides:

> Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportuni-

1. The Honorable Warren K. Urbom, Chief Judge, United States District Court for the District of Nebraska.

2. Prior to the adoption of the Federal Rules of Evidence, this Court applied a balancing test to assess the use of evidence of other crimes. Even if the evidence were relevant to show motive, intent, common plan or scheme, identity, or absence of mistake, *see, e. g., United States v. Conley,* 523 F.2d 650, 653 (8th Cir. 1975), *cert. denied,* 424 U.S. 920, 96 S.Ct. 1125, 47 L.Ed.2d 327 (1976); *United States v. Cochran,* 475 F.2d 1080, 1082 (8th Cir.), *cert. denied,* 414 U.S. 833, 94 S.Ct. 173, 38 L.Ed.2d 68 (1973), we held that it would only be admissible if "(1) [A]n issue on which other crime evidence may be received is raised; (2) . . . the proffered evidence is relevant to that issue; (3) . . . the evidence is clear and convincing; and (4) . . . the probative worth outweighs the probable prejudicial impact." *Unit-*

ty, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Fed.R.Evid. 403 authorizes the district court to exclude such evidence, even though relevant, "if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." Our task is to assess the relevancy and the probative value of the challenged evidence; if it meets the requirements of Rule 404(b) we may not reverse the ruling of the District Court unless we also find that the prejudice from admitting the evidence substantially outweighed its probative value. In making that evaluation, we must give great deference to the district judge, who saw and heard the evidence. *United States v. Nichols,* 534 F.2d 202 (9th Cir. 1976); *United States v. Gocke,* 507 F.2d 820, 824 (8th Cir. 1974), *cert. denied,* 420 U.S. 979, 95 S.Ct. 1407, 43 L.Ed.2d 660 (1975); *United States v. Skillman,* 442 F.2d 542, 551–52 (8th Cir.), *cert. denied,* 404 U.S. 833, 92 S.Ct. 82, 30 L.Ed.2d 63 (1971).

Prior to July 1, 1975, the effective date of the Federal Rules of Evidence, the federal courts developed a substantial body of case law dealing with the use of other crimes evidence. These pre-Rules decisions must now be harmonized and read in consonance with the most recent statement of congressional policy.[2]

ed States v. Clemons, 503 F.2d 486, 489 (8th Cir. 1974).

We also held prior to July 1, 1975, that where evidence of other crimes is relevant, reversal is only commanded when "it is clear that the questioned evidence has no bearing upon any of the issues involved." *United States v. Belle,* 516 F.2d 578, 581 (8th Cir. 1975), *quoting United States v. Gocke,* 507 F.2d 820, 824 (8th Cir. 1974), and *United States v. Cochran,* 475 F.2d 1080, 1082 (8th Cir.), *cert. denied,* 414 U.S. 833, 94 S.Ct. 173, 38 L.Ed.2d 68 (1973).

After July 1, 1975, this Court analyzed other crimes problems without specific use of the four-pronged *Clemons* test in *United States v. Aaron,* 553 F.2d 43 (8th Cir. 1977); *United States v. Moss,* 544 F.2d 954, 961 (8th Cir. 1976); *United States v. Porter,* 544 F.2d 936, 939 (8th Cir. 1976); and *United States v. Wixom,* 529 F.2d 217, 220 (8th Cir. 1976). *But see United States v. Jardan,* 552 F.2d 216 (8th Cir. 1977); *United States v. Davis,* 551 F.2d 233

[1]   Several
crimes evidenc
ed in the prese
were intent, o
tity.   It was i
to prove that
cashed the tw
ject of the in
any eyewitne
very much
government v
tent which i
offense.   *Uni*
129, 131 (8th
*v. Gocke, su*

Appellant's
idence on the
ment was the
dence to sho
Appellant's
cross-examin
appellant's f
placed on th
sons at any t
ed to the bar
a common pl
of mistake l

The eviden
counterfeit
wit...
checks ..
were cashed

(8th Cir. 19
F.2d 1035,
*v. Bledsoe,*
Fed.R.Evid.
Under Ci
crimes evid
worth" of
weigh[ed] t
403, releva
cluded if "
outweighed
. . . ."
Under th
exclude [c
basis of tf
403, i.e.,
time." S.
(1974); re
Ad.News.
evidence v
competent
into evide

A.

[1] Several matters on which other crimes evidence is admissible were contested in the present case. Particularly at issue were intent, or guilty knowledge, and identity. It was incumbent on the government to prove that appellant was the person who cashed the two checks which were the subject of the indictment. In the absence of any eyewitness identification, identity was very much in issue. In addition, the government was required to prove the intent which is an element of the § 2314 offense. *United States v. Spica,* 413 F.2d 129, 131 (8th Cir. 1969); *see United States v. Gocke, supra,* 507 F.2d at 824.

Appellant's defense to the fingerprint evidence on the checks charged in the indictment was the inconclusiveness of such evidence to show a purposeful law violation. Appellant's counsel sought by vigorous cross-examination to convince the jury that appellant's fingerprints could have been placed on the checks for a variety of reasons at any time before they were presented to the bank.[3] Thus the proof of identity, a common plan or scheme, and the absence of mistake became important.

The evidence that appellant cashed other counterfeit checks that six of these checks were drawn on the same bank as were the checks described in the indictment, that all were cashed within a two month period,

and that many were cashed in split deposit transactions, was highly probative on these issues. It tended to prove both that she cashed the checks and that she did so as part of a scheme, rather than through inadvertence or mistake. *See United States v. Wetzel,* 514 F.2d 175, 178 (8th Cir.), *cert. denied,* 423 U.S. 844, 96 S.Ct. 80, 46 L.Ed.2d 65 (1975); *United States v. Gocke, supra; United States v. Gray,* 464 F.2d 632, 636 (8th Cir. 1972); *United States v. Spica, supra.* It is clear that the requirements of Rule 404(b) were satisfied. In addition, Rule 403 presents no bar to the admission of this evidence, in that its probative value was not substantially outweighed by any prejudicial impact.[4] *See United States v. Nichols, supra.*

Appellant contends that the evidence of other checks is inadmissible because the government failed to prove every element of each of the other crimes concerning which evidence was introduced. She relies on *United States v. Broadway,* 477 F.2d 991 (5th Cir. 1973), where the Fifth Circuit, in a § 2314 prosecution, excluded evidence of the passing of other forged money orders, on the theory that it had not been proved that, although defendant had possessed the money orders, she was also the person who cashed them. The Fifth Circuit held that, where evidence of another crime is used to prove intent, the other crime must include

3. The government was entitled to anticipate this obvious defense. *See United States v. Conley,* 523 F.2d 650, 654 (8th Cir. 1975), *cert. denied,* 424 U.S. 920, 96 S.Ct. 1125, 47 L.Ed.2d 327 (1976); *United States v. Cirillo,* 499 F.2d 872, 888–89 (2d Cir.), *cert. denied,* 419 U.S. 1056, 95 S.Ct. 638, 42 L.Ed.2d 653 (1974).

4. Our Court has held that a relevant consideration is the amount of time and evidence required during trial to develop the evidence of other criminal activity. In *United States v. Clemons,* 503 F.2d 486, 491 (8th Cir. 1974), we held that such evidence so overshadowed the principal case that it very likely confused the jury and unduly prejudiced the defendant. Our review of the transcript satisfies us that in this case there has not been a prejudicial distortion by reason of excessive preoccupation with evidence of other criminal activity.

(8th Cir. 1977); *United States v. McMillian,* 535 F.2d 1035, 1038 (8th Cir. 1976); *United States v. Bledsoe,* 531 F.2d 888 (8th Cir. 1976). *See* 1 Fed.R.Evid.News 47 (1976).

Under *Clemons* and succeeding cases, other crimes evidence was admitted if "the probative worth" of the challenged evidence "outweigh[ed] the prejudicial impact." Under Rule 403, relevant evidence of other crimes is excluded if "its probative value is substantially outweighed by the danger of unfair prejudice . . . . ."

Under the new rules "the trial judge may exclude [other crimes evidence] only on the basis of those considerations set forth in Rule 403, i.e., prejudice, confusion, or waste of time." S.Rep.No.1277, 93d Cong., 2d Sess. 25 (1974); *reprinted in* [1974] U.S.Code Cong. & Ad.News. pp. 7051, 7071. Clearly, however, evidence which is vague and speculative is not competent proof and should not be admitted into evidence.

735

"the essential physical elements of the offense charged," and those elements "must be clearly proven by competent evidence." 477 F.2d at 995.

We expressed our reservations about the Fifth Circuit's holding in *United States v. Gocke, supra,* 507 F.2d at 825, where we said:

[W]e do not require in each case that evidence be that of an identical offense. It is enough that the evidence be of similar involvement reasonably related to the offending conduct and be presented in an manner in which prejudice does not outweigh its probative value. [footnotes omitted]

This reservation was again noted in *United States v. Belle,* 516 F.2d 578, 581 (8th Cir. 1975).[5] To this we have added that the evidence must not be of "vague and uncertain character." *United States v. Spica, supra,* 413 F.2d at 129.

In this case the evidence of the other crimes is of a series of checks, cashed in similar transactions, each bearing appellant's fingerprints, and some tied to her by direct evidence. This evidence shows similar involvement in related offenses; as indicated above, its prejudicial impact does not substantially outweigh its probative value. It is not of "vague and uncertain character." The evidence thus is admissible, notwithstanding the absence of direct proof that appellant was the person who cashed certain of the checks.[6]

## B.

[2] Appellant also challenges as the improper use of other crimes evidence the admission of the materials seized from her Denver apartment, which included counterfeit drivers' licenses, social security cards, and corporate checks. The connection between appellant and these items was clear and convincing. Her possession of these items, which would be of use in a scheme to pass counterfeit checks, was highly probative of her participation in such a scheme. The quantity in which they were found indicated that she did not possess the materials by mistake or inadvertence.

In *United States v. Gocke, supra,* we approved the admission of counterfeit drivers' licenses which had been in the possession of a defendant charged with passing counterfeit federal reserve notes. We found the licenses probative on the issues of the defendant's participation in a common scheme or plan, and the absence of inadvertence or mistake. The similar materials involved in this case were likewise relevant; their probative value was not substantially outweighed by their prejudicial impact.[7]

---

5. The rule in *United States v. Broadway,* 477 F.2d 991 (5th Cir. 1973), has been criticized by the Ninth Circuit as "overly restrictive." *United States v. Riggins,* 539 F.2d 682, 683 (9th Cir. 1976).

6. In *United States v. Riggins,* 539 F.2d 682 (9th Cir. 1976), the Ninth Circuit upheld the admission, in a § 2314 prosecution, of a forged money order not charged in the indictment. This money order was linked to the defendant by a fingerprint; it was admitted despite an absence of direct proof that the defendant was the person who cashed it.

In *United States v. Pickens,* 465 F.2d 884, 885 (10th Cir. 1972), also a § 2314 case, the Tenth Circuit upheld the admission of a stolen money order, not charged in the indictment, which was connected to the defendant by a fingerprint.

7. The Advisory Committee Note to Fed.R.Evid. 403 defines "unfair prejudice" as follows:

"Unfair prejudice" within its context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.

It further provides that,

[i]n reaching a decision whether to exclude on grounds of unfair prejudice, consideration should be given to the probable effectiveness or lack of effectiveness of a limiting instruction.

In his final charge, Judge Urbom instructed the jury, without objection, as follows:

Evidence that an act was done at one time, or on one occasion, is not any evidence or proof whatever that a similar act was done at another time, or on another occasion. That is to say, evidence that a defendant may have committed an earlier act of a like nature may not be considered by the jury in determining whether the accused committed any act charged in the indictment. Such evidence may be used, however, to show the identity of the person committing the acts alleged in the indictment.

Additionally, if the jury should find beyond a reasonable doubt from other evidence in

---

[3] Appellan[t] to admission of her apartment. was an insuffi cause prior to t which led to th The warrant wa judge on the Denver police showed that a checks had com that appellant h the checks by Denver police police that a s closed evidence identifications Lewis" in Denv appellant had

Reading the fashion, we co reliable inforr judge to supp cause that ap counterfeit ma her residence. *tresca,* 380 U.! L.Ed.2d gard,* 551 F. *United States* (1st Cir. 1976); F.2d 290, 293 U.S. 825, 96 S The warrant

[4] Appell[a] relates to cert the El Paso, T fied appellant counterfeit ch

the case tha in the part then the jur alleged ear[l] mining the the accusec ular count. earlier act evidence w jury may,

6418

## UNITED STATES v. MAESTAS
### Cite as 534 F.2d 834 (1977)

839

### II.

[3] Appellant makes a second objection to admission of the evidence seized from her apartment. She contends that there was an insufficient showing of probable cause prior to the issuance of the warrant which led to the seizure of the materials. The warrant was issued by a Colorado state judge on the basis of an affidavit by a Denver police officer. The affidavit showed that a large number of bogus checks had come into the Denver area, and that appellant had been linked to certain of the checks by fingerprint evidence. The Denver police had learned from Chicago police that a search in that city had disclosed evidence that counterfeit checks and identifications were being sent to a "Dee Lewis" in Denver; Dee Lewis was a name appellant had been known to use.

Reading the affidavit in a common sense fashion, we conclude that there was ample reliable information before the issuing judge to support a finding of probable cause that appellant had a quantity of counterfeit materials in her possession at her residence. *See United States v. Ventresca,* 380 U.S. 102, 109, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965); *United States v. Burgard,* 551 F.2d 190 at 192 (8th Cir., 1977); *United States v. Samson,* 533 F.2d 721, 723 (1st Cir. 1976); *United States v. Rahn,* 511 F.2d 290, 293 (10th Cir.), *cert. denied,* 423 U.S. 825, 96 S.Ct. 41, 46 L.Ed.2d 42 (1975). The warrant was properly issued.

### III.

[4] Appellant's final assertion of error relates to certain testimony of Ruth Hoyt, the El Paso, Texas, bank teller who identified appellant as having cashed one of the counterfeit checks. On direct examination the following occurred when the witness was handed a check and a deposit ticket:

Q: Is there any other reason that you remember these particular exhibits?

A: I tell you what; I can remember them because these are the same ones that were handed to me at the trial in El Paso, Texas.

The District Court immediately ordered this answer stricken. On cross-examination, the witness stated, in response to a question, that she "had been had" by appellant, and this was why she remembered her. Appellant's counsel subsequently moved for a mistrial, contending that the witness's statements had unfairly prejudiced the jury. The District Court, after careful consideration, refused a mistrial. Appellant claims this was error.

The District Court has broad discretion in determining whether claimed improper prejudicial testimony has so tainted the trial as to require a mistrial. *See United States v. Aaron,* 553 F.2d 43 (8th Cir. 1977); *United States v. Splain,* 545 F.2d 1131 at 1133 (8th Cir. 1976); *United States v. Bear Killer,* 534 F.2d 1253, 1261 (8th Cir. 1976). The District Court properly exercised that discretion here. As Judge Urbom pointed out, any reference to a trial in Texas[] did not import a criminal trial, and certainly did not imply a conviction. Similarly, references to the witness's having "been had" could not have so prejudiced the jury as to make a fair trial impossible.

Affirmed.



---

the case that the accused did the act charged in the particular count under deliberation, then the jury may consider evidence as to an alleged earlier act of a like nature in determining the state of mind or intent with which the accused did the act charged in the particular count. And where proof of an alleged earlier act of a like nature is established by evidence which is clear and conclusive, the jury may, but is not obliged to, draw the inference and find that in doing the act charged in the particular count under deliberation the accused acted wilfully and with specific intent and not because of mistake or accident or other innocent reason.

Appellant does not object to the sufficiency of this instruction. It is apparent that no plain error is shown. *See* Fed.R.Crim.P. 30 and 52(b).

737

The purpose of the children's benefits provisions is to provide support for all children of deceased insureds who can demonstrate their need in terms of dependency at the time of the insured's death. This protection extends to all children who have lost either the actual support of an insured parent or the anticipated support which that parent would have expected to furnish had his death not intervened. *See Jimenez v. Weinberger,* 417 U.S. 628, 634, 94 S.Ct. 2496, 2500, 41 L.Ed.2d 363 (1974); *Suarez v. Secretary of Health & Human Services,* 755 F.2d 1, 3 (1st Cir.), *cert denied,* 474 U.S. 844, 106 S.Ct. 133, 88 L.Ed.2d 109 (1985); *Parsons for Bryant v. Health and Human Services,* 762 F.2d 1188, 1190 (4th Cir.1985). As remedial legislation, enacted as a national insurance program, the Social Security Act, particularly those provisions relating to children, is to be accorded a liberal application in consonance with its humanitarian aims. *See Doran v. Schweiker,* 681 F.2d 605, 607 (9th Cir.1982) (liberal construction of requirement that father contribute to the support of an unborn illegitimate child); *Eisenhauer v. Mathews,* 535 F.2d 681, 686 (2d Cir.1976) (liberal interpretation of provisions for stepchildren); *Holmes v. Weinberger,* 423 F.Supp. 149, 154 (E.D.N.Y.1976) (liberal construction of terms in 42 U.S.C. § 402). A court is not to interpret the act so as to withhold benefits in marginal cases. *Smith v. Heckler,* 820 F.2d 1093, 1095 (9th Cir.1987); *Adams v. Weinberger,* 521 F.2d 656, 659 (2d Cir.1975).

The Secretary has maintained that much deference should be given to its decision to deny benefits. As it argued in *Jimenez,* such deference to the agency "is necessary to prevent spurious claims because '[t]o the unscrupulous person, all that prevents him from realizing ... gain is the mere formality of a spurious acknowledgment of paternity or a collusive paternity suit with the mother of an illegitimate child who is herself desirous or in need of the additional cash.'" 417 U.S. at 635, 94 S.Ct. at 2501. Yet, we need not defer to an illogical interpretation of the statute. Nor need we deny benefits in marginal cases merely because the Secretary fears "spurious

claims." *See NLRB v. Brown,* 380 U.S. 278, 291, 85 S.Ct. 980, 988, 13 L.Ed.2d 839 (1965) (courts need not rubber-stamp administrative decisions that are inconsistent with statutory mandate or that frustrate policy underlying statute). There has been absolutely no evidence presented in this case that would indicate that Groth acknowledged Scott as his son merely for his personal gain. Similarly, there has been no evidence of collusion or fraud on the part of Groth and Jeanette Luke. The desire to protect the social security trust fund from spurious claims should not override the mandate to award children's benefits in close cases. Even if, in fact, Groth was not Scott's father, we should not deny benefits unless the lack of a biological relationship can be conclusively proven. If the child has a valid written acknowledgment of parentage, and the Secretary cannot rebut the statutory presumption of legitimacy, that child should receive the financial protection of social security benefits.



---

UNITED STATES of America, Appellee,

v.

Keith Eugene BALL, Appellant.

No. 88–5183.

United States Court of Appeals,
Eighth Circuit.

Submitted Dec. 13, 1988.

Decided Feb. 23, 1989.

Rehearing Denied April 7, 1989.

Defendant was convicted in the United States District Court, Western District of South Dakota, Richard H. Battey, J., of forcibly assaulting a federal officer. Defendant appealed. The Court of Appeals, Whipple, District Judge, sitting by designation, held that defendant's postarrest statements were admissible.

Affirmed.

**1. Criminal Law**

Officers' testi[...]
rest statements [...]
admissible to pro[...]
prosecution for f[...]
officer with dang[...]
evidence was mat[...]
absence of mist[...]
statements were [...]
with charge of as[...]
proved by clear [...]
that defendant m[...]
bative value of e[...]
high, given that i[...]
able as to defen[...]
absence of mista[...]
404(b), 28 U.S.C[...]
1114.

**2. Criminal Law**

Trial court d[...]
in determining [...]
challenged state[...]
of federal officer[...]
weigh probative [...]
of other evidenc[...]
intent to commit [...]
evidence of post[...]
essary and not [...]
Rules Evi[...]

Jane Wipf, R[...]
lant.

Ted L. McBri[...]
City, S.D., for [...]

Before McMI[...]
Circuit Judges [...]
Judge.

WHIPPLE, I[...]

Appellant w[...]
with one coun[...]
federal officer [...]
weapon in viola[...]
18 U.S.C. § 1[...]

* The HONORAl[...]
States District J[...]
Missouri, sittin[...]

1. The Honorab[...]
States District [...]
Dakota, Wester[...]

U.S. v. BALL                                    985
Cite as 868 F.2d 984 (8th Cir. 1989)

**1. Criminal Law ⟜371(1, 12)**

Officers' testimony concerning postar-rest statements made by defendant was admissible to prove intent of defendant in prosecution for forcibly assaulting federal officer with dangerous or deadly weapon; evidence was material to issue of intent or absence of mistake, alleged threatening statements were similar and consistent with charge of assault, officers' testimony proved by clear and convincing evidence that defendant made statements, and probative value of evidence was exceptionally high, given that it was best evidence available as to defendant's intent, motive and absence of mistake. Fed.Rules Evid.Rule 404(b), 28 U.S.C.A.; 18 U.S.C.A. §§ 111, 1114.

**2. Criminal Law ⟜338(7)**

Trial court did not abuse its discretion in determining that prejudicial impact of challenged statements relating to assault of federal officer did not substantially outweigh probative value of statements; lack of other evidence establishing defendant's intent to commit assault indicated resort to evidence of postarrest statements was necessary and not unfairly prejudicial. Fed. Rules Evid.Rule 403, 28 U.S.C.A.

---

Jane Wipf, Rapid City, S.D., for appellant.

Ted L. McBride, Asst. U.S. Atty., Rapid City, S.D., for appellee.

Before McMILLIAN and BEAM, Circuit Judges and WHIPPLE,[*] District Judge.

WHIPPLE, District Judge.

Appellant was charged by indictment with one count of forcibly assaulting a federal officer with a dangerous or deadly weapon in violation of 18 U.S.C. § 111 and 18 U.S.C. § 1114. Trial commenced on

March 14, 1988, and on March 15, 1988, the jury returned its verdict of guilty upon the lesser included offense of forcibly assaulting a federal officer.

The sole issue presented on appeal is whether the district court[1] erred in admitting testimony regarding appellant's alleged post-arrest statements. We affirm.

**1. BACKGROUND**

On August 8, 1987 Forest Service enforcement officers Ronald Miller and Steven Ruppert were engaged in routine patrol in the Pactola District of the Black Hills National Forest near Rapid City, South Dakota. Both officers were in uniform and in a marked Forest Service vehicle. The officers arrived at a park picnic ground shortly after 10:00 p.m. and observed three individuals beside a campfire. The three individuals were later identified as Dean Kelley, Melanie Kelley, and appellant Keith Ball.

Appellant and his friends had spent the day recreating at the park. The picnic ground where they were located had been designated for day use which required it to be vacated by 10:00 p.m. and they were there after 10:00 o'clock at night due to the fact that the Kelleys' vehicle had stalled. They were waiting for assistance with the stalled vehicle when observed by the Forest Service officers.

After observing the three individuals beside the fire, the officers disembarked from their vehicle and immediately requested identification from appellant and the Kelleys. Dean Kelley complied. Melanie Kelley refused to provide any identification. At this point there is a divergence in the recitation of facts concerning what occurred.[2] Officers Miller and Ruppert testified that appellant was provocative and difficult concerning identification of his per-

---

[*] The HONORABLE DEAN WHIPPLE, United States District Judge for the Western District of Missouri, sitting by designation.

[1]. The Honorable Richard H. Battey, United States District Judge for the District of South Dakota, Western Division.

[2]. Both versions of the facts will be summarized but the jury has resolved the fact issues by its finding of guilty, which would be compatible with the officers' version of the incident.

son.[3]  However, appellant ultimately surrendered his fishing license to Officer Ruppert.  The officers testified that they then attempted to locate the Kelleys' keys to their vehicle.

The Kelleys testified that the officers had immediately requested identification and the officers removed the keys from the Kelleys' vehicle, which angered and concerned them.  During this time, appellant allegedly approached officer Miller and made derogatory or threatening statements.  Shortly thereafter, a friend of appellant's, David Marrs, returned to help move the Kelley vehicle.  Appellant and the others were going to tow the vehicle out of the picnic area with a logging chain and Mr. Marrs' pickup.

The officers testified that after appellant approached Miller and made derogatory or threatening statements concerning the chain,[4] Miller backed away from appellant and started to turn around when he was struck in the leg by the chain.  Appellant testified that he was connecting the chain between the disabled Kelley vehicle and the Marrs pick-up when Officer Miller tripped over the chain as appellant was kneeling down and pulling on it to remove the slack.  The appellant and his witnesses, Dean and

3.  Officer Ruppert testified that appellant pulled out a fishing license and intentionally dropped it on the ground in front of him.  Ruppert asked appellant to pick up the license.  Again, appellant dropped the license in front of him.  After Ruppert obtained the license he returned to the Forest Service vehicle to check the license with the local county sheriff's dispatcher.  While at the vehicle, Ruppert observed appellant pick up a large piece of firewood and begin beating the fire grill where he and his friends had built a fire.

4.  Officer Ruppert testified that appellant appeared at his side with the chain and Ruppert stepped around him to return to Melanie Kelley to again request indentification.  Then appellant approached him with the chain in his hand.  Ruppert turned to appellant and asked, "Are you threatening me with that chain?" (Tr. 96).  Appellant did not respond.  At this point officer Miller, the more experienced officer and the only armed officer, stepped between appellant and Ruppert and advised appellant not to threaten Ruppert with the chain.  Appellant apparently taunted the officers, stating, "Go ahead and take it off my shoulder."  Officer Miller took the chain off his shoulder and appellant

Melanie Kelley testified that this was how Officer Miller was injured by the chain.

After Officer Miller was struck by the chain, the appellant and Melanie Kelley were arrested and placed in the Forest Service vehicle for transportation back to the Pennington County Jail.  The officers testified that during the trip to the county jail, the appellant voluntarily stated that he had access to a 25.06 and a .41 Magnum (firearms) and that in order to become a member of the Sons of Silence, an infamous motorcycle gang, he would have to kill somebody.  The officers testified that appellant also stated that if he couldn't do it, he had friends who could.  The officers stated that no questions were asked of appellant during this time and that he voluntarily made these statements.  Both the appellant and Melanie Kelley denied that these statements were made.

Prior to trial, defense counsel moved in limine to suppress or limit admission of these post-arrest statements.  A hearing was held pursuant to 18 U.S.C. § 3501, for the purpose of taking the testimony regarding the post-arrest statements.  The court specifically found that the statements were admissible under the criteria set forth in § 3501.[5]

put it back on.  Again, Officer Miller took the chain off appellant's shoulder.  At this point Miller backed away from appellant and started to turn around.  (Tr. 54-56, 96-97).

5.  Section 3501 of 18 U.S.C. governs admissibility of confessions.  Sub-section (b) sets forth the five factors the trial judge should consider in determining the issue of whether information was given voluntarily, including (1) the time elapsing between arrest and arraignment of the defendant making the confession if it was made after arrest and before arraignment, (2) whether such defendant knew the nature of the offense with which he was charged or of which he was suspected at the time of making the confession, (3) such defendant was advised or knew that he was not required to make any statement and that any such statement could be used against him (4) whether or not such defendant had been advised prior to questioning of his right to the assistance of counsel, and (5) whether or not such defendant was without the assistance of counsel when questioned and giving such confession.

The district c—
admissible as
shortly after an
offense which c
as a continuatio
appellant stood t
determine the re
ture of the testi
other testimony
ployees.

Testimony of
statements was
trial.  Both offic
regarding the a
ments.  Appellar
nie and Dean
chain was hooke
hicles and that
tripped over it.

## II.  REVIEW

The standard
court's evidentia
the appellant is
its discretion.
727 F.2d 734, 73
466 U.S. 962, 104
(1984).  This stan
in *United State*
1020, 1022 (8t'
The adm
a determinatio
trict court, *Un*
F.2d 1265, 126
court will not
unless there ha
tion.  *United*
F.2d 77, 86 (8t
450 U.S. 1001,
203 (1981).

Indeed, "[i]t i
court is cloaked
cerning the adr
*Sparks v. Shelte*

6.  Fed.R.Evid. 404(
of evidence of a p
pose of proving t
therewith at the ti
provides certain e
hibition.  Bad ac
may be admissible
defendant's charac
knowledge.  Howe

U.S. v. BALL                                987
Cite as 868 F.2d 984 (8th Cir. 1989)

The district court found the statements admissible as evidence which occurred shortly after and in close proximity to the offense which could actually be construed as a continuation of events for which the appellant stood trial. The court decided to determine the relevance and prejudicial nature of the testimony following receipt of other testimony by the Forest Service employees.

Testimony of the appellant's post-arrest statements was received over objection at trial. Both officers were allowed to testify regarding the alleged threatening statements. Appellant and his witnesses, Melanie and Dean Kelley, testified that the chain was hooked up between the two vehicles and that officer Miller had merely tripped over it.

## II. REVIEW

The standard for review of the district court's evidentiary rulings challenged by the appellant is whether the court abused its discretion. *United States v. Poston*, 727 F.2d 734, 739 (8th Cir.), *cert. denied*, 466 U.S. 962, 104 S.Ct. 2179, 80 L.Ed.2d 561 (1984). This standard was clearly set forth in *United States v. Aboodely*, 801 F.2d 1020, 1022 (8th Cir.1986):

The admissibility of evidence is primarily a determination to be made by the district court, *United States v. Jones*, 687 F.2d 1265, 1267 (8th Cir.1982), and this court will not substitute its judgment unless there has been an abuse of discretion. *United States v. Iron Shell*, 633 F.2d 77, 86 (8th Cir.1980), *cert. denied*, 450 U.S. 1001, 101 S.Ct. 1709, 68 L.Ed.2d 203 (1981).

Indeed, "[i]t is settled that a district court is cloaked with broad discretion concerning the admissibility of evidence." *Sparks v. Shelter Life Ins. Co.*, 838 F.2d

987, 990–91 (8th Cir.1988), citing *United States v. Poston, supra*, 727 F.2d at 739.

The trial court determined that appellant's statements were "part of the overall acts or conduct which gave rise to the indictment." (Tr. 3). The court found the statements admissible because "it is the court's opinion that this evidence, which occurred shortly after and in close proximity to the offense itself, actually could be construed as a continuation of the events for which the appellant now stands trial." (Tr. 3).

Appellant argues that the statements made by him after his arrest should not have come into evidence for six reasons:

1. The statements were subsequent events which could not be construed as a continuation of events for which the appellant was on trial;

2. It is inconceivable that the statements be so "inextricably bound up with the offense charged," that the admission of the alleged threatening statements could be proof of the offense charged;

3. When the post-arrest statements were made, appellant was under arrest and the statements were not indicative of his intent at the time of the alleged assault;

4. The statements were not admissible pursuant to Fed.R. of Evid. 404.[6]

5. The prosecutor introduced the statements simply to depict appellant as a bad man and indicated that appellant desired to engage in antisocial behavior.

6. The statements were of such a heinous nature that they should have been precluded from evidence under Fed.R. of Evid. 403 because their prejudicial effect overrode their probative value.

Appellant concedes that this case depends primarily upon the credibility of the witnesses. Appellant contends that the

---

6. Fed.R.Evid. 404(a) prohibits the introduction of evidence of a person's character for the purpose of proving that he acted in conformity therewith at the time in question. Rule 404(b) provides certain exceptions to this general prohibition. Bad acts or other crimes evidence may be admissible to prove an issue other than defendant's character, such as motive, intent or knowledge. However, in order to admit bad act

evidence, the acts referred to must be relevant to an issue other than the defendant's character and the probative value of the evidence must not be substantially outweighed by its undue prejudice. In addition, the evidence admitted must be relevant to a material issue in the action. *United States v. Mays*, 822 F.2d 793, 796–98 (8th Cir.1987).

741

Respondent's Exhibit E

onviction must be reversed and remanded or a new trial because the statements produced by the prosecution were irrelevant to the elements of the crime charged and were introduced to depict appellant as a bad person, and prejudiced the appellant's right to a fair trial.

## III. DISCUSSION

In a criminal jury trial, the jury is the trier-of-the-facts and entitled to receive all the facts which present as nearly as possible a true picture of what transpired during the actual event for which an appellant stands trial. The disputed facts were resolved by the jury when they returned their guilty verdict, and the jury's finding will not be challenged.

[1] The trial court properly ruled that appellant's post-arrest statements were a continuing part of the incident that occurred that night in the park and were necessary to give the jury a total picture of appellant's state of mind during his entire contact with the arresting officers.

This court has consistently recognized ..t acts following the offense charged may be testified to as "integral parts of the offense for which the defendant was charged." *United States v. Two Eagle*, 633 F.2d 93, 95 (8th Cir.1980). The rules permit "the introduction of evidence of other criminal activity to complete the story of the crime on trial by proving its immediate context or the res gestae." *United States v. Two Eagle, supra,* 633 F.2d at 95, n. 3; *citing Carter v. United States*, 549 F.2d 77, 78 (8th Cir.1977), *quoting United States v. Howard*, 504 F.2d 1281, 1284 (8th Cir.1974).

According to the officers' testimony[7] within a matter of minutes after having forcibly resisted arrest and assaulting Officer Miller with a chain, the appellant made unsolicited statements evidencing a continuing intent or desire to do harm to the officers. This activity was an integral part

of the flow of the entire offense and is, therefore, relevant.

In a criminal action, "subsequent events or transactions may be introduced if they are an integral part of the offense for which the defendant is charged." *United States v. Poston, supra* 727 F.2d at 740, *citing United States v. Gallington*, 488 F.2d 637, 641 (8th Cir.1973), *cert. denied*, 416 U.S. 907, 94 S.Ct. 1613, 40 L.Ed.2d 112 (1974). Subsequent events evidence may be an integral part of the offense if such activity is "so blended or connected with the one [offense] on trial as that proof of one incidentally involves the other; *or explains the circumstances thereof;* or tends logically to prove any element of the crime charged." *United States v. Poston,* 727 F.2d at 740, *quoting United States v. Derring*, 592 F.2d 1003, 1007 (8th Cir.1979) (emphasis added). Here, the challenged statements clearly explain the circumstances of this incident. Specifically, they illustrate that the assault was not an accident. The statements tend to logically prove intent, an element of the crime charged.

The officer's testimony concerning the post-arrest statements was admissible because it was highly probative of the state of the mind of appellant during his contact with the Forest Officers in the field. The statements add credence to the officers' story of what actually occurred. Clearly, these statements are part of the res gestae. Proof of the post-arrest statements incidentally involves proof of the hostility of the appellant necessary to commit the assault and explains the hostile circumstances throughout the appellant's interaction with the officers.

Likewise, these statements are admissible under Rule 404(b) of the Federal Rules of Evidence to prove mens rea. Rule 404(b) provides that other acts are admissible for such purposes as proof of motive, intent or absence of mistake or accident. This is a particularly crucial element in this case. At the time the appellant threatened

the officers with
officer Miller wi
make any statem
his intent. This
mitted to show t
that it was not by
the officer was s

The criteria for
of evidence was c
*States v. Poston,*

(1) The evidence
material issue
(2) The evidence
and reasonably
charge on trial;
(3) Evidence of
acts must be cl
(4) Prejudice to
outweighed by tl
evidence.

As stated, (1) th
material to the issu
mistake; (2) the a
ments are similar
charge of assault;
ny proved by clear
that the appellant n
the probative valu
exceptionally high,
evidence available :
tent, motive and th
absence of mistake.
ognized the applic
properly admitted

[2] Appellant ha
the evidence is rele
cluded under Fede
403.[8] "The task of I
value of this evidenc
value is primarily fi
we normally defer to
ed *States v. Bass,* 7!
Cir.1986) *citing Uni*
679 F.2d 1240, 1244
*States v. Derring, st*
n. 6; *United States*
314, 332 (8th Cir.197

---

cumstances in existence when the defendant and the Kelleys interacted with the officers is materially in dispute.

8. Fed.R.Evid. 403 pr
dence may be exclude
substantially outweigh
fair prejudice. Factor

742

## LITTLE v. LOCKHART
Cite as 868 F.2d 989 (8th Cir. 1989)
989

the officers with the chain and then hit officer Miller with the chain, he did not make any statement which might evidence his intent. This evidence was properly admitted to show the appellant's intent and that it was not by mistake or accident that the officer was struck by the chain.

The criteria for introduction of this type of evidence is clearly set forth in *United States v. Poston,* 727 F.2d at 739–40:

(1) The evidence must be admissible on a material issue raised;

(2) The evidence must be similar in kind and reasonably close in time to the charge on trial;

(3) Evidence of the other crimes or bad acts must be clear and convincing; and

(4) Prejudice to the defendant must be outweighed by the probative value of the evidence.

As stated, (1) the evidence in this case is material to the issue of intent or absence of mistake; (2) the alleged threatening statements are similar and consistent with the charge of assault; (3) the officers' testimony proved by clear and convincing evidence that the appellant made the statements; (4) the probative value of this evidence was exceptionally high, given that it is the best evidence available as to the appellant's intent, motive and the fact that there was an absence of mistake. The district court recognized the applicability of *Poston* and properly admitted the evidence. (Tr. 3).

[2] Appellant has argued that even if the evidence is relevant, it should be excluded under Federal Rule of Evidence 403.[8] "The task of balancing the probative value of this evidence against its prejudicial value is primarily for the trial court, and we normally defer to its judgment." *United States v. Bass,* 794 F.2d 1305, 1312 (8th Cir.1986) *citing United States v. Boykin,* 679 F.2d 1240, 1244 (8th Cir.1982); *United States v. Derring, supra* 592 F.2d at 1007 n. 6; *United States v. Peltier,* 585 F.2d 314, 332 (8th Cir.1978).

8. Fed.R.Evid. 403 provides that relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. Factors controlling against ad-

Giving deference to the district judge who heard and saw the evidence, *United States v. Maestas,* 554 F.2d 834, 836 (8th Cir.), *cert. denied* 431 U.S. 972, 97 S.Ct. 2936, 53 L.Ed.2d 1070 (1977), we cannot say that the district court abused its discretion in determining that the prejudicial impact of the challenged statements relating to the assault of the forest officer did not substantially outweigh its probative value. Further, the lack of other evidence establishing appellant's intent to commit the assault indicates that resort to evidence of the post-arrest statements was necessary and not unfairly prejudicial. *Cf., United States v. Bohr,* 581 F.2d 1294, 1299 (8th Cir.), *cert. denied,* 439 U.S. 958; 99 S.Ct. 361, 58 L.Ed.2d 351 (1978).

The challenged statements were appropriately admitted to prove the intent of the appellant. They were necessary to complete the story of the crime on trial. Accordingly, the conviction is affirmed.



Edward LITTLE, Appellant,

v.

A.L. LOCKHART, Director Arkansas Department of Correction, Appellee.

No. 88–1448.

United States Court of Appeals,
Eighth Circuit.

Submitted Dec. 13, 1988.

Decided Feb. 27, 1989.

Defendant who had previously waived his right to appeal, brought habeas action. Upon a magistrate's recommendation, the United States District Court for Eastern District of Arkansas, Henry Woods, J., de-

missibility is a matter for the district court's judgment. *United States v. Abel,* 469 U.S. 45, 54, 105 S.Ct. 465, 470, 83 L.Ed.2d 450, 459 (1984).

743

Respondent's Exhibit E

118                    971 FEDERAL REPORTER, 2d SERIES

at all times reasonably believed that the package contained a small amount of drugs, the 243 grams originally contained in the package does not reflect Hayes' culpability. In sentencing Hayes, the district court did not address this concern. Accordingly, we vacate Hayes' ten-year sentence and remand to the district court for further factual findings. If, on remand, the court finds that Hayes reasonably believed the package contained a smaller quantity of cocaine than the package originally contained, the court should attribute this smaller quantity to Hayes for purposes of sentencing. If the evidence does not support such a finding, the court should attribute to Hayes the entire quantity of crack originally contained in the package.[4]

III.

For the foregoing reasons, we vacate Hayes' ten-year sentence and remand to the district court for further factual findings and resentencing.



Carl Dwayne PRINCE, Appellee,

v.

A.L. LOCKHART, Director, Arkansas Department of Correction, Appellant.

Carl Dwayne PRINCE, Appellant,

v.

A.L. LOCKHART, Director, Arkansas Department of Correction, Appellee.

Nos. 92–1203, 92–1287.

United States Court of Appeals, Eighth Circuit.

Submitted May 12, 1992.

Decided July 24, 1992.

Rehearing and Rehearing En Banc Denied in No. 92–1203 Sept. 22, 1992.

Defendant was convicted of burglary of a pharmacy and underlying theft of property. The Supreme Court, 304 Ark. 692, 805 S.W.2d 46, affirmed. Defendant petitioned for writ of habeas corpus. The United States District Court for the Western District of Arkansas, H. Franklin Waters, Chief Judge, granted writ. Government appealed. The Court of Appeals, Magill, Circuit Judge, held that: (1) petitioner had procedurally defaulted on evidentiary due process claim and had not even attempted to show cause for his default, so district court should not have addressed that claim; (2) in any event, trial court's refusal to permit defendant to inform jury of his prior acquittal on charges of possession of drugs taken in connection with burglary/theft did not violate defendant's due process rights; (3) double jeopardy was not violated by defendant's prosecution on burglary/theft charges following his acquittal on narcotics possession charges; and (4) collateral estoppel did not bar admission of seized drugs.

Affirmed in part and reversed in part.

1. Habeas Corpus ⟐366, 670(6), 816

Habeas petitioner had procedurally defaulted on evidentiary due process claim insofar as he did not raise that claim on direct appeal or in federal district court; even if read liberally, pro se petition did not give government notice of that particular claim. 28 U.S.C.A. § 2254; U.S.C.A. Const.Amends. 5, 14.

2. Habeas Corpus ⟐404

Habeas petitioner can overcome procedural default by showing cause for the default and prejudice resulting from it. 28 U.S.C.A. § 2254.

3. Judgment ⟐751

Judgment of acquittal is not generally admissible to rebut inferences that may be drawn from evidence that was basis of

4. We agree with the district court that the fortuitous event of the postal inspectors removing a portion of the package's original contents does not impact the sentencing decision. *See United*

*States v. Franklin*, 926 F.2d 734, 736–37 (8th Cir.), *cert. denied*, — U.S. ——, 112 S.Ct. 230, 116 L.Ed.2d 187 (1991); *United States v. White*, 888 F.2d 490, 498–500 (7th Cir.1989).

Respondent's Exhibit E

744

## PRINCE v. LOCKHART
Cite as 971 F.2d 118 (8th Cir. 1992)

previous trial; judgments of acquittal are hearsay and are not generally relevant because they do not prove innocence but simply show that government did not meet its burden of proving guilt beyond a reasonable doubt.

**4. Constitutional Law ⫟268(10)**
**Judgment ⫟751**

In prosecution for burglary and theft of pharmacy, trial court's refusal to permit defendant to inform jury of his acquittal on charges of possession of drugs taken in connection therewith did not violate his due process rights; possession acquittal was not relevant to burglary/theft charges, all elements of which were established by evidence other than the seized drugs. U.S.C.A. Const.Amends. 5, 14.

**5. Double Jeopardy ⫟102, 146**

Double jeopardy was not violated by defendant's Arkansas prosecution for burglary of pharmacy and underlying felony of theft of property following his acquittal on charges of possession of drugs taken in connection with burglary/theft; evidence of possession was not used to prove an entire element of either charged offense, and mere overlap of proof was permissible. U.S.C.A. Const.Amend. 5; A.C.A. §§ 5-36-103, 5-39-201.

**6. Double Jeopardy ⫟3**

Double jeopardy clause incorporates doctrine of collateral estoppel. U.S.C.A. Const.Amend. 5.

**7. Judgment ⫟751**

Defendant's prior acquittal on Arkansas charges of possession of drugs taken in connection with burglary of pharmacy and underlying felony of theft of property did not bar admission of seized drugs in burglary/theft prosecution under principles of collateral estoppel, as prior acquittal did not determine "an ultimate fact." A.C.A. §§ 5-36-103, 5-39-201.

Kelly Hook Hill, Asst. Atty. Gen., Little Rock, Ark., argued, for appellant.

Gary Person Fort Smith, Ark., argued, for appellee.

Before JOHN R. GIBSON, MAGILL, and BEAM, Circuit Judges.

MAGILL, Circuit Judge.

The government appeals the district court's grant of a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (1988), to Carl Dwayne Prince. Prince was convicted in state court of burglary of a pharmacy, Ark.Code Ann. § 5-39-201 (1987), and the underlying felony of theft of property. Ark.Code Ann. § 5-36-103 (1987). The district court granted the writ, finding that the trial court's refusal to allow Prince to introduce evidence of a previous acquittal rendered the trial fundamentally unfair in violation of the due process clause of the Fourteenth Amendment. Prince, on cross-appeal, argues that the introduction into evidence of pharmaceutical drugs from his previous possession trial constituted double jeopardy and the government was collaterally estopped from introducing it.[1] After careful review of the record, particularly the transcripts of the two trials at issue, we reverse the district court's grant of the writ on due process grounds and affirm the district court's denial of the writ on Prince's double jeopardy and collateral estoppel grounds.

### I.

On February 7, 1989, a burglary occurred at Medi–Sav Pharmacy in Fort Smith, Arkansas (Sebastian County). A number of controlled, pharmaceutical drugs were taken. On February 22, police executed a search at a cabin owned by Prince's girlfriend's parents in Crawford County, Arkansas. In a small, unlocked outbuilding the police found and seized numerous controlled, pharmaceutical drugs,

---

1. Prince also cross-appeals on two other grounds. First, he argues that the state failed to disclose certain information in violation of his due process rights under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

Second, he argues that the evidence was insufficient to support his conviction. We find both of these claims meritless for the reasons given in the district court opinion.

Respondent's Exhibit E

120                  971 FEDERAL REPORTER, 2d SERIES

including a bottle of Val-release that was positively identified as one that was taken from the Medi-Sav Pharmacy.

Prince was initially tried and acquitted in Crawford County for possession with intent to deliver and simple possession of drugs seized at the Crawford County cabin. Prince was then tried in Sebastian County for the burglary of the Fort Smith Medi-Sav Pharmacy and for the underlying felony of theft of property (pharmaceutical drugs). At that trial, most of the evidence that had been introduced in the Crawford County trial was again introduced as evidence of the burglary/theft. Prince, who was pro se, objected to the introduction of the drugs and other evidence seized in Crawford County on collateral estoppel grounds. Alternatively, he argued that he should be allowed to inform the jury of his acquittal in the Crawford County trial. The trial court held that the introduction of the evidence was not collaterally estopped and that the acquittal was irrelevant to the burglary/theft charges. It therefore admitted the evidence and denied Prince's request to tell the jury of his acquittal. The jury found Prince guilty of both burglary and theft. At the sentencing portion of the trial, Prince was found to be a habitual offender and sentenced to the maximum term on each charge.

The Arkansas Supreme Court affirmed the conviction on direct appeal. *Prince v. State,* 304 Ark. 692, 805 S.W.2d 46 (1991). Prince attempted, unsuccessfully, to pursue state collateral relief.[2] Prince then filed a petition for writ of habeas corpus in federal district court. The case was referred to a magistrate judge. After an evidentiary hearing, the magistrate judge issued her report and recommendation denying Prince's double jeopardy, collateral estoppel, *Brady* and sufficiency of the evidence claims.[3] The magistrate judge found, however, that Prince's trial was rendered fundamentally unfair by the trial court's refusal to permit him to tell the jury of his acquittal. The district court adopted the magistrate judge's report in full. It therefore granted the writ and ordered that Prince either be released or retried. *Prince v. Lockhart,* No. 91–2051 (W.D.Ark. Dec. 9, 1991). The government now appeals the grant of the writ on due process grounds. Prince cross-appeals the denial of the writ on double jeopardy and collateral estoppel grounds.

II.

We review findings of fact for clear error, and conclusions of law de novo. *See, e.g., Brown v. Wallace,* 957 F.2d 564, 566 (8th Cir.1992).

A. Evidence of Prior Acquittal

[1] The government argues that the district court erred in granting the writ because the exclusion of the evidence of Prince's acquittal on the possession charges did not render the trial fundamentally unfair. The first assertion of error the government makes is that Prince did not raise this evidentiary due process issue before either the state court on direct appeal or the federal district court. Thus, the government claims, Prince has procedurally defaulted on this issue and the district court should not have addressed it.[4]

---

2.  Post-conviction relief under Rule 37 of the Arkansas Rules of Criminal Procedure was not available to Prince because the Arkansas Supreme Court had temporarily abolished Rule 37. *See In re the Abolishment of Rule 37,* 770 S.W.2d 148 (Ark.1989) (per curiam), *reinstated, modified and amended in part sub nom. In re Post-Conviction Procedures,* 797 S.W.2d 458 (Ark. 1990) (per curiam), supplemental op., *In re the Reinstatement of Rule 37 of Arkansas Rules of Criminal Procedure,* 797 S.W.2d 458 (Ark.1990) (per curiam). When Prince attempted to bring a state habeas corpus action pursuant to Ark. Code Ann. § 16–112–101, et seq., the state circuit court denied the petition for failure to state grounds on which state habeas relief could be

granted. *Prince v. Lockhart,* No. LCIV-90-50-3 (Ark.Cir.Ct. Dec. 20, 1990).

3.  Prince raised other grounds before the district court. The district court also denied his petition on those grounds. We do not discuss those holdings because Prince did not appeal them to this court.

4.  The government also points out that no evidence or arguments were presented to the district court on this issue at the habeas hearing, and that the first time they had an opportunity to address the issue was after the magistrate judge's report and recommendation was issued.

Respondent's Exhibit E

746

Prince replies that his federal habeas corpus petition was filed pro se and so must be liberally construed. *Haines v. Kerner*, 404 U.S. 519, 520, 92 S.Ct. 594, 595–96, 30 L.Ed.2d 652 (1972); *Thompson v. Missouri Bd. of Parole*, 929 F.2d 396, 398 n. 2 (8th Cir.1991). He argues that grounds four and five of the petition are broad enough to encompass this claim. These grounds provide:

*Ground Four.* The trial court erred in denying Appellant's Motion In Limine and admitting into evidence evidence which violated the Double Jeopardy Clause. Did mislead the jurors and confuse the issues at stake.

*Fact:*

Approx. 3000 loose pills were submitted at trial, over the Appellant's objection.

. . . .

(3) This prejudicial evidence did inflame the jury.

. . . .

*Ground Five.* Conviction was obtained in violation of the protection against double jeopardy.

*Fact:*

The State re-litigated a material fact which had previously been decided in favor of the Petitioner (Crawford Co. CS# CR–89–58(I) [sic]).

The trial court errored in not allowing Petitioner to admit relevant evidence that he was acquitted of the (Crawford County Case). This error did deprive the Petitioner [sic] the right to raise an affirmative defense. The end result was a bad-faith collateral estoppel in violation of the Double Jeopardy Clause.

App. at A–6. The district court did not address the procedural default issue and simply ruled on the merits. Prince argues that his pro se petition, read liberally, gives the government sufficient notice that a due

process argument is being raised because he is challenging an evidentiary ruling. Since the only possible federal constitutional challenge to an evidentiary ruling is that the ruling was so prejudicial as to result in a denial of due process, *see Mercer v. Armontrout*, 844 F.2d 582 (8th Cir.), *cert. denied*, 488 U.S. 900, 109 S.Ct. 249, 102 L.Ed.2d 238 (1988), Prince asserts that the government had notice of this claim. We disagree.

A careful reading of grounds four and five of Prince's habeas petition reveals two claims. One is a claim that the double jeopardy clause was violated in the Sebastian County trial by the admission into evidence of the seized drugs. The second is that the trial court's refusal to permit Prince to inform the jury of his acquittal in Crawford County deprived him of an affirmative defense under Arkansas state law. There is no general claim that refusing to admit the acquittal evidence was error. Therefore, even if read liberally, the petition does not give the government notice of this particular claim.[5] Accordingly, we find that Prince has procedurally defaulted on this claim.

[2] A petitioner can overcome procedural default by showing cause for the default and prejudice resulting from it. *Wainwright v. Sykes*, 433 U.S. 72, 90–91, 97 S.Ct. 2497, 2508–09, 53 L.Ed.2d 594 (1977). Prince has not even attempted to show cause for his default. Therefore, the district court should not have addressed this issue.[6]

[3] Even if Prince had not procedurally defaulted on this claim, however, we agree with the government that the district court erred on the merits. Our review is limited to determining whether Prince's constitutional due process rights have been violated. *Mercer*, 844 F.2d at 587. We must

---

5. Counsel was appointed to represent Prince after he filed his federal petition but prior to his habeas hearing. Despite the fact that he had counsel, however, the petition was never amended to add a due process claim and no such claim was argued to the magistrate judge at the hearing. Given the appointment of counsel, Prince arguably is not entitled to the liberal

reading accorded pro se petitioners. We have, however, given him the benefit of the doubt.

6. Because we find that Prince did not present this due process claim to the federal district court on habeas, we do not need to address whether he presented this same claim on direct state appeal.

Respondent's Exhibit E

decide whether there was an error so conspicuously prejudicial that it fatally infected the trial and failed to afford Prince the fundamental fairness that is the essence of due process. *Id.*

The general rule is that

[a]lthough a judgment of acquittal is relevant with respect to the issues of double jeopardy and collateral estoppel, 'once it is determined that these pleas in bar have been rejected, a judgment of acquittal is not usually admissible to rebut inferences that may be drawn from the evidence that was admitted.'

*United States v. Kerley,* 643 F.2d 299, 300 (5th Cir. Unit B Apr. 1981) (citing *United States v. Viserto,* 596 F.2d 531, 537 (2d Cir.), *cert. denied,* 444 U.S. 841, 100 S.Ct. 80, 62 L.Ed.2d 52 (1979)); *see also United States v. Jones,* 808 F.2d 561, 566–67 (7th Cir.1986), *cert. denied,* 481 U.S. 1006, 107 S.Ct. 1630, 95 L.Ed.2d 203 (1987); *United States v. Sutton,* 732 F.2d 1483, 1493 (10th Cir.1984), *cert. denied,* 469 U.S. 1157, 105 S.Ct. 903, 83 L.Ed.2d 919 (1985); *United States v. Riley,* 684 F.2d 542, 546 (8th Cir.1982), *cert. denied,* 459 U.S. 1111, 103 S.Ct. 742, 74 L.Ed.2d 962 (1983). There are two primary reasons why a judgment of acquittal is not generally admissible to rebut inferences that may be drawn from evidence that was the basis of a previous trial. First, judgments of acquittal are hearsay. *Sutton,* 732 F.2d at 1493; *Viserto,* 596 F.2d at 537. Second, judgments of acquittal are not generally relevant, *Riley,* 684 F.2d at 546, because they do not prove innocence; they simply show that the government did not meet its burden of proving guilt beyond a reasonable doubt. *Jones,* 808 F.2d at 566; *Kerley,* 643 F.2d at 300.

[4] In this case, the trial court repeatedly ruled that the possession acquittal was not relevant to the burglary/theft charges, and we agree. The discovery and seizure of the drugs in Crawford County took place on February 22, and Prince was charged

with possession on that date. The burglary/theft, however, took place on February 7. Although the seized drugs were used to further connect Prince to the burglary/theft, it was not necessary for the State to show that Prince was in possession of the drugs on February 22 to prove that he committed the burglary/theft on February 7. The district court specifically found that evidence other than the seized drugs established all the elements of the burglary and theft charges. *Prince v. Lockhart,* No. 91-2051 at 7 ("In our view, Melody Blackwell's [Prince's girlfriend] testimony established the elements of the offenses, and the conduct of which petitioner was acquitted did not establish the entirety of an element."). Therefore, Prince's acquittal on the possession charges was not in any way relevant to show whether Prince had committed the burglary/theft.

Prince argues that the judgment of acquittal was relevant in this case because under Arkansas law a person commits theft if he "knowingly takes *or exercises unauthorized control over* the property of another...." Ark.Code Ann. § 5-36-103(a)(1) (emphasis added). Thus, Prince claims, the jury could have based its finding of theft on his apparent possession or "control" over the drugs on the date of seizure. This argument is meritless, however, because the jury was never instructed that it could base its finding of guilt on Prince's control over the drugs.[7]

We find that the trial court's refusal to permit Prince to inform the jury of his acquittal in Crawford County did not violate Prince's due process rights. We reverse the district court's grant of the writ of habeas corpus.

### B. Double Jeopardy

[5] Prince contends that his burglary/theft prosecution is barred by the Double Jeopardy Clause under *Grady v. Corbin,* 495 U.S. 508, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990). In *Grady,* Thomas

---

7. The relevant jury instruction read: "Carl Prince is charged with the offense of Theft of Property. To sustain this charge, the State must prove beyond a reasonable doubt that Carl Prince: Knowingly took the property of another person in excess of $200.00 with the purpose of depriving the owner thereof."

Respondent's Exhibit E

PRINCE v. LOCKHART 123
Cite as 971 F.2d 118 (8th Cir. 1992)

Corbin caused a fatal car accident. Later that evening, Corbin was served with two uniform traffic tickets, charging him with driving while intoxicated and failing to keep right of the median. Corbin pleaded guilty to the two traffic tickets. The court, unaware that there had been a fatality involved, imposed sentence of a $350 fine and a six-month license revocation. Two months later, a grand jury indicted Corbin for manslaughter and assault. The Supreme Court held that the manslaughter and assault prosecution was barred by the Double Jeopardy Clause. The Court stated that "the Double Jeopardy Clause bars any subsequent prosecution in which the government, to establish an essential element of an offense charged in that prosecution, will prove conduct that constitutes an offense for which the defendant has already been prosecuted." *Id.* at 510, 521, 110 S.Ct. at 2087, 2093.

The district court held, and we agree, that *Grady* is inapplicable here. Prince is essentially arguing that *Grady* establishes a "same evidence" test. *Grady* specifically disclaimed such a test, *id.* at 521, 110 S.Ct. at 2093, and the Supreme Court has said unequivocally that no such test exists. *United States v. Felix,* — U.S. —, —, 112 S.Ct. 1377, 1382, 118 L.Ed.2d 25 (1992) ("our precedents hold that a mere overlap in proof between two prosecutions does not establish a double jeopardy violation"); *cf. Dowling v. United States,* 493 U.S. 342, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990). "The critical inquiry is what conduct the State will prove, not the evidence the State will use to prove that conduct." *Grady,* 495 U.S. at 521, 110 S.Ct. at 2093. Thus, courts have interpreted *Grady* to prohibit a prosecution that seeks to establish the entirety of an element of the charged offense with proof of already-litigated conduct. *United States v. Clark,* 928 F.2d 639, 642 (4th Cir.1991); *United States v. Uselton,* 927 F.2d 905, 908–09 (6th Cir.1991). The district court found that Melody Blackwell's testimony alone established all the elements of the burglary and theft charges. Her testimony went directly to the elements of burglary and theft, and not to proving Prince's possession of the seized

drugs. Thus, the evidence of possession—the seized drugs—was not used to prove an entire element of either charged offense. This is a case of "mere overlap of proof." We affirm the district court's holding that there was no double jeopardy violation here.

### C. Collateral Estoppel

[6] Prince also contends that, under the doctrine of collateral estoppel, his prior acquittal precluded the government from introducing into evidence at his burglary/theft trial the drugs seized in Crawford County. The Double Jeopardy Clause incorporates the doctrine of collateral estoppel. *Dowling,* 493 U.S. at 347, 110 S.Ct. at 671–72; *Ashe v. Swenson,* 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970). The collateral estoppel doctrine provides that "when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Ashe,* 397 U.S. at 443. A fact previously determined in a criminal case is not an "ultimate fact" unless it was necessarily determined by the jury against the government and, in the second prosecution, that same fact is required to be proved beyond a reasonable doubt in order to convict. *See Dowling,* 493 U.S. at 349–52, 110 S.Ct. at 672–74.

[7] The district court found, however, and we agree, that Prince's prior acquittal did not determine an ultimate fact in the present case. Whether Prince possessed the seized drugs on February 22 was not an issue in the present case. The State was not required to show beyond a reasonable doubt that Prince possessed drugs from the Medi-Sav Pharmacy burglary on February 22 in order to convict him of committing burglary and theft on February 7. Therefore, we affirm the district court's holding that the admission of the seized drugs was not barred by collateral estoppel.

### III.

For the foregoing reasons, we reverse the district court's grant of the writ of

Respondent's Exhibit E

6431

habeas corpus on the ground that the trial court's refusal to allow Prince to inform the jury of his acquittal on possession charges rendered his trial fundamentally unfair. We affirm the district court on all other grounds.



James L. HAUGEN, Appellant,

v.

TOTAL PETROLEUM, INC., Appellee.

No. 91–2498.

United States Court of Appeals,
Eighth Circuit.

Submitted June 11, 1992.

Decided July 27, 1992.

Employee appealed dismissal of his disability discrimination claim as barred by statute of limitations. The Court of Appeals, 960 F.2d 762, reversed and remanded for reconsideration in light of subsequent state appellate court decision. On remand, the United States District Court for the District of Minnesota, David S. Doty, J., 791 F.Supp. 788, again dismissed claim as barred by statute of limitations, and employee appealed. The Court of Appeals, McMillian, Circuit Judge, held that extended Minnesota statute of limitations for disability claims was not retroactively applicable.

Affirmed.

1. Federal Courts ⚖776

Court of Appeals reviews de novo district court's determination of state law.

2. Limitation of Actions ⚖6(1)

Under Minnesota law, extended statute of limitations for disability discrimination claims enacted after alleged discriminatory practice had occurred was not retroactively applicable. M.S.A. §§ 363.06, subd. 3, 645.21.

_____

Daniel Taber, Minneapolis, Minn., argued, for appellant.

David Goldstein, argued, Reid Carron and Andrew Martens, Minneapolis, Minn., for appellee.

Before McMILLIAN and HANSEN, Circuit Judges, and VAN SICKLE,* Senior District Judge.

McMILLIAN, Circuit Judge.

James Haugen appeals from a final judgment entered in the United States District Court[1] for the District of Minnesota dismissing his disability discrimination claim under the Minnesota Human Rights Act, Minn.Stat. § 363.03, subd. 1 (1991), against Total Petroleum (Total), as barred by the statute of limitations, 791 F.Supp. 788. Haugen v. Total Petroleum, Inc., No. 4–91–21 (D.Minn. May 23, 1991). The district court held that the new, longer statute of limitations did not apply retroactively to Haugen's claim and, therefore, under the old statute of limitations his claim was time-barred. Since the district court issued its May 23, 1991, order and while the appeal was pending, the Minnesota Court of Appeals decided Wschola v. Snyder, 478 N.W.2d 225 (Minn.Ct.App.1991) (Wschola), review denied, No. CO–91–690 (Minn. Feb. 10, 1992), holding that the new, longer statute of limitations should be applied retroactively. We remanded the present case to the district court for reconsideration in light of Wschola and retained jurisdiction over the appeal. Haugen v. Total Petroleum, Inc., 960 F.2d 762 (8th Cir.1992). The district court concluded that the Minnesota Supreme Court would not follow Wschola and reaffirmed its earlier judgment dis-

_____

* The Honorable Bruce M. Van Sickle, Senior United States District Judge for the District of North Dakota, sitting by designation.

1. The Honorable David S. Doty, United States District Judge for the District of Minnesota.

Respondent's Exhibit E

750

6432

**1394**          **113 SUPREME COURT REPORTER**

Randy POWELL, petitioner, v. Howard
A. PETERS, Director, Illinois De-
partment of Corrections, et al.

No. 92–7195.

Case below, 180 Ill.App.3d 315, 129 Ill.
Dec. 243, 535 N.E.2d 1008; 127 Ill.2d 634,
136 Ill.Dec. 601, 545 N.E.2d 125; 980 F.2d
733.

Petition for writ of certiorari to the Unit-
ed States Court of Appeals for the Seventh
Circuit.

March 1, 1993.  Denied.



Robert E. COTNER, petitioner,
v. CREEK COUNTY,
OKLAHOMA, et al.

No. 92–7199.

Petition for writ of certiorari to the Su-
preme Court of Oklahoma.

March 1, 1993.  Denied.



Susie BALFOUR, petitioner,
v. MISSISSIPPI.

No. 92–7200.

Petition for writ of certiorari to the Cir-
cuit Court of Mississippi, DeSoto County.

March 1, 1993.  Denied.



Carl Dwayne PRINCE, petitioner, v. A.L.
LOCKHART, Director, Arkansas
Department of Correction.

No. 92–7221.

Case below, 304 Ark. 692, 805 S.W.2d 46;
971 F.2d 118.

Petition for writ of certiorari to the Unit-
ed States Court of Appeals for the Eighth
Circuit.

March 1, 1993.  Denied.



William L. ECHOLS, petitioner,
v. YUKON TELEPHONE
COMPANY, INC., et al.

No. 92–7229.

Case below, 972 F.2d 1338.

Petition for writ of certiorari to the Unit-
ed States Court of Appeals for the Ninth
Circuit.

March 1, 1993.  Denied.



Daniel R. DeNARDO, petitioner,
v. MUNICIPALITY OF
ANCHORAGE, et al.

No. 92–7238.

Case below, 974 F.2d 1341.

Petition for wr
ed States Court
Circuit.

March 1, 1993.



Godfrey L.C.
v. Angel
No
Petition for w
Court of Special
March 1,



Ismail SLOAN
OF LYN
No.
Petition for writ
ed States Court of
Circuit.

March 1, 1993.



Wilson WALKER,
COLLINS,
of Crimin
sion.
No.
Case below, 958

Case 4:22-cv-00699-LPR-JTR   Document 19-31   Filed 11/02/22   Page 227 of 276

Reuben DOWLING, Petitioner

v.

UNITED STATES.

No. 88–6025.

Argued Oct. 4, 1989.

Decided Jan. 10, 1990.

After remand, 814 F.2d 134, defendant was again convicted in the United States District Court for the Virgin Islands, David V. O'Brien, Chief Judge, of federal and territorial offenses in connection with bank robbery, and defendant appealed. The Court of Appeals for the Third Circuit, 855 F.2d 114, affirmed, and certiorari was granted. The Supreme Court, Justice White, held that introduction of evidence relating to crime that defendant had previously been acquitted of committing did not violate double jeopardy or due process.

Affirmed.

Justice Brennan filed dissenting opinion in which Justices Marshall and Stevens joined.

1. Double Jeopardy ⟊102
   Judgment ⟊751

Defendant's prior acquittal of burglary, attempted burglary, assault and weapons offenses did not preclude Government on double jeopardy and collateral estoppel grounds from introducing in defendant's bank robbery prosecution testimony of victim of prior offenses identifying defendant as perpetrator of those offenses; prior acquittal did not determine ultimate issue in bank robbery case, and jury might reasonably have concluded in earlier trial that defendant was masked man who entered victim's home, even if it did not believe beyond reasonable doubt that defendant committed crimes charged at first trial. U.S.C.A. Const.Amend. 5.

2. Judgment ⟊751

Acquittal in criminal case does not preclude Government from relitigating issue when it is presented in subsequent action governed by lower standard of proof.

3. Judgment ⟊956(1)

Defendant seeking to foreclose relitigation of issue in second case has burden of demonstrating that issue sought to be foreclosed was actually decided in first proceeding.

4. Criminal Law ⟊334

Burden on introducing party to establish relevancy of evidence does not also require that introducing party anticipate and rebut possible objections to offered evidence.

5. Constitutional Law ⟊266(4)
   Criminal Law ⟊369.2(6), 673(5)

Introduction of testimony of victim of house burglary that defendant was involved in that burglary did not violate due process test of fundamental fairness, even though defendant was acquitted of charges arising out of house burglary, particularly as trial judge gave limiting instructions and twice told jury of defendant's prior acquittal. U.S.C.A. Const.Amends. 5, 14.

*Syllabus* *

Petitioner Dowling was convicted of robbing a Virgin Islands bank while wearing a ski mask and carrying a small pistol. Relying on Federal Rule of Evidence 404(b) —which provides that evidence of other crimes, wrongs, or acts may be admissible against a defendant for purposes other than character evidence—the Government introduced at trial the testimony of one Henry, who stated that a similarly masked and armed Dowling had been one of two intruders who had entered her home two weeks after the bank robbery. Although Dowling had been acquitted of charges in

---

* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

Respondent's Exhibit E

the Henry case, the Government believed that Henry's description of him strengthened its identification of him as the bank robber and that her testimony linked him to another individual thought to be implicated in the bank robbery. The District Court permitted the introduction of the testimony and twice instructed the jury about Dowling's acquittal and the limited purpose for which the testimony was being admitted. The Court of Appeals affirmed the conviction, ruling that, although the Government was collaterally estopped by the acquittal from offering Henry's testimony at trial and the testimony was inadmissible under the Federal Rules of Evidence, its admission was harmless because it was highly probable that the error did not prejudice Dowling. The court declined to apply the more stringent standard of *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 applicable to constitutional errors because the District Court's error was evidentiary and not of constitutional dimension.

*Held:*

1. The admission of the testimony did not violate the collateral estoppel component of the Double Jeopardy Clause. The collateral estoppel doctrine prohibits the Government from relitigating an issue of ultimate fact that has been determined by a valid and final judgment, *Ashe v. Swenson,* 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 but does not bar in all circumstances the later use of evidence simply because it relates to alleged criminal conduct for which a defendant has been acquitted. Here, the prior acquittal did not determine the ultimate issue in the bank robbery case because in the second trial the Government was not required to show beyond a reasonable doubt that Dowling was the man who entered Henry's house. This decision is consistent with other cases where this Court has held that an acquittal in a criminal case does not preclude the Government from relitigating an issue when it is presented in a subsequent action governed by a lower standard of proof. *United States v. One Assortment of 89 Firearms,* 465 U.S. 354, 361–362, 104 S.Ct. 1099, 1104–1105, 79 L.Ed.2d 361: *One Lot Emerald Cut Stones v. United States,* 409 U.S. 232, 235, 93 S.Ct. 489, 492, 34 L.Ed.2d 438. Even if the lower burden of proof at the second trial did not serve to avoid the collateral estoppel component of the Double Jeopardy Clause, Dowling failed to satisfy his burden of demonstrating that the first jury determined that he was not one of the men who entered Henry's home. Pp. 671–674.

2. The introduction of the evidence did not violate the due process test of "fundamental fairness." Especially in light of the trial judge's limiting instructions, the testimony was not fundamentally unfair, since the jury was free to assess the truthfulness and significance of the testimony, since the trial court's authority to exclude potentially prejudicial evidence adequately addresses the possibility that introduction of such evidence will create a risk that the jury will convict a defendant based on inferences drawn from the acquitted conduct, since inconsistent verdicts are constitutionally tolerable, and since the tradition that the Government may not force a person acquitted in one trial to defend against the same accusation in a subsequent proceeding is amply protected by the Double Jeopardy Clause. Pp. 674–675.

855 F.2d 114 (CA 3 1988), affirmed.

WHITE, J., delivered the opinion of the Court. in which REHNQUIST, C.J., and BLACKMUN, O'CONNOR, SCALIA, and KENNEDY, JJ., joined. BRENNAN, J., filed a dissenting opinion, in which MARSHALL and STEVENS, JJ., joined.

Robert L. Tucker for petitioner.

Stephen L. Nightingale, Washington, D.C., for respondent.

Justice WHITE delivered the opinion of the Court.

At petitioner's trial for various offenses arising out of a bank robbery, testimony

Respondent's Exhibit E

670          110 SUPREME COURT REPORTER

was admitted under Rule 404(b) of the Federal Rules of Evidence, relating to an alleged crime that the defendant had previously been acquitted of committing. We conclude that neither the Double Jeopardy nor the Due Process Clause barred the use of this testimony.

I

On the afternoon of July 8, 1985, a man wearing a ski mask and armed with a small pistol robbed the First Pennsylvania Bank in Frederiksted, St. Croix, Virgin Islands, taking over $7,000 in cash from a bank teller, approximately $5,000 in cash from a customer, and various personal and travelers' checks. The culprit ran from the bank, scurried around in the street momentarily, and then commandeered a passing taxi van. While driving away from the scene, the robber pulled off his ski mask. An eyewitness, who had slipped out of the bank while the robbery was taking place, saw the maskless man and at trial identified him as petitioner, Reuben Dowling. Other witnesses testified that they had seen Dowling driving the hijacked taxi van outside of Frederiksted shortly after the bank robbery.

Following his arrest, Dowling was charged with the federal crimes of bank robbery, 18 U.S.C. § 2113(a), and armed robbery, § 2113(d), and with various crimes under Virgin Islands law. Dowling pleaded not guilty to all charges. Dowling's first trial ended with a hung jury. He was tried again and convicted, but the Third Circuit reversed this conviction on appeal. *Government of Virgin Islands v. Dowling,* 814 F.2d 134 (1987). After a third trial, Dowling was convicted on most of the counts; the trial judge sentenced him to 70 years imprisonment.

During petitioner's third trial, the Government over petitioner's objection called a woman named Vena Henry to the stand. Ms. Henry testified that a man wearing a knitted mask with cutout eyes and carrying a small handgun had, together with a man named Delroy Christian,

entered her home in Frederiksted approximately two weeks after the First Pennsylvania Bank robbery. Ms. Henry testified that a struggle ensued and that she unmasked the intruder, whom she identified as Dowling. Based on this incident, Dowling had been charged under Virgin Islands law with burglary, attempted robbery, assault, and weapons offenses, but had been acquitted after a trial held before his third trial in the bank robbery case.

The Government assertedly elicited Henry's testimony for two purposes. First, it believed that Henry's description of Dowling as wearing a mask and carrying a gun similar to the mask worn and the gun carried by the robber of the First Pennsylvania Bank strengthened the Government's identification of Dowling as the bank robber. Second, the Government sought to link Dowling with Delroy Christian, the other man who entered Henry's home. The day before the bank robbery, Dowling had borrowed a white Volkswagen from a friend. At Dowling's trial for the First Pennsylvania Bank robbery, a police officer testified that, shortly before the bank robbery, she and her partner had come upon Christian and another man parked in a white Volkswagen in front of the bank with the car door open into the street; Christian was in the backseat. The officers told the two men to close the door, and the men drove away to the north. The police followed the Volkswagen for about a mile and, shortly thereafter, received a radio message that the bank had been robbed. The Government's theory was that Christian and his friend were to drive the getaway car after Dowling robbed the bank.

Before opening statements, the Government disclosed its intention to call Ms. Henry and explained its rationale for doing so, relying on Rule 404(b) of the Federal Rules of Evidence, which provides that evidence of other crimes, wrongs, or acts may be admissible against a defendant for purposes other than character evidence. After disclosing this, the District Court characterized

Respondent's Exhibit F

the testimony as highly probative circumstantial evidence and ruled that it was admissible under Rule 404(b). App. 24–25. When Henry left the stand, the District Court instructed the jury that petitioner had been acquitted of robbing Henry, and emphasized the limited purpose for which Henry's testimony was being offered. *Id.,* at 28. The court reiterated that admonition in its final charge to the jury. *Id.,* at 29.

On appeal, the Third Circuit determined that the District Court should not have admitted Henry's testimony, but nevertheless affirmed Dowling's conviction. 855 F.2d 114 (1988). Relying on its decision in *United States v. Keller,* 624 F.2d 1154 (1980), the court held that petitioner's acquittal of the charges arising out of the incident at Henry's home collaterally estopped the Government from offering evidence of that incident at petitioner's trial for the First Pennsylvania Bank robbery.

Alternatively, the Court of Appeals ruled that the evidence was inadmissible under the Federal Rules of Evidence. The court noted that we had recently held in *Huddleston v. United States,* 485 U.S. 681, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988), that "[i]n the Rule 404(b) context, similar act evidence is relevant only if the jury can reasonably conclude that the act occurred and that the defendant was the actor." *Id.,* at 689, 108 S.Ct. at 1501. The Third Circuit found Henry's testimony inadmissible under Rule 404(b) because "when the prior act sought to be introduced was the subject of an acquittal by a jury, a second jury should not be permitted to conclude 'that the act occurred and that the defendant was the actor.'" 855 F.2d, at 122. The court also relied on Rule 403 of the Federal Rules of Evidence because, in the Third Circuit's opinion, the danger of unfair prejudice outweighed the probative value of Henry's testimony. 855 F.2d, at 122.

The Third Circuit, however, held that the admission of Henry's testimony was harmless because it was highly probable that the error did not prejudice the petitioner. *Id.,* at 122–124. The Court of Appeals explicitly declined to apply the more stringent standard, see *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967), applicable to constitutional errors because, according to the court, the District Court's mistake was merely evidentiary and not of constitutional dimension. 855 F.2d, at 122–123. Having rejected petitioner's other objections, the court affirmed the conviction. *Id.,* at 124.

Dowling claims that the Third Circuit was wrong when it found that the admission of Henry's testimony did not offend the Constitution and therefore declined to apply the *Chapman v. California, supra,* harmless-error standard.[1] We granted certiorari to consider Dowling's contention that Henry's testimony was inadmissible under both the Double Jeopardy and the Due Process Clauses of the Fifth Amendment. 489 U.S. ——, 109 S.Ct. 1309, 103 L.Ed.2d 579 (1989).

II

A

There is no claim here that the acquittal in the case involving Ms. Henry barred further prosecution in the present case. The issue is the inadmissibility of Henry's testimony.

In *Ashe v. Swenson,* 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970), we recognized that the Double Jeopardy Clause incorporates the doctrine of collateral estoppel. In that case, a group of masked men had robbed six men playing poker in the basement of a home. The State unsuccessfully prosecuted Ashe for robbing one of the men. Six weeks later, however, the defendant was convicted for the robbery of one of the other players. Applying the doctrine of collateral estoppel which we

---

1. Dowling does not challenge the holding that the error was harmless under the less strict standard applied by the Court of Appeals.

Respondent's Exhibit E

672          110 SUPREME COURT REPORTER

found implicit in the Double Jeopardy Clause, we reversed Ashe's conviction, holding that his acquittal in the first trial precluded the State from charging him for the second offense. *Id.,* at 445–446, 90 S.Ct., at 1195. We defined the collateral estoppel doctrine as providing that "when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Id.,* at 443, 90 S.Ct., at 1194. Ashe's acquittal in the first trial foreclosed the second trial because, in the circumstances of that case, the acquittal verdict could only have meant that the jury was unable to conclude beyond a reasonable doubt that the defendant was one of the bandits. A second prosecution was impermissible because, to have convicted the defendant in the second trial, the second jury had had to have reached a directly contrary conclusion. See *id.,* at 445, 90 S.Ct., at 1195.

[1] Dowling contends that, by the same principle, his prior acquittal precluded the government from introducing into evidence Henry's testimony at the third trial in the bank robbery case. We disagree because, unlike the situation in *Ashe v. Swenson,* the prior acquittal did not determine an ultimate issue in the present case. This much Dowling concedes, and we decline to extend *Ashe v. Swenson* and the collateral estoppel component of the Double Jeopardy Clause to exclude in all circumstances, as Dowling would have it, relevant and probative evidence that is otherwise admissible under the Rules of Evidence simply because it relates to alleged criminal conduct for which a defendant has been acquitted.

For present purposes, we assume for the sake of argument that Dowling's acquittal established that there was a reasonable doubt as to whether Dowling was the masked man who entered Vena Henry's home with Delroy Christian two weeks after the First Pennsylvania Bank robbery.[2]

But to introduce evidence on this point at the bank robbery trial, the Government did not have to demonstrate that Dowling was the man who entered the home beyond a reasonable doubt: the Government sought to introduce Henry's testimony under Rule 404(b), and, as mentioned earlier, in *Huddleston v. United States,* 485 U.S., at 689, 108 S.Ct., at 1501, we held that "[i]n the Rule 404(b) context, similar act evidence is relevant only if the jury can reasonably conclude that the act occurred and that the defendant was the actor." Because a jury might reasonably conclude that Dowling was the masked man who entered Henry's home, even if it did not believe beyond a reasonable doubt that Dowling committed the crimes charged at the first trial, the collateral estoppel component of the Double Jeopardy Clause is inapposite.

[2] Our decision is consistent with other cases where we have held that an acquittal in a criminal case does not preclude the government from relitigating an issue when it is presented in a subsequent action governed by a lower standard of proof. In *United States v. One Assortment of 89 Firearms,* 465 U.S. 354, 104 S.Ct. 1099, 79 L.Ed.2d 361 (1984), for example, we unanimously agreed that a gun owner's acquittal on a charge of dealing firearms without a license did not preclude a subsequent *in rem* forfeiture proceeding against those firearms, even though forfeiture was only appropriate if the jury in the forfeiture proceeding concluded that the defendant had committed the underlying offense. Because the forfeiture action was a civil proceeding, we rejected the defendant's contention that the government was estopped from relitigating the issue of the defendant's alleged wrongdoing:

"[The acquittal did] not prove that the defendant is innocent; it merely proves the existence of a reasonable doubt as to his guilt. ... [T]he jury verdict in the

Respondent's Exhibit E

756

riminal action did not negate the possibility that a preponderance of the evidence could show that [the defendant] was engaged in an unlicensed firearms business.... It is clear that the difference in the relative burdens of proof in the criminal and civil actions precludes the application of the doctrine of collateral estoppel. *Id.*, at 361–362, 104 S.Ct., .t 1104.

*One Lot Emerald Cut Stones v. United :tes*, 409 U.S. 232, 235, 93 S.Ct. 489, 492, L.Ed.2d 438 (1972), it was also held that Double Jeopardy Clause did not bar a feiture action subsequent to acquittal on underlying offense because "the differe in the burden of proof in criminal and l cases precludes application of the doc-1e of collateral estoppel." *Helvering v. :chell*, 303 U.S. 391, 397, 58 S.Ct. 630, ?, 82 L.Ed. 917 (1938), likewise observed .t "[t]he difference in degree in the bur-1 of proof in criminal and civil cases :cludes application of the doctrine of *res licata*."

Ne thus cannot agree that the Govern-nt was constitutionally barred from us-; Henry's testimony at the bank robbery il, and for the same reasons we find no rit in the Third Circuit's holding that the nmon-law doctrine of collateral estoppel all circumstances bars the later use of dence relating to prior conduct which e government failed to prove violated a minal law.

**B**

:3,4] Even if we agreed with petitioner it the lower burden of proof at the sec-

ond proceeding does not serve to avoid the collateral estoppel component of the Double Jeopardy Clause, we agree with the Government that the challenged evidence was nevertheless admissible because Dowling did not demonstrate that his acquittal in his first trial represented a jury determination that he was not one of the men who entered Ms. Henry's home. In *Ashe v. Swenson*, we stated that where a previous judgment of acquittal was based on a general verdict, courts must " 'examine the record of [the] prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict on an issue other than that which the defendant seeks to foreclose from consideration.' " 397 U.S., at 444, 90 S.Ct., at 1194 (citation omitted). The Courts of Appeals have unanimously placed the burden on the defendant to demonstrate that the issue whose relitigation he seeks to foreclose was actually decided in the first proceeding. *United States v. Citron*, 853 F.2d 1055, 1058 (CA2 1988); *United States v. Ragins*, 840 F.2d 1184, 1194 (CA4 1988); *United States v. Gentile*, 816 F.2d 1157, 1162 (CA7 1987); *United States v. Baugus*, 761 F.2d 506, 508 (CA8 1985); *United States v. Mock*, 640 F.2d 629, 631, n. 1 (CA5 1981); *United States v. Hewitt*, 663 F.2d 1381, 1387 (CA11 1981); *United States v. Lasky*, 600 F.2d 765, 769 (CA9), cert. denied, 444 U.S. 979, 100 S.Ct. 480, 62 L.Ed.2d 405 (1979). We see no reason to depart from the majority rule in this case.[3]

Dowling notes that the party introducing evi-ience carries the burden of demonstrating the :vidence's relevance. He argues that this duty, n the context of the collateral estoppel compo-tent of the Double Jeopardy Clause, requires he government to establish that a previous ac-quittal did not resolve a question at issue in a second trial. We disagree. Relevancy is a hreshold inquiry. That the burden is on the ntroducing party to establish relevancy, does .. .l. .....:.. .L. :..........:.. ....

Dowling also suggests that we should place the burden on the government in this instance because, as opposed to the situation in *Ashe v. Swenson*, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970), for example, he does not seek to terminate the prosecution but merely hopes to exclude evidence. This is a distinction without a difference. If anything, the equities weigh in the other direction: in this case, Dowling only faces the risk of the introduction of prejudicial evidence, whereas in *Ashe v. Swenson*, the

Respondent's Exhibit E

The only clue to the issues in the earlier case was a discussion between the prosecutor, Dowling's attorney, and the District Judge that took place during the District Court's hearing on the admission of Henry's testimony under Rule 404(b). App. 18–25. Arguing against the admission of Henry's testimony, Dowling's lawyer pointed out that Dowling had been acquitted of breaking into Ms. Henry's home. The trial judge, who had also presided at Dowling's first trial, recalled that Dowling "was not acquitted on the issue of identification." *Id.*, at 21. The prosecutor then contended that Dowling had not disputed identity, but rather had claimed that a robbery had not taken place because he and Christian allegedly "merely came to retrieve ... money from an individual in the house." *Ibid.* The court then made the statement that "Mr. Dowling's presence in the house was not seriously contested in the case but he stated the general defense. Mr. Dowling, I don't think took the stand." *Ibid.*

There are any number of possible explanations for the jury's acquittal verdict at Dowling's first trial. As the record stands, there is nothing at all that persuasively indicates that the question of identity was at issue and was determined in Dowling's favor at the prior trial; at oral argument, Dowling conceded as much. Tr. of Oral Arg. 16. As a result, even if we were to apply the Double Jeopardy Clause to this case, we would conclude that petitioner has failed to satisfy his burden of demonstrating that the first jury concluded that he was not one of the intruders in Ms. Henry's home.

III

Besides arguing that the introduction of Henry's testimony violated the Double Jeopardy Clause, petitioner also contends that the introduction of this evidence was unconstitutional because it failed the due process test of "fundamental fairness."

We recognize that the introduction of evidence in circumstances like those involved here has the potential to prejudice the jury or unfairly force the defendant to spend time and money relitigating matters considered at the first trial. The question, however, is whether it is acceptable to deal with the potential for abuse through nonconstitutional sources like the Federal Rules of Evidence,[4] or whether the introduction of this type of evidence is so extremely unfair that its admission violates "fundamental conceptions of justice." *United States v. Lovasco,* 431 U.S. 783, 790, 97 S.Ct. 2044, 2048, 52 L.Ed.2d 752 (1977).

[5] Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation. We, therefore, have defined the category of infractions that violate "fundamental fairness" very narrowly. As we observed in *Lovasco, supra,* at 790, 97 S.Ct., at 2048;

"Judges are not free, in defining 'due process,' to impose on law enforcement officials [their] 'personal and private notions' of fairness and to 'disregard the limits that bind judges in their judicial function.' *Rochin v. California,* 342 U.S. 165, 170, 72 S.Ct. 205, 208, 96 L.Ed. 183 (1952).... [They] are to determine only whether the action complained of ... violates those 'fundamental conceptions of justice which lie at the base of our civil and political institutions,' *Mooney v. Holohan,* 294 U.S. 103, 112, 55 S.Ct. 340, 341, 79 L.Ed. 791 (1935), and which define 'the community's sense of fair play and decency,' *Rochin v. California, supra,* at 173, 72 S.Ct., at 210."

Especially in light of the limiting instructions provided by the trial judge, we cannot hold that the introduction of Henry's testimony merits this kind of condemnation. Plainly Henry's testimony was at least cir-

4. The Third Circuit, as noted above, found Henry's testimony inadmissible under both Rule 404(b) and Rule 403. 855 F.2d 114, 122 (1988).

The United States urges that this was error, but in affirming we need not pass on the validity of the Court of Appeals' judgment in this respect.

Respondent's Exhibit E

DOWLING v. U.S.                                675
Cite as 110 S.Ct. 668 (1990)

cumstantially valuable in proving petition-er's guilt.

Petitioner lists four reasons why, according to him, admission of Henry's testimony was fundamentally unfair. First, petitioner suggests that evidence relating to acquitted conduct is inherently unreliable. We disagree: the jury in this case, for example, remained free to assess the truthfulness and the significance of Henry's testimony, and petitioner had the opportunity to refute it. Second, Dowling contends that the use of this type of evidence creates a constitutionally unacceptable risk that the jury will convict the defendant on the basis of inferences drawn from the acquitted conduct; we believe that the trial court's authority to exclude potentially prejudicial evidence adequately addresses this possibility.

Third, petitioner claims that the exclusion of acquitted conduct evidence furthers the desirable goal of consistent jury verdicts. We, however, do not find any inconsistency between Dowling's conviction for the First Pennsylvania Bank robbery and his acquittal on the charge of robbing Ms. Henry for the obvious reason that the jury's verdict in his second trial did not entail any judgment with respect to the offenses charged in his first. In any event, inconsistent verdicts are constitutionally tolerable. See *Standefer v. United States*, 447 U.S. 10, 25, 100 S.Ct. 1999, 2008, 64 L.Ed.2d 689 (1980).

Fourth, petitioner argues that the introduction of Henry's testimony in this case contravenes a tradition that the government may not force a person acquitted in one trial to defend against the same accusation in a subsequent proceeding. We acknowledge the tradition, but find it amply protected by the Double Jeopardy Clause. We decline to use the Due Process Clause as a device for extending the double jeopardy protection to cases where it otherwise would not extend.

IV

Because we conclude that the admission of Ms. Henry's testimony was constitution-al and the Court of Appeals therefore applied the correct harmless-error standard, we affirm the judgment of the Court of Appeals.

*It is so ordered.*

Justice BRENNAN, with whom Justice MARSHALL and Justice STEVENS join, dissenting.

At petitioner's trial for bank robbery, the prosecutor introduced the testimony of Vena Henry that petitioner had attempted to rob her in her home several weeks prior to the bank robbery. Petitioner, however, had already been tried in connection with that incident and had been acquitted of burglary, attempted robbery, assault, and weapons offenses. Because the introduction of this testimony effectively forced petitioner to defend against charges for which he had already been acquitted, the doctrine of criminal collateral estoppel grounded in the Double Jeopardy Clause should have prohibited the Government from introducing the testimony. I would reverse the judgment of the Court of Appeals for the Third Circuit and remand for consideration of whether the admission of this testimony was harmless error under the standard enunciated in *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). Therefore, I respectfully dissent.

I

"The law 'attaches particular significance to an acquittal.' " *United States v. DiFrancesco*, 449 U.S. 117, 129, 101 S.Ct. 426, 433, 66 L.Ed.2d 328 (1980) (quoting *United States v. Scott*, 437 U.S. 82, 91, 98 S.Ct. 2187, 2193, 57 L.Ed.2d 65 (1978)). The core protection of the Double Jeopardy Clause attaches to an acquittal and prohibits retrial for the "same offense" after an acquittal. *United States v. Martin Linen Supply Co.*, 430 U.S. 564, 571, 97 S.Ct. 1349, 1354, 51 L.Ed.2d 642 (1977). Two offenses are considered the "same offense"

Respondent's Exhibit E

676                           110 SUPREME COURT REPORTER

for double jeopardy purposes unless each offense requires proof of a fact that the other does not. *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932). An acquittal on a greater or lesser included offense, for example, bars prosecution on the other offense. *Brown v. Ohio*, 432 U.S. 161, 168, 97 S.Ct. 2221, 2226, 53 L.Ed.2d 187 (1977). This protection applies even if the acquittal is based on an "egregiously erroneous foundation." *Fong Foo v. United States*, 369 U.S. 141, 143, 82 S.Ct. 671, 672, 7 L.Ed.2d 629 (1962) (*per curiam*); *Sanabria v. United States*, 437 U.S. 54, 68–69, 98 S.Ct. 2170, 2180–2181, 57 L.Ed.2d 43 (1978).

According such significance to an acquittal reflects both an institutional interest in preserving the finality of judgments and a strong public interest in protecting individuals against governmental overreaching. See *Brown v. Ohio*, 432 U.S., at 165, 97 S.Ct., at 2225 ("Where successive prosecutions are at stake, the [Double Jeopardy Clause] serves 'a constitutional policy of finality for the defendant's benefit'") (quoting *United States v. Jorn*, 400 U.S. 470, 479, 91 S.Ct. 547, 554, 27 L.Ed.2d 543 (1971) (plurality opinion)). The overriding concern is that "[t]o permit a second trial after an acquittal, however mistaken the acquittal may have been, would present an unacceptably high risk that the Government, with its vastly superior resources, might wear down the defendant, so that 'even though innocent he may be found guilty.'" *Scott*, 437 U.S., at 91, 98 S.Ct., at 2193 (quoting *Green v. United States*, 355 U.S. 184, 188, 78 S.Ct. 221, 223–224, 2 L.Ed.2d 199 (1957)). The rule also protects a defendant against being compelled "to live in a continuous state of anxiety and insecurity" about whether he will be retried and from the "embarrassment, expense and ordeal" of an actual reprosecution. *Green*, 355 U.S., at 187, 78 S.Ct., at 223.

These concerns are most clearly implicated when the defendant is retried for the "same offense" after an acquittal.

*Ashe v. Swenson*, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970), however, the Court significantly expanded the protection to which a defendant is constitutionally entitled after an acquittal by holding that the Double Jeopardy Clause incorporates the doctrine of criminal collateral estoppel. *Id.*, at 445–446, 90 S.Ct., at 1195–1196. The doctrine of collateral estoppel "means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Id.*, at 443, 90 S.Ct., at 1194. In a criminal case, collateral estoppel prohibits the Government from relitigating any ultimate facts resolved in the defendant's favor by the prior acquittal. *Id.*, at 445–446, 90 S.Ct., at 1195–1196. Thus, in addition to being protected against retrial for the "same offense," the defendant is protected against prosecution for an offense that requires proof of a fact found in his favor in a prior proceeding.

The question in this case is whether the criminal collateral estoppel doctrine should apply when the Government seeks to introduce in a subsequent trial evidence relating to a prior criminal offense for which the defendant has been acquitted. Before a jury can consider facts relating to a prior criminal offense as proof of an element of the presently charged offense, the jury must conclude by a preponderance of the evidence "that the act occurred and that the defendant was the actor." *Huddleston v. United States*, 485 U.S. 681, 689, 108 S.Ct. 1496, 1501, 99 L.Ed.2d 771 (1988). To the extent that the acquittal of the prior offense determined either of those factual issues in the defendant's favor, the introduction of this evidence imposes on the defendant the burden of relitigating those facts and thereby increases the likelihood of an erroneous conviction on the charged offense. Thus, I would extend the collateral estoppel doctrine to preclude the Respondent's Exhibit E from introducing evidence

which relies on facts previously determined in the defendant's favor by an acquittal.[1]

The Court refuses to apply the collateral estoppel doctrine in this case for two reasons. First, it asserts that petitioner failed to carry his burden of proving that the issue on which he sought to foreclose relitigation was decided in his favor by the first acquittal. More importantly, the Court refuses to apply the collateral estoppel doctrine when facts underlying a prior acquittal are used as evidence of another offense. Both the Court's conclusions are inconsistent with the purposes of the collateral estoppel rule.

### A

The Court first asserts that petitioner did not prove that the issue on which he sought to foreclose relitigation "was actually decided in the first proceeding." *Ante,* at 673. The Court's summary conclusion that the defendant should bear the burden of proof when invoking the collateral estoppel doctrine fails to serve the purposes of the doctrine and the Double Jeopardy Clause in general. Since the doctrine serves to protect defendants against governmental overreaching, the Government should bear the burden of proving that the issue it seeks to relitigate was *not* decided in the defendant's favor by the prior acquittal. As we noted in *Ashe,* because criminal verdicts are general verdicts, it is usually difficult to determine the precise route of the jury's reasoning and the basis on which the verdict rests. See 397 U.S., at 444, 90 S.Ct., at 1194. By putting the burden on the defendant to prove what issues were "actually decided," the Court essentially denies the protection of collateral estoppel to those defendants who affirmatively contest more than one issue or who put the Government

to its burden of proof with respect to all elements of the offense. This result is inconsistent with our admonition in *Ashe* that an excessively technical approach to collateral estoppel "would, of course, simply amount to a rejection of the rule of collateral estoppel in criminal proceedings, at least in every case where the first judgment was based upon a general verdict of acquittal." *Ibid.* Indeed, forcing defendants to choose between forgoing the protections of the Double Jeopardy Clause and abandoning the defense of a general denial raises grave due process concerns.

Even assuming that petitioner was properly required to bear the burden of proof, I conclude that petitioner carried it in this case. Vena Henry testified that petitioner had entered her home wearing a mask and carrying a gun but that, after a struggle in which she pulled off the mask, he ran away. There is every reason to believe that the jury rested its verdict on the belief that petitioner was not present in the Henry home. Petitioner was charged with such a wide array of offenses relating to the Henry incident that no other conclusion is "rationally conceivable." *Ashe,* 397 U.S., at 445, 90 S.Ct., at 1195. For example, if the jury had acquitted petitioner of attempted robbery because he lacked the requisite intent, it would still have found him guilty of a weapons offense. Neither the comments of the trial judge in this trial that petitioner had not "seriously contested" the issue of identity in the Henry trial but had stated a general defense, App. 21, nor the prosecutor's statement in this case that petitioner's codefendant in the Henry trial had admitted being in the house, *ibid,* provides a sufficient basis on which to conclude that the issue of identity was not

---

1. The cases often refer to this situation as collateral estoppel with respect to an "evidentiary fact" in order to distinguish it from the situation present in *Ashe v. Swenson,* 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970). See, *e.g., United States v. Keller,* 624 F.2d 1154, 1159 (CA3 1980). In *Ashe,* the prior acquittal determined facts which were a necessary element of the

second offense. 397 U.S., at 445–446, 90 S.Ct., at 1195–1196 (since issue of identity determined in trial for robbery of one victim, collateral estoppel precluded prosecution for robbery of second victim). In this situation, by contrast, the previously litigated facts are introduced only as evidence of an element of another offense.

Respondent's Exhibit E

resolved in petitioner's favor by the acquittal.[2] Thus, if collateral estoppel applies to the evidentiary use of facts, the Government should not have been allowed to introduce Henry's testimony.

### B

The Court holds, however, that collateral estoppel does not apply when facts previously found in a defendant's favor are later introduced as evidence of a second offense. The Court excepts from the normal rule of criminal collateral estoppel those situations when the jury can consider the facts under a lower standard of proof in the second proceeding than in the first trial. The Court endorses this exception without any consideration of the purposes underlying the collateral estoppel doctrine; it is not surprising that the Court's holding reflects an unrealistic view of the risks and burdens imposed on the defendant when facts relating to a prior offense for which has been acquitted are introduced in a subsequent criminal proceeding.

As the Court notes, we have held that an acquittal in a criminal case does not bar subsequent civil forfeiture actions for the same transaction because the acquittal "merely proves the existence of a reasonable doubt as to [the defendant's] guilt."

*United States v. One Assortment of 89 Firearms*, 465 U.S. 354, 361, 104 S.Ct. 1099, 1104, 79 L.Ed.2d 361 (1984); see also *One Lot Emerald Cut Stones v. United States*, 409 U.S. 232, 235, 93 S.Ct. 489, 492, 34 L.Ed.2d 438 (1972); *Helvering v. Mitchell*, 303 U.S. 391, 397, 58 S.Ct. 630, 632, 82 L.Ed. 917 (1938). However, those forfeiture cases involved civil remedial measures rather than criminal punishment. *89 Firearms*, 465 U.S., at 362–366, 104 S.Ct., at 1104–1107; *Helvering*, 303 U.S., at 397–398, 58 S.Ct., at 632–33. We have never before applied such reasoning to a successive criminal prosecution in which the Government seeks to punish the defendant and hinges that punishment at least in part on a criminal act for which the defendant has been acquitted.[3] Indeed, in *Ashe* we indicated to the contrary: " 'It is much too late to suggest that [collateral estoppel] is not fully applicable to a former judgment in a criminal case, ... because the judgment may reflect only a belief that the Government had not met the higher burden of proof exacted in such cases for the Government's evidence as a whole....' " 397 U.S., at 443, 90 S.Ct., at 1194 (quoting *United States v. Kramer*, 289 F.2d 909, 913 (CA2 1961)). We have always recognized a distinction between governmental

---

2. In fact, in this case, the acquittal alone should have been sufficient to estop the Government from introducing the Henry evidence. Henry's testimony was introduced not as direct proof but as circumstantial evidence that petitioner was also the masked bank robber, because the mask worn by the intruder in Henry's home was not the same as the mask worn by the bank robber. App. 27. Thus, the jury was invited to infer from the fact that petitioner had allegedly once before worn a different mask and carried a gun that he was the masked bank robber. The jury was instructed that it was to consider the testimony only "to the extent that it helps you in determining the identity of the person who committed the [bank robbery].... Mr. Dowling was found not guilty of the crime of robbery in connection with that." *Id.*, at 29. Nothing in the instructions ensured that the jury did not consider the fact that petitioner had worn a mask and carried a gun *during a prior attempted robbery* as evidence that petitioner was the masked bank robber. Since the acquittal at

least determined that petitioner had not committed an attempted robbery, the acquittal should have been enough to preclude the Government from asking the jury to draw that inference.

3. The Government cites *Standefer v. United States*, 447 U.S. 10, 100 S.Ct. 1999, 64 L.Ed.2d 689 (1980), as support for its argument that the doctrine of collateral estoppel should not apply to the evidentiary use of facts. In *Standefer*, the Court held that a defendant could not invoke the acquittal of the principal as a bar to his prosecution as an accomplice. *Id.*, at 24, 100 S.Ct., at 2008. Although the Court noted that collateral estoppel should be applied sparingly against the Government, *id.*, at 22–24, 100 S.Ct., at 2007–2008, the defendant in *Standefer* had not yet been tried. Thus, the concerns which protect a defendant against relitigation were not implicated. When those concerns are implicated, they outweigh any need to apply collateral estoppel cautiously against the Government.

Respondent's Exhibit E

## DOWLING v. U.S.
Cite as 110 S.Ct. 668 (1990)

679

action intended to punish and that which is not, see, *e.g., United States v. Halper,* 490 U.S. ——, ——, 109 S.Ct. 256, ——, 102 L.Ed.2d 244 (1989) (Double Jeopardy Clause implicated when civil fine is punitive); *United States v. Salerno,* 481 U.S. 739, 746–747, 107 S.Ct. 2095, 2101, 95 L.Ed.2d 697 (1987) (upholding Bail Reform Act as regulatory rather than punitive measure). Thus, it would be consistent to hold that the collateral estoppel doctrine applies in the criminal (or quasi-criminal) context and not in the civil; when the Government seeks to punish a defendant, the concern for fairness is much more acute.[4]

Whenever a defendant is forced to relitigate the facts underlying a prior offense for which he has been acquitted, there is a risk that the jury erroneously will decide that he is guilty of that offense. That risk is heightened because the jury is required to conclude that the defendant committed the prior offense only by a preponderance of the evidence. Cf. *In re Winship,* 397 U.S. 358, 363, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970) (reasonable doubt standard "is a prime instrument for reducing the risk of convictions resting on factual error"). The fact that the prior offense is used as evidence of the presently charged offense raises concerns about the reliability of the jury's ultimate conclusion that the defendant committed the presently charged offense. These concerns stem in large part from the inherent danger of evidence relating to an extrinsic criminal offense. First, "[o]ne of the dangers inherent in the admission of extrinsic offense evidence is that

the jury may convict the defendant not for the offense charged but for the extrinsic offense. This danger is particularly great where ... the extrinsic activity was not the subject of a conviction; the jury may feel the defendant should be punished for that activity even if he is not guilty of the offense charged." *United States v. Beechum,* 582 F.2d 898, 914 (CA5 1978) (en banc) (citations omitted). Alternatively, there is the danger that the evidence "may lead [the jury] to conclude that, having committed a crime of the type charged, [the defendant] is likely to repeat it." *Ibid.* Thus, the fact that the defendant is forced to relitigate his participation in a prior criminal offense under a low standard of proof combined with the inherently prejudicial nature of such evidence increases the risk that the jury erroneously will convict the defendant of the presently charged offense.

The Court's only response is that the defendant is free to introduce evidence to rebut the contention that he committed the prior offense. This response, of course, underscores the flaw in the Court's reasoning: introduction of this type of evidence requires the defendant to mount a second defense to an offense for which he has been acquitted. That the facts relating to the prior offense are used only as evidence of another crime does not reduce the burden on the defendant; he is still required to defend against the prior charges. Moreover, because of the significance a jury may place on evidence of a prior criminal

---

4. The higher reasonable doubt standard is employed in the criminal context to ensure the accuracy of convictions and thereby *protect* defendants, not to permit introduction of evidence of crimes for which the defendant has been acquitted. *In Re Winship,* 397 U.S. 358, 363, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970). By definition, when the Government fails to prove a defendant guilty by a reasonable doubt, the defendant is considered legally innocent. Unlike the majority of the Court, I believe that at least with respect to subsequent criminal prosecutions, "the acquitted defendant is to be treated as innocent and in the interests of fairness and finality made no more to answer for his alleged

crime." *State v. Wakefield,* 278 N.W.2d 307, 308 (Minn.1979). It is ironic that petitioner would have been better off, in his second trial, if he had not been represented by counsel at the first trial and had been convicted because uncounseled convictions may not be used in any capacity in subsequent trials. See *Loper v. Beto,* 405 U.S. 473, 483, 92 S.Ct. 1014, 1019, 31 L.Ed.2d 374 (1972) (impeachment); *United States v. Tucker,* 404 U.S. 443, 447, 92 S.Ct. 589, 591, 30 L.Ed.2d 592 (1972) (sentencing enhancement); *Burgett v. Texas,* 389 U.S. 109, 115, 88 S.Ct. 258, 262, 19 L.Ed.2d 319 (1967) (substantive evidence).

Respondent's Exhibit E

offense, presenting a defense against that offense may be as burdensome as defending against the presently charged offense. Finally, since the lower standard of proof makes it easier for the jury to conclude that the defendant committed the prior offense, the defendant is essentially forced to present affirmative evidence to rebut the contention that he committed that offense.[5]

The Court today adds a powerful new weapon to the Government's arsenal. The ability to relitigate the facts relating to an offense for which the defendant has been acquitted benefits the Government because there are many situations in which the defendant will not be able to present a second defense because of the passage of time, the expense, or some other factor. Indeed there is no discernible limit to the Court's rule; the defendant could be forced to relitigate these facts in trial after trial. Moreover, the Court's reasoning appears to extend even further than the facts of this case and seems to allow a prosecutor to rely on a prior criminal offense (despite an acquittal) as evidence in a trial for an offense which is part of the *same transaction* as the prior offense. For example, a prosecutor could introduce facts relating to a substantive offense as evidence in a trial for conspiracy, *even though* the defendant had been acquitted of the substantive offense. Cf. *Ashe,* 397 U.S., at 445, n. 10, 90 S.Ct., at 1195, n. 10 (the question whether collateral estoppel was a constitutional requirement was of little concern until modern statutes gave prosecutors the ability to "spin out a startlingly numerous series of offenses from a single alleged criminal transaction"): Indeed, the Court's reasoning could apply even more broadly to justify the introduction of evidence of a prior offense for which the defendant had been acquitted in order to enhance a defendant's sentence under a sentencing scheme that requires proof by less than a reasonable doubt. See, *e.g.,* *McMillan v. Pennsylva-*

*nia,* 477 U.S. 79, 91–93, 106 S.Ct. 2411, 2418–2419, 91 L.Ed.2d 67 (1986) (upholding constitutionality of sentencing scheme requiring proof of additional facts by preponderance of evidence). Only by ignoring the principles upon which the collateral estoppel doctrine is based is it possible for the Court to tip the scales this far in the prosecution's favor.

II

The Court's holding today deprives an acquitted defendant of his rightful end to the "blight and suspicious aura which surround an accusation that he is guilty of a specific crime." *Wingate v. Wainwright,* 464 F.2d 209, 215 (CA5 1972). Because the Court's holding is based on a hypertechnical view of an acquittal and reflects a naive view of the defendant's burden in a criminal trial, I respectfully dissent.



Curtis GUIDRY, Petitioner

v.

SHEET METAL WORKERS NATIONAL PENSION FUND et al.

No. 88–1105.

Argued Nov. 29, 1989.

Decided Jan. 17, 1990.

Union official convicted of embezzling union funds brought action against union to recover retirement benefits. The United States District Court for the District of Colorado, 641 F.Supp. 360, Richard P.

---

5. The fact that the trial judge may instruct the jury that the defendant was acquitted does not sufficiently protect the defendant's interests because ... the jury will give any weight to the acquittal; the jury may disregard it or even conclude that the ... made a mistake.

Respondent's Exhibit E

764

TARKINGTON v. STATE     Ark.   **93**
Cite as 469 S.W.2d 93

ied on the lot.
have been pre-
g of a bond, but
ee.

at her claim was
d that the court
ant was enriched
e do not agree
here can be no
ntract cases. In
ormack Lines, 2
ter is stated very

ust enrichment or
act obviously does
ns in which the
s by word or deed
ssume a duty to-
g to charge him.
. . . where as
e is no legal con-
erson sought to be
sion of money or
onscience and
. . . ain, but should

ts § 6, p. 574, we

ld that where there
ct the law will not
nstructive contract.
ndulge in the fiction
ctive contract where
fact must be estab-
ubstitute one promi-
other. A quasi-con-
f unjust enrichment
n agreement deliber-
by the parties, how-
visions of such con-
e light of subsequent

ognized this principle
1860, where in Jack-

e country about this
ime I was getting a
t I really wanted the

son v. Jones, 22 Ark. 158, we stated that the law never accommodates a party with an implied contract when he has made a specific one on the same subject matter.

It is apparent from what has been said that we find the judgment entered to be erroneous, and the decree of the White County Chancery Court is accordingly reversed.

It is so ordered.



Bobby Gene TARKINGTON, Appellant,

v.

STATE of Arkansas, Appellee.

No. 5494.

Supreme Court of Arkansas.

June 21, 1971.

Rehearing Denied Aug. 9, 1971.

Defendant was convicted in the Circuit Court, Pulaski County, William J. Kirby, J., of rape, and he appealed. The Supreme Court, Fogleman, J., held, inter alia, that lineup procedure in which defendant was presented to prosecutrix with three other men, one of whom was weight and size of defendant, and at which prosecutrix made prompt and positive identification after having failed to identify her assailant in previous lineup from which defendant was absent was not so unnecessarily suggestive and conducive to irreparable mistaken identification as to deny defendant due process.

Affirmed.

**1. Criminal Law ⬳742(1)**

In rape prosecution, credibility of 15-year-old prosecutrix who made no outcry

during attack but who testified that she attempted to scream but "nothing would come out" and that defendant, who had pulled a knife on her, told her that he would kill if she said anything was for jury.

**2. Constitutional Law ⬳266**

Lineup procedure in which defendant was presented to prosecutrix with three other men, one of whom was weight and size of defendant, and at which prosecutrix made prompt and positive identification, after having failed to identify her assailant in previous lineup from which defendant was absent, was not so unnecessarily suggestive and conducive to irreparable mistaken identification as to deny defendant due process.

**3. Criminal Law ⬳730(3), 1044**

Where trial court sustained prompt defense objection to prosecutor's uncompleted question as to whether defendant had committed an assault shortly after he committed rape for which he was on trial and trial court further admonished jury to disregard question, defendant who did not thereafter move for mistrial was in no position to complain on appeal concerning question.

**4. Criminal Law ⬳1174(5)**

Where subject of alleged conversation between proposed prosecution witness and some jurors was not shown, witness denied that any conversation took place, and only juror called as witness could not remember state's witness having been called to stand or that anyone spoke to him at all, matter involved credibility question upon which Supreme Court would not predicate reversal.

**5. Criminal Law ⬳665(4)**
**Witnesses ⬳246(2)**

In rape prosecution, prosecutor's in-court request that defense witnesses be segregated and in-chambers examination of defense witnesses as to whether such wit-

Respondent's Exhibit F

nesses discussed proceedings during their testimony with witnesses who had not been called and whether defendant had "coached" other witnesses did not entitle defendant to mistrial on theory of intimidation of witnesses.

**6. Criminal Law ⚖918(1)**

Where defendant in rape prosecution did not ask any action of trial court at time of alleged incident involving hysterical crying and demonstration by prosecutrix in presence of eight or nine jurors even though, according to defendant, both he and his attorney were aware of incident, denial of new trial on such ground was not an abuse of discretion.

**7. Criminal Law ⚖1119(4)**

Supreme Court could not consider point of error based on statements in course of prosecution's closing argument of which there was no record.

**8. Criminal Law ⚖1035(3), 1044**

Court's statement in rape trial as to cost to state for trial in event of mistrial because of any juror's reading of newspaper and court's comments in regard to weather bureau reports, in response to defendant's offer of exhibits purporting to show amount of snowfall in area during month crime was allegedly committed, although perhaps inadvisable in presence of jury, did not constitute basis for reversal in light of fact that defendant did not object, did not seek any corrective action, and did not ask for mistrial.

**9. Criminal Law ⚖1092(12)**

Where there was no record of proceedings in which trial court allegedly erroneously refused to permit defendant to read transcript testimony of witness at an earlier hearing pertaining to defendant's rape prosecution because witness was outside jurisdiction of court, and no bystander's affidavit, even though record was on remand to trial court for purpose of settling record for more than four months,

and it was not known whether testimony of witness was relevant, material or competent, Supreme Court was under no obligation to consider a bystander's bill on the matter. Ark.Stats. §§ 27–1750, 27–1751.

———————

Guy Jones, Phil Stratton and Guy Jones, Jr., Conway, for appellant.

Ray Thornton, Atty. Gen., Milton Lueken, Asst. Atty. Gen., Little Rock, for appellee.

FOGLEMAN, Justice.

Appellant states 15 points for reversal of his conviction of the crime of rape. He argues them in four groups and relies upon those arguments to support his first three points, which are not otherwise covered.

[1] Appellant first asserts that his conviction was based upon prejudice, bias, speculation, conjecture, surmises and irrelevant and impeached testimony. This argument is based upon attacks on the credibility of the prosecutrix. He contends that her testimony is the only incriminating evidence against him. He points out that his accuser made no outcry, gave no notice to her neighbors in a thickly populated district in the city of North Little Rock, made a positive identification of a ring and a knife which she said appellant had in his possession at the time of the alleged attack without any reason for her certainty, or means of distinguishing them from thousands of other such objects similar in appearance, and varied her testimony at different times as to the hour and minute of the alleged crime and her state of dress when it occurred. This witness was positive in her identification of appellant, but he says that the jury could not have properly based its verdict upon her testimony, because it should be considered as incredible.

Appellant concedes that corroboration of prosecuting witness is not essential to a conviction of the crime of rape. Lacy v.

State, 240 Ark. 84, 398 S.W.2d 508. Where the prosecuting witness is positive in her identification, the question of her credibility is for the jury. Hamm v. State, 214 Ark. 171, 214 S.W.2d 917. Prosecutrix, who said that she was then 15 years old, testified that she attempted to scream, but "nothing would come out." She also said that appellant, who had pulled a knife on her, told her that he would not kill her if she cooperated, but if she said anything he would kill her. Failure of the prosecutrix to make an outcry or to make prompt complaint is properly considered when the defense is based upon her consent or want of resistance or upon the contention that a rape was not committed by someone. Kurck v. State, 235 Ark. 688, 362 S.W.2d 713, cert. denied, 373 U.S. 910, 83 S.Ct. 1299, 10 L.Ed.2d 412; Daniels v. State, 186 Ark. 255, 53 S.W.2d 231; Jackson v. State, 92 Ark. 71, 122 S.W. 101. Even then the failure to make an outcry is excused if prevented by fear of the prosecutrix for her life or bodily safety. Pemberton v. State, 221 Ark. 19, 251 S.W.2d 825; Zinn and Cheney v. State, 135 Ark. 342, 205 S. W. 704. But no such defense was made, and the prosecutrix testified that she did not make an outcry because of her assailant's threats. The prosecutrix and her husband had only lived at the apartment where the offense took place for three weeks. She testified that she told an elderly lady across the street what had happened when she found that she was unable to reach her husband by telephone because it was out of order. She then went by cab to the place her husband was in school and reported the incident to him. Questions of identification and alibi (the defense made by appellant) were jury questions. Hamm v. State, supra; Lacy v. State, supra. Resolution of conflicts in the testimony of the prosecutrix was also a jury function. Marshall v. State, 250 Ark. ——, 466 S.W. 2d 920 (May 3, 1971).

[2]   The next group of points argued by appellant turns upon his argument that a lineup identification, when he was without the assistance of counsel, violated his constitutional rights. Appellant was charged with having committed the crime on January 17, 1967, and the lineup in question was held on January 24, 1967, so the decisions in United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149, and Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178, both decided June 12, 1967, do not apply. Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); Foster v. California, 394 U. S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969). Appellant contends, however, that the identification procedures at the lineup, when judged by the totality of the circumstances, were so unnecessarily suggestive and conducive to irreparable mistaken identification that he was denied due process of law, relying upon *Foster*. Appellant also contends that his testimony about the lineup identification was more persuasive than that of the arresting officer. The determination of persuasiveness of the testimony on this point is a matter in which we must give substantial weight to the circuit judge's superior opportunity to evaluate credibility. See Jackson v. State, 249 Ark. ——, 460 S.W.2d 319 (December 14, 1970).

The circumstances here are entirely different from those in *Foster*, however. Sergeant Bruce of the North Little Rock Police Department picked Tarkington up off the streets, from a description given by the prosecutrix and a radio report that a man fitting that description was in the area. Another suspect had been previously picked up from this description, but the prosecuting witness failed to make an identification in a lineup in which he was placed, so he was released. According to Bruce, he placed Tarkington and three other persons in a lineup to be viewed by the prosecutrix at police headquarters. None of the others resembled Tarkington except that one of them was near Tarkington's weight and size. Tarkington said he was in the lineup about 10 minutes. Mrs. Jones testified that as soon as she looked at Tarkington, she said, "that's the man." Her

767

Respondent's Exhibit E

immediate identification of Tarkington was corroborated by Bruce.

The essential elements making the lineup identification a denial of due process in *Foster* are lacking here. Foster was at least six inches taller than both of the other persons in that lineup. He wore a jacket similar to one which the victim of the crime described as worn by the person who robbed him. The victim there could not positively identify Foster. Even after a face-to-face confrontation across a table in the absence of anyone else except prosecuting officials, the witness was unsure whether Foster was one of the robbers. At a second lineup in which there were five persons, of which Foster was the only one who had been in the first, the victim was convinced of Foster's identity. It was held that the procedures followed had the police, in effect, saying to the witness, "This is the man," made eventual identification of the accused by the victim inevitable and so undermined the reliability of the identification as to violate due process. Since one man in the lineup with Tarkington was of his weight and size, and the prosecutrix was prompt and positive in her identification after having failed to identify her assailant in a previous lineup, we find no violation of due process here. It also seems significant to us that a "class" ring fitting the description of one worn by the assailant, as related by the prosecutrix, had been removed from Tarkington's hand before the lineup was viewed by the prosecutrix.

The next group of points argued by appellant has to do with an allegedly prejudicial course of conduct of the prosecuting attorney. In appellant's original motion for new trial, he only asserted that the prosecuting attorney violated the orders of the court by asking him if he were not charged with assault with intent to rape on January 23, 1967, and improperly argued that appellant's whole defense was framed by Robert Tarkington, his father. An amended motion filed later asserted the single ground that the prosecuting attorney conducted a star chamber proceeding at which certain witnesses were intimidated and harassed.

[3] We are not aware of any question propounded to appellant about his being *charged* with assault with intent to rape. The only question of that nature called to our attention is one commenced by the deputy prosecuting attorney conducting the trial for the state. He asked appellant, "On the twenty-third day of January, 1967, did you assault Lois ——?" He never completed the question because the prompt objection by appellant was sustained by the circuit judge, who also admonished the jury to disregard the question.

There are several reasons, in addition to appellant's failure to make this question a part of his motion for new trial, why there was no prejudicial error. The court's admonition was certainly calculated to remove any prejudice. If appellant had felt that it failed to do so, he should have moved for a mistrial. Not having done so, he is in no position to complain. Freyaldenhoven v. State, 217 Ark. 484, 231 S.W. 2d 121; Fair v. State, 241 Ark. 819, 410 S.W.2d 604. When a defendant takes the stand, he may be asked, in good faith, about other crimes he may have committed, for the purpose of throwing light upon his credibility, but he cannot be asked if he has been charged, indicted or accused of other crimes. Johnson v. State, 236 Ark. 917, 370 S.W.2d 610. Appellant's argument apparently goes, however, to the deputy prosecuting attorney's good faith in asking the question because appellant relates the question to earlier incidents in the trial. It is admitted that, at the beginning of the trial, the court had directed the deputy prosecuting attorney not to call Lois Sikes as a witness. The court had heard a statement by the deputy prosecuting attorney that he expected to prove a similar incident within a week after the rape of the prosecutrix. During the course of the trial the deputy prosecuting attorney called Lois Sikes as a witness. She came from the

Case 4:22-cv-00899-LPR-JTR   Document 19-31   Filed 11/02/22   Page 244 of 276

witness room and walked past the jury box, but never took the stand, because of an objection by appellant's counsel and his request for a hearing in chambers.

At the hearing in chambers the deputy prosecuting attorney made the following proffer:

I have called as my next witness Mrs. Lois Sikes, and I would propose to prove by her that on the 23rd of January, 1967, this defendant came to her house asking about vacant apartments; that he asked her for a drink of water in order to gain entrance; that, upon gaining entrance, he pulled a knife on her and stated to her that he was going to have sexual relations with her; that, at that time, she lived at 505 Olive Street in North Little Rock, in close proximity to the residence of the complaining witness in this case; and I propose to introduce this testimony for the purpose of showing a course of conduct, not for the purpose of proving guilt or innocence in the case which we are trying today.

Although the circuit judge expressed some uncertainty about the matter, he sustained appellant's objection, and the state rested its case. After a motion for a directed verdict by appellant was denied, the court instructed the deputy prosecuting attorney to call his next witness. The deputy prosecuting attorney responded that he understood the court to have ruled that Mrs. Sikes (the state's last witness) would not be permitted to testify, and that the state rested.

It was appropriate for the circuit judge to be extremely cautious about the admission of such testimony, as any real doubt about the question should be resolved in favor of the accused. We have zealously guarded the rights of accused persons to have the state's evidence strictly confined to the issues to insure that no one is convicted because he has committed offenses other than that for which he is on trial or because he is of bad character and addicted to crime. See Alford v. State, 223 Ark.

330, 266 S.W.2d 804; Moore v. State, 227 Ark. 544, 299 S.W.2d 838, cert. denied, 358 U.S. 946, 79 S.Ct. 356, 3 L.Ed.2d 353. Yet the mere fact that evidence shows the defendant was guilty of another crime does not prevent its being admissible when otherwise competent on the issue on trial. State v. Dulaney, 87 Ark. 17, 112 S.W. 158, 160.

In *Alford,* we held that evidence of a prior assault with intent to rape by a defendant on trial for rape was inadmissible. Intent was not an issue either there or here. We recognized, however, that if conduct other than that with which an accused is charged is relevant as tending to prove some material point in issue, and not that the defendant is a criminal, evidence of that conduct may be admissible, but that a proper cautionary and limiting instruction should be given. Among those instances we gave was that arising where alibi is an issue.

In *Moore,* the state had been permitted to prove that two of four defendants on trial for murder committed in the perpetration of robbery assaulted and robbed another victim five days after the crime for which they were on trial. We held that error was committed in admitting this evidence because no connection between the two crimes was even alleged. The only similarity between the two was that the victims in both were picked up while hitchhiking. We again pointed out that there are innumerable situations in which proof of other conduct on the part of an accused is relevant and competent, even though it also shows the commission of another crime.

We have long recognized that evidence of other conduct by a defendant which shows other crimes by him is admissible when relevant to show mode or methods of operation, habits and practices of the defendant and to identify him as the person who committed the crime for which he is on trial. Tolbert v. State, 244 Ark. 1067, 428 S.W.2d 264; Wood v. State, 248 Ark.

469 S.W.2d—7

109, 450 S.W.2d 537; Roach v. State, 222 Ark. 738, 262 S.W.2d 647; Parks v. State, 136 Ark. 562, 208 S.W. 435; Puckett v. State, 194 Ark. 449, 108 S.W.2d 468; Larmon v. State, 171 Ark. 1188, 286 S.W. 933. We have repeatedly held that evidence of the commission of other similar crimes or acts by a defendant at about the same time, tends to show the guilt of the defendant when it tends to establish his identity as the person who committed the crime charged. Kurck v. State, 242 Ark. 742, 415 S.W.2d 61; Miller v. State, 160 Ark. 469, 254 S.W, 1069; Keese and Pilgreen v. State, 223 Ark. 261, 265 S.W.2d 542; Reed v. State, 54 Ark. 621, 16 S.W. 819; Nash v. State, 120 Ark. 157, 179 S.W. 159; Cain v. State, 149 Ark. 616, 233 S.W. 779.

One of the most widely recognized applications of the rule is in cases where the modus operandi tends to establish identity. If the crime charged has been committed by a novel means or in a particular manner, and the identity of its perpetrator is in issue and not otherwise conclusively established, evidence of a defendant's commission of a similar offense by that means or in such manner is admissible as tending to show identity of the perpetrator when the similarity of the means or manner employed logically operates to set the offenses apart from other crimes of the same general variety and tends to suggest that the perpetrator of one was the perpetrator of the other. Jones v. Commonwealth, 303 Ky. 666, 198 S.W.2d 969 (Ct.App.1947); People v. Haston, 69 Cal.2d 233, 70 Cal. Rptr. 419, 444 P.2d 91 (1968); State v. Moore, 460 P.2d 866 (Or.App.1969); Harris v. State, 189 Tenn. 635, 227 S.W.2d 8 (1950); Wollaston v. State, 358 P.2d 1111 (Okl.Crim.1961); Nester v. State, 75 Nev. 41, 334 P.2d 524 (1959); State v. Francis, 91 Ariz. 219, 371 P.2d 97 (1962); State v. Redmond, 19 Utah 2d 272, 430 P.2d 901 (1967); Thessen v. State, 454 P.2d 341 (Alaska 1969), cert. denied, 396 U.S. 1029, 90 S.Ct. 588, 24 L.Ed.2d 525; Ferrell v. State, 429 S.W.2d 901 (Tex.Crim.App. 1968); Anderson v. State, 222 Ga. 561, 150 S.E.2d 638 (1966); Brasher v. State, 33

Ala.App. 13, 30 So.2d 26 (1946), affirmed and modified, 249 Ala. 96, 30 So.2d 31 (1947); Williams v. State, 110 So.2d 654 (Fla.1959), cert. denied, 361 U.S. 847, 80 S. Ct. 102, 4 L.Ed.2d 86; United States v. Johnson, 382 F.2d 280 (2nd Cir. 1967); Fernandez v. United States, 329 F.2d 899 (9th Cir. 1964), cert. denied, 379 U.S. 832, 85 S. Ct. 62, 13 L.Ed.2d 40; State v. Sorenson, 270 Minn. 186, 134 N.W.2d 115 (1965); State v. Stevens, 26 Wis.2d 451, 132 N.W.2d 502 (1965); Layton v. State, 248 Ind. 52, 221 N.E.2d 881 (1966); State v. McClain, 240 N.C. 171, 81 S.E.2d 364 (1954). See also, State v. Stephenson, 191 Kan. 424, 381 P.2d 335 (1963); State v. Turner, 81 N.M. 571, 469 P.2d 720 (1970).

Examples of application of the identity exception to the general rule of exclusion to the method or means of approach taken by an assailant are numerous. See e. g., Allen v. State, 201 Ga. 391, 40 S.E.2d 144 (1946), where the common elements were that all the rapes and attempts to rape were committed by a negro upon white women in the same general section of the city, and a knife was the means of intimidation and coercion; Hart v. State, 447 S. W.2d 944 (Tex.Crim.App.1970), where the subsequent event about which evidence was admitted occurred eight days after the rape charged and was similar in that the person involved made his approach after watching the women in a washateria; Nester v. State, 75 Nev. 41, 334 P.2d 524 (1959), where the rape charged occurred about six months prior to the other rape and was similar in that the fuses or lights were unscrewed to keep the area where contact was made in darkness, the assailant concealed his face, the threatening language was virtually identical, the method of forcible entry was similar and accomplished without removal of the victim's garments; State v. Francis, 91 Ariz. 219, 371 P.2d 97 (1962), where the victim and another young female were each stopped on different occasions by a man who showed a badge, identified himself as a juvenile officer and each was asked to get into his automobile; Williams v. State, 110 So.2d

654 (Fla.19[...]
where the [...]
in the back[...]
in a parkin[...]
had crawle[...]
nap, thinkin[...]
was permit[...]
lier the acc[...]
when frigh[...]
automobile [...]
self at nigh[...]
App. 482, 3[...]
the charge[...]
were simila[...]
ered the fa[...]
bound her [...]
State v. St[...]
2d 502 (19[...]
and attemp[...]
which the ti[...]
a stranger, [...]
claim abilit[...]
home, ask [...]
she put cer[...]
bless and [...]
get both h[...]
house and t[...]
State v. M[...]
1969), wher[...]
ated ti. [...]
you believe[...]
pulled a g[...]
Cal.App.2d [...]
where the [...]
Sacramento[...]
another in [...]
men entered[...]
pointed it t[...]
clerk to tur[...]
behind a co[...]
cy from a c[...]
467 P.2d 65[...]
was discove[...]
on two occa[...]
and a fem[...]
trying on ri[...]
615, 55 Cal.[...]
where all [...]
during the [...]
or three m[...]
whom wore[...]

Case 4:22-cv-00690-LPR-JTR   Document 19-31   Filed 11/02/22   Page 246 of 276

654 (Fla.1959), in a prosecution for rape, where the assailant, who concealed himself in the back seat of the victim's automobile in a parking lot at night, explained that he had crawled into the automobile to take a nap, thinking it was his brother's, evidence was permitted to show that six weeks earlier the accused gave the same explanation when frightened away from another lady's automobile in which he had concealed himself at night; People v. Lindsay, 227 Cal. App. 482, 38 Cal.Rptr. 755 (1964), wherein the charged rapes and uncharged ones were similar in that the perpetrator covered the faces or eyes of his victim, and bound her before committing the rape; State v. Stevens, 26 Wis.2d 451, 132 N.W. 2d 502 (1965), where all thefts by fraud and attempts followed a procedure by which the thief would come to the home of a stranger, ask for an unknown person, claim ability to cure an ill person in the home, ask for a glass of water in which she put certain material, ask for money to bless and wrap in a cloth, use ruses to get both husband and wife out of their house and then disappear with the money; State v. Moore, 460 P.2d 866 (Or.App. 1969), where the robber in both cases initiated the robbery with the question, "Would you believe this is a holdup?" and then pulled a gun; People v. Adamson, 225 Cal.App.2d 74, 36 Cal.Rptr. 894 (1964), where the robbery charged occurred in Sacramento, California, two weeks prior to another in Reno, and in both cases, two men entered, one produced a hand weapon, pointed it toward a clerk and caused the clerk to turn his back while the other went behind a counter and removed only currency from a cash register; State v. Woolard, 467 P.2d 652 (Or.App.1970), where a ring was discovered missing in a jewelry store on two occasions shortly after the accused and a female companion had left after trying on rings; People v. Perez, 65 Cal.2d 615, 55 Cal.Rptr. 909, 422 P.2d 597 (1967), where all the robberies were committed during the evening or early morning, two or three men participated, one or more of whom wore a mask, a gun was used, and

no victim was physically injured; Thessen v. State, 454 P.2d 341 (Alaska 1969), where 10 fires were started in trash piles with paper towels or tissue and the fire charged was started with paper towels taken from a trash bucket; Ferrell v. State, 429 S.W.2d 901 (Tex.Cr.App.1968), where the robber of two different motels on occasions eight days apart was wearing a hat, drawstring gloves, a woman's hose over his face and exhibited an automatic pistol; Webster v. State, 425 S.W.2d 799 (Tenn. Cr.App.1967), cert. denied, 1968, where the instructions given and procedures followed by the abortionist in all instances were the same. Other cases where evidence of rapes or attempts to rape other persons was held admissible to establish identity in trials for rape or carnal abuse include: Mitchell v. State, 45 Ala.App. 668, 235 So.2d 917 (1970); Mosley v. State, 211 Ga. 611, 87 S.E.2d 314 (1955); Anderson v. State, 222 Ga. 561, 150 S.E.2d 638 (1966); People v. Clark, 6 Cal.App.3d 658, 86 Cal.Rptr. 106 (1970).

We have made this application of the rule in some cases without actually stating it, apparently accepting it as well established. For instance in Puckett v. State, 194 Ark. 449, 108 S.W.2d 468, we held testimony about an attempted burglary by the appellee about 15 minutes prior to the burglary with which he was charged to be admissible. The house burglarized was entered by cutting a screen and breaking a window in about the same manner as the accused was earlier seen attempting entry into another house. In Kurck v. State, 242 Ark. 742, 415 S.W.2d 61, testimony of witnesses about previous similar attempts to defraud by a "green money racket money press" was held properly admitted to show the accused's identity, scheme, purpose, intent, design and motives.

In this case, the prosecutrix testified substantially as follows:

Appellant knocked at her door and inquired about the apartment next door. When she brought a rent receipt to the

771

Respondent's Exhibit E

door to show appellant the name of the apartment building operator, Tarkington asked her for a drink of water. She told him to wait at the latched screen door, but when she returned with the water, he had entered the living room. She persuaded him to come outside by showing him the apartment office, but he asked for another drink of water. She became frightened and tried to get inside her apartment and close the door, but appellant followed her, prevented her from closing the door and followed her into the bedroom. When she turned he had a knife in his hand and was saying, "Don't be scared. I won't hurt you if you will just cooperate." He told her to pull off her housecoat, then pushed her down on the bed and raped her.

While the trial judge must exercise a sound judicial discretion in admitting such evidence, the similarity in the approach was such that the admission of Lois Sikes' testimony consistent with the proffer would not have been error especially if accompanied by an instruction limiting the purpose for which the jury might consider this evidence.

[4] Appellant seeks to connect the calling of Mrs. Sikes to the stand, the later question partially propounded to her and testimony on hearing of his motion for new trial that this proposed witness had been seen talking to some of the jurors. The subject of the conversation was not shown. Mrs. Sikes denied that any such thing took place. If the testimony of his witnesses, both of whom were relatives of appellant, was given full credit, perhaps the trial court would have been justified in finding prejudice or conducting further investigation. No juror was ever identified. The only one called as a witness could not remember Mrs. Sikes' having been called to the witness stand or anyone's having spoken to him at all. We are unable to predicate reversal upon the record in this regard, as the question was one of credibility.

[5] Appellant's argument about the "star chamber" proceeding is based upon the following sequence of events. His first witness was his father, Robert Tarkington. This witness laid the foundation for appellant's defense of alibi. The father identified one Gerald Cox as a person who was working with him on the date of the offense charged and as one who would know the date and time of a telephone call the father received from his son on that date. After two other alibi witnesses had testified, appellant called Gerald Cox as his next witness. The state's attorney then inquired whether the witnesses who had testified and those who had not were being segregated. When informed that they were not, he requested that this be done, and the court granted the request. Appellant's motion for mistrial was denied. The deputy prosecuting attorney requested a hearing in chambers, which was granted. At that hearing conducted while the jury was excused for the noon recess, the deputy prosecuting attorney examined Robert Tarkington and Gerald Cox, the uncle of appellant's wife, as to whether the witnesses who had testified and returned to the witness room had discussed the proceedings during their testimony with the witnesses who had not been called, and he specifically asked Tarkington if he had "coached" the other witnesses. When no significant disclosure was made, the deputy prosecuting attorney made no motion. Appellant's counsel again moved for a mistrial on the ground of intimidation of witnesses.

Appellant argues that this proceeding placed the witnesses under such a strain that their demeanor was affected and their credibility damaged. At the hearing on the motion for new trial, three of appellant's witnesses who had not been on the witness stand prior to this proceeding testified that the elder Tarkington and Cox returned to the witness room all "shook up" and even though they would not say anything, this frightened or made them nervous. One of these three said that he could not look at

or talk straig[...]
pellant's fath[...]
Cox said th[...]
these witness[...]
out" that an[...]
would be pro[...]
cuit judge h[...]
motion for [...]
witnesses wh[...]
not say that [...]
witnesses the [...]
the discretion[...]
in denying a [...]
conduct on [...]
cuting.

[6] It is [...]
duct of the [...]
misconduct [...]
Nevertheless [...]
timony of the[...]
that the pr[...]
second day [...]
her husband[...]
juge's cham[...]
tion of this [...]
presence of [...]
or at any ti[...]
fying, altho[...]

crying ... [...]
the presence[...]
pellant's fir[...]
Junior Lee [...]
father's bro[...]
such an inc[...]
and the two [...]
tor was wi[...]
that appell[...]
place. The [...]
her out qu[...]
that appella[...]
matter with [...]
Yet, this n[...]
circuit judg[...]
to the moti[...]
appellant n[...]
under the c[...]
attorney, an[...]
ed such an[...]

772

: ut the
s based upon
events. His
Robert Tar-
he foundation
libi. The fa-
x as a person
on the date of
ne who would
telephone call
s son on that
witnesses had
ald Cox as his
orney then in-
s who had tes-
not were being
ted that they
; this be done,
equest. Appel-
l was denied.
orney requested
h was granted.
..while the
... recess, the
examined Rob-
Cox, the uncle
r the wit-
t. returned to
cussed the pro-
imony with the
n called, and he
gton if he had
sses. When no
made, the deputy
no motion. Ap-
oved for a mis-
imidation of wit-

this proceeding
er such a strain
ffected and their
he hearing on the
ee of appellant's
en on the witness
ding testified that
Cox returned to
ook up" and even
say anything, this
nervous. One of
could not look at

or talk straight to the jury. Another, appellant's father-in-law, said he was sick. Cox said that he was nervous. One of these witnesses stated that a rumor "got out" that anybody from Faulkner County would be prosecuted for perjury. The circuit judge heard all the testimony on the motion for new trial and observed these witnesses when they did testify. We cannot say that there was any intimidation of witnesses through this proceeding or that the discretion of the trial judge was abused in denying a new trial on any alleged misconduct on the part of the attorney prosecuting.

[6] It is not at all clear to us how conduct of the prosecutrix during the trial is misconduct of the prosecuting attorney. Nevertheless, appellant showed by the testimony of the deputy prosecuting attorney that the prosecutrix was present on the second day of the trial and that she and her husband were in an anteroom of the juge's chambers. He denied any recollection of this witness having cried in the presence of jurors outside the courtroom or at any time except while she was testifying, although appellant's attorney stated that he had witnessed the prosecutrix crying hysterically and waving her arms in the presence of eight or nine jurors. Appellant's first cousin, his uncle and one Junior Lee Smart, identified as appellant's father's brother-in-law, all testified that such an incident occurred during a recess and the two relatives said that the prosecutor was with her. One of them testified that appellant's attorney saw what took place. The uncle said that someone got her out quickly. Appellant's father said that appellant's attorney had discussed the matter with him at the time it occurred. Yet, this matter was never called to the circuit judge's attention in any way prior to the motion for new trial. Even though appellant now argues that the witness was under the control of the deputy prosecuting attorney, and that he should have prevented such an occurrence, no excuse is of-

fered for failure on the part of appellant to ask any action by the trial court at the time, or even to make the circuit judge aware of the incident, even though, according to appellant, both he and his attorney were aware of it. The circuit judge did not abuse his discretion in denying a new trial on this ground.

[7] Appellant concedes that there is no record of the deputy prosecuting attorney's closing argument. Neither is there any record of any objection to it. Of course, we cannot consider any point based on statements in the course of this argument. We find no reversible error for the misconduct of the state's attorney.

[8] The next group of points relates to action of the trial court. Two points argued by appellant have to do with statements made by the trial judge. One of these was the court's admonition to the jury at the end of the first day of the trial. He admonished the jurors not to read newspapers, stating that if they did, he would have to declare a mistrial, and it had cost the state a couple of thousand dollars up to that time. Later during the presentation of appellant's evidence, he offered exhibits in the form of weather bureau reports purporting to show amount of snowfall in the Little Rock area during the months of January, February and March. The trial judge remarked that lots of times it is raining at Adams Field and not at his house. When the deputy prosecuting attorney stated that he was at a loss to determine what the offered exhibits showed, the judge asked: "Do you want to let the jury guess on it?" While the judge's statement as to the cost of the trial and his comments in regard to the weather bureau reports in the presence of the jury were perhaps inadvisable, we find no basis for reversal. Appellant did not object on either occasion, did not ask any corrective action and did not ask for a mistrial. Kimble v. State, 246 Ark. 407, 438 S.W.2d 705.

[9]  Another argument advanced by appellant in this category is that the circuit judge erroneously refused to permit him to read the transcribed testimony of Lawrence Keathley at an earlier hearing pertaining to the case, because the witness was outside the jurisdiction of the court. He admits that the record does not disclose this action in any way.

Appellant moved for diminution of the record in this respect on April 20, 1970. We granted certiorari. The writ was returned indicating that there was no such record. The court reporter filed her affidavit that no written or oral motion to make this testimony a part of the record was ever presented to the court, and that no subpoena was issued for Lawrence Keathley.

Appellant then renewed his motion and asked permission to file a bystander's bill of exceptions. We then remanded the case to the trial court for the purpose of settling the record on June 22, 1970. When the record had not been returned, we again issued a writ of certiorari on October 9, 1970. Return of this writ on November 6, 1970, indicated that the record was complete. Appellant's motion on November 25, 1970, for certiorari or diminution of the record and for additional time to prepare a bystander's bill of exceptions was denied by this court.

Appellant now argues that we must consider a bystander's bill on this point, in spite of these proceedings. We do not agree. While appellant relies on Ark.Stat. Ann. §§ 27–1750 and 27–1751 (Repl.1962), we have no record of the proceedings in the trial court before us and no bystander's affidavit, even though the record was on remand to the trial court for the purpose of settling the record for more than four months. Neither do we know that the testimony of the witness was relevant, material or competent.

The judgment is affirmed.

ARKANSAS STATE HIGHWAY COMMISSION, Appellant,

v.

SOUTHERN DEVELOPMENT CORPORATION, Appellee.

No. 5–5508.

Supreme Court of Arkansas.

June 21, 1971.

Rehearing Denied Aug. 9, 1971.

Condemnation case in which State Highway Commission appealed, and condemnee cross-appealed, from a decision of the Circuit Court, Jefferson County, Henry W. Smith, J. The Supreme Court, Ben Core, Special Justice, held that issue of value of condemned property as a bridge site should not have been submitted to jury where opinion of condemnee's expert, who testified to a value of $640,000, was not admissible since it violated the rule that the value of the site to the condemnor is not the measure of damages, since in this instance the expert was simply testifying as to the amount of money saved in construction costs by condemnor by placing his structure on the parcel in question, as opposed to the next most feasible parcel.

Reversed on both direct and cross appeal and remanded for new trial.

Fogleman, J., dissented and filed opinion in which Harris, C. J., and Holt, J., joined.

Byrd, J., not participating.

**1. Eminent Domain ⬅131**

True measure of just compensation in a condemnation case is the market value of the property.

**2. Eminent Domain ⬅131**

In arriving at market value of property in a condemnation case, consideration should be given as to what has been taken from the owner, that is, as to what the

owner has 1
the condemn

**3. Eminent D**

Proof o
property  fo
made, since
that use, wi
such market
mand for th
give it a val

**4. Evidence (**

Expert  ·
ceeding is en
market valu
out further (
stitute subst
support a ju
formation  is
that such ex|
basis for his

**5. Eminent D**

While n
condemnee's
State Highw
mission's cou
jury the ad
for direc·
struction,
trial court,
question as t
equate proof
market value
bridge site.

**6. Eminent D**

Issue of
as a bridge :
mitted to ju
nee's expert,
$640,000, wa
ed the rule t
condemnor i:
since in this
testifying as
in construct
placing his s
tion, as oppo
parcel.

6456

The appellant argues that the *Carter* case is distinguishable because there the opinion noted differences between the classes of persons affected by different limitation periods at issue. The contention here is that there are no such differences. The appellant has, however, not convinced us of that proposition. The appellant's evidence and the stipulation before the trial court were insufficient to prove that there were no differences between medical service providers and others which would make the limitations distinction reasonable. Rather, the appellant provided only evidence tending to show that the short period had caused problems for patients and for medical service providers working with insurance claims. No evidence was presented to show that the general assembly did not have or could not have had a reasonable basis for finding, in the words of the trial judge, "that medical services are traditionally provided under special circumstances deemed ... sufficient for medical providers to be in a different category from other creditors who perform services and sell goods to the public." Before we will declare an act of the general assembly unconstitutional, there must be clear and strong evidence that it is incompatible with the Constitution, and we will resolve all doubts in favor of the constitutionality of the act in question. *Phillips v. Giddings,* 278 Ark. 368, 646 S.W.2d 1 (1983). *See also Eason v. State,* 11 Ark. 851 (1851).

Affirmed.



292 Ark. 362

Edward Charles PICKENS, Appellant,

v.

STATE of Arkansas, Appellee.

No. CR 86–42.

Supreme Court of Arkansas.

June 1, 1987.

Defendant was sentenced to death in the Circuit Court, Southern District, Prairie County, Cecil A. Tedder, J., for felony-murder. Defendant appealed. The Supreme Court, Glaze, J., held that: (1) mitigating evidence concerning behavior and conduct of defendant before sentencing and during period of postconviction relief was admissible at sentencing phase; (2) prospective juror, who indicated decision to impose death penalty for murder, was excusable for cause; and (3) statute, that permits prosecutor to move for imposition of life sentence without parole or impaneling of new sentencing jury, if death sentence is vacated, was not ex post facto law.

Reversed and remanded.

Hickman, J., concurred and filed opinion.

See also, 683 S.W.2d 614.

1. Homicide ⬅354

Mitigating evidence concerning behavior and conduct of capital felony-murder defendant before sentencing and during period of postconviction relief was admissible at sentencing phase; evidence of mitigating behavior and conduct before and after crime was admissible. Ark.Stats. §§ 41–1301(3, 4), 41–1302(1).

2. Jury ⬅108

Prospective juror, who indicated decision to impose death penalty, if defendant was convicted of murder, could not be rehabilitated and was excusable for cause, even though juror indicated that mind was not made up as to whether to impose death penalty, where juror repeatedly stated that death penalty should be imposed for murder, after prosecutor attempted to rehabilitate juror. Ark.Stats. §§ 41–1301(3, 4), 41–1302(1); U.S.C.A. Const.Amends. 5, 14.

3. Criminal Law ⬅1166.18

Error, as result of trial court's refusal to excuse prospective juror, who indicated desire automatically to impose death penalty for murder, required reversal, where defendant used peremptory challenge to excuse prospective juror, and where anoth-

er objecti
upo   'efe
em,
1301(

4. Jury ⬅
Comm
death pena
juror's exc
5, 14.

5. Jury ⬅
Proper
capital cas
they would
vating and
volved who
life impriso
imposed.
1302(1).

6. Homici
Eviden
plices repe
bery while
store estab
capital fel
tion, appre
for robber
circu    'an
whe     to
Stats(
1303(5).

7. Constit
Crimina
Statute
move for i
out parole
jury, was p
permitting
without pa
and senten
sition, and,
law.   Ar
Const. Art.

8. Constitu
Crimina
Change
move for in
out parole
jury, if deat
deprive def
eliminating

er objectionable juror was later forced upon defendant due to exhaustion of peremptory challenges. Ark.Stats. §§ 41-1301(3, 4), 41-1302(1).

**4. Jury ⊜108**

Commitment automatically to impose death penalty is good cause for prospective juror's exclusion. U.S.C.A. Const.Amends. 5, 14.

**5. Jury ⊜131(17)**

Proper inquiry on voir dire of jury in capital case is to ask prospective jurors if they would first consider and weigh aggravating and mitigating circumstances involved when determining whether death or life imprisonment without parole should be imposed. Ark.Stats. §§ 41-1301(3, 4), 41-1302(1).

**6. Homicide ⊜354**

Evidence that defendant and accomplices repeatedly shot victims while they lay helplessly on floor of store established that defendant committed capital felony-murder to avoid identification, apprehension, arrest, and conviction for robbery, and established aggravating circumstance, for purpose of determining whether to impose death penalty. Ark. Stats. §§ 41-1301(3, 4), 41-1302(1), 41-1303(5).

**7. Constitutional Law ⊜197**
   **Criminal Law ⊜1206.1(1)**

Statute, that permits prosecutor to move for imposition of life sentence without parole or impaneling of new sentencing jury, was procedural change from prior law permitting reduction in sentence to life without parole or retrial as to both guilt and sentencing, did not enhance State's position, and, therefore, was not ex post facto law. Ark.Stats.   § 41-1358;   U.S.C.A. Const. Art. 1, §§ 9, cl. 3, 10, cl. 1.

**8. Constitutional Law ⊜250.3(1)**
   **Criminal Law ⊜1206.1(1)**

Change in law so that prosecutor could move for imposition of life sentence without parole or impaneling of new sentencing jury, if death sentence was vacated, did not deprive defendant of equal protection by eliminating possibility of retrial as to guilt

and sentencing phases. Ark.Stats. § 41-1358; U.S.C.A. Const.Amend. 14.

**9. Criminal Law ⊜189**

State's introduction of additional relevant evidence on remand at resentencing trial in capital felony-murder prosecution did not violate double jeopardy, especially where guilt had already been established, and where defendant did not show prejudice as result of admission of evidence. Ark.Stats.   § 41-1358;   U.S.C.A. Const. Amend. 5.

**10. Statutes ⊜87**

Statute, that requires capital case to be remanded to court in which defendant is originally sentenced, if death sentence is vacated, did not violate state constitutional provision against local or special law changing venue in criminal cases, where defendant agreed to venue change when case was originally tried. Ark.Stats. § 41-1358; Const. Art. 5, § 24.

**11. Costs ⊜172**

Defense attorney was entitled to maximum award of $1,000 for representation of indigent defendant in capital felony-murder prosecution. Ark.Stats. § 43-2419.

**12. Criminal Law ⊜1166.11(3)**

Defendant, who was led into courthouse in handcuffs during resentencing phase of capital felony-murder prosecution, was not prejudiced, where jury already knew that defendant had been convicted of murder. U.S.C.A. Const.Amends. 5, 14.

**13. Criminal Law ⊜1171.1(6)**

Prosecutor's reference to himself as representing "the people" and argument that death penalty deterred crime did not prejudice defendant in prosecution for capital felony-murder.

**14. Criminal Law ⊜1213.8(8)**

Death penalty for felony-murder was not cruel and unusual punishment. Ark. Stats. §§ 41-1301(3, 4), 41-1302(1); U.S. C.A. Const.Amend. 8.

Achor & Rosenzweig by Jeff Rosenzweig, Little Rock, for appellant.

Steve Clark, Atty. Gen. by Clint Miller, Asst. Atty. Gen., Little Rock, for appellee.

GLAZE, Justice.

On October 20, 1975, several people were shot in a robbery of a grocery store in Arkansas County. Three people were charged in the case, one being appellant. Venue for appellant was changed to Prairie County, where appellant subsequently was convicted of the capital felony murder of Wesley Noble, one of the customers in the store. Appellant was sentenced to death. The conviction and sentence were upheld in *Pickens v. State*, 261 Ark. 756, 551 S.W.2d 212 (1977). In *Pickens v. Lockhart*, 714 F.2d 1455 (8th Cir.1983), appellant's death sentence was vacated because of ineffective assistance of counsel, and remanded to state court to permit it to reduce appellant's sentence to life without parole or to conduct a new sentencing procedure. A resentencing trial took place in Prairie County Circuit Court in September 1985, and appellant was again sentenced to death. He appeals this new sentence, listing ten points for reversal. Some of these ten points include an additional number of sub-issues or reasons why appellant claims this cause should be reversed. Because we agree with appellant's first argument, we decide and discuss only those points which are required for the remand and retrial of this case.

Appellant's first argument centers on his having been found guilty of capital murder, after which, the jury, during the penalty phase, unanimously imposed the death sentence. In doing so, the jury was required to find that the aggravating circumstances of the murder outweighed all mitigating circumstances found to exist and the aggravating circumstances justified a sentence of death beyond a reasonable doubt. Ark. Stat. Ann. §§ 41–1301(3)(4) and –1302(1) (Repl. 1977). Appellant argues that the trial court erred in limiting appellant's proof concerning mitigating circumstances to those circumstances that existed in October 1975, the time of the murder. In this respect, appellant contends the trial judge should have allowed him to introduce the testimony of various witnesses regarding character, rehabilitation, adjustment to prison and good works he had undergone or performed since the murder occurred.

In support of this argument, appellant relies upon the Supreme Court's recent holding in *Skipper v. South Carolina*, 476 U.S. ——, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986). In *Skipper*, the trial court excluded the testimony of two jailers and a "regular visitor" regarding the defendant's good behavior while he was in jail for seven months awaiting trial. The Supreme Court held the trial court's exclusion of such testimony denied Skipper his right to place before the sentencer relevant evidence in mitigation of punishment. The Court said: "Although it is true that any such inferences would not relate specifically to petitioner's culpability for the crime he committed, [cite omitted], there is no question but that such inferences would be 'mitigating' in the sense that they might serve 'as a basis for a sentence less than death.'" 106 S.Ct. at 1671.

The State argues the *Skipper* decision should be limited to its facts and suggests a temporal limit exists that precludes a defendant from offering mitigating circumstances which arise after the jury decides the defendant is guilty of capital murder. The State submits to construe the *Skipper* holding otherwise would permit defendants, who are able to extend their appeals and post-conviction relief processes the longest, an opportunity to collect evidence in mitigation that, in time, is far removed from the circumstances of the crime, as well as from what their characters were when they committed the offense. Such an open-ended procedure, the State suggests, bestows on some death-row inmates the opportunity to accumulate mitigating evidence while others may not be so fortunate. In sum, the State concludes that to permit such erratic opportunities to present additional, post-sentence mitigation would produce capricious, arbitrary and freakish results in the application of the death penalty in Arkansas for years.

While the State's argument seems based on sound logic and reason, its position is not unlike the one argued to and rejected by the Court in the [S]kipper majority. Cour effect on the mi[...] fore us now, can [...] first reading Justice [...] opinion, joined in by [...] Burger and Justice Reh[...] curring Justices clearly [...] joined in reversing the [S]court not because it exc[...] igating evidence" but on[...] tioner was not allowed [...] and argument used ag[...] wise, the concurring Jus[...] greed with the majority [...] a defendant's conduct [...] should be considered "m[...] and that the sentencer [...] conduct under the Con[...] Powell concluded:

I see no reason why [...] consistent with these [...] evidence of a defendan[...] in jail following his arr[...] evidence is not offered [...] ny or argument such a[...] the prosecution here. [...] *no bearing at all on th[...] of the offense," [...] defendant's behav[...] has been committed.[...]* plied.)

Again, the majority Cou[...] jected Justice Powell's [...] that a state should have [...] clude evidence of a def[...] while awaiting trial or se[...] ing so, the majority place[...] the defendant's culpabilit[...] committed, but instead it [...] er should be able to consi[...] *a defendant's character [...]* of the circumstances of [...] the defendant proffers "[...] sentence less than death."[...] that evidence that the defe[...] pose a danger if spared ([...] must be potentially mitig[...]

1. We note the appellant pe[...] the veniremen discussed here[...] served his record on this po[...] objectionable juror was late[...]

djustment to
d undergone
ler    ·rred.
ı      .llant
ıu.. s recent
'arolina, 476
0 L.Ed.2d 1
:ourt exclud-
and a "regu-
ndant's good
il for seven
preme Court
of such tes-
ght to place
evidence in
: Court said:
ıch inference
 to petition-
e committed,
ion but that
ating' in the
ı a basis for
106 S.Ct. at

ıer decision
nd suggests
precludes a
ting circum-
iy   '-cides
i·     ler.
ı.  .xipper
mit defend-
ıeir appeals
)cesses the
:ct evidence
ar removed
e crime, as
ıcters were
ie. Such an
e suggests,
nmates the
igating evi-
e so fortu-
ıdes that to
ı to present
ıtion would
nd freakish
death pen-

eems based
position is
nd rejected

---

by the Court in the *Skipper* case. The *Skipper* majority Court's holding, and its effect on the mitigating evidence issue before us now, can best be understood by first reading Justice Powell's concurring opinion, joined in by then-Chief Justice Burger and Justice Rehnquist. Those concurring Justices clearly stated that they joined in reversing the South Carolina trial court not because it excluded "relevant mitigating evidence" but only because the petitioner was not allowed to rebut evidence and argument used against him. Otherwise, the concurring Justices strongly disagreed with the majority Court holding that a defendant's conduct after the crime should be considered "mitigating evidence" and that the sentencer must consider such conduct under the Constitution. Justice Powell concluded:

> I see no reason why a State could not, consistent with these principles, exclude evidence of a defendant's good behavior in jail following his arrest, as long as the evidence is not offered to rebut testimony or argument such as that tendered by the prosecution here. *Such evidence has no bearing at all on the "circumstances of the offense," since it concerns the defendant's behavior after the crime has been committed.* (Emphasis supplied.)

Again, the majority Court in *Skipper* rejected Justice Powell's expressed views that a state should have the right to exclude evidence of a defendant's conduct while awaiting trial or sentencing. In doing so, the majority placed emphasis not on the defendant's culpability for the crime he committed, but instead it held the sentencer should be able to consider *any aspect of a defendant's character or record* or any of the circumstances of the offense that the defendant proffers "as a basis for a sentence less than death." It said further that evidence that the defendant would not pose a danger if spared (but incarcerated) must be potentially mitigating.

1. We note the appellant peremptorily excused the veniremen discussed here, but appellant preserved his record on this point by showing an objectionable juror was later forced upon him

---

[1] We believe the *Skipper* decision mandates, in clear terms, that any relevant mitigating evidence concerning a defendant's character should not be excluded. That evidence may include, as the situation here, the defendant's behavior and conduct that existed not only before and at the time of the crime, but also that which occurred before sentencing and during the period of post-conviction relief, should a later resentencing occur. Accordingly, we reverse and remand this cause for resentencing to be conducted consistent with the *Skipper* holding and this court's opinion.

[2, 3] Appellant raises one other meritorious argument. In this respect, appellant argues the trial court erred in refusing to excuse certain jurors for cause, two of them because they indicated they would automatically impose the death penalty if appellant were convicted of murder. The State made every effort to rehabilitate one of those two jurors by leading him to say, "No, sir," when asked, "Now, we have to be fair, so in the other vein, life without parole is also a possible penalty, so you haven't got your mind made up at all that all capital murder deserves [the] death penalty?" Even after such efforts by the prosecutor, this witness repeatedly said that if appellant (or anyone) was guilty of murder (or rape), "I would burn them" or "be for the death penalty." As we pointed out in *Conley v. State,* 270 Ark. 886, 607 S.W.2d 328 (1980), a prospective juror's candid answers cannot be overcome merely by routine responses, and there is a point beyond which such a juror cannot be rehabilitated. We believe that situation occurred here and, accordingly, presents another reason why this cause must be reversed.[1]

[4, 5] The Supreme Court has said that a venireman should not be excluded unless he is irrevocably committed to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings. *See Rector*

because he had exhausted all his peremptory challenges. *Cf. Stephens v. State,* 277 Ark. 113, 640 S.W.2d 94 (1982).

*v. State*, 280 Ark. 385, 659 S.W.2d 168 (1983) (quoting from *Davis v. Georgia*, 429 U.S. 122, 97 S.Ct. 399, 50 L.Ed.2d 339 (1976)). By the same token, a venireman who is automatically committed to imposing the death penalty is, for the defense, good cause for that juror's exclusion from service. Clearly, proper inquiry on voir dire in the matter would be to ask the veniremen if they would first consider and weigh the aggravating and mitigating circumstances involved when determining whether death or life imprisonment without parole should be imposed.

Before turning to appellant's other points, we mention briefly those we do not reach. Appellant argues that the jurors, in rendering appellant's sentence, erroneously found the appellant had presented no evidence of mitigating circumstances. If error occurred in this instance, such error may readily be avoided at the retrial and we need not discuss it.

Similarly, we need not reach appellant's contention that the trial court erred in permitting the jury to consider the aggravating circumstance that appellant committed capital murder for pecuniary gain. Appellant presents a two-pronged argument: (1) the jury, which determined appellant's guilt at the original trial, also found that the murder the appellant committed was not for pecuniary gain, and appellant urges that to allow another jury, upon resentencing, to consider pecuniary gain as an aggravating circumstance violates the principle of double jeopardy; and (2) citing *Collins v. Lockhart*, 754 F.2d 258 (8th Cir.), *cert. denied*, — U.S. —, 106 S.Ct. 546, 88 L.Ed.2d 475 (1985), appellant argues his conviction was for robbery-murder, a crime that included pecuniary gain as an element, and he suggests that if the court permits the State to prove the aggravating circumstance of murder for pecuniary gain for sentencing purposes, the court improperly permits the double counting of one aspect of the evidence. Because this cause is reversed on other grounds and three other

aggravating circumstances remain available to the State, we need not presume or anticipate that this issue will arise at the resentencing trial.

[6] Appellant does attack one of the other remaining three aggravating circumstances, and we do dispose of that argument since we conclude it is wholly without merit. The jury found the appellant committed capital murder for the purpose of avoiding or preventing an arrest or effecting an escape from custody—an aggravating circumstance under Ark. Stat. Ann. § 41-1303(5). Appellant contends this circumstance is vague and overbroad as applied to the facts of this case. We consider this contention spurious in view of the overwhelming evidence that the appellant and his accomplices repeatedly shot their victims during the robbery while they laid helplessly on the floor of the store. One victim, Harold Goacher, testified the appellant and his accomplices asked if there was a room in which they could lock up their victims and when they were told no, Goacher said, "they turned around and said well, hell, we were (sic) just going to have to do away with them because if they get loose they will burn us." Unquestionably, the record supports the conclusion the appellant and his cohorts intended to kill their victims in order to avoid identification, apprehension, arrest and conviction for the robbery.[2]

Appellant next argues the unconstitutionality of Ark. Stat. Ann. § 41-1358 (Supp.1985), contending that its retroactive application here violates (1) the *ex post facto* clause, (2) the equal protection clause and (3) the double jeopardy prohibition. He argues further that the provision is a special law forbidden by Ark. Const. art. 5, § 24.

[7, 8] Section 41-1358 provides that a capital case is remanded to the court where the defendant was originally sentenced when a death sentence is vacated, and the

prosecutor ma[...] impose a life s[...] impanel [...] claims t[...] Act 546 of [...] lowed by law, [...] occurred, to a [...] without parole [...] guilt and any [...] On this point, [...] upon *Miller v* [...] S.W.2d 163 (19[...] ment, correctly [...] the instant cas[...] tion is that this [...] the federal cou[...] resentencing, [...] sue. Aside fr[...] preme Court, [...] U.S. 282, 97 [...] (1977), held th[...] state's death-s[...] *post facto* viola[...] deny a defend[...] the laws. In [...] that the new[...] altered the me[...] ing whether th[...] imposed and n[...] the quan[...] crime. [...] tion here. [...] was charged, [...] for it, and the [...] necessary to e[...] unaffected by [...] State's position [...] § 41-1358, sin[...] law, seek any [...] ment against th[...] committed tha[...] under the prio[...]

[9] Appella[...] permitted the S[...] al to presen[...] presented at hi[...] gests, violates [...] tion under the [...] connection, Jer[...] bery victims, t[...] trial, but had [...] first trial beca[...] at the time. [...]

---

2. Appellant also contends on appeal that it was error to permit the State to prove this aggravating circumstance because it was not found by the jury in his co-defendant's sentencing trial.

Although he raised this issue below, we find nothing in the record, nor does he offer any citation of authority, to support his argument.

main avail-
presume or
ar'     `t the

one of the
ing circum-
that argu-
olly without
oellant com-
purpose of
it or effect-
n aggravat-
Stat. Ann.
ids this cir-
road as ap-
We consider
iew of the
ie appellant
r shot their
ile they laid
store. One
d the appel-
if there was
I no, Goach-
id said well,
) have to do
ey get loose
i'   '- the
i        pel-
tc   i their
fication, ap-
ion for the

unconstitu-
§ 41-1358
i retroactive
he *ex post*
iction clause
ibition. He
ion is a spe-
onst. art. 5,

ides that a
court where
r sentenced
ted, and the

low, we find
he offer any
his argument.

prosecutor may move the trial court to
impose a life sentence without parole or to
impanel a new sentencing jury. Appellant
claims that, prior to § 41-1358 (enacted as
Act 546 of 1983), he would have been al-
lowed by law, when a penalty phase error
occurred, to a reduction in sentence to life
without parole or a retrial as to both the
guilt and any resulting sentencing phase.
On this point, appellant primarily relies
upon *Miller v. State*, 280 Ark. 551, 660
S.W.2d 163 (1983). The State, in its argu-
ment, correctly distinguishes *Miller* from
the instant case but the significant distinc-
tion is that this cause involves a remand by
the federal court to the state trial court for
resentencing, not a retrial on the guilt is-
sue. Aside from such differences, the Su-
preme Court, in *Dobbert v. Florida*, 432
U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344
(1977), held that a procedural change in a
state's death-sentencing law is not an *ex
post facto* violation, nor does such a change
deny a defendant the equal protection of
the laws. In *Dobbert*, the Court concluded
that the newly-enacted law there simply
altered the methods employed in determin-
ing whether the death penalty was to be
imposed and no change occurred regarding
the quantum of punishment attached to the
crime. The same can be said for the situa-
tion here. The crime for which appellant
was charged, the punishment prescribed
for it, and the quantity or degree of proof
necessary to establish his guilt, all remain
unaffected by § 41-1358. In sum, the
State's position is in no way enhanced by
§ 41-1358, since it may not, under that new
law, seek any greater penalty or punish-
ment against the appellant for the crime he
committed than that which was available
under the prior law.

[9] Appellant further urges § 41-1358
permitted the State at the resentencing tri-
al to present additional evidence not
presented at the original trial; this, he sug-
gests, violates the double jeopardy prohibi-
tion under the fifth amendment. In this
connection, Jerry Lockridge, one of the rob-
bery victims, testified at the resentencing
trial, but had not testified at appellant's
first trial because Lockridge was in Europe
at the time. A similar question of double

jeopardy to the one presented here was
considered in *United States v. Shotwell
Mfg. Co.*, 355 U.S. 233, 78 S.Ct. 245, 2
L.Ed.2d 234 (1957). The Court, in lan-
guage that is particularly instructive here,
said:

> It is undeniable, of course, that upon
> appellate reversal of a conviction the
> Government is not limited at a new trial
> to evidence presented at the first trial,
> but is free to strengthen its case in any
> way it can by the introduction of new
> evidence.

355 U.S. at 243, 78 S.Ct. at 252.

We are unaware of any reason why the
State should be precluded from introducing
additional relevant evidence on remand at a
resentencing trial, especially when appel-
lant's guilt already has been established
and when appellant has in no manner
shown or demonstrated prejudice that
would result from the admission of such
evidence.

[10] Finally, appellant asserts Ark.
Const. art. 5, § 24 prohibits the General
Assembly from passing any local or special
law changing the venue in criminal cases,
and the General Assembly, appellant says,
did just that here since § 41-1358 effective-
ly requires this case to be remanded to
Prairie County and not Arkansas County,
where the crime was committed in 1975.
Appellant's argument is far afield since the
parties, themselves, agreed to a venue
change to Prairie County when this cause
was originally tried. Thus, § 41-1358 had
nothing to do with fixing venue in this
matter; instead, it merely reinvests venue
for resentencing purposes in the county the
parties agreed on in the first instance.

[11] Next, appellant's counsel argues
the trial court erred in the application of
Ark. Stat. Ann. § 43-2419 (Repl.1977)
which provides for fees for attorneys repre-
senting indigents in criminal matters.
Counsel, without offering sufficient reason
or argument, requests that this court strike
the $1,000.00 limitation provided under
§ 43-2419 as being a violation of due pro-
cess and of appellant's right to the effec-
tive assistance of counsel. We reject ap-

pellant's request to reach the question concerning the constitutionality of § 43–2419, but we do recognize counsel's entitlement to the maximum award under that provision. Thus, because the trial court allowed only $650.00 for the actual trial on resentencing, we direct the trial court to award an additional amount in the sum of $350.00. (We decline counsel's suggestion that this court award his fees in advance of the second resentencing trial.)

Appellant raises two additional points we recently addressed and decided in *Duncan v. State*, 291 Ark. 521, 726 S.W.2d 653 (1987), *viz.*, that Arkansas's sentencing laws for capital murder are death-mandatory provisions prohibited by *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976), and that the prosecutor is not entitled to a second closing argument under such sentencing laws. In *Duncan, supra*, we rejected the contention that Arkansas's statutory scheme provides for a mandatory death penalty when the jury finds the aggravating circumstances outweigh mitigating circumstances. *See* Ark. Stat. Ann. §§ 41–1301 to 41–1304. As we pointed out there, the jury, irrespective of its findings under these provisions, can still return a life verdict without parole simply by rejecting the death penalty. *See also Hill v. State*, 289 Ark. 387, 713 S.W.2d 233 (1986). We also held in *Duncan, supra*, that the prosecutor had the right to close the argument in the penalty phase because the State had the burden of proof. Because we have already disposed of these points in *Duncan, supra*, no further discussion is required.

Appellant concludes his argument for reversal of this cause by listing a mixture of issues captioned "other claims." None of these claims have merit.

[12] Appellant first argues that he was prejudiced because he was led into the courthouse in handcuffs. To note the obvious, appellant's case was one of resentencing, only, and the jury was quite aware that appellant was guilty of capital murder since that was the very crime for which the jury was convened to impose a penalty. We fail to see how prejudice would result from a juror's view of appellant in handcuffs when that juror already knows the appellant had been convicted of murder nearly nine years earlier. As was said by the court in *United States ex rel. Stahl v. Henderson*, 472 F.2d 556 (5th Cir.) *cert. denied*, 411 U.S. 971, 93 S.Ct. 2166, 36 L.Ed.2d 694 (1973), "No prejudice can result from seeing what is already known." *See also Glick v. State*, 286 Ark. 133, 689 S.W.2d 559 (1985).

[13, 14] Next, appellant contends the prosecutor erred in referring to himself as representing "the people" and arguing to the jury that the death penalty is a deterrence and making other remarks appellant considers were designed to prejudice his case. Appellant submits no case authority and little argument to convince us these matters were errors, requiring the reversal of this cause. Neither do we find merit in appellant's expressed attempt to preserve his argument that death-qualified juries are unconstitutional since that issue has been decided against him. *Lockhart v. McCree*, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986). The same can be said for his contention that the death penalty is cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) and *Fairchild v. State*, 284 Ark. 289, 681 S.W.2d 380 (1984).

As previously mentioned, we reverse and remand for resentencing consistent with the directions and holdings set out herein.

HICKMAN, J., concurs.

HICKMAN, Justice.

I agree with the majority decision; we have no alternative but to reverse this case. However, I would go further and address the question raised by *Collins v. Lockhart*, 754 F.2d 258 (8th Cir.) cert. denied — U.S. ——, 106 S.Ct. 546, 88 L.Ed.2d 475 (1985). I would not follow the rationale of that decision which has been rejected by other federal and state courts. *Glass v. Blackburn*, 791 F.2d 1165 (5th Cir.1986); *Wingo v. Blackburn*, 783 F.2d 1046 (5th Cir.1986); *Evans v. Thigpen*, 631 F.Supp. 274, 275 (S.D.Miss. 1986); *State v. Williams*, 317

N.C. 474, Eight Am Cons shall imposed, n ments inflic of Appeals from that p because an der will be such a circu alty unconst

If a state ty, as Arka commit mur certain felon not such an criminal mis the guidelin States Supre gia, 408 U.S 346 (1972); 96 S.Ct. 290 ett v. Ohio, L.Ed.2d 973 not to impos

It is ironi cases ble a defenda son for their deserve the great majori ty, but becau sons left to their case. I will get the more freakin penalty than within reaso

N.C. 474, 346 S.E.2d 405 (1986). The Eighth Amendment to the United States Constitution simply says "excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." The Eighth Circuit Court of Appeals has indeed strayed a long way from that principle by finding that simply because an element of capital felony murder will be an aggravating circumstance, such a circumstance makes the death penalty unconstitutional.

If a state decides to limit the death penalty, as Arkansas has done to those who commit murder during the commission of certain felonies, in this case robbery, that is not such an arbitrary, broad category of criminal misconduct that fails or should fail the guidelines laid down by the United States Supreme Court. *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972); *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). A jury may still decide not to impose the death penalty.

It is ironical that the few death penalty cases which will slip through the interminable appeal process will mean that those defendants are simply unlucky. The reason for their fate will not be because they deserve the death penalty more than the great majority who are spared that penalty, but because there are no technical reasons left to throw out the death penalty in their case. Is this a fair way to decide who will get the death penalty? It seems a far more freakish way to impose the death penalty than to leave that decision to juries within reasonable guidelines.



293 Ark. 373
Ruth BAERLOCKER and Bernadine Dean, Appellants,

v.

Sam HIGHSMITH, Executor of the Estate of Luella M. Turner, & the Estate of Luella M. Turner, Appellees.

No. 86–298.

Supreme Court of Arkansas.

June 8, 1987.

Testator's sisters contested will, alleging that she was incompetent to execute will and that she was under undue influence. The Probate Court, Independence County, Carl B. McSpadden, J., ruled in favor of executor, and sisters appealed. The Supreme Court, Holt, C.J., held that: (1) sisters failed to demonstrate that testator lacked capacity to execute will or that she was under undue influence, and (2) fact that testator is peculiar or eccentric does not establish lack of capacity to make will.

Affirmed.

**1. Wills ⇐52(1), 163(1)**
   Party contesting validity of will has burden of proving by preponderance of evidence that testator lacked mental capacity or was unduly influenced at time will was executed.

**2. Wills ⇐55(1), 166(1)**
   Challengers to will failed to establish that testator was incompetent to execute will or that she was under undue influence of persons unknown, where evidence revealed that testator was emphatic about leaving half her estate to cancer society because her husband had died of cancer, and leaving other half to university to help young people with their education, that she kept meticulous records up until her death, and that she had stated that she did not wish to leave anything to her brother and sisters, though she was grieving over husband's death at time will was executed and testator had no contact with either cancer society or university.

not warrant the extraordinary protection afforded by the overbreadth doctrine.[6]

Because I have no difficulty with the statute's application in this case, I concur in the Court's judgment.



458 U.S. 782, 73 L.Ed.2d 1140
Earl ENMUND, Petitioner
v.
FLORIDA.
No. 81–5321.

Argued March 23, 1982.
Decided July 2, 1982.

Defendant was convicted in the Circuit Court, Hardee County, William A. Norris, Jr., J., of murder in the first degree and robbery, and was sentenced to death. He appealed. The Supreme Court of Florida, 399 So.2d 1362, affirmed. Certiorari was granted and, in an opinion by Justice White, the Supreme Court held that: (1) the Eighth Amendment does not permit imposition of death penalty on defendant who aids and abets felony in course of which murder is committed by others but who does not himself kill, attempt to kill, or intend that killing take place or that lethal force will be employed, and (2) identical treatment of robbers and their accomplice, and attribution to accomplice of culpability of those who killed victims, was impermissible under Eighth Amendment.

Reversed and remanded.

Justice Brennan filed concurring opinion.

6. See *FCC v. Pacifica Foundation, supra,* at 742–743, 98 S.Ct., at 3036–3037 (opinion of STEVENS, J.); *Young v. American Mini Theatres, Inc., supra,* at 59–61, 96 S.Ct., at 2446–2447; see also *Metromedia, Inc. v. City of San Diego,* 453 U.S. 490, 544–548, 101 S.Ct. 2882, 2911–2913, 69 L.Ed.2d 800 (STEVENS, J., dissenting in part); *Schad v. Borough of Mount Ephraim, supra,* at

Justice O'Connor filed dissenting opinion in which Chief Justice Burger, Justice Powell and Justice Rehnquist joined.

Opinion on remand, 439 So.2d 1383.

**1. Criminal Law ⚖️1213**

Eighth Amendment does not permit imposition of death penalty on defendant who aids and abets felony in course of which murder is committed by others but who does not himself kill, attempt to kill or intend that killing take place or that lethal force will be employed. West's F.S.A. § 921.141(2); U.S.C.A.Const.Amends. 8, 14.

**2. Criminal Law ⚖️1206(2)**
**Robbery ⚖️30**

Death penalty is excessive penalty for robber who, as such, does not take human life. West's F.S.A. § 921.141(2); U.S.C.A.Const.Amends. 8, 14.

**3. Criminal Law ⚖️1208(1)**

In determining validity of capital punishment for accomplice's conduct, focus had to be on his culpability, not on that of those who committed robbery and shot victims. West's F.S.A. § 921.141(2); U.S.C.A.Const.Amends. 8, 14.

**4. Criminal Law ⚖️1213**

Identical treatment of robbers, who killed victims, and accomplice, who did not kill or attempt to kill and did not intend to participate in or facilitate murder, and attributing to accomplice the culpability of those who killed victims, for purposes of imposing death penalty, was impermissible under Eighth Amendment. U.S.C.A.Const. Amends. 8, 14.

*Syllabus* *

Petitioner and a codefendant, at a jury trial in a Florida court, were convicted of

85, 101 S.Ct., at 2191 (STEVENS, J., concurring in judgment).

* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

first-degree murder and robbery of two elderly persons at their farmhouse, and were sentenced to death. The Florida Supreme Court affirmed. The court held that, although the record supported no more than the inference that petitioner was the person in a car parked by the side of the road near the farmhouse at the time of the killings waiting to help the robbers and killers (the codefendant and another) escape, this was enough under Florida law to make petitioner a constructive aider and abettor and hence a principal in first-degree murder upon whom the death penalty could be imposed. It was thus irrelevant to petitioner's challenge to the death sentence that he did not himself kill and was not present at the killings, or whether he intended that the victims be killed or anticipated that lethal force might be used to effectuate the robbery or escape.

*Held*: The imposition of the death penalty upon petitioner is inconsistent with the Eighth and Fourteenth Amendments. Pp. 3372–3379.

(a) The current judgments of legislatures, juries, and prosecutors weigh heavily on the side of rejecting capital punishment for the crime at issue. Only a small minority of States—eight—allow the death penalty to be imposed solely because the defendant somehow participated in the robbery in the course of which a murder was committed, but did not take or attempt or intend to take life, or intend that lethal force be employed. And the evidence is overwhelming that American juries have repudiated imposition of the death penalty for crimes such as petitioner's, the statistics demonstrating that juries—and perhaps prosecutors—consider death a disproportionate penalty for those who fall within petitioner's category. Pp. 3372–3376.

(b) While robbery is a serious crime deserving serious punishment, it is not a crime "so grievous an affront to humanity that the only adequate response may be the penalty of death." *Gregg v. Georgia*, 428 U.S. 153, 184, 96 S.Ct. 2909, 2930, 49 L.Ed.2d 859. The death penalty, which is "unique in its severity and irrevocability,"

*id.*, at 187, 96 S.Ct., at 2931, is an excessive penalty for the robber, who, as such, does not take human life. Here, the focus must be on petitioner's culpability, not on those who committed the robbery and killings. He did not kill or intend to kill and thus his culpability is different from that of the robbers who killed, and it is impermissible for the State to treat them alike and attribute to petitioner the culpability of those who killed the victims. Pp. 3376–3378.

(c) Neither deterrence of capital crimes nor retribution is a sufficient justification for executing petitioner. It is unlikely that the threat of the death penalty for murder will measurably deter one such as petitioner who does not kill or intend to kill. As to retribution, this depends on the degree of petitioner's culpability, which must be limited to his participation in the robbery. Putting him to death to avenge two killings that he did not commit or intend to commit or cause would not measurably contribute to the retribution end of ensuring that the criminal gets his just deserts. Pp. 3379–3377.

399 So.2d 1362, (Fla.) reversed and remanded.

---

James S. Liebman, New York City, for petitioner, pro hac vice, by special leave of Court.

Lawrence A. Kaden, Tallahassee, Fla., for respondent, pro hac vice, by special leave of Court.

Justice WHITE delivered the opinion of the Court.

I

The facts of this case, taken principally from the opinion of the Florida Supreme Court, are as follows. On April 1, 1975, at approximately 7:45 a. m., Thomas and Eunice Kersey, aged 86 and 74, were robbed and fatally shot at their farmhouse in central Florida. The evidence showed that Sampson and Jeanette Armstrong had gone to the back door of the Kersey house and

asked for water for an overheated car. When Mr. Kersey came out of the house, Sampson Armstrong grabbed him, pointed a gun at him, and told Jeanette Armstrong to take his money. Mr. Kersey cried for help, and his wife came out of the house with a gun and shot Jeanette Armstrong, wounding her. Sampson Armstrong, and perhaps Jeanette Armstrong, then shot and killed both of the Kerseys, dragged them into the kitchen, and took their money and fled.

Two witnesses testified that they drove past the Kersey house between 7:30 and 7:40 a. m. and saw a large cream- or yellow-colored car parked beside the road about 200 yards from the house and that a man was sitting in the car. Another witness testified that at approximately 6:45 a. m. he saw Ida Jean Shaw, petitioner's common-law wife and Jeanette Armstrong's mother, driving a yellow Buick with a vinyl top which belonged to her and petitioner Earl Enmund. Enmund was a passenger in the car along with an unidentified woman. At about 8 a. m. the same witness saw the car return at a high rate of speed. Enmund was driving, Ida Jean Shaw was in the front seat, and one of the other two people in the car was lying down across the back seat.

Enmund, Sampson Armstrong, and Jeanette Armstrong were indicted for the first-degree murder and robbery of the Kerseys. Enmund and Sampson Armstrong were tried together.[1] The prosecutor maintained in his closing argument that "Sampson Armstrong killed the old people." Record 1577. The judge instructed the jury that "[t]he killing of a human being while engaged in the perpetration of or in the attempt to perpetrate the offense of robbery is murder in the first degree even though there is no premeditated design or intent to kill." App. 6. He went on to instruct them that

"[i]n order to sustain a conviction of first degree murder while engaging in the

perpetration of or in the attempted perpetration of the crime of robbery, the evidence must establish beyond a reasonable doubt that the defendant was actually present and was actively aiding and abetting the robbery or attempted robbery, and that the unlawful killing occurred in the perpetration of or in the attempted perpetration of the robbery." *Id.*, at 9.

The jury found both Enmund and Sampson Armstrong guilty of two counts of first-degree murder and one count of robbery. A separate sentencing hearing was held and the jury recommended the death penalty for both defendants under the Florida procedure whereby the jury advises the trial judge whether to impose the death penalty. See Fla.Stat. § 921.141(2) (1981). The trial judge then sentenced Enmund to death on the two counts of first-degree murder. Enmund appealed, and the Florida Supreme Court remanded for written findings as required by Fla.Stat. § 921.-141(3) (1981). The trial judge found four statutory aggravating circumstances: the capital felony was committed while Enmund was engaged in or was an accomplice in the commission of an armed robbery, Fla.Stat. § 921.141(5)(d) (1981); the capital felony was committed for pecuniary gain, § 921.141(5)(f); it was especially heinous, atrocious, or cruel, § 921.141(5)(h); and Enmund was previously convicted of a felony involving the use or threat of violence, § 921.141(5)(b). 399 So.2d 1362, 1371–1372 (Fla.1981). The court found that "*none of the statutory mitigating circumstances applied*" to Enmund and that the aggravating circumstances outweighed the mitigating circumstances. *Id.*, at 1372. Enmund was therefore sentenced to death on each of the murder counts.

The Florida Supreme Court affirmed Enmund's conviction and sentences. It found that "[t]here was no direct evidence at trial that Earl Enmund was present at the back

1. Jeanette Armstrong's trial was severed and she was convicted of two counts of second-degree murder and one count of robbery and sentenced

to three consecutive life sentences. 399 So.2d 1362, 1371 (Fla.1981).

Cite as 102 S.Ct. 3368 (1982)

Case 1:22-cv-00699-LPR-JTR   Document 19-31   Filed 11/02/22   Page 261 of 276

attempted
robbery, the
nd ...on-
...ual-
...ing and
empted rob-
killing oc-
f or in the
e robbery."

and Samp-
counts of
unt of rob-
earing was
d the death
ler the Flor-
advises the
the death
11(2) (1981).
Enmund to
first-degree
d the Flori-
for written
tat. § 921.
found four
tances: the
while En-
accomplice
ed robbery,
ital
ain,
ly heinous,
h); and En-
of a felony
f violence,
, 1371–1372
t "none of
stances ap-
ggravating
mitigating
nmund was
each of the

firmed En- ⌐786
. It found
nce at trial
at the back

399 So.2d

door of the Kersey home when the plan to
rob the elderly couple led to their being
murdered." *Id.*, at 1370. However, it re-
jected petitioner's argument that at most
he could be found guilty of second-degree
murder under Florida's felony-murder rule.
The court explained that the interaction of
the " 'felony murder rule and the law of
principals combine to make a felon general-
ly responsible for the lethal acts of his
co-felon.' " *Id.*, at 1369, quoting *Adams v.
State*, 341 So.2d 765, 768–769 (Fla.1976),
cert. denied, 434 U.S. 878, 98 S.Ct. 232, 54
L.Ed.2d 158 (1977). Although petitioner
could be convicted of second-degree murder
only if he were an accessory before the
fact rather than a principal, the Florida
Supreme Court reasoned:

"[T]he only evidence of the degree of his
participation is the jury's likely inference
that he was the person in the car by the
side of the road near the scene of the
crimes. The jury could have concluded
that he was there, a few hundred feet
away, waiting to help the robbers escape
with the Kerseys' money. The evidence,
therefore, was sufficient to find that the
appellant was a principal of the second
degree, constructively present aiding and
abetting the commission of the crime of
robbery. This conclusion supports the
verdicts of murder in the first degree on
the basis of the felony murder portion of
section 782.04(1)(a)." 399 So.2d, at 1370.[2]

The State Supreme Court rejected two of
the four statutory aggravating circum-
stances found by the trial court. It held
that the findings that the murders were
committed in the course of a robbery and
that they were committed for pecuniary
gain referred to the same aspect of peti-
tioner's crime and must be treated as only
one aggravating circumstance. *Id.*, at
1373. In addition, the court held that
"[t]he recited circumstance, that the mur-
ders were especially heinous, atrocious, and
cruel, cannot be approved." *Ibid.*, citing
*Armstrong v. State*, 399 So.2d 953 (Fla.
1981).[3] However, because there were two
aggravating circumstances and no mitigat-
ing circumstances, the death sentence was
affirmed. In so doing, the court expressly
rejected Enmund's submission that because
the evidence did not establish that he in-
tended to take life, the death penalty was
barred by the Eighth Amendment of the
United States Constitution. 399 So.2d, at
1371.

We granted Enmund's petition for certio-
rari, 454 U.S. 939, 102 S.Ct. 473, 70 L.Ed.2d
246 (1981), presenting the question whether
death is a valid penalty under the Eighth
and Fourteenth Amendments for one who
neither took life, attempted to take life, nor
intended to take life.[4]

## II

As recounted above, the Florida Supreme
Court held that the record supported no

2. The Florida Supreme Court's understanding of
the evidence differed sharply from that of the
trial court with respect to the degree of En-
mund's participation. In its sentencing find-
ings, the trial court concluded that Enmund was
a major participant in the robbery because he
planned the robbery in advance and himself
shot the Kerseys. 399 So.2d, at 1372. Both of
these findings, as we understand it, were reject-
ed by the Florida Supreme Court's holding that
the only supportable inference with respect to
Enmund's participation was that he drove the
getaway car. The dissent, while conceding that
this holding negated the finding that Enmund
was one of the triggermen, argues that the trial
court's finding that Enmund planned the rob-
bery was implicitly affirmed. *Post*, at 3383. As
we have said, we disagree with that view. In
any event, the question is irrelevant to the con-
stitutional issue before us, since the Florida

Supreme Court held that driving the escape car
was enough to warrant conviction and the death
penalty, whether or not Enmund intended that
life be taken or anticipated that lethal force
would be used.

3. In *Armstrong* the Florida Supreme Court re-
jected the trial court's conclusion that the Ker-
seys had been killed in order to eliminate them
as witnesses, and stated that according to the
only direct account of the events, "the shootings
were indeed spontaneous and were precipitated
by the armed resistance of Mrs. Kersey." 399
So.2d, at 963.

4. The petitioner argues a second question:
whether the degree of Enmund's participation
in the killings was given the consideration re-
quired by the Eighth and Fourteenth Amend-
ments. We need not deal with this question.

more than the inference that Enmund was the person in the car by the side of the road at the time of the killings, waiting to help the robbers escape. This was enough under Florida law to make Enmund a constructive aider and abettor and hence a principal in first-degree murder upon whom the death penalty could be imposed. It was thus irrelevant to Enmund's challenge to the death sentence that he did not himself kill and was not present at the killings; also beside the point was whether he intended that the Kerseys be killed or anticipated that lethal force would or might be used if necessary to effectuate the robbery or a safe escape. We have concluded that imposition of the death penalty in these circumstances is inconsistent with the Eighth and Fourteenth Amendments.

A

The Cruel and Unusual Punishments Clause of the Eighth Amendment is directed, in part, "'against all punishments which by their excessive length or severity are greatly disproportionate to the offenses charged.'" *Weems v. United States*, 217 U.S. 349, 371, 30 S.Ct. 544, 551, 54 L.Ed. 793 (1910), quoting *O'Neil v. Vermont*, 144 U.S. 323, 339–340, 12 S.Ct. 693, 699–700, 36 L.Ed. 450 (1892) (Field, J., dissenting). This Court most recently held a punishment excessive in relation to the crime charged in *Coker v. Georgia*, 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977). There the plurality opinion concluded that the imposition of the death penalty for the rape of an adult woman "is grossly disproportionate and excessive punishment for the crime of rape and is therefore forbidden by the Eighth Amendment as cruel and unusual punishment." *Id.*, at 592, 97 S.Ct., at 2866. In reaching this conclusion, it was

stressed that our judgment "should be informed by objective factors to the maximum possible extent." *Ibid.* Accordingly, the Court looked to the historical development of the punishment at issue, legislative judgments, international opinion, and the sentencing decisions juries have made before bringing its own judgment to bear on ⌊789 the matter. We proceed to analyze the punishment at issue in this case in a similar manner.

B

The *Coker* plurality observed that "[a]t no time in the last 50 years have a majority of the States authorized death as a punishment for rape." *Id.*, at 593, 97 S.Ct., at 2866. More importantly, in reenacting death penalty laws in order to satisfy the criteria established in *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), only three States provided the death penalty for the rape of an adult woman in their revised statutes. 433 U.S., at 594, 97 S.Ct., at 2867. The plurality therefore concluded that "[t]he current judgment with respect to the death penalty for rape is not wholly unanimous among state legislatures, but it obviously weighs very heavily on the side of rejecting capital punishment as a suitable penalty for raping an adult woman." *Id.* 433 U.S., at 596, 97 S.Ct., at 2868 (footnote omitted).

Thirty-six state and federal jurisdictions presently authorize the death penalty. Of these, only eight jurisdictions authorize imposition of the death penalty solely for participation in a robbery in which another robber takes life.[5] Of the remaining 28 jurisdictions, in 4 felony murder is not a capital crime.[6] Eleven States require some

5. Cal.Penal Code Ann. §§ 189, 190.2(a)(17) (West Supp.1982); Fla.Stat. §§ 782.04(1)(a), 775.082(1), 921.141(5)(d) (1981); Ga.Code §§ 26–1101(b), (c), 27–2534.1(b)(2) (1978); Miss.Code Ann. §§ 97–3–19(2)(e), 99–19–101(5)(d) (Supp.1981); Nev.Rev.Stat. §§ 200.-030(1)(b), 200.030(4), 200.033(4) (1981); S.C. Code §§ 16–3–10, 16–3–20(C)(a)(1) (1976 and Supp.1981); Tenn.Code Ann. §§ 39–2402(a), 39–

2404(i)(7) (Supp.1981); Wyo.Stat. §§ 6–4–101, 6–4–102(h)(iv) (1977).

6. Mo.Rev.Stat. §§ 565.001, 565.003, 565.008(2) (1978) (death penalty may be imposed only for capital murder; felony murder is first-degree murder); N.H.Rev.Stat.Ann. §§ 630:1, 630:1(III), 630:1–a(I)(b)(2) (1974 and Supp.1981) (capital murder includes only killing a law enforcement officer, killing during a kidnaping,

culpable m
homicide a
a (
auth..
knowing,
premedital
murder.[7]
of a culpa
such as m
ence to bu
ty may be
therefore,
not subjec
proof of
was not r
⌊791 either un
or under t
Supreme C

Four ad
mit a defe

and mu
§§ 2502a
be impose
murder i
Code §§ !
alty may
ing).

7. Ala.Coc
2(a)(1) (1
of cita
'1
the
Ill.Rev.St
(1979) (e
intention
"created
bodily 1
(West S
N.M.Stat
31–20A–1
tal crime
absent i
officer),
(C), (D),
complici
intended
02(a), 19
the mur
Code Ar
or know
Va.Code
and pre
commis
deadly 1

8. Ark.St
treme ii

*790* culpable mental state with respect to the homicide as a prerequisite to conviction of a crime for which the death penalty is authorized. Of these 11 States, 8 make knowing, intentional, purposeful, or premeditated killing an element of capital murder.[7] Three other States require proof of a culpable mental state short of intent, such as recklessness or extreme indifference to human life, before the death penalty may be imposed.[8] In these 11 States, therefore, the actors in a felony murder are not subject to the death penalty without proof of their mental state, proof which was not required with respect to Enmund *791* either under the trial court's instructions or under the law announced by the Florida Supreme Court.

Four additional jurisdictions do not permit a defendant such as Enmund to be put to death. Of these, one State flatly prohibits capital punishment in cases where the defendant did not actually commit murder.[9] Two jurisdictions preclude the death penalty in cases such as this one where the defendant "was a principal in the offense, which was committed by another, but his participation was relatively minor, although not so minor as to constitute a defense to prosecution." [10] One other State limits the death penalty in felony murders to narrow circumstances not involved here.[11]

Nine of the remaining States deal with the imposition of the death penalty for a vicarious felony murder in their capital sentencing statutes. In each of these States, a defendant may not be executed *solely* for participating in a felony in which a person was killed if the defendant did not actually cause the victim's death. For a defendant

and murder for hire); 18 Pa.Cons.Stat. §§ 2502(a), (b), 1102 (1980) (death penalty may be imposed only for first-degree murder; felony murder is second-degree murder). Wash.Rev. Code §§ 9A.32.030, 10.95.020 (1981) (death penalty may be imposed only for premeditated killing).

7. Ala.Code §§ 13A–2–23, 13A–5–40(a)(2), 13A–6–2(a)(1) (1977 and Supp.1982) (to be found guilty of capital murder, accomplice must have had "intent to promote or assist the commission of the offense" and murder must be intentional); Ill.Rev.Stat., ch. 38, ¶¶ 9–1(a)(3), 9–1(b)(6) (1979) (capital crime only if defendant killed intentionally or with knowledge that his actions "created a strong probability of death or great bodily harm"); La.Rev.Stat.Ann. § 14:30(1) (West Supp.1982) ("specific intent to kill"); N.M.Stat.Ann. §§ 30–2–1(A)(2), 31–18–14(A), 31–20A–5 (Supp.1981) (felony murder is a capital crime but death penalty may not be imposed absent intent to kill unless victim was a peace officer); Ohio Rev.Code Ann. §§ 2903.01(B), (C), (D), 2929.02(A), 2929.04(A)(7) (1982) (accomplice not guilty of capital murder unless he intended to kill); Tex.Penal Code Ann. §§ 19.-02(a), 19.03(a)(2) (1974) "intentionally commits the murder in the course of [a felony]"); Utah Code Ann. § 76–5–202(1) (1978) ("intentionally or knowingly causes the death of another"); Va.Code § 18.2–31(d) (1982) ("willful, deliberate and premeditated killing of any person in the commission of robbery while armed with a deadly weapon").

8. Ark.Stat.Ann. § 41–1501(1)(a) (1977) ("extreme indifference to ... life"); see also § 41–

1501, Commentary ("an inadvertent killing in the course of a felony will not ... support ... a conviction entailing punishment by death"); Del.Code Ann., Tit. 11, §§ 636(a)(2), (6) (1979) ("recklessly" or "with criminal negligence" causes death during the commission of a felony); Ky.Rev.Stat. § 507.020(1)(b) (Supp.1980) (defendant must manifest "extreme indifference to human life" and "wantonly engag[e] in conduct which creates a grave risk of death ... and thereby causes ... death"); see also Commentary following Criminal Law of Kentucky Annotated, Penal Code § 507.020, p. 677 (1974) (each accomplice's "participation in [the] felony" must "constitut[e] wantonness manifesting extreme indifference to human life").

9. Md.Code Ann., Art. 27, §§ 410, 412(b), 413(d)(10), 413(e)(1) (1982) (except in cases of murder for hire, only principal in the first degree subject to the death penalty). In addition, two jurisdictions already accounted for in n. 7, *supra*, also preclude the death penalty where the defendant did not commit the murder. Ill.Rev. Stat., ch. 38, ¶¶ 9–1(a)(3), 9–1(b)(6) (1979) (defendant must actually kill victim); Va.Code §§ 18.2–31(d), 18.2–10(a), 18.2–18 (1982) (except in cases of murder for hire, only principal in the first degree may be tried for capital murder).

10. Colo.Rev.Stat. § 16–11–103(5)(d)(1978); 49 U.S.C. § 1473(c)(6)(D) (same).

11. Vt.Stat.Ann., Tit. 13, §§ 2303(b), (c) (Supp. 1981) (capital murder reserved for offenders who commit a second unrelated murder or murder of a correctional officer).

to be executed in these States, typically the statutory aggravating circumstances which are present must outweigh mitigating factors. To be sure, a vicarious felony murderer may be sentenced to death in these jurisdictions absent an intent to kill if sufficient aggravating circumstances are present. However, six |of these nine States make it a statutory *mitigating* circumstance that the defendant was an accomplice in a capital felony committed by another person and his participation was relatively minor.[12] By making minimal participation in a capital felony committed by another person a mitigating circumstance, these sentencing statutes reduce the likelihood that a person will be executed for vicarious felony murder. The remaining three jurisdictions exclude felony murder from their lists of aggravating circumstances that will support a death sentence.[13] In each of these nine States, a nontriggerman guilty of felony murder cannot be sentenced to death for the felony murder absent aggravating circumstances above and beyond the felony murder itself.

Thus only a small minority of jurisdictions—eight—allow the death penalty to be

imposed solely because the defendant somehow participated in a robbery in the course of which a murder was committed. Even if the nine States are included where such a defendant could be executed for an unintended felony murder if sufficient aggravating circumstances are present to outweigh mitigating circumstances—which often include the defendant's minimal participation in the murder—only about a third of American jurisdictions would ever permit a defendant who somehow participated in a robbery where a murder occurred to be sentenced to die. Moreover, of the eight States which have enacted new death penalty statutes since 1978, none authorize capital punishment in such circumstances.[14] While the current legislative judgment with respect to imposition of the death penalty where a defendant did not take life, attempt to take it, or intend to take life is neither "wholly unanimous among state legislatures," *Coker v. Georgia,* 433 U.S., at 596, 97 S.Ct., at 2868, nor as compelling as the legislative judgments considered in *Coker,* it nevertheless weighs·on the side of rejecting capital punishment for the crime at issue.[15]

---

12. Ariz.Rev.Stat.Ann. § 13–703(G)(3) (Supp. 1981–1982) ("relatively minor" participation); Conn.Gen.Stat. § 53a–46a(f)(4) (Supp.1982) (same); Ind.Code § 35–50–2–9(c)(4) (Supp. 1981) (same); Mont.Code Ann. § 46–18–304(6) (1981) (same); Neb.Rev.Stat. § 29–2523(2)(e) (1979) (same); N.C.Gen.Stat. § 15A–2000(f)(4) (Supp.1981) (same).

13. Idaho Code § 19–2515(f) (1979); Okla.Stat., Tit. 21, § 701.12 (1981); S.D.Comp.Laws Ann. § 23A–27A–1 (Supp.1981).

14. See the Ala., Colo., Conn., Md., Ohio, Pa., S.D., and Wash. statutes cited in nn. 5–7, 9, 10, 12, and 13, *supra.*

15. The dissent characterizes the state statutes somewhat differently. It begins by noting that 31 States "authorize a sentencer to impose a death sentence for a death that occurs during the course of a robbery." *Post,* at 3388. That is not relevant to this case, however. Rather, at issue is the number of States which authorize the death penalty where the defendant did not kill, attempt to kill, or intend to kill. The dissent divides the statutes into three categories. Its first category of 20 statutes include 8 about which there is no disagreement—Cal., Fla., Ga.,

Miss., Nev., S.C., Tenn., and Wyo. In 11 other States listed by the dissent—Ariz., Colo., Conn., Idaho, Ind., Mont., Neb., N.M., N.C., Okla., and S.D.—the dissent looks solely at the provisions defining the *crime* of capital murder. Colorado's capital sentencing statute makes a defendant's minimal participation in a murder an absolute defense to imposition of the death penalty. See n.10, *supra.* Contrary to the dissent's claim that this provision would have been of no help to petitioner, see *post,* at 3389, n. 36, if the case is judged on the basis of the Florida Supreme Court's findings, see n.2, *supra,* Colorado law may well have barred imposition of the death penalty in this case. Similarly, the Ariz., Conn., Ind., Mont., Neb., and N.C. capital sentencing statutes do not permit capital punishment solely for vicarious felony murder and reduce the likelihood that the death penalty will be imposed on a vicarious felony murderer, even where aggravating circumstances are present, by making a defendant's minimal participation in the homicide a mitigating circumstance. See n.12, *supra.* Three other States—Idaho, Okla., and S.D.—allow a defendant who does not kill or actually kill to be executed only where other aggravating circumstances are present, and in those States the felony murder

---

*[right column partially obscured]*

|794

Socie[...] rej[...] for acc[...] also indica[...] that juries ha[...] ously observe[...] cant and relia[...] porary values[...] volved.' " *Co[...] 596, 97 S.Ct.,[...] Georgia,* 428 [...] 2929, 49 L.Ed[...] is overwhelmin[...] repudiated imp[...] for crimes su[...] cording to th[...] reported appe[...] 1954 in cases[...] cuted for hom[...] executions, in[...] sonally comm[...] In 2 cases th[...] person commit[...] 16 cases the[...] sufficient deta[...] person execut[...] The survey re[...] where a non[...] was e[...]ted

itself c[...] stance. See n[...] sentencing sta[...] least one statu[...] fore the death[...] addition aggr[...] weigh mitigat[...] §§ 31–20A–4([...] statute lists se[...] stances, six o[...] §§ 31–20A–5(0[...] cumstance wi[...] element is no[...] that the victi[...] was acting in [...] duty when he[...] The remainin[...] penalty to n[...] here. See n.[...]

There is n[...] require a cul[...] before a non[...] compare n. 8[...] mental state [...] possess. Sim[...] ry of seven

---

|791 | 458 U.S. 795



| ⌐1794 | |
|---|---|

defendant ery in the of d. re ten for an ficient ag- ent to out- -which of- al partici- a third of permit a ated in a ed to be the eight eath pen- authorize stances.[14]

nent with | ⌐1793 h penalty life, at- ke life is ng state 433 U.S., ompelling idered in the side for the

Society's rejection of the death penalty for accomplice liability in felony murders is also indicated by the sentencing decisions that juries have made. As we have previously observed, " '[t]he jury ... is a significant and reliable objective index of contemporary values because it is so directly involved.' " *Coker v. Georgia, supra,* at 596, 97 S.Ct., at 2868, quoting *Gregg v. Georgia,* 428 U.S. 153, 181, 96 S.Ct. 2909, 2929, 49 L.Ed.2d 859 (1976). The evidence is overwhelming that American juries have repudiated imposition of the death penalty for crimes such as petitioner's. First, according to the petitioner, a search of all reported appellate court decisions since 1954 in cases where a defendant was executed for homicide shows that of the 362 executions, in 339 the person executed personally committed a homicidal assault.[16] In 2 cases the person executed had another person commit the homicide for him, and in 16 cases the facts were not reported in sufficient detail to determine whether the person executed committed the homicide.[17] The survey revealed only 6 cases out of 362 where a nontriggerman felony murderer was executed. All six executions took

place in 1955. By contrast, there were 72 executions for rape in this country between 1955 and this Court's decision in *Coker v. Georgia* in 1977.[18]

That juries have rejected the death penalty in cases such as this one where the defendant did not commit the homicide, was not present when the killing took place, and did not participate in a plot or scheme to murder is also shown by petitioner's survey of the Nation's death-row population.[19] As of October 1, 1981, there were 796 inmates under sentences of death for homicide. Of the 739 for whom sufficient data are available, only 41 did not participate in the fatal assault on the victim. Of the 40 among the 41 for whom sufficient information was available, only 16 were not physically present when the fatal assault was committed. These 16 prisoners included only 3, including petitioner, who were sentenced to die absent a finding that they hired or solicited someone else to kill the victim or participated in a scheme designed to kill the victim. The figures for Florida are similar.[20] Forty-five felony murderers are currently on death row. The Florida Supreme Court either found or affirmed a trial court or

| ⌐1795 | |
|---|---|

---

itself cannot serve as an aggravating circumstance. See n.13, *supra.* New Mexico's capital sentencing statute requires the jury to find at least one statutory aggravating circumstance before the death penalty may be imposed, and in addition aggravating circumstances must outweigh mitigating circumstances. N.M.Stat.Ann. §§ 31–20A–4(C)(1) and (2) (Supp.1981). The statute lists seven statutory aggravating circumstances, six of which require an intent to kill. §§ 31–20A–5(B)–(G). The only aggravating circumstance which does not include an intent element is not applicable here, for it requires that the victim must be "a peace officer who was acting in the lawful discharge of an official duty when he was murdered." § 31–20A–5(A). The remaining State, Vermont, limits the death penalty to narrow circumstances not present here. See n.11, *supra.*

There is no disagreement that three States require a culpable mental state short of intent before a nontriggerman may be put to death, compare n. 8, *supra,* with *post,* at 3389, n. 37, a mental state which Enmund was not proved to possess. Similarly, the dissent's second category of seven States which authorize the death

penalty only if the defendant had specific intent to kill the victim differs from our group of specific-intent States only because we include New Mexico in that group. Compare n. 7, *supra,* with *post,* at 3389–3390, n. 38. Finally, there is no disagreement that three States restrict application of the death penalty to felony murderers who actually kill. Compare n. 9, *supra,* with *post,* at 3390, n. 39.

16. See App. D to Brief for Petitioner.

17. There is no reason to believe that this group of 16 contains a higher proportion of nontriggermen than does the rest of the defendants studied.

18. See NAACP Legal Defense and Educational Fund, Inc., Death Row U.S.A. 1, n. * (Oct. 20, 1981).

19. See App. E to Brief for Petitioner; NAACP Legal Defense and Educational Fund, Inc., Death Row U.S.A. (Oct. 20, 1981).

20. See App. to Reply Brief for Petitioner A-1—A-7.

jury finding that the defendant intended life to be taken in 36 cases. In eight cases the courts made no finding with respect to intent, but the defendant was the trigger-man in each case. In only one case—Enmund's—there was no finding of an intent to kill and the defendant was not the trig-german.[21] The State does not challenge this analysis of the Florida cases.

The dissent criticizes these statistics on the ground that they do not reveal the percentage of homicides that were charged as felony murders or the percentage of cases where the State sought the death penalty for an accomplice guilty of felony murder. Post, at 3388. We doubt whether it is possible to gather such information, and at any rate, it would be relevant if prosecutors rarely sought the death penalty for accomplice felony murder, for it would tend to indicate that prosecutors, who represent society's interest in punishing crime, consider the death penalty excessive for accomplice felony murder. The fact remains that we are not aware of a single person convicted of felony murder over the past quarter century who did not kill or attempt to kill, and did not intend the death of the victim, who has been executed, and that only three persons in that category are presently sentenced to die. Nor can these figures be discounted by

attributing to petitioner the argument that "death is an unconstitutional penalty absent an intent to kill," post, at 3388, and observing that the statistics are incomplete with respect to intent. Petitioner's argument is that because he did not kill, attempt to kill, and he did not intend to kill, the death penalty is disproportionate as applied to him, and the statistics he cites are adequately tailored to demonstrate that juries—and perhaps prosecutors as well—consider death a disproportionate penalty for those who fall within his category.[22]

III

[1] Although the judgments of legislatures, juries, and prosecutors weigh heavily in the balance, it is for us ultimately to judge whether the Eighth Amendment permits imposition of the death penalty on one such as Enmund who aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed. We have concluded, along with most legislatures and juries, that it does not.

[2] We have no doubt that robbery is a serious crime deserving serious punishment. It is not, however, a crime "so grievous an affront to humanity that the

only adeq of death[;] 1[...] "[l]u does inv man life by anoth does not serious ir derer kill that, doe of the m life ... beyond U.S., at omitted). in Coker that the ( its sever Georgia, at 2931, robber w life.

1[3, 4] der; but penalty c robbed. dispropor murder, pu The that or and shot vidualize requiren tence," 98 S.Ct. (footnote must foc acter an er." W U.S. 28! L.Ed.2d not kill strued b record b that En pating i under Fl penalty | a robber

---

21. These statistics concerning the number of vicarious felony murderers who have been executed and the number of them on death row are consistent with the findings of a study of 111 cases in which the defendant was found guilty of a capital crime and hence could have received the death penalty. Kalven & Zeisel, The American Jury and the Death Penalty, 33 U.Chi.L.Rev. 769 (1966). The authors found that juries rebel "at imposing the death penalty for the vicarious criminal responsibility of the defendant," id., at 776, to the extent that felony murder and accomplice factors accounted for more jury decisions not to impose the death penalty when the trial judge decided to impose the death penalty than any other factor. Id., at 777. The authors had anticipated that "because of the rigidity of the felony murder rule, the jury's sense of equity would produce a broad area of disagreement." Id., at 776, n. 10. However, they found that "disagreement over the rule emerges only at the level of the death penalty." Ibid.

22. "[T]he climate of international opinion concerning the acceptability of a particular punishment" is an additional consideration which is "not irrelevant." Coker v. Georgia, 433 U.S. 584, 596, n. 10, 97 S.Ct. 2861, 2868, n. 10, 53 L.Ed.2d 982 (1977). It is thus worth noting that the doctrine of felony murder has been abolished in England and India, severely restricted in Canada and a number of other Commonwealth countries, and is unknown in continental Europe. ALI, Model Penal Code § 210.2, pp. 39–40 (Off. Draft and Revised Comments 1980) (hereafter Model Penal Code). It is also relevant that death sentences have not infrequently been commuted to terms of imprisonment on the grounds of the defendant's lack of premeditation and limited participation in the homicidal act. See Wolfgang, Kelly, & Nolde, Comparison of the Executed and Commuted Among Admissions to Death Row, 53 J.Crim.L.C. & P. S. 301, 310 (1962).

only adequate response may be the penalty of death." *Gregg v. Georgia,* 428 U.S., at 184, 96 S.Ct., at 2930 (footnote omitted). "[I]t does not compare with murder, which does involve the unjustified taking of human life. Although it may be accompanied by another crime, [robbery] by definition does not include the death of or even the serious injury to another person. The murderer kills; the [robber], if no more than that, does not. Life is over for the victim of the murderer; for the [robbery] victim, life ... is not over and normally is not beyond repair." *Coker v. Georgia,* 433 U.S., at 598, 97 S.Ct., at 2869 (footnote omitted). As was said of the crime of rape in *Coker,* we have the abiding conviction that the death penalty, which is "unique in its severity and irrevocability," *Gregg v. Georgia, supra,* 428 U.S., at 187, 96 S.Ct., at 2931, is an excessive penalty for the robber who, as such, does not take human life.

**[3, 4]** Here the robbers did commit murder; but they were subjected to the death penalty only because they killed as well as robbed. The question before us is not the disproportionality of death as a penalty for murder, but rather the validity of capital punishment for Enmund's own conduct. The focus must be on *his* culpability, not on that of those who committed the robbery and shot the victims, for we insist on "individualized consideration as a constitutional requirement in imposing the death sentence," *Lockett v. Ohio,* 438 U.S. 586, 605, 98 S.Ct. 2954, 2965, 57 L.Ed.2d 973 (1978) (footnote omitted), which means that we must focus on "relevant facets of the character and record of the individual offender." *Woodson v. North Carolina,* 428 U.S. 280, 304, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976). Enmund himself did not kill or attempt to kill; and, as construed by the Florida Supreme Court, the record before us does not warrant a finding that Enmund had any intention of participating in or facilitating a murder. Yet under Florida law death was an authorized penalty because Enmund aided and abetted a robbery in the course of which murder

was committed. It is fundamental that "causing harm intentionally must be punished more severely than causing the same harm unintentionally." H. Hart, Punishment and Responsibility 162 (1968). Enmund did not kill or intend to kill and thus his culpability is plainly different from that of the robbers who killed; yet the State treated them alike and attributed to Enmund the culpability of those who killed the Kerseys. This was impermissible under the Eighth Amendment.

In *Gregg v. Georgia* the opinion announcing the judgment observed that "[t]he death penalty is said to serve two principal social purposes: retribution and deterrence of capital crimes by prospective offenders." 428 U.S., at 183, 96 S.Ct., at 2929–30 (footnote omitted). Unless the death penalty when applied to those in Enmund's position measurably contributes to one or both of these goals, it "is nothing more than the purposeless and needless imposition of pain and suffering," and hence an unconstitutional punishment. *Coker v. Georgia, supra,* 433 U.S., at 592, 97 S.Ct., at 2866. We are quite unconvinced, however, that the threat that the death penalty will be imposed for murder will measurably deter one who does not kill and has no intention or purpose that life will be taken. Instead, it seems likely that "capital punishment can serve as a deterrent only when murder is the result of premeditation and deliberation," *Fisher v. United States,* 328 U.S. 463, 484, 66 S.Ct. 1318, 1328, 90 L.Ed. 1382 (1946) (Frankfurter, J., dissenting), for if a person does not intend that life be taken or contemplate that lethal force will be employed by others, the possibility that the death penalty will be imposed for vicarious felony murder will not "enter into the cold calculus that precedes the decision to act." *Gregg v. Georgia, supra,* 428 U.S., at 186, 96 S.Ct., at 2931 (footnote omitted).

It would be very different if the likelihood of a killing in the course of a robbery were so substantial that one should share the blame for the killing if he somehow participated in the felony. But competent

observers have concluded that there is no basis in experience for the notion that death so frequently occurs in the course of a felony for which killing is not an essential ingredient that the death penalty should be considered as a justifiable deterrent to the felony itself. Model Penal Code § 210.2, Comment, p. 38, and n. 96. This conclusion was based on three comparisons of robbery statistics, each of which showed that only about one-half of one percent of robberies resulted in homicide.[23] The most recent national crime statistics strongly support this conclusion.[24] In addition to the evidence that killings only rarely occur during robberies is the fact, already noted, that however often death occurs in the course of a felony such as robbery, the death penalty is rarely imposed on one only vicariously guilty of the murder, a fact which further attenuates its possible utility as an effective deterrence.

As for retribution as a justification for executing Enmund, we think this very much depends on the degree of Enmund's culpability—what Enmund's intentions, expectations, and actions were. American criminal law has long considered a defendant's intention—and therefore his moral guilt—to be critical to "the degree of [his] criminal culpability," *Mullaney v. Wilbur,* 421 U.S. 684, 698, 95 S.Ct. 1881, 1889, 44 L.Ed.2d 508 (1975), and the Court has found criminal penalties to be unconstitutionally excessive in the absence of intentional wrongdoing. In *Robinson v. California,* 370 U.S. 660, 667, 82 S.Ct. 1417, 1420, 8 L.Ed.2d 758 (1962), a statute making narcotics addiction a crime, even

though such addiction "is apparently an illness which may be contracted innocently or involuntarily," was struck down under the Eighth Amendment. Similarly, in *Weems v. United States,* the Court invalidated a statute making it a crime for a public official to make a false entry in a public record but not requiring the offender to "injur[e] any one by his act or inten[d] to injure any one." 217 U.S., at 363, 30 S.Ct., at 547. The Court employed a similar approach in *Godfrey v. Georgia,* 446 U.S. 420, 433, 100 S.Ct. 1759, 1767, 64 L.Ed.2d 398 (1980), reversing a death sentence based on the existence of an aggravating circumstance because the defendant's crime did not reflect "a consciousness materially more 'depraved' than that of any person guilty of murder."

For purposes of imposing the death penalty, Enmund's criminal culpability must be limited to his participation in the robbery, and his punishment must be tailored to his personal responsibility and moral guilt. Putting Enmund to death to avenge two killings that he did not commit and had no intention of committing or causing does not measurably contribute to the retributive end of ensuring that the criminal gets his just deserts. This is the judgment of most of the legislatures that have recently addressed the matter, and we have no reason to disagree with that judgment for purposes of construing and applying the Eighth Amendment.

IV

Because the Florida Supreme Court affirmed the death penalty in this case in the

---

23. The statistics relied upon by the American Law Institute may be summarized as follows:

| Date & Location | No. of Robberies | Robberies Accompanied by Homicide | % |
|---|---|---|---|
| Cook County, Ill. 1926–1927 | 14,392 (est.) | 71 | .49 |
| Philadelphia, Pa. 1948–1952 | 6,432 | 38 | .59 |
| New Jersey 1975 | 16,273 | 66 | .41 |

Model Penal Code § 210.2, Comment, p. 38, n. 96.

24. An estimated total of 548,809 robberies occurred in the United States in 1980. U.S. Dept. of Justice, Federal Bureau of Investigation, Uniform Crime Reports 17 (1981). Approximately 2,361 persons were murdered in the United States in 1980 in connection with robberies, *id.,* at 13, and thus only about 0.43% of robberies in the United States in 1980 resulted in homicide. See also Cook, The Effect of Gun Availability on Robbery and Robbery Murder, in 3 R. Haveman & B. Zellner, Policy Studies Review Annual 743, 747 (1980) (0.48% of all robberies result in murder).

absence of proof that Enmund killed or attempted to kill, and regardless of whether Enmund intended or contemplated that life would be taken, we reverse the judgment upholding the death penalty and remand for further proceedings not inconsistent with this opinion.

*So ordered.*

Justice BRENNAN, concurring.

I join the Court's opinion. However, I adhere to my view that the death penalty is in all circumstances cruel and unusual punishment prohibited by the Eighth and Fourteenth Amendments. See *Gregg v. Georgia*, 428 U.S. 153, 227, 96 S.Ct. 2909, 2950, 49 L.Ed.2d 859 (1976) (dissenting opinion).

Justice O'CONNOR, with whom THE CHIEF JUSTICE, Justice POWELL, and Justice REHNQUIST join, dissenting.

Today the Court holds that the Eighth Amendment prohibits a State from executing a convicted felony murderer. I dissent from this holding not only because I believe that it is not supported by the analysis in our previous cases, but also because today's holding interferes with state criteria for assessing legal guilt by recasting intent as a matter of federal constitutional law.

I

The evidence at trial showed that at approximately 7:30 a. m. on April 1, 1975, Sampson and Jeanette Armstrong approached the backdoor of Thomas and Eunice Kersey's farmhouse on the pretext of

obtaining water for their overheated car.[1] When Thomas Kersey retrieved a water jug to help the Armstrongs, Sampson Armstrong grabbed him, held a gun to him, and told Jeanette Armstrong to take his wallet. Hearing her husband's cries for help, Eunice Kersey came around the side of the house with a gun and shot Jeanette Armstrong. Sampson Armstrong, and perhaps Jeanette Armstrong, returned the fire, killing both of the Kerseys.[2] The Armstrongs dragged the bodies into the kitchen, took Thomas Kersey's money, and fled to a nearby car, where the petitioner, Earl Enmund, was waiting to help the Armstrongs escape. Record 1348–1351.[3]

Ida Jean Shaw[4] testified that on March 31 the petitioner and the two Armstrongs were staying at her house. When she awoke on April 1, the day of the murders, the petitioner, Jeanette, and Sampson, as well as Shaw's 1969 yellow Buick, were gone. *Id.,* at 1185–1186. A little after eight o'clock, either the petitioner or Sampson Armstrong entered the house and told her that Jeanette had been shot. *Id.,* at 1187–1188. After learning that Jeanette had been shot during a robbery, Shaw asked the petitioner "[W]hy he did it." Enmund answered that he had decided to rob Thomas Kersey after he had seen Kersey's money a few weeks earlier. *Id.,* at 1205.[5] At the same time, Sampson Armstrong volunteered that he had made sure that the Kerseys were dead. *Id.,* at 1207–1208.

Ida Jean Shaw also testified that, pursuant to the petitioner's and Sampson Armstrong's instructions, she had disposed of

---

1. Much of the evidence concerning these crimes came from J. B. Neal, to whom Sampson Armstrong made numerous admissions on the day of the murders. See Record 1344–1365.

2. J. B. Neal testified that Armstrong had told him that two guns were involved; Jeanette had one and Sampson had the other. *Id.,* at 1354.

3. An autopsy revealed that Mr. Kersey had been shot twice, once with a .38-caliber bullet, and once with a .22-caliber bullet. Mrs. Kersey had been shot six times; of the bullets that could be identified, two were fired from a .38-caliber gun, and one from a .22-caliber gun. According to a firearms expert, the .22-caliber bullets were fired from the same gun, and the .38-caliber

bullets were fired from the same gun. See 399 So.2d 1362, 1364 (Fla.1981).

4. Ida Jean Shaw was the petitioner's common-law wife and Jeanette Armstrong's mother. She was later given immunity from prosecution in return for her testimony. Record 1178–1179.

5. Thomas Kersey normally kept large sums of money in his wallet and indiscriminately showed the cash to people he dealt with. A few weeks before his murder, Kersey revealed the contents of his wallet to the petitioner and bragged that at any time he could "dig up $15,-000, $16,000." 399 So.2d, at 1365. See Record 1205–1206.

a .22-caliber pistol that she normally kept in her car, as well as a .38-caliber pistol belonging to the Armstrongs. *Id.*, at 1198–1202. The murder weapons were never recovered.[6]

In his closing argument, the prosecutor did not argue that Earl Enmund had killed the Kerseys. Instead, he maintained that the petitioner had initiated and planned the |804 |armed robbery, and was in the car during the killings. According to the prosecutor,

6. Ida Jean Shaw's trial testimony contradicted her earlier statements to police. When police initially questioned her, she insisted that Jeanette had been shot by an unknown assailant while she and Jeanette had been traveling to a nearby town. *Id.*, at 1191–1192. Later she gave investigators a statement implicating the petitioner and Sampson Armstrong in the murders. *Id.*, at 1209–1210. Subsequently, she gave two more statements repudiating the statement implicating the petitioner. *Id.*, at 1208–1209.

In his closing argument, the prosecutor acknowledged the conflict between Ida Jean Shaw's testimony that she was not in the yellow Buick the morning of the murders, and the testimony of a witness who saw her in the car shortly before and after the murders. The prosecutor deemed the inconsistency irrelevant. *Id.*, at 1571–1572.

7. At the sentencing hearing, the prosecutor theorized that the petitioner was not the "trigger man," but the "person who set it all up." *Id.*, at 1679. The prosecutor admitted that he did not "know whether [the petitioner] set foot inside that house or not. But he drove them there. He set it up, planned it." *Id.*, at 1679–1680. In this Court as well, the State acknowledges that the petitioner "was apparently not the trigger-man in the two murders involved in his [*sic*] case." Brief in Opposition 14.

8. In Florida at the time of the Kersey murders, first-degree murder was defined in Fla.Stat. § 782.04(1)(a) (1973) as

"[t]he unlawful killing of a human being, when perpetrated from a premeditated design to effect the death of the person killed or any human being, or when committed by a person engaged in the perpetration of, or in the attempt to perpetrate, any ... robbery...."

In instructing the jury on first-degree murder, the judge read the above provision verbatim. Record 1605–1606. He also added that

"[t]he killing of a human being while engaged in the perpetration of or in the attempt to perpetrate the offense of robbery is murder in the first degree even though there is no premeditated design or intent to kill." *Id.*, at 1606.

"Sampson Armstrong killed the old people." *Id.*, at 1577.[7]

After deliberating for four hours, the jury found Sampson Armstrong and the petitioner each guilty of two counts of first-degree murder[8] and one count of robbery.[9] The jury |then heard evidence per- |805 taining to the appropriate sentence for the two defendants, and recommended the death penalty for each defendant on each of the murder counts.[10]

Distinguishing first- and second-degree felony murder, the judge stated:

"In order to sustain a conviction of first degree murder while engaging in the perpetration of or in the attempted perpetration of the crime of robbery, the evidence must establish beyond a reasonable doubt that the defendant was actually present and was actively aiding and abetting the robbery or attempted robbery, and that the unlawful killing occurred in the perpetration of or in the attempted perpetration of the robbery.

"In order to sustain a conviction of second degree murder while engaged in the perpetration of or in the attempted perpetration of robbery, the evidence must establish beyond a reasonable doubt that the unlawful killing was committed in the perpetration of or in the attempted perpetration of robbery, and that the defendant actually, although not physically present at the time of the commission of the offense, did, nonetheless, procure, counsel, command or aid another to commit the crime." *Id.*, at 1609–1610.

9. On the motion of the petitioner and the prosecution, Jeanette Armstrong's trial had been severed from the trial of her co-defendants. *Id.*, at 50, 57. Jeanette Armstrong was tried first and convicted of two counts of second-degree murder and one count of robbery. The trial judge sentenced her to three consecutive life sentences. 399 So.2d, at 1371.

10. Under Florida law, the "court shall conduct a separate sentencing proceeding to determine whether the defendant should be sentenced to death or life imprisonment." Fla.Stat. § 921.-141(1) (1981). The jury renders only an "advisory sentence" based on the mitigating and aggravating circumstances. § 921.141(2).

At the sentencing hearing, the petitioner presented no evidence, Record 1677, but his attorney argued that the death penalty was inappropriate because at most the evidence showed that the petitioner saw Thomas Kersey's money, suggested the robbery, and drove the Armstrongs to the Kersey house. *Id.*, at 1683–1684. He also argued that death was an excessive

In his sentencing, the court found four aggravating circumstances, [volvemen...] previously ha[d] involving the [robbery in 195...] (1981); (2) t[he] during the co[urse] 141(5)(d); (3) th[e] for pecuniary g[ain]; the murders we[re] cious, or cruel; [had] been shot in a p[...] eliminate the[...] 141(5)(h). App[...] 1371–1372 (Fla...).

|806 |The trial cou[rt found] the statutory m[itigating circumstances] plied" to the pe[titioner...] in original). M[...] cluded that th[...] that the petitio[ner...] capital felony a[nd...] not been "relat[...] major in that h[...]

penalty because[...] and beyond t[he...] 1684.

11. Initia[lly...] ten findin[gs...] 141(5) (1981...). Florida Suprem[e...] such findings. [...]

12. Regarding t[he...] volvement, the [...] two different g[...] ders, and beca[use...] seriously woun[ded...] must have fire[d...] since each of [...] bullet of each[...] shot each victi[m...]

13. The court a[lso...] mitigating circu[mstances...] titioner did no[t...] convictions. F[...] there was no e[vidence...] the influence o[f...] disturbance, § [...] dence that the [...] consented to t[he...] was no eviden[ce...] duress or und[ue...]

In its sentencing findings,[11] the trial court found four statutory aggravating circumstances regarding the petitioner's involvement in the murder: (1) the petitioner previously had been convicted of a felony involving the use of violence (an armed robbery in 1957), Fla.Stat. § 921.141(5)(b) (1981); (2) the murders were committed during the course of a robbery, § 921.141(5)(d); (3) the murders were committed for pecuniary gain, § 921.141(5)(f); and (4) the murders were especially heinous, atrocious, or cruel because the Kerseys had been shot in a prone position in an effort to eliminate them as witnesses, § 921.141(5)(h). App. 30–31; 399 So.2d 1362, 1371–1372 (Fla.1981).[12]

The trial court also found that "*none of the statutory mitigating circumstances applied*" to the petitioner. App. 32 (emphasis in original). Most notably, the court concluded that the evidence clearly showed that the petitioner was an accomplice to the capital felony and that his participation had not been "relatively minor," but had been major in that he "planned the capital felony

penalty because the gunfight was spontaneous, and beyond the petitioner's control. *Id.*, at 1684.

11. Initially, the trial court failed to make written findings as required by Fla.Stat. § 921.141(3) (1981). On the first state appeal, the Florida Supreme Court remanded the case for such findings. See App. 29.

12. Regarding the extent of the petitioner's involvement, the trial court reasoned that because two different guns had been used in the murders, and because Jeanette Armstrong had been seriously wounded by gunfire, the petitioner must have fired one of the guns. Moreover, since each of the Kerseys was injured by a bullet of each type, the petitioner must have shot each victim. *Id.*, at 31; 399 So.2d, at 1372.

13. The court also rejected the other statutory mitigating circumstances. In particular, the petitioner did not have a record free of criminal convictions, Fla.Stat. § 921.141(6)(a) (1981); there was no evidence that he had acted under the influence of extreme mental or emotional disturbance, § 921.141(6)(b); there was no evidence that the victims were participants in or consented to the crimes, § 921.141(6)(c); there was no evidence that he acted under extreme duress or under the substantial domination of

and actively participated in an attempt to avoid detection by disposing of the murder weapons." *Ibid.*; 399 So.2d, at 1373. See Fla.Stat. § 921.141(6)(d) (1981).[13]

Considering these factors, the trial court concluded that the "aggravating circumstances of these capital felonies outweigh the mitigating circumstances," and imposed the death penalty for each count of murder. App. 32; 399 So.2d, at 1373. The court sentenced the petitioner to life imprisonment for the robbery. App. 28.[14]

On appeal, the Florida Supreme Court affirmed the petitioner's convictions and sentences.[15] In challenging his convictions for first-degree murder, the petitioner claimed that there was no evidence that he had committed premeditated murder, or that he had been present aiding and abetting the robbery when the Kerseys were shot. He argued that since the jury properly could have concluded only that he was in the car on the highway when the murders were committed, he could be found

another person, § 921.141(6)(e); there was no evidence that the petitioner was incapable of appreciating the criminality of his conduct or conforming his conduct to the requirements of law, § 921.141(6)(f); and because he was 42 years old at the time of the offense, his age was not a mitigating factor, § 921.141(6)(g). App. 32; 399 So.2d, at 1372–1373.

14. The trial court made nearly identical findings for Sampson Armstrong. In particular, it found that the murders were committed during the course of a robbery, that they were committed for pecuniary gain, and that they were especially heinous, atrocious, or cruel. See *Armstrong v. State*, 399 So.2d 953, 960–961 (Fla.1981). The trial court considered the only possible mitigating circumstance to be Armstrong's age (23), but did not actually find that fact to be mitigating. See *id.*, at 962 ("the factor of age was given no consideration"). Finding that the aggravating circumstances outweighed the mitigating circumstances, the trial judge imposed the death penalty for each murder conviction, and imposed a life sentence for the robbery. *Id.*, at 955, 962.

15. The Florida Supreme Court also affirmed the convictions and sentences of Sampson Armstrong. See *Armstrong v. State, supra,* at 960.

guilty at most of second-degree murder under the State's felony-murder rule.[16]

The court rejected this argument. Quoting from an earlier case, the Florida Supreme Court held:

" '[A]n individual who personally kills another during the perpetration or attempt to perpetrate one of the enumerated felonies is guilty of first degree murder.... Moreover, the felon's liability for first degree murder extends to all of his cofelons who are personally present. As perpetrators of the underlying felony, they are principals in the homicide. In Florida, as in the majority of jurisdictions, the felony murder rule and the law of principals combine to make a felon generally responsible for the lethal acts of his co-felon. Only if the felon is an accessory before the fact and not personally present does liability attach under the second degree murder provision of the applicable statute in the instant case.' " 399 So.2d, at 1369 (quoting *Adams v. State*, 341 So.2d 765, 768–769 (Fla.1976) (footnote omitted), cert. denied, 434 U.S. 878, 98 S.Ct. 232, 54 L.Ed.2d 158 (1977)).

[808] Consequently, the critical issue regarding liability was whether the petitioner's conduct would make him a principal or merely an accessory before the fact to the underlying robbery. Under Florida law at the time of the murders, "if the accused was present aiding and abetting the commission or attempt of one of the violent felonies listed in the first-degree murder statute, he is equally guilty, with the actual perpetrator of the underlying felony, of first-degree murder." 399 So.2d, at 1370. Moreover, " 'the presence of the aider and abetter need not have been actual, but it is sufficient if he was constructively present, provided the aider, pursuant to a previ-

ous understanding, is sufficiently near and so situated as to abet or encourage, or to render assistance to, the actual perpetrator in committing the felonious act or in escaping after its commission.' " *Ibid.* (quoting *Pope v. State*, 84 Fla. 428, 446, 94 So. 865, 871 (1922)).

The court noted that there "was no direct evidence at trial that Earl Enmund was present at the back door of the Kersey home when the plan to rob the elderly couple led to their being murdered." 399 So.2d, at 1370.[17] Instead,

"the only evidence of the degree of his participation is the jury's likely inference that he was the person in the car by the side of the road near the scene of the crimes. The jury could have concluded that he was there, a few hundred feet away, waiting to help the robbers escape with the Kerseys' money." *Ibid.*

This evidence, the court concluded, was sufficient to find the petitioner to be a principal under state law, "constructively present aiding and abetting the commission of the crime of robbery," and thus guilty of first degree murder. *Ibid.*

[809] Turning to the trial court's written sentencing findings, the State Supreme Court rejected two of the four aggravating circumstances. First, the court held that two of the trial judge's findings—that the murders were committed both in the course of robbery and for pecuniary gain—referred to the same aspect of the petitioner's crime. Consequently, these facts supported only one aggravating circumstance. Second, citing *Armstrong v. State*, 399 So.2d 953 (Fla.1981), the court held that "[t]he recited circumstance, that the murders were especially heinous, atrocious, and cruel, cannot be approved." 399 So.2d, at 1373.[18] The

court affirmed [...] that none of t[...] cumstanc[...] app[...] those fi[...] pation in t[...] due to his role i[...] State Supreme [...] the finding tha[...] robbery.

Regarding th[...] position of th[...] showing that [...] violate the Ei[...] cruel and unus[...] simply stated t[...] no binding lega[...] ports this pro[...] reject it." *Id,*[...]

[810] Earl Enmund [...] the death sente[...] trial court, an[...] Supreme Cour[...] proportionate t[...] robbery and m[...] particular, he c[...]

be said that th[...] killed in order [...] witnesses again[...] the cor[...] "[...] transpi[...] about Arn[...] account, the sh[...] and were prec[...] of Mrs. Kersey[...] sion, the State [...] trial court's co[...] thologist's test[...] that the victim[...] thologist's testi[...] and the positio[...] equivocal at be[...]

---

16. Second-degree murder, based on felony murder, is defined in Fla.Stat. § 782.04(3) (1973): "[W]hen committed in the perpetration of, or in the attempt to perpetrate, any ... robbery, ... except as provided in subsection (1), it shall be murder in the second degree ... punishable by imprisonment in the state prison for life or for such term of years as may be determined by the court."

17. The court also noted that Sampson Armstrong's admissions to J. B. Neal made no mention of the petitioner, and that the petitioner's admissions to Ida Jean Shaw indicated only "his complicity." 399 So.2d, at 1370.

18. In *Armstrong*, the Florida Supreme Court expressly had rejected the trial court's conclusion that the Kerseys were murdered in order to eliminate them as witnesses. "It simply cannot

19. In this Cou[...] lenges his con[...] murder nor a[...] stepped consti[...] der to include [...] sole challenge [...] murders.

20. Although t[...] the fact that h[...] of his argum[...] disproportiona[...] have the spe[...]

court affirmed the trial court's findings that none of the statutory mitigating circumstances applied. *Ibid.* Because one of those findings was that Enmund's participation in the capital felony was not minor, due to his role in planning the robbery, the State Supreme Court implicitly affirmed the finding that Enmund had planned the robbery.

Regarding the petitioner's claim that imposition of the death penalty, absent a showing that he intended to kill, would violate the Eighth Amendment's ban on cruel and unusual punishments, the court simply stated that the petitioner "offers us no binding legal authority that directly supports this proposition, and we therefore reject it." *Id.*, at 1371.

## II

Earl Enmund's claim in this Court is that the death sentence imposed by the Florida trial court, and affirmed by the Florida Supreme Court, is unconstitutionally disproportionate to the role he played in the robbery and murders of the Kerseys.[19] In particular, he contends that because he had

be said that there was proof that the robbers killed in order to assure that there would be no witnesses against them." 399 So.2d, at 963. On the contrary, "[t]he only direct account of what transpired is from the testimony of J. B. Neal about Armstrong's statement to him. By that account, the shootings were indeed spontaneous and were precipitated by the armed resistance of Mrs. Kersey." *Ibid.* In reaching this conclusion, the State Supreme Court also rejected the trial court's conclusions derived from the pathologist's testimony. Rather than indicating that the victims were prone when shot, the pathologist's testimony "as to the direction of fire and the positions of the victims when shot [was] equivocal at best." *Ibid.*

19. In this Court, the petitioner neither challenges his convictions for robbery and felony murder nor argues that the State has overstepped constitutional bounds in defining murder to include felony murder. The petitioner's sole challenge is to the penalty imposed for the murders.

20. Although the petitioner ostensibly relies on the fact that he was not the triggerman, the core of his argument is that the death penalty is disproportionate to his crime because he did not have the specific intent to kill the Kerseys.

no actual intent to kill the victims—in effect, because his behavior and intent were no more blameworthy than that of any robber—capital punishment is too extreme a penalty.[20]

In *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), a majority of this Court concluded that the death penalty does not invariably violate the Cruel and Unusual Punishments Clause of the Eighth Amendment.[21] See *id.*, at 187, 96 S.Ct., at 2931 (opinion of Stewart, POWELL, and STEVENS, JJ.) ("[W]hen a life has been taken deliberately by the offender, we cannot say that the punishment is invariably disproportionate to the crime. It is an extreme sanction, suitable to the most extreme of crimes") (footnote omitted); *id.*, at 226, 96 S.Ct., at 2949 (opinion of WHITE, J.) (rejecting the argument that "the death penalty, however imposed and for whatever crime, is cruel and unusual punishment"); *id.*, at 227, 96 S.Ct., at 2950 (BLACKMUN, J., concurring in judgment). In no case since *Gregg* and its companion cases,[22] has this Court retreated from that

Pulling the trigger is only one factor, albeit a significant one, in determining intent. See Tr. of Oral Arg. 21–23 (counsel for petitioner asserting that so long as a defendant had the intent to kill, he need not actually have pulled the trigger in order to be subjected to capital punishment, and that even if he had pulled the trigger, he would not be subject to the death penalty absent a specific intent to kill).

21. The Eighth Amendment provides that "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

22. See *Roberts (Stanislaus) v. Louisiana*, 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976) (holding that Louisiana's mandatory death penalty statute violated the Eighth and Fourteenth Amendments); *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) (holding that the State's mandatory death penalty statute violated the Eighth and Fourteenth Amendments); *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976) (upholding the Texas death penalty statute); *Proffitt v. Florida*, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976) (upholding Florida's death penalty statute).

POLICE
CRIMINAL COMPLAINT
PINE BLUFF, ARK.

Case Number                    NO.   57408

ON Wed, The 12th Day of May 1993 At 8:45 AM/PM

Name Reams          Kenneth    L,
     Last (Please Print) First    Middle

Street 1007 W 3rd

City - State Pine Bluff, ARK.

Age 18  Birth Date 2-21-74 Race B  Sex M  Ht 5'6" W

Hair BlK  Eyes Brn  Build med  Alias

Driver
Lic No                         Soc Sec
                               Security No

Place of Arrest Det Office   Officer Addison 156

Charge Capital Murder

Status
No 5-10-101  Facts of Arrest Subject was

arrested on probable cause

for Capital Murder

Evidence
Held By

Witness                    Address

Witness                    Address

Releasing                           Time    Date    Bond
Officer                                             By

Court Appearance  Day of              19    at
       Center 200 E 3rd St Pine Bluff Ark
       I promise to appear in said Court at said time and place

Signature

799

Respondent's Exhibit E

6481

RIGHTS FORM

READ TO: _Kenneth Reams_     CASE # _93-205_

PLACE: _Stuttgart City Jail_

DATE: _5-11-93_

TIME: _10 PM_

BEFORE WE ASK YOU ANY QUESTIONS, YOU MUST UNDERSTAND YOUR RIGHTS.

YOU HAVE THE RIGHT TO REMAIN SILENT.

DO YOU UNDERSTAND? _Yes K.R._

ANYTHING YOU SAY CAN AND WILL BE USED AGAINST YOU IN COURT.

DO YOU UNDERSTAND? _Yes K.R._

YOU HAVE THE RIGHT TO HAVE AN ATTORNEY PRESENT BEFORE MAKING ANY

STATEMENT AND YOU MAY TALK WITH HIM DURING QUESTIONING.

DO YOU UNDERSTAND? _Yes K.R._

IF YOU CANNOT AFFORD AN ATTORNEY, ONE WILL BE PROVIDED FOR YOU

BEFORE YOU ARE ASKED ANY QUESTIONS, IF YOU SO DESIRE.

DO YOU UNDERSTAND? _Yes K.R._

IF YOU WANT TO ANSWER QUESTIONS NOW, WITHOUT A LAWYER PRESENT,

YOU MAY DO SO; HOWEVER, YOU HAVE THE RIGHT TO STOP THE QUESTIONING

AT ANY TIME.

DO YOU UNDERSTAND? _Yes K.R._

SIGNED: _Kenneth Reams_

RIGHTS READ BY: _Lt. Terry Addison_

WITNESS: _Ken S. _____

WITNESS: _____

Respondent's Exhibit E

800

6482

RIGHTS FORM

READ TO: _Kenneth Reams_          CASE # _93-205_

PLACE: _Detective Office_

DATE: _5-12-93_

TIME: _1945 hours_

BEFORE WE ASK YOU ANY QUESTIONS, YOU MUST UNDERSTAND YOUR RIGHTS.

YOU HAVE THE RIGHT TO REMAIN SILENT.

DO YOU UNDERSTAND? _yes K.R._

ANYTHING YOU SAY CAN AND WILL BE USED AGAINST YOU IN COURT.

DO YOU UNDERSTAND? _yes K.R._

YOU HAVE THE RIGHT TO HAVE AN ATTORNEY PRESENT BEFORE MAKING ANY

STATEMENT AND YOU MAY TALK WITH HIM DURING QUESTIONING.

DO YOU UNDERSTAND? _yes K.R._

IF YOU CANNOT AFFORD AN ATTORNEY, ONE WILL BE PROVIDED FOR YOU

BEFORE YOU ARE ASKED ANY QUESTIONS, IF YOU SO DESIRE.

DO YOU UNDERSTAND? _yes K.R._

IF YOU WANT TO ANSWER QUESTIONS NOW, WITHOUT A LAWYER PRESENT,

YOU MAY DO SO;  HOWEVER, YOU HAVE THE RIGHT TO STOP THE QUESTIONING

AT ANY TIME.

DO YOU UNDERSTAND? _yes K.R._

SIGNED: _Kenneth L Reams_

RIGHTS READ BY: _Lt. Addison_

WITNESS: _____

WITNESS: _____

801

Respondent's Exhibit E

6483