**PROPERTY OF ARKANSAS SUPREME COURT/COURT OF APPEALS**

# SUPREME COURT CR-17-654

KENNETH REAMS                                          **APPELLANT(S)**

V. JEFFERSON COUNTY CIRCUIT COURT

    JOHN W COLE

    35CR-1993-301

STATE OF ARKANSAS                                      **APPELLEE(S)**

---

26__ VOLUME RECORD LODGED

***COUNSEL***

ATTORNEY GENERAL  APPELLEE COUNSEL

323 CENTER STREET, SUITE 200

LITTLE ROCK AR 72201


CORINNE IRISH  APPELLANT COUNSEL

30 ROCKEFELLER PLAZA

NEW YORK NY 10112


DAVID ROBERT RAUPP  APPELLEE COUNSEL

323 CENTER STREET, SUITE 200

LITTLE ROCK AR 72201


GEORGE KENDALL  APPELLANT COUNSEL

30 ROCKEFELLER PLAZA

NEW YORK NY 10112


JIN HEE LEE  APPELLANT COUNSEL

40 RECTOR STREET, 5TH FLOOR

NEW YORK NY 10006


JOHN WINFRED WALKER  APPELLANT COUNSEL

1723 BROADWAY

LITTLE ROCK AR 72206

RECORD FILED AUGUST 4, 2017

**STACEY PECTOL, CLERK**

BY RENEE R. HERNDON, DEPUTY CLERK

Respondent's Exhibit E

VOLUME 25

*Volume 25*

ORIGINAL

this event where the widow of the victim is suing Worthen Bank and a host of other people. That case is entirely separate from this one. I understand that under the law the defendant is presumed to be innocent and that presumption of innocence attends and protects him all the way through this trial. I understand that the defendant has no obligation to do anything by way of presenting evidence. The burden of proof is strictly upon the state to prove each and every element of the charge beyond a reasonable doubt. I am not going to require the defendant to prove his innocence. (T. 235, 236) I understand that the defendant has an absolute right to testify or not testify. If he does not testify upon advice of counsel I will follow the judge's instruction not to take that into consideration. (T. 236, 237) I don't know how to answer the question of whether I will require the defendant to prove anything to me with regard to his guilt or innocence. I understand that the prosecution has the burden of proving the allegations in the information and that it is not up to the defendant to prove anything. I would not believe a policeman over an ordinary citizen simply because the policeman is a policeman. I do not think it was a **. (T. 237, 238) I have never used this ATM machine. (T. 238, 239) In a case of two people committing a robbery, one with a gun and one without, I do not believe that the one with a gun who killed someone should get the sentence as the other one. I believe that the one who used the gun to kill someone should be punished more severely. I would be able to consider a lesser included offense. (T. 239, 240) I will consider all of the evidence before I make up my mind about whether the mitigating circumstances should be weighed the heaviest or the aggravating circumstances. I will weigh and consider every piece of evidence before I make up my mind. I understand that the victim in this matter was a white man and that the defendant is obviously a young black male. I do not think that race will be an issue with me. I understand that life without parole would be a

xlv

Respondent's Exhibit E

potentially long time in the Arkansas Department of Corrections especially for someone who is eighteen years of age. I understand that life without parole means that he will never be able to ask for parole.

DEPUTY PROSECUTING ATTORNEY: Your honor, Ms. Messina is good for the state.

DEFENSE COUNSEL: Good for the defense. (T. 241, 242)

* * *

(ABSTRACTOR'S NOTE: Following the examination of prospective juror Sandra A. Metz defense counsel exercised a peremptory challenge to excuse her. (T. 244, 259) Following the examination of prospective juror Lynne M. Flagg the state exercised a peremptory challenge to excuse her. (T. 260, 274) Following the examination of Huey Bradford the state exercised a peremptory challenge to excuse him from jury duty. (T. 277, 289)

DELLA MARIE HORACE, a prospective juror was examined by the parties as follows:
EXAMINATION BY THE STATE

I have been called for jury duty and then asked questions by attorneys in a criminal case but I have never served on a jury. (T. 289, 290) I have never really thought about whether I am for or against the death penalty. When a life is taken unlawfully and if all the evidence proves that the individual who committed that crime didn't have to commit it, I could consider the death penalty. Although I am involved to a great extent in religious organizations, I am not opposed to the death penalty. I am the musician for my home church and another church that I play for. I have lived in Pine Bluff all of my life. I heard about this murder at the ATM machine this summer

xlvi

1082

but only through reading about it in the newspaper. (T. 291, 292) I do not know any of the specifics about it. I understand that there are only two possibilities in punishment, life without parole or death by lethal injection. I would not allow this narrow range of punishment to affect my decision on the guilt or innocence determination. I have not heard of accomplice liability before. I understand that if one person goes in and robs a bank and the other person drives the car that they are both guilty of robbery. (T. 293, 294) If I were to believe beyond a reasonable doubt that this defendant either acted by himself or with another and that someone was killed, I would have no problem finding this defendant guilty of capital murder. The fact that the defendant is only eighteen years old would not have any bearing on my being able to find him guilty of capital murder or not. I think that he was responsible for his actions when he was 17 years. I understand that if we find the defendant guilty of capital murder that we would then have to hear evidence on aggravation and mitigation and determine after that whether the aggravating circumstances outweighed the mitigating circumstances. (T. 295, 296) If we determine that the aggravating circumstances outweighed the mitigating circumstances we would then have to determine whether the aggravating circumstances justified the death penalty. If we did determine that affirmatively our verdict would be death. I would have no problem in that case signing a jury form sentencing this man to death. (T. 296, 297)

EXAMINATION BY THE DEFENSE

I have been *voir dired* before which means I sat in the jury box and was questioned by lawyers. (T. 297, 298) I will consider the full range of options based upon the evidence I hear in both the guilt and innocence state and the punishment stage of this trial. We sometimes have a tendency to get caught up talking about the penalty when the death penalty is involved. We then

xlvii

1083

lose sight of the guilt or innocence of determination in the trial. I think I am the kind of juror who will not be overtaken with the thought of "My gosh, that sounds awful I cannot believe that someone would do that." I believe that I could give both sides equal opportunity. There is nothing about the death penalty that would make me hesitate or not be able to vote either for or against it. I would also consider an alternative to the death penalty of life without parole. I think that is a fairly severe punishment especially in view of the age of the defendant. (T. 299, 300) Although I have read something about this case it did not cause me to have any kind of preconceived notion about this matter.

DEPUTY PROSECUTING ATTORNEY: Good for the state.

DEFENSE COUNSEL: Good for the defense. (T. 301)

(ABSTRACTOR'S NOTE: Following the examination of prospective juror Mary Terkeurst, the defense excused Ms. Terkeurst by the use of a peremptory challenge. (T. 302, 310)

* * *

DWIGHT A. ROBINSON, a prospective juror was examined by the parties as follows: EXAMINATION BY THE STATE

I have never sat on a jury before. I have been called for jury duty four times this term but I have never sat on a jury. I am retired from the Cottonbelt Railroad and have been retired for five years. I read about this case in the paper when it first occurred. There was a shooting at a money machine but that's about all I remember of it. I don't know any details. (T. 310, 311) In my opinion if the crime that is committed is proven and that is the way it is, I could vote for the death penalty. There are some circumstances that I would vote for the death penalty, and murder

xlviii

1084

Respondent's Exhibit E

6767

would be one of those circumstances. If the state were to prove that the defendant acted with another person and committed or tried to commit a robbery and during the course of that robbery killed someone under circumstances showing extreme indifference to the value of human life, I could vote to find the defendant guilty of capital murder. (T. 312, 313) The fact that the defendant was seventeen years old at the time the crime was committed would have no bearing in my mind as to whether he was guilty or innocent. He would be liable as any other adult would be. I understand that there are only two alternatives for punishment in this case, life imprisonment without parole or death by lethal injection. The narrow range of punishment would have no influence on my decision concerning guilt or innocence. I understand that if we found him guilty we would come back later to decide punishment. During that phase of the trial we would be given evidence of aggravating circumstances and mitigating circumstances. If we found that the mitigating circumstances outweighed the aggravating circumstances, the sentence would have to be life without parole. (T. 314, 315) On the other hand, if the aggravating circumstances outweigh the mitigating circumstances, we would have to determine if the aggravating circumstances justified the death penalty. If everyone felt that way, then the verdict would have to be death. (T. 316, 317)

EXAMINATION BY THE DEFENSE

I am 67 years old. I have lived in Pine Bluff since May 25, 1944. I feel that crime has gotten to be a problem in Pine Bluff, but I understand that we are here today to try the case of State v. Kenneth Reams and not to try to clear up the crime problem in Pine Bluff. (T. 317, 318) Listening to the questions posed by the prosecuting attorney one might get the impression that we would want to skip right over the guilt phase and go directly to those mitigating and aggravating

xlix

1085

Respondent's Exhibit E

6768

circumstances. I understand that we are going to have a trial, and I understand some of the

constitutional safeguards. I understand the presumption of innocence to be that a person accused

of a crime is presumed to be innocent of that crime unless and until it is proven beyond a

reasonable doubt that he is guilty. I also understand that the defendant does not have to prove

anything. The defendant might also decide to take the witness stand and that that might be his

attorney's decision instead of his. He has an absolute constitutional right under the Fifth

Amendment to the Federal Constitution not to give testimony. I am familiar with the Worthen

Bank teller machine in question here but I have never used it before. I checked on the

questionnaire that I had read something about this case but I don't have any preconceived ideas

about the guilt or innocence of this defendant. I don't have enough knowledge of it to even go

into that part of it. (T. 319, 320) I will make my decision based upon the sworn testimony that I

will hear in this matter if I am chosen to serve as a juror. I will consider all the possible ranges of

punishment including life without parole. I do not know what you mean, defense counsel, by the

statements that life without parole is a significant sentence. Some people take the position that

life in a penitentiary is not harsh enough if someone's life is taken. I would agree that life

imprisonment without parole is a harsh punishment. If two people go out and commit a crime and

during the course of that crime someone dies, it would make no difference to me in terms of the

range of punishment whether one was the shooter and the other was not. If one of the individuals

was armed and the other had no idea that he was armed, that might accidentally make a little bit of

difference with me. I hope to be able to consider several different factors. (T. 321, 322) To a

degree I would have to say that I would tend to believe a police officer over an ordinary citizen

simply because he is a police officer. I would agree that he is a human being first and that he uses

1

1086

the same senses to gather information that the rest of us have and that he is capable of the same errors or mistakes that the rest of us make. I would do my best to weigh whatever a police officer had to testify about, just as I would anything that an ordinary citizen stated, keeping in mind that first he is a human being and that he is just performing a function.

DEPUTY PROSECUTING ATTORNEY: Good for the state.

DEFENSE COUNSEL: Good for the defense. (T. 323, 324)

(ABSTRACTOR'S NOTE: Defense counsel used a peremptory challenge to excuse Brandon Jones from jury duty. (T. 201, 324, 326) Prospective juror Bertha Parsley was excused for cause upon joint motion of counsel for the state and defense counsel. (T. 327, 334)

* * *

MARY H. JOHNSON, a prospective juror was examined by the parties as follows:
EXAMINATION BY THE STATE

I have served on a jury twice before. On one of those juries in a civil case we had a two-part trial. I am presently retired, working part-time in nursing. (T. 335, 336) As far as the facts of the case about this incident, I know only what I read about it in the newspaper near the time that it happened last summer. I have no preformed opinion about the thing. I understand that the state claims that the defendant and another person attempted to rob Gary Turner at an ATM machine and that during the course of that robbery they killed him. I understand that that is what he is charged with and that that is capital murder under Arkansas law. If the state proves all those things beyond a reasonable doubt I could convict him of capital murder. I understand I will hear some testimony that he was seventeen years old when this event happened. I do not think that his

1087                                    li

age should figure into whether he is guilty or innocent on this. I am not familiar with the term

accomplice liability. (T. 337, 338) I understand the example of accomplice liability given to me

as follows: Two people rob a bank. One goes in and robs the bank by pulling a gun, pointing it at

the people and taking the money. The other person drives the car. Both people are guilty

because they both knew what they were doing. I think that they should both bear some

responsibility in that situation. I would have no problem convicting both the person who pulled

the gun and the person who went along with it. (T. 338, 339) I understand that in Arkansas

capital murder carries two punishments only, life without parole and death by lethal injection. The

fact that the death penalty is involved in this case will have no influence on me in the guilt or

innocence phase of the trial. I understand that by finding the defendant guilty of capital murder

we do not automatically give him the death penalty. If we find him guilty then we would come

back in this courtroom and have some other things to do and consider before we could sentence

him to death. (T. 339, 340) The state would introduce evidence of things called aggravating

circumstances and the defense would introduce evidence of things called mitigating '

circumstances. After we decide which of the two were proven, we would then have to weigh one

against the other to determine if the aggravating circumstances outweigh the mitigating

circumstances. I understand that if we decide that mitigation outweighs aggravation, then the

sentence is life without parole. If we decide that aggravation outweighs mitigation, then we have

to determine if aggravation is sufficient to justify the death penalty. I believe that I would be able

to go through all these steps. If it is warranted, I am in favor of the death penalty. I believe that

there are some cases where the death penalty is appropriate and murder is one of them. I would

have no problem imposing the death penalty. Specifically, I would have no problem signing a

1088

Respondent's Exhibit E

form imposing the death penalty and then coming into court looking at the defendant and

sentencing him to death. (T. 341, 342)

EXAMINATION BY THE DEFENSE

I am a Baptist and attend the Baptist church. I am not sure I have ever reached a definite

opinion as to whether human beings have redemption abilities such that they can redeem

themselves of prior acts. That is what the Baptist religion is all about and I am a believer in that

religion, however. I have previously sat as a juror on one criminal case. (T. 333, 334)  In that

case we deliberated on guilt and then went back for a second stage of the proceeding and decided

the sentence. I understand that this proceeding will be very similar. I believe that I could exercise

discretion as a juror to  decide if the defendant is guilty of the crime charged or of some lesser

included offense. I will listen to the evidence and make my decision based on the evidence as I

believe it applies to the law in this case. (T. 345, 346) I understand that the defendant in a

criminal case is presumed to be innocent and that that presumption stays with him throughout the

trial. I understand that the defendant does not have to prove anything. I understand that he may

or may not take the witness stand and that if he does not testify in his own behalf, that I should

follow the judge's instruction not to consider that as evidence against him. I know where this

particular Worthen ATM machine is at 5th and Chestnut Streets, but I have never used it. I will

consider all of the mitigating and aggravating circumstances in this case before imposing any type

of punishment in this matter. (T. 347, 348) I understand that it might be more appropriate in this

case to sentence the defendant to life imprisonment without parole. I would consider that. I feel

that I am someone who is strong enough in my beliefs and convictions that I would vote my

conscience and not be swayed or run over necessarily by a stronger juror who might have a

1089

liii

Respondent's Exhibit E

different feeling about the matter.

DEPUTY PROSECUTING ATTORNEY:  She is good for the state.

DEFENSE COUNSEL:  Good for the defense.  (T. 348, 349)

* * *

BRUCE E. HORNSBY, a prospective juror was examined by the parties as follows:

EXAMINATION BY THE STATE

I understand that the state is charging the defendant and another person with robbing one Gary Turner and in the course of that robbery killing Mr. Turner.  (T. 351, 352)  I understand that there are two possible punishments for this crime which is capital murder, life without parole or the death penalty.  I understand that the trial will be in two phases, the first phase concerned with guilt or innocence and the second phase concerned with penalty.  Should the jury find the defendant guilty I understand that the jury will be called back for a second phase to weigh aggravating and mitigating circumstances.  I understand that most people have not heard of those terms but I have.  (T. 352, 353)  I understand that we will be asked to weight the aggravating circumstances against the mitigating circumstances.  If the aggravating circumstances outweigh the mitigating circumstances, they might warrant the death penalty in this case.  I have nothing against the death penalty and I could impose it in a proper case.  I understand that if we find that all the circumstances exist, we will all have to sign a verdict form assessing the death penalty.  I also understand that we would be asked to walk back out into the courtroom, look at the defendant and tell him that we believe that he deserves the death penalty for what he did.  I feel that I could do that.  I had heard of accomplice liability before but I am not sure that I understand it.  (T. 354, 355)  I understand now that it means that anytime you aid or encourage or help

liv

1000

someone commit or plan a crime that you are as liable as they are for committing the crime.  In a murder case a person could be liable as another even though they didn't pull the trigger.  I understand that one is just as guilty as the other and I agree with that.  I understand that just because you find someone guilty of capital murder it does not mean that they automatically get the death penalty.  (T. 356, 357)

EXAMINATION BY THE DEFENSE

I read something about this in the newspaper.  It was basically that it did happen at the ATM machine and that is it.  I have not read anything about this in the paper in the last month.  I understand that we might not ever get to the penalty phase of this trial if we do not find the defendant guilty.  (T. 357, 358)  I feel that I am a person who will vote my conscience and not allow other jurors to pressure me into doing what they want to do.  I think that I am the kind of person who can resist that pressure and do what I think is right.  (T. 359, 360)  I understand that I will be asked as a juror to decide whether the defendant was an accomplice or a principal should we find him guilty.  I also understand what is meant by making the punishment fit the crime.  That is something that I would consider in considering the full range of punishments in this case, life without parole as well as death.

DEPUTY PROSECUTING ATTORNEY:  Good for the state.

DEFENSE COUNSEL:  Good for the defense.  (T. 360, 361)

* * *

(ABSTRACTOR'S NOTE:  Mr. William Fox was excused by the defense by the use of a peremptory challenge with no examination.  (T.201, 363)  Prospective juror Syble Louis Hall was excused for cause on motion of the defense, agreed with by the state.  (T. 366, 376))

1091

lv

Respondent's Exhibit E

6774

JERRY LINDSEY, a prospective juror was examined by the parties as follows:

I did not know it when I came in today, but I do now understand that this is a capital murder case which has two possible sentences, one of which is death by lethal injection.  (T. 376, 377)  As to whether I believe in capital punishment it would depend on the circumstance.  If it were one of my family members I would say probably yes.  If it was planned and cold-blooded, stuff of that nature, probably yes.  Before I could answer that question honestly I would need some type of evidence or proof.  I am for the death penalty in cases of cold-blooded, premeditated and planned murders.  If somebody took somebody else's life in self defense or in the process of a tussle, I would think long and hard about it before I would decide to take his life.  I know nothing more about this case than what was in the newspaper.  I have not read any articles about it in the last two or three weeks.  (T. 377, 378)  I understand that the state has charged the defendant and another person with capital murder by committing an aggravated robbery and in the course of that robbery killing the victim under circumstances manifesting extreme indifference to the value of human life.  I understand that the state has to prove that that is what happened and that if we did find him guilty we would come back for a second stage of the trial to determine punishment.

I have never heard of and do not know what an accomplice liability is.  In the case of two people robbing a bank where one drives a car and waits while the other one goes into the bank, pulls a gun and demands the money, I think that the one driving the car is as guilty as the one pulling the gun because he knows exactly what is going on.  I understand that that is the law in Arkansas.  (T. 379, 380)  I understand that the state is alleging in this case that the defendant or his accomplice caused the death of Gary Wayne Turner in an attempt to rob him.  I would have no objection to finding the defendant guilty if I though he was an accomplice to the robbery.  I would

1092

have no reservations about finding him guilty of capital murder because he was seventeen years old at the time the murder was committed. I could set aside any thought of the punishment part of the trial and consider only the facts during the guilt or innocence state. (T. 380, 381) I understand that in the penalty phase we would be shown evidence of aggravating and mitigating circumstances. We would have to weigh them against each other and decide which outweighed the other. If the aggravating circumstances outweigh the mitigating circumstances, we would then have to decide whether the aggravating circumstances justified the death penalty. I am able to do that should I find the defendant guilty of capital murder. I would have no reservations about signing a form sentencing him to death and looking at him. (T. 383, 384)

EXAMINATION BY THE DEFENSE

I have heard people talking about this case at the coffee shop or sitting around the coffee pot. There was no discussion of names, only of the event. I have not come into court with any preconceived ideas about the guilt or innocence of the defendant. I was raised that you don't prejudge people. I understand that the charge against the defendant doesn't mean anything and that it is up to the state to prove beyond a reasonable doubt that the defendant is guilty. (T. 384, 385)

DEPUTY PROSECUTING ATTORNEY: Good for the state.

DEFENSE COUNSEL: Good for the defense. (T. 386, 387)

\* \* \*

KELLY NOELLE RUGGERI, a prospective juror was examined by the parties as follows:

EXAMINATION BY THE STATE

lvii

1093

Respondent's Exhibit E

0776

I am in the Junior League Provisional class along with you, Ms. Deputy Prosecuting Attorney. That would have nothing at all to do with my listening to the evidence in this case and making a decision based just on the evidence that I hear. I understand that this concerns the robbery killing at 5th and Chestnut at the ATM machine there. I understand that the state has alleged that the defendant and another person committed this crime under circumstances manifesting extreme indifference to the value of human life. I did not know the victim or his wife. (T. 389, 390)

I have not heard of what accomplice liability is. After your explanation of it, Ms. Prosecutor, I understand that it means that when two people commit a crime together, one actually committing the crime and the other aiding or abetting it, that they are both guilty of that crime. A typical scenario is if two people decide to commit a robbery. One of them drives the car and the other one goes in, pulls the gun and asks for the money. The person in the car is just as guilty as the one that pulled the gun. I understand that the state is alleging that the defendant is guilty on accomplice liability.

My feelings on the death penalty depend on the circumstances. I cannot say that I would give this defendant the death penalty. It depends on the circumstances. I don't necessarily believe in it and I don't necessarily not believe in it. It depends on the evidence. I am not saying that I could never give it and I am not saying that I would always give it. (T. 391, 392) I understand that the death penalty is not automatic just because someone is convicted of capital murder. There is a separate stage to the trail to decide what the punishment should be. I understand that in order to assess the death penalty we have to decide that any aggravating circumstances outweigh any mitigating circumstances found. (T. 393, 394) I have set in on a trial before. (T.

lviii

1094

395, 396)

EXAMINATION BY THE DEFENSE

    I remember several years ago when you, Mr. Defense Counsel, sued the Cottonbelt

Railroad on behalf of a client and that my dad was a witness in that case. I remember when the

case happened and that my dad said that you were the attorney that was against him. There was

nothing about that matter that might cause me to be less than fair and impartial in this case where

you are defense counsel. I sat in on a trial the other day where you were the lawyer, and it did not

affect me at all. I did not know that you also defended the guy who stole my brother's car from

his house, but that would not pose a problem with my impartiality in this case.

    On my questionnaire I stated the opinion that, "downtown Pine Bluff is not a safe place to

be after normal business hours or sometimes even during normal business hours." That was not a

reference to the guilt or innocence of the defendant here today. It was just a reference to several

things that have happened downtown. I remember two guys who worked for Simmons Bank

were jumped after hours and kidnapped. It is just not safe to be there after dark. (T. 396, 397) I

understand that we cannot do anything about that problem in this trial. (T. 397, 398) I

understand that we are here only for this case, the state of Arkansas v. Kenneth Reams. I think

that I could be fair and impartial in the consideration of the evidence that we will hear in this

particular trial. I have no preconceived ideas about what the appropriate punishment would be for

capital murder in the event that we found the defendant guilty. There are two ranges of

punishment and I would exercise my discretion after hearing all of the evidence. There is nothing

about the facts in this particular case in terms of a young man being killed at an ATM machine in

downtown Pine Bluff that would cause me to be less than fair and impartial. (T. 398, 399)

1095

lix

DEPUTY PROSECUTING ATTORNEY: Good for the state.

DEFENSE COUNSEL: Good for the defense. (T. 399, 400)

* * *

LARRY R. TIPTON, a prospective juror was examined by the parties as follows:

I am aware of the robbery that occurred at this ATM machine back in May of this year. I think I saw something on television or something about it, but I don't think I read anything about it. I have not heard anything about it since then. I really didn't know that there had been any arrest made. I am a member of the MENSA Society. It's a society of people whose IQ is in the 98th percentile. It is a nationwide organization. We only have about five member in Jefferson County. (T. 401, 402) I feel that the death penalty is appropriate in certain circumstances but not in all circumstances. It is especially appropriate in a case of premeditated, preplanned murder. I am a proponent of the death penalty. In this case I understand that the state alleges that the defendant participated in the robbery of the victim at the ATM machine there on 5th Street. In the course of that robbery the victim was killed. I would be less inclined to feel that death would be an appropriate sentence if the murder was in conjunction with a robbery if it was an almost unintentional sort of thing rather than being premeditated. I would feel less inclined than I would if it was premeditated. Premeditated is something like that guy on the Long Island Express that planned it six months in advance and bought a gun and wrote out his plans. I am not saying that I could not consider the death penalty in the scenario you just set out. It would depend on how the facts came out in court. (T. 403, 404)

I have set on two juries before, both criminal. I understand that the burden of proof is beyond a reasonable doubt and that it is not any higher just because this is a capital murder case.

lx

'1096

Respondent's Exhibit E

6779

I understand that the state says that this defendant or an accomplice attempted to rob the victim and that the victim was killed in the course of the robbery. I understand that capital murder also includes the concept of accomplice liability which I am familiar with. I agree with the concept of or theory of accomplice liability. (T. 405, 406) If I found that this defendant was guilty of having been an accomplice in the robbery I would have no problem finding him guilty of capital murder. That he was seventeen at the time of the crime would not factor in as far as the guilt or innocence of the defendant. I understand that if we found the defendant guilty of capital murder we would have to come back and find aggravating and mitigating circumstances. (T. 407, 408) We would have to determine whether the mitigating circumstances outweighed the aggravating circumstances. If the aggravating circumstances outweigh the mitigating circumstances, we would have to go one step further and determine whether the aggravating circumstances justify the death penalty. If I felt that the circumstances warranted the death penalty and that it was proved to me beyond a reasonable doubt, I would be able to look this defendant in the eye and sign a form sentencing him to death. I would have a difficult time sleeping at night, but I could do it. I have given that a lot of thought in these last seven or eight hours sitting out there. (T. 409, 410)

EXAMINATION BY THE DEFENSE

I could also vote for life without parole if I found that capital murder had been proven. (T. 411, 412) I have no preconceived ideas about the guilt or innocence of the defendant. I did not even know that he had been arrested or that anyone had been arrested. I did not know that even though someone could be convicted of a crime by means of accomplice liability that it was within the jury's discretion in assessing the punishment to weigh that person's level of

1097                                      lxi

0700

participation. I did not know that that was an option but it does make sense. I am comfortable with that.

> DEPUTY PROSECUTING ATTORNEY: Good for the state.

> DEFENSE COUNSEL: Good for the defense. (T. 413, 414)

<div align="center">* * *</div>

(ABSTRACTOR'S NOTE: Prospective juror Otis L. Brown was excused for cause by a joint motion of the defense and the state. (T. 420, 434)

MATTHEW HENRY, a prospective juror was examined by the parties as follows:

EXAMINATION BY THE STATE

I understand that we are here for a capital murder case and that a potential punishment is death by lethal injection. I think that capital punishment is appropriate under appropriate circumstances. Murder is one of those appropriate circumstances. (T. 435, 436) I have never sat on a criminal case before. I could definitely consider the death penalty in a case of a killing during a robbery. I understand that there are only two possible punishments for capital murder, life without parole or death. The fact that the defendant was 17 years old when this crime was committed and the fact that the death penalty might be imposed will not have any influence on my decision as to guilt or innocence. (T. 437, 438) I feel that regardless of his age he is responsible for his acts.

I have heard the term accomplice liability but I am not sure exactly what it entails. I would say that it means responsibility placed upon a person because that person is associated with a situation. I understand as the prosecution says that when two people plan a bank robbery, one

<div align="center">lxii</div>

<div align="right">1038</div>

<div align="center">Respondent's Exhibit E</div>
6781

drives the car and the other gets out, goes in and robs the bank, that both of them are guilty of

robbery. In my view they would be inseparable and I agree with that law. Should we the jury find

the defendant guilty of capital murder we would then have to come back to determine

punishment. We would have to then consider aggravating and mitigating circumstances. (T. 439,

440) I understand that the number of the circumstances does not mean as much as the substance

of them and that one might outweigh a number of others on the other side. If we determine that

mitigation outweighs aggravation, then the sentence will be life without parole. If we determine

that aggravation outweighs mitigation, we then have to determine whether those aggravating

circumstances justify the death penalty. If I felt that death was the appropriate sentence I could

sign a form which I understand we will be required to sign if we find that death is the appropriate

sentence, and then come back into the courtroom, look this man in the face and impose the death

penalty. I have no reservations about doing that if I felt in my heart that death was the

appropriate sentence. (T. 441, 442)

EXAMINATION BY THE DEFENSE

I understand that all this talk about the death penalty might be totally premature because

we might not find the defendant guilty of capital murder. Should we find him guilty of capital

murder I could consider both the possible ranges of punishment, life without parole or the death

penalty. I agree that life without parole is a significant sentence especially in the case of someone

who is 18 years of age given the life expectancy in this country being what it is. I agree that that

is a severe sentence under the circumstances and I could consider it. I feel that I am someone

who could stick to my guns and vote my conscience regardless of what other jurors felt strongly

and passionately about. (T. 442, 443) I could consider the level of participation of the defendant

lxiii

1099

Respondent's Exhibit E

or the role he played in the crime when it came to set punishment if I could discern the difference in the state of mind. I could do that if I could by some way see the difference in the state of mind and understand it or what is going to happen or whatever. I have not read any articles about this case or the co-defendant's case in the last several weeks. I have come into this courtroom with no preconceived idea about the guilt or innocence of the defendant based on anything that I have read or from any other source such as conversations with other individuals.

DEPUTY PROSECUTING ATTORNEY: Your honor, we will exercise a peremptory challenge against Mr. Henry.

DEFENSE COUNSEL: Your honor, I want to renew my objection on *Batson* grounds just as when the state excused Ms. Johnson. The only reason the state could have is race. Mr. Henry gave every appropriate response for any juror.

TRIAL COURT: There have been four peremptory challenges by the state. Ms. Johnson was black, Ms. Flagg was white, Mr. Bradford is white, Mr. Henry is black. I don't know what the reasons are. Is the state prepared to offer any reasons for striking Mr. Henry?

DEPUTY PROSECUTING ATTORNEY: Your honor, I would point out that one of the jurors that has been seated was a black lady, Ms. Della Marie Horace. (T. 44, 445) I also got the impression that Mr. Henry would only consider whether the defendant was the actual shooter as to whether or not he would consider the death penalty. Questions defense counsel asked would indicate that Mr. Henry was of the opinion that if the defendant was not the shooter he could not impose the death penalty in this case.

DEFENSE COUNSEL: Your honor, the state is not guaranteed a lock on any of these jurors. Mr. Henry said under appropriate circumstances he would consider the death penalty.

lxiv

1100

That is all the state is entitled to. I might also add that any number of the other jurors, most of whom are white, have given exactly the same response. That's what Mr. Tipton and Mr. Hornsby both said.

DEPUTY PROSECUTING ATTORNEY: Your honor, the state has had an opportunity to evaluate Mr. Henry's responses to those questions and the state is not making any strikes based solely on Mr. Henry's race.

TRIAL COURT: To be candid, I did not hear him say anything that would indicate to me that he would be reluctant to impose a death penalty if the circumstances warranted at the time. The thing that bothers me about what he said, and he said this a couple of times, was if the defendant's state of mind warranted it at the time. I am not sure how we would ever be able to prove the defendant's state of mind. When I say "we", I am talking about the state. His other responses were pretty much in line with what some of the other jurors have said.

DEPUTY PROSECUTING ATTORNEY: Your honor, it seems that whenever the state asked Mr. Henry questions he gave what would appear to be appropriate responses. Then when defense counsel asked him questions, all of a sudden he started vacillating on, as you said, the state of mind. It was as if he did almost a flip-flop. That's one of the things we can use our strikes for is to eliminate persons who we feel have flip-flopped between the time we questioned them and the defense questioned them. (T. 446, 447)

DEFENSE COUNSEL: State of mind is one of the elements of the charge. Reckless indifference to the value of human life ** state of mind.

TRIAL COURT: I think he was talking about the punishment phase at this point. I think he was talking about imposing punishment if the state of mind warranted it. I am not sure about

**1101**

lxv

Respondent's Exhibit E

that part of it.  What are you asking the court to do?

DEFENSE COUNSEL:  I guess grant a mistrial under the circumstances because I believe it is racially motivated.  There have been only three blacks that have been possible to be chosen and the state has struck two of them.  The last one I still submit was for no other reason than race.

DEPUTY PROSECUTING ATTORNEY:  We have four black jurors, two of which were struck by the state.

TRIAL COURT:  That is correct.  One other the court struck and one is sitting on the jury.  Let's suspend the proceedings for a few minutes and let me decide what to do about this.
(T. 448, 449)

PROSPECTIVE JUROR MATTHEW R. HENRY, continuing:

EXAMINATION BY THE STATE

In the guilt phase of this trial I could find the defendant guilty of capital murder if he participated in the robbery and murder.  I would not have to believe that he actually pulled the trigger in order to convict him but only that he participated in the robbery and knew about the robbery in order to convict him of capital murder.  In order to then give the defendant the death penalty I would not expect the state to prove beyond a reasonable doubt that the defendant actually fired the shot that killed the victim.  In my view any phase of the action is an integral part of the whole regardless of what the defendant did.  It has no relevance to the case at all.  (T. 450, 451)

DEPUTY PROSECUTING ATTORNEY:  My question to you is, would you require the state to prove that the defendant beyond a reasonable doubt, actually pulled the trigger and killed

1102

Respondent's Exhibit E

the victim before you would consider the death penalty in this case?

PROSPECTIVE JUROR HENRY: That wouldn't be necessary because, as I said, it's all integral parts of the defendant. (T. 451, 452) An integral element of intent would have to be present to intend to commit a certain act which resulted in something and the consequences would be the same. (T. 452, 453) I understand that in the penalty phase of this trial the state would try to prove aggravating circumstances and the defendant would try to prove mitigating circumstances. I could consider all of those factors, both the aggravating and the mitigating circumstances, as well as look at what the defendant's intent was and would not look only at what his intent was ignoring the aggravating and mitigating circumstances. I think the actions would show me what the intent was. The actions of the defendant would influence my perception of his intent and I think that is true with anybody. If an act takes place that would normally result in the taking of a life, one could conclude that there was an intent to do that. I have to look at the situation in that context. (T. 453, 454) The intent I am referring to would go to the robbery or the underlying crime. I understand that you could have a robbery without the taking of a life. If an act is committed that takes a life I would presume that the actor's intent was to take a life if the evidence merits that. I will consider that intent along with the aggravating and mitigating circumstances to arrive at a punishment. (T. 454, 455)

TRIAL COURT: After rereading the *Batson* case and a few other cases I think I was premature in asking the state for an explanation. Before I can ask for an explanation I have to find that there has been a pattern of discrimination exhibited by the state in the use of its peremptory challenges. Although the court is not satisfied with the state's explanation I cannot say at this point that with four strikes having been made by the state that a pattern has been

Respondent's Exhibit E

shown. Those strikes are as follows: one strike was exercised against a black female who had several members of her family as defendants in a criminal justice system. A second strike was used to excuse Ms. Flagg. Another peremptory was used to excuse a white male, Mr. Bradford. Finally we have this last peremptory strike being used to excuse Mr. Henry, a black male. With that history I cannot say that there is any kind of pattern. Had I correctly made that point I would never have gotten to the point of asking the state for its explanation.

Consequently if the state still wishes to strike Mr. Henry for whatever reason by the use of a peremptory challenge, he may do so. At this time I will not grant a *Batson* motion. (T. 455, 456) On the other hand, I will make my ruling accordingly when defense counsel renews his motion.

DEPUTY PROSECUTING ATTORNEY: Your honor, we strike Mr. Henry with the use of a peremptory challenge.

DEFENSE COUNSEL: For the purpose of the record, your honor, I renew my *Batson* motion.

TRIAL COURT: The court is going to deny the motion for a mistrial pursuant to *Batson v. Kentucky* for the reasons I just stated. (T. 456, 457)

(ABSTRACTOR'S NOTE: By joint motion of the state and the defense, Ms. Delois Thomas was stricken for cause. (T. 457, 458) By use of a peremptory challenge the defense excused the next two prospective jurors, Jerald F. Norton, (T. 462, 468), and Charles Wayne Martin, (T. 469).)

CAROLYN PHILLIPS, a prospective juror was examined by the parties as follows:

lxviii

1104

EXAMINATION BY THE STATE

I have attended *voir dire* examination before but I have never been selected as a juror. I understand that this case involves the robbery and murder of Gary Wayne Turner at the ATM machine there on 5th Street in May of this year. I believe in the death penalty. I think that it could be appropriate in the case of murder but it would depend on the circumstances of it. (T. 469, 470) I understand the concept of accomplice liability. It is that the person who is the accomplice is guilty of the same crime. I agree with that concept but I don't know that the penalty would be the same. From a guilt or innocence standpoint as opposed to a punishment standpoint, though, I totally agree with the concept. If two people rob a bank and one drives a car while the other gets out, goes in and robs the bank, the driver is just as guilty as the one who went in and did the robbery. I do not believe that the fact that the defendant was 17 at the time of this crime affects whether he is guilty or not. I think that he would be responsible for his conduct at that time as anyone else would. (T. 474, 472)

I understand that the trial will be in two phases, the first concerning guilt or innocence and the second concerning punishment. The fact that a potential sentence of death is involved would not affect my deliberation in the first phase of the trial. I could separate each phase from the other. I understand that the state will introduce aggravating circumstances, and the defendant will introduce mitigating circumstances in the second part of this trial. The jury will then have to weigh the mitigating against the aggravating circumstances. If mitigation outweighs aggravation, then the sentence will be life without parole. If aggravation outweighs mitigation, then we have to go one step further and decide whether the aggravating circumstances justify the death penalty. (T. 473, 474) I also understand that should we decide that the defendant deserves the death

1105

lxix

penalty, we will all have to sign our name on a form so stating. Were we to do that I would be able to come back in the courtroom after having signed that form, look at the defendant and sentence him to death if the evidence was appropriate. (T. 475)

EXAMINATION BY THE DEFENSE

I understand that this examination so far has all been about the death penalty because this will be the only opportunity the lawyers have to discuss this with us. I understand that we might not get to that topic because there are many options that the jury can take in the guilt or innocence phase including conviction of lesser included offenses. (T. 475, 476) I understand that the defendant has a presumption of innocence attending him and that remains with him throughout the trial. I understand that the state has to prove elements of the charge beyond a reasonable doubt and that the defendant does not have to prove anything. I also understand that the defendant does not have to testify. That decision is entirely up to him and will probably be made by his lawyer. If he chooses not to testify I understand that we will be instructed that we cannot take that into consideration in deciding guilt or innocence. I have no preconceived ideas about this matter or the guilt or the innocence of the defendant. I really have not read anything about this matter. I had been out of town when it happened. All I remember is my husband telling me not to go to the money machine after dark, that there had been a murder. I have not read anything in the last couple of weeks about this trial. (T. 477, 478) Should the jury reach the penalty phase, I can assure the court that I would consider the full range of options, both life without parole as well as the death penalty.

DEPUTY PROSECUTING ATTORNEY: Good for the state.

DEFENSE COUNSEL: Good for the defense. (T. 479, 480)

lxx

1106

Respondent's Exhibit E

* * *

(ABSTRACTOR'S NOTE:  By the use of a peremptory challenge defense counsel excused the next prospective juror, Clarence Arnold.  (T. 481, 488)

MARY DENISE HOFFMAN, a prospective juror was examined by the parties as follows:
EXAMINATION BY THE STATE

I have sat on a jury twice before.  One of those juries was the type where we first went out and decided guilt or innocence and then came back, heard more evidence and went out and decided punishment.  I understand that this is that kind of case today.  I also understand that there are two penalties possible, life without parole and the death penalty.  If circumstances warrant it, I believe that the death penalty should be used.  I believe that I am a person who could sit on a jury and decide this matter.  (T. 488, 489)  I understand that the facts in this case are that the defendant and an accomplice robbed one Gary Wayne Turner at the automatic teller machine on 5th Street and during the course of the robbery, one of them shot and killed Mr. Turner.

I have never heard of accomplice liability.  In the example given by the deputy prosecutor of two people robbing a bank, one driving the car while the other gets out, goes in the bank, robs someone and in the course of that shoots someone, I believe that they would both be guilty of murder if it can be proven that they had planned it and intended to do it.  I have no problem with that.  It would not affect my judgment as to whether the defendant was guilty or not to know that he was only 17 years old when the crime was committed.  I believe that at 17 he should be as responsible as anyone else for his actions.  (T. 490, 491)  The fact that there is a death penalty involved in this would not affect my consideration of guilt or innocence.  I understand that the

lxxi

1107

Respondent's Exhibit E

state will introduce evidence in the second phase of this trial of aggravating circumstances and that the defense will introduce evidence of mitigating circumstances. We will have to weigh the aggravating against the mitigating circumstances and that the sheer number of mitigating circumstances does not require them to outweigh the aggravating circumstances. The substance is more important. (T. 491, 492) I understand that if we determine that aggravation outweighs mitigation, we then have to go a final step and decide whether the aggravation justifies the death penalty. If we do make that decision, I understand that we will have to sign a form sentencing this man to death. I understand we will have to then come back into the courtroom and look at this man after having done that. I think that I could do that. (T. 493)

EXAMINATION BY THE DEFENSE

I understand that we will have a wide range of options open to us at each stage of the trial. I feel that I could consider those options at every state of the trial. I believe that I could be fair and open-minded and consider all the evidence and make my decision based on all the relevant facts. (T. 493, 494) I will consider all ranges of punishment. I understand that the burden of proof rests squarely on the shoulders of the state and that the defendant does not have to prove anything. I understand that the presumption of innocence stays with the defendant throughout this trial. I also understand that the defendant has the right to testify or not to testify and that if he chooses not to testify based upon his attorney's advice, that his failure to testify should not be taken into consideration by me as a juror. I have not formed any type of preconceived ideas about the guilt or innocence of this defendant based upon what I've heard outside the courtroom. I have not had extensive conversations about this with anyone. I really don't know any of the circumstances. I take the oath administered to a juror seriously.

lxxii

1108

DEPUTY PROSECUTING ATTORNEY:  Good for the state.

DEFENSE COUNSEL:  Good for the defense.  (T. 495, 496)

(ABSTRACTOR'S NOTE:  Defense counsel used two peremptory challenges to excuse prospective jurors Carolyn Bolin and Will Barnes.  (T. 497, 498)


MURIEL M. HAYES, a prospective juror was examined by the parties as follows:

EXAMINATION BY THE STATE

I understand what accomplice liability is.  It is where you're with someone who commits a crime.  I agree with that theory.  I do not understand that where two people commit a robbery and one person kills someone that the other person is also guilty of that murder.  (T. 498, 499)  No one told me that the state would be asking for the death penalty in this case.  I really do not want to be a person who would cause someone being put to death.  I would not want a guilty conscience.  I would not want to feel guilty.  I would do it if I had to, but I would not want to.  I would not want to be a part of saying that this person gets the electric chair.  (T. 500, 501)

EXAMINATION BY THE DEFENSE

* * *

I could consider either of the two punishments of life without parole or the death penalty, but I would rather not do so.  I could consider life without parole and the death penalty and vote my conscience as to which one I believe to be correct even though I would rather not do it.

DEPUTY PROSECUTING ATTORNEY:  Your honor, we will exercise peremptory challenge on this juror based upon her severe reservations about ever giving the death penalty.

DEFENSE COUNSEL:  I once again renew my motion under *Batson.*  I believe that she

<div style="text-align: center;">lxxiii</div>

1109

was rehabilitated when she said she would consider the full ranges of punishment. That state is not entitled to anyone who says they will give the death penalty. She said she would consider it and that is all the state is entitled to. I believe that the strike was based on race. (T. 504, 505)

DEPUTY PROSECUTING ATTORNEY: Your honor, she said from the beginning that we would practically have to put a gun to her head in order to get her to give the death penalty. True, Mr. Kizer asked her if she could consider that as a range and then she came around and said that she would. But her initial response was her gut reaction and the state is entitled to use one of its peremptories on her.

TRIAL COURT: I am going to deny your motion. (T. 505, 506)

* * *

JIM SHAW, a prospective juror was examined by the parties as follows:

EXAMINATION BY THE STATE

I have set on a jury before but it was a civil case. (T. 510, 511) I have thought about this business of imposing the death penalty in this case and I don't think I would want it hanging over my head, making a decision like that for somebody else. I am telling you that I would not necessarily want to be on a jury that had to consider the death penalty. I would not want to be the one who made that decision. I am not opposed to the death penalty and I believe that it would be appropriate in certain circumstances such as murder, but I would not want to be a juror who would have to sign a form saying that I voted in favor of it. I understand that the state would have to prove beyond a reasonable doubt that the defendant and another person robbed Gary Wayne Turner at the ATM machine on 5th Street and that the defendant or his accomplice shot and killed Mr. Turner. I understand what accomplice liability is, and I would not have any

lxxiv

1110

Respondent's Exhibit E

problem deciding guilt or innocence based on accomplice liability. (T. 512, 513) I understand that he would be as guilty as the person who actually did the shooting and would have no problem convicting him of capital murder. I would have no problem considering impartially his guilt or innocence simply because the death penalty is a possibility in this trial. I understand that this trial will be in two stages. The first concerns the guilt or innocence and the second involving punishment. In the second stage I understand that the state will put on evidence of aggravating circumstances, and the defense will introduce evidence of mitigating circumstances. The jury would have to weigh the aggravating circumstances against the mitigating circumstances. In order to assess the death penalty, the jury would have to determine that the aggravating circumstances outweigh the mitigating circumstances and that the aggravating circumstances justify the death penalty. This would put me in a bit better position to decide whether to go for the death penalty. (T. 514, 515) I understand that there are many things to consider here and I could probably decide the death penalty, but there would still be that lingering thought. I don't think that because of my reluctance to impose the death penalty that I would require the state to meet a higher standard of proof. It isn't the proof or anything like that that's bothering me. It is the mere thought of having to impose that type of sentence on somebody. (T. 516, 517)

EXAMINATION BY THE DEFENSE

* * *

As I said before, I would rather not assess the death penalty but I could do it if the evidence merits it. I am confident in myself that I could do that. It is not a very pleasant thing to do. I could consider life without parole as an appropriate punishment and I agree that it is a very severe sentence for someone who is eighteen years old.

lxxv

1111

Respondent's Exhibit E

6704

DEPUTY PROSECUTING ATTORNEY: The state uses a peremptory challenge to strike this juror. (T. 520, 521)

DOROTHY HODGES, a prospective juror was examined by the parties as follows:

EXAMINATION BY THE STATE

I understand that this case involves the murder at the ATM machine at 5th and Chestnut in the course of committing a robbery. I understand that the state is alleging that that constitutes capital murder and that it was committed under circumstances manifesting extreme indifference to the value of human life. I am not sure what accomplice liability means. I could find someone guilty on accomplice liability if they were willing, but if they were forced to be an accomplice, that is something else. I would consider accomplice liability in the case of willing participation. In the case of deputy prosecutor's example of two people robbing a bank, one person sitting in the car with the motor running while the other ran inside the bank with a gun, shot and killed someone in the course of the robbery, I think that the person sitting in the car outside is just as guilty in a way. I mean, he wasn't the trigger man or pulled the weapon or killed him, but if it was already planned and all that, to me he should serve time. (T. 522, 523) As far as assessing guilt in that case I would have no problem finding the person in the car being just as guilty. I do believe in the death penalty. I am not one of the people who believes in the death penalty but doesn't want to be the one who imposes it. If the facts prove that the person is totally guilty and I believed that in heart and mind then I would have no problem imposing it. In deciding guilt or innocence I would not let the penalty phase enter into my determination. (T. 524, 525) I understand that in the penalty stage of this trial that the state will introduce aggravating circumstances and the defense will introduce mitigating circumstances. The jurors will be called upon to decide whether those

<div align="center">lxxvi</div>

<div align="right">1112</div>

factors even exist and if so, whether one outweighs the other. If the mitigating circumstances outweigh the aggravating circumstances then the defendant is sentenced to life without parole. (T. 526, 527) If the jury finds that the aggravating circumstances outweigh the mitigating circumstances then it has to go back and determine whether those aggravating circumstances warrant the death penalty. I can assure the court that I will not let punishment enter into my decision about whether the defendant is guilty or not. The fact that he was seventeen would not enter into my mind to determine whether he was guilty or not. I think that someone who is seventeen years old is as responsible for his actions as anyone else is. (T. 528, 529)

EXAMINATION BY THE DEFENSE

I understand that we might not get to the penalty phase of this trial because of the many options that we have during the guilt phase. The jury could find the defendant guilty of a lesser included offense. (T. 529, 530) There will also be many factors to weigh should we get to the penalty phase in deciding which sentence to assess. I could weigh all of those factors and possibilities. (T. 530, 531) The fact that the victim in this case was a white male about defense counsel's age and that the alleged perpetrator is black would make no difference to me in making my decision. I understand that I could not let compassion for victims or any other emotionally-charged thing enter into my thought process when making a decision. I believe that I could do that.

DEPUTY PROSECUTING ATTORNEY: Good for the state.

DEFENSE COUNSEL: Good for the defense. (T. 531, 532)

(ABSTRACTOR'S NOTE: Prospective juror Alma Wallace was excused by the defense with the use of a peremptory challenge. (T. 533, 541) Without examination defense counsel

lxxvii

1113

Respondent's Exhibit E

excused prospective juror Katherine Austin with the use of a peremptory challenge. (T. 541)

DAVID STELOW, a prospective juror was examined by the parties as follows:

EXAMINATION BY THE STATE

I understand that in this case the state has charged the defendant and another man with attempting to rob a man by the name of Gary Turner at an ATM machine and in the course of that robbery causing his death under circumstances manifesting extreme indifference to the value of human life. I understand that if we show that either one of them committed the murder, that completes the crime. I have heard of accomplice liability. (T. 542, 543) I understand that one is guilty by accomplice liability when one helps another person commit a crime. So to use the deputy prosecutor's example, when two people plan a bank robbery, one person sitting in the car with the motor running while the other person goes in with a gun to get the money, and then while he is in there shoots and kills someone, the person in the car would be just as guilty as the other one. I did not know that the state was seeking the death penalty in this case. I believe in the death penalty and I could give it. I understand that the last form that we would have to fill out would be one where we all sign it saying that the defendant deserves the death penalty. I could sign that form if I found him guilty. I understand that this case is tried in two phases, one dealing with guilt or innocence and the other dealing with punishment. I understand that if someone is found guilty of capital murder that they do not automatically get the death penalty. (T. 544, 545) I understand that there are two sentences possible in a capital murder case, life without parole or the death penalty. To show that the defendant should get the death penalty the state will introduce what are called aggravating circumstances. The defense, on the other hand, will put on

lxxviii

1114

Respondent's Exhibit E

what is called mitigating circumstances, which are basically excuses for committing the crime. We could find that they don't exist at all or that they are legitimate excuses for having committed a crime. In the penalty phase when these matters are brought to our attention the jury will first have to decide whether there are aggravating circumstances present. If so, we will then have to see if there are mitigating circumstances present. If so, we would then have to weigh the aggravating circumstances against the mitigating circumstances. If the mitigating circumstances outweigh the aggravating circumstances the defendant automatically gets life without parole. (T. 546, 547) If the aggravating circumstances are found to outweigh the mitigating circumstances, I understand that the jury will then have to decide whether the aggravating circumstances in this case warrant the death penalty. (T. 548)

EXAMINATION BY THE DEFENSE

I have lived in Pine Bluff for a year and eight or nine months. I work at International Paper. I came here from Oconto, Wisconsin. I have heard people speak about this in general discussion, but there were no details discussed. Only about how awful it was. I read some headlines in the newspaper. I never read the story completely. I don't read the local newspaper. I am in a position to set aside whatever I have heard and base my decision strictly on the evidence I hear from the sworn testimony in this case. (T. 548, 549) I understand that we might never get to the penalty phase because the jury could return a not guilty verdict as well as a guilty verdict on a lesser included offense. I understand that when and if we would get to the penalty phase that there are a range of punishments, being life without parole or death and I can commit to defense counsel that I would consider both of those ranges if it gets to that point. (T. 550, 551)

DEPUTY PROSECUTING ATTORNEY: Good for the state, your honor.

lxxix

1115

Respondent's Exhibit E

DEFENSE COUNSEL: Good for the defense.

DEPUTY PROSECUTING ATTORNEY: According to my calculations defense counsel has used twelve peremptory challenges.

DEFENSE COUNSEL: That is correct.

TRIAL COURT: We have got our twelve jurors now, ladies and gentlemen. What is your pleasure as to the number of alternates? I thought we would go ahead and try to seat two at this time. That would mean that we would have to have some new peremptory challenges. I am not sure exactly how many.

DEFENSE COUNSEL: I think it's one for each alternate. We would get two and the state would get two.

TRIAL COURT: Okay. We will agree then that each side will have two peremptory challenges in our selection for the two alternate jurors. (T. 552, 553)

DEPUTY PROSECUTING ATTORNEY: Your honor, before we call the next one I move to strike Ms. Nancy Davis for cause based on her answers to her questionnaire, particularly answers to question numbers 26, 27, 39 and 41.

DEFENSE COUNSEL: I have no problem with that, you honor. It is pretty clear. She mentioned it four different times that she did not think she could in any way consider the death penalty.

TRIAL COURT: Do you want to do that without inquiring of her? Okay. I'll show her stricken for cause then. The next juror then is Phillip Rushing.

DEFENSE COUNSEL: Your honor, based on his response to the court's general questions and *voir dire*, I am going to use one of my peremptory challenges to excuse Mr.

lxxx

1116

Rushing.

TRIAL COURT: All right. We will excuse Mr. Rushing. (T. 554, 555)

(ABSTRACTOR'S NOTE: The next juror called for examination, Robert Hickerson, was excused on motion of the defense to challenge him for cause which was not objected to by the state. (T. 555, 563, 564)

MERLE COBBS, a prospective juror was examined by the parties as follows:

EXAMINATION BY THE STATE

I was not aware that the state was seeking the death penalty in this case. I understand that this case is about a robbery alleged to have been committed by the defendant and another man at the ATM machine at 5th and Chestnut in the course of which a man named Gary Turner was killed. I do not believe in the death penalty under any circumstances. I do not believe in taking people's lives. (T. 564, 565) I would not believe in it even if it were a member of my own family. I could not bring them back. I just don't believe in it. It would not matter what kind of proof that was put on about it.

DEPUTY PROSECUTING ATTORNEY: Motion to excuse for cause, your honor.

DEFENSE COUNSEL: I really cannot object to that, your honor.

DEPUTY PROSECUTING ATTORNEY: I believe the next one also says the very same thing.

DEFENSE COUNSEL: That is right. That is his response to number 41. (T. 565, 566)

TRIAL COURT: All right. Without objection we will strike for cause both of those folks, Merle Cobbs and John Weaver. (T. 567)

lxxxi

1117

Respondent's Exhibit E

BRENDA SILVEY, a prospective juror was examined by the parties as follows:

EXAMINATION BY THE STATE

I understand that this case involves the charge by the state that the defendant and another person were involved in a robbery and that during the robbery a person was killed. I have heard very little about this case. I understand that the trial will be conducted in two phases, one concerned with guilt or innocence and the other with punishment. I understand that the range of punishment in capital murder is either life without parole or death. (T. 567, 568) In regard to my opinion about the death penalty, it is something you have to weigh the issue of how severe it is and do they deserve that much punishment or what. I am not opposed to the death penalty. I know that there are cases where it is justified. It depends on the circumstances. If the circumstances justified it, I could impose it. I understand that in the guilt phase that the state would have to prove that either the defendant or his accomplice attempted to rob Mr. Gary Turner at the ATM machine and in the course of that robbery either the defendant or his accomplice shot and killed Mr. Turner. If I would find that those elements exist and that they show extreme indifference to the value of human life, I could render a verdict of guilty. The fact that he was seventeen years old at the time and might get the death penalty would not influence my decision because I think he was old enough to know the difference between right and wrong and that he put himself in the position of getting the death penalty. I understand that the state will introduce evidence of aggravating circumstances and that the defense will introduce evidence of mitigating circumstances. I understand that the number of circumstances is not as important as the substance of them. (T. 569, 570) I understand that we will have to weigh the aggravation against the mitigation. If we find that mitigation outweighs aggravation we must render a verdict

lxxxii

1118

of life without parole. If on the other hand we determine that aggravation outweighs medication
we have to decide whether the aggravation justifies the death penalty in this case. If it got to that
point and we found that it did justify the death penalty I could sign a form sentencing this man to
death. I will have no personal reservations about it. (T. 571, 572)

EXAMINATION BY THE DEFENSE

I understand that the defendant has constitutional rights, one being the presumption of
innocence and that the state has the burden of proving the defendant guilty. The defendant does
not have to prove anything at the trial. I also understand that when the jury goes to deliberate on
the guilt or innocence of this young man, that it will have options such as finding him not guilty or
finding him guilty of what are called lesser included offenses, which carry substantially less severe
punishment than the capital murder charge. I can commit to consider the entire range of options
when we deliberate on the issues of guilt or innocence. I understand that should the jury find the
defendant guilty of capital murder, that there will be in effect a second trial about the life of
Kenneth Reams wherein the state will present aggravating circumstances and the defense
mitigating circumstances. (T. 572, 573)

DEPUTY PROSECUTING ATTORNEY: Good for the state.

DEFENSE COUNSEL: Good for the defense. (T. 574)

MAY CATHERINE NEAL, a prospective juror was examined by the parties as follows:

EXAMINATION BY THE STATE

I have never really thought about the death penalty. If I were chosen to be a juror and that
were the issue, I think that I could do it, but it would not be my preference. If I were given an
option between life without parole and the death penalty I would automatically go with life

lxxxiii

1119

Respondent's Exhibit E

without parole. I can see myself giving someone the death penalty but I would first have to hear the evidence. (T. 575, 576) I could sign a form saying that this defendant deserves the death penalty if I voted that way. I believe that there are crimes that deserve the death penalty such as when someone kills someone else without malice or forethought, something very brutal. When I mean brutal I refer to something like a person just walking up to another person and shooting him without the person shooting knowing the person shot and the person shot had not done anything to his murderer. Prankish stuff and maybe mass murderers also are included, such as the New York subway deal. I understand that the state in this case alleges that the defendant and an accomplice killed Mr. Turner while trying to commit a robbery under circumstances showing extreme indifference to the value of human life. If it came out that the other person actually killed Mr. Turner, I could not find this man guilty of capital murder. In that case it would not seem that he did it. (T. 577, 578) I understand now that capital murder includes a concept called accomplice liability which is basically that if someone aids another in committing a crime, say furnishing a gun or helping plan the crime, then that person is just as guilty as the person who actually did it. I agree with that concept. However, I would have to hear all of this and these facts would have to be proven before I could vote that way. If it was proven to me that the other person planned it and all of this stuff and just happened not to be the one to do it, I don't know. I would have to think about that for a minute. I would not have a problem with it if it was proven to me, but just to sit up here and tell you that I would do that in this case, I cannot do that because I don't know what evidence you have. I can say that I could find someone guilty under that scenario, but in this particular case I would have to hear it. I realize that only one person can hold a gun and that if it takes two to go do the crime whoever draws the short straw may be the

<div align="center">lxxxiv</div>

Respondent's Exhibit E

6803

shooter. (T. 579, 580) The person who drew the long straw and stands there and watches is just as guilty as the person who drew the short straw. (T. 580, 581) I would not let the fact that the defendant was seventeen years old when this crime was committed enter into my guilt or innocence determination. I understand that should the jury get to the penalty phase, that the state would introduce what are called aggravating circumstances in order to seek the death penalty and the defense would introduce mitigating circumstances in order to keep from getting the death penalty. The jury would have to weigh the aggravating circumstances against the mitigating circumstances. If the aggravating circumstances were found to outweigh the mitigating circumstances the jury would then have to determine whether these particular aggravating circumstances warranted the death penalty. As I earlier said, if I were given the option of life without parole or the death penalty, my first option would always be life without parole. But after you have explained all of this I understand that I would just have to do what I had to do after we weighed the circumstances. (T. 581, 582) I would not let the fact that the defendant could get the death penalty enter into my consideration of his guilt or innocence. I can reserve any judgment about which penalty he should receive until we get to the penalty phase of the trial. (T. 582, 583)

DEPUTY PROSECUTING ATTORNEY: Your honor, I am going to excuse Ms. Neal. She was a major hang-up in a cut and dried case I had last month, and I believe based on her answers here that she would not even consider the death penalty, although she says that she would.

DEFENSE COUNSEL: I will use a peremptory challenge to excuse the next juror, Ms. Breitenstein. (T. 582, 583)

1121

lxxxv

Respondent's Exhibit E

DARLENE FRYE, a prospective juror was examined by the parties as follows:

EXAMINATION BY THE STATE

I understand that just because the defendant might be convicted of capital murder does not mean that he automatically gets the death penalty. I am for capital punishment but not in every case. I would weigh each case individually. Murder would be one of those cases. I am not opposed to sentencing someone to death if I think it is justified. I have sat on one jury before, a burglary case. (T. 584, 585) I understand that the state will have to prove that the defendant and another person attempted to rob Mr. Gary Turner at the ATM machine at Worthen Bank and in the course of that robbery the defendant or his accomplice shot and killed Mr. Turner. We would also have to prove that the circumstances under which this occurred manifested extreme indifference to the value of human life. The fact that the defendant was seventeen at the time this offense was committed would not influence my decision as to guilt or innocence. I understand that the state had two aggravating circumstances that it intends to prove and that the defense has a number of mitigating circumstances. I vaguely understand what is meant by aggravation and mitigation. (T. 586, 587) I understand now that aggravation are things that would justify the death penalty, whereas mitigation would be things that would justify him not being sentenced to the death penalty. I understand that we would have to weigh aggravation against mitigation. If mitigation outweighed aggravation, the sentence would be life without parole. If we felt that aggravation outweighed mitigation, then we would have to determine further whether those aggravating circumstances justified the death penalty. The sheer number of aggravating or mitigating circumstances is not as important as the substance of them, I understand. Should we get to that point and decide that the aggravating circumstances do justify the death penalty, I

lxxxvi

1122

would have no problem signing a form sentencing this defendant to death. (T. 588, 589)

EXAMINATION BY THE DEFENSE

      I remember reading something about this in the newspaper at the time it happened. I remember where it happened and the deceased's name and that's about all. I don't recall reading anything about this case in the last several months. My daughter had a friend who was the niece of the deceased. They used to be better friends than they are now. They had some sort of family problems and now they are just friends but not close. I understand that we might not even get to the penalty phase of this trial. (T. 589, 590) I understand that the jury has a number of options open to it in the guilt phase including finding the defendant innocent or guilty of lesser included offenses which carry with them much less severe penalty ranges. I can commit to defense counsel that should we get to the penalty phase after finding the man guilty of capital murder, I could consider the full range of punishment.

      DEPUTY PROSECUTING ATTORNEY. Good for the state.

      DEFENSE COUNSEL: Good for the defense. (T. 591, 592)

      (ABSTRACTOR'S NOTE: The following occurred in chambers out of the hearing of the jury.)


      TRIAL COURT: We are in chambers after returning from the noon recess for the purpose of disposing of a variety of motions that have been filed. The court has had an opportunity to read the motions and the responses thereto.

      We start with the motion to allow opening statement at the penalty phase. The state has no objection and that will be granted.

1123

<div align="center">lxxxvii</div>

Respondent's Exhibit E

The next motion is to require the state to reveal any agreement entered into between the state and any prosecution witness that could conceivably influence his testimony. The state's response indicates that it intended to do nothing of the kind. I would ask that should their response become any different that the state would notify the court and/or the defendant at that time.

DEFENSE COUNSEL: That motion really had nothing to do with whether Alford was going to testify or not.

TRIAL COURT: The next motion is to hold the sentencing provision of the death penalty statute, Ark. Code Ann. §5-4-603 unconstitutional. (T. 593, 594) This motion interests me. There are several forms that we give to the jury in this phase of the trial. Form three requires the jury to first conclude whether one or more aggravating circumstances did exist beyond a reasonable doubt. If they find that those did exist, they check part A. They go to part B where the aggravating circumstances outweigh beyond a reasonable doubt any mitigating circumstances. If they find that part B exists, then they move on to part C to consider whether or not the aggravating circumstances justify beyond a reasonable doubt a sentence of death. The instructions are that if you have checked paragraphs A, B and C, they'd sentence the defendant to death by lethal injection on form four. I am inquiring of the state at this time whether it is the state's position that this is a mandatory provision and that if the jurors have checked paragraphs A, B and C, then the jury must sentence this defendant to death by lethal injection. Should it read instead "may sentence him to death by lethal injection"? It is my understanding from reading the state's response that the jury has the alternative of not imposing the death penalty only by not checking paragraph C. It is my understanding of the law that the jury could only consider the

lxxxviii

1124

death penalty after checking parts A, B and C. It seems the better way to word the last portion of part 3 would be to say "if you have checked A, B and C, then you may sentence this defendant to death by lethal injection on form four". (T. 595, 596)

DEPUTY PROSECUTING ATTORNEY: I think given the way section C is written that form three would be the appropriate language.

TRIAL COURT: You think the conclusion of that would be that they must. If they do find that those circumstances justify the imposition of the death penalty, are you telling me that their discretion stops at that point and they have to impose it?

DEPUTY PROSECUTING ATTORNEY: I think that is what section C is saying.

DEFENSE COUNSEL: I think that is what the instruction is saying but I don't think that is what the law is.

TRIAL COURT: I think the Supreme Court has sustained a conviction where these virtually identical forms were used and they said that leaving part C unchecked is the way a jury cannot impose a death penalty if it is not so inclined. I am not sure it went so far as to say that where A, B and C were checked, the jury had to impose it. I'm not sure whether that is right now and I do not intend to rule on it right now until I read more closely those cases. I want to mention this to all of you at this time because I am concerned about the mandatory provisions in there and I want to make sure that we address that thoroughly at the time, so I'm going to withhold a ruling on that motion at this time.

Next one is a motion to assure a cross section of the community for the jury. The statutory procedure for jury selection has been followed. It will be granted to the extent that we do that anyway. I guess at this point it is moot by compliance as best I can tell.

1125                         lxxxix

Respondent's Exhibit E

Next one is a motion to quash the information on grounds that the death penalty is cruel and unusual punishment violative of the Eighth Amendment to the Constitution of the United States. I think the cases are replete to the contrary, and I will deny that motion.

The motion to compel disclosure of aggravating factors and information relating to mitigating factors will be granted. I think it is moot by compliance as well. I think the state's response has granted that.

DEFENSE COUNSEL: They have. (T. 597, 598)

TRIAL COURT: The motion to prohibit the state from seeking the death penalty on the grounds that historically the death sentence has been arbitrarily and capriciously imposed in a racially discriminatory manner in violation of the Eighth and Fourteenth Amendments to the United States Constitution is denied. That might be true somewhere, but I don't think there is sufficient evidence for this court to find that that has happened in this jurisdiction.

The motion to prohibit death qualification of the jury was verbally brought up to the court prior to our starting the jury selection process. For the record at this time, the motion was denied then. We have in fact death qualified the jury.

The motion to compel disclosure of circumstances which allegedly manifest extreme indifference to the value of human life has been rendered moot by the state's response, has it not defense counsel?

DEFENSE COUNSEL: They have.

TRIAL COURT: I would grant that motion but I think at this point it is moot.

The motion for full recordation is certainly granted. Other than off the record comments we have recorded everything so far.

xc

1126

Respondent's Exhibit E

6609

The motion to hold sentencing provisions of the death penalty statute unconstitutional I think is duplicated. I think there are two motions that appear to be identical.

DEFENSE COUNSEL: There may be. I was trying to cover all the bases and may have covered them twice.

TRIAL COURT: All right. This is really sort of what we were talking about earlier. We were talking about the mandatory provisions of the death penalty language. I am going to withhold a ruling on that until we read the rest of those cases.

The next motion is one to hold the provision of the death penalty statute unconstitutional by virtue of not having a mandatory appellant review. Mandatory review is not necessary. That motion is denied.

The next motion is one to omit from submission to the jury any aggravating circumstances completely unsupported by the evidence. That motion is certainly granted. (T. 599, 600)

The motion for discovery, inspection, examination and testing of physical evidence I believe is moot by compliance.

DEFENSE COUNSEL: The only thing I have not seen is whether Andrejack has given an additional report or did he just adopt the one he already gave?

DEPUTY PROSECUTING ATTORNEY: No, he gave a report. It is the very same thing.

DEFENSE COUNSEL: I will take her word at that.

TRIAL COURT: The next motion is one to require the investigative officers to retain their rough field notes. At this time I assume that they will do that and we will ask them to retain whatever notes they have at this time.

1127

xci

Respondent's Exhibit E

DEFENSE COUNSEL: It will really just depend on what their testimony is.

TRIAL COURT: I have no problem in asking them to retain what they have but if they don't have anything, they just don't have it. I would be inclined to grant that but if you will remember to ask the officers individually whether they have any such notes, I will appreciate it. I would ask the state to ask their witnesses to hold onto what notes they have. (T. 600, 601)

As I understand it the state is not going to seek to introduce any evidence of victim impact so the motion to prevent victim impact statement is moot at this point.

DEPUTY PROSECUTING ATTORNEY: It is correct that we are not planning to introduce any such evidence.

TRIAL COURT: The motion to prohibit submission to the jury of the aggravating circumstance, for pecuniary gain, at the penalty phase of the trial--

DEFENSE COUNSEL: I can honestly say that this is one area of the death penalty stuff I have gotten the most confused about because it seems that the court has been very serpentine in its decisions.

TRIAL COURT: The state of the current law as best I can follow it is as follows. I think the various U.S. circuits are split at this time but our circuit supports the *Lowenfield* reasoning which goes back to pre-*Collins v. Lockhart* days. What we are left with is being able to elicit testimony about pecuniary gain as an aggravating circumstance. So I will deny the motion on those grounds.

The motion for discovery I take is moot by compliance.

DEFENSE COUNSEL: It is.

TRIAL COURT: The motion to sequester witnesses will be granted. We will certainly

<div align="center">xcii</div>

<div align="right">1128</div>

Respondent's Exhibit E

bar them from the courtroom. Is there any particular place other than the jury pool room where we can place them? I don't know what to expect from members of the victim's family. The clerk told me the father-in-law of the victim is here.

DEFENSE COUNSEL: So is the victim's spouse.

TRIAL COURT: I am sure she is, and I suspect that his parents will be here also.

DEPUTY PROSECUTING ATTORNEY: They should be.

TRIAL COURT: From the conversation I had with them on the telephone about their interest in the matter, I would say that witnesses probably ought not be exposed to them. (T. 602, 603) We will exclude them from the courtroom to testify individually and caution them about discussing their testimony.

We have previously granted the motion for sequestered individual *voir dire*.

The motion *in limine* as to photographs. We've discussed that two or three times and I think that defense counsel is if not comfortable, has at least limited the state's amount of pictures according to what I have been told.

DEFENSE COUNSEL: That is correct. One of the deputy prosecutors showed me all of them. As long as she is going to use the ones that she thought she was going to, I have no objection to them. I don't particularly care for them but I don't have any objection to them.

DEPUTY PROSECUTING ATTORNEY: That would be the Crime Lab photos?

DEFENSE COUNSEL: Right and the other photographs of the truck.

DEPUTY PROSECUTING ATTORNEY: Well that's what I was wanting to make sure of. Do you have any objections to any of these?

DEFENSE COUNSEL: No, those are all the ones that she told me about.

xciii

1129

Respondent's Exhibit E

6812

TRIAL COURT: All right. Motion to preclude the prosecution from using peremptory challenges to exclude black persons was basically granted. I believe we crossed that bridge during the selection of the jury on an individual basis.

The motion to quash information on the grounds that the statutory aggravating circumstances are vague and over broad and have not been narrowly construed by the court will be denied. I think that those are the motions other than those relating to the double counting and the constitutionality of the death penalty.

DEFENSE COUNSEL: Do you want me to take up my motion on the retardation aspect if it arises during sentencing?

TRIAL COURT: Yes sir. (T. 604, 605)

* * *

(ABSTRACTOR'S NOTE: Because there are no objections or other significant attributes of the opening statements, they are not abstracted.)

GREG TAYLOR, a witness called by and on behalf of the state, testified as follows:

I have been a patrolman with the Pine Bluff Police Department for the last 2-1/2 years. I recognize state's exhibit 1 as an accurate diagram of the area of 5th and Chestnut Streets where the Worthen Bank teller machine is. It is on the southeast corner of 5th and Chestnut. (T. 623, 624) On May 5 of this year I received a call that there had been an armed robbery of an individual at the teller machine at the southeast corner of 5th and Chestnut. I was advised by radio that there had been shots fired and one person down with an ambulance in route to the scene. When I arrived there at 8:36 I found a blue Jeep pickup parked in the driveway to the teller machine just

xciv

1130

next to the teller machine. Right behind it was a gold Ford Taurus sitting at the southeast corner

of the teller machine out into the bank parking lot. (T. 625, 626) Actually the Jeep was a bit

forward of where you would actually put the card into the ATM machine. I went into the driver's

side of the truck and saw a white male with his head slumped forward on the steering wheel

bleeding from a wound to the side of the head. He was breathing very hard, gasping for breath. I

could not get a response from him. A black male approached me running at a fast walk and told

me that he had seen or heard what had happened and had called the police from the Econo Lodge

which is right here. He advised me that the gold Taurus was his car. His name was Mr. James

Nelson. I identified the victim by his driver's license and a photograph and other material inside

the vehicle as Gary Wayne Turner, a white male born in August of 1954. I called headquarters

and asked them to have the ambulance step it up, that we did have an injury there that I was

unable to deal with because I was not a medical person. The truck was a standard shift truck that

was in gear at the time. We were able to reach through the driver's side between Mr. Turner and

the steering wheel and put the truck out of first gear into neutral so that we could roll it forward

in order to allow ambulance personnel to get Mr. Turner out of the truck. (T. 627, 628) The

truck was so close to the building at the time that we could not open the door. We had to roll it

forward in order to open it. The passenger door was locked. We could not go through the

passenger side. As they were removing Mr. Turner from the truck, his Worthen Bank teller

machine card was still in his left hand. It fell out at that time. Mr. Nelson gave another officer a

full description of the assailants. He said they were two young black males approximately junior

high age, very young. One was approximately 5'11" and the other approximately 5'9". One of

them he said was wearing a grayish sweatshirt with a hood on it and the other one was wearing

xcv

1131

Respondent's Exhibit E
6814

black shorts and a T-shirt. He saw them run from the truck area across 5th Street. State's exhibit #2 is a photograph of the Worthen money card machine there at 5th and Chestnut. (T. 629, 630) State's exhibit #3 is a photograph through the window of the pickup truck showing the inside of the truck and articles in it. Nothing was moved inside the truck before the photograph was taken. The only thing I moved was the gearshift for putting it into neutral. Right there on the seat is a plastic Worthen Bank machine money card holder. Also Mr. Turner's glasses are there. (T. 631, 632)

*  *  *

JAMES NELSON, a witness called by and on behalf of the state, testified as follows:

I am twenty-two years old and have lived here all my life. On the night of May 5, I was riding around town. I was leaving the mall coming up 5th Street. I saw two guys at a truck parked at an ATM machine while I was at the light. Then they started running so I stopped. I went around and came back to the truck and I saw someone in the truck. I went to the Econo Lodge to call 911 and then went back to the truck. Then I saw that the guy had been shot. Then I went back to the Econo Lodge and called them again and told them that he had been shot and when I got back the police were there. My cousin Gordon was with me. (T. 634, 635) I was driving a gold Taurus. That is significant because it looks like a police car. One of the two individuals who I saw there and who ran away was tall and the other one was short. The one that was tall had on a hooded sweater. I heard two noises and they took off running at the very same time. (T. 636, 637) One went that way and the other one went that way. The tallest one was a short distance ahead of the other one. The first noise I heard was a boom. They couldn't get the money out and they hit the machine. The second one was louder than the first one. I knew that

xcvi

1132

something was wrong because they left the truck. I don't know what is strange about that. It just got my attention. I knew something had to be wrong. That is why I came back. When my cousin and I came back and went to the truck we were calling out trying to get this guy to talk to us. He would not say anything. That is when I went and used the telephone at the Econo Lodge about 2 blocks away. I had never seen anything like this before in my life. (T. 638, 639) I asked the people in the lobby if I could use the phone and I called 911. Then I went back to the truck and looked at the man closer. I could tell he was bleeding and that he had been shot. I then ran back to the Econo Lodge and called again. When I went back to the truck the police were there. When these guys were running across the street in front of me, I did not see a weapon or anything in their hands. (T. 640)

KENNY HEROMAN, a witness called by and on behalf of the state, testified as follows:

I am the captain in charge of the criminal investigation of the Pine Bluff Police Department. I have occupied that position for about four years. I have been with the Pine Bluff Police Department for about eighteen years. I had occasion to investigate the murder of Gary Wayne Turner at an ATM machine here in Pine Bluff. (T. 641, 642) We checked the car for fingerprints but none were lifted that were usable. When we arrived on the scene Mr. Turner was still alive and our main concern at that time was to give him aid.

We later received information that a subject by the name of Butterball and a subject known as Ken were involved in this robbery/homicide. We later developed that Butterball was one Alford Goodwin and that Ken was Kenneth Reams. We started receiving this information on the day after the homicide and continued receiving it through the 10th of May. I received a telephone call from a Mr. Jermaine Brown. He advised that he had information concerning this

xcvii

1133

Respondent's Exhibit E

homicide and eventually came in and gave a sworn statement at the prosecutor's office. He told us that he had overheard Alford Goodwin and Kenneth Reams talking about their involvement in the murder of Mr. Turner. They had talked about a robbery being across the street waiting for someone to come to the ATM machine to rob them and that one of the subjects had fired the shot that killed him. (T. 643, 644) We knew from the autopsy that a .32 caliber projectile had been found in the victim. In the sworn statement we received from Jermaine Brown we were advised that on the 6th of May, which would have been the day after the homicide, Brown observed Kenneth Reams with a .32 caliber pistol. He was aware that it was a .32 caliber pistol because Kenneth Reams told him it was a .32 caliber pistol. At this time we determined that with the information from Jermaine Brown and the results of the autopsy that we had probable cause to arrest Alford Goodwin and Kenneth Reams. Jermaine Brown pointed out Alford Goodwin and Kenneth Reams who were talking together at 3rd and Elm. Kenneth Reams is sitting here to my left with a brown plaid shirt. We also obtained a search warrant for the residence of Kenneth Reams. (T. 645, 646) We obtained consent to search at Alford Goodwin's residence. The two were arrested at about 4:00 p.m. and the search warrant was executed at about 5:40 p.m. (T. 647, 648) Alford Goodwin was the other suspect arrested along with Kenneth Reams. He was a nineteen year old black male who weighed 190 pounds and was 5'11". He was a student at Pine Bluff High School. He had a part-time job at the post office and had no previous criminal record.

The search of Kenneth Reams' residence recovered a holster which would be consistent with the size of a .32 caliber revolver and two brown leather jackets. Prior to that search and the information that we received from informants and anonymous callers, it had been indicated that the murder weapon was taken from a burglary of a dry cleaners in Pine Bluff. When we

xcviii

1134

researched our reports it was determined that on the night of April 27 or in the early morning hours of April 28, there was in fact a burglary of Pine Bluff Dry Cleaners located on Poplar. Taken in that burglary was a .32 caliber H & R revolver. Also taken in that burglary were three to four brown leather jackets. The holster located in Kenneth Reams' residence would be consistent with this stolen holster as would the brown leather jackets. (T. 649, 650) The owner of the pistol and the holster identified them as his. They were under the counter at the dry cleaners when they were stolen. The jackets were also identified as having come from the burglary of the dry cleaners.

The search of Alford Goodwin's residence netted a hooded gray sweatshirt, a .32 caliber H & R revolver and a brown leather jacket. The hooded sweatshirt was found in Alford Goodwin's bedroom. The pistol was located in the back yard under a bucket wrapped in plastic. (T. 651, 652) State's exhibit #9 is the .32 caliber H & R revolver that was located under the bucket in Alford Goodwin's back yard. After we found it on the 10th we sent it to the Arkansas Crime Lab on the 11th for ballistic testing. It was then sent back to us and has been locked in the evidence room of the Pine Bluff Police Department until this day.

In the course of the investigation someone in my office, Lieutenant Addison and Detective Phillips, took statements from Goodwin and Reams. (T. 653, 654)

DEPUTY PROSECUTING ATTORNEY: Do you know whether either one of the individuals admitted to being the shooter?

DEFENSE COUNSEL: Your honor, I object to any testimony having to do with Mr. Goodwin as being hearsay.

DEPUTY PROSECUTING ATTORNEY: Your honor, I don't think it is hearsay because

xcix

1135

Respondent's Exhibit E

I am not offering that as the truth of the matter. May we approach the bench?

(ABSTRACTOR'S NOTE: The following occurred at the bench out of the hearing of the jury.)

DEPUTY PROSECUTING ATTORNEY: His response is going to be that no one admitted to being the shooter. That is not based upon hearsay.

DEFENSE COUNSEL: How can it not be based upon hearsay? It is rank hearsay and it is also offered for the truth of the matter asserted. It goes right to one of the elements that one of them either did or did not admit that they discharged the gun during the robbery. I don't see how it could avoid being hearsay and I object to it.

TRIAL COURT: You could ask him if anybody admitted being the shooter. That is not hearsay

DEFENSE COUNSEL: It is if it is a response from anybody else. That means that two people then had to respond to that question and it is hearsay. (T. 655, 656)

TRIAL COURT: I think you can lay a foundation but at this point it is an out-of-court statement. You cannot elicit hearsay.

DEPUTY PROSECUTING ATTORNEY: The answer to the question is going to be that no, no one admitted to being the shooter. It cannot be hearsay.

DEFENSE COUNSEL: I guess y'all read different rules than I did. I don't understand that. I don't understand how any response given by a third party who is not here is not going to be hearsay. It has to be hearsay unless you can show me some exception and I don't think I can

c

Respondent's Exhibit E

6819

find it.

TRIAL COURT: I think that you can ask him if you obtained an admission from anybody but just avoid hearsay.

DEFENSE COUNSEL: Your exception is noted.

(ABSTRACTOR'S NOTE: The following occurred back in the hearing of the jury.)

CAPTAIN HEROMAN, continuing: Neither suspect admitted to shooting Mr. Turner. (T. 657, 658)

* * *

WILLIAM STURNER, a witness called by and on behalf of the state, testified as follows:

I am the chief medical examiner for the state of Arkansas. My field is forensic or medical legal pathology. I conducted an autopsy on Mr. Gary Wayne Turner on 10 May 1993. (T. 660, 661) As a result of findings made in the autopsy I have an opinion as to both the cause and manner of death in regard to Mr. Gary Wayne Turner. The manner of death was homicide and the cause of death was a gunshot wound to the head. (T. 662, 663) The gunshot wound was located 2-1/4 inches above and two inches in front of the auditory canal or the ear. (T. 664, 665) The wound had what we call stipling which are burned and unburned powder grains. The bullet passed through the brain and the skull. It was found in the scalp tissue on the right side of the head 3-1/2 inches above the ear and 1/2 inch behind the ear. The bullet penetrated the skull on the left side of the head and exited in the mid-portion somewhat behind on the right side. (T. 666, 667) The path of the bullet was generally from left to right with very little upward or downward deviation. It also comes out further behind the right ear than it goes in on the left side. (T. 668, 669)

ci

**1137**

Respondent's Exhibit E

* * *

State's exhibit #17 is the actual bullet that I removed from Mr. Turner's head. As I said before, there was stipling on the side of Mr. Turner's head at the entrance point of the bullet. (T. 671, 672) We cannot tell you based on that exactly how far away the gun was but we would say several inches. The range would be anywhere from a couple of inches to maybe twelve inches. The gun that fired the shot would have to have been on Mr. Turner's left side when it fired. (T. 673, 674)

IVAN PHILLIPS, a witness called by and on behalf of the state, testified as follows:

I am a detective with the Pine Bluff Police Department and have been for approximately four years. I took a statement from Mr. Kenneth Reams in the case of Gary Turner. (T. 674, 675) I did this on May 11 of this year the day after he was arrested. Lieutenant Addison advised Mr. Reams of his rights before he gave the statement. In fact, he gave two statements that day, one later that night. I was present for both of them. He seemed to understand his rights and waived an attorney and gave us a statement. The first statement was taken from him at the Stuttgart jail where he was being held at that time. He was transported to Stuttgart because of room problems at the county jail here. This was approximately 10 p.m. We initially spoke to him about a burglary that occurred in the early morning hours of April 28 at the Pine Bluff Dry Cleaners on Poplar Street and also about an aggravated robbery that took place at the Greyhound bus station in Pine Bluff on April 29. (T. 676, 677) He told me that he had robbed the Pine Bluff Dry Cleaners alone. He said he kicked in the back door of the business which was borne out by the report of the robbery. He said he took the .32 caliber revolver and some leather jackets. The other items he took were rolls of stamps, change and some hair clippers. As for the aggravated

1138

Respondent's Exhibit E

robbery he stated that he used the .32 caliber revolver he had gotten from the burglary of the dry cleaners. He held it on the lady behind the counter who he had lie down on the floor while he took the money from the register of the business. He said he acted alone in that robbery also. Toward the end of that statement he started talking about the ATM robbery that occurred at 5th and Chestnut at the Worthen ATM machine. He said that he and the other individual, Alford Goodwin, whom he referred to as Butterball, had been walking across the lot going to buy dope. (T. 678, 679) He stated that a truck had pulled up to the teller machine and Goodwin had walked over there to ask the man for a light. When he got there, Mr. Reams heard a pow like a gunshot. At that time Reams was on 6th Street. He ran over there and looked at the truck and then ran off. Reams said that Goodwin told him that he shot him because when Goodwin approached him the man asked him, "What the fuck he wanted." He never said anything about a racial slur. The word nigger, was not placed at the end of that statement. It is a direct quote from Reams.

We did not initially go to Stuttgart to interview Reams about this murder, but about the other matters. When he started talking about these we flipped the tape over and took a new interview. (T. 680, 681) This was the second statement Reams gave us about this. He said that at this point that what he was about to tell us was the truth this time. Goodwin told him that he needed money for graduation. He was going to graduate in a few days and that he needed money to get his graduation stuff. Goodwin had an idea of how to get a lot of money but they would have to rob a teller. Goodwin said that they could get a lot of money that way. He said they planned to go out after it became dark that night. In the meantime they watched movies and sat around the house until that time of evening. They watched the movie, Lethal Weapon. They then walked to a building nearby which was in the process of being torn down and sat there and

ciii

1139

Respondent's Exhibit E

waited. (T. 682, 683) They waited for someone to pull up to the teller machine. At this time Mr. Reams said that he had the gun because he had pockets in his pants where they could carry the gun. While they were waiting for a vehicle to pull up or when the truck had pulled up, he told Goodwin that he did not have the guts to pull the gun on anyone, so he gave the gun to Mr. Goodwin. When the truck pulled up and Goodwin got the gun, Reams said they went across the street to where the truck was pulled up to the teller machine. He said Goodwin walked behind the truck up towards the driver's door and that Reams went around the teller machine so he could come out in front of the truck. Reams said that as he was going around the teller machine he heard Goodwin tell the individual that this was a robbery and for the individual to give Goodwin all his money. He also heard this individual in the truck, "What the fuck do you want?" Just as he was coming around the teller machine he heard the gunshot. Reams said he then ran up to the driver's door of the truck, looked in and saw the victim's head fall slowly to the steering wheel as in slow motion. Alford had already taken off running. Reams said he stood there for a good minute before he took off running behind Goodwin. When he caught up with Goodwin around the railroad tracks he asked him why he shot the man. Again Reams stated that Goodwin said he shot the man because he asked him, "What the fuck do you want?" Reams said that Goodwin told him not to tell anyone and that if he did he would kill him. (T. 684, 685) Reams said that he believed that Goodwin would kill him and that Goodwin was a real villain.

Reams said that they then went to Goodwin's house where Reams washed his face and Goodwin changed clothes. Reams then went home from there. Reams said that he might have left his fingerprints on the steering wheel because he did reach in and touch the steering wheel. He also stated that he reached in and pushed the man's head. He repeated three or four times that

civ

Respondent's Exhibit E

the man just would not move. (T. 686, 687) Alford later told him that he had put the gun under a bucket in his back yard by a fence.

He stated that the gun initially had four bullets in it. He stated he had put the bullets in the gun and set the gun to where if you pulled the trigger, it would fall on an empty cylinder. Reams said that he was dressed in all black with a black and silver baseball cap. Alford Goodwin was wearing some sort of pants and a gray hooded sweatshirt. Goodwin is four or five inches taller than Reams. (T. 688, 689) We also asked Mr. Reams about an attempted robbery at the same teller machine on the 28th of April, the same night that the burglary occurred at the Pine Bluff cleaners. A Mr. Gilbert, a student at UAPB from Crossett, Arkansas was the victim of that attempted robbery. Reams told us that he thought Alford had tried this kind of a robbery before but he did not say that Alford committed that aggravated robbery. (T. 689, 690) Reams also said that Gary Turner was probably not the first person that Butterball had killed. He stated several time that Goodwin was a villain and had probably killed people before. (T. 691)

* * *

TERRY ADDISON, a witness called by and on behalf of the state, testified as follows:

I am a detective with the Pine Bluff Police Department. I am the lieutenant, the head of the swing shift from four to twelve. I had occasion to interview Kenneth Reams in connection with the Gary Turner murder on May 11 in Stuttgart. (T. 698, 699) This was somewhere between 9 and 10 o'clock at night. I had transported Reams to Stuttgart. Our jail here was full. On the way down there he told me some things and I had given him my card and told him that if he wanted to talk to me further about this to have the Stuttgart police call me. The next day the Stuttgart jail police called me and I went down there to talk to him about some incidents that he

1141

cv

Respondent's Exhibit E

6824

was involved in. He started out telling me that he had pulled a burglary in which he had stolen a

pistol and some coats and other things from Pine Bluff Dry Cleaners. He also told me that he

pulled a robbery with that weapon at the Greyhound bus station. After talking about those

incidents he said, "And I didn't shoot this man at the teller machine." At that time we concluded

that interview and started another one with me, him and detective Phillips on that incident.

On May 12 Kenneth called me collect. He said he wanted to talk to me again. I went to

Stuttgart and brought him back to Pine Bluff where we had an interview. He told me about some

robberies including the robbery and homicide of Gary Wayne Turner at the ATM machine. He

also told us about another attempted robbery at this same machine on a different day. Involved in

this robbery were Alford Goodwin, the defendant and a young man named Curry. I believe the

victim of this attempted robbery was named Griffin. On the 11th he told us that he did not know

anything about the first ATM robbery of Curtis Gilbert. He stated that Alford had done it but that

Alford had given him no details of it. (T. 700, 701) He said that Alford did not tell him very

much about it. However, when I spoke to Reams on May 12 he told me that he did participate in

that one after all. In fact, he said that he had the gun during that one. They didn't get any money

from Gilbert in that one. Gilbert had no money on him and he just floored the car and drove off.

He said that the gun used in that robbery was the one that he got from the burglary. (T. 702, 703)

It was a .32, which was the same gun used in the aggravated robbery at the bus station. One

thing in particular about the gun is that the serial numbers have been scratched out on it. When I

first asked Reams about it, he blamed Alford for it but then admitted that he had scratched the

numbers off, himself. He said he scratched them on the concrete. First he told us that Alford shot

the man at the ATM but later said he really couldn't say who did it because he was not there. He

cvi

1142

Respondent's Exhibit E

said that he was glad he got caught because if he had not been cau_ ..: he would have gone on a crime spree. He said he wished he could go to the man's funeral and that he was sorry about what happened. He said he tried to straighten up once before and just didn't make it. He started off one of the statements with the statement that it was the truth and that the other was lies. (T. 704, 705)

\* \* \*

RON ANDREJACK, a witness called by and on behalf of the state, testified as follows:

I am a firearms tool mark examiner with the Arkansas State Crime Laboratory. (T. 709, 710)

TRIAL COURT: Mr. Andrejack is qualified as an expert in firearms examination with no objection from the defense.

MR. ANDREJACK, continuing: I had an opportunity to examine a firearm and a bullet in regard to the Gary Turner case. The firearm was a .32 caliber H & R - Harrington & Richard - revolver and a discharged lead bullet. State's exhibit #9 is the weapon. (T 711, 71: State's exhibit #17 is the bullet submitted by the Pine Bluff Police Department. These two pieces of evidence were submitted to my office to determine whether or not the discharged bullet was fired from this gun. As a result of my examination it is my opinion that this bullet was fired from this gun. The serial number was pretty well obliterated by being sanded or filed somehow. I could make out four of the numbers but no more. Berwin L. Monroe the chief of the firearms section of the Crime Lab also looked at this and agreed with me that this bullet was fired from this gun. Mr. Monroe did the initial examination but he is hospitalized right now. I therefore did the test again. (T. 713, 714)

cvii

1143

Respondent's Exhibit E

DEPUTY PROSECUTING ATTORNEY: Your honor, the state rests.

(ABSTRACTOR'S NOTE: The following occurred in chambers out of the hearing of the jury.)

DEFENSE COUNSEL: I move at this time for a motion for directed verdict asking the court to find that there has not been sufficient proof of the indifference to the value of human life as defined by Arkansas law to find that this case should be submitted to the jury on the question of whether my client should be subjected to the death penalty. I almost feel that this argument is a bit premature but the defense needs to know how the court feels about the issue based on the state's evidence before I can determine how the defense is going to proceed from this point forward. I know that the court is not bound by a federal district judge but the opinion written by Judge Eisele in the Barry Lee Fairchild matter is quite exhaustive in its discussion on this particular issue. (T. 715, 716) In that opinion it is held that the Eighth Amendment prohibits cruel and unusual punishment which occurs if the state seeks the death penalty where the defendant did not act with reckless intent. The intent in this case is extreme indifference to the value of human life. At this point we don't know except from the statements that have been read into the record from the detectives from my client any of the particulars of how the crime may have been committed. The prosecution may attempt at some point to show that there was conflicting statements but my contention is that they cannot prove a positive by using negatives. There has been no proof that my client or the other individual involved acted with reckless indifference to the value of human life. In fact the only proof before the court is that my client indicated he had gone so far as to attempt to fix the gun so that it would not fire and that no one

Respondent's Exhibit E

would be injured during the course of this aggravated robbery. The second factor that I would ask the court to look at is that from all the evidence so far, particularly the statements given by my client, indicate that there was no death intended. The reckless indifference has been defined as a lot more severe than just simple negligence. I know that there is always an argument that any time you take a firearm into the commission of a felony that there is a chance that death would come about, but even that issue is discussed in quite some detail by Judge Eisele.

So for that reason I would ask the court to hear two motions. One motion is for a directed verdict on the charge of capital murder altogether. In the event that motion does not pass muster with the court I move that the court find that there is no basis on this evidence submitted thus far to submit this case to the jury for them to even consider the death penalty as within the realm of possibility. (T. 717, 718) If my first motion is not granted I move in the alternative that the court bar the state from seeking the death penalty.

DEPUTY PROSECUTING ATTORNEY: I have read the Eisele opinion also. The very case that Judge Eisele cites is the *Tyson* case from the Supreme Court. They talk quite a bit about circumstances manifesting extreme indifference to the value of human life and those are the very kind of circumstances we have in this case. They are such things as the planning of a robbery as opposed to being part of a rape, whereas Mr. Fairchild might not have had reason to know that a gun would be involved in a rape, a gun is almost an inherent part of the robbery. Judge Eisele discusses the circumstances that are likely to result in the loss of innocent life even absent an intent to kill as the basis for imposition of the death penalty. I would submit that the factors we have shown through Mr. Reams' own statements are that they planned this, that Reams actually loaded the gun and transported it there, and provided it for the robbery to even take place. They

cix

1145

Respondent's Exhibit E

sat there and waited for someone to come along. In some of the cases discussed by Judge Eisele it was said that the defendant knew the accomplice was going to kill and had no intent to interfere. Mr. Reams in this statement made several references to Mr. Goodwin as being a real villain and no telling how many people he had killed besides Gary Turner. He knew exactly the type of person he was dealing with. (T. 719, 720)

I also think that this argument might be premature at this point. Judge Eisele's argument is directed at the penalty phase of the trial and not at the guilt phase. This argument goes to the affirmative defense of capital murder. Reams' providing of the murder weapon and the loading of it would qualify and sufficient indifference to the value of human life at least in order to submit the case to the jury at the guilt phase of the trial.

TRIAL COURT: The court is of the opinion that the proof adduced to this point is sufficient for reasonable minds to conclude beyond a reasonable doubt that the elements of the crime of capital murder have in fact been prove. I am going to deny the motion for directed verdict as to capital murder at this point. As to the motion concerning the punishment that will need to be renewed should be get to that point. (T. 721, 722)

KENNETH REAMS, the defendant, testified in his own behalf as follows:

I am Kenneth Lynnord Reams. I am eighteen years old. I grew up in Pine Bluff, Arkansas, until the 8th grade when my family moved to Forrest City, Arkansas. There came a time when I had to leave Forrest City. When I was sixteen I had gotten in some trouble in Forrest City and I told my mother that I felt that I was about to start getting into a lot of trouble. She and I made the decision that I would go live with my aunt in Poplar Bluff, Missouri, to avoid getting in a lot of trouble in Forrest City. I started running with a lot of friends who were doing bad

cx

1146

Respondent's Exhibit E

things. (T. 723, 724) I lived there about a year or two. I then went back to Forrest City. The last grade I completed was the 10th grade. I had attended school in both Forrest City and in Poplar Bluff. While I was in Missouri I was placed on probation for burglarizing some places there. I then left Forrest City and came to Pine Bluff to stay with another aunt. (T. 725, 726) I have known Alford Goodwin from grade school. I met him when my family would come to Pine Bluff to visit. When I first came to Pine Bluff I had in mind to change my life. I thought I would get a job and try to get my GED. At that time I did not want to run into any of my old friends and I tried to avoid them. I got a job working for Ace Construction Co. and I was going to go to a GED class. After two or three weeks of being here I ran into Alford and some of my other friends and I started doing things with them and I quit my job. Alford lives about two blocks away from my aunt. He was in Pine Bluff High School at that time and working for the United Postal Service. I started spending the night at his house, drinking and smoking marijuana, partying and things like that. (T. 727, 728)

I am presently living at the Arkansas Department of Corrections serving a forty-year sentence. I pleaded guilty to two counts of aggravated robbery, one count of burglary and one count of theft of property. The burglary and theft of property occurred at the cleaners that has been discussed earlier. One of the aggravated robberies happened at the bus station here in Pine Bluff and another happened at the teller machine here in Pine Bluff located at 5th and Chester. That aggravated robbery at the ATM machine occurred a bit less than a week before the matter for which we are here today occurred. Alford Goodwin also pleaded guilty to that aggravated robber. He pleaded guilty to the charge I am on trial for today also.

On May 5 at around seven or so I was at Alford's house. We had been watching a movie

cxi

1147

Respondent's Exhibit E

6830

Lethal Injection, I mean Lethal Weapon. We had also been talking. He told me that he needed

some money. I offered to loan him some but I didn't have enough. Earlier he had come to my

house at about 4 p.m. and we had gone to his sister's house where we had drunk a little beer with

his sister. We actually drank with his sister's boyfriend or whatever. We also smoke some

marijuana with him. (T. 729, 730) Alford and I had already attempted to rob someone at this

teller before and Alford wanted to try it again. He needed the money to pay off his graduation

thing. The house that I stayed at and Alford's house was not very far from this ATM machine. I

told Alford that I would go with him when it got dark.

It started getting dark about 8 o'clock. The movie went off and a basketball game was

coming on. Alford then went in his room, changed clothes and retrieved the pistol that belongs to

me. I got this pistol from the burglary of Pine Bluff Dry Cleaners. It is the one that has been

introduced into evidence today, a .32 caliber revolver. (T. 731, 732) I had given the pistol to

Alford about a week before and I did not see it again until this evening when Alford brought it

out. We started walking towards the teller machine. As we were walking he gave me the pistol

and told me to hold it so he could turn his hooded sweater inside out. At that point I unzipped

my jacket, put it down my pants and zipped my jacket up and we kept walking. I had on a black

Nike suit. It is a warm-up suit type thing. Alford was wearing the gray colored sweatshirt and a

pair of green blue jeans. When we first reached the teller machine we went between this alley and

came out by this vacant building. As soon as we got to the building we saw a minivan pulled up

at the ATM machine. I had the pistol at that point, and I told Alford let's go rob this guy now.

He said no, let's wait. That person drove off and we sat down on the curb alongside the building.

At that point I took the pistol out of my pants and started rubbing the bottom of the pistol on the

cxii

Respondent's Exhibit E

concrete trying to scratch the serial number off. (T. 733, 734) I thought if anyone ever got caught with it they wouldn't be able to trace it back to the owner, whoever that was. It had three bullets in it. I know because after I got through rubbing it on the concrete I opened it and saw that it had three bullets. I sat the pistol so that when you pulled the trigger it would hit an empty shell. I tried it and it actually worked. I told Alford that I would not be able to pull the pistol this round. He said, "Ain't no problem. Give it to me." So I gave it to him. He put the pistol in the inside pocket on his hooded sweater. He saw me try the pistol and heard the hammer fall on the empty cylinder. We then heard someone pull up to the teller machine. He said let's do this person, let's rob him. Alford went up on the driver's side of the truck. I went around the teller part of the truck. (T. 735, 736) There was not enough room for both of us to go where Alford was going. I came around the teller machine. I could hear Alford and the man talking but I really couldn't make out what they were saying. At this point I had come all the way around the teller machine. I jumped through the window. I reached my arm through the window and as I was trying to turn the key off the man touched my hand. I did this because while Alford and I was sitting there, I told him that I wasn't going to pull the gun. I was going to reach in and turn off the switch because the last person we tried at the machine drove off. I was going to turn it off so that wouldn't happen again. Alford was at the edge of the window towards the tail of the truck. I did not hear any more conversation at this time. (T. 737, 738) When the man touched me on the hand, I heard a sound like a firecracker. At the time I did not know what happened. As I raised up out of the truck the man's head hit my shoulder. I looked around and I didn't see Alford anywhere. Then I looked back at the man. His head hit the steering wheel and he was making sounds like uh, uh. I got paranoid and stuff and started sweating. First I though I would run over

cxiii

1149

Respondent's Exhibit E
6832

to the Econo Lodge and call the police but then the traffic and stuff started coming and I got

scared. I just took off running. At first I didn't see Alford anywhere. Eventually I saw him

running down the tracks. I ran and caught up with him behind Smart Chevrolet. I asked him

what happened. He said, man I shot the dude. I said, why did you shoot the dude? He said I

shot the dude because he told me, he said, "What the fuck do you want, nigger?" like that.

 We then kept running to Alford's house. He then took the pistol out of his pants and put it

up under his bed. I went to the bathroom and washed my face because I had been sweating.

Alford changed his clothes. I then went back home and took off my clothes, put them in a sack

and told Alford's sister to give them to his nephew. We then went to Alford's brother's girlfriend's

house who lives across the street on Elm and stayed there all night. We decided that if the police

asked us anything about this that we would say that we were there all night until 12 or 1 o'clock.

(T 739, 740) When we going over to this ATM machine we never discussed killing anyone. (T.

740, 741) I fixed the gun the way it was so as to guard against a bullet actually being fired. I

though if it was one that had a lemon squeeze trigger that would be a guard against that. It was

not my intention that anyone would die. I didn't leave town because the way I looked at it, I had

not killed anybody. I did not think that the police would charge me with murder because I wasn't

the person that pulled the trigger. At that time I did not know about this accomplice stuff. The

next day Alford got off work around 3 and came to my house about 4 or 4:30. He told me the

man had died. I asked him what he had done with the pistol and he said that he had taken care of

it I did not know where he had put the pistol. (T. 741, 742)

 I later gave some statements to the Pine Bluff detectives who have testified about this

matter already. When we were first arrested and taken to the old Pine Bluff Police Department I

cxiv

1150

did not give a statement. When the Pine Bluff police first questioned me at the station I was initially telling them that I didn't know anything about any of this, that I had been at Alford's brother's girlfriend's house on that day. They kept on questioning me and telling me that my friend had already told them this, that and the other. Then about 11 o'clock at night they said all right, we will do it like this. If you take a lie detector test and pass it then we will let you go. We will ask you whether you killed this man or if you knew this man was going to get killed. I remember talking to them in Stuttgart. I did not tell them in the Stuttgart county jail that we were going to get a bag of weed from a dope house. The officer had given me a card and told me to call him if I wanted to talk to him about any of this. I tried to call him but the Stuttgart authorities would not let me. About 9 o'clock that night the detective came to the Stuttgart county jail and started asking me questions. They pulled out a tape recorder and a little microphone and told me that no one was going to believe the statement that I had already given. They told me that I might as well go ahead and tell them the truth and that my friend had already told them the truth. Then he went on talking to me about some burglaries that had happened and the robbery at the ATM machine I started crying at that point and finally I told them all right, I'm going to go on and tell you the truth. And then I said, "I ain't killed that man." So then he said hold up and flipped the tape over He told me to tell them what happened and that's when I started telling them that me and Alford had gone there to pull a robbery and all that stuff. (T. 745, 746) I told them that when we went up there to pull this robbery and stuff that it went wrong, that a man got killed. I did not know he was going to get killed or anything. I didn't know this was going to happen. I am sorry that it happened and everything. I have told the truth here today. (T. 747)

CROSS-EXAMINATION

1151

cxv

Respondent's Exhibit E

I stole the pistol and I gave it to Alford that night that we were at the Super Stop. It was a few days after I had stolen the pistol. (T. 747, 748) The day the pistol was stolen was the 28th but the first robbery of the ATM machine was not on the 28th. It was two or three days after I had stolen the pistol.

DEPUTY PROSECUTING ATTORNEY: So the police department is incorrect whenever they took a statement from the victim in that case where he said it had happened on the 28th?

DEFENSE COUNSEL: I object. She is asking the witness to speculate. He wasn't there when that statement was given, your honor.

DEPUTY PROSECUTING ATTORNEY: Your honor, I just wanted to know if they were incorrect. That's all I'm asking him.

TRIAL COURT: If he knows, he can answer. If he doesn't, he doesn't.

KENNETH REAMS, continuing: After I stole the pistol from the place we did not do the robbery until two or three days later. I don't understand what you are saying when you asked me whether all the days run together. I did not pull the pistol at the first robbery. Alford had the pistol during the first robbery. The reason I told the police officers that I had pulled the pistol was because I didn't want to say Alford did all that stuff. (T. 749, 750) This was because Alford had told me the night of the murder that if I tell the police anything that he would shoot me, too. That's why I did not want to say that Alford had done these things. I did have the pistol when the Greyhound bus station was robbed on the 29th. I think that was the same day that I gave the pistol to Alford. That robbery was in the morning and I gave Alford that pistol that night. I had possession of the pistol during the first ATM robbery but I did not pull it. Before we went to go

cxvi

1152

do this robbery I gave the pistol to Alford. I had it at my house before that. (T. 751, 752) It was Jermaine Brown's idea to rob that first ATM. He was supposed to go with us but he was not around when we went up there.

No one was with me when I robbed the bus station. When I first went in there I was just going to buy a ticket to go to Little Rock for a concert. There was no one in there. I saw a lady counting some money. At that point I decided I was going to rob her. I went out the back door of the bus station, pulled the pistol out and told her that this was a robbery. I told her to get on the floor and asked her where the money was. She said it was in the cash register. I got the money from the cash register and took off running. I ran home. When I got home I put the pistol in my aunt's bedroom. I pulled the money out of my pocket and started counting it.

When I worked for Ace Construction Co. I would go to work every morning at about 8 o'clock and get off work about 4 in the afternoon. (T. 753, 754) I quit working about a half a week before I did the burglary. Alford carried the gun to the robbery murder we're talking about here. It was right behind Smart Chevrolet three or four blocks away that he gave me the pistol to hold while he was switching his hood inside out. He had been carrying a pistol inside his hood. I told the police that I was carrying the gun because my pants had pockets that were better for carrying a gun because at the time I was scared and I just wanted to tell the police something so they would quit harassing me and hitting on me and things. Yes, they hit me all over. One of them slapped me, one of them grabbed me by the neck and one of them kicked me in the stomach with their boot. Some of the things I was telling them were true and some of the things were not true. The policeman had taken his pistol out of his holster and I thought they were going to start beating me up again. I told them what really happened so they wouldn't beat me up again. (T.

1153                          cxvii

Respondent's Exhibit E

755, 756) The police did not beat me at the Stuttgart county jail. They beat me in Pine Bluff at the police department. When they came to the Stuttgart county jail they had taken their guns off and everything and that's what they did before they beat me up at Pine Bluff, so I thought they were going to start doing it again and that's when I started telling the truth. I did not call them. I asked the jailer if I could call but he would not let me out. I don't know if the jailer called. Someone called, but I didn't do it. I wanted to talk to the police. I had gotten mad at the jailer. I went to sleep about 9 or 10 o'clock that night and they woke me up and told me that the police said they wanted to talk to me. I was mad at them because I wanted to talk to the police and they wouldn't let me call. They did not ask me anything about the murder to begin with. They just talked about the robbery at the ATM machine, the robbery at the bus station and the burglary. They told me if I would tell them the truth they would try to help me out. They said that the next day they were going to ship me back to Pine Bluff. (T. 757, 758) I did not make the statement that I was standing over on the other side of the parking lot whenever I heard Alford shoot at the Stuttgart county jail. I made that statement at the State Trooper headquarters the night they took me to Stuttgart. (T. 759, 760)

DEPUTY PROSECUTING ATTORNEY: I will read you this part of the statement. "Which man are you talking about?" "Mr. Turner." "I don't know. I can't think of his first name right now." "This was at the teller machine there at 5th and Chestnut." "Yes." "Who was there when this happened?" "Nobody but me and Alford. I was walking across the other side of the parking lot. I ain't had no idea nothing like this was going to happen." Did they just throw that line in?

DEFENSE COUNSEL: Your honor, I object. There is not a question anywhere in this.

cxviii

1154

If she is going to read the statement and testify I would like to be able to cross-examine her. She is not asking any questions.

DEPUTY PROSECUTING ATTORNEY: I just asked my question, your honor. I asked him did they just throw that last line in there?

TRIAL COURT: I think what she was doing was asking if he in fact made those statements during the tape recorded statement concerning the first ATM robbery. The question was, did he in fact make these statements at that time? That's the way I interpret it. It was a statement that was taken concerning the first ATM robbery when the gratuitous statement was thrown in about the second one.

KENNETH REAMS, continuing: I made that statement but it was not at the Stuttgart jail. It was at the headquarters office. (T. 761, 762) I know where I was when I made these statements. I could not hear what Alford and the man were saying to each other. After I reached in and turned the ignition off and came back up out of the truck Alford was nowhere around. I stayed there for about thirty seconds. I do not know which way Alford ran. I ran the way I ran. Alford told me that the man asked him, "What the fuck do you want," or, "What the fuck do you want, nigger?" (T. 763, 764) Although that statement might not be in some of the statements I gave some of the police in here, that is what he told me. It is not correct as I said on one of the statements that I took off behind Alford. I ended up catching up with him but I didn't know where he went. (T. 765, 766) The statements that the police have transcribed are not all inaccurate. Some of the things that they said on the tape is true and some of the things they left out. If you were to play the tape you can hear exactly what I said. I took my clothes off after the incident in case the police were out later that night looking for people dressed in those clothes.

1155

cxix

A lemon squeeze trigger is a term that people use for a gun with a trigger that will go off if you just barely touch it. (T. 766, 767) I have just heard people talk about that. I have never seen one of those things. I am not particularly familiar with pistols. I thought that I set the pistol so that if the trigger were pulled it would hit an empty shell. I did this because at this point I though I was going to be the one to pull the pistol. If I were to pull it back and if it had one of these lemon squeeze triggers then it wouldn't fire a bullet. It would hit an empty shell and no one would get shot. I thought about the possibility that somebody would get shot. (T. 768, 769)

(ABSTRACTOR'S NOTE: The following occurred in chambers out of the hearing of the jury.)

TRIAL COURT: The defense has offered a lesser included instruction on aggravated robbery along with a transitional instruction that tells the jury if it has a reasonable doubt of the defendant's guilt on the charge of capital murder they will then consider the charge of aggravated robbery. Counselor, do you have any law on this instruction?

DEFENSE COUNSEL: Your honor, I don't have a case that I can hand you. I'm just trying to cover my record.

TRIAL COURT: Certainly. I am going to hand them to the court reporter and the court will decline to give those instructions over the objection of the defendant. (T. 770, 771)

DEFENSE COUNSEL: When we go back into the courtroom I will announce that the defense rests. I would like the record to reflect now that I have renewed my motion for directed verdict.

TRIAL COURT: The record will so reflect. You have renewed your motion for directed verdict as to capital murder. We need to now take up the defense motion concerning whether the

cxx

6839   Respondent's Exhibit E

proof is sufficient to warrant instructing the jury on capital murder.

DEFENSE COUNSEL: With regard to the first part of my motion and the second part I stand on the cases that were cited by Judge Eisele and it is my contention that reckless indifference has not been proven in this circumstance that would justify submitting the case to the possibility that the death penalty would be considered.

TRIAL COURT: The court will deny the first part of your motion that the jury not be instructed on capital murder during this phase of the trial. As to whether or not it is sufficient to warrant the death penalty I am still mulling that over in my mind. I will most likely want to reread Judge Eisele's opinion. I reserve the right to grant your motion notwithstanding the jury's verdict in that matter if we haven't finished all of that when the jury is finished with their deliberations. (T. 772, 773) The instructions for the lesser included offense of first degree murder is virtually identical to the instructions on capital murder. There is no sense in my mind why the legislature cannot make enough of a distinction so that we don't continually confuse juries with giving them identical instructions on two different statutes. The only way to explain that to them and I am not sure it is the court's position or place to do that, is to tell them that it is basically the same crime but that the state treats certain felonies differently than garden variety felonies. Those are my words and not the legislature's. First degree murder is one that happens in the course of any felony. Capital murder is a murder that occurs during the commission of certain enumerated felonies. There ought to be a better way to ease that confusion by instructing the jury just like I did. It can be the same but there is a difference. Certain felonies advance you up a notch on the scale. Anyway I'm not interested in being a trail blazer today. The next lesser included is manslaughter. Have you looked over these, counselor?

1157                              cxxi

Respondent's Exhibit E

DEFENSE COUNSEL: Yes I have. The only thing is I did not catch it. Have you gotten to 1501(A) yet, the associated felon?

TRIAL COURT: Yes, we fixed that. The rest of the definition of robbery was included. (T. 774, 775)

* * *

(ABSTRACTOR'S NOTE: The following occurred in open court in the presence of the jury.)

DEFENSE COUNSEL: As I have previously informed the court in chambers the defense rests.

TRIAL COURT: Any rebuttal by the state?

DEPUTY PROSECUTING ATTORNEY: No, your honor. (T. 780)

* * *

(ABSTRACTOR'S NOTE: Because there are no portions of the instructions to the jury or the closing arguments germane to the issues raised on this appeal, they were not abstracted. After the jury retired to deliberate it returned and the following occurred in open court.)

TRIAL COURT: I am informed that the jury has reached a verdict and it has been passed to me through the bailiff. The verdict form is signed by the foreman and it says, "We, the jury, find Kenneth Reams guilty of capital murder of Gary Turner." (T. 820)

(ABSTRACTOR'S NOTE: The jury was then polled. (T. 820-822) The following occurred in chambers out of the presence of the jury.)

DEFENSE COUNSEL: I would first renew my motion that I made earlier that was probably not timely. Based on the line of cases cited by Judge Eisele I move that this case not be submitted to the jury for their consideration of the death penalty. The basis for this motion is that the proof of intent is insufficient.

cxxii

1158

Respondent's Exhibit E

The second motion I have goes to a request that the jury be instructed pursuant to Ark. Code Ann. §5-4-618 that the defendant has a sufficiently low IQ that he is classified to be in the mild range of mental retardation. According to this statute someone with the IQ of 65 is subject to the court making a finding or it being a finding made by the jury that because of the IQ rating that he should not be subjected to the death penalty but instead be sentenced to life imprisonment without parole. This defendant rated a classification of 66 which is just one point above that cut-off number. It is so close in proximity that I believe it would be a proper submission to this jury for its consideration. I have prepared a special jury verdict form that tracks the statute. Of course the jury would have the option of not finding that to be the case. (T. 823, 824)

(ABSTRACTOR'S NOTE: The following written motion, proffered instruction and special verdict form do not appear in the transcript until much later, but are abstracted here for continuity and ease of reading.)

*Motion To Instruct The Jury As To Allegation Of Defendant's Mental Retardation*
(T. 969, 970)

The defendant moves through counsel pursuant to Ark. Code Ann. §5-4-618. Pursuant to a report dated 28 September 1993 from the Southeast Mental Health Center, a copy of which is in the court's file, the defendant was found to have a WAIS-R Full Scale IQ of 66, which categorizes him in the mild range of mental retardation according to the Wechsler classification system. Therefore pursuant to Ark. Code Ann. §5-4-618 the defendant respectfully moves this court to instruct the jury by a special jury instruction that the jury may find by unanimous determination that the defendant was mentally retarded at the time the commission of the offense of capital murder as charged in this matter and in so doing the defendant would be automatically sentenced to life imprisonment without the possibility of parole. (T. 969, 970)

1159                              cxxiii

Respondent's Exhibit E

*Instruction*
(Proffered by the Defense but Refused)
(T. 971)

Defendant has alleged that he was mentally retarded at the time of committing capital murder because of a low intelligence quotient.

The defendant has the burden of proving mental retardation by a preponderance of the evidence.

The jury may unanimously determine that the defendant was mentally retarded at the time of the commission of capital murder, which will result in the defendant's automatically being sentenced to life imprisonment without possibility of parole. (T. 971)

*Special Verdict Form*
(Proffered by the Defense but Refused)
(T. 972)

We, the jury, unanimously determine that the defendant Kenneth Reams was mentally retarded at the time of the commission of capital murder involving the death of Gary Wayne Turner.

_____

_____

_____

_____

_____

_____

_____

cxxiv

1160

_____

_____

_____

_____ (T. 972)

\* \* \*

TRIAL COURT: This is a 1993 Act. What is the effective date of the Act?

DEFENSE COUNSEL: I think there was an emergency clause on that bill.

DEPUTY PROSECUTING ATTORNEY: Well, if the Act did not have an emergency

clause it would not be effective until August.

TRIAL COURT: Nothing that I have says that it had an emergency clause.

DEFENSE COUNSEL: Well, if it doesn't say it has an emergency clause I would think

that you would have to assume that it does not. (T. 825, 826)

TRIAL COURT: The September 28 report from the Southeast Arkansas Mental Health

Center previously furnished the court by virtue of an order for examination of Mr. Reams should

be put in the record in this matter.

DEPUTY PROSECUTING ATTORNEY: That was Act 420 of 1993.

DEFENSE COUNSEL: I have previously provided some school records from my client's

schools. I would like to seek to introduce those. I have someone on hold in Forrest City. (T.

826, 827) I also have someone from Pine Bluff. The defendant also went through a place for

troubled youth called Sears in Poplar Bluff, Missouri. I had a guy named Mike Moss who was

going to be here from Poplar Bluff and that organization. I would like to introduce these things

without having these people here and would like to know from the prosecution whether they

cxxv

6844

Respondent's Exhibit E

would agree that we could go ahead and introduce those things or will they make me have these people here for a foundation? Mike Moss had a doctor's appointment in St. Louis today and the earliest he can be here is first thing in the morning.

TRIAL COURT: All right. The other deputy prosecutor has retrieved for us a copy of Act 20 of 1993. It does not in fact have an emergency clause. It would have gone into effect ninety days after the adjournment of the legislature which has been computed to be somewhere on or about August 13. The proof in this matter indicates that this crime occurred on or about 5 May 1993. (T. 828, 829) By its provisions, §1(B) talks in terms of a defendant with mental retardation at the time of committing capital murder. It is obvious that the statute was not in effect as of that time. Defense counsel is asking me to so instruct the jury even though this statute was not in affect at the time and even though his client's IQ tested to be 66 instead of 65. The court does not have the authority to instruct in the words of a statute that was not in affect or to instruct outside the range of IQs set out in the statute. I am going to deny his motion as for that instruction. It may be shown as proffered and denied. There is no argument that defense counsel will not be allowed to argue that this client's relatively low IQ is a mitigating factor.

Now I would like to take up the second part of defense counsel's motion of whether the evidence adduced in trial was sufficient to submit to the jury for consideration of the death penalty.

DEPUTY PROSECUTING ATTORNEY: After rereading Judge Eisele's opinion in the *Fairchild* case it is obvious that he relied on the Supreme Court's *Tyson* case. (T. 830, 831) In *Tyson* it was held that one's participation in a violent felony under circumstances likely to result in the loss of life even absent an intent to kill was sufficient to qualify the defendant for the death

cxxvi

1162

penalty. *Tyson* therefore stands for the proposition that an awareness that a killing might be the result of a crime is sufficient to go to the jury for the death penalty. Judge Eisele concluded in the case of *Fairchild* that Fairchild could not have foreseen that the victim might be killed and that he therefore could not be given the death penalty. In this case there is a distinction. We have proven that Kenneth Reams had the gun before the murder and that he gave the loaded gun to an accomplice just before the robbery. This person Reams said he thought had killed some people before and is likely to kill people straight up. That goes to the defendant's state of mind and based on *Tyson* would show that there might have been or likely would have been a killing involved in this armed robbery.

DEFENSE COUNSEL: I will just stand on my original argument.

TRIAL COURT: It appears to me that Judge Eisele's opinion sets forth a foreseeability standard. It holds that if a defendant participates in a crime and it is foreseeable that death or serious physical injury would or could be a likely result, then if testimony is adduced to that affect it would satisfy the "other circumstances involving extreme indifference to the value of human life" element of capital murder. And if that evidence was not there it would not apply. (T. 832, 833) In *Fairchild* there was no evidence that Fairchild was armed or contemplated the use of lethal force. There was nothing to indicate that he contemplated that his accomplice would do anything more than he himself had done.

DEPUTY PROSECUTING ATTORNEY: Your honor, in this case given the defendant's own testimony that he loaded the gun and handed it to the accomplice shows that he had to have contemplated that lethal force would be used.

DEFENSE COUNSEL: If you are going to use his testimony you have to use all of it.

1163                                  cxxvii

Respondent's Exhibit E

His testimony was that he tried to insure that lethal force would not be used. So there is no clarity to it. It is all murky. It is clear from the state's point of view but it is not clear to the defense.

TRIAL COURT: I am not convinced first that Judge Eisele's reasoning is binding on this court or second that this is such a case as Fairchild's. What I am going to do now is to continue to withhold my ruling on this motion until I can finish reading all the cases that have been furnished to me by the defense. (T. 834, 835)

DEPUTY PROSECUTING ATTORNEY: I have no objection to the defense introducing as a package all the records from the various schools his client has been to.

TRIAL COURT: Is there any kind of motion *in limine* concerning the sentence received by the co-defendant? Is there any objection? I am sure that defense counsel intends to inform the jury of that.

DEPUTY PROSECUTING ATTORNEY: My gut reaction is to object to that mainly because Alford is not the one on trial here today.

DEFENSE COUNSEL: Well, the statute goes on to say that the death penalty part of the trial is a lot different from the guilt or innocence phase. (T. 836, 837)

TRIAL COURT: Unless there is a strong argument against it I am going to allow it. I think it is the direction our legislature is pointing to as well as our new enactments. The jury should not know anything but what the rules of evidence provide for in the guilt or innocence phase, but when it comes down to sentencing they ought to know as much as they can about the defendant. (T. 838, 839) What it boils down to in my mind is that it is an element of fairness. Under the circumstances I think that what happened to a co-defendant is something the jury ought

1164

Respondent's Exhibit E

to know. I don't know if that is a mitigating factor but it certainly an element of proof that I am going to let him introduce it for that reason.

DEPUTY PROSECUTING ATTORNEY: Could the record note our objection?

TRIAL COURT: You bet. (T. 840, 841)

(ABSTRACTOR'S NOTE: The following instructions were given the jury before proceedings began in the penalty phase of this trial.)

TRIAL COURT: Ladies and gentlemen of the jury, we will be back in session. You have previously found Mr. Reams guilty of capital murder. As we alluded to during the jury selection process, there is a second phase of this trial which we will now undertake. After hearing additional testimony and argument of counsel, you will again retire to deliberate and decide whether Mr. Reams is to be sentenced to death by lethal injection or to life imprisonment without parole. In determining which sentence shall be imposed, you may be required to make specific written findings as to the existence or absence of aggravating or mitigating circumstances. There are three forms for you to use in reaching your decision. First of all, Form 1 deals with the aggravating circumstances. It lists a number of aggravating circumstances that are specified by law and the appearance of those aggravating circumstances on that form does not mean that they existed in this case. The state has the burden of proving beyond a reasonable doubt that one or more of the listed aggravating circumstances existed. If you unanimously find beyond a reasonable doubt that one or more of these aggravating circumstances existed then you will indicate so by checking the appropriate space on Form 1. If you do not unanimously find beyond a reasonable doubt the existence of any aggravating circumstance, you will cease deliberations at that point and indicate on the verdict form that a sentence of life imprisonment without parole is

cxxix

1165

Respondent's Exhibit E

6848

your verdict.

Now if you do unanimously find that one or more aggravating circumstances exist then you should move on and complete Form 2 which deals with mitigating circumstances. That form lists some factors that you may consider as mitigating circumstances but you are not limited to that list. You may in your discretion find other mitigating circumstances. You are not required to be convinced of the existence of a mitigating circumstance beyond a reasonable doubt. (T. 841, 842) A mitigating circumstance is shown if you believe from the evidence that it probably existed.

Form 2 is divided into four parts. Part A is a list of mitigating circumstances to be checked only if you unanimously agree that a particular mitigating circumstance existed. Part B is a list to be checked where some of you may think that a mitigating circumstances existed but all of you don't agree. Part C is to reflect circumstances of which there has been some evidence that no member feels existed. Part D is to be checked only if the jury concludes that there is no evidence of mitigating circumstances.

After making the determinations required to complete Forms 1 and 2, you will then move on to complete Form 4. In no event would you return a verdict imposing the death penalty unless you unanimously make three particular written findings on Form 3. Those findings are:

First, that one or more aggravating circumstances existed beyond a reasonable doubt;

Second, that such aggravating circumstances outweigh beyond a reasonable doubt any mitigating circumstances that you have found to exist;

And, third, that the aggravating circumstances justify beyond a reasonable doubt the sentence of death. Now if you make those findings, you may impose the death penalty. Otherwise you will sentence the defendant to life imprisonment without parole.

cxxx

1166

Respondent's Exhibit E

After you have made your determination on Forms 1 and 2 and reflected on your

conclusions on Form 3, then you must check the appropriate verdict form on Form 4. Each of

you must sign the verdict form. In other cases only the foreman signs it but in this case each of

you must sign it. (T. 843, 844)

(ABSTRACTOR'S NOTE: The opening remarks of counsel are not abstracted as there
were no objections lodged in either of them and they are not germane to any of the issues raised
herein.)

* * *

DEPUTY PROSECUTING ATTORNEY: Your honor, at this point I would like to

introduce to the jury State's Exhibits Nos. 18 and 19, which are certified copies of the aggravated

robbery conviction of Mr. Kenneth Reams.

DEFENSE COUNSEL: No objection.

TRIAL COURT: Without objection let them be received.

DEPUTY PROSECUTING ATTORNEY: The case number on State's Exhibit No. 18 is

93-300 and on No. 19, 93-299.

Ladies and gentlemen of the jury, as I told you in my opening remarks we were alleging

two aggravating circumstances. One of them was that the murder was committed for pecuniary

gain. There was testimony introduced here today even from the defendant himself that the

purpose of this particular robbery was in fact to get money. That is what the pecuniary gain

aggravating circumstance is. (T. 849, 850)

The other statutorily set out circumstance we are alleging that we have shown here with

the certified copies of the aggravated robbery convictions is that Kenneth Reams previously

committed another felony, an element of which was the use of the threat of violence to another

person or the creation of a substantial risk of death or serious physical injury to another person.

(T. 851)

DAVID NANAK, a witness called by and on behalf of the defense, testified as follows:

I am the coordinator of psychological services for the Southeast Arkansas Mental Health Center. I am a licensed psychological examiner. I have a master's degree in pre-clinical psychology and to get the license I had to pass the state test. I have been licensed since 1979 and have worked since then with the Southeast Arkansas Mental Health Center. In the course of my employment there I have performed probably over 1,000 psychological evaluations. I have been qualified as an expert in giving testimony in a courtroom before.

TRIAL COURT: On motion of the defense and without objection from the state Mr. Nanak is qualified as an expert in the field of psychological examination. (T. 852, 853)

I have conducted a psychological evaluation of the defendant in this case and brought a copy of my report that was sent to the court earlier. For this evaluation I used a variety of tests. First, I used the Wechsler Adult Intelligence Scale - Revised. It is an intellectual scale that breaks intelligence down into two categories, verbal and non-verbal. We try to get a feel for the intellectual level of the individual. Next I used the Wide Range Achievement Test which is an academic achievement test. I used this test as the two scores should correlate between the intelligence test and the academic achievement test. We look for correlation there. The House-Tree-Person is a projective test that is used to get at personality. The Bender Visual-Motor Gestalt Test is a visual motor test used to rule out organic problems, i.e., brain damage, and also to get at some personality factors. I do a brief interview to look at alertness, orientation and other factors I can use to either verify or disprove test findings. These tests have been recognized

cxxxii

Respondent's Exhibit E

(

within my profession as being qualified standards in the industry, so to speak. (T. 854, 855) On

the Intelligence Scale the defendant tested out in what we call the mild mental retardation range.

His Full Scale IQ score was that of 66. The range for mild mental retardation would depend on

the scale you use. It starts at about 50 and goes to about 70. Sixty-six is a composite of both the

verbal and non-verbal factors that went into what we call the Full Scale IQ based on the Wechsler

system. IQ stands for intellectual quotient. When someone is in a mild retarded range of

intellectual quotient this means that those people are a little bit slower as far as learning and being

able to function. They are not necessarily the quick thinkers. All of the other test I performed

corroborated and were consistent with this finding. I understand that the Arkansas legislature has

passed a law that will come into effect in the very near future that provides that in death penalty

cases an intelligent quotient of 65 is important for the court and the jury to take into consideration

before someone can be subjected to the death penalty. The significance of the number 65 is not

(

known to me. I was told that to make sure the intellectual quotient is given because 65 is the cut-

off for the death penalty. Sixty-five would be in the upper third of the mild mental retardation

range of from 50 to 70. Other than that, I do not know the significance of 65. (T. 856, 857)

There is a standard error of measurement built into most of the psychological tests. On the

Wechsler the standard of error of measurement runs about 7 or 8 points. Again, that is with

different scales. The legislature might have chosen 65 to give the benefit of the doubt picking a

little bit lower into the scale so that just in case they did happen to guess right on a few or wrong

on a few 65 would give them a few extra points to make sure that they were dealing with a

mentally retarded individual. According to my report the defendant said that he had never held a

full-time job or had a driver's license although he was capable of driving a car and did drive some.

1169

cxxxiii

(

(T. 857, 858)

On the second page of my report I drew some conclusions from the defendant's House-Tree-Person drawings. "Emotionally immature individual with poor self image. Feelings of instability and ineffectiveness. More of a self-centered approach to life. Some underlying anger and frustration that could increase the acting out or explosive behavior." Further down that same page I made the following conclusions. The behavioral section, "emotionally immature individual, problems with impulse control, low frustration tolerance. There is underlying anger and frustration which increases acting out potential in an explosive manner." In the last paragraph I indicate that there is some impairment in common sense reasoning. "Common sense reasoning and judgment appear to be limited; however, he was able to express the difference between right and wrong. He did express some remorse over his situation he is currently involved in."

There are some factors built into this kind of testing to detect evasion and untruthful answers. I feel that the results of this evaluation are valid. (T. 859, 860)

CROSS-EXAMINATION

I did not test on 27 September 1993. The cut-off range as far as retardation would be an IQ of 70. Sixty-nine is mild retardation, 70 is borderline retardation. Borderline is not considered retarded. (T. 860, 861) The defendant functioned at an IQ of 66 which is mild retardation. (T. 861, 862) He was able to express the difference between right or wrong. Generally when people are retarded, we find that the repetition increases learning. When a retarded person is able to perform an action that would be something someone would do only at a higher level, it is because he has repeated that action. (T. 862)

REDIRECT EXAMINATION

cxxxiv

1170

Respondent's Exhibit E

My report and findings were made in September, a four or five month gap after this act occurred on May 5. I feel that the defendant would have been functioning with the same intelligence quotient at the time. I am not aware of any intervening variables that would have changed it. (T. 863)

* * *

REVEREND GEORGE MCDANIEL, a witness called by and on behalf of the defense, testified as follows:

I am a minister and the pastor of Central Baptist Church, Poplar Bluff, Missouri. I have been there for seven years. Kenneth Reams was a member of that church. He started coming to Central about two months after I got there and he came religiously. I think at the time he was sixteen or seventeen years of age. This would have been in 1992. I had not known him or any member of his family prior to his attending the church. (T. 865, 866) I never had any problems out of Kenny. He would come to me and we would talk about life from time to time. He left the church when he left and came home. He was there for about a year. He was on our usher board at the church. He was particularly close to Sister Jenny Mack who was the mother of his girlfriend. While he was in Poplar Bluff he encountered a problem with the law and was placed on probation. I was aware of that . He spoke to me about that problem. I was not aware of his using alcohol or marijuana while he was in Poplar Bluff. I have seen Mr. Reams' drawings and I thought they looked good. He did some drawings for the church. (T. 867, 868) I never saw a violent or disrespectful side of Kenny Reams. He was never disrespectful around me. I never noticed him acting out in any church function. While he was in Poplar Bluff he lived with an aunt, Amelia Reams, another member of the parish.

cxxxv

1171

I can say to this jury that Kenny is a good young man and he has always been respectful to me. He has qualities and I don't think that he is hard-headed. I have been able to observe younger people who have problems but grew out of those problems as they matured and got older. No one can predict but I feel that Kenny will grow out of his problems. I feel that from my heart. Because of what he has been through, he could influence some other young person not to follow down the same path that he has. I think the thing that he has been through would help a lot of young people that need help. (T. 869, 870)

CROSS-EXAMINATION

I did not say that Kenny was never in any trouble while he was there. I know that he was in the Sears boys home while he was there. I knew him approximately one year. I got there in November of 1991. I cannot give you a date of the last time he was in my church because people come and go all the time. I can say that when he came back to Poplar Bluff he would always come by and see me. (T. 870, 871) I would have to get the records of the church to say how long it has been since he was there or to tell you the last time the defendant was in church. I was not aware of his having been placed on probation for stealing in September of 1992. I was not aware that he absconded on his probation. I know that he left Poplar Bluff. I did not know that there was a warrant for his arrest for absconding on his probation. I also did not know that there is another warrant dated 15 March of this year for a burglary and theft of property in Missouri. (T. 872, 873)

BEATRICE WHITESIDE, a witness called by and on behalf of the state, testified as follows:

I am the mother of Kenneth Reams. I have two other children. We all live in Forrest City,

cxxxvi

1172

Arkansas. My husband is Scott Whiteside and I am thirty-eight years old. I do not now work outside the home. In the past I did work outside the home in personal care aid for the Forrest City Health Department. I did some sitting in people's homes and that type of thing. I grew up in Altheimer. We left Pine Bluff when Kenny was in the 5th grade. (T. 874, 875) We moved to Utomwa, Iowa which was a place we felt there would be less crime to bring up our family. My husband had a job opportunity there. We stayed there for about six months and then moved to Forrest City, and we have been there ever since. He was everything a mother could ask for.

He was never disrespectful to me. When he got to a certain age when he was a teenager some problems developed that we thought it would be good for him to go live with his aunt in Poplar Bluff, Missouri. He started changing. I felt like his friends had a lot to do with it, the crowd he hung out with. He was easily influenced by other people. I tried to get some sort of help for him, something like counseling or other doctor's care. (T. 876, 877) It was a very difficult decision to have him to live with my sister in Poplar Bluff, Missouri. I would call and talk to him on the telephone and he would write me letters. I never went up there and visited him while he was living there. I had transportation problems and still do. I was aware that he was convicted of burglary in Missouri and was sent to the Sears Youth Home. I did not visit him there but I did talk to some of his counselors there. I saw some type of good change come out of Kenneth after having been in the Sears youth home.

Kenny has always had artistic ability. He was always drawing even when he was very small. I have encouraged him to get some instruction in this area but I don't know if he has ever received any. He was never mean or cruel to his little brothers. I could always trust him to watch the kids at home if I needed to go to the store. (T. 878, 879)

cxxxvii

1173

Respondent's Exhibit E

If the jury finds that Kenneth is going to spend his time in the penitentiary I feel that I and the family will be able to visit him there. That opportunity to visit would be something that I would cherish. When Kenny was younger he was very slow. He has always been short. He is 5'4" tall. He has been taken advantage of because of his size. He seemed to have always had to fight more often and harder because of his size. Smaller men have to actually fight more often and harder. He complained about this when he was in high school. He used to talk to my older sister Amelia Reams when he had problems. Knowing about my son's talents and abilities, I think that he would be productive while in the penitentiary. (T. 880, 881)

When Ken left to come to Pine Bluff he was not coming to stay. He was coming to visit my sister. He was here during January and February before he started having these problems that led him to these convictions. I really did not know anything about these problems with the law here in Pine Bluff. It is all new to me. I believe that Ken is worth society keeping around and I am asking the jury to do that. (T. 882, 883)

CROSS-EXAMINATION

I did not know what was going on with Ken until he was arrested and I was called after that somewhere around May the 10th of this year. I have not come to visit him since that time. He lived with me all of his life except for about two years. I am not sure about the dates. I have been through so much I just don't know about dates. All I know is that he left home in February and came to Pine Bluff. Before he came to Pine Bluff he had been home for one year. (T. 883, 884) He went to live with my sister in Missouri in April of 1991. It was a decision made by the judge and Kenneth and I. I did not want to make the decision. It is true that the authorities in Forrest City told him not to come back to Arkansas. That is why he went to life with my sister in

Respondent's Exhibit E
6857

Missouri. (T. 885, 886)

AMELIA REAMS, a witness called by and on behalf of the defense, testified as follows:

My sister is Beatrice Whiteside. I am thirty-eight years old. Although Jefferson County is my home, I presently live in Poplar Bluff, Missouri. I will have lived there for four years the last of this month. I do not work outside the home there. I have two sons age nineteen and twenty. Kenneth Reams is my nephew. (T. 886, 887) He came to live with me in 1990, I think. Ken came and told us about his problems at home. He said he wanted to get his life together and straighten up. He was in trouble. I wanted to help. I went back home with Ken and talked to the juvenile authorities there with Ken and asked them if he could come and live with me. I told them I would try to help him out because I felt he was missing some love or some stability or just somebody to show him that somebody cared. I thought he needed someone who loved him and wanted him to do better, to do something different with his life.

I thought that he did all right. He got along with my boys real good like brothers. He was crazy about going to school and never missed school. He lived with me for about two years. At one stretch of time during that period he lived at the Sears youth home. He got to stealing again. He got to messing with some boys and got influenced and started stealing all over again. I never knew him to use illegal drugs like marijuana or to abuse alcohol. I am aware that while he was at the Sears Troubled Youth Center he received counseling for alcohol abuse and drug abuse. I saw him and visited him while he was there. (T. 888, 889) He was at that youth home for about a year. He was placed there by the Missouri court.

I would say that Ken has been easily influenced by other people during his life. When he first came out of the youth center he started going to church and messing around with people that

1175

Respondent's Exhibit E

6858

go to church. He would go to movies and stuff like that. And then there was one time when he was walking and these boys stopped in a car and asked him to get in. The police saw that he got in the car. The car was stopped because the police saw that Ken was in the car and it just so happened that there was some marijuana in it and a case of beer in the trunk. The police blamed it all on Ken and charged him with possession of alcohol and marijuana. That is when Ken got scared and panicked. We tried to tell him that we would stick by him and not let them charge him with those charges. He just got scared and that is why he ran.

I am aware that when he was in Missouri he not only picked up the charges that got him in the youth home but he also had a burglary or a theft of property that he picked up later. He has never exhibited any violent tendencies while he's been in my house. He would pass his time in my house with his girlfriend, listening to music, drawing and going to church. His girlfriend was Lorendo Mack. I think she is a college student at ASU. Ken also developed a relationship with this girl's mother. (T. 890, 891) Ms. Mack was always a nice lady. You don't find too many people like her. She was real good and was always there for us. She is an outstanding person. I think that Ken could contribute to society even if he has to do it behind prison walls. He has made a lot of mistakes in his life and he can contribute to a lot of these young kids nowadays by showing them the road he has traveled and the mistakes he has made. By doing that he might help someone not to make the same mistakes that he has made. (T. 892)

CROSS-EXAMINATION

I tried to help Ken out. I am familiar with his having been placed on probation for burglary and stealing in September of 92. It was for stealing a pager from his probation officer. I understand that he was supposed to have met with his probation officer every month but that he

<center>cxl</center>

1176

did not do that. I was not aware that the state of Missouri has a warrant out for his arrest for burglary and theft from March 15 of this year. (T. 893, 894)

(ABSTRACTOR'S NOTE: The following occurred at the bench out of the hearing of the jury.)

DEFENSE COUNSEL: I move to introduce these exhibits and I will rest at this point. Mr. Caffey is not here and I do want to pursue a contempt citation against him.

(ABSTRACTOR'S NOTE: The following occurred in open court in the presence of the jury.)

DEFENSE COUNSEL: At this time I have no more witnesses to call but I would like to introduce some exhibits, two of which have been agreed to by the prosecution by stipulation. The first one is a certified copies of some records of Poplar Bluff Senior High School of Kenneth Reams showing his grade performance and comments of the teachers during the period of time that he attended school there. That would be defendant's exhibit 2.

Defendant's exhibit 3 is a certified copy of the state of Missouri, Department of Social Services, Division of Youth Services record during the period of time Mr. Reams was committed to and lived at the Sears Home for Troubled Youth.

Defendant's exhibit 4 is a certified copy of the circuit clerk's record of the judgment and commitment of Alford Goodwin showing that he entered a plea of guilty to this charge and received a sentence of life without parole. (T. 895, 896) We have nothing further for the defense.

* * *

cxli

1177

Respondent's Exhibit E

(ABSTRACTOR'S NOTE: Defendant's Exhibit No. 2, certified copies of the records on Kenneth Reams of Poplar Bluff Senior High School, are found in the record at pages 978-1000. This exhibit is abstracted here for continuity and ease of reading.)

DEFENDANT'S EXHIBIT NO. 2
*Records on Kenneth Reams of the Poplar Bluff Senior High School*
(T. 978-1000)

(ABSTRACTOR'S NOTE: These records are not self-explanatory. To the extent they are understandable and relevant to the issues raised herein, they are abstracted. In many cases it is not clear who the author of a report, letter or other document is.

Poplar Bluff Senior High School is an accredited, AAA high school in Poplar Bluff, Missouri. (T. 978, 978)

This record shows that Reams entered this high school in the 9th grade on 8/24/90 and dropped out on 12/6/9 because he was moving. He re-entered again on 1/25/91 and dropped out on 4/24/91, the reason listed being the Sears Youth Center. He entered again on 1/6/92 in the 10th grade and was suspended for the rest of the school year on 4/10/92. He entered the 10th grade again on 8/19/92 and dropped out on 10/7/92, the reason listed as moved to Arkansas, per aunt

Grades listed for him while at the Sears Youth Center between 4/23/91 and 12/17/91 are as follows

| Course | Grade |
|---|---|
| Vocational Preparation | C |
| Life Skills | C |
| Lang Arts (Eng I, Fresh) | B |
| Basic Math (Gen, Funct) | B |
| General Science | B |
| Citizenship | C |
| Basic Skills-Chap 1 | B  (T. 980, 981) |

The next record shows essentially the same information, but with the following grades for

cxlii

1178

Reams in the 8th grade in the 1989-1990 school year.

| Course | Grade for the Year |
|---|---|
| History | D |
| Science | D |
| Math | D |
| English | F |
| Boys PE | S |
| Music | S |
| Enhanced | F |

As of 4/10/92 Kenneth Reams's grades in the following subjects were as follows:

| Course | Grade |
|---|---|
| Civics | F |
| P.E. | F |
| Pre Alg | F |
| Biology | F |
| LA II-4 | F |
| Gen Shop | F |

As of 10/7/92 Kenneth Reams's grades in the following subjects were as follows:

| Course | Grade for the Year |
|---|---|
| Biology Bas | D |
| Art I | C |
| PE | C |
| Pre-Alg | B |
| LA II-4 | F |
| W. Geog Bas | F |
| Drama | F  (T. 982, 983) |

As of 12/6/90 Kenneth Reams's grades in the following subjects were as follows:

| Course | Grade for the Year |
|---|---|
| Civics-Basic | F |
| Phys. Ed. | C |
| Study Hall | E |

cxliii

1179

Respondent's Exhibit E

| | |
|---|---|
| Basic Biology | F |
| LAI-3 | F |
| Basic Math | F |
| Home Econ. I | D- |

As of 4/24/91 Kenneth Reams's grades in the following subjects were as follows:

| Course | Grade for the Year |
|---|---|
| Basic Math - 1 | F |
| Phys Ed | F |
| Study Hall | — |
| Basic Biology | F |
| LAI-3 | F |
| Civics-Basic | F |
| Home Ec I | F  (T. 983, 984) |

<div align="center">***</div>

Records of the W. E. Sears Youth Center show the same grades as noted earlier.  On the third page of this record it is stated that "Kenny has learned to handle himself in those areas which caused concern for behavior problems.  He has the ability to make appropriate choices should he choose to control himself and should have support for positive behaviors.  his grades are based on use of materials appropriate to Kenny's reading level and abilities.  Recommendations:  Consider continuation of special services."  (T. 987, 988)

This record also states more clearly the courses taken by Kenneth Reams at the Sears Youth Center and his grades for each:

| Course | Grade |
|---|---|
| Behavior Disorder | B |
| Learning Disability: Language Arts | B |
| Learning Disability: Reading | A |
| Chapter Basic Skills | B |

<div align="center">cxliv</div>

<div align="center">Respondent's Exhibit E</div>

| | |
|---|---|
| Civics | C |
| General Math | B |
| General Science | B |
| Life Skills | C |
| Vocational Preparation | Passed  (T. 989, 990) |

*  *  *

A report signed by Vicki Reed, Guidance Counselor, states that the appellant, referred to as Kenny, has problems with reading comprehension and basic reading skills. It concludes that he meets the criteria for learning disability in written language and basic reading skills, as well as for behavior disorder.

The next page begins an unsigned report dissenting from the conclusions reached on the preceding page. The area of disagreement is not with the general conclusions, but with the areas of specific learning disability. On the next page of the report on the back of page 993 the writer looks into Kenny's background. He states that he came to Missouri to live with a maternal aunt from Arkansas, where he had an extensive juvenile record. He was reported to have been a member of the "Disciples" gang. The writer states that Kenny has achieved below level in written language and knowledge and a bit above aptitude in reading and math, but overall "his levels are not commensurate with his age." His behavior is seen adversely affecting his performance, but it is not known whether that is "transient or habitual." In conclusion the writer concurs with the previous report, stating, "Although Kenny's behavior was more inappropriate in a public setting, it is felt that if we removed the tight structure of our program he would again experience the same difficulties. Therefore, it is our opinion that Kenny meets the criteria for both **learning disabilities services (written expression and reading comprehension) and behavior disorder services.** (T. 992, 993)

1181                                        cxlv

Respondent's Exhibit E

* * *

(ABSTRACTOR'S NOTE:  This exhibit appears much later in the transcript, but is abstracted here for continuity and ease of reading.)

DEFENDANT'S EXHIBIT NO. 4
*Certified Records from the Missouri Department of Social Services,*
*Division of Children and Youth Services, of*
*Kenneth Reams's Stay at the W. E. Sears Youth Center*
(T. 1000-10044)

(ABSTRACTOR'S NOTE:  The vast majority of these records are status reports of how the appellant was doing in group therapy sessions.  What reports of academic grades appear herein are duplicated in the previous exhibit abstracted.  Although this exhibit is very large, the appellant deems only several parts of it relevant to this appeal and therefore abstracts very little of it.)

SUMMARY TO SUPPLEMENT TO PERMIT FOR PLAN OF CARE

I. <u>PROGRESS AT FACILITY</u>.  Upon arrival at the center Kenny was evaluated for a period of thirty days and this individual treatment plan was then developed.  It was identified that much of his behabvior was for acceptance.  He came from a family with a lot of problems with alcohol abuse.  He was allowed to roam the streets at will.  He is small in size for his age at 17.  He tried to make up for his small size by trying to steal more than anyone else.  During his seven month stay at the center he was able to work through a lot of hurt feelings over his family situation.  (T. 1015)

* * *

(ABSTRACTOR'S NOTE:  In the initial Family Evaluation, dated April, 1991, (T. 1041-1043), the following was stated.)

7. **Family Problems/Stress**.  In interviewing Ken, it was clear that he feels that his natural mother has let him down.  He feels a great deal of agner and resentment toward her.  One

cxlvi

1182

member of the staff believes that he steals in order to get her attention, but that nothing works to get her attention. Two members of the staff believe that he was so socially restricted in his mother's home that he is now "racing to catch up" with other youth in his age group and will go to extremes to impress them and gain their acceptance. (T. 1043)

<div align="center">

DEFENDANT'S EXHIBIT NO. 4
*Judgment and Commitment*
*State of Arkansas v. Alford Goodwin*
Jefferson Circuit No. 93-301-3
(T. 1045)

</div>

On 1 December 1993 the defendant, Alford Goodwin, pleaded guilty to capital murder, committed on 5 May 1993 and sentenced to life imprisonment without parole.

Filed: 3 December 1993. (T. 1045)

DEPUTY PROSECUTING ATTORNEY: Your honor, I would like to introduce a warrant from Missouri and a certified copy of the judgment of probation and warrant on that. This is the active warrant for burglary and stealing and is marked as State's Exhibit No. 20. State's Exhibit No. 21 is the warrant for absconding probation and a judgment of probation.

DEFENSE COUNSEL: I have previously seen the documents and I have no objection to their introduction. (T. 897)

(ABSTRACTOR'S NOTE: Closing arguments of counsel were then made. Because no objections were made during them and they do not relate to any issue raised on appeal they are not abstracted. Following those arguments the court again instructed the jury just as it did in the beginning of the penalty phase. (T.898-910) The trial court then went over the verdict forms in the same manner as had been done previously, (T 910-914), after which the jury retired to

<div align="center">

cxlvii

</div>

1183

Respondent's Exhibit E

deliberate.  (T. 914))

TRIAL COURT:  The jury has returned and has passed a verdict to the court.  The court has examined the forms as executed by the jury.  They appear to be in order.  Form 1 is signed by jury foreman Mr. Robinson.  Form 2 is signed by Mr. Robinson and Form 3 is signed by Mr. Robinson.  Form 4, the verdict form, states, "We, the jury, after careful deliberation have determined that for the capital felony murder of Gary Turner that Kenneth Reams shall be sentenced to death by lethal injection."  This is signed by the twelve members of the jury panel.  I will go ahead at this point and poll you ladies and gentlemen and ask if this is in fact your verdict and your signatures.  (T. 914, 915)

(ABSTRACTOR'S NOTE:  The jury was then polled.  (T. 916, 916)

* * *

*Lesser Included Offenses:*
*Transitional Instruction*
*(Proffered by the Defense but Refused)*
(T. 966)

If you have a reasonable doubt of the defendant's guilt on the charge of capital murder, you would then consider the charge of aggravated robbery.  (T. 966)

*Aggravated Robbery*
*(Proffered by the Defense but Refused)*
(T. 967)

Kenneth Reams is charged with the offense of aggravated robbery.  To sustain this charge the state must prove the following things beyond a reasonable doubt:

First, that with the purpose of committing a theft Kenneth Reams employed physical force

cxlviii

1184

Respondent's Exhibit E

upon another and

      Second, that Kenneth Reams and an accomplice were armed with a deadly weapon or

represented by words or conduct that they were armed with a deadly weapon and attempted to

inflict death or serious physical injury upon another person.

## DEFINITIONS

    Physical force means any bodily impact, restraint or confinement.

     Deadly weapon means a firearm or anything manifestly designed, made or adapted for the

purpose of inflicting death or serious physical injury or anything that in the manner of its use or

intended use is capable of causing death or serious physical injury.

     Serious physical injury means physical injury that created a substantial risk of death or that

causes protracted disfigurement, protracted impairment of health or loss or protracted impairment

of the function of any bodily member or organ.

     Purpose.  A person acts with purpose with respect to his conduct when it is his conscious

object to engage in the conduct.  (T. 967)

*Verdict Form - Class Y Felony*
*(Proffered by the Defense but Refused)*
(T. 968)

    We, the jury, find Kenneth Reams guilty of aggravated robbery and fix his sentence at:

    A term of _____ (not less than ten years nor more than forty

years or life) in the Arkansas Department of Correction.

                            _____
                             Foreman

    We, the jury, find Kenneth Reams not guilty.

**1185**

cxlix

Respondent's Exhibit E

6868

Foreman

(T. 968)

*Motion To Instruct The Jury As To Allegation Of Defendant's Mental Retardation*
(T. 969, 970)

The defendant moves through counsel pursuant to Ark. Code Ann. §5-4-618. Pursuant to a report dated 28 September 1993 from the Southeast Mental Health Center, a copy of which is in the court's file, the defendant was found to have a WAIS-R Full Scale IQ of 66, which categorizes him in the mild range of mental retardation according to the Wechsler classification system. Therefore pursuant to Ark. Code Ann. §5-4-618 the defendant respectfully moves this court to instruct the jury by a special jury instruction that the jury may find by unanimous determination that the defendant was mentally retarded at the time the commission of the offense of capital murder as charged in this matter and in so doing the defendant would be automatically sentenced to life imprisonment without the possibility of parole. (T. 969, 970)

*Instruction*
*(Proffered by the Defense but Refused)*
(T. 971)

Defendant has alleged that he was mentally retarded at the time of committing capital murder because of a low intelligence quotient.

The defendant has the burden of proving mental retardation by a preponderance of the evidence.

The jury may unanimously determine that the defendant was mentally retarded at the time of the commission of capital murder, which will result in the defendant's automatically being sentenced to life imprisonment without possibility of parole. (T. 971)

*Special Verdict Form*
*(Proffered by the Defense but Refused)*
(T. 972)

We, the jury, unanimously determine that the defendant Kenneth Reams was mentally

retarded at the time of the commission of capital murder involving the death of Gary Wayne

Turner.

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

(T. 972)

*Judgment and Commitment Order*
*Jefferson Circuit No. CR-93-300-3*
*State's Exhibit 18*
(T. 973)

On 30 September 1993 the defendant, Kenneth Reams, appeared before the Jefferson

cli

1187

Respondent's Exhibit E

County circuit court and pleaded guilty to aggravated robbery alleged to have been committed on

29 April 1993. He was then sentenced to four years imprisonment which was ordered to run

concurrently with the sentences received in two other Jefferson County case numbers, to wit, CR-

93-298-3 and CR-93-299-3.

Filed 30 September 1993 (T. 973)

### Judgment and Commitment Order
### Jefferson Circuit No. CR-93-299-3

On 30 September 1993 the defendant, Kenneth Reams, appeared before the Jefferson

County circuit court and entered a plea of guilty to the charge of aggravated robbery alleged to

have been committed on 28 April 1993. He was sentenced to four years imprisonment which was

ordered run concurrently with the sentences received in Jefferson County circuit numbers CR-93-

298-3 and CR-93-300-3.

Filed 30 September 1993 (T. 974)

### Psychological Evaluation
### (T. 975-977)

(ABSTRACTOR'S NOTE: This evaluation indicates that it was conducted on 27
September 1993. The reason for the evaluation was a referral by the Jefferson County circuit
court for evaluation in determining competency. The person being evaluated was Kenneth Reams
born on 21 December 1974. The tests administered were the Wechsler Adult Intelligence Scale -
Revised (WAIS-R), the Wide Range Achievement Test - Revised (WRAT-R), House-Tree-
Person (HTP) and Bender Visual-Motor Gestalt Test. This report also indicates that a brief
interview was conducted. (T. 975))

Mr. Reams stated that he completed the 8th grade and was put out of the school in the 9th

grade for fighting when he hit a principal. He stated that prior to his arrest he was living with

different friends for about the past two years. Although his family is in Forrest City where he last

attended school, he moved to Pine Bluff about two years ago.

clii

1188

Respondent's Exhibit E

When asked about the current charges against him, he stated that he was being charged with murder. He said this was not the first time that he had been arrested. He said that he had previously been arrested for stealing. In 1991 he had been in a youthful offenders camp for stealing. He has never held a full-time job and does not have a driver's license although he can drive a car a little bit. When I asked him again about the charges against him currently, he started crying, stating that he is really in trouble, that he is only eighteen and that he is going to spend the rest of his life on death row. He stated that he did not do it but that it was his gun.

TEST RESULTS AND INTERPRETATION. Mr. Reams attained an intelligence quotient of 66 which falls into the mild range of mental retardation according to the Wechsler Classification System. He attained a Verbal IQ of 67 and a Performance IQ of 67 with both scores falling in the same classification range and no significant discrepancy noted among scores.

On the WRAT-R, Reams made a standard score of 57 and a grade equivalent of less than 3 in reading and a standard score of 54 and a grade equivalent of 3E in arithmetic. Both these grade equivalents are significantly behind Reams' stated 8th grade educational level. His performance on the WRAT-R would support mild mental retardation.

His handling of the Bender-Gestalt suggests an individual who has problems with impulse control and low frustration tolerance.

Reams' completion of his HTP drawings suggests an emotionally immature individual with a poor self image. Feelings of instability and ineffectiveness are noted. He may tend to take more of a self-centered approach to life. There appears to be some underlying anger and frustration that he could act out in an explosive manner.

Reams' academic achievement level tested out at or below the 3rd grade level. He did

1189

cliii

Respondent's Exhibit E

demonstrate some visual motor coordination problems during his testing.

Behaviorally, Reams is seen as an emotionally immature individual who has problems with impulse control and low frustration tolerance. There is some underlying anger and frustration which may increase his acting out potential in an explosive manner.

Current psychological testing did not suggest the presence of any active psychosis or severe psychopathology. However, common sense reasoning and judgment appear to be limited. He was able nevertheless to express the difference between right and wrong. He did express some remorse over the situation he currently is involved in. (T. 975, 976)

Current testing suggests that Mr. Reams could be able to actively participate in his own defense. It is recommended that communications with him be of a verbal nature as his reading capacity is quite limited. It is also recommended that he be questioned about his understanding to make sure that he does understand what is being said to him and that he be allowed to completely express himself so he does not become confused.

David Nanak, M.A.
Psychological Examiner


Patrick Caffey, Ph.D.
Consulting Psychologist

(T. 977)

cliv

1100

Respondent's Exhibit E

ARGUMENT

I.

## THE STATE UNCONSTITUTIONALLY USED ITS PEREMPTORY STRIKES TO EXCLUDE BLACKS FROM THE PETIT JURY

The state used its peremptory challenges in this case to exclude blacks from the petit jury in violation of the Equal Protection Clause of the Fourteenth Amendment as construed in *Batson v. Kentucky*, 476 U.S. 79 (1986), and its progeny. The first *Batson* motion came after the state struck the first venire member examined, Ms. Irma Johnson. The trial court did not have the state explain its reasons for peremptorily striking Ms. Johnson because no pattern had been established at that time, and the objection was overruled. (T. 226)

The second *Batson* objection came after the examination of venire member Matthew Henry. At that point the state had used four peremptory challenges, two for black venire members and two for white venire members. One black venire member had been seated as a juror. (T. 444, 445) The state proffered as its explanation of the striking of Mr. Henry that he had indicated that he would not consider the death penalty unless the defendant was the shooter. Defense counsel disagreed, saying that he had stated that he would consider the death penalty under appropriate circumstances, which is exactly what white jurors Tipton and Hornsby, who had been seated earlier, (T. 361, 414), had stated. The trial court stated that he did not hear Mr. Henry indicate that he would be reluctant to impose the death penalty if the circumstances warrant it, but he did think that his responses about the defendant's intent were worrisome. The state agreed with the trial court, stating that it appeared that Henry made normal responses to the state's questioning, but "started vacillating" while under questioning from the defense about such

1

6874   Respondent's Exhibit E

things as state of mind. (T. 446, 447)

Mr. Henry was then questioned further by both parties. To the deputy prosecutor's question, " Would you require the State to prove . . . beyond a reasonable doubt that Mr. Reams actually fired the shot that killed the victim before you could consider the death penalty," Henry replied, "No, I think -- you asked the question about accomplice liability. And my view . . . is that any phase of action is an integral part of the whole regardless." (T. 451) The deputy prosecutor asked the question again: "[W]ould you require the State to prove that the defendant beyond a reasonable doubt actually pulled the trigger and killed the victim before you could consider the death penalty in this case?" This time Mr. Henry's response was clear: "That wouldn't be necessary." (T. 451, 452) In attempting to discern what Mr. Henry meant by intent, the deputy prosecutor and the trial court questioned him further and ascertained that he would consider intent as well as the evidence of mitigating and aggravating circumstances introduced. (T. 452, 453)

The trial court then reversed itself and found that there had been no pattern of racially discriminatory peremptory strikes shown that would require the state to proffer an explanation for its strikes  Even so, the trial court stated that it was not satisfied with the explanation that the state did give. (T. 455, 456) Given its pleasure, the state excused Mr. Henry. (T. 457)

The *Batson* motion was later renewed after the state used a peremptory strike to excuse venire member Muriel M. Hayes. (T. 498, 505) The state explained that the peremptory strike was used because of Ms. Hayes's reservations about imposing the death penalty. The trial court denied the motion without comment. (T. 505, 506)

To prevail on the argument that the state in a criminal case has unconstitutionally excluded

2

1192

blacks, one must first show a prima facie case of racial discrimination in the state's use of its peremptory challenges, after which the burden shifts to the state to make a race neutral explanation for the use of its challenges.  As the court stated recently in *Tucker v. State*, 313 Ark. 624, 629, 855 S.W.2d 948 (1993), quoting *Colbert v. State*, 304 Ark. 250, 801 S.W.2d 643 (1990):

> [U]pon a showing by a defendant of circumstances which raise an inference that the prosecutor exercised one or more of his peremptory challenges to exclude venire persons from the jury on account of race, the burden shifts to the state to establish that the peremptory strike(s) were for racially neutral reasons.  The trial court shall then determine from all relevant circumstances the sufficiency of the racially neutral explanation.  If the state's explanation appears insufficient, the trial court must then conduct a sensitive inquiry into the basis for each of the challenges by the state
> The standard of review for reversal of the trial court's evaluation of the sufficiency of the explanation must test whether the court's findings are clearly against a preponderance of the evidence.  In every instance, however, the court shall state, in response to the defendant's objections, its ruling as to the sufficiency or insufficiency of the racially neutral explanation provided by the state.

In this case the trial court held that the appellant had not made a prima facie case of racial discrimination, yet found the proffered explanation of the state for striking Mr. Henry unconvincing.  The trial court committed reversible error in failing to find the issue of a prima facie case moot or, alternatively, in failing to find a prima facie case, and in denying the *Batson* objection after finding the state's explanation not race neutral.

A. *PRIMA FACIE CASE.*  The appellant submits first that because the state had given its purported race neutral explanation, the issue of whether a prima facie case had been made is moot.  The only issue left is whether the explanation was race neutral.

In *Hernandez v. New York*, 500 U.S. 352, 114 L.Ed.2d 395, 111 S.Ct. 1859 (1991), the prosecutor stated his race neutral explanation for having used peremptory strikes to excuse

3

1193

Respondent's Exhibit E

several Hispanic venire members after a *Batson* objection was made, not waiting for the trial court to find a prima facie case. In that case, the Court ruled, the issue of whether a prima facie case had been established was moot. Analogizing to a case of employment discrimination under Title VII of the Civil Rights Act of 1964, the Court stated that

> "[w]here the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so is no longer relevant." *United States Postal Service Bd. of Govs. v. Aikens*, 460 US 711, 715 . . . (1983). The same principle applies under Batson. Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant has made a prima facie showing becomes moot.

*Hernandez v. New York*, 114 L.Ed.2d at 405.

In this case the prosecution had done all it was supposed to have done following the appellant's *Batson* objection, and the trial court had ruled that its explanation did not make the grade. Hence, whether a prima facie case had been established was and is moot. That the prosecution did not volunteer the explanation out of turn, as was done in *Hernandez*, is of no moment. The point of *Hernandez* was not that the defense is relieved of establishing a prima facie case when the prosecution acts out of turn, but that when an explanation is before a trial court, regardless of how or when it arrived, it will must be examined and a determination of race neutrality made. *United States v. Brooks*, 2 F.3d 838, 840 (8th Cir. 1993); *United States v. Johnson*, 941 F.2d 1102, 1108 (10th Cir. 1991); *United States v. Childs*, 5 F.3d 1328, 1338, n. 7 (9th Cir. 1993); *Adams v. State*, 862 S.W.2d 139, 144, n. 3 (Tex.Ct.App. 1993). Cf. *Tucker v. State, supra*.

It is clear from the foregoing that the issue of whether a prima facie case was made is

4

Respondent's Exhibit E

moot. Assuming, *arguendo*, that the court disagrees, the appellant submits that a prima facie case was established, anyway.

The trial court was under the impression that the only way in which to make out a prima facie case of racial discrimination was to show a pattern of peremptory strikes by the state against blacks. This was a misconception. Although a pattern of strikes is the method of establishing a prima facie case most often noted, it is not the only method. Caselaw usually discusses thee ways of showing a prima facie case, to wit:

> (1) showing that the totality of the relevant facts gives rise to an inference of a discriminatory purpose, (2) demonstrating total or seriously disproportionate exclusion of blacks from the jury, or (3) showing a pattern of strikes, questions or statements by a prosecuting attorney during voire dire.

*Thompson v. State*, 301 Ark. 488, 489, 785 S.W.2d 29 (1990). *See also Watson v. State*, 308 Ark. 444, 825 S.W.2d 569 (1992); *Wainwright v. State*, 302 Ark. 371, 790 S.W.2d 420 (1990), *cert. denied* 499 U.S.913 (1991); *Ward v. State*, 293 Ark. 88, 733 S.W.2d 728 (1987); *Givens v. State*, 42 Ark.App. 173, 856 S.W.2d 33 (1993).

As the Supreme Court said in *Batson*, these methods are merely illustrative. *Id*. at 98. As this and many other courts have held, one peremptory strike can make a prima facie case where it results in the exclusion of all black venire members and an all white jury. *Hollamon v. State*, 312 Ark. 48, 846 S.W.2d 663 (1993); *Mitchell v. State*, 295 Ark. 341, 750 S.W.2d 936 (1988); *Rucker v. State*, 41 Ark.App. 164, 852 S.W.2d 139 (1993). It is the totality of relevant facts that is important, and no set scenario must be presented in order to show a prima facie case.

Indeed, "the striking of a single black juror for racial reasons violates the equal protection clause, even though other black jurors are seated, and even when there are valid reasons for the

1195

5

Respondent's Exhibit E

striking of some black jurors. *United States v. Gordon*, 817 F.2d 1538, 1541 (11th Cir. 1987);

*United States v. David*, 803 F.2d 1567, 1571 (11th Cir. 1986)." *United States v. Battle*, 836 F.2d

1084, 1086 (8th Cir. 1987). An example of this type of prima facie case is *Franklin v. State*, 314

Ark. 329, 863 S.W.2d 268 (1993), also the appeal of a capital murder conviction of a young black

male for the murder of a white person. In that case, as here, the first black venire member called

was challenged for cause. The evidence had shown that just before the murder Franklin said

something about killing some white people. Disagreeing with the trial court, this court held, "We

disagree with the circuit court which concluded that Franklin failed to make a prima facie case.

The first black juror called was challenged by the State in a case fraught with racial overtones."

*Id.*, at 314 Ark. 338. Granted, the jury in *Franklin* was all white, but it was not all white when

the first venire member was challenged by the state, and that is when a prima facie case was held

to have been made.

In this case the totality of the circumstances showed a prima facie case in three ways, to

wit, by the first strike, by the state's explanation for the strike of Mr. Henry and by a pattern of

strikes. The state's explanation and the pattern are intertwined, as one is needed to see the other.

In this case, as in *Franklin*, there were racial overtones. The jurors were asked

throughout *voire dire* whether it would make any difference that the victim of this murder was

white and the appellant was black. Further, as would come out later in the trial and as the parties

full well knew before trial, the co-defendant, who actually was the trigger man, told the appellant

that he shot the victim because he, a white man, called the co-defendant a "nigger." (T. 740)

Also as in *Franklin*, the state used a peremptory strike to excuse the very first black venire

member called. That strike in and of itself raised a prima facie case, and the trial court should

6

1196

Respondent's Exhibit E

have asked for a race neutral explanation then in response to the appellant's *Batson* objection. (T. 226, 227)

When the state finally was asked for a race neutral explanation for its strike of Mr. Henry, the deputy prosecutor said he was excused because he stated that he could consider the death penalty only if the appellant had been the trigger man and had actually shot the deceased. As set out above, further examination of Mr. Henry refuted that assertion, yet the state used a peremptory strike, anyway. These comments of the prosecution become compelling indicators of a prima facie case of racial discrimination when compared with the state's questioning and use of peremptory strikes with other jurors, which show a pattern.

Ms. Irma Johnson, the first black venire member called, stated in discussing accomplice liability that she would treat the trigger man differently. She was asked, " if one of them shot and killed a person and the other one did not, but he was there, he was still participating, do you feel as though you would treat those people the same?" to which Ms. Johnson replied, "No, I don't." (T. 221) When the next juror called, Ms. Linda Messina, a white woman, (T. 444, 445), was asked, "[T]wo people go up to commit a robbery, one of them has a gun, one of them does not, the one who has the gun shoots and kills the other individual. Do you believe both people should be treated the same when it comes to punishment?" to which she replied, "Well, I definitely feel like the one that did it should be punished more severely." (T. 239) This venire member was accepted by the state, even though she stated exactly what the state said caused it to use a peremptory strike against Mr. Henry. The only difference in the two is that Mr. Henry was black and Ms. Messina white.

Another white venire member, Carolyn Phillips, the next juror chosen after Mr. Henry,

7

1197

Respondent's Exhibit E

also opined that accomplices should be treated differently in regard to sentence. After acknowledging that she knew what accomplice liability was, Ms. Phillips was asked if she agreed with the concept of accomplice liability, to which she succinctly replied, "Well, yes. I don't know that the penalty would be the same." (T. 470, 471) Ms. Dorothy Hodges, also a white woman chosen to sit on the jury, expressed similar sentiments after being explained the concept of accomplice liability: "I mean, he [the person driving the getaway car in a bank robbery-murder] wasn't the trigger man or pulled the weapon or killed him, but if it was already planned and all that, to me he should serve time." (T. 522, 523)

The disparate treatment of these venire members by the state not only establishes a pattern, but also shows the specious nature of the state's "race neutral" explanation for its peremptory strike of Mr. Henry. This opinion that accomplices should be treated differently in regard to sentence mattered to the state only when that opinion was held by a black person. This difference in treatment was most pronounced and clear in the case of Mr. Henry.

*B. RACE NEUTRAL EXPLANATION.* For an explanation to be sufficient, it need not rise to the level to justify a challenge for cause, but it must be related to a characteristic other than race, it must be related to the case being tried and it must not be pretextual. *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S.___, 128 L.Ed.2d 89, 107, 114 S.Ct.1419 (1994), citing *Hernandez v. New York, supra; Batson v. Kentucky, supra; Pacee v. State*, 306 Ark. 563, 816 S.W.2d 856 (1991). .

The appellant reiterates and emphasizes at this point that the trial court did not find the state's explanation acceptable. That finding should end this part of the analysis on appeal, for the standard on appeal for review of the trial court's ruling on the sufficiency of that explanation is "whether the [trial] court's findings are against a preponderance of the evidence." *Tucker v.*

8

1198

Respondent's Exhibit E

*State, supra*, 313 Ark. at 629. This standard accords with the "clearly erroneous" standard of review of a state trial court's determination in this regard set forth in *Hernandez v. New York*, succinctly set forth in language quoted from *Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985), as "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Hernandez v. New York, supra*, 114 L.Ed.2d at 412. *See also Jones v. State*, 45 Ark.App. 28, 36, 871 S.W.2d 403 (1994); *Jones v. Jones*, 938 F.2d 838, 841, n. 4 (8th Cir. 1991).

As the discussion of the facts in the section on a prima facie case shows, there was ample evidence from which the trial judge could have drawn the conclusion that the explanation offered did not make the grade. The proffered explanation of what was objectionable in Mr. Henry's *voire dire* examination was relevant to the prosecution only in the case of black jurors. "A reason [for using a peremptory strike] is more likely to pass muster if the record indicates the same reason was used in challenging white prospective jurors, and by the same token a reason is unacceptable if it appears whites were not challenged on the same basis." W. LaFave and J. Israel, *Criminal Procedure* §21.3, p. 255 (Cum. Supp. 1991). This principle was applied by this court in *Franklin v. State, supra*, where the prosecutor's proffered explanation was that the black juror in question would not be able to consider the full range of punishment. When it was considered that the state had used peremptory strikes against five other white venire members for the same reason, the court held that explanation good. *Id.*, 314 Ark. at 339.

This principle was also approved in *Floyd v. State*, 511 So.2d 762 (Fla.Dist.Ct.App. 1987), cited by this court in *Pacee v. State, supra*. Quoting *Slappy v. State*, 503 So.2d 350, 355 (Fla.Dist.Ct.App. 1987), the court in *Floyd* stated at 511 So.2d 764 that the following would

9

6882   Respondent's Exhibit E

weigh heavily against the legitimacy of any race-neutral explanation:

> . . . (3) disparate examination of the challenged juror, i.e., questioning the challenged venireperson so as to evoke a certain response without asking the same question of other panel members; (4) the reason given for the challenge is unrelated to the facts of the case; and (5) *disparate treatment where there is no difference between responses given to the same question by challenged and unchallenged venirepersons.* [Emphasis added.]

A clearer case of disparate treatment given venire members who answered the same question the same way cannot be imagined.

The appellant notes in closing that its assertion that the jury as finally seated contained only one black person, Mrs. Della Marie Horace, is not totally supported by the record. The record does reflect her race and the race of the other seven jurors seated at that time, (T. 242, 301, 324, 349, 361, 387, 399, 400, 414, 444, 445), but there is no definitive indication in the record of the race of the other four jurors and two alternates chosen after Mr. Henry was excused. Counsel knows, however, that Mrs. Horace was the only black juror chosen, and counsel for the state could determine that easily by speaking with the prosecutor who tried the case. This was apparently what was done in the case of *Franklin v. State, supra,* where the appellant asserted that the jury had been all white, and the state did not dispute that assertion. *Id.,* 314 Ark. at 336. The decision was then made based on that fact. The state probably wanted to conserve judicial resources and have this issue determined then on direct appeal and not later in post-conviction proceedings pursuant to A.R.Cr.P. Rule 37.

It is hoped that the state makes that same choice in this case, but if it does not, the appellant's case is not strongly affected. The prosecution treated two jurors differently on the basis of the same purported reason after Mr. Henry was stricken. If they were both white or both

10

1200

black, that they were treated differently than Mr. Henry does not militate in favor of race neutrality for the state's proffered explanation for its peremptory strike of Mr. Henry.

Indeed, this case is as ripe for reversal on *Batson* grounds as any the court is likely to see.

## II.

### BECAUSE OF KENNETH REAMS'S MENTAL RETARDATION, HIS EXECUTION WOULD VIOLATE THE STATE AND FEDERAL GUARANTEES AGAINST CRUEL AND UNUSUAL PUNISHMENT AND DEPRIVE HIM OF DUE PROCESS AND EQUAL PROTECTION OF THE LAW

Following the jury's verdict of guilty of capital felony murder, defense counsel moved that the jury be instructed in accordance with Ark. Code Ann. § 5-4-618 (Repl. 1993), the codification of Act 420 of 1993, that the appellant is a person who is mentally retarded and should not be subject to the death penalty. Even though Reams was found to have an intelligence quotient (IQ) of 66, one point above the presumption of mental retardation set out at § 5-4-618(a)(2), counsel was of the opinion that the jury should be so instructed, anyway. He had a specially prepared jury instruction and verdict form prepared. (T. 824, 969-972) The trial court determined that Act 420 did not have an emergency clause and therefore went into effect sometime in August, 1993, several months after the offense in this case was committed on 5 May 1993. Accordingly, Act 420 was found not to apply to the appellant's case, and the motion to instruct the jury was denied. (T. 829, 830)

When the jury was instructed, Form 2, the form used for indicating the existence of mitigating circumstances, listed in all parts the possible mitigating circumstance, "Kenneth Reams suffers from borderline mental retardation." (T. 159-162) The jury checked this possible

11

1201

 Respondent's Exhibit E

mitigating circumstance in Part C of Form 2, which indicated that, "There was evidence of the following mitigating circumstances, but the jury unanimously agreed that they do not exist." (T. 161)

The statutory provision in question provides that, "No defendant with mental retardation at the time of committing capital murder shall be sentenced to death." § 5-4-618(b). Mental retardation as used in this provision means:

> (A) Significantly subaverage general intellectual functioning accompanied by significant deficits or impairments in adaptive functioning manifest in the developmental period, but no later than age 18; and
> (B) Deficits in adaptive behavior.

It is further provided that, "There is a rebuttable presumption of mental retardation when a defendant has an intelligence quotient of sixty-five (65) or below." § 5-4-618(a)(2). Where the trial court finds that the defendant is mentally retarded for purposes of this provision, the jury shall not be death qualified and "shall sentence the defendant to life imprisonment without possibility of parole." § 5-4-618(d)(2)(B). If on the other hand the trial court determines that the defendant is not mentally retarded, the defendant may raise the question with the jury during the sentencing phase of the trial, in which case the jury shall be given a special verdict form on mental retardation. If the jury unanimously finds that the defendant is mentally retarded, it shall "automatically" sentence the defendant to life imprisonment without possibility of parole. § 5-4-618(d)(A).

Act 420 of 1993 was signed by the governor and became law on 10 March 1993. Because it contained no emergency clause, it took effect ninety days following adjournment of the 1993 legislative session *sine die* in accordance with Ark. Const, Amend. 7. *See State v. Ziegenbein*,

12

1202

Respondent's Exhibit E

282 Ark. 162, 666 S.W.2d 698 (1984).

The trial court committed error in failing to make a determination of whether the appellant was mentally retarded and denying the appellant's motion to instruct the jury as per this statute. Fundamentally, the trial court erred in holding that the statute did not apply at all. By the words of the statute, itself, it applies to anyone being *sentenced* to death who was mentally retarded at the time of the capital murder. The appellant acknowledges that most sentencing provisions are applied as of the date of the commission of the offense, *e.g. State v. Gaylean*, 315 Ark. 699, 870 S.W.2d 706 (1994), and *State v. Williams*, 315 Ark. 464, 868 S.W.2d 461 (1994), but points out that the sentencing provision in question here is specific on this point. The operative fact here is sentencing. Where the words of a statute are clear, no interpretation is permitted: it should mean just how it reads. *Mings v. State*, 316 Ark. 650, 653, 873 S.W.2d 559 (1994).

The statute was also read erroneously as providing that it applied only to individuals with IQ's of sixty-five or less. As the record shows, the appellant certainly fit the first definition of mental retardation of someone who had significant subaverage general intellectual functioning and significant deficits or impairments in adaptive functioning which manifested in the appellant before the age of 18.

The only witness who testified about this matter was Mr. David Nanak, a licensed psychological examiner with the Southeast Arkansas Mental Health Center qualified without objection as an expert in the field of psychological examination. (T. 852, 853) Nanak put the appellant through a battery of tests, including the Wide Range Achievement Test (an academic achievement test), the House-Tree-Person test and the Bender Visual-Motor Gestalt Test. (T. 854, 855) The results of this testing was a composite intelligence quotient (IQ) on the Wechsler

Adult Intelligence Scale-Revised. (T. 855, 856) Nanak testified that this score made the appellant mildly retarded, the scale of mild retardation extending from IQ scores of 50 to 70. (T. 856, 857) On cross-examination Nanak stated that an IQ of 69 and 70 was borderline retarded, but that 66 was mildly retarded. Whereas borderline retarded is not considered retarded, mildly retarded is considered retarded. (T. 861, 862)

The other most significant evidence in this regard were the records of the appellant's progress in school and in a boys' reform school in Poplar Bluff, Missouri, introduced as Defendant's Exhibits Nos. 2 and 3. Exhibit No. 2 is abstracted at length, and it contains records of the appellant's progress when he was in high school and when he was in the W. E. Sears Youth Center, an institution for boys of the Missouri Department of Social Services, Division of Youth Service. These records indicate that the appellant had learning disabilities and behavior problems then that responded to the tight structure given him at the Sears Youth Center. They show plainly that the appellant, in the words of the statute involved here had, "[s]ignificantly subaverage general intellectual functioning accompanied by significant deficits or impairments in adaptive functioning manifest in the developmental period" well before age 18, the appellant's age at the time of this offense.

Had the trial court considered the statute, this evidence would have to have been heard by the trial court, which would then have to have made a decision. That decision would more than likely have been that the appellant was retarded at the time and that the appellant could be sentenced only to life imprisonment without parole in accordance with § 5-4-618(d)(2)(B). In the unlikely event that the decision was otherwise, the jury would then have to be instructed in the words of the statute, including a definition of mental retardation of the two ways of finding mental

14

1204

Respondent's Exhibit E

retardation discussed above and set out at Ark. Code Ann. §§ 5-4-618(a)(1)(A) and (B).

In addition to violating the statute, itself, the trial court's holding that Ark. Code Ann. § 5-4-618 did not apply also violated both the state and the federal constitutions.

*A. VIOLATION OF THE ARKANSAS CONSTITUTION.* Ark. Const., art. 2, § 9, prohibits the infliction of cruel and unusual punishments. A punishment is cruel and unusual if it "shock[s] the moral sense of the community." *Carter & Burkhead v. State*, 255 Ark. 225, 500 S.W.2d 368, 373 (1973), *cert. denied*, 416 U.S. 905 (1974). This definition is not a static concept, but instead changes "in light of maturing standards of civilized society." *Fairchild v. State*, 284 Ark. 289, 681 S.W.2d 380 (1984), *cert. denied*, 471 U.S. 1111 (1985). *See also Penry v. Lynaugh*, 492 U.S. 302 (1989).

To ascertain whether a society currently views a particular punishment as cruel and unusual, the court must look to objective evidence. Such evidence may include information gathered from public opinion polls, but legislative enactments constitute the clearest and most objective evidence of how contemporary society views a particular punishment. *Id.*, at 335. Those enactments mark the shifting or evolution of societal consensus.

In *Fleming v. Zant*, 259 Ga. 687, 386 S.E.2d 339 (1989), the Georgia Supreme Court reached the same conclusion the appellant now urges upon this court. At issue in *Fleming* was a recently enacted law prohibiting the execution of the mentally retarded. The new statute was expressly prospective in its application. The court noted that "[o]n its face the statute [did] not apply to Son Fleming, who was tried more than ten years ago." *Id.*, at 340. Nevertheless, the *Fleming* court held that it would violate the Georgia constitution's ban against cruel and unusual punishment to execute Fleming, since "[t]he legislative enactment reflect[ed] a decision by the

15

1205

Respondent's Exhibit E

people of Georgia that the execution of mentally retarded offenders makes no measurable contribution to acceptable goals of punishment. Thus, although there may be no 'national consensus' against executing the mentally retarded, this state's consensus is clear." *Id.*, at 342 (Footnote omitted.)

Similarly, while Act 420 is prospective by its terms, this reading is of no moment with respect to the constitutional ban against the imposition of cruel and unusual punishment. The passage of Act 420 reflects the moral consensus of the people against imposing the death penalty on the mentally retarded. It is this evolved standard of decency that defines what the people of Arkansas consider cruel and unusual punishment, thereby triggering the appellant's right vested in the Arkansas constitution to be free from such punishment. It would be cruel, cruel beyond words, to execute a mentally retarded person like the appellant. It would also be extremely unusual, since no retarded offender who will be tried after the effective date of Act 420, no matter how heinous the crime, will ever be executed.

In *Penry v. Lynaugh, supra*, the Supreme Court decided that, since there was no national consensus, the execution of mentally retarded persons was not banned by the Eighth Amendment. *Id.*, 492 U.S. at 340. In contrast, the objective evidence indicates that a state consensus against the execution of the mentally retarded now exists in Arkansas, and thus the execution of the retarded is barred under the cruel and unusual punishment clause of the Arkansas constitution. The appellant urges this court to recognize, as did the Georgia Supreme Court in *Fleming*, that federal constitutional standards represent the minimum and not the maximum protection a state may afford its citizens. *See generally* Brennan, *State Constitutions and the Protection of Individual Rights*, 90 Harv. L. Rev. 489 (1977) (noting numerous state courts that have extended

16

1206

to their citizens via state constitutions greater protections than accorded under the Bill of Rights.)

B. *VIOLATION OF THE FEDERAL CONSTITUTION*. The Arkansas legislature and electorate speak with one voice on the issue of the appellant's sentence: the mentally retarded should not be executed. This Arkansas response has significant implications under the Eight Amendment that militate against the execution of Kenneth Reams.

In *Penry v. Lynaugh, supra*, the Supreme Court found that there was not yet a sufficient national consensus against execution of the mentally retarded. *Id*. 492 U.S. at 334. *Penry* did not address, however, the constitutional implications of a state statute that prohibited prospectively the execution of persons who are identical to the appellant in all material respects. There is a question under the Eighth Amendment with respect to evenhanded, rational and consistent application of the death penalty in Arkansas that is raised by operation of Act 420 on only a prospective basis.

   1)    *There is no meaningful way to differentiate between who is executed and who is not.*

In order to pass constitutional muster, a death penalty statute must provide a meaningful basis for distinguishing between those few persons wo are eligible for execution and the many who are not. *Maynard v. Cartwright*, 486 U.S. 356 (1988). In Arkansas the only "meaningful" way to determine which equally situated mentally retarded offenders may receive the death penalty is the date they are tried (or *retried*). Not even the date of the offense is of actual legal relevance. A person first sentenced to death before the enactment of Act 420 banning imposition of the death penalty on mentally retarded persons, but whose sentence is reversed, and who faces resentencing after the effective date of the statute, may not be sentenced to death again. But a

17

1207

Respondent's Exhibit E

mentally retarded person sentenced to death the day before the effective date would receive the benefit of Act 420 only if his or her sentence was reversed and a resentencing followed. Under such a scheme, a mentally retarded person would be much better off having an unfair trial before the effective date of Act 420, so that a reversal would bring a bar to capital punishment afterwards.

This result is truly a game of chance: the possibility of receiving the benefits of Act 420 depend on but are not decisively controlled by factors such as court calendars and the occurrence of trial errors in a first trial wholly unrelated to mental health issues or the moral culpability of the offender. Nothing could be more arbitrary or capricious.

In this instance due process and equal protection constraints against arbitrary and invidious state action are clearly implicated by a legislative enactment that would permit Reams's execution while exempting from capital punishment the entire class of persons identically situated to Reams but for calendar dates. It is hardly disputable that a serious due process and equal protection violation would arise if the legislature decreed the death penalty for murders occurring on Mondays, Wednesdays and Saturdays only, with no showing of circumstances that distinguish these three days of the week from others. Similarly, a legislative enactment that would permit Reams's execution if his crime occurred the day *before* the statute's effective date, but would spare the life of an identically situated, mentally retarded defendant whose crime occurred the day *after*, is equally constitutionally flawed.

Here, there is no reason at all to draw the line in time the trial court drew with its ruling. The traditional reasons for prospective lawmaking, i.e., protection of vested interests and legitimate expectations based upon transactions predating a new law, *see Great Northern Railway*

1208

Respondent's Exhibit E

6891

*Co. v. Sunburst Oil Co.*, 287 U.S. 358, 364 (1932), are not implicated here. Neither the state, nor anyone else has acquired a vested interest or a legitimate expectation in Reams's execution. To the contrary, the state through its legislature has determined that the state has *no* interest in executing persons with mental retardation.

Moreover, a substantive due process violation is implicated here. "'Substantive due process' prevents the government from engaging in conduct that 'shocks the conscience'" *United States v. Salerno*, 481 U.S. 739, 746 (1987), quoting *Rochin v. California*, 342 U.S. 165, 172 (1952). For the state of Arkansas to reach the moral consensus that mentally retarded persons as a class should be immune from execution, but then proceed to execute a member of that same class because of an arbitrary starting date for the statutory enactment is governmental behavior that "shocks the conscience." It is just as appalling as a legislative pronouncement decreeing the death penalty for murders occurring on randomly selected days of the week. The Supreme Court has recognized that "implicit in the concept of ordered liberty," *Palko v. Connecticut*, 302 U.S. 319, 325-26 (1937), is "freedom from all [such] arbitrary impositions." *Poe v. Ullman*, 367 U.S. 497, 543 (1961) (Harlan, J., dissenting from dismissal on jurisdictional grounds).

2.   *There is no penological justification for executing the mentally retarded*

"A punishment is 'excessive' and unconstitutional if it . . . makes no measurable contribution to acceptable goals of punishment." *Coker v. Georgia*, 433 U.S. 584, 592 (1977). The Supreme Court sustained the death penalty because it was seen as contributing to "two principal societal purposes: retribution and deterrence of capital crimes by prospective offenders." *Gregg v. Georgia*, 428 U.S. 153, 183 (1976).

19

1209

Respondent's Exhibit E

The appellant's execution will have no deterrent effect, since his execution will not deter prospective offenders. The very media reports announcing his demise will surely inform such offenders that the legislature has since forbidden any such execution ever again. Reams's execution would simply not deter prospective mentally retarded offenders, and "[t]he fact that the . . . Legislature saw fit to repeal the [death penalty for mentally retarded offenders] . . . seriously undermines [any] . . . contention that such a [penalty] . . . is needed as a deterrent." *Sumner v. Shuman*, 483 U.S. 66, 83 (1987).

Its function will be limited to visiting retribution upon a single person under circumstances that the legislature has decreed do not in any other indistinguishable case merit capital punishment. The legislative voice has spoken and determined that a fitting measure of retribution against a mentally retarded offender no longer requires taking his or her life. Under the Eighth Amendment, therefore, the carrying out of the death penalty on the appellant would be "excessive and unconstitutional [since] it . . . makes no measurable contribution to acceptable goals of punishment." *Coker v. Georgia, supra*, at 592.

It is thus by legislative quirk, and not some jurisprudential nicety, that the appellant, but no one else, warrants retribution. Such quirks command no respect under the Eighth Amendment. Such a quirk is indefensibly arbitrary under *Furman v. Georgia*, 408 U.S. 238 (1972), and serves no valid penological function.

The jury in this case also cannot be absolved, for it plainly ignored uncontradicted evidence of mental retardation by finding that it did not exist as a mitigating circumstance. As the court held in *Giles v. State*, 261 Ark. 413, 424, 549 S.W.2d 479, *cert. denied*, 434 U.S. 894 (1977):

<div align="center">20</div>

<div align="center">1210</div>

The jury was not free to arbitrarily disdregard reasonable testimony, where other testimony is supportive, rather than conflicting, and no questions of credibility are to be resolved, and it cannot be said that it is physically impossible or that there is no reasonable probability that it is true. [Citations omitted.]

For these reasons, the execution of Kenneth Reams would violate the federal constitutional proscription against cruel and unusual punishment.

## III.

### THE SUBMISSION OF PECUNIARY GAIN TO THE JURY AS AN AGGRAVATING CIRCUMSTANCE IN THE PENALTY PHASE WAS AN UNCONSTITUTIONAL DOUBLE COUNTING AWRY OF THE EIGHTH AMENDMENT

Before trial the appellant moved to prohibit the submission to the jury in the penalty phase of this trial of the aggravating circumstance, for pecuniary gain. (T. 68-71) The motion was denied summarily. (T. 602, 603) This aggravating circumstance was submitted for the jury's consideration in the penalty phase of the trial, and the jury found unanimously that it existed beyond a reasonable doubt. (T. 158, 841, 842) It served as one of two aggravating circumstances upon which the jury based its decision to assess the death penalty in this case. (T. 158) The submission of this aggravating circumstance deprived him of rights guaranteed him under the Eighth and Fourteenth Amendments.

The appellant was charged with capital felony murder, alleged to have been committed in the course and in furtherance of a robbery. (T. 3-5) An essential element of the offense charged, which must have been proven beyond a reasonable doubt in the guilt phase, was that the murder was committed in the perpetration or attempted perpetration of a robbery. *Bly v. State*, 263 Ark. 138, 562 S.W.2d 605 (1978). As construed by this court, the phrase, for pecuniary gain, is a term of common understanding meaning in the perpetration or attempted perpetration of a robbery.

21

1211

 Respondent's Exhibit E

*Neal v. State*, 259 Ark. 27, 531 S.W.2d 17 (1975), *vacated on other grounds* 429 U.S. 966

(1976). Hence, pecuniary gain is an element of the underlying felony, robbery, which must be

proven in order to establish guilt of capital murder.

The submission of this aggravating circumstance double counted pecuniary gain as both an

element of the underlying felony, which gave rise to the higher degree of capital murder, and

duplicatively as an aggravating circumstance justifying imposition of the death penalty. In *Collins*

*v. Lockhart*, 754 F.2d 258 (8th Cir. 1985), *cert. denied*, 474 U.S. 1013 (1986), it was held that

the use of an aggravating circumstance that duplicates an element of the crime, itself, is a violation

of the Eighth Amendment because the double counting of that element fails to narrow the class of

persons eligible for the death penalty and to reasonably justify the imposition of a more severe

sentence on that defendant as compared to others found guilty of murder. Although the decision

in *Collins* was subsequently overruled in *Perry v. Lockhart*, 871 F.2d 1384 (8th Cir.), *cert. denied*

493 U.S. 959 (1989), based upon the decision in *Lowenfield v. Phelps*, 484 U.S. 231 (1988), the

appellant submits that upon a closer look at *Lowenfield* and in light of recent Supreme Court

decisions, *Collins* is the correct decision and should be followed. The Tennessee Supreme Court

specifically so found in *State v. Middlebrooks*, 840 S.W.2d 317 (Tenn. 1992), and the appellant

urges this court to consider and adopt its analysis. As stated by the court in *Ruiz v. Norris*, No.

PB-C-395, Slip Op. at 55, (E.D.Ark. 2 August 1994), although bound by *Perry*, "This court is

inclined to agree with the Tennessee Supreme Court."

*Lowenfield* dealt with the Louisiana death penalty statute and held that double counting an

element of an underlying offense as an aggravating circumstance was permissible where the

narrowing of the class of offenders eligible for the death penalty occurred in the guilt stage by the

22

1212

Respondent's Exhibit E

definition of the offense.  Although narrowing was necessary, the Court held, it could be accomplished in either the guilt or innocence stages of a capital trial.

The statute in question was La. Rev. Stat. Ann. §14.30(a), which provided in pertinent part that first degree murder, Louisiana's capital offense, was defined as:

. . . the killing of a human being:

(1) when the offender has specific intent to kill or inflict great bodily harm and is engaged in the perpetration or attempted perpetration of aggravated kidnapping, aggravated escape, aggravated arson, aggravated rape, aggravated burglary, armed robbery or simple robbery

The remainder of the statute set out four other definitions and aggravating circumstances, to wit, (2) the intentional killing of a police officer or fireman engaged in the performance of his lawful duties, (3) intentional multiple killings, (4) intentional killings for money or anything of value and (5) the intentional killing of a person under twelve years old.  What makes murder first degree or capital murder in Louisiana is the specific intent to kill or inflict great bodily harm.  The situations accompanying each of the five definitions are the aggravating circumstances.

Thus, in Louisiana exposure to the death penalty occurs at the guilt stage upon a showing of an intentional homicide and the commission of that homicide under one of the five aggravating circumstances set out above.  *See also Sawyer v. Whitley*, 505 U.S. __, 120 L.Ed.2d 269, 112 S.Ct. 2514, 2523 (1992).

Texas similarly narrows the class of defendants who are death eligible.  Its statute requires proof of both an intentional or knowing murder and its commission under certain statutory aggravating circumstances.  Only after both of these findings are made may a defendant be found guilty of capital murder and thereafter exposed to the death penalty.  V. Tex. C.A. Penal Code

1213

23

§19.03.

The Arkansas statute under which the appellant was tried, Ark. Code Ann. § 5-10-101 (Repl. 1993), defines capital murder as charged in this case as follows:

> (a) acting alone or with one or more other persons, he commits or attempts to commit . . . robbery, . . . and in the furtherance of the felony or in immediate flight therefrom, he or an accomplice causes the death of any person under circumstances manifesting extreme indifference to the value of human life

The Louisiana and Arkansas definitions of capital felony murder differ in at least one important way: Louisiana requires a specific intent to kill or inflict great bodily harm, whereas Arkansas requires only that the killing occur "under circumstances manifesting extreme indifference to the value of human life." Arkansas defines capital felony murder as something far less than intentional killing. Thus, the Louisiana statute is far narrower in its definition of capital felony murder than the Arkansas statute.

The Supreme Court has compared the respective statutes of Arkansas and Louisiana on several occasions and reached a conclusion that was ignored or overlooked in *Perry*. In *Enmund v. Florida*, 458 U.S. 782, 790, n. 7 (1982), the Court noted that Louisiana was one of eight states that "made knowing, intentional, purposeful or premeditated killing an element of capital murder." Arkansas, however, was noted as one of three states that "require proof of a culpable mental state short of intent, such as recklessness or extreme indifference to the value of human life." *Id.*, n. 8. In *Tison v. Arizona*, 481 U.S. 137 (1987), the Court revisited *Enmund* and again noted the difference between the Louisiana and Arkansas statutes. Absent an intent to kill, Louisiana "forbids imposition of the death penalty even though the defendant's participation is major and the likelihood of killing is so substantial as to raise an inference of extreme recklessness." *Id.*, at 154.

24

1214

 Respondent's Exhibit E

Arkansas, however, has held that "substantial participation in a violent felony under circumstances likely to result in the loss of innocent human life may justify the death penalty even in the absence of an 'intent to kill' . . ." *Id.*, quoting *Clines, Holmes, Richley & Orndorff v. State*, 280 Ark. 77, 656 S.W.2d 684 (1983), *cert. denied*, 465 U.S. 1051 (1984).

Therefore, under *Enmund*, *Tison* and *Lowenfield*, Louisiana can be said to perform the narrowing function at the guilt phase of the trial, but the same cannot be said of Arkansas. Although *Tison* held that a mental state of reckless indifference coupled with major participation in the felony was sufficient to satisfy the *Enmund* culpability requirement, both *Enmund* and *Tison* implicitly recognized that this lesser culpable mental state pulls more defendants into the net of potential capital liability and, thus, broadens rather than narrows the class of persons eligible for the death penalty. It is only at the penalty phase in Arkansas that narrowing of the class of death eligible defendants occurs through the use of aggravating and mitigating circumstances.

This is the distinction the Tennessee Supreme Court drew in *Middlebrooks* between its statute–for purposes of this appeal identical to the Arkansas statute–and the Louisiana statute dealt with in *Lowenfield*. As that court stated at 840 S.W.2d 341, quoting *Engberg v. State*, 686 P.2d 541, 560 (Wyo. 1984) (Rose, J., dissenting):

> A comparison of the sentencing treatment afforded first degree murder defendants further highlights the impropriety of using the underlying felony to aggravate felony-murder. The felony murderer, in contrast to the premeditated murderer, enters the sentencing stage with one aggravating circumstance automatically charged against him. This disparity in sentencing treatment bears no relationship to legitimate distinguishing features upon which the death penalty might constitutionally rest.

Whereas the capital defendant charged under Ark. Code Ann. § 5-10-101(a)(4) with premeditated murder would go from the guilt phase of the trial to the penalty phase only expectant of proof of

25

1215

Respondent's Exhibit E

aggravating circumstances from the state, the capital defendant charged with felony murder goes into the guilt phase assured of one aggravating circumstance, pecuniary gain, which the jury in the guilt phase has already found existed beyond a reasonable doubt. As between the two, is not the premeditated murderer morally more culpable than the reckless murderer who kills in the course of a robbery?

Two other aspects of the Arkansas statute differentiate it from the Louisiana statute. First, like the statutory schemes in Florida, *Sochor v. Florida*, 504 U.S. __, 119 L.Ed.2d 326, 112 S.Ct. 2114 (1992), and Mississippi, *Stringer v. Black*, 503 U.S.__, 117 L.Ed.2d 367, 112 S.Ct. 1130 (1992), and unlike those in Louisiana and Texas, Arkansas's sentencing scheme is a weighing one. Under Arkansas law after a jury has found a defendant guilty of capital murder and has also found the existence of at least one statutory aggravating circumstance, it is directed to then weigh the aggravating factor or factors against all evidence presented in mitigation. This difference in the statute is "of critical importance," *Stringer v. Black*, 112 S.Ct. at 1137, and the importance of this mandatory weighing process under the Arkansas sentencing scheme has long been emphasized. *See, e.g., Giles v. State*, 261 Ark. 413, 549 S.W.2d 479, *cert. denied*, 434 U.S. 894 (1977). The presence of this weighing requirement further distinguishes the Arkansas statute from the Louisiana statute considered in *Lowenfield. Stringer v. Black*, 112 S.Ct. at 1138. *See also Engberg v. Meyer*, 820 P.2d 70 (Wyo. 1991) (distinguishing *Lowenfield* on the basis of the weighing requirement in the Wyoming statute); *State v. Middlebrooks, supra*.

The second and perhaps more important distinguishing factor of the Arkansas law is that it is also a justification statute, as are the death penalty statutes in Florida and Mississippi. The jury can impose a death sentence only after weighing the aggravating circumstances against the

26

6899 Respondent's Exhibit E

(

evidence of mitigation, deciding that the aggravating circumstances outweigh the mitigating evidence and then deciding that the aggravating circumstances justify the death penalty beyond a reasonable doubt. Failure to take this third step of justification results in a sentence of life imprisonment without parole.

If the jury's consideration of aggravating factors during the sentencing phase is of no constitutional significance because the requisite differentiation among defendants for death penalty purposes has taken place during the jury's guilt deliberation, then the inclusion of the weighing and justification requirements in the Arkansas scheme can only be deemed superfluous. A finding that these requirements are superfluous cannot reasonably be made, for all parts of a statute are to be considered when construing it. *Life Insurance Company of Arkansas v. Ashley*, 308 Ark. 335, 824 S.W.2d 393 (1992); *Sargent v. Cole*, 269 Ark. 121, 598 S.W.2d 749 (1980).

The legislature recognized that the narrowing function was performed in the sentencing phase when it enacted Ark. Code Ann. § 5-4-616 (Repl. 1993) in 1983 to provide for the retrial of the sentencing phase only, leaving the conviction intact, where prejudicial error occurs in the sentencing phase only.

After *Lowenfield* was delivered, this court held that the narrowing function occurred in the Arkansas scheme of things in the guilt phase of the trial in *O'Rourke v. State*, 295 Ark. 57, 746 S.W.2d 52 (1988), but then corrected itself in *Johnson v. State*, 308 Ark. 7, 823 S.W.2d 800, *cert. denied*, 505 U.S. __, 120 L.Ed.2d 911, 112 S.Ct. 3043 (1992), and held that narrowing occurred in the penalty phase. The inclusion of § 5-10-101(a)(4), premeditated and deliberated killings, into the capital murder statute in 1989 makes the narrowing function performed in the penalty phase indispensable, for now virtually any murder can be charged as a capital crime.

(

1217                            27

(

Respondent's Exhibit E

Instead of narrowing the class of death eligible defendants by its definition of capital murder, the Arkansas legislature has broadened it.

Because of the differences in the Arkansas and Louisiana statutory schemes and in light of the development of the law since *Lowenfield* was handed down, the continuing validity of *Perry v. Lockhart, supra,* should be reconsidered and *Collins* given precedence once again.

The appellant notes in closing that the question of whether *Perry* was correctly decided was before the Court in *Lockhart v. Fretwell,* 506 U.S.___, 122 L.Ed.2d 180, 113 S.Ct. 838 (1993), but the Court declined to reach the issue. *Id.,* 113 S.Ct. at 843, n. 4.

IV.

### THE IMPOSITION OF THE DEATH PENALTY ON THE APPELLANT IS DISPROPORTIONATE TO HIS PARTICIPATION AND UNDULY HARSH

Alford Goodwin and the appellant were charged with and convicted of the murder of Gary W. Turner in the course of or in flight from a robbery 5 May 1993. (T. 3, 167) Alford Goodwin did not testify. What evidence there was of the comparative roles each of these men played in this robbery-murder came from the appellant, himself, and from detectives testifying to statements the appellant had made to them before trial.

Detective Ivan Phillips took a statement from the appellant on 11 May 1993, (T. 675, 676), and Detective Terry Addison was present for that statement and took another the next day on 12 May 1993. (T. 700, 701) Reams told the officers on May 11 that he had obtained the .32 caliber revolver used in this robbery from the burglary of dry cleaning establishment in Pine Bluff about one week before this robbery and murder. With this revolver he stated he also committed an armed robbery of a bus station in Pine Bluff on the next day. (T. 677, 678) After first giving

28

1218

 Respondent's Exhibit E

the detectives an evasive story about the events of May 5, Reams told the officers that he was going to tell the truth, which version became his own testimony. (T. 679-681)

Alford Goodwin told Reams that he needed money for high school graduation expenses. He had the idea of robbing an automatic teller machine (ATM). Waiting till dark, the two went to a nearby building and awaited the arrival of a customer. (T. 683, 684) Reams had carried the gun to the site because he was wearing clothes with pockets in which to carry it. Before the arrival of a customer, he had given the gun to Alford, telling him that he did not have the guts to pull the gun on anyone. When Gary Turner pulled up to the machine in his truck, the two walked over to the truck, Alford arriving first on the driver's side of the truck from behind. Reams was going to come around the machine in front of the truck. As he was going around the machine, he said he heard the shot and came around to find the deceased slumped forward over the steering wheel. Alford had run away, and Reams ran after him. When he caught up with him, Alford told Reams that he had shot the man because he had asked him, Alford, "What the fuck do you want?" (T. 684, 685)

In his statement to Detective Addison on May 12 Reams told the officer about a previously attempted ATM robbery of a person named Curtis Gilbert on the same day the dry cleaning establishment was robbed. (T. 689, 690, 703) In this robbery he said that he had held the gun, which was the same .32 caliber revolver used in this murder. The intended victim simply floored the car and drove away, leaving his would be robbers empty handed. (T. 703, 704)

Reams' testimony was fairly consistent with his statements to the detectives. He recounted that Alford needed money for graduation expenses and suggested robbing someone at an ATM. (T. 731, 732) Because Reams had given him the gun about a week earlier, Alford

29

6902   Respondent's Exhibit E

already had the gun and had started walking to the ATM with it. En route, Alford asked Reams to hold the gun while he turned his hooded sweater out, at which point Reams put the gun in his waist band under his jacket. When they reached the point where they waited, Reams attempted to scratch off the serial numbers of the gun on the concrete and attempted to arrange the bullets in the gun so that the hammer would not hit a live round in a loaded cylinder when the weapon was fired. (T. 732-735).

His testimony was a bit different in that he stated that he was right there with Alford when the shot was fired, (T. 738, 739), trying to turn off the ignition, and that Alford told him later he had shot the man because he had asked Alford, "What the fuck do you want, nigger?" (T. 739)

In the guilty phase of the trial defense counsel introduced a copy of the judgment and commitment in Alford's case showing that he had pleaded guilty to this same charge and had been sentenced to life imprisonment without parole. (T. 896, 897, 1045)

Although Reams's version of the events of May 5 changed between his statement to the detectives and his testimony in court, it remained the same on a very important point, to wit, his role in these events. Never did he waiver as to which of them actually pulled the trigger and killed Gary Wayne Turner--Alford did. Because Alford actually shot the victim in this case and because Alford did not get the death penalty, the imposition of the death penalty on Reams is not defensible.

This court performs comparative review on all death penalty cases. As stated in *Sanders v. State*, 317 Ark. 328, 344, 345, __ S.W.2d __ (1994):

> This court conducts, on a case-by-case basis, a comparative review of each death penalty case on appeal. *Ruiz v. State*, 280 Ark. 190, 655 S.W.2d 441 (1983). In conducting this comparative review, the Supreme Court considers the following

30

1220

 Respondent's Exhibit E

factors: (1) whether the death sentence at issue was the result of passion, prejudice, or any arbitrary factors; (2) whether the evidence supports the jury's finding of any statutory aggravating circumstance; (3) whether the evidence supports the jury's findings with regard to whether the aggravating circumstances outweigh the mitigating circumstances; and (4) whether a death sentence is excessive. *Henderson v. State*, 311 Ark. 398, 844 S.W.2d 360 (1993).

*See also Sheridan v. State*, 313 Ark. 23, 852 S.W.2d 772 (1993).

The court has not hesitated to reduce death sentences "where it is imposed capriciously (see *Sumlin v. State*, 273 Ark. 185, 617 S.W.2d 372 (1981)), or where the culpability of co-felons is disproportionate (see *Henry v. State*, 278 Ark. 478, 647 S.W.2d 419 (1983)), or where death is unduly harsh under the circumstances (*Neal v. State*, 274 Ark. 217, 623 S.W.2d 191 (1981) and *Giles v. State*, 261 Ark. 413, 549 S.W.2d 479 (1977))." *Clines, Holmes, Richley & Orndorff v. State*, 280 Ark. 77, 85, 656 S.W.2d 684 (1983), *cert. denied*, 465 U.S. 1051 (1984).

This case is close to *Henry v. State, supra.* In that case the appellant had been sentenced to death in the shooting death of a local police chief by an accomplice. The accomplice was never tried because he was killed by police in a shootout several days after the shooting. In setting aside Henry's death sentence, the court stated at 278 Ark. 488, 489 that:

> After comparing it with other death sentences and sentences of life without parole, we find that appellant's sentence should be reduced from death to life without parole for two reasons: (1) the evidence is overwhelming that he was merely an accomplice and *did not personally fire the fatal shots*, and (2) the jury may have sentenced him to die out of passion and prejudice because the main actor in the murder could not be tried.

Similarly, in *Sumlin v. State, supra*, the court reduced Warren Sumlin's death sentence to life imprisonment without parole when his co-defendant, his wife, Ruth Sumlin, had actually committed the murder and had been sentenced only to life imprisonment without parole. In that case the Sumlins had conspired to break Warren Sumlin out of the Columbia County Jail. In

31

1221

6904 Respondent's Exhibit E

furtherance of this conspiracy, Ruth Sumlin was to murder one J. Y. Cooper and steal his car. She committed this murder, stole his car and broke Warren Sumlin and several other inmates out of the Columbia County Jail. Following the jail break the escapees and Ruth Sumlin went on a wild escapade, during which the Sumlins shot but only wounded both of the inmates they helped escape, and Warren Sumlin shot but only wounded a passing motorist who stopped to help Warren Sumlin with what appeared to be a car problem.

In this case we have a factual situation between that in *Henry* and that in *Sumlin*, for the appellant seems to have been more involved in the incident that led to the shooting that Henry had been, but not as involved as Warren Sumlin had been. Although he had been involved in the planning of this robbery, Reams attempted to insure that no one would be hurt by attempting to line up the bullets so that the hammer of the revolver would not strike a live round in a loaded cylinder, and he did not fire shot that killed the victim. In fact he did not fire the weapon at all.

We have here the first and the fourth factors listed in *Sanders, supra,* to wit, a death sentence the result of passion and prejudice and a death sentence that is excessive. The passion and prejudice is much the same as was present in *Henry*, which could be termed frustration. In *Henry* the frustration was born of the inability of the state to try the dead co-defendant who fired the fatal shot, and here the frustration was an inability to visit the death penalty on the co-defendant who fired the fatal shot who was already sentenced to life imprisonment without parole.

If the death sentence in *Sumlin* was excessive, the death sentence in this case is even more excessive. There, Warren Sumlin planned the jail break with his wife, and the plan included the murder of J. Y. Cooper. Additionally, Warren Sumlin tried mightily to kill someone else after the escape, shooting at least two people. In contrast to that case we have the appellant, who planned

32

Respondent's Exhibit E

1222

a robbery that did *not* include a murder and who tried, albeit in vain, to arrange the bullets in the revolver used so as to make it impossible for anyone to be killed.

The death sentence in this case is also excessive in the sense that it is disproportionate because he is mentally retarded. As noted in Point II, *supra*, the appellant, if executed, would more than likely be one of the last retarded persons in Arkansas to be executed. With the advent of Act 420 of 1993, it is certain that no other mentally retarded person will be executed in the future. The mentally retarded are simply not in the pool of cases for which the death penalty is possible. The paradoxical singularity of Kenneth Reams's situation is not defensible.

The Indiana Supreme Court untangled a similar paradox in *Cooper v. State*, 540 N.E.2d 1216 (Ind. 1989). The defendant committed murder and was sentenced to death at age 15. After the crime and the imposition of the death penalty, the Indiana legislature passed a law prohibiting the execution of persons under the age of 16 at the time of the crime. The Indiana legislature made the law prospective, thus ensuring that it would not apply to Cooper. The Indiana Supreme Court, performing its "duty to review and revise sentences," found that the new statute made the appellant's sentence "unique and disproportionate to any other sentence for the same crime," and reversed the sentence of death. *Id.*, at 1220. This court should make the same ruling in this case.

Clearly, the appellant's death sentence should be set aside as the result of passion and prejudice and as being excessive and disproportionate.

<div align="center">V.</div>

<div align="center">THE JURY DID NOT ADEQUATELY CONSIDER<br>THE MITIGATING CIRCUMSTANCE OF YOUTH AS IT BORE ON<br>THE APPELLANT'S MORAL CULPABILITY</div>

It is undeniable that the appellant was eighteen years old at the time of this offense. The

<div align="center">33</div>

1223

Respondent's Exhibit E

jury unanimously found in Form 2, Part C, that there was evidence of "the youth of Kenneth

Reams at the time of the commission of the capital murder," but that youth as a mitigating

circumstance "did not exist." (T. 161, 162)

The Supreme Court has always acknowledged the mitigating power of a defendant's

youth. When the Supreme Court has enumerated the factors that sentencers must consider in

determining the defendant's fate, youth has assumed a primary place. *See, e.g., Sumner v.*

*Shuman*, 483 U.S. 66, 81-82 (1987); *Lockett v. Ohio*, 438 U.S. 586, 608 (1978) (Ohio capital

sentencing statute unconstitutional because, *inter alia*, "considerations of a defendant's

comparatively minor role in the offense, or *age*, would generally not be permitted, *as such*, to

affect the sentencing decision) (first emphasis added); *Roberts v. Louisiana*, 431 U.S. 633, 637

(1977); *Gregg v. Georgia*, 428 U.S. 153, 197 (1976) (joint opinion of Stewart, Powell and

Stevens, JJ.)

Moreover, when a majority of the Supreme Court adopted the rule of *Lockett, supra*, it

specifically emphasized the critical importance of a defendant's youth and youthful infirmities in

reducing his culpability:

> Nor do we doubt that the evidence Eddings offered was relevant mitigating
> evidence. *Eddings was a youth of sixteen years at the time of the murder* . . . The
> trial judge recognized that *youth must be considered a relevant mitigating factor.*
> But youth is *more than a chronological fact.* It is a time and condition of life
> when a person may be most susceptible to influence and to psychological damage.
> Our history is replete with laws and judicial recognition that minors, especially in
> their earlier years, generally are less mature and responsible than adults.
> Particularly 'during the formative years of childhood and adolescence, minors
> often lack the experience, perspective, and judgment' expected of adults. . . . [J]ust
> as the *chronological age of a minor is itself a relevant mitigating factor of great
> weight,* so must the background and mental and emotional development of a
> youthful defendant be duly considered in sentencing.

34

1224

Respondent's Exhibit E

*Eddings v. Oklahoma*, 455 U.S. 104, 115-116 (1982) (all emphases added) (citations omitted).

This unbroken line of authority is consistent with opinions expressed in the most influential scientific literature:

> Only under the pressure of painful adolescence does [the youth] gradually learn to impose restrictions upon his impulses and to accept the demands of society without conflict, and thus become social.

Aichorn, *Wayward Youth* at 6 (introduction by Sigmund Freud) (Viking ed. 1963). Social science universally accepts that young people are less intellectually mature, more prone to faulty judgment, more susceptible to the influence of others and less accustomed to making moral decisions than are their elders. Young people likewise may not easily learn from experience or mistakes. As Erik Erikson explained in his pathbreaking work, *Childhood and Society* (1963):

> In their search for a new sense of continuity and sameness, adolescents have to refight many of the battles of earlier years, even though to do so they must artificially appoint perfectly well-meaning people to play the roles of adversaries. . . . Adolescence is the age of the final establishment of a dominant positive ego identity.

*Id.* at 261-263, 306.

Indeed, young people characteristically are so unable to weigh alternatives or evaluate the consequences of their conduct that they may unintentionally imperil themselves or others:

> The adolescent lives in an intense present: 'now' is so real to him that past and future seem pallid by comparison. Everything that is important and valuable in life lies either in the immediate life situation or in the rather close future.

Kastenbaum, "Time and Death in Adolescence." in Feifel, ed., *The Meaning of Death* 99, 104 (1959). In sum, the difference that separates young people from adults is their "immature, undeveloped ability to reason in an adultlike manner." Streib, *Death Penalty for Juveniles* 3-20, 184-189 (1987).

35

1225

Finally, youth undeniably possesses at least one *unique* quality as a mitigating factor: every juror has been young.  Most other familiar mitigating factors are outside jurors' actual experience; as a result, they can only appreciate the destructive consequences of circumstances such as desperate poverty, child abuse, mental illness and mental retardation by analogy to their own life experience.  Even if particular jurors might have suffered youth's infirmities to a greater or lesser degree, however, each has a *real, immediate* and *subjective* appreciation of the uncertainty, turmoil and struggle that characterize that "time and condition of life."

It is for these reasons that the jury's decision that although there was evidence of Kenneth Reams's youth introduced, that it was not a mitigating factor cannot stand.  The evidence was overwhelming that Reams's chronological age, when coupled with his mental retardation, produced an individual much younger than his years and with much, much less an understanding of the gravity of the capital murder with which he was involved than could be expected of someone eighteen years old.  As was held in *Giles v. State*, 261 Ark. 413, 424, 549 S.W.2d 479, *cert. denied* 434 U.S. 894 (1977), the jury was not free to arbitrarily disregard uncontradicted, reasonably based testimony.  Clearly, the appellant's death sentence should be vacated for this reason as much as for any other.

## VI.

### FORM TWO, WHICH DEALT WITH MITIGATING CIRCUMSTANCES, LED THE JURY TO BELIEVE THAT UNANIMITY WAS REQUIRED FOR CONSIDERATION OF ANY MITIGATING CIRCUMSTANCES IN THE WEIGHING PROCESS, OR THAT THE JURY DID NOT HAVE TO CONSIDER COLLECTIVELY MITIGATING FACTORS FOUND BY SOME OF THE JURORS

In *Mills v. Maryland*, 486 U.S. 367 (1988), the Supreme Court found unconstitutional a jury instruction sheet that led the jury to believe that unanimity was required for the consideration

<center>36</center>

<center>1226</center>

Respondent's Exhibit E

of mitigating circumstances.  The jury instructions used in the penalty phase of this trial suffered from the same constitutional defect.

Form 1 required the jury to list the aggravating circumstances it unanimously found to exist.  (T. 158)  Form 2 addressed mitigating factors specifically requiring the jury to list those factors that the jury unanimously agreed existed (Part A); to list those factors that some but not all of the jurors agreed existed (Part B); and to list those factors that the jury unanimously believed did not exist (Part C).  (T. 159-163)  Form 3, which guided the jury in the weighing of aggravating and mitigating factors, provided in part that the jury must unanimously find that "the aggravating factors outweigh beyond a reasonable doubt any mitigating circumstances" (Part B). (T. 164, 165)

One fatal constitutional flaw lies in the interplay of these forms, which the trial court conceded were "relatively confusing."  (T. 844)  While Form 2 provided for individual jurors to reach their own determinations on the existence of mitigating factors, Form 3 required a collective decision making that could lead a reasonable jury to believe that unanimity on mitigating factors was required for the ultimate weighing process.  Absent any further instruction from the trial court, as in this case, that would have clarified how the jury was to consider mitigating factors, the jury could have easily  been misled to believe that unanimous agreement on mitigating factors was required in the weighing process, also, in violation of *Mills v. Maryland, supra.*

Another fatal constitutional defect here is that the charge given to the jury is at odds with constitutional requirements that once one or more mitigating circumstances have been found to exist by one or more jurors, the entire jury must consider the factor(s) in the weighing process. The instruction sheet used in this case would have, at best, limited the consideration of mitigating

37

1227

Respondent's Exhibit E

factors to those jurors who had found them to exist, instead of the more broad consideration of

mitigating factors that is compelled by the Eighth and Fourteenth Amendments, as well as by the

analogous provisions of the Arkansas constitution.

<div align="center">VII.</div>

<div align="center">THE JURY RECEIVED NO ADEQUATE INSTRUCTION ON THE
CONSIDERATION OF NON-STATUTORY MITIGATING EVIDENCE</div>

The Supreme Court held in *Lockett v. Ohio*, 438 U.S. 586 (1978), that a jury must be able

to consider and give effect to any and all mitigating evidence proffered by a capital defendant at

his trial.  This key holding of *Lockett* was reaffirmed in *Hitchcock v. Dugger*, 481 U.S. 393

(1987), where the Court held unconstitutional a sentencing charge that erroneously led a jury not

to consider a defendant's non-statutory mitigating evidence presented at his trial.

In this case there was powerful non-statutory mitigating evidence introduced.  David

Nanak, the state mental health expert who examined the appellant pursuant to court order to

determine competence to stand trial, explained that he had given Reams several tests, including

the Bender Visual Motor Gestalt Test, which is used, *inter alia*, to assess "organic problems"

such as "brain damage." (T. 855)  Mr. Nanak's report, introduced into evidence as Defendant's

Exhibit No. 1 at the penalty phase, found that Reams did have some organic malfunctioning,

specifically noting that "[h]e did demonstrate some visual-motor coordination problems during

this testing." (T. 976)

Other important non-statutory mitigating evidence came through the testimony of Reams's

minister and family.  Reverend George McDaniel testified regarding Reams's positive character,

such as the fact that "he was on the usher board at the church," (T. 867), and that Reams used his

<div align="center">38</div>

<div align="center">1228</div>

  Respondent's Exhibit E

artistic abilities to produce drawings for the church. (T. 868) Finally, the Reverend attested to the fact that Reams was "a good young man," with "qualities" that were special to him. (T. 869, 870) Reams's mother, Beatrice Whiteside, also testified about her son's special artistic gift, as well as the fact that he had been dependable as a baby-sitter for his younger siblings. (T. 879) Finally, reports from Reams's former counselors were submitted to the jury, indicating that he began to engage in crime to get his mother's attention; she often deserted him. (T. 1015, 1043)

While this crucial non-statutory mitigating evidence in favor of sparing Reams's life was presented to the jury, there was no instruction on how—or even whether—to consider this evidence. In its charge to the jury the trial court made no mention of the jury's consideration of non-statutory mitigating evidence. Indeed, by the court's instruction a reasonable jury would have believed that its consideration was limited to the *listed* mitigating factors. The trial court instructed:

> There are four parts to form 2. Part A is the *listing* of mitigating circumstances . . .
> . Part B is a *list* . . . Then Part C is a *list* . . .

(T. 912) (Emphasis added.)

The jury was given no explanation of the "other" category of mitigating evidence listed on Form 2. The only clue to this "other" section were the words, "Specify in writing," but reasonable jurors could have concluded that this section was for special mitigating factors which the judge would have informed them about. Thus, while the defense counsel presented to the jury in closing argument many non-statutory mitigating factors for it to consider, the trial court failed to instruct the jury how those factors were to be considered in relation to Form 2. The trial court never explained, for example, that the jury had to consider whether *non*-listed mitigating factors

39

1229

Respondent's Exhibit E

Mr. Right

I would like to know if I can have a copy of everything you have about on my capital murder case as soon as possible. Will you please do this for me.

Sincerly,
Kenneth Reams

Please
Respond
As soon
as
possible

Send To:
Kenneth Reams
Varner Unit
Post Office Box 600
Grady, Ar.
            71644-0600

1230

```
· ·CONFIRMATION REPORT · ·

TRANSMISSION
TRANSACTION(S) COMPLETED


NO.   DATE/TIME   DESTINATION              DURATION PGS    STATUS   MODE

761   APR. 30  9:50              5015347010  0° 01' 13"  002    OK     NORMAL
```



**NAACP LEGAL DEFENSE**
**AND EDUCATIONAL FUND, INC.**

*National Office*
Suite 1600
99 Hudson Street
New York, N.Y. 10013-2897   (212) 219-1900   Fax: (212) 226-7592

# FAX COVER SHEET

**DATE:** _4/30/96_

## *PLEASE DELIVER THE FOLLOWING FAX IMMEDIATELY*

**TO:** _Maxie Kizer, Esq._

**FAX #:** _501-534-7010_

**FROM:** _George Kendall_

**SUBJECT:** _Reams v. AK_

**TOTAL NUMBER OF PAGES INCLUDING FAX SHEET:** _2_

**COMMENTS:** _____

_____

_____

1231 _____

6914          Respondent's Exhibit E

tion from electrocution to lethal injection. This change would permit one now to elect either of these methods by which to die, so even if there were error in the exclusion of the testimony, a convicted person suffered no actual harm in the jury's not being apprised of the pain and suffering incurred during an electrocution, for he need not choose that method of execution. Swindler v. Lockhart, 693 F. Supp. 760 (E.D. Ark. 1988), aff'd, 885 F.2d 1342 (8th Cir. 1989), cert. denied, 495 U.S. 911, 110 S. Ct. 1938, 109 L. Ed. 2d 301 (1990).

**Pronouncement of Death.**

The death of a person who has been executed must be pronounced according to accepted standards of medical practice. Hill v. Lockhart, 791 F. Supp. 1388 (E.D. Ark. 1992).

An execution ends with the pronouncement of death by someone qualified to determine the absence of vital signs, and this section does not require that this determination be made by a medical doctor. Hill v. Lockhart, 791 F. Supp. 1388 (E.D. Ark. 1992).

## 5-4-618. Mental retardation.

(a)(1) As used in this section, "mental retardation" means:

(A) Significantly subaverage general intellectual functioning accompanied by significant deficits or impairments in adaptive functioning manifest in the developmental period, but no later than age 18; and

(B) Deficits in adaptive behavior.

(2) There is a rebuttable presumption of mental retardation when a defendant has an intelligence quotient of sixty-five (65) or below.

(b) No defendant with mental retardation at the time of committing capital murder shall be sentenced to death.

(c) The defendant has the burden of proving mental retardation at the time of committing the offense by a preponderance of the evidence.

(d)(1) A defendant on trial for capital murder shall raise the special sentencing provision of mental retardation by motion prior to trial.

(2) Prior to trial, the court shall determine if the defendant is mentally retarded.

(A) If the court determines that the defendant is not mentally retarded, the defendant may raise the question of mental retardation to the jury for determination de novo during the sentencing phase of the trial.

(i) At the time the jury retires to decide mitigating and aggravating circumstances, the jury shall be given a special verdict form on mental retardation.

(ii) If the jury unanimously determines that the defendant was mentally retarded at the time of the commission of capital murder, then the defendant will automatically be sentenced to life imprisonment without possibility of parole.

(B) If the court determines that the defendant is mentally retarded, then the jury shall not be "death qualified," but the jury shall sentence the defendant to life imprisonment without possibility of parole upon conviction.

(e) However, this section shall not be deemed to require unanimity for consideration of any mitigating circumstance, nor shall this section

be deemed to supersede any suggested mitigating circumstance regarding mental defect or disease currently found in § 5-4-605.

**History.** Acts 1993, No. 420, § 1.
**A.C.R.C. Notes.** References to "this chapter" in subchapters 1-5 and §§ 5-4-601 — 5-4-617 may not apply to this section which was enacted subsequently.

References to "this subchapter" in §§ 5-4-601 — 5-4-617 may not apply to this section which was enacted subsequently.

# CHAPTER 5
# DISPOSITION OF CONTRABAND AND SEIZED PROPERTY

SUBCHAPTER.
1. GENERAL PROVISIONS.
3. FORFEITURE OF PROPERTY.

## SUBCHAPTER 1 — GENERAL PROVISIONS

SECTION.
5-5-101. Disposition of contraband and
seized property.

## 5-5-101. Disposition of contraband and seized property.

(a) All seized property shall be returned to the rightful owner or possessor thereof except contraband owned by a defendant.

(b) Contraband includes:

(1) Any article possessed under circumstances prohibited by law;

(2) Any weapon or other instrumentality used in the commission or attempted commission of a felony; and

(3) Any other article designated contraband by law.

(c) Contraband shall be destroyed, except that any article of contraband capable of lawful use may in the discretion of the court having jurisdiction be retained for use by the law enforcement agency responsible for the arrest or sold, and the proceeds disposed of, in the manner provided by subsections (e), (f), and (g) of this section.

(d) Unclaimed seized property shall be sold at public auction to be held by the sheriff of the county in which the seizure took place, and the proceeds, less the cost of sale and any storage charges incurred in preserving it, shall be paid into the general fund of the county.

(e) The time and place of sale of seized property shall be advertised for at least fourteen (14) days next before the day of sale by posting written notice at the courthouse door and by publication in the form of at least two (2) insertions, at least three (3) days apart, before the day of sale in a weekly or daily newspaper published or customarily distributed in the county.

(f) All seized property to be sold at public sale shall be offered for sale on the day for which it was advertised between 9:00 a.m. and 3:00

1233

Respondent's Exhibit E

# $ 5,000 REWARD

# FOR MURDER SUSPECTS

Worthen Bank has offer a $ 5000 reward for Information leading to the arrest and conviction of the suspects involved in the murder of Gary Turner.

Mr. Turner was shot and killed on May 5, 1993 at 8:30 pm while apparently making a transaction at the Worthen Bank Money Machine at 5th and Chestnut.

Anyone with information should contact the Pine Bluff Police Department Detective Division.  All information will be kept confidential.

## Call 543-5111 or 543-5143.

Respondent's Exhibit E                    1234

# MAXIE G. KIZER, P.A.

**ATTORNEY AT LAW**

721 PINE STREET
P. O. BOX 7423
PINE BLUFF, ARKANSAS 71611

MAXIE G. KIZER
BAR NO.
83101

TELEPHONE:
(501) 534-7004
FAX NO.
(501) 534-7010

December 29, 1993

The Honorable Fred D. Davis, III
Circuit Judge
Post Office Box 9140
Pine Bluff, Arkansas  71611

    Re:  State of Arkansas v. Kenneth Reams;
        Jefferson Circuit No. CR-93-301-3

Dear Judge Davis:

    Please find enclosed the original and one (1) copy of a Stay
of Execution which I have prepared in the above matter.  If this
meets with your approval, please sign it and ask the Clerk to file
it of record.

    Thank you for your consideration in this matter.

                Sincerely,

                MAXIE G. KIZER, P.A.

MGK:kb
Enclosure
cc:  Ms. Carol Billings
     Mr. Kenneth Reams

1235

Respondent's Exhibit E

IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ARKANSAS

STATE OF ARKANSAS                                              PLAINTIFF

VS.                            NO. CR-93-301-3

KENNETH REAMS                                                  DEFENDANT

## STAY OF EXECUTION

Now on this day comes on the above named matter and the State of Arkansas, appeared by and through it Prosecuting Attorney, Carol Billings and the Defendant, Kenneth Reams, appeared by and through his attorney, Maxie G. Kizer, and from the pleadings, the arguments of counsel, and other matters of fact and law properly before the Court, the Court doth find and order as follows:

1.    That the Defendant was found guilty at a jury trial held in this matter on December 13-15, 1993, of the crime of Capital Murder and was sentenced to death by lethal injection.

2.    That an Amended Judgment and Commitment Order was filed on the 29th day of December, 1993, setting the Defendant's execution date for January 14, 1994.

3.    That subsequently on the 5th day of January, 1994, the Defendant filed a Notice of Appeal in this matter for review of this case by the Arkansas Supreme Court.

4.    Therefore, the Court's Order of Execution in this matter is hereby stayed pending the completion of the appeal to the Arkansas Supreme Court.

FILED

JAN 1 0 1994

DOROTHY G. PEARSON
Circuit & Chancery Clerk
JEFFERSON COUNTY, ARKANSAS

1236

6919   Respondent's Exhibit E

IT IS SO ORDERED this __10__ day of _January_, 1994.

FRED D. DAVIS, III, Circuit Judge

 Respondent's Exhibit E

IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ARKANSAS

STATE OF ARKANSAS                                      PLAINTIFF

VS.                          NO. CR-93-301-3

KENNETH REAMS                                          DEFENDANT

## STAY OF EXECUTION

Now on this day comes on the above named matter and the State of Arkansas, appeared by and through it Prosecuting Attorney, Carol Billings and the Defendant, Kenneth Reams, appeared by and through his attorney, Maxie G. Kizer, and from the pleadings, the arguments of counsel, and other matters of fact and law properly before the Court, the Court doth find and order as follows:

1.   That the Defendant was found guilty at a jury trial held in this matter on December 13-15, 1993, of the crime of Capital Murder and was sentenced to death by lethal injection.

2.   That the Judgment and Commitment Order was filed on the 16th day of December, 1993.

3.   That subsequently on the 17th day of December, 1993, the Defendant filed a Notice of Appeal in this matter for review of this case by the Arkansas Supreme Court.

4.   Therefore, the Court's Order of Execution in this matter is hereby stayed pending the completion of the appeal to the Arkansas Supreme Court.

IT IS SO ORDERED this _____ day of _____, 199___.


                                    _____
                                    FRED D. DAVIS, III, Circuit Judge


                                                          1238

6921 Respondent's Exhibit E

SUPREME COURT
COURT OF APPEALS
STATE OF ARKANSAS
Justice Building
625 Marshall Street
Little Rock, AR 72201

## NOTICE OF FILING OF APPEAL

Little Rock, Ark., 26th day of May, 1994

Transcript was filed today in the case of

KENNETH REAMS

vs          No. CR   94 00558

STATE OF ARKANSAS

Appellant's brief due  5th day of July, 1994

Appellee's brief due 30 days after appellant's brief filed

Reply brief due 15 days after appellee's brief filed

Pursuant to Supreme Court Rule 11(g), if you are a court appointed
attorney, you must file the original brief with the Clerk's office
and submit two (2) copies of your brief to the Attorney General's
Office along with a letter requesting that they print the additional
copies needed for filing.

By per curiam order of February 1, 1993, the Arkansas Supreme Court
adopted the revised Rules of the Supreme Court and Court of Appeals
that became effective May 1, 1993.  Your attention is called to Article
4 of the rules that contain several significant changes relative to the
filing of briefs.

LESLIE W. STEEN, CLERK

By: Denise Parks

1239

   Respondent's Exhibit E

Office of the Clerk
SUPREME COURT
COURT OF APPEALS
STATE OF ARKANSAS
Justice Building
625 Marshall Street
Little Rock, AR 72201

June 27th, 1994

KENNETH REAMS

    vs          No. CR   94 00558

STATE OF ARKANSAS

Attorneys of Record:

The time allowed for filling the appellant's brief in the above case
has been extended to 09/03/1994.

                              Leslie W. Steen
                              Clerk
                              By: Todd Hill, D.C.

1240

Respondent's Exhibit E

IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ARKANSAS

STATE OF ARKANSAS                                          PLAINTIFF

VS.                          NO. CR-93-301-3

KENNETH REAMS                                              DEFENDANT

## MOTION TO INSTRUCT THE JURY AS TO ALLEGATION OF DEFENDANT'S MENTAL RETARDATION

Comes the Defendant, Kenneth Reams, by and through his attorney, Maxie G. Kizer, pursuant to A.C.A. 5-4-618, and for his Motion, states:

1.   That pursuant to a report dated September 28, 1993, from the Southeast Arkansas Mental Health Center, a copy of which is in the Court's file, the Defendant was found to have a WAIS-R full scale IQ of 66, which categorizes him in the mild range of mental retardation, according to the Wechsler Classification System.

2.   Therefore, pursuant to A.C.A. 5-4-618, the Defendant respectfully moves this Court to instruct the jury by a special jury instruction that the jury may find by unanimous determination that the Defendant was mentally retarded at the time the commission of the offense of Capital Murder as charged in this matter; and, in so doing, the Defendant would be automatically sentenced to life in imprisonment without the possibility of parole.

1241                    ᴺᴶᵁ 959

WHEREFORE, the Defendant, Kenneth Reams, prays that he be granted the relief outlined above, and for all other relief to which he may be entitled.

KENNETH REAMS, Defendant

By: _____
MAXIE G. KIZER (83101)
Attorney at Law
Post Office Box 7423
Pine Bluff, Arkansas   71611
(501) 534-7004

## CERTIFICATE OF SERVICE

I, Maxie G. Kizer, do hereby certify that a copy of the foregoing Motion has been hand-delivered to Ms. Carol Billings, Prosecuting Attorney, Jefferson County Courthouse, Pine Bluff, Arkansas 71601, on this 14th day of December, 1993.

_____
MAXIE G. KIZER

970

1242

6925      Respondent's Exhibit E

SPECIAL VERDICT FORM

We, the jury, unanimously determine that the Defendant, Kenneth Reams, was mentally retarded at the time of the commission of Capital Murder involving the death of Gary Wayne Turner.

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

9?2

1243

Respondent's Exhibit E

# MAXIE G. KIZER, P.A.

ATTORNEY AT LAW

721 PINE STREET
P. O. BOX 7423
PINE BLUFF, ARKANSAS 71611

XIE G. KIZER
BAR NO.
83101

TELEPHONE:
(501) 534-7004
FAX NO.
(501) 534-7010

December 29, 1993

The Honorable Fred D. Davis, III
Circuit Judge
Post Office Box 9140
Pine Bluff, Arkansas  71611

     Re:  State of Arkansas v. Kenneth Reams;
         Jefferson Circuit No. CR-93-301-3

Dear Judge Davis:

    Please find enclosed the original and one (1) copy of a Stay
of Execution which I have prepared in the above matter.  If this
meets with your approval, please sign it and ask the Clerk to file
it of record.

    Thank you for your consideration in this matter.

                 Sincerely,

                 MAXIE G. KIZER, P.A.

MGK:kb
Enclosure
cc:  Ms. Carol Billings
     Mr. Kenneth Reams

1244

6927   Respondent's Exhibit E

Debbie Sallings →          663-1440

Jim Overton ⟷ Phil McMath
  + assoc.              ↓
              repr. Simens v. Worthen

Went to see Kenneth Reams
Told him they had your approval.

1245

Respondent's Exhibit E



9/29/93

JO ANN
REAMS
1003 WEST
PB, ARK
Close to
Whitney St.
asked
Aunt

MET w/ KENNETH REAMS -

REAMS - Adrian Love - Attends JACK ROBEY
           Jr High School - JACK ROBEY

Statements - testimony to be offered
              by Δ @ suppression Hearing

Officers - Beat him, choked him
           threatened him w/ death
           penalty & showed him
           pictures of KKK

Δ agreed to take lie detector
test about 2:00 AM after being
arrested @ 3:00 pm previous day -
Told he flunked test - Δ said he
would now tell truth -

JERMAINE -

8/3/93

* ROBERT WHITE — Need to Petition the
Court to be relieved as Atty — Cite
a conflict in the defenses between
White + Willis —

* ROBERT GOULD — Need mental evaluation —
— Don Smith → liked my family —

* KENNETH KEAME —

| * Adrian Love — |     * Showed him
| Oak St. |     pictures —
Elevator |   Lives w/ Alfred Godwin |     of KKK —
Door Need | * Tim Perry |
officers |   1003 West 3rd · |     Beat △ up—
|   PB, Ark |

Seek to suppress statements —
Lie Detector Test △

Testimony — 40 yrs →
Exchange for Testimony —

fiduciary
deed

1247

Respondent's Exhibit E

Met w/ Δ @ Jail

① Motion — Suppress

Witnesses

Adrian Love — 314 South Oak

Lives @ same address @ Alfred Goodwin

Tim Perry
1003 West 3rd
PB, Ark

= had been
previously
told that Δ
wanted to enter
plea - However
that is not
the case.

* Mental Health Evaluation
6/14/93

Burglary   CR-93-298   tried first

Agg Robbery CR-93-299   Bus Station

Agg Robbery CR-93-300   ATM

Capital Murder CR-93-301   ATM - Turner

9:00 AM Thursday

1248

Respondent's Exhibit E

KENNETH KEAMS                                    11/11/9

* Met w/ Δ's family — his MOTHER
plus — father — @ my office —
& — DEBBIE calling

1249

IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ARKANSAS

STATE OF ARKANSAS

PLAINTIFF

VS. CASE NO.

DEFENDANT

PRESENTENCE REPORT

NAME: _____    DATE OF ARREST: _____

ADDRESS: _____    OFFENSE: _____

_____    PLEA: _____ DATE: _____

_____    DETAINERS OR CHARGES PENDING: _____

PHONE: _____    _____

.    CUSTODY: _____

LENGTH OF TIME IN STATE: _____    DAYS IN JAIL: _____ BONDSMAN: _____

AGE: _____ DOB: _____    BOND AMOUNT: _____

PLACE OF BIRTH: _____    DATE BOND POSTED: _____

EDUCATION: _____    JUDGE PRESIDING: _____

RACE: _____    DEFENSE ATTORNEY: _____

HEALTH: _____    STATE'S ATTORNEY: _____

MARITAL STATUS _____    CO-DEFENDANTS: _____

_____    AND _____

DEPENDENTS: Number: _____          CO-DEFENDANTS' DISPOSITION: _____

               Ages:  _____          _____

        Relationship: _____          PRIOR FELONIES: _____

ALCOHOL INVOLVED: Yes:_ No:_            MISDEMEANORS: _____

NARCOTICS INVOLVED:                     PROBATION OR PAROLE: _____

         Yes: _____ No: _____         _____


SOCIAL SECURITY NUMBER: _____   DRIVERS LICENSE: _____
EMPLOYMENT RECORD:

1251

2 Respondent's Exhibit E

CRIMINAL RECORD:

STATEMENT CONCERNING PRESENT OFFENSE:

PRESENTENCE REPORT:   (Continued)

1.   Is there undue risk during the period of a suspension or probation that the defendant will commit another offense?

2.   Is the defendant in need of correctional treatment that can be provided most effectively by his commitment to an institution?

1252

4.    Did the defendant's conduct cause or threaten to cause serious
      harm?

5.    Did the defendant know that his conduct would cause or threaten to
      cause serious harm?

6.    Did the defendant act under provocation?

7.    Are there substantial grounds tending to excuse or justify the
      defendant's conduct, though failing to establish a defense?  If
      so, please state.

8.    Did the victim of the offense cause or contribute to its
      commission?

9.    Has the defendant compensated or is he financially able to
      compensate the victim of the offense for the damage or injury he
      sustained?

1253

4

10.   If the defendant has a criminal record, state how long it has been
      since last criminal charge.

11.   Was the defendant's conduct the result of conditions unlikely to
      recur?

12.   Does the character and attitude of the defendant indicate he will
      be unlikely to commit another offense?

13.   Will the defendant likely respond affirmatively to suspension or
      probation?

14.   Would the imprisonment of the defendant entail excessive hardship
      to him or his dependants?

15.   Is the defendant in poor health?  If so, describe.

16.   Did the defendant cooperate with the law enforcement authorities
      in his own prosecution or in the prosecution of others?

IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ARKANSAS
ELEVENTH JUDICIAL DISTRICT WEST

STATE OF ARKANSAS                                          PLAINTIFF

V.                          NO. CR-

                                                           DEFENDANT

PRESENTENCE REPORT

NAME:                              DATE OF ARREST:

ADDRESS:
                                   CUSTODY:

LENGTH OF TIME IN STATE:           OFFENSE:

AGE:

DATE OF BIRTH:         .           PLEA:

EDUCATION:                         DATE:

HEALTH:                        DETAINERS, CHARGES PENDING:

MARITAL STATUS:


DEPENDANTS:                        JUDGE PRESIDING:

ALCOHOL INVOLVED?:                 DEFENSE ATTORNEY:

NARCOTICS INVOLVED?:               STATE'S ATTORNEY:


CODEFENDANTS, AND DISPOSITIONS:

1255

A. Condensed official version

B. Defendant's version

C. Comments you might have regarding the two versions

D. Defendant's prior record

E. Additional charges pending in Municipal Court @/or other jurisdictions

SOCIAL HISTORY

A. Immediate family history

B. Education – might also include IQ, behavior/attitude in school, other training/vocational, etc.

C. Employment present & past

D. Financial situation (consider nature and amount of debts, normal income, spending/savings habits)

E. Military

F. Marital situation/responsibilities toward

G. Mental and physical health including drug and alcohol abuse

COMMUNITY ATTITUDE

A. Victims' statements

B. Restitution (discuss with prosecutor)

EVALUATION

Discuss defendant's empathy, sense of responsibility, self-concept, social outlook, self-control, degree of remorse, emotional and intellectual maturity, and his responses to help and assistance. Other items to consider: who is the most significant influence in the defendant's behavior, whether positive or negative; what opportunities are realistically open to him; and who or what offers the most effective controls over his behavior (Example: family, friends, law enforcemtns agencies, treatment facilities) Questions include as well

RECOMMENDATION & OTHER COMMENTS

6939    Respondent's Exhibit E

17.   Other information or recommendations:




                        SIGNED this _____ day of _____, 198_

                        _____
                        PROBATION OFFICER


DATE: _____

DISPOSITION:







                        SENTENCING JUDGE: _____
                                          CIRCUIT JUDGE


1257



# ARKANSAS DEATH PENALTY RESOURCE CENTER, INC.

1500 Riverfront Drive, Suite 118
Little Rock, Arkansas 72202

Al Schay, Executive Director

(501) 663-1440
Fax (501) 663-2612

Staff Attorney
Deborah R. Sallings

Tommy Crosthwait
Investigator

November 8, 1993

Mr. and Mrs. Scott Whiteside
411 East Davis
Forrest City, AR  72335

     Re:  Kenneth Reams

Dear Mr. and Mrs. Whiteside:

    This will confirm our appointment on Thursday, November 11, 1993, at 9:00 a.m. at the office of Mr. Maxie Kizer, 721 Pine Street, Suite 5 in Pine Bluff, Arkansas.

    I look forward to meeting you.

                 Very truly yours,

                 Deborah R. Sallings

DRS/dr

cc:  Maxie G. Kizer, Esq.

1258

Respondent's Exhibit E

Office of The Clerk
Supreme Court of The State of Arkansas
Arkansas Court of Appeals
Justice Building
625 Marshall Street
Little Rock, AR 72201

Leslie W. Steen
Clerk

Robin Horne
Chief Deputy Clerk

Melissa Fuller
Chief Deputy Clerk

Janie Owen
Office Administrator

Jeanne Matthews
Records Supervisor

SEPTEMBER 11, 1995

Deputy Clerks:

Denise Parks

Greta Houston

Daniel Dodson

Holli North

Ginger Mullins

Todd Hill

Joan Owens

Clint Miller
Deputy Attorney General
Senior Appellate Advocate
200 Tower Building
323 Center Street
Little Rock, AR   72201

    RE:   CR   94 00558   KENNETH REAMS v.
              STATE OF ARKANSAS

Dear Mr. Miller:

    The Arkansas Supreme Court made the following order today in
the above styled case:

    "Appellee's motion to file enlarged brief is
    granted."

Appellee's brief is filed this date.

                              Sincerely,

                              Leslie W. Steen, Clerk

LWS:rh

cc:  Maxie G. Kizer

1259

   Respondent's Exhibit E

# MAXIE G. KIZER, P.A.

### ATTORNEY AT LAW

721 PINE STREET
P. O. BOX 7423
PINE BLUFF, ARKANSAS 71611

MAXIE G. KIZER
BAR NO.
83101

TELEPHONE:
(501) 534-7004
FAX NO.
(501) 534-7010

July 7, 1995

Mr. Theodore Holder, Esq.
2311 State Street
Little Rock, Arkansas  72206

        Re:  Kenneth Reams v. State of Arkansas;
             Appeal No. CR-94-558

Dear Ted:

        Please find enclosed a copy of a Motion for an Extension of
Time in which to file the Appellee's Brief.

                    Sincerely yours,

                    MAXIE G. KIZER, P.A.

MGK:kb
Enclosure
cc:  Mr. Kenneth Reams

1260

6943   Respondent's Exhibit E

Redemption →
Gr Britian

Follower/ Leader
Vote conscisice
Given in convictions -
In Prison - Uncreated
Life/Death

6944   Respondent's Exhibit E

Motion To Instruct Jury
As To the Issue of
Mental Ret

How many Blacks do you Think
We have in Next 20?

1262

# ARKANSAS DEATH PENALTY RESOURCE CENTER, INC.

1500 Riverfront Drive, Suite 118
Little Rock, Arkansas 72202

Al Schay, Executive Director

(501) 663-1440
Fax (501) 663-2612

Staff Attorney
Deborah R. Sallings

Tommy Crosthwait
Investigator

September 28, 1993

Maxie G. Kizer, Esq.
BYNUM & KIZER
721 Pine, Suites 3, 4 & 5
P.O. Box 2768
Pine Bluff, AR  71611

Re:  Calvin Porter; Kenneth Reams; Willie Lee Moorehead,
     Jr.; Nakia Davis and Romondo Jenkins

Dear Maxie:

This will confirm our appointment for Friday, October 1, 1993, to meet at our office to discuss the referenced cases.  Mr. Al Schay and Mr. Tommy Crosthwait will be meeting with us.

In order to make this meeting as productive as possible, prior to the meeting we will have reviewed the case files you provided us last week.  If you have received any other information from anyone, including the prosecutors or the police since you sent us your files, please bring that information to our Friday meeting.

I look forward to meeting with you and working with you.  If you have any questions, please do not hesitate to call any of us.

Very truly yours,

Deborah Sallings

Deborah R. Sallings

DRS/

1263

Respondent's Exhibit E

# MAXIE G. KIZER, P.A.

### ATTORNEY AT LAW

721 PINE STREET
P. O. BOX 7423
PINE BLUFF, ARKANSAS 71611

MAXIE G. KIZER
BAR NO.
83101

TELEPHONE:
(501) 534-7004
FAX NO.
(501) 534-7010

November 12, 1993

Ms. Jo Ann Reams
1119 East Second Street
Pine Bluff, Arkansas  71601

    Re:  State of Arkansas v. Kenneth Reams;
        Jefferson Circuit No. CR-93-301-3

Dear Ms. Reams:

    Please be advised that I am the attorney representing your nephew, Kenneth, regarding the above matter.  It would be appreciated if you would please call my office as soon as possible and set up an appointment to visit with me concerning this matter.

    Sincerely,

    MAXIE G. KIZER, P.A.

MGK:kb

1264

Respondent's Exhibit E

# MAXIE G. KIZER, P.A.

ATTORNEY AT LAW

721 PINE STREET
P. O. BOX 7423
PINE BLUFF, ARKANSAS 71611

MAXIE G. KIZER
BAR NO.
83101

TELEPHONE:
(501) 534-7004
FAX NO.
(501) 534-7010

July 18, 1995

Mr. Kenneth Reams
S. K. 927
2501 State Farm Road
Tucker, Arkansas 72168

Re:   Kenneth Reams v. State of Arkansas
      Appeal No. CR-94-558

Dear Kenneth:

Please find enclosed another Motion for an Extension of Time
in which to File the Appellee's Brief received in the above
matter.

Sincerely,

MAXIE G. KIZER, P.A.

MGK:kb
Enclosure

cc:  Mr. Ted Holder

1265

Respondent's Exhibit E

IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ARKANSAS

STATE OF ARKANSAS                                              PLAINTIFF

VS.                              NO. CR 93-301-3

KENNETH REAMS                                                  DEFENDANT

## SUPPLEMENTAL JUROR QUESTIONNAIRE

A jury must be selected from the panel of which you are a member to hear the above-captioned case. As part of the jury selection process, the questions asked in this questionnaire could be asked in open court. You are given more privacy by answering them in this questionnaire. Please answer each question. If you need more space, please use the back and so indicate on the front.

By court order, none of the information you reveal in response to these questions is to be used for any purpose other than the selection of qualified jurors to serve in this case. Attorneys will be required to return all copies of these questionnaires to the Clerk of the Court for destruction after a final resolution of this case.

NAME (PRINT): _____
                (Last)              (First)           (Middle)

ADDRESS: _____
          (Street, P.O. Box)        (City)        (State)
OCCUPATION: _____
                      (If retired so indicate.)

SPOUSE'S OCCUPATION: _____
                          (If retired so indicate.)

1.  Has your marital status changed in the last 10 years?
    Yes___ No___  If yes, was that by: Death of Spouse___
    Divorce___  Marriage___  Remarriage___

2.  Total number of children_____ or stepchildren_____
    Number of boys _____    Their ages _____
    Number of girls _____   Their ages _____
    Have you ever had any foster children? _____
    How many live with you? _____

3.  Does anyone live in your home other than your spouse or
    children? Yes ___  No ___

4.  What is your highest level of education? _____

5.  What is your spouse's highest level of education? _____

6.  Where did you attend high school? _____

Respondent's Exhibit E                    1266

If you attended college, name the college and its location.
_____

What was your major? _____
What was your minor? _____
If you attended graduate school? If so, name of institution
and degree obtained. _____
_____

7.  Please indicate by the organizations, clubs and religious
    activities in which you actively participate:

    Civic _____      Fraternal _____
    Religious _____      Volunteer _____
    Social _____      Other _____

8.  Have you or any member of your family been a party to a
    lawsuit?  Yes___  No___  If yes, please specify _____
    _____

9.  Have you or any member of your family been a witness in a
    lawsuit?  Yes___  No___  If yes, please specify _____
    _____

10. Have you ever been the victim of a crime?  Yes___  No___
    Was the crime reported to the police or were the police
    involved?  Yes___  No___  Was the crime prosecuted?  Yes___
    No___  If yes, was it resolved to your satisfaction?_____
    _____

11. Has any member of your family ever been a victim of murder,
    manslaughter or negligent homicide?  Yes___  No___  If yes,
    please specify and state whether resolved to your
    satisfaction. _____
    _____

12. Have you, any member of your family, or a close friend ever
    been accused of any action related to murder, manslaughter
    or negligent homicide?  Yes___  No___

13. Have you ever been convicted of a crime other than traffic
    offenses?  Yes___  No___

14. Have you ever been arrested and charged with any crime other
    than a traffic offense?  Yes___  No___  If yes, please
    specify. _____
    _____

15. Have you, any member of your family, or close friend ever
    had any special training in law or law enforcement?  Yes___
    No___  If yes, please specify. _____
    _____

2

1267

 Respondent's Exhibit E

16. Do you or any member of your family have personal or
business relationships with any member or employee of the
following state or county offices?

PLEASE PLACE A CHECK IN THE APPROPRIATE BLANK

|  | Yes | No |
|---|---|---|
| Police Department | | |
| County Sheriff's Office | | |
| Other Law Enforcement Agency | | |
| Prosecuting Attorney's Office | | |
| Arkansas Department of Correction | | |

17. Do you or any member of your family, or close friend, have
any knowledge of or any personal relationship with _____?
Yes___ No___

18. Do you have any knowledge of or have you had any contact or
relationship with any of the following individuals who may
appear as witnesses in this case?  Please check the
appropriate blank to indicate any relationship or knowledge
you or any member of your family may have of that witnesses
or any member of that witness' family.

| List of Witnesses | I have heard of | I know | I know member of witness' family | Family knows witness or family |
|---|---|---|---|---|
| ~~Greg Taylor~~ | | | | |
| ~~James Nelson~~ | | | | |
| Taquante Nelson | | | | |
| Bud Phillips | | | | |
| Terry Addison | | | | |
| Jo Ann Reams | | | | |
| Dr. Sturner | | | | |
| Ron Andrejack | | | | |
| Phillip Curry | | | | |
| ~~Kenny Heroman~~ | | | | |
| David A. Nanak | | | | |
| Patrick Coffey | | | | |
| Elgin Anders | | | | |
| Amelia Reams | | | | |
| John Cone | | | | |
| George McDaniel | | | | |
| Jeannie Mack | | | | |
| Mike Moss | | | | |

19. Have you read any newspaper articles about this?  Yes___
No___  Have you formed any opinion regarding this case after
reading the newspaper articles?  Yes___  No___

3

20. Have you discussed this case with anyone?  Yes___ No___  If
    yes, what was the nature of this discussion?  _____
    _____
    If yes, did anyone offer any opinions or facts about the
    case?  Yes___ No___

21. Have you heard this case discussed by anyone even if you
    were not a participate in the conversation?  Yes___ No___
    If yes, did anyone offer any opinions about it?  Yes___
    No___

22. What opinions, if any, have you formed concerning this case?
    Please explain in detail.  _____
    _____
    _____
    _____
    _____

    Have you expressed your opinion to others?  Yes___ No___
    If yes, to whom?  _____

23. Do you have any specific problems at home or on the job that
    might cause you to lose concentration during the trial?
    Yes___  No___  If yes, please explain in detail.  _____
    _____
    _____
    _____

24. Do you have any physical or emotional disabilities which
    would make it difficult or impossible to serve on this jury?
    Yes___  No___  If yes, please explain in detail. _____
    _____
    _____

25. Are you taking any medication regularly?  Yes___ No___  If
    so, what?  _____

4

1269

Respondent's Exhibit E

26.  Do you have religious, moral or philosophical beliefs which would prevent you from sitting in judgment on another person?  Yes____  No____   If yes, please explain. _____

_____

27.  Would your religious beliefs <u>in any way</u> make it difficult for you to serve as a juror on this case and to reach a verdict based on the laws of the State of Arkansas as given to you in this case by the Judge?  Yes____  No____   If yes, please explain fully. _____

_____

28.  Have you formed an opinion concerning what would be a desirable verdict in this case?  Yes____  No____   If yes, what is that opinion? _____

_____

_____

29.  What do you do in your spare time? _____

30.  What is the last book you have read? _____

31.  Are there certain types of books you prefer to read over others (for example, mysteries, biographies, nonfiction?)

_____

32.  What magazines do you read regularly? _____

33.  To what magazines do you subscribe? _____

34.  Do you have a newspaper subscription?  Daily____   Weekly____ What paper(s)? _____

35.  How often do you watch television? _____ Please estimate the number of hours per day. _____

36.  What kind of television shows do you watch (sports, movies, situation comedies, soap operas, talk shows?) _____

_____

37.  Do you watch local news programs?  Yes____  No____   How often?_____  What channel(s)? _____

38.  Do you watch national news programs?  Yes____  No____   How often?_____  What channel(s)? _____

5

 Respondent's Exhibit E

39. Do you know of any reason you could not serve as a fair and impartial juror in this particular case which involves a violent crime? Yes___ No___ If yes, please explain fully.

_____

_____

_____

40. Would you find it difficult to listen to or to concentrate on evidence relating to:

    (a) Acts of violence              Yes___   No___
    (b) Abnormal human behavior       Yes___   No___
    (c) Psychological disorders       Yes___   No___
    (d) Troubled or disturbed childhood  Yes___   No___

41. Is there any reason why you feel that you would not want to serve on this jury? Yes___ No___ If yes, please explain fully. _____

_____

_____

42. Can you think of <u>any</u> reason, no matter how insignificant it might seem to be, whether addressed in this questionnaire or not, why you could <u>not</u> be a fair juror in this case? Yes___ No___ If yes, please explain fully. _____

_____

_____

_____

I SWEAR THAT THE ANSWERS GIVEN ABOVE ARE TRUTHFUL TO THE SAME EFFECT AS IF I WERE SWORN UNDER OATH IN OPEN COURT TO GIVE TRUTHFUL ANSWERS TO THE SAME.

_____
(Signature)

6

1271

 Respondent's Exhibit E

Death Penalty Resources Center
1500 Riverfront Drive
Suite 118
Rebesamen Building
Little Rock, AR

Phone: ~~663-1400~~ - Diane

Mr. Al Schay - Director

Bring any discovery that you have.

Diane could not think of the car dealership name, but you turn
right off Cantrell between the dealership and Harvest Foods store
which is located at 14901 Cantrell.  The Rebesamen Building has a
clock on top.

Mr. Schay would like to have the case numbers on the cases you want
help with.  Also, he will be there all morning, so whatever time
you finish your hearing, just go there.

1272



**NAACP LEGAL DEFENSE
AND EDUCATIONAL FUND, INC.**

Suite 1600
99 Hudson Street
New York, N.Y. 10013-2897    (212) 219-1900    Fax: (212) 226-7592

April 30, 1996

Maxie G. Kizer, Esq.
721 Pine Street
Post Office Box 83101721
Pine Bluff, AK 71611

Dear Mr. Kizer:

I have received the record in Reams v. Arkansas and am writing to request that you send additional materials. In order to adequately assess this case, I need to see your files. In addition, pages 26 and 27 were not included in the copy of your Arkansas Supreme Court brief.

Please send me these materials as soon as possible. You may use our UPS number for overnight delivery (NY 160-842) or, if you prefer, we will reimburse you for delivery by other means. Thank you very much for your assistance.

Sincerely,

George Kendall
Associate Counsel

1273

*Contributions are deductible for U.S. income tax purposes.*  The NAACP Legal Defense & Educational Fund, Inc. (LDF) is not part of the National Association for the Advancement of Colored People (NAACP) although LDF was founded by the NAACP and shares its commitment to equal rights. LDF has had for over 30 years a separate Board, program, staff, office and budget.

*Regional Offices*

Suite 301
1275 K Street, NW
Washington, DC 20005
(202) 682-1300
Fax: (202) 682-1312

Suite 208
315 West Ninth Street
Los Angeles, CA 90015
(213) 624-2405
Fax: (213) 624-0075

Respondent's Exhibit E

# MAXIE G. KIZER, P.A.

### ATTORNEY AT LAW

721 PINE STREET
P. O. BOX 7423
PINE BLUFF, ARKANSAS 71611

MAXIE G. KIZER
BAR NO.
83101

TELEPHONE:
(501) 534-7004
FAX NO.
(501) 534-7010

May 2, 1996

Mr. George Kendall
NAACP Legal Defense and Educational Fund
Suite 1600, 99 Hudson Street
New York, New York  10013-2897

Re:   Kenneth Reams

Dear Mr. Kendall:

Thank you for your letter of April 30, 1996, concerning my former client, Kenneth Reams. I am sorry for the oversight in not including pages 26 and 27 of the Appellant's Arkansas Supreme Court Brief.  I am enclosing those with this letter.

As for the other materials that you requested, the information I have already sent to you is public record and I did not feel as though I needed any type of release of the attorney-client privilege in order to provide you with that information.  However, in order to provide a copy of my file, I will need a release executed by Kenneth Reams that authorizes me to do so.

Additionally, I provided  you the briefs and the transcript at a cost of about $100 out of my pocket.  If you obtain a release from Mr. Reams, we will have discuss the payment the copying of my file before I can provide same.

I look forward to hearing from you soon.

Sincerely,

MAXIE G. KIZER, P.A.

MGK:kb
Enclosure

Respondent's Exhibit E

# MAXIE G. KIZER, P.A.

### ATTORNEY AT LAW

721 PINE STREET
P. O. BOX 7423
PINE BLUFF, ARKANSAS 71611

MAXIE G. KIZER
BAR NO.
83101

TELEPHONE:
(501) 534-7004
FAX NO.
(501) 534-7010

December 13, 1993

12-13-93

HAND-DELIVERED

Ms. Pam Ratliff
County/Probate Clerk
Jefferson County Courthouse
Pine Bluff, Arkansas  71601

   Re:  Indigent Defense Contract

Dear Pam:

   The following is a list of cases which we handled from November 15, 1993, to December 15, 1993:

Second Division Circuit Court

Sentencings:

| | |
|---|---|
| Mark Anthony Rodgers | CR-89-432-2 |
| | CR-89-476-2 |
| | CR-89-582-2 |
| Christopher Robinson | CR-93-481-2 |
| Patrick Haltiwanger | CR-93-614-2 |
| Gregory McCray | CR-93-398-2 |
| Laura Bradley | CR-90-642-2 |
| Chris Baird | CR-92-650-2 |
| David Hill | CR-93-486-2 |
| Maxine Williams | CR-90-86-2 |
| Ronald Wilson | CR-93-533-2 |
| James Taylor | CR-93-533-2 |
| Marvin Johnson | CR-93-259-2 |
| | CR-93-699-2 |
| Jerry Dixon | CR-93-63-2 |

Revocations:

| | |
|---|---|
| James Collier | CR-91-79-2 |
| Roderick D. Clark | CR-91-535-2 |

1275

Respondent's Exhibit E

Ms. Pam Ratliff
December 13, 1993
Page 2


Hearings:

Jessie Coker                          CR-93-396-2
Robert Lewis                          CR-92-67-2

Third Division Circuit Court

Sentencings:

Marcus Muldrow                        CR-93-599-3
                                      CR-93-600-3
Theodore Clayton                      CR-93-499-3
Soloman Thompson                      CR-93-654-3
Eddie Lee Jackson                     CR-93-564-3


Revocations

Vera Franklin                         CR-92-752-3
                                      CR-93-409-3
Dean Ramsay                           CR-89-706-3
James Golden                          CR-91-567-3
Edward Smith                          CR-88-68-3

Jury Trials:

Kenneth Reams                         CR-93-301-3(


                    Sincerely,


                    MAXIE G. KIZER, P.A.

MGK:kb

 Respondent's Exhibit E

IN THE SUPREME COURT OF ARKANSAS

KENNETH REAMS                                                    APPELLANT

v.                              No. CR 94-558

STATE OF ARKANSAS                                                APPELLEE

## MOTION FOR EXTENSION OF TIME IN WHICH TO FILE BRIEF

Comes now the appellant, by and through counsel, Maxie G. Kizer, and for his motion for

an extension of time, states:

I.

The appellant is before this court on appeal from a conviction of capital murder and a

sentence of death by lethal injection.  He has previously requested a extension of sixty (60) days'

duration, thus making it due to be filed with the court on or before 3 September 1994.

II.

The last extension of time was sought due to the enormity of the task before counsel,

including the abstracting of the over 1,000 page record in compliance with Ark.Sup.Ct.R. 4-3(h)

and the making of the many arguments contained in that record in counsel's busy trial schedule.

The abstracting of the record is virtually complete at present, but the crafting of the arguments is

not.  As was stated in the last motion for extension of time, the writer is spending a great deal of

time on this brief, but not great periods of time due to his schedule.  Looking ahead at what is left

to be done on this brief and what is on the writer's schedule, it is clear that a quality brief of use to

the court is not realistically possible by September 3.  It is also clear that, barring unforeseen

circumstances of great proportions, no other extension of time will be needed.

LESLIE W. STEEN, CLERK

1994 AUG 22 P 4: 45

SUPREME COURT OF APPEALS
RECEIVED

1277

6960 Respondent's Exhibit E

III.

Senior Assistant Attorney General Clint Miller, has given his permission to state in this

motion that the appellee has no objection to the requested extension of time and will file no

response thereto.

WHEREFORE, the appellant respectfully prays the court to grant it an extension of thirty

(30) days' duration, thus making the brief for the appellant due to be filed with the court on or

before 3 October 1994.

Respectfully submitted,

Maxie G. Kizer
Ark. Bar Reg. No. 83101
721 Pine Street
P. O. Box 7423
Pine Bluff, Arkansas 71611
(501) 534-7004

*Attorney for Appellant*

CERTIFICATE OF SERVICE

I, Maxie G. Kizer, do hereby certify that I have served this motion on counsel for the
appellee by placing a copy of the same in the box placed in the office of the Clerk of the Arkansas
Supreme Court and Court of Appeals for the purpose of receiving service of papers filed in that
office on this 22nd day of August, 1994.

Maxie G. Kizer

2

1278

Respondent's Exhibit E

Office of the Clerk
SUPREME COURT
COURT OF APPEALS
STATE OF ARKANSAS
Justice Building
625 Marshall Street
Little Rock, AR 72201

August 24th, 1994



    vs        No. CR   94 00558

STATE OF ARKANSAS

Attorneys of Record:

The time allowed for filling the appellant's brief in the above case
has been extended ██████████████████.

                              Leslie W. Steen
                              Clerk
                              By: Todd Hill, D.C.

1279

Office of The Clerk
Supreme Court of The State of Arkansas
Arkansas Court of Appeals
Justice Building
625 Marshall Street
Little Rock, AR 72201

Leslie W. Steen
Clerk

Robin Horne
Chief Deputy Clerk

Melissa Fuller
Chief Deputy Clerk

Janis Owen
Office Administrator

Jeanne Matthews
Records Supervisor

OCTOBER 17, 1994

Deputy Clerks:

Denise Parks

Rae Millerd

Greta Houston

Daniel Dodson

Holli North

Ginger Mullins

Todd Hill

Maxie G. Kizer
Attorney at Law
P. O. Box 7423
Pine Bluff, AR   71611

RE:   CR   94 00558   KENNETH REAMS v.
STATE OF ARKANSAS

Dear Mr. Kizer:

The Arkansas Supreme Court made the following order today in
the above styled case:

"Appellant's motion to file belated brief is
granted."

Appellant's brief is filed this date.

Sincerely,

Leslie W. Steen, Clerk

LWS:rh

cc:  Clint Miller

1280

Office of The Clerk
Supreme Court of The State of Arkansas
Arkansas Court of Appeals
Justice Building
625 Marshall Street
Little Rock, AR 72201

OCTOBER 24, 1994

Leslie W. Steen
Clerk

Robin Horne
Chief Deputy Clerk

Melissa Fuller
Chief Deputy Clerk

Innie Owen
Office Administrator

Jeanne Matthews
Records Supervisor

Deputy Clerks:

Denise Parks

Ane Millerd

Greta Houston

Daniel Dodson

Holli North

Ginger Mullins

Todd Hill

Maxie G. Kizer
Attorney at Law
P. O. Box 7423
Pine Bluff, AR   71611

RE:   CR   94 00558   KENNETH REAMS v.
      STATE OF ARKANSAS

Dear Mr. Kizer:

The Arkansas Supreme Court made the following order today in
the above styled case:

"Appellant's motion to file enlarged brief
is granted."

Appellant's brief is filed this date.

Sincerely,

Leslie W. Steen, Clerk

LWS:rh

cc:  Clint Miller

1281             6964

Respondent's Exhibit E

IN THE ARKANSAS SUPREME COURT

KENNETH REAMS                                                    APPELLANT

V.                              No. CR 94-558

STATE OF ARKANSAS                                               APPELLEE

### MOTION FOR AN EXTENSION OF TIME IN WHICH TO FILE THE APPELLEE'S BRIEF

Comes now the petitioner/appellee, the State of Arkansas, by and through counsel, Winston Bryant, Attorney General, and Clint Miller, Acting Deputy Attorney General, and for its motion requesting an extension of time in which to file its appellee's brief, states:

I.

The appellee's brief is due to be filed with this Court on or before November 28, 1994. The appellee has not previously received any extension of the time in which it is to file its brief. The appellee respectfully requests an extension of thirty-nine (39) days in which to file its brief. If this Court grants the appellee such an extension, then its brief will be due to this Court on or before January 6, 1995.

Due to the large number of State's briefs and other matters currently assigned to the appellee's counsel, Acting Deputy Attorney General Clint Miller, counsel has not had sufficient time in the month of November, 1994 in which to prepare the appellee's brief in the above-styled case. Preparation of the appellee's brief in the above-styled case

Respondent's Exhibit E

1282

will be especially time consuming because appellee Reams is appealing his conviction for capital murder and the imposition on him of the penalty of death. On appeal, Reams has raised seven allegations of error. At least six of the allegations of error that Reams has raised present complicated Eighth Amendment issues having to do with the validity of the death sentence that was imposed on Reams. Moreover, the record on appeal in Reams's case is approximately 1,056 pages in length and this record will have to be reviewed pursuant to this Court's Rule 4-3(h). Review of an appellate court record pursuant to this Court's Rule 4-3(h) is very time consuming in that Rule 4-3(h) requires that each page of the record on appeal be reviewed in order to make certain that the appellee has abstracted all rulings made by the trial court below that were adverse to the appellee. Moreover, the State's counsel, Acting Deputy Attorney General Clint Miller, has spoken with appellee Reams's counsel, the Honorable Maxie G. Kizer, and Mr. Kizer has graciously stated that he has no objection to an extension of the time in which the State is to file its appellee's brief in the above-styled case.

<center>III.</center>

WHEREFORE, the State, as petitioner/appellee, respectfully requests that the time within which it is to file its brief in the above-styled case be extended by thirty-nine (39) days, thereby making the State's appellee's

1283

-2-

brief due to be filed with this Court on or before January 6, 1995.  This motion is made in good faith and is not made merely for purposes of delay.

Respectfully submitted,

WINSTON BRYANT
Attorney General

BY: _____
CLINT MILLER
Arkansas Bar No. 83126
Acting Deputy Attorney General
200 Tower Building
323 Center Streets
Little Rock, Arkansas 72201
(501) 682-3657

ATTORNEYS FOR PETITIONER/
APPELLEE

## CERTIFICATE OF SERVICE

I, Clint Miller, Acting Deputy Attorney General, do hereby certify that I have served a copy of the foregoing pleading for petitioner/appellee, to Maxie G. Kizer, Attorney at Law, P.O. Box 7423, Pine Bluff, AR 71611, this 14th day of November, 1994.

_____
CLINT MILLER

-3-

1284

SUPREME COURT
COURT OF APPEALS
STATE OF ARKANSAS
Justice Building
625 Marshall Street
Little Rock, AR 72201

November 15th, 1994

KENNETH REAMS

vs        No. CR   94 00558

STATE OF ARKANSAS

Attorneys of Record:

The time allowed for filling the appellee's brief in the above case has
been extended to 01/06/1995.

Leslie W. Steen
Clerk
By: Todd Hill, D.C.

1285

6968      Respondent's Exhibit E

IN THE ARKANSAS SUPREME COURT

KENNETH REAMS                                          APPELLANT

V.                          No. CR 94-558

STATE OF ARKANSAS                                      APPELLEE

## MOTION FOR AN EXTENSION OF TIME IN WHICH TO FILE THE APPELLEE'S BRIEF

Comes now the petitioner/appellee, the State of Arkansas, by and through counsel, Winston Bryant, Attorney General, and Clint Miller, Acting Deputy Attorney General, and for its motion requesting an extension of time in which to file its appellee's brief, states:

I.

The appellee's brief is due to be filed with this Court on or before January 6, 1995.  The appellee has previously received one extension of the time in which it is to file its brief. The appellee respectfully requests an extension of fifty-six (56) days in which to file its brief.  If this Court grants the appellee such an extension, then its brief will be due to this Court on or before March 3, 1995.

Due to the large number of State's briefs and other matters currently assigned to the appellee's counsel, Acting Deputy Attorney General Clint Miller, counsel has not had sufficient time in the month of December, 1994 and will not have sufficient time in the months of January and February, 1995 in which to prepare the appellee's brief in the above-styled case.  Preparation of the appellee's brief in

Respondent's Exhibit E

1286

the above-styled case will be especially time consuming because appellee Reams is appealing his conviction for capital murder and the imposition on him of the penalty of death.   On appeal, Reams has raised seven allegations of error.   At least six of the allegations of error that Reams has raised present complicated Eighth Amendment issues having to do with the validity of the death sentence that was imposed on Reams.   Moreover, the record on appeal in Reams's case is approximately 1,056 pages in length and this record will have to be reviewed pursuant to this Court's Rule 4-3(h).   Review of an appellate court record pursuant to this Court's Rule 4-3(h) is very time consuming in that Rule 4-3(h) requires that each page of the record on appeal be reviewed in order to make certain that the appellee has abstracted all rulings made by the trial court below that were adverse to the appellee.   Moreover, the State's counsel, Acting Deputy Attorney General Clint Miller, has spoken with appellee Reams's counsel, the Honorable Maxie G. Kizer, and Mr. Kizer has graciously stated that he has no objection to an extension of the time in which the State is to file its appellee's brief in the above-styled case.

<div align="center">III.</div>

WHEREFORE, the State, as petitioner/appellee, respectfully requests that the time within which it is to file its brief in the above-styled case be extended by fifty-six (56) days, thereby making the State's appellee's

1287

<div align="center">-2-</div>

Respondent's Exhibit E

brief due to be filed with this Court on or before March 3, 1995.  This motion is made in good faith and is not made merely for purposes of delay.

Respectfully submitted,

WINSTON BRYANT
Attorney General

BY: _____
CLINT MILLER
Arkansas Bar No. 83126
Acting Deputy Attorney General
200 Tower Building
323 Center Streets
Little Rock, Arkansas 72201
(501) 682-3657

ATTORNEYS FOR PETITIONER/
APPELLEE

## CERTIFICATE OF SERVICE

I, Clint Miller, Acting Deputy Attorney General, do hereby certify that I have served a copy of the foregoing pleading for petitioner/appellee, to Maxie G. Kizer, Attorney at Law, P.O. Box 7423, Pine Bluff, AR  71611, this 3rd day of January, 1995.

_____
CLINT MILLER

-3-

Office of the Clerk

SUPREME COURT
COURT OF APPEALS
STATE OF ARKANSAS
Justice Building
625 Marshall Street
Little Rock, AR 72201

January 5th, 1995

KENNETH REAMS

vs          No. CR   94 00558

STATE OF ARKANSAS

Attorneys of Record:

The time allowed for filling the appellee brief in the above case has
been extended to 03/03/1995.

Leslie W. Steen
Clerk
By: Dan Dodson, D.C.

1289

Respondent's Exhibit E
Gz38(J)

IN THE ARKANSAS SUPREME COURT

KENNETH REAMS                                        APPELLANT

V.                          No. CR 94-558

STATE OF ARKANSAS                                    APPELLEE

<u>MOTION FOR AN EXTENSION OF TIME IN</u>
<u>WHICH TO FILE THE APPELLEE'S BRIEF</u>

Comes now the petitioner/appellee, the State of

Arkansas, by and through counsel, Winston Bryant, Attorney

General, and Clint Miller, Acting Deputy Attorney General,

and for its motion requesting an extension of time in which

to file its appellee's brief, states:

I.

The appellee's brief is due to be filed with this Court

on or before March 3, 1995.  The appellee has previously

received two extensions of the time in which it is to file

its brief. The appellee respectfully requests an extension of

twenty-one (21) days in which to file its brief.  If this

Court grants the appellee such an extension, then its brief

will be due to this Court on or before March 24, 1995.

Due to the large number of State's briefs and other

matters currently assigned to the appellee's counsel, Acting

Deputy Attorney General Clint Miller, counsel has not had

sufficient time in the month of February, 1995 in which to

prepare the appellee's brief in the above-styled case.

Preparation of the appellee's brief in the above-styled case

will be especially time consuming because appellee Reams is

1290

appealing his conviction for capital murder and the
imposition on him of the penalty of death.  On appeal, Reams
has raised seven allegations of error.  At least six of the
allegations of error that Reams has raised present
complicated Eighth Amendment issues having to do with the
validity of the death sentence that was imposed on Reams.
Moreover, the record on appeal in Reams's case is
approximately 1,056 pages in length and this record will have
to be reviewed pursuant to this Court's Rule 4-3(h).  Review
of an appellate court record pursuant to this Court's Rule
4-3(h) is very time consuming in that Rule 4-3(h) requires
that each page of the record on appeal be reviewed in order
to make certain that the appellee has abstracted all rulings
made by the trial court below that were adverse to the
appellee.  Moreover, the State's counsel, Acting Deputy
Attorney General Clint Miller, has spoken with appellee
Reams's counsel, the Honorable Maxie G. Kizer, and Mr. Kizer
has graciously stated that he has no objection to an
extension of the time in which the State is to file its
appellee's brief in the above-styled case.

### III.

WHEREFORE, the State, as petitioner/appellee,
respectfully requests that the time within which it is to
file its brief in the above-styled case be extended by
twenty-one (21) days, thereby making the State's appellee's

1291

6974  Respondent's Exhibit E

brief due to be filed with this Court on or before March 24, 1995.  This motion is made in good faith and is not made merely for purposes of delay.

Respectfully submitted,

WINSTON BRYANT
Attorney General

BY:  _Clint Miller_____

CLINT MILLER
Arkansas Bar No. 83126
Acting Deputy Attorney General
200 Tower Building
323 Center Streets
Little Rock, Arkansas 72201
(501) 682-3657

ATTORNEYS FOR PETITIONER/
APPELLEE

## CERTIFICATE OF SERVICE

I, Clint Miller, Acting Deputy Attorney General, do hereby certify that I have served a copy of the foregoing pleading for petitioner/appellee, to Maxie G. Kizer, Attorney at Law, P.O. Box 7423, Pine Bluff, AR 71611, this 28th day of February, 1995.

_Clint Miller_____

CLINT MILLER

-3-

1292

6975 Respondent's Exhibit E

Office of the Clerk

SUPREME COURT
COURT OF APPEALS
STATE OF ARKANSAS
Justice Building
625 Marshall Street
Little Rock, AR 72201

93-3169

March  6th, 1995

KENNETH REAMS

  vs     No. CR  94 00558

STATE OF ARKANSAS

Attorneys of Record:

The time allowed for filling the appellee brief in the above case has
been extended to 03/24/1995.


                                       Leslie W. Steen
                                       Clerk
                                       By: Dan Dodson, D.C.

1293

Respondent's Exhibit E

IN THE ARKANSAS SUPREME COURT

KENNETH REAMS                                              APPELLANT

V.                          No. CR 94-558

STATE OF ARKANSAS                                          APPELLEE

<u>MOTION FOR AN EXTENSION OF TIME IN
WHICH TO FILE THE APPELLEE'S BRIEF</u>

Comes now the petitioner/appellee, the State of Arkansas,
by and through counsel, Winston Bryant, Attorney General, and
Clint Miller, Deputy Attorney General, Senior Appellate
Advocate, and for its motion requesting an extension of time
in which to file its appellee's brief, states:

I.

The appellee's brief is due to be filed with this Court
on or before March 24, 1995.  The appellee has previously
received three extensions of the time in which it is to file
its brief. The appellee respectfully requests an extension of
twenty-one (28) days in which to file its brief.  If this
Court grants the appellee such an extension, then its brief
will be due to this Court on or before April 21, 1995.

Due to the large number of State's briefs and other
matters currently assigned to the appellee's counsel, Deputy
Attorney General, Senior Appellate Advocate, Clint Miller,
counsel has not had sufficient time in the months of February
and March, 1995 in which to prepare the appellee's brief in
the above-styled case.  Preparation of the appellee's brief
in the above-styled case will be especially time consuming

1294

Respondent's Exhibit E

because appellee Reams is appealing his conviction for
capital murder and the imposition on him of the penalty of
death.  On appeal, Reams has raised seven allegations of
error.  At least six of the allegations of error that Reams
has raised present complicated Eighth Amendment issues having
to do with the validity of the death sentence that was
imposed on Reams.  Moreover, the record on appeal in Reams's
case is approximately 1,056 pages in length and this record
will have to be reviewed pursuant to this Court's Rule
4-3(h).  Review of an appellate court record pursuant to this
Court's Rule 4-3(h) is very time consuming in that Rule
4-3(h) requires that each page of the record on appeal be
reviewed in order to make certain that the appellee has
abstracted all rulings made by the trial court below that
were adverse to the appellee.  Moreover, the State's counsel,
Deputy Attorney General, Senior Appellate Advocate, Clint
Miller, has spoken with appellee Reams's counsel, the
Honorable Maxie G. Kizer, and Mr. Kizer has graciously stated
that he has no objection to an extension of the time in which
the State is to file its appellee's brief in the above-styled
case.

                              III.

     WHEREFORE, the State, as petitioner/appellee,
respectfully requests that the time within which it is to
file its brief in the above-styled case be extended by
twenty-eight (28) days, thereby making the State's appellee's

1295                          -2-

brief due to be filed with this Court on or before April 21, 1995.   This motion is made in good faith and is not made merely for purposes of delay.

Respectfully submitted,

WINSTON BRYANT
Attorney General

BY: _Clint Miller_
CLINT MILLER
Arkansas Bar No. 83126
Deputy Attorney General
Senior Appellate Advocate
200 Tower Building
323 Center Streets
Little Rock, Arkansas 72201
(501) 682-3657

ATTORNEYS FOR PETITIONER/
APPELLEE

## CERTIFICATE OF SERVICE

I, Clint Miller, Acting Deputy Attorney General, do hereby certify that I have served a copy of the foregoing pleading for petitioner/appellee, to Maxie G. Kizer, Attorney at Law, P.O. Box 7423, Pine Bluff, AR  71611, this 22nd day of March, 1995.

_Clint Miller_
CLINT MILLER

1296

IN THE ARKANSAS SUPREME COURT

KENNETH REAMS                                              APPELLANT

V.                                No. CR 94-558

STATE OF ARKANSAS                                          APPELLEE

## MOTION FOR AN EXTENSION OF TIME IN WHICH TO FILE THE APPELLEE'S BRIEF

Comes now the petitioner/appellee, the State of Arkansas, by and through counsel, Winston Bryant, Attorney General, and Clint Miller, Deputy Attorney General, Senior Appellate Advocate, and for its motion requesting an extension of time in which to file its appellee's brief, states:

I.

The appellee's brief is due to be filed with this Court on or before April 21, 1995.  The appellee has previously received four extensions of the time in which it is to file its brief. The appellee respectfully requests an extension of twenty-one (21) days in which to file its brief.  If this Court grants the appellee such an extension, then its brief will be due to this Court on or before May 12, 1995.

Due to the large number of State's briefs and other matters currently assigned to the appellee's counsel, Deputy Attorney General, Senior Appellate Advocate, Clint Miller, counsel has not had sufficient time in the months of March and April, 1995 in which to prepare the appellee's brief in the above-styled case.  Preparation of the appellee's brief in the above-styled case will be especially time consuming

1297

Respondent's Exhibit E

because appellee Reams is appealing his conviction for capital murder and the imposition on him of the penalty of death. On appeal, Reams has raised seven allegations of error. At least six of the allegations of error that Reams has raised present complicated Eighth Amendment issues having to do with the validity of the death sentence that was imposed on Reams. Moreover, the record on appeal in Reams's case is approximately 1,056 pages in length and this record will have to be reviewed pursuant to this Court's Rule 4-3(h). Review of an appellate court record pursuant to this Court's Rule 4-3(h) is very time consuming in that Rule 4-3(h) requires that each page of the record on appeal be reviewed in order to make certain that the appellee has abstracted all rulings made by the trial court below that were adverse to the appellee. Moreover, the State's counsel, Deputy Attorney General, Senior Appellate Advocate, Clint Miller, has spoken with appellee Reams's counsel, the Honorable Maxie G. Kizer, and Mr. Kizer has graciously stated that he has no objection to an extension of the time in which the State is to file its appellee's brief in the above-styled case.

III.

WHEREFORE, the State, as petitioner/appellee, respectfully requests that the time within which it is to file its brief in the above-styled case be extended by twenty-one (21) days, thereby making the State's appellee's

-2-

Respondent's Exhibit E

1208

brief due to be filed with this Court on or before May 12, 1995.   This motion is made in good faith and is not made merely for purposes of delay.

                              Respectfully submitted,

                              WINSTON BRYANT
                              Attorney General

                  BY:   _____
                              CLINT MILLER
                              Arkansas Bar No. 83126
                              Deputy Attorney General
                              Senior Appellate Advocate
                              200 Tower Building
                              323 Center Streets
                              Little Rock, Arkansas 72201
                              (501) 682-3657

                              ATTORNEYS FOR PETITIONER/
                              APPELLEE

                    CERTIFICATE OF SERVICE

     I, Clint Miller, Acting Deputy Attorney General, do
hereby certify that I have served a copy of the foregoing
pleading for petitioner/appellee, to Maxie G. Kizer,
Attorney at Law, P.O. Box 7423, Pine Bluff, AR  71611, this
17th day of April, 1995.

                    _____
                    CLINT MILLER

1299
                         -3-

Office of the Clerk
SUPREME COURT
COURT OF APPEALS
STATE OF ARKANSAS
Justice Building
625 Marshall Street
Little Rock, AR 72201

April 17th, 1995

KENNETH REAMS

vs        No. CR   94 00558

STATE OF ARKANSAS

Attorneys of Record:

The time allowed for filling the appellee's brief in the above case has
been extended to 05/12/1995.

Leslie W. Steen
Clerk
By: Todd Hill, D.C.

1300

Respondent's Exhibit E

93-31ᴄ9

IN THE ARKANSAS SUPREME COURT

KENNETH REAMS                                              APPELLANT

V.                           No. CR 94-558

STATE OF ARKANSAS                                          APPELLEE

### MOTION FOR AN EXTENSION OF TIME IN WHICH TO FILE THE APPELLEE'S BRIEF

Comes now the petitioner/appellee, the State of Arkansas, by and through counsel, Winston Bryant, Attorney General, and Clint Miller, Deputy Attorney General, Senior Appellate Advocate, and for its motion requesting an extension of time in which to file its appellee's brief, states:

I.

The appellee's brief is due to be filed with this Court on or before May 12, 1995.  The appellee has previously received five extensions of the time in which it is to file its brief. The appellee respectfully requests an extension of fourteen (14) days in which to file its brief.  If this Court grants the appellee such an extension, then its brief will be due to this Court on or before May 26, 1995.

Due to the large number of State's briefs and other matters currently assigned to the appellee's counsel, Deputy Attorney General, Senior Appellate Advocate, Clint Miller, counsel has not had sufficient time in the months of April and May, 1995 in which to prepare the appellee's brief in the above-styled case.  Preparation of the appellee's brief in the above-styled case will be especially time consuming

1301

Respondent's Exhibit E

because appellee Reams is appealing his conviction for
capital murder and the imposition on him of the penalty of
death.  On appeal, Reams has raised seven allegations of
error.  At least six of the allegations of error that Reams
has raised present complicated Eighth Amendment issues having
to do with the validity of the death sentence that was
imposed on Reams.  Moreover, the record on appeal in Reams's
case is approximately 1,056 pages in length and this record
will have to be reviewed pursuant to this Court's Rule
4-3(h).  Review of an appellate court record pursuant to this
Court's Rule 4-3(h) is very time consuming in that Rule
4-3(h) requires that each page of the record on appeal be
reviewed in order to make certain that the appellee has
abstracted all rulings made by the trial court below that
were adverse to the appellee.  Moreover, the State's counsel,
Deputy Attorney General, Senior Appellate Advocate, Clint
Miller, has spoken with appellee Reams's counsel, the
Honorable Maxie G. Kizer, and Mr. Kizer has graciously stated
that he has no objection to an extension of the time in which
the State is to file its appellee's brief in the above-styled
case.

<div align="center">III.</div>

WHEREFORE, the State, as petitioner/appellee,
respectfully requests that the time within which it is to
file its brief in the above-styled case be extended by
fourteen (14) days, thereby making the State's appellee's

<div align="center">1302</div>

<div align="center">-2-</div>

brief due to be filed with this Court on or before May 26, 1995.  This motion is made in good faith and is not made merely for purposes of delay.

Respectfully submitted,

WINSTON BRYANT
Attorney General

BY: _Clint Miller_

CLINT MILLER
Arkansas Bar No. 83126
Deputy Attorney General
Senior Appellate Advocate
200 Tower Building
323 Center Streets
Little Rock, Arkansas 72201
(501) 682-3657

ATTORNEYS FOR PETITIONER/
APPELLEE

## CERTIFICATE OF SERVICE

I, Clint Miller, Acting Deputy Attorney General, do hereby certify that I have served a copy of the foregoing pleading for petitioner/appellee, to Maxie G. Kizer, Attorney at Law, P.O. Box 7423, Pine Bluff, AR 71611, this 12th day of May, 1995.

_Clint Miller_

CLINT MILLER

1303

-3-

6986   Respondent's Exhibit E

Office of the Clerk
SUPREME COURT
COURT OF APPEALS
STATE OF ARKANSAS
Justice Building
625 Marshall Street
Little Rock, AR 72201

May 15th, 1995


KENNETH REAMS

   vs      No. CR   94 00558

STATE OF ARKANSAS

Attorneys of Record:

The time allowed for filling the appellee's brief in the above case has
been extended to 05/26/1995.


                              Leslie W. Steen
                              Clerk
                              By: Todd Hill, D.C.



1304

SUPREME COURT
COURT OF APPEALS
STATE OF ARKANSAS
Justice Building
625 Marshall Street
Little Rock, AR 72201

May 26th, 1995

KENNETH REAMS

  vs      No. CR  94 00558

STATE OF ARKANSAS

Attorneys of Record:

The time allowed for filling the appellee's brief in the above case has
been extended to 05/26/1995.

Leslie W. Steen
Clerk
By: Todd Hill, D.C.

1305

6988   Respondent's Exhibit E

IN THE ARKANSAS SUPREME COURT

KENNETH REAMS                                      APPELLANT

V.                          No. CR 94-558

STATE OF ARKANSAS                                  APPELLEE

<u>MOTION FOR AN EXTENSION OF TIME IN</u>
<u>WHICH TO FILE THE APPELLEE'S BRIEF</u>

Comes now the petitioner/appellee, the State of Arkansas,
by and through counsel, Winston Bryant, Attorney General, and
Clint Miller, Deputy Attorney General, Senior Appellate
Advocate, and for its motion requesting an extension of time
in which to file its appellee's brief, states:

I.

The appellee's brief is due to be filed with this Court
on or before May 26, 1995.  The appellee has previously
received six extensions of the time in which it is to file
its brief. The appellee respectfully requests an extension of
twenty-one (21) days in which to file its brief.  If this
Court grants the appellee such an extension, then its brief
will be due to this Court on or before June 16, 1995.

Due to the large number of State's briefs and other
matters currently assigned to the appellee's counsel, Deputy
Attorney General, Senior Appellate Advocate, Clint Miller,
counsel has not had sufficient time in the month of May, 1995
in which to prepare the appellee's brief in the above-styled
case.  Preparation of the appellee's brief in the
above-styled case will be especially time consuming because

1306

appellee Reams is appealing his conviction for capital murder and the imposition on him of the penalty of death.  On appeal, Reams has raised seven allegations of error.  At least six of the allegations of error that Reams has raised present complicated Eighth Amendment issues having to do with the validity of the death sentence that was imposed on Reams.  Moreover, the record on appeal in Reams's case is approximately 1,056 pages in length and this record will have to be reviewed pursuant to this Court's Rule 4-3(h).  Review of an appellate court record pursuant to this Court's Rule 4-3(h) is very time consuming in that Rule 4-3(h) requires that each page of the record on appeal be reviewed in order to make certain that the appellee has abstracted all rulings made by the trial court below that were adverse to the appellee.  Moreover, the State's counsel, Deputy Attorney General, Senior Appellate Advocate, Clint Miller, has spoken with appellee Reams's counsel, the Honorable Maxie G. Kizer, and Mr. Kizer has graciously stated that he has no objection to an extension of the time in which the State is to file its appellee's brief in the above-styled case.

<center>III.</center>

WHEREFORE, the State, as petitioner/appellee, respectfully requests that the time within which it is to file its brief in the above-styled case be extended by twenty-one (21) days, thereby making the State's appellee's

Respondent's Exhibit E

brief due to be filed with this Court on or before June 16, 1995. This motion is made in good faith and is not made merely for purposes of delay.

Respectfully submitted,

WINSTON BRYANT
Attorney General

BY: *Clint Miller*

CLINT MILLER
Arkansas Bar No. 83126
Deputy Attorney General
Senior Appellate Advocate
200 Tower Building
323 Center Streets
Little Rock, Arkansas 72201
(501) 682-3657

ATTORNEYS FOR PETITIONER/
APPELLEE

CERTIFICATE OF SERVICE

I, Clint Miller, Acting Deputy Attorney General, do hereby certify that I have served a copy of the foregoing pleading for petitioner/appellee, to Maxie G. Kizer, Attorney at Law, P.O. Box 7423, Pine Bluff, AR 71611, this 25th day of May, 1995.

*Clint Miller*

CLINT MILLER

-3-

1308

Office of the Clerk
SUPREME COURT
COURT OF APPEALS
STATE OF ARKANSAS
Justice Building
625 Marshall Street
Little Rock, AR 72201

May 31st, 1995



KENNETH REAMS

vs        No. CR  94 00558

STATE OF ARKANSAS

Attorneys of Record:

The time allowed for filling the appellee's  brief in the above case
has been extended to 06/16/1995.

Leslie W. Steen
Clerk
By: Todd Hill, D.C.

1309

Respondent's Exhibit E

IN THE ARKANSAS SUPREME COURT

KENNETH REAMS                                                    APPELLANT

V.                              No. CR 94-558

STATE OF ARKANSAS                                               APPELLEE

## MOTION FOR AN EXTENSION OF TIME IN WHICH TO FILE THE APPELLEE'S BRIEF

Comes now the petitioner/appellee, the State of Arkansas, by and through counsel, Winston Bryant, Attorney General, and Clint Miller, Deputy Attorney General, Senior Appellate Advocate, and for its motion requesting an extension of time in which to file its appellee's brief, states:

I.

The appellee's brief is due to be filed with this Court on or before June 16, 1995. The appellee has previously received seven extensions of the time in which it is to file its brief. The appellee respectfully requests an extension of twenty-one (21) days in which to file its brief. If this Court grants the appellee such an extension, then its brief will be due to this Court on or before July 7, 1995.

Due to the large number of State's briefs and other matters currently assigned to the appellee's counsel, Deputy Attorney General, Senior Appellate Advocate, Clint Miller, counsel has not had sufficient time in the month of June, 1995 in which to prepare the appellee's brief in the above-styled case. Preparation of the appellee's brief in the above-styled case will be especially time consuming because

1310

Respondent's Exhibit E

appellee Reams is appealing his conviction for capital murder
and the imposition on him of the penalty of death.   On
appeal, Reams has raised seven allegations of error.   At
least six of the allegations of error that Reams has raised
present complicated Eighth Amendment issues having to do with
the validity of the death sentence that was imposed on
Reams.   Moreover, the record on appeal in Reams's case is
approximately 1,056 pages in length and this record will have
to be reviewed pursuant to this Court's Rule 4-3(h).   Review
of an appellate court record pursuant to this Court's Rule
4-3(h) is very time consuming in that Rule 4-3(h) requires
that each page of the record on appeal be reviewed in order
to make certain that the appellee has abstracted all rulings
made by the trial court below that were adverse to the
appellee.   Moreover, the State's counsel, Deputy Attorney
General, Senior Appellate Advocate, Clint Miller, has spoken
with appellee Reams's counsel, the Honorable Maxie G. Kizer,
and Mr. Kizer has graciously stated that he has no objection
to an extension of the time in which the State is to file its
appellee's brief in the above-styled case.

                              III.

     WHEREFORE, the State, as petitioner/appellee,
respectfully requests that the time within which it is to
file its brief in the above-styled case be extended by
twenty-one (21) days, thereby making the State's appellee's

1311                         -2-

Respondent's Exhibit E

brief due to be filed with this Court on or before July 7, 1995.  This motion is made in good faith and is not made merely for purposes of delay.

Respectfully submitted,

WINSTON BRYANT
Attorney General

BY: *Clint Miller*

CLINT MILLER
Arkansas Bar No. 83126
Deputy Attorney General
Senior Appellate Advocate
200 Tower Building
323 Center Streets
Little Rock, Arkansas 72201
(501) 682-3657

ATTORNEYS FOR PETITIONER/
APPELLEE

## CERTIFICATE OF SERVICE

I, Clint Miller, Acting Deputy Attorney General, do hereby certify that I have served a copy of the foregoing pleading for petitioner/appellee, to Maxie G. Kizer, Attorney at Law, P.O. Box 7423, Pine Bluff, AR 71611, this 16th day of June, 1995.

*Clint Miller*

CLINT MILLER

-3-

1312

6995 Respondent's Exhibit E

Office of the Clerk
SUPREME COURT
COURT OF APPEALS
STATE OF ARKANSAS
Justice Building
625 Marshall Street
Little Rock, AR 72201

93-3169

June 19th, 1995

KENNETH REAMS

    vs        No. CR  94 00558

STATE OF ARKANSAS

Attorneys of Record:

The time allowed for filling the appellee brief in the above case has been extended to 07/07/1995.


                                    Leslie W. Steen
                                    Clerk
                                    By: Dan Dodson, D.C.

1313

Respondent's Exhibit E

IN THE ARKANSAS SUPREME COURT

KENNETH REAMS                                                APPELLANT

V.                              No. CR 94-558

STATE OF ARKANSAS                                            APPELLEE.

<u>MOTION FOR AN EXTENSION OF TIME IN
WHICH TO FILE THE APPELLEE'S BRIEF</u>

Comes now the petitioner/appellee, the State of Arkansas,
by and through counsel, Winston Bryant, Attorney General, and
Clint Miller, Deputy Attorney General, Senior Appellate
Advocate, and for its motion requesting an extension of time
in which to file its appellee's brief, states:

I.

The appellee's brief is due to be filed with this Court
on or before July 7, 1995.  The appellee has previously
received eight extensions of the time in which it is to file
its brief. The appellee respectfully requests an extension of
seven (7) days in which to file its brief.  If this Court
grants the appellee such an extension, then its brief will be
due to this Court on or before July 14, 1995.

Due to the large number of State's briefs and other
matters currently assigned to the appellee's counsel, Deputy
Attorney General, Senior Appellate Advocate, Clint Miller,
counsel has not had sufficient time in the month of June,
1995 in which to prepare the appellee's brief in the above-
styled case.  Preparation of the appellee's brief in the
above-styled case will be especially time consuming because

1314

appellee Reams is appealing his conviction for capital murder and the imposition on him of the penalty of death.  On appeal, Reams has raised seven allegations of error.  At least six of the allegations of error that Reams has raised present complicated Eighth Amendment issues having to do with the validity of the death sentence that was imposed on Reams.  Moreover, the record on appeal in Reams's case is approximately 1,056 pages in length and this record will have to be reviewed pursuant to this Court's Rule 4-3(h).  Review of an appellate court record pursuant to this Court's Rule 4-3(h) is very time consuming in that Rule 4-3(h) requires that each page of the record on appeal be reviewed in order to make certain that the appellee has abstracted all rulings made by the trial court below that were adverse to the appellee.  Moreover, the State's counsel, Deputy Attorney General, Senior Appellate Advocate, Clint Miller, has spoken with appellee Reams's counsel, the Honorable Maxie G. Kizer, and Mr. Kizer has graciously stated that he has no objection to an extension of the time in which the State is to file its appellee's brief in the above-styled case.

III.

WHEREFORE, the State, as petitioner/appellee, respectfully requests that the time within which it is to file its brief in the above-styled case be extended by seven (7) days, thereby making the State's appellee's brief due to be filed with this Court on or before July 14, 1995.  This

1315

-2-

motion is made in good faith and is not made merely for purposes of delay.

Respectfully submitted,

WINSTON BRYANT
Attorney General

BY: _Clint Miller_

CLINT MILLER
Arkansas Bar No. 83126
Deputy Attorney General
Senior Appellate Advocate
200 Tower Building
323 Center Streets
Little Rock, Arkansas 72201
(501) 682-3657

ATTORNEYS FOR PETITIONER/
APPELLEE

## CERTIFICATE OF SERVICE

I, Clint Miller, Acting Deputy Attorney General, do hereby certify that I have served a copy of the foregoing pleading for petitioner/appellee, to Maxie G. Kizer, Attorney at Law, P.O. Box 7423, Pine Bluff, AR 71611, this 6th day of July, 1995.

_Clint Miller_

CLINT MILLER

1316

Respondent's Exhibit E

IN THE ARKANSAS SUPREME COURT

KENNETH REAMS                                          APPELLANT

V.                              No. CR 94-558

STATE OF ARKANSAS                                      APPELLEE

MOTION FOR AN EXTENSION OF TIME IN
WHICH TO FILE THE APPELLEE'S BRIEF

Comes now the petitioner/appellee, the State of Arkansas,
by and through counsel, Winston Bryant, Attorney General, and
Clint Miller, Deputy Attorney General, Senior Appellate
Advocate, and for its motion requesting an extension of time
in which to file its appellee's brief, states:

I.

The appellee's brief is due to be filed with this Court
on or before July 14, 1995.  The appellee has previously
received nine extensions of the time in which it is to file
its brief. The appellee respectfully requests an extension of
fourteen (14) days in which to file its brief.  If this Court
grants the appellee such an extension, then its brief will be
due to this Court on or before July 28, 1995.

Due to the large number of State's briefs and other
matters currently assigned to the appellee's counsel, Deputy
Attorney General, Senior Appellate Advocate, Clint Miller,
counsel has not had sufficient time in the month of July,
1995 in which to prepare the appellee's brief in the above-
styled case.  Preparation of the appellee's brief in the
above-styled case will be especially time consuming because

1317

Respondent's Exhibit E

appellee Reams is appealing his conviction for capital murder
and the imposition on him of the penalty of death.  On
appeal, Reams has raised seven allegations of error.  At
least six of the allegations of error that Reams has raised
present complicated Eighth Amendment issues having to do with
the validity of the death sentence that was imposed on
Reams.  Moreover, the record on appeal in Reams's case is
approximately 1,056 pages in length and this record will have
to be reviewed pursuant to this Court's Rule 4-3(h).  Review
of an appellate court record pursuant to this Court's Rule
4-3(h) is very time consuming in that Rule 4-3(h) requires
that each page of the record on appeal be reviewed in order
to make certain that the appellee has abstracted all rulings
made by the trial court below that were adverse to the
appellee.  Moreover, the State's counsel, Deputy Attorney
General, Senior Appellate Advocate, Clint Miller, has spoken
with appellee Reams's counsel, the Honorable Maxie G. Kizer,
and Mr. Kizer has graciously stated that he has no objection
to an extension of the time in which the State is to file its
appellee's brief in the above-styled case.

                            III.

    WHEREFORE, the State, as petitioner/appellee,
respectfully requests that the time within which it is to
file its brief in the above-styled case be extended by
fourteen (14) days, thereby making the State's appellee's

1318

7001 Respondent's Exhibit E

brief due to be filed with this Court on or before July 28, 1995.  This motion is made in good faith and is not made merely for purposes of delay.

<div style="margin-left: 40%">

Respectfully submitted,

WINSTON BRYANT
Attorney General

BY: _____
CLINT MILLER
Arkansas Bar No. 83126
Deputy Attorney General
Senior Appellate Advocate
200 Tower Building
323 Center Streets
Little Rock, Arkansas 72201
(501) 682-3657

ATTORNEYS FOR PETITIONER/
APPELLEE

</div>

## CERTIFICATE OF SERVICE

I, Clint Miller, Acting Deputy Attorney General, do hereby certify that I have served a copy of the foregoing pleading for petitioner/appellee, to Maxie G. Kizer, Attorney at Law, P.O. Box 7423, Pine Bluff, AR  71611, this 14th day of July, 1995.

_____
CLINT MILLER

1319

-3-

Office of the Clerk
SUPREME COURT
COURT OF APPEALS
STATE OF ARKANSAS
Justice Building
625 Marshall Street
Little Rock, AR 72201

July 17th, 1995

KENNETH REAMS

vs          No. CR   94 00558

STATE OF ARKANSAS

Attorneys of Record:

The time allowed for filling the appellee brief in the above case has
been extended to 07/28/1995.

                                        Leslie W. Steen
                                        Clerk
                                        By: Dan Dodson, D.C.

1320

Respondent's Exhibit E

IN THE ARKANSAS SUPREME COURT

KENNETH REAMS                                    RESPONDENT/APPELLANT

V.                              No. CR 94-558

STATE OF ARKANSAS                                PETITIONER/APPELLEE

<u>APPELLEE'S MOTION REQUESTING PERMISSION
TO FILE ENLARGED BRIEF</u>

Comes now the petitioner/appellee, by and through
counsel, Winston Bryant, Attorney General, and Clint Miller,
Deputy Attorney General, Senior Appellate Advocate, and for
its motion to file an enlarged brief states that:

I.

Pursuant to Ark. Sup. Ct. R. 4-1(b), the State's brief
may not contain an argument section that exceeds twenty-five
pages unless this Court grants permission to file an enlarged
brief.  The State, as appellee, formally requests permission
to file an enlarged brief in the above-styled case.

II.

With this motion, the State has tendered a brief in the
above-styled case that has thirty-five pages of argument,
which is ten pages over the twenty-five page limitation set
for Rule 4-1(b).  The State respectfully submits that the ten
additional pages are necessary because appellant Reams has
raised seven allegations of error that appellee must answer.
At least six of the allegations of error that Reams has
raised present complicated Eighth Amendment issues having to
do with the validity of the death sentence that was

1321

imposed on Reams.   Because this case is a death penalty case,
the State has raised one additional issue.

The appellee's counsel, Clint Miller, Deputy Attorney
General, Senior Appellate Advocate, has made a good faith
effort to comply with the twenty-five page limitation set
forth in Rule 4-1(b), but is unable to reduce the thirty-
five page argument section of the State's brief down to
twenty-five pages.   The State's counsel is unable to do so
because he believes, in good faith, that reduction of the
State's brief would result in prejudice to the appellee and
in additional work for this Court in terms of marshalling
the pertinent facts of the case and the applicable
principles of law.   The State's counsel, in his reasonable
professional judgment, believes that it is necessary to
argue the State's case in the instant case in thirty-five
pages in order to properly present the State's position and
to assist the Court.   This Court can grant a waiver of the
twenty-five page limit set forth in Rule 4-1(b) if counsel
has made a good faith effort to comply with the twenty-five
page limitation.   See Pemberton v. State, 291 Ark. 198, 723
S.W.2d 372 (1987).

III.

WHEREFORE, the State, as appellee, respectfully requests
that this Court grant it permission to file an enlarged
brief in the instant case that consists of an argument
section that is thirty-five pages in length.

-2-

1322

Respectfully submitted,

WINSTON BRYANT
Attorney General

BY: _Clint Miller_
CLINT MILLER
State Bar #83126
Deputy Attorney General
Senior Appellate Advocate
200 Tower Building
323 Center Street
Little Rock, Arkansas 72201
(501) 682-3657

ATTORNEYS FOR APPELLEE

CERTIFICATE OF SERVICE

I, Clint Miller, Deputy Attorney General, Senior
Appellate Advocate, do hereby certify that I have served a
copy of the foregoing pleading for appellee, to the Honorable
Maxie Kizer, Attorney at Law, P.O. Box 7423, Pine Bluff, AR
71611, this 28th day of July, 1995.

_Clint Miller_
CLINT MILLER

1323

-3-

VS.

# PETIT JURY VENIRE

| # | NAMES | GOOD | PLAINTIFF | DEFENDANT | CAUSE |
|---|-------|------|-----------|-----------|-------|
| 1 | James A. Nesbett | 534-8787 | | | |
| 2 | ~~WILLIAM BAIRD SMITH~~ | | | | |
| 3 | SANDRA SHARP | 247-9800 | | | |
| 4 | Donnie Reynolds | | | | |
| 5 | Winnie Ruth Gean | | | | |
| 6 | Karen M. Hardy *Car Wreck* | | | | |
| 7 | Charles L. Prather *Sick* | | | | |
| 8 | Cindy E. Ryals *Sick* | | | | |
| 9 | Minnie M. Harris | | | | |
| 10 | Nancy Hogan *Sick* | | | | |
| 11 | Linda Mullins | | | | |
| 12 | Jackie S. Deuerling | 397-2498 | | | |
| 13 | DIANE JOHNSON | | | | |
| 14 | GARY CAMP | | | | |
| 15 | TROY FREEMAN | | | | |
| 16 | MONROE JACKSON | 534-1955 | | | |
| 17 | ALMOUS LAVERNE DICKSON*GRAHAM | 535-1034 | | | |
| 18 | Robert Morris | 534-5326 or 534-0465 | | | |
| 19 | PAMMY GRAVES | 536-7948 before 2:45 goes to work then | | | |
| 20 | Bill Shollmier | | | | |
| 21 | Betty L. Gillespie | | | | |
| 22 | Shirley B. Furley | | | | |
| 23 | ~~Newton Davis~~ | | | | |
| 24 | Patricia Meadows | 543-8621 | | | |
| 25 | | | | | |
| 26 | | | | | |
| 27 | | | | | |
| 28 | | | | | |
| 29 | | | | | |
| 30 | | | | | |
| 31 | | | | | |
| 32 | | | | | |
| 33 | | | | | |
| 34 | | | | | |
| 35 | | | | | |
| 36 | | | | | |
| 37 | | | | | |
| 38 | | | | | |
| 39 | | | | | |
| 40 | | | | | |
| 41 | | | | | |
| 42 | | | | | |
| 43 | | | | | |
| 44 | | | | | |
| 45 | | | | | |
| 46 | | | | | |
| 47 | | | | | |
| 48 | | | | | |
| 49 | | | | | |
| 50 | | | | | |

Respondent's Exhibit E

7007

1324

DECEMBER 13, 1993

| STATE OF ARKANSAS | | JUDGE FRED D. DAVIS, III |
|---|---|---|

vs.  CR-93-301-3

...NETH REAMS

## PETIT JURY VENIRE

~~XXX X 5 4 3 2 1~~   ~~XX XXXXXXX~~

| No. | NAME | GOOD | PLAINTIFF | DEFENDANT | CAUSE |
|---|---|---|---|---|---|
| 1 | Irma Johnson | B/f | ① | | |
| 2 | Linda Messina | w/f | ① | | |
| 3 | Sandra A. Metz | w/f | | ① | |
| 4 | Lynne M. Flagg | w/f | ② | | |
| 5 | Willa M. Stewart ? | Not Present | | | |
| 6 | Betty L. Gillespie | w/f moved to bottom of list | ③ | | |
| 7 | Huey P. Bradford | w/m | | | |
| 8 | Della M. Fisher Horace | B/f | ② | | |
| 9 | Mary M. Terkeurst | w/f | | ② | |
| 10 | Dwight A. Robinson | w/m | ③ | | |
| 11 | J. Brandon Jones | w/m | | ③ | |
| 12 | Bertha Arlene Parsley | w/f | | ③ | |
| 13 | Mary H. Johnson | w/f | ④ | | ex cause + ex son police off. |
| 14 | Bruce E. Hornsby | w/m | ⑤ | | |
| 15 | WILLIAM FOX | w/m | | ④ | |
| 16 | Howard E. Garman | w/m | | ⑤ | |
| 17 | ..ble Louise Hall | w/f | | | No bond opin ex cause |
| 18 | ..rry Lindsey | | ⑥ | | |
| 19 | Shirley B. Turley | w/f | moved to bottom of list | | |
| 20 | Kelly Noelle Ruggeri | w/f | ⑦ | | |
| 21 | Larry R. Tipton | w/m | ⑧ | | |
| 22 | Otis L. Brown | B/m | | | cause, knows accused |
| 23 | William Earl Smith | w/m X | | | FRIEND OF VICTIM |
| 24 | Matthew R. Henry | B/m | ④ | | |
| 25 | Delois Thomas | B/f | | | cause, freedom showties |
| 26 | Jerald F. Norton | w/m | | ⑥ | |
| 27 | Charles Wayne Martin | w/m | | ⑦ | |
| 28 | Carolyn Phillips | w/f | ⑨ | | |
| 29 | Clarence Arnold | w/m | | ⑧ | |
| 30 | Mary Denise Hoffman | w/f | ⑩ | | |
| 31 | Carolyn Ann Bolin | w/f | | ⑨ | |
| 32 | Will Barnes | w/m | | ⑩ | |
| 33 | Muriel M. Hayes | B/f | ⑤ | | |
| 34 | Jim Shaw | w/m | ⑥ | | |
| 35 | ..lba J. Lee | Absent | | | |
| 36 | ..othy M. Hodges | w/f | ⑪ | | |
| 37 | Alma Wallace | w/f | | ⑪ | |
| 38 | Katherine R. Austin | w/f | | ⑫ | |
| 39 | Pammy Graves (move to Bottom) | w/f | | | |
| 40 | David Stelow | w/m | ⑫ | | |
| 41 | Nancy L. Davis | B/f | | | Cause, No to Death penalty |
| 42 | Phillip L. Rushing | w/m | | 1A | |
| 43 | Robert L. Hickerson | w/m | | | Cause, Made up mind |
| 44 | Merle Cobbs | B/f | | | Cause, NO to Death penalty |
| 45 | John T. Weaver | w/m | | | Cause, No to Death penalty |
| 46 | Brenda Silvey | w/f | 13 | ○ | |
| 47 | Lynne T. Ravellette | X | | | Friend of Victim Widow |
| 48 | May Catherine Neal | B/f | 1A | | |
| 49 | Ida J. Breitenstein | w/f | | 2A | |
| 50 | Darlene R. Frye | w/m | 14 | | |
| 51 | Houston Davis | w/m | | | |

Respondent's Exhibit E

7008                1995

DECEMBER 13, 1993

STATE OF ARKANSAS                                                  JUDGE FRED D. DAVIS, III

vs.   CR-93-301-3

~NETH REAMS                              PETIT JURY VENIRE

| No. | NAMES | GOOD | PLAINTIFF | DEFENDANT | CAUSE |
|---|---|---|---|---|---|
| 1 | ᴵrma Johnson | | | | |
| 2 | Linda Messina | | | | |
| 3 | Sandra A. Metz | | | | |
| 4 | Lynne M. Flagg | | | | |
| 5 | Willa M. Stewart | | | | |
| 6 | Betty L. Gillespie | | | | |
| 7 | Huey P. Bradford | | | | |
| 8 | Della M. Fisher Horace | | | | |
| 9 | Mary M. Terieurst | | | | |
| 10 | Dwight A. Robinson | | | | |
| 11 | J. Brandon Jones | | | | |
| 12 | Bertha Arlene Parsley | | | | |
| 13 | Mary H. Johnson | | | | |
| 14 | Bruce E. Hornsby | | | | |
| 15 | WILLIAM FOX | | | | |
| 16 | Howard E. Garman | | | | |
| 17 | Syble Louise Hall | ~~Grahm~~ | | | |
| 18 | ᵉrry Lindsey | | | | |
| 19 | ᵃhirley B. Turley | | | | |
| 20 | Kelly Noelle Ruggeri | | | | |
| 21 | Larry R. Tipton | | | | |
| 22 | Otis L. Brown | | | | |
| 23 | ~~William Earl Smith~~ | X | | | ✓ |
| 24 | Matthew R. Henry | | | | |
| 25 | Delois Thomas | | | | |
| 26 | Jerald F. Norton | | | | |
| 27 | Charles Wayne Martin | | | | |
| 28 | Carolyn Phillips | | | | |
| 29 | Clarence Arnold | | | | |
| 30 | Mary Denise Hoffman | | | | |
| 31 | Carolyn Ann Bolin | | | | |
| 32 | Will Barnes | | | | |
| 33 | Muriel M. Hayes | | | | |
| 34 | Jim Shaw | | | | |
| 35 | ~~ᵃlba J. Lee~~   ? | | | | |
| 36 | ᴰrothy M. Hodges | | | | |
| 37 | ᴵlma Wallace | | | | |
| 38 | Katherine R. Austin | | | | |
| 39 | ~~Pammy Graves~~ ─ move to bottom of list | | | | |
| 40 | David Stelow | | | | |
| 41 | Nancy L. Davis | | | | |
| 42 | Phillip L. Rushing | | | | |
| 43 | Robert L. Hickerson | ✓ | | | |
| 44 | Merle Cobbs | | | | |
| 45 | John T. Weaver | | | | |
| 46 | Brenda Silvey | | | | |
| 47 | Lynne T. Ravellette | X | | | ✓ |
| 48 | May Catherine Neal | | | | |
| 49 | Ida J. Breitenstein | | | | |
| 50 | Darlene R. Frye | | | | |

Respondent's Exhibit E

7009

1336

MONDAY, D' EMBER 13, 1993

STATE OF ARKANSAS
vs.
'ENNETH REAMS          CR-93-301-3

JUDGE FRED D. DAVIS, III

# PETIT JURY VENIRE

| | NAMES | GOOD | PLAINTIFF | DEFENDANT | CAUSE |
|---|---|---|---|---|---|
| 1 | Clarence Arnold ℗ | | | | |
| 2 | Katherine R. Austin ℗ | | | | |
| 3 | Carolyn Ann Bolin ℗ | | | | |
| 4 | Huey P. Bradford ℗ | | | | |
| 5 | Ida J. Breitenstein ℗ | | | | |
| 6 | Otis L. Brown ℗ | | | | |
| 7 | Gary W. Camp ℗ | | | | |
| 8 | Merle Cobbs ℗ | | | | |
| 9 | Myrtle T. Curry | | | | |
| 10 | Nancy L. Davis ℗ | | | | |
| 11 | Jackie S. Deuerling ℗ | | | | |
| 12 | Kathleen Moore-Everette | | | | |
| 13 | Lynne M. Flagg ℗ | | | | |
| 14 | Troy Lee Freeman ℗ | | | | |
| 15 | Darlene R. Frye ℗ | | | | |
| | Howard E. Garman ℗ | | | | |
| | Minnie Ruth Gean ℗ | | | | |
| 16 | Betty L. Gillespie ℗ | | | | |
| 19 | Pammy Graves ℗ | | | | |
| 20 | Almous Laverne Dickson-Graham | | | | |
| 21 | Dorothy M. Griffin | | | | |
| 22 | Syble Louise Hall ℗ | | | | |
| 23 | Karen M. Hardy Car wreck | | | | |
| 24 | Ida B. T. Harris | | | | |
| 25 | Minnie M. Harris | | | | |
| 26 | Muriel M. Hayes ℗ | | | | |
| 27 | Matthew R. Henry ℗ | | | | |
| 28 | Robert L. Hickerson ℗ | | | | |
| 29 | Dorothy M. Hodges ℗ | | | | |
| 30 | Mary Denise Hoffman | | | | |
| 31 | Nancy Hogan Deck) | | | | |
| 32 | Della M. Fisher Horace ℗ | | | | |
| 33 | Bruce E. Hornsby ℗ | | | | |
| | Monroe Jackson ℗ | | | | |
| 35 | Diane Johnson | | | | |
| 36 | Irma Johnson ℗ | | | | |
| 37 | J. Brandon Jones ℗ | | | | |
| 38 | Melba J. Lee ℗ | | | | |
| 39 | Jerry Lindsey ℗ | | | | |
| 40 | Charles Wayne Martin ℗ | | | | |
| 41 | Patricia Meadows ℗ | | | | |
| 42 | Linda Messina | | | | |
| 43 | Sandra A. Metz ℗ | | | | |
| 44 | Gary L. Miller | | | | |
| 45 | Robert Morris ℗ | | | | |
| 46 | Linda Mullins | | | | |
| 47 | May Catherine Neal ℗ | | | | |
| 48 | James A. Nesbett ℗ | | | | |
| 49 | Jerald E. Norton ℗ | | | | |
| 50 | Bertha Arlene Parsley ℗ | | | | |

Respondent's Exhibit E

7010

1207

VS.

# PETIT JURY VENIRE

| | NAMES | GOOD | PLAINTIFF | DEFENDANT | CAUSE |
|---|---|---|---|---|---|
| 1 | Carolyn Phillips | P | | | |
| 2 | Charles L. Prather | Sick | | | |
| 3 | Lynne T. Ravellette X | P | | ⋅ | ✓ |
| 4 | Donnie Reynolds | P | | | |
| 5 | Dwight A. Robinson | P | | | |
| 6 | Kelly Noelle Ruggeri | P | | | |
| 7 | Phillip L. Rushing | P | | | |
| 8 | Cindy E. Ryals | Sick | | | |
| 9 | Sandra K. Sharp X | P | ⋅ | | ✓ |
| 10 | Jim Shaw | P | | | |
| 11 | William G. Shollmier | Sick | | | |
| 12 | Brenda Silvey | P | | | |
| 13 | William Earl Smith X | P | | | ✓ |
| 14 | David Stelow | P | | | |
| 15 | Willa M. Stewart | P | | | |
| 16 | Mary M. Terkeurst | P | | | |
| 17 | Delois Thomas | P | | | |
| 18 | Larry R. Tipton | P | | | |
| 19 | Shirley B. Turley | P | | | |
| 20 | Alma Wallace | P | | | |
| 21 | John T. Weaver | P | | | |
| 22 | Lessie Bea Washington | | | | |
| 23 | Will Barnes | P | | | |
| 24 | Mary H. Johnson | P | | | |
| 25 | Philip A. Reynolds | Cld not get messoge | | | |
| 26 | WILLIAM FOX | P | | | |
| 27 | | | | | |
| 28 | | | | | |
| 29 | | | | | |
| 30 | | | | | |
| 31 | | | | | |
| 32 | | | | | |
| 33 | | | | | |
| 34 | | | | | |
| 35 | | | | | |
| 36 | | | | | |
| 37 | | | | | |
| 38 | | | | | |
| 39 | | | | | |
| 40 | | | | | |
| 41 | | | | | |
| 42 | | | | | |
| 43 | | | | | |
| 44 | | | | | |
| 45 | | | | | |
| 46 | | | | | |
| 47 | | | | | |
| 48 | | | | | |
| 49 | | | | | |
| 50 | | | | | |

Respondent's Exhibit E

7011                                                    1328

DECEMBER 13, 1993

STATE OF ARKANSAS            JUDGE FRED D. DAVIS, III

vs.   CR-93-301-3

ENNETH REAMS

# PETIT JURY VENIRE

| | NAMES | GOOD | PLAINTIFF | DEFENDANT | CAUSE |
|---|---|---|---|---|---|
| 1 | Irma Johnson | X | | | |
| 2 | Linda Messina | 1 | | | |
| 3 | Sandra A. Metz | X | | ✓ | \ |
| 4 | Lynne M. Flagg | X | | | X |
| 5 | Willa M. Stewart absent | | ✓ | | |
| 6 | Betty L. Gillespie (Moved to Bottom) | | | | |
| 7 | Huey P. Bradford | X | ✓ | | |
| 8 | Della M. Fisher Horace | 2 | | | |
| 9 | Mary M. TerKeurst | X | | ✓ | |
| 10 | Dwight A. Robinson | 3 | | | |
| 11 | J. Brandon Jones | X | | ✓ | |
| 12 | Bertha Arlene Parsley | X | | | ✓ |
| 13 | Mary H. Johnson | 4 | | | ✓ |
| 14 | Bruce E. Hornsby | 5 | | | |
| 15 | WILLIAM FOX | X | | ✓ | |
| 16 | Howard E. Garman | X | | ✓ | |
| 17 | Syble Louise Hall | X | | | ✓ |
| 18 | Jerry Lindsey | 6 | | | |
| 19 | Shirley B. Turley (Moved to Bottom) | | | | |
| 20 | Kelly Noelle Ruggeri | 7 | | | |
| 21 | Larry R. Tipton | 8 | | | |
| 22 | Otis L. Brown | X | | | ✓ |
| 23 | William Earl Smith | X | | | ✓ |
| 24 | Matthew R. Henry | X | ✓ | | |
| 25 | Delois Thomas | X | | | ✓ |
| 26 | Jerald F. Norton | X | | ✓ | |
| 27 | Charles Wayne Martin | X | | | |
| 28 | Carolyn Phillips | 9 | | | |
| 29 | Clarence Arnold | X | | ✓ | |
| 30 | Mary Denise Hoffman | 10 | | | |
| 31 | Carolyn Ann Bolin | X | | ✓ | |
| 32 | Will Barnes | X | | ✓ | |
| 33 | Muriel M. Hayes | X | ✓ | | |
| 34 | Jim Shaw | X | ✓ | | |
| 35 | Melba J. Lee | | | | |
| 36 | Dorothy M. Hodges | 11 | | | |
| 37 | Alma Wallace | X | | ✓ | |
| 38 | Katherine R. Austin | X | | ✓ | |
| 39 | Pammy Graves (move to Bottom) | | | | |
| 40 | David Stelow | 12 | | | |
| 41 | Nancy L. Davis | X | | | ✓ |
| 42 | Phillip L. Rushing | X | | ✓ | |
| 43 | Robert L. Hickerson | X | | | ✓ |
| 44 | Merle Cobbs | X | | | ✓ |
| 45 | John T. Weaver | X | | | ✓ |
| 46 | Brenda Silvey | 13 | ✓ | | |
| 47 | Lynne T. Ravellette | X | | | ✓ |
| 48 | May Catherine Neal | X | ✓ | | ✓ |
| 49 | Ida J. Breitenstein | X | | | |
| 50 | Darlene R. Frye | 14 | | | |
| 51 | Houston Davis | | | | |

Respondent's Exhibit E

7012

1399

CAPITAL MURDER--BIFURCATED TRIAL--

PUNISHMENT

MEMBERS OF THE JURY, YOU HAVE FOUND KENNETH REAMS GUILTY OF
CAPITAL MURDER.  AFTER HEARING Addl Testimony and ARGUMENTS OF COUNSEL, YOU WILL AGAIN
RETIRE TO DELIBERATE AND DECIDE WHETHER HE IS TO BE SENTENCED TO
DEATH BY LETHAL INJECTION OR TO LIFE IMPRISONMENT WITHOUT PAROLE.

IN DETERMINING WHICH SENTENCE SHALL BE IMPOSED, YOU MAY BE
REQUIRED TO MAKE SPECIFIC WRITTEN FINDINGS AS TO THE EXISTENCE OR
ABSENCE OF AGGRAVATING OR MITIGATING CIRCUMSTANCES.   APPROPRIATE
FORMS WILL BE PROVIDED FOR YOU, AND I WILL NOW INSTRUCT YOU ON THE
PROCEDURES THAT YOU MUST FOLLOW.

THERE ARE THREE FORMS FOR YOU TO USE IN REACHING YOUR DECISION,
AND A VERDICT FORM FOR YOU TO USE WHEN YOUR VERDICT HAS BEEN
REACHED.

FORM 1, WHICH WILL BE HANDED TO YOU LATER, DEALS WITH
AGGRAVATING CIRCUMSTANCES.   THE APPEARANCE OF ANY PARTICULAR
AGGRAVATING CIRCUMSTANCE ON THE FORM DOES NOT MEAN THAT IT ACTUALLY
EXISTED IN THIS CASE.   THESE ARE SPECIFIED BY LAW AND ARE THE ONLY
AGGRAVATING CIRCUMSTANCES THAT YOU MAY CONSIDER.  THE STATE HAS THE
BURDEN OF PROVING BEYOND A REASONABLE DOUBT THAT ONE OR MORE OF THE
LISTED AGGRAVATING CIRCUMSTANCES EXISTED AT THE TIME OF THE
COMMISSION OF THE CAPITAL MURDER.  IF YOU FIND UNANIMOUSLY AND
BEYOND A REASONABLE DOUBT THAT ONE OR MORE OF THESE AGGRAVATING
CIRCUMSTANCES EXISTED, THEN YOU WILL INDICATE YOUR FINDINGS BY

7013

1330

-2-

CHECKING THE APPROPRIATE SPACES ON FORM 1.   IF YOU DO NOT
UNANIMOUSLY FIND BEYOND A REASONABLE DOUBT THE EXISTENCE OF ANY
AGGRAVATING CIRCUMSTANCE, THEN YOU WILL CEASE DELIBERATIONS AND
INDICATE ON THE VERDICT FORM A SENTENCE OF LIFE IMPRISONMENT
WITHOUT PAROLE.

IF YOU DO UNANIMOUSLY FIND ONE OR MORE AGGRAVATING
CIRCUMSTANCES, YOU SHOULD THEN COMPLETE FORM 2, WHICH DEALS WITH
MITIGATING CIRCUMSTANCES.  FORM 2 LISTS SOME FACTORS THAT YOU MAY
CONSIDER AS MITIGATING CIRCUMSTANCES.  HOWEVER, YOU ARE NOT LIMITED
TO THIS LIST.   YOU MAY, IN YOUR DISCRETION, FIND OTHER MITIGATING
CIRCUMSTANCES.

UNLIKE AN AGGRAVATING CIRCUMSTANCE, YOU ARE NOT REQUIRED TO BE
CONVINCED OF THE EXISTENCE OF A MITIGATING CIRCUMSTANCE BEYOND A
REASONABLE DOUBT.   A MITIGATING CIRCUMSTANCE IS SHOWN IF YOU
BELIEVE FROM THE EVIDENCE THAT IT PROBABLY EXISTED.

FORM 2 IS MADE UP OF FOUR PARTS.  PART A IS A LIST OF MITIGATING
CIRCUMSTANCES TO BE CHECKED ONLY IF YOU UNANIMOUSLY AGREE THAT A
PARTICULAR CIRCUMSTANCE EXISTED.  PART B IS A LIST TO BE CHECKED
WHERE SOME OF YOU THINK A CIRCUMSTANCE EXISTED, BUT ALL DO NOT
AGREE.  PART C IS A LIST TO REFLECT CIRCUMSTANCES OF WHICH THERE
MAY HAVE BEEN SOME EVIDENCE BUT NO MEMBER OF THE JURY FEELS

1331

Respondent's Exhibit E

-3-

THAT THE CIRCUMSTANCE EXISTED.  THE LAST PART D IS TO BE CHECKED ONLY IF THE JURY CONCLUDES THAT THERE IS NO EVIDENCE OF MITIGATING CIRCUMSTANCES.

AFTER MAKING THE DETERMINATIONS REQUIRED TO COMPLETE FORM 1 AND FORM 2, IF APPLICABLE, YOU WILL THEN COMPLETE FORM 3.

IN NO EVENT WILL YOU RETURN A VERDICT IMPOSING THE DEATH PENALTY UNLESS YOU UNANIMOUSLY MAKE THREE PARTICULAR WRITTEN FINDINGS ON FORM 3.  THESE ARE:

FIRST:       THAT ONE OR MORE AGGRAVATING CIRCUMSTANCES, EXISTED BEYOND A REASONABLE DOUBT;

SECOND:      THAT SUCH AGGRAVATING CIRCUMSTANCES OUTWEIGH BEYOND A REASONABLE DOUBT ANY MITIGATING CIRCUMSTANCES FOUND TO EXIST; AND

THIRD:       THAT THE AGGRAVATING CIRCUMSTANCES JUSTIFY BEYOND A REASONABLE DOUBT THE SENTENCE OF DEATH.

IF YOU MAKE THOSE FINDINGS YOU MAY IMPOSE THE DEATH PENALTY. OTHERWISE YOU WILL SENTENCE THE DEFENDANT TO LIFE IMPRISONMENT WITHOUT PAROLE.

AFTER YOU HAVE MADE YOUR DETERMINATION ON FORMS 1 AND 2 AND HAVE REFLECTED YOUR CONCLUSIONS ON FORM 3, THEN YOU MUST CHECK THE APPROPRIATE VERDICT ON FORM 4.  EACH OF YOU MUST SIGN EACH VERDICT FORM.

YOU MAY NOW RETIRE TO CONSIDER YOUR DECISION.

1333

Respondent's Exhibit E

# CR 94-558

## IN THE ARKANSAS SUPREME COURT

KENNETH REAMS                                          APPELLANT

V.                          No. CR 94-558

STATE OF ARKANSAS                                      APPELLEE


AN APPEAL FROM THE
JEFFERSON COUNTY CIRCUIT COURT

THE HONORABLE FRED D. DAVIS
CIRCUIT JUDGE


BRIEF OF APPELLEE


WINSTON BRYANT
Attorney General

BY:    CLINT MILLER
Deputy Attorney General
Senior Appellate Advocate
Arkansas Bar No. 83126
200 Tower Building
323 Center Street
Little Rock, Arkansas 72201
(501) 682-3657

ATTORNEYS FOR APPELLEE

Respondent's Exhibit E

Respondent's Exhibit E

IN THE ARKANSAS SUPREME COURT


KENNETH REAMS                                          APPELLANT

V.                               No. CR 94-558

STATE OF ARKANSAS                                      APPELLEE


AN APPEAL FROM THE
JEFFERSON COUNTY CIRCUIT COURT

THE HONORABLE FRED D. DAVIS
CIRCUIT JUDGE


BRIEF OF APPELLEE


Respondent's Exhibit E

1335

7019

7020   Respondent's Exhibit E

<u>TABLE OF CONTENTS</u>

<div align="right"><u>PAGE</u></div>

TABLE OF CONTENTS.......................................i

POINTS TO BE RELIED UPON...............................ii

TABLE OF AUTHORITIES...................................iv

SUPPLEMENTAL ABSTRACT

    1.  Verdict forms filled out by the jury during penalty phase of the trial...................................AS1

    2.  Questions asked of defense counsel at the close of penalty phase after the jury was excused...........AS10

ARGUMENT...............................................1

CONCLUSION............................................33

<div align="center">-i-</div>

Respondent's Exhibit E

1336

## POINTS TO BE RELIED UPON

### I.

THE STATE DID NOT VIOLATE APPELLANT REAMS'
CONSTITUTIONAL RIGHT TO EQUAL PROTECTION OF THE LAW BY
ITS USE OF ITS PEREMPTORY CHALLENGES TO EXCLUDE BLACK
VENIREPERSONS FROM THE JURY...........................1

### II.

THE TRIAL COURT DID NOT ERR IN DENYING REAMS' REQUEST
THAT THE JURY BE INSTRUCTED WITH THE AFFIRMATIVE
DEFENSE TO THE DEATH PENALTY OF MENTAL RETARDATION....6

### III.

THE TRIAL COURT'S SUBMISSION TO THE JURY, IN THE
PENALTY PHASE OF APPELLANT REAMS' TRIAL, OF PECUNIARY
GAIN AS AN AGGRAVATING CIRCUMSTANCE WAS NOT VIOLATIVE
OF THE EIGHTH AND FOURTEENTH AMENDMENTS' PROHIBITION
AGAINST CRUEL AND UNUSUAL PUNISHMENT..................9

### IV.

THIS COURT DOES NOT CONDUCT A PROPORTIONALITY REVIEW OF
DEATH SENTENCES......................................22

### V.

THE JURY GAVE ADEQUATE CONSIDERATION TO THE MITIGATING
CIRCUMSTANCE OF APPELLANT REAMS' AGE..................23

### VI.

THE VERDICT FORM FILLED OUT BY THE JURY IN THE PENALTY
PHASE OF APPELLANT REAMS' TRIAL DID NOT LEAVE MEMBERS
OF THE JURY WITH THE IMPRESSION THAT EACH JUROR COULD
NOT CONSIDER EVIDENCE OF A MITIGATING CIRCUMSTANCE
UNLESS THE JURY UNANAMOUSLY AGREED THAT THE EVIDENCE
PROVED THE MITIGATING CIRCUMSTANCE EXISTED...........25

1337

7022

Respondent's Exhibit E

POINTS TO BE RELIED UPON

VII.

THE JURY RECEIVED ADEQUATE INSTRUCTIONS REGARDING ITS
CONSIDERATION OF NONSTATUTORY MITIGATING EVIDENCE.....27

VIII.

THE JURY DID NOT ERR IN EVALUATING THE STATE'S PROOF OF
AGGRAVATING CIRCUMSTANCES AND APPELLANT REAMS' PROOF OF
MITIGATING CIRCUMSTANCES.............................28

Respondent's Exhibit E

7023

1338

TABLE OF AUTHORITIES

CASES                                                              PAGE

Batson v. Kentucky, 476 U.S. 79 (1986)................1,2,5

Bradley v. State, 320 Ark. 100, 896 S.W.2d 425 (1995).......3

Burnett v. State, 295 Ark. 401, 749 S.W.2d 308 (1988)......15

Clemons v. Mississippi, 494 U.S. 738 (1990)............19,21

Collins v. Lockhart, 754 F.2d 258 (8th Cir.), cert. denied,
474 U.S. 1013 (1985)................................10,11,13

Cox v. State, 313 Ark. 184, 853 S.W.2d 266 (1993).........11

Dansby v. State, 319 Ark. 506, 893 S.W.2d 331 (1995).......28

Elders v. State, 321 Ark. 60, ___ S.W.2d ___ (1995).........8

Engberg v. Meyer, 820 P.2d 70 (Wyo. 1991).............18,19

Fairchild v. Norris, 21 F.3d 299 (8th Cir. 1994)..........15

Franklin v. State, 314 Ark. 329, 863 S.W.2d 268 (1993)......3

Fretwell v. State, 289 Ark. 91, 708 S.W.2d 630
(1986)...................................9,24,26,28,35

Furman v. Georgia, 408 U.S. 238 (1972)....................16

Godfrey v. Georgia, 446 U.S. 420 (1980)....................12

Greene v. State, 317 Ark. 350, 878 S.W.2d 384 (1994).......35

Harris v. Alabama, 115 S. Ct. 1031 (1995).................19

Henderson v. State, 281 Ark. 406, 664 S.W.2d 451 (1984)....31

Henry v. State, 278 Ark. 478, 647 S.W.2d 419, cert. denied,
464 U.S. 835 (1983).......................................22

Hill v. State, 278 Ark. 194, 644 S.W.2d 282 (1983)........31

Hill v. State, 289 Ark. 387, 703 S.W.2d 233 (1986), cert.
denied, 479 U.S. 1101 (1987)..............................25

Hollamon v. State, 312 Ark. 48, 846 S.W.2d 663 (1993).......1

Lowenfield v. Phelps, 484 U.S. 231 (1988).............10,20

1339

Respondent's Exhibit E

7024

## TABLE OF AUTHORITIES

CASES                                                                PAGE

Mauppin v. State, 309 Ark. 235, 831 S.W.2d 104 (1992)......8

Maynard v. Cartwright, 486 U.S. 356 (1988)..........19,20,21

Mills v. Maryland, 486 U.S. 367 (1988)..................26,27

Nolen v. State, 278 Ark. 17, 643 S.W.2d 257 (1982).........17

Parker v. Norris, 859 F. Supp. 1203 (E.D. Ark. 1994).......27

Parker v. State, 292 Ark. 421, 731 S.W.2d 756
(1987)..............................................9,24,26,28,35

Perry v. Lockhart, 871 F.2d 1384 (8th Cir.), cert. denied,
493 U.S. 959 (1989)........................................11

Pickens v. State, 301 Ark. 244, 783 S.W.2d 341, cert. denied,
497 U.S. 1011 (1990).......................................27

Pulley v. Harris, 465 U.S. 37 (1984).......................23

Purkett v. Elem, 115 S. Ct. 1769 (1995).....................3

Redman v. State, 265 Ark. 774, 580 S.W.2d 945 (1979).......8

Remeta v. State, 300 Ark. 92, 777 S.W.2d 833 (1989).........7

Ridenhour v. State, 305 Ark. 90, 805 S.W.2d 639 (1991)......8

Ruiz v. Norris, 868 F. Supp. 1471, (E.D. Ark. 1994).......27

Ruiz v. State, 299 Ark. 144, 772 S.W.2d 297 (1989).........11

Sasser v. State, CR 94-933, slip op. at 13-4 (July 17,
1995)...................................................23,29

Sims v. State, 320 Ark. 528 ___ S.W.2d ___ (1995)..........3

State v. Dennis, 318 Ark. 80, 883 S.W.2d 811 (1994)........7

State v. Middlebrooks, 840 S.W.2d 317 (Tenn. 1992), cert.
dismissed as improvidently granted, 114 S. Ct. 651
(1993)..................................................10,11

-v-

Respondent's Exhibit E
7025

TABLE OF AUTHORITIES

CASES                                                          PAGE

State v. Middlebrooks, 840 S.W.2d 317 (Tenn. 1992)......18,19

State v. Murphy, 315 Ark. 68, 864 S.W.2d 842 (1993).........8

State v. Townsend, 314 Ark. 427, 863 S.W.2d 288 (1993)......8

State v. Vowell, 276 Ark. 258, 634 S.W.2d 118 (1982).......17

Stringer v. Black, 503 U.S. _____, 112 S. Ct. 1130, 117
L.Ed.2d 367 (1992)..................................19,20,21

Teague v. Lane, 489 U.S. 288 (1989)........................20

Tigue v. State, 319 Ark. 147, 889 S.W.2d 760 (1994).......17

Tison v. Arizona, 481 U.S. 137 (1987).........10,11,14,15

Tuileapa v. California, 114 S. Ct. 2630 (1994)..........12,14

U.S. v. Cheely, 36 F.3d 1439 (9th Cir. 1994)...............14

Wainwright v. Norris, 872 F. Supp. 574 (E.D. Ark. 1994)....23

Ward v. State, 308 Ark. 415, 827 S.W.2d 110, cert. denied,
113 S. Ct. 124 (1992)......................................11

Watson v. State, 308 Ark. 444, 825 S.W.2d 569 (1992).........3

Weger v. State, 315 Ark. 555, 869 S.W.2d 688 (1994).......17

Whitmore v. State, 296 Ark. 308, 756 S.W.2d 890 (1988).....31

Williams v. State, CR 93-988 slip op. at 10-11 (July 10,
1995)...................................................23,29

Zant v. Stephens, 462 U.S. 862, 875 n.13 (1983)...........19

Zant v. Stephens, 462 U.S. 862, 877 n.15 (1993)...........12


RULES/STATUTES

Ark. Code Ann. § 16-91-113(a) (1987).......................34

Ark. Code Ann. § 5-10-101(a)(2) (Repl. 1993)..............21

Ark. Code Ann. § 5-12-103(a) (Repl. 1993).................31

-vi-

1341

TABLE OF AUTHORITIES

RULES/STATUTES                                          PAGE

Ark. Code Ann. § 5-4-604(3) (Repl. 1993)...............,.........30

Ark. Code Ann. § 5-4-604(6) (Repl. 1993).................9,29

Ark. Code Ann. § 5-4-618 (Repl. 1993)................6,7

Arkansas Code Annotated § 5-4-603(a)(2) (Repl. 1993).......19

Arkansas Rule of Criminal Procedure 36.24.................34

Arkansas Statute Annotated § 41-2205 (Repl. 1964).........16

Arkansas Supreme Court Rule 4-3(h)...........................34


MISCELLANEOUS

Robert Weisberg, _Deregulating Death_ 1983 Sup. Ct. Rev. 305
(1984)......................................................11

Respondent's Exhibit E

7027

1342

SUPPLEMENTAL ABSTRACT

(ABSTRACTOR'S NOTE:  During its penalty phase
deliberations, the jury filled out the following verdict
forms.)

FORM 1

AGGRAVATING CIRCUMSTANCES

WE, THE JURY, AFTER CAREFUL DELIBERATION, HAVE

UNANIMOUSLY DETERMINED THAT THE FOLLOWING AGGRAVATING

CIRCUMSTANCE EXISTED BEYOND A REASONABLE DOUBT AT THE TIME OF

THE COMMISSION OF THE CAPITAL MURDER.  (R. 158)


1. (X)      THE CAPITAL MURDER WAS COMMITTED FOR PECUNIARY GAIN.

2. (X)      KENNETH REAMS PREVIOUSLY COMMITTED ANOTHER FELONY,

            AN ELEMENT OF WHICH WAS THE USE OR THREAT OF

            VIOLENCE TO ANOTHER PERSON OR THE CREATION OF A

            SUBSTANTIAL RISK OF DEATH OR SERIOUS PHYSICAL

            INJURY TO ANOTHER PERSON.


            s/ Dwight A. Robinson
            FOREMAN

Respondent's Exhibit E

FORM 2

MITIGATING CIRCUMSTANCES

A.    (   )    WE UNANIMOUSLY FIND THAT THE FOLLOWING MITIGATING
              CIRCUMSTANCES PROBABLY EXIST:  (CHECK APPLICABLE
              CIRCUMSTANCES AND SPECIFY ANY ADDITIONAL ONES.)

   1. (   )    THE CAPITAL MURDER WAS COMMITTED WHILE KENNETH
              REAMS WAS UNDER EXTREME MENTAL OR EMOTIONAL
              DISTURBANCE.

   2. (   )    THE CAPITAL MURDER WAS COMMITTED WHILE KENNETH
              REAMS WAS ACTING UNDER UNUSUAL PRESSURES OR
              INFLUENCES OR UNDER THE DOMINATION OF ANOTHER
              PERSON.  (R. 159)

   3. (   )    THE CAPITAL MURDER WAS COMMITTED WHILE THE
              CAPACITY OF KENNETH REAMS TO APPRECIATE THE
              WRONGFULNESS OF HIS CONDUCT OR TO CONFORM HIS
              CONDUCT TO THE REQUIREMENTS OF LAW WAS IMPAIRED AS
              A RESULT OF MENTAL DISEASE OR DEFECT,
              INTOXICATION, OR DRUG ABUSE.

   4. (   )    THE YOUTH OF KENNETH REAMS AT THE TIME OF THE
              COMMISSION OF THE CAPITAL MURDER.

   5. (   )    THE CAPITAL MURDER WAS COMMITTED BY ANOTHER PERSON
              AND KENNETH REAMS WAS AN ACCOMPLICE AND HIS
              PARTICIPATION RELATIVELY MINOR.

   6. (   )    KENNETH REAMS HAS NO SIGNIFICANT HISTORY OF PRIOR
              CRIMINAL ACTIVITY.  (R. 159)

-SA2-

Respondent's Exhibit E

1344

FORM 2

MITIGATING CIRCUMSTANCES - PAGE 2

7. ( )   KENNETH REAMS SUFFERS FROM BORDERLINE MENTAL
         RETARDATION.   (R. 160)

8. ( )   KENNETH REAMS HAS ABILITIES THAT WOULD ALLOW HIM TO
         BE A PRODUCTIVE MEMBER OF SOCIETY EVEN IN PRISON.

9. ( )   OTHER:  SPECIFY IN WRITING. _____
         _____
         _____

B.  ( )   ONE OR MORE MEMBERS OF THE JURY BELIEVED THAT THE
          FOLLOWING MITIGATING CIRCUMSTANCES PROBABLY
          EXISTED, BUT THE JURY DID NOT UNANIMOUSLY AGREE:

1. ( )   THE CAPITAL MURDER WAS COMMITTED WHILE KENNETH
         REAMS WAS UNDER EXTREME MENTAL OR EMOTIONAL
         DISTURBANCE.

2. ( )   THE CAPITAL MURDER WAS COMMITTED WHILE KENNETH
         REAMS WAS ACTING UNDER UNUSUAL PRESSURES OR
         INFLUENCES OR UNDER THE DOMINATION OF ANOTHER
         PERSON.

3. (X )  THE CAPITAL MURDER WAS COMMITTED WHILE THE CAPACITY
         OF KENNETH REAMS TO APPRECIATE THE WRONGFULNESS OF
         HIS CONDUCT OR TO CONFORM HIS CONDUCT TO THE
         REQUIREMENTS OF LAW WAS IMPAIRED AS A RESULT OF
         MENTAL DISEASE OR DEFECT, INTOXICATION, OR DRUG
         ABUSE.   (R. 160)

1345
-SA3-
Respondent's Exhibit E
7030

FORM 2

MITIGATING CIRCUMSTANCES - PAGE 3

4. (  )  THE YOUTH OF KENNETH REAMS AT THE TIME OF THE
         COMMISSION OF THE CAPITAL MURDER.

5. (  )  THE CAPITAL MURDER WAS COMMITTED BY ANOTHER PERSON
         AND KENNETH REAMS WAS AN ACCOMPLICE AND HIS
         PARTICIPATION RELATIVELY MINOR.  (R. 161)

6. (  )  KENNETH REAMS HAS NO SIGNIFICANT HISTORY OF PRIOR
         CRIMINAL ACTIVITY.

7. (  )  KENNETH REAMS SUFFERS FROM BORDERLINE MENTAL
         RETARDATION.

8. (X )  KENNETH REAMS HAS ABILITIES THAT WOULD ALLOW HIM TO
         BE A PRODUCTIVE MEMBER OF SOCIETY EVEN IN PRISON.

9. (  )  OTHER:  SPECIFY IN WRITING.  _____

         _____

C.  (X )  THERE WAS EVIDENCE OF THE FOLLOWING MITIGATING
          CIRCUMSTANCES, BUT THE JURY UNANIMOUSLY AGREED THAT
          THEY DID NOT EXIST AT THE TIME OF THE MURDER:

1. (X )  THE CAPITAL MURDER WAS COMMITTED WHILE KENNETH
         REAMS WAS UNDER EXTREME MENTAL OR EMOTIONAL
         DISTURBANCE.

2. (X )  THE CAPITAL MURDER WAS COMMITTED WHILE KENNETH
         REAMS WAS ACTING UNDER UNUSUAL PRESSURES OR
         INFLUENCES OR UNDER THE DOMINATION OF ANOTHER
         PERSON.  (R. 161)

-SA4-

Respondent's Exhibit E

7031

1346

FORM 2

MITIGATING CIRCUMSTANCES - PAGE 4

3. (  )  THE CAPITAL MURDER WAS COMMITTED WHILE THE CAPACITY
        OF KENNETH REAMS TO APPRECIATE THE WRONGFULNESS OF
        HIS CONDUCT OR TO CONFORM HIS CONDUCT TO THE
        REQUIREMENTS OF LAW WAS IMPAIRED AS A RESULT OF
        MENTAL DISEASE OR DEFECT, INTOXICATION, OR DRUG
        ABUSE.  (R. 162)

4. (X )  THE YOUTH OF KENNETH REAMS AT THE TIME OF THE
        COMMISSION OF THE CAPITAL MURDER.

5. (X )  THE CAPITAL MURDER WAS COMMITTED BY ANOTHER PERSON
        AND KENNETH REAMS WAS AN ACCOMPLICE AND HIS
        PARTICIPATION RELATIVELY MINOR.

6. (X )  KENNETH REAMS HAS NO SIGNIFICANT HISTORY OF PRIOR
        CRIMINAL ACTIVITY.

7. (X )  KENNETH REAMS SUFFERS FROM BORDERLINE MENTAL
        RETARDATION.

8. (  )  KENNETH REAMS HAS ABILITIES THAT WOULD ALLOW HIM TO
        BE A PRODUCTIVE MEMBER OF SOCIETY EVEN IN PRISON.

9. (  )  OTHER:  SPECIFY IN WRITING.  _____

        _____

        _____

1347

7032

Respondent's Exhibit E

FORM 2

MITIGATING CIRCUMSTANCES - PAGE 5


D.   (  )   THERE WAS NO EVIDENCE OF ANY MITIGATING

CIRCUMSTANCE.   (CHECK IF APPLICABLE).   (R. 163)

<u>s/ Dwight A. Robinson</u>
FOREMAN

Respondent's Exhibit E

7033

1348

FORM 3

CONCLUSIONS


THE JURY, HAVING REACHED ITS FINAL CONCLUSIONS, WILL SO INDICATE BY HAVING ITS FOREMAN PLACE A CHECK MARK (X) IN THE APPROPRIATE SPACE IN ACCORDANCE WITH THE JURY'S FINDINGS.  IN ORDER TO CHECK ANY SPACE, YOUR CONCLUSIONS MUST BE UNANIMOUS. THE FOREMAN OF THE JURY WILL THEN SIGN AT THE END OF THIS FORM.  (R. 164)

WE THE JURY CONCLUDE:

(A)   (X )   ONE OR MORE AGGRAVATING CIRCUMSTANCES DID EXIST BEYOND A REASONABLE DOUBT, AT THE TIME OF THE COMMISSION OF THE CAPITAL MURDER.

(IF YOU DO NOT UNANIMOUSLY AGREE TO CHECK PARAGRAPH (A) THEN SKIP (B) AND (C), AND SENTENCE KENNETH REAMS TO LIFE IMPRISONMENT WITHOUT PAROLE ON FORM 4.)

(B)   (X )   THE AGGRAVATING CIRCUMSTANCES OUTWEIGH BEYOND A REASONABLE DOUBT ANY MITIGATING CIRCUMSTANCES.

(IF YOU DO NOT UNANIMOUSLY AGREE TO CHECK (B) THEN SKIP (C) AND SENTENCE KENNETH REAMS TO LIFE IMPRISONMENT WITHOUT PAROLE ON FORM 4.)

(C)   (X )   THE AGGRAVATING CIRCUMSTANCE JUSTIFY BEYOND A REASONABLE DOUBT A SENTENCE OF DEATH.

(IF YOU DO NOT UNANIMOUSLY AGREE TO CHECK PARAGRAPH (C) THEN SENTENCE KENNETH REAMS TO LIFE IMPRISONMENT WITHOUT PAROLE ON FORM 4.)  (R. 164)


1349                        -SA7-

Respondent's Exhibit E

FORM 3

CONCLUSIONS - PAGE 2


IF YOU HAVE CHECKED PARAGRAPHS (A), (B), AND (C) THEN

SENTENCE KENNETH REAMS TO DEATH BY LETHAL INJECTION ON

FORM 4. (R. 165)

                                    s/ Dwight A. Robinson
                                         FOREMAN

Respondent's Exhibit E

7035

1350

FORM 4

VERDICT

WE, THE JURY, AFTER CAREFUL DELIBERATION, HAVE
DETERMINED THAT FOR THE CAPITAL FELONY MURDER OF GARY TURNER
THAT KENNETH REAMS SHALL BE SENTENCED TO:

A.     ( ) LIFE IMPRISONMENT WITHOUT PAROLE.

B.     (X) DEATH BY LETHAL INJECTION.

(EACH JUROR MUST SIGN THIS VERDICT.)


s/ Dwight A. Robinson          s/ Kelly Ruggeri


s/ Jerry Lindsey               s/ Carolyn Phillips


s/ Larry R. Tipton             s/ Linda Messina


s/ Mary Denise Hoffman         s/ David R. (illegible)


s/ Dorothy Hodges              s/ Gary H. Johnson


s/ Bruce E. Hornsby            s/ Della M. Horace


1351                    -SA9-

Respondent's Exhibit E

(ABSTRACTOR'S NOTE:  At the close of the penalty phase of Reams' trial, after the trial court excused the jury, the trial court asked Reams' counsel the following questions.)

TRIAL COURT:  Mr. Kizer (defense counsel), is there any desire that the defendant's sentence be postponed?

DEFENSE COUNSEL:  I know of no legal reason why Your Honor.

TRIAL COURT:  Okay.  The next thing I was going to ask you is there any legal reason that you can think of that the Court should not impose sentence at this time?

DEFENSE COUNSEL:  None that I'm aware of, Your Honor.  (R. 917)

TRIAL COURT:  Other than those that have previously been raised.  All right Mr. Reams, will you stand up if you would, please, sir.  Kenneth Reams, the jury of your peers having considered the evidence in this case and having found you guilty of the offense of the capital felony murder and having again heard evidence and deliberated and returned a sentence of death by lethal injection and no legal reason having been shown to the Court why sentence should not be imposed, it is the judgment and sentence of the Court that you be remanded to the Sheriff of Jefferson County and by him transported to the Department of Correction where on a day prescribed by the Governor of this State, the Superintendent of the Department of Correction will carry out the sentence of this Court and you will be put to death by lethal injection.  (R. 918)

Respondent's Exhibit E

7037

1352