ELECTRONICALLY FILED
Arkansas Supreme Court
Stacey Pectol, Clerk of the Courts
2018-Jun-08  17:05:33
CR-17-654
238 Pages

No. CR 17-654

IN THE ARKANSAS SUPREME COURT

_____

**Kenneth Reams,** *Appellant/Cross-Appellee*,

**v.**

**State of Arkansas,** *Appellee/Cross-Appellant*.

_____

On Appeal from Rule 37 Proceedings
Circuit Court of Jefferson County
Honorable John W. Cole

_____

**CROSS-APPELLEE'S SUPPLEMENTAL ABSTRACT,
BRIEF, AND SUPPLEMENTAL ADDENDUM**

Jin Hee Lee*
NAACP Legal Defense &
  Educational Fund, Inc.
40 Rector Street, 5th Floor
New York, NY  10006
(212) 965-2200
jlee@naacpldf.org

George H. Kendall*
Corrine Irish*
Squire Patton Boggs (US) LLP
30 Rockefeller Plaza, 23rd Floor
New York, NY  10112
(212) 872-9800
george.kendall@squirepb.com
corrine.irish@squirepb.com

Christopher Kemmitt*
Ajmel Quereshi*
NAACP Legal Defense &
  Educational Fund, Inc.
1444 I Street NW
Washington, DC 20005
(202) 682-1300
ckemmitt@naacpldf.org
aquereshi@naacpldf.org

John W. Walker
Ark. Bar No. 64046
John W. Walker, P.A.
1723 Broadway
Little Rock, AR  72206
(501) 374-3758
johnwalkeratty@aol.com

*Admitted *Pro Hac Vice*

# TABLE OF CONTENTS

**PAGE(S)**

POINTS ON CROSS-APPEAL ................................................................. iii

TABLE OF AUTHORITIES ................................................. iv

CROSS-APPELLEE'S SUPPLEMENTAL ABSTRACT ..................... Supp. Ab. 1

**RULE 37 HEARING, May 1, 2007** ...................................... Supp. Ab. 1

CROSS-APPELLEE'S STATEMENT OF THE CASE ................... SoC 1

ARGUMENT ..................................................................... Arg 1

I.    This Court Should Affirm the Circuit Court's Ruling That Mr. Reams'
      Trial Counsel Was Ineffective During the Penalty Phase of Trial. ......... Arg 1

      A.    Trial Counsel Was Ineffective for Not Investigating and
            Presenting Available Mitigation Witnesses, Who Would Have
            Proved That Mr. Reams Was Not the Shooter. ............................ Arg 2

            1.    *Trial Counsel Was Deficient for Not Investigating or*
                  *Presenting Phillip Curry and Alford Goodwin.* .................. Arg 3

            2.    *Mr. Reams Was Prejudiced by Trial Counsel's Failure to*
                  *Investigate and Present Available Mitigation Evidence*
                  *That He Was Not the Shooter.* ............................................ Arg 8

      B.    Trial Counsel's Failure to Investigate and Present Available
            Mitigation Evidence Regarding Mr. Reams' Traumatic Life and
            Family History Supports the Circuit Court's Decision to Vacate
            Mr. Reams' Death Sentence. ....................................................... Arg 12

Respondent's Exhibit F2

**PAGE(S)**

1.   *It Was Objectively Unreasonable for Trial Counsel Not to Investigate and Present the Extensive and Available Mitigation Evidence About Mr. Reams' Traumatic Life and Family History.* ........................................................ Arg 13

   (a)   Family History of Mental Illness, Abuse, and Neglect. ........................................................ Arg 17

   (b)   Mr. Reams' Childhood Abuse and Neglect ........... Arg 18

   (c)   Mr. Reams' Mental Health ..................................... Arg 19

2.   *Mr. Reams Was Prejudiced by Trial Counsel's Failure to Adequately Investigate Mitigation Evidence of His Traumatic Life and Family History.* ................................. Arg 20

II.   Mr. Reams' Intellectual Disability Renders Him Ineligible for the Death Penalty. ....................................................................... Arg 23

CONCLUSION ............................................................................... Arg 30

CERTIFICATE OF SERVICE ........................................................ Arg 32

SUPPLEMENTAL ADDENDUM .................................................... Supp. Add. 001

Respondent's Exhibit F2

# POINTS ON CROSS-APPEAL

I.    The Circuit Court did not clearly err in ruling that Mr. Reams received ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984), because his trial counsel failed to investigate and present mitigation evidence during the penalty phase of his trial that he was not the shooter, entitling him to a new sentencing.

II.   Mr. Reams also received ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984), because his trial counsel failed to investigate and present mitigation evidence of his traumatic life and family history during the penalty phase of his trial, thus providing another basis to affirm the Circuit Court's ruling.

III.  The Circuit Court failed to address Mr. Reams' claim that his intellectual disability renders him ineligible for the death penalty under *Atkins v. Virginia*, 536 U.S. 304 (2004), requiring remand to the Circuit Court if the Circuit Court's grant of sentencing relief based on ineffective assistance of counsel is found to be clearly erroneous.

Respondent's Exhibit F2

# TABLE OF AUTHORITIES

**PAGE(S)**

## CASES

*Anderson v. State*,
  2011 Ark. 488, 385 S.W.3d 783 (2011) ................................................. Arg 25, 26

*Atkins v. Virginia*,
  536 U.S. 304 (2004) ...................................................................Arg 23-24, 28, 29

*Chambers v. Armontrout*,
  907 F.2d 825 (8th Cir. 1990)......................................................................Arg 5-6

*Davis v. State*,
  345 Ark. 161, 44 S.W.3d 726 (2001) ......................................................... Arg 28

*Echols v. State*,
  2010 Ark. 417, 373 S.W.3d 892 (2010) ...................................................... Arg 23

*Eldridge v. Atkins*,
  665 F.2d 228 (8th Cir. 1981) ...................................................................... Arg 6

*Farmer v. State*,
  321 Ark. 283, 902 S.W.2d 209 (1995) .......................................................... Arg 6

*Flores v. State*,
  350 Ark. 198, 85 S.W.3d 896 (2002) .......................................................... Arg 10

*Gunter v. Liberty Bank of Arkansas*,
  92 Ark. App. 163, 211 S.W.3d 579 (2005) .................................................. Arg 27

*Hall v. Florida*,
  134 S. Ct. 1986 (2014) ............................................................................. Arg 25

*Henderson v. Sargent*,
  926 F.2d 706 (8th Cir. 1991)...................................................................... Arg 6

*Jones v. Norman*,
  633 F.3d 661 (8th Cir. 2011)..................................................................... Arg 28

Respondent's Exhibit F2

**PAGE(S)**

**CASES**

*Kenley v. Armontrout,*
  937 F.2d 1298 (8th Cir. 1991) ................................................... Arg 2, 3

*Myers v. State,*
  333 Ark. 706, 972 S.W.2d 227 (1998) ...................................... Arg 7, 8

*Penry v. Lynaugh,*
  492 U.S. 302 (1989) ................................................................. Arg 28

*Pickens v. Lockhart,*
  714 F.2d 1455 (8th Cir. 1983) ................................................. Arg 2, 3

*Porter v. McCollum,*
  558 U.S. 30 (2009) ................................................................... Arg 16

*Reams v. Arkansas,*
  322 Ark. 336, 909 S.W.2d 324 (1995) ...................................... Arg 11

*Rompilla v. Beard,*
  545 U.S. 374 (2005) ................................................................. Arg 23

*Rowbottom v. State,*
  341 Ark. 33, 13 S.W.3d 904 (2000) .......................................... Arg 29

*Russell v. State,*
  302 Ark. 274, 789 S.W.2d 720 (1990) ........................................ Arg 6

*Sanford v. State,*
  342 Ark. 22, 25 S.W.3d 414 (2000) .................................. Arg 2-3, 12-13, 16, 22

*Sasser v. State,*
  338 Ark. 375, 993 S.W.2d 901 (1999) ...................................... Arg 29

*Simmons v. Luebbers,*
  299 F.3d 929 (8th Cir. 2002) .................................................... Arg 23

*Sparkman v. State,*
  373 Ark. 45, 281 S.W.3d 277 (2008) ....................................... Arg 23

Respondent's Exhibit F2

**PAGE(S)**

**CASES**

*State v. Barrett,*
    371 Ark. 91, 263 S.W.3d 542 (2007) ................................................... Arg 1, 6, 10

*State v. Dillard*,
    338 Ark. 571, 998 S.W.2d 750 (1999) .......................................................... Arg 6

*State v. Franklin,*
    351 Ark. 131, 89 S.W.3d 865 (2002) ............................................................ Arg 7

*State v. Harrison*,
    2012 Ark. 198, 404 S.W.3d 830 .................................................................. Arg 27

*State v. Rainer*,
    2014 Ark. 306, 440 S.W.3d 315 (2014) .................................................. Arg 28-29

*Strickland v. Washington,*
    466 U.S. 668 (1984) ........................................................................... Arg 2, 10-11

*Thiel v. Schuetzle,*
    200 F.3d 1120 (8th Cir. 1999) ..................................................................... Arg 8

*Wiggins v. Smith*,
    539 U.S. 510 (2003) ....................................................... Arg 11-12, 16, 22-23

**PAGE(S)**

**STATUTES & RULES**

Ark. Code Ann. § 5-4-618 (1993) ........................................................ Arg 24-25, 29

Arkansas Rules of Criminal Procedure 37.2(f) ............................................... Arg 24

Respondent's Exhibit F2

## SUPPLEMENTAL ABSTRACT

### RULE 37 HEARING
### IN THE CIRCUIT COURT OF JEFFERSON COUNTY
### HONORABLE THOMAS BROWN
### MAY 1, 2007

**THE COURT:**     This is Case No. CR-1993-301. The original style of the case was State of Arkansas v. Kenneth Reams. Mr. Reams has filed a petition for Rule 37. And, Ms. Swarns, you and Mr. Walker are representing Mr. Reams. Do you need a moment to meet with him?

**MS. SWARNS:**     No, Your Honor. In the brief moment since he's arrived in the courtroom, I have spoken with Mr. Reams and we're ready to proceed.

**THE COURT:**     Now, who's going to be representing the interests of the State?

**MR. HOLT:**     Your Honor, my name is Kent Holt. I'm an assistant attorney general, along with David Raupp, who's also an assistant attorney general; and we have been appointed in this case as special prosecutors, citing a conflict with the Office of the Prosecuting Attorney at present.

**THE COURT:**     Both of y'all will be representing the interests of the State? **(SR. 12).**

**MR. HOLT:**     Yes, Your Honor.

**THE COURT:**     Thank you, Mr. Holt. Ms. Swarns, whom might be, other than yourself, representing Mr. Reams?

Respondent's Exhibit F2

**MS. SWARNS:**     Mr. Reams is represented by the NAACP Legal Defense Fund; and that is myself, Norman Chachkin, C-h-a-c-h-k-i-n, who is not here with me today, and John Walker, who is here.

**THE COURT:**     Yes. Mr. Walker, thank you, sir.

**MR. WALKER:**  Yes, Your Honor.

**MS. SWARNS:**     And George Kendall, K-e-n-d-a-l-l, from the law firm of Holland & Knight, K-n-i-g-h-t, in New York.

**THE COURT:**     And you will be the primary?

**MS. SWARNS:**     Yes, Your Honor.

**THE COURT:**     All right. Mr. Walker will assist as needed. And we have two representatives from the State. Very good. Has everyone received a copy of the Court's decision and order concerning your motion for summary judgment?

**MS. SWARNS:**     Yes, Your Honor. **(SR. 13).**

**MR. WALKER:**  Yes, Your Honor.

**MR. HOLT:**      Yes, Your Honor.

**THE COURT:**     The State has and Mr. Walker has. Now, I have faxed it; and if it is agreeable with counsel, generally what I would prefer to do is if there are various decisions made in writing, I prefer to fax them or email them to primary counsel and then mail copies to secondary counsel. That way you can get them fairly quickly because you are the primary movants. Very good. I need to ask: Ms. Swarns,

do you have your client's Rule 37 petition?

**MS. SWARNS:**    Yes, Your Honor.  We filed a Rule 37 petition on January 31st of 1997. We then filed a --

**THE COURT:**    We have some large, thick files.

**MS. SWARNS:**    We have a lot of pleadings, yes.

**THE COURT:**    Yes. **(SR. 14).** I just didn't bring everything out here, and I am just inundated with this. There's a lot -- and transcripts. So, might I look at your originally filed Rule 37 petition?

**MS. SWARNS:**    Yes. May I approach?

**THE COURT:**    Yes. And the State has a copy. Now, is this the one filed by your client --

**MS. SWARNS:**    No, that --

**THE COURT:**    -- personally?

**MS. SWARNS:**    -- was filed by George Kendall, counsel for Mr. Reams.

**THE COURT:**    All right.

**MS. SWARNS:**    We subsequently filed a verification in the fall of 2006.

**THE COURT:**    Wait a minute. This is January of '97?

**MS. SWARNS:**    Yes, that was the original Rule 37 petition that we filed.

**THE COURT:**    When was your verification? Fall of '06?

**MS. SWARNS:**    Yes.

**THE COURT:**     You mean --

**MS. SWARNS:**     Yes, Your Honor. Initially that verification -- I mean -- I'm sorry. **(SR. 15).** That petition was accompanied by an attorney verification. As it was filed in 1997, that was the practice at that time. Subsequently, as Your Honor is aware, there's been a series of decisions in the Arkansas Supreme Court requiring personal verification by --

**THE COURT:**     By your client.

**MS. SWARNS:**     Exactly right, by defendants. And in response to that, we did file a verification. And Mr. Reams would, if you would like to ask him, would be happy to personally verify. I think the State had some questions about the verification that we filed. I've prepared another verification.

**THE COURT:**     Well, I think the Rules require that the individuals that filed their Rule 37 petitions must file a verified petition. Similar in nature to a civil claim filed by a person or an attorney, and they verify that the pleadings – what's contained therein are true and correct. All right. **(SR. 16).**

**MS. SWARNS:**     I prepared a supplemental affidavit of Kenneth Reams where he states under oath that the previously filed petition and supplement, that the facts stated are true, correct, and complete to the best of his knowledge and information. I believe that is verbatim the language of the verification in the current Rule 37. I can have him sign that, and it will need to be notarized.

**THE COURT:**     I understand. I assume that you have -- since there has been an extended delay in the handling of this matter, you have had adequate opportunity to meet with your client and discuss the petition, either you or Mr. Walker or you other counsel.

**MS. SWARNS:**     Absolutely.

**THE COURT:**     And I want to make sure that your client clearly understands the nature of this action and the limitations upon this action. You have discussed those with Mr. Reams? **(SR. 17).**

**MS. SWARNS:**     Yes, I have explained to him not only what the substance of our pleadings but what the Rule 37 requirements are.

**THE COURT:**     Mr. Reams, you have met with counsel; is this correct?

**MR. REAMS:**     Yes, sir.

**THE COURT:**     And you clearly understand that this is a Rule 37 petition, under Rule 37 of the Arkansas Rules of Procedure. This is not a new trial. This is not anything of that. This is very limited in nature. I want to ensure that you understand this.

**MR. REAMS:**     Yes, sir.

**THE COURT:**     Do you?

**MR. REAMS:**     Yes, sir.

**THE COURT:**     Thank you.  Ms. Swarns, I assume that he understands that the burden of moving forward and the burden of proof rests with the petitioner, which is you.

**MS. SWARNS:**   Yes, sir.

**THE COURT:**     All right. Today we are here only for the purposes of hearing various arguments of counsel. Judge Dennis had previously granted an evidentiary hearing. **(SR. 18).** I had in review of my file concurred that an evidentiary hearing needed to be scheduled, and I scheduled it to today. And at our telephonic conference of last month, y'all indicated that no one would be ready today. And so, I conferred with y'all; and we set this for August.

Now, I will be honest with you, I work a lot. I'm here five days a week. I primarily handle juvenile cases, and I don't have a spare week. I don't have a spare three days. So, I have taken two days out of my calendar to hear this matter in August. I want to be very sure that absent either the second coming or a world calamity, we've got this set August -- was it -- let's see, what day was that in August. What day do y'all have in August for that?

**MR. HOLT:**     Weren't there two --

**MS. SWARNS:**   Yeah.

**MR. HOLT:**     There were possibilities.

**THE COURT:**     There were two days y'all were going to tell me. **(SR. 19).**

**MS. SWARNS:**   When we left off, the State submitted a letter to Your Honor indicating which dates there were available for Monday through Wednesday in August.

**MR. HOLT:**   Do we have a calendar?

**THE COURT:**   I happen to have one. So, please tell me, because time is pressing and every other judge has recused in a criminal case. So, I now got stuck with a criminal jury trial. Y'all look that over because I want to be sure that when we go to court we won't be postponing it and I won't waste three days. All right. What days?

**MR. HOLT:**   Either the 20th through the 22nd or the 27th through the 29th.

**THE COURT:**   We said two days. You had like a half a day, I think, on a Monday or something like that or. Well, you see every Monday morning, everybody that gets arrested on Friday will have to come before me.

**MR. HOLT:**   Right.

**THE COURT:**   Plus, I also have felony cases. Every Tuesday I have misdemeanor cases. Every Wednesday is child abuse cases. Every Thursday is child abuse cases. And every other Friday I'm in Star City. **(SR.20).** So, I need to figure out which three days are acceptable, which two and a half days are acceptable so that –

**MR. HOLT:**     Either with us is all right, with the State.

**THE COURT:**     The 20th through the 22nd or the 27th through the 29th?

**MS. SWARNS:**     Both are fine. Let's go with the 20th to the 22nd, Your Honor.

**THE COURT:**     We'll go with the 20th through 22nd. Next question: Your client will need to be present. That hearing will be here.

**MS. SWARNS:**     Okay.

**THE COURT:**     Is 9:30 a satisfactory time?

**MS. SWARNS:**     It is, Your Honor.

**THE COURT:**     On each day. The reason I ask is that on the 20th, I'll just find someone that will sit in for our probable cause hearings, because even though we're out here, folks still get arrested. So, we have to have a probable cause hearing. All right. August the 20th through the 22nd. **(SR. 21).**

Mr. Holt, if you would be kind enough to simply prepare an order defining that we are all here today and we all agreed that the evidentiary hearing shall be held August the 20th through the 22nd, beginning at 9:30 here at the Jefferson County Detention Facility.

You will need to prepare an order to deliver. Quite frankly we've had some confusion; and so, we prepared three of our own. And the sheriff's department is not the one who transports. And I was in error. In all my years of dealing with these

cases of various kinds, it was the sheriff's office. But the DOC provides this transportation.

**MR. HOLT:**     Okay.

**THE COURT:**     So, you'll need to prepare your order.

**MS. SWARNS:**     Yes, Your Honor.

**THE COURT:**     In fact, here is the order that I prepared that covers it, if you want it.

**MS. SWARNS:**     Yes, I have a copy of it, Your Honor. **(SR. 22).**

**THE COURT:**     Right. Because –

**MS. SWARNS:**     I will replicate that.

**THE COURT:**     -- I don't want to put him in the new jail, and that's why I put "not the new jail." All right. If you'll prepare that order scheduling the evidentiary hearing for August the 20th through the 22nd beginning at 9:30 a.m. each of those three days.

Now, I believe we need to discuss the matter of witnesses and witness lists. How long will it take you to make those available to counsel?

**MS. SWARNS:**     As soon as we conclude today's proceedings and determine -- we'll hear Your Honor's rulings, I guess. After today's proceedings and we hear Your Honor's ruling on the issues before the Court, in terms of

cognizability, I should be able to get a witness list to the Court and counsel within two weeks.

**THE COURT:**   Say by the 30th for sure?

**MS. SWARNS:**   Sure.

**THE COURT:**   Will y'all have witnesses also? **(SR. 23).**

**MR. HOLT:**   We very well may, Your Honor. Part of it may deal, in fact, with what witnesses Mr. Reams calls.

**THE COURT:**   Well, you have the right to present witnesses; but I also want the disclosure of those witnesses to counsel.

**MR. HOLT:**   Exactly.

**THE COURT:**   Could you do that by June the 30th?

**MR. HOLT:**   Certainly. Certainly.

**THE COURT:**   And that will give you seven weeks. And my guess is that their witnesses are not going to be of great substantive nature. Perhaps some rebuttal areas. Would that be --

**MR. HOLT:**   That will be the case.

**THE COURT:**   All right. Ms. Swarns, you have numerous motions before the Court. And the Court has reviewed almost all of them and I am satisfied that there are a lot of them that do not fall within Rule 37.

**MS. SWARNS:**   Okay. **(SR. 24).**

**THE COURT:**     I'm also confident that this matter needs to proceed. We need to resolve issues, but I am constrained by Rule 37 requirements.  We can't try the case again. We are limited. And while I wish it were within my purview to hear all of these issues so that they could be brought to the forefront and ultimately resolved, I have to follow what the law says.

**MS. SWARNS:**     Your Honor, if I could be heard.

**THE COURT:**     Well, yes, I want you to make arguments. I want you -- I'm going to give you opportunities to make arguments in all of the areas so that you can make a proper record. The State will need to respond. And then I will have to make a decision as to which of all of these areas are truly cognizable and actionable under Rule 37 and which must come under other areas such as the habeas proceeding before a federal judge or something of that nature. **(SR. 25).** So, without further ado, would you like to -- and we have no podium here, or is that going to be --

**MS. SWARNS:**     Mr. Walker, can he be excused?

**THE COURT:**     Oh, Mr. Walker, I apologize.

**MR. WALKER:**   No problem.

**THE COURT:**     You had indicated to the Court you had pressing business. No objections from the State that Mr. Walker might be excused?

**MR. HOLT:**     None.

**THE COURT:**     Mr. Walker, perhaps we will see you in August. Perhaps

not. Safe speed, sir.

**MR. WALKER:**   Thank you.

**THE COURT:**   Ms. Swarns, you may proceed.

## ARGUMENT

**MS. SWARNS:**   Thank you, Your Honor. As Your Honor has indicated, Mr. Reams is before the Court on a petition for relief under Rule 37. We filed in 1997 an initial Rule 37 petition. In the fall of 2006, we filed a supplement to that petition. **(SR. 26).** We have filed replies to the State's responses to those briefs. All of the claims that we raised in our initial Rule 37 petition and our supplement are pled under Rule 37(a)(i) that the sentence imposed was in violation of the Constitution or the laws of the United States or of Arkansas. Or in one instance, under Rule 37.1(a)(iii) "that the sentence was in excess of the maximum sentence authorized by law." And that, of course, our claim that Mr. Reams' mental retardation renders him ineligible for the death penalty. As to each claim for relief that we have alleged, we have specified the federal and state constitutional ground on which it lies. And so, that is the basis of our claims of cognizability under Rule 37(a).

As to each substantive claim of constitutional error, we also claimed that trial and appellate counsel were ineffective for failing to raise and properly litigate those claims. **(SR. 27).**

These Rule 37 proceedings are Mr. Reams' first opportunity to challenge trial counsel's conduct in this case because trial counsel also handled the direct appeal in this case. So, Rule 37 presents the first opportunity for any court to review trial counsel's behavior in addition to reviewing appellate counsel's.

**THE COURT:**     Behavior or –

**MS. SWARNS:**     Or his conduct in this case.

**THE COURT:**     Okay.

**MS. SWARNS:**     His litigation, his representation.

**THE COURT:**     His ability to receive adequate counsel.

**MS. SWARNS:**     Well, right.   The effectiveness of his representation of Mr. Reams during both the trial and the direct appeal. So, obviously this is a critical stage for Mr. Reams with respect to his claims of ineffective assistance of counsel. **(SR. 28).** If this Court does not review the claims of trial counsel's ineffectiveness, Mr. Reams will have left state court with no court reviewing trial counsel's competency at the time of Mr. Reams' trial. With respect to our claims of ineffective assistance of counsel, the State has made essentially -- and let me just back up by saying, I'm going to begin by sort of talking about the broader issues that I can talk about in a general nature and then I'm going to walk through each specific claim and explain to Your Honor and the Court why I believe each specific claim entitles us to be heard in Rule 37.

**THE COURT:**     In the evidentiary hearing?

**MS. SWARNS:**     Yes. And for this Court to make a ruling whether it's, you know, through evidentiary proceedings or based on the law as pled in our motion. So, initially the State has claimed that our guilt/innocence phase ineffective assistance of counsel claims are conclusory.

In our initial Rule 37 petition, which we filed in 1997, we were constrained by a very strict 10-page limit. The Arkansas Rules dictated that there was a sanction of dismissal if we exceeded the 10-page limit on Rule 37 petitions. **(SR. 29).** In recognition of that fact, we pled what you see are numerous claims that we believe of constitutional error in Mr. Reams' case.

In summary fashion, we asked and we advised the court that we could not adequately plead the substance of each of Mr. Reams' claims for relief within the page limit and we reserved his right to seek an amendment to the Rule 37 petition, which is available under the Rules. And that was all pled in our initial Rule 37 petition.

We specifically explained that that 10-page limit was not adequate for us to explain all of the errors in Mr. Reams' case and asked for the opportunity to expand. Judge Dennis granted us that opportunity to expand, and we filed a supplement in the fall of 2006.

In that supplement, we explained in detail what the legal requirements for ineffective assistance of counsel are under federal constitutional law and under Arkansas law. We cited <u>Strickland v. Washington,</u> the federal constitutional case. **(SR. 30).**

We cited <u>Cotheren v. State</u> with respect to our claims of ineffective assistance of counsel. We cited cases finding of counsel ineffective under circumstances which are similar to the claims and situations presented by Mr. Reams' case.

We cited to the record of and the transcript of the proceedings in Mr. Reams' case with respect to these claims. We attached exhibits, extensive exhibits to the supplement providing support and detail for our allegations of error.

And as to each claim, we explained not only our legal entitlement to relief on each error, which is consistent with deficient performance under the federal constitutional standard, and we also explained how Mr. Reams was prejudiced by each error and by counsel's failure to pursue the errors we have raised.

The State says, well, you only said counsel was ineffective after you had pled the substantive claim for relief. **(SR. 31).** Essentially the State would ask that we plead a substantive claim for relief and then plead it again under the captions deficient performance and prejudice. The substantive claim for relief contained all of the information that was required to establish ineffective assistance of counsel.

And we laid out, as I indicated, the law of ineffective assistance of counsel and why Mr. Reams was -- trial counsel was ineffective.

There's no obligation for us to repeat which was already a 91-page supplement to duplicate our pleadings just to put it in – just so it -- it would be completely repetitive. And there's absolutely no basis under law for us to say the same exact facts twice. We established deficient performance and prejudice.

**THE COURT:**     In other words, your position would be that your original pleading coupled with your 91-page supplement covers all of the errors in which you believe he is entitled to an evidentiary hearing?

**MS. SWARNS:**     Yes, Your Honor.

**THE COURT:**     Okay. **(SR. 32).**

**MS. SWARNS:**     And I would just add to that including the affidavits that we supplemented the record with. Just all of the pleadings that we have filed. That is correct.

**THE COURT:**     Go ahead.

**MS. SWARNS:**     With respect to our claim of ineffective assistance of counsel at penalty phase, the State acknowledges -- and I quote – "that we set out alleged deficiencies of trial counsel at the penalty phase at some length." So, they don't seem to be claiming or complaining that our penalty phase claim of ineffectiveness is conclusory. Instead, the State just goes on to dispute our

entitlement to relief under the law. And that's their right to do.   But that means that there is a genuine issue of fact that can and should be decided at a hearing. That is not a basis for this Court to go on and say that the claim of ineffective assistance at penalty phase is not cognizable under the statute. Essentially the State concedes the cognizability of the penalty phase ineffectiveness claim. **(SR. 33).**

**THE COURT:**     And the ineffectiveness claim that you allege within those pleadings is the failure to address the issues of mental retardation?

**MS. SWARNS:**     And with respect to Mr. Reams' difficult childhood, the poverty, and abuse he sustained and suffered.

**THE COURT:**     I understand, but the primary thing is the mental retardation?

**MS. SWARNS:**     It is, yes.

**THE COURT:**     That's the main thrust for which, at least I appreciate you've concurred, that I was correct and that there is an argument of fact?

**MS. SWARNS:**     Oh, I certainly agree with that, Your Honor.

**THE COURT:**     Okay.

**MS. SWARNS:**     Yes.

**THE COURT:**     At least once I was correct.

**MS. SWARNS:**     And that is certainly one of the important issues before this Court with respect to penalty phase. **(SR. 34).** We've already discussed the

verification which I'm prepared to sign. I would just, before I move into each of the individual claims there, point out that the irony, for want of a better word, that the State has consistently complained about Mr. Reams' capacity to file timely claims for relief despite the fact that the State itself was unable to file a timely response to Mr. Reams' initial Rule 37 petition.

Under State law, the State had 20 days to respond to Mr. Reams' initial Rule 37 petition. The State did not come anywhere near meeting that legal requirement. The State did not file a response to Mr. Reams' initial Rule 37 petition until two months after that response was due. The State, however, seeks to have it both ways.

It asks the Court to hear the argument it raises in an untimely response but asks that this Court ignore serious claims of constitutional error that Mr. Reams allegedly brought in an untimely matter. **(SR. 35).**

**THE COURT:**    In other words, your argument is that there were some technicalities not necessarily completely complied with by your client. There were some technicalities not necessarily completely complied with from your position by the State; is that right?

**MS. SWARNS:**    Well, I don't want to concede that there were technicalities not complied with by Mr. Reams; but certainly that is their argument. And I think it is an inconsistency in the State's argument.

**THE COURT:**    All right. Go ahead. Thank you.

**MS. SWARNS:**    With respect to each of the claims, I'm going to talk now about each of the claims that we have raised on behalf of Mr. Reams. Our first claim for relief on behalf of Mr. Reams was that there was no change of venue in this case. We indicated that at the time of Mr. Reams' capital trial this community was saturated with prejudicial publicity about the shooting and at the shooting and the killing of Mr. Turner at the Worthen ATM machine. **(SR. 36).** Voir dire records demonstrated that many, many of the potential jurors in Mr. Reams' case had read about Mr. Reams' supposed involvement in that robbery and shooting and the news coverage of this event was particularly damaging to Mr. Reams because it indicated that Mr. Reams' co-defendant at that time, Alfred Goodwin, had implicated Mr. Reams in the shooting. Basically the news coverage said, well, you know, Alfred Goodwin says that Kenny Reams did the shooting.

United States Supreme Court law <u>Bruton v. United States</u> talks explicitly about how damaging and corrupting and prejudicial a statement of a co-defendant implicating another is to a jury. **(SR. 37).** They say extrajudicial statements of a co-defendant are so, and I quote them, "powerfully incriminating as to create a situation," and I quote them again, "in which the risk that the jury will not or cannot follow instructions is so great and the consequences of failure so vital to the defendant that the practical and human limitations of the jury system cannot be ignored."

And so, we have alleged that because of the saturation and particularly prejudicial nature of the publicity in this matter there should have been a change of venue. The State has responded by saying that that claim is not cognizable because it could have been raised at trial on direct appeal.

Our response to that is, of course, we think counsel should have raised that claim on direct appeal. Counsel failed to raise that claim on direct appeal and at trial, I should say, and he was, therefore, ineffective for failing to do so. Mr. Reams was prejudiced by counsel's deficient performance in failing to recognize the prejudicial nature of that publicity and seek to protect his client from that by getting a jury that was not exposed and contaminated by that publicity. **(SR. 38).**

**THE COURT:** Your position then, as I understand it, would be not so much that the pretrial publicity is found -- is a cognizable action under Rule 37 but that trial counsel's failure to adequately argue to the trial judge that the venue should be changed leads you to the conclusion that he was ineffective? That's your real argument there, is it not? Not so much that purely, because -- I mean, if I am in error, you correct me. But I've handled several capital cases on both sides of the aisle and I understand about pretrial publicity. If there is substantial publicity and trial counsel argues and presents evidence and testimony on a motion for a change of venue and if that is denied, then would you not agree that while it may be heard on appeal it is not within Rule 37?

**MS. SWARNS:**     If counsel had raised it at trial?

**THE COURT:**     Had raised it at trial.

**MS. SWARNS:**     And it was heard on direct appeal?

**THE COURT:**     And it was denied.

**MS. SWARNS:**     And it was denied?

**THE COURT:**     If it was granted, you wouldn't have to worry about it.

**(SR. 39).**

**MS. SWARNS:**     Yeah.

**THE COURT:**     And then it was an issue heard on appeal. Then that is not an appropriate Rule 37 remedy.

**MS. SWARNS:**     Well, hypothetically Your Honor has given me without any more information indicating, for example, that there's been a change in law or some other substantial, you know, fact outside of what Your Honor has given me, I would have to say, yes, that's correct. Issues that are settled on appeal are not cognizable under Rule 37.

**THE COURT:**     Right. So, your real argument here is not so much that there was pretrial publicly but that the failure of trial counsel to bring that to the court's attention through a motion for change of venue, evidence and testimony, folks in the community, newspaper articles is or was ineffective assistance of counsel. So, this gets back to your ineffective --

**MS. SWARNS:**    Yes, it does. **(SR. 40).**

**THE COURT:**    -- assistance of counsel and is an element of that. It doesn't stand on its own two feet. It is simply a leg upon which you wish to stand in ineffective assistance of counsel?

**MS. SWARNS:**    Well, yes. I think -- let me back up and say to Your Honor that I believe, and Mr. Reams believes, that the substantive claim of -- all of the substantive claims that we have raised raise significant constitutional violations which the Court should hear. I understand that the constraints and the constructions given to Rule 37 by the legislature and by the courts limits Your Honor's capacity to review those substantive claims.

And to that, we would object; and we would ask, of course, that Your Honor do notwithstanding review the substantive claims.   But insofar as Your Honor is not inclined to do that, we certainly believe that those claims are cognizable and available even with the limited constraints that are left to hear a claim of ineffective assistance of counsel.

**THE COURT:**    I understand that. You may proceed. **(SR. 41).**

**MS. SWARNS:**    Our second claim for relief is that Mr. Reams' arrest was based on unreliable and insufficient information. Specifically, we have explained that the informants upon whom the police relied in arresting Mr. Reams were unreliable. None were actual witnesses to the shooting. None established a basis for

the reliability of the information that they provided. The police had numerous reasons to question the veracity of every one of the callers; and those reasons included most notably the fact that each one of those informants waited to call the police until after a reward was offered. And the most critical of those informants, Jermaine Brown, had pending charges at the time he contacted the police. And there is absolutely no evidence that the police had ever relied on any of these informants before and had any reason to know any of these informants to be reliable. Under federal constitutional law, such unreliable evidence cannot result in or sustain a capital murder conviction. **(SR. 42).**

Now, in response, the State has said that this claim is not cognizable because it could have been raised at trial or on direct appeal. This claim in particular is different from most of the other claims before this Court. Because the reason that it was not raised at trial or on direct appeal is because the State withheld the information underlying the claim. The State had an obligation under federal constitutional law and state constitutional law to disclose any and all information it had about deals or about undermining the credibility of the witnesses involved in Mr. Reams' case.

Mr. Kizer, defense counsel for Mr. Reams, repeatedly asked for that information before trial.  He filed, and I quote, "a motion to require State to reveal any agreements entered into between the State and any prosecution witness that

could conceivably influence his testimony." **(SR. 43).** He filed a motion for discovery, and I quote, "the exact nature and substance of any and all consideration or promises of leniency, immunity, or any other consideration given to or made on behalf of any State witness or person providing information to the authorities herein." He asked for any and all prosecutions, investigations, or possible prosecutions pending which could have been brought against any State witness or person providing information to the authorities herein and any probation, parole, or deferred prosecution status of such person or witness.

In response to those clear and unequivocal requests for constitutionally required information, the State basically lied. It said, and I quote, "the State of Arkansas is not giving any consideration or promises of consideration." And it said, "the State will comply with the discovery requirements set forth in relevant case law." They said that in response to defendant's motion for disclosure of impeaching information. They said it in response to the State's response to defendant's motion for discovery. **(SR. 44).** In the State's response to defendant's motion for disclosure of agreement entered into between the State and prosecution witnesses. And we know, as I've indicated, that the State had a constitutional obligation to disclose this information.

Farmer v. State at 54 Ark. App. 66 cites Arkansas Rule of Criminal Procedure 17.1(d) And explains that the Rule incorporates the due process requirement that the

prosecutor disclose all evidence in its possession favorable to the defendant on guilt or punishment. And that the prosecution under Arkansas Rule of Criminal Procedure 19.2 has a continuing duty to disclose that.

We have now provided the Court with an affidavit from Jermaine Brown. And Jermaine Brown's affidavit indicates that he received from the police officers in this case $3,000 in cash in exchange for his -- the information he provided to the police. That establishes that Mr. Reams' counsel did everything he could have done to raise this claim. **(SR. 45).** The fact that he did not raise this claim at trial or on direct appeal is a direct product of the State's misconduct in this case.

We also now know from looking at Jermaine Brown's criminal history that charges that he had been pending at the time of Kenneth Reams' capital trial were surprisedly dismissed, notwithstanding the fact that he failed to appear for trial, a bench warrant was ordered. Not only were those charges dismissed, the bail was returned to Mr. Brown notwithstanding that fact that he was a prior felon and he didn't even bother to show up in court.

There is substantial evidence in this case to indicate that the witnesses who supported -- on whose word the police relied in arresting Mr. Reams was incredible and unreliable. The only reason that Mr. Reams' prior lawyer did not bring it to the attention of the Court sooner is because the State held it back. **(SR. 46).**

According to the United States Supreme Court, and I will quote them, and in Banks v. Dretke -- that's 504 U.S. 668, a 2004 decision, the Supreme Court says, "defense counsel cannot be faulted for relying on the State's representations that they have complied with their obligations to disclose Brady material. Supreme Court decisions lend no support to the notion that defendants must scavenge for hints of undisclosed Brady material when the prosecution represents that all such material has been disclosed. A rule declaring that the prosecutor may hide, defendant must seek, is not tenable in a system constitutionally bound to accord defendant's due process."

So, the State can certainly claim that this could have and should have been raised at trial or on direct appeal -- and I agree it should have and it could have -- if the State had only followed its constitutional duty and disclosed the evidence that it was required to disclose under federal and state constitutional law of the deals that it made with the witnesses in this case. **(SR. 47).**

**THE COURT:**    I would like for you to give me a clearer explanation as to how you believe that this limited area is found within Rule 37.

**MS. SWARNS:**    Yes.  I think Rule 37 specifically says -- and, you know, the State has pointed out that the claims which could have -- and I quote, it says, "could have been raised."And I have the statute here in front of me. Okay.

**THE COURT:**     Well, I mean, let me narrow this down. Your position, as I understand it, is that the information received by the police resulting in the arrest of the defendant is an area under Rule 37 which we can delve, and that is different than prosecutorial discloses as deals and things of this nature of witnesses brought forth at trial. Do you see the difference? One leads to --

**MS. SWARNS:**     Yes.

**THE COURT:**     -- an arrest.

**MS. SWARNS:**     Right.

**THE COURT:**     Which is not a prosecutorial function. **(SR. 48).**

**MS. SWARNS:**     You know, Your Honor –

**THE COURT:**     That's a law enforcement function.

**MS. SWARNS:**     The prosecution bears the burden of misconduct by all State actors.

**THE COURT:**     I understand, but there's a difference between obtaining information leading to an arrest and people going to trial.

**MS. SWARNS:**     Yes.

**THE COURT:**     And have witnesses testifying against them.

**MS. SWARNS:**     Yes.   And I was sort of going in the order of the claims in which I raise, but we later discussed the fact that Jermaine Brown, although Your Honor is correct, who did not testify at this trial featured very prominently in the

evidence presented by the State at trial. He was referenced specifically by the prosecution in the closing argument. The statements that he gave to the police were referenced by prosecution witnesses during the trial. **(SR. 49).** Jermaine Brown was the star witness in this case, whether or not he testified or not. The State used and relied on Jermaine Brown throughout this trial. They managed to avoid having to have him face cross-examination and confrontation by not calling him as a witness. I think that is another error -- you know, an error we have alleged. But it is not a sort of thing, like I said, trying to walk through the claims as they are constructed; but absolutely I think the contamination of Jermaine Brown is not limited to the unreliability of Mr. Reams' arrest. I think it contaminates and undermines a lot of other aspects of the case as we have pled in the supplement.

**THE COURT:**   All right. Go ahead.

**MS. SWARNS:**   And so, I do not think that Arkansas Rule of Criminal Procedure -- or Rule 37 was intended to condone prosecutorial misconduct or to punish defense lawyers or capitally sentenced prisoners by saying you cannot raise claims that the State withheld from you. **(SR. 50).** I don't think any construction of the Rule or any legislative history of the Rule would encompass such an interpretation. Defense counsel and capitally -- and death sentenced prisoners cannot be held responsible for the State's misconduct. And that is what the Supreme Court

has said in explicit terms. When the prosecution hides evidence, you can't blame it on the defense that they couldn't present a claim based on that evidence.

**THE COURT:**     Well, that's where my concern is the articulation of hiding of evidence. Now, that's a --

**MS. SWARNS:**     Failure to disclose evidence, that's a conclusion.

**THE COURT:**     Okay.

**MS. SWARNS:**     You're right.

**THE COURT:**     All right. Let's stick with –

**MS. SWARNS:**     Let me be –

**THE COURT:**     -- a failure to disclose.

**MS. SWARNS:**     Yes. On that, there is no question because we have the motions and responses of the State saying they did not make payments. **(SR. 51).**

**THE COURT:**     One implies bad conduct on people. The other implies negligence.

**MS. SWARNS:**     Under constitutional law, of course, it doesn't matter whether the motives of the State are intentional or negligent. The ultimate outcome is the same with respect to Mr. Reams and his case.

**THE COURT:**     All right.

**MS. SWARNS:**     Right. I don't -- and it makes me no difference, quite frankly, whether the State, you know, said, we're never going to tell Mr. Reams'

counsel or the police never told Mr. Reams' prosecutor that they handed Jermaine Brown $3,000 in cash. It makes absolutely no difference to me because the outcome is the same. It significantly undermined Mr. Reams' constitutional rights to a fair trial.

**THE COURT:**     Okay. Let's go ahead then.

**MS. SWARNS:**     And I would just add, of course, as with all claims, although in this situation counsel did specifically request the exact information that we're talking about. **(SR. 52).** Insofar as Your Honor thinks that those motions were inadequate, we would say that he was ineffective.

The third claim we have raised is that illegally seized tangible evidence was introduced against Mr. Reams at his trial. Specifically, there was a warrant to search Mr. Reams' home. And that warrant was again based on the unreliable information provided by Jermaine Brown.

In the transcript of the trial, Captain Heroman of the Pine Bluff Police Department testified explicitly that the basis of his search was the word of Jermaine Brown. Mr. Reams was prejudiced by this search because evidence that was ultimately found was admitted at trial and improperly connected to a gun that was found with his co-defendant.

Again, the State says this is not cognizable because it could have been raised

at trial or on direct appeal. **(SR. 53).** We would say the same thing I just said before, of course, that the State did not disclose information that Mr. Brown's unreliability, his motive to seek and curry favor with the State; and, therefore, counsel cannot be held responsible for the failure to raise and litigate this issue because he had no opportunity to know, due to the State's violation of its obligations under the Arkansas Rules of Criminal Procedure and under state and federal constitutional law.

And again, as with all of these claims, we would further assert that insofar as you feel that counsel had a further obligation than he pursued -- although again, he filed numerous motions in this regard, requesting exactly the type of information that the State should have disclosed about Jermaine Brown receiving this $3,000 in cash -- we would say he was ineffective.

Our next claim of error is that unlawfully obtained custodial statements were admitted at trial against Mr. Reams. We have detailed in the supplement that Mr. Reams' statement was involuntary and inadmissible because it was the results of violence, threats of violence, and other coercive techniques. There's evidence that he was hit and slapped and grabbed about the neck, kicked and threatened with a gun. **(SR. 54).** At no point during the presentation of that evidence was there any rebuttal by the State to these claims. As a result, we would say that Mr. Reams was prejudiced because involuntary and incriminating and inconsistent statements of his

were presented to the jury which ultimately undermined his trial testimony and his credibility at trial.

The State has responded by indicating that that claim is not cognizable because it could have been raised at trial or on direct appeal. It is our position that trial counsel could have and should have raised a challenge to the voluntary nature of Mr. Reams' statements. He did not so do. His failure to do so --

**THE COURT:**   You mean he failed to file a motion to suppress those statements?

**MS. SWARNS:**   Yes.

**THE COURT:**   Okay.

**MS. SWARNS:**   And failed to pursue a hearing on those statements. **(SR. 55).** And his failure to do so constituted deficient performance which prejudiced Mr. Reams because, of course, as I indicated, Mr. Reams' ultimate trial credibility was undermined by the presentation of these inconsistent, involuntary, incriminating statements at trial.

**THE COURT:**   I want to make sure. No motion to suppress his confession was filed by trial counsel. Now, in conjunction with that, do you have some evidence to indicate that your client advised trial counsel of the nature and the circumstances surrounding the confession?

**MS. SWARNS:**   Yes, Your Honor.

**THE COURT:**     Okay.

**MS. SWARNS:**     Well, Mr. Reams certainly testified to the circumstances of his being subjected to --

**THE COURT:**     No. No. I mean, prior to trial.

**MS. SWARNS:**     Oh, prior to trial.

**THE COURT:**     So that it would enable counsel to have the opportunity to file that motion. **(SR. 56).** An example is if the defendant makes no statements to his client -- I mean to his attorney such as, they beat a confession out of me, or they gave me drugs. And, you know, if counsel is not aware of these things --

**MS. SWARNS:**     Yes, Your Honor.

**THE COURT:**     -- he can't file motions. Do you see what I'm saying?

**MS. SWARNS:**     Yes.   Yes, Your Honor, I do see what you're saying.

**THE COURT:**     And that would -- that would not be ineffective.

**MS. SWARNS:**     Right. Well, I would suggest, Your Honor, that would, of course, raise an issue of fact that we could litigate at a hearing whether -- if that is Mr. Kizer's defense to our allegation. It is --

**THE COURT:**     I have no idea. I'm just asking.

**MS. SWARNS:**     I don't have additional proof beyond Mr. Reams' advice that certainly he did make counsel aware that he had been abused by the police.

**THE COURT:**     Okay. Go ahead. **(SR. 57).**

**MS. SWARNS:** Our next claim is that Mr. Reams faced at trial inadmissible evidence of other crimes during the guilt phase of his capital trial. Specifically the State introduced evidence and testimony about crimes which were entirely unrelated to Mr. Reams' capital murder case. Specifically they introduced evidence of a burglary of a dry cleaner, a bus station, an attempt to rob someone else at an ATM.

Under state law, of course, evidence of other crimes have only a very limited -- can only be admitted against a capitally-charged or any person charged with a crime for very limited and narrow purposes.

The evidence of the other crimes presented in this case met none of those standards, and of course, Mr. Reams was prejudiced by the introduction of these other crimes, because ultimately the State which had no evidence, no substantial evidence, no hard evidence proving that Mr. Reams was the person who was the shooter in this case allowed and relied on the evidence of these prior crimes **(SR. 58).** to argue that Mr. Reams was the shooter, to undermine Mr. Reams' testimony that he had given the gun to Mr. Goodwin, his co-defendant, and essentially to argue that based on this criminal history Mr. Reams had a propensity for violence and gun crime. And, therefore, the jury should conclude that he was the person that wielded the gun in this case.

Of course, our claims that that fact that Mr. Reams was the shooter, we have provided other proof that he was not including and not limited to Alfred Goodwin's statement and declaration that he, in fact, was the person that shot Mr. Turner at the ATM and that Mr. Reams was not that person.

The State has responded to our claim by saying that the claim that other crimes evidence should not have been introduced, that claim is not cognizable because it could have been raised at trial or on direct appeal. **(SR. 59).**

Our response, of course, is that trial counsel was ineffective for failing to object to the introduction of this incriminating evidence. And we also later talk about he also was ineffective for failing to seek a limiting instruction to the jury for the use -- for their use and consideration of this other crimes evidence at the close of the guilt/innocence phase and at the penalty phase.

Again, Mr. Reams was prejudiced by trial counsel's deficient performance in this regard because once again, the State used the facts of these prior inadmissible crimes to put basically the gun in the hand of Mr. Reams. They had no solid evidence of that fact otherwise. They relied on this inadmissible prior crimes evidence to suggest to the jury that Mr. Reams was the shooter when we now know, of course, that he was not.

And so, that is our claim with respect to the other crimes evidence. We have alleged that Mr. Reams -- there was inadmissible prejudicial hearsay introduced

against Mr. Reams throughout his capital trial. **(SR. 60).** I think we can fairly argue that much of the State's -- substance of the State's case was based on hearsay. We've already mentioned and we've discussed, Your Honor, that the State improperly introduced the information provided by Jermaine Brown. Captain Heroman testified that Jermaine Brown saw Mr. Reams with a .32 caliber gun. That was obviously extremely prejudicial. Mr. Reams had no opportunity to cross-examine Mr. Jermaine Brown about how he was familiar and able to identify guns by caliber, you know. And aside from the fact that counsel for Mr. Reams had no opportunity to, of course, challenge Jermaine Brown's credibility with respect to the other issues, his receiving a deal on his case, and his receiving $3,000 in cash. And then Mr. Reams was obviously prejudiced by the reference to Jermaine Brown because the State used this information to connect Mr. Reams -- this completely hearsay, unreliable testimony to connect Mr. Reams to the gun, the type of gun, the caliber of gun with which **(SR. 61).** Mr. Turner was killed.

We've also alleged that police -- under the same category of inadmissible hearsay, that Officer Taylor testified to information that was allegedly conveyed to him by a witness to the crime, James Nelson. Officer Taylor testified that Mr. Nelson saw two people -- and he offered a very specific description of these two people -- who committed the crime. Mr. Nelson, who later testified, never made the same specific description of the two perpetrators of the crime. So, Officer Taylor's

testimony suggested that James Nelson had provided the police with a description of the offenders that was closer to Mr. Reams than that which was actually testified to by Mr. Nelson. And so, obviously Mr. Reams was prejudiced in that regard by the admission of that hearsay testimony.

The State improperly was allowed to publish police reports to the jury. **(SR. 62).** Those police reports included statements indicating that Mr. Reams was arrested, and I quote, "on the basis of probable cause for murder." Obviously that was extremely prejudicial to the jury because it left them -- I mean, prejudicial to Mr. Reams because it left the jury with a false impression that reliable evidence supported Mr. Reams' arrest, when, as we now know, the information that supported Mr. Reams' arrest was far from credible since it relied heavily on Jermaine Brown.

We have also alleged that the medical examiner in this case was allowed to offer speculative testimony about the distance between the gun and the decedent, Mr. Turner, and path taken by the bullet, even though the medical examiner acknowledged that he had no expertise and ability to offer that kind of testimony. And we have asserted that obviously Mr. Reams was prejudiced by that testimony because the State used it to argue that based on the positioning suggested and opined by Dr. Turner, it seemed that Kenny Reams must have been the shooter, the gunman in this case. **(SR. 63).** And again, we now know from Alfred Goodwin's affidavit that that is not the case.

With respect to all of these claims, the State has responded that these are not cognizable, could have been raised at the trial or on direct appeal. And, of course, it is our position that trial counsel could have and should have challenged each of these pieces of hearsay testimony I have --

**THE COURT:**     Let me interrupt.

**MS. SWARNS:**     Yes, Your Honor.

**THE COURT:**     Did you say at the trial there was testimony from the medical examiner or did you say the coroner? There is a difference.

**MS. SWARNS:**     Let me --

**THE COURT:**     A coroner is a local official who gives his opinion on causes of death. Generally they are at the scene of the crime and their testimony is limited to such things like, I saw apparent gunshot wounds. Stippling was present. Kind of like a police officer who recites factual things. **(SR. 64).** And my conclusion that the cause of death was natural or accidental or a homicide. I sent the body to the State Medical Examiner's office. So, that's my question. The State medical examiner is an expert witness who testifies as to exact causes of death and gives very precise medical testimony. At least in my experience, State medical examiners can testify that, for example, there was gunshot stippling to the upper thorax of the deceased which clearly indicates to me that the gun was discharged within four to five feet of

the deceased. Those things are readily within the realm of the expertise of the medical examiner. Of course, you've got firearms experts who can testify.

**MS. SWARNS:**   Sure.

**THE COURT:**   And they don't go far beyond that. So, that's why I'm asking. You said that the medical examiner. Now, whom might that be?

**MS. SWARNS:**   Dr. Sterner.  **(SR. 65).** And he, however, Your Honor, was the one that acknowledged that he lacked the expertise to offer the testimony that we are speaking of now. During the course of his testimony, he indicated that he did not have the expertise to make this assessment about the distance between the gun and the decedent at the time of the crime. Notwithstanding that fact, he then went on at the behest of the prosecution to guess, essentially, about what that distance would be. This is directly from the transcript. This is not from --

**THE COURT:**   I understand that, but --

**MS. SWARNS:**   So, yes, I guess Your Honor is -- I will accept --

**THE COURT:**   It's the medical --

**MS. SWARNS:**   -- Your Honor's representation.

**THE COURT:**   -- examiner -- so, it's the State of Arkansas Medical Examiner's office, not the coroner. I was going to say if it's the coroner, you might -- but the medical examiner, at least in my experience, can at least get into such

things as the gunshot wounds might have been well within five feet or -- that's more general testimony. **(SR. 66).**

     **MS. SWARNS:**   I accept Your Honor's representation.

     **THE COURT:**   You see what I'm saying? I mean, that's not into the very technical specifics. That's more of a general thing. I found no gunshot powder or stippling upon the wound. Therefore, I conclude that the gunshot was fired more than six or eight feet away. Beyond that, I don't give -- do you see what I'm saying? So, that's why I'm asking: How is this particular area, just this one area of the medical examiner, which apparently counsel, counsel defense got him to say, well, I'm not an expert in this area, how is that found within Rule 37?

     **MS. SWARNS:**   Oh, how is it found within Rule 37?

     **THE COURT:**   How does Rule 37 cover that?

     **MS. SWARNS:**   Well, as I said, that counsel was ineffective for failing to object to that testimony, that speculative testimony. **(SR. 67).** He should have moved to strike it insofar as Dr. Sterner acknowledged that the testimony that he was offering was outside of the range of his expertise.

     **THE COURT:**   Well, that doesn't make it speculative.

     **MS. SWARNS:**   Okay. If -- okay.

**THE COURT:**     Do you see the difference? Just because it might be outside the range of his particular expertise does not lead one to the conclusion that it is speculative. There's a difference.

**MS. SWARNS:**   Well, I mean, we could, you know.

**THE COURT:**   That's why I'm asking.

**MS. SWARNS:**   I understand what Your Honor is saying. I suppose that if I offer testimony about --

**THE COURT:**     If you came up here and said, I went out there and I saw these two folks lying on the ground and it was obvious that they had been shot; and they were shot at close range. How do you know that? Well, because they just looked like that. That would be speculation. **(SR. 68).** But a medical technician or someone with more medical training, the more training you have the more your testimony shifts from speculation to -- do you see? That's why I'm asking.

**MS. SWARNS:**   I understand. Maybe it's my --

**THE COURT:**   How is this --

**MS. SWARNS:**   I will accept --

**THE COURT:**   -- within --

**MS. SWARNS:**   -- that it is my in artful phrasing. That it is --

**THE COURT:**   Well, how does --

**MS. SWARNS:**   -- not speculative.

**THE COURT:**      -- this deal within Rule 37?

**MS. SWARNS:**      Again, I have said that counsel had an obligation to object

to that testimony as outside, insofar as -

**THE COURT:**      Since counsel didn't object --

**MS. SWARNS:**      Yes.

**THE COURT:**      -- then it is --

**MS. SWARNS:**      Absolutely.

**THE COURT:**      -- ineffective assistance of counsel.

**MS. SWARNS:**      It is ineffective assistance of counsel. **(SR. 69).**

**THE COURT:**      Not a conclusion that the testimony is speculative but the

lack of objection to the testimony itself.

**MS. SWARNS:**      Well, in order for us to determine or for this Court to find

that counsel was deficient in failing to object, Your Honor would have to conclude

that there was some legitimate basis on which he had to object.  You know, some --

**THE COURT:**      Right.

**MS. SWARNS:**      -- legitimate legal reason --

**THE COURT:**      And that's my concern --

**MS. SWARNS:**      -- for him to object.

**THE COURT:**      -- in this limited area.

**MS. SWARNS:**      I understand. And my position would be that that limited

reasonable legal basis for his objection would be maybe there are some medical examiners that could testify to this. This one acknowledged that he couldn't. **(SR. 70).** And insofar as he acknowledged and testified that he couldn't or that his opinion in this regard was not entitled to the expert -- you know, was entitled -- was not within the realm of his expertise or was outside of the realm of the expertise for which he was tendered as a witness in this case.

> **THE COURT:**   Okay.

> **MS. SWARNS:**   Then counsel should have objected because the evidence -- the un – now the unexpert testimony would have been considered by the jury as expert testimony because it's still being offered by an expert.

> **THE COURT:**   I'm not so sure you're standing on a good ledge there, but go ahead.

> **MS. SWARNS:**   We may disagree, Your Honor. That is -- so, yes, with respect to those claims, I think Your Honor understands that. Our next claim of error was that Mr. Reams faced a jury that which African Americans were under represented. Jefferson County at the time of Mr. Reams' trial relied on voter registration lists as a basis for selecting juries, jury pools, jury venires. **(SR. 71).** African Americans are significantly under-represented in jury pools because of felon disenfranchisement law in Arkansas. And as a result of both of those phenomenon, Mr. Reams faced a jury that under represented African Americans. The State's

response as indicated in its response to the Rule 37 petition that this was previously litigated on direct appeal. Actually that is incorrect. There was no claim of this regard litigated on direct appeal. And it would be our position that trial counsel should have and could have raised this claim both at the time of trial and on direct appeal, that he was ineffective for failing to do so; and the prejudice to Mr. Reams is fairly clear that he was obviously exposed to an unfairly selected jury.

**THE COURT:**     Okay.

**MS. SWARNS:**     Our next claim is that the prosecutor, the trial prosecutors in this case exercised their peremptory challenges in a racially discriminatory manner. **(SR. 72).** Specifically we have alleged that the trial prosecutor used their peremptory challenges to exclude all but one of the qualified African American potential jurors because of their race. And, of course, we have alleged that Mr. Reams was prejudiced as being tried by an unfair and unrepresentative jury. The State has responded by asserting that this is not cognizable because it was previously litigated on direct appeal.

However, the significant bases of the state court's decision on direct appeal have been undermined by subsequent decisions of the United States Supreme Court. In its direct appeal analysis of Mr. Reams' <u>Batson</u> challenge, the Arkansas State Supreme Court considered and relied on speculative reasons, reasons that it called,

and the trial court called from its own review of the voir dire record, to justify exclusions of potential jurors Johnson and Henry.

In the United States Supreme Court decision that was announced in 2005, <u>Miller-El v. Dretke</u> -- that's a case out of Texas. **(SR. 73).** The cite is 545 U.S. 231, 2005 decision said, and I will quote them, "When illegitimate grounds like race are in issue, a prosecutor simply has got to state his reasons as best he can and stand or fall on the plausibility of the reasons he gives. A <u>Batson</u> challenge does not call for the mere exercise in thinking up any rational basis. If a stated reason does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have shown up as false."

The Court of Appeals in the dissent, "substitution of a reason for excluding Warren does nothing to satisfy the prosecutors' burden." The Supreme Court in the second case announced in 2005, <u>Johnson v. California</u>, said the same thing.   This is the United States Supreme Court. "The <u>Batson</u> framework is designed to produce actual answers to suspicions and inferences. A discrimination may have infected the jury selection process. **(SR. 74).** The inherent uncertainty present in inquiries of discriminatory purpose counsels against engaging in needless and imperfect speculation when a direct answer can be obtained by asking a simply question."

So, the Arkansas Supreme Court's analysis is saying, well, I can see reasons -- and the trial court did the same thing -- well, I can see why the prosecutor struck

these jurors is now squarely unconstitutional. At no point before <u>Miller-El</u> and <u>Johnson</u> had the United States Supreme Court made an explicit statement on whether that was appropriate behavior by a reviewing court. That is the first time, 2005. So, that changes and affects the Arkansas Supreme Court's decision on appeal.

**THE COURT:**   Let me ask: If defense counsel and the State had proceeded properly with the Rule 37 hearing years ago, this particular issue would not be -- would have been -- in other words, this issue couldn't have been raised as you have laid out back in the late Nineties if this had been done; but this issue could have been raised in a different venue, could it not? **(SR. 75).**

**MS. SWARNS:**   It could have been – well, it certainly would have and could have -- it would have been raised, you know, whether or not -- it certainly would have been raised.  I can certainly say to you that, you know --

**THE COURT:**   In a different venue, though.

**MS. SWARNS:**   No, I -- you know, certainly I know that prior counsel or my co-counsel would have challenged the use of speculative reasons. Now, would we have had the United States Supreme Court ruling on that decision in 1997? No, it did not. The decision came out in 2005.

**THE COURT:**   Right.

**MS. SWARNS:**    There were certainly lower circuit court decisions making such findings, but we did not have the decision of the United States Supreme Court. Now, I don't know that I think that Mr. Reams should be prejudiced by the delay in the proceedings, which were currently not of his own making. **(SR. 76).** You know, this is not something that Mr. Reams did -- there's nothing that Mr. Reams did to hold up the proceedings in his Rule 37 petition. I can tell you as an officer of the court Mr. Reams has been very interested -- and you know from seeing him yourself that he's been interested in seeing this proceed. So, I don't know that Mr. Reams should be prejudiced and denied the benefit of United States Supreme Court decisions that came out in 2005 because the --

**THE COURT:**    No, that's not my --

**MS. SWARNS:**    -- county and the court --

**THE COURT:**    -- thrust. My thrust is, are those matters properly within a Rule 37 hearing?

**MS. SWARNS:**    Yes.

**THE COURT:**    As opposed to a federal --

**MS. SWARNS:**    Yes.

**THE COURT:**    -- district court?

**MS. SWARNS:**    Yes, I understand.

**THE COURT:**    Do you see the distinction?

**MS. SWARNS:**     Yes, I do. I do see the distinction. **(SR. 77).** I would just say that again the intent of even the federal -- you know, federal habeas courts will say, we need to have state courts have the first opportunity to pass and review on claims of constitutional error. And that is what we are asserting, that this Court and the State of Arkansas should have the opportunity to correct and address serious claims of constitutional error. If the United States Supreme Court has clarified the Batson standard, then the Arkansas courts should, you know, have the first opportunity to address Mr. Reams' Batson claims in light of that new explanation of the law under Batson.

**THE COURT:**     In other words, we need to go ahead and get it behind us now.

**MS. SWARNS:**     Yes.

**THE COURT:**     One way or the other.

**MS. SWARNS:**     Yes.

**THE COURT:**     So that it won't have to be redone in some other court in some other venue. Because if we had done it when we should have done it years ago, it wouldn't have been covered and we would have been in some other court.

**MS. SWARNS:**     Certainly that, yes, sir. **(SR. 78).**

**THE COURT:**     Okay. Go ahead.

**MS. SWARNS:**   Again, in the Arkansas Supreme Court's decision addressing Mr. Reams' claim of discriminatory exercise of peremptory challenges, the Arkansas Supreme Court notes that the trial court – I mean, I'm sorry, the trial prosecutor when confronted with the <u>Batson</u> challenge adopted a reason that had been initially proposed for the first time about -- one of the speculative reasons proposed by the trial court as a reason for the strikes. And this is as to potential juror Mr. Henry. Again, the Supreme Court in <u>Miller-El</u> talked explicitly about sort of these post-hoc justifications and said that, at least in the context of the <u>Miller-El</u> case, that kind of adopting of an explanation offered by a court reeks of afterthought and is incredible and is nothing more than wait – make wait, in their words, entitled to no deference.

The State in this case has accepted similarly situated white jurors. **(SR. 79).** <u>Miller-El</u> makes clear that a comparison of similarly situated white jurors is a critical piece of a <u>Batson</u> analysis and in determining whether the prosecutor stated reasons are credible.

And last, in analyzing Mr. Reams' claim of discriminatory exercise of peremptory challenges, the Arkansas Supreme Court looked at this challenge one juror at a time. It did not look at the sort of pattern as a whole, the universe as a whole, the evidence as a whole. And in <u>Miller-El</u>, the United States Supreme Court said you have to look at the cumulative effect of all of the evidence. You can't just

sort of take it piece by piece and say, well, if you look at this juror, there's an explanation. If you look at this juror -- so, you have to look at the entire thing to determine whether there's a prima facie case of discrimination and if the prosecutor--

THE COURT:     And this is on two jurors?

MS. SWARNS:     There are three or four. The prosecutor struck, I believe, three or four. **(SR. 80).**

THE COURT:     Do you know --

MS. SWARNS:     I can tell you specifically.

THE COURT:     Well, you've mentioned only two names.

MS. SWARNS:     I will tell you. The names are -- I will tell, you Erma Johnson, Matthew Henry, and Muriel Hayes.

THE COURT:     Henry --

MS. SWARNS:     Are the ones that are stricken.

THE COURT:     -- Hayes, and Johnson?

MS. SWARNS:     Yes.

THE COURT:     So, there are three?

MS. SWARNS:     Right.

THE COURT:     Okay. Thank you.

**MS. SWARNS:**     So, that is our claim with respect to that. Our next claim in the petition and the supplement is that there was insufficient evidence of extreme indifference in this case against --

**THE COURT:**     Oh, one of the aggravated circumstances?

**MS. SWARNS:**     And as an element of capital murder.

**THE COURT:**     Okay. Run that by again. **(SR. 81).** There was --

**MS. SWARNS:**     There was insufficient evidence of extreme indifference to human life. As you know, that is an element of the crime of capital murder under the Arkansas statute. And that is one of the critical factors that makes a case a capital offense as opposed to a noncapital offense. It is our position that the State has failed to present and prove beyond a reasonable doubt that Mr. Reams acted with extreme indifference. And obviously Mr. Reams was prejudiced because the jury convicted him of capital murder as opposed to noncapital murder or not finding him not guilty of anything and ultimately exposed Mr. Reams to the death penalty, to face the death penalty. Ultimately get sentenced to the death penalty without sufficient evidence.

The State has responded by saying that that is not cognizable because it could have been raised at trial or on direct appeal and it was not -- actually the record reflects that trial counsel moved for a directed verdict on this basis. **(SR. 82).** That motion was denied at the time of trial. He, however, ineffectively failed to raise and litigate -- continue to raise and litigate that motion on direct appeal. And so, it is our

position that counsel was ineffective for failing to pursue and prosecute the claim that there was insufficient evidence of extreme indifference, the element of capital murder. And that is our position with respect to that claim.

> **THE COURT:** On appeal is your primary concern there?

> **MS. SWARNS:** Yes, because he did move for --

> **THE COURT:** While it was objected to at trial level, and denied, it was not properly -- or it was not mentioned at all in the appeal?

> **MS. SWARNS:** Correct.

> **THE COURT:** Now, your position would be different if it had been brought up at appeal.

> **MS. SWARNS:** Yes.

> **THE COURT:** And then ruled upon.

> **MS. SWARNS:** Yes. **(SR. 83).**

> **THE COURT:** Because then I wouldn't cover that.

> **MS. SWARNS:** Yes.

> **THE COURT:** Okay. Go ahead.

> **MS. SWARNS:** Okay. We have alleged that the jury instructions provided to Mr. Reams' jury were insufficient in that the trial court failed to provide the jury with a definition or a clarification of the phrase extreme indifference.

Now, as I just discussed, it's one of the essential elements of the crime of capital murder. It is our position that the phrase quote, unquote, "extreme indifference" is constitutionally vague and Mr. Reams was prejudiced by the lack of a clarifying instruction, because the jury was, therefore, allowed to convict Kenny Reams of capital murder and expose him to a death sentence without proof essentially of -- or a clear understanding of what is – of what is required to make any murder show extreme indifference as opposed to what is the difference between a murder that involves extreme indifference and a murder. **(SR. 84).** that does not.

We've also said that the trial court failed to instruct the jury, which I mentioned before, about the limited use it could make of the other crimes evidence that was introduced by the State. Insofar as Your Honor determines that there was some admissible purpose for that evidence, although we assert that there is not, there certainly should have been a limiting instruction given to the jury for its use of that evidence. Obviously because there was no such instruction, Mr. Reams was prejudiced because his jury was allowed to convict him and conclude that it could use propensity or the theory of propensity as a basis for finding him guilty here.

In response, the State has said that these are claims --

**THE COURT:**   There was no instruction in this area?

**MS. SWARNS:**   No.

**THE COURT:**   Okay. I didn't hear you say that.

**MS. SWARNS:**     I'm sorry. **(SR. 85).** In response the State, has said that this is not cognizable because it could have been raised at trial or on direct appeal. With respect to our claim that there should have been an extreme indifference clarifying instruction to the jury, it is our position that counsel failed to seek such an instruction, failed to object to the absence of such an instruction; and Mr. Reams was prejudiced by counsel's failure.

As to the other crimes evidence -- I'm sorry. As to the other crimes evidence, Mr. Reams' counsel did raise a challenge to it on direct appeal. He claimed that there should have been a limiting instruction to the jury's consideration of the other crimes evidence at the penalty phase. He never raised a challenge to the absence of a limiting instruction in the guilt/innocence proceedings.

**THE COURT:**     You'll have to explain that one a little better.

**MS. SWARNS:**     Okay. I'm sorry. **(SR. 86).** As I indicated, there was no limiting instruction to the jury's use and consideration of other crimes evidence.

**THE COURT:**     In the --

**MS. SWARNS:**     Either phase.

**THE COURT:**     In either. Okay.

**MS. SWARNS:**     On direct appeal, counsel raised a challenge to the penalty phase, the problem as to the penalty phase; but he never raised a challenge as to the guilt/innocent phase.

**THE COURT:**    Where would the objection come in at the guilt or innocence phase? I've not heard you say -- and perhaps you didn't say, you just assumed that I knew – that prior criminal records were introduced as evidence --

**MS. SWARNS:**    Yes.

**THE COURT:**    -- during the guilt or innocence phase; is that correct?

**MS. SWARNS:**    Yes, Your Honor.

**THE COURT:**    And for what purpose?

**MS. SWARNS:**    Well, the other crimes evidence, I can't necessarily speak to the purpose without speculating. **(SR. 87).** The other crimes evidence was introduced, which I summarized briefly before, was evidence that Mr. Reams and another person had committed a prior robbery at an ATM, that he had committed a prior burglary of a dry cleaners, and had committed a prior robbery of a bus station.

**THE COURT:**    I understand, but how was this introduced during the -- how was it –

**MS. SWARNS:**    It was introduced during the prosecution's case in chief.

**THE COURT:**    But for what purpose?

**MS. SWARNS:**    It was never challenged, and there never -- I can tell you it was ultimately used by the prosecution in closing argument to say, well, he carries a gun all the time. So, therefore, we know he -- there's no reason for you to accept his testimony that he was afraid to carry a gun at the time of this offense. So, I can

speculate that it was introduced to make that argument. I don't -- you know, I don't there's no legal basis, is my position, for the introduction of that evidence. **(SR. 88).**

**THE COURT:**     And I'll break to the State here, just because I'm curious about this. Generally speaking, prior felony convictions of a defendant on trial are not admissible against a defendant to show that he committed this crime.

Now, they might be if he takes the witness stand and he's had convictions for theft and forgeries. They can be used to impeach his credibility for his lack of honesty. So, let me shift to the State. Does the State know how or for what purpose prior felony convictions, certified copies of a prior felony record, were introduced during the case in chief by the State to show guilt?

**MR. HOLT:**     Your Honor, in this instance, the prior felonies were prior acts of the defendant that -- and I'm sure Ms. Swarns is not unfamiliar with 404(b) evidence -- to show a motive, to show a lack of mistake, to show a plan or to show a scheme.

In this case, the gun that was traced to a burglary a few days before the murder was also the murder weapon. **(SR. 89).** And objects taken in the burglary of the dry cleaners were also found in the residence of Mr. Reams.

**THE COURT:**     Okay. But those are matters of evidence.

**MR. HOLT:**     Correct.

**THE COURT:**     In other words, the police, at least in my opinion, could give testimony, we investigated a burglary occurring six days before this crime. We received information from the victim that a .357 magnum was stolen. And when we searched the car of the victim -- of the defendant, we found a .357 magnum, which the owner said was stolen from his house and which later turned out to be the gun used in this killing. That's not a prior felony conviction.

**MR. HOLT:**     Correct. I'm not so certain that any prior felony conviction was admitted in the State's case in chief. Although the underlying acts were -- I'm fairly certain were admitted pursuant to 404(b). **(SR. 90).**

**THE COURT:**     Well, now, there's a difference –

**MR. HOLT:**     Yes, there is a difference.

**THE COURT:**     And that's why I asked counsel if certified copies of his prior felony convictions were admitted by the prosecuting attorney and for what purpose would they be admitted as to the guilt or innocence phase. And you said they were admitted.

**MS. SWARNS:**     I didn't understand -- no, I said I didn't know why they would be admitted, but I did not –

**THE COURT:**     No, but you said they were admitted.

**MS. SWARNS:**     I didn't understand. You were talking about certified copies. I meant what Mr. Holt has indicated.

THE COURT:     Okay.

MS. SWARNS:     That there was testimony.

THE COURT:     There was testimony concerning prior actions, prior bad acts, if you want to call them that. And there is a distinct difference –

MS. SWARNS:     Right. **(SR. 91).**

THE COURT:     -- between, Judge, we want to admit into evidence the defendant was convicted four years ago and given three years in the penitentiary for six burglaries, and we want to admit that and show it to the jury to convince the jury that he's a terrible person and, therefore, he's guilty. That didn't happen?

MS. SWARNS:     No.

THE COURT:     Thank you. Because I was worried deeply that that happened and that -- and since it didn't happen, thank you.

MR. HOLT:     Your Honor.

THE COURT:     Yes.

MR. HOLT:     May I add, though, as I think you have pointed out, it might be a matter of timing, because the defendant did, in fact, take the stand.

THE COURT:     Well, but that's a different matter.

MR. HOLT:     Yes, it is a different matter. **(SR. 92).**

THE COURT:     Because during the prosecution's case in chief, which is what she had said, the guilt or the innocence phase, the prosecution has its case in

chief, and if they offered into evidence certified copies of prior convictions, that's not good.

**MR. HOLT:**     That would be problematic.

**THE COURT:**     Yeah, that would be serious. But if the defendant takes the witness stand and says various things, I was in Tucumcari, New Mexico, when this crime occurred, and the prosecution produces certified copies of his prior convictions of 18 counts of perjury, well, a jury is entitled to look at that and say, we're not so sure he's telling the truth. That's a difference.

**MR. HOLT:**     Yes, sir.

**THE COURT:**     It's not used to convict him so much as it is used to terribly undermine his testimony and impeach his testimony. So, these things weren't admitted into evidence as prior felony convictions. **(SR. 93).** There was testimony and evidence showing that a prior crime occurred which was either tangentially or directly related to a finding of a pistol which might have been used. Okay. That's different than a prior felony conviction.

**MS. SWARNS:**     I just want to clarify, Your Honor.

**THE COURT:**     Okay.

**MS. SWARNS:**     There was testimony that there was a pistol taken from a dry cleaner burglary. There was no testimony that Mr. Reams used a gun during the course or in commission of that dry cleaning burglary. I just want to be very clear.

**THE COURT:**     Well, I understand that.

**MS. SWARNS:**     No. No. Let me just –

**THE COURT:**     It was stolen.

**MS. SWARNS:**     Right. Okay. Right. Exactly. Separately the State also introduced testimony that Mr. Reams committed two other offenses that have nothing to do with any evidence that was related to the ATM shooting of Mr. Turner. They introduced testimony of a bus station robbery and they introduced testimony of a prior ATM robbery. **(SR. 94).** With respect to the bus station robbery, the allegation was that Mr. Reams held up this bus station attendant with a gun. The State then went on to say in its closing -- so, this evidence had nothing -- no evidence taken from the bus station.

**THE COURT:**     But they are prior bad acts.

**MS. SWARNS:**     Correct.

**THE COURT:**     For which the State says, if he used a gun there, then I'll bet you he used it here.

**MS. SWARNS:**     Exactly.

**THE COURT:**     Okay. I can --

**MS. SWARNS:**     Exactly.

**THE COURT:**     -- understand that.

**MS. SWARNS:**     And that had nothing -- none of the evidence taken from the bus station had anything to do with the evidence in this case. Nothing taken from the bus station was used in the shooting, murder of Mr. Turner. No relationship whatsoever. And, yes, the State argued explicitly propensity on that offense.

**THE COURT:**     Was there objections --

**MS. SWARNS:**     No. **(SR. 95).**

**THE COURT:**     -- by counsel? So, this comes back to your ineffective assistance of counsel argument?

**MS. SWARNS:**     Yes, Your Honor.

**THE COURT:**     Let me make a note because I want to mark that down here. All right. Let's move on to the next one.

**MR. HOLT:**     Before we do.

**THE COURT:**     Yes.

**MR. HOLT:**     This might be a time to bring this up as a suggestion. This hearing is very helpful to flesh out exactly what we will be talking about, and now that the -- now that the Court has been provided with a transcript of the trial and that we have been provided with a copy of the defense file in this case, matters such as this, for instance, might benefit from sometime between now and the hearing itself a more -- a prehearing **(SR. 96).** briefing that cites directly to -- one of the things that we propose to do as an exhibit in this case, for example, is to Bates stamp the defense

file and make it an exhibit. Of course, the trial record itself as an exhibit. And these issues that now have some deal of particularity we could either do that prehearing or posthearing, in terms of whether or not there was an objection to the other crimes evidence that came in that would also be linked with this defendant's confession that he had, in fact, committed the bus station robbery in the same manner that the murder was committed and had also committed an attempted robbery at the ATM shortly before this murder was committed.

**THE COURT:**   Well, since the burden of proof in going forward with evidence and testimony rests with Ms. Swarns and Mr. Reams, would it not be to her benefit when she presents her evidence and testimony to specifically cite in the trial transcript, Judge, here is this testimony. **(SR. 97).** Nowhere in here is there an objection, and she cites the page. Do you see what I'm saying?

**MR. HOLT:**   Yes, sir.

**THE COURT:**   And you're saying --

**MR. HOLT:**   Well, what I'm saying is, if there is an introduction, for instance, if there is an evidentiary ruling by the trial court on a 404(b) issue and then --

**THE COURT:**   That needs to being argued?

**MR. HOLT:**   Well, in the transcript, for instance. If there is a 404(b) ruling that the trial court makes and evidence comes in, at that point if it comes in

and there's not an objection -- I mean, it doesn't matter if there is an objection or there's not an objection. If there has been, it has come in and over an objection at one point and it is then brought up at another point, it's been ruled upon. I mean, what I'm saying is –

      **THE COURT:**    You mean it's been ruled upon and could have been used during the course of an appeal? **(SR. 98).**

      **MS. SWARNS:**    Well, I would ask Mr. Holt to direct us to the page of which there was a 404 hearing.

      **THE COURT:**    Well, it wouldn't necessarily be a hearing.

      **MS. SWARNS:**    There was no discussion.

      **THE COURT:**    There would be --

      **MS. SWARNS:**    There was no discussion.

      **THE COURT:**    Well, I understand, but you should be bringing this --

      **MS. SWARNS:**    Your Honor, we have cited page --

      **THE COURT:**    I understand that.

      **MS. SWARNS:**    The page --

      **THE COURT:**    Well, I think --

      **MS. SWARNS:**    -- of the transcript --

      **THE COURT:**    -- what he's saying is --

      **MS. SWARNS:**    -- in our pleadings. That's all in here.

**THE COURT:**      In order to elucidate the trial court, meaning me, you --

and, you know, I know she doesn't need to be told how to handle her case. She's

doing pretty good so far.  **(SR. 99).** But I understand what he's saying is, prior to an

evidentiary, you may wish to, and they may wish to respond, lay all of this out in

pretrial briefs. Judge -- you know, let's say you're on Argument No. 11 here; and

then you go through what you've gone through here today and then you file, here's

this page, here's this page, here's this page that you can look at to see where we're

arguing about what we're arguing. And then he would respond, yes; but back on this

page and this page, those issues were dealt with. And he's arguing to do that before

our evidentiary hearing. Or failing that, to do it afterwards so that I can examine it.

I figure you're probably going to do that because actually it's a pretty good idea and

I figured you thought of it because they've thought of it.

**MS. SWARNS:**      Well, Your Honor, I mean, I think -- I'm not exactly sure

-- we've plead --

**THE COURT:**      We're not here today --

**MS. SWARNS:**      No. No. No.

**THE COURT:**      -- on which page.

**MS. SWARNS:**      I understand. **(SR. 100).** But we have plead in exquisite

detail where in the record, records, citations. We have provided quotations from the

record, from the transcript. It is the State that has elected for the past 11 years to

make exactly no substantive response to these allegations. Now, I just want to be very clear, we have 91 pages and appendices --

**THE COURT:**    I understand that.

**MS. SWARNS:**    -- on exactly these things. I'm not exactly sure what you're asking me to do --

**THE COURT:**    I'm not asking you --

**MS. SWARNS:**    -- additionally.

**THE COURT:**    -- to do anything.   I'm not asking you to do anything.

**MS. SWARNS:**    With respect to these claims. I don't think we could provide the Court with much more detail than we have --

**THE COURT:**    Well, I think your position is that we have given the Court a great deal of detail and the Court can read it and make its own decision. **(SR. 101).**


**MS. SWARNS:**    If Your Honor believes that there is something -- I don't --

**THE COURT:**    If I need something --

**MS. SWARNS:**    I'm struggling with --

**THE COURT:**    -- I'll tell you.

**MS. SWARNS:**    Yes.   Exactly. I'm struggling with what it is, because we have given you transcript citations --

**THE COURT:**    I understand.

**MS. SWARNS:**     -- with respect to each claim.

**THE COURT:**     If I need something, I'll ask for it.

**MS. SWARNS:**     Okay.

**THE COURT:**     All right.

**MS. SWARNS:**     Because I'm not sure --

**THE COURT:**     I understand your position.

**MS. SWARNS:**     -- what we else could give you.

**MR. HOLT:**     And the State may feel compelled to just file something, Your Honor.

**THE COURT:**     Well, you have every right to just file something.

**MR. HOLT:**     Because the supplement to the Rule 37 was not filed 9 or 11 years ago. **(SR. 102).** And a Rule 37 is essentially a civil proceeding; and most civil proceedings when they are not pursued by the plaintiff are dismissed for lack of prosecution.

**THE COURT:**     Well, I understand that; or to use the realistic term, the doctrine of laches. I understand that. But think of the fair consequences to everyone if we were to say to ourselves, nothing happened for 10 years; therefore, nothing should ought to happen. In our society, that would be unfair to the victim's family because they need finality. It would be unfair to the defendant because the defendant needs finality. Whichever way it goes, we need to close these books in fairness and

Respondent's Exhibit F2

honesty to all the people. She represents this man. That's her job. You represent the people of the State of Arkansas and these victims. That's your job. And my job is to make a decision based upon evidence and testimony. **(SR. 103).** I will be honest with you, I would prefer to make a decision based upon evidence and testimony even though everybody has sat around for about 9 or 10 years because we need to for the good of everyone concerned: This gentleman here, family members, and this case as a matter of law. It needs to be resolved. So, I can tell you my ruling right now is if you're going to say, Judge, everybody sat around for 10 years. Throw the case out. I'm going to say, no. We need to resolve it. And you can say, well, Judge Brown was wrong; and I'm going appeal that. And more power to you. But I would rather get it all lined out so that people that are much smarter and more experienced than I can tell me, you are right and you are right here, but you were wrong over here, or you were wrong on everything, or you were right on everything. But someone needs to tell us. So, let's go ahead. **(SR. 104).**

MS. SWARNS:   And our next claim is that there was a failure to demonstrate Mr. Reams' eligibility for the death penalty; and this, of course, relates to our assertion that Mr. Reams suffers from mental retardation as well as our claim that I had just discussed before that there was insufficient evidence of intent to kill. Obviously, that is one of the issues that we think made him death eligible. With respect to mental retardation, Your Honor has read the pleadings, extensive

pleadings about that. And our position with respect to evidence of intent to kill is Mr. Reams' testimony; and the evidence in the case indicates that he was not the shooter and, therefore, he did not share the shooter's intent to kill.

In response, the State has indicated that this was previously litigated on direct appeal. With respect to the mental retardation claim, that was raised on direct appeal. But, of course, there has been, as Your Honor is aware, an intervening change in the law. The United States Supreme Court in <u>Atkins v. Virginia</u> has explicitly condemned and declared unconstitutional the execution of any person that suffers from mental retardation. **(SR. 105).**

The uncontroverted evidence in this case is that Mr. Reams was diagnosed by two State mental health experts as suffering from mental retardation. I won't rehash all that because Your Honor knows it quite well. The claim that Mr. Reams lacked the intent to kill that was required to make him death eligible was not actually raised on direct appeal. A proportionality claim was raised, but not a failure to demonstrate death eligibility claim. And it is our position that trial counsel was ineffective for failing to raise and litigate a challenge to Mr. Reams' death eligibility with respect to the insufficient evidence of intent to kill.

Our next claim is that a pecuniary gain factor was double counted in this case.

**THE COURT:**     Say that again now.

**MS. SWARNS:**     Pecuniary gain.

**THE COURT:**   Oh, okay. I didn't hear you. I'm sorry.

**MS. SWARNS:**   Was double counted. And basically the fact that the crime was committed, robbery for pecuniary gain, made him death eligible for -- or made him eligible for capital murder, which, of course, made him eligible for the death penalty. **(SR. 106).** And it was also a basis for death appropriateness at the penalty phase, an aggravating circumstance.

So, basically the jury used one circumstance to find both death eligibility and death appropriateness; and that denied Mr. Reams of the constitutionally-required narrowing for death eligibility. There's a split in the law on this between the Eighth Circuit which says that the constitutionally-required narrowing for death eligibility is done by defining a specific group of crimes as capital.

Whereas, the Arkansas courts say that the constitutionally-required narrowing is done when the jury considers aggravating circumstances. So, these are sort of headed toward each other. We're saying that you can't have it both says. And ultimately at the end of the day, there was no narrowing in terms of making this murder so bad that it was a capital murder.

The State has said that this was previously litigated on direct appeal. I believe it was previously litigated on direct appeal. **(SR. 107).** It's our position that insofar as counsel did not adequately assert or explain that claim he was ineffective.

Our next assertion is that the jury arbitrarily failed to consider mitigating evidence. The jury failed to specifically consider and weigh the evidence of Mr. Reams' mental retardation and his youth. During the course of the penalty phase, the prosecution conceded both the fact of his mental retardation and the fact of his youth. Trial counsel asked the jury to find both facts as mitigating circumstances. The jury basically said that they did not unanimously find either of those circumstances. Mr. Reams was prejudiced by the jury's failure to consider this relevant mitigating evidence.

The State responds by saying that this claim was previously litigated on direct appeal. As a point of fact, the claim that Mr. Reams -- that the jury failed to consider Mr. Reams' mental retardation was not raised on direct appeal. **(SR. 108).** In his direct appeal brief, Mr. Reams claimed that his mental retardation rendered his death sentence cruel and unusual punishment; but it did not complain about the jury's failure to consider as mitigation his mitigating circumstance.

We would assert that insofar as trial counsel failed to raise and litigate the arbitrary failure to consider this critical mitigating evidence on direct appeal, that he was ineffective and Mr. Reams was prejudiced by that.

Mr. Reams' counsel did raise on direct appeal a challenge to the jury's failure to consider his youth. And it is our position insofar as Mr. Reams' direct appeal counsel was inadequate in presenting and litigating that issue that he was ineffective.

We have alleged that Mr. Reams' trial counsel was ineffective at the penalty phase. Specifically we have asserted that trial counsel failed to properly investigate, develop, and present available mitigating evidence. **(SR. 109).** He did not present the information about Mr. Reams' difficult childhood, the abuse he was exposed to, his poverty, mentalness, his susceptibility to reform in institution. There was an enormous amount of mitigating evidence available to counsel, but he failed to properly investigate, present -- develop and present it. We have asserted that he failed to properly prepare and investigate and present the witnesses that he did put on the stand on Mr. Reams' behalf. And we have filed affidavits in support of that claim. Essentially, the State takes issue with the conclusions that we've reached that because of these failures, trial counsel was ineffective; but they do not dispute the cognizability of that claim, as far as I can tell. **(SR. 110).**

**THE COURT:** And I believe that they've admitted that -- and y'all correct me -- the State does say that the area of trial counsel's alleged ineffectiveness in investigating his past, including his mental retardation, his bad childhood, and things of this nature, is an area under the ineffective assistance of counsel that can be addressed without argument at the evidentiary hearing. I want to make sure that that's correct.

**MR. RAUPP:** That's correct.

**MS. SWARNS:** Okay. So, I'll just move on.

**THE COURT:**     Well, you can make a star by that one.

**MS. SWARNS:**     Okay.

**THE COURT:**     Because now the State has agreed to one area.

**MS. SWARNS:**     Okay.

**THE COURT:**     This area for sure we'll be hearing.

**MS. SWARNS:**     Okay. And then the only other issue before the Court, which I just will mention, although we sort of decided to table for the moment, which is our challenge to the constitutionality of Arkansas' method of execution: Lethal injection. Although in our prior conference call on this subject –

**THE COURT:**     I just don't see where that is found in a Rule 37. **(SR. 111).** You're just -- where do I have the authority? And I'll be honest with you, I don't see any authority under Rule 37 for me to make a determination that the manner and the method of our execution system is unconstitutional. Can you just show me upon which nail you want to hang that hat?

**MS. SWARNS:**     Well, I guess the argument would be that a cruel and unusually imposed sentence is in excess of the maximum imposed by the law. It's a stretch.

**THE COURT:**     And I will -- I mean, while we wish to be fair and resolve these issues, that particular issue it's not within my purview under Rule 37. And

correct me if I'm in error, but are not some of these cases currently before both the Arkansas Supreme Court and some federal courts?

**MS. SWARNS:**     Yes, certainly in federal court.

**THE COURT:**     And this is just going by what I read in the newspaper. **(SR. 112).** There's a couple of fellows who are arguing the unconstitutionality of the manner and method in which it's carried out, and that issue is before our Supreme Court. Am I wrong on that?

**MR. RAUPP:**     There's currently litigation pending in the United States District Court.

**THE COURT:**     Okay.

**MR. RAUPP:**     And the State Supreme Court has resisted opening any case to --

**THE COURT:**     They have said that this is not a matter for them to discuss. That this is more properly in the venue of a federal district court?

**MR. RAUPP:**     I think that's correct. There's not an open Arkansas Supreme Court case, but there certainly is active litigation in the United States Supreme Court.

**THE COURT:**     And I can go ahead and tell you right now that I do not at all think that it is within any stretch of the imagination under Rule 37 for this Court to make a factual determination or even a legal one. **(SR. 113).** I just don't think that

this is within the purview of Rule 37 of these Arkansas Rules. That's beyond the scope, clearly beyond the scope of these hearings. If it is your position that the Arkansas penitentiary executes death penalty prisoners in an improper and painful manner, such as found in other states, Texas or Virginia or Florida, then the federal court is where you need to pitch that ball.

**MS. SWARNS:**     Yeah, so perhaps --

**THE COURT:**     Not me.

**MS. SWARNS:**     -- a civil action. I understand Your Honor's ruling.

**THE COURT:**     That's not me. So, I can address that issue immediately and you can even prepare an order that finds that that particular issue is clearly -- and I think you've almost acceded to that issue, not being before the --

**MS. SWARNS:**     I can't concede it, Your Honor, but I --

**THE COURT:**     I said acceded, not conceded.    And there's a difference in the vernacular. **(SR. 114).** That particular issue is not what -- this Court does not have the authority to hear.

**MS. SWARNS:**     I just would like to say, to be clear, you know, the United States Supreme Court has made explicit -- we didn't want to withhold this claim, because the United States Supreme Court has made explicit that capital prisoners who raise challenges to lethal injection at the last minute under warrant that federal

courts can and should hold that fact against them that they held back this claim all these years. And I didn't want --

THE COURT:   This is not holding back. And I don't think that this is a last minute claim.

MS. SWARNS:   Right. So, we wanted to raise it at the first opportunity --

THE COURT:   I understand.

MS. SWARNS:   -- to preserve Mr. Reams' rights under the law.

THE COURT:   It's appropriate to raise it and it's also appropriate to me to say that this is not the proper venue. **(SR. 115).**

MS. SWARNS:   I understand, Your Honor.

THE COURT:   Or the forum with which to hear that. All right. Let me hear the response from the State. Now, Mr. Holt, Mr. Raupp, who's going to be doing this?

MR. HOLT:   Both of us.

THE COURT:   Both of you?

MR. HOLT:   It depends on what we're doing here.

THE COURT:   Then Mr. Holt will be first and, Mr. Raupp, you'll be second, or are you going back and forth?

MR. RAUPP:   I guess I'll speak when he tells me to or the Court tells me.

THE COURT:   You're responding. So, I'll leave it up to y'all. Go ahead.

## ARGUMENT

**MR. HOLT:**      We would observe that by and large that the arguments by counsel are correctly framed in terms of whether or not a particular issue is an IAC claim. **(SR. 116).** In terms of the initial response that the State filed in this particular case, we believe that the responses were correct, but they might bear some explanation.

As an overall -- as an overarching sort of observation with regard to several of these claims, and this goes to the State's suggestion that a prehearing brief might be suitable. For instance, in terms of --

**THE COURT:**    To narrow the issues?

**MR. HOLT:**      To narrow -- yes, to even narrow them even further, the -- and not necessarily dispose of them but at least narrow some of them. For instance, with regard to venue and whether a venue -- there may, in fact, be testimony that could be heard on that particular issue. However, given the state of the -- you know, given what the record is and what the record says with regard to jurors who were impaneled in the particular case, it's a difficult -- you know, Strickland is a two-prong assessment.

First, it's deficient performance; and then it's, in fact, prejudice. And the -- in that regard, it's no different. **(SR. 117).** A venue claim when it is made or even when it is not made, it boils down to whether or not 12 jurors who could be fair and

impartial were, in fact, seated in a case. I have seen nothing in the pleadings that has said that there were not fair and impartial jurors who were, in fact, seated in this particular case. Even the judge could have taken -- he could have taken it as -- at the end of voir dire, he could have, in fact, made a motion on his own to say, we've not been able to seat fair and impartial jurors, because that's what his oversight function is about. In terms of the failure to disclose whatever it is Jermaine Brown has done, or whatever it is he was paid, if, in fact, he was paid -- and we dispute the fact that he was paid anything -- I believe that the – just the record itself or the case file itself will demonstrate that Jermaine Brown was, in fact, close to Alfred Goodwin and close to Kenneth Reams and was not a – counsel herself said that they had not relied on these informants before. **(SR. 118).** You know, this is not the same sort of assessment as a reliable paid informant that you're using to establish probable cause for search warrants or an arrest. This is someone who is informing on someone else. This is a tip that they receive. We believe that we have some difficulty -- although we -- you know, we look forward to testimony I believe on this particular issue, what's contained in the pleadings is not an affidavit by Jermaine Brown. It's just not. I mean --

      **THE COURT:**    Well, I'm sure that they will produce evidence and testimony.

      **MR. HOLT:**    Okay. Well.

**THE COURT:** That's -- I need to hear evidence and testimony. Right now I'm hearing arguments.

**MR. HOLT:** Yeah.

**THE COURT:** Arguments are not evidence and testimony. They are arguments. They are your positions. What you can argue and what you can prove may wind up being two different things. **(SR. 119).**

**MR. HOLT:** Well, the prosecutorial misconduct issue is cabined within an error *coram nobis* type petition, not in a Rule 37. The cognizability of this particular -- as I said, they've phrased it correctly; but whether or not there was – what, in fact, was said by Jermaine Brown at any one time and how that went into the basis for probable cause, at this point it's not cognizable.

**THE COURT:** You mean the probable cause that resulted in his arrest.

**MR. HOLT:** Of his arrest, yes.

**THE COURT:** Okay.

**MR. HOLT:** The evidence that they allege that was illegally seized, you know, I suppose that we're going to take testimony on that. However, there is documentation in the file. As an IAC claim, it may come through about what Maxie Kizer knew and when he knew it. **(SR. 120).**

**THE COURT:** Well, now, I would have to agree with counsel if there is an allegation, for example, of an illegal search and seizure of a residence and counsel

becomes aware of that based upon statements by the prosecutor or the file or the defendant, they broke into my house, never had a warrant and took these things. And counsel says, well, don't worry about that. We'll deal with that at trial. And never files a motion to suppress, clearly that's an argument for ineffective assistance of counsel that can be raised at these proceedings. Or they beat a confession out of me and counsel says – unfortunately I've heard many years ago – don't worry about that. We'll take care of that at trial. And no motion to suppress was ever filed. Those are issues of clear ineffective assistance of counsel for which she can show me, which fall within Rule 37, that ineffectiveness.

Are you saying, then, that -- well, on particular small area, I'm not following you then. I didn't follow that then. Do you want to tell me that one again, because if -- and that's why I always preface it with "if" -- there is counsel's failure to file various motions that are almost fundamental, then that would be -- clearly we need to hear that.

**MR. HOLT:**     I'll say this. **(SR. 121).** It looks like with regard to suppression issues, because these were not, in fact, conducted at the time of -- before, that we will be trying suppression issues.

**THE COURT:**     How will you be trying suppression issues then?

**MR. HOLT:**      The way that they have to establish ineffective assistance of counsel is whether or not counsel would have prevailed on an issue, as you've set out in your scenario, was –

**THE COURT:**      Well, let me try and limit this. If counsel failed to file motions to suppress, there are circumstances in which counsel can say, look, I've reviewed everything and I have no hope of success. Therefore, the motion would be frivolous and baseness. That's one thing. Counsel would file a motion to suppress because he says, I see some argument here and we've got perhaps just a leg to stand on, but the judge may not grant it or he will grant it.

Or the third area is, man, this looks terrible.  **(SR. 122).** There's some clear evidence here that these things were taken illegally, or your confusion was obtained illegally. And the second or the third -- counsel should have filed these motions because there's some serious argument here about what was illegally obtained or not, and he didn't do so. Or -- and perhaps it wasn't done here -- counsel should have filed these motions because there's clear evidence that rights were violated and he didn't do so, then we need to hear that. And if they're saying that, then they'll have to show -- and you're right, there will be a suppression -- you know, evidence on suppressions. Judge, we've been able to show you that if he had filed these motions, there is clear evidence that rights were violated. Do you see what I'm saying?

**MR. HOLT:**      Yes.

**THE COURT:**      Now, if she comes up and she says, well, Judge, he should have filed these motions and the only evidence to show that my client's rights were violated was my client's statement. **(SR. 123).** And yet, here's, on the other side, videotapes of everything to show that there was no violations. Well, then I can see as a defense counsel saying to myself, this would be a frivolous motion, because there's absolutely no evidence other than a simple assertion by my client. There's nothing else upon which to hang a hat. I don't think they're going to come forward with that. Or if they do, I would have to say, I'm sorry. There's no basis here.

So, you may wind up having to argue some suppression hearings; but the first burden rests with them to show me that, Judge, he should have filed these motions because -- let me -- let tell you why, and there's evidence and testimony as to these things. Am I even being somewhat clear?

**MR. HOLT:**      Yes. And it doesn't work as a freestanding claim, but it works as an ineffective assistance claim. **(SR. 124).**

**THE COURT:**      And that's what I was trying to go -- to counsel over here, Ms. Swarns, is, I am not so sure that – it's kind of like when you make a stew. You don't just eat the meat and you don't just eat the tomatoes and the carrots and the other things. But when you put it altogether, then you've got a pot of stew. But each doesn't stand on its own. You know, you say, well, Judge, under Rule 37, we want to cover his illegally obtained confession. That little morsel is not within Rule 37,

and I can tell you that clearly. But when you put all of these morsels together, then it becomes not all of the morsels, but it becomes a stew, a pot filled with ineffectiveness of counsel, which you may or may not be able to show. But that -- tasting is -- you know, the proof of that is in the tasting of the pudding. But go ahead.

      **MR. HOLT:**     The fourth -- that forth issue, involuntary –

      **THE COURT:**     I couldn't hear you. **(SR. 125).**

      **MR. HOLT:**     The fourth issue that Ms. Swarns discussed was the alleging that the statement that Mr. Reams gave was involuntary. Yes, it should have been raised on appeal; but I think that it's properly cabined within an IAC claim. No. 5, faced other crime -- the 404(b), the introduction of that particular evidence, you know, I think that that will be mainly, depending on how it was entered, it would be -- as the Judge explained earlier, that could be a frivolous objection to evidence properly admitted.

      **THE COURT:**     Well, now most objections aren't frivolous. There's a difference –

      **MR. HOLT:**     But this -- yeah.

      **THE COURT:**     Most objections from lawyers have something. They may or may not hang well, but there's something. Judge, I object.

      **MR. HOLT:**     Right.

**THE COURT:**      And the judge can say, I'm sorry, you're overruled because of A, B, and C. But most attorneys that I know of don't make frivolous objects. Some file frivolous motions. **(SR. 126).** And a few may even file a frivolous lawsuit. But most of their objections during the course of a trial are okay. They may be denied, but they're okay. They don't jump up like a jumping jack and make just baseless objections. I just don't -- go ahead.

**MR. HOLT:**      Okay. Well, this will also be -- I mean, it will have both components again, whether or not there was, in fact, deficient performance based on whether or not it was a -- it would have been a well-taken objection and whether or not there was, in fact, prejudice to it. No. 6, the inadmissible hearsay that appears – by Jermaine Brown. That appears to largely be a record -- an argument based on the record.

**THE COURT:**      The trial record?

**MR. HOLT:**      Yes.

**THE COURT:**      Okay.

**MR. HOLT:**      The -- and it also includes other instances of hearsay, which could or could not have been objected to based on many factors, which would be part of the ineffective assistance claim and the factual hearing. **(SR. 127).**

**THE COURT:**      Well, let me also lay this out. If counsel is going to come in and say, Judge, we are going to satisfy you that there has been a pattern of lack of

objections. In other words, we're almost going to prove a negative.      We're going to show a pattern of numerous opportunities to properly object to good things about which we can argue, and there were no objections. Thus a pattern of not objecting when clearly things should have been objected to, they can perhaps show a pattern.

Now, conversely to show -- to come in and say, well, on this one error over here, there should have been this objection, I'm not going to go there, because one or two little minor tiny areas -- and I emphasize the words "minor" and "small" -- are not going to warrant a Rule 37 hearing. **(SR. 128).** But I contemplate her showing a whole pattern of, Judge, here are 12 different things for which counsel should have objected, for which if he had objected, there would have been serious arguments on both sides, and the judge could have made a ruling for him or against. And there were no objections. To me, that causes me pause. Now, they may not satisfy me that that's ineffectiveness; but at least that gets them in the door.

    **MR. HOLT:**      And it gets them in the door, you're right. But -- and there's the other step after you get in the door.

    **THE COURT:**      Well, just because you get in the door doesn't mean you win your case.

    **MR. HOLT:**      No. 7, faced a jury in which African Americans are under represented. This –

**THE COURT:**      Based on felony convictions. Therefore, they don't vote. Therefore, they're not on the voter registration rolls. Therefore, they can't be --

**MR. HOLT:**      Right.

**THE COURT:**      -- selected as jurors.

**MR. HOLT:**      I can't remember what the State's response was. But it strikes me as being conclusory and that hasn't been demonstrated in the petition either district wide. **(SR. 129).** It can't be just based upon this particular jury. So, I think that that's probably a legal argument completely that would probably be addressed without a hearing.

**THE COURT:**      You mean it will be without evidence and testimony?

**MR. HOLT:**      Without evidence, yes, without testimony.

**THE COURT:**      Okay. We are going to have a hearing?

**MR. HOLT:**      We are, yes. Peremptory challenges with regard to <u>Batson</u>. Again, I believe that there probably will be a hearing with regard to those. There may be some testimony with regard to those, with regard to challenges. However –

**THE COURT:**      You mean from both sides?

**MR. HOLT:**      Yes.

**THE COURT:**      Okay.

**MR. HOLT:**      However, it's not certain based upon the pleadings whether or not the State was ever required to establish a prima facie case. You know,

<u>Batson</u> certainly does apply and the requirements of <u>Miller-El</u> would certainly apply. **(SR. 130).** But we're not sure in terms of ineffective assistance of counsel. This sort of harkens to their other argument with regard to pecuniary gain, in that -- which I believe has actually been disposed of by the State Supreme Court in terms of the double counting. Because in that situation as applicable to this situation, it's like counsel cannot be ineffective for failing to object on a basis that isn't actually Arkansas law.

**THE COURT:**    Well, Ms. Swarns, my concern, as I mentioned to you earlier in this area, is that these <u>Batson</u> issues that come out, especially in later years, how do we hold trial counsel back then liable, if you want to use that word, for issues that were never even brought to fruition for another 10 years? Do you see?

**MS. SWARNS:**    I do.

**THE COURT:**    How can they reasonably foresee these things? Now, that does not mean that you have other arenas in which to make that argument. Do you see what I'm saying? **(SR. 131).**

**MS. SWARNS:**    However, just to be clear, <u>Batson</u> was decided in 1986.

**THE COURT:**    Yes.

**MS. SWARNS:**    This trial was in 1993. The 2005 decisions are not new law. This is not a clear break from precedence. The United States Supreme Court

decisions in 2005 do not have retroactivity problems. They are clearly a -- it's just an explanation of -- the Supreme Court explanation of established precedent. There is no retroactivity problem with respect to <u>Miller-El</u> and <u>Johnson</u> and <u>Batson</u> as it applies to Mr. Reams' case.

**THE COURT:**   Well, I'm going to hear some evidence and testimony because my first leap would be to say, you need to make your argument based upon trial counsel's failure of law in existence at that time. And if these are somewhat extensions -- do you see what I'm saying?

**MS. SWARNS:**   I do understand that. **(SR. 132).** Let me just clarify that <u>Batson</u> on its face says that the prosecutor himself or herself has to come forward with explanations for their strikes if -- if the defense --

**THE COURT:**   Neutral explanation.

**MS. SWARNS:**   Right. Exactly. If the defense makes a prima facie case of discrimination, the burden shifts to the State --

**THE COURT:**   Prosecutor.

**MS. SWARNS:**   -- to come forward with reasons for the strike. In the language of <u>Batson</u>, it says specifically the prosecutor cannot just claim his own good faith. The language of <u>Batson</u> specifically says that the prosecutor him or herself must give specific case-related reasons for the strikes. So, we can go on face of <u>Batson</u> itself, which by the way, <u>Miller-El</u> and <u>Johnson</u> refer back to, which is

what they say, which is that on <u>Batson</u> on its face makes clear that the obligation on the prosecutor is to come forward, that you can't have some -- the obligation is the prosecute -- the question in <u>Batson</u> is what is in the prosecutor's mind. The question in <u>Batson</u> is not what someone else can make up about, you know, a reason for a strike. **(SR. 133).** The question is always in <u>Batson</u>, what is going on in the prosecutor's head and can the defense prove --

**THE COURT:**     I understand, but there's --

**MS. SWARNS:**     -- intentional discrimination.

**THE COURT:**     I have to -- I'm going to have to see some kind of a nexus between that and how trial counsel was seriously deficient.

**MS. SWARNS:**     I understand.

**THE COURT:**     And I'm not so sure you can reach that level.

**MS. SWARNS:**     I understand.

**THE COURT:**     But they're saying -- and they seem to be saying that while you can make arguments, they don't see how you're going to reach that level either.

**MS. SWARNS:**     I understand.

**THE COURT:**     But at least you walk in the door.

**MS. SWARNS:**     Right.

**THE COURT:**     All right. Go ahead, Mr. Holt. I apologize. **(SR. 134).**

**MR. HOLT:**      That's helpful. The ninth, the element of extreme indifference. Trial counsel did move for a directed verdict. Failed to pursue that further. We believe that that's also really an issue of law that the Supreme Court in this case did a 4-3(h) review and examined all objections that were made at the time for prejudicial error. And, you know, we would stand on that review of that particular objection and the fact that it is not -- that it is not -- it needn't be defined by instruction.

**THE COURT:**      You mean the phrase extreme indifference to the value of human life --

**MR. HOLT:**      Correct.

**THE COURT:**      -- has no jury instruction --

**MR. HOLT:**      No.

**THE COURT:**      -- that specifically or even generally defines that, and that is a determination that the jurors must base – make based upon their understanding of the facts of the case?

**MR. HOLT:**      Correct. **(SR. 135).**

**THE COURT:**      And their common knowledge?

**MR. HOLT:**      Correct.

**THE COURT:**      In other words, 12 jurors would vote unanimously that in their opinion the State has proven beyond a reasonable doubt that the defendant,

based upon his actions, evidenced an extreme indifference to the value of human life and it cannot have a definition. And their argument is that since it can't have a definition, it's vague because it doesn't have a definition.

**MR. HOLT:**     Correct.

**THE COURT:**     Is that phrased -- and should have one.

**MS. SWARNS:**     Correct. Because it make someone eligible for the death penalty.

**MR. HOLT:**     And that's an argument that's been rejected by the Supreme Court, which is sort of --

**THE COURT:**     And my tendency would be that I don't see where that falls within our Rule 37 hearing, that one. **(SR. 136).**

**MS. SWARNS:**     Well, I argued that counsel was ineffective for failing to seek an instruction and for failing to object to the lack of an instruction.

**THE COURT:**     Right. And that may flow within your overall ineffective; but as it stands on its own, it doesn't fit. In other words, if -- and I may be redundant here; but if all you ever came up here was with, I this was what counsel failed to do: He failed to ask for an instruction defining extreme indifference and he failed to object with a lack of instruction and then he didn't really argue that on appeal, I would have to say that that's not before me.

Now, I will also say that in the overarching scheme of things, there would be

evidence and testimony; but that's of a lesser area of my concern.

**MS. SWARNS:**   I understand.

**THE COURT:**   Okay. All right. Go ahead.

**MR. HOLT:**   Somewhere on that same spectrum is going to be the failure to offer a limiting -- or to seek a limiting instruction on other crimes. We anticipate that's probably testimony.

**THE COURT:**   Right. **(SR. 137).** And that's similar in nature, because generally jury instructions are found within our jury instruction book and it is fairly rare to go outside them, because we pretty well contemplate most eventualities.

And it's hard to say that the failure to insist upon an instruction is ineffective assistance of counsel.

Now, that's in that one area. And you may put it all together and you may come up with something; but we'll see. All right.   Go ahead.

**MR. HOLT:**   The assertion that Mr. Reams is ineligible for the death penalty. One phase or this or one aspect of this we believe that we answered in our -- we answered in our response to the motion for summary judgment.

**THE COURT:**   Oh, okay.

**MR. HOLT:**   You know, we believe that the state of the law even then was that there was a jury consideration of the particular -- it wasn't an Atkins issue back then; but it, in effect, was an Atkins issue. **(SR. 138).** Because Atkins, for

example, references the Arkansas statute with regard to a consensus among states in terms of executing the mentally retarded and the procedure for doing that, or the procedure for considering what is mentally retarded.

THE COURT:   I was going to say, we don't have a procedure for executing the --

MR. HOLT:   Well, we don't.

THE COURT:   -- mentally retarded.

MR. HOLT:   Well, what is -- what is the procedure for determining --

THE COURT:   Determining whether or not --

MR. HOLT:   Yes.

THE COURT:   -- someone --

MR. HOLT:   Is or isn't.

THE COURT:   -- is or is not.

MR. HOLT:   Yes.

THE COURT:   Well, we have a --

MR. HOLT:   So, that part of it we believe is settled, as Ms. Swarns said. We did, however, agree that in terms of mitigation that that was a cognizable claim.

THE COURT:   I wrote it down that y'all have agreed.

MR. HOLT:   I put a star by it. **(SR. 139).**

THE COURT:   I did, too. Actually I have a star right there.

**MR. HOLT:**      And just prior to that, of course, was the pecuniary gain, No. 12. We believe that was litigated on direct appeal. I guess they're trying to preserve the issue. But we believe that issue is settled.

**THE COURT:**      I think her argument was, more or less, that he did it poorly.

**MR. HOLT:**      Well, however he did it, the Supreme Court has said it doesn't. We can double count. An element of the offense can be used as an aggravating circumstance.

**THE COURT:**      And you've also agreed that as part and parcel of that mental retardation is the area of trial counsel's failure to adequately investigate?

**MR. HOLT:**      Correct. Yes.

**THE COURT:**      As those two go together.

**MR. HOLT:**      Correct.

**THE COURT:**      And one -- let me ask you this. And it may go within that other you've agreed. **(SR. 140).** Her position is that the jury failed to consider his problematic youth and conditions of his raising does go within your failure to investigate?

**MS. SWARNS:**   No, there are two -- no.

**THE COURT:**      Failure to investigate and present those areas?

**MS. SWARNS:**   No, that they presented evidence of his youth and his

mental retardation. The jury, even though the State conceded those issues cannot --

did not find them and apparently did not weigh them in determining whether or not

Mr. Reams should be sentenced to death, or I should say, they did not unanimously

find them.

| | |
|---|---|
| **MR. HOLT:** | There we go. |
| **MS. SWARNS:** | Which, of course, is another claim that was already raised. |
| **THE COURT:** | All right. What else, Mr. Holt? |
| **MR. HOLT:** | May I confer with my co-counsel? |
| **THE COURT:** | I thought he was going to make arguments. |
| **MR. HOLT:** | He may. He may. |
| **THE COURT:** | Go ahead. |
| **MR. RAUPP:** | Thank you, Your Honor. **(SR. 141).** |

### ARGUMENT

**MR. RAUPP:**      Just by way of summary, The State anticipates resisting

each of the ineffective assistance claims, which are the only ones, we believe, that

have been made that are cognizable.   All the claims as stand-alone claims are not

cognizable, and we anticipate, with the Court's indulgence, either prehearing or

posthearing providing briefing or a -- and proposed order for the Court to resolve

those claims. As is required under Rule 37.5, the Court has to resolved each claim,

even those that aren't cognizable, even if it's just by saying it's not cognizable, just

as the Court has suggested it would do with the lethal injection claim. That's not a cognizable claim; but nevertheless, it's been advanced in the petition and it needs to be resolved.

So, we anticipate meeting at the hearing each of the claims that would be raised as IAC claims on the record and the proof presented from the hearing. **(SR. 142).** I wanted to make one summary point, which is to the extent the Court would indulge counsel and Mr. Reams' cumulative ineffective assistance of counsel as a stand-alone claim, the State would resist that as a matter of law, because the Arkansas Supreme Court does not recognize cumulative ineffective assistance claims. Each claim must prevail on its own. Now, what I mean by that is, for example, the Rule 37 relief is not available because counsel was ineffective with respect to failure to move for venue, failure to suppress, failure to raise 404(b), failure to object to hearsay evidence.  Each one of those claims must stand on its own. And forgive me, the Court probably recognizes that; but I wanted to be sure to let the Court know as a legal argument the State would resist the indulgence of a cumulative ineffective assistance claim.

THE COURT:     Well, I must slightly disagree with that. **(SR. 143).** I'm of the opinion that while her arguments, each standing alone, are either accepted or rejected, that if – and that's why I say the word "if" -- she is able to satisfy the Court that there has been a pattern of ineffectiveness contained within a trial and she is

able to reach those levels to show that, A, his overall performance within the scope of a trial is seriously deficient and that results in a prejudice to the defendant, then that argument can be validly acted upon by this Court.

Now, you're saying that -- and perhaps I misunderstood you -- I'm not so -- do you see what I'm saying? If that pattern of ineffectiveness is shown, then she will have to prevail because if she shows a whole bunch of dots and if each dot is rejected by this Court, then there's no pattern of ineffectiveness. There's no process of he's had ineffective counsel, because I found that each little thing was perfectly okay, or fairly well okay. **(SR. 144).** But if she is able to convince the Court that when you add all of these up a substantial majority of all these dots were really gross errors in the trial proceeding and should have been objected to or should have had some objection, then this Court can find that all of those placed together result in a seriously deficient performance of an attorney in representing their client. And I think she has to go that next step and show that while it was deficient it also resulted in a prejudice to her client. Are you saying that even if all of those put together showed deficient performance the Court could not consider them?

MR. RAUPP:     I'm saying the Court needs to take each one on its own. The venue claim, if it's ineffective --

THE COURT:     I understand that.

MR. RAUPP:     Yeah, each one on its own. And then the cumulative effect

as to deficiency or prejudice isn't recognized that claim would have resulted -- she must demonstrate that each claim represented on its own would have resulted in an unfair trial. **(SR. 145).** The cumulative effect isn't recognized short of the Court concluding that counsel was essentially -- that Mr. Reams was essentially denied counsel. That the performance was so poor that there was no act of representation. I don't think –

> **THE COURT:**     Well, I'm not so sure she can –
>
> **MR. RAUPP:**     -- she purports to make --
>
> **THE COURT:**      -- satisfy the Court to that effect. She may. But what I'm

saying is, if there is a serious pattern of ineffective actions -- in other words, if she -- you take each one and she prevails, and this objection should have been made because it's clear that they would have won, or made serious good arguments, and then you bring them altogether, then there is that possibility that when they're all brought together each one or -- might stand alone, may result in ineffectiveness. **(SR. 146).** But when you all bring them together, they become such a pattern -- and I'm not saying she can reach this -- but such a pattern is shown of gross ineffectiveness that the whole trial counsel was ineffective and he was denied effective assistance of counsel.

I understand what you're saying is, Judge, you shouldn't add them up; but as a practical matter when we take each one individually and make individual

assessments, you're almost forced to add them up. It's kind of like runs in a ballgame, you know. This run here and this run here and this run here and this one here and this one here, when they're all counted against you do they overarching show a serious deficient activity on the part of trial counsel? And the answer may be, yes, or the answer may be, no. And she may be able to show me that this one in and of itself was just so bad that you don't even have to worry about all the others.

MR. RAUPP:     That's right. And certainly if one claim of ineffective assistance is satisfied through to the Strickland prejudice component, one claim is all it takes to warrant a new trial. If the Court finds there is not deficient performance or prejudice --

THE COURT:     On any of them. **(SR. 147).**

MR. RAUPP:     -- on any of them, there's nothing –

THE COURT:     Well, if they're --

MR. RAUPP:     -- to cumulate.

THE COURT:     -- cumulative, because you've lost at every time at bat.

MR. RAUPP:     Right. But there's a stand-alone cumulative claim that's advanced that I've seen in the petition and wisely because it's not recognized. It may be that I'm parsing words.

THE COURT:     Perhaps you are.

MR. RAUPP:     And I don't want to waste the Court's time with that.

**THE COURT:**     You aren't. I've got all day set aside for this. Seriously, I mean, I just said, okay, I'll be all day. If it takes all day, it takes all day. If it doesn't, that's fine.

**MR. RAUPP:**     But as we are here to talk largely about arguments, I wanted to let the Court know that that's an argument the State would resist being one on which you could prevail cumulation of error. **(SR. 148).** Not maybe again that what the Court is talking about is demonstrating prejudice in any single component based on error, based on the entirety of the trial, which is, of course, the right way to evaluate prejudice, which is one of the principal current deficiencies in the petition. I anticipate in posthearing briefing there will be a better explanation of how the proof at trial would have resulted in a different outcome, either at the guilt or the penalty phase. And I think to the extent the Court is saying that the cumulation of error as demonstrated to show prejudice in the trial as a whole, which is the test, to the extent the Court is saying that, that, of course, is the Strickland standard. But to cumulate the – I have, I think, 13 separate ineffective assistance claims listed. To accumulate those is not an available claim -- and if I'm wrong, of course, the Court --

**THE COURT:**     Let me back up. **(SR. 149).** What I'm not saying is this: If she shows 13 areas and I say, well, you didn't prove it on any of these 13, but taken as a whole, it doesn't look good, that's not what I'm going to do. But she may say,

here are four. Maybe I didn't do good on the other nine, but here are four that are clear, clear and succinct and gross errors. Then I can say, based upon that, there is -- I'll grant your 37 petition. And then you carry it one step forward and say, based upon those four, when you look at the total package, those four have destroyed that total package. You know, if you can't prove the 13, you just don't say, well, we came close on 13. Therefore, we need to look at the whole thing. That's not what I'm saying. You can't come close. It's not like horseshoes. You know, it's kind of like a baseball game, you either hit the ball or you don't. Either make it to the base or you don't.

**MR. RAUPP:**     I agree.

**THE COURT:**     You either scored a run or you don't. It's not like horseshoes. Close doesn't count. **(SR. 150).**

**MR. RAUPP:**     I agree entirely, and we will resist each claim both with proof and argument. Thank you.

**THE COURT:**     Anything else?

**MS. SWARNS:**     Yes, Your Honor.

**THE COURT:**     All right. Ms. Swarns. Briefly because it's noon and everybody is probably getting hungry.

**MS. SWARNS:**     Yes, sir.

## FURTHER ARGUMENT

**MS. SWARNS:**   I will rest on my very long presentation before. I just want to clear up a couple of other outstanding housekeeping issues. We have pending two discovery requests before Your Honor, and those have not been --

**THE COURT:**   I've not ruled on them.

**MS. SWARNS:**   No, you have not ruled on those; and I just want to bring those back to your attention. I also wanted to be clear as to whether Your Honor would like me to file yet a supplemental affidavit of verification from Mr. Reams.

**THE COURT:**   Let's go ahead and get that done.

**MS. SWARNS:**   Okay. **(SR. 151).** I just wanted the make sure because --

**THE COURT:**   That's fine. I do need to ask the State's counsel -- and perhaps you did it and I didn't see it.  Did y'all file a response to her discovery requests? And I think I saw it, but I can't find it.

**MR. RAUPP:**   I filed one -- your first discovery claim that was filed with the memo and the supplement.

**THE COURT:**   Here is their supplemental motion for discovery of <u>Brady</u> material, March 14th.

**MR. RAUPP:**   That has not been responded to, I'm sorry. The supplemental motion, I don't think we filed a response to the supplemental motion. It was my understanding after the conference call – and I didn't participate -- that

we were responding only to the request for summary judgment.

**THE COURT:**     Okay. **(SR. 152).**

**MR. RAUPP:**     I mean, we're happy to --

**THE COURT:**     That's true, but do you wish to respond -- in other words, what is your position on her motion for the <u>Brady</u> material? Because I can't find your initial response to that. Now, admittedly this is just one stack of paperwork. And I know that I saw, or I'm fairly sure I saw, something there. While you're looking, why should I grant your motion for discovery prior to an evidentiary hearing?

**MS. SWARNS:**     Well, Your Honor, we asked for discovery in advance of the evidentiary hearing basically to sort of expedite and clarify the issues in the case. We will, if we're not given discovery in advance of the hearing, obviously seek leave from Your Honor to issue subpoenas for the similar information that we're requesting in the discovery motions.

We asked for discovery related to the Jermaine Brown payment, because Mr. Brown informed me personally that he received $3,000 in cash from the police officers. We know that the State has alleged that they made no payments of any kind to any witness or informant. **(SR. 153).**

**THE COURT:**     If they allege that, then how do you obtain proof?

**MS. SWARNS:**    Because subsequent to them saying that they made no such payments, we now have a contrary statement from one of their witnesses saying, in fact, I did receive exactly that kind of payment.

**THE COURT:**    All right. I'm talking about material items.

**MS. SWARNS:**    Oh, okay.

**THE COURT:**    Things.

**MS. SWARNS:**    So, we're asking for proof of –

**THE COURT:**    That they didn't do something?

**MS. SWARNS:**    No, I'm saying I'd like proof of the payment. I accept the word of the witness who I will certainly subpoena and ask to come and testify himself as to – I would just subpoena police reports or any documentation. We've requested any and all the materials pertaining to payments to informed or other witnesses. **(SR. 154).**

We have provided not only Jermaine Brown's affidavit but his also his criminal history report which reflects an unusual, to say the least, dismissal of charges that were pending at the time of -- he gave information about Mr. Brown.

He failed to appear. Had a bench warrant ordered.

**THE COURT:**    Those are arguments.

**MS. SWARNS:**    Oh, yeah. Yeah. Yeah. But these are things --

**THE COURT:**     I want to hear why I need to grant your motion for discovery --

**MS.SWARNS:**     Well, the State --

**THE COURT:**     -- of these things.

**THE WITNESS**:  -- has a constitutional obligation to provide -- a continuing constitutional obligation to provide any and all <u>Brady</u> material. That's under Arkansas Rule of Criminal Procedure and under federal and state constitutional law. We believe and we have proffered evidence indicating that such payments and such disposition has been given. We're asking for discovery of any records and corroboration of those payments.

**THE COURT:**     Of that fact?

**MS. SWARNS:**     Uh-huh. Of the fact of those payments. **(SR. 155).**

**THE COURT:**     What else?

**MS. SWARNS:**     We have asked --

**THE COURT:**     Jermaine Brown's payments?

**MS. SWARNS:**     And disposition of charges.

**THE COURT:**     And Jermaine Brown's prior records. That's a matter of public record. Can't you obtain --

**MS. SWARNS:**     Yes, I have the public record; but I would like any and all

information in the custody of the State that indicates that that subsequent dismissal was essentially consideration for Mr. Brown's providing of information.

THE COURT:     And that would be probably within the prosecuting --

MS. SWARNS:     Yes.

THE COURT:     -- attorney's file.

MS. SWARNS:     Or the police department, correct.

THE COURT:     Okay. All right. **(SR. 156).**

MS. SWARNS:     We have now proffered a statement from Alfred Goodwin, indicating that he has now admitted that he was the person who shot Gary Turner and that Mr. Reams was not that person. We have asked whether the government has any records or interviews or statements where Mr. Goodwin previously made such an admission. Given that Mr. Reams has -- and actually Mr. Goodwin have alleged complaints of abuse by the Pine Bluff Police Department, we have asked for records pertaining to complaints of abuse lodged against the officers involved in Mr. Reams' --

THE COURT:     What kind of complaints? Do you mean a complaint through internal channels of the police department?

MS. SWARNS:     Yes, through internal channels or through -- yes, through internal channels. Absolutely. I can go and find public records. But any information in the custody of the State regarding complaints of abuse by the officers

who arrested and transported and interrogated Mr. Reams during the course of this investigation. **(SR. 157).** And that would include personnel records, internal affair records. I don't know if there's a civilian review –

> **THE COURT:**   Complaints of abuse by the defendant against officers?

> **MS. SWARNS:**   Yes, exactly. We in light of our <u>Batson</u> claim have asked for a copy of the trial prosecutor's handwritten notes from jury selection process, the jury questionnaires, and other documents relating to the voir dire process at Mr. Reams' trial. We have sought manuals and policies and procedures for jury selection by the Jefferson County District Attorney's Office, what their training polices were with respect to selecting juries. We have asked for --

> **THE COURT:**   These are the ones in existence at that time?

> **MS. SWARNS:**   Yes. Yes, absolutely. We have asked for notes, if they are available, of the trial judge from the jury selection. We have asked for Jefferson County's policies and procedures for jury selection, in light of our under-representation claim. **(SR. 158).** We have asked for --

> **THE COURT:**   I'm not so sure that particular information is available to the State.

> **MS. SWARNS:**   Okay.

> **THE COURT:**   That particular information as to how a particular county --

**MS. SWARNS:**    Right.

**THE COURT:**    -- goes about -- I mean, I can tell you the general practice; but I don't think that that information is available to the State of Arkansas.

**MS. SWARNS:**    I can accept that.

**THE COURT:**    I mean the general practice is exactly as you have articulated, the voter registration lists and then they just draw names and numbers at random.

**MS. SWARNS:**    I would guess we would like information about, for example, who --

**THE COURT:**    The person to subpoena would be the Circuit Clerk.

**MS. SWARNS:**    Because obviously we would want information about who makes the choice, whether it would be just voter registration as opposed to a broader potential pool. **(SR. 159).** You know, how that determination is made, whether, you know, consideration has been -- these are -- these are the questions.

**THE COURT:**    That would be a proper subpoena to the Circuit Clerk. Although, quite frankly, our Circuit Clerk is newly elected and may not be able to answer what occurred back in 19 -- whenever this happened. '92?

**MR. HOLT:**    '93.

**MS. SWARNS:**    We'll issue subpoenas. Yeah, then maybe for records that are in the –

Respondent's Exhibit F2

**THE COURT:**     That would not come from the State.

**MS. SWARNS:**     I got it.

**THE COURT:**     So, on that particular area, you need to issue that subpoena.

**MS. SWARNS:**     Okay. Done. And then the rest I think relate to lethal injection. **(SR. 160).** So, I will not --

**THE COURT:**     We're not covering that. All right. Let me ask: What is the State's position on providing any proof of payments by the prosecutor's office -- excuse me, the police department to Jermaine Brown and his prior record?

**MR. RAUPP:**     Well, if that's part of the claim that Ms. Swarns thinks she can make, it's her burden to investigate it and prove it in this proceeding. We don't dispute we've a <u>Brady</u> obligation; but by her saying Mr. Brown says he was paid, that doesn't – as Your Honor asked, what's the material? I cannot disprove the negative. She said that he said he was paid.

**THE COURT:**     You mean can't prove a negative.

**MR. RAUPP:**     I can't proof a negative. I can't prove we don't have it.

**THE COURT:**     All right. Let's do this.

**MR. RAUPP:**     And I don't feel like the State can be compelled to investigate her claim for her, or should be compelled.

**THE COURT:**     No, she's not asking that. **(SR. 161).** But, Ms. Swarns, let's do this: Concerning Mr. Jermaine Brown, you are asking for two things: You are

asking for whether or not there is any evidence of proof of payment of money by the police department as, I guess, a reward --

**MS. SWARNS:**    Yes.

**THE COURT:**    -- for a tip.   In that regard, I think you need to subpoena the police department and its records and investigators, because I think that that's the best way to do it.

**MS. SWARNS:**    And also -- yes. I also have the claim with respect to the disposition of his charges, so.

**THE COURT:**    Then the prosecuting attorney's office --

**MS. SWARNS:**    If you're authorizing me to subpoena them, I'm happy to do it by subpoena.

**THE COURT:**    I will authorize you to subpoena the prosecuting attorney's records concerning his priors. Now, generally those are a matter of public record; and you can also get them through the Circuit Clerk's office. **(SR. 162).**

**MS. SWARNS:**    The prosecutor's file?

**THE COURT:**    No, his public record of convictions.

**MS. SWARNS:**    I have that, yes. Yes, I have that.

**THE COURT:**    But you are authorized to subpoena the prosecuting attorney's files in which there may be indicia of, here's what we're going to do and why we're going to do it.

**MS. SWARNS:**     Okay.

**THE COURT:**     Concerning Alfred Goodwin, you will have to locate and subpoena Mr. Goodwin yourself.

**MS. SWARNS:**     Yes.

**THE COURT:**     If he's your witness --

**MS. SWARNS:**     No.    No.    I will produce him.

**THE COURT:**     The State doesn't need to get into your witness business.

**MS. SWARNS:**     Right. **(SR. 163).** I was just -- can I –

**THE COURT:**     Concerning complaints of abuse by the defendant to the police department --

**MS. SWARNS:**     Of the police department on –

**THE COURT:**     -- on the officers, you will need to -- and I will limit your subpoena to any complaints filed by your client to the police department concerning allegations of physical abuse against him by officers. That's it. Nothing else. Now, I will back that up with this: If you are able to produce those actual complaints to the Court, then you may be able to expand your subpoenas to what were the results of that.

**MS. SWARNS:**     Okay. We were actually asking for broader questions about whether those officers had been accused of similar acts of abuse by others.

**THE COURT:**     Absent some evidence of that, I can't grant that. The trial notes by the prosecuting attorney of the jurors, you can subpoena the prosecuting attorney's trial notes. I was one for five years, and I don't ever remember keeping my notes. **(SR. 164).** I was a defense attorney for six years, and I kept by notes in my file.     I don't know why the difference is. Perhaps because the prosecutor's job is to secure justice and it doesn't matter one way or the other how it comes out. And the defense attorney is to represent his client. The policies and procedures, you may -- there's no subpoena. You may issue -- you may do the following: I will authorize you to enter an interrogatory to the prosecutor asking the prosecuting attorney what were their policies and procedures on jury selections in 1993.  And then if they answer that they have policies and procedures and they are in the form -- and you may ask, in what form are they contained.     Then  if  you  get  an affirmative to that, yes, we do have and they're in a book or something, then you 1are authorized to examine that book. Not  subpoena  the  book  but  examine  that book.

**MS. SWARNS:**   Okay.

**THE COURT:**     Is that the last one or was there one more?

**MS. SWARNS:**    And this is probably not directed to the prosecutor. **(SR. 165).** The trial judge's notes, are we authorized to subpoena that or is that in the court file?

**THE COURT:**     If a trial judge keeps notes, which almost all trial judges do, there are two course of practices: One is, they keep their notes in a file and throw them away at some point in the future. Or No. 2, they place them within the courthouse file.

**MS. SWARNS:**     Okay.

**THE COURT:**     Now, while they're not part of the record, they are just simply stuck in the courthouse file. So, your better practice would be to look in the courthouse file.

**MS. SWARNS:**     Okay.

**THE COURT:**     If they aren't there, then that judge, whomever -- I don't know who the judge was. But most judges keep notes. But at least back in the early Nineties, most judges -- and I was a judge in the early Nineties. My notes are generally -- I mean with a jury trial, you don't keep a lot of notes. But I won't speak for another judge. **(SR. 166).** So, if they kept them and placed them in the courthouse file, that's where they'll be. If they didn't, then I don't know how you're going to get them. Who was the judge, do you know?

**MR. HOLT:**     Judge Davis.

**THE COURT:**     You're not going to be able to subpoena him, I don't think. If it was Judge Taylor, he's deceased. So, I think you may be unsuccessful in that area, unless they're part of the courthouse file.

**MS. SWARNS:** Okay. And my last request is -- and I appreciate and I will issue all these subpoenas -- but I assume that the government is complying with its continuing obligation under <u>Brady</u>.

**MR. RAUPP:** Yes.

**THE COURT:** Yes, they will. Anything else?

**MS. SWARNS:** No.

**THE COURT:** One other housekeeping -- then I've ruled upon your motions for discovery. You'll need to prepare that order.

**MS. SWARNS:** Yes.

**THE COURT:** Okay. **(SR. 167).** And y'all are going to prepare the order on the brief denial of the form of the lethal injection?

**MR. RAUPP:** Yes.

**THE COURT:** That's not within the Rule 37. Let's do this: Let's take an hour and 15 minutes for lunch. I will meet counsel back here at 1:30, and I'll give you some decisions. Do you wish to excuse the presence of your client or do you wish your client to remain here?

**MS. SWARNS:** I'd like him to remain here.

**THE COURT:** I will leave that up to y'all. We will meet back here at 11:30. Anything else before we recess?

**MR. HOLT:** No, Your Honor.

Respondent's Exhibit F2

**THE COURT:**     All right. We'll see y'all at 1:30 right here.

(Lunch recess.)

**THE COURT:**     We are back on the record in Mr. Reams' case, CR-93-

301. I need to ask: Is there any further argument from counsel, Ms. Swarns?

**MS. SWARNS:**   No, Your Honor. **(SR. 168).**

**THE COURT:**    From the State, Mr. Holt?

**MR. HOLT:**     No, Your Honor.

**THE COURT:**     I have looked at the Rule 37, some of those cases, I have

gone over these notes; and we have already made two determinations. And, Mr. Holt,

if you will be good enough to prepare the Court's order. First, I have granted certain

portions of Ms. Swarns' motion for discovery. And you're going to prepare an order

to that effect.

**MS. SWARNS:**   Yes, Your Honor.

**THE COURT:**     Next, I have ruled against her on her impositions of the

death penalty and how that is imposed; and that is not a -- that is not within the

purview of Rule 37. And, Mr. Holt, if you will prepare an order to that effect. Ms.

Swarns seems to be arguing that there are numerous individual violations of both the

Arkansas Constitution and the United States Constitution that occurred at the trial of

Mr. Reams in 1993. **(SR. 169).** Her position is that each one of these individual

arguments is, standing on its own, sufficient to enable the Court to hold a Rule 37

evidentiary hearing and presumably then to rule in favor of her client. I have gone over the Court's notes on each one of these, and I took some fairly extensive notes here.

And, Mr. Holt, I will ask you to prepare the order arising out of this hearing. And I recognize that also in one of them you did reach an agreement. So, that will need to be put in there. But this Court is satisfied that in these areas as specifically enumerated by counsel there are no Rule 37 guidelines that would enable this Court to address each specific individual request for relief.

In other words, each of her allegations, standing on their own merit, do not warrant Rule 37 actions.  In other words, there may be some mere error in some of these things. Some of these things are definitely by themselves not cognizable or actionable under Rule 37. **(SR. 170).** After having said that, this Court is satisfied that she has made a sufficient case under the allegations of ineffective assistance of counsel that would warrant the evidentiary hearing and I am persuaded that she is entitled to an evidentiary hearing on these issues. And I recognize that I'm treading the same ground that Judge Dennis tread a year ago, and Judge -- now, Judge Dennis apparently did not have before her all of your pleadings.    She simply granted you an evidentiary hearing. But the proper method is to lay out all of the things you are seeking. And this Court is satisfied that in these areas -- and I believe there were 13 of which y'all have agreed to one already -- you will have the burden of proof.

And I'm going to go over most of these so that there won't be any questions. But, Mr. Holt, you will need to add some specificity to the order. Okay. Your arguments were that there were errors at trial that would cause the Court to grant either, A, a new trial, or, B, set aside the imposed death penalty. **(SR. 171).** And those errors, each of them or any of them, would be sufficient to find ineffective assistance of counsel; and that is the only area in which I am granting you a hearing. In other words, you can't say because this happened, therefore, I'm entitled to relief; but you can say because this happened the attorney was ineffective. And there's a fine line difference there. Just because an error might have been made does not mean that he is ineffective. I am really not greatly concerned with your argument that 10 pages -- you know, that -- in these petitions, you're not limited with 10 pages. And Judge Dennis granted you the right to expound -- expand that, and you've presented your written arguments fairly well.

Your secondary argument for which you may present evidence is that trial counsel, who was also appellate counsel, had numerous errors for which you're going to try and show that any or all were resulting in ineffective assistance of counsel. I am also not concerned with your client's failure to properly verify his petition nor am I deeply concerned with the State's slightly tardy response. We are here to resolve these issues. **(SR. 172).** Therefore, you will be entitled to bring forth evidence, testimony, and argument in the following areas. Now, whether or not you

can prove these things is a whole different ballgame, because the burden of proof rests upon you. And the area of the change of venue, insofar as that might lead to ineffective assistance of counsel, the arrest of your client – although this Court will tell you up front, I have some serious reservations about that issue. My inclination is that I see almost nothing that would cause this Court to think that you have even a nail upon which to hang your hat that just because – see, there's a huge difference between being arrested and being tried. I'll permit you some evidence and testimony, but I am telling you up front that is such a thin piece of ice I don't think you really want to stand on it, I really don't.

Let's see. You need to present evidence and testimony concerning exculpatory material and Brady material and things of this nature. That is of concern to the Court. **(SR. 173).** But it has primarily to do with witnesses, people who testify. If you'll permit me a personal story. Years ago when I was in law school, they were drafting the Arkansas Criminal Code. There was an unpleasant fellow here in town by the name of Big Joe Pridgeon. Now, Big Joe dealt heroin back in the Seventies. That's what they did. And the State got two informants to go into his house and buy the heroin from him. And our office, I was just in law school, defended Mr. Pridgeon. And the city attorney who was a deputy prosecutor offered the folks in the hospital total immunity if they'd testify against Mr. Pridgeon. And being good, smart citizens, they said they'd be glad to testify against Mr. Pridgeon. And Mr. Pridgeon

was convicted. And they filed motions for discovery under <u>Brady vs. Maryland</u> and the new Arkansas law. And so, my boss at that said, I know you're still in law school. I want you to appeal this. And so, I wrote all the briefs and we filed it with the Arkansas Supreme Court in about 1977. **(SR. 174).** They called me and they said, well, your case got reversed. And I didn't know what they were talking about. So, that was the very first Arkansas case decision on discoverable material. And the Supreme Court said, look, these clear deals where they offered immunity to a potential co-defendant, one of whom testified and one of whom didn't, need to be disclosed.

So, those issues concern me. Now, that doesn't mean that you'll be able to prove any case; but they cause me concern, as does illegally-seized physical evidence. You have the opportunity, the statements, and the confessions; but you understand, these are not removed from the trial proceedings and must go together with ineffective assistance of counsel. What I won't permit is the argument, because this happened, therefore. You may argue, because these things happened, counsel was ineffective and, therefore.

I'm also a little bit leery of the prior crimes. I don't see your strength there. But that needs to be more developed properly. **(SR. 175).** The hearsay at the trial, I'm not so sure where you're going to be able to go with that. That might or might not be considered mere error. I have never been at a trial in which some hearsay isn't

admitted somehow, some way. I realize that death cases are most serious cases and just because some hearsay is at a trial without objections does not necessary equate to it being prejudicial against your client. But you may develop that as part of your overall theory. The concern about the medical examiner and the testimony of the distance of the gunshot, I can tell you right now, I am not going to permit that inquiry into ineffective assistance of counsel. That does not reach the failure to object to the medical expert who said it looks like the gunshot was at close range or 5 feet away. But I am not an expert in this area. Probably did not warrant an objection. Perhaps arguments during closing, but I don't see that small area tied in with ineffectiveness of counsel. **(SR. 176).** I just don't see that.

Let's see. You may present your testimony about the under-representation of majorities on the jury panel. But I will tell you that I personally think that that might exceed the scope of a Rule 37 hearing. It might. But I think that that is -- when you combine that and only in combination with your <u>Batson</u> issues, if it were simply that standing alone, I don't think you would have any leg to stand upon. So, I will permit you to combine that with your improperly excused jurors, so you say, and what you believe are the violations of the <u>Kentucky vs. Batson</u> case. But they must be tied together. If you do not tie those two together, then I will strike that portion or not consider that portion concerning the jury selection, insofar as felony convictions of

minorities and things of that nature. It has to be tied together. If not, I'm going to sever it and let you proceed only on the secondary issues. **(SR. 177).**

I will permit you to go into the jury instructions on extreme indifference; but again, I must confess that I do not see how the failure to request a specific jury instruction for which there is no definition can be considered ineffective assistance of counsel. But I will permit you to explore that; but giving you fair warning that this Court doesn't look very well on that, because if you take that to its logical conclusion, then we would have to be submitting jury instructions on almost everything. And I've always found in all my years of doing this, only once, once, have I ever, ever questioned a jury's decision. I may not like it, or I may like it; but I accept it. I just firmly believe that 12 citizens, good and true, can make an intelligent decision. And so, 12 citizens of this community can decide that under these circumstances extreme indifference existed. So, I will tell you that I think that this is a very thin area in which you are working on. Let's see, we've already discussed the prior bad acts. **(SR. 178).** Now, I gather that a primary thrust of your case is going to be the issues concerning the mental retardation of your client.

**MS. SWARNS:**     It is one, yes, and the background, of course.

**THE COURT:**     And I think the State admits that if there is clear evidence to show a -- I believe the threshold is 65 on the IQ. Is that -- did I state that correctly?

**MR. RAUPP:**     That's the statutory presumption, Your Honor.

**THE COURT:**     Right. That if there is clear evidence showing that he is below that -- and I don't know if there is or not -- but if there is, then we've moved into an entirely different realm. And if there is evidence of it below, then you have to overcome. So, I expect you to expend some time on that area and build that into your ineffective claim. **(SR. 179).** But I think the State is aware and should be aware that if you are able to produce clear -- and I say "clear," not just some -- evidence and testimony that the defendant's IQ at the time of the trial was below 65, then we shift completely. Is that a fair statement?

**MR. RAUPP:**     At the time of the crime?

**THE COURT:**     The crime or the trial? Well, at the time of the examination, excuse me, which is after the crime and before the trial. And I don't know if you can show that or not, but it has to be clear evidence of that. We just can't say, well, I think. And then the lack of consideration about his youth and all of these issues. The pecuniary gain aspect of this has, in my opinion, been covered on appeal. That has been litigated, that has been argued, and I don't think that that aspect of it is proper Rule 37 considerations. So, that will come -- that won't be part of the Rule 37.

**MR. HOLT:**     Your Honor.

**THE COURT:**     Yes.

**MR. HOLT:**     These last two, mental retardation and failure to consider

mitigating evidence, are those two also cabined into the ineffective assistance of counsel? **(SR. 180).**

      **THE COURT:**    I think the mental retardation can stand upon its own merit. Now, whether or not she proves that is a different story. But that is a separate issue, but it is also part of the issue of ineffective assistance of counsel.

      **MR. HOLT:**    Right.

      **THE COURT:**    Do you see what I'm saying? If she can satisfy this Court that there was a seriously negligent investigation, just a poor investigation, and thus poor presentation of mitigating circumstances, then she's got something upon which to stand. And if -- you know, just – but just to come up and say, well, I think that they should have done this and they should have done that is not going to get it. I think they should have hired three doctors to examine him instead of one.

      Those are conclusory statements that aren't – I'm not going to consider those. **(SR. 181).** So, those are all tied into the proper investigation and the proper presentation of mitigation during the penalty phase for which you have to present in the penalty phase he's had an abusive childhood, he is mentally retarded. Whatever those things are that can legitimately be brought out with a reasonable investigation. The law does not require that we turn over every single stone, grasping at every single straw. If you don't do that, that doesn't mean that it's ineffective assistance of counsel. Let's see, I think that I have -- and, of course, and you have -- I want to

make sure you have thoroughly explained to your client -- and I want to make sure he understands -- Mr. Reams, that the burden of proof rests with you.

**MR. REAMS:**     Yes.

**THE COURT:**     You understand that you and your attorneys -- well not you, but your attorneys have to present evidence and testimony and that the thrust, the main portion of your attorneys' case seems to be that your trial counsel did a poor job, was ineffective in representing you and/or did a poor job on your appeal. **(SR. 182).** In order to satisfy a court, they have to show that the lawyer's performance was deficient, really poor, just not good at all and, furthermore, that they have to show that that poor performance by the attorney resulted in prejudice to you and your defense. Do you understand that?

**MR. REAMS:**     Yes.

**THE COURT:**     Okay. Do you understand that just because they show me that, well, perhaps he should have done this and didn't do it, that's not sufficient?

**MR. REAMS:**     Yes.

**THE COURT:**     I want to make sure you understand these things because the burden, as your attorney, rests with y'all. If they can't convince this Court of these things, then your motion will be denied. I assume, Ms. Swarns, you have thoroughly discussed this with your client; but on the record, I want to make sure he understands these things.

**MS. SWARNS:**     Yes.   Thank you, Your Honor.

**THE COURT:**     All right.     Well, that's for everyone's benefit. **(SR. 183).** Have I left out any of these issues? I think I've covered them all. I think we've denied three, and all the rest are going forward. I'm not so sure there were actually 13 separate matters. Does the State have anything that you want me to add into the order? Have I omitted anything?

**MR. HOLT:**     Do we want to put the scheduling in this?

**THE COURT:**     We'll put in the court order that all parties have agreed to appear in court here, along with the defendant, at 9:30 on August the 20th, I believe. The 20th, 21st, and 22nd, 9:30 a.m. each day. That counsel for the petitioner shall provide her witness list by the 30th of May. And let me make sure that that's an acceptable -- we'll just say by May the 31st to you. That the State will have any witness list and items of evidence to her by June the 29th. Copies to the Court. She'll prepare her own separate order on granting the motions for discovery. I guess you can put in my one denial. **(SR. 184).** I guess you could put it into all these others. You don't have to have a separate of that. I just denied it upfront. What else? Have I omitted anything or neglected anything from the State's position?

**MR. RAUPP:**     No, Your Honor.

**THE COURT:**     Ms. Swarns, have I omitted anything or neglected anything from defense's position?

**MS. SWARNS:**    No, Your Honor.

**THE COURT:**    And y'all are satisfied that at this hearing three days will be sufficient?

**MS. SWARNS:**    I believe so, but I cannot promise. I have to work on the witness list. Obviously I have developed a tentative witness list, but my side certainly should be able to get most of its witnesses on.

**THE COURT:**    I've got to have something more than that. I mean, because I really have serious scheduling considerations. And if you say, Judge, we can do it all. **(SR. 185).** I can do mine in two days and they can do theirs in one. That's three days.  Do you need some time to consider this?

**MS. SWARNS:**    Yes.

**THE COURT:**    Because what I don't want to have happen is we take out three days and then you say, I'm almost finished; and then they've got another day and a half. And it will be months. I mean, my calendar I don't have days back to back.

**MS. SWARNS:**    That week, Your Honor, are those the only three days you have available?

**THE COURT:**    In August, yes.

**MS. SWARNS:**    That same week.

**THE COURT:**    I had to create those days.

**MS. SWARNS:**   Oh, yeah.    Okay.

**THE COURT:**   I have to actually go through my calendar and create those days.

Between now and Christmas, I don't have any two days back to back that's not filled with stuff. Between now and April of next year, I don't have any two days that does not have something. **(SR. 186).** Now, I can arrange that those cases be shuffled around, but I don't have two day -- I can't just say, oh, here's a two-day time slot that's free and open. So, that's why I've already created the 20th, the 21st, and the 22nd.

**MS. SWARNS:**   Right. Your Honor, I guess I -- you know, just with respect to the penalty phase issues, for example -- and this is taking actually into consideration the mental retardation issue, we would have to call, of course, Mr. Kizer; and that would be a relatively long examination on its face as trial counsel because of all the issues that Your Honor has addressed. But also, you know, there are at least four of Mr. Reams' family members for which we have provided affidavits. Mr. Kizer's trial – the secretary who was working with him at the time of trial. Obviously the trial prosecutors are now going to have to testify with respect to the Batson issue. Potentially other former defense attorneys or prosecutors who were practicing at that time. Mr. Goodwin, Mr. Brown, Phillip Curry, who was another of the witnesses who corroborates Mr. Goodwin's statement. **(SR. 187).** I've just

summarily that's just a quick run through of, you know, some of the witnesses I know I have to call. So, I would -- my usual -- candidly, my usual is for a week.

THE COURT:    I will see if I can squeeze out the 23rd, and I'm reasonably sure I can. But on the 24th, I have court in Star City and it is -- that's another county. It's very difficult for me to rearrange court in another county, because down there I simply do what shows up on the docket.

MS. SWARNS:    Right.

THE COURT:    And it would be difficult, really difficult to modify that Friday. Not impossible but difficult.

MS. SWARNS:    And would the following Monday be a possibility, the 27th?

THE COURT:    The 27th?

MS. SWARNS:    Yes. **(SR. 188).**

THE COURT:    Yes, that's -- I can -- I can –

MS. SWARNS:    So, I think we had the 20th through to the 23rd and potentially the 27th, then I think, yes, we can do that.

THE COURT:    We'll have to change some times because on the 23rd I've got someone who can take care, and all I will schedule on the 20th would be my probable cause criminal hearings. And whatever is set for the 21st and the 22nd I can move those because we're far enough out. The 23rd are my child abuse cases,

and those are difficult to move because kids are all over the state in foster care. But I will see what I can do, but I'll still have to have at least an hour because if folks get arrested on Mondays or Tuesdays I'm in court on Thursdays. Every 48 to 72 hours. And the same would apply to the 27th. So, we might not be able to start at 9:30.

MS. SWARNS:     That's fine. I think even with that then I think we should be to get through it.

THE COURT:     All right. Is still agreeable with the State?

MR. HOLT:     Yes, Your Honor. We'll be available.

THE COURT:     Well, all right. **(SR. 189).** Will you prepare the order arising out of this as promptly as possible and send a copy to counsel. Ms. Swarns, what we generally do down here -- I don't know if you do it there -- we just call it our five-day rule. I receive it; and if I hadn't heard a complaint from you about how it's typed up in five business days, I sign it.

MS. SWARNS:     Sounds good.

THE COURT:     And if you have a complaint, you fax it to me and say, I don't like these words and these words. And if they don't agree to change, we'll conference call it.   But I don't think this is that difficult.   If you'll send me your order, the same is true and a copy to them. Anything else then, Ms. Swarns?

MS. SWARNS:     No, Your Honor.

**MR. HOLT:**     We will include the 27th on the order?

**THE COURT:**     Yes. And the 23rd and the 27th. And hopefully we can get it done in four days. **(SR. 190).** It's just, I'm the only one in the whole district that does these cases and the other judges generally doesn't sit in for me because they have no area of expertise. And to be honest with you, I just don't have any spare time, and I'm sorry.

**MS. SWARNS:**     I understand.

**THE COURT:**     All right. Anything else? All right. We will be in recess.

**MS. SWARNS:**     Thank you, sir.

*(WHEREUPON, the proceedings were concluded.)* **(SR. 191).**

## CROSS-APPELLEE'S STATEMENT OF THE CASE

This cross-appeal requires the Court to determine (a) whether the Circuit Court clearly erred in ruling that Appellant/Cross-Appellee Kenneth Reams received ineffective assistance of counsel during the penalty phase of his capital murder trial, based on trial counsel's failure to investigate and present available mitigation evidence that he was not the shooter and, thus, is entitled to a new sentencing, (b) whether the ineffective assistance of trial counsel, based on his failure to investigate and present available mitigation evidence of Mr. Reams' traumatic life and family history, provides additional and/or alternative grounds for vacating his death sentence, or (c) in the event that this Court does not affirm the Circuit Court's ruling, whether it should remand this case to the Circuit Court to address Mr. Reams' claim that he received ineffective assistance of counsel, based on trial counsel's failure to investigate and present available mitigation evidence of Mr. Reams' traumatic life and family history, and his claim that he is ineligible for the death penalty due to his intellectual disability.

Mr. Reams respectfully refers the Court to the Statement of Case in his appeal brief for a summary of the trial and direct appeal proceedings and the Rule 37 proceedings.  (SoC 1-5.)

Respondent's Exhibit F2

## ARGUMENT

**I.     This Court Should Affirm the Circuit Court's Ruling That Mr. Reams'
Trial Counsel Was Ineffective During the Penalty Phase of Trial.**

The Circuit Court correctly found that Mr. Reams' Sixth Amendment right to
effective assistance of counsel was violated because his court-appointed defense
attorney, Maxie Kizer, failed to investigate, develop, and present available,
mitigating evidence that his co-defendant Alford Goodwin—and not Mr. Reams—
shot and killed Gary Turner.   This failure was highly prejudicial.   Mr. Reams'
significantly lesser role in the crime was a key component of the defense's case at
sentencing.   However, because of trial counsel's failure to investigate, the sole
evidence presented to the jury about Mr. Reams' lesser role was his own statements,
which, without corroboration, was insufficient to avoid a death verdict.

This Court must affirm the Circuit Court's ruling unless it is "clearly
erroneous."   *State v. Barrett*, 371 Ark. 91, 95, 263 S.W.3d 542, 545-46 (2007)
(citation omitted).   "A finding is clearly erroneous when, although there is evidence
to support it, the appellate court after reviewing the entire evidence is left with the
definite and firm conviction that a mistake has been committed."   *Id.* (citation
omitted).   "In making a determination on a claim of ineffectiveness of counsel, the
totality of the evidence before the fact-finder must be considered.   *Id.* (citation
omitted).   Moreover, this Court must "defer to the trial court's determination of
credibility on Rule 37.1 appeals."   *Id.* (citation omitted).

Respondent's Exhibit F2

As confirmed by the State's very short and meritless arguments, there is no indication, let alone a "definite and firm conviction," that the Circuit Court committed a mistake in granting sentencing relief.  Rather, the record confirms the gross deficiency and prejudicial result of trial counsel's failure to investigate and present two available witnesses—both known to him at trial—who could corroborate the powerful mitigating circumstance that Mr. Reams was not the shooter.  Thus, under the well-established framework set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), trial counsel rendered ineffective assistance of counsel.

**A.  Trial Counsel Was Ineffective for Not Investigating and Presenting Available Mitigation Witnesses, Who Would Have Proved at Trial That Mr. Reams Was Not the Shooter.**

 "[T]he failure to investigate, discover, and present mitigating evidence has been deemed ineffective assistance numerous times."  *See Sanford v. State*, 342 Ark. 22, 31, 25 S.W.3d 414, 420 (2000) (citation omitted).  That is because, "given the severity of the potential punishment and 'the reality that the life of [counsel's] client [is] at stake, . . . it [is] incumbent to offer mitigating proof.'"  *Id.* at 31-32, 25 S.W.3d at 420 (quoting *Pickens v. Lockhart*, 714 F.2d 1455, 1467-68 (8th Cir. 1983)).

Although deference is accorded to an attorney's informed strategic choices, "strategy resulting from lack of diligence in preparation and investigation is not protected by the presumption in favor of counsel."  *Kenley v. Armontrout*, 937 F.2d 1298, 1304 (8th Cir. 1991).  It is "only after a full investigation of all the mitigating

circumstances that counsel can make an informed, tactical decision about which information would be the most helpful to the client's case." *Sanford*, 342 Ark. at 33, 25 S.W.3d at 421 (citing *Pickens*, 714 F.2d at 1467).

The record unequivocally shows that trial counsel ignored his constitutional duty by electing to pursue a defense strategy that focused on Mr. Reams' assertion that he did not shoot and kill the decedent (Ab. 1331-32, 1336, 1410), while inexplicably failing to investigate or present two available witnesses whom he knew could corroborate this theory of defense. This failure was both objectively unreasonable and prejudicial to Mr. Reams during the penalty phase of his trial.

     1.  *Trial Counsel Was Deficient for Not Investigating or Presenting Phillip Curry and Alford Goodwin.*

Trial counsel knew that Phillip Curry and Alford Goodwin possessed information supporting Mr. Reams' claim that he did not shoot the decedent. As part of pretrial discovery, trial counsel received a sworn statement from Phillip Curry that was given to the prosecution approximately one week after Mr. Turner's death. (Add. 633-50.) According to that statement, on the day after the fatal shooting, Mr. Goodwin admitted to Mr. Curry that he, not Mr. Reams, was the shooter. (Add. 644-46.) When repeatedly questioned as to the shooter's identity, Mr. Curry consistently said that it was Mr. Goodwin. (*See, e.g.*, Add. 650.) Mr. Curry had no reason to falsely shift the blame from Mr. Reams to Mr. Goodwin because he had been close friends with Mr. Goodwin "all [his] life." (Add. 634; *see also* Ab. 662

(Mr. Goodwin testifying that Mr. Reams was his friend, not Mr. Curry's).)

In his Rule 37 testimony, trial counsel confirmed that Mr. Curry's testimony would have been helpful. (Ab. 99.) In fact, Mr. Curry was on trial counsel's witness list (Ab. 168; Add. 266-67) and was subject to an order for his delivery from prison to testify at Mr. Reams' trial (Add. 610). Nonetheless, trial counsel did not call Mr. Curry to testify, and could not specifically recall ever speaking with him. (Ab. 86, 95, 98-100.) Mr. Curry confirmed that he was never contacted by trial counsel, never spoke to trial counsel about the events of Mr. Turner's death, and never spoke to any investigator or lawyer working in Mr. Reams' defense before Mr. Reams' trial. (Ab. 588.) Trial counsel's files confirm that his investigator never spoke to Mr. Curry. (Ab. 872; Add. 620-24.) Trial counsel could not explain his failure to call Mr. Curry as a defense witness, given his statement to the prosecution. (*See* Ab. 98-99.)

Trial counsel also failed to interview Alford Goodwin, or present his testimony to the jury, even though Mr. Goodwin was the only living witness to the shooting other than Mr. Reams. During the Rule 37 hearing, Mr. Goodwin testified that he, and not Mr. Reams, carried the weapon during the robbery and shot Mr. Turner. (Ab. 627, 639-40.) Mr. Goodwin stated that neither he nor Mr. Reams intended to harm anyone, and that Mr. Reams had set the gun to an empty cylinder. (Ab. 627-28, 639, 657.) Indeed, when Mr. Goodwin inadvertently fired the gun and

killed Mr. Turner, he risked Mr. Reams' life as well due to Mr. Reams' close proximity to Mr. Turner at the time. (Ab. 640.)

Trial counsel could not think of any reason why he would not have spoken to Mr. Goodwin. (Ab. 95.) Nonetheless, counsel never contacted him, explaining only that Mr. Goodwin was represented by counsel. (Ab. 94-95.) However, the record is clear that trial counsel knew that Mr. Goodwin's plea and sentencing to life without parole took place before Mr. Reams' trial, thus making him available as a witness, because trial counsel argued these facts to the jury. (Ab. 1363-67, 1410.)

Mr. Curry was an unbiased, exculpatory witness, who had given a sworn statement to the prosecution that corroborated Mr. Reams' trial testimony. Mr. Goodwin could definitively confirm that Mr. Reams was not the shooter. Both witnesses were available: Mr. Goodwin was beginning to serve his life without parole sentence after pleading guilty to the same crime, and Mr. Curry was personally known to trial counsel, having been represented by him in another criminal matter (Ab. 86, 588) and being on trial counsel's witness list for Mr. Reams' trial (Ab. 168; Add. 266-67). Yet, despite the crucial importance of their testimony, trial counsel unreasonably failed to contact them or call either of them at sentencing.

This failure constituted deficient performance because it is "less competent than the assistance that should [have] be[en] provided by a reasonable attorney under the same circumstances." *Chambers v. Armontrout*, 907 F.2d 825, 828 (8th Cir.

1990); *see also State v. Dillard*, 338 Ark. 571, 573, 998 S.W.2d 750, 751 (1999) (finding counsel ineffective for failing to interview or subpoena potential defense witnesses); *Farmer v. State*, 321 Ark. 283, 287-88, 902 S.W.2d 209, 212 (1995) (finding counsel ineffective for "fail[ing] to secure the testimony of the only witnesses available who could corroborate his client's version of the facts"); *Russell v. State*, 302 Ark. 274, 277-78, 789 S.W.2d 720, 722 (1990) (finding counsel ineffective for failing to call an exculpatory witness without reason); *Henderson v. Sargent*, 926 F.2d 706, 711-12 (8th Cir. 1991) (finding unreasonable trial attorney's failure to investigate and interview alternative potential suspects); *Eldridge v. Atkins*, 665 F.2d 228, 235 (8th Cir. 1981) (finding counsel's investigation unreasonable where he made no effort to contact or subpoena two potentially helpful witnesses).

The State briefly presents three reasons for not finding trial counsel's performance deficient, contending that: (1) "it is a dubious proposition" that Mr. Goodwin would have testified at Mr. Reams' sentencing; (2) Mr. Goodwin's admission to being the shooter was "readily disputable"; and (3) the utility of Mr. Curry's testimony "would have been less than certain" due to contradictory evidence as to the identity of the shooter. (Arg. 16-18.) Each argument is based on speculation and supposition with no record support and, thus, does not establish a "definite and firm conviction that a mistake has been committed." *Barrett*, 371 Ark. at 95, 263 S.W.3d at 545-46 (citation omitted).

Indeed, the State made similar arguments to the Circuit Court (Add. 496-97), which the court soundly rejected after hearing the testimony of Mr. Goodwin, Mr. Curry, and trial counsel.  (Add. 522.)   Nowhere in trial counsel's extensive Rule 37 testimony did he raise any of the State's arguments to explain his failure to contact Mr. Goodwin and Mr. Curry or to present them at trial.  To the contrary, trial counsel testified that both witnesses would have corroborated Mr. Reams' defense and, when given the opportunity to explain himself, provided no credible explanation for failing to interview them.  (Ab. 94-95, 97, 99-100.)  As noted by the State, this Court must defer to the Circuit Court's credibility determinations of the Rule 37 witnesses that led to its ultimate finding of ineffectiveness.  (Arg. 3 (citing *State v. Franklin*, 351 Ark. 131, 136, 89 S.W.3d 865, 867 (2002))); *see also Myers v. State*, 333 Ark. 706, 719, 972 S.W.2d 227, 234 (1998) (noting lower court "apparently credited" a witness' testimony in denying Rule 37 relief and that "resolution of credibility issues is within the province of the trial court").

Mr. Curry unequivocally confirmed that he would have testified at Mr. Reams' trial consistent with his Rule 37 testimony.  (Ab. 589-90.)  For his part, in trying to answer honestly and thoughtfully, Mr. Goodwin noted that he was a different person at the time of Mr. Reams' trial (Ab. 659), but he also stated that he would like to think he would have testified truthfully at his trial (Ab. 649.)  He never said that he would have refused a request from trial counsel to testify about his true

role in the crime, and the State cites no authority suggesting that this Court should presume that he would have perjured himself at trial. *Cf. Thiel v. Schuetzle*, 200 F.3d 1120, 1123 (8th Cir. 1999) (ruling that federal habeas court lacked authority to "assume" witness' testimony was perjury in absence of a finding of perjury by state courts). The Circuit Court reviewed all of this evidence before finding trial counsel ineffective, and its credibility determinations that led to this decision are entitled to deference by this Court. *See Myers*, 333 Ark. at 719, 972 S.W.2d at 234.

The State's remaining argument—that Mr. Curry's testimony would not have "utility" because it would present more conflicting evidence as to the identity of the shooter (Arg. 17)—is plainly illogical. It is certainly true that the prosecution and Mr. Reams' trial counsel made conflicting assertions at trial about who fired the fatal shot that killed Mr. Turner. However, in the absence of any direct evidence from the prosecution—and only Mr. Reams' testimony from the defense—on the specific issue of who shot and killed Mr. Turner, the testimony from an unbiased witness like Mr. Curry would have transformed the issue before the jury. Mr. Curry's testimony had more than mere utility; it was essential.

>    2. *Mr. Reams Was Prejudiced by Trial Counsel's Failure to Investigate and Present Available Mitigation Evidence That He Was Not the Shooter.*

The evidence presented to the jury during the penalty phase of Mr. Reams' trial was vastly different than what could have been presented had trial counsel

properly investigated and presented the compelling testimony from Mr. Curry and Mr. Goodwin.   During its closing argument in the guilt/innocence phase, the prosecution vigorously and effectively attacked Mr. Reams' credibility and his claim that he did not shoot the decedent.   The prosecution accused Mr. Reams of "lying about his level of participation because he had a whole week to think about what he needed to say," and claimed that Mr. Reams was "trying to set [Mr. Goodwin] up." (Ab. 1342-43.)   During the penalty phase, the prosecution made clear that it continued to maintain that Mr. Reams was the shooter, and that the jury would have to decide the issue after having "heard the facts and the circumstances" of Mr. Turner's murder.  (Ab. 1406.)

Mr. Reams' trial counsel failed to rebut this entirely inaccurate picture painted by the prosecution.  Instead, after submitting into evidence that Mr. Goodwin pled guilty and was sentenced to life without parole for this offense, trial counsel unconvincingly argued that there was no "clear, convincing evidence" about who "pull[ed] the trigger," leaving the jury with a "murky set of circumstances where you don't know." (Ab. 1410.)  According to trial counsel, the jury was forced to "guess": "If you guess right, you may give the death penalty to somebody who pulled the trigger. If you guess wrong, Alford Goodwin is going to be sitting out in the penitentiary for the rest of his days knowing that he's the one that pulled the trigger."

(*Id.*)  Due to Mr. Kizer's deficiencies, the jury did not hear the available evidence from two credible witnesses, rather than having to make a random "guess."

The testimony of either Mr. Curry or Mr. Goodwin would have transformed Mr. Reams' assertion that he was not the shooter from self-serving statements to corroborated evidence.  Thus, counsel's failure to investigate and present these witnesses clearly "had an adverse effect on the defense."  *Flores v. State*, 350 Ark. 198, 206, 85 S.W.3d 896, 901 (2002).  That is precisely what the Circuit Court ruled:

> The Rule 37 hearing testimony has left the Court with doubts that the petitioner fired the fatal shot.  The Court concludes those doubts as demonstrated at the hearing would have caused at least one reasonable juror to have doubt that the petitioner should be sentenced to death, despite his unquestionable complicity in the capital murder.

(Add. 522.)  That ruling was not clearly erroneous and should be affirmed.

Without any record support, the State speculates that the jury would have been skeptical of the veracity of Mr. Curry's and Mr. Goodwin's testimony.  (Arg. 19.)  This argument is baseless and contradicts the Circuit Court's credibility determinations that were necessary to have "doubts that the petitioner fired the fatal shot" (Add. 522)—determinations to which this Court must defer, *Barrett,* 371 Ark. at 95, 263 S.W.3d at 546 (citation omitted).  Moreover, *Strickland* does not require certainty that the sentencing jury would have found Mr. Goodwin and/or Mr. Curry credible.  All that is required is a "reasonable probability that, but for counsel's

unprofessional errors," a juror would have found either witness credible and, thus, would have voted for life. *Strickland*, 466 U.S. at 694.

The State also asserts—again without support—that the Circuit Court clearly erred because there is no reasonable probability that the jury would not have imposed a death sentence. (Arg. 19-20.)  Such a contention is belied by the record.  Without the benefit of either Mr. Curry's or Mr. Goodwin's testimony, trial counsel directed the sentencing jury to "guess" who shot and killed Mr. Turner.  (Ab. 1410.)  As a result, the sentencing jury unanimously found two aggravating circumstances (pecuniary gain and prior violent felony) and no mitigating circumstances to exist. (Add. 6-15.)  If Mr. Curry or Mr. Goodwin had testified, no guessing would have been necessary, and the jury would have had a powerful mitigating circumstance to weigh against the aggravators.[1]  With that mitigating circumstance in place, "there is a reasonable probability that at least one juror would have struck a different

---

[1] Contrary to the State's assertion (Arg. 20 n.7), Mr. Reams is not calling for proportional review, but rather a proper weighing of mitigating and aggravating circumstances, which did not occur at trial due to counsel's deficient performance. *See Reams v. Arkansas*, 322 Ark. 336, 338, 909 S.W.2d 324, 326 (1995) (noting that, even though proportional review is not required, the court "will continue to review the aggravating and mitigating circumstances presented to the jury").

balance." *Wiggins v. Smith*, 539 U.S. 510, 537 (2003).

In fact, as explained in Mr. Reams' opening appeal brief, juries have not only declined to impose a death sentence, but have also convicted for the lesser-included offense of first-degree murder for acts comparable to—if not worse than—Mr. Reams' role in Mr. Turner's death. (Arg. 23-26 (citing cases).) The mitigating strength of not being a shooter is likely why the Chief Deputy Prosecutor of Jefferson County, who also prosecuted Mr. Reams' case in 1993, testified that his office would not seek the death penalty for an accomplice to a homicide. (Ab. 616.)

### B.  Trial Counsel's Failure to Investigate and Present Available Mitigation Evidence Regarding Mr. Reams' Traumatic Life and Family History Supports the Circuit Court's Decision to Vacate Mr. Reams' Death Sentence.

The record and law amply support affirming the Circuit Court's ruling that trial counsel was ineffective for failing to investigate and present available evidence that Mr. Reams was not the shooter. The Circuit Court, therefore, did not need to address trial counsel's ineffectiveness for failing to investigate and present the available mitigation evidence of Mr. Reams' violent and dysfunctional life and family history. This Court also need not address this issue unless it finds the Circuit Court's grant of sentencing relief to be clearly erroneous, which it is not.

However, should this Court find clear error, it may also grant sentencing relief based on these additional grounds, which independently and cumulatively prejudiced Mr. Reams at sentencing. *See Sanford*, 342 Ark. at 29, 25 S.W.3d at 419

Respondent's Exhibit F2

(holding that, in death penalty cases, this Court will even consider "errors argued for the first time on appeal where prejudice is conclusively shown by the record, and this [C]ourt would unquestionably require the trial court to grant relief under Rule 37"). Alternatively, this Court should remand this case to the Circuit Court to address the substantial evidence of trial counsel's ineffectiveness regarding his failure to investigate and present available mitigation evidence about Mr. Reams' traumatic life and family history.

1. *It Was Objectively Unreasonable for Trial Counsel Not to Investigate and Present the Extensive and Available Mitigation Evidence About Mr. Reams' Traumatic Life and Family History.*

As explained by Russ Stetler, the Rule 37 defense expert in mitigation investigation, trial counsel "barely scratched the surface and did not give the jurors the information that they needed" to make "a reasoned moral decision about whether Mr. Reams should live or die." (Ab. 235; *see also* Supp. Add. 11-23.) Specifically, trial counsel failed to investigate and present the abundant mitigation evidence known to Beatrice Whiteside, Mr. Reams' mother; Amelia Akins, his aunt; and Michael Moss, his counselor at the Sears Youth Center, a juvenile facility in Poplar Bluff, Missouri. All three witnesses were known and available to counsel: Ms. Whiteside and Ms. Akins testified during the penalty phase of Mr. Reams' trial (Ab. 1390-1400), and Mr. Moss was scheduled to testify but was inexplicably not called even though counsel stated at trial that he "would prefer to have here [sic]

because he knows something more about Kenneth personally" (Ab. 1361-62).

Due to trial counsel's ineffectiveness, he never fully investigated these witnesses. Ms. Whiteside met with Mr. Kizer in a 10-minute meeting and again for approximately 30 minutes to prepare for her trial testimony; in neither meeting did he explain the type of information that would be helpful to Mr. Reams' defense. (Ab. 530-33.) Ms. Akins did not know about Mr. Reams' trial and only testified because she happened to be visiting him on the trial date. (Ab. 798-99, 801-02; Supp. Add. 29.) Thus, trial counsel only met with her briefly at the courthouse about an hour before she took the stand, and never explained what questions he would be asking or what information she should be providing in her testimony. (Ab. 799; Supp. Add. 29.) Karen Brantley, trial counsel's legal secretary who had no relevant training or experience in mitigation investigation, interviewed Ms. Akins with three other individuals in a single, videotaped, group meeting, and then interviewed Mr. Moss in a similar single, videotaped meeting. (Ab. 112-14, 206-08, 216-17, 223, 696-97, 699-700; Supp. Add. 29-30.) During these brief interviews with Ms. Brantley, neither Ms. Akins and Mr. Moss were told what information would be helpful to Mr. Reams' defense; nor did they feel their short meeting was sufficient to explain what they knew about Mr. Reams. (Ab. 768-69, 798; Supp. Add. 29.)

These limited interactions were entirely insufficient for trial counsel to uncover the multi-generational cycle of mental illness, violence, and abuse in

Respondent's Exhibit F2

Mr. Reams' family—to which Mr. Reams was a victim and a witness. (Ab. 411-15, 420-34, 436-40, 454-58, 474-79, 488-92, 510-17, 787-97; Supp. Add. 24-30.) Nor did these limited interactions reveal the extensive mental health history of Mr. Reams' mother—a history of hospitalizations for her mental illness and counseling for her abuse of Mr. Reams—documented in records that trial counsel made no effort to secure. (Supp. Add. 31-54, 59-60.) Trial counsel's lack of interaction with Mr. Moss resulted in the failure to obtain valuable testimony from a non-family member about the devastating impact that Mr. Reams' childhood abuse had on him and the link between that abuse and Mr. Reams' involvement in illegal activity. (Ab. 739-41.) Mr. Moss also had knowledge about how Mr. Reams benefited from the counseling, as well as the structured and stable environment, at the Sears Youth Center, and how the center "dropped the ball" on him by not providing aftercare services upon his release. (Ab. 740-47, 765-68.)

In addition to some school records, the only documents that trial counsel collected were Mr. Reams' records from the Sears Youth Center, which he unreasonably admitted into evidence without presenting any testimony to explain their contents to the jury. (Ab. 1361-63.) Trial counsel also failed to retain an expert to evaluate Mr. Reams' mental health in the context of his childhood trauma and to explain to the jury how this trauma stunted his development and functioning.

This Court, as well as the United States Supreme Court, has firmly held that

counsel is constitutionally required to conduct an adequate mitigation investigation during the penalty phase of a capital case. *See, e.g.*, *Sanford*, 342 Ark. at 33-34, 25 S.W.3d at 421-22 (citing with approval 1980 ABA Standard for Criminal Justice that "[i]nvestigation is essential" to "raising mitigation factors" at sentencing in finding counsel ineffective for failure to investigate); *Wiggins*, 539 U.S. at 524 (finding counsel ineffective for falling short of 1989 ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, which "provide that investigations into mitigating evidence 'should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor'") (citation omitted). By failing to investigate all the available mitigation evidence, vital information was not presented to the jury regarding Mr. Reams' abuse, neglect, intellectual disability, and his family's history of violence, abuse, and mental illness. Thus, as in *Wiggins,* trial counsel was constitutionally deficient for "abandon[ing] [his] investigation of [Mr. Reams'] background after having acquired only rudimentary knowledge of his history from a narrow set of sources." 539 U.S. at 524; *see also Porter v. McCollum*, 558 U.S. 30, 40 (2009) (finding counsel deficient for "ignor[ing] pertinent avenues for investigation of which he should have been aware").

Had trial counsel conducted an adequate mitigation investigation, he would have unearthed the following evidence in support of a life verdict:

(a)     Family History of Mental Illness, Abuse, and Neglect

Ms. Whiteside was 15 years old when Mr. Reams was born, and has been repeatedly hospitalized for depression, anxiety, and/or auditory hallucinations beginning just prior to his birth.  (Ab. 442, 500, 539; 791-93; Supp. Add. 24-27, 31-54.)  She has been diagnosed with "major depression, recurrent, severe, with psychotic features" (Supp. Add. 55-56), for which she currently receives treatment (Ab. 472-73; Supp. Add. 57-58).  Several family members also have a history of mental illness.  (Supp. Add. 45 (mother); Ab. 486-88, 547 (brother); Ab. 487, 505 (sister); Ab. 504-05 (nephew).)

Ms. Whiteside was regularly beaten by her father, and she witnessed her father's violent beatings of her mother and her siblings.  (Ab. 411-14, 424-26, 429.) These beatings ended when her mother almost fatally stabbed her father, at which time he left their home.  (Ab. 422-23.)  While living with her mother, Ms. Whiteside was also raped repeatedly by her mother's boyfriend.  (Ab. 488-91, 793-94.) Mr. Reams was an infant when these rapes occurred.  (*Id.*)  Once, Ms. Whiteside tried to escape with Mr. Reams, only to be taken back to her mother's home by her mother and her boyfriend.  (Ab. 490-91.)

The domestic violence that Ms. Whiteside witnessed as a child was repeated in her marriage.  Mr. Reams' biological father, Dwight Revada, had very little contact with him.  (Ab. 518-20; Supp. Add. 24-25.)  Ms. Whiteside married Mickey

Whiteside when Mr. Reams was approximately eight years old, and early into their marriage, they began having weekly "knock-out/drag-out fights." (Ab. 453-57, 795, 929-30; Supp. Add. 25, 29.) During these violent altercations, they would hit and throw things at each other, sometimes using knives. (Ab. 454-56; Supp. Add. 25.)

> (b)    Mr. Reams' Childhood Abuse and Neglect

Ms. Whiteside's mental illness made her violent. (Ab. 477-79.) When Mr. Reams was an infant, Ms. Whiteside tried to choke him multiple times. (Ab. 792, 888.) Ms. Whiteside also used a knife to stab a bed where Mr. Reams was lying when he was only six or seven months old. (Ab. 888.) She began abusing Mr. Reams when he was three or four years old "with belt[s], switch[es], and extension cord[s]." (Ab. 429, 433; Supp. Add. 25.) Ms. Whiteside hit Mr. Reams at least twice a week, leaving whelps on his legs, arms, back, and chest. (Ab. 429-30, 795; Supp. Add. 25.) When he was ten or eleven years old, the school reported Ms. Whiteside to the police and children's services for hitting him in the face with a belt. (Ab. 510-13; Supp. Add. 59-60.) This physical and emotional abuse continued until Mr. Reams left his mother's home at age 15, at which time Ms. Whiteside gave up legal custody of him. (Ab. 573-74, 927; Supp. Add. 61-62.)

When he was 12 years old, Mr. Reams and his cousin visited an arcade, but did not return home after dark as expected. (Ab. 494.) His mother looked for him and called the police, but Mr. Reams did not come home until 11 p.m. (Ab. 494-

95.)  When he knocked on the door, he was completely naked and had tape marks on the sides of his mouth and around his wrists and ankles.  (Ab. 496-97; Supp. Add. 26, 29.)  Two men had abducted Mr. Reams and raped him in the woods.  (Ab. 497-98; Supp. Add. 26, 29.)  Even though Mr. Reams appeared frantic and scared after the rape, Ms. Whiteside did not seek counseling for him.  (Ab. 499.)

In addition to the physical abuse, both Mr. Reams' mother and step-father abandoned and neglected him.  When Ms. Whiteside went back to high school, she left Mr. Reams as a toddler with her grandmother, who had been institutionalized for mental illness.  (Ab. 480, 484.)  Around that time, Mr. Reams was rushed to the hospital after ingesting poison.  (Supp. Add. 25.)  Later in his childhood, Mr. Reams was hit by a car while riding his bicycle.  (Ab. 437-38.)  His mother did not take him to a doctor after the accident, even after he reported back pain.  (Ab. 439-40.)  Ms. Whiteside acknowledged that her involvement in Mr. Reams' education was "very pitiful" given her minimal contact with his teachers.  (Ab. 460-61; Supp. Add. 26.)  Mr. Whiteside was never a father to Mr. Reams (Ab. 415) and did not show him any affection (Supp. Add. 28-29).   When his wife was not at home, Mr. Whiteside would not let Mr. Reams in the house to eat, sleep, or change clothes.  (Ab. 796.)

(c)     Mr. Reams' Mental Health

Dr. David Lisak, an expert in clinical psychology, testified about the effects

of long-term exposure to trauma and neglect on Mr. Reams. He explained that chronic abuse of a child hinders the development of basic adult functions, such as impulse control, decision making, and maturity. (Ab. 919-21, 923.) This caused Mr. Reams to function well below the level of a normal 18-year-old at the time of his arrest. (Ab. 927-28, 932.) Dr. Lisak testified that a properly prepared expert would have explained to the sentencing jury how Mr. Reams' intellectual disability interacted with the psychological consequences of the "savage" beatings, neglect, and abandonment from Mr. Reams' mother. (Ab. 926-32.)

> ### 2. Mr. Reams Was Prejudiced by Trial Counsel's Failure to Adequately Investigate Available Mitigation Evidence of His Traumatic Life and Family History.

The extensive evidence of violence, mental illness, abuse, and neglect that was presented in the Rule 37 hearing stands in stark contrast to the scarce evidence that was actually presented by trial counsel to the sentencing jury. (*Compare, e.g.*, six abstract pages of Ms. Whiteside's trial testimony (Ab. 1390-96), *with* 172 abstract pages of her Rule 37 testimony (Ab. 411-582).) Defense witnesses during the penalty phase of trial were limited to David Nanak, a state-employed, licensed psychologist at the Southeast Arkansas Mental Health Center, who evaluated Mr. Reams in 1993; Rev. George McDaniel, the pastor of a church that Mr. Reams attended when he lived in Poplar Bluff, Missouri; Beatrice Reams Whiteside, Mr. Reams' mother; and Amelia Akins, Mr. Reams' aunt. Together, the only

information these witnesses provided to the sentencing jury was: that a psychological evaluation revealed that Mr. Reams had a mild intellectual disability with an IQ score of 66 (Ab. 1377-84); that he served as an usher in church, was respectful to the pastor, and had some artistic ability (Ab. 1386-87, 1392); that he was loved by his mother, was easily influenced by others, went to live in Missouri with his aunt, improved after going to a youth facility for burglary charges, was a good older brother, was not violent at home, and was taken advantage of because of his small size (Ab. 1386-95); and that he had a girlfriend (Ab. 1398-99). Trial counsel's entire cursory presentation during the penalty phase comprised only 23 abstract pages. (Ab. 1377-1400.)

The sentencing jury heard nothing about Mr. Reams' horrific childhood from Ms. Whiteside or Ms. Akins, who were neither asked nor prepared to share this type of private and traumatic information about their family. (Ab. 532-34; 798-99.) Without the benefit of Mr. Moss' testimony, the jury did not know the context of what may otherwise be considered negative evidence in the Sears Youth Center records that trial counsel admitted wholesale without explanation. (Ab. 750-60.) The jury also did not hear Mr. Moss describe how Mr. Reams' intellectual disability manifested in his schoolwork and interactions with peers. (Ab. 748-50.) And Mr. Moss was not able to express his own personal regret about the failure to provide Mr. Reams with aftercare services, which Mr. Moss believed would have sustained

Respondent's Exhibit F2

the progress that Mr. Reams had been making at the center.  (Ab. 750-60, 744-47.)

The prosecution exploited the absence of this crucial mitigation testimony by arguing to the jury that the Sears Youth Center records proved that Mr. Reams "disregarded rules," was "defiant" and "manipulative," "steals for immediate gratification for himself and his peer," and "has been a rolling hell on wheels ever since he's been able to get out and get about."  (Ab. 1407-08.)  The prosecution further argued that, despite Mr. Reams' low IQ, "he gets out there and he functions in society.  He goes where he wants to.  He does what he wants to.  He's gone to school.  You've got his records.  And you can judge whether or not you think that this [sic] an excuse for this crime that he has committed."  (Ab. 1406-07.)

This Court's decision in *Sanford*, 342 Ark. 22, 25 S.W.3d 414, bears a striking similarity to the instant case.  As in Mr. Reams' case, counsel in *Sanford* presented general mitigation evidence through the defendant's family (his parents) that he "was young, had been a good son, had a mental problem, and his life was worth saving" to counter the prosecution's portrait of the defendant as "a remorseless, heartless, cold-blooded person."   *Id.* at 32-33, 25 S.W.3d at 421.   In these circumstances, this Court ruled that counsel was ineffective for failing to investigate and present available mitigating evidence. *Id.* at 34, 25 S.W.3d at 422; *see also Wiggins*, 539 U.S. at 537 ("Had the jury been able to place petitioner's excruciating life history on the mitigating side of the scale, there is a reasonable probability that

at least one juror would have struck a different balance."); *Rompilla v. Beard*, 545 U.S. 374, 393 (2005); *Simmons v. Luebbers*, 299 F.3d 929, 939 (8th Cir. 2002).

Trial counsel's failure to investigate and present mitigation evidence of Mr. Reams' traumatic life and family history, as well as his failure to investigate and present mitigation evidence of Mr. Reams not being the shooter, separately and cumulatively establish prejudice, further supporting the grant of sentencing relief. However, should this Court not affirm the grant of sentencing relief, it must remand this case to the Circuit Court to address Mr. Reams' claim that trial counsel was ineffective for failing to investigate and present available mitigation evidence about his traumatic life and family history during the penalty phase of his trial.

## II.   Mr. Reams' Intellectual Disability Renders Him Ineligible for the Death Penalty.

This Court "will not reverse a circuit court's decision granting or denying postconviction relief unless it is clearly erroneous." *Sparkman v. State*, 373 Ark. 45, 48, 281 S.W.3d 277, 280 (2008).  However, where the trial court's decision is based on issues of law without factual findings, such as the interpretation of a statute, this Court has reviewed the ruling de novo. *See, e.g.*, *Echols v. State*, 2010 Ark. 417, at 6, 373 S.W.3d 892, 897 (2010) (citation omitted).

The Circuit Court's order denied Mr. Reams' intellectual disability claim as part of its ruling on the guilt/innocence phase.  (Add. 521.)  However, Mr. Reams did not raise an intellectual disability challenge in the guilt/innocence phase of his

trial, but instead argues that he is ineligible for the death penalty pursuant to *Atkins v. Virginia*, 536 U.S. 304, 321 (2004).  The Circuit Court's order, therefore, never ruled on this specific claim.  The Circuit Court's order is also clearly erroneous in suggesting that claims for sentencing relief based on intellectual disability are not cognizable under Rule 37.  Thus, if this Court does not affirm the Circuit Court's grant of sentencing relief, it should remand this case to the Circuit Court with specific direction to rule on the cognizability of the intellectual disability claim as to *sentencing* relief under Rule 37 and/or to fully adjudicate the merits of this claim.

Mr. Reams' trial counsel presented unrebutted evidence that Mr. Reams had an intellectual disability, including testimony from a court-appointed psychologist that Mr. Reams had an IQ of 66.  (Ab. 1377-84; Supp. Add. 1-10.)  Although trial counsel did not raise an Eighth Amendment challenge, he argued that Mr. Reams was entitled to a jury instruction under Arkansas Code Ann. § 5-4-618(b) (1993) ("Act 420"), which forbids executing a defendant with "mental retardation" at the time of the crime.  The trial court rejected the motion, ruling that (1) Act 420 did not apply because it went into effect two months after the crime, and (2) Mr. Reams did not fall within the "statutory cut-off of 65" because his IQ score was 66.[2]  (Ab. 1356-

---

[2] Act 420 did not have a "statutory cut-off of 65," but rather a rebuttable presumption of "mental retardation" for defendants with a score of 65 or lower.  *See*

57.)  Shortly thereafter, the trial court sentenced Mr. Reams to death.

Mr. Reams argued in his supplemental Rule 37 petition that the trial record conclusively established his intellectual disability and, by extension, the unconstitutionality of his death sentence.  (Add. 97-104.)  The Circuit Court agreed that the claim was "cognizable under Rule 37" and allowed it to proceed.  (Supp. Ab. 122; Supp. Add. 65.)  At the Rule 37 hearing, the State made no effort to challenge the trial evidence of Mr. Reams' intellectual disability and offered no evidence to the contrary.  But the State reargued the cognizability issue, citing to *Anderson v. State*, 2011 Ark. 488, 385 S.W.3d 783, in support.  (Add. 448 n.8.)  The State did not dispute Mr. Reams' intellectual disability or the United States Constitution's prohibition against executing individuals with intellectual disabilities.

The Circuit Court's order adopted the State's cognizability argument in a footnote without explanation in the guilt/innocence portion of its ruling: "The petitioner's mental-retardation claim is not cognizable in these proceedings.  *See generally Anderson*."  (Add. 521 n.4.)  The Circuit Court's decision ruled on this issue as a guilt/innocence phase claim, not a penalty phase claim.  The Circuit

---

Ark. Code Ann. § 5-4-618(a) (1993).  The United States Supreme Court has prohibited "statutory cut-offs" that limit intellectual disability to an IQ of 70 or below.  *See Hall v. Florida*, 134 S. Ct. 1986, 2001 (2014).

Respondent's Exhibit F2

Court's ruling was also clearly erroneous because it relies on an inaccurate interpretation of *Anderson*, which does not, in fact, address whether intellectual disability claims are cognizable under Rule 37, but instead concerned an unrelated question about remands.

In *Anderson*, the petitioner filed a Rule 37 petition in the Circuit Court, which was denied. *Id.* at 2; 385 S.W.3d at 786. After appealing the denial of Rule 37 relief to this Court, the petitioner sought a remand back to the Circuit Court to reconsider the intellectual disability issue under Rule 37. *Id.* This Court denied petitioner's request, and he reargued the request for a remand for a "full factual and legal development of the retardation issue" as part of his overall appeal. *See id.* at 2, 6, 9, 385 S.W.3d at 786, 788-89. The *Anderson* case, therefore, presented the issue of whether a petitioner is entitled to have this Court "recall a mandate so that [the] petitioner whose initial postconviction proceedings were procedurally sound may file a subsequent petition for relief." *Id.* at 10, 385 S.W.3d at 790.

This Court answered that legal question by denying petitioner's request and ruling that petitioner "may file a new petition" when the "first postconviction proceedings were procedurally flawed." *Id.* That ruling in no way bars a petitioner, like Mr. Reams, from raising an intellectual disability claim in the first instance under Rule 37. Indeed, although the petitioner in *Anderson* sought sentencing relief for his intellectual disability under Rule 37, the Court at no time ruled that the claim

was categorically not cognizable.  The Circuit Court's (and State's) reliance on *Anderson* is, therefore, clearly erroneous.

Furthermore, the Circuit Court should not have even considered the State's cognizability arguments because, as Mr. Reams argued in his appeal brief, the State had previously waived all such procedural defenses.  (Arg. 38-40.)  Under Rule 37.2(f) of the Arkansas Rules of Criminal Procedure, the deadline for the State's response to a Rule 37 petition is 20 days after the service of the petition. Where the State fails to file a timely answer, the Court may strike the response, and—at a minimum—should find any procedural defenses waived.  *See Gunter v. Liberty Bank of Arkansas*, 92 Ark. App. 163, 164-65, 211 S.W.3d 579, 581-82 (2005) (holding that defendant in civil case that filed untimely answer could not raise defenses not in common with co-defendant who filed a timely response); *see also State v. Harrison*, 2012 Ark. 198, at 1, 404 S.W.3d 830, 832 (recognizing that Rule 37 proceedings are civil in nature and applying appellate rules of civil procedure).

In this case, Mr. Reams filed his petition for relief on January 31, 1997.  (Add. 22-32.)  The State did not respond until March 28, 1997—more than a month after the 20-day requirement.  (Add 33-36.)  Thus, as set forth in Mr. Reams' appeal brief, the State has defaulted any argument that Mr. Reams' claims, including his intellectual disability claim, are not cognizable.  (Arg. 38-40.)  Excusing the State's failure to comply with its procedural obligations, while penalizing Mr. Reams for an

alleged procedural error, would be patently unfair.  *See, e.g.*, *Jones v. Norman*, 633 F.3d 661, 666 (8th Cir. 2011) (refusing to find petitioner's claim procedurally defaulted where the government failed to timely raise the defense).

If this Court excuses the State's procedural failure, Mr. Reams' intellectual disability claim is still cognizable because he could not have brought this Eighth Amendment challenge at his trial or argued it on appeal.  While Rule 37 does not provide a remedy for claims that could have been raised at trial or argued on direct appeal, Mr. Reams Eighth Amendment claim falls in neither category.  *State v. Rainer*, 2014 Ark. 306, at 12, 440 S.W.3d 315, 322; *Davis v. State*, 345 Ark. 161, 169, 44 S.W.3d 726, 730 (2001).  In 1989, the United States Supreme Court made clear that the execution of a person with an intellectual disability was constitutional under the Eighth Amendment, *see Penry v. Lynaugh*, 492 U.S. 302, 335 (1989), thus precluding Mr. Reams from obtaining sentencing relief under the Eighth Amendment at the time of his trial or direct appeal.  Because a subsequent decision by the United States Supreme Court categorically bars the execution of people with an intellectual disability, *see Atkins*, 536 U.S. at 321, Mr. Reams is entitled to raise this claim in the first instance.

Mr. Reams is also entitled to relief under Rule 37 because his intellectual disability claim is cognizable as a fundamental error.  As indicated above, Rule 37 generally prohibits the consideration of claims that could have been raised at trial or

on direct appeal. *Rainer*, 2014 Ark. 306, at 12, 440 S.W.3d at 322. However, an exception applies when errors are so fundamental as to "render the judgment of conviction void and subject to collateral attack." *Id.* It is beyond dispute that the execution of a person with an intellectual disability is prohibited under federal and state law. *Atkins*, 536 U.S. at 320-21; Ark. Code Ann. § 5-4-618(b). Thus, a death sentence for an individual with an undisputed and undisputable intellectual disability should be 'render[ed] . . . void and subject to collateral attack." *Rainer*, 2014 Ark. 306, at 12, 440 S.W.3d at 322. Intellectual disability claims further resemble "fundamental" errors because they are not subject to harmless-error analysis. *See Sasser v. State*, 338 Ark. 375, 384, 993 S.W.2d 901, 906 (1999) (explaining that fundamental or structural errors are not subject to harmless-error analysis).

This Court's treatment of double jeopardy claims is instructive. Just as a double jeopardy violation is cognizable under Rule 37 because it "'renders the judgment a complete nullity,'" *Rowbottom v. State*, 341 Ark. 33, 36, 13 S.W.3d 904, 906 (2000) (citation omitted), so too is an *Atkins* violation. In both cases, the legal problem is the same: the United States Constitution has determined that a particular defendant is categorically ineligible for a punishment. Just as a court has no authority to punish a defendant twice for the same offense, the jury has no authority to sentence a person with an intellectual disability to death. In both instances, the error renders the proceeding at issue a nullity, and the error is fundamental.

## CONCLUSION

Mr. Reams unquestionably received ineffective assistance of counsel when his trial counsel unreasonably failed to investigate and present to the sentencing jury available mitigation evidence from two witnesses, Phillip Curry and Alford Goodwin, that he was not the person who shot and killed Gary Turner. Mr. Reams was prejudiced by trial counsel's error because there is a reasonable probability that the testimony of either witness would have caused at least one juror to render a life verdict. Accordingly, the Circuit Court's grant of sentencing relief was not clearly erroneous, and Mr. Reams respectfully requests that this Court to affirm that ruling.

In the event that this Court rules that the Circuit Court's ruling was clearly erroneous, the additional and substantial mitigation evidence of Mr. Reams' deeply abusive and traumatic childhood and his family's cycle of violence and mental illness—which trial counsel unreasonably did not investigate and present to the sentencing jury and which prejudiced Mr. Reams at trial—provides further grounds for sentencing relief. In the alternative, this Court should remand this matter to the Circuit Court to address Mr. Reams' claim of ineffective assistance of counsel for failure to investigate and present available mitigation evidence of his traumatic life and family history and his claim of intellectual disability.

Dated:  June 8, 2018

Respectfully submitted,


  /s/ Jin Hee Lee
Jin Hee Lee*
NAACP Legal Defense &
  Educational Fund, Inc.
40 Rector Street, 5th Floor
New York, NY  10006
(212) 965-2200

Christopher Kemmitt*
Ajmel Quereshi*
NAACP Legal Defense &
  Educational Fund, Inc.
1444 I Street NW
Washington, DC 20005
(202) 682-1300

George H. Kendall*
Corrine Irish*
Squire Patton Boggs (US) LLP
30 Rockefeller Plaza, 23rd Floor
New York, NY  10112
(212) 872-9800

John W. Walker
John W. Walker, P.A.
1723 Broadway
Little Rock, AR  72206
(501) 374-3758
Ark. Bar No. 64046

*Counsel for Appellant/Cross-Appellee
Kenneth Reams*

*Admitted *Pro Hac Vice*

## CERTIFICATE OF SERVICE

I certify that on this 8th day of June 2018, I electronically filed the foregoing **CROSS-APPELLEE'S SUPPLEMENTAL ABSTRACT, BRIEF, AND SUPPLEMENTAL ADDENDUM** with the Clerk of the Arkansas Supreme Court by using the Arkansas Judiciary Electronic filing system. I further certify that a copy has been sent via overnight mail to counsel for Cross-Appellant to:

Kent G. Holt
David R. Raupp
Senior Assistant Attorney General
323 Center Street, Suite 200
Little Rock, Arkansas 72201


/s/ Jin Hee Lee
Jin Hee Lee

# SUPPLEMENTAL ADDENDUM
# TABLE OF CONTENTS

**PAGE(S)**

Petitioner's Exhibit 17 (Rule 37): Letter from Southeast Arkansas Mental Health Center to Judge Fred Davis, dated September 28, 1993, and enclosed Psychological Evaluation, Court-Ordered Social History, and Psychiatric Evaluation, all dated September 27, 1993 (R. 2739) ............................................ Supp. Add. 1

Petitioner's Exhibit 31 (Rule 37): Affidavit/Declaration of Russell Stetler Pursuant to 28 U.S.C. § 1746 and A.C.A. § 5-53-102, dated July 28, 2007 (R. 3100) ............................................ Supp. Add. 11

Petitioner's Exhibit 32 (Rule 37): Affidavit of Beatrice Reams Whiteside, dated December 14, 2005 (R. 3114).............................. Supp. Add. 24

Petitioner's Exhibit 33 (Rule 37): Affidavit of Amelia Reams Atkins, dated December 14, 2005 (R. 3119) ................................... Supp. Add. 28

Excerpts of Petitioner's Exhibit 37 (Rule 37): Medical Records of Beatrice Reams, Kenosha Memorial Hospital (R. 3177, 3218-21, 3241-43, 3253-54, 3268, 3288-90, 3292-93, 3307, 3310-13, 3351, 3359-60) ................................................................ Supp. Add. 31

Excerpt of Petitioner's Exhibit 38 (Rule 37): Medical Records of Beatrice Whiteside, Jefferson Regional Memorial Center (R. 3408-09)........................................................................................ Supp. Add. 55

Excerpts of Petitioner's Exhibit 39 (Rule 37): Medical Records of Beatrice Whiteside, Southeast Arkansas Behavioral Healthcare System, Inc. (R. 3510-11, 3589-90) .............................. Supp. Add. 57

Petitioner's Exhibit 42 (Rule 37): Order of Transfer of Custody, *Arkansas v. Reams*, No. J-91-221, Chancery Court of St. Francis County, Arkansas, Juvenile Division, filed January 24, 1991 (R. 3601) ....................................................................... Supp. Add. 61

Respondent's Exhibit F2

Petitioner's Exhibit 48 (Rule 37): Affidavit/Declaration of Karen
    Brantley Pursuant to 28 U.S.C. § 1746 and A.C.A. § 5-53-102,
    dated January 23, 2007 (R. 4361) .................................................... Supp. Add. 63


Order [granting evidentiary hearing; ruling on whether
    Petitioner's claims were cognizable under Rule 37; and
    granting in part, and denying in part, Petitioner's discovery
    requests], filed on May 31, 2007 (R. P12) ...................................... Supp. Add. 64

Respondent's Exhibit F2





EXHIBIT
Ret #A

# SOUTHEAST ARKANSAS

# MENTAL HEALTH CENTER, INC.

2500 Rike Drive
P.O. Box 1019
Pine Bluff, AR 71613
501/534-1834
800/272-2008
FAX 501/534-5798

CLARENCE W. PERKINS
*Administrator*

**BOARD OF DIRECTORS**
MRS. ANN SHELTON
*President*
MRS. JANELLE POWELL
*Vice-President*
MRS. M.C. ARRANT
*Secretary*
MRS. NOVELLE B. CLARK
*Treasurer*
MRS. EDWARD E. BROWN
STEVE BROWN
R. NOEL F. "BUD" BRYANT
MRS. FRANCES HARPER
MRS. JAMES R. HOPSON
MRS. GEORGE HOWARD, JR.
J.B. JOHNSON, ED.D.
JUDGE BERLIN JONES
JUDGE JACK JONES
MRS. CAROL MARTIN
JOHN McCLANAHAN, PH.D.
RICHARD RILEY
THOMAS E. TOWNSEND, M.D.

WILLIAM JOE JAMES, M.D.
*Medical Director*

I.L. CARLTON, M.D.
*Assistant Medical Director*

LLOYD YOUNG, M.D.
*Child/Adolescent Psychiatrist*

September 28, 1993

Judge Fred Davis
Jefferson County Circuit Court
Jefferson County Courthouse
Barraque at Main Streets
Pine Bluff, Arkansas   71601

Re:  State of Arkansas
     vs. Kenneth Reams
     No. CR-93-298-3; CR-93-299-3;
     CR-93-300-2; CR-93-301-3

Dear Judge Davis:

As directed by the Order entered in the above-captioned matter, Kenneth Reams was seen for evaluation at the Southeast Arkansas Mental Health Center to determine competency to stand trial.

Enclosed are the individual evaluation reports prepared by our staff after interviews conducted with Mr. Reams.  These reports include a Social History, Psychological Evaluation, and Psychiatric Evaluation.

If we may be of further assistance to the Court in this matter, please let us know.

Sincerely,

Clarence Perkins
Clarence W. Perkins
ADMINISTRATOR

CWP:kh - encs.

cc: w/encs.

Prosecuting Attorney

Mr. Maxie Kizer
Attorney at Law

Mr. Billy Burris
Division of Mental Health Services

**THIS DOCUMENT IS FILED IN OPEN COURT**

Filed this 20 day of Aug 2007.

Thomas E. Brown
**Circuit Judge**

THIS AGENCY IS COMMITTED TO THE NON-DISCRIMINATORY DELIVERY OF SERVICES AND IS AN AFFIRMATIVE ACTION EQUAL OPPORTUNITY EMPLOYER

432222

PSYCHOLOGICAL EVALUATION

NAME:   KENNETH REAMS     #834222
DOT:    9/27/93
DOB:    12/21/74
CA:     18-9
DAN:ls  5830P

REASON FOR REFERRAL:  This 18-year-old black male is referred
through Jefferson County Circuit Court for evaluation to aid in
determining competency.

TESTS ADMINISTERED:

WECHSLER ADULT INTELLIGENCE SCALE-REVISED (WAIS-R)
WIDE RANGE ACHIEVEMENT TEST-REVISED (WRAT-R)
HOUSE-TREE-PERSON (HTP)
BENDER VISUAL-MOTOR GESTALT TEST
BRIEF INTERVIEW

Mr. Reams' testing began at 10:15 a.m. and ended at 12:00 noon.

NOTES AND OBSERVATIONS:  Mr. Reams entered the testing situation in
a reserved manner.  Without speaking he seated himself in a chair in
the examiner's office.  He easily established and maintained good eye
contact with the examiner, however, he was not verbally spontaneous.
His verbalizations were rather soft and shallow.  Mr. Reams was alert
and oriented to time, date, place and person.  His responses seemed
slow and guarded.  His speech was directed and not pressured.  At
the start of the session, he was noted to be involved with some
inappropriate laughter, but as the session progressed and he became
more involved in tasks presented, the laughter ceased until there
was a pause in the testing.

Mr. Reams states that he completed the 8th grade and was put out of
school in the 9th grade for fighting when he hit a principal.  He
stated that prior to his arrest, he was living with different friends
for about the past two years.  He stated that he last attended
school in Forrest City.  He added that is where his family is, but
he moved to Pine Bluff about two years ago.

When asked about the current charges against him, he stated that he
is being charged with murder.  He states that this is not the first
time that he has been arrested, stating that he was arrested
previously for stealing.  He stated in 1991 he was in a youthful
offenders camp for stealing.  He states that he has never held a
full-time job and does not have a driver's license, but can drive a
car a little bit.  When I asked him again about the charges against
him, he started crying, stating that he is really in trouble, that
he is only 18 and he is going to spend the rest of his life on death
row.  He stated that he did not do it, but that it was his gun.

PAGE 2
PSYCHOLOGICAL EVALUATION
KENNETH REAMS

TEST RESULTS AND INTERPRETATION: Mr. Reams attained a WAIS-R Full Scale IQ of 66, which falls into the Mild range of Mental Retardation, according to the Wechsler Classification System. He attained a Verbal IQ of 67 and a Performance IQ of 67, with both scores falling in the same classification range and no significant discrepancy noted among scores.

Mr. Reams, who claims to have an 8th grade education, attained the following grade equivalent and standard scores on the WRAT-R:

|  |  |  |
|---|---|---|
| Reading | less than 3 | 57 |
| Arithmetic | 3E | 54 |

As noted, both grade equivalents are significantly behind his stated 8th grade educational level. Mr. Reams' performance on the WRAT-R would support mild mental retardation.

Mr. Reams completed his Bender-Gestalt in 2 minutes 24 seconds. His handling of this task suggests an individual who has problems with impulse control and low frustration tolerance.

Mr. Reams completed his HTP drawings in a rather free and easy manner. His handling of this task suggests an emotionally immature individual with a poor self-image. Feelings of instability and ineffectiveness are noted. He may tend to take more of a self-centered approach to life. There appears to be some underlying anger and frustration that he could act out in an explosive manner.

In general, Mr. Reams currently tested into the Mild range of Mental Retardation, according to the Wechsler Classification System. His academic achievement level tested out at or below the 3rd grade level. He did demonstrate some visual-motor coordination problems during this testing.

Behaviorally, Mr. Reams is seen as an emotionally immature individual, who has problems with impulse control and low frustration tolerance. There is some underlying anger and frustration which may increase his acting out potential in an explosive manner.

Current psychological testing did not suggest the presence of any active psychosis or severe psychopathology at this time. Common sense reasoning and judgement appear to be limited, however, he was able to express the difference between right and wrong, and he did express some remorse over the situation he is currently involved in.

PAGE 3
PSYCHOLOGICAL EVALUATION
KENNETH REAMS


Current testing suggests that Mr. Reams could be able to actively
participate in his own defense.  It is recommended that
communications with Mr. Reams be of a verbal nature as his reading
is quite limited.  It is also recommended that Mr. Reams be
questioned about his understanding to make sure that he does
understand what is being said to him, and that he be allowed to
completely express himself so he does not become confused.


*David A. Nanak*

David A. Nanak, M.A.                         Patrick Caffey, Ph.D.
PSYCHOLOGICAL EXAMINER                       CONSULTING PSYCHOLOGIST

COURT-ORDERED SOCIAL HISTORY

KENNETH REAMS      #834222
9/27/93
AJ:ls   14264


Time:  9:00 a.m. to 10:00 a.m.


IDENTIFYING INFORMATION:  Mr. Reams is an 18-year-old, single black
male, currently incarcerated in the city jail locally.  He is charged
with Capital Murder I.

PRESENTING PROBLEMS:  Mr. Reams stated that he was walking several
weeks ago with two friends, whose ages approximate his own,
identified as "Butterball and Jermaine."  He indicated they were on
the way to "get some dope", when apparently the friend identified as
Butterball saw a pickup truck, he thought he identified as being one
of his friends.  He stated that they were all smoking cigars, but did
not have any matches, so he approached the truck to ask for a light.
He stated the next thing he heard was a "shot."  Apparently,
Butterball and Jermaine left the scene.  Mr. Reams stated that he
approached the truck and saw "this white guy shot."  He stated that
he assumed that the man was dead.  The truck apparently continued to
move so he entered the vehicle with the intent of bringing it to a
halt.  He decided to leave the truck and noticed that the two friends
had left the scene and he could not locate them.  He stated that he
left the area and was arrested a short time later "down the street
from my house."

Mr. Reams stated that the gun used in this homicide belonged to him,
but he had "loan it to Butterball" a few days earlier.  He denies
emphatically that he shot this victim.  He stated that at the time
of the incident he was on probation for burglary, but could not
recall with any accuracy circumstances involved in this alleged
crime.  He was arrested and allegedly beat up by the detectives, whom
he stated tied him up with a rope, slapped him around, picked him up
by his neck, and threatened to have him killed by the Klu Klux Klan.
Mr. Reams stated that he signed a confession based on harassment and
coercion by the arresting officers.

FAMILY BACKGROUND:  Mr. Reams is a very poor historian, and I was
unable to decipher accurate information with regard to his
background.  He answered many questions with "I just don't know."

Mr. Reams stated that he raised himself from a child and does
remember living from time to time with grandparents and an aunt.  He
stated that he never knew his father; with regard to his mother, he
merely stated, "I miss her."  He stated that he does not remember
his birth date.


## CONFIDENTIAL

PAGE 2
COURT-ORDERED SOCIAL HISTORY
KENNETH REAMS

He lists the last school attended in Forrest City and stated that he
thinks he completed the 9th grade, although he was expelled several
times for behavioral problems.  He claims that he was ridiculed by
his peers in school and was referred to as being "loco."  Hence, he
adopted the name "Loco G."  He stated that he attended special
education and flunked out of most courses that were offered.  He
stated that he was also referred to as "Super Stupid."

Mr. Reams stated that he has two younger brothers, but their
whereabouts are unknown.  He claims to have resided in Pine Bluff
five months prior to his arrest, having visited an aunt and uncle.
He claims he had been "running from the police."  He claims that he
has not seen his mother for several years.  He states that he has
hitchiked to the following states: Illinois, Iowa, Missouri and
Wisconsin.

MARITAL HISTORY:  Mr. Reams has never married, nor has he fathered
any children, by his own admission.  He does state that he has a
girlfriend but does not know her whereabouts.  He prefers
heterosexual relationships and states that he has never been involved
in a homosexual affair.

EMPLOYMENT HISTORY:  His employment history is negative for gainful
employment.  Mr. Reams stated that he has "dealt in drugs."  He
stated that he has earned up to $2,000 per week and "gave most of it
away."  He stated that he was a member of gangs ("The Folks" and
"The Disciples").

MEDICAL HISTORY:  The medical history is negative for
hospitalizations or surgeries.  He claims that he is in good
health.  He has numerous scars and bruises from fights he has been
engaged in since early childhood.  He claims that he had to fight in
order to survive a rather hostile environment.

When asked to identify the day, month and year, he stated, "I hope
it's a good day."  In regard to the month, he states, "I believe
it's the month that Labor Day is in."  He correctly identified the
year as 1993.  He is unable to identify the president, mayor, or any
state representative.

Mr. Reams stated that he hears voices all of the time, "Like
somebody talking to me."  He does appear somewhat preoccupied and
his long-term and short-term memory seems grossly impaired.

PAGE 3
COURT-ORDERED SOCIAL HISTORY
KENNETH REAMS


CURRENT SITUATION:  Mr. Reams has been charged with capital murder.
He was incarcerated along with a friend, whom he accuses of being the
perpetrator of this crime.  Mr. Reams stated that he has never killed
anyone.  He does admit to a rather lengthy antisocial background,
including being on probation for burglary at the time of the alleged
incident.

Mr. Reams is unable to recall with any accuracy important develop-
ments of his childhood.  He apparently was raised by relatives other
than his biological parents.  He states that he does not have a
father and indicates that it has been several years since he has
seen his mother.

He admits to using marijuana and other unidentified pills.  He stated
that he drinks a lot, although he does deny being an alcoholic.  He
stated that he has been arrested on numerous occasions but has never
spent time in the Boys Training School.

Mr. Reams stated that he felt alienated and isolated most of his
life.  He states that people refer to him as "Super Stupid."  He
adopted the name "Loco G" because the children called him that so
much until he thought it was his real name.  He has also been
referred to as "Crazy Kenneth."

TREATMENT AND RECOMMENDATIONS:  Completed reports will be forwarded
to the appropriate components.



Allen Johnson, ACSW, LCSW
PSYCHIATRIC SOCIAL WORKER

PSYCHIATRIC EVALUATION
(CIRCUIT COURT)

NAME:   Kenneth Reams      #834222
DATE:   09-27-93
AS:sbg      7263Y

Time In:   1:00 p.m.
Time Out:  2:30 p.m.

IDENTIFICATION OF PATIENT:  Kenneth Reams is an 18-year-old, single,
black male who has been referred here by Circuit Court
Judge Fred D. Davis, III, for an evaluation to determine whether or
not he lacks the capacity to understand the proceedings against him
and to effectively assist in his own defense.  His charges are:
(1) Burglary and Theft of Property;  (2) Aggravated Robbery; and
(3) Capital Murder.

Mr. Reams presents as a sullen, withdrawn 18-year-old male appearing
his stated age.  His attitude was evasive and eye contact very
erratic and poor.  He was noted to at times giggle inappropriately
and response to questions was very brief and at times monosyllabic.
He appeared rather resistive and somewhat uncooperative with the
interview process ("Why are you asking me these questions?  I've
been through this before.").

PRESENTING PROBLEM:  When questioned as to what his charges were,
his response was, "I'm in jail for murder and I didn't do it.  The
police said that I have robbed a man and killed him.  I am charged
because they beat me.  I don't know how my fingerprints got on the
gun and on the truck that the man was in.  They are going to fry me
for another man's action."

When he was asked to give an account of what had really happened
since he was denying his charges, he was rather vague in his
presentation and had to stop frequently as though he was having
memory lapses.  He states, "All I remember is that this dude and I
were going to buy some weed from the man in the truck, but when I
got there I heard a bang like a gunshot.  It turned out to be my gun
that was fired and I don't know how my fingerprints got on the gun
or on the truck.  Police beat me up and insisted that I had killed
him."

BACKGROUND INFORMATION:  Mr. Reams reports that he was born in
Pine Bluff and that he was the oldest son of his parents.  He
reports having two younger brothers ages 6 and 7 respectively.  He
said he was raised in Forrest City and went to Forest City High
School.  He describes his interpersonal relationships with his
parents as very distant and that they would beat him and there were
frequent arguments and fights over trivial things.  He, himself, was
involved in frequent fights and got involved in drinking alcohol and
doing drugs at an early age.  He would hang around in gangs and

# CONFIDENTIAL

PAGE 2
PSYCHIATRIC EVALUATION
(CIRCUIT COURT)
KENNETH REAMS

would sell drugs.  He would be involved in fights in school and
reportedly punched the principal of his school when he was in the
9th grade and never went back to school again.  There has been a
history of antisocial behavior right from early adolescence.  He
denies any legal charges prior to his present ones.  He denies a
past psychiatric history or being hospitalized for any reason other
than for a head injury many years ago.

FAMILY HISTORY:  He reports that a maternal uncle has a history of
mental illness.  No details are obtainable at this time.

MEDICAL HISTORY:  The patient denies any medical problems.  He is
not on any routine medications and does not have any allergies.

SUBSTANCE ABUSE HISTORY:  Mr. Reams reports drinking alcohol almost
on a daily basis since the age of 16 and smoking marijuana very
often.  He could not quantify the frequency or length of usage.  He
denied other street drugs or intravenous drug abuse.

Mr. Reams has been at the County Jail in Pine Bluff since the
beginning of 1993.

MENTAL STATUS:  This is a somewhat withdrawn, 18-year-old, black
male who appears rather resistive with the examination.  He was
noted to laugh inappropriately, with response to questions being
rather vague and searching as though he has problems with his
memory.  However, he is alert and oriented in all three spheres.
His recent and remote memory are intact.  He was able to recollect
the names of three unrelated objects after ten minutes, though he
had a little difficulty.  His speech was clear, coherent, and of
normal rate, volume, and prosody.  There was no evidence of a
thought disorder.  He was goal directed.  There was no
disorganization, tangentiality, or circumstantiality.  He denied
auditory or visual hallucinations or any perceptual distortions.
His mood was somewhat withdrawn and affect was appropriate to his
mood.  His general fund of knowledge was poor.  Serial 7s were
inaccurate.  Serial 3s were done with great difficulty and were
inaccurate.  He was very concrete with the interpretation of
proverbs, similarities, and differences and seemed to be functioning
in the mildly mentally retarded range.

IMPRESSION:  Though Mr. Reams denies his charges and appears to be
mildly mentally retarded, he does have the mental capacity to
appreciate the criminality of his conduct and to conform his conduct
to the requirements of the law. He knows what the outcome of
murdering a person is.

PAGE 3
PSYCHIATRIC EVALUATION
(CIRCUIT COURT)
KENNETH REAMS

He does understand the nature and purpose of this examination.  He
knows that this has been ordered by the court.  His knowledge of the
judicial system is somewhat limited, but I believe he has the
capacity to understand the proceedings against him and to assist
effectively in his own defense.  Though he denies his legal charges,
his account of what actually transpired was very vague and
unconvincing.  He is able to distinguish right from wrong and what
is legal and unlawful and knows what the outcome of murdering a
person is.

DIAGNOSIS:
           Axis I    -  Alcohol Abuse
                     -  Cocaine Abuse
           Axis II   -  Mild Mental Retardation
                     -  Antisocial Personality
           Axis III-  None
           Axis IV  -  Moderate/Moderate

OPINION:  Though Mr. Reams appears mildly mentally retarded and is
denying his legal charges, he does have the capacity to distinguish
what is legal from criminal and understands what the outcome of
committing a murder is.

--------------------------------------
Ahsan Syed, M.D.
STAFF PSYCHIATRIST

Supp. Add. 010



EXHIBIT
Pet. 31

## AFFIDAVIT/DECLARATION OF RUSSELL STETLER
## PURSUANT TO 28 U.S.C. § 1746 AND A.C.A. § 5-53-102

I, Russell Stetler, declare as follows:

1.    In 2005, I joined the Federal Defender Program to fill a newly created position as National Mitigation Coordinator working with and through the Federal Death Penalty Resource Counsel, Capital Resource Counsel and Habeas Assistance and Training Counsel Projects. This new national position was created in response to the increased demand for high-quality mitigation preparation in death penalty cases following the February 2003 revision of the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases and the U.S. Supreme Court's decision in *Wiggins v. Smith*, 539 U.S. 510 (2003).

2.    For the preceding ten years (1995 to 2005), I served as the Director of Investigation and Mitigation at the New York Capital Defender Office, which was established under New York State's death penalty statute with a mandate to ensure that indigent defendants in capital cases receive effective assistance of counsel. The Capital Defender Office was charged with creating an effective system of capital defense throughout New York State by providing direct representation and offering assistance to private counsel assigned by the courts to represent indigent capital defendants. I supervised a statewide staff of investigators and mitigation specialists, and I consulted with investigators, mitigation specialists, lawyers, and other professionals who were retained or employed by the Capital Defender Office or the private bar in connection with death penalty cases.

3.    From 1990 to 1995, I served as Chief Investigator at the California Appellate Project, a nonprofit law office in San Francisco which coordinated appellate and post-conviction

1

representation of all the prisoners under sentence of death in California. In that capacity, I also supervised an in-house staff and consulted with investigators, mitigation specialists, lawyers, and other professionals outside the office who were retained to assist counsel representing death-sentenced prisoners.

4.     I have investigated all aspects of death-penalty cases since 1980, first working in a private office in California and later in institutional offices. Since 1980, I have regularly attended seminars and conferences relating to the defense of capital cases at trial and on appeal. Most of these conferences were organized and attended by attorneys specializing in capital work.

5.     Since 1990, I have lectured extensively on capital case investigation, particularly the investigation of mitigation evidence. I have been invited to lecture on these subjects not only in New York and California, but in many other death-penalty jurisdictions, including Alabama, Arizona, Arkansas, Colorado, Florida, Georgia, Idaho, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maryland, Missouri, New Jersey, New Mexico, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Utah, and Virginia. I have also lectured on numerous occasions under the auspices of the Administrative Offices of the United States Courts (in connection with federal death-penalty cases and habeas corpus litigation) and at the Fourth Capital Litigation Workshop of the U.S. Army Trial Defense Service.

6.     I have lectured on mitigation investigation at multiple national training conferences sponsored by the following organizations: the NAACP Legal Defense Fund (annual Airlie conferences), the National Legal Aid and Defender Association ("Life in the Balance"), and the National Association of Criminal Defense Lawyers ("Making the Case for Life"). At various times in the past decade and a half, I have served on the planning committees for these

2

national conferences, as well as the Capital Case Defense Seminar sponsored by California

Attorneys for Criminal Justice (CACJ) and the California Public Defenders Association (CPDA).

7.  I have contributed extensively to the California Death Penalty Defense Manual

published by the California defense bar (CACJ and CPDA) since 1993.  This four-volume

reference has a volume devoted to the investigation and presentation of mitigation evidence

which I helped to shape in the 1990s.  In 1999, I published articles on "Mitigation Evidence in

Death Penalty Cases" and "Mental Disabilities and Mitigation" in *The Champion*, the monthly

magazine of the National Association of Criminal Defense Lawyers, as well as an article entitled

"Why Capital Cases Require Mitigation Specialists" in *Indigent Defense*, published by the

National Legal Aid and Defender Association.  These and other articles of mine have been cited

in the Commentary to the Revised ABA Guidelines for the Appointment and Performance of

Defense Counsel in Death Penalty Cases (available at www.abanet.org/deathpenalty).  At the

request of *Hofstra Law Review*, I wrote a commentary addressing particular sections of the

Revised ABA Guidelines (31 Hofstra Law Review 1157 (Summer 2003)).  My latest article,

"Mitigation Investigation: A Duty That Demands Expert Help But Can't Be Delegated,"

appeared in the March 2007 issue of *The Champion*.

8.  I am the coauthor of chapters on psychiatric issues in death penalty cases in two

recent books: "Dead Men Talking: Mental Illness and Capital Punishment," in Gerald Landsberg,

D.S.W., and Amy Smiley, Ph.D., eds., *Forensic Mental Health: Working with Offenders with

Mental Illness* (Kingston, New Jersey: Civic Research Institute, Inc., 2001) and "Punishment," in

Richard Rosner, M.D., ed., *Principles and Practice of Forensic Psychiatry*, 2nd edition (London:

Arnold Medical Publishing, 2003; U.S. distribution by Oxford University Press).

3

9.   Over the years, I have been directly involved in hundreds of capital cases in California and New York, including dozens of trials and postconviction hearings. I have also been consulted on capital cases in numerous other jurisdictions around the country, and I have provided evidence on the standard of care in investigating capital cases and mitigation by live testimony or affidavit in numerous jurisdictions, including Arizona, Arkansas, California, Mississippi, Missouri, New York, Oklahoma, Pennsylvania, Tennessee, Texas, and Wyoming. In 2004, I received the "Life in the Balance Achievement Award" from the National Legal Aid and Defender Association for my work in this field.

### Standard of Care in Capital Cases

10.   Investigation of a capitally charged client's background, character, life experiences, and mental health is axiomatic in the defense of a capital case, and has been for as long as I have done this work. In every seminar I have participated in since 1980, instructors have emphasized the importance of conducting a "mitigation investigation" in preparation for the penalty phase of a capital trial and developing a unified strategy for the guilt-innocence and sentencing phases.

11.   As early as 1983, Professor Gary Goodpaster discussed trial counsel's "duty to investigate the client's life history, and emotional and psychological make-up" in capital cases. He wrote, "There must be inquiry into the client's childhood, upbringing, education, relationships, friendships, formative and traumatic experiences, personal psychology and present feelings. The affirmative case for sparing the defendant's life will be composed in part of information uncovered in the course of this investigation. The importance of this investigation,

4

and the care with which it is conducted, cannot be overemphasized." (Gary Goodpaster, "The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases," 58 New York University Law Review 299 (1983) at 323-324.)

12.     Since the early 1980s, it has also been standard practice for competent defense counsel to determine whether their capital client had suffered from organic brain injury, psychiatric disorders, mental impairments, or trauma outside the realm of ordinary human experience.

13.     In three recent cases, the U.S. Supreme Court has found trial counsel ineffective for failing to investigate potential mitigation evidence: *Williams v Taylor*, 529 U.S. 362 (2000), *Wiggins v. Smith*, 539 U.S. 510 (2003) and *Rompilla v. Beard*, 545 U.S. 374 (2005). In *Wiggins*, trial counsel were found deficient in their performance, even though they had had their client examined by one mental health expert, because they failed to conduct a complete social history investigation. In *Rompilla*, counsel were found deficient "even when a capital defendant's family members and the defendant himself have suggested that no mitigating evidence is available" and despite consulting mental health experts.

14.     In a capital case, competent defense counsel have a duty to conduct life-history investigations, but generally lack the skill to conduct the investigations themselves. Moreover, even if lawyers had the skills, it is more cost-effective to employ those with recognized expertise in developing mitigation evidence. Thus, competent capital counsel retain a "mitigation specialist" to complete a detailed, multigenerational social history to highlight the complexity of the client's life and identify multiple risk factors and mitigation themes. The Subcommittee on Federal Death Penalty Cases, Committee on Defender Services for the Judicial Conference of the

5

3104

United States, for example, noted that mitigation specialists "have extensive training and experience in the defense of capital cases. They are generally hired to coordinate an investigation of the defendant's life history, identify issues requiring evaluation by psychologists, psychiatrists or other medical professionals, and assist attorneys in locating experts and providing documentary material for them to review." This report also bluntly commented, "The work performed by mitigation specialists is work which otherwise would have to be done by a lawyer, rather than an investigator or paralegal." (*Federal Death Penalty Cases: Recommendations Concerning the Cost and Quality of Defense Representation*, Federal Judicial Conference, May 1998, available at http://www.uscourts/gov/dpenalty/1COVER.htm.)

15.     The Revised ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (hereinafter, 2003 Revised ABA Guidelines, available at www.abanet.org/deathpenalty) state unequivocally that lead counsel at any stage of capital representation (trial or postconviction) should assemble a defense team as soon as possible after a case is designated for capital prosecution with at least one mitigation specialist and at least one member qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairments (Guideline 10.4), in order to conduct a thorough and independent investigation relating to penalty (Guideline 10.7 and Guideline 10.11). The previous Guidelines, adopted in 1989, similarly required counsel to begin investigation immediately upon counsel's entry into the case and to "discover all reasonably available mitigating evidence." (1989 Guideline 11.4.1.) The 1989 Guidelines also required counsel to retain experts for investigation and "preparation of mitigation" (1989 Guideline 11.4.1.(7)) Notably, the 1989 Guidelines specifically stated that "the investigation for preparation of the sentencing phase

6

should be conducted regardless of any initial assertion by the client that mitigation is not to be offered." The 1989 ABA Guidelines were recognized by the U.S. Supreme Court in *Wiggins* as "well-defined norms." (539 U.S. at 524). "The new ABA Guidelines adopted in 2003 simply explain in greater detail than the 1989 Guidelines the obligations of counsel to investigate mitigating evidence." *Hamblin v. Mitchell*, 354 F.3d 482 at 487 (6th Cir. 2003).

16.     Without a thorough social history investigation, it is impossible to ascertain the existence of previous head injuries, childhood trauma, and a host of other life experiences that may provide a compelling reason for the jury to vote for a life sentence. Moreover, without a social history, counsel cannot make an informed and thoughtful decision about which experts to retain, in order to gauge the nature and extent of a client's possible mental disorders and impairments. Mental health experts, in turn, require social history information to conduct a thorough and reliable evaluation.

17.     The social history investigation should include a thorough collection of objective, reliable documentation about the client and his family, typically including medical, educational, employment, social service, and court records. Such contemporaneous records are intrinsically credible and may document events which the client and other family members were too young to remember, too impaired to understand and record in memory, or too traumatized, ashamed, or biased to articulate. The collection and analysis of this documentation is a slow and time-intensive process. Many government record repositories routinely take months to comply with appropriately authorized requests. Great diligence is required to ensure compliance. Careful review of records often discloses the existence of collateral documentation which, in turn, needs to be pursued.

7

18.     A social history cannot be completed in a matter of hours or days. In addition to the bureaucratic obstacles to the acquisition of essential documentation, it takes time to establish rapport with the client, his family, and others who may have important information to share about the client's history. It is quite typical, in the first interview with clients or their family members, to obtain incomplete, superficial, and defensive responses to questions about family dynamics, socio-economic status, religious and cultural practices, the existence of intra-familial abuse, and mentally ill family members. These inquiries invade the darkest, and most shameful secrets of the client's family, expose raw nerves, and often re-traumatize those being interviewed. Barriers to disclosure of sensitive information may include race, nationality, ethnicity, culture, language, accent, class, education, age, religion, politics, social values, gender, and sexual orientation.

19.     Only with time can an experienced mitigation specialist break down these barriers, and obtain accurate and meaningful responses to these sorts of questions. In my professional opinion, an experienced mitigation specialist requires, at minimum, hundreds of hours to complete an adequate social history – even working under intense time pressure. (One nationally recognized authority in mitigation investigation, Lee Norton, has stressed the cyclical nature of the work and estimated that hundreds of hours will typically be required. See Lee Norton, "Capital Cases: Mitigation Investigation," *The Champion* (May 1992), pp. 43-45.)

20.     Mitigation investigation is particularly important when the client does not share the attorney's cultural background. Cultural differences can include not only race, ethnicity, and language, but all the badges of social identity that define an individual's world and belief system, including politics, religion, and sexual orientation.

21.     Mitigation evidence is not developed to provide a defense to the crime. Instead, it

8

provides evidence of a disability, condition, or set of life experiences that inspire compassion, empathy, mercy and understanding. Unlike insanity and competency, both of which are strictly defined by statute, mitigation need not involve a mental disease or defect. Nevertheless, in many, many cases, defendants do suffer mental impairments that may not meet the legal definition of insanity or incompetency, but are nevertheless powerfully mitigating disabilities which are given great weight when juries are charged with assessing individualized culpability. *See Tennard v. Dretke*, 542 U.S. 274 (2004) ("impaired intellectual functioning is *inherently mitigating*"), at 287 (emphasis added).

22.    For clients who are psychiatrically disordered or brain damaged, mitigation evidence may explain the succession of facts and circumstances that led to the crime, and how that client's disabilities distorted his judgment and reactions.

23.    Over the years, I have been involved in hundreds of capital cases, including dozens of trials and postconviction hearings. My personal experience of the effectiveness of mitigation evidence accords with the research of social scientists who have studied the decision-making processes of actual jurors in death-penalty cases. See, for example, Stephen P. Garvey, "Aggravation and Mitigation in Capital Cases: What Do Jurors Think?" 98 Columbia Law Review 1538 (1998) and "The Emotional Economy of Capital Sentencing," 75 New York University Law Review 26 (2000) (concluding that mitigation does matter, especially mental retardation and mental illness).

*Standard of Care in Capital Mental Health Evaluations*

24.    Both anecdotal reports from capital defense practitioners and social science

9

research indicate that defense experts are viewed with great skepticism and often regarded as "hired guns" unless their conclusions are supported by abundant, credible evidence from lay witnesses. (See, for example, Scott Sundby, "The Jury as Critic: An Empirical Look at How Capital Juries Perceive Expert and Lay Testimony," 83 Va. L. Rev. 1109 (1997), finding that two thirds of the witnesses jurors thought "backfired" were defense experts.) Thus, if only for pragmatic reasons, capital defense counsel are well advised not to rely on expert testimony without the corroborative lay witnesses whose identity and potential evidence can only be learned through life-history investigation. In addition, the proper standard of care for a competent evaluation of mental disorders or impairments in a capital case requires an accurate medical and social history as its foundation.

### Review of the Kenneth Reams Case

25.    At the request of postconviction counsel for petitioner Kenneth Reams, I have provided this affidavit/declaration setting forth the standard of practice in mitigation investigation in death penalty cases, the general contours of the mitigation investigation that would have been appropriate in preparation for Mr. Reams's trial in 1993, and the standard of care in mental health evaluations in death penalty cases. Based on the information I have been provided by Mr. Reams's current counsel, it is my professional opinion that trial counsel's performance fell far below the national standard of practice in capital cases in 1993 in failing to conduct an investigation to discovery all reasonably available mitigation evidence.

26.    Based on the information provided by counsel, it is my understanding that trial counsel did not engage the services of a mitigation specialist or even apply to the court for

10

funding such services. As discussed in detail above in paragraph 14, mitigation specialists offer skills that trial lawyers typically lack. They know how to gather and analyze life-history records that document all the influences that shaped a client's life. They know how to conduct interviews relevant to potential mental health evidence. Their social history investigation forms the foundation of a reliable mental health assessment and aids lawyers in choosing the case-appropriate expert(s) and in defining the appropriate referral expert(s) to address.

27.     Based on the information provided by counsel, including the Affidavit/Declaration of Karen Brantley, it is my understanding that trial counsel Maxie Kizer asked his secretary (Ms. Brantley) to "help him . . . by handling the penalty phase investigation" even though she had no training or experience in mitigation or investigation techniques of any kind. By her own account, Ms. Brantley made a single trip to Poplar Bluff, Missouri, and relied on Mr. Reams's aunt, Amelia Reams Atkins, to choose and assemble potential witnesses there ("a bunch of Kenny's friends and relatives," also described by Ms. Brantley as a "handful of people"). Although these individuals were reportedly cooperative, the information that Ms. Brantley could elicit was limited to their responses to a template of questions provided to Ms. Brantley by Mr. Kizer. Ms. Brantley interviewed these witnesses a single time at a motel. A trained and experienced mitigation specialist would have visited life-history witnesses more than one time and in their own homes — the setting most likely to evoke memories of Mr. Reams and to build rapport and trust with the witnesses. Indeed, their homes and neighborhoods were themselves relevant to the cultural, economic, and social circumstances of Mr. Reams's background. In addition, in their homes a trained and experienced mitigation specialist might have found photographs, family albums, and other mementoes from Mr. Reams's time in

11

Missouri. Finally, a trained and experienced mitigation specialist would not have allowed a family member to select potential witnesses, but would have found teachers, classmates, neighbors, and staff from any agencies that had contact with Mr. Reams in his developmental years. Ms. Brantley's mitigation investigation was so perfunctory that she didn't even interview Mr. Reams's half-brother Dominique Whiteside.

28.   A skilled mitigation specialist would have known -- and known how -- to explore and document the trauma that Mr. Reams had experienced and witnessed in his developmental years, as well as the impact and significance of his mother's "nervous breakdowns," and his step-father's substance abuse. A skilled mitigation specialist would also have appreciated the importance of developing evidence of Mr. Reams's subaverage intellectual functioning and cognitive impairments. There is no evidence that Mr. Kizer or Ms. Brantley was qualified by training or experience to screen for the presence of mental disorders or impairments on the part of Mr. Reams, his mother, or other family members.

29.   Trial counsel's failure to develop more than rudimentary information from a narrow set of sources deprived the jurors of powerful mitigating evidence that might have inspired empathy or mercy as they struggled to decide whether Mr. Reams should be subjected to a punishment of last resort. A competent mitigation investigation would have disclosed evidence of severe sexual trauma, brutal exposure to domestic violence, inherently mitigating subaverage intellectual functioning, and familiar mental illness and substance abuse. Instead, Mr. Reams was sentenced to death by jurors who had no ability to consider this evidence. Trial counsel's failure to investigate and document this readily available evidence fell below the standard of capital defense practice in 1993.

12

30.    I have provided his affidavit/declaration on a pro bono basis.

I declare under penalty of perjury under the laws of the States of Arkansas and California, and the United States of America, that the foregoing is true and correct.


_____
Russell Stetler

Dated: July 28: 2007

13

003114



EXHIBIT
Pet. 32

## AFFIDAVIT OF Beatrice Reams Whiteside

STATE OF Arkansas          }

COUNTY OF Jefferson        }

I, Beatrice Reams Whiteside, after being duly sworn according to law, state as follows:

1.    My name is Beatrice Reams Whiteside. My friends and family call me, "BB." I am Kenneth Reams' mother. I am a United States citizen, of legal age, and a resident of Pine Bluff, Arkansas.

2.    I am the fifth of ten full brothers and sisters. My family and I grew up in Alteimer, Arkansas. When I was fifteen years old and in high school, I began dating Ken's father. We did not date very long but I wound up pregnant. I was afraid to tell my mother that I was going to have a baby. I hid my pregnancy for a long time.

3.    During the summer that I was pregnant with Ken, I asked to got and visit my father in Kenosha, Wisconsin. Not long after I got there, I started crying all the time. I also stopped talking. My father didn't have any idea what was wrong with me so he brought me to the hospital. It was then that he learned for the first time that I was pregnant. I stayed in the hospital for two days and while I was there I was treated with Librium and vitamins. I also received prenatal care for the firs time during my pregnancy.

4.    My father was good to me after he found out that I was pregnant. He asked me if I wanted to give the baby up for adoption. Even though I was miserable because I wanted to continue school and become a teacher and I knew that having a baby would make that almost impossible, I decided to keep the baby. My father supported my decision.

5.    Four months after Ken was born, my family had to take me back to the hospital. I don't remember all that was going on but I do remember that I was having severe headaches and that the doctors told me that I had a nervous breakdown. I was in the hospital for three days and was supposed to follow up with a doctor after I was released. I never kept that appointment.

6.    Within a week, my father had to bring me back to the hospital because my headaches were so bad that I was waking up crying and rolling my head. This time, I stayed in the hospital seven days and had several tests. When I was released from the hospital, my father sent Ken and me back to Arkansas to live with my mother and other brothers and sisters.

7.    When I was in Wisconsin, I wrote to Ken's father to tell him about the baby. He never responded to my letters. When I got back to Arkansas, Ken's father acted like he wanted

us to keep dating and he wanted us to spend time together with Ken. Because I was hurt and disappointed by the fact that he hadn't answered my letters from Wisconsin, I refused to see him and refused to let him see Ken. So Ken never had contact with his dad or his dad's family when he was growing up.

8.     I know now that even thought I loved Ken, I had no business having a child. Ken and I really grew up together because I was a baby who had a baby. I made a lot of mistakes along the way and sometimes Ken got hurt. For example, when Ken was around two years old, he went out on the porch and drank poison. I had to rush him to the emergency room.

9.     I also now realize that I was too hard on Ken. I used to beat him with belts and extension cords and other things. I hit him so hard that I left whelps on him. I gave Ken a lot of whippings he didn't deserve. For example, there were times when would whip Ken just because he wanted to spend time with my mother when I wanted him to come home. That's the kind of small reason I used for beating Ken. I think I whipped Ken so hard because I resented Ken because I was so young when I had him that I did not know how to deal with him.. I know now that I should have found other ways to deal with my stress. There were a lot of times that I told Ken he was bad but now, looking back on it, I realize he really wasn't bad. He was just a child acting like a child.

10.     On a couple of occasions, SCAN investigated me for child abuse. Once SCAN got involved because I hit Ken with a belt and he got a scratch on his eye. Ken went to school with that mark on his face and I guess the school called SCAN. I wound up having to go to a court hearing and the SCAN people told me that if I whipped Ken anymore they would take him away from me. I though that I should be able to whip him if I needed to. During that time, there was a nice social worker who came and talked to me. Also, Ken and I went to mental health counseling. That all ended after a short period of time because my family moved from Pine Bluff to Forrest City Arkansas. We never got any counseling after that.

11.     When Ken was small, I didn't work that much. When he was around eight years old, I married my current husband, Scott Lee "Mickey" Whiteside, Jr. I thought that Mickey would be good for Ken and me because I thought he could help us financially and be a good husband. Unfortunately, things did not turn out the way I had hoped.

12.     Mickey and I began fighting about eight months after we got married. We've fought constantly ever since. I would say that we fought at least once a week. Our fights were always right in front of Ken. My fights with Mickey were loud and violent. I hit him and he hit me. We cursed at each other and threatened to kill one another. We ripped up clothes and pulled knives on each other. A lot of times, we threw things at each other and hit each other with whatever we could grab. The police were called to our house many times because of our fights. Because our fights were always right in front of Kenny, I'm sure they had a terrible impact on him.

13. .   Mickey also ran around with other women and smoked marijuana throughout our marriage. In fact, he kept big bowls of marijuana right out in the open in front of Ken. Also,

because Mickey didn't pay our bills, we constantly had to move.

14.     When Ken was around twelve years old, Ken and I moved back to Pine Bluff with my family because I once again suspected Mickey of cheating on me. One afternoon, Ken asked me if he could go and play videogames. I let him go. Ken was supposed to come back in an hour. I fell asleep while waiting for him and when I woke up, more than an hour had passed and Ken was not home. I went to check on him but couldn't find him at the video arcade. I called the police. Ken finally came home late that night. When he knocked on the front door he was naked, alone and frantic. He told me that two men had grabbed him, put him in a truck, took him to the woods and raped him. I know that his mouth had been covered with tape because I could still see the marks. Ken asked me if he could take a shower before we went to the hospital and I let him. He stayed in that shower for over an hour. After he came out, I took him to the hospital for treatment. I realize now that I shouldn't have let him bathe before taking him to the hospital.

15.     Mickey and I had two sons together -- Scott and Dominique. Not long after they were born, I began working at a full-time job. Ken had to babysit his little brothers while I was at work. Ken loved his brothers and did a good job caring for them. Ken also had other chores around the house.

16.     Mickey didn't treat Ken like he treated his own sons. I can't remember Mickey ever buying Ken anything. He also tried to work Ken to death. Mickey got part time jobs cutting people's grass and he took Ken with him and made Ken do all the work. Mickey would take the money and give Ken almost nothing. Mickey has been a good, loving father to his own sons and he spent time with them and bought them many things. Mickey bought his own sons expensive presents like a motorcycle, and a go-cart. He never bought gifts for Ken. Mickey never showed Ken any love or affection.

17.     When Ken was growing up, I was not very involved with Ken's education. I was at Ken's trial when I heard for the first time that he had had problems in school. I guess my problems with Mickey made me forget to focus on Ken.

18.     In 1990 or 1991, Ken moved to Poplar Bluff, Missouri to live with my sister. I never visited him while he lived there.

19.     In 1993, I lived in Forrest City, Arkansas. About three weeks before Ken's trial, my husband and I traveled to Pine Bluff to meet with Kenny's lawyer, Mr. Kizer. During our visit with Mr. Kizer, a woman who I didn't know -- I believe it was his secretary -- asked me a handful of questions about my background and pregnancy with Ken. Neither Mr. Kizer nor the woman explained to me why they were asking these questions or how information about our background could help Ken. I was confused by their questions because I didn't understand the charges and I didn't understand what was going to happen in court. I didn't know what information would be helpful to Ken. Had he explained the process and asked me specifically about our lives, I would have told Mr. Kizer and his secretary about Ken and my family history of poverty, physical abuse, mental illness, substance abuse and domestic violence.

20.     At no point did Mr. Kizer or anyone working for him ask me permission to get birth or other medical records about Ken. They also never asked permission to get any records about me. Had I been asked I would have given Mr. Kizer access to whatever records he thought were necessary to help Ken.

21.     At the time of Ken's trial and during my meeting with Mr. Kizer, I was taking medicine for my nerves. This medicine made me feel like I was in a fog. Mr. Kizer never asked me whether I was on any medication even though it should have been pretty obvious that I was out of it. When I testified, I was pitiful and nervous. I could barely see and hear. Mr. Kizer didn't properly prepare me to testify and he definitely didn't prepare me for cross-examination. I was not able to explain some of what I said. I now feel that testifying -- without preparation and in my messed up mental state -- was the worst thing I could've done under the circumstances.

22.     Since Ken's trial, I have continued to have headaches, medical problems and nerve problems. Less than a month ago, I was again hospitalized for several days because I had another nervous breakdown. There have been many times throughout my life that so many things are bothering me tat I feel I cannot go on and I don't know what to do.

FURTHER THE AFFIANT SAITH NOT.

*Beatrice Whiteside*

Beatrice Reams Whiteside

Date: *December 14, 2005*

State of *Arkansas*

County of *Jefferson*

The above, with whom I am personally acquainted, appeared before me, the undersigned, in and for said State and County and acknowledged that she executed the foregoing instrument for the purpose therein contained as his free act and deed.

Subscribed and sworn to me on the *14* day of *December*, 2005.

Notary Public
My Commission Expires:

*2-12-2008*



*Glori Shettles*

003119



EXHIBIT
PET. 33

## AFFIDAVIT OF Amelia Reams Atkins

STATE OF Arkansas        }

COUNTY OF Jefferson      }

I, Amelia Reams Atkins, after being duly sworn according to law, state as follows:

1.      My name is Amelia Reams Atkins. My friends and family call me, "Nip." I am Kenneth Reams' maternal aunt. I am a United States citizen, of legal age, and a resident of Pine Bluff, Arkansas.

2.      I am two years ~~younger~~ older than Ken's mother, Beatrice Reams Whiteside, and I have had a great deal of contact with Kenneth Reams throughout his life. In fact, I was with my sister, Beatrice Whiteside, in Kenosha, Wisconsin when Ken was born. Beatrice traveled to Kenosha to live with our father when she realized she was pregnant with Kenneth. She had kept her pregnancy a secret so when she went to live with dad, no one in the family knew she was pregnant. Beatrice stayed in Kenosha with our father until about six months after Kenneth's birth. Beatrice then returned to live with our mother in Arkansas.

3.      For approximately one month during Beatrice's pregnancy, Beatrice's behavior was unpredictable and strange. At one point, she set the mattress on fire and ran into walls. She also attempted to commit suicide on more than one occasion. At one point, Beatrice got so crazy that my brothers and I had to keep Beatrice tied down because we were afraid that she was going to jump off of a bridge. During that time, Beatrice did not just try and harm herself. She also attempted to attack me and my brothers and sisters with a knife. Also, not long after Kenneth's birth, I found Beatrice holding Ken down and trying to kill him. I intervened, but do not know how long Beatrice had been holding Ken like that. Following that incident, Beatrice was admitted to the hospital and psychiatric unit for three days.

4.      When Ken was eight years old, his mother married her present husband, Micky Whiteside. My sister had two sons with Micky within a short time after they were married. When Ken came to live with me (when he was about 14 years old), he talked a lot about having to baby-sit his younger brothers everyday and he was not allowed to spend time outside playing with children his own age. My sister and her husband gave Ken a lot of responsibility at an early age and he was not allowed to be a kid.

5.      My sister and her husband did not treat all three of the children as equals. Ken was treated like a "step-kid" after his brothers were born. He did not get the material things his younger brothers got. Ken was acutely aware that he was treated differently. When kids are not treated the same, it hurts them and I felt this when Ken would talk to me about his life after he came to live with me. Micky did not show any affection toward Ken and he did not spend time

003120

with him like he did his own sons.

6.    My sister's household was very unstable. There were many incidents of domestic abuse throughout Beatrice and Micky's marriage. Their fighting started long before Kenneth's trial and have continued since his trial. Additionally, the family was constantly moving because of Micky's lack of employment and inability to pay rent.

7.    Not long after Ken and his family moved to Forrest City, my sister and Micky separated. Beatrice and her sons returned to Pine Bluff. One day, Beatrice allowed Ken to go to the video arcade to play video games. That night, Ken returned naked and terrified. Ken reported he had been abducted by two men, who raped him.

8.    Kenneth was influenced by whomever he was around. I really noticed this when Ken came to live with me and my sons in Poplar Bluff, Missouri.

9.    It was obvious that Ken did not like the way he was treated at his mother's house. When Ken returned to Pine Bluff for a visit, prior to his arrest he lived with other various relatives rather than returning to Beatrice and Micky's home.

10.   In 1993 I lived in Poplar Bluff, Missouri. Prior to Kenny's trial, I was visited by Kenny's attorney, Maxie Kizer and his secretary. Mr. Kizer's secretary interviewed me and Mr. Kizer videotaped it. The secretary only asked me general information about Ken. No one ever asked me any specific questions about Ken's childhood or family background.

11.   Although I had been interviewed by Maxie Kizer's secretary, there was no discussion or preparation of my testimony prior Kenneth's trial. I did not even know the trial date. I just happened to decide to travel from Polar Bluff, Missouri to Pine Bluff, Arkansas to visit Ken in jail. When I got there, I learned that the trial was already in progress. Neither Maxie Kizer nor anyone from his office contacted me to tell me that the trial was starting, to tell me that I should attend the trial or to tell me that they would need me to testify on Kenneth's behalf. The first time I discussed my actual testimony was I met with Maxie Kizer an hour before I took the witness stand. Obviously, I was completely unprepared, I had no knowledge or appreciation of what information I could provide during my testimony which would have been helpful.

003121

12.     Had I been asked, I would have testified about our family history of substance abuse, mental illness and domestic abuse. But neither Mr. Kizer nor his secretary ever asked me about these matters or said anything that would lead me to believe that such information would be helpful to Ken at trial.


FURTHER THE AFFIANT SAITH NOT.


Amelia Reams Atkins

Date: *December 14, 2005*

State of *Arkansas*

County of *Jefferson*

The above, with whom I am personally acquainted, appeared before me, the undersigned, in and for said State and County and acknowledged that she executed the foregoing instrument for the purpose therein contained as his free act and deed.

Subscribed and sworn to me on the *14* day of *December* 2005.


Notary Public
My Commission Expires:
*February 12 2008*

GLORI SHETTLES
NOTARY PUBLIC AT LARGE
SHELBY COUNTY, TN

**KENOSHA MEMORIAL HOSPITAL**

6308 - 8th Avenue

Kenosha, Wisconsin 53140

Adm. 9-22-74
Dis. 9-24-74

02 50 87

Beams, Miss Beatrice
Dr. Whetstone
15        452A

To include:

1. Provisional & Final Diagnosis
2. Reason for admission
3. Pertinent laboratory, x-ray, other diagnostic studies
4. Course of treatment
5. Condition on discharge
6. Follow-up & Discharge Medication

**FINAL DIAGNOSIS:** Pregnancy - primipara, third trimester.
Anxiety depression state.

**WORKING DIAGNOSIS:** Pregnancy, third trimester, primipara. Depression state.

The patient is a 15-year-old female, who was brought to the Kenosha Hospital Emergency Room by her father on Sunday afternoon because of the patient's complaint of being tired, and crying all of the time. The patient was pregnant, she denied any knowledge of the pregnancy. Uterus was enlarged to approximately eight months gestation size. The patient was relatively uncommunicative, was seen in consultation by Dr. Tonkiewicz on request of the present examiner. Treatment consisted of the use of Librium for two days in the hospital, vitamins, and attendance at prenatal clinic. She is discharged home on multi-vitamins, two daily, office follow-up appointment in one week.

OHW/lsl
Dict: 9-24-74

O. H. Whetstone, M.D.

**DISCHARGE SUMMARY**

_____ M.D.
Attending Physician

**KENOSHA MEMORIAL HOSPITAL**
6308 - 8th Avenue
Kenosha, Wisconsin 53140

| | |
|---|---|
| Adm. 5-25-75 | REAMS, BEATRICE   02 50 87 |
| Dis. 5-28-75 | Dr. Whetstone |
| | 16                    233A |

To include:

1. Provisional & Final Diagnosis
2. Reason for admission
3. Pertinent laboratory, x-ray, other diagnostic studies
4. Course of treatment
5. Condition on discharge
6. Follow-up & Discharge Medication

FINAL DIAGNOSIS:
1. Headache, probably on a tension basis.

WORKING DIAGNOSIS:
Probable epileptiform seizure.  Rule out behavior disorder on an emotional intellectual level.

This is a 16-year-old colored female who recently had a infant male four months ago who comes to the Hospital because severe headaches and enters via rescue squad to the Emergency Room.  She was admitted to the Hospital.  It was noted that patient has had some emotional problems in the past, and patient was placed on Mellaril 10 mg., t.i.d., Tylenol for headaches.

During her hospital course, she had an electroencephalogram which was normal.  Her CBC, urinalysis, and chest x-ray were normal.  Headaches continued intermittently, and patient states that Tylenol did not relieve the headaches.  Psychiatric consult was requested on two separate days, but was not obtainable by the time the patient wished discharge on 5-28-75, and she will be seen in the office for followup.

OHW/sjp
D/5-29-75
T/6-2-75

O. H. Whetstone, M. D.

DISCHARGE SUMMARY

M.D.

Attending Physician

KENOSHA MEMORIAL HOSPITAL
4208 - 6th Avenue
Kenosha, Wisconsin 53140

Adm: 5-25-75
Dis: 5-28-75

REAMS, BEATRICE
Dr. Whetstone
16

02 50 87

233A

To include:

Final Diagnosis
Working Diagnosis
Present Illness
Past History and
System Review
Family History
Physical Examination

**FAMILY HISTORY:**
Father and mother living and well. Mother lives down South in Arkansas
I think. Father lives in Kenosha and works for Arneson Foundry. Five
brothers and four sisters are living and well.

**PAST HISTORY:**
Allergies denied.
Past surgical history denied.
The patient is gravida I, para I. The present examiner delivered a
normal male Negro infant approximately 5 months ago at Kenosha Memorial
Hospital. This was conceived while the patient was living down South
with her mother and she moved to Kenosha while she was 5 months pregnant.

**CHIEF COMPLAINT:**
The patient had severe headache, was uncommunicative and was brought
to Kenosha Memorial Hospital.

**PRESENT ILLNESS:**
The patient is a 16 year old colored female who has always been rather
withdrawn, shy, introverted and not too communicative even with the
examiner. She has been on no medication, has had no previous illness
except that she has been thrashing about and holds her head and will
not answer questions or interrogations by people around her. Her
brother states that this has happened before. The patient also states
that this happened while she was down South as well as since she has
been up North and has had her baby. She was brought by rescue squad
to Kenosha Memorial Hospital Emergency Room at approximately 4 AM.
Again, she was not answering questions of the nurses. She continued
holding her head, continued crying and was admitted to the hospital
for further observation.

**WORKING DIAGNOSIS:**
1. Probable epileptiform seizure. Rule out behavior disorder on
an emotional intellectual level.

**PHYSICAL EXAMINATION:**
Temperature on admission was 98.6, pulse rate 116, respirations 36
per minute, blood pressure 122/90. She is a well developed, well
nourished 16 year old colored female who is rational, quiet, answers
questions now in the morning, denies headache and states she has no
complaints at the present.
Head and Neck: Pupils are round and equal, react to light and accommo-
    dation. Scleras are white. Ears, nose and Throat negative for
                                                        (over)

**HISTORY AND PHYSICAL EXAMINATION**

000045

## HISTORY AND PHYSICAL EXAMINATION

infection.  Neck is supple.  Cervical nodes not enlarged.
Breasts:  Pendulous.  No masses.
Heart:  Point of maximum impulse is in the fourth interspace, midcla-
    vicular line.  No murmurs, no arrhythmias.
Lungs:  Clear to percussion and auscultation.  No rales.
Abdomen:  Soft.  Nontender.  Liver, spleen not palpable.  Bowel sounds
    are normal active.  No costovertebral angle tenderness.
Genitalia:  Normal female.
Pelvic and Rectal:  Within normal limits.  No evidence of incontinence.
Extremities:  Negative for ulceration, edema, inflammation.
Neurological:  Physiological.  Deep tendon reflexes equal and active
    bilaterally.

Incidentally there were no bite marks of the tongue.


OHW:mab
D: 5-25-75                              O. H. Whetstone, M.D.
T: 5-26-75

DO NOT WRITE IN THIS SPACE

000046

003221

98

## KENOSHA MEMORIAL HOSPITAL
### KENOSHA, WISCONSIN

EEG. NO. 8699    NR 02 50 87 8    ROOM NO. 233d    HOSPITAL NO. 321332 9

NAME: Reams, Beatrice    AGE 16  SEX f  DATE 5-27-75

ADDRESS:    REFERRING PHYSICIAN: Dr. Whetstone

REPORT ON ELECTROENCEPHALOGRAM:

CLINICAL INFORMATION:
Withdrawn behavior. Patient has had these spells before. At times cries and refuses to communicate. Patient states she has a frequent bifrontal headache with occasional lightheadedness. Mellaril, 10 mg., 10½ hours prior to test. Last meal 1/2 hour prior to test.

EEG INFORMATION:
Test is performed on a Grass Model 6 10-channel device, 0.12 second time constant, HFF 70 Hz., sensitivity 6.7 mv/mm pen deflection.

EEG REPORT:
10 Hz. alpha at 50 microvolts. It is rhythmic. There seems to be suppression of the rhythmic activity in left temporal area compared with right. A 10 to 12 Hz. low voltage nonrhythmic pattern is seen on the right, with occasional superimposed 8 to 9 Hz. alpha band frequencies. In frontal region the patterns are 8 to 10 Hz. There is good blocking response to eyes opening. Some rather vague, low voltage, 300 to 400 millisecond slow waves are seen in F4, F8 differential recording when the patient drowsed. Drowse response was otherwise unremarkable. Arousal response is within normal range. Hyperventilation activation failed to demonstrate any significant change.

IMPRESSION:
The record is acceptable, i.e., within normal range at this point.

A. YALE GEROL, M.D.
A. Yale Gerol, M.D.

AYG:jo

CHART COPY

000047

003241

**KENOSHA MEMORIAL HOSPITAL**
6308 - 8th Avenue
Kenosha, Wisconsin 53140

Adm.  5-30-75
Dis.  6-5-75

REAMS, BEATRICE

Dr. Whetstone

16                    233 CX

HR  02 50 87

To include:

1. Provisional & Final Diagnosis
2. Reason for admission
3. Pertinent laboratory, x-ray, other diagnostic studies
4. Course of treatment
5. Condition on discharge
6. Follow-up & Discharge Medication

**FINAL DIAGNOSIS:**
Cephalalgia due to psychosomatic cause.

**WORKING DIAGNOSIS:**
Severe headaches, etiology to be determined.  Possibly on a vascular basis.

The patient is a 16 year old female who had an illegitimate child six months ago and who is here from Arkansas, now living with the father, has been having severe headaches in the last five to six months.  She stated that she also got these while living down South.  She is constantly being brought to the Emergency Room by her father who cannot cope with the situation.  Spinal tap was normal.  Laboratory workup was normal.  Consultation by Dr. Rafinliah revealed no neurological disease.  Consultation with Dr. Fai agrees with psychic emotional headaches.  The patient was placed on Valium 2½ mg. t.i.d., Tylenol #3 tablets two every four hours p.r.n. for headaches.  She was discharged home with her father on 6-5-75.  He states that he is thinking of sending her back to live with her mother in Arkansas because he cannot take care of the child since he works all day and she lives with two younger brothers and keeps house for him.  She will be seen and followed by Dr. Fai if the patient stays in the city.

LLF:jms
Dic: 6-5-75
Tran: 6-6-75

O. H. Whetstone, M.D.

**DISCHARGE SUMMARY**

_____  M.D.
Attending Physician

Respondent's Exhibit F2                    Supp. Add. 036

**.KENOSHA MEMORIAL HOSPITAL**
6308 - 8th Avenue
Kenosha, Wisconsin 53140

Adm. 5-30-75

Dis. 6-5-75

MR  02-50-87

REAMS, MISS BEATRICE

Dr. Whetstone

16        233-C

To Include:
Final Diagnosis
Working Diagnosis
Present Illness
Past History and
System Review
Family History
Physical Examination

**FAMILY HISTORY:**
Age 16, race negro, marital status single, father is living and
well, in Kenosha. Mother is living and well in the southern
states. Siblings are all living and well. Allergies denied.

**PAST HISTORY:**
Negative. Patient is a Gravida I, Para I.

**PRESENT ILLNESS:**
Chief complaint--Severe headaches for the past several_ years,
usually in the frontal area, intermittently and severe.
Patient is a 16 year old colored female, who was hospitalized
at Kenosha Memorial Hospital during the past week for several
days for a work-up for severe headaches which had been occurring
to her for several years. She states that there has been no
precipitating cause that she knows of and the headaches are
extremely severe, she wakes up crying at night and rolling her
head. She states that she had these while she was living with
her mother down south, she became pregnant and came to Kenosha
where she delivered a normal male infant, who is about five months
old at the present time. Headaches have not been relieved. They
have been occurring several times per week. She has come twice
to the Kenosha Memorial Hospital emergency room by rescue squad.
Most recently, the morning of admission. The patient did have an
EEG done on her previous admission. She did not wish to stay for
any further studies and called the examining physician stating
that she also wanted to go home on Wednesday, 5-27-75. She was
released, but she again returned on the morning of this admission.
She had been on Elavil 10 mg. t.i.d. and Tylenol for the pain.
She says that this has not relieved the pain and the headaches
at home. She denied any nausea, vomiting or auditory or occular
prior to these attacks. She states that they get extremely severe.
She is unable to tolerate it. Psychiatric consultation had been
recommended on her last visit but had not been accomplished. She
is being admitted for further work-up and diagnosis.

**WORKING DIAGNOSIS:**
Severe headaches, etiology to be determined. Possibly on a vascular
basis.

**PHYSICAL EXAMINATION:**
Temperature is 98.6°f. Pulse rate is 84, respirations are 18 per
minute. Blood pressure is 118/80 . She is a well developed, well
nourished, 16 year old colored female, in no critical distress.
**HISTORY AND PHYSICAL EXAMINATION**
                                              ( O V E R )

## HISTORY AND PHYSICAL EXAMINATION

Head and Neck--Pupils are round and equal, react to light and
accommodation.  Sclerae are white.
Ears, Nose, Throat--Negative for infection.  Patient's affect
and judgement is rather abnormal.  She is extremely introverted
and reluctant to speak and answer questions, and she is in
no untord reactions.  She is appropriate, but extremely

Breasts--Pendulous.  No masses.
Heart--Point of maximu m impulse in the fourth interspace, mid-
clavicular line.  No murmurs, no arrhythmias.
Lungs--Clear to percussion and auscultation, no rales.
Abdomen--Soft.  Nontender.  Liver and spleen are not palpable.  Bowel
sounds are normal and active.  Nocostovertebral angle tenderness
Genitalia--Normal female.
Pelvic examination--Has been done recently in the office and was
within normal limits.  Last normal menstrual period was May
1975.
Rectal examination--Deferred.
Extremities--Negative for ulceration, edema, and inflammation.
Neurological--Physiological.  Deep tendon reflexes are equal and
active bilaterally.

O. H. Whetstone  M.D.

OHW:jez
D&T:5-30-75

DO NOT WRITE IN THIS SPACE

**KENOSHA MEMORIAL HOSPITAL**

6308 - 8th Avenue
Kenosha, Wisconsin 53140

6-4-75

REAMS, BEATRICE

Dr. Whetstone

16          233 C

Regarding:    Beatrice Reams

Patient's name    5115 - 13th Avenue      (If minor—Father's Name also)

Address

TO:    Dr. Fai

Consulting Physician

Reason for Request    *Psychosomatic*      *Headache*

Attending Physician

O. H. Whetstone, M.D.

## REPORT

June 4, 1975
_____
Date

**PRESENT ILLNESS:**

The patient at the present time is on the Pediatric Ward. This 16 year old colored girl has been admitted to the Hospital for the second time in a few days because of intractable headaches which according to her usually appear in the middle of the night, starting at the front and then involves the whole head. She gets dizzy occasionally and then gets the headaches. The patient said that these headaches started after she had her baby five months ago. Prior to this she never had this type of headache.

The patient lived most of her life, up until last August, in Arkansas with her mother. At that time, being pregnant, moved up North. She delivered her baby five months ago. Presently she keeps house with the father and there are two siblings in the household and she also goes to school. It is also significant that the patient's mother use to have similar headaches for a period of time.

The patient has never been hospitalized except for these hospitalizations previously mentioned and for delivery of the baby. She also had some minor difficulties with the father, who takes the money given by the Welfare for the baby and many times spends it himself. Which results in some arguments. The patient had no boyfriends since she had the baby.

At the time of the examination the patient was well oriented in persons, places and time. Affect was appropriate. Memory seemed to be intact. Intelligence was average or slightly above average. Insight and judgment, however, was poor.

**DIAGNOSTIC IMPRESSION:**

Cephalalgia, due to psychosomatic origin.

IT seems that due to the fact of the patient's condition mimics the mothers condition previously and happened only after the patient's previous sexual partner disappeared. As well as after the delivery of her child, seems to substantiate that the headaches

**CONSULTATION REPORT**    *OHw*      CONSULTANT      M.D.

are of psychosomatic origin.  However, I would like to make some additional psychological testing and therefore the patient would be advised to come to my office where I could do my testing.  Beside all of the prescribed, Valium and Dilantin, no other additionaly medications seem to be necessary at this time. With supportive and may be insight psychotherapy later on, the patient's condition hopefully will be improved.  From general the symptomatic treatment is also recommended, by Dr. Whetstone.

Thank you for this interesting consultation.


LLF:jms
Dic:  6-5-75
Tran:  6-5-75

                              L. L. Fai, M.D.

16

# KENOSHA MEMORIAL HOSPITAL
### KENOSHA, WISCONSIN

EEG. NO. 8699     MR 02 50 87 8     ROOM NO. 2331     HOSPITAL NO. 321332 9

NAME: Reams, Beatrice     AGE 16   SEX  f    DATE 5-27-75

ADDRESS:     REFERRING PHYSICIAN: Dr. Whetstone

REPORT ON ELECTROENCEPHALOGRAM:

**CLINICAL INFORMATION:**
Withdrawn behavior. Patient has had these spells before. At times cries and refuses to communicate. Patient states she has a frequent bifrontal headache with occasional lightheadedness. Mellaril, 10 mg., 10½ hours prior to test. Last meal 1/2 hour prior to test.

**EEG INFORMATION:**
Test is performed on a Grass Model 6 10-channel device, 0.12 second time constant, HFF 70 Hz., sensitivity 6.7 mv/mm pen deflection.

**EEG REPORT:**
10 Hz. alpha at 50 microvolts. It is rhythmic. There seems to be suppression of the rhythmic activity in left temporal area compared with right. A 10 to 12 Hz. low voltage nonrhythmic pattern is seen on the right, with occasional superimposed 8 to 9 Hz. alpha band frequencies. In frontal region the patterns are 8 to 10 Hz. There is good blocking response to eyes opening. Some rather vague, low voltage, 300 to 400 millisecond slow waves are seen in F4, F8 differential recording when the patient drowsed. Drowse response was otherwise unremarkable. Arousal response is within normal range. Hyperventilation activation failed to demonstrate any significant change.

**IMPRESSION:**
The record is acceptable, i.e., within normal range at this point.

A. YALE GEROL, M. D.
A. Yale Gerol, M.D.

AYG:jc

Respondent's Exhibit F2          Supp. Add. 041

003288

65

**KENOSHA MEMORIAL HOSPITAL**
6308 - 8th Avenue
Kenosha, Wisconsin 53140

Adm.   5-30-75

Dis.   6-5-75         REAMS, BEATRICE

Dr. Whetstone

16              233 CX

HR   02 50 87

**To Include:**
1. Provisional & Final Diagnosis
2. Reason for admission
3. Pertinent laboratory, x-ray, other diagnostic studies
4. Course of treatment
5. Condition on discharge
6. Follow-up & Discharge Medication

**FINAL DIAGNOSIS:**
Cephalalgia due to psychosomatic cause.

**WORKING DIAGNOSIS:**
Severe headaches, etiology to be determined. Possibly on a vascular basis.

The patient is a 16 year old female who had an illegitimate child six months
ago and who is here from Arkansas, now living with the father, has been having
severe headaches in the last five to six months. She stated that she also got
these while living down South. She is constantly being brought to the Emergency
Room by her father who cannot cope with the situation. Spinal tap was normal.
Laboratory workup was normal. Consultation by Dr. Rafiullah revealed no
neurological disease. Consultation with Dr. Fai agrees with psychic emotional
headaches. The patient was placed on Valium 2½ mg. t.i.d., Tylenol #3 tablets
two every four hours p.r.n. for headaches. She was discharged home with her
father on 6-5-75. He states that he is thinking of sending her back to live
with her mother in Arkansas because he cannot take care of the child since
he works all day and she lives with two younger brothers and keeps house for
him. She will be seen and followed by Dr. Fai if the patient stays in the
city.

LLF:jms
Dic:  6-5-75
Tran:  6-6-75

O. H. Whetstone, M.D.

**DISCHARGE SUMMARY**

_____M.D.
Attending Physician

**KENOSHA MEMORIAL HOSPITAL**
6308 - 8th Avenue
Kenosha, Wisconsin 53140

Adm. 5-30-75

Dis. 6-5-75

MR   02-50-87

REAMS, MISS BEATRICE

Dr. Whetstone

16        233-C

To Include:

Final Diagnosis
Working Diagnosis
Present Illness
Past History and
System Review
Family History
Physical Examination

**FAMILY HISTORY:**
Age 16, race negro, marital status single, father is living and
well, in Kenosha. Mother is living and well in the southern
states. Siblings are all living and well. Allergies denied.

**PAST HISTORY:**
Negative. Patient is a Gravida I, Para I.

**PRESENT ILLNESS:**
Chief complaint--Severe headaches for the past several years,
usually in the frontal area, intermittently and severe.
Patient is a 16 year old colored female, who was hospitalized
at Kenosha Memorial Hospital during the past week for several
days for a work-up for severe headaches which had been occurring
to her for several years. She states that there has been no
precipitating cause that she knows of and the headaches are
extremely severe, she wakes up crying at night and rolling her
head. She states that she had these while she was living with
her mother down south, she became pregnant and came to Kenosha
where she delivered a normal male infant, who is about five months
old at the present time. Headaches have not been relieved. They
have been occurring several times per week. She has come twice
to the Kenosha Memorial Hospital emergency room by rescue squad.
Most recently, the morning of admission. The patient did have an
EEG done on her previous admission. She did not wish to stay for
any further studies and called the examining physician stating
that she also wanted to go home on Wednesday, 5-27-75. She was
released, but she again returned on the morning of this admission
She had been on Elavil 10 mg. t.i.d. and Tylenol for the pain.
She says that this has not relieved the pain and the headaches
at home. She denied any nausea, vomiting or auditory or occular
prior to these attacks. She states that they get extremely severe.
She is unable to tolerate it. Psychiatric consultation had been
recommended on her last visit but had not been accomplished. She
is being admitted for further work-up and diagnosis.

**WORKING DIAGNOSIS:**
Severe headaches, etiology to be determined. Possibly on a vascular
basis.

**PHYSICAL EXAMINATION:**
Temperature is 98.6°F. pulse rate is 84, respirations are 18 per
minute. Blood pressure is 118/80. She is a well developed, well
nourished, 16 year old colored female, in no critical distress.
HISTORY AND PHYSICAL EXAMINATION
                                    ( O V E R )

## HISTORY AND PHYSICAL EXAMINATION

Head and Neck--Pupils are round and equal, react to light and
accommodation.  Sclerae are white.
Ears, Nose, Throat--Negative for infection.  Patient's affect
and judgement is rather abnormal.  She is extremely introverted
and reluctant to speak and answer questions, and she is in
no untord reactions.  She is appropriate, but extremely

Breasts--Pendulous.  No masses.
Heart--Point of maximu m impulse in the fourth interspace, mid-
clavicular line.  No murmurs, no arrhythmias.
Lungs--Clear to percussion and auscultation, no rales.
Abdomen--Soft.  Nontender.  Liver and spleen are not palpable.  Bowel
sounds are normal and active.  Nocostovertebral angle tenderness
Genitalia--Normal female.
Pelvic examination--Has been done recently in the office and was
within normal limits.  Last normal menstrual period was May
1975.
Rectal examination--Deferred.
Extremities--Negative for ulceration, edema, and inflammation.
Neurological--Physiological.  Deep tendon reflexes are equal and
active bilaterally.

O.  H.  Whetstone   M.D.

OHW:jez
D&T:5-30-75

DO NOT WRITE IN THIS SPACE

**KENOSHA MEMORIAL HOSPITAL**

6308 - 8th Avenue

Kenosha, Wisconsin 53140

6-4-75

REAMS, BEATRICE

Dr. Whetstone

16          233 C

Regarding: __Beatrice Reams__

Patient's name

5115 - 13th Avenue          (If minor—Father's Name also)

Address

TO:          Dr. Fai

Consulting Physician

Reason for Request ___Psychosomatic___     ___Headache___

O. H. Whetstone, M.D.

Attending Physician

---

**REPORT**

June 4, 1975

Date

**PRESENT ILLNESS:**

The patient at the present time is on the Pediatric Ward. This 16 year old colored girl has been admitted to the Hospital for the second time in a few days because of intractable headaches which according to her usually appear in the middle of the night, starting at the front and then involves the whole head. She gets dizzy occasionally and then gets the headaches. The patient said that these headaches started after she had her baby five months ago. Prior to this she never had this type of headache.

The patient lived most of her life, up until last August, in Arkansas with her mother. At that time, being pregnant, moved up North. She delivered her baby five months ago. Presently she keeps house with the father and there are two siblings in the household and she also goes to school. It is also significant that the patient's mother use to have similar headaches for a period of time.

The patient has never been hospitalized except for these hospitalizations previously mentioned and for delivery of the baby. She also had some minor difficulties with the father, who takes the money given by the Welfare for the baby and many times spends it himself. Which results in some arguments. The patient had no boyfriends since she had the baby.

At the time of the examination the patient was well oriented in persons, places and time. Affect was appropriate. Memory seemed to be intact. Intelligence was average or slightly above average. Insight and judgement, however, was poor.

**DIAGNOSTIC IMPRESSION:**

Cephalgia, due to psychosomatic origin.

IT seems that due to the fact of the patient's condition mimics the mothers condition previously and happened only after the patient's previous sexual partner disappeared. As well as after the delivery of her child, seems to substantiate that the headaches

**CONSULTATION REPORT**                     CONSULTANT          M.D.

... of psychosomatic origin. However, I would like to make some additional psychological testing and therefore the patient would be advised to come to my office where I could do my testing. Beside all of the prescribed, Valium medications, or other additionaly medications seem to be necessary at this time. With supportive and may be insight psychotherapy later on, the patient's condition hopefully will be improved. From general the symptomatic treatment is also recommended, by Dr. Whetstone.

Thank you for this interesting consultation.

LLF:jms
Dic: 6-5-75
Tran: 6-5-75

L. L. Fai, M.D.

16

KENOSHA MEMORIAL HOSPITAL
6308 - 8th Avenue
Kenosha, Wisconsin 53140

Adm: 5-25-75
Dis: 5-28-75

REAMS, BEATRICE
Dr. Whetstone
16

02 50 87

233A

To include:
Final Diagnosis
Working Diagnosis
Present Illness
Past History and
System Review
Family History
Physical Examination

**FAMILY HISTORY:**
Father and mother living and well. Mother lives down South in Arkansas
I think. Father lives in Kenosha and works for Arneson Foundry. Five
brothers and four sisters are living and well.

**PAST HISTORY:**
Allergies denied.
Past surgical history denied.
The patient is gravida I, para I. The present examiner delivered a
normal male Negro infant approximately 5 months ago at Kenosha Memorial
Hospital. This was conceived while the patient was living down South
with her mother and she moved to Kenosha while she was 5 months pregnant.

**CHIEF COMPLAINT:**
The patient had severe headache, was uncommunicative and was brought
to Kenosha Memorial Hospital.

**PRESENT ILLNESS:**
The patient is a 16 year old colored female who has always been rather
withdrawn, shy, introverted and not too communicative even with the
examiner. She has been on no medication, has had no previous illness
except that she has been thrashing about and holds her head and will
not answer questions or interrogations by people around her. Her
brother states that this has happened before. The patient also states
that this happened while she was down South as well as since she has
been up North and has had her baby. She was brought by rescue squad
to Kenosha Memorial Hospital Emergency Room at approximately 4 AM.
Again, she was not answering questions of the nurses. She continued
holding her head, continued crying and was admitted to the hospital
for further observation.

**WORKING DIAGNOSIS:**
1. Probable epileptiform seizure. Rule out behavior disorder on
an emotional intellectual level.

**PHYSICAL EXAMINATION:**
Temperature on admission was 98.6, pulse rate 116, respirations 36
per minute, blood pressure 122/90. She is a well developed, well
nourished 16 year old colored female who is rational, quiet, answers
questions now in the morning, denies headache and states she has no
complaints at the present.
Head and Neck: Pupils are round and equal, react to light and accommo-
dation. Sclerae are white. Ears, nose and Throat negative for
(over)

**HISTORY AND PHYSICAL EXAMINATION**

000133

**KENOSHA MEMORIAL HOSPITAL**

6308 - 8th Avenue

Kenosha, Wisconsin 53140

Adm. 9-22-74          02 50 87
Dis. 9-24-74   Reams, Miss Beatrice
               Dr. Whetstone
               15        452A

To Include:

1. Provisional & Final Diagnosis
2. Reason for admission
3. Pertinent laboratory, x-ray, other diagnostic studies
4. Course of treatment
5. Condition on discharge
6. Follow-up & Discharge Medication

FINAL DIAGNOSIS:   Pregnancy - primipara, third
                   trimester.
                   Anxiety depression state.

WORKING DIAGNOSIS:  Pregnancy, third trimester, primipara.  Depression state.

The patient is a 15-year-old female, who was brought to the Kenosha Hospital Emergency Room by her father on Sunday afternoon because of the patient's complaint of being tired, and crying all of the time.  The patient was pregnant, she denied any knowledge of the pregnancy.  Uterus was enlarged to approximately eight months gestation size. The patient was relatively uncommunicative, was seen in consultation by Dr. Tonkiewicz on request of the present examiner.  Treatment consisted of the use of Librium for two days in the hospital, vitamins, and attendance at prenatal clinic.  She is discharged home on multi-vitamins, two daily, office follow-up appointment in one week.

OHW/lsl
D&T: 9-24-74

O. H. Whetstone, M.D.

**DISCHARGE SUMMARY**

_____ M.D.
                Attending Physician

Respondent's Exhibit F2          Supp. Add. 048

**KENOSHA MEMORIAL HOSPITAL**
6308 - 8th Avenue
Kenosha, Wisconsin 53140

Adm. 9-22-74          02 50 87
Dis. 9-24-74  Reams, Miss Beatrice
              Dr. Whetstone
              15          452A

To Include:

Final Diagnosis
Working Diagnosis
Present Illness
Past History and
System Review
Family History
Physical Examination

FINAL DIAGNOSIS:   Pregnancy - primipara.

WORKING DIAGNOSIS: Pregnancy, third trimester, primipara.  Depression state.

FAMILY HISTORY:
Father is living and well and brought the patient to the hospital.  Mother is in
Arkansas.  Nine siblings are living and well.  Allergy denied.

PAST HISTORY:
Past surgical history negative, except for four teeth extracted in Kenosha, one
week ago.

Last menstrual period—the patient does not know when she had her last period.

PRESENT ILLNESS:
Chief complaint:  Crying all the time, sleeps, states that she does not feel well.
The patient is a 15-year-old, colored female, who was brought to Kenosha Emergency
Room by the father on Sunday afternoon, stating that the child has not been feeling
well, does not tell him what is wrong.  He brought her up here from Arkansas, where
she lived with her mother six weeks ago, in the company of the brother and sister;
she has been enrolled here in a school in Kenosha, Wisconsin and has been in good
health, except for the fact that she has not been feeling well for the last several
weeks.  The father and the child deny any knowledge of pregnancy, however, examination
does reveal the uterus to be approximately 8 months gestation size and she was
advised admission to the hospital after examination.

PHYSICAL EXAMINATION:
Temperature is 99.2°F.  Pulse rate 120, respirations 18 per minute.  Blood pressure
118/70.  She is well developed, well nourished 15 year old colored female, in no
acute distress.
Head and neck examination:  Patient averts the gaze, does not answer questions, except
in monosyllables of "No Sir....Yes Sir", she denies any knowledge of pregnancy, she
states that she does not know when her last menstrual period was.  She also states
that she does not know what is wrong with her, except that she feels as though she
is very sad and lonely.
Eyes:  Pupils are round and equal and react to light and accommodation.
       Sclerae are white.
Neck:  Supple, cervical nodes are not enlarged.
Breasts:  Pendulous, engorged.
Heart:  Point of maximum impulse in the 4th interspace midclavicular line, no arrhythmias.
        No murmurs.
Lungs:  Clear to percussion and auscultation.  No rales.
Abdomen:  Protuberant.
Pelvic:  Uterus is symmetrically enlarged to just under the costal margins.  Fetal
         heart tones are heard.  Small amount of white discharge present.  Good vaginal

(OVER)

**HISTORY AND PHYSICAL EXAMINATION**                                         M.D.
                                                        Attending Physician

Respondent's Exhibit F2                    Supp. Add. 049



## CONTINUE HISTORY AND PHYSICAL HERE

support.  Cervix is fixed, thick.  Fetal parts are floating.
Rectal:  Brown stool on rectal glove.  No intraluminal masses.
Extremities:  Negative for ulceration, edema, inflammation.
Neurological:  Physiological.  Deep tendon reflexes equal and active bilaterally..

OHW/lsl
D: 9-22-74
T: 9-23-74

O. H. Whetstone, M.D.

DO NOT WRITE IN THIS SPACE

Respondent's Exhibit F2          Supp. Add. 051

003351

228

TAL

Adm. 5-25-75    REAMS, BEATRICE        02 50 87

Dis. 5-28-75    Dr. Whetstone

16                      2331

FINAL DIAGNOSIS:
1. Headache, probably on a tension basis.

DIAGNOSIS:
...cable epileptiform seizure. Rule out behavior disorder on an emotional intellectual level.

This is a 16-year-old colored female who recently had a infant male four months ago who comes to the Hospital because severe headaches and enters via rescue squad to the Emergency Room. She was admitted to the Hospital. It was noted that patient has had some emotional problems in the past, and patient was placed on Mellaril 10 mg., t.i.d., Tylenol for headaches.

During her hospital course, she had an electroencephalogram which was normal. Her CBC, urinalysis, and chest x-ray were normal. Headaches continued intermittently, and patient states that Tylenol did not relieve the headaches. Psychiatric consult was requested on two separate days, but was not obtainable by the time the patient wished discharge on 5-28-75, and she will be seen in the office for followup.

OHW/sjp
D/5-29-75
T/6-2-75

O. H. Whetstone, M. D.

DISCHARGE SUMMARY                                               M.D.
                                                      Attending Physician

**KENOSHA MEMORIAL HOSPITAL**
6308 - 8th Avenue
Kenosha, Wisconsin 53140

321513-4
BEANS BEATRICE    P
DR WHETSTONE      16YRS
MR 07 (S N)

Regarding: _Beatrice Beans_
Patient's name
(If minor—Father's Name also)

Address

TO: _Neurology Clinic_
Consulting Physician

Reason for Request _Headaches - Withdrawn -_

Attending Physician

## REPORT

6-2-75
Date

This 16-year-old patient had been admitted by Dr. Whetstone for investigation of headaches. So far, brain scan, EEG, spinal tap, have been done, which have been normal. The patient gives a distinct history of having aggravation of precipitation of these headaches when under stress.

Neurological examination reveals her to be alert, oriented and cooperative. There is no papilledema or hemorrhages, normal to confrontation, all cranial nerves intact. Deep tendon reflexes are equal, symmetrical and normal. There is no pathological reflexes. Motor power is equal, and normal. Cerebellar functions are normal. Sensation is normal to various modalities.

IMPRESSION: Normal neurological examination The etiology of her headaches would be attributed most likely to her anxiety state.

Thank you very much for allowing me to see this patient.

MR/lsl
D: 6-11-75
TL 6-12-75

N. Rafiullah, M.D.

**CONSULTATION REPORT**

CONSULTANT                                                    M.D.

## HISTORY AND PHYSICAL EXAMINATION

infection.  Neck is supple.  Cervical nodes not enlarged.
**Breasts:**  Pendulous.  No masses.
**Heart:**  Point of maximum impulse is in the fourth interspace, midcla-
    vicular line.  No murmurs, no arrhythmias.
**Lungs:**  Clear to percussion and auscultation.  No rales.
**Abdomen:**  Soft.  Nontender.  Liver, spleen not palpable.  Bowel sounds
    are normal active.  No costovertebral angle tenderness.
**Genitalia:**  Normal female.
**Pelvic and Rectal:**  Within normal limits.  No evidence of incontinence.
**Extremities:**  Negative for ulceration, edema, inflammation.
**Neurological:**  Physiological.  Deep tendon reflexes equal and active
    bilaterally.

Incidentally there were no bite marks of the tongue.


OHW:mab
D: 5-25-75
T: 5-26-75                              O. H. Whetstone, M.D.


DO NOT WRITE IN THIS SPACE

000186

Respondent's Exhibit F2                    Supp. Add. 054

003408

Page 285
3187

# JEFFERSON REGIONAL MEDICAL CENTER
1515 West 42nd Avenue . Pine Bluff, AR 71603 . (870)541-7100
## History and Physical Examination

**PATIENT'S NAME:** WHITESIDE, BEATRICE
**ACCOUNT #:** 0002064759
**MR #:** 000076990
**ROOM #:** PY3187A
**ADMIT DATE:** 11/10/05


2064759

Ms. Whiteside is a 46-year-old married black female admitted through the emergency room with reports of depression, auditory hallucinations telling her to kill herself and suicidal ideations. She reported she could not remember being happy for 2 or 3 months at a time since she was 9 years old. That was when her brothers started sexually abusing her and they did so for several years. She reported she has been having difficulty with sleep, appetite, energy and concentration for at least this year and having death wishes off and on. In the last week she had gotten worse, started feeling paranoid and then on the day prior to admission started hearing the auditory hallucinations for the first time.  She explained that the most recent stressor was when one son told her that another son was facing 40 years to life in prison. Her 32-year-old son has been on death row for 12 years for being involved in a murder in Pine Bluff when he was 17. She indicated that the family thought that the case had been dropped, but a new judge has reopened it and he is reportedly getting letters from Missouri telling him that he has to come back to court. The patient has not seen the letters because her sons won't show them to her. She did not talk about it during this evaluation, but she talked to the nurse about her husband being emotionally abusive as well. She acknowledged that she tries to keep feelings about all these problems bottled up inside and has all her life. She acknowledged drinking beer and using occasional marijuana, but denied cocaine that was present on her urine drug screen on admission.

PSYCHIATRIC HISTORY:  Included longstanding depression with periods of major depression, multiple suicide attempts and one psychiatric hospitalization when she was 16.  She reported being arrested once on charges filed by a woman who was having an affair with her husband, but the charges were dropped.

FAMILY HISTORY:  Not explored for lack of time, but included the sons with legal problems at least.

SOCIAL HISTORY:  Included patient living in Pine Bluff and being the 10th of 16 children, and just recently bringing her father back from Wisconsin after he was bludgeoned in the head. She reported he is doing well. She indicated she is closer to the 20 year old son that she lives with.

PAST MEDICAL HISTORY:  Included **no known drug allergies.** She is status post partial hysterectomy and umbilical hernia repair. She has no identified illnesses.

MEDICATIONS:  She takes  no medications. She reported she had been on antidepressants in the past, but could not remember what.

History and Physical Examination
Page 1 of 2

Respondent's Exhibit F2                    Supp. Add. 055

286

003409

**PATIENT'S NAME:** WHITESIDE, BEATRICE
**MR #:** 000076990
**ROOM #:** PY3187A
**ADMIT DATE:** 11/10/05

**MENTAL STATUS EXAM:** Showed a cooperative, spontaneously talkative obese female with normal speech and motor movement and good eye contact. Affect and facies were very depressed and she was tearful through most of this session. Thoughts were organized with no looseness of association or flight of ideas. Content included the suicidal ideations, but no homicidal ideations or delusions. She did not appear to be hallucinating, but reported continued auditory hallucinations of voices. Sensorium and mental function were grossly impaired. IQ was estimated to be average. Insight and judgment were intact. Strengths included seeking help. Weaknesses included history of suppressing painful thoughts and feelings.

**IMPRESSION:**

|        |                                                                                                                                              |
|--------|----------------------------------------------------------------------------------------------------------------------------------------------|
| Axis I | Major depression, recurrent, severe with psychotic features. Dysthymic disorder. Rule out alcohol abuse. Marijuana abuse. Rule out cocaine abuse. Partner relationship problems. |
| Axis II | Deferred. |
| Axis III | Obesity. |
| Axis IV | Primary support problems, family problems. |
| Axis V | 35. |

**PLAN:** Start antidepressant and antipsychotic medications. Refer to outpatient follow-up at Southeast Arkansas Behavioral Healthcare System and encourage her to begin expressing painful thoughts and feelings rather than continuing to suppress them.

**ESTIMATED LENGTH OF STAY:** Seven days.

**DISCHARGE CRITERIA:** No aggression, no suicidality or psychosis, improving mood and social interactions, no adverse drug reactions.

**PROGNOSIS:** Fair.

David M. Sizemore, M.D.: fah
DD: 11/10/2005          DT: 11/11/2005

**History and Physical Examination**
**Page 2 of 2**

000048

Respondent's Exhibit F2                    Supp. Add. 056

003510



387

SOUTHEAST ARKANSAS BEHAVIORAL
HEALTHCARE SYSTEM, INC.
2500 Rike Drive    P. O. Box 1019
Pine Bluff, Arkansas   71613
Phone 870/534-1834    1/800/272-2008
Fax 870/534-5798

CONFIDENTIAL

MEDICATION MAINTENANCE

BEATRICE WHITESIDE   #822491
07-11-08
HH:ats

TIME IN:            9:32 A.M.
TIME OUT:           9:42 A.M.

SUBJECTIVE:  Ms. Whiteside comes in for follow up of Major Depressive Disorder, recurrent, severe, with psychotic features and Dysthymic Disorder, by history. The patient's current medications include Geodon 60 mg three by mouth at bedtime, Wellbutrin XL 150 mg three by mouth every morning, and Abilify 30 mg two by mouth daily. Today, the patient states that she is doing well. She is now seeing a new therapist, Andre'Ka, after Alicia had left. She comes to Day Treatment on Wednesdays and Fridays and she is enjoying it.  She had disclosed her rape incident to her therapist and she is working well with Her.  She would like to continue her current medications without change. No adverse side effects are reported at this time.

MENTAL STATUS EXAMINATION: This is a 49-year-old obese African-American female whose appearance is noted to be casually dressed and groomed. She maintains good eye contact. Speech is clear, logical, and goal-directed. Her behavior is cooperative. Affect is appropriate. Mood is euthymic.  She denies any delusions or any perceptual distortions. She is alert and oriented. She does not appear to be a danger to herself or others.

IMPRESSION:      Axis I     Major Depressive Disorder, recurrent, severe, with psychotic features; Dysthymic Disorder, by history; Marijuana and Alcohol Abuse, in remission
                 Axis V     Current GAF = 45

TREATMENT PLAN:  1)  We will continue the current medications without change. The patient has enough refills at this time.  The side effects profile was discussed with patient and she is agreeable to this plan. 2) I will see this patient back in two to three weeks for follow up and review of medications.

000001

Respondent's Exhibit F2                          Supp. Add. 057

003511

PAGE 2
MEDICATION MAINTENANCE
BEATRICE WHITESIDE
07-11-08

**CONFIDENTIAL**

3) The patient is to continue in the Day Treatment program to improve social skills, to prevent relapse, and for her overall functioning.   4) The patient is to engage in individual psychotherapy as indicated.

Henedine C. Hernando, APRN, BC
ADVANCED NURSE PRACTITIONER



SOUTHEAST ARKANSAS MENTAL
HEALTH CENTER, INC.

DISCHARGE SUMMARY

CONFIDENTIAL

NAME:   BEATRICE WHITESIDE          CASE NO.:   822491

DATE OF ADMISSION:        8/16/85

DATE OF TERMINATION:      12/17/85

PRESENTING PROBLEM: Patient was referred to us by SCAN for an
evaluation. Patient admitted that she did spank her son and he
ended up with a mark on his nose which was seen by one of the
schoolteachers.

CLINICAL RESUME': Patient was seen for an initial interview
only. She did not ever complete her evaluations.

FINAL DIAGNOSIS: Other Unspecified Family Circumstances.

REFERRAL TO: (If Applicable) N/A.

FOLLOW-UP PLAN: Scan did notify us that Mrs. Whiteside had
moved out of this county.

PRIMARY THERAPIST:
CINDY SLAUGHTER, ACSW
PSYCHIATRIC SOCIAL WORKER



INITIAL INTERVIEW

BEATRICE WHITESIDE  #822491
8-16-85
CS:dm 901

CONFIDENTIAL

IDENTIFYING INFORMATION:  Mrs. Whiteside is a 26-year-old, black, female seen at our clinic as a referral from SCAN.  She is seen here as a referral for evaluation because of suspected abuse of her 11-year-old son.

PRESENTING PROBLEM:  The patient indicates that she did in fact "spank my son Ken twice with a belt" because he left some toys on the couch and indicated that he was not going to pick them up.  She states that he had a mark on his nose and went to school and was then contacted with regard to the mark on him and an investigation began.  There are two other children within the home; a son Scott age 1 year and 3 months and another son Dominique who is 2 weeks old.  She indicates that this occurred approximately two weeks prior to school being out.  She had been pregnant with Dominque and had not come in for that reason.  The patient gave me very little information about this and I do not have a report from SCAN about the situation.

BACKGROUND HISTORY:  The patient states that she was born and reared in Altheimer with nine siblings.  She attended school through the 12th grade and states that she worked a restaurants and in factories until she married.  She married when she was 21-years-old and her husband is employed.  She gives a history of her father having left when she was approximately in the sixth grade and denies abuse as a child.

She denies any use of drugs or alcohol but indicates that her husband is abusive to her at times.

The patient indicates that her SCAN worker, Ruth Rice, is working with her sometimes twice a week.  She continues to spank Ken and indicates that she has been attempting to use other methods such as taking his bicycle away as far as something of this nature but does not feel that this has worked.  Mrs. Whiteside does not feel that she has any problems with abusing Ken.  He is still in the home at this time and she states that she is trying to learn some other methods of discipline but does not feel a spanking is inappropriate.

RECOMMENDATIONS:  Psychiatric and psychological evaluations. Reports will be made to the Court upon completion.
SCAN

Cindy Slaughter, ACSW, LCSW
PSYCHIATRIC SOCIAL WORKER

S

003601

EXHIBIT 478
Petitioner's
42

IN THE CHANCERY COURT OF ST. FRANCIS COUNTY, ARKANSAS
JUVENILE DIVISION

STATE OF ARKANSAS

VS.                              NO. J-91-221

KENNETH REAMS, A JUVENILE, ET AL

ORDER OF TRANSFER OF CUSTODY

FILED

JAN 24 1991

TIME: M
BETTE S. GREEN, CLERK
ST. FRANCIS COUNTY

On this 22nd day of January, 1991, this matter properly came before the Court and the Court after hearing statements of counsel, testimony ore tenus, and being well and sufficiently advised, finds:

1.  This Court, pursuant to Arkansas Code Annotated Section 9-27-330 (1) has the power to transfer legal custody of a juvenile.  Amelia Reams of 1000 Cole St., Poplar Bluff, Missouri 63901, has been presented to the Court as a fit and proper person to hold custody of the juvenile, Kenneth Reams.

2.  Beatrice Whiteside, mother of the juvenile, Kenneth Reams, has consented to said transfer of custody.

3.  It is proper under the provisions of Arkansas Law, that custody of Kenneth Reams be immediately transferred to Amelia Reams and that he be ordered and directed to remain in her custody, at her residence, in Poplar Bluff, Missouri, until such time as this Court shall enter any modification of this Order.

IT IS THEREFORE CONSIDERED, ORDERED, ADJUDGED AND DECREED that legal custody of Kenneth Reams should be, and is hereby, transferred to Amelia Reams, who resides at 1000 Cole St., Poplar Bluff, Missouri 63901.  Said Amelia Reams shall, until such time as this Order is modified, continue in all respects and circumstances as the Guardian and Custodian of Kenneth Reams.

Respondent's Exhibit F2                    Supp. Add. 061

003602

Beatrice Whiteside is hereby awarded visitation and as set forth in prior Orders of this Court and as agreed upon by the parties. This Order is entered pursuant to Arkansas Code Annotated 9-27-330 (1).

CHANCELLOR, JUVENILE DIVISION

# CERTIFICATE

STATE OF ARKANSAS } SS
County of St. Francis.

I, __Bette S. Green_____, duly elected, qualified and acting Clerk of the C and Ex-Officio Recorder, within and for the County and State aforesaid, do hereby certify that the fo true and complete copy of __Order Transfering Custody__ filed in my office on __Jan. 25, 19__
_____State of Arkansas_____ vs. Kenneth Reams_____

IN TESTIMONY WHEREOF, I have hereunto set my hand and seal as such Clerk on this____25____ day of ___January_____, 19_91_.   _____Bette S. Green_____, Clerk
By _Shannon Burns_____, D. C.

Respondent's Exhibit F2          Supp. Add. 062

004361



1243

PETITIONER'S
EXHIBIT
48

## AFFIDAVIT/DECLARATION OF KAREN BRANTLEY
## PURSUANT TO 28 U.S.C. SECTION 1746 AND A.C.A. SECTION 5-53-102

1.  My name is Karen Brantley. I am currently employed as a secretary for the Jefferson County Public Defender. I was Maxie Kizer's secretary from 1986 or 1987 through 2003, when Mr. Kizer left the public defender's office.

2.  I was Mr. Kizer's secretary when, in 1993, he represented Kenneth Reams. Kenny and a co-defendant were charged with capital murder for a shooting death that occurred during an ATM robbery. At that time, the public defender's office had precious few resources. For example, we did not have a staff investigator. Whenever a lawyer felt that an investigator was necessary for their case, s/he had to petition the court for the funds required to retain one.

3.  Mr. Kizer asked me to help him with Kenny's case by handling the penalty phase investigation. Although I usually just watched and took notes while Mr. Kizer interviewed the witnesses in his cases, this time Mr. Kizer asked me to do the interviews myself. Because I did not have any special training in mitigation or investigation techniques, Mr. Kizer helped me by setting up the meetings and explaining to me what information he hoped I would elicit from Kenny's witnesses.

4.  I met with Kenny's aunt, Amelia Reams, at a motel in Poplar Bluff, Missouri, to do the interviews. Amelia brought together a bunch of Kenny's friends and relatives for me to meet. Although I cannot remember who they all were, I know that I met with a handful of people. I asked them all of the questions that Mr. Kizer told me to ask. Everyone cooperated with me. They all seemed to want to help Kenny in whatever way they could. After I came back, I told Mr. Kizer about the interviews and he used that information to decide which witnesses to call at the penalty phase.

5.  I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information and belief subject to U.S.C. Section 1746 and A.C.A. Section 5-53-102.

Karen Brantley
Karen Brantley

Dated:

1-23-07

Respondent's Exhibit F2                    Supp. Add. 063

IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ARKANSAS
SIXTH DIVISION

KENNETH REAMS                                                    PETITIONER

VS.                              NO.   CR-1993-301-3-6

STATE OF ARKANSAS                                               RESPONDENT

## ORDER

Comes now the Court, upon a hearing held on May 1, 2007, all parties being present and represented by counsel, and the Petitioner appearing in person before this Court concerning the above-styled cause of action, and from the things and matters presented to the Court, the Court doth hereby enter its findings of fact and order with respect to Petitioner's Rule 37 Petition, Supplement and Memorandum of Law and requests for discovery, as follows:

1.      This Court will hold an evidentiary hearing in this case on August 20, 21, 22, 23 and 27, 2007 beginning at 9:30 a.m. each morning in the courtroom at the Jefferson County Juvenile Justice Center, 301 East 2nd, Pine Bluff, Arkansas, provided that the Department of Corrections (the "DOC") agrees to let the prisoner be present in this courtroom instead of the other courtroom at the Jefferson County Regional Detention Facility. The Attorney General's Office is encouraged to ask the DOC to provide transportation for the inmate as well as security, and to notify this Court in writing as promptly as possible if the DOC will not agree to transport the prisoner to this facility but requests that the other facility be utilized.

2.      The Court directs that the Petitioner's witness list shall be filed with this Court on or before May 31, 2007 with copies to the Court and to counsel. Respondent's witness list is due to be filed with the Court with copies to counsel on or before June 29, 2007.

FILED

MAY 3 1 2007

ANNETTE P. BRANCH
Circuit Clerk
JEFFERSON COUNTY, ARKANSAS

- 1 -

Respondent's Exhibit F2                        Supp. Add. 064
P12

3.      This Court finds that Arkansas Rule of Criminal Procedure 37 precludes this

Court from taking any action - including, but not limited to, the granting of relief or the granting

of an evidentiary hearing - on the claims of Constitutional error argued by Petitioner in

paragraphs 4-24 and 27-31 of his Rule 37 Petition, Claims a-j, k(2)-m of Petitioner's Supplement

and Memorandum of Law.  This Court also finds that Petitioner's supplemental claim that

execution by lethal injection is a cruel and unusual punishment (found at Petitioner's

Memoradum pages 88-91) is not a relief cognizable under Rule 37.  Thus, each one of these

claims cannot be heard and therefore, the Court cannot address those issues.  These claims need

to be raised in a different forum.

4.      This Court further finds that Petitioner's claim that his mental retardation renders

his death sentence unconstitutional pursuant to both federal and state law is cognizable under

Rule 37.  This Court further holds that Petitioner may present evidence and testimony at said

scheduled evidentiary hearing regarding any and all aspects of this claim including, but not

limited to, the allegations of ineffective assistance of counsel.

5.      This Court also finds that several of Petitioner's claims of ineffective assistance of

trial counsel and appellate counsel are cognizable under Rule 37.  This Court holds that as to the

below listed claims of error contained in ¶32 of Petitioner's Rule 37 Petition and at pages 69-87

in Petitioner's Memorandum make a sufficient showing that would warrant this Court to grant

Petitioner an evidentiary hearing:

a.      Failure to Change Venue (see Rule 37 Petition at ¶32; Memorandum
        at 69-71).
b.      Petitioner's Arrest based upon unreliable or insufficient information (see Rule
        37 Petition at ¶32 and Memorandum at 69-71).
c.      Admission of Illegally Seized Tangible Evidence (see Rule 37 Petition at ¶32
        and Memorandum at 69-71).

- 2 -



d.   Admissions of Evidence of Other Crimes during the guilt phase of Petitioner's trial (Rule 37 Petition at ¶32; Memorandum at 69-70 and 73).

e.   Admission of Inadmissible and/or Prejudicial Hearsay Testimony (Rule 37 Petition at ¶32 and Memorandum at 69-73).

f.   Allegation of Underrepresentation of African-Americans in the Arkansas Jury System and Discriminatory Exercises of Peremptory Challenges (as these are tied together). (See Rule 37 Petition at ¶32 and Memorandum at 69-72).

g.   Insufficient Evidence of Extreme Indifference to the Value of Human Life and/or a Vague Standard contained in jury instructions or a lack thereof (See Rule 37 Petition at ¶32 and Memorandum at 69-74).

h.   Absence of Crucial Jury Instructions (See above).

i.   State's failure to demonstrate Petitioner's eligibility for the imposition of the death penalty (only as to issues concerning mental retardation and no other). (See Rule 37 Petition at ¶¶25-26 and Memorandum at 69-74).

j.   Alleged Ineffective Assistance of Trial Counsel for failure to adequately investigate, develop and present all available mitigating evidence during the mitigation portion of the trial (See Rule 37 Petition at ¶32 and Memorandum at 75-87).

6.   Petitioner's discovery requests of the Respondent are denied generally, but are specifically granted as to certain matters contained in a separate written Order addressing issues and matters of *Brady* material and are more specifically addressed in separate Orders

IT IS SO ORDERED this __30__ day of May, 2007.

_____
THOMAS E. BROWN
CIRCUIT JUDGE

- 3 -

CERTIFICATE OF SERVICE

I hereby certify that on this date, I caused the foregoing Order to be served by Facsimile and First Class Mail upon the following persons at the following addresses:

Ms. Christina Swarns
NAACP Legal Defense & Educational
    Fund, Inc.
99 Hudson Street, 16th Floor
New York, NY  10013
Fax  212-226-7592

Mr. Kent G. Holt
Office of the Attorney General
Criminal Department
323 Center Street, Suite 1100
Little Rock, AR  72201
Fax 501-682-8084

and by First Class Mail upon the following persons at the following addresses:

Mr. Norman J. Chachkin
NAACP Legal Defense & Educational
    Fund, Inc.
99 Hudson Street, 16th Floor
New York, NY  10013

Mr. John W. Walker
John W. Walker, P.A.
1723 Broadway
Little Rock, AR  72206

Mr. George H. Kendall
Holland & Knight
195 Broadway, 24th Floor
New York, NY  10007

Mr. David R. Raupp
Office of the Attorney General
Criminal Department
323 Center Street, Suite 100
Little Rock, AR  72201

Dated this 30th day of May, 2007.

Thomas E. Brown, Circuit Judge

- 4 -

Respondent's Exhibit F2
P15
Supp. Add. 067