ELECTRONICALLY FILED
Jefferson County Circuit Court
Barbara A. Collins, Circuit Clerk
2022-Feb-01 15:10:43
35CR-93-301A
C11WD06 : 10 Pages

# IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ARKANSAS
# ELEVENTH JUDICIAL DISTRICT-WEST, SECOND DIVISION

| | |
|---|---|
| **KENNETH REAMS** | **PETITIONER** |
| v. | No. 35CR-93-301A |
| **STATE OF ARKANSAS** | **RESPONDENT** |

## ORDER

In *Reams v. State*, 2018 Ark. 324, 560 S.W.3d 441, the Arkansas Supreme Court affirmed this Court's grant of Rule 37 relief with regard to the claim that Mr. Reams's trial counsel was constitutionally ineffective for failing to present his codefendant's testimony at the penalty phase of Mr. Reams's capital-murder trial. *Id.* at 26, 560 S.W.3d at 457. With regard to Mr. Reams's claim that trial counsel was ineffective for failing to raise a fair-cross-section claim pursuant to *Duren v. Missouri*, 439 U.S. 357 (1979), the Court held that a *Duren* claim is cognizable in Rule 37 proceedings. *Id.* at 19, 560 S.W.3d at 454. The Court remanded the case to this Court to make factual findings with regard to "whether Reams has established a valid *Duren* claim[.]" *Id.* at 22, 560 S.W.3d at 455.

Mr. Reams bears the burden of establishing a violation of his fair-cross-section right by proving, in accordance with *Duren*, the following: (1) that the

Respondent's Exhibit K                                                          1

group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection-process. *Id.* at 18, 560 S.W.3d at 453 (citing *Duren*, 439 U.S. at 364).

The parties called witnesses at the Rule 37 hearing and, on remand, submitted supplemental materials including briefs, affidavits and reports of additional witnesses, and supplemental statutes. After a review of the testimony, the evidence, and the arguments of the parties, the Court makes the following findings of fact and conclusions of law with regard to the three factors that Mr. Reams must prove in order to satisfy the requirements of *Duren*.

**1. Distinctive group within the community.** There is no dispute between the parties that Mr. Reams's *Duren* claim satisfies this requirement in that African-Americans are a distinctive group within the community. *See, e.g., Lee v. State*, 327 Ark. 692, 698, 942 S.W.2d 231, 234 (1997).

**2. "Fair and reasonable" representation.** The second prong of *Duren* requires the Court to determine whether the representation of African-Americans in the jury venire was fair and reasonable in relation to the number of African-Americans in Jefferson County eligible for jury duty. *See Duren*, 439

2

U.S. at 364. *Duren* requires that this claim be supported with accurate, reliable data. *Id.* The Court finds that Mr. Reams has failed to carry his burden of establishing that the representation of African-Americans on Jefferson County juries was not fair and reasonable as described below.

**A. The race of the individual jurors.** In the first instance, the data Mr. Reams admittedly relies upon, with the exception of one petit venire, does not actually identify the race of the jurors. (Pet. Br. at 9 n.4; Pet. Ex. 1, Vogel Aff. At 2 ¶ 5) Rather, his analysis relies upon "geocoding." Mr. Reams has cited a handful of out-of-state cases over a span of 20 years in which geocoding has been utilized: three voter-dilution cases and two employment-discrimination cases. Pet.'s Repl. Br. at 4-5. Mr. Reams also has submitted an additional affidavit from one of his statistical experts claiming "[t]he rates of correspondence between self-identified and geocoded racial group membership usually fall between 80 percent and 96 percent." *Id.*, Ex. E at 2. This 16-point disparity may explain the dearth of reported cases—none of which is *Duren* cases—in which geocoding was utilized.

Mr. Reams argues that his expert who analyzed the data a decade later, using the same method as his first expert, got nearly the same result. (Pet.'s Repl. Br. at 10, n.2.) However, that the same method reaches a similar, generalized result does not enhance the method's accuracy nor eliminate the

need to determine the race of the individual jurors with regard to a *Duren* claim. Having failed to accurately and reliably identify the race of the individual jurors as a prerequisite for drawing conclusions from the data, the Court finds that Mr. Reams's *Duren* claim is not proven.

**B. Representation of the identified group.** Even were the Court to assume that "geocoding" is an accepted, reliable statistical method, according to Mr. Reams's experts they "estimated that 38.6% of the potential jurors on the clerk-selected lists were African American, which is only 0.9% below the expected result of 39.5%." (Pet. Br. at 10) With an absolute disparity of 0.9% with regard to the master list, Mr. Reams's experts conceded that "[i]n no instance did the measures of absolute disparity or comparative disparity rise to a level to suggest the systematic exclusion of African Americans. **These findings suggest no racial bias in the overall pool of potential jurors nor in the pools specific to each of the judges.**" *Id.* (emphasis added). The Court finds that—even based upon the "geocoding" method—there is no substantial "absolute disparity" between African-Americans on the jury master list and African-Americans in the general population.

Mr. Reams's secondary argument focuses on the panel lists—the lists prepared by the clerk's office based on returned jury questionnaire responses. Mr. Reams asserts that the three divisions of circuit court used "different

4

courtrooms used different methods to select juries." The Court finds that this allegation was not proven. To the contrary, the extent of the evidence before the Court indicates that Judges Jones and Davis used similar methods in order to obtain jurors. There was no evidence presented with regard to Judge Taylor's court.

According to the affidavit of Judge Jones, "the clerk's office would gather responses to the questionnaires" and send them to Judge Jones. Pet. Br. Ex. 7, at ¶ 5. This statement indicates that there were questionnaires that were not returned, which is corroborated by the testimony of the chief deputy clerk who testified regarding the high non-return rate. In addition to not identifying various demographic data (including race) with regard to the non-returned jury summonses, Mr. Reams does not identify the demographic data associated with the non-returned questionnaires. It is apparent to the Court that neither those individuals who failed to answer the general jury summons, nor those who failed to return a subsequent, court-specific questionnaire were identified—by any method—in the studies by Mr. Reams's experts. Mr. Reams admittedly focuses "entirely on the jury pool that was created **after** the summonses were returned[.]" Repl. Br. at 9. But such studies, even if the demographic distribution of those potential jurors is the same across all three divisions of circuit court, create, depending upon the previously chosen norms, a disparity

5

based upon factors that are external to the process. The failure of Mr. Reams's studies to take into account external factors, such as the effect of poverty, employment (or the lack of it), residential mobility, or distrust of the legal system on a potential juror's personal choice not to respond to a juror questionnaire or summons is insufficient evidence on which to draw any credible conclusions with respect to the *Duren* requirements. While Mr. Reams attempts to distinguish the cases relied on by the State in pointing out this flaw, the Court believes that ignoring the demographic makeup of those who didn't return summonses or subsequent disision-specific questionnaires undermines any conclusion that could be drawn from the data, and, consequently, the data relied upon is insufficient to establish underrepresentation.

Additionally, the Court finds that the failure of Mr. Reams's statistical experts to explain why they only used one panel list from Judge Jones's court in their analysis while Judge Jones's affidavit indicates that the creation of panel lists occurred "[a]bout four times each year (once every quarter)[,]" further undermines the validity of any conclusion that may be drawn from this evidence. *Cf.* Pet.'s Ex. 1, Appx. Table 2, with Jones Aff. at ¶ 3.

It also is notable that Mr. Reams's trial took place in Judge Davis's division of court. Mr. Reams's experts have not explained why they have combined the data from Judge Taylor's and Judge Davis's court. As the State

points out, the statistical findings in Judge Davis's court—without the addition of Judge Taylor—are similar to those found in Judge Jones's courtroom. Resp.'s Br. at 10-11. It also is apparent that in two of the five petit venires in Judge Davis's division of court, Mr. Reams's own calculations show that the percentage of African-Americans was higher than the percentage of eligible voters who were African-American. *See* Pet.'s Ex. 1, Appx. Table 3. Mr. Reams has argued in reply that that the State has not identified any statistical or legal principle that forecloses such an analysis as was conducted here. Pet.'s Repl. Br. at 11. However, at this stage of the inquiry, Mr. Reams bears the burden of proof and has presented no legal or statistical authority for doing so.

In sum, the Court finds that the data offered by Mr. Reams and the conclusions drawn therefrom fails to establish the second prong of the fair-cross-section requirement from in *Duren*.

**C. Systematic exclusion.** The third prong of *Duren* requires Mr. Reams to prove that underrepresentation is due to systematic exclusion of the group in the jury-selection process. Mr. Reams asserts that a separate process for each circuit judge led to a disparate numbers of African-Americans serving in the different divisions of circuit court. He claims that there were (1) discretionary excusals from jury service with no uniform criteria; (2) discrepancies as to the level of emphasis, if any, during jurors' orientation on the importance of a jury

7

reflecting a fair-cross- section of the community; and (3) exercises of discretion by bailiffs as to the manner and order by which they called prospective jurors for jury service. The Court finds that these allegations have not been proven.

Mr. Reams presented an affidavit from Judge Berlin Jones. *See* Pet. Br. Jones Aff., Ex. 7. In his affidavit, Judge Jones described the process by which he received juror questionnaires that had been collected by the clerk. *Id.* Judge Jones's affidavit makes it clear that before he could consider the excusal of a potential juror, the circuit clerk "would gather **responses** to the questionnaires" sent to the selected potential jurors. *See* Pet.'s Ex. 7, ¶ 5. Judge Jones stated in his affidavit that each division had "separate procedures for selecting jurors." *Id.* at ¶ 2. However, Judge Jones did not describe any deviance in the procedures used in the other divisions.

The State submitted an affidavit from Judge Fred Davis, who presided over Mr. Reams's trial. In his affidavit, he described a process similar to the one outlined by Judge Jones. *See* Resp.'s Ex. 1. Judge Davis also stated that his bailiff, who is deceased, was African-American and that it was his bailiff's practice to call everyone on the list that was provided by the circuit clerk's office. *Id.* The Supreme Court has remanded this case, in part, to determine the accuracy of the testimony of an attorney called by Mr. Reams who stated that "Black bailiff[s] would tend to call people who were black that they know

8

and trust them as good jurors[,]" and "white bailiffs tended to call white people." *Reams* at 6, 560 S.W.3d 441, 447. There is nothing before this Court to indicate that this practice existed generally or in the division of court in which Mr. Reams was tried. In any event, according to Mr. Reams's own figures, the responses from African-Americans in Judge Davis's division of court often appeared to have exceeded the population of African-Americans who were eligible voters. Moreover, while Mr. Reams's attorneys apparently interviewed Judge Davis, they did not call him as a witness to establish that there was any kind of procedure practiced in his court that subjectively excluded African-Americans.

In sum, Mr. Reams has failed to demonstrate any selective practice on the part of any division of court that excluded a potential juror belonging to a distinctive group. His failure to demonstrate that any underrepresentation in his venire was due to systematic exclusion by the system used by Jefferson County to assemble the venires necessarily means he fails to establish the third *Duren* prong.

## Conclusion

Based upon the foregoing findings of fact and conclusions of law, the Court finds that Mr. Reams has failed to prove a *Duren* claim, and, consequently, trial counsel could not have been ineffective for failing to raise this issue at trial.

It is so ordered this __11th__, day of November, 2021

_____
John W. Cole, Circuit Judge